# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust, Inc., | |
| Plaintiff, | **CASE NO. 07 C 6174** |
| v. | |
| INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION; THE INLAND GROUP, INC., INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP., INLAND WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL A. GOODWIN, ROBERT A. BAUM, G. JOSEPH COSENZA, KPMG LLP , AND WILLIAM BLAIR & COMPANY, L.L.C, | **JURY TRIAL REQUESTED** |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT AND DERIVATIVE ACTION FOR VIOLATION OF FEDERAL SECURITIES LAWS AND FOR BREACHES OF FIDUCIARY DUTIES AND CONTRACT

## TABLE OF CONTENTS

I.  **PRELIMINARY STATEMENT & SYNOPSIS** ........................................................ 1

II.  **JURISDICTION AND VENUE** ........................................................................5

III.  **PARTIES** ...............................................................................................5

    A.  **Co-Lead Plaintiffs** ........................................................................5

    B.  **The Entity Defendants** ...................................................................6

        *1.*  *Inland Western Retail Real Estate Trust, Inc.* ..........................6

        *2.*  *The Advisor - Inland Western Retail Real Estate Advisory Services, Inc.* ........................................................8

        *3.*  *The Sponsor - Inland Real Estate Investment Corporation* ................9

        *4.*  *The Inland Group, Inc.* ......................................................10

        *5.*  *The Property Managers* .....................................................11

            a.  **Inland Southwest Management Corporation** ...........................11

            b.  **Inland Northwest Management Corporation** ...........................12

            c.  **Inland Western Management Corporation** ..............................13

        *6.*  *KPMG LLP* ....................................................................14

        *7.*  *William Blair & Company, L.L.C.* ........................................16

    C.  **The Individual Defendants** ..............................................................17

        *1.*  *Principal Stockholders of the Advisor and Property Managers* ..............17

            a.  **Daniel Goodwin** .............................................................17

            b.  **Robert H. Baum** .............................................................18

            c.  **G. Joseph Cosenza** ..........................................................18

        *2.*  *Inland REIT's Directors and Officers Who Were Also Shareholders of the Advisor and/or Property Managers* ..................19

|   |   |   | a. | Robert D. Parks | ............................................ | 19 |

|   |   |   | b. | Brenda G. Gujral | ....................................... | 20 |

|   |   |   | c. | Steven P. Grimes | ....................................... | 20 |

|   |   | 3. | *The Director Defendants* | ....................................... | 22 |

|   |   |   | a. | Frank A. Catalano, Jr. | ............................... | 22 |

|   |   |   | b. | Kenneth H. Beard | ..................................... | 22 |

|   |   |   | c. | Paul R. Gauvreau | ..................................... | 23 |

|   |   |   | d. | Gerald M. Gorski | ..................................... | 23 |

|   |   |   | e. | Barbara A. Murphy | ................................... | 23 |

| IV. | **CLASS ACTION ALLEGATIONS** | ........................................ | 25 |

| V. | **DERIVATIVE DEMAND ALLEGATIONS** | ......................... | 27 |

| VI. | **SUBSTANTIVE ALLEGATIONS** | ..................................... | 35 |

|   | A. | **The Advisor and Property Managers: Responsibilities, Pertinent Provisions of Governing Documents and Fee Structure** | ................. | 35 |

|   |   | 1. | *The Advisor and Advisory Agreement* | .................... | 35 |

|   |   | 2. | *The Property Managers and Property Management Agreements* | .......... | 40 |

|   |   | 3. | *Varying Statements in Company's Documents as to the Property Management Fees* | ..................... | 43 |

|   | B. | **Events Leading Up to the Merger Agreement** | ................. | 48 |

|   | C. | **The Merger of the Advisor and the Property Managers Into Inland REIT - the Proposed Internalization.** | ............. | 51 |

|   | D. | **The Proxy.** | ................................................ | 51 |

|   |   | 1. | *The Proxy's Proposals* | ............................. | 52 |

|   |   | 2. | *Description of the Merger and the Transfer of Employees.* | .............. | 53 |

    3.    *Calculation of Internalization Consideration* ...........................................54

E.    **The Proxy was Materially False and Misleading.** ...............................................56

    1.    *The Proxy Contained Materially False and Misleading Financial Statements of the Advisor and the Property Managers.* .........56

        a.    **The Advisor Historically Understated and Failed to Report Expenses.** ..................................................................................57

        b.    **The Property Managers' Financial Statements Understated Actual Operating Expenses** ..........................................................60

        c.    **The Property Managers' Fees Exceeded Market Rates.** ...........62

    2.    *The Proxy Contained False and Misleading "Independent Auditors' Reports."* ..................................................................................63

        a.    **The Financial Statements of the Advisor and Property Managers Violated Generally Accepted Accounting Practices ("GAAP")** ....................................................................................66

        b.    **The Independent Auditors' Reports Were Conducted in Violation of Generally Accepted Auditing Standards ("GAAS")** ..................................................................................69

    3.    *The Proxy Contained Materially False and Misleading Statements about the Value of the Advisor and the Property Managers and the Fairness of the Internalization Consideration.* ...........................................74

    4.    *The Proxy Contained False and Misleading Statements About the Purchase Options.* ..................................................................76

    5.    *The Proxy Failed to Disclose Material Facts About Strategic Alternatives and Shareholders' Liquidity Events.* ...............................77

    6.    *The Proxy Contained Materially False And Misleading Statements Concerning The Advisor and Property Managers' Performance and Fees* ..............................................................................79

    7.    *The Proxy Contained a False and Misleading "Fairness Opinion."* .....80

        a.    **The Fairness Opinion Relied Entirely on Faulty Information From Defendants without Any Independent Verification.** .....81

        b.    **The Fairness Opinion Was False and Misleading in its Use of Non-Comparable Companies and Transactions** ......................83

      c.    **The Proxy and Fairness Opinion Omitted Material Facts About the Advisor's "Forecasted" Earnings.**............................85

F.    **Breaches of Fiduciary Duty.**................................................................87

    *1.*    *The Fiduciary Duty Defendants.* ..........................................87

    *2.*    *Breaches of the Duties Owed by The Fiduciary Duty Defendants* .........88

    *3.*    *The Director Defendants Failed to Enforce the Provisions of the REIT's Articles of Incorporation, the Advisory and Property Management Agreements* ...........................................90

    *4.*    *The Fiduciary Duty Defendants Breached Their Fiduciary Duties By Abandoning the Contractually Agreed Upon Purchase Options.* ..........92

    *5.*    *William Blair Aided and Rendered Substantial Assistance to The Fiduciary Duty Defendants in Breaching their Fiduciary Duties Owed to the Shareholders.* ..................................................94

    *6.*    *KPMG Aided and Rendered Substantial Assistance to The Fiduciary Duty Defendants in Breaching their Fiduciary Duties Owed to the Shareholders* ..........................................................95

VII.    **COUNTS**....................................................................................98

VIII.    **REQUEST FOR RELIEF**.......................................................115

IX.    **JURY DEMAND**..................................................................116

Co-Lead Plaintiffs, City of St. Clair Shores General Employees Retirement System and Madison Investment Trust, (collectively, "Co-Lead Plaintiffs"), shareholders of Inland Western Retail Real Estate Trust, Inc. ("Inland REIT," the Company or the "REIT"), individually and on behalf of all other persons similarly situated, and derivatively on behalf of Inland REIT, by their undersigned attorneys, for their Amended Class Action Complaint And Derivative Action For Violation Of Federal Securities Laws And For Breaches Of Fiduciary Duties ("Amended Complaint") against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters based upon, *inter alia*, the investigation of Counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Inland REIT, other regulatory filings and reports, industry analysts' reports about the REIT, press releases and other public statements issued by the REIT, and consultations with experts, including real estate and forensic accounting experts.

## I.      PRELIMINARY STATEMENT & SYNOPSIS

1.      This Action asserts claims under the federal securities laws and/or for breaches of fiduciary duty and contract by Defendant Inland REIT, certain of Inland REIT's directors, officers and affiliates, financial advisor William Blair & Company, L.L.C. ("William Blair") and KPMG LLP ("KPMG"), auditor to Inland REIT and its affiliates.

2.      The Action is asserted on behalf of a proposed class ("Class") of Inland REIT Shareholders ("Shareholders") who received and were entitled to vote on the proposals contained in Inland REIT's September 10, 2007 Proxy Statement ("Proxy").  By means of the Proxy, Defendants secured the Shareholders' approval for Inland REIT to acquire (the "Internalization") affiliated entities that performed advisory and property management services for Inland REIT (the "Advisor" and the "Property Managers").  The Advisor and Property Managers, which were

1

wholly owned, directly or indirectly, by Inland REIT's officers, directors and/or their affiliates, were acquired by Inland REIT in the Internalization in exchange for consideration valued at approximately $375 million, comprised entirely of 37,500,000 shares of Inland REIT's common stock, representing 7.7% of its total shares outstanding ("Internalization Consideration"). On November 15, 2007, Defendants consummated the Internalization.

3.      Plaintiffs allege that the Proxy was materially false and misleading in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). The Proxy, pursuant to which Defendants secured Shareholder approval of the self-dealing, improper Internalization that overvalued the Advisor and Property Managers, was false and misleading in that it:

     (a)  failed to state material information about the business and operations of the Property Managers and the Advisor;

     (b)  failed to disclose that the Advisor and Property Managers historically understated and underreported expenses, which resulted in an overvaluation of the Advisor and Property Managers in the Internalization;

     (c)  failed to disclose that Inland REIT historically overpaid fees to the Property Managers that were materially in excess of maximum levels disclosed in Inland REIT's prospectuses, registration statements, Advisory Agreement and Articles of Incorporation, which resulted in an overvaluation of the Advisor and Property Managers in the Internalization;

     (d)  failed to state material information about the propriety of the Internalization and the derivation and fairness of the Internalization Consideration;

(e) included and utilized a false and misleading purported "fairness opinion" prepared by William Blair stating that $375 million for the Internalization was fair, from a financial point of view to the Shareholders; and

(f) included and utilized false and misleading financial statements of the Advisor and Property Managers, appended to which were false and misleading independent auditors' reports prepared by Defendants' auditor, KMPG. The materially false financial statements of the Advisor and Property Managers rendered false and misleading all of the valuation-related disclosures contained in the Proxy, including the representation that the Internalization was preferable to the exercise of certain contractual Purchase Options (*see* ¶¶ 122-123, 128-129) which were an alternative way for Inland REIT to acquire the Advisor and Property Managers.

4.      The Action also asserts direct claims for breaches of fiduciary duty, and aiding and abetting breaches of fiduciary duty, on behalf of Inland REIT Shareholders against certain Defendants (Counts III and IV), and asserts derivative claims for breach of fiduciary duty, unjust enrichment and breach of contract on behalf of Inland REIT against the Advisor, the Property Managers and/or certain Individual Defendants (Counts V-VII).   At each turn, Defendants made choices that were in their own self-interest and against the best interests of the Shareholders and the Company, in breach of the contractual and common law fiduciary duties they owed to the Shareholders and the Company.  In this regard, Defendants:

(a) failed to adhere to the language and terms of the Company's Offering Documents (*see* ¶¶ 130-140), its agreement with the Advisor, and its Articles of Incorporation, by permitting Inland REIT to pay excessive fees to the Property Managers;

3

(b) circumvented contractual provisions, the Purchase Options, governing the Company's acquisition of the Advisor and Property Managers;

(c) failed to supervise the relationships of the Company with the Advisor and Property Managers so that they would not become vehicles for self-dealing by Defendants;

(d) formulated, proposed and consummated the self-dealing, improper Internalization that, to the detriment of the Shareholders and Company, significantly overvalued the Advisor and Property Managers because the financial results and performance of these entities were inflated by (a) the Property Managers' receipt of excessive fee revenues; and (b) the material understatement of the Advisor's and the Property Managers' expenses.

5.     This Amended Complaint seeks damages from Defendants who received the excessive Internalization Consideration, who were responsible for disseminating and securing Shareholder approval of the Internalization by means of a materially false and misleading Proxy, who proposed, recommended and consummated the self-dealing Internalization and/or who caused the REIT to pay excessive fees to the Property Managers. This Amended Complaint also seeks injunctive relief to: (a) render null and void any approvals given by Shareholders in response to the materially false and misleading Proxy; (b) rescind the Internalization and Merger Agreement, and all ancillary agreements, including employment agreements; and (c) disgorge the Property Managers and Individual Defendants of excessive fees secured at the expense of and to the detriment of the Shareholders and Inland REIT.

## II.    JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, 28 U.S.C. §§1331, 1337, and principles of supplemental jurisdiction.

7.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391. Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District and certain of the Defendants have their principal places of business or reside within this District.

8.      In connection with the acts, conduct, and other wrongs complained or herein, Defendants used the means and instrumentalities of interstate commerce.

## III.    PARTIES

### A.    Co-Lead Plaintiffs

9.      Co-Lead Plaintiff City of St. Clair Shores General Employees Retirement System ("City of St. Clair Shores GERS"), a citizen of St. Clair, Michigan, held 57,321 shares of Inland REIT stock as of October 30, 2007 (Exhibit A), continues to hold shares of Inland REIT sock, was entitled to vote on the Proxy and is a member of the Class. This action is not collusive to confer jurisdiction on a court of the United States, which it would not otherwise have.  City of St. Clair Shores GERS has suffered substantial damages as a result of Defendants' wrongful acts, as alleged herein.

10.     Co-Lead Plaintiff Madison Investment Trust, ("Madison") a citizen of Greenwood Village, Colorado, held 1,897,557.33 shares of Inland REIT stock on August 31, 2007, the record date for determining stockholders entitled to vote on the Proxy, and continues to hold shares of Inland REIT stock (Exhibit B). Madison was entitled to vote on the Proxy and is, thus, a member of the Class.  This action is not collusive to confer jurisdiction on a court of the United

States, which it would not otherwise have. Madison has suffered substantial damages as a result of Defendants' wrongful acts, as alleged herein.

    **B.**    **The Entity Defendants**

        ***1.***    ***Inland Western Retail Real Estate Trust, Inc.***

11.    Inland REIT, a corporation organized under the laws of the State of Maryland on March 5, 2003, maintains its principal executive offices at 2901 Butterfield Road, Oak Brook, Illinois. Inland REIT is primarily engaged in the acquisition and ownership of commercial real estate properties, focusing on multi-tenant shopping centers located primarily in states west of the Mississippi River.

12.    Inland REIT was formed by Inland Real Estate Investment Corporation (the "Sponsor"), which is wholly owned by Defendant The Inland Group, Inc., which in turn is controlled by and substantially owned by Individual Defendants Goodwin, Parks, Baum, Cosenza and Gujral.

13.    Since commencing an initial public offering on September 17, 2003, and a subsequent offering on December 28, 2004 ("Offerings"), Inland REIT has raised net offering proceeds, including merger consideration before offering costs, of over $4.8 billion as of December 31, 2007, and has approximately 484,921,000 shares outstanding.

14.    Inland REIT's business model is fundamental. It takes the money raised and acquires the most durable of assets – real estate, a long-lived physical asset with the potential to produce income. As of December 31, 2007, Inland REIT's portfolio consisted of 180 multi-tenant shopping centers and 122 free-standing, single-user properties of which 103 are net lease properties.

6

15.    Inland REIT operates for federal income tax purposes as a real estate investment trust which combines the capital of many investors to own and, in most cases, operate, income-producing real estate.

16.    Inland REIT is a public unlisted REIT, meaning that, (1) it is *public* because it is registered with the SEC, can sell to the investing public rather than only to "qualified investors" and is required to file reports with the SEC; and (2) it is *unlisted* because its securities are not listed on a national stock exchange.

17.    There is no public trading market for the shares of Inland REIT's common stock. Inland REIT's Prospectuses dated September 15, 2003 and December 21, 2004 both stated that Inland REIT anticipated that by September 15, 2008, its board of directors would determine when, and if, to apply to have shares of Inland REIT common stock listed for trading on a national stock exchange or included for quotation on a national market system. The Prospectuses further stated that if the board of directors determined that it was not feasible to list shares or include them in a national market system by September 15, 2008, it may decide to: (i) sell the REIT's assets individually; (ii) list shares at a future date; or (iii) liquidate within ten years of such date.

18.    Inland REIT's Prospectus dated January 21, 2004 ("1/21/2004 Prospectus") stated that its three primary investment objectives were: (1) to make regular distributions to the stockholders; (2) to provide a hedge against inflation by entering into leases which contain clauses for scheduled rent escalations or participation in the growth of tenant sales, permitting them to increase distributions and realize capital appreciation; and (3) to preserve Shareholders' capital.

19.    With no direct employees of its own prior to the consummation of the Internalization, substantially all of Inland REIT's business was conducted through its Advisor and Property Managers. The following chart depicts the ownership of the Advisor and Property Managers by Defendants prior to the consummation of the Internalization:



The "Property Managers"

**2.    The Advisor - Inland Western Retail Real Estate Advisory Services, Inc.**

20.    Until the consummation of the Internalization, Inland Western Retail Real Estate Advisory Services, Inc. ("Advisor") was an Illinois corporation and a wholly-owned subsidiary of Inland REIT's Sponsor, Inland Real Estate Investment Corporation, which is wholly owned by The Inland Group, and which is controlled by Individual Defendants Goodwin, Parks, Baum, Cosenza and Gujral.  The Advisor was not publicly held, and thus, its financial statements were not publicly available until they were disclosed in the Proxy.  KPMG was the auditor of the Advisor's financial statements.

21.    The Advisor was formed in 2003 and since its inception, its sole business was to serve as business manager and advisor to Inland REIT.  Since 2003, the Advisor was responsible for the day-to-day operations of Inland REIT, including negotiating the acquisition of its properties, overseeing the Property Managers, administering its bookkeeping, accounting and legal functions, investor relations and consulting with the Company's board of directors on policy decisions, which are more fully described in ¶¶ 114-118, *infra*.  The initial investment in the Advisor in 2003 consisted of 1000 shares of common stock with a total value of $1,000.  At the time of its acquisition by Inland REIT, the Advisor had no assets and no apparent infrastructure.

22.    The Advisor is liable as a primary violator for making, and causing to be made, false and misleading statements in the Proxy that operated to mislead Inland REIT Shareholders to approve the Internalization and for breaching the contractual agreements with and fiduciary duties it owed to the Shareholders and Inland REIT.  In addition to its direct involvement in the wrongdoing, by reason of its position, its intimate involvement in the day-to-day management of Inland REIT and its advisory role to Inland REIT and Inland REIT's board of directors (*see* ¶¶ 114-118), the Advisor was a controlling person of Inland REIT and had the power to cause (and did cause) Inland REIT to disseminate a materially false and misleading Proxy and to aid and abet the Individual Defendants, the Property Managers, the Sponsors and The Inland Group's breaches of fiduciary duties owed to the Shareholders and Company.

### 3.    *The Sponsor - Inland Real Estate Investment Corporation*

23.    Inland Real Estate Investment Corporation (the "Sponsor"), which maintains its principal executive offices at 2901 Butterfield Road, Oak Brook, Illinois was instrumental in Inland REIT's formation and organization.

24.     Prior to the consummation of the Internalization, the Sponsor wholly owned and controlled the Advisor. The Sponsor is not publicly held, and thus, its financial statements are not publicly available.  KPMG was the auditor of the Sponsor's financial statements.

### 4.     The Inland Group, Inc.

25.     The Inland Group, Inc. ("The Inland Group"), with its principal executive offices at 2901 Butterfield Road, Oak Brook, Illinois, is a group of companies that have been engaged in real estate-related businesses for over 35 years.  Their affiliated companies are active in property management, leasing, marketing, acquisition, disposition, development, redevelopment, syndication, renovation, construction, finance and other related services.

26.     The Inland Group was started by Defendants Goodwin, Parks, Baum and Cosenza in 1967 and incorporated the following year. As of January 1, 2004, each of the four founders served as officers or directors of The Inland Group.

27.     The Inland Group owns the Sponsor, which, prior to the consummation of the Internalization, owned the Advisor.  Accordingly, as stated in Inland REIT's Prospectus, the Advisor was indirectly controlled by The Inland Group. The Inland Group is not publicly held, and thus, its financial statements are not publicly available.  KPMG was the auditor of The Inland Group's financial statements.

28.     The Sponsor and The Inland Group are liable as primary violators for breaching the fiduciary duties they owed to the Shareholders and Inland REIT.  In addition to their direct involvement in the wrongdoing, by reason of their position of control over the Advisor, which is intimately involved in the day-to-day management of Inland REIT, the Sponsor and The Inland Group were controlling persons of Inland REIT and the Advisor, and thereby had the power to cause (and did cause) Inland REIT and the Advisor to disseminate a materially false and

10

misleading Proxy and to aid and abet the Individual Defendants, the Property Managers', and the Advisor's breaches of fiduciary duties owed to the Shareholders and Company.

### 5.    *The Property Managers*

29.    Since its inception, Inland REIT utilized the services of three Property Managers to furnish it with property management services under the terms of a property management agreement for each designated property.  Inland REIT was a party to three separate Master Management Agreements with each of its Property Mangers as well as individual property management agreements for each specific property under management. Prior to the consummation of the Internalization, the Property Managers were owned by Defendants Parks, Goodwin, Baum, Cosenza, Gujral and Grimes.

30.    At December 21, 2006, the combined assets of the Property Managers, exclusive of cash earned from the Property Management Agreements, totaled $666,000.

31.    The Property Managers were not publicly held, and thus, their financial statements were not publicly available until they were disclosed in the Proxy. KPMG was the auditor of the Property Managers' financial statements.

### a.    Inland Southwest Management Corporation

32.    Prior to the consummation of the Internalization,  Inland Southwest Management Corporation ("ISMC") was a Property Manager for Inland REIT's investment properties located in the states of Alabama, California, Colorado, Delaware, Georgia, Kentucky, Louisiana, Mississippi, Oklahoma, Tennessee, Texas, and Washington.  ISMC conducted its property management activities primarily from offices located in Smyrna, Georgia, Huntsville, Alabama, and Knoxville, Tennessee. ISMC maintained its principal executive office at 2901 Butterfield Road, Oak Brook, Illinois, 60523.

