# Exhibit C

On August 14, 2007, the special committee met telephonically, along with its legal and financial advisors to review the final terms of the proposed acquisition. At the meeting, representatives of William Blair reviewed the financial results for us and the Business Manager/Advisor and Property Managers through June 30, 2007, as well as updated financial projections that it had received for us and for our Business Manager/Advisor and Property Managers and presented an update of its analysis to the special committee. Then, William Blair delivered to the special committee its oral opinion that the consideration of approximately 37,500,000 shares of our common stock to be paid by us for the acquisition of our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders. See "- Opinion of the Financial Advisor." Later that same day, William Blair delivered its written opinion to the same effect. Counsel for the special committee reviewed the various alternatives and the advantages and disadvantages considered by the special committee with respect to each alternative. These alternatives included:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

The special committee unanimously recommended that our Board and stockholders approve the Merger, subject to the terms and conditions set forth in the Merger Agreement and ancillary agreements thereto.

Following the meeting of the special committee, our Board met telephonically and unanimously approved the Merger and the Merger Agreement and ancillary agreements thereto.

**Reasons for Requiring Your Ratification**

There is no legal requirement to submit our entry into the Merger Agreement or our approval of the Merger to our stockholders for ratification. Because we believe it is desirable to obtain your ratification of our entry into the Merger Agreement and our approval of the Merger, we have made your ratification a condition to the closing of the Merger. If the Merger proposal is not approved, we will continue to operate under our current management structure, paying fees and cost reimbursements to our Property Managers and our Business Manager/Advisor under their contracts and our Board will examine its other alternatives.

**Reasons for the Merger**

The special committee recommended that our Board approve the proposed transaction based upon a variety of factors, both for and against the proposed transaction. The decision by the special committee followed numerous meetings with its legal and financial advisors as described in greater detail above in "- Background of the Merger." The special committee took into account the following positive factors without assigning relative weights, which the special committee believes favor the proposed transaction:

- *Goal of Self Administration.* The acquisition of our Business Manager/Advisor and Property Managers is one of the most significant steps in achieving our objective of becoming a fully self-administered REIT. The special committee believes that analysts and investors have shown a preference for self-administered REITs and, as a result, the consummation of the proposed transaction may better position us to raise capital or list our shares on a national securities exchange. We also believe that a self-administered REIT better aligns the interests of the

20

management of our Business Manager/Advisor and Property Managers with the interests of our stockholders. Although we will continue to obtain from Inland various services not provided by our Business Manager/Advisor or Property Managers, the special committee believes that we will obtain these services at rates at or below market and that continuity of these services is, at this time, more important than internalization of such services. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs, among other things.

- *Reduction of Operating Costs and Impact on Funds from Operations.* Our portfolio of real estate assets has grown substantially since 2003. Our Business Manager/Advisor and Property Managers are currently compensated based on a fixed percentage of our real estate assets, which results in ratable increases in the fees we pay under the advisory and property management agreements as our asset base grows. By acquiring our Business Manager/Advisor and Property Managers, we will substantially transform the costs associated with the advisory and management function to fixed costs, which we expect will allow us to benefit from the economies of scale that result in connection with the growth of our real estate portfolio. In addition, the special committee believes that upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger, and it is estimated to be increasingly accretive in subsequent years, because the costs of internalizing the advisory and property management functions plus the distributions to be paid on the shares issued is expected to be less than the advisory and property management fees expected to be paid to our Business Manager/Advisor and Property Managers.

- *Opinion of William Blair.* The special committee considered the opinion of William Blair to the effect that, as of August 14, 2007, and based upon and subject to the assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders; however, the opinion does not apply to stockholders of the Business Manager/Advisor or the Property Managers, including such stockholders who are also our stockholders.

- *Review of Material Terms of Proposed Transaction.* The special committee considered and discussed with its legal counsel and our counsel the material terms of the Merger Agreement, including the representations, warranties, covenants, conditions to closing and indemnification obligations set forth therein, together with the material terms of the ancillary agreements entered into or to be entered into in connection with the proposed transaction. The special committee believes the terms of these agreements are fair and commercially reasonable.

- *Access to Properties Identified by Inland.* The special committee believes that Inland has experienced employees who are knowledgeable in the retail real estate field and are particularly skilled at identifying, and have proprietary access to, properties within our investment guidelines. In connection with the proposed transaction, we will retain a right of first offer to acquire, on a priority basis relative to other clients of Inland, certain retail and lifestyle properties located west of the Mississippi River, but excluding that portion of such geographical area located within 400 miles of Oak Brook, Illinois. The special committee believes that access to these properties is of substantial value to us, which will be preserved as a result of the proposed transaction.

