IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION, THE INLAND GROUP, INC., INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP., INLAND WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL A. GOODWIN, ROBERT A. BAUM, G. JOSEPH COSENZA, KPMG LLP, AND WILLIAM BLAIR & COMPANY, L.L.C., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 07 C 6174 <br><br> Judge Robert W. Gettleman |

**MEMORANDUM IN SUPPORT OF THE NON-KPMG/WILLIAM BLAIR
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION..................................................................................................1

STATEMENT OF FACTS...................................................................................4

ARGUMENT.........................................................................................................9

I.    PLAINTIFFS LACK STANDING TO ASSERT THEIR COMMON
    LAW CLAIMS. ..............................................................................................9

    A.    Counts III–VII Should Be Dismissed Because Plaintiffs Fail To Plead
        Particularized Facts Showing That Demand Was Futile. ...................9

    B.    Plaintiffs Lack Standing To Pursue Counts III And IV...................15

    C.    Counts III–VII Should Be Dismissed Because Plaintiffs Fail To Plead
        Facts Sufficient To Overcome The Protections Of The Business
        Judgment Rule. ..................................................................................16

        1.    Plaintiffs Fail To Rebut The Presumption That The Board
            Decisions Were Approved By A Majority Of Disinterested,
            Independent Directors...................................................................18

        2.    Plaintiffs Fail To Rebut The Presumption That The Board
            Decisions Were Made With Due Care. ..........................................19

        3.    Plaintiffs Cannot Conceal The Defects In Their Claims Through
            The Use Of Prohibited "Shotgun" Pleading....................................21

II.    PLAINTIFFS' 1934 ACT CLAIMS ARE FATALLY FLAWED AND
     SHOULD BE DISMISSED. .........................................................................25

    A.    Applicable Pleading Standards.........................................................26

        1.    Rule 12(b)(6)...................................................................................26

        2.    The PSLRA's Heightened Pleading Standards...............................26

    B.    Plaintiffs' § 14(a) Claim Fails To Satisfy The Heightened Pleading
        Standards Of The PSLRA...................................................................28

        1.    Plaintiffs Fail To Plead With Particularity That Each Defendant
            Acted With The Required State Of Mind To Support Their
            Allegations Of Financial Statement Manipulation. ......................29

        2.    Plaintiffs Fail To Sufficiently Allege That The Financial
            Statements Contained Material Misstatements Or Omissions --
            Basic Elements of Their § 14(a) Claim Under the PSLRA. ........32

a.    There Is No Basis For Plaintiffs' Conclusion That The
Advisor's And Property Managers' Financial Statements
Misleadingly Understated Operating Expenses. ...................................33

i.    Plaintiffs' Allegations Are Mere Conclusions Not
Supported By Facts. ..........................................................33

ii.    The Proxy Disclosures Undercut Plaintiffs' Assumptions. ...........34

b.    There Is Similarly No Basis For Plaintiffs' Allegation That The
Property Managers' Financial Statements Were False And
Misleading Because They Received Excessive Fees. ...........................35

3.    Plaintiffs Failure To Plead How Any Statement In The Proxy Was
Rendered Misleading By The Alleged Omissions Requires
Dismissal Of Their Remaining § 14(a) Allegations. ...................................37

C.    Plaintiffs' § 20(a) Claim Fails As A Matter Of Law. ..............................38

III.    PLAINTIFFS' COMMON LAW CLAIMS SUFFER FROM FATAL
DEFICIENCIES THAT PROVIDE ADDITIONAL BASES FOR
DISMISSAL ..........................................................................................................39

A.    Count VII Of The Amended Complaint Fails To State A Colorable
Claim For Breach Of Contract. ....................................................................39

1.    Defendants Cannot Breach A Term That Does Not Exist In The
Property Management Agreement. ....................................................39

2.    The Voluntary Payment Doctrine Bars The Breach Of Contract
Claim (Count VII) And The Unjust Enrichment Claim (Count VI) .........40

3.    Because Certain Defendants Are Non-Parties To The Agreements
In Dispute, They Cannot Be Liable For A Breach Of Those
Agreements. ............................................................................41

4.    IWEST Cannot Allege Breach Of A Contractual Term That It
Expressly Waived. ....................................................................42

B.    Multiple, Fatal Defects Undermine Count VI's Attempt To Assert A
Claim For Unjust Enrichment. ....................................................................42

1.    Plaintiffs' Unjust Enrichment Claim Alleges Factual
Inconsistencies Regarding The Recipients Of The Property
Management Fees. ....................................................................42

2.    Plaintiffs' Unjust Enrichment Claim Fails Because The Merger Agreement Governs The Relationship Between IWEST And The Recipients Of The Internalization Consideration. .......................................43

C.    Plaintiffs' Fiduciary Duty Claims In Counts III-V Fail To Allege Cognizable Duties Or Breaches. .......................................................43

CONCLUSION ......................................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*,
  77 F.3d 364 (11th Cir. 1996) ...................................................................................22

*Anetsberger v. Metro. Life Ins. Co.*,
  14 F.3d 1226 (7th Cir. 1994) ...................................................................................42

*Beck v. Dobrowski*,
  No. 06 C 0411, 2007 WL 3407132 (N.D. Ill. Nov. 14, 2007)...................................... passim

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)...........................................................................................26

*Bender v. Schwartz*,
  917 A.2d 142 (Md. Ct. Spec. App. 2007) .............................................................18

*Black v. Fox Hills N. Cmty. Ass'n, Inc.*,
  599 A.2d 1228 (Md. Ct. Spec. App. 1992) ...........................................................17

*Blau v. Harrison*,
  No. 04 C 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006) ..................................27

*Bloomington Partners, L.L.C. v. City of Bloomington*,
  No. 04-CV-2287, 2005 WL 3536340 (C.D. Ill. Dec 23, 2005)..............................25

*Bond  Opportunity Fund v. Unilab Corp.*,
   No. 99 Civ. 11074, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003)...............28, 29, 32

*Calderon v. Southwestern Bell Mobile Systems, LLC*,
  390 F. Supp. 2d 714 (N.D. Ill. 2005) ....................................................................40

*Danielewicz v. Arnold*,
  769 A.2d 274 (Md. 2001) .................................................................................10, 11, 15

*Donovan v. ABC-NACO Inc.*,
  No. 02 C 1951, 2002 WL 1553259 (N.D. Ill. July 15, 2002) ...........................38, 39

*Feldman v. Motorola, Inc.*,
  No. 90 C 5887, 1993 WL 497228 (N.D. Ill. Oct. 14, 1993).....................................39

*Fisher v. Kanas*,
  467 F. Supp. 2d 275 (E.D.N.Y. 2006) .............................................................27, 32

*Gagliardi v. TriFoods Int'l, Inc.*,
    683 A.2d 1049 (Del. Ch. 1996)..................................................................20

*Geier v. Hamer Enters., Inc.*,
    589 N.E.2d 711 (Ill. App. Ct. 1992) ........................................................42

*Guinn v. Hoskins Chevrolet*,
    836 N.E.2d 681 (Ill. App. Ct. 2003) ........................................................43

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)..................................................................20

*Harrison v. Dean Witter Reynolds, Inc.*,
    974 F.2d 873 (7th Cir. 1992) ...................................................................38

*Hudson v. Prime Retail, Inc.*,
    No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ..........18, 19, 20

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)....................................................................26

*In re Caremark Int'l Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996)..................................................................20

*In re CNL Hotels & Resorts, Inc. Securities Litigation*,
    No. 604CV1231ORL31KRS, 2005 WL 2219283 (M.D. Fla. Sept. 13, 2005).............2, 12, 13

*In re CompuCom Sys., Inc. Stockholders Litig.*,
    No. Civ.A. 499-N, 2005 WL 2481325 (Del. Ch. Sept. 29, 2005) .........................19

*In re Franklin Mut. Funds Fee Litig.*
    388 F. Supp. 2d 451 (D. N.J. 2005) ........................................................14, 15

*In re InfoSonics Corp. Deriv. Litig.*,
    No. 06 cv1336, 2007 WL 2572276, at *7 (S.D. Cal. Sept. 4, 2007) ......................13

*In re Sagent Tech., Inc. Deriv. Litig.*,
    278 F. Supp. 2d 1079, 1094–95 (N.D. Cal. 2003) ..................................23

*In re Verisign, Inc., Deriv. Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ....................................................27

*In re W. Nat'l Corp. S'holders Litig.*,
    No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000)........................................19

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964)................................................................................28

*Jackson v. F.B.I.*,
No. 02 C 3957, 2007 WL 433143 (N.D. Ill. Jan. 31, 2007) ................................................22

*JP Morgan Chase & Co. Sec. Litig.*,
No. 06 C 4674, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ....................................26, 27, 28

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991)........................................................................................................9, 10

*Kamen v. Kemper Fin. Servs., Inc.*,
939 F.2d 458 (7th Cir. 1991) ................................................................................................14

*Kauth v. Hartford Ins. Co. of Ill.*,
852 F.2d 951 (7th Cir. 1988) ................................................................................................39

*King v. First Capital Fin. Servs. Corp.*,
828 N.E.2d 1155 (Ill. 2005)..................................................................................................41

*LaBolle v. Metro. Sanitary Dist.*,
629 N.E.2d 56 (Ill. App. Ct. 1992) ......................................................................................24

*Lambert v. Calprotrack, Inc.*,
No. 95 C 4076, 1996 WL 224515 (N.D. Ill. May 1, 1996) ....................................................39

*Little Gem Life Scis. LLC v. Orphan Med., Inc.*,
Civ. No. 06-1377, 2007 WL 2695787 (D. Minn. Sept. 13, 2007)..........................................27

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ................................................................................................31

*McSparran ex rel Career Educ. Corp. v. Larson*,
Nos. 04 C 0041, 04 C 4778, 2007 WL 684123, at *3 (N.D. Ill. Feb. 28, 2007) ................ 10

*Meeker v. Gray*,
492 N.E.2d 508 (Ill. App. Ct. 1986) ....................................................................................41

*Nagel v. ADM Investor Servs., Inc.*,
995 F. Supp. 837 (N.D. Ill. 1998) ........................................................................................23

*Orman v. Cullman*,
794 A.2d 5, 24 (Del. Ch. 2002)............................................................................................18

*Paskowitz v. Wohlstadter*,
822 A.2d 1272 (Md. Ct. Spec. App. 2003) ..........................................................................15

*Riggs Partners, LLC v. Hub Group, Inc.*,
No. 02 C 1188, 2002 WL 31415721 (N.D. Ill. Oct. 25, 2002)........................................ passim

*Rudolph v. UTStarcom,*
    No. C 07-04578, 2008 WL 1734763 (N.D. Cal. Apr. 14, 2008) ......................................27, 34

*Santella v. Grishaber,*
    672 F. Supp. 321 (N.D. Ill. 1987) ...........................................................................................41

*Scalisi v. Fund Asset Mgmt., L.P.,*
    380 F.3d 133 (2d Cir. 2004) ...................................................................................................15

*Sekuk Global Enters. Profit Sharing Plan v. Kevenides,*
    Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508 (Md.
    Cir. Ct. May 25, 2004) ....................................................................................................11, 14

*Spagnola v. Chubb Corp.,*
    No. 06 Civ. 9960(HB), 2007 WL 927198 (S.D.N.Y. Mar. 27, 2007) .....................................40

*Starr v. !hey, Inc.,*
    No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) ......................................38

*Tamayo v. Blagojevich,*
    526 F.3d 1074 (7th Cir. 2008) ................................................................................................43

*Taylor v. First Union Corp. of S.C.,*
    857 F.2d 240 (4th Cir. 1998) ...........................................................................................37, 38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ......................................................................................................26, 28

*Textainer P'ship Sec. Litig.,*
    No. C-05-0969, 2005 WL 3801596 (N.D. Cal. Dec. 12, 2005) ..............................................37

*Touche Ross & Co. v. Redington,*
    442 U.S. 560 (1979) ................................................................................................................28

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ..........................................................................................................27, 38

*United States ex rel. Garst v. Lockheed,*
    328 F.3d 374 (7th Cir. 2003) ..................................................................................................22

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.,*
    20 F.3d 771 (7th Cir. 1994) ....................................................................................................22

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991) ..............................................................................................................32

*Waller v. Waller,*
    49 A.2d 449 (Md. 1946) ....................................................................................................15, 16

*Washtenaw Cty. Emp. Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*,
    2008 WL 2302679 (N.D. Ga. Mar. 31, 2008) ................................................................ passim

*Werbowsky v. Collomb*,
    766 A.2d 123 (Md. 2001) ................................................................................................ passim

*Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp.*,
    794 N.E.2d 1012 (Ill. App. Ct. 2003) ...................................................................................41

*Wittman v. Crooke*,
    707 A.2d 422 (Md. Ct. Spec. App. 1998) ............................................................................17

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007)...................................................................................34

## STATUTES

15 U.S.C. § 78u-4(a)(1) ...........................................................................................................26

15 U.S.C. § 78u-4(b)(1) ..............................................................................................26, 27, 37

15 U.S.C. § 78u-4(b)(2) ...........................................................................................................26

15 U.S.C. § 78u-4(b)(3) .....................................................................................................26, 27

28 U.S.C. § 1332(a) .................................................................................................................39

MD. CODE ANN, CORPS. & ASS'NS § 2-405.1(a)...............................................................16, 17

MD. CODE ANN, CORPS. & ASS'NS § 8-601.1 ........................................................................17

## OTHER AUTHORITIES

FED. R. CIV. P. 8(a)..................................................................................................................22

FED. R. CIV. P. 12(b)(6)......................................................................................................25, 26

FED. R. CIV. P. 23.1 ..............................................................................................................1, 10

## <u>INTRODUCTION</u>

At its core, the seven-count, 351-paragraph Amended Complaint, concerns two alleged matters:  (1) overpayment of fees by IWEST to its Property Managers during 2005 and 2006, and (2) IWEST's acquisition of its Advisor and Property Managers (the "Internalization") at an inflated price.  The decisions concerning both of those matters were made by IWEST's Board of Directors ("Board"), the majority of whom are independent.  Accordingly, as a threshold matter, Plaintiffs have no standing to bring any of the claims alleged in Counts III–VII, and the Board's decisions with respect to those matters are entitled to a presumption of good faith and to the protection of the business judgment rule.

