# EXHIBIT 1

DEFM14A 1 a07-22282_2defm14a.htm DEFM14A

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# SCHEDULE 14A
Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant  ☒
Filed by a Party other than the Registrant  ☐

Check the appropriate box:
☐ Preliminary Proxy Statement
☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒ Definitive Proxy Statement
☐ Definitive Additional Materials
☐ Soliciting Material Pursuant to §240.14a-12

Inland Western Retail Real Estate Trust, Inc.
_____
(Name of Registrant as Specified In Its Charter)

_____
(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☐ No fee required.
☒ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
  (1) Title of each class of securities to which transaction applies:
      Common Stock, par value $.001 per share
  (2) Aggregate number of securities to which transaction applies:
      37,500,200
  (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
      $10.00; value set forth in merger agreement
  (4) Proposed maximum aggregate value of transaction:
      $375,002,000
  (5) Total fee paid:
      $11,513
☒ Fee paid previously with preliminary materials.
☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.
  (1) Amount Previously Paid:
      _____
  (2) Form, Schedule or Registration Statement No.:
      _____
  (3) Filing Party:
      _____
  (4) Date Filed:
      _____

financial advisor, William Blair & Company, LLC, which we refer to as William Blair, which concluded that, subject to certain assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid by us pursuant to the Merger Agreement to acquire our Business Manager/Advisor and Property Managers was fair, from a financial point of view, to us and our stockholders.

**Q:**  **What will be the impact of the Merger on the current stockholders?**

**A:**  If the Merger is ratified by our stockholders, we will issue approximately 37,500,000 shares of our common stock to the stockholders of our Business Manager/Advisor and Property Managers as consideration for those four companies, which is approximately 7.7% of our common stock after giving effect to the Merger. We expect that the distributions paid on approximately 37,500,000 shares, plus the incremental general and administrative costs of self-administration, will be less than the advisory and property management fees plus cost reimbursements under our existing contracts with our Business Manager/Advisor and Property Managers. Upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger, and it is estimated to be increasingly accretive in subsequent years.

**Q:**  **What are the reasons for the proposed Merger?**

**A:**  Many stock analysts and institutional investors have a preference for "self-administered" REITs, which have a dedicated management team and staff strictly focused on the REIT's day-to-day business. In the future, we may wish to list our shares on a national exchange. Our Board believes that such a future listing would be better received by the investment community, and potentially result in a higher valuation for our company, if we are self-administered.

In addition, acquiring our Business Manager/Advisor means that we will not have to pay fees to our Business Manager/Advisor relating to the sale of any of our properties that we choose to sell in the future.

See "The Merger – Reasons for Merger" for additional reasons for the proposed Merger.

**Q:**  **How was the Merger process conducted and what was the process to determine the Merger consideration?**

**A:**  Our Board established a special committee, comprised of four independent, non-affiliated directors, to evaluate alternatives and make recommendations with respect to the Merger. The special committee retained its own independent counsel, the law firm of Sidley Austin LLP, and its own independent financial advisor, William Blair, who provided the special committee and our Board with a fairness opinion, the full text of which is attached in **Appendix B**. After a more than 14 month due diligence and negotiation process, the special committee recommended entry into the Merger Agreement and approval of the Merger.

**Q:**  **Why is the Merger occurring now?**

**A:**  Our Board elected not to wait and pursue the option outlined in this proxy statement whereby we could acquire our Business Manager/Advisor and Property Managers under the terms of the existing advisory agreement and property management agreement, beginning in September and May 2008, respectively, which could have resulted in approximately 54.1 million shares issued in connection with such acquisition.

See "The Merger – Reasons for Merger" for additional information relating to the timing of the proposed Merger.

**Q:**  **Who will be the management team and our employees?**

**A:**  If the Merger is approved, our management team is expected to include Michael J. O'Hanlon as President and Chief Executive Officer, Steven P. Grimes as Chief Operating Officer and Chief Financial Officer,

iii

Opinion of the Financial Advisor | 47
Accounting Treatment | 57
Federal Tax Consequences | 57
Regulatory Matters | 59
Past Contacts, Transactions or Negotiations | 59
Vote Required | 60
ELECTION OF DIRECTORS | 61
Nominees for Election as Directors | 61
Vote Required | 64
Board Meetings in 2006 | 64
Committees of the Board of Directors | 64
Compensation Committee Interlocks and Insider Participation | 65
Nominating Committee | 65
Audit Committee Report | 66
Stockholder Communications | 66
OUR EXECUTIVE OFFICERS | 67
Our Affiliation with The Inland Real Estate Group of Companies, Inc. | 67
Biographies of our Executive Officers | 67
COMPENSATION PAID TO OUR DIRECTORS AND OFFICERS | 69
Director Compensation | 69
Report of Directors on Compensation | 70
Compensation Discussion and Analysis | 70
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 71
DESCRIPTION OF OUR SECURITIES | 74
SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 75
SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE | 76
RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE 2007 FISCAL YEAR | 77
Principal Accounting Fees and Services | 77
Vote Required | 78
SELECTED HISTORICAL FINANCIAL DATA | 79
SELECTED HISTORICAL FINANCIAL DATA OF OUR BUSINESS MANAGER/ADVISOR | 81
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF OUR BUSINESS MANAGER/ADVISOR | 82
Overview | 82
Significant Accounting Policies | 82
Results of Operations | 82
Liquidity and Capital Resources | 85

II

## INFORMATION ABOUT THE ANNUAL MEETING

**Information about the Annual Meeting**

Our Annual Meeting will be held on November 13, 2007 at 10:00 a.m. Central Time at 2901 Butterfield Road, Oak Brook, Illinois 60523. Please contact our Vice President and Secretary, Roberta S. Matlin, at (630) 218-8000 if you plan to attend. Additionally, please contact Morrow & Co., Inc. at 1-800-573-4804 if you have any questions with respect to authorizing a proxy to vote your shares at the Annual Meeting.

**Information about this Proxy Statement**

We sent you this proxy statement and the proxy card on behalf of our Board who is soliciting a proxy from you to vote your shares at the Annual Meeting. This proxy statement summarizes information we are required to provide to you and is designed to assist you in voting your shares. On or about September 14, 2007, we began mailing the proxy materials to all stockholders of record as of the close of business on August 31, 2007, the record date fixed by our Board for determining the holders of record of our common stock, $.001 par value per share, entitled to notice of and to vote at the Annual Meeting. Each of the outstanding shares of common stock, as of the record date, is entitled to one vote on all matters to be voted upon at the Annual Meeting. On the record date, there were 451,339,585 shares of common stock issued and outstanding.

**Proposals to be Considered by You at the Annual Meeting**

At the Annual Meeting, we will be asking you to:

PROPOSAL 1:    Ratify our entry into the Merger Agreement with our Business Manager/Advisor and Property Managers and certain other parties and our approval of the Merger;

PROPOSAL 2:    Elect seven directors; and

PROPOSAL 3:    Ratify the appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year.

**Information about Voting**

VOTING OF PROXIES - Votes cast by proxy or in person at the Annual Meeting will be tabulated by an inspector of election appointed for the Annual Meeting. Each executed and timely returned proxy will be voted in accordance with the directions indicated on it. Each stockholder giving a proxy has the power to revoke it at any time before the shares it represents are voted by giving written notice of the revocation to our Vice President, by delivering a later-dated proxy (which automatically revokes the earlier proxy), or by voting in person at the Annual Meeting. Except for "broker non-votes" described below, executed but unmarked proxies will be voted by the person(s) named thereon (i) for the ratification of our entry into the Merger Agreement with our Business Manager/Advisor and Property Managers and certain other parties thereto, and for the ratification of the Merger; (ii) for the election of the nominees named herein as directors (or a substitute for a nominee if such nominee is unable or refuses to serve); (iii) for the ratification of our appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year; and (iv) in the discretion of such person(s) upon such matters not presently known or determined that properly may come before the Annual Meeting.

AUTHORIZATION OF PROXIES ELECTRONICALLY VIA THE INTERNET - Stockholders may authorize a proxy to vote via the Internet at the www.proxyvoting.com/INWEST until 11:59 p.m. Eastern Time, on November 12, 2007. The Internet proxy authorization procedures are designed to authenticate the stockholders' identity and to allow stockholders to vote their shares and confirm that their instructions have been properly recorded.

AUTHORIZATION OF PROXIES VIA TOUCH-TONE TELEPHONE — Stockholders may authorize a proxy to vote via touch-tone telephone by calling the toll-free phone number provided on their proxy card until 11:59 p.m. Eastern Time, on November 12, 2007. The touch-tone telephone proxy authorization procedures are designed to

3

## SUMMARY

This summary highlights the material information contained in the proxy statement, but may not contain all of the information that is important to you and, therefore, you should read carefully this entire document, including the appendices and the other documents to which we refer you, for a more complete understanding of the transactions that are the subject of this proxy statement.