33.    ISMC was formed on November 10, 2003 and was a Delaware corporation owned primarily by individuals affiliated with Inland REIT, including Defendants Parks, Goodwin, Baum and Cosenza.

34.    ISMC entered into a Master Management Agreement with Inland REIT on November 11, 2003.  ISMC furnished property management services (such as rental, leasing, operation and management services), including preparing a monthly income report, budget variance report and annual operating budget, pursuant to its property management agreements for each designated property in the Inland REIT's portfolio.

### b.    Inland Northwest Management Corporation

35.    Prior to the consummation of the Internalization, Inland Northwest Management Corporation ("INMC") was a Property Manager for Inland REIT's investment properties located in the Northwest United States.  INMC conducted its property management activities primarily from its principal executive office at 2901 Butterfield Road, Oak Brook, Illinois, 60523.

36.    INMC was formed on November 10, 2003 as a Delaware corporation owned primarily by individuals affiliated with Inland REIT, including Defendants Parks, Goodwin, Baum and Cosenza.

37.    INMC entered into a Master Management Agreement with Inland REIT on November 11, 2003.  INMC furnished  property management services (such as rental, leasing, operation and management services), including preparing a monthly income report, budget variance report and annual operating budget, pursuant to its property management agreements for each designated property in Inland REIT's portfolio.

### c.    Inland Western Management Corporation

38.    Prior to the consummation of the Internalization, Inland Western Management Corporation ("IWMC") was a Property Manager for Inland REIT's investment properties located in the Western United States.  IWMC conducted its property management activities primarily from its principal executive office at 2901 Butterfield Road, Oak Brook, Illinois, 60523.

39.    IWMC was formed on January 30, 2003 as a Delaware corporation owned primarily by individuals affiliated with Inland REIT, including Defendants Parks, Goodwin, Baum and Cosenza.

40.    IWMC entered into a Master Management Agreement with Inland REIT on September 13, 2003.  IWMC furnished  property management services (such as rental, leasing, operation and management services), including preparing a monthly income report, budget variance report and annual operating budget, pursuant to its property management agreements for each designated property in Inland REIT's portfolio.

41.    Collectively, ISMC, INMC, and IWMC are referred to herein as the "Property Managers."

42.    The Property Managers are liable as primary violators for making, and causing to be made, false and misleading statements in the Proxy that operated to mislead Inland REIT Shareholders to vote to approve the Internalization and for breaching the fiduciary duties owed to the Shareholders and Inland REIT. In addition to their direct involvement in the wrongdoing, by reason of their position and their intimate involvement in the day-to-day operations of Inland REIT, the Property Managers were controlling persons of Inland REIT and had the power to cause (and did cause) Inland REIT to disseminate a materially false and misleading Proxy and to

aid and abet the Individual Defendants, the Advisor's, the Sponsor's and The Inland Group's breaches of fiduciary duties owed to the Shareholders and Company.

43.    By reason of their service as Advisor and Property Managers of the REIT, and by reason of the Sponsor and The Inland Group's control of and affiliation with the Advisor and Property Managers, the Advisor, the Property Managers, the Sponsor and the Inland Group had the authority and ability to make public statements in the name of Inland REIT and had access to the undisclosed information discussed herein with respect to the Advisor and Property Managers' operations and financial statements.    Accordingly, the Advisor, the Property Managers, the Sponsor and the Inland Group had the ability to cause and direct (and did cause and direct) that such information be disseminated and to promptly correct any previously disseminated information that was false and misleading to the Shareholders.

### 6.    KPMG LLP

44.    KPMG LLP ("KPMG") is a United States limited liability partnership that is part of KPMG International, a Swiss "non-operating association," with its headquarters located at 345 Park Ave, New York, NY, 10154.    KPMG, one of the largest accounting firms in the United States, provides audit, tax and advisory services through 94 offices in the United States and the Caribbean.

45.    KPMG was the independent auditor for at least the following Inland affiliated entities at relevant times:    Inland REIT, the Advisor, the Property Managers, the Sponsor and The Inland Group.    Inland REIT paid KPMG fees of $1,085,850 in 2006 and $1,353,946, in 2005, for auditing Inland REIT's annual financial statements and providing other audit and tax related services.

46.    KPMG issued independent auditor reports that accompanied the financial statements of the Advisor and Property Managers that were made a part of the Proxy. KPMG expected and intended that those independent auditor reports would legitimize and lend credence to the accompanying financial statements of the Advisor and Property Managers and would be relied on by the Shareholders and members of the Class in determining how to vote on the Proxy and Internalization.

47.    Since, among other things, the financial statements of the Advisor and Property Managers materially overstated their net income and earnings before interest, taxes, depreciation and amortization (EBITDAs) by understating operating expenses, the financial statements were not prepared in accordance with generally accepted accounting principles ("GAAP"), and KPMG's issuance of independent auditor's reports with respect to the financial statements of the Advisor and Property Managers was therefore a violation of generally accepted auditing standards ("GAAS") and operated to mislead the Shareholders into voting in favor of the Internalization. *See* ¶¶ 195-216, below. Further, KPMG violated GAAS by failing to investigate and disclose certain related party transactions. *See* ¶¶ 203-216, below. Accordingly, KPMG's statements in the Proxy that the financial statements of the Advisor and the Property Managers were in conformity with GAAP and that their audit was conducted in accordance with GAAS were materially false and misleading.

48.    Defendant KPMG is liable as a primary violator for making false and misleading statements that operated to mislead Inland REIT shareholders in exercising their right to vote on the proposals contained in the Proxy, and liable for aiding and abetting the Individual Defendants, the Advisor, the Property Managers, the Sponsor and the Inland Group in breaching their fiduciary duties to the Inland REIT and its Shareholders.

### 7.    *William Blair & Company, L.L.C.*

49.    William Blair & Company, L.L.C. ("William Blair") is a limited liability corporation with its principal executive offices located at 222 West Adams Street, Chicago, Illinois, 60606.    Defendant William Blair is a Chicago-based investment firm offering investment banking, asset management, equity research, institutional and private brokerage, and private capital to individual, institutional, and issuing clients.

50.    On June 16, 2006, certain Defendants retained William Blair to participate in negotiating the possible internalization as well as to opine on the fairness of the consideration to be paid in connection with the Internalization.    On August 14, 2007, William Blair provided an oral and written opinion, which was incorporated into the Proxy, stating that the Internalization Consideration to be paid by Inland REIT was financially fair to Inland REIT and its stockholders ("William Blair Opinion").    William Blair intended and expected that its Opinion would be communicated to and relied upon by the members of the Class in determining how to vote on the proposed Internalization.

51.    Pursuant to a letter agreement dated June 19, 2006, William Blair was paid a retainer fee of $100,000 and was paid $550,000 upon the delivery of the William Blair Opinion. The June 19, 2006 letter agreement also provided that William Blair would be entitled to receive an additional fee of $350,000 upon consummation of the Internalization.

52.    Defendant William Blair is liable as a primary violator for making false and misleading statements that operated to mislead Inland REIT shareholders in exercising their right to vote on the proposals contained in the Proxy, and liable for aiding and abetting the Individual Defendants, the Advisor, the Property Managers, the Sponsor and the Inland Group in breaching their fiduciary duties to Inland REIT and its Shareholders.

C.     **The Individual Defendants**

1.     *Principal Stockholders of the Advisor and Property Managers*

a.     **Daniel Goodwin**

53.     Daniel Goodwin ("Goodwin") is Chairman and President of The Inland Group, Inc. He is Chairman and Chief Executive Officer of The Inland Real Estate Group of Companies, Inc., Chairman of the Board of Inland Real Estate Corporation, a public REIT, and Chairman of the Board of Inland Bancorp, a multi-bank holding company whose subsidiaries include residential and commercial mortgage companies, alternative real estate loan companies and full service banks.

54.     Goodwin is the controlling shareholder of The Inland Group, the ultimate owner of the Advisor, and, along with Parks, Cosenza, Baum, and Gujral, owned substantially all of the Advisor's stock prior to the Internalization. Goodwin was also a shareholder of the Property Managers. Together Goodwin, Parks, Cosenza, Grimes, Gujral, and Baum owned in the aggregate greater than 50% of the stock of each of the Property Managers. According to the Proxy, on behalf of the Advisor and Property Managers Goodwin negotiated the Merger Agreement and Internalization. And, as part of the Internalization, Goodwin entered into a three-year, unpaid consulting agreement with Inland REIT.

55.     Goodwin had a material financial interest in the Internalization. As disclosed in the Schedule 13D filed by Daniel Goodwin with the SEC on November 15, 2007, as a result of the Internalization, Goodwin became a beneficial owner of an additional 30,863,578 shares of Inland REIT common stock, or approximately 82% of the total Internalization Consideration, valued at over $300 million.

17

56.     As of November 15, 2007, Goodwin had a beneficial ownership in 30,981,156,4424 shares, or 6.4% of the 486,807,714 outstanding shares of Inland REIT stock due to the combination of stock (1) purchased by him and his wife, (2) received by him in the Internalization, (3) purchased by The Inland Group, Inc., of which he is considered to have shared control, and (4) received by The Inland Group, Inc., as a result of the Internalization, of which he was considered to have shared control.    Accordingly, as of November 15, 2007, Goodwin had sole voting power with respect to 12,231,156.4424 shares of Inland REIT stock and shared voting power with respect to 18,750,000 shares of Inland REIT stock.

### b.     Robert H. Baum

57.     Robert H. Baum ("Baum") currently serves as Vice Chairman and Executive Vice President-General Counsel of The Inland Group, Inc.  In his capacity as General Counsel, Baum is responsible for the supervision of the legal activities of The Inland Group, Inc., and its affiliates. This responsibility includes the supervision of The Inland Group Law Department and serving as liaison with outside counsel.

58.     Baum had a material financial interest in the consummation of the Internalization in that, along with Goodwin, Parks, Cosenza, and Gujral, he owned substantially all of the Advisor's stock and, together with Goodwin, Parks, Cosenza, Grimes, and Gujral, owned in the aggregate greater than 50% of the stock of each of the Property Managers.

### c.     G. Joseph Cosenza

59.     G. Joseph Cosenza ("Cosenza") is a Director and Vice Chairman of The Inland Group, Inc. and oversees, coordinates and directs Defendant Inland REIT's many enterprises. As part of the proposed Internalization, Cosenza entered into a three-year, unpaid consulting agreement with Inland REIT.

60.    Cosenza had a material financial interest in the consummation of the Internalization in that, along with Goodwin, Parks, Baum, and Gujral, he owned substantially all of the Advisor's stock and, together with Goodwin, Parks, Baum, Grimes, and Gujral, owned in the aggregate greater than 50% of the stock of each of the Property Managers.

### 2.    *Inland REIT's Directors and Officers Who Were Also Shareholders of the Advisor and/or Property Managers*

### a.    Robert D. Parks

61.    Robert D. Parks ("Parks") has been Chairman and a Director of Defendant Inland REIT since March 5, 2003.   Parks formerly served as Chief Executive Officer of Inland REIT from its inception until 2005.  Parks is also involved with the Advisor and its Affiliates:

> (a)    as a stockholder of the Property Managers;

> (b)    as a stockholder of The Inland Group;

> (c)    as a Director of the Inland Group, and is one of its four original principals; and

> (d)    as Chief Executive Officer and a Director of the Sponsor, which was the parent company of the Advisor.

62.    In addition, Parks is currently Chairman of Inland American Real Estate Trust, Inc., and President and Director of Inland Real Estate Exchange Corporation.

63.    Parks had a material financial interest in the consummation of the Internalization in that, along with Goodwin, Cosenza, Baum and Gujral, he owned substantially all of the Advisor's stock and, together with Goodwin, Baum, Cosenza, Grimes, and Gujral, owned in the aggregate greater than 50% of the stock of each of the Property Managers. When the Internalization was consummated, Parks received shares of the Inland REIT common stock valued at approximately $6.8 million due to his ownership of stock in The Inland Group and the Property Managers.

b.    **Brenda G. Gujral**

64.    Brenda G. Gujral ("Gujral") was Chief Executive Officer of Defendant Inland REIT from 2005 until November 15, 2007, when she resigned concurrent with the consummation of the Internalization. Defendant Gujral has been a Director since March 5, 2003 and she remained a Director subsequent to the Internalization. Defendant Gujral was also involved with the Advisor and its Affiliates:

(a)    as a stockholder of the Property Managers;

(b)    as a stockholder of the Inland Group;

(c)    as President, Chief Operating Officer and Director of the Sponsor, which was the parent company of the Advisor.

In addition, Gujral is currently President, Chief Operating Officer and a Director of Inland Securities Corporation, Director of Inland Investment Advisors, Inc., Chairman of Inland Real Estate Exchange Corporation, and President and Director of Inland American Real Estate Trust, Inc.

65.    Gujral had a material financial interest in the consummation of the Internalization in that, along with Goodwin, Cosenza, Baum and Parks, she owns substantially all of the Advisor's stock and, together with Goodwin, Baum, Cosenza, Grimes, and Parks owned in the aggregate greater than 50% of the stock of each of the Property Managers. When the Internalization was consummated, Gujral received shares of the Inland REIT common stock valued at approximately $1.3 million due to her ownership of stock in The Inland Group and the Property Managers.

c.    **Steven P. Grimes**

66.    Steven P. Grimes ("Grimes") served as Treasurer and Principal Financial Officer of Inland REIT from 2004 until the consummation of the Internalization  Grimes also served as

20

the Chief Financial Officer of the Advisor from February 2004 until the consummation of the Internalization and a stockholder of one or more of the Property Managers.

67.    Grimes had a material financial interest in the Internalization in that, together with Goodwin, Baum, Cosenza, Parks, and Gujral, he owned in the aggregate greater than 50% of the stock of each of the Property Managers. When the Internalization was consummated, Grimes received shares of Inland REIT common stock valued at approximately $380,000 due to his holdings as a stockholder of "one or more of the Property Managers."

68.    In addition, effective November 15, 2007 upon the consummation of the Internalization, Inland REIT's Board of Directors appointed Grimes Chief Operating Officer and Chief Financial Officer, pursuant to an employment agreement Inland REIT entered into with Grimes on August 14, 2007 in contemplation of the Internalization.  Pursuant to his employment agreement, Grimes will receive a salary of $300,000 per year, pro-rated for 2007, in addition to a bonus, as determined by the Sponsor, in its sole discretion.

69.    Prior to the consummation of the Internalization, Inland REIT had no employees, and its executive officers did not receive any compensation in any form (e.g. cash, equity awards, or perquisites) *from Inland REIT* for their services as the REIT's officers.  Instead, the executive officers were employees of The Inland Group, or its subsidiaries and their affiliates.

70.    Inland REIT did not have any input into the compensation the Advisor paid Inland REIT's executive officers.  Similarly, Inland REIT did not know (or have control over) what the objectives of the Advisor and its affiliates were with respect to their compensation programs, what those compensation programs were designed to reward, what elements were included in those compensation programs, why those entities chose to pay each element included in their compensation programs, how those entities determined the amount (and, where

21

applicable, the formula) for each element to pay, or how each compensation element and those entities' decisions regarding that element fit into those entities' overall compensation objectives and affected decisions regarding other elements. Because of this, the interests of Inland REIT's executive officers, including Defendants Gujral and Grimes, were not aligned with the REIT or the REIT's Shareholders.

### 3.    *The Director Defendants*

#### a.    **Frank A. Catalano, Jr.**

71.    Frank A. Catalano, Jr. ("Catalano") has been a Director of Inland REIT since March 5, 2003.

72.    Catalano was an original member of the Special Committee of the Board of Directors formed to evaluate the Internalization and its alternatives ("Special Committee"). However, on July 5, 2006, Inland REIT's Board of Directors became concerned that Catalano, who had a then existing financial relationship with Inland affiliates, would not be considered "independent" under the various definitions of independence applicable to the Inland REIT directors. Ultimately, the Board of Directors concluded that there was a question as to whether Catalano could truly be characterized as independent and removed him from the Special Committee, announcing that: "[t]o avoid any perceived impairment of the independence of the Special Committee members, Mr. Catalano resigned from the Special Committee."

#### b.    **Kenneth H. Beard**

73.    Kenneth H. Beard ("Beard") has been a Director of Inland REIT since March 5, 2003. Beard is a member of the Special Committee and a member of the Audit Committee.

74.     Beard serves as chairman of the foundation board of the Wellness House in Hinsdale, Illinois, a cancer support organization, of which Defendant Robert A. Baum is a member of the Board of Directors.

### c.     Paul R. Gauvreau

75.     Paul R. Gauvreau ("Gauvreau") has been a Director of Inland REIT since March 5, 2003.  Gauvreau is the chairperson of the Special Committee and a member of the Audit Committee.

76.     Gauvreau serves as a Trustee of Benedictine University, along with Defendant Goodwin.

### d.     Gerald M. Gorski

77.     Gerald M. Gorski ("Gorski") has been a Director of Inland REIT since July 1, 2003.  Defendant Gorski is a member of the Special Committee and a member of the Audit Committee.

### e.     Barbara A. Murphy

78.     Barbara A. Murphy ("Murphy") has been a Director of Inland REIT since July 1, 2003.  Murphy is a member of the Special Committee and a member of the Audit Committee.

79.     Defendants Parks, Gujral, Catalano, Beard, Gauvreau, Gorski, and Murphy are collectively referred to herein as "Director Defendants."

80.     The Director Defendants along with Defendants Goodwin, Cosenza, Grimes, and Baum are collectively referred to herein as the "Individual Defendants."

81.     Each Individual Defendant is liable as a primary violator for making false and misleading statements that operated to mislead Inland REIT Shareholders in exercising their right to vote on the proposals contained in the Proxy.

82.    Each Individual Defendant is liable as a primary violator for violating fiduciary duties owed to Shareholders and the REIT, *see* ¶¶ 256-272.

83.    Because of their memberships on the Board of Directors of Inland REIT, their service as executive officers of the REIT, their affiliations with the Advisor and the Property Managers, their ownership of the Advisor and/or the Property Managers, and/or their authority and ability to make public statements in the name of Inland REIT, each of the Individual Defendants had access to the undisclosed information discussed herein and further they each had the ability to cause and direct that such information be disseminated, and the duty to promptly correct any previously disseminated information that was false and misleading to the Shareholders.

84.    In addition, as signatories of the Company's Offering Documents, Individual Defendants Catalano, Grimes, Gujral, Parks, Beard, Gavreau, Gorski and Murphy (*see* ¶¶ 130-131) had access to the information discussed therein with respect to the fees to be paid to the Property Managers (*see* ¶¶ 133-140) and each had the ability to cause and direct that such information be disseminated to Shareholders in the Proxy, the duty to promptly seek reimbursement of the excessive fees paid and the duty to enforce the Property Management fee structure that was in the best interest of the REIT and Shareholders.

85.    By reason of their membership on Inland REIT's Board of Directors, their service as executive officers of the REIT, their affiliation to the Advisor and the Property Managers, the ownership of the Advisor and/or Property Managers, and/or their authority and ability to make public statements in the name of Inland REIT, the Individual Defendants were controlling persons of Inland REIT, the Advisor, the Property Managers, the Sponsor and The Inland Group and had the power to cause (and did cause) Inland REIT, the Advisor, the Property Managers,

the Sponsor and The Inland Group to engage in the conduct complained of herein, and to aid and abet the Advisor, the Property Managers, the Sponsors and The Inland Group's breaches of fiduciary duties owed to the Shareholders and Company.

## IV.    CLASS ACTION ALLEGATIONS

86.    This is a class action pursuant to Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of Shareholders of Inland REIT, and their successors, heirs and assigns,  who were entitled to vote on the matters that were the subject of the Schedule 14A Proxy Statement that was filed with the SEC by Inland REIT on September 10, 2007, pursuant to Section 14(a) of the Exchange Act, as amended or supplemented on October 10, October 12, and November 9, 2007 ("Proxy"), and who suffered harm as a result of the actions complained of herein. ("Class").

87.    Excluded from the Class are the Defendants named herein, the officers and directors of Defendant entities at all relevant times, members of each Individual Defendant's immediate family, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors, and predecessors in interest or assigns of any such excluded party.

88.    As of March 27, 2007, Inland REIT had 483,710,075 shares of common stock outstanding held by over 112,000 shareholders of record. Members of the Class are so numerous that joinder of all members is impracticable.

89.    Co-Lead Plaintiffs' claims are typical of the claims of the members of the Class, because Co-Lead Plaintiffs and all of the Class members sustained damages arising out of Defendants' wrongful conduct.

90.    Co-Lead Plaintiffs will fairly and adequately protect the interests of all Class members and have retained counsel experienced and competent in class and securities litigation.

Co-Lead Plaintiffs have no interests contrary to, or in conflict with, the members of the Class that Co-Lead Plaintiffs seek to represent.

91.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it impossible for Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

92.    Final injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the entire Class.

93.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class include:

> (a)    Whether Inland REIT, the Advisor, the Property Managers, KPMG, the Individual Defendants and William Blair violated Sections 14(a) and/or 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder by causing a materially false and misleading Proxy to be issued and voted upon;

> (b)    Whether the Shareholder vote approving the Internalization was secured by means of a false and misleading Proxy in violation of Sections 14(a) and/or 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

(c)      Whether William Blair's Fairness Opinion rendered the Proxy materially false and misleading, in violation of Sections 14(a) and/or 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

(d)      Whether the alleged misstatements and omissions would have assumed significance in the deliberations of a reasonable shareholder in deciding how to vote on the Proxy;

(e)      Whether demand on the Board of Directors as of the date of filing the initial complaint on November 1, 2007 is excused, thereby permitting pursuit of the derivative claims, and whether Plaintiffs have standing to pursue direct claims against Defendants;

(f)      Whether the Advisor, the Property Managers, KPMG, the Individual Defendants, and William Blair breached their fiduciary duties to the members of the Class and/or aided others in breaches of fiduciary duties, by engaging in the conduct alleged herein;

(g)      Whether Defendants were unjustly enriched at the expense of the REIT and its Shareholders; and

(h)      Whether, as to each claim the members of the Class have sustained damages and, if so, the proper measure of such damages.