- *Rights to Inland Marks.* The "Inland" name and logo, together with our name and logo, are currently licensed from Inland to our Business Manager/Advisor on a non-exclusive basis. We are authorized to use the Inland name under the advisory agreement. In connection with the proposed transaction, the special committee negotiated an arrangement whereby we will have an exclusive right to use our name and logo, subject to the right of Inland to use our name for general marketing and communications purposes. See "- Ancillary Agreements — License Agreement Modification." The special committee believes that the goodwill associated with the Inland marks

21

Case 1:07-cv-06174    Document 50-4    Filed 07/16/2008    Page 5 of 7
Page 39 of 397

and our name is of substantial value to us, which will be preserved on an exclusive basis as a result of the proposed transaction.

- *Retention of Key Management Personnel.* The proposed transaction will permit us to retain directly the services of key management of our Business Manager/Advisor and Property Managers, including the services of Messrs. O'Hanlon, Grimes, Garrison and Byrne. These knowledgeable and experienced employees have day-to-day familiarity with the management of our assets. The proposed transaction will also permit us to retain, at no cost to us, the consulting services of Messrs. Parks, Cosenza and Goodwin.

- *Access to Inland Affiliated Services.* The special committee believes that the services provided by Inland are of a higher quality and provided at equal or lower costs than could be obtained from unaffiliated third parties. These services include office and facilities management, insurance and risk management, computer consulting, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services. The special committee believes that access to these services is of substantial value to us, which will be preserved as a result of the proposed transaction.

The special committee also took into account the following negative factors, without assigning relative weights, which the special committee believes are outweighed by the positive factors discussed above. The negative factors considered by the special committee included:

- *Inability to Immediately Become Fully Self-Administered.* The special committee considered whether certain administrative functions not provided directly by our Business Manager/Advisor or Property Managers could be performed internally following the Mergers. These services include office and facilities management, insurance and risk management, computer services, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services. In order to assure the continuity of these administrative services while allowing us time to develop these service areas in-house or to hire other third-party service providers for these services, we entered into or amended several services agreements, to obtain these services, with Inland. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs.

- *Potential Loss of Key Employees.* Through the transaction, a key asset we will acquire is knowledgeable, experienced employees. The working knowledge of these employees is specific to our real estate portfolio, our tenants and our property acquisition processes. While the special committee considered and negotiated for employment agreements with certain key employees, there is no guarantee that those employees, or employees not subject to employment agreements, will remain with our Business Manager/Advisor or Property Managers or become our employees following the Merger. Further, their employment agreements are short-term and do not include non-compete provisions.

- *Unanticipated Costs of Services Performed by Our Business Manager/Advisor and Property Managers.* The special committee carefully considered the fees paid to our Business Manager/Advisor and Property Managers relative to the costs of performing these functions internally. With the growth of our asset base since 2003, the special committee determined that cost savings could likely be achieved by eliminating the advisory and management fees presently paid to our Business Manager/Advisor and Property Managers and internalizing those functions. The determination that performing services internally will be cost effective assumes knowledge of the actual costs of performing the advisory and property management services. If there are costs that were not correctly estimated or unanticipated costs in performing these services, the economic benefits to us sought to be attained through the Mergers will not be fully realized.

22

http://www.sec.gov/Archives/edgar/data/1222840/000110465907068062/a07-22282_2def...    7/16/2008

The special committee considered these factors, among others, in light of various alternatives that are described more fully below:

- *Maintain the Status Quo.* This alternative ensured continuity of operations, including the receipt of certain no cost and low cost services, and key personnel, but had the disadvantage of, among other things, requiring us to pay on-going advisory and management fees.

- *Hire New Third Parties to Provide Advisory and Property Management Services and Terminate Our Advisory and Property Management Agreements.* The advantage of this alternative was the prospect of negotiating lower fees with third-party providers, provided that the services provided by or through our Business Manager/Advisor and Property Managers could be adequately provided by a single service provider or a discrete group of service providers. The disadvantages of this alternative included, among other things, the costs associated with a lengthy transition period, the loss of the continuity and experience of our Business Manager/Advisor's and Property Managers' key employees, the loss of the right to use the "Inland" name and our name and logo, and the payment of on-going advisory and management fees.

- *Build Advisory and Property Management Functions Internally and Terminate Our Advisory And Property Management Agreements.* The benefit of this alternative was the prospect of reducing costs, on an asset basis, over time because our business management, advisory and property management costs would no longer be based on a percentage of our real property assets. The disadvantages of this alternative included, among other things, the costs associated with a lengthy transition period and risks attendant to internally developing the broad range of services provided by our Business Manager/Advisor and Property Managers, the loss of continuity and experience of our Business Manager/Advisor's and Property Managers' key employees, the potential loss of certain administrative services provided by Inland, the disruption to our property acquisition pipeline and the loss of the right to use the "Inland" name and our name and logo.