Under Maryland law, Plaintiffs were required to make a demand on IWEST's Board that the Board take action against the Defendants, prior to instituting litigation in IWEST's name. Because Plaintiffs did not make a demand, it is their burden under Rule 23.1 to allege with particularity why demand should be excused.  Demand is excused only if the Amended Complaint includes particularized facts demonstrating that a majority of the Board was so personally conflicted or committed to the disputed transactions that it could not possibly respond to a demand in good faith.  Stripped of conclusory allegations, the Amended Complaint contains no facts to satisfy this heightened pleading standard.  Instead, the facts pled in the Amended Complaint show that the decisions at issue were made by a majority of four independent directors who had no material financial interests in the transactions.  These four directors constituted the Special Committee that analyzed, negotiated and recommended the Internalization.  Because Plaintiffs cannot establish demand futility, the derivative claims belong to IWEST and must be dismissed.

Plaintiffs' derivative claims also fail under the business judgment rule.  Under Maryland law, it is presumed that the Board members acted at all times with due care and in the best interests of the corporation.  To rebut the presumption that the Board acted in the best interests of IWEST, Plaintiffs must allege particularized facts demonstrating that a majority of the Board had either a material financial interest in the transaction or lacked independence in its decision

making. Plaintiffs' efforts to impugn the disinterestedness and independence of the Special Committee fall far short of this substantive pleading requirement. To rebut the presumption that the Board acted with due care, Plaintiffs must plead particularized facts attacking the process by which the Board made its decisions, rather than simply second-guessing the results of those decisions. The Amended Complaint is conspicuously silent on the process by which the Board approved the property management fees. And with respect to the Board's decision to approve the Internalization, Plaintiffs acknowledge that the Special Committee spent 14 months in protracted negotiations, analyses and due diligence reviews, and consulted with its independent legal counsel and advisors -- all facts that substantiate the presumption that the Board acted with due care.

Plaintiffs' attempt to associate over a dozen other non-director parties to each Board decision adds nothing but confusion and bloat. In impermissible shotgun and conclusory fashion, Plaintiffs make indiscriminate, group pleading allegations that various individuals and entities worked in concert with the Board to effectuate the challenged decisions at issue. Yet Plaintiffs fail to allege any facts explaining how each of these non-director Defendants stripped the independent Board members of their decision-making capacity. Baldly asserting that multiple parties like the Property Managers, the Advisor, The Inland Group, Inc., and the Sponsor were somehow linked to each and every allegation does not make IWEST's disinterested, independent Board members any less so.

Indeed, courts applying Maryland law have dismissed with prejudice similar REIT-related breach of duty claims brought by Plaintiffs' counsel of record in two other cases: *Washtenaw County Employees' Retirement System v. Wells Real Estate Investment Trust, Inc.*, Civil Action No. 1:07-CV-862, 2008 WL 2302679 (N.D. Ga. Mar. 31, 2008) and *In re CNL Hotels & Resorts, Inc. Securities Litigation*, No. 604CV1231ORL31KRS, 2005 WL 2219283 (M.D. Fla. Sept. 13, 2005). In the former, plaintiff (and his counsel) was expressly admonished to "avoid [pleading] tactics that result in shotgun pleading." *Wells*, 2008 WL 2302679, at *16.

2

The instant Plaintiffs ignore this judicial admonition and again submit an Amended Complaint loaded with similar impermissible pleading tactics. It must be rejected.

With respect to the Proxy disclosure claims in Counts I and II, Plaintiffs allege that the Proxy was false and misleading because the Internalization transaction was based upon manipulated financial statements that inflated revenues. As an initial matter, Plaintiffs fail to proffer any, much less sufficient, facts to establish their conclusory allegation that the Advisor's and Property Managers' financial statements actually reflect excess fees and hidden expenses. Moreover, Counts I and II allege that Defendants all knew and understood that the financial statements had been manipulated to inflate the earnings, but schemed to conceal this knowledge from the shareholders, with the "end-game" of enriching company insiders. Under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Plaintiffs must plead with particularity facts creating a strong inference that each Defendant acted with this state of mind. Here, the Amended Complaint is devoid of any facts suggesting that even one Defendant, let alone all of them, knew that the property management fees were too high, the expenses were understated, or that the Internalization consideration was based on manipulated financial statements. Plaintiffs instead rely on speculation and conclusory group pleading -- precisely the type of allegations the Seventh Circuit routinely has rejected.

It is an extraordinary measure to ask the Court to second-guess the decisions of a corporate board. To establish entitlement to such extreme relief, Plaintiffs must first overcome substantial pleading hurdles. There are simply no particularized facts in the Amended Complaint that establish demand futility, rebut the presumptions of the business judgment rule, or satisfy the PSLRA's heightened pleading requirements. Given the pervasive nature of Plaintiffs' pleading infirmities, granting leave to replead yet a second time would be futile. The Amended Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

**Inland Western Retail Real Estate Trust, Inc.**

Inland Western Retail Real Estate Trust, Inc. ("IWEST") is a Maryland corporation formed in March 2003 that operates as a real estate investment trust ("REIT") primarily focused on acquiring, developing, operating and leasing multi-tenant shopping centers and single-user net lease properties. (Excerpts from IWEST Proxy filed with the SEC on September 10, 2007 ("Proxy") (Ex. 1) at 6.)[1] As of June 30, 2007, IWEST's property portfolio consisted of 288 wholly-owned properties, 16 properties in which IWEST held an interest of between 45% and 95%, and six development joint venture projects in which IWEST had an investment. (*Id*.)

IWEST issued shares of stock to the public through two public offerings spanning several months -- its initial public offering that commenced on September 17, 2003, and a subsequent offering of shares that commenced on December 28, 2004. (Am. Compl. ¶ 13.) There currently is no public trading market for IWEST's shares. (*Id*. ¶ 17.) From its inception, IWEST has informed its existing and prospective shareholders that IWEST has contemplated having its shares listed on a national stock exchange or included for quotation on a national market system, selling the REIT's assets individually, or liquidating at a future date. (*Id*.; Excerpts from IWEST Prospectus filed with the SEC on September 8, 2004 ("Prospectus") (Ex. 2) at 12.)

Prior to the Internalization, IWEST had no employees and therefore needed to rely on service providers, including a business advisor, property managers, and other entities, to organize, supervise and conduct its day-to-day operations. (Am. Compl. ¶ 19; Proxy (Ex. 1) at 6.) To that end, IWEST contracted with and paid Inland Western Retail Real Estate Advisory Services, Inc. (the "Advisor"); Inland Southwest Management Corp., Inland Northwest Management Corp., and Inland Western Management Corp. (the "Property Managers"); as well as multiple other entities affiliated with The Inland Group, Inc. ("TIGI") to provide the services

---

[1] In evaluating a motion to dismiss, the Court may consider the attached Proxy, Prospectus, and Property Management Agreement as all of those documents are cited, referred to, and/or quoted in the Amended Complaint and were filed with the SEC. *See Riggs Partners LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *1 (N.D. Ill. Oct. 25, 2002).

necessary for IWEST to operate.  (Am. Compl. ¶ 19; Prospectus (Ex. 2) at 3.)  The Advisor provided overall business management and advisory services; the Property Managers managed IWEST's real estate holdings; and the TIGI affiliates provided IWEST with other necessary services.  (Am. Compl. ¶ 19; Prospectus (Ex. 2) at 3.)

From inception, the Board considered the possibility of becoming a self-administered entity.  For example, IWEST's September 8, 2004 Prospectus informed prospective shareholders that IWEST may later seek to become self-administered, and notes that its contracts with the Advisor and Property Managers give IWEST the right to acquire those service providers. (Prospectus at (Ex. 2) 22, 76.)  According to the Proxy, the Special Committee determined that becoming self-administered helps a REIT, such as IWEST, better position itself to raise capital or list its shares on a national securities exchange and makes the REIT's shares a more liquid asset for its shareholders, enabling them to cash-out of their investment more quickly.  (Am. Compl. ¶ 156; Proxy (Ex. 1) at 20–21.)

**Service Agreements:**

### The Advisory Agreement.

IWEST and the Advisor entered into a Second Amended and Restated Advisory Agreement dated December 28, 2004 ("Advisory Agreement"). (Am. Compl. ¶ 114.)  The Advisory Agreement sets forth the services to be performed by the Advisor and the fees to be paid by IWEST for such services.  (*Id.* ¶¶ 116–17.)  Under the Advisory Agreement, IWEST agreed to pay the Advisor an asset management fee of not more than 1% of IWEST's Average Invested Assets (as defined in the Advisory Agreement).  (*Id.* ¶ 117.)

### The Property Management Agreement.

IWEST entered into identical contracts (the "Property Management Agreement"), with each of the three Property Managers outlining the services to be provided and the fees to be paid for such services.  (Am. Compl. ¶¶ 124–26; Property Management Agreement filed with the SEC on May 8, 2003 (Ex. 3).)  Under the Property Management Agreement, IWEST agrees to pay the

Property Managers a fee of up to 4.5% of Gross Income for the base services anticipated and specified in the agreement. There is no limit on the amount of fees that may be paid under the 4.5%-times-Gross Income formula. (Am. Compl. ¶ 126; Property Management Agreement (Ex. 3) at 11.) The Agreement further provides that if IWEST and the Property Managers agree that "[a]ny services beyond those specified" are necessary, they shall agree on the scope of those extra services. (*Id.*) A cap applies to those services, as the fee for agreed-upon extra services may "not exceed 90% of that which would be paid to unrelated parties providing such services[.]" (*Id.*)

In filings with the SEC, the property management fee was characterized in two ways. For example, IWEST's September 8, 2004 Prospectus, characterizes the fee as "4.5% of gross income" on some pages (*see, e.g.*, Prospectus (Ex. 2) at 42, 302, F-22, F-43, F-58, F-63), and "4.5% of gross income/cannot exceed 90% of the fee which would be payable to an unrelated third party" on other pages (*id.* at 7, F-21; *see also* Am. Compl. ¶ 134).[2] Moreover, the Prospectus cautions: "Whenever a reference is made in this prospectus to any contract or other document of ours, the reference may not be complete and you should refer to the exhibits that are a part of the registration statement for a copy of the contract or document." (Prospectus (Ex. 2) at 309.) The Property Management Agreement, stating that the 90%-of-market cap does not apply to the 4.5% fee for base services, was filed with the SEC on May 8, 2003 as Exhibit 10.3 of the Amended Registration Statement. (Property Management Agreement (Ex. 3).)

**Other Services Agreements.**

From IWEST's formation, affiliates of TIGI have contracted directly with IWEST to provide additional services, with IWEST compensating these entities pursuant to the various contracts. (Proxy (Ex. 1) at 40, 72.) IWEST disclosed in the Proxy that these services, which continued after Internalization, include services related to IWEST's securities investments, loan

---

[2] Plaintiffs allege that a 90% cap on the 4.5% fee for base services also was set forth in IWEST's Articles of Incorporation and the Advisory Agreement. The 90% cap does not appear anywhere in the Articles of Incorporation. Although the Advisory Agreement contains a definition of "Property Management Fee" that references a 90% cap, that defined term is not used in the Advisory Agreement itself.

servicing, and mortgage financing and that the contracts covering these and other services were being modified as part of the Internalization. (*Id.* at Appx. K-1–K-8.)

**The Internalization Process.**

Pursuant to the Advisory Agreement and the Property Management Agreement, on or after September 15, 2008 and May 2008, respectively, IWEST had the option ("Purchase Option") to acquire the Advisor and Property Managers pursuant to a specified formula. (Am. Compl. ¶¶ 122, 128–29.) In February 2006, the Board determined that it would be advisable to form a special committee comprised only of independent directors to consider and evaluate a possible Internalization and the alternatives thereto. (*Id.* ¶ 141; Proxy (Ex. 1) at 14.) The "Special Committee" consisted of Independent Directors Beard, Gauvreau, Gorski and Murphy. (Am. Compl. ¶ 141; Proxy (Ex. 1) at 14.)[3]

The Special Committee independently evaluated the possible Internalization. It did not rely solely on information provided to it by IWEST, the Advisor, or the Property Managers; instead, the Special Committee hired its own independent financial advisor, William Blair & Company ("William Blair") and its own independent legal counsel, Sidley Austin LLP ("Sidley") to provide professional business and legal advice during its evaluation process. (Am. Compl. ¶ 143; Proxy (Ex. 1) at 14–15.)