### Ratification of our Entry into the Merger Agreement and our Approval of the Merger

*Background*. We are a real estate investment trust that was formed in 2003. We have primarily focused on acquiring, developing, operating and leasing multi-tenant shopping centers and single-user net lease properties. As of June 30, 2007, our portfolio consisted of 288 wholly-owned properties, 16 properties in which we have an interest of between 45% and 95%, and six development joint venture projects in which we have an investment, four of which we consolidate. As of June 30, 2007, our portfolio contained approximately 46 million square feet of leasable space. Our anchor tenants include nationally and regionally recognized grocers, discount retailers, financial companies, and other tenants who provide basic household goods and services. Of our total annualized revenue as of June 30, 2007, approximately 69% is generated by anchor or credit tenants, including American Express, Zurich Insurance Company, Best Buy, Ross Dress For Less, Bed Bath & Beyond, GMAC, Wal-Mart, Publix Supermarket, and several others. The term "credit tenant" is subjective and we apply the term to tenants who we believe have a substantial net worth.

Since our inception, our Property Managers have been responsible for, among other things, leasing, collecting rents and performing routine maintenance work that is not otherwise the tenant's responsibility. For our Property Managers' services, we pay a fee of 4.5% of gross operating income of each property managed by the Property Managers. In 2006, 2005 and 2004, we paid our Property Managers property management fees of $29.8 million, $20.7 million and $5.4 million, respectively.

Likewise since inception, Inland Western Retail Real Estate Advisory Services, Inc., has served as our business manager and advisor. Since we do not have any employees, our Business Manager/Advisor has been responsible for our day-to-day operations, including negotiating the acquisition of our properties, overseeing our Property Managers, administering our bookkeeping and accounting and legal functions, investor relations and consulting with our Board on policy decisions. For these services, we can be charged by our Business Manager/Advisor an annual asset management fee of up to 1% of our average invested assets; however, our Business Manager/Advisor has historically charged us no more than 0.53% on an annual basis. Average invested asset value is defined as the average of the total book value, including acquired intangibles, of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt or other similar non-cash reserves. We compute the values at the end of each month for which the fee is being calculated. The fee is paid quarterly in an amount equal to ¼ of the estimated annual fee based on our average invested assets as of the last day of the immediately preceding quarter. Based upon the maximum allowable advisor asset management fee of 1% of our average invested assets, maximum fees of $74.9 million, $54.9 million and $15.0 million could have been charged for the years ended December 31, 2006, 2005 and 2004, respectively. However, we paid $39.5 million and $20.9 million for the years ended December 31, 2006 and 2005, respectively. Our Business Manager/Advisor waived all asset management fees for the year ended December 31, 2004. Our Business Manager/Advisor has agreed to forego any fees allowable but not taken on an annual basis.

In addition to the asset management fee, we are obligated to pay to our Business Manager/Advisor a property disposition fee and a subordinated incentive fee payable on sale of a property. The disposition fee is equal to the lesser of: (i) 3% of the contract sales price of the property, or (ii) 50% of the customary commission that would be paid to third parties for the property. The incentive fee is equal to 15% of the net proceeds remaining from the sale of any property after our stockholders have first received: (i) a cumulative, non-compounded return equal to 10% on an annual basis on the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties and (ii) a return of the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties. Our obligation to pay future disposition and incentive fees terminates upon consummation of the Merger.

6

## RISKS OF THE MERGER TO US AND OUR STOCKHOLDERS

*Certain of our officers and directors have potential conflicts of interest.*

Certain of our directors and officers have interests in connection with the Merger, our Property Managers and our Business Manager/Advisor that are different from, and may potentially conflict with, our interests. In particular, all of our current executive officers and two of our current directors are also executive officers and/or directors of Inland. We have entered into a non-compensated consulting agreement, that will become effective upon the closing, with Robert D. Parks, our current chairman and director. Mr. Parks and Ms. Brenda G. Gujral, our chief executive officer and a director, are stockholders of our Property Managers and TIGI, the ultimate owner of our Business Manager/Advisor. As such, these individuals will receive direct and indirect substantial benefits, in the form of our payment of shares of our common stock as consideration in the Merger.

Mr. Grimes, our current Treasurer and Principal Financial Officer, has entered into an employment agreement with us, that will become effective upon the closing, and will become our Chief Operating Officer and Chief Financial Officer. Mr. Grimes is also currently a stockholder of one or more of the Property Managers. If the Merger is consummated, Mr. Grimes will receive additional economic interest in our common stock through his ownership in one or more of the Property Managers. Mr. Grimes, due to his ownership interest in one or more Property Managers, is subject to the terms of the Merger Agreement and other ancillary agreements including the agent appointment agreement and the escrow agreement. Under the terms of the escrow agreement, 55% of our common shares issued in the Merger will be deposited into an escrow account and subject to two release dates, the second of which will occur on the earlier of the 30th day after receipt by us of an audit opinion from our independent registered public accounting firm covering our financial statements for the year ending December 31, 2008 and the second anniversary of the effective date of the escrow agreement. Certain provisions of the Merger Agreement and the escrow agreement may further have a significant impact on shares owned by stockholders of the Property Managers and our Business Manager/Advisor. In particular, Mr. Grimes is subject to potential conflicts of interest in connection with the enforcement against us and the enforcement by us against one or more Property Managers of indemnification obligations under the Merger Agreement and the escrow agreement. The enforcement of the provisions of these agreements may adversely affect the financial interests of Mr. Grimes and the economic interests of Mr. Grimes may affect his judgment as to whether and to what extent we should enforce the indemnification obligations against the Property Managers or contest any attempt by the Property Managers to enforce indemnification obligations against us after the consummation of the Merger.

*We are dependent on Inland to provide services to us.*

We rely on Inland to provide certain administrative services to us. The services provided to us are described in service agreements including the ancillary agreements executed, and to be executed, pursuant to the Merger Agreement. Our ability to achieve our business objectives will depend to a large extent on the quality of Inland's performance under these service agreements. Therefore, we depend heavily on the ability of Inland to retain the services of each of its executive officers and key employees. The loss of these individuals, or similar changes, could have a material adverse effect on us.

*We may compete with our affiliates for properties.*

Certain of our affiliates could seek to acquire properties that, while not directly in our industry or geographic segment, could satisfy our acquisition criteria. For example, Inland, which provides property acquisition services to us, also provide these services to other entities, including REITs, such as Inland Real Estate Corporation and Inland American Real Estate Trust, Inc., which have superior rights to acquire certain properties identified by Inland that are of a certain type and within certain geographic areas.

*Our funds from operations for the current fiscal year will decrease if the Merger is consummated in 2007.*

If the Merger is consummated in 2007, our funds from operations for the current fiscal year will decrease as a result of the non-cash charge we will incur for the portion of the Merger consideration that pertains to the costs of terminating the advisory agreement and property management agreements. After termination of the advisory agreement, we will no longer incur certain fees previously paid to affiliates of our Business Manager/Advisor. Our

12

## THE MERGER

PROPOSAL NO. 1: RATIFICATION OF OUR ENTRY INTO THE MERGER AGREEMENT WITH OUR BUSINESS MANAGER/ADVISOR AND PROPERTY MANAGERS AND CERTAIN OTHER PARTIES AND OUR APPROVAL OF THE MERGER.

### Background of the Merger

Since its inception, our Board has considered, from time to time, the possibility of becoming self-administered. In February 2006, following discussions with representatives of Inland, our Board began to consider the strategic benefits of internalizing the services conducted for us by our Business Manager/Advisor and Property Managers. Our advisory agreement with our Business Manager/Advisor and our property management agreements with our Property Managers each include a provision, which we refer to as the purchase options, permitting us to acquire, at our option, the business conducted by our Business Manager/Advisor, including all of its assets, and by each Property Manager, including all of their assets, in exchange for a number of shares of our common stock determined in accordance with a formula established in those agreements. We could exercise the purchase options beginning in September 2008 for the Business Manager/Advisor and in May 2008 for the Property Managers.

In February 2006, after discussion and consultation with counsel, our Board determined that it would be advisable to form a special committee of the Board comprised only of independent directors to consider and evaluate a possible acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such a transaction.

On March 7, 2006, the special committee, initially composed of Kenneth H. Beard, Frank A. Catalano, Jr., Paul R. Gauvreau, Gerald M. Gorski, and Barbara A. Murphy, met in person with our counsel, Duane Morris LLP, which we refer to as Duane Morris, and unanimously resolved to recommend to our Board that it adopt and approve the special committee's charter. At this meeting, Mr. Gauvreau was also elected chairman of the special committee.

On March 14, 2006, our Board adopted the charter recommended by the special committee and formally established the special committee. The Board delegated all its power and authority to the special committee, subject to applicable law, in connection with all matters pertaining to the possible acquisition of our Business Manager/Advisor and Property Managers and the evaluation of alternative strategies. The special committee met telephonically that same day with a representative from Duane Morris to discuss the special committee process and the retention of independent financial and legal advisors to assist the special committee in evaluating the potential acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such an acquisition and negotiating any transaction.

On April 11, 2006, the special committee met in person with representatives from Duane Morris present to discuss further the process of retaining financial and legal advisors.

During April and May 2006, the special committee solicited proposals from potential financial advisors and legal advisors to assist them in evaluating and negotiating any internalization transaction. On May 10, 2006, the special committee met in person and interviewed potential financial advisors. On May 12, 2006, the special committee met in person and interviewed potential legal advisors.