## V.      DERIVATIVE DEMAND ALLEGATIONS

94.    Co-Lead Plaintiffs did not make a demand upon the Board of Directors of Inland REIT prior to or at the time of the filing of the initial complaint on November 1, 2007 to bring action against the directors and officers of Inland REIT and the other culpable parties named herein, because doing so was excused or would have been futile.

27

95.    Director Defendants Parks, Gujral, Catalano, Beard, Gauvreau, Gorski, and Murphy comprised Inland REIT's Board of Directors at the time of the filing of the initial complaint on November 1, 2007 ("Board of Directors").

96.    Because of at least the following reasons, the majority of the Director Defendants serving on the Board of Directors were so personally and directly conflicted or committed to the decisions in dispute that they could not reasonably have been expected to respond to a demand to act in good faith and within the ambit of the business judgment rule:

97.    Defendants Beard, Gauvreau, Gorski and Murphy comprised the members of the Special Committee which purportedly investigated, evaluated, and reviewed the terms of the Internalization and, prior to the dissemination of the Proxy, approved the Internalization, and gave their recommendation to the Class to approve the Internalization.  Defendant Catalano was deemed not independent and removed from the Special Committee.

98.    Each of the Director Defendants approved the Internalization and publicly stated that the Internalization was "fair to [] the [] stockholders of [the] company", and recommended in the Proxy that each shareholder vote for the Internalization.

99.    Each Director Defendant is a signatory of the Proxy, which is alleged herein to contain materially false and misleading statements.

100.    Director Defendants Parks and Gujral had a financial interest in the consummation of the Internalization.  *See* ¶¶ 63, 65.  In addition,

    (a)    Defendants Parks and Gujral, as former executives, were employees of one or more Inland REIT affiliates, and their salaries were both determined by and paid by the Advisor.  Parks and Gujral were directly

28

linked, loyal and beholden to the Advisor and its affiliates by virtue of the executive compensation arrangement.

(b)    Defendants Parks and Gujral were stockholders of the Property Managers and of The Inland Group, the ultimate owner of the Advisor, and as a result received shares of Inland REIT common stock valued at approximately $6.8 million and $1.3 million, respectively, upon consummation of the Internalization.

101.    Inland REIT's Articles of Incorporation stated that each of the Director Defendants serves in a fiduciary capacity to the REIT and has a fiduciary duty to the Shareholders of the REIT, including a specific fiduciary duty to supervise the relationship of the REIT with the Advisor and the Property Managers.   Each of the Director Defendants was responsible for, among other things (*see* ¶¶ 261-268, *infra*):

(a)    supervising the performance of the Advisor and the Property Managers;

(b)    justifying the compensation paid to the Advisor and the Property Managers by the REIT

(c)    confirming that the provisions of the Advisory and Property Management Agreements were being carried out; and

(d)    evaluating the performance of the Advisor and the Property Managers before renewing their Agreements.

102.    It was incumbent on the Director Defendants to implement appropriate measures to assure that the Advisor and the Property Managers did not become vehicles for wrongful self-dealing, but instead, as outlined in ¶¶ 259-272, *infra,* these Director Defendants failed to

29

implement such measures, and consequently breached the fiduciary duties of loyalty, good faith and due care that they owed to Inland REIT and the Shareholders.

103.    Each of the Director Defendants also permitted and countenanced the historic overpayment of fees by Inland REIT to the Property Managers. Director Defendants Parks, Gujral, Catalano, Beard, Gauvreau, Gorski, and Murphy all signed the Offering Documents containing statements about the market rate cap on the payment of fees to the Property Managers (*see* ¶¶ 138-140; 181-184), but instead paid the Property Managers fees that exceeded that rate and permitted the Property Managers to be paid consideration in the Internalization based on inflated financial statements.

104.    Accordingly, each Director Defendant has subjected him or herself to a substantial risk of personal liability for breach of fiduciary duty because of his or her gross negligence in failing to prevent or remedy the Advisor's and Property Managers' improper self-dealing with Inland REIT, and instead causing and allowing the Property Managers to be significantly overpaid, renewing their and the Advisor's contractual arrangements with Inland REIT, proposing and consummating the Internalization that overvalued, and caused the REIT to pay excessive consideration, for the Advisor and the Property Managers, all to the detriment of Inland REIT and its Shareholders.

105.    Director Defendants Parks, Gujral, Catalano, Beard and Gauvreau were also the original five members of Inland REIT's board of directors at its inception in 2003. Each of these Directors was selected as a member of the Company's board by the Advisor's owners and their affiliates, and thus owed loyalty and allegiance to the Advisor and the Advisor's owners. Consequently, these Director Defendants could not act independently and in furtherance of the interests of Inland REIT and its Shareholders.

106.    Director Defendants Gorski and Murphy joined the board of directors on August 20, 2003, pursuant to the REIT's Amended Articles of Incorporation, which changed the provision setting forth the initial number of Directors from five to seven.  Defendants Gorski and Murphy were also selected by the Advisor's owners and their affiliates, and thus owed loyalty and allegiance to the Advisor and the Advisor's owners. Consequently, these Director Defendants could not act independently and in furtherance of the interests of Inland REIT and its Shareholders.

107.    In addition, with the exception of Defendants Parks and Gujral, each of the Director Defendants is paid an annual fee of $15,000 to serve as a Director, and receives $500 for attending in-person, or $350 for attending by telephone, each meeting of the Board, and $1,000 for attending, whether in person or via telephone, special meetings. Also, Defendants Beard, Gauvreau and Gorski are members of the Audit Committee and each receives $750 for attending an Audit Committee meeting in person or $500 for attending via telephone.  And, Defendants Beard, Gauvreau, Gorski, and Murphy are the members of the Special Committee and received $1,000 for attending each meeting of the Special Committee. The following table summarizes the compensation paid to them in connection with their Board of Director attendance in 2006:

|  | Fees earned or paid in cash | Option Awards | Total |
|---|---|---|---|
| Frank Catalano | $30,200 | $350 | $30,550 |
| Kenneth H. Beard | $33,750 | $350 | $34,100 |
| Paul R. Gauvreau | $37,850 | $350 | $38,200 |
| Gerald M. Gorski | $34,950 | $350 | $35,300 |

| Barbara A. Murphy | $31,250 | $350 | $31,600 |
| --- | --- | --- | --- |

108.    In addition, according to the Proxy, the members of the Special Committee met at least 22 times between March 2006 and August 2007.  Therefore, Defendants Beard, Gauvreau, Gorski, and Murphy also received compensation of at least $22,000 for their service as the members of the Special Committee.

109.    Moreover, certain of the Director Defendants have minimal stock ownership in the REIT:

| | Number of Shares Beneficially Owned (Includes 4,000 shares issuable upon exercise of options granted under Independent Director Stock Option Plan) |
| --- | --- |
| Frank Catalano | 7,148 |
| Gerald M. Gorski | 6,375 |
| Barbara A. Murphy | 4,000 |

Therefore, because these Director Defendants, especially Defendants Catalano, Gorski, and Murphy, beneficially own a *minimal* number of shares of the REIT and receive tens of thousands of dollars to serve as Directors of the REIT and on Board committees, their interests are not aligned with the REIT's Shareholders but instead they are financially motivated to retain their directorships. Thus, any interest these Director Defendants may have had in ensuring that the REIT's stock value would not be diluted in the Internalization was outweighed by the fees they received as members of the Special Committee and the fees they continue to receive for serving as members of the Audit Committee and as a director generally.

110.    The following chart summarizes the conflicts which permeated the Inland REIT's Board of Directors rendering them interested or lacking in independence and rendering demand futile:

| | Interest or relationship to Advisor and/or Property Managers | Multiple Directorships | Membership in Pertinent Board Committee | Charged with Oversight of the Advisor and Property Managers | Stock Ownership/ Directors' Fees Paid in 2006 | Interested/ Demand Excused |
|---|---|---|---|---|---|---|
| **Robert Parks** | Director of The Inland Group<br><br>One of four principal owners of the Advisor and the Property Managers<br><br>Advisor paid his salary.<br><br>Selected by Advisor to serve on Board | Chairman of Inland American Real Estate Trust, Inc.<br><br>President, CEO and a director of Inland Real Estate Corporation<br><br>Director of Inland Real Estate Exchange Corporation | | Yes. | 180,825 shares | ✔ |
| **Brenda Gujral** | President, COO and a director of the Sponsor<br><br>Owner of the Property Managers and The Inland Group<br><br>Advisor paid her salary.<br><br>Selected by Advisor to serve on Board | President, COO and a director of Inland Securities Corporation<br><br>Director of Inland Investment Advisors, Inc.<br><br>Chairman of the board of Inland Real Estate Exchange Corporation<br><br>President and a director of Inland American | | Yes. | | ✔ |

| | | Real Estate Trust, Inc. | | | | |
|---|---|---|---|---|---|---|
| **Frank A. Catalano, Jr.** | Selected by Advisor to serve on Board | | Member of Special Committee, resigned on July 5, 2006 due to "then existing financial relationship with Inland" | YES | 7,1478 shares<br><br>$30,550 in fees | ✔ |
| **Kenneth H. Beard** | Selected by Advisor to serve on Board | Serves as chairman of the foundation board of the Wellness House in Hinsdale, Illinois, a cancer support organization; Robert A. Baum is a member of the Board of Directors. | Member of Special Committee;<br><br>Member of Audit Committee | YES | 63,320 shares<br><br>$34,100 in fees | ✔ |
| **Paul R. Gauvreau** | Selected by Advisor to serve on Board | Serves as Trustee of Benedictine University with Daniel Goodwin | Member of Special Committee;<br><br>Member of Audit Committee | YES | 115,732 shares<br><br>$38,200 in fees | ✔ |
| **Gerald M. Gorski** | Selected by Advisor to serve on Board | | Member of Special Committee;<br><br>Member of Audit Committee | YES | 6,375 shares<br><br>$35,300 in fees | ✔ |
| **Barbara A. Murphy** | Selected by Advisor to serve on Board | | Member of Special Committee;<br><br>Member of Audit Committee | YES | 4,000 shares<br><br>$31,600 in fees | ✔ |

111.   For these reasons, each Director Defendant was directly conflicted or committed to the decisions in dispute and could not reasonably have been expected to impartially consider

34

or respond to a demand in good faith and within the ambit of the business judgment rule. Thus, a demand on the Director Defendants would have been futile.

112. The Director Defendants could not have been expected to have acted in the best interest of Inland REIT in their consideration of a demand because they were directly involved in the Internalization, owners and/or officers of the Advisor and Property Mangers, responsible for oversight of the Property Managers and the Advisor, participated in the mismanagement of Inland REIT and self-dealing practices within Inland REIT as alleged herein, and by their actions, were deeply implicated in the breach of fiduciary duty claims brought derivatively in this Action.

113. Because each Director Defendant was deeply and directly involved in the wrongdoing alleged herein, and had ample opportunity to consider and reconsider the Advisor's and Property Managers' self-dealing misconduct in managing Inland REIT and in formulating and proposing the Internalization a demand by shareholders or Plaintiffs on the Board of Directors to remedy the wrongdoing alleged herein would have been futile.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    The Advisor and Property Managers: Responsibilities, Pertinent Provisions of Governing Documents and Fee Structure

#### 1.    *The Advisor and Advisory Agreement*

114. As an externally-managed REIT, Inland REIT's day-to-day operations were conducted by the Advisor through the authority delegated to it under Inland REIT's Articles of Incorporation and the Second Amended and Restated Advisory Agreement, entered on December 28, 2004 ("Advisory Agreement"). The Advisory Agreement had an initial term of one year and was renewable for successive one-year terms upon the mutual consent of the parties.

35

115.    The Advisory Agreement states that the Advisor generally has responsibility for furnishing advice, recommendations and providing services to Inland REIT with respect to all aspects of its business.

116.    The duties and responsibilities of the Advisor are enumerated in Section 2 of the Advisory Agreement and included, but were not limited to:

(2) DUTIES OF THE ADVISOR. . .

(a) Present to the Company a continuing and suitable real estate investment program and opportunities to make investments in Real Properties consistent with the investment policies of the Company and the investment program adopted by the Board of Directors and in effect at the time and furnish the Company with advice with respect to the making, acquisition, holding and disposition of investments and commitments therefore…;

(b) Manage the Company's day-to-day investment operations, subject to the final paragraph of this Section 2, to effect the investment program adopted by the Board of Directors and perform or supervise the performance of such other administrative functions necessary in connection with the management of the Company as may be agreed upon by the Advisor and the Company;

(c) Serve as the Company's investment advisor, subject to the final paragraph of this Section 2, in connection with policy decisions to be made by the Board of Directors and, as requested, furnish reports to the Board of Directors and provide research, economic and statistical data in connection with the Company's investments and investment policies;

(d) On behalf of the Company, investigate, select and conduct relations with lenders, consultants, accountants, brokers, property managers, attorneys, underwriters, appraisers, insurers, corporate fiduciaries, banks, builders and developers, sellers and buyers of investments and persons acting in any other capacity specified by the Company from time to time, and enter into contracts with, retain and supervise services performed by such parties in connection with investments which have been or may be acquired or disposed of by the Company;

(e) Cooperate with the Management Agent in connection with property management services and other activities relating to the

Company's assets as the Advisor shall deem appropriate in the particular circumstances, subject to the requirement that the Advisor or the Management Agent, as the case may be, qualifies as an "independent contractor" as that phrase is used in connection with applicable laws, rules and regulations affecting REITs that own Real Property;

   (f)  Upon request of the Company, act, or obtain the services of others to act, as attorney-in-fact or agent of the Company in making, acquiring and disposing of investments, disbursing, and collecting the funds, paying the debts and fulfilling the obligations of the Company and handling, prosecuting and settling any claims of the Company, including foreclosing and otherwise enforcing mortgage and other liens and security interests securing investments;

   (g)  Assist in negotiations on behalf of the Company with investment banking firms and other institutions or investors for public or private sales of securities of the Company or for other financing on behalf of the Company, but in no event in such a way that the Advisor shall be acting as a broker, dealer, underwater or investment advisor in securities of or for the Company;

*       *       *

(j)  Supervise the preparation and filing and distribution of returns and reports to governmental agencies and to investors and act on behalf of the Company in connection with investor relations;

*       *       *

   (l)  Advise the Company of the operating results of the Company properties, to cause the Manager to prepare on a timely basis, and to review, for such properties operating budgets, maintenance and improvement schedules, one, three and five year projections of operating results and such other reports as may be appropriate;

   (m) As requested by the Company, make reports to the Company of its performance of the foregoing services and furnish advice and recommendations with respect to other aspects of the business of the Company;

   (n) Prepare on behalf of the Company all reports and returns required by the Securities and Exchange Commission, Internal Revenue Service and other state or federal governmental agencies; and

   (o)  Undertake and perform all services or other activities necessary and proper to carry out the investment objectives of the Company.

37

117.    In exchange for its services to Inland REIT, the Advisor received various fees as fully set forth in the Advisory Agreement, but summarized here:

(a)    **Advisor Asset Management Fee** of not more than 1% of the Average Invested Assets.

(b)    **Incentive Advisory Fee** equal to 15% of the remaining proceeds from the sale of Real Properties after the Stockholders have first received: (i) their Cumulative Return; and (ii) the return of their Invested Capital.

(c)    **Property Disposition Fee**, payable upon the sale of a Real Property equal to the lesser of: (i) 3% of the contracted for sales price of the Real Property or (ii) 50% of the commission paid to third parties which is reasonable, customary and competitive in light of the size, type and location of such property ("Competitive Real Estate Commission").

118.    The Advisor was also reimbursed for certain expenses, including:

(a)    **Acquisition Expenses**, for the expenses attendant to Property acquisitions, in an aggregate amount not in excess of 0.5% of (i) the Gross Offering Proceeds, and (ii) the gross proceeds from the sale of up to 20,000,000 Shares pursuant to the Company's Distribution Reinvestment Program, PROVIDED THAT the Acquisition Expenses respecting any specific Property acquired by the Company shall not exceed 6% of the gross purchase price of that Property;

(b)    **Reimbursement for the cost to the Advisor and its Affiliates for**:

(i)    the cost to the Advisor or its Affiliates of goods and services used for and by the Company and obtained from unaffiliated parties; and

(ii)    administrative services related thereto. "Administrative Services" include ministerial services such as typing, record keeping, preparation and dissemination of Company reports, preparation and maintenance of records regarding Stockholders, record keeping and administration of the Company's Distribution Reinvestment and Share Repurchase Programs, preparation and dissemination of responses to Stockholder inquiries and other communications with Stockholders and any other record keeping required for Company purposes.

119.    The compensation and reimbursements paid by the REIT to the Advisor and its Affiliates required and received the approval of a majority of Inland REIT's directors.

38

120.   The Director Defendants had a responsibility to determine that such fees and reimbursements were fair and reasonable to the REIT and not less favorable to the REIT than would be available from an unaffiliated source. Pursuant to Article VII, Section 5(i) of Inland REIT's Articles of Incorporation, "[t]he Directors shall determine from time to time and at least annually that the compensation which the REIT contracts to pay the Advisor is reasonable in relation to the nature and quality of services performed and that such compensation is within the limits prescribed by these Articles and applicable state law."

121.   For the years ended December 31, 2005 and 2006, Inland REIT paid $20.9 million and $39.5 million, respectively, as fees to the Advisor.

122.   Pursuant to the Advisory Agreement, from and after September 15, 2008, Inland REIT retained the right to acquire the entire business, affairs, operations and assets of the Advisor on the following terms ("Advisor Purchase Option"):

> If the Company desires to acquire the Advisor's Business in a Business Combination, the Company shall send a written notice to the Advisor to that effect ("Election Notice"). Any agreement with respect to a Business Combination shall contain provisions providing for: (i) the termination of this Agreement and all Advisory Agreements entered into pursuant hereto and the release or waiver of all fees payable by the Company to the Advisor under the Advisory Agreements (except for the payment of fees due and payable under the Advisory Agreements for services rendered by the Advisor up to and until the consummation of the Business Combination); and (ii) the issuance of a certain number of shares of common stock of the Company as determined below (the "Shares") to be issued to the Advisor, or its stockholders, members or other equity holders, as the case may be, in connection with the Business Combination. The Advisor represents to the Company that the Advisor has obtained the consent of its board of directors and its shareholders to a Business Combination with the Company and that Advisor will obtain similar consents from any future shareholders, members or other equity holders of the Advisor.

123.   Pursuant to the Advisory Agreement, the number of Shares to be issued by the REIT to the Advisor or its shareholders, members or other equity holders as the case may be, in

connection with the contractual Advisor Purchase Option would be determined by the following formula ("Advisor Purchase Option Formula"):

> The net income of the Advisor for the calendar month immediately preceding the month in which the Merger Agreement is executed, as determined by an independent audit conducted in accordance with generally accepted auditing standards, shall be annualized (the "Annual Net Income"). The Annual Net Income shall then be multiplied by ninety percent (90%) and then divided by the "Funds from Operations per Weighted Average Share" of the Company. "Funds from Operations per Weighted Average Share" shall be equal to the annualized Funds from Operations, on the basis of four (4) times the Funds from Operations for the fiscal quarter immediately preceding the month in which the Merger Agreement is executed, per weighted average Share of the Company for such quarter as stated in the quarterly report on Form 10-Q of the Company given to its shareholders for such quarter. The resulting quotient shall constitute the number of Shares to be issued by the Company to the Advisor or its shareholders, members or other equity holders as the case may be, with delivery thereof and the closing of the Business Combination to occur within ninety (90) days after the date the Election Notice is given to Advisor.

### 2.    The Property Managers and Property Management Agreements

124.    Each of the Property Managers performed services for Inland REIT pursuant to a Property Management Agreement.  Each Property Management Agreement consisted of two parts: (1) a Master Management Agreement which set forth the relationship between Inland REIT and the Property Manager; and (2) a separate Management Agreement for each individual property in Inland REIT's portfolio (collectively, the "Property Management Agreement"). Inland REIT entered into a Master Management Agreement with IWMC on September 13, 2003. Inland REIT entered into Master Management Agreements with each of INMC and ISMC on November 11, 2003.

125.    The duties and responsibilities of the Property Managers are enumerated in the Property Management Agreement and included, but were not limited to:

> (a)    Property Management functions including collecting rent and other monies from tenants with respect to the properties, performing all duties of the landlord including duties relating to operation, maintenance, and day-to-day management of the properties and leases, inspecting the properties

and ensuring the properties are maintained.

    (b)    Leasing Agent functions including coordinating the leasing of the properties.

126.    In exchange for its property management services to Inland REIT, the Property Management Agreement provided for a property management fee at an amount "**no greater than** [4.5%] of the Gross Income for the month for which the payment is made," (emphasis added) and, for services beyond those specified in the Property Management Agreement, 90% of "that which would be paid to unrelated parties providing such services" ("Property Management Fee"):

> THE OWNER AGREES TO PAY THE MANAGER, AS A MONTHLY MANAGEMENT FEE HEREUNDER, an amount no greater than four and one half percent (4-1/2%) of Gross Income for the month for which the payment is made, which shall be deducted monthly by the MANAGER and retained by the MANAGER from Gross Income prior to payment to OWNER of Net Proceeds. Such Management Fee shall be compensation for those services specified herein. Any services beyond those specified herein, such as sales brokerage, construction management, loan origination and servicing, property tax reduction and risk management services, shall be performed by MANAGER and compensated by OWNER only if the parties agree on the scope of such work and provided that the compensation to be paid therefor will not exceed 90% of that which would be paid to unrelated parties providing such services and provided further that all such compensation must be approved by a majority of the independent directors of OWNER.

127.    For the years ended December 31, 2006 and 2005, Inland REIT paid fees of $29.8 million and $20.7 million in the aggregate the Property Managers.