- *Acquire Our Business Manager/Advisor and Property Managers.* The advantages of this alternative were, among other things, eliminating the fees paid to our Business Manager/Advisor and Property Managers, achieving an internally managed structure appropriate to our scale, aligning more closely the interests of the management of our Business Manager/Advisor and Property Managers with our stockholders, substantially reducing transition risks associated with the termination alternatives, preserving our access to the administrative services provided by Inland, and preserving the right to use the "Inland" name and our name and logo. Under this alternative, we were able to retain, at no cost to us, the consulting services of Messrs. Goodwin, Parks and Cosenza. The disadvantage of this alternative was the difficulty in quantifying the value of the relationships with Inland as well as the business management, advisory and property management services provided by our Business Manager/Advisor and Property Managers.

- *Sell Our Company to a Third Party.* The potential advantage of this alternative was primarily the possibility of obtaining a premium from an acquiror of our company. The disadvantages were, among other things, the loss of no cost and low cost services provided by Inland due to a change in control and the loss of key personnel. The special committee also considered the value that self-administration could add to our company in anticipation of a public listing or liquidity event.

After carefully weighing the option of internalizing by acquiring our Business Manager/Advisor and Property Managers and the possible alternatives to such a transaction, and the positive and negative factors with respect to each option, the special committee determined that the acquisition of our Business Manager/Advisor and Property Managers was (i) fair to and in the best interests of our stockholders, (ii) fair, competitive and commercially reasonable and (iii) fair and reasonable to us and on terms and conditions not less favorable to us than those available from unaffiliated third parties. Accordingly, the special committee unanimously recommended to our Board the Merger Agreement and the consummation of the Merger pursuant to the terms of the Merger Agreement.

23

**Merger Agreement**

The following discussion is a summary of the material terms of the Merger Agreement. It does not contain all of the information regarding the Merger Agreement that you may consider important. We encourage you to read the Merger Agreement in its entirety, a copy of which is attached hereto as **Appendix A**.

*General — Structure of the Merger.* The structure of the Merger involves four separate mergers, wherein our Business Manager/Advisor and each of the three Property Managers (each of which we refer to as a Service Provider and collectively as the Service Providers) will become our wholly-owned subsidiaries. We have incorporated four wholly-owned corporate subsidiaries, IWEST Acquisition 1, Inc., IWEST Acquisition 2, Inc., IWEST Acquisition 3, Inc. and IWEST Acquisition 4, Inc., each of which we refer to as an Acquisition Entity, solely for the purposes of effectuating the Merger. On the closing date, the four separate mergers will take place as follows:

- IWEST Acquisition 1, Inc., will merge with and into our Business Manager/Advisor, with our Business Manager/Advisor as the surviving corporation in this merger;

- IWEST Acquisition 2, Inc., will merge with and into ISMC, with ISMC as the surviving corporation in this merger;

- IWEST Acquisition 3, Inc., will merge with and into INMC, with INMC as the surviving corporation in this merger; and

- IWEST Acquisition 4, Inc., will merge with and into IWMC, with IWMC as the surviving corporation in this merger.

Upon consummation of the Merger, each surviving corporation will continue as one of our wholly-owned subsidiaries, and will succeed to all of the assets, business and liabilities of the corresponding Service Provider, and certain employees of the Property Managers will become employees of the corresponding surviving corporation.

For each of the four separate mergers, the charter and bylaws of the Acquisition Entity will be the charter and bylaws of the corresponding surviving corporation after that merger, until later amended as provided therein and under applicable law. In addition, the officers and directors of the involved Acquisition Entity will be the officers and directors of the corresponding surviving corporation until their resignation or such time as they may be relieved of their duties.

Under Maryland law and our existing charter, holders of our common shares will not be entitled to rights of appraisal with respect to the Merger.

*Payment of Merger Consideration.* Upon consummation of the Merger, the stockholders of our Business Manager/Advisor and our Property Managers have the right to receive newly issued shares of our common stock according to an exchange ratio separately calculated with respect to each Service Provider. In lieu of issuing fractional common shares, all fractional common shares that any holder of the issued and outstanding shares of any of the Service Providers would otherwise be entitled to receive as a result of the respective merger will be aggregated for such stockholder, and if any fractional common share results from such aggregation, the number of our shares issued to such holder will be rounded up to the nearest whole number. 55% of the consideration for the Merger will be placed into an escrow account and the remaining 45% of the consideration will be issued directly to the stockholders of the Service Providers. The consideration will be allocated to the stockholders of the Service Providers as follows:

- In the merger of IWEST Acquisition 1, Inc., with and into our Business Manager/Advisor, each outstanding share of the capital stock of our Business Manager/Advisor will be converted into the right to receive 18,750 shares of our common stock, and a total of 10,312,500 of these shares will be deposited into the escrow account;

24