In formulating, negotiating and recommending the Internalization to its shareholders, IWEST requested that its independent auditor, KPMG, provide an independent auditor opinion with respect to the financial statements of the Advisor and the Property Managers. (Am. Compl. ¶¶ 185–86.) KPMG opined that the financial statements presented fairly the financial position of the Advisor and Property Managers in all material respects, and further opined that the financial statements conformed with GAAP. (*Id.* ¶ 186–87.) These financial statements and independent auditor reports were included in the Proxy, and presented by the Special Committee to William Blair for use as part of William Blair's financial analysis. (*Id.* ¶¶ 186–88, 235, 240.)

---

[3] Although Mr. Catalano was originally a member of the Special Committee, he subsequently resigned due to a financial relationship with the Advisor. (Am. Compl. ¶ 72; Proxy (Ex. 1) at 15.)

On December 12, 2006, after nearly seven months of due diligence, the Special Committee discussed several possible business alternatives: (a) maintaining the status quo; (b) terminating existing Agreements and hiring new providers to supply advisory and property management services; (c) creating internal advisory and property management functions and terminating the Agreements; or (d) selling IWEST to a third party. (Am. Compl. ¶ 144; Proxy (Ex. 1) at 16.) As part of its evaluation, the Special Committee, assisted by its business and legal advisors, considered, among other things, the scope of services provided by the Advisor, Property Managers, and other service providers; the costs of these services as compared to services that could be provided by third parties; the risks of creating an internal staff to perform these services as compared to acquiring the Advisor and Property Managers; the potential cost savings that could be realized by the Internalization; and the potential immediate, positive impact to IWEST's earnings as a result of the Internalization. (Am. Compl. ¶¶ 147–48; Proxy (Ex. 1) at 16–17.) After evaluating these options, the Special Committee concluded, among other things, that it would be difficult and impractical to replace the services provided by the Advisor and Property Managers. (*Id.*) The Special Committee believed that the Internalization would be accretive to IWEST's funds from operations ("FFO," a common REIT metric) by approximately $.08 per share in the first year. (Proxy (Ex. 1) at 21.) That translates to an extra $36 million in FFO given that there were 450 million shares outstanding. (*Id.* at 75.)

Further, the Special Committee reviewed and considered William Blair's financial analysis of the Internalization and its projection that the Purchase Option formula would yield a potential purchase price of 54.1 million shares. (Am. Compl. ¶ 222; Proxy (Ex. 1) at 56.) The Special Committee viewed the Purchase Option price as a "ceiling" on the number of shares that could be issued in connection with the Internalization. (Proxy (Ex. 1) at 17.)

On February 17, 2007, the parties preliminarily agreed to an aggregate purchase price of 37.5 million shares, well below the 54.1 million shares projected by William Blair under the Purchase Option formula. (Am. Compl. ¶ 150; Proxy (Ex. 1) at 18.) On August 14, 2007, William Blair presented its updated financial analysis to the Special Committee and opined that

37.5 million shares to be paid by IWEST for the Internalization "was financially fair to [IWEST] and its stockholders." (Am. Compl. ¶ 151; *accord* Proxy (Ex. 1) at 20.) After more than 14 months of due diligence and negotiations, the Special Committee unanimously recommended approval of the Internalization. (Am. Compl. ¶¶ 151, 217; Proxy (Ex. 1) at iii, 20.) Thereafter, the "Board met telephonically and unanimously approved the [Internalization.]" (Am. Compl. ¶¶ 151, 217; Proxy (Ex. 1) at 20.)

**The Proxy and Internalization.**

On September 10, 2007, IWEST issued the Proxy to solicit support for the Internalization, among other reasons, to be voted on at IWEST's 2007 annual meeting of shareholders on November 13, 2007. (Proxy (Ex. 1) at 3.) As a result of the completed Internalization, the Advisor and Property Managers are operating as wholly-owned subsidiaries of IWEST.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING TO ASSERT THEIR COMMON LAW CLAIMS.

Before the Court even reaches the merits of the Amended Complaint, it should dismiss Counts III–VII because Plaintiffs lack standing to assert these claims.

### A.    Counts III–VII Should Be Dismissed Because Plaintiffs Fail To Plead Particularized Facts Showing That Demand Was Futile.

A fundamental premise of Maryland corporate law[4] is that a corporation's business and affairs, including the decision to institute litigation, are managed by its board of directors and not by its shareholders. *Werbowsky v. Collomb*, 766 A.2d 123, 133 (Md. 2001). "Shareholders are not ordinarily permitted to interfere in the management of the company," with one very narrow exception. *Id.* Shareholders can bring a derivative action to enforce a corporate cause of action only if those in control of the company improperly refuse to bring the action. *See Kamen v.*

---

[4] Substantively, a shareholder derivative action is governed by the law of the state of incorporation. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97 (1991). Because IWEST is a Maryland corporation (Am. Compl. ¶ 11), Maryland law controls its actions.

*Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991); *Werbowsky*, 766 A.2d at 133–34. A derivative claim is an "extraordinary equitable device," and before it is filed, shareholders must either make a demand on the board that the company bring the suit, or show that demand is excused as futile. *Werbowsky*, 766 A.2d at 133–35. This is known as the "demand requirement." *Id.*

The demand requirement is both a procedural and a substantive requirement. *Id.* at 134. Maryland courts have recognized:

> The demand requirement *is* important. Directors are presumed to act properly and in the best interest of the corporation. They enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing. Nor should they, or the corporation, be put unnecessarily at risk by minority shareholders bent simply on mischief, who file derivative actions not to correct abuse as much to coerce nuisance settlements.

*Id.* at 144 (emphasis in original). "The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Id.* at 134 (quoting *Kamen*, 500 U.S. at 96).

Plaintiffs concede that they did not make a demand on the IWEST Board before bringing this lawsuit. (Am. Compl. ¶ 94.) Under both Maryland law and Rule 23.1, the Amended Complaint should be dismissed unless Plaintiffs can demonstrate that demand should be excused. *See Werbowsky*, 766 A.2d at 133–34. This is known as the "demand futility exception." *Id.* Notably, "the trend . . . has been to enforce more strictly the requirement of pre-suit demand and at least to circumscribe, if not effectively eliminate, the futility exception." *Id.* at 137. Further, plaintiffs must set forth *with particularity* the reasons why demand is excused. *Id.; see also* FED. R. CIV. P. 23.1;[5] *Danielewicz v. Arnold*, 769 A.2d 274, 290–93 (Md. 2001) (affirming dismissal

---

[5] Under Rule 23.1, a plaintiff must "(3) state with particularity: (A) any effort by [it] to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." FED. R. CIV. P. 23.1(b)(3)(A)-(B). This rule requires plaintiff to satisfy more stringent pleading requirements than simple notice pleading. *McSparran ex rel Career Educ. Corp. v. Larson*, Nos. 04 C 0041, 04 C 4778, 2007 WL 684123, at *3 (N.D. Ill. Feb. 28, 2007) ("the normally liberal pleading standards of the Federal Rules of Civil Procedure are heightened in this case by Rule 23.1"). Further, although Rule 23.1 requires that the Amended Complaint be verified, Plaintiffs have not done so in this case.

of plaintiff's claims for failure to make a demand and holding that particularity is required to plead demand futility); *Sekuk Global Enters. Profit Sharing Plan v. Kevenides*, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508, at *5, 9 (Md. Cir. Ct. May 25, 2004) (same). Plaintiffs must plead "evidence," and not merely rely upon "conjecture and speculation[]" that "the directors' proposed interests in the transaction would have caused them to reject a demand . . . had such demand been made at the appropriate time." *Danielewicz*, 769 A.2d at 291.

Under Maryland law, the "very limited" demand futility exception applies only when allegations "clearly demonstrate, in a very particular manner" that:

> (1)  a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or

> (2)  a majority of the directors are *so personally and directly conflicted or committed to the decision in dispute* that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

*Werbowsky*, 766 A.2d at 144 (emphasis added). Here, Plaintiffs have not attempted to allege that a demand, or delay, would cause irreparable harm to satisfy the first prong of this standard. Nor have Plaintiffs alleged particularized facts sufficient to satisfy the second prong of this standard.

Specifically, the IWEST Board consisted of seven directors at the time the complaint was filed. (Am. Compl. ¶ 95.) To show that demand was futile, Plaintiffs must present particular facts sufficient to demonstrate that four of these directors (a majority) are "so personally and directly conflicted to the decision in dispute" that they cannot properly respond to a demand. *See Werbowsky*, 766 A.2d at 144. The relevant members of the Board for demand futility purposes are Defendants Beard, Gauvreau, Gorski and Murphy (the "Special Committee"). Because Maryland law requires an analysis with respect to the majority of directors only, Plaintiffs' allegations of conflicts involving defendants Parks, Gujral and Catalano can be ignored. (*See, e.g.*, Am. Compl. ¶¶ 97, 100, 110.)

11

The Special Committee directors are not employees of IWEST or its affiliates, and did not receive any benefits in connection with the Internalization or fees paid to the Property Managers, or engage in any other alleged wrongdoing. As such, none of the Special Committee directors are so personally and directly conflicted that they were incapable of responding to a demand. *See, e.g., CNL*, 2005 WL 2219283, at *5 & n.20 (applying Maryland law and finding where five of nine directors were independent, demand was required).

Notwithstanding, Plaintiffs allege that demand is excused because the Special Committee directors participated in events that are the subject of this lawsuit, are potentially liable for breach of fiduciary duties, receive fees as directors, hold minimal IWEST stock, participate in civic activities with other Defendants, and were nominated to the Board by affiliates. (Am. Compl. ¶¶ 94–113.) *Werbowsky* rejects such allegations as "smoke and speculation" that are insufficient as a matter of law to establish demand futility, *see* 766 A.2d at 146, stating:

> We . . . are not willing to excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action.

*Id.* at 143–44.

Despite this roadmap of what "not" to plead, counsel of record in this action have repeatedly attempted to end-run the *Werbowsky* standard in federal court complaints challenging REIT internalizations; each time, courts swiftly reject the demand futility allegations under *Werbowsky* and dismiss the derivative claims with prejudice for failure to support the conclusory demand futility allegations. *See, e.g.*, *Wells,* 2008 WL 2302679 (rejecting similar allegations as insufficient to establish demand futility under *Werbowsky*); *CNL*, 2005 WL 2219283 (same). In *CNL*, the court criticized plaintiffs' failure to proffer facts establishing demand futility:

> Ultimately, however, [the plaintiffs'] arguments are long on rhetoric and short on concrete factual support. Instead of offering the clear demonstration, supported with particular factual evidence as is required by Maryland law, the Plaintiffs instead point to certain [*Werbowsky*] factors (which, under Maryland law, are

12

insufficient) and simply repeatedly state that based on those factors, demand would have been futile.

2005 WL 2219283, at *12–13.  The result must be the same here.  None of Plaintiffs' allegations provide *any* evidence to challenge the fact that there are independent directors who should determine whether this litigation should be brought on behalf of IWEST.

**Involvement in conduct at issue.**  Plaintiffs allege that demand is excused because the Special Committee directors (1) approved the Internalization, (2) signed the Proxy, and (3) caused IWEST to pay an "excessive" fee to the Property Managers.  (Am. Compl. ¶¶ 97, 98, 101–103, 112–113.)   None of these allegations establishes a "direct conflict," or even a "commitment" to the Internalization or fee payments that could excuse Plaintiffs from making a demand.  If allegations of participation in a challenged transaction alone were sufficient to excuse demand, the demand requirement effectively would be eradicated given that every corporate board manages the company's business and plaintiffs are, by definition, challenging corporate acts that necessarily were authorized by directors.  Accordingly, the *Werbowsky* court expressly held that demand is not excused simply "because a majority of the directors approved or participated in some way in the challenged transaction or decision[.]"  766 A.2d at 143; *accord Wells*, 2008 WL 2302679, at *14–15;  *In re InfoSonics Corp. Deriv. Litig.*, No. 06 cv1336, 2007 WL 2572276, at *7 (S.D. Cal. Sept. 4, 2007); *CNL*, 2005 WL 2219283, at *5.

**Threat of personal liability.**  Similarly, Plaintiffs allege that each director is subject "to a substantial risk of personal liability for breach of fiduciary duty because of his or her gross negligence in failing to prevent or remedy the Advisor's and Property Managers' improper self-dealing with [IWEST]."  (Am. Compl. ¶ 104; *see also id.* ¶¶ 101–103, 112.)   Again, if this allegation were sufficient, demand would be excused every time a plaintiff derivatively challenged a corporate act, as a plaintiff always can plead that a director's involvement creates the potential for personal liability.  *See Werbowsky*, 766 A.2d at 139; *see also InfoSonics*, 2007 WL 2572276, at *7 (rejecting allegations concerning "substantial likelihood of liability").  Moreover, the *Werbowsky* court clearly stated that, in determining whether demand was futile, courts should focus on the "real, limited issue" of futility and not address "issues that go more to

13

the merits of the complaint -- whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack." 766 A.2d at 144. *See also Sekuk Global Enters.*, 2004 WL 1982508, at \*9. Thus, the merits of Plaintiffs' allegations are legally irrelevant to the demand futility analysis.