On May 15, 2006, Silver Portal Capital, which we refer to as Silver Portal, financial advisors to the Business Manager/Advisor and Property Managers, presented to our Board and to the members of the special committee its financial analysis and valuation of the Business Manager/Advisor and Property Managers and its economic rationale for an internalization transaction. Thereafter, Mr. Gauvreau, at the direction of the special committee, contacted Mr. Goodwin, the Chairman of TIGI and one of its principal stockholders, and requested additional information regarding the Silver Portal presentation and its valuation analysis.

The special committee met in person on June 13, 2006 and formally retained Sidley Austin LLP, which we refer to as Sidley, as legal counsel to the special committee. The special committee's counsel reviewed with the members of the committee their legal duties and discussed the independence of each member of the special committee. At this meeting, representatives from Sidley also reviewed with the special committee applicable

14

provisions of our charter and bylaws, including the exculpatory, indemnification, advancement of expenses and insurance provisions. The special committee's counsel noted, among other things, that our charter and bylaws contained provisions different from those customarily found in the organizational documents of publicly listed and traded companies. The special committee requested that Sidley provide additional analysis of these provisions.

By letter dated June 19, 2006, the special committee engaged William Blair to serve as its financial advisor in connection with the special committee's consideration of a possible internalization transaction, including participating in negotiations relating to the possible internalization transaction, and rendering an opinion as to the fairness to us of the consideration to be paid by us in the possible internalization transaction or advising the special committee and the Board that William Blair is unable to render such an opinion.

On June 23, 2006, the special committee and its counsel met telephonically and were joined by Mr. Goodwin, as a representative of TIGI, certain of our officers, and a representative from Duane Morris. The special committee and its counsel discussed certain apparent inadvertent errors in our charter and determined to recommend to the Board that it file a certificate of correction with the state of Maryland to remedy these drafting errors. The special committee further reviewed and discussed the independence of each member of the special committee. In addition, the special committee and our representatives discussed the scheduling of our annual meeting and the need for amendments to our charter.

Our Board met on July 5, 2006. At this meeting, our Board determined to file a certificate of correction to remedy certain drafting errors in our charter. The Board also determined to seek stockholder approval of amendments to our charter at our stockholders' annual meeting to adopt indemnification, exculpatory and insurance provisions more customary with publicly listed and traded companies. The Board also discussed the composition of the special committee and considered whether Mr. Catalano, who had a then existing financial relationship with Inland, would be considered "independent" under the various definitions of independence applicable to our directors. To avoid any perceived impairment of the independence of the special committee members, Mr. Catalano resigned from the special committee.

On August 2, 2006, the special committee, then comprised of Messrs. Beard, Gauvreau and Gorski and Ms. Murphy, met telephonically, along with its legal and financial advisors. The special committee discussed with its legal and financial advisors, among other things, the actions taken by the Board and the duties of the members of the special committee under Maryland law and under our charter and bylaws in connection with evaluating whether to acquire our Business Manager/Advisor and Property Managers and alternatives to an internalization transaction. Representatives of William Blair provided preliminary comments on the financial analysis prepared by Inland, the financial advisors to the Business Manager/Advisor and Property Managers. Representatives of William Blair also provided the special committee with an overview of its analytical approach to the financial valuation of potential target companies. In connection with its discussion, the special committee began to evaluate potential alternatives to an internalization of the Business Manager/Advisor and Property Managers.

On August 10, 2006, we filed with the SEC our proxy materials for the annual meeting of our stockholders, which was to be held on October 10, 2006, to consider, among other things, the amendment and restatement of our charter.

On October 10, 2006, our stockholders approved the amendment and restatement of our charter at our annual meeting and, promptly thereafter, the amended and restated charter was filed with Silver Portal and the State Department of Assessments and Taxation for the state of Maryland. At the end of October and the beginning of November, our legal advisors commenced legal due diligence and our financial advisors commenced financial due diligence with respect to a possible internalization transaction with the Business Manager/Advisor and Property Managers and the alternatives to such a transaction.

Our Board met on November 14, 2006. At the meeting, the Board ratified its prior actions, including the formation of the special committee and the delegation of authority to it in connection with the evaluation of a possible internalization transaction with the Business Manager/Advisor and Property Managers and the alternatives to such a transaction and all actions taken by the special committee with respect to the possible internalization transaction.

15

During November and December 2006, the legal and financial advisors to the special committee continued to conduct due diligence and review materials and information provided by the Business Manager/Advisor and Property Managers.

On December 12, 2006, the special committee met in person with its financial and legal advisors. At this meeting, representatives of William Blair summarized the status of its due diligence review and provided additional perspective on the financial analysis prepared by Silver Portal for the Business Manager/Advisor and Property Managers. The members of the special committee requested that William Blair provide a preliminary valuation analysis of the Business Manager/Advisor and Property Managers and of our common stock in early January 2007.

Representatives of Sidley also provided an update on the status of its due diligence review at the December 12, 2006 meeting of the special committee, including an analysis of the existing advisory and property management agreements. The special committee also discussed possible alternatives to an internalization transaction, including the following alternatives:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

In evaluating a possible termination of our existing agreements with our Business Manager/Advisor and Property Managers, the special committee noted that it would be difficult to promptly replace the services provided by the Property Managers and also discussed the practical difficulties that termination of the advisory agreement might create, including transition costs related to the loss of experienced employees of our Business Manager/Advisor and the loss of important administrative services and assets, including the "Inland" name, licensed to us through our Business Manager/Advisor. The special committee requested that William Blair obtain additional due diligence information relating to the cost of the services provided by the Business Manager/Advisor and the Property Managers compared to such services that could be provided by third-party service providers.

On December 21, 2006, representatives from William Blair and Sidley met in person with representatives from the Business Manager/Advisor and Property Managers. At this meeting, the representatives from the Business Manager/Advisor and Property Managers presented their position on, and provided additional information related to, the services provided by the Business Manager/Advisor and Property Managers, valuation of the Business Manager/Advisor and Property Managers, valuation of our common stock, the potential advantages of an internalization to our company, and the process for proceeding with negotiations should the special committee decide to do so. In addition, our Business Manager/Advisor and Property Managers provided additional due diligence materials relating to services provided to our company directly or through our Business Manager/Advisor by Inland at this meeting and personnel and functions that would be internalized in an internalization transaction.

On January 9, 2007, representatives of our Business Manager/Advisor and Property Managers made a presentation to our Board regarding, among other things, the scope of the services that our Business Manager/Advisor and Property Managers currently provided to us including, among others, office and facilities management, insurance and risk management, computer, personnel, property tax, communications, loan, and property acquisition due diligence services, many of which are provided to our Business Manager/Advisor by Inland. Our Business Manager/Advisor and Property Managers also discussed the potential transition issues associated with terminating the advisory or property management agreements, including potential cessation of our

16

property acquisition program and the value to us of access to property acquisition services of affiliates of our Business Manager/Advisor, all of which could be provided directly or indirectly through our Business Manager/Advisor.

Immediately after the Board meeting on January 9, 2007, the special committee met with its financial and legal advisors. The special committee reviewed and discussed the materials distributed at the Board meeting regarding the services currently provided to us by the Business Manager/Advisor and the Property Managers, the cost of such services compared to services that could be provided by third-party service providers, and the potential cost savings that might be realized by acquiring the Business Manager/Advisor and the Property Managers. The special committee also discussed additional possible benefits of an internalization, including the ability to hire key personnel and retain key officers and employees of our Business Manager/Advisor and Property Managers, continued cost-effective access to important administrative services provided by our Business Manager/Advisor and Property Managers and their affiliates including access to the Inland property acquisition "pipeline" via agreements with Inland regarding properties located in our market area, and the use of the "Inland" name and logo. The special committee also explored the risks of building a staff internally as compared to acquiring our Business Manager/Advisor and Property Managers, including the potential risks related to a transition in management and services as well as management distractions related to such a transition, investor relations and the relationship between us, TIGI and Inland.

At this meeting, William Blair reviewed for the special committee its preliminary financial analyses with respect to our Business Manager/Advisor and Property Managers and us. The special committee determined that the purchase options could be viewed as a ceiling on the number of shares that we might exchange to internalize the Business Manager/Advisor and Property Managers. William Blair also provided the special committee with a preliminary financial analysis regarding the valuation of our Business Manager/Advisor and Property Managers and our per share valuation, as well as the corresponding number of shares to be included as consideration in the possible internalization transaction. William Blair also presented to the special committee a comparison of the cost of certain services provided by the Business Manager/Advisor and the Property Managers as a percentage of our assets compared to that cost ratio for selected publicly traded REITs that have internally provided advisory and property management services. The special committee, along with its financial and legal advisors, discussed the advantages and disadvantages of the various strategic alternatives available to the special committee, including that acquiring our Business Manager/Advisor and Property Managers could enhance stockholder value by, among other things, positioning us to list our shares on a national securities exchange, reducing the potential conflict due to the fact that fees paid to our Business Manager/Advisor and Property Managers are primarily based on a percentage of our real property asset base, and generating cost savings which could increase earnings and funds from operations.

The special committee determined that it was in our best interest and the best interest of our stockholders to pursue further discussions regarding an internalization transaction. The committee authorized Mr. Gauvreau and representatives from William Blair to enter into discussions with representatives of the Business Manager/Advisor and Property Managers regarding the valuation of the Business Manager/Advisor and Property Managers and about our valuation, and the corresponding number of shares to be included as consideration in the possible internalization transaction.