128.    According to the terms of the Property Management Agreement, from and after May of 2008, Inland REIT retained the right to acquire the entire business, affairs, operations and assets of the Property Managers on the following terms ("Property Manager Purchase Option" (referred to herein with the Advisor Purchase Option as the "Purchase Options")):

> If the Company desires to acquire the Manager's Business in a Business Combination, the Company shall send a written notice to the Advisor to that

effect ("Election Notice"). Any agreement with respect to a Business Combination shall contain provisions providing for: (i) the termination of this Agreement and all Management Agreements entered into pursuant hereto and the release or waiver of all fees payable by the Company to the Manager under the Management Agreements (except for the payment of fees due and payable under the Management Agreements for services rendered by the Manager up to and until the consummation of the Business Combination); and (ii) the issuance of a certain number of shares of common stock of the Company as determined below (the "Shares") to be issued to the Manager, or its stockholders, members or other equity holders, as the case may be, in connection with the Business Combination. The Manager represents to the Company that the Manager has obtained the consent of its board of directors and its shareholders to a Business Combination with the Company and that Manager will obtain similar consents from any future shareholders, members or other equity holders of the Manager.

129.    Pursuant to the Property Management Agreement, the number of Shares to be issued by the REIT to the Property Managers' shareholders, in connection with the contractual Property Manager Purchase Option, would be determined by the following formula ("Property Manager Purchase Option Formula"):

The net income of the Manager for the calendar month immediately preceding the month in which the Merger Agreement is executed, as determined by an independent audit conducted in accordance with generally accepted auditing standards, shall be annualized (the "Annual Net Income"). The Annual Net Income shall then be multiplied by ninety percent (90%) and then divided by the "Funds from Operations per Weighted Average Share" of the Company. "Funds from Operations per Weighted Average Share" shall be equal to the annualized Funds from Operations, on the basis of four (4) times the Funds from Operations for the fiscal quarter immediately preceding the month in which the Merger Agreement is executed, per weighted average Share of the Company for such quarter as stated in the quarterly report on Form 10-Q of the Company given to its shareholders for such quarter. The resulting quotient shall constitute the number of Shares to be issued by the Company to the Manager or its shareholders, members or other equity holders as the case may be, with delivery thereof and the closing of the Business Combination to occur within ninety (90) days after the date the Election Notice is given to Manager.

    **3.**       *Varying Statements in Company's Documents as to the Property Management Fees.*

130.    On September 15, 2003, Inland REIT commenced an initial public offering by filing with the SEC a Registration Statement (No. 333-103799) on Form S-11 covering 250,000,000 of its shares to be offered to the public ("Initial Offering"), which Form S-11 and Initial Offering was accomplished, supplemented and amended by Form S-11/A Amended Registration Statements, Rule 424(b)(3) Prospectuses, and POS AM Post-Effective Amendments which were signed by Defendants Parks, Grimes, Gujral, Catalano, Beard, Gauvreau, Gorski and Murphy. Inland REIT consummated the sale of all of the shares of the Initial Offering on March 22, 2005.

131.    Inland REIT commenced its second public offering by filing with the SEC a Registration Statement (No. 333-118860) on Form S-11 covering 250,000,000 of its shares to be offered to the public ("Second Offering"), which Form S-11 and Initial Offering was accomplished, accompanied, supplemented and amended by Form S-11/A Amended Registration Statements, Rule 424(b)(3) Prospectuses, and POS AM Post-Effective Amendments which were signed by Defendants Parks, Grimes, Gujral, Catalano, Beard, Gauvreau, Gorski and Murphy. Inland REIT consummated the sale of all of the shares of the Second Offering on September 9, 2005.

132.    The documents filed with the SEC comprising the Initial and Second Offering are collectively referred to as the Offering Documents.

133.    In comparison to the statement in the Property Management Agreement that the Property Management Fee would be at an amount "**<u>no greater than</u>** [4.5%] of the Gross Income for the month for which the payment is made," (emphasis added), the Company's Offering

Documents provided clear parameters as to the calculation and amount of the Property Management Fee.

134.     The Offering Documents stated that Property Management Fees paid to the Property Managers could not exceed "90% of the fee which would be payable to an unrelated third party providing such services" ("90% of Market Rate"), and would *initially* be set at 4.5% of the REIT's monthly gross income.   This language appears throughout the Offering Documents:

| Statement About Property Management Fees | Offering Documents in Which Misleading Statement Appeared |
|---|---|
| "our property management services agreements provide that we pay our property managers a monthly management fee of no greater than 90% of the fee which would be payable to an unrelated third party providing such services." | *Initial Offering*:POS AM, filed on: 3/15/05 [pages 5, F-14]; Rule 424B3 Prospectus, filed on: 2/18/05 [page 7] and 9/19/03 [page 37]; Amended Registration of Securities, S-11/A, filed on: 5/8/03 [page 33], 6/30/03 [page 35], 8/20/03 [page 37], and 9/15/03 [page 37]; Registration of Securities, S-11, filed on:  3/13/03 [page 26]<br><br>*Second Offering:* POS AM, filed on: 9/15/05 [page 11], 6/16/05 [pages 10-11], 3/18/05 [pages 3, F-14], and 3/16/05 [pages 3, F-14]; Rule 424B3 Prospectus, filed on: 2/18/05 [page 7] and 12/28/04 [page 37]; Amended Registration of Securities, S-11/A, filed on: 12/21/04 [page 37] and 11/20/04 [page 37]; Registration of Securities, S-11, filed on:  9/8/04 [page 37] |
| "We have agreed to pay the property manager a monthly management fee in an amount no greater than 90% of the fee which would be payable to an unrelated party providing such services, which fee will initially be 4.5% of gross income, as defined in the management agreement from the properties managed for the month for which the payment is made." | *Initial Offering:* POS AM, filed on: 3/15/05 [page 41]; 12/16/04 [page 3]; 10/13/04 [page 25]; 9/15/04 [page 3]; Rule 424B2 Prospectus, filed on: 9/19/03 [page 77]; Amended Registration of Securities, S-11/A, filed on: 5/8/03 [page 70]; 6/30/03 [page 74]; 8/20/03 [page 75]; 9/15/03 [page76]; Registration of Securities, S-11, filed on:  3/13/03 [page 60]<br><br>*Second Offering:* Rule 424B2 Prospectus, filed on: 12/28/04 [page 82]; Amended Registration of Securities, S-11/A, filed on: 12/21/04 [page 82]; 11/20/04 [page 78]; Registration of Securities, S-11, filed on:  9/8/04 [page 78] |

| | |
|---|---|
| "Property management fee. <u>4.5% of the gross income from the properties (Cannot exceed 90% of the fee that would be payable to an unrelated third party)."</u> | <u>*Initial Offering:*</u> POS AM, filed on: 3/15/05 [page 12]; 12/16/04 [page F-104], 10/13/04 [page F-130], and 3/15/04 [page F-12]; <u>Rule 424B3 Prospectus, filed on:</u> 2/18/05 [page 2] and 9/19/03 [pages 6, 107, F-57]; <u>Amended Registration of Securities, S-11/A, filed on:</u> 5/8/03 [pages 6, 99. F-4], 6/30/03 [pages 6, 103, F-5], 8/20/03 [pages 6, 104, F-5], and 9/15/03 [pages 6, 106, F-5]<br><br><u>*Second Offering:*</u> POS AM, filed on: 9/15/05 [page 3], 6/16/05 [page 3], 3/18/05 [page 10], and 3/16/05 [page 10]; <u>Rule 424B3 Prospectus, filed on:</u> 2/18/05 [page 2] and 12/28/04 [pages 7. F-25]; <u>Amended Registration of Securities, S-11/A, filed on:</u> 12/21/04 [pages 7, F-25]; 11/20/04 [pages 7, F-23]; <u>Registration of Securities, S-11, filed on:</u>  9/8/04 [pages 7, F-21] |

135.     Moreover, the Advisory Agreement, to which Defendants were also contractually bound, included similar language to that of the Offering Documents by defining "Property Management Fees to mean:  "any fee paid to an Affiliate or third party as compensation for management of the Company's Properties. The Property Management Fee shall be equal to not more than 90% of the fee which would be payable to an unrelated party providing such services, which fee shall initially be 4.5% of the gross revenues from the Properties." (Advisory Agreement at p. 4).

136.     In addition, under the terms of the Company's Articles of Incorporation, the Director Defendants are responsible for overseeing the activities and performance of the Advisor, including approving that "The compensation and reimbursements paid by the Company to . . . its Affiliates shall be approved by a majority of the Directors . . .as ***being fair and reasonable*** to the Company and ***not less favorable to the Company than would be available from an unaffiliated source***." (emphasis added)

137.    Despite the language concerning the cap and "market check" on Property Management Fees, that served as a significant protection for Inland REIT and its Shareholders from overreaching by its affiliates, the Property Managers and its owners, Defendants charged and the REIT incurred Property Management Fees at or greater than 4.5%, which percentage was far in excess of rates and fees that would be available to the Company from an unaffiliated source or from an unrelated third party.

138.    The property management market is fragmented and highly competitive, resulting in favorable market rates for consumers of management services such as Inland REIT.  Since 2004, the market rates for property management services were significantly below 4.5%.  For example, since 2004, fees that would be payable to an unrelated party providing property management services for which the Property Managers received a fee of at least 4.5%, would range from approximately 1.0%, for retail properties with single tenant triple-net leases, to 2.0% for office properties with single tenant triple-net leases, to a maximum of approximately 3.0% for properties with multi-tenant leases.    And, according to the Offering Documents and Advisory Agreement, the fees to the Property Managers were to be *not more than* 90% of those "market" fees.

139.    The 4.5% fee also exceeded "90% of Market Rate" and was less favorable to the Company than would be available from an unaffiliated source for at least the following additional reasons:

(a)    A percentage of the Company's 306 properties owned as of December 31, 2006 were free standing single tenant properties, which require far less management attention, and therefore are typically managed for a fee as low as 1% to 2%.

46

(b)    The profitability of the Property Managers when measured by EBITDA as a percentage of gross revenue was 61%, which was in stark contrast to the purportedly comparable EBITA of 3-15% earned by the supposed comparable companies identified by William Blair in support of its fairness opinion  The wide gap in profit percentages is largely due to the charge of fees at markedly above-market rates and demonstrates why, as provided for in the Property Management Agreements, the Property Managers' rates should have been no more than 90% of the Market Rate, rather than above market.

(c)    On April 27, 2007, Inland Western and Morgan Stanley Real Estate Advisor, Inc. ("Morgan Stanley") announced the signing of a definitive agreement to establish a $1 billion joint venture with a state pension fund investor advised by Morgan Stanley. The purpose of this joint venture is to acquire and manage retail properties in the U.S.  The property management agreement entered into in the Joint Venture sets forth fees of 4.5% of monthly gross income for leases which allow reimbursement of the fee as a pass-through expense and 3.5 % of monthly gross income for all other leases.

(d)    In *addition* to the 4.5% fee paid, the statement of the Property Managers included in the Proxy indicated that $5.3 Million in salaries were also reimbursed and paid to the REIT in 2006 and $2.3 million in 2005.

140.    Since 2004, the Property Mangers charged the REIT a Property Management Fee of at least 4.5%, and therefore failed to limit the Property Management Fees to an amount equal to not more than 90% of the "market" fee, instead collecting tens of millions of dollars of excessive fees from Inland REIT.  Moreover, the Property Managers' receipt of such excessive

and contractually unsupported fees since 2004, materially inflated the Property Managers' net income as reported in its financial statements. *See* ¶¶ 138-140; 181-184.

### B.    Events Leading Up to the Merger Agreement

141.    According to the Proxy, in February 2006, Inland REIT's Board began to consider whether to internalize the services conducted by the Advisor and Property Managers, and contemporaneously formed the Special Committee comprised of Defendants Beard, Gauvreau, Gorski and Murphy[1] to purportedly evaluate the possible acquisition of the Advisor and Property Managers by Inland REIT.  The Special Committee conducted initial meetings in April and May 2006.

142.    On May 15, 2006, a financial advisor to the Advisor and Property Managers, Silver Portal Capital ("Silver Portal"), presented a financial analysis and valuation of the Advisor and Property Managers to Inland REIT's Board of Directors and the Special Committee.

143.    Thereafter, on June 13, 2006 and June 16, 2006, respectively, the Special Committee hired Sidley Austin LLP ("Sidley") as its legal advisor and William Blair as its financial advisor. William Blair was retained to participate in negotiating the possible Internalization as well as to opine on the fairness of the consideration to be paid in connection with the contemplated transaction.

144.    At a December 12, 2006 meeting of the Special Committee, Sidley and William Blair summarized the status of their work, and the Special Committee discussed, *inter alia*, the following alternatives:  (1) maintaining the status quo and continuing to externalize advisory and management services under the existing agreements with the Advisor and Property Managers; (2) terminating the existing agreements and externalizing advisory and management services to

---

[1]    Defendant Catalano was a member of the Special Committee until he resigned on July 5, 2006 due to "then existing financial relationship" with the Advisor and its affiliates.

new third party providers; (3) terminating the existing agreements and building internal advisory and management services through hiring; and (4) selling Inland REIT to a third party.

145.    On December 21, 2006, representatives of Sidley and William Blair met with representatives of the Advisor and Property Managers to discuss "the potential advantages of internalization" and "the process for proceeding with negotiations should the Special Committee decide to do so." The Advisor and Property Managers also provided information at this meeting concerning the "personnel and functions that would be internalized in an internalization transaction." (Proxy at 16).

146.    Three weeks later, on January 9, 2007, representatives of the Advisor and Property Managers made a presentation to the Inland REIT Board with respect to the services they were currently providing and "discussed the potential transition issues associated with terminating the advisory or property management agreements, including potential cessation of [the REIT's] property acquisition program and the value to [the REIT] of access to property acquisition services of affiliates of" the Advisor. (Proxy at 16-17).

147.    At a January 9, 2007 meeting, the Special Committee also "discussed the advantages and disadvantages of the various strategic alternatives available to the Special Committee, including that acquiring [the Advisor] and Property Managers could enhance stockholder value by, among other things, positioning [the REIT] to list our shares on a national securities exchange, reducing the potential conflict due to the fact that fees paid to [the Advisor] and Property Managers are primarily based on a percentage of our real property asset base, and generating cost savings which could increase earnings and funds from operations." The Special Committee concluded it was in the "best interest" of Inland REIT and its stockholders to "pursue further discussions regarding an internalization transaction."   (Proxy at 17).

49

148.    Immediately after the January 9, 2007 meeting, the Special Committee met with representatives of Sidley and William Blair to discuss the "potential cost savings" and "additional possible benefits of an internalization" and to "explore[] the risks" of building a staff internally rather than internalizing the Advisor and Property Managers. At this meeting, William Blair also provided its "preliminary financial . . . valuation" of the Advisor and Property Managers and its analysis of the consideration that Inland REIT might pay to internalize those entities. (Proxy at 17).

149.    On January 26, 2007, Defendant Gauvreau (the Chair of the Special Committee) and William Blair representatives met with Defendant Goodwin, in his capacity as the Chairman of The Inland Group, owner of the Advisor, and Thomas McGuinness, the president of the Property Managers, to discuss William Blair's valuation and other Internalization-related issues.

150.    By February 19, 2007, the Special Committee and representatives of the Advisor and Property Managers had preliminarily agreed to the 37,500,000 shares of Inland REIT stock as the purchase price for the Internalization.

151.    On August 14, 2007, the Special Committee met telephonically with its advisors to review the final terms of the Internalization transaction and William Blair presented its updated financial analysis and opinion that the consideration to be paid by Inland REIT in connection with the transaction was financially fair to Inland REIT and its stockholders. The Special Committee unanimously recommended Board and shareholder approval of the Merger and ancillary agreements. Inland REIT's Board of Directors, the Director Defendants, convened telephonically that same day and unanimously approved the Internalization.

C.    **The Merger of the Advisor and the Property Managers
Into Inland REIT - the Proposed Internalization.**

152.    On August 17, 2007, Inland REIT publicly announced that it had entered into an

agreement and plan of merger (the "Merger Agreement") with the Advisor, the Property

Managers, the Sponsor and IWEST Merger Agent, LLC, as agent for the stockholders of the

Property Managers (the "Agent").  The REIT's Shareholders were informed that Inland REIT's

Board of Directors had voted unanimously to acquire the Advisor and the Property Managers via

four separate mergers of those companies with newly formed subsidiaries of the REIT (the

"Internalization") for a total consideration comprised entirely of 37,500,000 newly issued shares

of Inland REIT's common stock valued at $375 million (the "Internalization Consideration").

153.    The purpose of the Internalization, as described in the Proxy, was to internalize

the functions of the Advisor and Property Managers with and into Inland REIT.  On September

10, 2007, the same day Defendants disseminated the Proxy, Defendant Parks, as Chairman,

disseminated a letter to the Shareholders stating that (emphasis added):

> As is the case with other REITs established by our sponsor, our business
> plan incorporates both a process for self-administration and, at a future
> point in time, the exploration of a liquidity event to be determined by our
> board of directors.  A liquidity event could take the form of listing our
> shares on a stock exchange, merging our REIT with a publicly traded REIT,
> or selling our real estate assets, any one of which would **provide our
> stockholders with an exit strategy from their investment.  We believe
> that acquiring our Property Managers and our Business
> Manager/Advisor is one of the most significant steps toward achieving
> our goal of an effective liquidity event for our stockholders**, and we
> expect the Merger to have a positive impact on our future financial
> performance.

D.    **The Proxy.**

154.    On September 10, 2007, Defendants filed with the SEC a Schedule 14A Proxy

Statement, pursuant to Section 14(a) of the Exchange Act, seeking shareholder approval of the

Internalization.  The shareholder vote on the Proxy was scheduled to take place on November 13, 2007 in Oak Brook, Illinois.

### 1.    *The Proxy's Proposals*

155.    Specifically, the Proxy presented the Shareholders with three proposals ("Proxy Proposals"):

(a)    Ratification of the Mergers;

(b)    Election of seven Directors for a new term, including those who served on the Special Committee; and

(c)    Ratification of the appointment of KPMG LLP as the independent registered public accounting firm for the 2007 fiscal year.

156.    Among other things, the Proxy set out the following reasons for the proposed Internalization:

(a)    "*Goal of Self Administration*.  The acquisition of our … Advisor and Property Managers is one of the most significant steps in achieving our objective of becoming a fully self-administered REIT. The Special Committee believes that analysts and investors have shown a preference for self-administered REITs and, as a result, **the consummation of the proposed transaction may better position us to raise capital or list our shares on a national securities exchange**. . . .."

(b)    "*Reduction of Operating Costs and Impact on Funds from Operations*. . . . we will substantially transform the costs associated with the advisory and management function to fixed costs. . . upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger. . ."

(c)    "*Retention of Key Management Personnel*. The proposed transaction will permit us to retain directly the services of key management ..."

(d)    "*Access to Inland Affiliated Services*.  The Special Committee believes that the services provided by Inland are of a higher quality and provided at equal or lower costs than could be obtained from unaffiliated third parties..."

(Emphasis added).

157.    The Proxy also stated that the Special Committee failed to recommend pursuing alternatives to the Internalization because, among other reasons, "the value that self-administration could add to our company in anticipation of a public listing or liquidity event."

## 2.    Description of the Merger and the Transfer of Employees.

158.    Subject to the approval of the Internalization by Inland REIT's Shareholders, the Merger Agreement provided for the occurrence of four separate mergers wherein the Advisor and each of the three Property Managers would become wholly-owned subsidiaries of Inland REIT:

> (a)    IWEST Acquisition 1, Inc., will merge with and into the Advisor, with the Advisor as the surviving corporation;
>
> (b)    IWEST Acquisition 2, Inc., will merge with and into ISMC, with ISMC as the surviving corporation;
>
> (c)    IWEST Acquisition 3, Inc., will merge with and into INMC, with INMC as the surviving corporation; and
>
> (d)    IWEST Acquisition 4, Inc., will merge with and into IWMC, with IWMC as the surviving corporation.

159.    The Proxy informed Shareholders that as a result of the Internalization, each surviving corporation would continue as a wholly-owned subsidiary of Inland REIT, and would succeed to all of the assets, business and liabilities of the corresponding predecessor, and certain employees of the Property Managers would become employees of the corresponding surviving corporation.  Upon the closing of the Internalization, Inland REIT would become "self-advised."

160.    Inland REIT had no employees. In this regard, the Proxy stated that following the Internalization, Inland REIT would add more than 250 employees and had entered into employment agreements with the "executive team" of Michael J. O'Hanlon, a senior vice president of the Inland REIT's Sponsor since 2005, Defendant Grimes, Shane C. Garrison, an

Inland US Management vice president since 2004, and Niall J. Byrne, a senior vice president of the Property Managers.

### 3.    *Calculation of Internalization Consideration*

161.    The Proxy informed Shareholders that upon consummation of the Internalization, the stockholders of the Advisor and the Property Managers would receive newly issued shares of Inland REIT common stock "according to an exchange ratio separately calculated with respect to each [Advisor or Property Manager]." The Proxy informed Shareholders that Inland REIT agreed to convey 37,500,000 shares of its common stock, valued at $10.00 per share, to the owners of the Advisor and Property Managers as consideration for the Internalization.    The Proxy stated that "the amount and form of the Merger consideration ... were determined through negotiations between us and the … Advisor and the Property Managers."

162.    Upon consummation of the Internalization, the Internalization Consideration would be allocated to the stockholders of the Advisor and Property Managers as follows:

> (a)    In the merger of IWEST Acquisition 1, Inc., with and into the Advisor, each outstanding share of the capital stock of the Advisor will be converted into the right to receive 18,750,000 shares of Inland REIT common stock, and a total of 10,312,500 of these shares will be deposited into the escrow account;

> (b)    In the merger of IWEST Acquisition 2, Inc., with and into ISMC, each outstanding share of the capital stock of ISMC will be converted into the right to receive 6,206,560 shares of Inland REIT common stock, and a total of 3,437,500 of these shares will be deposited into the escrow account;

> (c)    In the merger of IWEST Acquisition 3, Inc., with and into INMC, each outstanding share of the capital stock of INMC will be converted into the right to receive 6,203,480 shares of our common stock, and a total of 3,437,500 of these shares will be deposited into the escrow account; and

> (d)    In the merger of IWEST Acquisition 4, Inc., with and into IWMC, each outstanding share of the capital stock of IWMC will be converted into the right to receive 6,558,240 shares of our common stock, and a total of 3,437,500 of these shares will be deposited into the escrow account.