**Director fees and stock ownership.** Plaintiffs claim that demand is excused because the Directors receive fees for serving as directors (Am. Compl. ¶¶ 107–08) and have "minimal stock ownership in [IWEST]" (*id.* ¶ 109). The *Werbowsky* court held that demand is not excused because directors "are paid well for their services as directors[.]" 766 A.2d at 143 (rejecting allegations of conflict based on fees and presumed desire to maintain directorships); *accord Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 460 (7th Cir. 1991) (under Maryland law if allegations of director fee payments were sufficient "the demand rule would be negated – for almost all directors receive fees"); *In re Franklin Mut. Funds Fee Litig.* 388 F. Supp. 2d 451, 470 (D. N.J. 2005). The fact that the alleged fees exceed the Directors' "minimal" stock ownership (i.e.*,* less than .01%) flies even further from the mark. The fee payments, insufficient to excuse demand on their own, receive no more weight in light of their relation to stock ownership levels. Indeed, to the extent Defendants own any stock in IWEST, they stand in the same position as the other shareholders, further undercutting a suggestion that demand would be futile.

**Social or business relationships.** Plaintiffs further allege that demand should be excused because two of the Independent Directors serve on other civic boards (i.e., the Wellness House and Benedictine University) with other Defendants. (Am. Compl. ¶ 110.) However, Plaintiffs do not offer a single fact to demonstrate how or why these relationships would induce IWEST's Directors to shirk their responsibilities to IWEST and its shareholders. The mere fact that directors have other social and business relationships is insufficient in itself to demonstrate that they were in any way personally and directly conflicted or committed to the decision in dispute. *See Werbowsky*, 766 A.2d at 145–46; *Sekuk Global Enters.*, 2004 WL 1982508, at \*5.

**Selection for Board.** Plaintiffs' allegations that Defendants could not act independently because they "were selected as a member of the Company's board by" insiders (Am. Compl.

14

¶¶ 105–06) have been repeatedly rejected as insufficient to excuse demand.  The *Werbowsky* court clearly stated that demand is not excused because directors "were chosen as directors at the behest of controlling stockholders" given "[t]hat is the usual way a person becomes a corporate director."  766 A.2d at 139, 143 (quotations and citations omitted).  *See also Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 140 (2d Cir. 2004) (rejecting suggestion of interestedness based on fact directors were appointed by fund's investment advisor and beholden to it for large salaries);  *Franklin Mut. Funds*, 388 F. Supp. 2d at 470 ("Under Maryland law, plaintiffs' allegations that the directors were chosen by the investment advisors . . . are, by themselves, insufficient to demonstrate that the directors are interested.")

As a result, Counts V–VII, which are properly labeled as derivative must be dismissed because Plaintiffs failed to make a demand on IWEST, and Counts III–IV which are derivative in nature should be dismissed as well (*see* Section I.B. below).

### B.    Plaintiffs Lack Standing To Pursue Counts III And IV.

Tacitly conceding that they lack standing to pursue derivative claims in Count V for breach of fiduciary duty, Plaintiffs alternatively allege "direct" shareholder claims in Counts III and IV for breach of fiduciary duty and aiding and abetting breach of fiduciary duty against certain of the Defendants.  Despite the substitution of the term "direct" for "derivative," however, Counts III and IV are derivative in nature under Maryland law and, like Count V, can be pursued only by IWEST.  "Whether a claim is derivative or direct is not a function of the label the plaintiff gives it." *Paskowitz v. Wohlstadter*, 822 A.2d 1272, 1277 (Md. Ct. Spec. App. 2003).  For a claim to be "direct" under Maryland law, a shareholder must allege an injury that is separate and distinct from any alleged injury to the corporation and its shareholders.  *Waller v. Waller*, 49 A.2d 449, 454 (Md. 1946); *Danielewicz*, 769 A.2d at 284–86 (applying *Waller* and holding that an alleged transfer of one plaintiff's controlling interest to another shareholder is not a "direct" injury separate and distinct from the company and the other shareholders).

Plaintiffs' alleged injuries to their "individual economic interests" and "voting rights" are not pled as personal to Plaintiffs, but common to all IWEST shareholders.  (*See* Am. Compl.

¶ 315.)  Because Plaintiffs have merely alleged injuries that were common to all shareholders and incidental to any injuries suffered by IWEST, any alleged wrongdoing was "done to the corporation, affected all the stockholders of the corporation, and could be redressed only by an action brought by the corporation[.]"  *Waller*, 49 A.2d at 454.[6]  Counts III and IV belong to IWEST, not Plaintiffs, and should be dismissed for lack of standing.

       **C.**      **Counts III–VII Should Be Dismissed Because Plaintiffs Fail To Plead Facts Sufficient To Overcome The Protections Of The Business Judgment Rule.**

Plaintiffs allege nearly all Defendants breached their fiduciary duties owed to shareholders by, among other things, causing IWEST to pay certain fees to the Property Managers; recommending the Internalization, not investigating or evaluating other alternatives; and causing the dissemination of the Proxy.  (*See, e.g.*, Am. Compl. ¶¶ 259(a)–(h), 265, 269, 314.)  The fundamental problem with Plaintiffs' claim is that each of these actions was taken by a Board, the majority of whom was independent and entitled to a presumption of good faith under the business judgment rule.  Even if Plaintiffs had standing to bring derivative claims (and they do not), Plaintiffs have not pled facts alleging fraud, self-dealing or other misconduct sufficient to overcome the protection of the business judgment rule.  Instead, they have impermissibly lumped nearly all Defendants together and alleged everything against all as a group as if they constitute a monolithic block.

In Maryland, the conduct of corporate directors is governed by Section 2-405.1(a) of the Corporations and Associations Article of the Annotated Code of Maryland, which states:

---

[6] The Maryland Court of Appeals further stressed in *Waller* the advantage of precluding shareholders from pursuing monetary recoveries that rightfully belong to the corporation:  "The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each."  49 A.2d at 454.  This rationale rings particularly true here, where the Plaintiffs, who attempt to represent both the shareholders and the corporation simultaneously, have alleged both direct and derivative actions that compete for the same pool of money.  Plaintiffs' direct claims, like their derivative claims, are based primarily on alleged injuries to IWEST.  Any injuries to the shareholders are both incidental and common.

> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:  (1) In good faith; (2) In a manner he reasonably believes to be in the best interest of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

MD. CODE ANN., CORPS. & ASS'NS § 2-405.1(a).  A director "who performs his duties in accordance with the standard [of Section 2-405.1(a)] shall have the immunity from liability." *Id*. § 2-405.1(c).  Under Section 2-405.1(e), Maryland's statutory enactment of the business judgment rule, "[a]n act of a director of a corporation is *presumed* to satisfy the standards of subsection (a) of this section."[7] *Id.* § 2-405.1(e) (emphasis added).

Maryland courts strictly adhere to this statutory presumption of proper business judgment, and are loathe to interfere or second-guess business decisions. *See, e.g.*, *Wittman v. Crooke*, 707 A.2d 422, 425 (Md. Ct. Spec. App. 1998) ("there is a presumption that directors of a corporation acted in good faith and in the best interest of the corporation[]").  "The 'business judgment rule' . . . precludes judicial review of a legitimate business decision of an organization, absent fraud or bad faith."  *Black v. Fox Hills N. Cmty. Ass'n, Inc.*, 599 A.2d 1228, 1231 (Md. Ct. Spec. App. 1992); *accord Werbowsky*, 766 A.2d at 138 ("[a]bsent an abuse of discretion, [business] judgment will be respected by the courts").  As stated in *Wittman*:

> [The stockholder] argues that [the company] could have gotten a better deal. But that is really not a cause of action.  Maybe they could have.  Maybe they couldn't have.  But that doesn't constitute a cause of action.  That's something that stockholders can decide.  What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of due care.

707 A.2d at 426.  As set forth below, no such evidence of disloyalty, bad faith or lack of due care exists; Plaintiffs simply complain that the property management fees were too high, expenses were too low, overpayments were made and, based on the above, it automatically follows that the Defendants breached their fiduciary duties to them.  Further, Plaintiffs indiscriminately lump nearly all of the Defendants together -- even though they acted and served in different capacities

---

[7] The business judgment rule is expressly made applicable to Maryland REITs by MD. CODE ANN., CORPS. & ASS'NS § 8-601.1.

-- in an attempt to suggest that they all were complicit in a scheme to mislead the IWEST shareholders so as to enrich unfairly the Advisor and Property Manager shareholders.  That is simply not enough to overcome the business judgment rule.

      1.      **Plaintiffs Fail To Rebut The Presumption That The Board Decisions Were Approved By A Majority Of Disinterested, Independent Directors.**

To rebut the presumption of the business judgment rule, Plaintiffs must establish that a majority of the Board did not exercise their judgment independently, or had a material interest in the transaction at issue.  *See Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at *11–12 (Md. Cir. Ct. Apr. 1, 2004).  Specifically, to raise an issue concerning independence, Plaintiffs "must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.  The shorthand shibboleth of 'dominated and controlled directors' is insufficient."  *Id.* at *12 (quoting *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002)).  The materiality standard is also high:

> The requirement of materiality imposes upon plaintiffs the burden of pleading facts to show that "the alleged benefit was significant enough *in the context of the director's economic circumstances*, as to have made it improbable that the director could perform [the director's] fiduciary duties to the . . . shareholders without being influenced by [the] overriding personal interest.

*Id.* (quoting *Orman*, 794 A.2d at 23 & n.44).  Plaintiffs must rebut the business judgment rule's presumption with "more than mere suspicions and must state a claim in particular, rather than conclusory terms."  *Bender v. Schwartz*, 917 A.2d 142, 152–53 (Md. Ct. Spec. App. 2007).

Plaintiffs do not come close to satisfying their burden.  The actions at the core of Plaintiffs' claims -- the approval of the Internalization and the consideration given thereto, and fees paid to the Property Managers -- were legitimate business decisions made by a majority of independent, disinterested directors.  As demonstrated in Section I.A., *supra*, a majority of the Board -- i.e., the four Special Committee directors -- did not have a personal interest, financial or otherwise, in the Internalization, the property management fees, or the Advisor or Property

Managers.  Further, Plaintiffs allege no facts demonstrating that the Special Committee was dominated or controlled by a materially interested director.

Given that they cannot impugn the Special Committee majority, Plaintiffs impermissibly add the Advisor, Property Managers, the Sponsor, TIGI and other non-directors to each and every allegation in an attempt to create self-interest where none exists.  For example, Plaintiffs allege that *these* Defendants *all* put their own self-interest above the shareholders' interests and were each "motivated by securing:  (i) a portion of the Internalization Consideration; (ii) a substantial equity position in the REIT; and/or (3) a guaranty of lucrative employment contracts as employees of [IWEST.]"  (Am. Compl. ¶ 260.)  Fatal to Plaintiffs' claim, however, is the fact that none of these allegations are relevant to the four independent directors who formed the Special Committee.  *See, e.g., In re CompuCom Sys., Inc. Stockholders Litig.*, No. Civ.A. 499-N, 2005 WL 2481325, at *8–9 (Del. Ch. Sept. 29, 2005) (dismissing complaint where plaintiff failed to allege facts sufficient to establish that special committee lacked independence); *In re W. Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192, at *29–30 (Del. Ch. May 22, 2000) (same).  The presumption that the majority of IWEST's Board acted in good faith and in the best interests of the corporation remains intact.

## 2.    Plaintiffs Fail To Rebut The Presumption That The Board Decisions Were Made With Due Care.

To rebut the statutory presumption that a director acted with due care, Plaintiffs must present particularized facts "directed solely at the manner, or *process*, by which a director makes decisions rather at the *results* of those decisions."  *Hudson*, 2004 WL 1982383, at *11 (emphasis added) (quotation omitted).  With respect to process, Plaintiffs' Amended Complaint is more remarkable for what it fails to allege than what it actually does allege in 351 paragraphs.  First, with respect to Plaintiffs' allegation that the Board breached its duty of care by causing IWEST to pay "excessive" property management fees (Am. Compl. ¶ 259(a)), Plaintiffs fail to plead any facts regarding the process by which the Board approved the fee.  Instead, Plaintiffs simply second-guess the decision itself:  based entirely on their subjective analysis that the property

management fees of 4.5% are "excessive," Plaintiffs automatically presume that the Board did not act with due care in approving the fees.  Under Maryland statute, however, the exact opposite is presumed; Plaintiffs' dissatisfaction with the Board's decision is legally irrelevant.  *See Hudson*, 2004 WL 1982383, at *11; *see also Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1053 (Del. Ch. 1996) (the fact "that plaintiff regards the decision as unwise, foolish, or even stupid in the circumstances is not legally significant").  Plaintiffs must plead particularized facts demonstrating that the Board's approval of the property management fee was the result of a faulty decision making process.  Because the Amended Complaint is devoid of any facts describing what the Board did and did not consider, Plaintiffs' judgment cannot be substituted for the presumably well-informed judgment of the Board.