Mr. Gauvreau and representatives of William Blair met with Mr. Goodwin and Mr. Thomas McGuinness, the President of our Property Managers, on January 26, 2007. The special committee's representatives presented the Business Manager/Advisor and Property Managers' representatives with a summary of William Blair's preliminary valuation analysis. The representatives for both parties discussed valuation, share accretion and personnel issues. Mr. Goodwin presented Mr. Gauvreau and the representatives of William Blair with a proposed term sheet for an internalization transaction and the parties agreed to continue discussions in early February.

At Inland's request, the special committee requested that representatives of Sidley contact representatives of Jenner & Block LLP, which we refer to as Jenner, counsel for the Business Managers/Advisors and Property Managers, to discuss the legal terms of the potential transaction. The special committee also requested that Sidley commence drafting and negotiating a merger agreement and requested that representatives of Sidley contact representatives from Duane Morris to identify and begin drafting and negotiating the ancillary service agreements that we would need to enter into or amend in connection with the potential internalization transaction.

17

On February 14, 2007, the special committee met in person with its financial and legal advisors. The special committee discussed certain human resources and employment matters relating to the proposed internalization transaction and reviewed a draft post-internalization organizational chart provided by Mr. Grimes, the Chief Financial Officer of our Business Manager/Advisor and Mr. O'Hanlon, the Senior Vice President of Asset Management of our Sponsor.

At the invitation of the committee, Mr. Goodwin, along with Mr. McGuinness and Mr. Robert Barg, joined the meeting to present the Business Manager/Advisor's and Property Managers' views on the valuation of those entities and the accretive value to us of the proposed internalization transaction. The special committee emphasized to the representatives of our Business Manager/Advisor and Property Managers that it was important that, upon any acquisition of our Business Manager/Advisor and Property Managers, if any, we would have the key employees necessary to perform the services currently provided by our Business Manager/Advisor and Property Managers. The representatives of our Business Manager/Advisor and Property Managers indicated that Inland also would be amenable to having certain persons serve in a consulting capacity at minimal or no cost to us for a period of time to be determined.

Following the presentation by the representatives of the Business Manager/Advisor and Property Managers, the special committee met with its financial and legal advisors to discuss the valuation of the Business Manager/Advisor and Property Managers and the corresponding number of shares to be included as consideration in the possible internalization transaction. The members of the special committee also discussed the valuation of our common stock. The members of the special committee also reviewed a draft merger agreement and draft ancillary service agreements and discussed their terms. The special committee discussed the persons who would be retained on a consultancy basis, in the event that the proposed internalization transaction were accomplished, as well as information regarding transition and continuation services that Inland is expected to provide to us in connection with the acquisition.

On February 19, 2007, after additional discussion between representatives of the special committee and representatives of the Business Manager/Advisor and Property Managers, regarding the parties' respective valuation analyses, the parties preliminarily agreed to an aggregate purchase price for our Business Manager/Advisor and Property Managers of 37,500,000 shares of our common stock, subject to the negotiation of the terms and conditions set forth in the merger agreement and ancillary agreements. The draft merger agreement also was provided to Jenner on this date.

On February 22, 2007, the special committee met in person along with representatives from Sidley and Duane Morris. At the invitation of the special committee, Mr. Grimes and Mr. O'Hanlon attended the meeting. The special committee again discussed, if we acquired our Business Manager/Advisor and Property Managers, the key employees who would become our employees. Mr. O'Hanlon and Mr. Grimes presented the members of the special committee with an updated draft employee organizational chart for the proposed internalization at this meeting.

On March 1, 2007, the special committee met in person to discuss human resources matters relating to the proposed internalization transaction, including senior management positions, employment agreements and consulting agreements. On March 13, 2007, the special committee met again with Mr. O'Hanlon and Mr. Grimes regarding the persons who would become full-time employees of ours if a transaction were completed.

During March and April 2007, the legal advisors to the special committee, at the direction of the special committee, our legal advisors and the legal advisors to the Business Manager/Advisor, Property Managers and Inland met in person and telephonically on numerous occasions to negotiate the terms of the merger agreement and the ancillary service agreements with Inland. During this period, the special committee met on numerous occasions with its counsel to review the status of the negotiations and review drafts of these agreements.

On April 6, 2007 and on April 17, 2007, the special committee met telephonically with its legal advisors and reviewed the status of negotiations relating to the merger agreement and ancillary service agreements.

During the week of April 23, 2007, representatives of the Business Manager/Advisor and Property Managers proposed that they meet again with members of the special committee to discuss certain terms of the merger agreement and ancillary agreements. The members of the special committee, along with representatives of

18

On August 14, 2007, the special committee met telephonically, along with its legal and financial advisors to review the final terms of the proposed acquisition. At the meeting, representatives of William Blair reviewed the financial results for us and the Business Manager/Advisor and Property Managers through June 30, 2007, as well as updated financial projections that it had received for us and for our Business Manager/Advisor and Property Managers and presented an update of its analysis to the special committee. Then, William Blair delivered to the special committee its oral opinion that the consideration of approximately 37,500,000 shares of our common stock to be paid by us for the acquisition of our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders. See "- Opinion of the Financial Advisor." Later that same day, William Blair delivered its written opinion to the same effect. Counsel for the special committee reviewed the various alternatives and the advantages and disadvantages considered by the special committee with respect to each alternative. These alternatives included:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

The special committee unanimously recommended that our Board and stockholders approve the Merger, subject to the terms and conditions set forth in the Merger Agreement and ancillary agreements thereto.

Following the meeting of the special committee, our Board met telephonically and unanimously approved the Merger and the Merger Agreement and ancillary agreements thereto.

**Reasons for Requiring Your Ratification**

There is no legal requirement to submit our entry into the Merger Agreement or our approval of the Merger to our stockholders for ratification. Because we believe it is desirable to obtain your ratification of our entry into the Merger Agreement and our approval of the Merger, we have made your ratification a condition to the closing of the Merger. If the Merger proposal is not approved, we will continue to operate under our current management structure, paying fees and cost reimbursements to our Property Managers and our Business Manager/Advisor under their contracts and our Board will examine its other alternatives.

**Reasons for the Merger**

The special committee recommended that our Board approve the proposed transaction based upon a variety of factors, both for and against the proposed transaction. The decision by the special committee followed numerous meetings with its legal and financial advisors as described in greater detail above in "- Background of the Merger." The special committee took into account the following positive factors without assigning relative weights, which the special committee believes favor the proposed transaction:

- *Goal of Self Administration.* The acquisition of our Business Manager/Advisor and Property Managers is one of the most significant steps in achieving our objective of becoming a fully self-administered REIT. The special committee believes that analysts and investors have shown a preference for self-administered REITs and, as a result, the consummation of the proposed transaction may better position us to raise capital or list our shares on a national securities exchange. We also believe that a self-administered REIT better aligns the interests of the

20

management of our Business Manager/Advisor and Property Managers with the interests of our stockholders. Although we will continue to obtain from Inland various services not provided by our Business Manager/Advisor or Property Managers, the special committee believes that we will obtain these services at rates at or below market and that continuity of these services is, at this time, more important than internalization of such services. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs, among other things.

- *Reduction of Operating Costs and Impact on Funds from Operations.* Our portfolio of real estate assets has grown substantially since 2003. Our Business Manager/Advisor and Property Managers are currently compensated based on a fixed percentage of our real estate assets, which results in ratable increases in the fees we pay under the advisory and property management agreements as our asset base grows. By acquiring our Business Manager/Advisor and Property Managers, we will substantially transform the costs associated with the advisory and management function to fixed costs, which we expect will allow us to benefit from the economies of scale that result in connection with the growth of our real estate portfolio. In addition, the special committee believes that upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger, and it is estimated to be increasingly accretive in subsequent years, because the costs of internalizing the advisory and property management functions plus the distributions to be paid on the shares issued is expected to be less than the advisory and property management fees expected to be paid to our Business Manager/Advisor and Property Managers.

- *Opinion of William Blair.* The special committee considered the opinion of William Blair to the effect that, as of August 14, 2007, and based upon and subject to the assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders; however, the opinion does not apply to stockholders of the Business Manager/Advisor or the Property Managers, including such stockholders who are also our stockholders.

- *Review of Material Terms of Proposed Transaction.* The special committee considered and discussed with its legal counsel and our counsel the material terms of the Merger Agreement, including the representations, warranties, covenants, conditions to closing and indemnification obligations set forth therein, together with the material terms of the ancillary agreements entered into or to be entered into in connection with the proposed transaction. The special committee believes the terms of these agreements are fair and commercially reasonable.

- *Access to Properties Identified by Inland.* The special committee believes that Inland has experienced employees who are knowledgeable in the retail real estate field and are particularly skilled at identifying, and have proprietary access to, properties within our investment guidelines. In connection with the proposed transaction, we will retain a right of first offer to acquire, on a priority basis relative to other clients of Inland, certain retail and lifestyle properties located west of the Mississippi River, but excluding that portion of such geographical area located within 400 miles of Oak Brook, Illinois. The special committee believes that access to these properties is of substantial value to us, which will be preserved as a result of the proposed transaction.