163. Under the Merger Agreement, the Internalization Consideration would be allocated and paid to the Advisor and Property Managers as follows: (a) $187,500,000 worth of Inland REIT stock (or 18,750,000 shares) to the Advisor; and (b) $189,968,280 worth of Inland REIT stock (or 18,968,280 shares) in the aggregate to the three Property Managers.[2]

164. Fifty-five percent of the Internalization Consideration was to be placed into an escrow account, and the stockholders of the Advisor and Property Managers were to receive 45% of the newly issued Inland REIT stock on the date that the Internalization was consummated. Pursuant to the Merger Agreement, one-half of the escrowed Internalization Consideration is to be released one year after the Merger and the other half is to be released no later than the second anniversary of the Internalization, subject to the total amounts of any indemnification claims by Inland REIT that may be pending as of those respective release dates.

165. The Proxy stated that if the Internalization was consummated as planned, the majority of the Internalization Consideration was to be received by the following Individual Defendants:

(a) Defendant Goodwin was to receive the lion's share of the Internalization Consideration. As a result of the Internalization and his direct or indirect ownership of Inland REIT stock prior to the Internalization, Defendant Goodwin will own over 30 million shares of Inland Stock valued at over $300 million.

(b) Defendants Parks, Gujral and Grimes were to receive substantial consideration in the Internalization consisting of shares of Inland REIT stock

---

[2]    The Proxy states that the $375 million of Internalization Consideration is approximate and the actual amount of Internalization Consideration is subject to adjustment. Based on these statements taken from the Proxy, it appears that the Internalization Consideration amounts to shares of Inland REIT's stock valued at more than $377 million.

valued at approximately $6.8 million, $1.3 million, and $380,000 respectively. Defendant Grimes was to become an executive officer of Inland REIT.

(c)    Defendants Baum and Cosenza were to receive a material percentage of the Internalization Consideration through their ownership of The Inland Group and the Property Managers.

166.    Following the dissemination of the Proxy, Inland REIT held its annual meeting of Shareholders on November 13, 2007, and at such meeting, the Inland REIT Shareholders approved the Proxy's Proposals and the Internalization.

167.    On November 15, 2007, Inland REIT consummated the Internalization.

**E.    The Proxy was Materially False and Misleading.**

>    **1.    The Proxy Contained Materially False and Misleading Financial Statements of the Advisor and the Property Managers.**

168.    The following Table I compiles information contained in the Proxy about the Advisor's revenues and expenses from 2004 through 2006:

**TABLE I**

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenues | | | |
| Advisor Fees | $ 39,500,000 | $ 20,925,000 | $        - |
| Reimbursement of Salary and Benefits | 1,018,856 | 1,608,420 | 1,502,511 |
| Total Revenues | 40,518,856 | 22,533,420 | 1,502,511 |
| Expenses | | | |
| Salary and Benefits | 1,019,108 | 1,608,777 | 1,503,455 |
| Depreciation Expenses | - | - | 1,374 |
| General and Administrative | 159,680 | 32,686 | 34,557 |
| Total Expenses | 1,178,788 | 1,641,463 | 1,539,386 |
| Income before Investment in REITs | 39,340,068 | 20,891,957 | (36,875) |
| Income from Investments in REITs | 1,392 | 2,396 | 1,306 |
| Income before Taxes | 39,341,460 | 20,894,353 | (35,569) |
| Provision for Income Taxes | 15,697,242 | 8,336,790 | (13,836) |
| **Net Income (Loss)** | **$ 23,644,218** | **$ 12,557,563** | **$ (21,733)** |
| | | | |
| **EBITDA** | **$ 39,341,460** | **$ 20,894,353** | **$ (35,569)** |

169.   The following Table II compiles information contained in the Proxy about the collective consolidated financial statements of three Property Managers from 2004 through 2006:

**TABLE II**

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenues |  |  |  |
| Management Fees | $ 30,046,069 | $ 20,741,549 | $ 5,370,242 |
| Reimbursement of Salary and Benefits | 5,312,801 | 2,267,891 |  |
| Interest and Other Income | 118,510 | 37,236 | 14,500 |
| Total Revenues | 35,477,380 | 23,046,676 | 5,384,742 |
| Expenses |  |  |  |
| Salary and Benefits | 10,828,297 | 6,271,855 | 1,114,320 |
| Sub-management Fee | 443,367 | 858,438 | 624,776 |
| G& A, Rent , Computer Chgs. | 2,610,917 | 1,989,165 | 966,883 |
| Depreciation Expenses | 135,813 | 77,399 | 24,358 |
| Franchise Tax Expense | 590,228 | 374,341 | 65,993 |
| Interest | 547 |  |  |
| Total Expenses | 14,609,169 | 9,571,198 | 2,796,330 |
| **Net Income** | **$ 20,868,211** | **$ 13,475,478** | **$ 2,588,412** |
| **EBITDA** | **$ 21,594,799** | **$ 13,927,218** | **$ 2,678,763** |

      **a.**    **The Advisor Historically Understated and Failed to Report Expenses.**

170.   The Advisor's financial statements contained in the Proxy (*see* ¶ 168) reflect essentially no expenses, including a relatively inconsequential amount for "salary and benefits." As a result, the Advisor's financial statements reflect an EBITDA of nearly 100% of Total Revenues.

171.   The Advisor was contractually obligated to provide numerous services to Inland REIT which presumably were to be performed by the Advisor's employees (*see* ¶¶ 114-118). And, in fact, the Advisor was paid Advisory Fees by the REIT of approximately $39.5 million and $20.9 million in 2006 and 2005, respectively, to perform such services. However, the financial statements of the Advisor do not reflect the Advisor having incurred any amount of expenses that would be required or necessary in order to perform and carry out such numerous

services and duties, including the amount of expenses sufficient to cover necessary salaries and benefits. A business operating with EBITDA of nearly 100% of Total Revenues is impossible.

172. The Individual Defendants, the Sponsor, The Inland Group and the Advisor, by virtue of their roles, their ownership and/or involvement in the Advisor and the REIT understood and knew the Advisor's business structure and model, including that the Advisor failed to account for or record necessary expenses. In addition, the Individual Defendants, the Sponsor, The Inland Group and the Advisor knew that the Advisor's entire financial existence was dependent on and derived from Inland REIT and that the Advisor had required virtually no investment on the part of its shareholders, but it prospered immediately due to the significant fees it received from Inland REIT, while it failed to account for any necessary expenses of conducting its business and performing those services for the REIT. And, Defendants operated the Advisor knowing that the "end-game" and profitable exit-strategy for themselves was to effectuate a merger of the Advisor with the REIT, which would give them REIT stock valued in the hundreds of millions of dollars, depending on the Advisor's revenues, income and profitability. The effect of this business model was that the Advisor reported an incredible overall financial performance, and in particular, an extraordinarily high EBITDA. And, as a result of artificially inflating the Advisor's profitability and EBITDA, the Advisor was, in turn, afforded an unjustified and unsupportable valuation in connection with the Internalization.

173. Until the dissemination of the Proxy, the Advisor's financial statements and financial condition were not disclosed to the Shareholders. The Proxy was materially false and misleading in that it: included and utilized financial statements of the Advisor that underreported expenses; and failed to state that the Advisor's failing to report, or underreporting of, its expenses, would inflate the Advisor's valuation in the Internalization.

174.     The Advisor's financial statements for 2005 and 2006, that were attached to and disclosed to Inland REIT's Shareholders for the first time in the Proxy, were materially false and misleading by:

     a.    Reflecting an EBITDA for the Advisor that was nearly 100% of Total Revenues

     b.    Failing to report expenses, rendering the Advisor's financial statements patently inflated, unrealistic and not reflective of the true operating and financial performance of the Advisor.

     c.    In an effort to overstate the financial performance of the Advisor, redirecting the Advisor's expenses to affiliates of the Advisor by allocating minimal operating expenses to the Advisor.

     d.    Failing to report, for the years ended December 31, 2006, 2005 and 2004, reimbursements from Inland REIT for $3.4 million, $4.5 million and $1.5 million of general and administrative costs, respectively.

     e.    Misleadingly stating in the Notes to the Advisor's financial statements, at page F-17 of the Proxy, that, with respect to certain operating expense allocations, that the amounts of such allocations were "not necessarily indicative of the expense the [Advisor] may have incurred on its own account." Such a disclosure does not satisfy GAAP and GAAS requirements particularly where the Advisor's financial results are principal factors considered by the Shareholders and Defendants in assessing the fairness of the Internalization and Internalization Consideration.

b.    **The Property Managers' Financial Statements Understated Actual Operating Expenses**

175.    The Property Managers' financial statements contained in the Proxy (*see* ¶ 169) reflect minimal expenses, including less than $11 million in 2006 and approximately $6.3 million in 2005 for "salary and benefits."  Due to this relatively minimal amount of expenses reported, the Property Managers' financial statements reflect an EBITDA that was nearly 60% of Total Revenues.

176.    The duties of the Property Managers that were presumably to be performed by the Advisor's employees are numerous (*see* ¶¶ 124-125).  And, in fact, the Property Managers were paid approximately $30 million and $20.7 million in Property Management Fees by the REIT in 2006 and 2005, respectively, to perform such duties. Only a fraction of the duties and responsibilities of the Property Managers are subcontracted out to third parties.  In 2005 and 2006, the Property Managers only paid $858,438 and $443,367, respectively, in sub-management fees. (Proxy at F-25). The Property Managers themselves, therefore, retained primary responsibility to handle the property management duties and responsibilities for the bulk of Inland Western's Properties.

177.    The levels of expenses and reimbursements reflected on the Property Managers' financial statements are materially less than the magnitude of expenses and reimbursements required to provide adequate property management services for the Properties.  Such property management services were therefore either provided by Inland-affiliated entities or the Property Managers, but those services and expenses were not accurately, or never, reflected on the Property Managers' financial statements.  This resulted in the Property Managers' profitability to be artificially and falsely inflated.

178.    The Individual Defendants, the Sponsor, The Inland Group and the Property Managers, by virtue of their roles, their ownership and/or involvement in the Property Managers and the REIT understood and knew the Property Managers' business structure and model, including that the Property Managers failed to account for or record necessary expenses, and charged fees in excess of those permitted under governing Company documents.  In addition, the Individual Defendants, the Sponsor, The Inland Group and the Property Managers knew that the Property Managers' entire financial existence was dependent on and derived from Inland REIT, while it failed to account for any necessary expenses of conducting its business and performing services for the REIT.  And, Defendants operated the Property Managers knowing that the "end-game" and profitable exit-strategy for themselves was to effectuate a merger of the Property Managers with the REIT, which would give them REIT stock valued in the hundreds of millions of dollars, depending on the Property Managers' revenues, income and profitability. The effect of this business model was that the Property Managers reported an incredible overall financial performance, and in particular, an extraordinarily high EBITDA.  And, as a result of artificially inflating the Property Managers' profitability and EBITDA, the Property Managers was, in turn, afforded an unjustified and unsupportable valuation in connection with the Internalization.

179.    Until the dissemination of the Proxy, the Property Managers' financial statements and financial condition was not disclosed to the Shareholders. The Proxy was materially false and misleading in that it: included and utilized financial statements of the Property Managers that underreported expenses; and failed to state that the Property Managers' failing to report, or underreporting of, its expenses, would inflate the Property Managers' valuation in the Internalization.

180.    The Property Managers' financial statements included in the Proxy are false and misleading by their material understatement of the Property Managers' operating expenses.  In addition, as a result of reporting unsupportable excessive profitability in their financial statements, Defendants were able to materially and falsely inflate the Property Managers' purported value in the Internalization and increase the amount of Internalization Consideration Defendants received in the Internalization.

c.        **The Property Managers' Fees Exceeded Market Rates.**

181.    As set forth in the Property Management Agreements, the Property Managers are entitled to fees of *up to* 4.5% of the gross monthly income of the property.  As discussed above in ¶¶ 130-140, there was language in the Offering Documents, Advisory Agreement and Articles of Incorporation which clearly stated and dictated that under these Agreements, the Property Managers' fees could not exceed 90% of that which would be paid to unrelated parties providing such services or "90% of the Market Rate."

182.    The Property Managers' compensation was never capped at 90% of the Market Rate, and instead, historically, the Property Managers have been compensated at, at least, a 4.5% rate, which is <u>above</u> a Market Rate and certainly not 90% of the Market Rate. *See* ¶¶ 138-140.

183.    The Proxy (*see* ¶ 169, Table II) indicates that the Property Managers were paid over $20 million and $30 million in fees in 2006 and 2005. Therefore, in addition to the artificial inflation of EBITDA through the Property Managers' underreporting of expenses (¶¶ 175-180), the Property Managers' profitability and EBITDA were also improperly and misleadingly inflated through the taking and reporting of tens of millions in excessive Property Management Fees, which facts were concealed from the Shareholders in the Proxy.  This inflated profitability and EBITDA in turn resulted in the Property Managers being overvalued in the Internalization

62

184.    The Proxy was materially false and misleading in that it: included and utilized financial statements of the Property Managers that reported inflated and excessive expenses; and failed to state that the Property Managers' being paid expenses inconsistent with the terms of the Offering Documents, Property Management Agreement, Articles of Incorporation and the Advisory Agreement, would inflate the Property Managers' valuation in the Internalization. If the Property Management Fees were calculated at 90% of Market Rate, the Property Managers would have had materially less income and reduced EBITDA in 2005 and 2006, which would have materially reduced the Property Managers' valuation in connection with the Internalization and the amount of the Internalization Consideration.

### 2.    The Proxy Contains False and Misleading "Independent Auditors' Reports."

185.    KPMG has served as Inland REIT's independent auditor since its formation in 2003.  Each year thereafter, the Board of Directors, upon the recommendation of its Audit Committee, appointed KPMG to act as Inland REIT's independent auditors to examine the Company's consolidated financial statements for the fiscal year and sought shareholder approval of the selection of KPMG as the Company's independent auditor, via proxy statement.

186.    In formulating, negotiating and recommending the Internalization to Inland REIT's Shareholders, Inland REIT and its affiliates requested KPMG to provide an independent auditor opinion with respect to the financial statements of the Advisor and the Property Managers.

187.    KPMG opined, in two separate independent auditors' reports, that the financial statements of the Advisor and the Property Managers "presented fairly, in all material respects, the financial position of the Advisor [and the Property Managers] as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the years in the three-year

period ended December 31, 2006 in conformity with U.S. generally accepted accounting principles." KPMG further certified that:

> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. <u>An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.</u> We believe that our audits provide a reasonable basis for our opinion.

188.    KPMG's independent auditors' reports with respect to the financial statements of the Advisor and the Property Managers were included in, and part of, the Proxy disseminated to the Inland REIT Shareholders.

189.    The inclusion of KPMG's so-called "independent auditors' reports" in the Proxy misled Inland REIT's Shareholders to believe that the financial statements of the Advisor and the Property Managers fairly presented their financial performance and objectives in accordance with GAAP.

190.    KPMG expected and intended that those independent auditor reports would legitimize the accompanying financial statements of the Advisor and Property Managers and would be relied on by the members of the Class in determining how to vote on the proposed Internalization.

191.    KPMG had a responsibility to discharge its professional responsibilities in compliance with GAAS.  In fact, as alleged herein, the financial statements of the Advisor violated many important aspects of GAAP, including specific guidelines concerning disclosure

of related party transactions.  KPMG falsely represented that the financial statements presented fairly, in all material respects, the financial positions of the Advisor and the Property Managers when, in fact, they materially overstated Net Income and EBITDA by understating operating expenses.  KPMG, in violation of GAAS, failed to conduct a reasonable investigation of the financial statements of the Advisor and the Property Managers and to detect material misstatements that violated GAAP, and thus, did not possess reasonable grounds for expressing its opinions that the financial statements were presented and prepared in accordance with GAAP.

192.    KPMG's audit of the financial statements of the Advisor and the Property Managers was conducted in the context of related party transactions, which translated into increased "audit risk" and increased "fraud risk."  KPMG's audits of the financial statements of the Advisor and the Property Managers, patently failed to plan adequately for or take account of these risks in conducting its audits.  These audit risks were particularly pronounced given the fact that the related party transactions of the Advisor and the Property Managers were with entities, namely The Inland Group, the Sponsor and their affiliates, that did not have public stockholders and did not disseminate their financial statements to the SEC or the investing public.  In sum, The Inland Group, the Sponsor and their affiliates were motivated to manipulate expense allocations for the Advisor and the Property Managers in a manner that would have the desired effect of inflating the EBITDAs and reducing the operating expenses of the Advisor and the Property Managers without risking any adverse impact on public or investor perception (since none existed) of the financial performance of The Inland Group, the Sponsor or their affiliates.

193.    KPMG's independent auditors' reports were intended to give comfort to the Class that the financial statements of the Advisor and the Property Managers were supported by independent assessments of their compliance with GAAP.    In the context of pervasive and

significant self-dealing transactions, securing such an independent, meaningful assessment is critical.

194.    Instead, KPMG's opinions misleadingly conveyed to the Class and Shareholders the impression that some independent entity had conducted a meaningful assessment of the financial statements of the Advisor and the Property Managers and "obtain[ed] reasonable assurance about whether the financial statements are free of material misstatement."

> c.    **The Financial Statements of the Advisor and Property Managers Violated Generally Accepted Accounting Practices ("GAAP")**

195.    GAAP comprises the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest authority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Statements ("SFAS").

196.    FASB's Statement of Financial Accounting Standards No. 57 ("SFAS 57") establishes requirements for related party disclosure.  Financial statements must disclose material transactions between related parties, defined as:

> (a)  a parent company and its subsidiaries;
>
> (b)  subsidiaries of a common parent;
>
> (c)  an enterprise and trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of the enterprise's management;
>
> (d)  an enterprise and its principal owners, management, or members of their immediate families; and
>
> (e)  affiliates.

197.    The Advisor and Property Managers were wholly owned subsidiaries of common owners—Individual Defendants Goodwin, Parks, Baum and Cosenza.  In addition, they were affiliates of Inland REIT, The Inland Group and the Sponsor.  As related parties, the financial statements of Inland REIT, the Advisor and the Property Managers, were required, in accordance with SFAS 57, to disclose all material transactions between or among affiliates including:

198.    The nature of the relationship(s) involved

(a) A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions of the financial statements

(b) The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

(c) Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

199.    Even in the absence of a material transaction, disclosure is required where one entity controls or can significantly influence the management or operating policies of another to an extent that one entity might be prevented from fully pursuing its own separate interests. FAS 57 states:

If the reporting enterprise and one or more other enterprises are under common ownership or management control and the existence of that control could result in operating results or financial position of the reporting enterprise significantly different from those that would have been obtained if the enterprises were autonomous, the nature of the control relationship shall be disclosed even though there are no transactions between the enterprises.

Because Inland REIT and the Advisor and the Property Managers were under common ownership and/or management control, the financial statements of Inland REIT, the Advisor and the Property Managers were required to disclose the details of any related party transactions,

including disclosure of expense allocations and payments of salaries. The financial statements reviewed by KPMG failed to provide such disclosures, in violation of GAAP standards.

200.    The Advisor and the Property Managers were the beneficiaries of officer and employee salaries, rent, advertising, accounting and legal, other administrative expenses which were paid by affiliates The Inland Group, the Sponsor, and their affiliates. These related party transactions were not adequately or properly disclosed or accounted for in the KPMG audited financial statements..

201.    SFAS 57 also states that "an enterprise's financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable. Completeness implies that nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions." (SFAS 57, ¶ 16 (internal citation omitted)). Further, omissions of relevant related party transactions are violations of GAAP because the "completeness of information affects its relevance. Relevance of information is adversely affected if a relevant piece of information is omitted, even if the omission does not falsify what is shown." (SFAS 57, ¶ 17). The financial statements of the Advisor and Property Managers failed to present "complete" information by failing to disclose fully the value of services provided by The Inland Group, the Sponsor and/or their affiliates.

202.    The financial statements of the Advisor and the Property Managers failed to present complete information concerning the related party transactions between and among the Advisor, the Property Managers, Inland REIT and their affiliates in violation of SFAS 57. Therefore, KPMG's statements that the financial statements of the Advisor and the Property Managers were in conformity with GAAP were materially false and misleading.

> **d.  The Independent Auditors' Reports Were Conducted in Violation of Generally Accepted Auditing Standards ("GAAS")**

203.    GAAS are the standards prescribed by the American Institute of Certified Public Accountants ("AICPA") for the conduct of auditors in the performance of an examination. The AICPA's Auditing Standards are the authoritative literature setting forth GAAS standards.

204.    AICPA's Auditing Standards, SAS 1, AU Section 240 ("AU 230") states:  An independent auditor is required to plan and perform his or her work with due professional care. Due professional care imposes a responsibility upon each professional within an independent auditor's organization to observe the standards of field work and reporting and to possess "the degree of skill commonly possessed by other auditors" and should exercise it with "reasonable care and diligence"  AU 230.02, 230.03.

205.    AICPA's Auditing Standards, SAS 45, AU Section 334 ("AU 334") establishes requirements for related party disclosure.  During the course of an audit, the auditor should be aware of the possible existence of material related party transactions that could affect the financial statements and of common ownership or management control relationships for which FASB Statement No. 57 (*see* ¶ 196, *supra*) requires disclosure even though there are no transactions.   In determining the scope of work to be performed with respect to possible transactions with related parties, the auditor should:

> (a)  obtain an understanding of management responsibilities and the relationship of each component to the total entity;
>
> (b)  consider controls over management activities;
>
> (c)  consider the business purpose served by the various components of the entity, including the abilities of management, tax and legal considerations, product diversification, and geographical location.  (AU 334.05)

      (d) AU 334.05 specifically warns auditors that "Experience has shown, however, that business structure and operating style are occasionally deliberately designed to obscure related party transactions."