    Second, with respect to the process by which the Board analyzed, negotiated and recommended the Internalization, Plaintiffs go a dramatic step further and allege that the Board engaged in no process at all.[8]  Without supporting factual allegations, Plaintiffs conclude that the Board "fail[ed] to investigate or evaluate any strategic alternatives to the Internalization," and "never consider[ed] whether the Advisory and Property Management Agreements should not be renewed or that, if renewed, [their] fee structure should be significantly modified and reduced[.]" (Am. Compl. ¶ 259(f)–(g).)  Contrary to Plaintiffs' conclusory assertions, Plaintiffs' own Amended Complaint elsewhere recognizes that the Special Committee designated by the Board to evaluate the Internalization in fact addressed, discussed and considered these items.

> At a December 12, 2006 meeting of the Special Committee, Sidley and William Blair summarized the status of their work, and the Special Committee discussed, *inter alia*, the following alternatives: (1) maintaining the status quo and continuing to externalize advisory and management services under the existing agreements with the Advisor and Property Managers; (2) terminating the existing agreements and externalizing advisory and management services to new third party providers; (3) terminating the existing agreements and building internal

---

[8] This "failure of oversight" theory is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see also Guttman v. Huang*, 823 A.2d 492, 505–06 (Del. Ch. 2003) ("A *Caremark* claim is a difficult one to prove.").  Plaintiffs must plead facts showing intentional misconduct, *i.e.*, "that the directors were conscious of the fact that they were not doing their jobs."  *Guttman*, 823 A.2d at 506.

advisory and management services through hiring; and (4) selling Inland REIT to a third party.

*    *    *

Three weeks later, on January 9, 2007, representatives of the Advisor and Property Managers made a presentation to the Inland REIT Board with respect to the services they were currently providing and "discussed the potential transition issues associated with terminating the advisory or property management agreements, including potential cessation of [the REIT's] property acquisition program and the value to [the REIT] of access to property acquisition services of affiliates of" the Advisor.  (Proxy at 16-17).

(Am. Compl. ¶¶ 144, 146.)   Page 17 of the Proxy cited by Plaintiffs above discloses similar deliberations:

Immediately after the Board meeting on January 9, 2007, the special committee met with its financial and legal advisors. The special committee reviewed and discussed the materials distributed at the Board meeting regarding the services currently provided to us by the Business Manager/Advisor and the Property Managers, ***the cost of such services compared to services that could be provided by third-party service providers***, and the potential cost savings that might be realized by acquiring the Business Manager/Advisor and the Property Managers. The special committee also discussed additional possible benefits of an internalization . . . .

(Proxy (Ex. 1) at 17.) (emphasis added).   Plaintiffs allege no facts suggesting, let alone demonstrating, that these meetings did not take place, or these discussions never happened. Given the statutory presumption of the business judgment rule, and the allegations in the Amended Complaint that validate this presumption, these claims are insufficient in both law and fact.

### 3.    Plaintiffs Cannot Conceal The Defects In Their Claims Through The Use Of Prohibited "Shotgun" Pleading.

Plaintiffs attempt to divert the Court's attention from their inadequate pleadings by lumping together all of the Defendants to create a smokescreen of impropriety where none exists.[9]   Recognizing that they cannot establish that the Board breached any duties, Plaintiffs

---

[9] Defendants move to dismiss the entire Amended Complaint.  The fact that this Memorandum does not and cannot possibly address every improper shotgun pleading allegation may not be used by Plaintiffs against Defendants.  *See Wells*, 2008 WL 2302679 at n.3 (rejecting plaintiffs' argument that defendants'

21

attempt to link the Board to any and all imagined wrongdoing by any and all Defendants, in the hope that some of the mud being indiscriminately hurled will splatter the Board. Such an approach to pleading violates established federal pleading requirements. Rule 8(a) requires that a complaint include a "short and plain statement of the claim" so that a defendant, and the court, will have "fair notice" of the claims asserted against it. *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775 (7th Cir. 1994). A complaint so disjointed, confusing, or unintelligible that judges and defendants are required to "try to fish a gold coin from a bucket of mud" may be dismissed. *United States ex rel. Garst v. Lockheed*, 328 F.3d 374, 378 (7th Cir. 2003); *see also Vicom*, 20 F.3d at 775; *Jackson v. F.B.I.,* No. 02 C 3957, 2007 WL 433143, at *2–3 (N.D. Ill. Jan. 31, 2007).

Plaintiffs' Amended Complaint does not give Defendants fair notice of the claims against them; instead, Plaintiffs' scattershot pleading creates confusion for both the Court and Defendants, making it impossible to ascertain which Defendants are responsible for which allegedly wrongful acts. A shotgun complaint lays out so many lengthy, undifferentiated factual allegations that it is "virtually impossible" for defendants (and the court) to sort out "which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). The Seventh Circuit has repeatedly and emphatically condemned this type of pleading by obfuscation. *See, e.g.*, *Lockheed*, 328 F.3d at 378; *Vicom*, 20 F.3d at 775. In *Lockheed*, for example, the Seventh Circuit lambastes plaintiff's third amended complaint and more definite statement -- comprising 155-pages with 400-paragraphs and 99 attachments -- as "pestilential," and affirmed the lower court's dismissal. 328 F.3d at 379.

District courts have been equally consistent and clear in expressing their message that such obfuscatory pleadings are improper. This Court has complained that pleadings that conflate multiple defendants "undermine[] the court's ability to decipher the contours of plaintiffs'

failure to seek dismissal of every shotgun allegation meant that plaintiffs could proceed beyond the pleading stage).

allegations[.]" *Riggs Partners LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721, at *7 (N.D. Ill. Oct. 25, 2002). In *Riggs*, plaintiffs failed to distinguish between the parent corporation and the partially-owned subsidiary, thereby preventing this Court from finding that the requisite state of mind had been properly pled as to the parent corporation. *Id.*; *see also In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1094–95 (N.D. Cal. 2003) (dismissing complaint that lumped together thirteen "individual defendants," many of whom were not present during the relevant time frame, for failing to give "fair notice" to all defendants); *Nagel v. ADM Investor Servs., Inc.*, 995 F. Supp. 837, 844–45 (N.D. Ill. 1998) (dismissing a 16-count, 93-page complaint that made it impossible to resolve basic, threshold issue).  Indeed, a court recently chastised the team of attorneys representing Plaintiffs here, in another case attacking a REIT internalization, for precisely this type of prohibited pleading -- "the plaintiff's complaint seems to be the kind of verbose, shotgun pleading that the Eleventh Circuit has repeatedly condemned." *Wells*, 2008 WL 2302679, at *4 & n.3.  Here, Plaintiffs remain unabashed in their efforts, conflating nearly all Defendants without ever identifying which Defendant is accused of having done what.

Specifically, Counts III–V lump together nearly all Defendants and incorrectly presume that all defendants stand in precisely the same position and owe all of the same duties to IWEST or its shareholders, even in situations where such uniformity is impossible.[10]  For example, Plaintiffs do not and cannot allege that the Board knew that the property management fees being paid allegedly were more than would be charged by an unaffiliated third party.  Since they cannot make the necessary allegation as against the Directors, Plaintiffs simply include the Property Managers and other insiders in the group of Fiduciary Duty Defendants, hopeful that some other Defendant's presumed knowledge of the market will support a claim against the

---

[10] Count III purports to assert a direct claim for breach of fiduciary duty against all Defendants other than IWEST, William Blair and KPMG (collectively, "the Fiduciary Duty Defendants") (Am. Compl. ¶¶ 309–16); Count IV alleges aiding and abetting a breach of fiduciary duty by the Fiduciary Duty Defendants as well as KPMG and William Blair (*id.* ¶¶ 317–27); and, Count V purports to assert a derivative claim for breach of fiduciary duty against the Fiduciary Duty Defendants (*id.* ¶¶ 345–53).

Directors.  Similarly, Plaintiffs accuse all 17 "Fiduciary Duty Defendants" -- including the Advisor and the Property Managers -- of breaching fiduciary duties to IWEST and its shareholders by abandoning the purchase options in the Advisory and Property Management Agreements and by renewing those Agreements.  (Am. Compl. ¶¶ 259, 269–272.)  Those allegations are nonsensical.  The ability to exercise the purchase options and renew the Agreements belonged exclusively to IWEST and *not* to the Advisor or the Property Managers, who were the contractual counter-parties.  Even more remote are Defendants who were not even parties to the contracts, like the owner of the Advisor (the Sponsor), the owner of the owner of the Advisor (TIGI), and shareholders of the owner of the owner of the Advisor (Goodwin, Baum, and Cosenza).  Defendants that had no power or authority to exercise an option or renew the Agreements cannot have breached any duty by failing to do so.  *See LaBolle v. Metro. Sanitary Dist.*, 629 N.E.2d 56, 61 (Ill. App. Ct. 1992) (affirming summary judgment on breach of fiduciary duty count where defendant had no power to perform the act plaintiffs alleged it should have performed and therefore, could not have breached any duty by not acting).

Similar deficiencies infect the aiding and abetting claim (Count IV).  Despite the 17 Defendants' varying positions, roles, and duties, Plaintiffs allege without differentiation that all "Fiduciary Duty Defendants" "knowingly aided and abetted the breaches of fiduciary duty committed by The Fiduciary Duty Defendants to the detriment of the Class" (Am. Compl. ¶ 320) and "rendered substantial and knowing assistance to *each other* in the breaches of *their* fiduciary duties to the Shareholders  . . . ." (*Id.* ¶ 323) (emphasis added).  Adding to the confusion is the fact that the acts allegedly constituting aiding and abetting are nearly identical to the acts allegedly constituting the breaches themselves.  (*Compare id.* ¶¶ 256–72, *with* ¶¶ 322–23.)  Each of 17 different Fiduciary Duty Defendants is alleged to have both breached fiduciary duties by taking a set of actions *and* aided and abetted themselves in the breach of their fiduciary duties by doing the very same things.  (*See*, *e.g.*, *id.* ¶ 323 stating that "the Individual Defendants "rendered substantial and knowing assistance to *each other* in the breaches of *their* fiduciary duties to the Shareholders by . . . (f) rendering substantial and knowing assistance to the

24

wrongful self-dealing by the Individual Defendants.") (emphasis added).)  A party simply cannot be liable both for breach of fiduciary duty *and* for aiding and abetting that breach of fiduciary duty.  *See, e.g., Bloomington Partners, L.L.C. v. City of Bloomington*, No. 04-CV-2287, 2005 WL 3536340, at *10–11 (C.D. Ill. Dec 23, 2005) (fiduciary duty already encompasses duty not to induce others to breach their fiduciary duties).  Having failed to identify specific ways in which Board members breached any duties, Plaintiffs cannot salvage their claim suggesting that the Directors are responsible, in an unspecified way, for aiding and abetting multiple other Defendants in their unspecified breaches of duty.

Plaintiffs' efforts to obfuscate through verbose, shotgun pleading cannot conceal the fact that the Board's actions regarding the Internalization, including its oversight and dealings with the Advisor and Property Managers, fall within the scope of the business judgment rule's protection.  Therefore, the derivative claims in Counts III–V should be dismissed.  Because the Internalization consideration and fees at issue were properly authorized by the Board in exercise of their business judgment, Plaintiffs' claims for unjust enrichment (Count VI) and breach of contract (Count VII) should also be dismissed.

## II.    PLAINTIFFS' 1934 ACT CLAIMS ARE FATALLY FLAWED AND SHOULD BE DISMISSED.

The demand requirement and business judgment rule and pleading deficiency defects discussed above are not the only fatal problems with the Amended Complaint.  An evaluation of the merits demonstrates that Plaintiffs fail to allege facts sufficient to establish claims under the federal securities laws (Counts I and II).  Count I of the Amended Complaint alleges that all Defendants violated § 14(a) of the Securities and Exchange Act of 1934 (the "1934 Act") and SEC Rule 14a-9 by issuing a false and misleading proxy statement.  Claims under § 14(a) must comply not only with the standards set by Rule 12(b)(6), but also with the more stringent pleading standards established by the PSLRA.  Under those controlling standards, the Amended Complaint falls well short of alleging the facts necessary to establish a § 14(a) claim.  Moreover,

because Plaintiffs' § 20(a) claim (Count II) depends completely upon the success of the § 14(a) claim, the failure of the § 14(a) claim also requires dismissal of the § 20(a) claim.

### A.    Applicable Pleading Standards.

#### 1.    Rule 12(b)(6).

Under Federal Rule of Civil Procedure 12(b)(6), a complaint is subject to dismissal unless it sets forth factual allegations sufficient to raise a right to relief above a "speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). To survive this motion to dismiss, at the most basic level, Plaintiffs are required to provide the grounds of their entitlement to relief, offering more than just "labels and conclusions" or "a formalistic recitation of the elements[.]" *Twombly*, 127 S. Ct. at 1964–65. Plaintiffs must "nudge[] their claims across the line from conceivable to plausible [or] their complaint must be dismissed." *Id.* at 1974.