- *Rights to Inland Marks.* The "Inland" name and logo, together with our name and logo, are currently licensed from Inland to our Business Manager/Advisor on a non-exclusive basis. We are authorized to use the Inland name under the advisory agreement. In connection with the proposed transaction, the special committee negotiated an arrangement whereby we will have an exclusive right to use our name and logo, subject to the right of Inland to use our name for general marketing and communications purposes. See "- Ancillary Agreements — License Agreement Modification." The special committee believes that the goodwill associated with the Inland marks

21

and our name is of substantial value to us, which will be preserved on an exclusive basis as a result of the proposed transaction.

- *Retention of Key Management Personnel.* The proposed transaction will permit us to retain directly the services of key management of our Business Manager/Advisor and Property Managers, including the services of Messrs. O'Hanlon, Grimes, Garrison and Byrne. These knowledgeable and experienced employees have day-to-day familiarity with the management of our assets. The proposed transaction will also permit us to retain, at no cost to us, the consulting services of Messrs. Parks, Cosenza and Goodwin.

- *Access to Inland Affiliated Services.* The special committee believes that the services provided by Inland are of a higher quality and provided at equal or lower costs than could be obtained from unaffiliated third parties. These services include office and facilities management, insurance and risk management, computer consulting, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services. The special committee believes that access to these services is of substantial value to us, which will be preserved as a result of the proposed transaction.

The special committee also took into account the following negative factors, without assigning relative weights, which the special committee believes are outweighed by the positive factors discussed above. The negative factors considered by the special committee included:

- *Inability to Immediately Become Fully Self-Administered.* The special committee considered whether certain administrative functions not provided directly by our Business Manager/Advisor or Property Managers could be performed internally following the Mergers. These services include office and facilities management, insurance and risk management, computer services, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services. In order to assure the continuity of these administrative services while allowing us time to develop these service areas in-house or to hire other third-party service providers for these services, we entered into or amended several services agreements, to obtain these services, with Inland. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs.

- *Potential Loss of Key Employees.* Through the transaction, a key asset we will acquire is knowledgeable, experienced employees. The working knowledge of these employees is specific to our real estate portfolio, our tenants and our property acquisition processes. While the special committee considered and negotiated for employment agreements with certain key employees, there is no guarantee that those employees, or employees not subject to employment agreements, will remain with our Business Manager/Advisor or Property Managers or become our employees following the Merger. Further, their employment agreements are short-term and do not include non-compete provisions.

- *Unanticipated Costs of Services Performed by Our Business Manager/Advisor and Property Managers.* The special committee carefully considered the fees paid to our Business Manager/Advisor and Property Managers relative to the costs of performing these functions internally. With the growth of our asset base since 2003, the special committee determined that cost savings could likely be achieved by eliminating the advisory and management fees presently paid to our Business Manager/Advisor and Property Managers and internalizing those functions. The determination that performing services internally will be cost effective assumes knowledge of the actual costs of performing the advisory and property management services. If there are costs that were not correctly estimated or unanticipated costs in performing these services, the economic benefits to us sought to be attained through the Mergers will not be fully realized.

22

*TIGI Letter Agreement.* TIGI, under the terms of the TIGI letter agreement, attached hereto as **Appendix G** and dated as of the date of the Merger Agreement, agrees to perform all of its actions and obligations under the Merger Agreement regarding access to information, notice of certain events, employee matters and tax matters as if it were a party to the Merger Agreement. TIGI further covenants for itself and its affiliates to perform all actions and obligations to be performed under the Merger Agreement regarding access to information, notice of certain events and non-solicitation, as if it were a party to the Merger Agreement.

*Agent Appointment Agreement.* Each of the Principal Stockholders has executed and delivered his respective agent appointment agreement. Under the terms of the agent appointment agreement, substantially in the form attached hereto as **Appendix H**, IWEST Merger Agent, LLC is appointed as the agent for each of the stockholders of our Property Managers who has signed such an agreement. The Property Managers have told us that they anticipate that all of their stockholders will sign such an agreement. The PM Stockholder Agent is required to use commercially reasonable efforts to cause each stockholder of the Property Managers to execute an agent appointment agreement prior to closing. The PM Stockholder Agent will act as the agent, representative and attorney-in-fact with full and exclusive power and authority to represent and bind such stockholders of our Property Managers with respect to all matters arising in connection with the Merger Agreement, the escrow agreement, the registration rights agreement and the Merger. Such stockholders of our Property Managers irrevocably consent to any actions taken or decisions made by the PM Stockholder Agent as required or permitted under any of the foregoing agreements or any matters arising out of such agreements. Any action taken by the PM Stockholder Agent in accordance with the agent appointment agreement is approved, ratified and confirmed in all respects as the act and deed of such stockholder of our Property Managers. We are entitled to deal exclusively with the PM Stockholder Agent on all matters relating to the Merger with respect to the stockholders of our Property Managers.

*Sublease.* At the closing, we will enter into a sublease, substantially in the form attached hereto as **Appendix I**, with our Sponsor, under which we will sublease from our Sponsor approximately 36,740 square feet at 2907 Butterfield Road, Oak Brook, Illinois. The initial term of the sublease will be five years from the closing date, with one five-year extension option. Base rent under the sublease during the initial term is $13.50 per square foot, or $41,333 per month, and will increase during any extension term based on the cumulative percentage increase of the consumer price index in each year of the initial term of the sublease. We will also be obligated to pay a 37.33% pro rata share of all real estate taxes and expenses of managing, operating, maintaining, replacing and repairing the buildings leased under the prime lease. Our Sponsor has agreed to reimburse us for the cost of up to $300,000 of tenant improvements to be constructed by us in the sublet premises, which amount, together with interest, will be amortized and paid as additional rent under the sublease based on a 60-month amortization schedule.

*IREA Letter.* We received a letter from IREA, which is attached hereto as **Appendix J**. The IREA letter formalizes the existing oral agreement between us and IREA. In the IREA letter, IREA agrees, subject to its existing acquisition agreements, to make us aware of all the properties that IREA is acquiring, with the understanding that although we are primarily interested in retail and life-style centers, we may also be interested in commercial, office, net lease and residential properties and would be able to bid on them through IREA, if we so choose.

*Amendments to Services Agreements.* Amendments to each of the existing service agreements with Inland, including the amendment to office and facilities management services agreement, the amendment to insurance and risk management services agreement, the amendment to computer services agreement, the amendment to personnel services agreement, the amendment to property tax services agreement, the amendment to communications services agreement, the amendment to the loan services agreement, and the second amendment to the mortgage brokerage services agreement, substantially in the forms attached as **Appendices K-1 through K-8**, respectively, will be executed as of the closing date. The amendments provide that either party can terminate without any fee or penalty, and that the services provided under the terms of the applicable services agreement are to be provided on a non-exclusive basis in that our Business Manager/Advisor shall be permitted to employ other parties to perform any one or more of the services and that the applicable counter party shall be permitted to perform any one or more of the services to other parties. Our Business Manager/Advisor shall have the right to terminate the applicable services agreement, without cause, by providing not less than 180 days prior written notice. If we have a change of control, the applicable counter party shall have the right to terminate the applicable services agreement, without cause, upon not less than 30 days prior written notice.

40

*Transition Property Due Diligence Services Agreement with Inland Real Estate Acquisitions, Inc.* IREA will enter into a transition property due diligence services agreement with us substantially in the form attached hereto as **Appendix L**. In connection with our acquisition of new properties, IREA will, if requested, provide various services including to negotiate property acquisition transactions on our behalf and prepare suitability, due diligence, and preliminary and final pro forma analyses of properties proposed to be acquired. We will pay all reasonable, third party out-of-pocket costs incurred by IREA in providing such services; pay an overhead cost reimbursement of $11,500 per transaction; and, to the extent these services are requested by us, pay $7,000 for due diligence expenses and a negotiated fee of $25,000 for negotiation expenses per transaction. The term of the agreement begins upon execution and continues for one year and automatically renews for one year periods until either party elects not to renew. IREA may terminate the agreement at any time upon the failure by us to make payment for services, following a ten day cure period; a request by us for IREA to violate any applicable law, or to take action that would result in fraud being committed by or civil liability being imposed on IREA; or upon a change in control. We may terminate the transition property due diligence services agreement with ten days notice for cause, following a 30 day cure period, or for any reason with 60 days prior notice.

*Institutional Investor Relationships Services Agreement.* We will enter into an institutional investor relationships services agreement with Inland Capital Partners substantially in the form attached hereto as **Appendix M**. Under the terms of the agreement, Inland Capital Partners will secure institutional investor commitments by, among other things, assisting our management team with the refinement of our overall strategy for expanding our institutional investor relationships in exchange for advisory and client fees and reimbursement of project expenses.

The agreement is non-exclusive as to both parties. The terms of the agreement reflect an oral agreement between the parties as of May 2006. Although the agreement will not be signed until the closing date, the term of the agreement is four years from the effective date (May 3, 2006) and will be automatically renewed for consecutive three year terms unless terminated earlier. We may terminate for cause upon ten days prior written notice, following a 30 day cure period, or without cause by providing not less than 180 days prior written notice. If we experience a change in control, Inland Capital Partners may terminate the agreement upon 30 days written notice; otherwise, Inland Capital Partners may terminate the agreement at any time, without cause, by providing not less than 180 days prior written notice. Inland Capital Partners may terminate the agreement or decline to provide a particular service under the agreement upon ten days written notice to us upon the occurrence of certain events.