206.    Further, the auditor should be aware of the possibility that transactions with related parties may have been motivated solely, or in large measure, by conditions similar to the following:

      (a) Lack of sufficient working capital or credit to continue the business

      (b) An urgent desire for a continued favorable earnings record in the hope of supporting the price of the company's stock

      (c) An overly optimistic earnings forecast

      (d) Dependence on a single or relatively few products, customers, or transactions for the continuing success of the venture

      (e) A declining industry characterized by a large number of business failures

      (f) Excess capacity

      (g) Significant litigation, especially litigation between stockholders and management

      (h) Significant obsolescence dangers because the company is in a high technology industry. (AU 334.06)

207.    Therefore, an auditor should be aware of the possibility that transactions with related parties may have been motivated solely, or in large measure, by "[a]n urgent desire for a continued favorable earnings record in the hope of supporting the Company's stock. AU 334.06. It is evident that KPMG failed to conduct a sufficient review to attempt to discover the existence of related party transactions.

208.    An auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity. Certain relationships, such as parent-subsidiary or investor-investee, may be clearly evident. For each material related party transaction or common ownership or management control relationship for which FAS 57 requires disclosure, "the auditor should consider whether he has obtained sufficient appropriate audit evidence to

understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. An auditor should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements." AU 334.11

209.    KPMG failed to comply with the GAAS standards set forth in AU 334.  The related nature of the relationships between and among Inland REIT, the Sponsor, the Advisor, the Property Managers and other Inland affiliates, should have set off red flags to the auditor of the possible existence of either material related party transactions that could affect the financial statements and of common ownership or management control relationships for which disclosure was required.

210.    In identifying transactions with related parties, AU 334.08 provides guidance for identifying material transactions with parties known to be related and for identifying material transactions that may be indicative of the existence of previously undetermined relationships, including consideration of "whether transactions are occurring, but are not being given accounting recognition, such as receiving or providing accounting, management or other services at no charge or a major stockholder absorbing corporate expenses" AU 334.08. By failing to identify and challenge the financial statements of the Advisor that showed $7.7 billion of real estate was purchased and managed without the Advisor incurring essentially any reported expenses, KMPG clearly violated this auditing standard.

211.    Auditors are warned that "business structure and operating style are occasionally deliberately designed to obscure related party transactions."   AU 334.05.   KPMG was specifically retained for the purpose of auditing the financial statements of the Advisor and the

71

Property Managers in the context of a related party transaction. KPMG could not overlook the fact that those entities were under common control and management with Inland REIT and the resultant audit risk. KPMG's independent audits were not conducted in compliance with AU 334.

212. An auditor has a responsibility to plan and perform an audit in such a manner as to determine whether the financial statements are free from material misstatement, whether caused by error or fraud. AU 316. AU 316 provides specific standards and guidelines auditors must follow in order to fulfill their responsibility as it relates to fraud in accordance with GAAS. An audit of financial statements in accordance with GAAS should be planned and performed with an attitude of professional skepticism. AU 316.16. An auditor must neither assume that management is dishonest nor assume unquestioned honesty. Rather, an auditor must recognize that conditions observed and evidential matter obtained, including information from prior audits, must be objectively evaluated to determine whether the financial statements are free of material misstatement. If an auditor remains in substantial doubt about any assertion of material significance, he must refrain from forming an opinion until he has obtained sufficient competent evidential matter to remove such substantial doubt, or he must qualify or disclaim his opinion. AU 326.23.

213. An auditor is charged with assessing fraud risk factors, including whether the nature of the entity's operations provides opportunities to engage in fraudulent financial reporting resulting from "Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm." Appendix to AU 316, Examples of Fraud Risk Factors. Therefore, because the Advisor and the Property Managers engaged in related-party transactions with the Sponsor, which is a related entity that is not

audited, KPMG failed to properly assess the fraud risk factors, in violation of GAAS.

214.    When there are significant transactions between related parties and the scope of the audit does not cover the records of other significant parties to the transactions (for example, an entity owned by the president of the company that provides management services to the company, but is not subject to audit), there is increased audit and fraud risk. The Proxy's presentation of the financial statements of the Advisor and the Property Managers reflecting inflated management fees and materially understated operating expenses, demonstrates that KPMG did not adequately consider this obvious increased risk, especially in the absence of any indication that KPMG audited the affiliates of the Sponsor that provided myriad services to the Advisor and Property Managers.

215.    KPMG's independent auditors' reports of the Advisor and the Property Managers were not conducted in compliance with AU 334 and 316.  Related party transactions permeated the relationships between and among the Advisor, the Property Managers and Inland REIT and other Inland affiliates.  KPMG failed to conduct its audit in a manner such that a reasonable auditor would have discovered the existence of material misstatements in the financial statements of the Advisor and the Property Managers with respect to its related party transactions. Therefore, KPMG's statements that its independent auditors' reports were conducted in compliance with GAAS were materially false and misleading.

216.    According to KPMG, their audit included "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion."  KPMG failed to properly assess the accounting principles used by the Advisor and the

Property Managers because a reasonable auditor would have discovered that the financial statements failed to comply with GAAP. For this reason, KPMG's statements that its audit was conducted in accordance with GAAS are materially false and misleading.

### 3. The Proxy Contained Materially False and Misleading Statements about the Value of the Advisor and the Property Managers and the Fairness of the Internalization Consideration.

217. The Proxy contained at least the following affirmative statements concerning the value of the Advisor and Property Managers and the corresponding fairness of the Merger and the Internalization Consideration:

(a)    "Because of the related-party nature of the proposed Merger, our Board formed a Special Committee comprised only of independent directors to consider the Merger and alternatives to such a transaction. The Special Committee retained independent legal and financial advisors to assist in the evaluation and negotiation of the Merger. The Special Committee also obtained a fairness opinion from its independent financial advisor, William Blair & Company, LLC, which we refer to as William Blair, which concluded that, subject to certain assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid by us pursuant to the Merger Agreement to acquire our Business Manager/Advisor and Property Managers was fair, from a financial point of view, to us and our stockholders."

(b)    "Q:    How was the Merger process conducted and what was the process to determine the Merger consideration?

A:    Our Board established a Special Committee, comprised of four independent, non-affiliated directors, to evaluate alternatives and make recommendations with respect to the Merger. The Special Committee retained. . . its own independent financial advisor, William Blair, who provided the Special Committee and our Board with a fairness opinion, the full text of which is attached in Appendix B. After a more than 14 month due diligence and negotiation process, the Special Committee recommended entry into the Merger Agreement and approval of the Merger."

(c)    "*Opinion of Financial Advisor*. William Blair provided its opinion to the Special Committee and our Board that, as of the date of the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to the stockholders of our Property Managers and our Business Manager/Advisor is fair, from a financial point of view, to us and our stockholders."

(d)   ***"Summary of the Aggregate Valuation for our Business Manager/Advisor and Property Managers.*** William Blair performed a selected public company analysis, selected M&A transaction analysis of comparable transactions and REIT internalization transactions and a discounted cash flow analysis to determine aggregate valuation ranges for our Business Manager/Advisor and Property Managers. Based on its analysis and results as presented above, William Blair determined that a range of aggregate enterprise values for our Business Manager/Advisor and Property Managers ranged from $399 million to $990 million with a mean and median value of $609 million and $566 million, respectively."

(e)   "THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE FOR THE RATIFICATION OF OUR ENTRY INTO THE MERGER AGREEMENT AND APPROVAL OF THE CONTEMPLATED MERGER."

218.   As alleged in the preceding paragraphs ¶¶ 138-140; 175-180; 181-184, the Property Managers were paid excessive fees and the Advisor and Property Managers underreported, or failed to report, operating expenses, which resulted in the Advisor and Property Managers' historical financial statements and operating results being artificially inflated. In deriving its opinion and range of purported valuation for the Advisor and Property Managers, William Blair utilized the "audited historical financial statements and those of [ ] Advisor and Property Managers for the two fiscal years ended December 31, 2005 and 2006" and focused almost entirely on the EBITDA of both the Advisor and the Property Managers (*see* ¶¶ 243-247, below).

219.   As a result of the false and misleading financial statements, the Internalization Consideration to be paid for the Advisor and Property Managers materially exceeded the actual and fair value of those entities. Accordingly, the statements in the Proxy concerning the range of value for the Advisor and the Property Managers, the fairness of the Internalization Consideration, and the fairness of the Internalization are rendered materially false and misleading because they are based on the inflated EBITDA calculated from the historical financial statements of the Advisor and Property Managers.

220.    The Proxy failed to provide any meaningful information, evaluation or comparison concerning the valuation of the Advisor and Property Managers which was material to a member of the Class in determining how to evaluate the self-dealing Internalization, the Internalization Consideration and in casting their vote on the Proxy.

**4.    *The Proxy Contained False and Misleading Statements About the Purchase Options.***

221.    The Advisory Agreement and Property Management Agreements each include a provision, referred to as the "Purchase Option," *see* ¶¶ 122-123-128-129, *supra*, permitting Inland REIT to acquire, at its option, the business conducted by and assets of the Advisor and each Property Manager in exchange for a number of shares of Inland REIT common stock determined in accordance with a formula established in those Agreements. Inland REIT would have been permitted to exercise the purchase options beginning in May 2008 for the Property Managers and in September 2008 for the Advisor.

222.    The Proxy states that "Our Board elected not to wait and pursue the options outlined in this proxy statement whereby we could acquire our Business Manager/Advisor and Property Managers under the terms of the existing advisory agreement and property management agreement, beginning in September and May 2008, respectively, which could have resulted in approximately 54.1 million shares issued in connection with such acquisition."

223.    Defendants improperly calculated the amount that would have been paid under the Purchase Options because they utilized the false and misleading financial and operating results for the Advisor and Property Managers as set out in ¶¶ 168-220, *supra,* to derive a purchase price of over $541 million in the aggregate for the Advisor and Property Managers.

224.    In addition, the Purchase Option Formula required use of the "annualized audited Net Income" of the Advisor and Property Managers, "for the calendar month immediately

preceding the month in which the Merger Agreement is executed." The Merger Agreement was executed on August 17, 2007. In deriving the purported "$541 million" "purchase price" under the Purchase Option Formulas, in order to "assure" the Shareholders of the reasonableness of the Internalization Consideration, Defendants did not use annualized audited Net Income for July 2007, but instead used the Advisor and Property Managers' 2006 financial statements. In fact, the Advisor's revenues had substantially decreased in 2007 from 2006.

225.    If the cost to acquire the Property Managers and Advisor in accordance with the Purchase Options had been properly calculated, using un-inflated revenue and income amounts for the Advisory and Property Managers, and using annualized audited, financial statements for July 2007, the Purchase Options would have yielded amounts that were materially less than both the $541 million and the $375 million Internalization Consideration.

226.    Defendants' dispensing with the Purchase Options, contrary to its misleading presentation in the Proxy, was in no way a "favor" to the Shareholders and was, in fact, a way to (i) circumvent the protections afforded to Shareholders under which Defendants would garner a fraction of the proposed consideration for this self-dealing transaction; and (ii) to mislead the Shareholders into voting for a transaction that was not a "better deal," but rather a scheme to transfer a significant equity interest in Inland REIT from the Shareholders to their perfidious fiduciaries.

> ### 5.    *The Proxy Failed to Disclose Material Facts About Strategic Alternatives and Shareholders' Liquidity Events.*

227.    Defendants stated that the Internalization was "the most significant step[] toward achieving our goal of an effective liquidity event" for Shareholders. *See* ¶ 153, *supra* (". . .our business plan incorporates both a process for self-administration and, at a future point in time, **the exploration of a liquidity event** . . . A liquidity event could take the form of listing our

shares on a stock exchange, merging our REIT with a publicly traded REIT, **or** selling our real estate assets, any one of which would **provide our stockholders with an exit strategy from their investment. We believe that acquiring our Property Managers and our Business Manager/Advisor is one of the most significant steps toward achieving our goal of an effective liquidity event for our stockholders**" (Emphasis added))

228.   These statements are false and misleading because they do not state whether or not Defendants explored any alternative to the costly Internalization that would have provided an effective, alternative liquidity event for the REIT's Shareholders that was in their best interests.

229.   These statements are also false and misleading because they do not disclose the negative impact that the Internalization would have on the Shareholders if the various liquidity events stated occur or do not occur. Inland REIT Shareholders were not informed in the Proxy that subsequent to other internalization transactions, by which other non-listed REITs have internalized their affiliated-advisors, those REITs have **not** gone forward with a listing of their shares, but instead have indefinitely postponed liquidity events or, alternatively, have been the subject of business combinations which have garnered investors virtually no value for the millions just paid for an internalized advisor. Similarly, the Proxy did not disclose whether or not the dilutive effect of the Internalization on the REIT's Shareholders would be accounted-for in the event a liquidation of assets or some other business combination occurred.

230.   The Proxy also stated that an alternative to the Internalization, the sale of the REIT to a third party, "was rejected," but the Proxy failed to disclose whether or not the Director Defendants actually affirmatively sought out any third party offers to buy the REIT's stock or its assets, or if Defendants received and rejected any such third-party offers.

231.    In sum, the Proxy did not provide any meaningful information, evaluation or discussion concerning the liquidity events and strategic alternatives considered by the Director Defendants when evaluating, proposing, approving and recommending the Internalization. These facts are material to a shareholder voting to approve the costly Internalization.

### 6.    *The Proxy Contained Materially False And Misleading Statements Concerning The Advisor and Property Managers' Performance and Fees*

232.    The Proxy omitted material facts about the Advisor's and Property Managers' performance in advising and managing Inland REIT.

233.    The REIT's Articles of Incorporation include specific criteria that the Director Defendants were to use in connection with a determination as to whether to renew the Advisory Agreement.  Such criteria include:

> (a)    the success of the Advisor and Property Managers in generating opportunities that meet the investment objectives of the Company;
>
> (b)    the quality and extent of service and advice furnished by the Advisor and Property Managers;
>
> (c)    the performance of the investment portfolio of the REIT, including income, conservation or appreciation of capital, and number and frequency of problem investments; and
>
> (d)    the quality of the Property portfolio of the REIT in relationship to the investments generated by the Advisor for its own account.

234.    Without disclosures about items (a) – (d) in ¶ 233, which constitute an objective evaluation of the Advisor's and Property Managers' value and worth, the Shareholders were left with an incomplete basis on which to vote in favor of the Internalization. These facts would have been material to a member of the Class in determining how to evaluate, and whether to approve, the self-dealing Internalization and Internalization Consideration.

*7.    The Proxy Contains a False and Misleading "Fairness Opinion."*

235.    The Special Committee retained William Blair to issue a fairness opinion to the Special Committee and Inland REIT's Board in connection with the Internalization. On August 14, 2007, William Blair delivered to the Special Committee its oral opinion that "the consideration of approximately 37,500,000 shares of our common stock to be paid by us for the acquisition of our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders." Later that same day, William Blair delivered its written opinion to the same effect (collectively, the "Fairness Opinion").

236.    The Proxy also included:

> (a)    "a summary of the material financial analyses performed and material factors considered by William Blair to arrive at its opinion. William Blair performed certain procedures, including each of the financial analyses described below, and reviewed with the Special Committee and the Board the assumptions upon which such analyses were based, as well as other factors. Although the summary does not purport to describe all of the analyses performed or factors considered by William Blair in this regard, it does set forth those considered by William Blair to be material in arriving at its opinion."

> (b)    And the statement that, "William Blair performed certain financial procedures, including each of the financial analyses described below in order to evaluate the fairness of the Merger consideration, from a financial point of view to us and our stockholders (other than our Business Manager/Advisor, Property Managers and their equityholders). As contemplated by the Merger Agreement, we will issue approximately 37.5 million shares in the Merger. William Blair evaluated each of the following analyses independently and on an aggregate basis in its assessment of the fairness of the proposed transaction."

237.    The Fairness Opinion and financial analyses performed by William Blair should have given, and were intended to give, comfort to the Class that the price being paid for the Advisor and Property Managers was supported by an independent assessment of the value of the Advisor and Property Managers and the fairness of the Internalization Consideration. In the context of a self-dealing transaction, securing such an independent, meaningful assessment is critical.  (*See* ¶ 217 (a), *quoting* Proxy, "***Because of the related-party nature of the proposed***

80

*Merger*, our Board formed a Special Committee [which]. . . retained independent legal and financial advisors to assist in the evaluation and negotiation of the Merger [and] . . . obtained a fairness opinion from its independent financial advisor, William Blair & Company, LLC."). (Emphasis added).

238.    Instead, based on the following allegations, the Proxy's dissemination of the fundamentally flawed and deficient Fairness Opinion and the recitation of the inadequate and wanting financial analyses performed by William Blair were materially false and misleading.  It served only to misleadingly convey to the Class and Shareholders the impression that some independent entity had conducted a meaningful assessment of the value of the Advisor and the Property Managers and the fairness of the Internalization Consideration. The Individual Defendants intended by such disclosures to wrongfully cause the Class to rely on the Fairness Opinion and to cause Class members to vote in favor of the Proxy's proposals.

> a.    **The Fairness Opinion Relied Entirely on Faulty Information From Defendants without Any Independent Verification.**

239.    The Proxy stated that in "rendering its fairness opinion, William Blair assumed and relied, without independent verification, upon the accuracy and completeness of all the information examined by or otherwise reviewed or discussed with William Blair for purposes of its opinion, including the Forecasts provided by Inland REIT's senior management and the senior management of the Advisor and Property Managers." Therefore, William Blair prepared its opinion based entirely on Defendants' projections (*i.e.,* those prepared by persons and entities personally and financially interested in the Internalization and held interests adverse those William Blair's Fairness Opinion was intended to benefit, the Shareholders).

240.    In deriving its opinion and range of purported valuation for the Advisor and Property Managers, William Blair utilized the "audited historical financial statements and those

81

of [ ] Advisor and Property Managers for the two fiscal years ended December 31, 2005 and 2006," without any assessment as to whether or not the REIT and Advisor and the Property Managers complied with the terms of the Advisory and Property Management Agreements or the REIT's Articles of Incorporation, in deriving the fees paid to the Advisor and the Property Managers under those Agreements. Notwithstanding the use of audited financial statements, William Blair ignored the terms of the Advisory and Property Management Agreements and that the Internalization constituted a purchase of an income stream calculated based on the terms of those Agreements. William Blair failed in connection with rendering the Fairness Opinion to review the Advisory and Property Management Agreements, or ignored the terms of such Agreements, which would have revealed to William Blair the distorted and inflated historical income stream, resulting from the inflated amounts that Inland REIT paid to the Property Managers and the failure of the Advisor and Property Managers to report expenses.

241. Despite the statement in the Notes to the financial statements of both the Advisor and the Property Managers that operating expenses allocated to those entities by their affiliates were "not necessarily indicative of the expense [the Advisor and Property Managers] may have incurred if [they] received such services from providers not affiliated" with Inland REIT, William Blair:

> (a) failed to adequately investigate and determine the amount of operating expenses that the Advisor and Property Managers would have incurred if they were stand-alone companies and not subsidized by their affiliates;

> (b) failed to take into consideration in preparing its fairness opinion that the affiliates that subsidized, and thereby inflated the earnings of the Advisor and Property Managers, were owned and managed by the persons who would benefit from the

Internalization at inflated values; and

    (c) failed to adjust the values it placed on the Advisor and Property Managers by virtue of the material understatement of operating expenses of the Advisor and Property Managers.

242.    Accordingly, as alleged above in ¶¶ 168-216, the financial statements of the Advisor and Property Managers were materially false and misleading, inflated the Advisor and Property Managers' profitability, revenue and income, and violated GAAP, which resulted in a material impact, to the detriment of Inland REIT's Shareholders, to the calculation of the Advisor and Property Managers' value and rendered the Fairness Opinion and statement of William Blair's financial analyses false and misleading.

        **b.**    **The Fairness Opinion Was False and Misleading in its Use of Non-Comparable Companies and Transactions**

243.    Using a selected public company analysis, William Blair calculated the enterprise value of the Advisor and Property Managers as a multiple of estimated EBITDA (earnings before interest, taxes, depreciation and amortization) for three selected real publicly traded companies with operations in the real estate industry, CB Richard Ellis Group, Inc.; Jones Lang LaSalle, Inc.; and Grubb & Ellis Company.

244.    The Proxy stated that William Blair considered these comparable companies' EBITDAs to be the primary measure of their profitability and ultimately used that data to derive the multiples that were applied to the Advisor and Property Managers' EBITDAs. The following Table III compares the operations of these so-called comparable companies to those of the Advisor and Property Managers. The information contained in Table III was not disclosed in the Proxy.

83

**TABLE III**

**(Dollar amounts in Millions)**

| Y/E | 2006 Advisor | | 2006 Manager | | June-07 Grubb & Ellis | | 2006 CB Richard Ellis | | 2006 Jones Lang LaSalle | |
|---|---|---|---|---|---|---|---|---|---|---|
| Gross Revenues (Million) | $ | 41 | $ | 35 | $ | 513 | $ | 4,084 | $ | 2,014 |
| Assets | $ | 9 | $ | 3 | $ | 258 | $ | 5,487 | $ | 1,050 |
| Stockholders' Equity | $ | - | $ | 2 | $ | 48 | $ | 1,181 | $ | 731 |
| EBITDA | | 39 | | 22 | | 16 | | 629 | | 303 |
| EBIDTA as % of Gross Revenues | | 97% | | 61% | | 3% | | 15% | | 15% |
| EBIDTA as % of Assets | | 437% | | 720% | | 6% | | 11% | | 29% |
| EBIDTA as % of Equity | | Incalculable | | 1080% | | 33% | | 53% | | 41% |

245.    Table III, which compares the EBITDAs of the so-called comparable companies' and the Advisor and Property Managers, demonstrates that the purportedly "comparable companies" are not "comparable" because the fees paid by Inland REIT to the Advisor and Property Managers grossly exceed those fees paid to the "comparable" companies engaged in arms-length business transactions, especially in light of the Advisor and Property Managers' underreporting, and failure to report, expenses. These material facts, including the EBITDAs of the comparable companies in contrast to those of the Advisor and Property Managers, were not contained in the Proxy.