#### 2.    The PSLRA's Heightened Pleading Standards.

Congress enacted the PSLRA as an amendment to the 1934 Act, to function "[a]s a check against abusive litigation by private parties[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007). It is widely recognized that the purpose of the PSLRA is to eliminate frivolous "strike suits" aimed at forcing corporate defendants to settle claims to avoid the costly discovery process. *See, e.g., In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 1999). The PSLRA ensures against wasteful discovery on meritless claims by, *inter alia*, imposing a heightened pleading standard that applies without exception to "any private action arising under this chapter." 15 U.S.C. § 78u-4(b)(1), (2), (3)(B); *accord Beck v. Dobrowski*, No. 06 C 0411, 2007 WL 3407132, at *4–5 (N.D. Ill. Nov. 14, 2007) (Leinenweber, J.). The PSLRA's pleading standards are more stringent than those of Rule 9(b) and supplement the Federal Rules' other generally applicable pleading standards. *Beck*, 2007 WL 3407132, at *4–5.

By its express terms, the PSLRA applies to "any private action arising under [the 1934] act" and thus its heightened pleading standards apply here to Plaintiffs' § 14(a) claim. *See* 15 U.S.C. § 78u-4(a)(1); *JP Morgan Chase & Co. Sec. Litig.*, No. 06 C 4674, 2007 WL 4531794, at

*7–8 (N.D. Ill. Dec. 18, 2007) (Coar, J.); *Beck*, 2007 WL 3407132, at *3–4; *see also, e.g.*, *Fisher v. Kanas*, 467 F. Supp. 2d 275, 281 (E.D.N.Y. 2006).[11]  Plaintiffs are thus required to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see Beck*, 2007 WL 3407132, at *6.  Merely stating that the Proxy contained false and misleading statements is not enough.  *Rudolph v. UTStarcom*, No. C 07-04578, 2008 WL 1734763, at *8 (N.D. Cal. Apr. 14, 2008).  Furthermore, to demonstrate materiality, Plaintiffs must allege how, under the circumstances, each misstatement or omission upon which they rely would have assumed "actual significance" and "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 445, 448 (1976).

In addition, the PSLRA requires even more detailed pleading where "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind."  15 U.S.C. § 78u-4(b)(2).  With respect to each alleged act or omission, the complaint shall "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id*.  To qualify as "strong," the inference "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."  *Tellabs*, 127 S.Ct at 2510.  Where, as here, Plaintiffs allege that Defendants engaged in intentional wrongdoing, Plaintiffs must offer specific facts creating a strong inference that Defendants engaged in knowing misconduct, even if the relevant cause of action does not require proof of fraud.  *Beck*, 2007 WL 3407132, at *5.  Even if a plaintiff asserts a § 14(a) claim based

---

[11] One judge in this District reached a contrary conclusion in *Blau v. Harrison*, No. 04 C 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006) (Hibbler, J.).  That decision, in the distinct minority, has been sharply criticized and rejected by subsequent cases to consider this issue, including two recent cases in this District.  *JP Morgan Chase.*, 2007 WL 4531794, at *7–8 (Coar, J.) (disagreeing with *Blau*); *Beck*, 2007 WL 3407132, at *3–4 (same); *In re Verisign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1213 (N.D. Cal. 2007); *Little Gem Life Scis. LLC v. Orphan Med., Inc*., Civ. No. 06-1377, 2007 WL 2695787, at *3 (D. Minn. Sept. 13, 2007).

on allegations of negligence, the plaintiff still must come forward with specific facts providing a "strong inference" that each defendant acted at least negligently. *JP Morgan*, 2007 WL 4531794, at *7–8; *Beck*, 2007 WL 3407132, at *3–4.

**B.      Plaintiffs' § 14(a) Claim Fails To Satisfy The Heightened Pleading Standards Of The PSLRA.**

The purpose of § 14(a) is "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964), *abrogated on other grounds by Touche Ross & Co. v. Redington*, 442 U.S. 560, 577 (1979). To state a claim under § 14(a), Plaintiffs must establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction." *Bond  Opportunity Fund v. Unilab Corp*., No. 99 Civ. 11074, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003) (internal quotations omitted).

Despite the Amended Complaint's length and apparent complexity, the wrongdoing alleged at the core of Plaintiffs' lawsuit is quite simple -- the Advisor's and Property Managers' financial statements were manipulated to inflate their earnings, which caused IWEST to pay too much to acquire them. Equally straight-forward are the two ways in which the Advisor's and Property Managers' financial statements were manipulated:  (1) the Advisor and Property Managers concealed expenses that, if included on their financial statements, would have lowered their profitability; and (2) the Property Managers charged property management fees at a rate higher than permitted. (Am. Compl. ¶¶ 168–184.)  With respect to state of mind, Plaintiffs allege that all Defendants knew and understood that the financials were manipulated, but schemed to conceal this fact from the shareholders.  (*Id*.)  Plaintiffs' § 14(a) claim fails because the Amended Complaint does not offer facts to support Plaintiffs' central claim of financial statement manipulation.  Plaintiffs do not plead facts giving rise to a "strong inference" that *each* Defendant acted with the required state of mind. *See Tellabs*, 127 S. Ct. at 2510; *Bond Opportunity*, 2003 WL 21058251, at *5–6.  Furthermore, Plaintiffs offer only vague and general

28

facts to substantiate their assertion that Defendants engaged in misrepresentations and omissions by mailing a Proxy that cited and relied upon manipulated financial statements. Such unsupported, conclusory allegations are an insufficient basis for the purported misstatements or omissions.

      **1.**    **Plaintiffs Fail To Plead With Particularity That Each Defendant Acted With The Required State Of Mind To Support Their Allegations Of Financial Statement Manipulation.**

Plaintiffs fail to offer specific facts creating a strong inference that Defendants acted with the alleged state of mind, so their § 14(a) claim fails as a matter of law. To determine whether the Amended Complaint survives this threshold pleading requirement, this Court should conduct a comparative evaluation that considers both Plaintiffs' inferences and any competing inferences that can rationally be drawn from the facts alleged. *Tellabs*, 127 S. Ct. at 2504. General and vague allegations that Defendants must have known of, or failed to detect, alleged improprieties are insufficient to provide a "cogent" and "compelling" inference that each Defendant acted with the required state of mind. *Id.* at 2510; *see Riggs*, 2002 WL 31415721, at *7–8.

Here, Plaintiffs allege that numerous Defendants organized a "scheme" to transfer equity from the shareholders to their "perfidious fiduciaries," and to "conceal" this fact from the shareholders in an effort to "mislead" them (Am. Compl. ¶¶ 183, 226.) Plaintiffs further allege that these same Defendants employed KPMG and William Blair to assist in carrying out their "scheme" by preparing false and misleading audit reports and a fairness opinion in the Proxy. (*Id.* ¶¶ 278, 281, 289.) In its central allegations, the Amended Complaint charges multiple Defendants with knowingly operating the Advisor and Property Managers so as to artificially inflate profitability and thus enable Defendants to demand unjustifiably high consideration in the Internalization. (*Id.* ¶¶ 172, 178.) The Amended Complaint alleges:

> The Individual Defendants, the Sponsor, The Inland Group and the Advisor, by virtue of their roles, their ownership and/or involvement in the Advisor and the REIT understood and knew the Advisor's business structure and model, including that the Advisor failed to account for or record necessary expenses. In addition, the Individual Defendants, the Sponsor, The Inland Group and the Advisor knew that . . . the Advisor . . . prospered immediately due to the significant fees it

> received from Inland REIT, while it failed to account for any necessary expenses
> of conducting its business and performing those services for the REIT. *And,
> Defendants operated the Advisor knowing that the "end-game" and profitable
> exit-strategy for themselves was to effectuate a merger of the Advisor with the
> REIT, which would give them REIT stock valued in the hundreds of millions of
> dollars, depending on the Advisor's revenues, income and profitability.*

(*Id.* ¶ 172.) (emphasis added.)    Plaintiffs fail, however, to substantiate these serious charges of knowing financial statement manipulation with any specific facts.

Nowhere do Plaintiffs assert how all of the Defendants organized this "scheme," let alone how each Defendant allegedly participated in the "scheme." Plaintiffs do not allege, for example, that Defendants had meetings, or even conversations, in which they planned and structured their "scheme" in an effort to achieve their "end game." Nor do Plaintiffs present any facts even suggesting that each Defendant "knew and understood" that the financial statements were manipulated, or the source of such knowledge for each Defendant. Plaintiffs never allege how each Defendant actually operated the Advisor or Property Managers. It is counter-intuitive to think that many Defendants -- including the independent directors of IWEST or TIGI or TIGI shareholders -- would possess knowledge of how the Advisor or Property Managers accounted for their expenses, yet Plaintiffs offer no facts to support such an inference.

It is even harder to imagine how Defendants unconnected to the Property Managers would have knowledge not only of expenses, but of the market rates for property management services. (*Id.* ¶ 183.) Still, Plaintiffs set forth the conclusion that the financial statements were misleading because "Defendants charged and [IWEST] incurred Property Management fees" above the fees to which they were allegedly entitled. (*Id.* ¶¶ 137, 181–184.) Plaintiffs offer no facts to establish how each Defendant is actually associated with the Property Managers or how that association provided detailed knowledge of expenses and market rates. Plaintiffs offer no relevant facts, let alone specific facts creating a strong inference that each of the nineteen Count I Defendants used his, her, or its knowledge and association to manipulate Property Managers' profitability as part of a scheme to benefit a few Defendants.

To hide their pleading deficiencies, Plaintiffs refer generally to groups of Defendants without regard to the role or roles each Defendant actually played with respect to IWEST.  For example, Count I alleges generally that, "None of the Defendants named in this count" -- which includes IWEST, the Advisor, the Property Managers, KPMG, the Individual Defendants, and William Blair -- "made a reasonable investigation or possessed reasonable grounds for the belief that the statements made in the Proxy were true." (*Id.* ¶ 299.)  In relying not on particularized facts as to each Defendant's knowledge and actions, but instead on inferences drawn "by virtue of" Defendants' roles, ownership and/or involvement with IWEST and the Advisor (Am. Compl. ¶ 172), Plaintiffs apparently rely on the "group pleading doctrine."  The group pleading doctrine, expressly rejected by the Seventh Circuit, is a judicial presumption that statements in a proxy are "attributable to officers and directors who have day-to-day control or involvement in regular company operations."  *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  The Seventh Circuit has rejected the group pleading doctrine as "inconsistent with the 'strong inference' requirement" of the PSLRA.  *Id.*

Whether cast as shotgun pleading or the group pleading doctrine, Plaintiffs' allegations fail to create the strong inference required by the PSLRA.  These group allegations gloss over critical differences between the various Defendants, and utterly fail to offer facts establishing, for example, what information each Individual Defendant knew and/or provided, how such information was material, or even how it was misleading.  *See Riggs*, 2002 WL 31415721, at *7.  Plaintiffs fail to create any inference, much less a "strong inference," that a combination of 19 individuals and entities -- including a Big Four accounting firm, a respected financial advisory firm, two of IWEST's service providers, the full IWEST Board, the parent/grand-parent companies of the Advisor, and several other individuals -- all engaged in a scheme to artificially inflate the financial statements of the Advisor and Property Managers to reach the "end game" of unjustifiably high Internalization consideration.  Plaintiffs' failure to plead specific facts creating a strong inference that *each* Defendant acted with the required state of mind dooms their § 14(a) claim under the applicable pleading standards of the PSLRA.

**2.      Plaintiffs Fail To Sufficiently Allege That The Financial Statements Contained Material Misstatements Or Omissions -- Basic Elements of Their § 14(a) Claim Under the PSLRA.**

Plaintiffs' allegation of financial statement manipulation is central to their claim that the Proxy was misleading and violated § 14(a).  Nearly all of the Amended Complaint's alleged Proxy misstatements or omissions are premised on the assertion that the Advisor's and Property Managers' financial statements artificially inflated their profitability.  Thus, the first Proxy misstatement alleged by the Amended Complaint is: the Proxy contained materially false and misleading financial statements of the Advisor and Property Managers.  (Am. Compl. ¶¶ 168–84.)  The alleged misstatements based upon the inclusion of independent auditors' reports (*id.* ¶¶ 185–216) and a fairness opinion (*id.* ¶¶ 235–55) also are premised on the assertion that the financial statements were misstated.[12]  Likewise, in alleging that the Proxy misrepresented the fairness of the Internalization, Plaintiffs state:  "As a result of the false and misleading financial statements, the Internalization Consideration to be paid for the Advisor and Property Managers materially exceeded the actual and fair value of those entities."  (*Id.* ¶¶ 217–20.)  Finally, the only support for Plaintiffs' contention that the Proxy misrepresented the purchase options (*id.* ¶¶ 221–26) is the charge that the purchase option price set out in the Proxy was incorrect because it "utilized the false and misleading financial and operating results for the Advisor and Property Managers as set out in ¶¶ 168–220" (*id.* ¶ 223).[13]  Because Count I depends upon the assertion that the financial statements were misstated, Plaintiffs' failure to offer facts establishing "the reason or reasons why" the financial statements were misleading, as described below, dooms their § 14(a) claim.

---

[12] Plaintiffs' allegations that the Proxy's inclusion of KPMG's audit opinions and William Blair's fairness opinion misled the shareholders by suggesting that these purportedly independent entities conducted an assessment of the relevant finances (Am. Compl. ¶¶ 185–216, 243–47) also fail because Plaintiffs do not allege that the KMPG and William Blair opinions were both objectively and subjectively false.  *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095–96 (1991); *Fisher*, 467 F. Supp. 2d at 282; *Bond Opportunity Fund*, 2003 WL 21058251, at *5.