Inland Capital Partners' advisory fee will be $250 per hour for principals and $100 per hour for associates, plus expenses. Project expenses include travel, overnight document delivery and out-of-pocket expenses and will be generally in the range of 10% of the advisory fee. The client relations fee will be offset by any accrued advisory fee. The client relations fee for Inland Capital Partners obtaining investor commitments will be 35 basis points for relationships with new investors of TIGI or Inland and 25 basis points for relationships with existing investors of TIGI or Inland. If the agreement is terminated by either party, Inland Capital Partners will submit to us a schedule of investors who have been contacted on our behalf, along with a schedule of committed but un-invested capital, for which future success fees will become due upon funding. Further, if a marketing effort fails to produce a partnership acceptable to us, any accrued and unpaid advisory fees will be due and payable by us. As of the date of the agreement, we will only be responsible for potential fees to Inland Capital Partners with respect to certain identified projects, each of which may be terminated after six months of engagement with a 30 day notice resulting in no further fees due by us.

*Legal Services Agreement.* TIREG will enter into a legal services agreement with us, substantially in the form attached hereto as **Appendix N**, where TIREG will provide us with certain legal services in connection with our real estate business.

The agreement is non-exclusive as to both parties. The term of the agreement is four years from the closing date and will be automatically renewed for consecutive three year terms, unless terminated earlier. We may terminate the agreement at any time for cause upon ten days prior written notice, following a 30 day cure period. We may also terminate the agreement without cause by providing not less than 180 days prior written notice.

TIREG may terminate the agreement at any time after the first anniversary from the closing date by providing not less than 60 days prior written notice. TIREG may also terminate the agreement, or decline to provide a certain service, upon ten days prior written notice to us upon the occurrence of certain events. TIREG may also

41

terminate the agreement upon written notice to us if we have a change in control. We will promptly make payment to TIREG for services performed prior to the date of termination.

We will pay TIREG for legal services rendered under the agreement on the basis of actual time billed by attorneys and paralegals at TIREG's hourly billing rate then in effect in increments of one-tenth of one hour. The billing rate is subject to change on an annual basis, provided, however, that the billing rates charged by TIREG will not be greater than the billing rates charged to any other client and will not be greater than 90% of the billing rate of attorneys of similar experience and position employed by nationally recognized law firms located in Chicago, Illinois performing similar services. We will also reimburse TIREG for reasonable, actual, out of pocket costs, expenses and charges incurred by TIREG with respect to rendering services under the agreement.

*License Agreement Modification.* TIREG will enter into a license agreement modification with us, substantially in the form attached hereto as **Appendix O**, which modifies that certain license agreement entered into between us and TIREG as of March 5, 2003. Under the terms of the license agreement modification, TIREG grants us the exclusive rights to use our name and logo, except TIREG can use the name and logo for certain limited marketing purposes.

*License Agreement (Property Management Corporations).* TIREG will enter into a license agreement, substantially in the form attached hereto as **Appendix P**, with each of the Property Managers whereby it will grant to each Property Manager a non-exclusive, non-transferable, revocable, royalty-free right to use the trade name "Inland" in connection with the management services for us.

**Contact Information**

The contact information for each party to the Merger Agreement is as follows:

Our company and the Acquisition Entities:

Inland Western Retail Real Estate Trust, Inc.
c/o Special Committee of the Board of Directors
2901 Butterfield Road
Oak Brook, Illinois 60523
Telephone: (630) 218-8000

For our Sponsor, our Business Manager/Advisor, our Property Managers, and the PM Stockholder Agent:

c/o The Inland Real Estate Group, Inc.
2901 Butterfield Road
Oak Brook, Illinois 60523
Telephone: (630) 218-8000

**Our Business**

We are a real estate investment trust that was formed in 2003. We have primarily focused on acquiring, developing, operating and leasing multi-tenant shopping centers and single-user net lease properties. As of June 30, 2007, our portfolio consisted of 288 wholly-owned properties, 16 properties in which we have an interest of between 45% and 95%, and six development joint venture projects in which we have an investment, four of which we consolidate. As of June 30, 2007, our portfolio contained approximately 46 million square feet of leasable space. Our anchor tenants include nationally and regionally recognized grocers, discount retailers, financial companies, and other tenants who provide basic household goods and services. Of our total annualized revenue as of June 30, 2007, approximately 69% is generated by anchor or credit tenants, including American Express, Zurich Insurance Company, Best Buy, Ross Dress For Less, Bed Bath & Beyond, GMAC, Wal-Mart, Publix Supermarket, and several others. The term "credit tenant" is subjective and we apply the term to tenants who we believe have a substantial net worth. We conduct our activities primarily from offices located in Illinois.

42

*Additional Analyses*

In developing its fairness opinion, William Blair also performed certain financial analyses described below.

*Internalization Formula Valuation.* Per our advisory agreement with our Business Manager/Advisor, dated December 28, 2004, William Blair calculated the number of shares that we could choose to issue to the holders of our Business Manager/Advisor and Property Managers in a merger transaction at our option beginning in September 2008 for our Business Manager/Advisor and May 2008 for the Property Managers. The number of our shares to be distributed to the stockholders of our Business Manager/Advisor and Property Managers was calculated as 90% of the annualized net income of our Business Manager/Advisor and Property Managers divided by our annualized FFO per weighted average share. Annualized net income was assumed to be 2007 projected net income of our Business Manager/Advisor and Property Managers. The implied number of shares for our Business Manager/Advisor and Property Managers implied by the internalization formula is approximately 54.1 million, as compared to the approximate 37.5 million shares to be issued in the Merger.

*Accretion/Dilution Analysis.* William Blair analyzed certain pro forma effects resulting from the Merger, including the potential impact of the Merger on projected FFO per share of us following the Merger, with Expected Cost Savings. William Blair utilized our FFO for 2007 through 2012 according to the Forecasts provided by us. William Blair's post-transaction pro forma analysis assumed 100% of our Business Manager/Advisor and Property Managers' outstanding common stock was exchanged for approximately 37.5 million shares of our common stock. William Blair's analysis indicated that the transaction would be $0.078 to $0.097 accretive on a per share basis to our 2008 through 2012 FFO when taking into consideration the Expected Cost Savings as a result of the Merger.

### General

This summary is not a complete description of the analysis performed by William Blair but contains the material elements of the analysis. The preparation of an opinion regarding fairness is a complex process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances, and, therefore, such an opinion is not readily susceptible to partial analysis or summary description. The preparation of an opinion regarding fairness does not involve a mathematical evaluation or weighing of the results of the individual analyses performed, but requires William Blair to exercise its professional judgment, based on its experience and expertise, in considering a wide variety of analyses taken as a whole. Each of the analyses conducted by William Blair was carried out in order to provide a different perspective on the financial terms of the proposed Merger and add to the total mix of information available. The analyses were prepared solely for the purpose of William Blair providing its opinion and do not purport to be appraisals or necessarily reflect the prices at which securities actually may be sold. William Blair did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion about the fairness of the Merger consideration. Rather, in reaching its conclusion, William Blair considered the results of the analyses in light of each other and ultimately reached its opinion based on the results of all analyses taken as a whole. William Blair did not place particular reliance or weight on any particular analysis, but instead concluded that its analyses, taken as a whole, supported its determination. Accordingly, notwithstanding the separate factors summarized above, William Blair believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by it, without considering all analyses and factors, may create an incomplete view of the evaluation process underlying its opinion. No company or transaction used in the above analyses as a comparison is directly comparable to our Business Manager/Advisor, Property Managers or the Merger. In performing its analyses, William Blair made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by William Blair are not necessarily indicative of future actual values and future results, which may be significantly more or less favorable than suggested by such analyses.

William Blair is a nationally recognized firm and, as part of its investment banking activities, is regularly engaged in the valuation of businesses and their securities in connection with merger transactions and other types of strategic combinations and acquisitions. William Blair participated in certain of the negotiations leading to the Merger Agreement.

56

*Services Provided by Affiliates of Our Business Manager/Advisor*

During the offering periods, our Business Manager/Advisor and its affiliates were entitled to reimbursement for salaries and expenses of employees of our Business Manager/Advisor and its affiliates relating to our offerings. In addition, an affiliate of our Business Manager/Advisor was entitled to receive selling commissions, a marketing contribution and due diligence expense allowance from us in connection with the offerings. Such offering costs were offset against the stockholders' equity accounts. Such costs totaled $444.5 million at June 30, 2007 and December 31, 2006. Pursuant to the terms of the offerings, our Business Manager/Advisor guaranteed payment of all public offering expenses (excluding sales commissions, marketing contribution and due diligence expense allowance) in excess of 5.5% of the gross proceeds of the offering or all organization and offering expenses (including selling commissions) which together exceed 15% of gross proceeds. Offering costs did not exceed the 5.5% and the 15% limitations.

Our Business Manager/Advisor and its affiliates are entitled to reimbursement for general and administrative costs relating to our administration and acquisition of properties. The costs of these services are included in general and administrative expenses. During the three months ended June 30, 2007 and 2006, we incurred $1.5 million and $697,000, respectively, of these costs. Costs of $3.1 million and $1.6 million were incurred during the six months ended June 30, 2007 and 2006, respectively. Of these costs, $869,000 and $667,000 remained unpaid as of June 30, 2007 and December 31, 2006, respectively.