246.    Moreover, each of the so-called "comparables" is a large, multi-office real estate service and brokerage company engaged in a much broader range of services for a diversified client base. And, none of the purportedly comparable companies are "advisors" because their income is derived, unlike the Advisor, primarily from hard asset operations and transactions, and their operations are completely different from those of the Advisor. These material facts were not contained in the Proxy.

247.    The Proxy and the Fairness Opinion were materially false and misleading in that they professed that the Class could reasonably rely on an opinion of fairness that was clearly not based on comparable companies.

    **c.**    **The Proxy and Fairness Opinion Omitted Material Facts About the Advisor's "Forecasted" Earnings.**

248.    The Proxy stated that William Blair was provided and utilized:

(a)    "our unaudited financial statements and those of our Business Manager/Advisor and Property Managers for the six months ended June 30, 2006, and 2007" ("Unaudited Financial Statements");

(b)    "certain internal business, operating and financial information and forecasts of us, our Business Manager/Advisor and Property Managers, or the Forecasts, for fiscal years 2007 through 2012 prepared by our senior management and the senior management of our Business Manager/Advisor and Property Managers" ("Forecasts").

249.    And, in rendering its Fairness Opinion and preparing its financial analyses, William Blair assumed and relied, without independent verification, upon the accuracy and completeness of these Unaudited Financial Statements and Forecasts, and assumed that the Forecasts would be achieved in the amounts and at the times contemplated thereby. William Blair utilized the Unaudited Financial Statements and Forecasts to derive the following financial analyses:

(a)    a discounted cash flow analysis of the Advisor and the Property Managers' projected future cash flows for the period commencing on January 1, 2007 and ending December 31, 2012.

(b)    a discounted cash flow analysis of projected future dividends per share for the period commencing on January 1, 2007 and ending December 31, 2012.

(c)    certain pro forma effects resulting from the Internalization, including the potential impact of the Merger on projected FFO per share of Inland Western following the Merger, with Expected Cost Savings.

250.    The above described financial analyses were material factors considered by William Blair to arrive at its Fairness Opinion and the Proxy stated that such analysis resulted in the following range of values for the Advisor, Property Managers and the REIT:

> (a)    "The implied range of enterprise values for our Business Manager/Advisor and the Property Managers implied by the discounted cash flow analysis ranged from approximately $481 million to $667 million with a mean and median value of $568 million and $567 million, respectively."

> (b)    "Using discounted cash flow methodology, William Blair calculated the present values of our projected free cash flows per share. . . .The implied range of per share equity values for us implied by the discounted cash flow analysis ranged from approximately $9.78 to $11.35 per share."

251.    In contrast to the disclosed valuation ranges for the Advisor, Property Managers and the REIT derived from the use of the Unaudited Financials and Forecasts, as the REIT's quarterly financials for the six months ended June 30, 2007 state, only $9.5 million of gross Advisory Fees were due from Inland REIT.  Given that no expenses have been charged against this $9.5 million amount and that, on an annualized basis, this represents only half of what Defendants stated the Advisor "earned" in 2006, it does not support the exorbitant valuation ranges presented in the Proxy which were predicated on income that was more than twice the 2007 annualized amount.

252.    Moreover, the Proxy did not state material facts about the projections of profitability underlying the Forecasts which are material to determine the viability and probability of the Forecasts utilized to value the Advisor and Property Managers.

253.    Also, to arrive at the Forecasts, historical income statements and financials of the Advisor and Property Managers are used.  As alleged above in ¶¶ 168-216, the historical income statements were false and inflated. Accordingly, the Forecasts relied on faulty historical financials suffer from the same defect, and result in inflated forecasted financial performance of the Advisor and Property Managers.  These material facts were not disclosed in the Proxy.

86

254.    The Proxy's statements concerning the Advisor and Property Managers' range of value were, therefore, based on inflated amounts as it would be impossible for the Advisor to now achieve the forecast operating results for either Net Income or EBITDA represented in the Proxy to purportedly justify the valuation and amount of Internalization Consideration.

255.    The Proxy was false and misleading in that it provided no assessment or material facts about the projections of profitability underlying the Forecasts, which were material to determine the viability and probability of the projections utilized to value the Advisor and Property Mangers or opine on the Internalization Consideration. This is material information a reasonable shareholder would have considered important in deciding how to vote on the Proxy.

**F.    Breaches of Fiduciary Duty.**

*1.    The Fiduciary Duty Defendants.*

256.    Pursuant to the Advisory Agreement, "The Advisor, on behalf of itself and its Affiliates, acknowledges that the Advisor and its Affiliates have fiduciary duties to the Company and to the Company's Stockholders."  According to the Prospectus dated December 21, 2004, the Advisor and the Property Managers were considered "Inland Affiliated Companies." Moreover, the term "Affiliate", as defined in the Company's Third Articles of Amendment and Restatement ("Articles of Incorporation"), dated September 20, 2006, means:

> "with respect to any other Person: (i) any Person directly or indirectly owning, controlling, or holding, with the power to vote 10% or more of the outstanding voting securities of such other Person; (ii) any Person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held, with the power to vote, by such other Person; (iii) any Person directly or indirectly controlling, controlled by or under common control with such other Person; (iv) any executive officer, director, trustee or general partner of such other

Person; and (v) any legal entity for which such Person acts as an executive officer, director, trustee or general partner." [3]

Accordingly, due to their common ownership, relationship with and control of the Advisor, the Property Managers, and/or Inland REIT, "Affiliates" that owe fiduciary duties to the Shareholders and Company are: the Advisor, Property Managers, The Inland Group, the Sponsor and Individual Defendants Goodwin, Parks, Baum, Cosenza, Gujral and Grimes,.

257.    In addition, Inland REIT's Articles of Incorporation state that each of the Director Defendants serves in a fiduciary capacity to the REIT and has a fiduciary duty to the Shareholders of the REIT, including a specific fiduciary duty to supervise the relationship of the REIT with the Advisor and its Affiliates.

258.    Therefore, the Advisor, the Property Managers, Individual Defendants, the Sponsor and The Inland Group (collectively referred to herein as "The Fiduciary Duty Defendants"), individually and collectively, owe and owed to Inland REIT and its Shareholders the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Inland REIT and in the use and preservation of Inland REIT's property and assets.

## *2.    Breaches of the Duties Owed by The Fiduciary Duty Defendants.*

259.    The Fiduciary Duty Defendants breached their fiduciary duties of loyalty, candor and due care to the Shareholders and Company by at least the following affirmative acts:

> (a)    Causing Inland REIT to pay fees to the Property Managers that clearly did not comply with the terms of the Offering Documents, Advisory Agreement, Articles of Incorporation and Property Management Agreement resulting in excessive management fees being paid to the Property Managers;

---

[3]    The Articles of Incorporation defines "Person" as "an individual, corporation, business trust, estate trust, partnership, limited liability company, association, two or more persons having joint or common interest, or any other legal or commercial entity."

(b)     Causing and permitting the Advisory and Property Management Agreements to be used as vehicles for wrongful self-dealing to further the interests of themselves and other Defendants to the detriment of the Shareholders' and Company's best interests by underreporting expenses in the financial statements of the Advisor and Property Managers so as to artificially inflate the Internalization Consideration;

(c)     Utilizing the Advisory and Property Management Agreements as vehicles for wrongful self-dealing and to further the interests of themselves and other Defendants to the detriment of the Shareholders' best interests;

(d)     Proposing, formulating and recommending an unfair, self-dealing Internalization;

(e)     Proposing, formulating and recommending an unfair, self dealing Internalization at a price that was based on false and misleading financial statements and exceeded any fair or reasonable value of the Advisor and Property Manager;

(f)     Failing to investigate or evaluate any strategic alternative to the Internalization in order to provide the Shareholders with a more appropriate or profitable liquidity event;

(g)     Never considering whether the Advisory and Property Management Agreements should not be renewed or that, if renewed, its fee structure should be significantly modified and reduced;

(h)     Causing Inland REIT to disseminate to Shareholders a false and misleading Proxy.

260.    The Fiduciary Duty Defendants put their own self interests above the best interests of the Shareholders and were motivated by securing: (i) a portion of the Internalization Consideration; (ii) a substantial equity position in the REIT; and/or (iii) a guaranty of lucrative employment contracts as employees of Inland REIT.

> **3.    *The Director Defendants Failed to Enforce the Provisions of the REIT's Articles of Incorporation, the Advisory and Property Management Agreements.***

261.    Pursuant to the Company's Articles of Incorporation, the Director Defendants are responsible for overseeing the activities and performance of the Advisor, including that:

> (a)    "The Directors shall determine from time to time and at least annually that the compensation which the Company contracts to pay to the Advisor is reasonable in relation to the nature and quality of services performed and that such compensation is within the limits prescribed by these Articles and applicable state law.

> (b)    The Directors shall also supervise the performance of the Advisor to determine that the Advisor or a successor Advisor possesses sufficient qualifications to perform the advisory function for the Company and to justify the compensation paid to it by the Company as well as to confirm that the provisions of such contract are being carried out.

> (c)    It shall be the duty of the Directors to evaluate the performance of the Advisor before entering into or renewing an advisory contract. . .

> (d)    The compensation and reimbursements paid by the Company to the Advisor and its Affiliates shall be approved by a majority of the Directors (including a majority of the Independent Directors), as being fair and reasonable to the Company and not less favorable to the Company than would be available from an unaffiliated source."

262.    In addition, it was the responsibility of the Director Defendants to supervise the fees paid to the Property Managers, which are Affiliates of the Advisor:

> Payments to the Advisor, its Affiliates and the Directors for services rendered in a capacity other than that as investment advisor or Director may only be made upon a determination that: (i) the compensation is not in excess of their compensation paid for any comparable services; and (ii) the compensation is not greater than the charges for comparable services available from others who are competent and not affiliated with any of the parties involved.

263.    All Director Defendants were also generally responsible for determining whether the fees and expenses of the Company are reasonable:

> The Directors shall determine, from time to time but at least annually, that the total fees and expenses of the Company are reasonable in the light of the investment performance of the Company, its Net Assets, its Net Income, and the fees and expenses of other comparable unaffiliated Companies. Each such determination shall be reflected in the minutes of the meeting of the Directors. (Articles Art. 7; § 5(f)).

264.    Therefore, it was incumbent on the Director Defendants to implement appropriate measures to assure that the Advisory and Property Management Agreements did not become a vehicle for wrongful self-dealing.  The Director Defendants failed to implement such measures, and consequently breached their fiduciary duties of loyalty, good faith and due care owed to Inland REIT and the Inland REIT Shareholders.

265.    Instead, each Director Defendant wrongfully and in breach of his or her fiduciary duty: (i) caused and allowed Inland REIT to pay excessive and unjustified fees to the Property Managers; (ii) renewed annually without scrutiny the Advisory and Property Managers' Agreements; and (iii) failed to take action to investigate the wrongful acts alleged herein or to put in place the proper supervision and control mechanisms that would have brought these unlawful practices to their attention.

266.    Each Director Defendant knew that the Defendants, affiliates of Inland REIT, derived substantial benefits from the Advisor's and the Property Managers' relationships and agreements with Inland REIT. Therefore, it was incumbent upon the Director Defendants to take prudent measures to implement internal controls and systems or other programs that would enable them to properly oversee all aspects of the Advisor's and Property Managers' conduct.

267.    This is particularly important in the context of the Internalization because the Purchase Option formula for determining the cost of the Advisor and Property Manager to be paid by Inland REIT, used the Advisor and Property Managers' net income, which is dependent

upon the accuracy of the Advisor's and Property Managers' financial statements. Accordingly, at all times, the Director Defendants should have been aware of the fact that any activity that would falsify either the income or expenses of the Advisor or Property Managers, would work to the detriment of Inland REIT Shareholders if Inland REIT were to exercise the Purchase Options, resulting in a grossly inflated valuation and purchase price for the Advisor and Property Managers which would be borne by the Shareholders and the REIT.

268.    In addition, as the Advisory Agreement and Property Management Agreements drew to the point of termination, Director Defendants knew or should have known that based on Inland REIT's own criteria for assessment of the relationship with its Advisor and Property Managers, the Advisory Agreement and Property Management Agreements (a) should not be renewed; or (b) if renewed, should have a significantly modified fee structure that reduced the Advisor's and Property Managers' fees dramatically. Because of the inherent conflicts of interest of the Defendants and the self-dealing nature of Inland REIT's relationship with the Advisor, Property Manager, Sponsor, the Inland Group and certain Individual Defendants, the Director Defendants had a heightened responsibility in this regard. Instead, the Director Defendants renewed the Advisory Agreement and Property Management Agreements unchanged in any respect with regard to the payment and amount of fees.

### 4.    *The Fiduciary Duty Defendants Breached Their Fiduciary Duties By Abandoning the Contractually Agreed Upon Purchase Options.*

269.    The 2003 Advisory Agreement and Property Management Agreements contemplated the possibility of an internalization transaction and set forth virtually identical formulas for determining the consideration to be paid by Inland REIT in such a transaction. *See* ¶¶ 122-123; 128-129, *supra*. Defendants, however, knowing that the Purchase Option Formulas, if properly applied (*see* ¶¶ 221-226) would potentially yield them negligible consideration,

92

abandoned the Purchase Option Formulas to the substantial detriment of Inland REIT's Shareholders.

270.    The Purchase Options would have become available to Inland REIT in mid-2008. The Fiduciary Duty Defendants, however, began discussing the Internalization in February 2006 and rushed to complete it by November 2007, six months prior to the effective date of the Purchase Options. An acceleration of Internalization is inappropriate in the absence of the acceleration of a listing of the REIT's shares on a national stock exchange. There is a disconnect between valuing the Advisor and Property Managers in a vacuum, as is being done here, without knowing what the "exit strategy" or "appropriate liquidity event" is for the Shareholders.  For example, if the REIT listed its shares, the value placed by the market on the REIT's shares would provide an objective measure of the effectiveness and value of the advisory and management services that the REIT had been receiving.

271.    In negotiating and determining the Internalization Consideration, the Fiduciary Duty Defendants completely abandoned the formula contained in the Purchase Options for deriving the number of shares to be issued by the REIT to the owners of the Advisor and Property Managers. Rather, the 37,500,000 shares comprising the Internalization Consideration and the $10 per share price assigned to the REIT's shares resulted from non-arms length negotiations among the Defendants, many of whom had material financial interest in the Internalization.  This was precisely the type of conflict and self-dealing process and transaction that the Purchase Options were intended to prevent.

272.    Finally, if The Fiduciary Duty Defendants had applied the Purchase Option Formulas to non-inflated financial statements and utilized 2007 audited financials, rather than

93

circumventing it via the Internalization, the Purchase Options would have yielded a fraction of the $375 million Internalization Consideration.

> ### 5. *William Blair Aided and Rendered Substantial Assistance to The Fiduciary Duty Defendants in Breaching their Fiduciary Duties Owed to the Shareholders.*

273.    In formulating, negotiating and recommending the Internalization to Inland REIT's Shareholders, Inland REIT and its affiliates hired William Blair as a "financial advisor to the Special Committee" and to "render[] a fairness opinion."

274.    The inclusion of William Blair's so-called "fairness opinion" in the Proxy misled Inland REIT's Shareholders into thinking that the price being paid for the REIT affiliated-entities was supported by a meaningful assessment performed by an independent, third-party, and to mask and aid Defendants' breaches of fiduciary duty.

275.    Having been intimately involved in the negotiations of, and assessments of alternatives to, the Internalization, William Blair was not independent.  *See ¶¶* 143-151.

276.    William Blair had three predetermined objectives of their engagement: (a) to make certain the Internalization was pursued; (b) to take any steps necessary to get the Shareholders to approve the Internalization; and (c) to ensure the Internalization was consummated.  This is so because over one-third of William Blair's fee (as of June 19, 2006, just days after William Blair was initially retained) was contingent upon the <u>consummation</u> of the Internalization.  *See ¶* 51.

277.    Moreover, William Blair secured intimate knowledge, in part through its participation as advisor to the Special Committee in evaluating and negotiating the Internalization, has had unrestricted access to financial information of the Advisor and Property Managers.  However, William Blair, in preparing and rendering its financial analyses and

Fairness Opinion persisted in using false and inflated financial statements provided by Defendants, without independent verification.  William Blair predicated their "fairness opinion" on such false information.

278.    William Blair's Fairness Opinion was so devoid of credibility or reliability that it only amounted to a vehicle to mask and aid Defendants' breaches of fiduciary duty.  In this regard the Fairness Opinion and financial analyses performed by William Blair gave no independent assessment of and failed to address the following material facts:

(a)    The Advisor's and Property Managers' financial statements;

(b)    Comparable companies engaged in the advisory or real estate management industries;

(c)    The competitiveness of the fees charged by the Advisor and Property Manger and their EBITDA levels and lack of expenses reported, when compared to the selected comparable companies and the market in general;

(d)    The profitability of Inland REIT, i.e. the percentage of gross income that it brings down to the bottom line compared to the comparable companies used in the Fairness Opinion;

(e)    The discounts to competitive fees that should be afforded Inland REIT given the guaranteed business opportunity it affords the Advisor and Property Managers;

(f)    The genesis of the Advisor and the Property Managers and whether or not they can be compared to conventionally capitalized and competitively grown comparable companies; and

(g)    The possibility that the Advisor and the Property Managers are in fact the asset of Inland REIT by virtue of Inland REIT's complete funding of their activities since inception.

### 6.    KPMG Aided and Rendered Substantial Assistance to The Fiduciary Duty Defendants in Breaching their Fiduciary Duties Owed to the Shareholders

279.    In formulating, negotiating and recommending the Internalization to Inland REIT's Shareholders, Inland REIT and its affiliates requested KPMG provide an independent auditor report of the Advisor and the Property Managers.

280. KPMG opined, in two separate independent auditors' reports that the financial statements of the Advisor and the Property Managers presented fairly, in all material respects, the financial position of the Advisor and the Property Managers as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2006 "in conformity with U.S. generally accepted accounting principles."

281. The inclusion of KPMG's so-called "independent auditors' reports" in the Proxy misled Inland REIT's Shareholders into thinking that the price being paid for the REIT affiliated-entities was supported by a meaningful assessment performed by an independent, third-party, and to mask and aid Defendants' breaches of fiduciary duty.

282. KPMG had a responsibility to those who relied on the objectivity and integrity of the public accounting profession to discharge its professional responsibilities in a manner that transcends conflicting pressures from its clients. Those who relied on KPMG's independent audit reports expected them to discharge their responsibilities with integrity, objectivity, due professional care, and a genuine interest in serving the public. AICPA Code of Professional Conduct Section 53.

283. Essential to fulfilling its responsibilities to the public, KPMG owed the duty of due care, which requires an accountant to discharge its professional responsibilities with competence and diligence with concern for the best interest of those for whom the services are performed and consistent with the professions' responsibility to the public. AICPA Code of Professional Conduct of the American Institute of Certified Public Accountants Section 56.

284. Having provided independent auditors' reports to Inland REIT since 2003, KPMG was not able to provide an independent analysis of the Advisor and Property Managers' financial

statements.

285.     Despite lack of independence, KPMG issued independent auditor reports that accompanied the financial statements of the Advisor and Property Managers as part of the Proxy. KPMG expected and intended that those independent auditor reports would legitimize the accompanying financial statements of the Advisor and Property Managers and would be relied on by the members of the Class in determining how to vote on the proposed Internalization.

286.     Since, among other things, the financial statements of the Advisor and Property Managers materially overstated Net Income and EBITDA by understating operating expenses that were apparently incurred by Defendants' affiliates but not accurately reported by the Advisor and Property Managers, the  financial statements were not prepared in accordance with GAAP, and thus KPMG's issuance of independent auditor's reports with respect to the financial statements of the Advisor and Property Managers were in violation GAAS and misled the Class into voting in favor of the Internalization.

287.     The Advisor and Property Managers were wholly owned subsidiaries of parties related to the Sponsor, and are therefore related parties, thus the accounting for related party transactions and the disclosures associated with payments made on the behalf of the Advisor and Property Managers were required to conform to all of the GAAP and GAAS pronouncements governing related party transactions.

288.     Further, KPMG failed to comply with GAAP and GAAS as to discovery and disclosure of related party transactions. In this regard, KPMG's accounting and auditing practices were so deficient that the audit amounted to no audit at all, and an egregious refusal to both see the obvious, and to make further investigation which would have discovered the existence of related party transactions for which adequate disclosure was necessary.  Further,

KPMG made accounting judgments such that no reasonable accountant would have made the same decisions if confronted with the same facts.

289.    KPMG's independent auditors' reports are so devoid of credibility or reliability that they only amounted to vehicles to mask and aid Defendants' breaches of fiduciary duty.  In this regard the independent audits performed by KPMG gave no independent assessment of and failed to address the Advisor's and Property Managers' financial statements.

290.    KPMG rendered substantial and knowing assistance to The Fiduciary Duty Defendants in their breaches of their fiduciary duties to the Shareholders.  *See* ¶¶ 259-272.

## VII.  COUNTS

## COUNT I

## BY THE CLASS AGAINST INLAND REIT, THE ADVISOR, THE PROPERTY MANAGERS, KPMG, THE INDIVIDUAL DEFENDANTS AND WILLIAM BLAIR FOR VIOLATION OF SECTION 14(a) AND RULE 14a-9

291.    Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 14(a) claim. This Count is asserted under § 14(a) of the Exchange Act and Rule 14a-1 promulgated thereunder on behalf of the Class against Inland REIT, the Advisor, the Property Managers, KPMG, the Individual Defendants and William Blair.

292.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n (a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

293.    SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the

circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false and misleading."

294.    Inland REIT, the Advisor, the Property Managers, KPMG, the Individual Defendants and William Blair, disseminated and provided information which was contained in the Proxy, allowed their names to be used in connection with the Proxy and the solicitation of Shareholders' votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy, would have a continuing material relationship with Inland REIT following the votes on the Merger and other issues presented in the Proxy, solicited votes under the Proxy, and caused the Proxy to be disseminated to the Class through the use of the United States mails and the means and instrumentalities of interstate commerce.