[13] Plaintiffs' allegation that the Board's decision not to pursue the purchase options also fails because Plaintiffs do not allege that this omission was material.  (Am. Compl. ¶¶ 221–26.)  In fact, Plaintiffs omit the word "material" from this allegation.

a.     **There Is No Basis For Plaintiffs' Conclusion That The Advisor's And Property Managers' Financial Statements Misleadingly Understated Operating Expenses.**

Plaintiffs rely heavily upon their conclusory allegation that the Advisor and Property Managers understated their operating expenses, which, in turn, caused their financial statements to be false and misleading. According to Plaintiffs, the Advisor's and Property Managers' level of profitability appears to be too high so the level of expenses reported in their financial statements must be too low. (*Id.* ¶¶ 171, 177.) This baseless conclusion, undercut by contradictory information included in the Proxy, is insufficient to support Plaintiffs' allegation that the financial statements of the Advisor and Property Managers were false and misleading.

i.     **Plaintiffs' Allegations Are Mere Conclusions Not Supported By Facts.**

The Amended Complaint identifies the responsibilities of the Advisor and Property Managers under their respective agreements, describes the fees and reimbursements to which they are entitled under the agreements, and then sets out the actual fees and stated expenses for 2005 and 2006. (*Id.* ¶¶ 116–18, 121, 124–27, 168–69.) From these publicly disclosed facts, the Amended Complaint baldly concludes that expenses were not accurately reflected on the financial statements, thus resulting in allegedly inflated profitability. (*Id.* ¶¶ 171, 177.) Although Plaintiffs concede that the financial statements reflect Advisor expenses of more than $1 million for 2005 and 2006, and Property Managers' expenses of over $14.6 million and $9.5 million for 2006 and 2005, Plaintiffs assert that the financial statements reflect "minimal" or "no" expenses, and inconsequential "salary and benefits." (*Id.* ¶¶ 170, 175.) According to Plaintiffs, there necessarily had to have been more expenses, as relying on the purportedly understated expenses yields an Advisor EBITDA of "nearly 100% of Total Revenue," which "is impossible" (*id.* ¶¶ 170–71), and a Property Managers' EBITDA of "nearly 60% of Total Revenues" (*id.* ¶ 175).

Plaintiffs' sole basis for concluding that the financial statements do not accurately reflect expenses is a deduction Plaintiffs draw, without substantiation, from the EBITDA levels.

Because the financial statements reflect surprisingly high EBITDAs, at least according to Plaintiffs, the Amended Complaint concludes that there simply must be improprieties in the reporting of expenses.  (Am. Compl. ¶¶ 170–71.)  Courts have rejected pleadings based on the theory that the financials *must* be wrong because the defendant could not have legitimately made that much money.  *See Xerion Partners I LLC v. Resurgence Asset Mgmt.*, *LLC*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007).  In *Xerion*, the plaintiff alleged that the defendant inflated its EBITDA by employing a "variety of techniques to inflate earnings," including accruing "unauthorized, improper, and unsustainable deductions from accounts payable due to vendors . . . and manipulat[ing] 'same store' sales figures."  *Id.* at 513.  Those allegations were insufficient because the plaintiff "ha[d] not alleged a single fact to support its claim that the EBITDA number was inflated—instead, it ha[d] simply concluded that it was."  *Id.* at 518.

Like *Xerion*, Plaintiffs here simply conclude that the stated expenses for the Advisor and Property Managers do not reflect "any amount of expenses that would be required or necessary in order to perform and carry out [their] numerous services and duties," (Am. Compl. ¶¶ 170–71; *see also id.* ¶¶ 176–77.)  Plaintiffs offer no further facts or explanation.  Plaintiffs do not point to services that were not, but should have been, provided.  Plaintiffs do not identify any category of expenses that were incurred but were excluded from the financial statements.  Plaintiffs offer no explanation as to why their inference of financial statement manipulation is even conceivable, much less probable or plausible.  Plaintiffs' unsupported assumption that the Advisor and Property Managers must be understating expenses is insufficient to sustain their § 14(a) claim.

### ii.    The Proxy Disclosures Undercut Plaintiffs' Assumptions.

Plaintiffs also assume that all services to IWEST are being supplied exclusively by the Advisor and the Property Managers, and they cannot possibly have done everything necessary at the stated expense levels.  This Court need not accept Plaintiffs' conclusions, couched as factual allegations, as evidence of misleading Proxy statements.  *See Rudolph*, 2008 WL 1734763, at *8; *Beck*, 2007 WL 3407132, at *6.  As made clear in the Proxy, IWEST relied on a host of service

providers, through ancillary agreements, to conduct its affairs.  The Proxy's multiple references to the services upon which IWEST relied undercut Plaintiffs' smoke-and-mirror allegations that all expenses associated with running IWEST were borne by, and then concealed by, the Advisor and Property Managers.  Specifically, in the "Risks of the Merger to Us and Our Stockholders" section, the Proxy states "We rely on [TIGI's Affiliates] to provide certain administrative services to us.  The services provided to us are described in service agreements including the ancillary agreements executed, and to be executed, pursuant to the Merger Agreement.  Our ability to achieve our business objectives will depend to a large extent on the quality of [TIGI's Affiliates'] performance under these service agreements."  (Proxy (Ex.1) at 12.)  In addition, the Proxy states that IWEST "[w]ill continue to obtain from [TIGI's Affiliates] various services not provided by our [Advisor] or Property Managers . . ." and that the "[c]ontinuity of these services is, at this time, more important than internalization of such services."  (*Id.* at 21.)  The Proxy even specifies the amounts that IWEST spent on the services for various time periods in 2006 and 2007 (*id.* at 72–73), and contains multiple other references to services TIGI's Affiliates provided to IWEST  (*id*. at 22, 40, 41–42).

Plaintiffs do not and cannot point to anything to support their speculation that expenses should have been higher, and Plaintiffs' presumptions are specifically undercut by contrary information in the Proxy.  Accordingly, the Amended Complaint does not demonstrate that the financial statements were false and misleading.

### b. There Is Similarly No Basis For Plaintiffs' Allegation That The Property Managers' Financial Statements Were False And Misleading Because They Received Excessive Fees.

The Amended Complaint also asserts that the Property Managers' financial statements are misleading because those financial statements reflect the receipt of excessive property management fees. (Am. Compl. ¶¶ 183–84.)  There is, however, no factual support for this allegation, rendering it useless as support for Count I's claim under § 14(a).

Instead, the Amended Complaint demonstrates that the Property Managers' financial statements accurately disclose the property management fees.  The purpose of the financial

35

statements is to reflect the operations of the Property Managers.  In evaluating the portions of the financial statements relating to the property management fee payments received, two questions are relevant.  <u>First</u>, do the financial statements accurately reflect the fees actually paid by IWEST to the Property Managers as property management fees?  <u>Second</u>, are the disclosed property management fees paid at a rate that is consistent with the rate set by the controlling contract?  Here, both questions are answered affirmatively, meaning the financial statements accurately describe the property management fees.

The Amended Complaint does not dispute that the Property Managers' financial statements accurately reflect the management fees IWEST actually paid to the Property Managers.  To the contrary, the Amended Complaint sets out the fees from the financial statements as accurate reflections of fees actually paid (*id.* ¶¶ 127, 169) and then refers to those amounts throughout the rest of the Amended Complaint (*id.* ¶¶ 176, 183).  Plaintiffs never allege that the financial statements reflect anything other than the exact fees the Property Managers actually received.

The Amended Complaint likewise concedes that the property management fees were charged at a base rate of 4.5%, and that this 4.5% rate was precisely the rate set by the Property Management Agreement.  In Paragraph 126, the Amended Complaint cites the controlling Property Management Agreement, conceding that the Agreement provides for fees at "an amount no greater than four and one half percent (4-1/2%) of Gross Income."  (*Id.* ¶ 126.)  Plaintiffs do not dispute that IWEST paid the agreed-upon rate of 4.5% or that the fee revenues in the Property Managers' financial statements do, in fact, reflect payments at the contractual rate of no more than 4.5%.  Because the Amended Complaint admits that the Property Managers received fees in compliance with the terms of the Property Management Agreement, and that those financial statements correctly set out the fees that the Property Managers actually received, there is no factual basis for any suggestion that the Property Managers' financial statements reflect excess fees.

3.    **Plaintiffs Failure To Plead How Any Statement In The Proxy Was Rendered Misleading By The Alleged Omissions Requires Dismissal Of Their Remaining § 14(a) Allegations.**

In addition to claims based on the Advisor's and Property Managers' financial statements, Plaintiffs further allege that "The Proxy Contained Materially False and Misleading Statements Concerning the Advisor and Property Managers' Performance" (Am. Compl. ¶¶ 232–34), and "The Proxy Failed to Disclose Material Facts About Strategic Alternatives and Shareholder Liquidity Events" (*id*. ¶¶ 227–31). These allegations fail because Plaintiffs do not sufficiently allege, as they must, how any statement in the Proxy was rendered misleading as a result of these alleged omissions. 15 U.S.C. § 78u-4(b)(1).

Specifically, Plaintiffs allege that the Proxy omits a discussion about the Directors' assessment of the Advisor's and Property Managers' performance based on criteria set forth in IWEST's Articles of Incorporation. (Am. Compl. ¶¶ 232–34.) Nowhere, however, do Plaintiffs assert why any statement in the Proxy was actually rendered materially misleading by this alleged omission. Simply stating, without more, that Defendants failed to include a performance assessment of the Advisor, in the manner described in the Articles of Incorporation, is insufficient under the PSLRA. *See Textainer P'ship Sec. Litig.*, No. C-05-0969, 2005 WL 3801596, at *5 (N.D. Cal. Dec. 12, 2005) (dismissing the § 14(a) claim where plaintiffs failed to state with particularity why the Proxy statements were materially misleading as opposed to merely incomplete).

Similarly, Plaintiffs fail to plead why any statement in the Proxy was rendered misleading by the omission of information about strategic alternatives and shareholder liquidity events. (Am. Compl. ¶¶ 227–31.) Plaintiffs contend only that IWEST should have cited "additional" alternatives to the Internalization beyond those already disclosed in the Proxy. (*Id.* ¶¶ 228–29.) Plaintiffs do not allege -- indeed there is no basis to conclude -- that IWEST actually was required to provide the shareholders with more hypothetical alternatives, or that a laundry list of every possible alternative would be "material" to the shareholders. *See Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 245 (4th Cir. 1998) (requiring disclosure of speculative prospects

37

would "operate as a deterrent to the legitimate conduct of corporate operations and threaten to 'bury the shareholders in an avalanche of trivial information'; the very perils that the limit on disclosure impose by the materiality requirement serves to avoid"); *see also Wells*, 2008 WL 2302679, at *6 (holding that a proxy statement "need not include the 'panoply of possible alternatives' in the course of the action proposed.").

Accordingly, Plaintiffs' failure to sufficiently set forth why each statement and omission upon which they rely is material and misleading -- basic elements of their § 14(a) claim -- requires dismissal. *See TSC Indus.*, 426 U.S. at 449–50; *Beck*, 2007 WL 3407132, at *5–6.

### C. Plaintiffs' § 20(a) Claim Fails As A Matter Of Law.

Section 20(a) of the Securities Exchange Act imposes liability on persons having control over, or aiding and abetting, violators of the Exchange Act. 15 U.S.C. § 78t. Section 20(a) only provides for secondary liability and is dependent upon the finding of primary liability under the relevant provisions of the Act, here, § 14(a). *Id.* Because Plaintiffs fail to sufficiently allege a violation of § 14(a), their § 20(a) claim also fails as a matter of law. *See Beck*, 2007 WL 3407132, at *7 ("dismissal of Plaintiff's Section 14(a) claim also requires dismissal of his Section 20(a) claim").

Plaintiffs also fail to allege any facts supporting an inference that any of the individual director and officer Defendants exercised the type of control necessary for liability under § 20(a). The Seventh Circuit has recognized that plaintiffs alleging control person liability must show, in addition to an underlying violation, that the defendant both exercised general control over the primary violator and had actual or potential power to control the specific transaction that caused the violation. *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Thus, merely asserting that these individual Defendants were directors or officers is insufficient to sustain Plaintiffs' control person claims. *See, e.g., Starr v. !hey, Inc.*, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) ("Courts within this District have consistently held that a plaintiff may not premise control person liability solely upon status within the company."); *Donovan v. ABC-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002)

38

("The mere fact that Plaintiff alleges these Defendants are directors is not enough."); *Lambert v. Calprotrack, Inc.*, No. 95 C 4076, 1996 WL 224515, at *3 (N.D. Ill. May 1, 1996) ("[I]t is not enough to establish control by merely claiming the person occupies a position of control within an organization."); *Feldman v. Motorola, Inc.*, No. 90 C 5887, 1993 WL 497228, at *10 (N.D. Ill. Oct. 14, 1993) (holding as insufficient plaintiffs' "sweeping conclusions" that premised control person liability on status within the company).[14]

## III. PLAINTIFFS' COMMON LAW CLAIMS SUFFER FROM FATAL DEFICIENCIES THAT PROVIDE ADDITIONAL BASES FOR DISMISSAL.

Counts III–VII attempt to assert derivative common law claims for breach of fiduciary duty and aiding and abetting same, unjust enrichment, and breach of contract against nearly all Defendants. As discussed above in Section I, *supra*, the Court need not address the merits of these claims because they all belong to IWEST, not Plaintiffs, and Plaintiffs do not and cannot allege facts that would excuse them from making the demand required by Maryland law. In addition, these claims, which arise from legitimate board decisions, are precluded by the business judgment rule.