An affiliate of our Business Manager/Advisor provides investment advisory services to us related to our securities investments for an annual fee. The fee is incremental based upon the aggregate amount of assets invested. Based upon our assets invested at June 30, 2007, the fee was equal to 0.75% per annum (paid monthly) of aggregate assets invested. We incurred fees totaling $570,000 and $483,000 for the three months ended June 30, 2007 and 2006, respectively, and $1.1 million and $885,000 for the six months ended June 30, 2007 and 2006, respectively. As of June 30, 2007 and December 31, 2006, $376,000 and $362,000, respectively, of such costs remained unpaid.

An affiliate of our Business Manager/Advisor provides loan servicing to us for an annual fee. Effective May 1, 2005, the agreement stipulated that if the number of loans being serviced exceeded one hundred, a monthly fee was charged in the amount of $190 per month, per loan being serviced. Effective April 1, 2006, the agreement was amended so that if the number of loans being serviced exceeded one hundred, a monthly fee of $150 per month, per loan is charged. Effective May 1, 2007, the agreement was again amended so that if the number of loans being serviced exceeds two hundred a monthly fee of $125 per month, per loan is charged. Such fees totaled $150,000 and $165,000 for the three months ended June 30, 2007 and 2006, respectively. Fees totaled $321,000 and $361,000 for the six months ended June 30, 2007 and 2006, respectively. As of June 30, 2007 and December 31, 2006, $6,000 and $24,000, respectively, remained unpaid.

We use the services of an affiliate of our Business Manager/Advisor to facilitate the mortgage financing that we obtain on some of the properties purchased. We pay the affiliate 0.2% of the principal amount of each loan obtained on our behalf. Such costs are capitalized as loan fees and amortized over the respective loan term as a component of interest expense. For the three months ended June 30, 2007 and 2006, we paid loan fees totaling $196,000 and $339,000, respectively, to this affiliate. For the six months ended June 30, 2007 and 2006, we paid loan fees totaling $785,000 and $773,000, respectively, to this affiliate. As of June 30, 2007 and December 31, 2006, none remained unpaid.

Although our Business Manager/Advisor can charge us an asset management fee of up to 1% of our average invested assets, our Business Manager/Advisor has never charged us more than .53% of our average invested assets. Average invested asset value is defined as the average of the total book value, including acquired intangibles, of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt or other similar non-cash reserves. We compute the average invested assets by taking the average of these values at the end of each month for which the fee is being calculated. The fee is payable quarterly in an amount equal to ¼ of 1% of our average invested assets as of the last day of the immediately preceding quarter. Based upon the maximum allowable advisor asset management fee of 1% of our average invested assets, maximum fees of $19.1 million and $18.7 million were allowed for the three months ended June 30, 2007 and 2006, respectively, and $38.7 million and $36.7 million for the six months ended June 30, 2007 and 2006, respectively. We accrued actual fees to our Business Manager/Advisor totaling $9.5 million and $10.5 million for the three

72

months ended June 30, 2007 and 2006, respectively, and $9.5 million and $20.0 million for the six months ended June 30, 2007 and 2006, respectively. The Business Manager/Advisor elected not to be paid an advisor asset management fee for the three months ended March 31, 2007. As of June 30, 2007 and December 31, 2006, $9.5 million and $9.0 million, respectively, remained unpaid. The Business Manager/Advisor has agreed to forego any fees allowed but not taken on an annual basis. For any year in which we qualify as a REIT, our Business Manager/Advisor must reimburse us for the following amounts, if any: (1) the amounts by which total operating expenses, the sum of the advisor asset management fee plus other operating expenses paid during the previous fiscal year exceed the greater of: (i) 2% of average assets for that fiscal year, or (ii) 25% of net income for that fiscal year; plus (2) an amount, which will not exceed the advisor asset management fee for that year, equal to any difference between the total amount of distributions to stockholders for that year and a 6% minimum annual return on the net investment of stockholders. Our Business Manager/Advisor has not been required to reimburse us for any such amounts to date.

The Property Managers, entities owned principally by individuals who are affiliates of our Business Manager/Advisor, are entitled to receive property management fees totaling 4.5% of gross operating income, for management and leasing services. We incurred property management fees of $7.7 million and $7.3 million for the three months ended June 30, 2007 and 2006, respectively. Fees of $16.3 million and $14.5 million were incurred for the six months ended June 30, 2007 and 2006, respectively. As of June 30, 2007 and December 31, 2006, $2.4 million and none remained unpaid.

As of June 30, 2007, we were due funds from affiliates of $300,000 for costs paid by us on their behalf.

In 2005, we entered into a subscription agreement with Minto Builders (Florida), Inc., or MB REIT, an entity consolidated by one of our affiliates, Inland American Real Estate Trust, Inc., or Inland American, to purchase newly issued series C preferred shares at a purchase price of $1,276 per share for a total cost of $300.0 million. Under the agreement, MB REIT had the right to redeem any series C preferred shares it issued to us with the proceeds of any subsequent capital contributed by Inland American at $1,276 per share. MB REIT was required to redeem any and all outstanding series C preferred shares held by us by December 31, 2006 and did so during the fourth quarter of 2006, redeeming a total of $264.0 million we had invested. The series C preferred shares, while outstanding, entitled us to an annual dividend equal to 7.0% on the face amount of the series C preferred shares, which was paid monthly. We earned $4.6 million and $9.2 million in dividend income related to this investment during the three and six months ended June 30, 2006.

We entered into an arrangement with Inland American whereby we were paid to guarantee customary non-recourse carve out provisions of Inland American's financings until such time as Inland American reached a net worth of $300.0 million. The fee arrangement called for a fee of $50,000 annually for loans equal to and in excess of $50.0 million and $35,000 annually for loans less than $50.0 million. We recorded fees totaling $47,000 and $98,000 for the three and six months ended June 30, 2006, all of which had been received as of that date. We were released from all obligations under this arrangement during 2006.

In October 2005, an affiliate of ours acquired a freestanding office building leased to the General Services Administration (GSA) for the U.S. Joint Force Command. We provided the initial financing of approximately $24.3 million for the affiliate to acquire the property. The loan was repaid in full including accrued interest on December 6, 2005.

During 2004, our Sponsor advanced funds to us for a portion of distributions paid to our stockholders until funds available for distributions were sufficient to cover the distributions. Our Sponsor forgave $2.4 million of these amounts during the second quarter of 2004 and these funds were no longer due and were recorded as a contribution to capital in the accompanying consolidated financial statements. As of December 31, 2004, we owed funds to our Sponsor in the amount of $3.5 million for repayment of the funds advanced for payment of distributions. These funds were repaid in their entirety during 2005 and no funds were due to our Sponsor as of December 31, 2005. No funds were advanced during 2005 or 2006.

73

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL
## OWNERS AND MANAGEMENT

The following table sets forth information as of August 1, 2007 regarding the number and percentage of shares beneficially owned by: (i) each director; (ii) each executive officer; (iii) all directors and executive officers as a group; and (iv) any person known to us to be the beneficial owner of more than 5% of our outstanding shares. As of August 1, 2007, no stockholder beneficially owned more than 5% of our outstanding shares. As of August 1, 2007 we had over 115,000 stockholders of record and 450,546,425 shares of common stock outstanding.

| Name and Address Of Beneficial Owner (1) | Number Of Shares Beneficially Owned (2) | Percent Of Class |
|---|---|---|
| Robert D. Parks | 180,825.2503(3) | * |
| Brenda G. Gujral | — | * |
| Kenneth H. Beard | 63,320.1958(4) | * |
| Frank A. Catalano, Jr. | 7,147.9662(4) | * |
| Paul R. Gauvreau | 115,731.8440(4) | * |
| Gerald M. Gorski | 6,375.2784(4) | * |
| Barbara A. Murphy | 4,000.0000(4) | * |
| Roberta S. Matlin | 325.8398 | * |
| Steven P. Grimes | — | * |
| All Directors and Executive Officers as a group (9 persons) | 377,726.3745(3) | * |

* Less than 1%

(1)  The address of each of the persons listed above is 2901 Butterfield Road, Oak Brook, IL 60523.

(2)  Beneficial ownership includes outstanding shares and shares which are not outstanding that any person has the right to acquire within 60 days after the date of this table. However, any such shares which are not outstanding are not deemed to be outstanding for the purpose of computing the percentage of outstanding shares beneficially owned by any other person. Except as indicated in the footnotes to this table and pursuant to applicable community property laws, the persons named in the table have sole voting and investing power with respect to all shares beneficially owned by them.

(3)  Includes 20,000 shares owned by our Sponsor. Mr. Parks is a control person of our Sponsor and disclaims beneficial ownership of the shares owned by our Sponsor.

(4)  Includes 4,000 shares issuable upon exercise of options granted under our independent director stock option plan, to the extent that such options are currently exercisable or will become exercisable within 60 days after the date of this table.