295.    Defendants Inland REIT, the Advisor, the Property Managers, KPMG, the Individual Defendants and William Blair solicited proxies from the Co-Lead Plaintiffs and members of the Class by means of a Proxy which contained false and misleading statements concerning each of the matters alleged in ¶¶ 168-225, above.

296.    Each of the matters described in ¶¶ 168-255 would have been considered by a reasonable investor, separately as well as in the aggregate, to have been material to his or her decision in voting on the matters presented in the Proxy, and to have been a material part of the mix of information upon which such decisions were made.

297.    These misrepresented or omitted facts are material, because, under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false or misleading statements or omitted facts important in deciding how to vote on the Proxy or a

material part of the mix of information available to Class members in deciding how to exercise their voting rights.

298.    By reason of the foregoing, the Proxy was materially false and misleading, in violation of Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder.

299.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy were true, without omissions of any material facts, and not misleading.  Specifically, the Defendants named in this Count are liable under Section 14(a) of the Exchange Act for the following reasons:

(a)    Inland REIT, the Advisor, KPMG, the Property Managers, Individual Defendants and William Blair provided material information that they knew, understood and intended would be contained in the Proxy, and that was false and misleading and/or omitted material and necessary facts. The information provided by the Advisor and Property Managers included information about their own business, finances, prospects and profitability.  The Advisor, Property Manager, Inland REIT and Individual Defendants provided virtually all of the information with respect to Inland REIT, its business and finances, for which the Advisor and Property Managers effectively functioned as Inland REIT's staff and management because Inland REIT had no employees of its own.

(b)    In addition, the Advisor, the Property Managers and the Individual Defendants were directly financially interested in the matters to be voted on in the Proxy, primarily the Internalization proposal;

(c)      The Advisor, the Property Managers, KPMG and William Blair allowed their names to be used in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy;

(d)      Inland REIT was the stated author and issuer of the Proxy, directly solicited votes in connection with the matters to be voted upon in the Proxy, and permitted the use of its name both in the Proxy and in that solicitation effort;

(e)      The Individual Defendants, as affiliates, directors and/or officers of Inland REIT, the Advisor and the Property Managers, allowed their names to be used in the Proxy, in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy, and affirmatively recommended in the Proxy that Shareholders vote in favor of all of the proposals contained in the Proxy. The use of their names was not incidental, but rather material in connection with the solicitation of votes regarding all of the matters to be voted upon in the Proxy, including, but not limited to, their standing for election as directors of Inland REIT.  The use of their names lent substantial and material support to the other matters to be voted upon and which were recommended for affirmative action by Inland REIT's Board of Directors;

(f)      Director Defendants Beard, Gauvreau, Gorski and Murphy served on the Special Committee of the Board of Directors, which recommended the Merger to the full Inland REIT Board.  Defendants Beard, Gauvreau, Gorski and Murphy allowed their names and a description of their roles, duties and activities on the Special Committee, as well as their endorsement and recommendation of the

Merger, to be used in the Proxy in connection with the solicitation of votes regarding the matters to be voted upon in the Proxy;

(g)     Director Defendant Parks signed an accompanying explanatory letter to Shareholders which was part of the Proxy solicitation materials that contained the Board's recommendation in favor of each proposal for which proxies were being sought by Inland REIT;

(h)     Director Defendants Parks and Gujral were directly financially interested in the outcome of the votes being solicited by the Proxy because of their significant ownership interest in the Advisor; and

(i)     The Individual Defendants, the Advisor, KPMG, the Property Managers, William Blair and Inland REIT, directly, or through the employ of others, solicited votes for the matters to be voted upon in the Proxy.

300.    None of the materially false and misleading statements contained in the Proxy, or material matters omitted from the Proxy, all as described above, were known to Co-Lead Plaintiffs or the Class at the time they voted on the matters presented to them in the Proxy.

301.    As a result of these Proxy violations, the Class members are threatened with irreparable injury, for which there is no adequate remedy at law, as well as substantial economic damages.

## COUNT II

### BY CLASS AGAINST THE ADVISOR, THE PROPERTY MANAGERS, THE SPONSOR, THE INLAND GROUP AND THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT

302.    Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any element of a Section 20(a) claim.

303.    This Count is asserted under § 20(a) of the Exchange Act on behalf of the Class against the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants.

304.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides  that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title [15 U.S.C. §§ 79a et seq.] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such  controlled person to any person to whom such control person is liable."

305.    As alleged in Count I, Inland REIT, the Advisor, the Property Managers, the Individual Defendants provided information which was contained in the Proxy, allowed their names to be used in connection with the Proxy and the solicitation of votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy, would have a continuing material relationship with Inland REIT following the votes on the Merger and other issues presented in the Proxy, solicited votes under the Proxy, and caused the Proxy to be disseminated to the Class through the use of the United States mails and the means and instrumentalities of interstate commerce. Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), prohibits any person soliciting a proxy from doing so "in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

306.    With respect to the Proxy, the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants acted as controlling persons of Inland REIT within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of authority as officers and/or directors of Inland REIT, and their ability to control the activities of Inland REIT,

particularly with regard to the Proxy which they caused Inland REIT to issue, and their exercise and use of that control, the Individual Defendants had the power, influence and authority to cause or prevent the wrongful conduct described herein.

307.    Based on the allegations made herein, the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants had the power, influence and authority to cause or prevent the wrongful conduct described herein.

308.    None of the materially false and misleading statements contained in the Proxy, or material matters omitted from the Proxy, all as described above, were known to Co-Lead Plaintiffs or the Class at the time they voted on the matters presented to them in the Proxy.

## COUNT III

### BY THE CLASS AGAINST THE ADVISOR, THE PROPERTY MANAGERS, THE SPONSOR, THE INLAND GROUP AND THE INDIVIDUAL DEFENDANTS, FOR BREACH OF FIDUCIARY DUTY

309.    Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

310.    As alleged herein, at ¶¶ 256-272, the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants (collectively, "The Fiduciary Duty Defendants") owe the fiduciary duties of loyalty, candor, and due care to the Shareholders of Inland REIT.

311.    The Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants, individually and collectively, owe and owed to the Class members the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Inland REIT and in the use and preservation of Inland REIT's property and assets.

312.    Further, the Director Defendants owed a duty to the Shareholders of Inland REIT to supervise the relationship of the REIT with the Advisor and the Property Managers and owed a duty to the Inland REIT Shareholders not to place their own personal self-interest above the Inland REIT Shareholders' best interests. *See* ¶¶ 259-272.

313.    To discharge their duties, The Fiduciary Duty Defendants were required to exercise prudent supervision over Inland REIT's management, policies, practices, controls, and financial and corporate affairs.

314.    As alleged herein at ¶¶ 259-272, each of The Fiduciary Duty Defendants breached his, her or its fiduciary duties to the Class members and permitted and caused Inland REIT to enter into Advisory and Property Management Agreements and the proposed Merger and Internalization, which placed The Fiduciary Duty Defendants' personal self-interests above the Class members' best interests.

315.    The Shareholders suffered injury to their individual economic interests and their voting rights as a result of the wrongful conduct of the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants, who received unfair benefits, at the expense of the Shareholders.

316.    As a direct and proximate result of those breaches of fiduciary duties, the Class members have suffered damages.

## COUNT IV

### BY THE CLASS AGAINST INDIVIDUAL DEFENDANTS, THE INLAND GROUP, THE SPONSOR, THE ADVISOR, THE PROPERTY MANAGERS, KPMG AND WILLIAM BLAIR FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

317.    Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a claim of aiding and abetting a breach of fiduciary duty.

318.    By their conduct complained of herein, The Fiduciary Duty Defendants have breached fiduciary duties of loyalty and due care to the members of the Class. The Fiduciary Duty Defendants owe and owed to the Class members the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Inland REIT and in the use and preservation of Inland REIT's property and assets, and/or a duty to supervise the relationship of the REIT with the Advisor and Property Managers and not to place their own personal self-interest above the Inland REIT Shareholders' best interests.

319.    As alleged herein, The Fiduciary Duty Defendants did not act alone in their scheme.

320.    The Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and William Blair knowingly aided and abetted the breaches of fiduciary duty committed by The Fiduciary Duty Defendants to the detriment of the Class. Indeed, the Merger Agreement could not have been entered into without the active participation of the Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and/or William Blair.  Not only was the Internalization adverse to the interests of the Class, but The Inland Group, the Sponsor and Individual Defendants, the owners of the Advisor, the Property Managers are the beneficiaries of the wrongs complained of and have been unjustly enriched.

321.    The Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and William Blair were at all times aware of the fiduciary duties being breached by The Fiduciary Duty Defendants.    The Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and William Blair knew or should have known that The Fiduciary Duty Defendants owed "a fiduciary duty to the

Stockholders of the REIT, including a specific fiduciary duty to supervise the relationship of the REIT with the Advisor." Moreover, the Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and William Blair knew or should have known that affiliates of the Advisor (*see* ¶¶ 256-258) owed fiduciary duties to the Shareholders.

322. The Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and William Blair knew:

(a) that Inland REIT, Individual Defendants, the Advisor, the Property Managers, KPMG and/or William Blair disseminated a Proxy which contained false and misleading statements *as alleged in* ¶¶ 221-226; and

(b) that The Fiduciary Duty Defendants were breaching their fiduciary duties to Inland REIT and the Shareholders by, among other things, *see* ¶¶ 256-272:

(i) causing the Shareholders and Inland REIT to have paid excessive and unearned fees to the Property Managers;

(ii) causing and permitting the Advisor and Property Managers to underreport or fail to report for expenses, thereby artificially inflating their financial statements and EBITDA;

(iii) formulating and proposing the Internalization, that overvalued the Property Managers and Advisors and was not in the best interests of the Shareholders; and

(iv) disseminating the false and misleading Proxy.

107

323.    The Individual Defendants, The Inland Group, the Sponsor, the Advisor, and the Property Managers rendered substantial and knowing assistance to each other in the breaches of their fiduciary duties to the Shareholders by, among other things:

(a)    using Inland REIT as the instrumentality and means to effectuate the Merger Agreement and Internalization for the benefit of themselves and to the detriment of the Shareholders;

(b)    retaining, instructing and encouraging the preparers of the so-called fairness opinions to distort the value of the Advisor and the Property Managers;

(c)    failing to implement appropriate measures to ensure that the Advisor and the Advisory Agreement and the Property Managers and the Property Management Agreements did not become vehicles for wrongful self-dealing;

(d)    jointly preparing and disseminating a false and misleading Proxy;

(e)    soliciting each stockholder's vote pursuant to the Proxy; and

(f)    rendering substantial and knowing assistance to the wrongful self-dealing by the Individual Defendants.

324.    KPMG rendered substantial and knowing assistance to The Fiduciary Duty Defendants in their breaches of their fiduciary duties to the Shareholders by, among other things, *see* ¶¶ 279-290:

(a)    Preparing and issuing independent auditor reports of the Advisor and Property Managers using inflated financial statements supplied by Defendants without verification or otherwise testing the validity of these

financial statements, including but not limited to, failing to determine whether the financial statements of the Advisor and Property Managers materially overstated Net Income and EBITDAs by understating operating expenses, failing to disclose related party transactions and opining that the financial statements were prepared in accordance with GAAP.

(b)     Conducting an independent audit in such a manner that it failed to discover and disclose material related party transactions in violation of GAAS. In this regard, KPMG's auditing practices were so deficient that the audit amounted to no audit at all, and an egregious refusal to both see the obvious, and to make further investigation which would have discovered the existence of related party transactions for which adequate disclosure was necessary.

325.     William Blair rendered substantial and knowing assistance to The Fiduciary Duty Defendants in their breaches of their fiduciary duties to the Shareholders by, as alleged in ¶¶ 273-278, including:

(a)     Preparing and disseminating financial analyses and a Fairness Opinion using inflated financial statements supplied by Defendants without verification or otherwise testing the validity of these financial statements, including but not limited to, failing to determine the basis for the inflated EBITDA of the Advisor and Property Managers, and whether the excessive fees paid to the Property Managers in 2005 and 2006 were consistent with the compensation provisions of the Property Managers' Agreements and Company documents.

(b) Preparing and disseminating financial analyses and a Fairness Opinion inappropriate and non- "comparable" companies.

(c) Preparing and disseminating a Fairness Opinion that was devoid of credibility, provided no assessment or material facts about the projections of profitability underlying the Advisor's and Property Managers' Forecasts and provided no reasonable basis on which a Shareholder could assess the fairness of the Internalization or Internalization Consideration.

326. By their conduct complained of herein, the Individual Defendants, The Inland Group, the Sponsor, the Advisor, the Property Managers, KPMG and William Blair are liable for aiding and abetting the breaches of fiduciary duties.

327. As a direct and proximate result of the aiding and abetting of the breaches of fiduciary duties, the Class members have suffered damages.

<u>**COUNT V**</u>

<u>**DERIVATIVE CLAIM AGAINST THE FIDUCIARY DUTY DEFENDANTS AND THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**</u>

345. Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of fiduciary duty claim.

346. As alleged herein, at ¶¶ 259-272, the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants (collectively, "The Fiduciary Duty Defendants") owe the fiduciary duties of loyalty, candor, and due care to Inland REIT.

347. The Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants, individually and collectively, owe and owed to Inland REIT the fiduciary

duties of loyalty, candor, and due care in the management and administration of the affairs of Inland REIT and in the use and preservation of Inland REIT's property and assets.

348.     By reason of his, her or its fiduciary relationships, each Individual Defendant and the Advisor owed and owe Inland REIT the highest obligation of good faith, fair dealing, loyalty and due care, discharging their duties in a manner the director or officer reasonably believes to be in the best interests of the corporation, and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.   Md. Code, Corp. & Assoc., §2-405.1.

349.     The Advisor, and Individual Defendants, each owe and owed to Inland REIT the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of Inland REIT and in the use and preservation of Inland REIT's property and assets. Further, said defendants owed a duty to Inland REIT not to waste its assets and not to place their own personal self-interest above Inland REIT's best interests.

350.     To discharge those duties, the Advisor, and the Individual Defendants, individually and collectively, were required to exercise prudent supervision over Inland REIT's management, policies, practices, controls, and financial and corporate affairs.

351.     As alleged herein at ¶¶ 259-272, the Advisor and the Individual Defendants breached his, her or its fiduciary duties to Inland REIT by permitting and causing the Advisor to proceed with the courses of action described herein which materially harmed Inland REIT.

352.     As alleged above at ¶¶ 259-272, the Advisor and the Individual Defendants, individually and collectively, also breached his, her, or its fiduciary duties to preserve and not to waste Inland REIT's assets by conducting Inland REIT's business in a way that benefited their interests and financially damaged Inland REIT.

353.    As a direct and proximate result of the wrongful conduct alleged above, Inland REIT suffered economic injuries in an amount to be determined at trial.

## COUNT VI

## DERIVATIVE CLAIM AGAINST THE ADVISOR, THE PROPERTY MANAGERS, THE INLAND GROUP, THE SPONSOR, GOODWIN, PARKS, BAUM, COSENZA, GRIMES AND GUJRAL FOR UNJUST ENRICHMENT

354.    Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state an unjust enrichment claim.

355.    As alleged above, Defendants Goodwin, Parks, Baum, Cosenza, Grimes and Gujral, directly as owners of the Property Managers, and Defendants Goodwin, Parks, Baum, Cosenza and Gurjal indirectly as owners of The Inland Group and the Sponsor, which directly owned the Advisor, had substantial financial interests in the outcome of the votes being sought by the allegedly false and misleading Proxy and their owners had, and continue to have, material relationships with Inland REIT following the Internalization.

356.    As a result of the wrongdoing alleged herein at ¶¶ 168-290, Defendants Goodwin, Parks, Baum, Cosenza, Grimes, Gujral and the Inland Group and the Sponsor were unjustly enriched at the expense of and to the detriment of the REIT and its Shareholders by their receipt of excessive and unsupported Internalization Consideration and receipt of excessive Property Management Fees.

357.    Accordingly, Defendants Goodwin, Parks, Baum, Cosenza, Grimes, Gujral and the Inland Group and the Sponsor should be required to disgorge all excessive fees, improper expense reimbursements and other compensation obtained by them, and each of them, from their wrongful conduct, breach of contract and fiduciary breaches described herein.

## COUNT VII

## DERIVATIVE CLAIM AGAINST THE ADVISOR, THE PROPERTY MANAGERS, THE INLAND GROUP, THE SPONSOR, DEFENDANTS GOODWIN, PARKS, BAUM, COSENZA, GRIMES, AND GUJRAL FOR BREACH OF CONTRACT

341.    Co-Lead Plaintiffs repeat and reallege the allegations above as if fully set forth herein excluding any and all allegations above not necessary to prove any elements required to state a breach of contract claim.

342.    On December 28, 2004, Inland REIT entered into the Second Amended and Restated Advisory Agreement ("Advisory Agreement") with the Advisor.  Inland REIT entered into a Master Management Agreement with Inland Western Management Corporation on September 13, 2003 and with Inland Southwest Management Corporation and Northwest Management Corporation on November 11, 2003.

343.    As alleged herein, on December 15, 2007, Inland REIT became "self-advised" whereby the Advisor and the Property Managers were merged with and into, Inland REIT and the Advisory Agreement and the Property Management Agreements were terminated. Accordingly, Inland REIT's claims for breach of contract are brought against the individuals and entities that owned and controlled the Advisor and the Property Managers from time that Inland REIT entered into the Advisory Agreement and the Property Management Agreements until those Agreements were terminated.

344.    The Advisor was owned and controlled by Defendants the Sponsor, The Inland Group, Goodwin, Parks, Cosenza, Baum and Gujral.  The Property Managers were owned and controlled by Defendants Goodwin, Parks, Cosenza, Baum, Gujral and Grimes during the time that the Advisory Agreement and Property Management Agreements were in effect.  These

Defendants are liable for derivative breach of contract claims against the Advisor and the Property Managers for actions which took place prior to the Internalization.

345.    In accordance with the terms of the Property Management Agreements (*see* ¶¶ 124-126) the Property Managers were entitled to compensation, including fees and reimbursements, from Inland REIT for the performance of services rendered to Inland REIT.

346.    By the conduct complained of herein, the Property Managers, Goodwin, Parks, Cosenza, Baum, Gujral and Grimes violated the terms of the Property Management Agreements by charging Inland REIT for Property Management Fees that exceeded 90% of the fee which would be payable to an unrelated party providing such services (*see* ¶¶ 138-140; 181-184).

347.    In addition, the Advisory Agreements and the Property Management Agreements each include a provision, referred to as the "Purchase Options," (*see* ¶¶ 122-123; 128-129, *supra*) permitting Inland REIT to acquire, at its option, the business conducted by and assets of the Advisor and each Property Manager in exchange for a number of shares of Inland REIT common stock determined in accordance with a formula established in those Agreements.  Inland REIT would have been permitted to exercise the purchase options beginning in May 2008 for the Property Managers and in September 2008 for the Advisor.

348.    By the conduct complained of herein, the Advisor, the Property Managers, the Sponsor, The Inland Group, Goodwin, Parks, Cosenza, Baum, Gujral and Grimes violated the terms of the Advisory and Property Management Agreements by circumventing and failing to comply with the Purchase Options (*see* ¶¶ 122-123; 128-129).

349.    In accordance with the Advisory Agreement, the Advisor and its Affiliates owed fiduciary duties to the Company and to the Company's Stockholders."    According to the

Prospectus dated December 21, 2004, the Advisor and the Property Managers were considered "Inland Affiliated Companies." (*See* ¶ 256).

350.    By the conduct complained of herein, *see* ¶¶ 259-272, the Advisor, the Property Managers, the Sponsor, The Inland Group, Goodwin, Parks, Cosenza, Baum, Gujral and Grimes violated the terms of the Advisory Agreement by breaching their fiduciary duties to the Company.

351.    As a direct and proximate result of these breaches of the Advisory and Property Management Agreements, Inland REIT has suffered damages.

## VIII.   REQUEST FOR RELIEF

**WHEREFORE**, Co-Lead Plaintiffs respectfully request that the Court enter judgment as follows:

A.    Certifying the Class as set forth herein and designating Co-Lead Plaintiffs as the representatives thereof;

B.    Declaring the Proxy to be materially false and misleading in violation of Section 14(a) of the Exchange Act;

C.    Declaring the conduct of the Defendants to be in violation of law as set forth herein;

D.    Declaring any authorizations secured by Defendants pursuant to the false and misleading Proxy to be null and void (including the rescission of all Employment Agreements entered into in furtherance of the Internalization);

E.    Awarding Co-Lead Plaintiffs and members of the Class compensation for the damages which they have sustained as a result of Defendants' unlawful conduct;

F.      Awarding Inland REIT damages it has suffered as a result of the wrongful conduct committed by the Individual Defendants, the Sponsor, the Inland Group, the Advisor and the Property Managers, as set forth in Counts V, VI, and VII.

G..     Declaring the Internalization and Merger Agreements null and void;

H.      Awarding Co-Lead Plaintiffs reasonable attorneys' fees, experts' fees, disbursements, interest and costs of suit; and

I.      Such other and further relief as this Court may deem just.

## IX.    <u>JURY DEMAND</u>

Co-Lead Plaintiffs demand a trial by jury on all claims so triable.

Dated:  June 12, 2008                        Respectfully submitted,


**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC**


*/s/  Adam J. Levitt*
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone:  (312) 984-0000
Facsimile:  (312) 984-0001
Email:  levitt@whafh.com

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Lawrence A. Sucharow
Joseph Sternberg
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

Lawrence P. Kolker
Alexander Schmidt
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

*Co-Lead Counsel*

Michael J. VanOverbeke
Thomas C. Michaud
**VaNOVERBEKE MICHAUD &
  TIMMONY, P.C.**
79 Alfred Street
Detroit, Michigan  48201
Telephone:  (313) 578-1200
Facsimile:  (313) 578-1201

*Counsel to City of St. Clair Shores
  General Employees Retirement System*

117