Nevertheless, if this Court proceeds to an examination of the merits of Counts III through VII, it should conclude that additional separate flaws exist that compel the dismissal of each count attempting to assert a common law claim.

### A. Count VII Of The Amended Complaint Fails To State A Colorable Claim For Breach Of Contract.

#### 1. Defendants Cannot Breach A Term That Does Not Exist In The Property Management Agreement.

In Count VII, Plaintiffs allege, on behalf of IWEST, that certain Defendants "violated the terms of the Property Management Agreements by charging IWEST for Property Management Fees that exceeded 90% of the fee which would be payable to an unrelated party providing such

---

[14] If the Court grants Defendants' motion to dismiss Plaintiffs' federal law claims, the Court has jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. 1332(a). *See Kauth v. Hartford Ins. Co. of Ill.*, 852 F.2d 951, 959 (7th Cir. 1988).

services." (Am. Compl. ¶ 346.)  Plaintiffs do not attach a copy of the Property Management Agreement to their Amended Complaint, nor cite any specific provision in the contract that limits property management fees in this regard, as they are required to do.  *See Calderon v. Sw. Bell Mobile Sys., LLC*, 390 F. Supp. 2d 714, 718 (N.D. Ill. 2005) (Grady, J.).  The reason for this omission is simple:  there is no provision in that Agreement that limits the fee for base property management fees to "90% of the fee which would be payable to an unrelated party providing such services."

To the contrary, as discussed above (*see supra* Section II.B.2.) the Property Management Agreement expressly permits the Property Managers to charge a 4.5% fee, without restriction, for anticipated property management services.  For any extra services, beyond those anticipated in advance and covered by the 4.5% rate, the parties must agree on a fee and that fee must "not exceed 90% of that which would be paid to unrelated parties providing such services."  (Am. Compl. ¶ 126; Property Management Agreement (Ex. 3) at 11.)  The only fee ever charged by the Property Managers was the base 4.5% fee, and even Plaintiffs begrudgingly concede that this fee is allowed under the contract:

> As set forth in the Property Management Agreements, the Property Managers are entitled to fees of up to 4.5% of the gross monthly income of the property.

(Am. Compl. ¶ 181).  A fee of 4.5% is what was agreed-to in the contract; it is what was charged; and it is what was paid.  Simply stated, Defendants cannot be liable for breaching a contractual term that does not exist.  *Spagnola v. Chubb Corp.*, No. 06 Civ. 9960(HB), 2007 WL 927198, at *2–3 (S.D.N.Y. Mar. 27, 2007) (granting motion to dismiss because contract terms upon which the plaintiff sued did not exist).

### 2.    The Voluntary Payment Doctrine Bars The Breach Of Contract Claim (Count VII) And The Unjust Enrichment Claim (Count VI).

Under the "voluntary payment doctrine," money voluntarily paid under a claim of right to the payment, with full knowledge of the facts by the person making the payment, cannot be recovered solely because the claim was illegal, unless the payment was made under

circumstances amounting to compulsion.  *King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1170–71 (Ill. 2005).  The voluntary payment doctrine applies to both breach of contract and restitution claims.  *See id.* at 1170–73 (affirming dismissal of restitution claim based on voluntary payment doctrine); *Wermers Floorcovering, Inc. v. Santanna Natural Gas Corp.*, 794 N.E.2d 1012, 1013 (Ill. App. Ct. 2003) (dismissing breach of contract claims based on voluntary payment doctrine).

Counts VI and VII consist of breach of contract and unjust enrichment claims that seek to recover allegedly excessive property management fees and Internalization consideration that IWEST purportedly paid to various Defendants.  Pursuant to the voluntary payment doctrine, these claims collapse under the weight of Plaintiffs' allegations that the Individual Defendants, who include IWEST's Board, "understood and knew" that both the property management fees and Internalization consideration were excessive.  (Am. Compl. ¶¶ 172, 176) (emphasis added).  And because Plaintiffs do not allege that these payments were made by IWEST under "compulsion," the exception to the doctrine is inapplicable.  Thus, the voluntary payment doctrine precludes Counts VI and VII.

### 3. Because Certain Defendants Are Non-Parties To The Agreements In Dispute, They Cannot Be Liable For A Breach Of Those Agreements.

It is axiomatic that a non-party to a contract cannot be held liable for a breach of that contract. *Santella v. Grishaber*, 672 F. Supp. 321, 328 (N.D. Ill. 1987) ("Non-parties are not liable for breach of contract."); *accord Meeker v. Gray*, 492 N.E.2d 508, 515 (Ill. App. Ct. 1986).  Count VII alleges a breach of contract claim against TIGI, the Sponsor, Goodwin, Parks, Baum, Cosenza, Grimes and Gujral for alleged violations of the Advisory Agreement and the Property Management Agreement. (Am. Compl. ¶¶ 345–50.)  None of these defendants are a party to either one of those contracts.  Thus, under *Santella*, these non-contracting parties cannot possibly be liable for a breach of contract.

### 4.     IWEST Cannot Allege Breach Of A Contractual Term That It Expressly Waived.

In Count VII Plaintiffs allege that the Advisor, Property Managers and several other non-contracting Defendants violated the Advisory Agreement and Property Management Agreement by "circumventing and failing to comply with the Purchase Options." (Am. Compl. ¶ 348.) IWEST cannot allege a breach of contract for this conduct because it expressly waived this provision.

"Waiver of a contractual provision may be established by conduct indicating that strict compliance with the provision will not be required." *Geier v. Hamer Enters., Inc.*, 589 N.E.2d 711, 722 (Ill. App. Ct. 1992). "The sufficiency of facts necessary to constitute waiver of contractual provision is a question of law" that may be decided on a motion to dismiss. *Id.; see also Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1233 (7th Cir. 1994) ("Whether the facts of this case are sufficient to constitute a waiver of the contractual provision is a question of law.") Here, the Court need look no further than Plaintiffs' own allegations, which disclose IWEST's statement in the Proxy that the Board decided to forego the purchase option:

> The Proxy states that "Our Board elected not to wait and pursue the [Purchase Options] outlined in this proxy statement whereby we could acquire our Business Manager/Advisor and Property Managers under the terms of the existing advisory agreement and property management agreement, beginning in September and May 2008, respectively . . . .

(Am. Compl. ¶ 222.)  That statement effectively ends the inquiry.

### B.     Multiple, Fatal Defects Undermine Count VI's Attempt To Assert A Claim For Unjust Enrichment.

### 1.     Plaintiffs' Unjust Enrichment Claim Alleges Factual Inconsistencies Regarding The Recipients Of The Property Management Fees.

Plaintiffs allege in Count VI that TIGI, the Sponsor, Goodwin, Parks, Baum, Cosenza, Grimes and Gujral were unjustly enriched to the detriment of IWEST and its shareholders "by their receipt of excessive Property Management Fees." (Am. Compl. ¶ 356.)  This allegation contradicts Plaintiffs' preceding allegations that the property management fees were paid by

IWEST directly to the Property Managers. (*See, e.g.*, Am. Compl. ¶¶ 3, 103, 104, 127, 176, 322.) Plaintiffs do not allege that either IWEST or the Property Managers diverted the property management fees to eight other Defendants, or allege any facts suggesting that the corporate veil of the Property Managers should be pierced to recover from its owners.  Given this glaring inconsistency, the claim is inherently flawed and should be dismissed. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (recognizing that "our pleading rules do not tolerate factual inconsistencies in a complaint").

> **2.     Plaintiffs' Unjust Enrichment Claim Fails Because The Merger Agreement Governs The Relationship Between IWEST And The Recipients Of The Internalization Consideration.**

"[W]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application."  *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 703 (Ill. App. Ct. 2003).  Here, Plaintiffs' unjust enrichment claim in Count VI is based on the alleged receipt by certain Defendants of "Internalization Consideration" that was agreed to, placed in escrow, and handled pursuant to the Merger Agreement, which was attached to the Proxy. (*See* Am. Compl. ¶¶ 162–65; *see also* Proxy (Ex. 1) at III.)  Plaintiffs have not alleged that the Internalization consideration was funneled to any Defendants in an alternative fashion. Thus, under *Guinn*, the existence of a specific contract that governs the payment of the Internalization consideration prevents Plaintiffs from bringing a quasi-contractual unjust enrichment claim.

> **C.     Plaintiffs' Fiduciary Duty Claims In Counts III-V Fail To Allege Cognizable Duties Or Breaches.**

As noted above, the Amended Complaint consistently avoids particularized allegations of wrongdoing against specific Defendants, opting instead for conclusory allegations directed at multiple Defendants.  (*See supra* at Section I.C.3.)  The fiduciary duty claims also suffer from substantive shortcomings.  As an initial matter, Plaintiffs' fiduciary duty claims are completely dependent upon the same allegations of wrongdoing as the flawed Proxy claim -- that the purported fiduciaries:  (1) caused IWEST to pay excessive fees to the Property Managers; (2)

caused and permitted the Advisor and Property Managers to under-report expenses, thereby creating false financial statements that were used to generate an inflated Internalization price; and (3) circulated a misleading Proxy based upon those misleading financial statements and an inflated Internalization price. (Am. Compl. ¶ 259(a)-(h).) These claims all depend entirely upon Plaintiffs' ability to establish the same key fact as undergird the Proxy claim -- that Defendants employed manipulated financial statements that reflected excess property management fees and that hid expenses. As demonstrated above, in discussing the failure of Count I under § 14(a), the Amended Complaint fails to establish these foundational facts, thus dooming the fiduciary duty claims.

## CONCLUSION

For the foregoing reasons, the Non-KPMG/William Blair Defendants, respectfully request that this Court grant their Motion to Dismiss and dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  July 17, 2008

Respectfully submitted,

**Counsel for Inland Real Estate Investment Corporation, The Inland Group, Inc., Robert D. Parks, Brenda G. Gujral, Daniel L. Goodwin, Robert H. Baum, and G. Joseph Cosenza**

*/s/ James L. Thompson*
Jerold S. Solovy
James L. Thompson
Anthony C. Porcelli
JENNER & BLOCK, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484

**Counsel for Kenneth H. Beard, Paul R. Gauvreau, Gerald M. Gorski, Barbara A. Murphy**

*/s/ Richard B. Kapnick (with consent)*
Richard B. Kapnick
Courtney A. Rosen
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

**Counsel for Inland Western Retail Real Estate Trust, Inc., Inland Western Retail Real Estate Advisory Services, Inc., Inland Northwest Management Corp., Inland Southwest Management Corp., Inland Western Management Corp., Frank A. Catalano, Jr., and Steven P. Grimes**

*/s/ Samuel B. Isaacson (with consent)*
Samuel B. Isaacson
Joseph E. Collins
DLA PIPER US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
Telephone: (312) 368-4000
Facsimile:  (312) 236-7516

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony C. Porcelli, an attorney, hereby certify that on July 17, 2008, I caused **Memorandum In Support Of the Non-KPMG/William Blair Defendants' Motion To Dismiss Plaintiffs' Amended Complaint** to be filed electronically with the United States District Court for the Northern District of Illinois, Eastern Division.  Notice of this filing will be sent electronically to the following parties by operation of the Court's electronic filing system.  Parties and interested persons may access this filing through the Court's system.

| | |
|---|---|
| Nicholas E. Chimicles<br>Kimberly M. Donaldson<br>Kimberly L. Kimmel<br>CHIMICLES & TIKELLIS LLP<br>361 W. Lancaster Avenue<br>Haverford, PA 19041 | Adam J. Levitt<br>WOLF HALDENSTEIN ADLER<br>  FREEMAN & HERZ LLC<br>55 West Monroe Street<br>Suite 111<br>Chicago, IL 60661 |
| Alexander H. Schmidt<br>Lawrence P. Kolker<br>WOLF HALDENSTEIN ADLER<br>  FREEMAN & HERZ LLC<br>270 Madison Avenue<br>New York, NY 10016 | Lawrence A. Sucharow<br>Joseph Sternberg<br>LABATON SUCHAROW LLP<br>140 Broadway<br>New York, NY 10005 |
| Harold C. Hirshman<br>SONNENSCHEIN NATH & ROSENTHAL<br>7800 Sears Tower<br>233 South Wacker Drive<br>Chicago, IL 60606-6404 | James C. Schroeder<br>John Joseph Tharp, Jr.<br>MAYER BROWN LLP<br>71 South Wacker Drive<br>Chicago, IL 60606 |
| | Jonathan C. Medow<br>PERKINS COIE LLP<br>131 South Dearborn Street<br>Suite 1700<br>Chicago, IL 60603 |

/s/  Anthony C. Porcelli