*Equity Compensation Plan Information*

The following table sets forth the following information as of December 31, 2006: (i) the number of shares of our common stock to be issued upon the exercise of outstanding options, warrants and rights, (ii) the weighted-average exercise price of such options, warrants and rights and (iii) the number of shares of our common stock

75

Appendix K-1

## FORM OF AMENDMENT
## TO OFFICE AND FACILITIES MANAGEMENT SERVICES AGREEMENT

This Amendment to that certain Office and Facilities Management Services Agreement dated as of February 10, 2005 ("Services Agreement") made between INLAND FACILITIES MANAGEMENT, INC., INLAND OFFICE SERVICES, INC., INLAND REAL ESTATE STRATEGIC SERVICES, INC. (n/k/a Inland Purchasing Services, Inc. ) (collectively, "Service Provider"), all Illinois corporations, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2 The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a non-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.      Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3 At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.      Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.      Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-1-1

INLAND WESTERN RETAIL REAL ESTATE ADVISORY
SERVICES, INC.

By: _____
Its: _____

INLAND FACILITIES MANAGEMENT, INC.

By: _____
Its: _____

INLAND OFFICE SERVICES, INC.

By: _____
Its: _____

INLAND PURCHASING SERVICES, INC.

By: _____
Its: _____

**[Signature Page to Amendment to Office and Facilities Management Services Agreement]**

K-1-2

Appendix K-2

FORM OF AMENDMENT TO
**INSURANCE AND RISK MANAGEMENT SERVICES AGREEMENT**

This Amendment to that certain Insurance and Risk Management Services Agreement dated as of January 1, 2004 ("Services Agreement") made between INLAND RISK AND INSURANCE MANAGEMENT SERVICES, INC.("Service Provider"), an Illinois corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2  The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a non-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.      Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3 At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.      Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.      Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-2-1

INLAND WESTERN RETAIL REAL ESTATE ADVISORY
SERVICES, INC.

By: _____
Its: _____

INLAND RISK AND INSURANCE MANAGEMENT
SERVICES, INC.

By: _____
Its: _____

**[Signature Page to Amendment to Insurance and Risk Management Services Agreement]**

K-2-2

Appendix K-3

## FORM OF AMENDMENT TO COMPUTER SERVICES AGREEMENT

This Amendment to that certain Computer Services Agreement dated as of January 1, 2004 ("Services Agreement") made between INLAND COMPUTER SERVICES, INC. ("Service Provider"), an Illinois corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2  The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a non-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.      Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3  At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.      Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.      Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-3-1

INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.

By: _____
Its: _____

INLAND COMPUTER SERVICES. INC.

By: _____
Its: _____

**[Signature Page to Amendment to Computer Services Agreement]**

K-3-2

Appendix K-4

## FORM OF AMENDMENT TO PERSONNEL SERVICES AGREEMENT

This Amendment to that certain Personnel Services Agreement dated as of January 1, 2004 ("Services Agreement") made between INLAND PAYROLL SERVICES, INC. (n/k/a Inland Human Resource Services, Inc.)("Service Provider"), an Illinois corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.       Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

        "2.2  The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a non-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.       Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

        "3.3 At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.       Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.       Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

        "If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-4-1

INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.

By: _____
Its: _____

INLAND HUMAN RESOURCE SERVICES, INC.

By: _____
Its: _____

**[Signature Page to Amendment to Personnel Services Agreement]**

K-4-2

## FORM OF AMENDMENT TO PROPERTY TAX SERVICES AGREEMENT

This Amendment to that certain Property Tax Services Agreement dated as of January 1, 2004 ("Services Agreement") made between INVESTORS PROPERTY TAX SERVICES, INC. ("Service Provider"), an Illinois corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2  The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a on-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.      Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3 At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.      Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.      Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-5-1

INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.

By: _____
Its: _____

INVESTORS PROPERTY TAX SERVICES, INC.

By: _____
Its: _____

**[Signature Page to Amendment to Property Tax Services Agreement]**

K-5-2

Appendix K-6

## FORM OF AMENDMENT TO COMMUNICATIONS SERVICES AGREEMENT

This Amendment to that certain Communications Services Agreement dated as of January 1, 2004 ("Services Agreement") made between INLAND COMMUNICATIONS, INC. ("Service Provider"), an Illinois corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2  The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a non-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.    Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3 At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.    Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.    Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-6-1

INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.

By: _____
Its: _____

INLAND COMMUNICATIONS, INC.

By: _____
Its: _____

**[Signature Page to Amendment to Communication Services Agreement]**

K-6-2

## FORM OF AMENDMENT TO LOAN SERVICES AGREEMENT

This Amendment to that certain Loan Services Agreement dated as of January 1, 2004, as amended,("Services Agreement") made between INLAND MORTGAGE SERVICING CORPORATION ("Service Provider"), an Illinois corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of _____, 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.       Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2  The Business Manager and Service Provider acknowledge that the relationship created hereby is on a non-exclusive basis such that during the Initial Services Term and any Additional Services Term, the Business Manager is permitted to retain third parties to perform the same or similar Services for any loan that has not been placed with the Service Provider to service, or to have the REIT perform such services; and that Service Provider shall be permitted to perform the Services or any individual Service for any other parties. Once a loan has been placed with the Service Provider, it cannot be withdrawn unless this Agreement has been terminated as hereinafter provided."

2.       Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3  At any time during the Initial Services Term or during an Additional Services Term, the Business Manager, or the successor to the REIT if a Change of Control has occurred, shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to so terminate and specifying the effective date of such termination; provided, however:

(a)  In the event Business Manager is terminating this Agreement for the purpose of either (i) having the REIT service all of the loans covered by this Agreement in house or (ii) having all of the loans covered by this Agreement serviced by another loan servicer, but in either case of (i) or (ii) not in connection with a Change of Control of the REIT, then in such event, Service Provider will initiate the transfer of the loans to the entity designated by the Business Manager in the termination notice. Until the effective date of termination, the Service Provider shall continue to be paid monthly compensation in an amount equal to the total monthly compensation on the date the termination notice is served until and through the month of the effective termination date stated in the termination notice. In the event that any lender does not complete the transfer of any loan until

K-7-1

after the effective date of termination, the Service Provider will be paid a monthly fee of $250.00 on each loan until the transfer of the loan has been completed;

(b) In the event of a Change of Control of the REIT, the entity assuming control of the REIT may terminate this Agreement after the Change of Control is complete by giving the Service Provider not less than one hundred eighty (180) days' notice of the effective date of the termination. In such event, Service Provider will initiate the transfer of the loans to the entity designated in the termination notice. Thereafter, until the effective date of termination, the Service Provider shall be paid monthly compensation in an amount equal to the total number of loans being serviced on the date the termination notice was given to the Service Provider multiplied by $250.00 until and through the month of the effective termination date stated in the termination notice, to cover the increased costs involved in the transfer and the underwriting of the entity assuming control of the REIT. For any loans not transferred by the effective date of termination, the Service Provider will be paid a monthly fee of $250.00 on each loan until the transfer of the loan has been completed;

The terms of this Section 3.3 shall control over any conflicting terms of Section 2 of Exhibit A attached hereto."

3.      Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.      Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-7-2

INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.

By: _____
Its: _____

INLAND MORTGAGE SERVICING CORPORATION

By: _____
Its: _____

[Signature Page to Amendment to Loan Services Agreement]

K-7-3

Appendix K-8

## FORM OF
## SECOND AMENDMENT TO MORTGAGE BROKERAGE SERVICES AGREEMENT

This Second Amendment to that certain Mortgage Brokerage Services Agreement dated as of January 1, 2004, as amended ("Services Agreement"), made between INLAND MORTGAGE INVESTMENT CORPORATION ("Service Provider"), an Illinois corporation whose interest in such agreement has been assigned to Inland Mortgage Brokerage Corporation, and INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC. ("Business Manager"), an Illinois corporation, is made as of              , 2007 by the parties to the Services Agreement.

In consideration of the agreements to be made herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.         Section 2.2 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"2.2 The Business Manager and Service Provider acknowledge that the Services to be provided by Service Provider hereunder are to be provided on a non-exclusive basis such that Business Manager shall be permitted to employ other parties to perform any one or more of the Services and that Service Provider shall be permitted to perform any one or more of the Services to other parties."

2.         Section 3.3 of the Services Agreement is hereby deleted in its entirety and in lieu thereof the following is inserted:

"3.3 At any time during the Initial Services Term or during an Additional Services Term, the Business Manager shall have the right to terminate this Agreement, without cause, by providing not less than one hundred eighty (180) days' prior written notice to Service Provider of any election to terminate and specifying the effective date of such termination."

3.         Section 3.4 of the Services Agreement is hereby amended by deleting the words "sixty (60)" set forth therein and in lieu thereof inserting the words "thirty (30)".

4.         Section 3.5 of the Services Agreement is hereby amended by deleting the first sentence thereof in its entirety and in lieu thereof the following is inserted:

"If at any time during the Initial Services Term or any Additional Services Term the REIT has had a Change of Control, as hereinafter defined, Service Provider shall have the right to terminate this Agreement, without cause, upon not less than thirty (30) days prior written notice to Business Manager."

In all other respects the Services Agreement remains in full force and effect.

K-8-1

INLAND WESTERN RETAIL REAL ESTATE ADVISORY
SERVICES, INC.

By: _____
Its: _____

INLAND MORTGAGE BROKERAGE CORPORATION

By: _____
Its: _____

**[Signature Page to Second Amendment to Mortgage Brokerage Services Agreement]**

K-8-2