# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CITY OF ST. CLAIR SHORES )
GENERAL EMPLOYEES RETIREMENT )
SYSTEM and MADISON INVESTMENT )
TRUST, On behalf of Themselves and All )
Others Similarly Situated, and Derivatively )
On behalf of Inland Western Retail Real )
Estate Trust Inc., )
 )
   Plaintiffs, )
 )
   vs. )
 )
INLAND WESTERN RETAIL REAL )
ESTATE TRUST, INC., INLAND REAL )
ESTATE INVESTMENT )  Case No. 07 C 6174
CORPORATION, THE INLAND GROUP, )
INC., INLAND WESTERN RETAIL )  Judge Robert W. Gettleman
REAL ESTATE ADVISORY SERVICES, )
INC., INLAND SOUTHWEST )
MANAGEMENT CORP., INLAND )
NORTHWEST MANAGEMENT CORP., )
INLAND WESTERN MANAGEMENT )
CORP., ROBERT D. PARKS, BRENDA )
G. GUJRAL, FRANK A. CATALANO, )
JR., KENNETH H. BEARD, PAUL R. )
GAUVREAU, GERALD M. GORSKI, )
BARBARA A. MURPHY, STEVEN P. )
GRIMES, DANIEL A. GOODWIN, )
ROBERT A. BAUM, G. JOSEPH )
COSENZA, KPMG LLP, AND WILLIAM )
BLAIR & COMPANY, L.L.C., )
 )
   Defendants. )

**INDEX OF CASES NOT AVAILABLE IN AN OFFICIAL REPORTER BUT
AVAILABLE ON WESTLAW CITED IN THE MEMORANDUM IN SUPPORT OF THE
NON-KPMG/WILLIAM BLAIR DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT**

A.      *Beck v. Dobrowski*, No. 06 C 0411, 2007 WL 3407132 (N.D. Ill. Nov. 14, 2007)

B.      *Blau v. Harrison*, No. 04 C 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006)

C.      *Bloomington Partners, L.L.C. v. City of Bloomington*, No. 06 C 6411, 2005 WL 3536340
        (C.D. Ill. Dec 23, 2005)

D.      *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074, 2003 WL 21058251
        (S.D.N.Y. May 9, 2003)

E.      *Donovan v. ABC-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259
        (N.D. Ill. July 15, 2002)

F.      *Feldman v. Motorola, Inc.,* No. 90 C 5887, 1993 WL 497228 (N.D. Ill. Oct. 14, 1993)

G.      *Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383
        (Md. Cir. Ct. Apr. 1, 2004)

H.      *In re CNL Hotels & Resorts, Inc. Sec. Litig.*, No. 604CV1231ORL31KRS,
        2005 WL 2219283 (M.D. Fla. Sept. 13, 2005)

I.      *In re CompuCom Sys., Inc. Stockholders Litig.*, No. Civ.A. 499-N, 2005 WL 2481325
        (Del. Ch. Sept. 29, 2005)

J.      *In re InfoSonics Corp. Deriv. Litig.*, No. 06 cv1336, 2007 WL 2572276
        (S.D. Cal. Sept. 4, 2007)

K.      *In re Western Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192
        (Del. Ch. May 22, 2000)

L.      *Jackson v. F.B.I.*, No. 02 C 3957, 2007 WL 433143 (N.D. Ill. Jan. 31, 2007)

M.      *JP Morgan Chase & Co. Sec. Litig.,* No. 06 C 4674, 2007 WL 4531794
        (N.D. Ill. Dec. 18, 2007)

N.      *Lambert v. Calprotrack, Inc.*, No. 95 C 4076, 1996 WL 224515 (N.D. Ill. May 1, 1996)

O.      *Little Gem Life Scis. LLC v. Orphan Med., Inc.*, Civ. No. 06-1377, 2007 WL 2695787
        (D. Minn. Sept. 13, 2007)

P.      *McSparran ex rel Career Educ. Corp. v. Larson*, Nos. 04 C 0041, 04 C 4778,
        2007 WL 684123 (N.D. Ill. Feb. 28, 2007)

Q.      *Riggs Partners, LLC v. Hub Group, Inc.*, No. 02 C 1188, 2002 WL 31415721
        (N.D. Ill. Oct. 25, 2002)

R.    *Rudolph v. UTStarcom*, No. C 07-04578, 2008 WL 1734763 (N.D. Cal. Apr. 14, 2008)

S.    *Sekuk Global Enters. Profit Sharing Plan v. Kevenides*, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004)

T.    *Spagnola v. Chubb Corp.*, No. 06 Civ. 9960(HB), 2007 WL 927198 (S.D.N.Y. Mar. 27, 2007)

U.    *Starr v. !hey, Inc.,* No. 01 C 6087, 2003 WL 21212596 (N.D. Ill. May 23, 2003)

V.    *Textainer P'ship Sec. Litig.,* No. C-05-0969, 2005 WL 3801596, at *5 (N.D. Cal. Dec. 12, 2005)

W.    *Washtenaw Cty. Emp. Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, Civil Action No. 1:07-CV-862, 2008 WL 2302679 (N.D. Ga. Mar. 31, 2008)



Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 94,521
**(Cite as: 2007 WL 3407132 (N.D.Ill.))**
< KeyCite Citations >

United States District Court,
N.D. Illinois,
Eastern Division.

**Philip BECK, Individually and On Behalf of All Others Similarly Situated and Derivatively on Behalf of EQUITY OFFICE PROPERTIES TRUST, Plaintiff,**
**v.**
**Thomas E. DOBROWSKI, Samuel Zell, William M. Goodyear, James D. Harper, Jr., Sheli Z. Rozenberg, Jan H.W.R. Van Der Vlist, Richard D. Kincaid, Marilyn A. Alexander, Stephen I. Sadove and Sally Susman, Defendants,**
**and**
**Equity Office Properties Trust, a Maryland Real Estate Investment Trust, Nominal Defendant.**

**No. 06 C 6411.**

Nov. 14, 2007.

Amelia Susan Newton, Leigh R. Lasky, Norman Rifkind, Lasky & Rifkind, Ltd., Marvin Alan Miller, Miller Law LLC, Stephen J. Oddo, Coughlin Stoia Geller Rudman & Robbins LLP, Adam J. Levitt, Wolf, Haldenstein, Adler, Freeman & Herz LLC, Chicago, IL, Darren J. Robbins, Randall J. Baron, Lerach Coughlin Stoia Geller Rudman & Robbins, San Diego, CA, for Plaintiff.

David F. Graham, Kathleen Marie McNamara, Richard Bradshaw Kapnick, Ryan Malloy Sandrock, Sidley Austin LLP, Chicago, IL, for Defendants.

MEMORANDUM OPINION AND ORDER

HARRY D. LEINENWEBER, District Judge.

**\*1** Plaintiff Philip Beck (hereinafter, the "Plaintiff") brings this shareholder action against nominal defendant Equity Office Properties Trust ("EOPT") and its board of directors, Defendants Thomas Dobrowski, Samuel Zell, William M. Goodyear, James D. Harper, Jr., Sheli Z. Rozenberg, Jan H.W.R. Van Der Vlist, Richard D. Kincaid, Marilyn A. Alexander, Stephen I. Sadove, and Sally Susman (hereinafter, "the Board") under

Sections 14(a) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78n(a) and 78t(a) (the "SEA"), and related common law causes of action. Defendants have moved to dismiss Plaintiff's Second Amended Complaint ("the Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendants' Motion is granted.

I. BACKGROUND

The Court derives the following factual and procedural summary from the pleadings, resolving all reasonable inferences and factual conflicts in Plaintiff's favor.

This case arises from the February 7, 2007, sale of EOPT, formerly the largest publicly held office building owner and manager in the United States. The Blackstone Group ("Blackstone") acquired EOPT for $39 billion cash, or $55.50 per share, following a vote of EOPT shareholders approving the transaction.

The sale marked Blackstone's victory in a bidding war for EOPT between Blackstone and Vornado Realty Trust ("Vornado"). Although at least two other companies had previously expressed interest in acquiring EOPT, EOPT only began meaningful consideration of a sale in July 2006 when Vornado approached EOPT, and the companies entered into a standstill agreement to engage in high-level discussions. Ultimately, on October 25, 2006, Vornado met with Defendant Zell regarding a deal, but discussions apparently broke down, and Vornado and EOPT had no further direct contact following this meeting.

Approximately one month after Vornado and EOPT began discussions, Blackstone approached EOPT regarding its own interest in purchasing EOPT for between $40 and $42 per share. Eventually, on November 2, 2006, Blackstone increased this figure to $47.50 per share. After another two weeks, on November 19, EOPT and Blackstone signed a merger agreement at $48.50 per share, for a total of $36 billion, in cash with an early February closing date.

The November 19 agreement did not, however,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

end the sale process. On January 17, 2007, Vornado made an unsolicited proposal to buy EOPT at $52 per share, payable 60% in cash and 40% in Vornado stock, subject to approval by Vornado shareholders. In response, on January 24, Blackstone proposed to increase the consideration for the November 19 agreement to $54 per share, contingent upon an increase in that agreement's termination fee from $200 million to $500 million. Then, on February 1, Vornado revised its proposal to $56 per share, payable $31 per share in cash and the rest in Vornado stock. On February 4, Vornado further modified its proposal to involve a tender offer for up to 55% of EOPT's shares at $56 with the rest to be acquired through a swap for Vornado shares. On February 5, EOPT sought and received from Blackstone two increases in the consideration for an all-cash Blackstone-EOPT agreement, first to $55.25 per share, then to $55.50 per share, contingent upon a further increase of the termination fee, this time to $720 million. On February 7, Vornado withdrew its proposal, and EOPT shareholders voted to approve the EOPT-Blackstone merger agreement at $55.50.

*2 During the bidding war, the EOPT Board filed with the SEC and disseminated to shareholders four proxy solicitations. The first was on December 29, 2006 ("the Initial Proxy"), and related to the initial November 19, 2006, merger agreement with Blackstone. It described the history of other companies' interest in acquiring EOPT and the Board's and EOPT management's discussions with such companies. It stated the initial terms of the proposed Blackstone merger, as well as the Board's recommendation that the shareholders vote to approve the merger. Additionally, it disclosed the ownership by three of the ten EOPT Board members of certain classes of stock granting those members the option of converting their shares into an ownership interest in the surviving partnership. The Initial Proxy also disclosed the fact that eight shareholder suits (including this one) had been filed against the company and the Board, alleging breaches of fiduciary duties, failure to maximize shareholder value, and improper self-dealing by the Board. The Initial Proxy provided for a vote date of February 5, 2007.

Following the Initial Proxy, the Board filed and disseminated three supplemental proxies: the "First Supplemental Proxy" on January 29 in connection with Blackstone's January 24 increase in its offered

consideration; the "Second Supplemental Proxy" on February 2 in connection with Vornado's February 1 revised offer; and the "Third Supplemental Proxy" on February 6 in connection with Blackstone's ultimate increase in its offered consideration to $55.50. Each supplemental proxy reported EOPT's most recent discussions with Vornado and Blackstone, described the proposed terms of Vornado's expressions of interest, stated the terms of the amendments to the Blackstone agreement, indicated the Board's and management's concerns about the structure of the proposed Vornado deal and the likelihood of it closing, and recommended that shareholders vote in favor of the amended Blackstone merger agreement. The Second Supplemental Proxy also informed the shareholders that the vote date would be delayed until February 7, 2007.

The instant suit is one of three currently pending shareholder actions arising from EOPT's sale. The other two suits are in the Maryland and Illinois state courts. The Maryland action names EOPT and the members of EOPT's Board as defendants and advances claims related to breach-of-fiduciary-duty, negligent misrepresentation, and fraud. That suit initially unsuccessfully sought to enjoin the Blackstone merger. Subsequently, the Maryland court dismissed most of that complaint's claims with leave to replead only certain allegations, which the Maryland plaintiffs did. The Maryland court eventually dismissed the amended complaint in its entirety, and the Maryland plaintiffs have appealed.

This case and the Illinois state case have lagged behind the Maryland action. Plaintiff here originally filed his complaint shortly after the November 19, 2006, merger agreement was announced but then filed the Second Amended Complaint (the subject of this motion) following the Maryland court's initial dismissal of the Maryland action with partial leave to replead. As for the Illinois action, the Illinois court has stayed that case pending the resolution of the Maryland case.

## II. DISCUSSION

*3 The Complaint comprises six counts. Counts I and II allege individual and derivative claims under Sections 14(a) and 20(a) of the Securities Exchange Act, respectively. Counts III through V allege various individual and derivative claims under

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Maryland state law. Count VI alleges a class claim of breach of fiduciary duty under Maryland state law. Plaintiff's claims attack the sufficiency and truthfulness of Defendants' proxy disclosures, the adequacy of the sale price, and the general process by which Defendants sold EOPT.

Defendants move to dismiss all counts in their entirety. Plaintiff does not oppose dismissal of all derivative claims and of Counts III through V in their entirety. Consequently, only three counts remain pending--Counts I, II, and VI.

### A. Securities Exchange Act Claims (Counts I & II)

Section 14 (a) of the Securities Exchange Act, 15 U.S.C. § 78n, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, together prohibit the solicitation of any proxy

    containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a).

Section 20 of the SEA, for its part, imposes liability on persons having control over, or aiding and abetting, violators of the SEA. See 78 U.S.C. § 78t. This secondary liability depends on a finding of primary liability under the relevant provisions of the SEA, in this case Section 14(a). See FMC Corp. v. Boesky, 727 F.Supp. 1182, 11199 n. 19 (N.D.Ill.1989).

Plaintiff alleges that EOPT's proxy statements regarding the Blackstone deal violated Section 14(a) and Rule 14a-9 in two general ways. Plaintiff alleges that the Initial and Supplemental Proxies made untrue statements of material fact and omitted to state material facts related to the sales process and the value of the company. Plaintiff also alleges that the Initial Proxy was made materially false or misleading because the Board disseminated the Supplemental Proxies too late for shareholders to absorb adequately and reasonably consider the supplemental information.

### 1. Applicability of the Private Securities Litigation Reform Act

As a threshold matter, the parties disagree on the applicability to this action of the Private Securities Litigation Reform Act ("the PLSRA" or "the Act"), 15 U.S.C. § 78u-4. Two aspects of the Act are potentially relevant. First, the Act provides for a heightened pleading standard in securities cases involving allegations of false or misleading statements or omissions of material fact. The Act requires the plaintiff to "specify each statement alleged to have been misleading[ ][and] the reason or reasons why the statement is misleading...." 15 U.S.C. § 78u-4(b)(1). The Act further provides that when "the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4 (b)(2). Second, the Act sets forth the following "loss causation" proof requirement: "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4 (b)(4).

*4 Plaintiff argues that the PSLRA does not apply to Section 14(a) claims. As for the heightened pleading requirements, Plaintiff contends that because Section 14(a) claims can be based on mere negligence, he need only meet the familiar "short and plain statement" notice pleading standard set forth in Federal Rule of Civil Procedure 8(a). As for "loss causation," Plaintiff contends that 14(a) claims are governed by the relaxed causation analysis set forth in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), rather than by the PSLRA.

The Court concludes that the PSLRA governs Plaintiff's claim. Although the Seventh Circuit has not decided whether the PSLRA applies to Section 14(a) cases, the statutory language is unambiguous. All relevant sections of the Act commence with the phrase, "[i]n any private action arising under this chapter," 15 U.S.C. § 78u-4(b)(1), (2), & (4) (emphasis added). The Act contains no exceptions based on considerations of scienter or previous

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 3407132, *4 (N.D.Ill.))

common law causation rules. Indeed, the Act's pleading standard provisions are to the contrary. Section (b)(2) applies to actions for money damages requiring proof of only "a particular state of mind." Since negligence is a state of mind, the language of Section (b)(2) by its terms encompasses negligence-based securities actions. What is more, the omission of the "particular state of mind" language from Section (b)(1) implies that Section (b)(1)'s heightened standards apply even to securities actions requiring no proof of mental state.

Plaintiff's view that the PSLRA does not apply to his complaint is based on the case of Blau v. Harrison, 2006 WL 850959 (N.D.Ill., 2006). Blau held that the PSLRA's pleading standards are inapplicable where the plaintiff's 14(a) claim sounds in negligence rather than intentional fraud. Id. at *6.

In the Court's view, Blau is unavailing to Plaintiff. Blau rests on the Seventh Circuit's opinion in Kennedy v. Venrock Associates, 348 F.3d 584, 593 (7th Cir.2003), which states only that Federal Rule of Civil Procedure 9(b)'s heightened pleading standards do not apply to Section 14(a) claims unless those claims charge fraud, as opposed to negligence. But Kennedy never addressed the PSLRA at all, and since Rule 9(b) is expressly limited to claims of fraud or mistake, Kennedy 's analysis regarding the interplay of that rule and Section 14(a) does not translate to the PSLRA, which contains no such limitations. Blau is also unavailing to Plaintiff because that case did not address the "loss causation" question at all.

In applying the PSLRA to this Section 14(a) action, the Court joins the majority of courts that have addressed the question. See, e.g., Knollenberg v. Harmonic, Inc., No. 03-16238, 152 Fed. Appx. 674, 682-683 (9th Cir.2005); Hayes v. Crown Cent. Petroleum Corp., No. 02-2190, 78 Fed. Appx. 857, 861 (4th Cir.2003); Fisher v. Kanas, 467 F.Supp.2d 275, 281 (E.D.N.Y.2006).

*5 In any case, even if this Court agreed with Blau 's view of the PSLRA's heightened pleading standards, Plaintiff's reliance on that case is misplaced because, unlike in Blau, Plaintiff's 14(a) claims here are based in intentional conduct, not negligence. Although Plaintiff attempts to cast his claim as negligence-based, the language of the Complaint betrays his efforts. To give just a few

examples, Plaintiff alleges: (1) Defendants rushed the sale of EOPT "in order to avoid an informed shareholder vote and evade liability for their misconduct here" (SAC ¶ 5.); (2) "it is safe to assume that the information contained in the Second and Third Supplemental Proxies did not--and was not intended to--reach shareholders before they were required to vote on February 7th" (SAC ¶ 55.); and (3) "Defendants timed the proposal to freeze out Vornado in order to aggrandize their own interests and capture for themselves EOP's future potential without paying an adequate or fair price to the Company's shareholders" (SAC ¶ 69.) (all emphases added). In the Court's view, one cannot reasonably construe the Complaint as claiming that Defendants' proxy statements were false and misleading through mere negligence. And when a securities plaintiff only charges a fraudulent violation, heightened pleading standards are appropriate--even if the relevant cause of action does not require proof of fraud. See Kennedy, 348 F.3d at 593.

As a final note, Defendants also contend that, in addition to the PSLRA, Rule 9(b) governs this action. But in light of the Court's application of the PSLRA (which provides a more stringent pleading standard than 9(b), Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 594 (7th Cir.2006)), the Court need not rule on Defendants' Rule 9(b) argument.

2. Adequacy of Plaintiff's Pleading

Defendants contend that Plaintiff's allegations run afoul of the PSLRA with regard to both the loss causation issue and the general pleading standards issue. As to the first, Defendants argue that Plaintiff has failed to plead any loss whatsoever, let alone the "loss causation" required by the PSLRA. Second, Defendants argue that Plaintiff has failed to identify any misleading statements or omissions or the reasons any such statements or omissions were misleading, as required by the PSLRA.

a. Plaintiff's Loss Allegations

As noted above, the parties dispute whether the PSLRA or the common law rule governs the causal link between the defendant's conduct and the plaintiff's loss. As also noted above, the Court has concluded that the PSLRA governs this action. But Plaintiff's loss pleadings are deficient under either

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 3407132, *5 (N.D.Ill.))

Page 8

standard because the Complaint appears to contain no loss allegations at all. See 15 U.S.C. § 78u-4 (b)(4) (requiring proof of causation of "the loss for which the plaintiff seeks to recover damages"); Mills, 396 U.S. at 385 (analyzing the pre-PSLRA requirements for showing a "causal relationship between the violation and the injury for which he seeks redress").

*6 Plaintiff's only response is to point to the Complaint's allegation that Blackstone sold $15 billion dollars' worth of EOPT properties on the same day the acquisition closed. He argues that this allegation demonstrates that "the value of continued ownership [of EOPT stock] exceed[ed] the value of the Acquisition consideration." But the Court does not see, and Plaintiff does not explain, how the allegation supports even this vague and speculative type of economic loss. At the very least, pleading loss would seem to require some allegation that Plaintiff's holdings in EOPT would have at some point been worth more than the $55.50 per share he received from the merger.

b. False Or Misleading Statements Or Omissions

Although Plaintiff's loss allegation deficiency is independently fatal, the Court also notes the Complaint's failure to meet the PSLRA's heightened pleading standards. First, as to Plaintiff's allegations that Defendants omitted material information from the proxies, Plaintiff was required to allege not just that Defendants made such omissions, but that those omissions rendered statements that Defendants actually made misleading. See 17 C.F.R. § 240.14a-9(a). Plaintiff was further required by the PSLRA to explain how any information allegedly omitted from the proxies had such an effect on a specific statement actually made. 15 U.S.C. § 78u-4(b)(1). Instead, Plaintiff simply lists information that Defendants allegedly omitted from the proxies, which is insufficient under both of these standards.

As to Plaintiff's few allegations of affirmatively false or misleading statements (which appear only to involve statements of opinion regarding the fairness of the transaction), Plaintiff fails to explain with any specificity why the statements were false or misleading. Moreover, such statements of opinion as a matter of law cannot be false or misleading unless the plaintiff alleges with particularity facts demonstrating that the opinion is not only

objectively false but also subjectively false (i.e., that the opinion holder did not actually believe the opinion). In re AOL Time Warner, Inc. Securities and "ERISA" Litigation, 381 F.Supp.2d 192, 243 (S.D.N.Y.2004) (citing Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1092-1096, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991)), and Plaintiff here has alleged no such facts.

Additionally, the Complaint fails the PSLRA's state-of-mind pleading requirements. As noted above, Plaintiff was required to state with particularity facts giving rise to a strong inference that Defendants acted at least negligently. 15 U.S.C. § 78u-4(b) (2). The Court does not believe Plaintiff has done so here. In particular, the Court takes note of the fact that the proxy statements in fact disclosed a great deal of information adverse to Defendants' alleged personal interest in completing the Blackstone transaction, including detailed accounts of Vornado's proposals, of the Board's ownership interests in various classes of EOPT shares affected by the merger, and of the numerous shareholder suits that were filed in an attempt to stop the merger.

*7 Finally, the Court finds inadequate Plaintiff's allegations that the timing of the Supplemental Proxies necessarily rendered statements made in the Initial Proxy false and misleading. Under Plaintiff's theory, the information in the Initial Proxy became false and misleading when the subsequent Vornado-Blacks tone bidding war changed the available offers for EOPT and resulted in the revised Merger Agreement. Plaintiff contends that Defendants effectively failed to correct the Initial Proxy's statements because Defendants issued the Supplemental Proxies too close to the vote date to have altered the information available to shareholders. In addition to Plaintiff's failure to allege with particularity facts creating a strong inference that the timing of the Supplemental Proxies was at least negligent, the Complaint acknowledges that Defendants did issue the Supplemental Proxies prior to the vote date and it makes only conclusory statements that shareholders did not have time to reasonably consider the supplemental information. It is particularly noteworthy that Plaintiff makes no allegation that he cast his vote without having considered the Supplemental Proxies. The federal cases Plaintiff relies on regarding this issue are unpersuasive

Not Reported in F.Supp.2d
**(Cite as: 2007 WL 3407132, \*7 (N.D.Ill.))**

because they are between 15 and 28 years old and addressed a very different state of affairs than exists now in 2007 with regard to how information can be quickly and efficiently disseminated.

### 3. Section 20(a)

As noted above and conceded by Plaintiff, dismissal of Plaintiff's Section 14(a) claim also requires dismissal of his Section 20(a) claim.

### B. Breach of Fiduciary Duties Claim (Count VI)

Defendants urge the stay or dismissal of Count VI based on the Colorado River abstention doctrine. Under that doctrine, "a federal court may stay or dismiss a suit in exceptional circumstances when there is a concurrent state proceeding and the stay or dismissal would promote wise judicial administration." Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800, 818, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Abstention is appropriate if the state and federal actions are parallel, Jacobson v. City of Chicago, 233 F.Supp.2d 1001, 1007 (N.D.Ill.2002), and there are "exceptional circumstances" in which, on balance, the advantages of a dismissal or stay outweigh the disadvantages, Clark v. Lacy, 376 F.3d 682, 685 (7th Cir.2004).

The Court agrees with Defendants that Count VI should be dismissed under the Colorado River doctrine. First, the Maryland action and Count VI here are parallel proceedings. Two suits are parallel when "substantially the same parties are contemporaneously litigating substantially the same issue in both state and federal court." Jacobson, 233 F.Supp.2d at 1007. The Maryland action is against the same defendants as here and purports to represent the same class of persons. It advances the same cause of action based on the same set of facts within many cases literally identical allegations.

**\*8** Second, "exceptional circumstances" exist favoring dismissal of Count VI. Generally, federal courts consider ten non-exclusive factors in determining whether such circumstances exist: (1) the desirability of avoiding piecemeal litigation; (2) the relative progress of state and federal proceedings; (3) the order in which jurisdiction was obtained by the concurrent forums; (4) the source of governing law; (5) the adequacy of state-court action

to protect the federal plaintiff's rights; (6) the presence or absence of concurrent jurisdiction; (7) the vexatious or contrived nature of the federal claim; (8) the inconvenience of the federal forum; (9) whether the state has assumed jurisdiction over property; and (10) the availability of removal. Caminiti and Iatarola, Ltd. v. Behnke Warehousing, Inc., 962 F.2d 698, 700 (7th Cir.1992). The Maryland action was filed first and has progressed all the way through trial-court disposition and is currently on appeal. The claim is a state law claim, and as a member of the purported class in Maryland, Plaintiff's rights are protected in that action. The Court is also not unmindful of the fact that Plaintiff here did little to prosecute this action until after the Maryland court issued an initial unfavorable ruling. In short, this Court believes the balance of the above-listed factors weigh strongly in favor of abstention.

### III. CONCLUSION

For the reasons stated herein, the Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint is granted. The Complaint is hereby dismissed in its entirety.

IT IS SO ORDERED.

2007 WL 3407132 (N.D.Ill.), Fed. Sec. L. Rep. P 94,521

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# B

Not Reported in F.Supp.2d
(Cite as: 2006 WL 850959 (N.D.Ill.))

Page   11

<KeyCite Yellow Flag>

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

Dr. Stephen BLAU, Individually and On Behalf
of All Others Similarly Situated,
Plaintiffs,
v.
William B. HARRISON, Jr. Hans W. Becherer,
Riley P. Bechtel, Frank A. Bennack,
Jr., John H. Biggs, Lawrence A. Bossidy, M..
Anthony Burns, Laurence Fuller,
Ellen V. Futter, William H. Gray, III, Helene L.
Kaplan, Lee R. Raymond, John
R. Stafford, and J.P. Morgan Chase & Co.,
Defendants.

No. 04 C 6592.

March 24, 2006.

Adam J. Levitt, Mary Jane Fait, Wolf, Haldenstein, Adler, Freeman & Herz LLC, Chicago, IL, Gregory M. Nespole, Jeffrey G. Smith, Wolf Haldenstein Adler Freeman & Hertz LLP, Chicago, NY, for Plaintiffs.

Kathleen Lynn Roach, Chante Danielle Spann, Courtney Ann Rosen, Sidley Austin LLP, Julie A. Lepri, Jpmorgan Chase, Chicago, IL, Michael A. Cooper, Sharon L. Nelles, Sullivan & Cromwell LLP, New York, NY, Joseph N. Gielata, Wilmington, DE, for Defendants.

MEMORANDUM OPINION AND ORDER

HIBBLER, J.

MOTION TO STRIKE

*1 As an initial matter, Defendants filed a motion to strike the expert report of Steven Wolfe attached to Plaintiffs' response to the motion to dismiss. Defendants' move to strike this submission because the pleadings neither referenced nor included the report. Blau argues that the report is an "affidavit" submitted with the intent of demonstrating that the materiality of a proxy omission raises issues of fact that cannot be determined on a motion to dismiss.

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. The Court, however, may consider matters outside the pleadings without converting the motion to dismiss into one for summary judgment if they are referred to in the plaintiff's complaint and are central to plaintiff's claim. Rosenblaum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir.2002). In addition, documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed.R.Civ.P. 10(c). As Wolfe's affidavit is neither referenced in the Complaint nor attached to the pleadings, the Court may not consider this affidavit in ruling on the Defendants' Rule 12(b)(6) motion. Accordingly, the Court grants Defendants' motion to strike and excludes the extraneous material.

MOTION TO DISMISS

Plaintiffs allege that Defendants negligently failed to disclose material terms of the negotiation involving the merger between Bank One Corporation ("Bank One") and J.P. Morgan Chase & Co. ("J.P.Morgan") to J.P. Morgan shareholders in its proxy statement. Specifically, Plaintiffs contend that Defendants failed to disclose Bank One's CEO's offer to "do the deal for no premium if he could become chief executive immediately." According to Plaintiffs, Defendants' actions amounted to negligence, and resulted in J.P. Morgan Shareholders approval of a 14 percent premium in favor of Bank One shares.

Defendants seek to dismiss Blau's Amended Class Action Complaint ("Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the pleading standards set forth in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA"). In addition, Defendants maintain that the putative class lacks standing to bring this claim. For the reasons set forth below, Defendants' motion is DENIED in part and GRANTED in part.

FACTUAL BACKGROUND

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 850959, *1 (N.D.Ill.))

I. The Parties

This putative class action lawsuit is brought by Dr. Stephen Blau individually and on behalf of all persons who held common stock of J .P. Morgan, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date on which the company consummated the merger with Bank One. On January 5, 2005, this Court entered an order appointing Dr. Blau and American Growth Fund lead Plaintiffs. [FN1]

> FN1. Lead Plaintiff American Growth Fund withdrew as co-Lead Plaintiff on February 18, 2005.

*2 Prior to the merger, J.P. Morgan was a Delaware corporation with its principal place of business in New York, New York. J.P. Morgan, a financial and multi-bank holding firm, was engaged in the provision of investment banking, securities, investment management, and other financial and banking services. Defendants William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford (collectively "Individual Defendants") were all directors of J.P. Morgan prior to the merger. [FN2] William B. Harrison ("Harrison") also served as Chief Executive Officer ("CEO") and Chairman of the Board during the relevant period. Bank One was a financial holding and multi-bank holding company, incorporated in Delaware, with its headquarters in Chicago.

> FN2. Defendant Laurence Fuller was dismissed from this action on June 6, 2005.

II. Merger

In resolving the motion to dismiss, the Court takes as true the following facts from Plaintiffs' Complaint. In November 2003, J.P. Morgan CEO and Chairman William Harrison began discussing the possibility of a merger with James Dimon ("Dimon"), then the CEO and Chairman of Bank One. After briefing their respective boards on their conversations on November 18, 2003, both CEO's were encouraged to continue discussions regarding the potential merger. During December 2003,

Dimon and Harrison continued their discussions regarding the key terms of the financial transaction and periodically updated their respective boards on these communications. In early to mid-January 2004, each company's respective board of directors convened special meetings to consider the terms of the merger. At these meetings board members reviewed the terms of Dimon's employment agreement, proposed employment arrangements for other senior management, along with the exchange ratio and related valuation information for the stock. On January 14, 2004, the Board of Directors of both J.P. Morgan and Bank One each unanimously approved a stock-for-stock merger in which 1.32 shares of J.P. Morgan common stock would be issued to Bank One shareholders for each share of Bank One common stock. On April 21, 2004, the J.P. Morgan Board of Directors disseminated its proxy statement regarding the merger to its shareholders. While the proxy statement listed the factors the board considered in approving the merger, it did not disclose Dimon's offer to transact the merger without a premium in favor of Bank One if Dimon were appointed CEO of the merged company immediately.

On May 25, 2004, J.P. Morgan shareholders approved the merger at a special meeting, with 99.18% of the shareholders voting in favor of transacting the merger. On July 1, 2004, the merger was consummated and included a premium, based on closing stock prices the trading day before the merger was agreed to and announced, of approximately 14% for Bank One shares. The merger agreement also included a provision that Harrison would remain CEO of J.P. Morgan for two years after completion of the merger, Dimon would serve as President and Chief Operating Officer, and would become CEO after Harrison's tenure.

III. Newspaper Articles

*3 Shortly after the merger was transacted, several news sources reported that during negotiations Dimon offered to conduct the transaction with no premium if he could become CEO of the merged entity immediately. According to these sources, Harrison rejected the Dimon's offer so that he could be appointed CEO of the merged company and, in response, Dimon requested a premium for Bank One shares. Specifically, on June 27, 2004, the New York Times published an article containing

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 850959, *3 (N.D.Ill.))

allegations regarding Harrison's refusal to accept Bank One's proposal to conduct a no premium stock exchange. The article stated:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the extra two years, to secure a smooth transition, although he may cost J.P. Morgan shareholders extra money in doing so. Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal.

> When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations.

Comp. ¶ 31 (emphasis supplied in Complaint). Several days later on July 3, 2004, The Financial Times (London) reported on the merger negotiations and quoted an additional source, allegedly an advisor on the negotiations, who attested that Harrison refused to conduct the merger for no premium if he were named the immediate CEO. That article noted " 'There was a spectrum of outcomes in terms of premium and governance,' said one advisor at the time. Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay." Id. ¶ 32. Additionally, on December 29, 2004, the Wall Street Journal reported that "in-house bankers at J.P. Morgan endorsed the $56.9 billion price [Merger]--negotiated by their boss [Harrison]--as 'fair,' ' even though "during the negotiations [Dimon] ... suggested selling his bank [Bank One] for billions of dollars less if, among other conditions, he immediately became chief of the merged firm, according to a person familiar with the talks. The suggestion wasn't accepted by J.P. Morgan." Id. ¶ 35.

### ANALYSIS

The two-count Complaint in this case is premised on the alleged negligence of J.P. Morgan with regard to an alleged omission of a material fact in its proxy statement. In count one, Plaintiffs allege that Defendants violated Section 14(a) [FN3] of the Securities and Exchange Act of 1934 ("the Exchange Act") and Rule 14a-9 [FN4] promulgated by the SEC. Count two alleges that the Individual Defendants violated Section 20(a) of the Exchange Act. Defendants move to dismiss the Complaint in its entirety for failure to state a claim pursuant to

Federal Rule of Civil Procedure 12(b)(6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the pleading standards set forth in the PSLRA. Defendants further allege that Plaintiffs lack standing to bring this cause of action.

> FN3. Section 14(a) of the Exchange Act provides that "It shall be unlawful for any person, by use of the mails ... or otherwise ... to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of the title."

> FN4. Rule 14a-9 prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ..." 17 C.F.R. § 240.14a

### I. Standard of Review

*4 The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. See Triad Assocs., Inc. v. Chicago Housing Auth., 892 F.2d 583, 586 (7th Cir.1989). When considering a motion to dismiss, the Court considers "whether relief is possible under [any] set of facts that could be established consistent with [the] allegations." Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir.1992). The Court views all the facts alleged in the Complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to Plaintiff. See Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir.2000). Dismissal of a complaint is appropriate only where it appears beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir.1999); Kennedy v. National Juvenile Det. Ass'n, 187 F.3d 690, 695 (7th Cir.1999).

### II. Count I--Section 14(a)

#### A. Pleading

In order to state a claim under Section 14(a),

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiffs must allege that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction. Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 354-85, 90 S.Ct. 616, 621-22, 24 L.Ed.2d 593 (1970). "The purpose of [Section] 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." J.I. Case Co. v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1965). Section 14(a) and Rule 14a-9 regulate the proxy solicitation process and "prohibit[ ] the solicitation of proxies by means of materially false or misleading statements." Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1087, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

In enacting the Private Securities Litigation Reform Act, Congress raised the pleading standards for claims alleging private securities fraud, "to a very specific version of fact pleading--one that exceeds even the particularity requirements of Federal Rule of Civil Procedure 9(b). See Makor Issues & Rights, Ltd., et al. v. Tellabs, Inc., et al., 437 F.3d 588 (7th Cir.2006) citing In re: Rockefeller Crt. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir.2002)(noting that the PSLRA "imposes another layer of factual particularity to allegations of securities fraud"). As such plaintiffs asserting a securities fraud claim must assert the "who, what, when, where, and how," of the claim. DiLeo v. Ernest & Young, 901 F.2d 624, 627 (7th Cir.1990). The PSLRA mandates that for a securities fraud claim, the complaint must "specify each statement alleged to have been misleading, the reasons or reasons why the statement is misleading, and if an allegation regarding the state or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, a plaintiff is required to demonstrate "proof that the defendant acted with a particular state of mind, the complaint with respect to each act or omission ... must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

*5 Defendants contend that both the PLSRA's

heightened pleading standards and the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), apply to Plaintiffs' Section 14(a) claims. See e.g., Hayes v. Crown Cent. Petroleum Corp., 249 F.Supp.2d 725, 728 (E.D.Va.2002), (aff'd in part, vacated in part); In re Harmonic Inc., 2002 U.S. District Lexis 26676 *64 n. 17 (N .D. Cal. Nov. 13, 2002); Bond Opportunity Fund v. Unilab Corp., 2003 U.S. Dist. LEXIS 7838 at *8 (S.D.N.Y. May 9, 2003). Defendants argue that Blau's Section 14(a) claims must plead with particularity facts that give rise to a strong inference of negligence on the part of all defendants. See In re McKesson HBOC, Inc. Sec. Lit., 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000). Defendants further argue that Plaintiffs' Complaint fails to meet the heightened standards as it fails to state with particularity facts giving a strong inference of negligence. Further, in its allegations based upon "information and belief," the Complaint fails to state with particularity all facts on which that belief is formed as required by the PSLRA. 15 U.S.C. § 78u-4(b)(1).

Plaintiffs respond that its Section 14(a) claims are sufficiently pled pursuant to Federal Rule of Civil Procedure 8(a) . [FN5] Plaintiffs argue that because the Complaint purports that Defendants acted with negligence, not fraud, the heightened pleading requirements of the PSLRA are not implicated. See California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 U.S. 126, 145 n. 9 (3d Cir.2004)(noting that because plaintiff's Section 14(a) claims were grounded in fraud, the claims must meet the PSLRA particularity requirements.); In re Cendant Corp. Litig., 60 F.Supp.2d 354, 378 (D.N.J.1999)(holding that because plaintiffs have alleged that defendants acted negligently, they need not plead fraud at all, let alone with particularity); In re: Trump Hotels Shareholder Derivative Litig., 2000 U.S. Dist. LEXIS 13550, (S.D.N.Y. Sept. 21, 2000). Thus, Plaintiff contends that its Complaint is sufficiently pled in accordance with Fed. R. Civ. Pro. 8(a) as the Complaint neither alleges intentional conduct, nor does the Complaint "sound in fraud." See e.g. Kennedy v. Venrock Assocs., 348 F.3d 584, 593 (7th Cir.2003).

FN5. Federal Rule of Civil Procedure 8(a) requires a pleading to set forth a short and plain statement of the claim showing that the pleader is entitled to relief.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In Kennedy, the Seventh Circuit considered the pleading requirements for a claim that alleged that the proxy statement contained material omissions and discussed the nuances between a proxy claim pleading fraud and a proxy claim pleading solely negligence. The Kennedy court queried "[I]n charging that the proxy statement contained material omissions and misstatements, are the plaintiffs charge fraud, and fraud alone?" Id. In response, the Seventh Circuit stated that a plaintiff was not required to plead fraud with regard to a proxy statement omitting material facts. Id. The court reasoned that if a claim failed to plead fraud, than Rule 9(b) was inapplicable to the plaintiffs' allegations, and, therefore did not have to be pled with particularity. Id. The court further explained that a plaintiff was not precluded from alleging negligence in omission of a material fact from a proxy statement because pursuant to Section 14(a) negligent omission of material information from a proxy statement violated federal law. Id. (citations omitted). While the Kennedy court did not set forth the applicability of the PSLRA to Section 14(a) claims, this Court finds its reasoning applicable to the facts of the instant case.

**\*6** Viewing, as the Court must, all the facts alleged in the Complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to Plaintiff. Stachon, 229 F.3d 673 at 675. Plaintiffs' Complaint sets forth a Section 14(a) claim alleging that Defendants acted negligently; thus, they need not plead fraud at all, let alone fraud with particularity. Simply, Plaintiffs' Section 14(a) allegations are not required to meet the PSLRA particularity requirements because these claims are based on averments of negligence. Plaintiffs allege that the Defendants acted negligently in not revealing the "no premium" offer which resulted in shareholders voting on the proxy without benefit of the knowledge of the alternative offer. Plaintiffs charge that this material omission/misrepresentation from this proxy statement caused them injury, and that the proxy solicitation itself was an essential link in the transaction. Specifically, the Complaint alleges that the Proxy Statement was materially misleading because "it failed to disclose material facts about Mr. Dimon's offer on behalf of Bank One to engage in a transaction with no premium for Bank One shareholders." Am. Comp. ¶ 86. The Complaint further alleges that Defendants were negligent in disseminating the Proxy Statement

containing the materially false and misleading statements. Id. at ¶ 87. The Complaint also states that each shareholder has been damaged "... as a direct and proximate result of such violations because they were denied an opportunity to make an informed decision in response to the proposed transaction with respect to the Merger premium ..." Id. at. ¶ 91. Accordingly, the Court finds that Blau's Complaint sufficiently pled violations of Section 14(a).

**B. Materiality**

An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). "The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." Id. at 450.

The crux of Plaintiffs' Complaint is Defendants negligently failed to disclose a material fact during the proxy solicitation regarding Harrison's rejection of an offer to conduct the merger with no premium. According to the Complaint, after Harrison rejected this offer, the negotiations resulted in Bank One shareholders receiving a 14% premium for their stock and which ultimately cost J.P. Morgan shareholders over 7 billion dollars in unnecessary merger compensation. Defendants argue that the proxy statement was not required to disclose alleged negotiating positions. See e.g. Kaufman v. Cooper Comps., Inc., 719 F.Supp. 174, 183 (S.D.N.Y.1989)(holding that defendant's efforts to work out an arrangement for preferred shareholders were adequately disclosed and that defendant did not have to describe each step of negotiations); Beaumont v. American Can Co., 797 F.2d 79, 85 (2d Cir.1986).

**\*7** On a motion to dismiss, the Court must assume the truth of the facts asserted by Plaintiffs and all reasonable inferences in favor of the Plaintiff. The Proxy Statement indicated that the offer was "fair, from a financial point of view." If, as Plaintiffs allege, Dimon offered to consummate the transaction for no premium and the only reason Harrison

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                            **Page 16**
**(Cite as: 2006 WL 850959, \*7 (N.D.Ill.))**

rejected the offer was to retain a position as CEO of the merged company, this may be a fact a "reasonable shareholder would consider ... important." TSC Indus., 426 U.S. at 449. While it is not necessary to disclose all factors in a negotiation, failure to offer shareholders a more profitable exchange may have been important to shareholders in considering whether or not to approve the merger. For the purposes of the instant motion to dismiss, the Court concludes that the omission regarding an alleged "no premium" stock exchange is material.

Accordingly, Defendants' motion to dismiss Plaintiffs' Section 14(a) claim against them in Count I of the Complaint is DENIED.

III. Count II--Section 20(a)

Section 20(a) of the Exchange Act provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall be liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did nor directly or indirectly induce the act or acts constituting the violation of the cause of the action.
15 U.S.C. § 78t(a). Plaintiffs must allege the following in order to state a Section 20(a) claim: (1) a primary securities violation; (2) each of the Individual Defendants exercised general control over the operations of J.P. Morgan; (3) each of the Individual Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir.1992).

Plaintiffs have pled an underlying violation of Section 14(a) of the Exchange Act by Individual Defendants. The Complaint alleges that the Individual Defendants "By virtue of their positions as Directors ... and, participation as directors ... they had the power to influence and control and did influence and control the decision-making of the Company, including the content and dissemination

of the various statements which plaintiff contend are false and misleading." Am. Comp. ¶ 93. The Complaint further alleges that these Defendants were "provided with or had unlimited access to copies of the Company's proxy statements and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." Id. ¶ 95. Lastly, it alleges that "each of the individual defendants ... is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein." Thus, Plaintiffs have sufficiently alleged that the Individual Defendants acted as controlling persons within the meaning of § 20 of the Exchange Act. The ultimate determination of whether Defendants were controlling persons involves questions of fact not to be resolved at the pleading stage of this litigation. See e.g. In re Sears, Roebuck & Co. Sec. Litig., 291 F.Supp.2d 722, 727 (N.D.Ill.2003). Accordingly, the Defendants' motion to dismiss the § 20(a) claims against them in Count II is denied.

IV. Standing

**\*8** Alternatively, Defendants argue that, as defined, the putative class lacks standing because the Proxy Statement explicitly sets forth that only "common stockholders of record at the close of business on April 2, 2004 may vote at the meeting." [FN6] Def. Exh. A at Notice of Annual Meeting. They allege that Section 14(a) and Rule 14a-9 establishes a cause of action solely for shareholders who are entitled to vote on the transaction as set forth in the proxy statement. See In re AOL Time Warner, Inc. Sec. & ERISA Litig., 2004 U.S. Dist. Lexis 7917, \*125 (S.D.N.Y. May 5, 2004)(holding that "Section 14(a)'s emphasis on the Proxy Statement solicitation process indicates that the stature was designed to protect only those shareholders with voting rights"). Defendants maintain that because some members of the putative class were not entitled to vote on the merger, the class is overbroad and, thus does not have standing to bring this claim. See Shields v. Erickson, 710 F.Supp. 686, 693 (N.D.Ill.1989)(dismissing class action where complaint failed to indicate whether any plaintiffs had standing under the proxy statement and class as a whole was improperly defined).

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2006 WL 850959, *8 (N.D.Ill.))

FN6. In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed.R.Civ.P. 10(c) Accordingly, the Court may consider the proxy statement.

Plaintiffs respond alleging that because the defined class is inclusive of all individuals who were injured through dilution of their stock by Defendants' violations of Section 14(a) and Rule 14a-9, the class as a whole has standing.  Plaintiffs further argue that several courts have certified classes, bringing private actions pursuant to Section 14(a), which included members other than those entitled to vote on the proxy statement. See, e.g., Alexander v. Centrafarm Group, N.V. 124 F.R.D. 178, 186 (N.D.Ill.1988); Koppel v. 4987 Corp., 191 F.R.D. 360, 369 n. 12; Tracinda Corp v. DaimlerChrysler AG, 216 F.R.D. 291, 301 (D.Del.2003).

Indeed, the Proxy Statement notice entitled J.P. Morgan "common stockholders of record at the close of business on April 2, 2004" to vote on the merger. In converse to the proxy statement, Plaintiffs' Complaint defined the putative Class as:

... all persons ..., who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such meeting (the "Proxy Statement")) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation ("Bank One")),

Comp. ¶ 1. Thus, extending the class to include members who held shares from the date the proxy statement was issued to the date the merger was consummated.

Standing to sue, even in class actions, is determined at the time the suit is filed. See Walters v. Edgar, 163 F.3d 430, 432-33 (7th Cir.1998)( "Certification of a class action comes after the suit is filed, so if the named plaintiffs lacked standing when they filed the suit ... there was no case when class certification was sought."). There is no issue that members who held shares on April 2, 2004 have standing to bring this claim pursuant to Section 14(a) and Rule 14a-9. The question remains whether

Section 14(a) and Rule 14a-9, which mandate the proxy solicitation process and prohibit the selection of proxies by means of materially false or misleading statements, provide causes of action for shareholders with no voting rights.

*9 Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails ... or otherwise ... to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of the title.

15 U.S.C. § 78n(a). Rule 14a-9 prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading ..." 17 C.F.R. § 240.14a-9. The AOL Time Warner court reasoned that Section 14a's focus on the proxy solicitation process reflects the statute's intent to protect only the shareholder's having voting rights. In re AOL Time Warner, Inc., 2004 U.S. Dist. Lexis 7917 at 125 (citing 7547 Corporation v. Parker & Parsley, 38 F.3d 211, 229-30 (4th Cir.1994); Hazen, The Law of Securities Regulation § 11.3 (3d ed. 1995)("Since the proxy regulations are designed to protect shareholder voting rights, standing should be limited to shareholders who had the right to vote."). This Court agrees with the District Court's approach in AOL Time Warner, Inc. Accordingly, this Court finds that only common stockholders of record who held J.P. Morgan stock on April 2, 2004 the record date for voting on the merger, have standing to bring this private action under Section 14(a).

CONCLUSION

For the reasons set forth above, Defendant Harrison's motion to dismiss is DENIED in part and Granted in Part. Plaintiff Blau is ordered to file an Amended Complaint consistent with this opinion.

IT IS SO ORDERED.

2006 WL 850959 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

C

Not Reported in F.Supp.2d
**(Cite as: 2005 WL 3536340 (C.D.Ill.))**
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court,
C.D. Illinois.

**BLOOMINGTON PARTNERS, LLC, a limited
liability company, Plaintiff,
v.
CITY OF BLOOMINGTON, an Illinois
municipal corporation; John Butler,
individually and d/b/a Butler Company, LLC; JB
Butler Company, LLC; Michael
Nelson; Mnelson Company, LLC; Central Illinois
Arena Management, Inc.; BNAM,
LLC; Larry Hundman; and Thomas Hamilton,
Defendants.**

No. 04-CV-2287.

Dec. 23, 2005.

James M. Dezelar, Thomas K. Tryboski, Robbins
Salomon & Patt, Chicago, IL, James C. Kearns,
Kingshuk Roy, Heyl Royster Voelker & Allen,
Urbana, IL, for Plaintiff.

J. Todd Greenburg, City of Bloomington, Thomas
Jesse Arkell, Mark T. Dunn, Dunn Willard Arkell
& Bugg, Bloomington, IL, Michael J. Tague,
Robert E. Jacobson, Flynn Palmer & Tague,
Champaign, IL, for Defendants.

OPINION

MCCUSKEY, Chief J.

*1 On November 22, 2005, the Magistrate Judge
filed a Report and Recommendation (# 66) in this
case which recommended denying the Motion to
Dismiss (# 52) filed by Defendant Thomas
Hamilton. On December 8, 2005, Defendant
Hamilton filed his Objection to Report and
Recommendation (# 72). Plaintiff filed an Answer
to the Objection (# 73) on December 12, 2005.
Following this court's careful and thorough de novo
review, this court agrees with Defendant Hamilton
that he is immune from liability under the Illinois
Local Governmental and Governmental Employees
Tort Immunity Act (Tort Immunity Act), 745 Ill.
Comp. Stat. 10/1-101 et seq. (West 2004).
Accordingly, the claims against Hamilton in Counts

IV, V, and VI of Plaintiff's First Amended
Complaint (# 31) must be dismissed, and Hamilton's
Motion to Dismiss Counts IV, V and VI of the First
Amended Complaint (# 52) is therefore GRANTED.

On November 23, 2005, the Magistrate Judge
filed a Report and Recommendation (# 67) which
recommended granting in part and denying in part
the Motion to Dismiss Counts IV, V and VI of
Plaintiff's First Amended Complaint (# 54) filed by
Defendants BNAM, LLC (BNAM) and Larry
Hundman. Defendants BNAM and Hundman did not
file any objections to the portion of the Report and
Recommendation which recommended denying, in
part, their Motion to Dismiss. Accordingly, that
portion of the Report and Recommendation is
accepted by this court. See Video Views, Inc. v.
Studio 21, Ltd., 797 F.2d 538 (7th Cir.1986).
However, on December 7, 2005, Plaintiff filed its
Objection to Report and Recommendation (# 68).
Defendants BNAM and Hundman have not filed a
timely response to the Objection. Following this
court's careful and thorough de novo review, this
court agrees with Plaintiff that Count V should not
be dismissed based upon the "law of the case."
Accordingly, the Motion to Dismiss (# 54) is denied
in its entirety.

I. HAMILTON'S MOTION TO DISMISS

In its First Amended Complaint (# 31), Plaintiff
alleged, in Count IV, that the City of Bloomington
(City), Hamilton, Hundman and BNAM are liable
for monetary damages for aiding and abetting
Defendants John Butler and Michael Nelson in
breaching their fiduciary duties to Plaintiff. Plaintiff
alleged that Hamilton and Hundman had secret
meetings with Butler and Nelson and that Hamilton,
the City's manager, caused the City to rescind its
Arena Agreement with Plaintiff and enter into an
agreement with an entity controlled by Hundman,
BNAM. Plaintiff alleged that, in addition, Hamilton
unreasonably refused to accept Plaintiff's proposed
Pre-Opening budget in order to create a pretext for
the City to rescind its agreement with Plaintiff and
took various other actions which resulted in the City
entering into agreements which were favorable to
Butler and Nelson and unfavorable to Plaintiff.
Plaintiff alleged that Hamilton knew that Butler and
Nelson owed a fiduciary duty to Plaintiff and aided
and abetted their breach of that duty.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2005 WL 3536340, *2 (C.D.Ill.))

*2 In Count V, Plaintiff alleged that Hamilton, acting on his own behalf and on behalf of the City, engaged in misconduct as part of his scheme (along with Butler, Nelson, and Hundman) to intentionally interfere with the Arena Agreement between the City and Plaintiff. In Count VI, Plaintiff alleged that Hamilton and others intentionally engaged in misconduct as part of their scheme to interfere with the economic expectancy and business relationship between the City and Plaintiff and to cause the City to terminate its economic and business relationship with Plaintiff. In both Count V and Count VI, Plaintiff sought monetary damages for unreimbursed expenses and loss of profits and business opportunities.

In his Motion to Dismiss (# 52), Hamilton argued that he had absolute immunity from liability based upon § 2-201 and § 2-204 of the Tort Immunity Act. Hamilton relied upon Village of Bloomingdale v. CDG Enterprises, Inc., 196 Ill.2d 484, 256 Ill.Dec. 848, 752 N.E.2d 1090, 1097-1101 (Ill.2001). The Magistrate Judge, in his Report and Recommendation, first accepted Plaintiff's argument that § 2-204 of the Tort Immunity Act did not immunize Hamilton because Plaintiff alleged that Hamilton was liable based upon his own conduct, not that of other people. In the Report and Recommendation, the Magistrate Judge also determined that dismissal based upon § 2-201 was not appropriate because Hamilton "failed to present any discussion, argument, or case law supporting his assertion that his conduct at issue constituted both a determination of policy and the exercise of discretion."

As noted, Hamilton filed a timely Objection to the Report and Recommendation. Hamilton contended that, although his motion to dismiss was not argued as well as it should have been, a review of the Bloomingdale case made clear that "allegations involving interference with contract and interference with economic expectation claims are matters involving the determination of policy and the exercise of discretion." Hamilton argued that, as a matter of law, he is immune from liability under the Tort Immunity Act for all of Plaintiff's theories. Plaintiff responded to the Objection and argued that, in its First Amended Complaint, it adequately pled "that Hamilton acted on behalf of the private interests of defendants John Nelson and Michael Butler rather than on behalf of the City of Bloomington" so that Hamilton did not engage in his activities in the process of "determining policy" or "exercising discretion."

The parties do not dispute that Illinois law applies in this case. Section 2-201 of the Tort Immunity Act provides:
> Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.

745 Ill. Comp. Stat. 10/2-201 (West 2004).

In Village of Bloomingdale, CDG Enterprises (CDG) alleged that it was the contract purchaser of five parcels of land adjacent to the Village of Bloomingdale (Village). CDG petitioned the Village's planning commission to annex the five parcels and rezone them so that CDG could build a subdivision on the parcels. Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1094. CDG alleged that its representatives met with the Village's land planner and other officials, including the mayor, who allegedly told CDG that the project would be approved. CDG further alleged as follows:
> *3 [The Village] secretly formed a "task force" in order to pursue the acquisition and development of a golf course, which was adjacent to the five parcels; commissioned Planning Resources, Inc., the Village's consultant in charge of reviewing CDG's petition, to prepare a plan to redesign the golf course so that some of the holes would be on the property CDG intended to acquire; and secretly met with other individuals to create opposition to CDG's plan. In August 1995, the Village's planning commission voted down CDG's project, with the chairman allegedly pressuring other members to vote against it. Then, in October 1995, the Village's board of trustees voted down CDG's petition at a public hearing. Soon afterward, the Village publicly revealed that it planned to acquire the golf course, and later did so. In addition, one of the parcels was allegedly bought by individuals "closely aligned with certain of the Village's officials."

Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1094. CDG did not, however, claim that the Village itself acquired any of the five parcels. Village of Bloomingdale, 256 Ill.Dec. 848, 752

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2005 WL 3536340, *3 (C.D.Ill.))

N.E.2d at 1094.

CDG sought damages, alleging that the "Village deliberately frustrated CDG's business expectancy by secretly working to force CDG out of the planned development." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1094-95. CDG alleged that the Village "planned all along to develop the adjoining golf course and help cronies of certain Village officials purchase one of the five parcels." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1094. The Village moved to dismiss CDG's claims based upon the Tort Immunity Act. The trial court dismissed the claims, but the Illinois Appellate Court, Second District, reversed. The Appellate Court held that the general grants of immunity afforded by the Tort Immunity Act are limited by the common law exception for "corrupt or malicious motives." Village of Bloomingdale, 762 N.E.2d at 1095.

The Illinois Supreme Court reversed the Appellate Court and affirmed the circuit court judgment dismissing CDG's claims. The court carefully analyzed the history of the Tort Immunity Act and the case law construing it. The court noted that "the tort liability of a local public entity or employee is expressly controlled both by the constitutional provision and by legislative prerogative as embodied in the Tort Immunity Act." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1095. The court then noted that the "purpose of the Tort Immunity Act is to protect local public entities and public employees from liability arising from the operation of government." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1095-96. The court conducted a careful review of its prior precedent and noted that, under § 2-201, a public employee is immune from liability for willful and wanton misconduct. Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1097, citing In re Chicago Flood Litig., 176 Ill.2d 179, 223 Ill.Dec. 532, 680 N.E.2d 265 (Ill.1997) and Harinek v. 161 N. Clark Street Ltd. P'ship, 181 Ill.2d 335, 230 Ill.Dec. 11, 692 N.E.2d 1177 (Ill.1998).

*4 The court in Village of Bloomingdale then noted that CDG was asking the court to impose the common law exception for "corrupt or malicious motives" onto provisions of the Tort Immunity Act. The court stated:

Based on the foregoing precedent, we think it obvious that, just as the Act does not contemplate an exception to immunity for "willful and wanton misconduct," unless it expressly provides for such, the Act does not implicitly contemplate the common law exception for "corrupt or malicious motives."

Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1097-98. The court stated that "because the plain language of these provisions [including § 2-201] does not contain an exception for 'corrupt or malicious motives,' we will not insert one." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1098. The court went on to state that the "Village's denial of CDG's rezoning petition is precisely what the legislature intended to immunize such entities from." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1099. The court further stated that, "whether the Village denied the petition through an 'abuse of official process and power,' through 'corrupt and malicious misuse of power,' or for 'corrupt and malicious motives,' " was wholly immaterial because the applicable statute did not contain an exception for "willful and wanton misconduct" or "corrupt or malicious motives." Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1099.

The court in Village of Bloomingdale also rejected CDG's contention that the Village was not immune from liability under the Tort Immunity Act because it was not performing discretionary tasks but, instead, improperly performed ministerial tasks for which it could not claim immunity. Village of Bloomington, 256 Ill.Dec. 848, 752 N.E.2d at 1099-1100. The court explained:

Official action is judicial where it is the result of judgment or discretion. Official duty is ministerial, when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion.

Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1099, quoting Chicago Flood, 223 Ill.Dec. 532, 680 N.E.2d at 272.

In this case, there is no question that Hamilton, as City Manager for the City of Bloomington, is a "public employee serving in a position involving the determination of policy or the exercise of discretion" under § 2-201 of the Tort Immunity Act. This court

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2005 WL 3536340, *4 (C.D.Ill.))

further concludes that Village of Bloomingdale is dispositive on the issue raised in this case. Here, Plaintiff alleged that Hamilton engaged in "secret" meetings and caused the City to rescind its Arena Agreement with Plaintiff and enter into agreements favorable to Butler and Nelson and unfavorable to Plaintiff. This court is at a loss as to how these allegations are materially different from CDG's allegations in Village of Bloomingdale that the Village "secretly met" with individuals to create opposition to CDG's development plan for the five parcels and voted down CDG's request for rezoning to "help cronies of certain Village officials purchase one of the five parcels."

**\*5** In Village of Bloomingdale, CDG argued that the Village engaged in this conduct for "corrupt or malicious motives" and an exception should be read into the Tort Immunity Act for that kind of conduct. As noted, the court in Village of Bloomingdale held that no such exception exists. In this case, Plaintiff argues that Hamilton was acting, not for the benefit of the City, but for the benefit of Butler and Nelson. However, Plaintiff has cited no case law which has accepted this type of exception to § 2-201 of the Tort Immunity Act and this court sees no real difference between this argument and an argument that Hamilton acted with "corrupt or malicious motives." Moreover, based upon Village of Bloomingdale, it is clear that the allegations of Plaintiff's First Amended Complaint show that Hamilton, in causing the City to rescind the Arena Agreement with Plaintiff and enter into other agreements favorable to Butler and Nelson, was acting with judgment or discretion and was not engaging in a ministerial task that was "absolute, certain and imperative, involving merely the execution of a set task." See Village of Bloomingdale, 256 Ill.Dec. 848, 752 N.E.2d at 1099.

Based upon Village of Bloomingdale, this court concludes that Hamilton is immune from liability under § 2-201 of the Tort Immunity Act. Accordingly, his Motion to Dismiss Count IV, V and VI of the First Amended Complaint (# 52) is hereby GRANTED.

## II. BNAM AND HUNDMAN'S MOTION TO DISMISS

In his Report and Recommendation (# 67), the Magistrate Judge accepted the argument of Defendants BNAM and Hundman that Count V should be dismissed because Plaintiff could not state a claim for tortious interference with contract based on the law of the case doctrine. The Magistrate Judge noted that this court, in ruling on Plaintiff's motion for a temporary restraining order and preliminary injunction, concluded that "the Management Agreement never became an enforceable agreement" between Plaintiff and the City. The Magistrate Judge concluded that, consistent with this court's reasoning in its previous order, Plaintiff's allegations that the Arena Agreement constituted a valid enforceable agreement between Plaintiff and the City were not well-pleaded in light of the evidence provided by the attachments.

In its Objection to Report and Recommendation (# 68), Plaintiff argued that this conclusion was incorrect because this court's interlocutory order ruling on the motion for a temporary restraining order and preliminary injunction was not a ruling on the merits of the case and cannot be relied upon as the "law of the case." Plaintiff further argued that many of the exhibits this court relied upon in ruling on the motion for a temporary restraining order and preliminary injunction were not attachments to the First Amended Complaint and could not properly be considered in ruling on a Motion to Dismiss.

This court agrees with Plaintiff that this court's Order ruling on the motion for a temporary restraining order and preliminary injunction was not a final determination on the merits on any claims. See Dupuy v. Samuels, 423 F.3d 714, 721-22 (7th Cir.2005) ("court stopped significantly short of deciding definitively any aspect of the case"). In its Order, this court discussed the issue of whether there was a valid enforceable contract in order to determine whether Plaintiff had shown a likelihood of success on the merits. This court ultimately concluded that Plaintiff did not show a likelihood of success on the merits and was not entitled to a temporary restraining order or preliminary injunction. However, this was not a final determination on the issue of whether a contract existed. This court fully agrees with United States District Judge Joan B. Gottschall's statement in Loewen Group Int'l, Inc. v. Haberichter, 1998 WL 603050 (N.D.Ill.1998). Judge Gottschall stated:

**\*6** The law of the case doctrine does not prohibit a court from reconsidering findings and conclusions

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

from a preliminary injunction hearing. The findings and conclusions for a preliminary injunction are, by their nature, preliminary. Loewen Group, 1998 WL 603040, at *2. This court notes that, under Rule 65(a)(2), a court may order the trial on the merits consolidated with the hearing on the application for injunctive relief. Fed R. Civ. P. 65(a)(2). However, this court did not order a consolidation of the hearing in this case, and a hearing on the merits has not been held. See Dupuy, 423 F.3d at 722 n. 2; Loewen, 1998 WL 603040, at *2.

In this case, Plaintiff has alleged in Count V that BNAM and Hundman intentionally interfered with a valid enforceable contract between the City and Plaintiff. No final determination has been made in this case regarding the existence of a valid enforceable contract, and this court therefore concludes that BNAM and Hundman have not shown that they are entitled to dismissal of Count V of Plaintiff's First Amended Complaint. Accordingly, their Motion to Dismiss (# 54) is DENIED in its entirety.

IT IS THEREFORE ORDERED THAT:

(1) The Report and Recommendation (# 66) filed by the Magistrate Judge on November 22, 2005, is not accepted by this court.

(2) Defendant Hamilton's Motion to Dismiss Counts IV, V and VI of the First Amended Complaint (# 52) is GRANTED, Counts IV, V and VI are dismissed, with prejudice, as to Defendant Hamilton. Defendant Hamilton is terminated as a party to this action.

(3) The Report and Recommendation (# 67) filed by the Magistrate Judge on November 23, 2005, is accepted in part and rejected in part by this court.

(4) The Motion to Dismiss Counts IV, V and VI(# 54) filed by Defendants BNAM, LLC and Larry Hundman is DENIED in its entirety.

(5) The duplicate motion to dismiss docketed as # 55 is hereby STRICKEN.

(6) This case is referred to the Magistrate Judge for further proceedings.

REPORT AND RECOMMENDATION

BERNTHAL, Magistrate J.

In December 2004, Plaintiff, Bloomington Partners, LLC, filed a Verified Complaint for Injunctive Relief (# 1) against Defendant, City of Bloomington. In April 2005, Plaintiff filed a First Amended Complaint (# 31) against Defendants City of Bloomington; John Butler, individually and d/b/a Butler Company, LLC; JB Butler Company, LLC; Michael Nelson; MNelson Company, LLC; Central Illinois Arena Management, Inc.; BNAM, LLC; Larry Hundman; and Thomas Hamilton. Federal jurisdiction is based on diversity pursuant to 28 U.S.C. § 1332.

In June 2005, Motion of Defendants BNAM, LLC and Larry Hundman To Dismiss Counts IV, V, and VI of Plaintiff's First Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6)(# 54) was filed. Defendants also filed an identical motion to dismiss that has been docketed as # 55. After reviewing the parties' pleadings and memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that the Motion of Defendants BNAM, LLC and Larry Hundman To Dismiss Counts IV, V, and VI of Plaintiff's First Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6)(# 54) be GRANTED in part and DENIED in part. In addition, the Court recommends STRIKING the duplicate motion to dismiss docketed as # 55.

I. Background

*7 The following background is taken from the complaint. At relevant times, Defendant Hamilton was City Manager for the City of Bloomington. Central Illinois Arena Management, Inc. (hereinafter "CIA") is a corporation wholly owned by Defendants Butler and Nelson. Defendant Butler is the only member of JB Butler Company, LLC (hereinafter "Butler LLC"). Butler LLC acted at all times solely through Butler. Nelson is the only member of MNelson Company, LLC (hereinafter "MNelson LLC"). MNelson LLC acted at all times solely through Nelson. Defendant Hundman is the chief operating officer of BNAM, LLC (also known as Bloomington-Normal Arena Management Group).

The City of Bloomington (hereinafter "City") has

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2005 WL 3536340, *7 (C.D.Ill.))

worked with Defendants Butler and Nelson since at least 2000 to bring a professional hockey team to the area and to plan, develop, and construct a sports arena to house the hockey franchise and cater other local entertainment events. In 2003, the City and Butler and Nelson brought Barry Kemp, Richard Adams, and David LeFevre into this Arena Project. In 2003, Adams, Kemp, LeFevre, Butler, and Nelson agreed among themselves to make a proposal to the City, in the name of a yet to be formed partnership called Bloomington Partners, to manage the Arena Project, provide anchor tenants, furnish food and beverage concession equipment, and give financing guarantees for the Arena Project. (# 31, ¶ 25.) This proposal was reduced to writing in the form of a Term Sheet and presented to the City for consideration in July 2003. (# 31, ¶¶ 26-27.)

During the first quarter of 2004, the participants in the proposed partnership ultimately reached agreement with the City on the terms of a contract. (# 31, ¶ 35.) In early April 2004, the City's attorney asked LeFevre to prepare a final draft of the Arena Development and Management Agreement (hereinafter "Arena Agreement" or "Management Agreement"). (# 31, ¶ 36.) On April 27, 2004, Mayor Judy Markowitz signed the Arena Agreement on behalf of the City. (# 31, ¶ 40.) Thereafter, the City obtained nearly $30,000,000 in general bond financing. Construction of the sports arena began in August 2004.

On May 3, 2004, Kemp, LeFevre, and Adams formed Bloomington Partners (hereinafter "BP"), bringing in Defendants Butler and Nelson as additional members. (# 31, ¶ 41.)

On November 23, 2004, the City Council voted to terminate the agreement with BP. On November 29, 2004, Defendants Butler and Nelson gave BP written notice that they were resigning their membership in BP. On December 13, 2004, the City Council voted to enter into a new management and development agreement (the BNAM Agreement) with a third party named Bloomington-Normal Arena Management Group (BNAM). Butler and Nelson remained involved with the project.

Plaintiff BP's Arena Agreement with the City requires the parties to engage in good faith in dispute resolution procedures. The City has ignored this requirement. Plaintiff seeks injunctive relief

requiring the City to engage in good faith in dispute resolution procedures as required by the agreement, and to enjoin the City from approving a new development and management agreement with a third party until the dispute resolution procedures are exhausted.

**\*8** Plaintiff's first amended complaint alleges six counts, as follows: (1) Count I, against the City, alleges breach of express contract; (2) Count II, against the City, alleges estoppel; (3) Count III, against Defendants Butler, Butler LLC, Nelson, and MNelson LLC, and CIA, alleges breach of fiduciary duty; (4) Count IV, against Defendants City, Hamilton, BNAM, and Hundman, alleges aiding and abetting; (5) Count V, against the City, Hamilton, Butler, Nelson, Butler LLC, MNelson LLC, CIA, Hundman, and BNAM, alleges intentional interference with contract; and (6) Count VI, against the City, Hamilton, Butler, Nelson, Butler LLC, MNelson LLC, CIA, Hundman, and BNAM, alleges intentional interference with economic expectations.

Plaintiff attached three documents to the complaint, including the Arena Agreement, dated April 27, 2004; the Consulting and Sales Agreement between the City of Bloomington and CIA, dated 2001 (hereinafter "CS Agreement"); and the Pre-Opening Sales and Management (hereinafter "POSM") Agreement between the City and CIA, dated April 27, 2004.

In Count IV, Plaintiff alleges that Hamilton and Hundman caused BNAM to enter into a development and management agreement with the City. Hamilton and Hundman frequently communicated in secret with Butler and Nelson after April 27, 2004, about the status of BP's Arena Project activities and related matters and these secret communications were part of the activities that constituted Hundman's aiding and abetting Butler and Nelson to breach their fiduciary duties. Hamilton and Hundman knew that BP had entrusted Butler and Nelson to act as BP's representatives and agents in matters concerning the Arena Agreement and Arena Project and knew that Butler and Nelson were engaging in misconduct by breaching their fiduciary duty to BP. Hamilton and Hundman knew that Butler and Nelson wanted to and acted to deprive BP of revenues from its post-Arena Agreement activities, and wanted CIA to replace BP

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                      **Page  11**
**(Cite as: 2005 WL 3536340, \*8 (C.D.Ill.))**

on Pre-Opening Services and as developer, consultant, and manager for the Arena Project. Hamilton and Hundman actively aided and abetted Butler and Nelson in breaching their fiduciary duty and Hundman profited from the success of Butler and Nelson by receiving the BNAM Agreement. In Count V, Plaintiff alleges that Hundman, acting on his own and on behalf of BNAM, intentionally interfered with the Arena Agreement between BP and the City. In Count VI, Plaintiff alleges that Hundman, acting on his own and on behalf of BNAM, intentionally interfered with the business relationship between BP and the City.

### II. Standard

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits of the case. Miller v. Reebie Storage and Moving Co., Inc., No. 93 C 3986, 1993 WL 414689, \*1 (N.D.Ill. Oct.15, 1993). When considering a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the claim and draw all reasonable inferences in the light most favorable to the nonmoving party. Gutierrez v. Peters, 111 F.3d 1364, 1368-69 (7th Cir.1997). The Court should dismiss the case only if the nonmoving party can prove no set of facts consistent with the allegations of the complaint that would entitle him to relief. Turner/Ozanne v. Hyman/Power, 111 F.3d 1312, 1319-20 (7th Cir.1997).

### III. Analysis

**\*9** Defendants Hundman and BNAM argue that the Court should dismiss the claims against them in Counts IV, V, and VI for the following reasons: (1) Plaintiff has failed to state a claim against Hundman individually; (2) neither Hundman nor BNAM owed any duty to Plaintiff, therefore, Plaintiff has failed to state a claim in Count IV; (3) in a previous order in this case, the Court held that no contract existed between Plaintiff and the City, so Plaintiff cannot state a claim for tortious interference with contract (Count V); (4) Plaintiff has failed to allege how either BNAM or Hundman tortiously interfered with Plaintiff's economic expectations (Count VI); and (5) Plaintiff has failed to allege a basis for punitive damages.

#### A. The Claims against Defendant Hundman Individually

Defendants first argue that Plaintiff has failed to state a claim against Hundman individually. Specifically, Defendants contend that Plaintiff has not alleged the Hundman failed to follow corporate formalities so as to allow piercing of BNAM's corporate veil.

Plaintiff responds that it is seeking to hold Hundman liable for his own actions; it is not seeking to pierce the corporate veil and hold Hundman individually liable for the actions of BNAM. See Spartech Corp. v. Opper, 890 F.2d 949, 953 (7th Cir.1989) (stating that the principle of limited liability protects shareholders and officers of a corporation from "derivative liability, that is, from being called to account for the wrongs of the corporation.").

As Plaintiff points out, derivative liability or piercing the corporate veil is not the only grounds for imposing liability on a corporate officer. The doctrine of limited liability does not protect a corporate officer from liability for his or her own wrongful acts. NPF WL, Inc. v. Sotka, No. 99 C 7966, 2000 WL 574527, \*4 (N.D.Ill. May 10, 2000) (citing Spartech, 890 F.2d at 953). A review of the allegations in Counts IV, V, and VI indicates that they seek damages allegedly caused by Hundman's personal actions, as well as the actions of BNAM. Therefore, the Court recommends denying the motion to dismiss the claims against Hundman individually.

#### B. The Claim of Aiding and Abetting (Count IV)

Defendants next argue that Plaintiff has failed to state a claim of aiding and abetting. Defendants address this argument in the context of aiding and abetting both breach of contract and breach of fiduciary duty, stating that it is difficult to tell which one Count IV alleges.

Plaintiff's response indicates that it is alleging a claim of "aiding and abetting a tortfeasor." See Sanke v. Bechina, 216 Ill.App.3d 962, 160 Ill.Dec. 258, 576 N.E.2d 1212, 1219 (Ill.App.Ct.1991) (referring to aiding and abetting, based on Restatement (Second) of Torts § 876).

Regarding a claim for aiding and abetting a breach of contract, Defendants rely on Montgomery v. Aetna Plywood, Inc., in which the Seventh Circuit

Not Reported in F.Supp.2d
(Cite as: 2005 WL 3536340, *9 (C.D.Ill.))

court stated as follows: "[W]e have discovered no Illinois case recognizing a cause of action for aiding and abetting a breach of contract." Montgomery v. Aetna Plywood, Inc., 231 F.3d 399, 413 n. 6 (7th Cir.2000). That note goes on to refer to Section 876 of the Restatement (Second) of Torts, which sets out a cause of action for, among other things, providing substantial assistance or encouragement to another's tortious acts. Because breach of contract is not a tort, the Court concludes that Plaintiff is not attempting to allege aiding and abetting breach of contract.

**\*10** Regarding a claim for aiding and abetting a breach of fiduciary duty, Defendants contend that Plaintiff has failed to allege the elements of that tort, specifically, that BNAM or Hundman substantially assisted a breach of fiduciary duty. A claim of aiding and abetting includes the following elements: (1) The party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be generally aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. Wolf v. Liberis, 153 Ill.App.3d 488, 106 Ill.Dec. 411, 505 N.E.2d 1202, 1208 (Ill.App.Ct.1987).

Here, Plaintiff has alleged Defendants Hamilton and Hundman were aware that Butler and Nelson owed Plaintiff a duty of loyalty, trust, and confidence and that Butler and Nelson's conduct breached their fiduciary duties to Plaintiff. Thus, Plaintiff has adequately alleged the first two elements of the claim.

As to the third element, Plaintiff specifically contends that Hamilton and Hundman aided and abetted Butler and Nelson by the following conduct: (1) they secretly planned for BNAM to take over BP's role in the Arena Agreement; (2) together with Butler and Nelson, they planned to assume control of development and management of the Arena Project before November 22, 2004; (3) they talked to Butler and Nelson prior to November 22, 2004, about replacing BP with BNAM and they exchanged drafts of agreements, negotiated, and acted to accomplish BNAM's takeover of the Arena Project without telling BP; (4) they had actual knowledge that Butler and Nelson had not informed BP of the November 22, 2004, City Council vote to terminate

the Arena Agreement and failed to inform BP of the vote; and (5) they negotiated a "hold harmless" agreement between the City and BNAM to immunize the City from any claims by Hundman in the event the BNAM Agreement was held to be invalid.

Based on notice pleading standards, Plaintiff has alleged enough to survive a motion to dismiss on the basis of failure to allege "substantial assistance."

Defendants also contend that Plaintiff failed to state a claim because BNAM and Hundman did not owe Plaintiff any duty. See Shapo v. Engle, No. 98 C 7909, 1999 WL 1045086, *19 (N.D.Ill. Nov.12, 1999) (stating that, to state a claim of aiding and abetting a breach of fiduciary duty, a plaintiff must allege that a defendant facilitated an underlying tortious act against a third party by another, and that the defendant's substantial assistance in accomplishing the tortious result itself constitutes a breach of duty to that third person).

Plaintiff responds that aiding and abetting liability is predicated on the defendant's encouragement and assistance to another to commit a tort, not on any independent duty that the defendant owes the plaintiff. As Plaintiff points out, Defendants' interpretation would eliminate the need for the tort of aiding and abetting because the plaintiff could state a claim for direct breach of the duty. The Court agrees. Section 876 of the Restatement (Second) of Torts, provides, in pertinent part, as follows:

**\*11** § 876. Persons Acting in Concert

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979). Subparagraph (b) refers to a duty by the one who is being aided ("the other's conduct constitutes a breach"), not the one who is aiding the tortfeasor.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

After considering the Restatement (Second) of Torts § 876(b) and case law regarding aiding and abetting, the Court concludes that the claim of aiding and abetting a breach of fiduciary duty does not require that a defendant owed a plaintiff an independent duty. Accordingly, the Court concludes that Plaintiff has adequately alleged a claim of aiding and abetting a breach of fiduciary duty and recommends denying the motion to dismiss Count IV for failure to state a claim.

### C. The Claim for Tortious Interference with Contract (Count V)

Defendants next argue that Plaintiff cannot state a claim for tortious interference with contract based on the doctrine of the law of the case. In a previous order addressing Plaintiff's motion for temporary restraining order, the Court stated that, "based upon the plain language contained in the Management Agreement, ... the Management Agreement never became an enforceable agreement between the parties [ (BP and the City) ]." (Order, # 29, p. 14.) The absence of an agreement is fatal to a claim of tortious interference with contract. See Cress v. Recreation Servs., Inc., 341 Ill.App.3d 149, 277 Ill.Dec. 149, 795 N.E.2d 817, 842 (Ill.App.Ct.2003) (stating that the elements of a claim include (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contractual relationship between the plaintiff and another; (3) the defendant's intentional and unjustifiable inducement of a breach of the contract; (4) a breach of contract by the other caused by the defendant's wrongful acts; and (5) damage to the plaintiff).

Plaintiff responds that the law of the case doctrine does not prohibit a court from reconsidering findings and conclusions from a preliminary injunction hearing. Loewen Group Int'l, Inc. v. Haberichter, 93 C 7377, 1998 WL 603040, *2 (N.D.Ill. Sept.4, 1998) ("The findings and conclusions for preliminary injunction are, by their nature, preliminary."). Furthermore, Plaintiff contends that the allegations of the complaint sufficiently allege that the Arena Agreement was a valid and enforceable contract between BP and the City.

In considering a Rule 12(b)(6) motion to dismiss

for failure to state a claim, the court is limited to the allegations contained in the pleadings. Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir.1993). Pleadings include the complaint, the answer, and any written instruments attached as exhibits, such as affidavits, letters, contracts, and loan documentation. N. Ind. Gun & Outdoor Shows, Inc., 163 F.3d 449, 452 (7th Cir.1998). In addition, the Court may take judicial notice of other court proceedings if the proceedings are directly related to the case. Scholes v. Lehmann, 56 F.3d 750, 762 (7th Cir.1995).

**\*12** With these standards in mind, the Court notes that the order on the motion for preliminary injunction concluded that the Arena Agreement (referred to in the order as the Management Agreement) never became an executed, enforceable contract. This conclusion was based on the plain language of the Management Agreement and the provisions of the CS Agreement and the POSM Agreement. The Management Agreement (attached to the first amended complaint as Exhibit B) indicates that BP never executed that agreement.

Without repeating the entire analysis from the previous order in this case, this Court notes that, consistent with the reasoning in the previous order, Plaintiff's allegations that the Arena Agreement constituted a valid enforceable agreement between BP and the City are not well-pleaded in light of the evidence provided by the attachments. As a result, the Court concludes that Plaintiff has failed to state a claim for tortious interference with contract in Count V and recommends granting Defendants' motion to dismiss Count V.

### D. The Claim for Tortious Interference with Economic Expectations (Count VI)

Defendants next argue that Plaintiff has failed to state a claim for tortious interference with Plaintiff's economic expectations. Apparently, Defendants contend that Plaintiff has failed to allege (1) the elements of a claim as to Hundman and BNAM, or (2) that BNAM and Hundman acted with actual malice. In addition, Defendants state that BNAM is not even mentioned in Count VI, except in the prayer for relief.

With regard to the latter argument, the Court notes that Plaintiff alleged that Hundman acted on

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

his own behalf and on behalf of his entity, BNAM. See Jansen v. Packaging Corp. of Am., 123 F.3d 490, 495 (7th Cir.1997) (stating that a corporation can only act through its employees and agents). Thus, Plaintiff has alleged conduct by BNAM. As for the argument that Plaintiff failed to allege malice, the Court notes that Paragraph 110 of Count VI alleges as follows: "Butler, Nelson, Hamilton, and Hundman intentionally engaged in the aforementioned misconduct in a willful, wanton, and malicious manner." (# 31, ¶ 110.)

In support of their argument that Plaintiff failed to allege the elements of the claim, Defendants list the elements of a claim for tortious interference with economic expectations, quote two cases, restate their premise that the Court should dismiss the claim, and finish off with this statement:

Furthermore, there is no contract between BP and the City that prohibited BNAM from entering into a contract with the City and, as a result, pursuant to the rationale set forth in Frandsen, BNAM committed no tort when it signed a contract with the City. Competition is not a tort.

(# 56, p. 10.)

Defendants have not explained which elements Plaintiff has failed to allege. Certainly Defendants could not be suggesting that Plaintiff failed to allege all of the elements, because the complaint clearly alleges, at a minimum, the existence of its economic expectations from the City and that Hundman's conduct was willful, wanton, and malicious. As the Seventh Circuit stated in the appellate context, "[i]t is not enough for an appellant in his brief to raise issues; they must be pressed in a professionally responsible fashion." Pearce v. Sullivan, 871 F.2d 61, 64 (7th Cir.1989). Accordingly, the Court recommends denying the motion to dismiss Count VI.

E. Punitive Damages

*13 Defendants also argue that Plaintiff has failed to allege a basis for punitive damages. Specifically, Defendants argue that Plaintiff has failed to allege a basis for its conclusory allegations that Hundman's conduct was "willful, wanton, and malicious." (Count V, ¶ 109; Count VI, 110.)

In a suit in federal court where federal jurisdiction is based on diversity, state law determines whether punitive damages are appropriate. Ross v. Black & Decker, Inc., 977 F.2d 1178, 1187 (7th Cir.1992) (citing West v. W. Cas. & Sur. Co., 846 F.2d 387, 398 (7th Cir.1988)). In Illinois, punitive damages may be awarded when the defendant acted with fraud, actual malice, deliberate violence or oppression, or when the defendant acted willfully, or with such gross negligence as to indicate a wanton disregard for the rights of others. Id. Furthermore, "[w]ilful and wanton conduct is that which usually approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of that risk." Homewood Fishing Club v. Archer Daniels Midland Co., 239 Ill.App.3d 102, 179 Ill.Dec. 126, 605 N.E.2d 1140, 1148 (Ill.App.Ct.1992).

In Count VI, Plaintiff has expressly alleged that Hundman acted in a willful, wanton, and malicious manner. (# 31, ¶ 110.) Furthermore, Plaintiff alleged that Hundman intentionally interfered with BP's economic expectations with the City. Accordingly, the Court recommends denying the motion to dismiss the claim for punitive damages in Count VI.

In Count IV, Plaintiff has not expressly alleged that Hundman acted in a willful, malicious, or oppressive manner. However, Plaintiff has alleged that Hundman knew about the breach of fiduciary duty by Butler and Nelson, worked secretly and intentionally with them to replace BP as developer and manager of the Arena Project, actively aided and abetted Butler and Nelson's activities, and profited from their success. Accordingly, the Court recommends denying the motion to dismiss the request for punitive damages in Count IV.

IV. Summary

For the reasons set forth above, this Court recommends that the Motion of Defendants BNAM, LLC and Larry Hundman To Dismiss Counts IV, V, and VI of Plaintiff's First Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6)(# 54) be GRANTED as to Count V; and DENIED as to Count IV, Count VI, the claims against Hundman individually, and the requests for punitive damages in Counts IV and VI. In addition, the Court recommends STRIKING the Motion of Defendants BNAM, LLC and Larry Hundman To Dismiss

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
**(Cite as: 2005 WL 3536340, \*13 (C.D.Ill.))**

Counts IV, V, and VI of Plaintiff's First Amended Complaint Pursuant to Fed.R.Civ.P. 12(b)(6)(# 55).

The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten (10) working days afer being served with a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1).   Failure to object will constitute a waiver of objections on appeal. Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir.1986).

**\*14** ENTER this 23rd day of November, 2005.

2005 WL 3536340 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# D

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 92,418
**(Cite as: 2003 WL 21058251 (S.D.N.Y.))**

Page   17

< KeyCite Yellow Flag >

United States District Court,
S.D. New York.

**BOND OPPORTUNITY FUND and Steven
Gidumal, suing on their own behalf
individually, and on behalf of shareholders of
Unilab Corporation, Plaintiffs,
v.
UNILAB CORPORATION, David C. Weavil,
Haywood Cochrane, Jr., Kirby L. Cramer,
William J. Gedale, Richard A. Michaelson,
Gabriel B. Thomas, and BT Alex.Brown,
Defendants.**

**No. 99 Civ. 11074(JSM).**

May 9, 2003.

Former shareholders brought action against
former directors, investment banker, and others,
alleging that proxy materials containing false and
misleading statements were issued in furtherance of
a scheme to induce them to sell their shares at an
unfairly low price pursuant to a buyout arising from
a merger. Upon defendants' motions to dismiss, the
District Court, Martin, J., held that: (1) claims
failed to meet the pleading standards set out by the
Private Securities Litigation Reform Act (PSLRA);
(2) no claim could be maintained for control person
liability; and (3) claims against investment banker
were time-barred.

Dismissed.

West Headnotes

**[1] Securities Regulation     49.28**
349Bk49.28
Claims of shareholders, who alleged that proxy
materials containing false and misleading statements
were issued in furtherance of a scheme to induce
them to sell their shares at an unfairly low price
pursuant to a buyout arising from a merger, failed to
meet the demanding pleading standards set out by
the Private Securities Litigation Reform Act
(PSLRA); although the disclosure with respect to
the merger may not have been perfect, the "total
mix" of information provided was complete and
accurate enough to allow a shareholder to make an
informed decision, none of the misstatements or

omissions alleged by shareholders could pass the
materiality test, and they also did not show that the
directors were negligent in their failure to disclose
material information in the proxy materials.
Securities Exchange Act of 1934, § 21D(b), as
amended, 15 U.S.C.A. § 78u-4(b); Securities
Exchange Act of 1934, § 14(a), 15 U.S.C.A. §
78n(a); 17 C.F.R. § 240.14a-9(a).

**[2] Corporations     320(4)**
101k320(4)
Since the waste of corporate assets affects all
shareholders equally, it is a derivative claim, which
is extinguished upon completion of a merger.

**[3] Securities Regulation     49.21**
349Bk49.21
Misrepresentation.
Breach of fiduciary duty to protect corporate assets
for the benefit of all of the shareholders does not
give rise to a securities law claim for false and
misleading statements in proxy materials. Securities
Exchange Act of 1934, § 14(a), 15 U.S.C.A. §
78n(a); 17 C.F.R. § 240.14a-9(a).

**[4] Securities Regulation     49.25(1)**
349Bk49.25(1)
Since complaint failed to state an underlying
violation of statute prohibiting false and misleading
statements in proxy materials, no claim could be
maintained for control person liability. Securities
Exchange Act of 1934, §§ 14(a), 20(a), 15
U.S.C.A. §§ 78n(a), 78t(a); 17 C.F.R. § 240.14a-
9(a).

**[5] Limitation of Actions     99(1)**
241k99(1)

**[5] Limitation of Actions     100(1)**
241k100(1)
Statute of limitations applicable to claims for false
and misleading statements in proxy materials is one
year from discovery or three years from the
occurrence that gives rise to the complaint,
whichever is less. Securities Exchange Act of 1934,
§ 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. §
240.14a-9(a).

**[6] Limitation of Actions     100(12)**
241k100(12)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21058251 (S.D.N.Y.))

Given that at least the basics of investment banker's role as a key player on both sides of the merger was disclosed in the proxy statement, and elaborated in the supplemental proxy, limitations period for claims for false and misleading statements in proxy materials began to run prior to investment banker's deposition, which took place one year after supplemental proxy and filing of original complaint. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9(a).

OPINION AND ORDER

MARTIN, J.

*1 This purported class action, filed by former shareholders of Unilab Corporation, arises out of a buyout of virtually all of the public shareholders of Unilab in a merger of Unilab into UC Acquisition Sub, Inc., a subsidiary of Kelso & Co., which was created for that purpose. Plaintiffs allege that the proxy statement dated October 26, 1999, and a supplemental proxy statement dated November 15, 1999, [FN1] contained false and misleading statements in violation of §§ 14(a) and 20(a) of the Securities Exchange Act, 15 U .S.C. §§ 78n(a), 78t(a). In addition, Plaintiffs assert state law claims of breach of fiduciary duty, common law fraud and deceit, and negligent misrepresentation.

> FN1. The Plaintiffs filed their original Complaint in this action, seeking to enjoin the merger, on November 4, 1999. The supplemental proxy was prepared with the participation of Plaintiffs' counsel, and published pursuant to a preliminary settlement, subject to confirmatory discovery. The shareholder vote, in which the merger was approved, took place on November 23, 1999.

Plaintiffs claim that the allegedly misleading proxy materials were issued in furtherance of a scheme to induce shareholders to sell their Unilab shares at an unfairly low price. They contend that this scheme was intended to benefit the director defendants, BT Alex .Brown (the investment banker), Kelso, and three institutional shareholders, two of which remained shareholders after the merger. Plaintiffs claim that the extent to which Unilab stock was undervalued in the merger is demonstrated by the fact that 18 months after the buyout at $5.85 per share, Kelso took the successor company public at $16 per share, and it closed its

first day of trading at $23 per share. This increase took place despite the fact that Unilab's results over that period of time were not as good as had been expected, and the stock market declined generally.

All Defendants have moved to dismiss the Third Amended Complaint pursuant to Fed.R.Civ.P. Rules 12(b)(6) and 9(b), and § 21D(b) of the Securities Exchange Act, 15 U.S.C. § 78u-4(b), for failure to state a cause of action. In addition, BT Alex.Brown has moved to dismiss the securities law claims asserted against it as barred by the statute of limitations.

The Proxy Materials

Plaintiffs charge that the original proxy statement contained a number of misstatements and omissions, and that the supplemental proxy that was sent to shareholders after the Plaintiffs filed the original Complaint in this action, and before the vote approving the merger, did not remedy a number of deficiencies in the disclosure with respect to the merger. Plaintiffs allege that the following statements constituted material misstatements and omissions.

1. The statement in both the proxy and the supplemental proxy that two institutional investors, Pequot Scott Fund, LP and EOS Partners, LP, were retaining a portion of their shares in the merger and that this was a benefit to other shareholders, who would be able to receive cash for all of their shares, and would allow ther merger to be accunted for as a recapitalization, was untrue because Pequot and EOS Partners actually were permitted to retain their shares primarily because they had expressed disappointment in the proposed $5.85 buy out price.

2. The proxy and supplemental proxy did not disclose that prior to the announcement of the merger, the Unilab Board had elected not to exercise a prepayment option on a $14 million note held by Oaktree, which was convertible into Unilab stock, allegedly giving Oaktree a windfall and gaining Oaktree's support for the buyout as a result.

*2 3. The proxy stated that the $5.85 buy out price was supported by earnings estimates of research analysts, when, in fact, there was only one research analyst who covered Unilab, and it was not disclosed that Unilab had urged that analyst to

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

reduce her earnings estimates.

4. The proxy did not disclose that the financial projections that were included in the proxy were not the ones used by BT Alex.Brown in rendering its fairness opinion to the Board, and that using the same projections would have yielded an implied range of values that were $1.95 higher than the range of values presented to the Board.

5. The proxy stated that the company had engaged in an extensive auction process, which ensured that the buyout price was fair. Plaintiffs allege that this statement was false and misleading because it failed to state that in addition to its role as financial advisor to Unilab, BT Alex.Brown had agreed to provide financing to six of the nine parties that initially indicated interest in purchasing Unilab, to two of the final three bidders, and to Kelso, with whom Unilab negotiated exclusively in May 1999. Kelso, the ultimate purchaser, also agreed to permit BT Alex.Brown to purchase a 1% interest in the new company Consequently, according to Plaintiffs, BT Alex.Brown was on both sides of the negotiations. In addition, while the proxy stated that the Board had created a special committee to oversee the negotiations, the negotiations were actually left to BT Alex.Brown, which allegedly had motivation to keep the price as low as possible and to ensure that Kelso was the winning bidder.

6. The proxy statement included a fairness opinion prepared by BT Alex.Brown, and stated that in reaching its opinion, BT Alex.Brown relied upon data prepared by management and publicly available research analysts' estimates, when the estimated financial data upon which BT Alex.Brown relied actually was prepared by Unilab alone and did not include projections of benefits from Unilab's recent Meris and Bio-Cypher acquisitions.

7. The Unilab net income figure for the last twelve months that was included in the proxy allegedly was understated because it did not include the benefit of Unilab's net operating loss carry forwards.

8. BT Alex.Brown allegedly did not use appropriate discount rates in the proxy, making the "discounted cash flow analysis" materially false and misleading. Moreover, the inclusion of "Projections" and the description of a discounted

cash flow analysis made it appear that BT Alex.Brown had discounted the projections in arriving at its range of fairness, when, it is alleged, it had not.

The supplemental proxy disclosed BT Alex.Brown's compensation from Unilab and Kelso, BT Alex.Brown's intent to make an equity investment in UC Acquisition Sub, and the failure to include net operating loss carryforwards in BT Alex.Brown's discounted cash flow analysis, but it did not correct the alleged misrepresentations and omissions regarding the auction process, the fairness opinion, the failure to use appropriate discount rates, the failure to include the benefits of the Meris and Bio-Cypher acquisitions in the cash flow figures, the true reason why EOS and Pequot would retain their shares after the merger, the fact that only one analyst followed Unilab and that Unilab employees had urged her to reduce her price projections for the company, and the benefit realized by Oakland due to Unilab's failure to prepay its note.

Section 14(a) Claims

*3 A motion to dismiss is directed to the sufficiency of the Complaint, and, for purposes of the motion, all of the material allegations of the Complaint are assumed to be true, and are viewed in the light most favorable to the plaintiff. Jenkins v. McKeithen, 395 U.S. 411, 423, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969); Harris v. City of New York, 186 F.3d 243, 247 (2d Cir.1999). The motion may be granted only if it appears beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief. Minzer v. Keegan, 218 F.3d 144, 148 (2d Cir.2000), cert. denied, 531 U.S. 1192, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") dictates the pleading standards for Plaintiffs' claim under § 14(a) of the Securities Exchange Act and Rule 14a-9. The PSLRA requires that the complaint specify each statement that is alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, all facts with particularity upon which that belief is formed. 15 U.S.C. § 78u-4(b)(1). In addition, the complaint must "state with particularity facts giving rise to a

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21058251, *3 (S.D.N.Y.))

strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "strong inference" requirement has been held to mean that plaintiffs are entitled to only the "most plausible of competing inferences." In re: Champion, 145 F.Supp.2d 871, 877 (E.D.Mich.2001) (citing Helwig v. Vencor, 251 F.3d 540, 553 (6th Cir.2001), cert. denied, 536 U.S. 935, 122 S.Ct. 2616, 153 L.Ed.2d 800 (2002)). However, plaintiffs must plead with particularity only sufficient facts to support their beliefs, and not every fact necessary to prove their claim. Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir .), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

Rule 14a-9 provides:
No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.
17 C.F.R. § 240.14a-9(a).

Thus, plaintiffs must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction. Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 384-85, 90 S.Ct. 616, 621-22, 24 L.Ed.2d 593 (1970).

Materiality

A plaintiff who charges that a statement or omission is materially false must show:
a substantial likelihood that, under the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.
*4 TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

In the context of a merger, an omitted or misstated fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Id.

On a motion to dismiss pursuant to Rule 12(b), the Court may dismiss for lack of materiality only if the facts that are alleged to have been omitted or misleading are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." In re: MCI World Com, Inc. Securities Litigation, 93 F.Supp.2d 276, 282 (E.D.N.Y.2000). On the other hand, proxy materials need not be perfect. They need only convey a sufficiently accurate picture so as not to mislead. Id.; Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 (2d Cir.1978) ("[N]it-picking should not become the name of the game.").

State of Mind

Although the Supreme Court has reserved decision on whether scienter is necessary for liability under § 14(a), Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1091 n. 5, 111 S.Ct. 2749, 2757 n. 5, 115 L.Ed.2d 929, the lower courts generally have held that the plaintiffs need prove only negligence when seeking to impose liability under that section and Rule 14a-9. In Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298-1301 (2d Cir.1973), the Second Circuit held that with respect to a corporate defendant, plaintiffs who "represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the statement ... are not required to establish any evil motive or even reckless disregard of the facts." Id., 478 F.2d at 1300. [FN2] Numerous other courts have held that the negligence standard also applies to § 14(a) claims against individual defendants. See, e.g., Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 778 (3rd Cir.1976); In re: Trump Hotels Shareholder Derivative Litigation, Nos. 96 Civ. 7820, 96 Civ. 8527, 2000 WL 1371317, *12 (S.D.N.Y. Sept.21, 2000); In re: Reliance Securities Litigation, 135 F.Supp.2d 480, 511 (D.Del.2001) ("In enforcing that standard, courts should apply the standard of due diligence rather

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

than the standard of actual knowledge or gross negligence."); In re: McKesson HBOC, Inc. Securities Litigation, 126 F.Supp.2d 1248, 1263 (N.D.Cal.2000); Lichtenberg v. Besicorp Group, Inc., 43 F.Supp.2d 376, 384-85 (S.D.N.Y.1999), app. dism., 204 F.3d 397 (2d Cir.2000); Katz v. Pels, 774 F.Supp. 121, 126 (S.D.N.Y.1991) ("In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure.").

> FN2. In that case, the Second Circuit did "not pass on the principles that govern liability of directors and other individuals having some responsibility for the statement, as distinguished from a controlling corporation which has been the beneficiary of the action that was induced." Gerstle v. Gamble-Skogmo, 478 F.2d at 1298.

Therefore, under the standards imposed by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants. For this purpose, the corporation is assumed to know all that any of its agents know. Gerstle v. Gamble-Skogmo, 478 F.2d at 1299. However, with respect to the individual directors, the PSLRA has eliminated the "group pleading" doctrine. Therefore, Plaintiffs may not impute knowledge to the individual Defendants solely on the basis of the positions they held. In re: Reliance, 135 F.Supp.2d at 507; In re: Digital Island Securities Litigation, 223 F.Supp.2d 546, 555 (D.Del.2002) (That insiders "must have known" true facts does not satisfy the relevant pleading requirements.); In re: NAHC, Inc. Securities Litigation, No. 00-4020, 2001 U.S. Dist. LEXIS 16754, *64 (E.D.Pa. Oct. 17, 2001) (Under the PSLRA pleading requirements, general statements that a defendant must have been aware that statements were false by virtue of his position within the company are inadequate.). Moreover, where plaintiffs contend that the defendants had access to facts contrary to those stated in the proxy materials, they must specifically identify the reports or statements containing this information. Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.2000), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

Statements of Opinion

**\*5** Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially misleading, must allege "with particularity" "provable facts" to demonstrate that the statement of opinion is both objectively and subjectively false. Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1093-98, 111 S.Ct. 2749, 2758-60, 115 L.Ed.2d 929 (1991). Thus, the plaintiff must show both that the directors did not actually hold the belief or opinion stated, and that the opinion stated was in fact incorrect. Id. at 2760 ("[T]o recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize § 14(a) litigation confined solely to what one skeptical court spoke of as the 'impurities' of a director's 'unclean heart.' "); In re: Reliance Securities Litigation, 135 F.Supp.2d 480, 514-15 (D.Del.2001) ("Disbelief or undisclosed motivation alone does not satisfy the element of fact that must be established under § 14(a)") (quoting Freedman v. Value Health, Inc., 958 F.Supp. 745, 752 (D.Conn.1997)); In re: McKesson HBOC, Inc. Securities Litigation, 126 F.Supp.2d 1248, 1265 (N.D.Cal.2000) ("While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion was not sincerely held."; "Plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false.").

The Motions to Dismiss

[1] Plaintiffs' claims fail to meet the demanding pleading standards set out by the PSLRA and in the cases. An examination of the proxy and supplemental proxy reveals that although the disclosure with respect to the merger may not have been perfect, the "total mix" of information provided was complete and accurate enough to allow a shareholder to make an informed decision. Moreover, absent impermissible speculation and extensive extrapolation as to defendants' purposes and motives, plaintiffs have not set out sufficient facts to support the conclusion that the proxy and supplemental proxy contained statements that were false and misleading.

For example, Plaintiffs allege that it was not disclosed that the real reason why the Pequot Scott Fund and EOS Partners were allowed to retain 25% and 43% of their shares, respectively, in the merger,

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21058251, *5 (S.D.N.Y.))

was to buy their votes in favor of the merger after they expressed dissatisfaction with the price. However, in the proxy statement, it is stated that:

   although they would continue to have the opportunity to participate in any potential improvements of Unilab's business following the merger, the institutional stockholders of Unilab and members of Unilab's management in either case designated by UC Acquisition Sub and who agree to retain shares in the merger would, by that agreement, enable all other common stockholders to receive cash for all of their shares and ensure that the merger be accounted for as a recapitalization.

*6 The supplemental proxy elaborated further, identifying EOS Partners and Pequot Scott as the two institutional investors that would retain shares after the merger, stated the number of shares that each would retain, and stated that Mr. Weavil would retain a small percentage of his shares. Thus, the proxy does acknowledge that retaining Unilab shares would allow the institutional investors to participate in future improvements in the business. In fact, the proxy makes no other statement regarding the funds' reasons or motivation for retaining a portion of their shares. It simply does not say, or imply, that the funds agreed to retain shares in the company in order to benefit the other shareholders. Furthermore, Plaintiffs have done no more than speculate as to the "real motive" that they allege, and they do not explain why the Funds would agree to sell the majority of their shares at an inadequate price in return for the "opportunity" to keep fewer than half of their shares as compensation, given that the significant number of shares that they owned would have given them a fair chance of defeating the merger, had they sought to oppose it.  [FN3] Nor have Plaintiffs shown that the statement that the institutional shareholders' willingness to retain some of their shares would allow the company to purchase all of the public shareholders' tendered shares and account for the transaction as a recapitalization was, in fact, false.

   FN3. There was testimony during discovery that Pequot was "disappointed" by the merger price, but no evidence has been cited to support the claim that EOS Partners held the same view.

Plaintiffs also allege that the statement that the $5.85 buyout price was supported by the earnings estimates of independent research analysts (plural)

was false and misleading because there was, in fact, only one analyst who covered Unilab stock, and Unilab employees had urged that analyst to reduce her estimates. Assuming it is true that there was only one analyst, [FN4] this distinction is de minimus--and not a fact that would so alter the total mix of available information that it might change the vote of a reasonable shareholder. Plaintiffs also have not pled facts to support the conclusion that simply because Unilab employees suggested to the analyst that she reduce her earnings estimates, either that her original estimates were not overly optimistic or that her judgment was so overborne that her estimates could no longer be considered independent.

   FN4. Defendants argue that it was true that there were at least two analysts covering Unilab because the Stephens report on Unilab was signed by two individuals.

Plaintiffs allege that the net income figures for the last twelve months that were included in the proxy statement were understated because they did not include Unilab's net operating loss carry forwards. However, the supplemental proxy did state that net operating loss carry forwards were not factored into the discounted cash flow analysis performed by BT Alex.Brown in connection with its fairness opinion. Even if this statement addresses a slightly different issue, it would put a reasonable investor at least on inquiry notice as to the inclusion of such figures in Unilab's cash flow analyses and income figures.

Plaintiffs assert that the directors' recommendation that the shareholders vote to approve the merger was misleading because the financial projections that were included in the proxy were not the same as those used by BT Alex.Brown in rendering its fairness opinion to the Board, and using the same projections would have yielded an implied range of values $1.95 higher than the range of values presented to the Board. However, the fairness opinion does not set out or otherwise state what financial projections BT Alex.Brown relied on in preparing its opinion. [FN5] In addition, the proxy contained a "Cautionary Statement Regarding Forward-Looking Statements" that was more than a full page long. As the Court stated in Rodman v. Grant Foundation, 608 F.2d 64, 72 (2d Cir.1979), a company has no duty to include "speculative financial predictions" in a proxy.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN5. The Fairness Opinion stated that BT Alex.Brown had "(i) reviewed the reported prices and trading activity for Unilab Common Stock, (ii) compared certain financial and stock market information for Unilab with similar information for certain other companies whose securities are publicly traded, (iii) reviewed the financial terms of certain recent business combinations which it deemed comparable in whole or in part, (iv) reviewed the terms of a draft of the Merger Agreement dated May 24, 1999, and (v) performed such other studies and analyses and considered such other factors as it deemed appropriate."

**\*7** Therefore, if anything, Plaintiffs' allegations regarding BT Alex . Brown's financial analyses would tend to support a claim that the Board was misled by BT Alex.Brown, not that the Board misled the public shareholders. Furthermore, if it is true that the proxy statement contained projections that yielded a higher range of values than those presented to the Board, the shareholders were, in fact, given the information from which they could have concluded for themselves that the merger price was not adequate. That is all that § 14(a) requires.

The plaintiffs allege that BT Alex.Brown did not use appropriate discount rates, making the discounted cash flow analysis contained in the "Projections" section of the proxy materially false and misleading. It is clearly stated, however, in that section, that the projections were prepared for the company's internal purposes, and are included in the proxy only because they were furnished to UC Acquisition Sub and Kelso in connection with the negotiation of the Merger Agreement. [FN6] It stated further that

FN6. There is no allegation that this statement is untrue.

It is not possible to predict whether the assumptions made in preparing the projected financial information will be valid, and actual results may prove to be materially higher or lower than those contained in the projections. The inclusion of this information should not be regarded as an indication that the Company, UC Acquisition Sub or anyone else who received this information considered it a reliable predictor of future events, and this information should not be relied on as such. None of the Company, UC

Acquisition Sub or any of their respective representatives assumes any responsibility for the validity, reasonableness, or completeness of the projected financial information, and the Company has made no representation to UC Acquisition Sub regarding such information.

Thus, absent a showing that BT Alex.Brown knowingly used inappropriate rates in order to mislead the shareholders, or incompetently did so, and that the Board was negligent in its failure to discover this lack of care, this allegation cannot support a claim under § 14(a).

Plaintiffs allege that the fairness opinion prepared by BT Alex.Brown and attached to the proxy statement falsely stated that BT Alex.Brown had relied on estimated financial data from management and publicly available research analysts' estimates, when, in fact, the data was prepared by Unilab alone, and did not include benefits from the recent acquisitions of Meris and Bio-Cypher. However, the fairness opinion states that:

in arriving at its opinion, BT Alex.Brown has reviewed certain publicly available financial and other information concerning Unilab and certain internal analyses and other information furnished to or discussed with it by Unilab and its advisors. BT Alex.Brown has also held discussions with members of the senior management of Unilab and Kelso regarding the business and prospects of Unilab.

Proxy at B-1.

Nowhere in this statement, nor in the rest of the paragraph detailing analyses and reviews conducted by BT Alex.Brown, is there mention of research analysts' estimates. The statements to which Plaintiffs object are located on page 22 of the proxy in the sections titled, "Analysis of Selected Public Companies" and "Analysis of Selected Precedent Transactions." Plaintiffs do not state on what information they base the allegation that BT Alex.Brown did not look at analysts' reports, but assuming that to be true, it is a de minimus misstatement, which would not have affected a reasonable shareholder's vote with repect to the merger, especially in light of the statement that

**\*8** The above summary is not a complete description of the opinion of BT Alex.Brown to the Board of Directors or the financial analyses performed and factors considered by BT Alex.Brown in connection with its opinion. The

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances and, therefore, a fairness opinion is not readily susceptible to summary description. BT Alex.Brown did not form a conclusion as to whether any single factor or analysis, considered in isolation, supported or did not support an opinion as to fairness from a financial point of view. Rather, BT Alex.Brown believed that the totality of the factors considered and analyses performed by it in connection with its opinion operated collectively to support its determination as to the fairness of the Common Stock Merger Consideration from a financial point of view. Accordingly, BT Alex.Brown believes that its analyses and the summary above must be considered as a whole and that selecting portions of its analyses and factors or focusing on information presented in tabular format, without considering all analyses and factors or the narrative description of the analyses, could create a misleading or incomplete view of the processes underlying BT Alex.Brown's analyses and opinion.
Proxy at 24. [FN7]

> FN7. If Plaintiffs' complaint is that there was only one analyst who covered Unilab, that misstatement (if it actually is a misstatement, given that the Stephens report is signed by two analysts), it cannot be found, as stated previously, that such a discrepancy would affect the vote of a reasonable shareholder with respect to the merger. To allow this action to continue on the basis of discrepancies of this type would violate the direction that "nitpicking should not become the name of the game." Kennecott Copper Corp. v. Curtiss Wright Corp., 584 F.2d 1195, 1200 (2d Cir.1978).

Furthermore, Plaintiffs present no reason to doubt that BT Alex.Brown "reviewed certain publicly available financial and other information concerning Unilab," including Unilab's public SEC filings, which are themselves incorporated by reference into the proxy statement. In addition, the proxy stated that the "Company's management believed that the Meris acquisition offered a strong opportunity for the Company." (Proxy at 15). The proxy also referenced both the Meris and the Bio-Cypher

transactions in the Note on page 11, which stated that the variation in year-to-year financial results were primarily due to the acquisition of Bio-Cypher Laboratories on May 6, 1999, and of Meris on November 5, 1998.

[2] Some of Plaintiffs' other claims of failure to disclose cannot support a cause of action pursuant to § 14(a) because they are actually claims of breach of fiduciary duty or corporate waste. [FN8] For example, Plaintiffs claim that the Board failed to disclose that it had declined to exercise a prepayment option on a $14 million note held by Oaktree, which was convertible into Unilab stock, in order to give Oaktree additional consideration for its shares and gain Oaktree's support for the buyout. While apparently pled in order to demonstrate that Oaktree realized that the merger price was unsatisfactory and that the Defendants had to use such a device to secure Oaktree's vote in favor of the merger, there is nothing in the Complaint to support Plaintiffs' conclusion that the failure to prepay the note was a way of giving Oaktree additional consideration for its shares and thereby buying Oaktree's vote. Absent that speculative and conclusory extrapolation, all that is alleged is that the Unilab Board's treatment of the Oaktree note violated the duty to protect corporate assets for the benefit of all of the shareholders.

> FN8. Since the waste of corporate assets affects all shareholders equally, it is a derivative claim, which is extinguished upon completion of a merger. Behrens v. Aerial Communications, Inc., Civil Action No. 17436, 2001 Del. Ch. LEXIS 80, *19 (Del. Ch. May 18, 2001), revised, 2001 Del. Ch. LEXIS 80 (Del. Ch. May 22, 2001).

*9 [3] The breach of such a fiduciary duty does not give rise to a securities law claim, however. Section 14(a) and Rule 14a-9 relate only to disclosure obligations. They do not give rise to a cause of action for breach of fiduciary duty, and do not give Plaintiffs a right to an advantageous price, or even a fair price for their shares. Minzer v. Keegan, 218 F.3d 144, 151 (2d Cir.2000), cert. denied, 531 U.S. 1192, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001) (There is no § 14(a) violation for merely failing to inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders.); Mendell v. Greenberg, 938 F.2d 1528, 1529 (2d Cir.1991) (

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
**(Cite as: 2003 WL 21058251, \*9 (S.D.N.Y.))**

"Securities laws do not guarantee sound business practices and do not protect investors against reverses."); see In re: PHLCORP Securities Tender Offer Litigation, 700 F.Supp. 1265, 1269 (S.D.N.Y.1988) (stating, in the context of a § 14(e) case, that as long as the relevant underlying facts are disclosed, the securities laws do not require insiders to characterize conflict of interest transactions with pejorative nouns or adjectives) (citing Goldberg v. Meridor, 567 F.2d 209, 218 n. 8 (2d Cir.1977), cert. denied, 434 U.S. 1069 (1978)).

Furthermore, claims based on Defendants' failure to disclose past acts that may have negatively impacted the value of Plaintiffs' shares do not state a cause of action pursuant to § 14(a) because knowledge of those facts, which would tend to support a conclusion that the corporation was worth less than the value attributed to it by the market, would not have influenced a reasonable shareholder to decline to sell his or her shares and reject the merger. Minzer v. Keegan, 218 F.3d at 149; In re: McKesson HBOC, Inc. Securities Litigation, 126 F.Supp.2d 1248, 1260 (N.D.Cal.2000).

Plaintiffs' claims relating to the statements regarding the auction process through which Unilab found a buyer for the company are somewhat similar in that they have more weight as complaints about the way the Board conducted the process, than about the disclosure related to that process. Plaintiffs allege that the statement that the auction process ensured that the buyout price was fair was false and misleading because it did not reveal either the full extent of BT Alex.Brown's role throughout that process or BT Alex.Brown's alleged motivation to keep the price low and to ensure that Kelso was the ultimate purchaser, and did not reveal that the special committee appointed to supervise the final negotiations with Kelso allegedly abdicated its responsibilities and left those negotiations entirely in BT Alex.Brown's hands.

However, an examination of the proxy statement and supplemental proxy reveals that the disclosure on these subjects was at least adequate to place a reasonable shareholder on inquiry notice as to the relevant facts. The original proxy stated that BT Alex.Brown had acted as a financial advisor to Unilab in connection with the merger and would receive a fee for its services, "a significant portion of which is contingent upon the consummation of

the merger," that BT Alex.Brown would be participating in the financing of the merger, and that it had provided financial services to both Unilab and Kelso in the past. The supplemental proxy added more specific information about BT Alex.Brown's role in the financing of the merger, and stated that an affiliate of BT Alex.Brown would act as "lead arranger, book manager, administrative agent and a lender under Unilab's new credit facility," and as a deal manager for Unilab's repurchase of its outstanding notes, and it set forth the fees that BT Alex.Brown would receive for those services. It also stated that BT Alex.Brown and Kelso anticipated that an affiliate of BT Alex.Brown would make an approximately $2 to $3 million investment in UC Acquisition Sub. Plaintiffs have presented no facts beyond those set forth in the proxy and supplemental proxy with respect to BT Alex.Brown's role to support their contention that BT Alex.Brown was motivated to keep the price to be paid for the shares as low as possible, [FN9] and to ensure that Kelso was the ultimate purchaser.

> FN9. The proxy states that upon completion of the merger, BT Alex.Brown would receive an aggregate financial advisory fee equal to 1% of the aggregate consideration paid, a fact that would make it in BT Alex.Brown's interest to negotiate a higher share price. On the other hand, BT Alex.Brown's role as an equity investor in the new company, which is disclosed in the supplemental proxy, creates an interest in a lower price. Regardless of what BT Alex.Brown's motivations may have been in this regard, its multiple roles were disclosed to the Unilab shareholders.

**\*10** According to Plaintiffs, the strongest evidence that the disclosure in the proxy materials was misleading is the fact that eighteen months later, UC Acquisition Sub shares sold for as much as $17.15 (or 300%) more than the price paid in the merger, even though the stock market fell generally over that period of time. Defendants respond that this argument constitutes an impermissible attempt to plead fraud by hindsight. "Allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.), cert. denied, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). See also In re: NAHC, Inc. Securities Litigation, No. 00-4020, 2001 U.S.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

(Cite as: 2003 WL 21058251, *10 (S.D.N.Y.))

Dist. LEXIS 16754, *34 (E.D.Pa. Oct. 17, 2001), aff'd, 306 F.3d 1314 (3rd Cir.2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). The mere fact that the shares increased in value over the eighteen months subsequent to the merger does not, in itself, constitute any evidence of a securities law violation.

Furthermore, Defendants indicated in the proxy statement that they believed that Unilab stock was worth more than its current market price. The proxy stated, "Notwithstanding the significantly improved financial performance, the Company's stock price was essentially flat. As a result, the Company believes its historical stock market price has not fully reflected the Company's true value." (Proxy at 15). In fact, it is stated that this was a major reason for seeking a purchaser for the company. In addition, the section titled "Historical and Recent Market Prices Compared to Consideration to be Received by Holders of Common Stock" showed that over the 2 1/2 to 3 months prior to the issuance of the proxy statement, the price of Unilab shares had risen markedly (Proxy at 18), and the "Premiums Analysis" in the proxy showed that the premium implied in the merger had decreased from 122.9% in March 1999, to 53.4% in April, to 18.5% on the day prior to the public announcement of the merger. (Proxy at 23).

For the reasons stated, none of the misstatements or omissions alleged by Plaintiffs can pass the materiality test of § 14(a). Moreover, even if one or more of the alleged misstatements or omissions were actually false and misleading, and could, in fact, have altered the "total mix" of available information in a way that might have caused a reasonable shareholder to withhold his or her vote for the merger, Plaintiffs have not shown that the directors were negligent in their failure to disclose that information in the proxy materials. Given that knowledge cannot be attributed to directors simply by virtue of their positions, it is difficult to imagine that the directors knew or should have known of the alleged flaws in the financial analyses, which allegedly were so hidden that Plaintiffs' counsel, who engaged in exacting scrutiny and began confirmatory discovery prior to the approval of the merger, and who are experts in this field, were satisfied with the supplemental proxy. In fact,

Plaintiffs allege that due to BT Alex.Brown's overreaching, the directors were affirmatively misled by BT Alex.Brown. In addition, they claim that despite diligent inquiry, they themselves were not able to discover the true facts until November 1, 2000. Thus, Plaintiffs present no support either for the proposition that the directors did not believe that the price paid for the shares in the merger was fair from a financial point of view, and that it was in the best interests of the shareholders generally, or that they were negligent in not discovering that their belief was incorrect.

*11 In this regard, it is extremely significant that all of the defendant directors sold all or most of their Unilab shares for the same $5.85 buyout price that was paid to the public shareholders. The one exception was defendant Weavil, who retained less than 6% of his shares (85,000 out of total holdings of 1,487,428 shares). As the Second Circuit stated in Shields v. Cititrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994), we must "assume the [director] defendant[s are] acting in [their] informed economic self-interest." See also Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir.2001) ("Where plaintiff's view of the facts defies economic reason, ... it does not yield a reasonable inference of fraudulent intent."; achieving a superior merger would have benefitted all shareholders, including defendants). Thus, achieving a higher price for the shares would have benefitted the directors, and particularly defendant Weavil, whose holdings were substantial.

Plaintiffs attempt to overcome this presumption by arguing that because the outside directors were allowed to purchase their shares cheaply, they could make a profit even at a low price, and therefore they had no motivation to ensure that the shareholders receive the highest price possible. This, however, does not negate these directors' self-interest in achieving a higher price for their shares. Since it is very common for directors and officers of a company to be given the opportunity to purchase shares at below market prices, acceptance of Plaintiffs' theory in this regard, without a further factual showing, would raise suspicion about directors' and officers' "conflicts" in any case where directors and officers have been given such opportunities. Furthermore, the proxy contains full disclosure as to the exercise prices of the directors' options. (Proxy at 47).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21058251, *11 (S.D.N.Y.))

Section 20(a) Control Person Liability

[4] In order to maintain a cause of action for control person liability under § 20(a), 15 U.S.C. § 78t(a), plaintiffs must establish: (1) an underlying violation by a control person or entity; (2) that the defendants are controlling persons; and (3) that the defendants were in some meaningful sense culpable participants in the fraud. In re: Digital Island Secs. Litigation, 223 F.Supp.2d 546, 560 (D.Del.2002). Since the Complaint fails to state an underlying violation of § 14(a), plaintiffs' claims pursuant to § 20(a) must be dismissed as well. Feasby v. Industri-Matematik Int'l Corp., No. 99 Civ.  8761, 2000 WL 977673, *7 (S.D.N.Y. July 17, 2000); Ellison v. American Image Motor Co., 36 F.Supp.2d 628, 641 (S.D.N.Y.1999). This being the case, there is no need to determine whether the defendant directors were controlling persons within the meaning of the securities laws and whether they were culpable participants in an underlying securities violation.

State law claims

Plaintiffs have alleged state law claims of breach of fiduciary duty against the directors, and of fraud and deceit against the directors and Unilab. Since jurisdiction over these claims is asserted solely on the basis of the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and the court has found that the securities law claims over which it has original jurisdiction should be dismissed, there is no reason or basis upon which to retain supplemental jurisdiction over the state law claims. United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Leyh v. Property Clerk of City of New York Police Dep't, 774 F.Supp. 742, 747 (E.D.N.Y.1991). Therefore, Plaintiffs' state law claims shall be dismissed as well.

Claims Against BT Alex.Brown

*12 Plaintiffs added BT Alex.Brown as a defendant in this action in an Amended Complaint filed in September 2001. They asserted claims against BT Alex.Brown under § 14(a), for aiding and abetting the directors' breach of their fiduciary duties, fraud and deceit, and negligent misrepresentation. BT Alex.Brown contends that the § 14(a) claim should be dismissed because it did not participate in the solicitation of proxies and there was no substantial connection between the use of BT Alex.Brown's name and the solicitation effort, see Lazzaro v. Manber, 701 F.Supp. 353, 367 (E.D.N.Y.1988), and because the claims are time-barred.

[5] The statute of limitations applicable to the § 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the Complaint, whichever is less. Ceres Partners v. GEL Associates, 918 F.2d 349, 362-63 (2d Cir.1990). Although the original Complaint was filed in this action in November 1999, Plaintiffs did not name BT Alex.Brown as a defendant until nearly two years later. BT Alex.Brown contends that Plaintiffs were on inquiry notice as to its role in the merger as of November 1999, causing the one year limitations period to begin to run. Plaintiffs argue that they did not learn the true facts of BT Alex.Brown's involvement until they took BT Alex.Brown's deposition in November 2000, and that therefore the limitations period should not expire until November 2001.

In LC Capital Partners v. Frontier Ins. Group, 318 F.3d 148 (2d Cir.2003), the Second Circuit stated:

The one-year limitations period applicable to discovery of the violation begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge."

318 F.3d at 154 (citing Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir.), cert. denied, 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992)) (emphasis in original).

In LC Capital Partners, the Court elaborated:

As we have explained, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." "Such circumstances are often analogized to 'storm warnings.' '

The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21058251, *12 (S.D.N.Y.))

investor makes some inquiry once the duty arises, we will impute knowledge of what an investor "in the exercise of reasonable diligence, should have discovered" concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud. Id. (citations omitted).

In this case, Plaintiffs claim that because they began to make inquiry immediately upon issuance of the proxy, in late October/early November 1999, knowledge of BT Alex.Brown's role should not be imputed until they actually learned all the facts in November 2000. This argument is unconvincing, however. LC Capital Partners holds that the running of the statute of limitations against a plaintiff who has attempted to make an inquiry and learn the facts will be delayed as compared to the application of the statute in a situation to a plaintiff who simply sat back and made no such attempt. However, this does not mean that a plaintiff can move that inquiry along slowly, limited only by the otherwise applicable three year maximum limitations period. Thus, the Second Circuit clearly referred to the point at which, "in the exercise of reasonable diligence, [the plaintiff] should have discovered" the facts of the alleged fraud as the point at which the statute of limitations begins to run against a plaintiff who makes an inquiry. A minimal or lackadaisical investigation will not serve to extend the statute of limitations until the plaintiff actually learns facts that could have been discovered much earlier had a diligent investigation taken place.

*13 [6] In this case, given that at least the basics of BT Alex.Brown's role as a key player on both sides of the merger was disclosed in the October 26, 1999 proxy statement, and elaborated in the supplemental proxy dated November 15, 1999, it is incomprehensible how Plaintiffs can claim that they were not sufficiently aware of BT Alex.Brown's involvement in this transaction to name it as a defendant in this action prior to its deposition in November 2000. Nor is it understandable how Plaintiffs can claim that they engaged in a diligent inquiry yet did not obtain the testimony of a BT Alex.Brown representative until a full year after the merger took place. Accordingly, the statute of limitations has run on Plaintiffs' § 14(a) claims against BT Alex.Brown, and those claims will be dismissed.

State Law Claims Against BT Alex.Brown

Since jurisdiction over the state law claims against BT Alex.Brown is founded on the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and the securities law claims against BT Alex.Brown are being dismissed, the state law claims against BT Alex.Brown shall be dismissed as well. See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

Conclusion

For the foregoing reasons, the securities claims asserted against Unilab and the director defendants in the Third Amended Complaint are dismissed pursuant to Fed.R.Civ.P. Rules 12(b)(6) and 9(b), and § 21D(b) fo the Securities Exchange Act for failure to state a cause of action. The securities claims against BT Alex.Brown are dismissed as time-barred. Upon dismissal of all of the federal claims asserted in the Third Amended Complaint, the state law claims are dismissed as well.

SO ORDERED.

2003 WL 21058251 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,418

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# E

Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 91,954
(Cite as: 2002 WL 1553259 (N.D.Ill.))
< KeyCite Citations >

United States District Court, N.D. Illinois, Eastern
Division.

John L. DONOVAN and Donovan Demolition,
Inc., Plaintiffs,
v.
ABC-NACO INC., Joseph A. Seher, Vaughn W.
Makary, John W. Waite, Steven M.
Yoder, Donald W. Duval, Richard A. Drexler,
Jean-Pierre M. Ergas, James E.
Martin, George W. Peck IV, and Willard H.
Thompson, Defendants.

No. 02 C 1951.

July 15, 2002.

Unsecured creditors brought action against debtor-
corporation' directors, officers, and agents, alleging
that they violated federal and state securities laws
and engaged in fraud in connection with debtor's
purchase of creditors' assets. Defendants moved to
dismiss. The District Court, Charles P. Kocoras, J.,
held that: (1) creditors' allegations with respect to
seven of the defendants were insufficient to meet the
heightened pleading requirements for fraud; (2)
allegations with respect to these seven defendants
were insufficient to establish their liability as
"controlling persons"; (3) creditors' agreement not
to hold defendants liable based on any statements
outside the four corners of the asset purchase
agreement negated the element of justifiable
reliance, as required for their remaining fraud
claims; and (4) defendants' alleged "golden egg"
statement was mere puffery and could not be the
basis of creditors' fraud claims.

Motion granted.

West Headnotes

[1] Federal Civil Procedure    636
170Ak636
Allegations that failed to identify any affirmative
misrepresentations made by any of the subject
defendants, that failed to contend that the defendants
had a duty to speak under state law, and that thereby
"lumped" all the defendants together under
conclusory allegations of fraud, were insufficient to
meet the heightened pleading requirements for

fraud. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[2] Securities Regulation    60.40
349Bk60.40
Allegations that defendants were directors was not
enough to establish their liability under the
securities laws as "controlling persons" of
corporation. Securities Exchange Act of 1934, §
20(a), 15 U.S.C.A. § 78t(a); 17 C.F.R. § 240.10b-
5.

[3] Fraud    36
184k36
Sellers' agreement not to hold buyer's officers and
directors liable based on any statements outside the
four corners of the parties' asset purchase agreement
negated the element of justifiable reliance on the
officers' and directors' alleged oral promises, as
required for sellers' fraud claims.

[4] Fraud    11(1)
184k11(1)

[4] Securities Regulation    60.27(5)
349Bk60.27(5)
Alleged statements of buyer's officers and directors,
that sellers' business would be a "golden egg" that
would increase the price of buyer's stock, was mere
puffery and, therefore, was not actionable under
either the securities laws or Illinois common law
fraud. Securities Exchange Act of 1934, § 1 et seq.,
15 U.S.C.A. § 78a et seq.; 17 C.F.R. § 240.10b-5.

MEMORANDUM OPINION

KOCORAS, J.

*1 Before the court is Defendants' Joseph A.
Seher ("Seher"), Vaughn Makary ("Makary"),
Steven M. Yoder ("Yoder"), John Waite ("Waite"),
Donald W. Duval ("Duval"), Richard A. Drexler
("Drexler"), Jean-Pierred M. Ergas ("Ergas"),
James E. Martin ("Martin"), George W. Peck IV
("Peck"), and Willard H. Thompson ("Thompson"),
(collectively herein referred to as "Defendants"),
Federal Rule of Civil Procedure Rule 12(b)(6)
motion to dismiss the complaint of Plaintiffs John L.
Donovan ("Donovan") and Donovan Demolition,
Inc.'s ("DDI"). For the reasons set forth below, the
motion is granted.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1553259, *1 (N.D.Ill.))

## BACKGROUND

The following facts are taken from the complaint and we accept them as true, as we must, for the purposes of this motion. Brontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir.1993). Donovan is the majority shareholder of DDI. DDI, until recently, was a leader in the business of explosion surface hardening of specialty manganese steel railroad track work. ABC-NACO, Inc. ("ABC-NACO") is in the business of manufacturing and selling products to the railroad industry. ABC-NACO is a publicly traded company on the NASDAQ stock exchange. Prior to April 2000, DDI was a closely-held Illinois corporation substantially owned by Donovan. At that time, Donovan was also the inventor and sole owner of intellectual property rights in certain improvements related to DDI's business, including an invention called the "Donovan Blast Chamber" as claimed in U.S. Patent No. 5,613,453 and reissued with broader claims as U.S. Re. 36,912, and as disclosed and claimed in numerous counterpart applications in foreign countries (the "Patent Rights"). ABC-NACO was among DDI's principal customers for railroad track work hardening services.

In the early months of 2000, ABC-NACO approached Donovan through its officer and agent, Yoder, about purchasing DDI's assets. ABC-NACO memorialized this intent in a written Letter of Intent dated March 10, 2000 and signed by Donovan and Yoder. This Letter of Intent was subsequently amended by an Amended Letter of Intent dated April 26, 2000. In the Amended Letter of Intent, ABC-NACO agreed to purchase DDI's assets for $12 million with payments in cash and/or ABC-NACO stock valued at a strike price of $15.00 per share. The closing date was June 1, 2000. The Amended Letter of Intent further provided ABC-NACO with a low-cost, long-term lease of the property occupied by DDI on Donovan's farm, a ten-year supply agreement for sheet explosives from Donovan's separate company, Donovan Commercial Industries, Inc., a non-competition agreement from Donovan, and three-year employment contracts for Donovan and certain other DDI employees. Like the original Letter of Intent, the Amended Letter of Intent was signed by Yoder and Donovan.

From April 26, 2000 through June 23, 2000, further negotiations about the proposed asset sale took place between the parties telephonically, by

telefax, mail, and personal meetings at DDI's offices. These negotiations culminated in an Asset Purchase Agreement dated June 23, 2000. The Asset Purchase Agreement contained the following key terms: (1) DDI would sell all of its assets to ABC-NACO in return for 500,000 shares of ABC-NACO's capital stock; (2) Donovan would give ABC-NACO a 100-year lease for DDI's business premises for a total sum of $1.00 per year, with ABC-NACO paying only maintenance and real estate taxes; (3) Donovan would convey his Patent Rights to ABC-NACO in return for the payment of $4.4 million, payable $1.9 million at closing, $1.25 million on January 1, 2001, and $1.25 million on January 1, 2002; (4) Donovan would execute a five-year covenant not to compete in return for the payment at closing of $100,000, for a total payment of $2 million; (5) ABC-NACO would enter five-year employment agreements with Donovan and three of his key employees; (6) ABC-NACO would grant back to Donovan a paid-up, royalty-free, fully assignable license to use the Patent Rights in all fields having to do with the destruction of explosive, chemical, or biological weapons; (7) the closing would take place on June 23, 2000.

*2 The parties closed the transaction on the designated date. At the closing, Donovan received $1.9 million as the initial payment for the Patent Rights and $100,000 for the covenant not to compete, and a note for the remaining $2.5 million providing payment as agreed. Donovan also received an assignable exclusive license to use the Patent Rights for munitions destruction purposes only, and 500,000 shares of ABC-NACO common stock. ABC-NACO received title to all of DDI's assets, all the Patent Rights, a 100-year $1.00 per year lease for DDI's business premises, and a long-term sheets explosives supply agreement from Donovan Commercial Industries. For reasons not important here, Donovan was required by the United States Patent and Trademark Office to execute, on September 10, 2001, a supplemental patent assignment to ABC-NACO of certain of his Patent Rights, for which he received the exclusive license.

On or about October 17, 2001, the NASDAQ stock market stopped all stock trading with ABC-NACO. Shortly thereafter, ABC-NACO filed a petition under Chapter 11 in the United States Bankruptcy Court for the Northern District of

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1553259, *2 (N.D.Ill.))

Illinois, Eastern Division; ABC-NACO is the principal debtor in Case No. 01-B-36484. Plaintiffs are unsecured creditors of ABC-NACO. Legal title for all of Donovan's inventions and patent rights relating to the Donovan Blast Chamber, for which he has not yet been fully paid, became part of ABC-NACO's bankruptcy estate. By an order dated December 11, 2001, the sale of these assets under 11 U.S.C. § 363(f) was approved to the successful bidder, TCF Railco, Inc., for $75 million. The secured claims of ABC-NACO's bank lenders total about $176 million. Plaintiffs contend that, after all relevant bankruptcy proceedings, ABC-NACO will be unable to pay its secured creditors. Plaintiffs seek relief via the lawsuit they filed before this court.

Plaintiffs' complaint is based on allegations that Defendants, in their capacity as directors, officers, and agents of ABC-NACO, made certain affirmative misrepresentations and material omissions throughout and after the three-month long negotiations between Plaintiffs and ABC-NACO. Plaintiffs complain that these alleged affirmative representations and omissions induced them into agreeing to the transaction. The alleged affirmative misrepresentations are as follows. First, Plaintiffs allege that Makary and Seher, prior to the execution of the June 23, 2000 Agreement, represented to Donovan and others at DDI that DDI would be the "golden egg" of the Rail Systems Division, giving customers "one stop shopping" for their specialty track work, which would raise the market price of ABC-NACO's stock which was at that time in decline. Makary and Seher allegedly made these representations telephonically and in person. Makary and Seher also, at the same time and in the same manner, represented ABC-NACO would place the sum of $2.5 million that would be due to Donovan in return for the Patent Rights "in escrow" to assure that all remaining payments would be made when due starting January 1, 2001. Waite, also prior to execution of the June 23, 2000 Agreement, similarly represented to Donovan in one or more telephone conversations that ABC-NACO would place $2.5 million "in escrow" to assure that the payments for the Patent Rights would be made. After the June 23, 2000 closing, Waite represented to Donovan in at least one telephone conversation that such sum had in fact been placed in "escrow" pursuant to the oral representations of Makary, Seher, and Waite.

*3 Plaintiffs further allege that during these negotiations Defendants made certain material omissions of fact. Plaintiffs allege that ABC-NACO was at that time in violation of one or more covenants in loan agreements with the consortium of banks from which it had already borrowed in excess of $150 million, and that it could not reasonably expect to pay Donovan his final $2.5 million payment on and after January 1, 2001. Plaintiffs further allege that ABC-NACO was prevented by its loan agreements with its banks from placing $2.5 million into an escrow account as promised by Defendants. Also, should ABC-NACO actually pay Donovan the remaining $2.5 million due under the Asset Purchase Agreement, that ABC-NACO reasonably expected to render itself insolvent and unable to pay its debts as they accrued. Finally, that ABC-NACO's business expectations were such that the market price of its stock would likely fall to less than half of the $15 per share "strike" price represented as reasonable by Seher.

Plaintiff initially filed a complaint naming as Defendants all the current Defendants and ABC-NACO. Plaintiffs subsequently amended their complaint to remove ABC-NACO from the case. Plaintiffs' First Amended Complaint contains seven Counts. In Count I, Plaintiffs claim that Defendants violated section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Section 10(b)"). In Counts II, III, and IV Plaintiffs claim that Defendants violated sections 12-F, 12-G, and 12-I, respectively, of the Illinois Securities Law of 1953, as amended, 815 ILCS 5/ 12(F), 12(G), & 12(I) ( "the Illinois Securities Act"). In Count V, Plaintiffs assert that Defendants made fraudulent transfers. Count VI alleges a claim of Illinois common law fraud. Finally, in Count VII Plaintiffs claim that Defendants conspired to commit a common law fraud in the inducement. Defendants have moved to dismiss all of the Counts in Plaintiffs' complaint.

LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Triad Assoc., Inc. v. Chicago Housing Auth., 892 F.2d 583, 586 (7th Cir.1989). In ruling on a motion to dismiss, the court must first construe the

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1553259, *3 (N.D.Ill.))

Page 22

complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir.1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see also Hartford Fire Ins. Co. v. California, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); Sherwin Manor Nursing Ctr., Inc. v. McAuliffe, 37 F.3d 1216, 1219 (7th Cir.1994). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir.1992).

*4 In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed.R.Civ.P. 10(c). In addition, "documents that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir.1993). With these principles in mind, the court turns to the instant motion.

## DISCUSSION

We note at the outset that, after reviewing Defendants' papers, Plaintiffs have voluntarily agreed to dismiss Count V, their claim of fraudulent conveyance and Count VII, their claim of common law civil conspiracy. Accordingly, we do not address Defendants' arguments as to these Counts. We address here only Defendants' arguments in support of dismissing Counts I, II, III, IV, and VI.

We first address the arguments that apply only to Defendants Yoder, Duval, Drexler, Ergas, Martin, Peck, and Thompson. These Defendants argue that Plaintiffs' allegations as to them fail to meet the heightened pleading requirements of Federal Rules of Civil Procedure ("Rule 9(b)") and, therefore,

they should be dismissed from the case. Rule 9(b) applies to Plaintiffs' securities fraud claims and common law claim of fraudulent inducement. Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 471 (7th Cir.1999); Sears v. Likens, 912 F.2d 889, 893 (7th Cir.1990). Rule 9(b) mandates that, in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Fed. R. Civ. Pro. 9(b). To do so, a plaintiff must plead the "who, what, when, where, and how: the first paragraph of a newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990). In a case such as this one involving multiple defendants, "Rule 9(b) prohibits 'lumping together' all the defendants under a general accusation ... the rule requires that the complaint inform each defendant of the nature of his alleged participation in the fraud and specify which defendants were involved in what activity." Md. Staffing Servs., Inc. v. Manpower, Inc., 936 F.Supp. 1494, 1500 (E.D.Wis.1996). To survive a motion to dismiss, a plaintiff must plead "which defendants said what to whom and when...." Ackerman, 172 F.3d at 471.

[1] Applying these principles to Plaintiffs' complaint we find Plaintiffs' allegations as to Yoder, Duval, Drexler, Ergas, Martin, Peck, and Thompson insufficient. Plaintiff does not identify any affirmative misrepresentations made by any of these Defendants; only Defendants Seher, Makay, and Waite are individually identified as having made any statements to Plaintiffs. Indeed, there are no allegations that Duval, Drexler, Ergas, Martin, Peck, and Thompson ever came into contact with Plaintiffs. And although the complaint alleges that Yoder has dealt with Donovan, there are no allegations that Yoder made any affirmative misrepresentations in his dealings with Plaintiffs.

*5 Nor do Plaintiffs sufficiently connect Yoder, Duval, Drexler, Ergas, Martin, Peck, or Thompson to any of the alleged omissions. Under all the causes of action Plaintiffs attempt to bring against Defendants, a defendant cannot be liable for an alleged omission unless the defendant has a duty to speak. See, e.g., Athey Products Corp. v. Harris Bank Roselle, 89 F.3d 430, 435 (7th Cir.1996); Wafra Leasing Corp.1999-A-1 v. Prime Capital Corp., 192 F.Supp.2d 852, 867-68 (N.D.Ill.2002); Security Center, Inc. v. Am. Tel. & Tel. Co., 1995 WL 307267, at *8 (N.D.Ill. May 16, 1995); DiLeo,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

901 F.3d at 628; State Sec. Ins. Co. v. Frank B. Hall & Co., 258 Ill.App.3d 588, 196 Ill.Dec. 775, 630 N.E.2d 940, 944 (Ill.App.Ct.1994). Specifically with regard to the Plaintiffs' federal securities claim, Rule 10b-5 proscribes omissions that render affirmative statements misleading; thus a defendant is liable only for those omissions that make his own speech misleading or deceptive. Tricontinental Indus., Ltd. v. Anixter, 184 F.Supp.2d 786, 788 (N.D.Ill.2002); Wafra, 192 F.Supp.2d at 867-68; Rowe v. Maremont Corp., 650 F.Supp. 1091, 1105 (N.D.Ill.1986), aff'd 850 F.2d 1226 (7th Cir.1988). A duty to speak may also arise where the law imposes special obligations, depending on the facts of the case. Tricontinental, 184 F.Supp.2d at 788 (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1206 (11th Cir.2001)). State law, not federal securities law, is the source of any duty in that case. Id.

Here, Defendants Yoder, Duval, Drexler, Ergas, Martin, Peck and Thompson are not specifically alleged to have made any statements that would be misleading unless they disclosed the alleged omissions to Plaintiffs--they are not alleged to have made any statements at all. Additionally, Plaintiffs do not allege that these Defendants otherwise had any duty to disclose the alleged omissions under state law. Therefore, Plaintiffs' fraud claims against Defendants Yoder, Duval, Drexler, Ergas, Martin, Peck and Thompson are insufficient. Plaintiffs' attempt to state viable claims against these Defendants by "lumping" all the Defendants together under conclusory allegations of fraud constitutes improper pleading under Rule 9(b).

[2] Perhaps realizing that their allegations as to Defendants Duval, Drexler, Ergas, Martin, Peck, Yoder, and Thompson are insufficient to establish primary liability for fraud, Plaintiffs attempt to salvage their case as against these Defendants by claiming that these Defendants may be liable under the securities laws as "controlling persons" of ABC-NACO. Plaintiffs cannot establish these Defendants' liability under § 10(b) by merely asserting that these Defendants are "control persons." See, e.g., Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.1998); Great Neck Capital Appreciation Inv. P'ship v. PricewaterhouseCoopers, L.L.P., 137 F.Supp.2d 1114, 1120 (E.D.Wis.2001). Plaintiffs may be attempting to state a claim for "control person"

liability under § 20(a), 15 U.S.C. § 78t(a), for the case they cite Lindelow et al. v. Hill et al., No. 00 C 3727, 2001 WL 830956 (N.D.Ill. Jul.20, 2001), discusses this theory of liability. Plaintiffs, however, make no mention of § 20(a) in their complaint. Nor do they expressly state in their response that they are really making such a claim. If their argument and cite to Lindelow is their way of indicating as much, it will not do. Plaintiffs cannot amend their complaint by means of their brief in opposition to Defendants' motion to dismiss. Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir.1984).

*6 Even if they were doing as much, their allegations are inadequate. Plaintiffs do not allege any facts from which these Defendants could fairly be deduced as subject to "controlling person" liability under § 20(a) except for the fact that they were directors of ABC-NACO. The mere fact that Plaintiff alleges these Defendants are directors is not enough. Feldman v. Motorola, 1993 WL 497228, at *10-11 (N.D.Ill. Oct.14, 1993) (dismissing § 20(a) claim that was based solely on Defendants' status as director); Craig v. First American Capital Resources, Inc., 740 F.Supp. 530, 537 (N.D.Ill.1990) (same); see Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir.1992) (setting forth test for finding "control person" liability). Moreover, such a claim would also fail because, as explained below, Plaintiffs cannot establish primary liability under § 10(b) on the part of Defendants Seher, Makary, and Waite. Krieger v. Gast, 1998 WL 677161, at *8 (N.D.Ill. Sept.28, 1998). Because the allegations in Plaintiffs' complaint fail to allege a sufficient factual basis for any of Plaintiffs' claims against Defendants Yoder, Duval, Drexler, Ergas, Martin, Peck or Thompson, these Defendants are dismissed from this case.

[3] Having dismissed the other Defendants from the case, we now address whether Plaintiffs can proceed against Defendants Seher, Makary, and Waite. Defendants make a number of arguments challenging the sufficiency of Plaintiffs' claims, but we address their challenge to Plaintiffs' ability to establish justifiable reliance first, because justifiable reliance is an element in all of Plaintiffs' remaining fraud claims. Rissman, 213 F.3d at 383 (7th Cir.2000) (stating "without reliance [plaintiff] has no claim under section 10(b) or Rule 10b-5"); Foster v. Alex, 213 Ill.App.3d 1001, 157 Ill.Dec.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1553259, *6 (N.D.Ill.))

778, 572 N.E.2d 1242, 1245 (Ill.App.Ct.1991) (instructing that Illinois Act requires plaintiff to establish element of reasonable reliance); Trautman v. Knights of Columbus, 121 Ill.App.3d 911, 77 Ill.Dec. 294, 460 N.E.2d 350, 352 (Ill.App.Ct.1984) (stating reliance upon a representation is a necessary element of common law fraud in Illinois); One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283, 1286 (D.C.Cir.1988) (instructing that to state a claim for fraud or securities fraud plaintiffs allegations must indicate that plaintiff's reliance on the allegedly fraudulent representations was reasonable).

Defendants argue that Plaintiffs are precluded from arguing that their reliance on Defendants' alleged misrepresentations was reasonable because the Asset Purchase Agreement contains an integration clause. That clause provides, in pertinent part:

This Agreement ... contain[s] the entire agreement and understanding between the parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements and understandings relating to such subject matter. Neither party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein

*7 Am. Compl. Exh. C § 7.06. We agree with Defendants that this clause prohibits Plaintiffs from relying on oral promises not contained in the Asset Purchase Agreement. "Silence in a final agreement containing an integration clause--in the face of prior explicit representations--must be deemed an abandonment or excision of those earlier representations." One-on-One, 848 F.2d at 1286-87. By agreeing to this term in the Asset Purchase Agreement, Plaintiffs accepted that they would not be bound by any representations not found in the Asset Purchase Agreement. The alleged misrepresentations are not found in the Asset Purchase Agreement. Additionally, Plaintiffs agreed that such statements outside the four corners of the Asset Purchase Agreement would not form the basis of any liability on the part of Defendants. Plaintiffs' agreement not to hold Defendants liable based on any statements outside the four corners of the agreement "negates the element of reasonable reliance." Am. Bankcard Int'l, Inc. v. Schlumberger Techs., Inc., 2001 WL 1465760, at * 3 (N.D.Ill. Nov.14, 2001). Because Plaintiffs cannot meet this necessary element of all their fraud claims, their claims must be dismissed. Much v. Pac. Mut. Life Ins. Co., 266 F.3d 637, 644 (7th Cir.2001); Rissman v. Rissman, 213 F.3d 381 (7th Cir.2000); Am. Bankcard Int'l, Inc., 2001 WL 1465760, at *3; One-on-One, 848 F.2d at 1286-87; Braunstein v. Benjamin Berman, Inc., 1990 WL 192547, at *8-10 (D.N.J. Sept.12, 1990). Thus, we find that Plaintiffs cannot establish that they reasonable relied on the alleged misrepresentations made by Defendants Seher, Makary, and Waite.

[4] Defendants further argue that Plaintiffs' claims, insofar as they are based on Defendants' statement that DDI would be a "golden egg" that would increase the price of ABC-NACO's stock, fail for the additional reason that this alleged statement is mere puffery and is, therefore, not actionable. We agree with Defendants. "Predictions and forecasts which are not of the type subject to objective verification are rarely actionable under § 10(b) and Rule 10b-5." Searles v. Glasser, 64 F.3d 1061, 1066 (7th Cir.1995) (collecting cases). "Courts consistently hold that mere puffery and glowing representations of expected boom are not enough to state claims under the [Securities Act]." Medline Indus. Inc. Employee Profit Sharing & Retirement Trust v. Blunt, Ellis & Loewi, Inc., No. 89 C 4851, 1993 WL 13436, at *4 (N.D. Ill. Jan 21, 1993) (statement that investment was as "good as gold" was not actionable); see Anderson v. Abbott Labs., 140 F.Supp.2d 894, 904 (N.D.Ill.2001); Fewel v. Kozak, 1999 WL 966447, at *3 (N.D.Ill. Oct.19, 1999); In re Abbott Labs. Sec. Litig., 813 F.Supp. 1315, 1319 (N.D.Ill.1992); In re Miller Indus., Inc. Sec. Litig., 12 F.Supp.2d 1323, 1330-31 (N.D.Ga.1998); Plevy v. Haggerty, 38 F.Supp.2d 816, 827 (C.D.Cal.1998). Furthermore, such statements of opinion are not actionable under Illinois common law fraud. See, e.g., Thacker v. Menard, Inc., 105 F.3d 382, 386 (7th Cir.1997). Therefore, we find that Defendants' alleged "golden egg" statement cannot be the basis of Plaintiffs' fraud claims for this additional reason.

CONCLUSION

*8 For the foregoing reasons, Defendants' motion to dismiss is granted and Plaintiffs' complaint is dismissed in its entirety.

2002 WL 1553259 (N.D.Ill.), Fed. Sec. L. Rep.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

(Cite as: 2002 WL 1553259, *8 (N.D.Ill.))

P 91,954

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.
Fed. Sec. L. Rep. P 97,806
**(Cite as: 1993 WL 497228 (N.D.Ill.))**
<KeyCite Yellow Flag>

United States District Court, N.D. Illinois.

**FELDMAN, et al.**
**v.**
**Motorola, Inc., et al.**

**Civ. A. No. 90 C 5887.**

Oct. 14, 1993.

To The Honorable Charles R. Norgle, Sr., one of the Judges of the United States District Court for the Northern District of Illinois.

GOTTSCHALL, United States Magistrate Judge.

REPORT AND RECOMMENDATION

**\*1** Two matters are presently pending in the referral of this case to this court. This report addresses each motion in turn.

MOTION FOR CLASS CERTIFICATION

Plaintiffs move under Fed.R.Civ.P. ("Rule") 23(b)(3) for certification of the two claims of securities fraud asserted in their second consolidated amended complaint ("complaint").

In Count I, plaintiffs bring claims under Section 10(b) of the Securities Exchange Act ("the Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The class is defined as including all persons who purchased the common stock of Motorola, Inc. ("Motorola" or "the Company") during the period extending from May 4, 1990 through January 16, 1991 ("the Class Period"). [FN1]

To prove liability for securities fraud, plaintiffs rely on the fraud on the market theory articulated in Basic, Inc. v. Levinson, 485 U.S. 224 (1988), pursuant to which theory the market price of a security is determined by publicly available information concerning the company and its business. See, e.g., Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1416 n. 4 (7th Cir.1992) (quoting Basic, 485 U.S. at 241-242). Because most publicly available information is reflected in market price, an investor is presumed to have relied

on material misrepresentations concerning the Company and its financial status. In re Bally Mfg. Corp. Sec. Litig., 141 F.R.D. 262, 269 (N.D.Ill.1992). The liability of the individual defendants under Count I is premised on their status as "controlling persons" of Motorola under Act § 20, 15 U.S.C. § 78t(a). Alternatively, plaintiffs contend that the individual defendants directly participated in or aided and abetted Motorola's acts of securities fraud.

In Count II, a subclass of plaintiffs asserts claims of insider trading under 15 U.S.C. § 78t-1(a) against individual defendants Robert W. Galvin, John F. Mitchell, and Morton L. Topfer (collectively "the insider-trading defendants"). The subclass is defined as including all persons who purchased Motorola common stock contemporaneously with sales of Motorola common stock by the insider-trading defendants during the period July 24, 1990 to August 16, 1990. With the exception of the issue of standing, the parties have not separately addressed the requirements of Rule 23 as applied to this insider trading claim. Since the challenge to standing overlaps with defendants' arguments that most of the insider trading claims should be dismissed, this report will return to the question of certification of Count II after it addresses the motion to dismiss.

In determining whether to certify a class under Rule 23(b)(3), a two-step procedure must be followed. First, plaintiffs must establish that the following four requirements of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the other class members; and (4) the class representatives are able to protect the interests of the class fairly and adequately. Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir.1993); Spencer v. Central States, Southeast and Southwest Areas Pension Fund, 778 F.Supp. 985, 989 (N.D.Ill.1991). Besides satisfying all the requirements of Rule 23(a), a plaintiff must establish one of the requirements of Rule 23(b). Rosario v. Livaditis, 963 F.2d 1013, 1017 (7th Cir.1992), cert. denied, 113 S.Ct. 972 (1993). As part of the analysis on class

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                              **Page 28**
**(Cite as: 1993 WL 497228, *1 (N.D.Ill.))**

certification, the court makes no determination as to the merits of the case.    Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 178 (1979).    Plaintiffs bear the burden of proving that each of the requirements for class certification has been met. General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 162 (1982); Trotter v. Klincar, 748 F.2d 1177, 1183 (7th Cir.1984).    In ruling on the motion, the court accepts as true the allegations made in support of certification. Bally Mfg. Corp. Sec. Litig., 141 F.R.D. 262, 267 (N.D.Ill.1992).

**\*2** Several elements of the test for class certification are not challenged here, and this court agrees that they are met.    First, under Rule 23(a)(1), the court must determine that the plaintiff class is so numerous that joinder is impracticable. This finding may be supported by common sense assumptions.    In re VMS Sec. Litig., 136 F.R.D. 466, 473 (N.D.Ill.1991).    Since more than 44 million shares of Motorola stock were traded on major stock exchanges during the Class Period, and hundreds of thousands of shares were traded during the periods when the insider-trading defendants sold large blocks of their stock, the class and subclass are so numerous that joinder would be impracticable.

The inquiry into adequacy of representation is two-pronged. Fry v. UAL Corp., 136 F.R.D. 626, 634 (N.D.Ill.1991); Riordan v. Smith Barney, 113 F.R.D. 60, 64 (N.D.Ill.1986).    "First, the named representatives must have a sufficient interest in the outcome to insure vigorous advocacy while having no interest antagonistic to the interest of the class." Id.    Second, "counsel for plaintiffs must be competent, experienced, and capable of conducting the class action." Harris v. General Dev. Corp., 127 F.R.D. 655, 662 (N.D.Ill.1989).    This court readily concludes that the named plaintiffs' claims are coincidental with those of other potential class members, and that they have a sufficient interest in the outcome of this suit.    Also, counsel is experienced, competent and capable of representing the class.

Certification under Rule 23(b)(3) entails two sets of findings:  (1) that the questions of law or fact common to class members predominate over any question affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Riordan, 113 F.R.D. at 65.  Looking

to the second requirement under that subsection, this court agrees with those decisions concluding that the class action device is a superior means of litigating claims like those that are raised in this lawsuit. See, e.g., Bally Mfg. Corp. Sec. Litig., 141 F.R.D. 262, 267 (N.D.Ill.1992).    Thus, only the requirement of predominance of common issues is potentially problematical.    Defendants' challenge to predominance, as well as to commonality and typicality under Rules 23(a)(3) and (a)(4), interrelates with their argument that the Class Period should be limited to the time period between July 25, 1990 and October 9, 1990.    Accordingly, these three elements will be discussed after defendants' arguments concerning the class period.

Question of the Appropriate Class Period

The named plaintiffs in this case purchased their stock in Motorola on or after July 26, 1990. However, they seek to represent a class of investors that purchased stock as early as May 4, 1990 and as late as January 16, 1991.    The latter date is approximately three months after plaintiffs sued Motorola for securities fraud.    Thus, some potential class members would have purchased their shares of Motorola stock after this lawsuit had already commenced.

**\*3** The Class Period corresponds to the period over which defendants allegedly made a series of misleading statements in order to artificially inflate the price of Motorola common stock.    The statements in question all related to Motorola's 1990 earnings and were allegedly made without a reasonable basis for defendants' representations that its earnings would increase over 1989 levels.    A number of the public pronouncements also are alleged to have had an immediate impact on the market price of Motorola stock.

First, on July 25, 1990, defendants' statements in a meeting with securities analysts allegedly assured the public that market concerns with lagging profits were unwarranted.    Cmplt., ¶¶ 43-44.    The representations impacted favorably on analysts' views of the Company, and the price of Motorola stock increased $3 1/8 per share the day after the meeting.    Cmplt. ¶¶ 45-47.    All along, though, defendants allegedly knew that increased research and development expenditures would result in declining profit margins.    Cmplt., ¶¶ 48-49.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 497228, *3 (N.D.Ill.))

The market allegedly first came to suspect that earnings predictions were inflated on September 5, 1990, after Motorola informed analysts of reductions in certain growth estimates and profit predictions.    At that point, the market price of Motorola common stock fell sharply.    Cmplt. ¶ 51. A month later, on October 9, 1990, "without warning and to the shock of the marketplace," Motorola announced a decline in third quarter earnings.    Cmplt., ¶ 54.    The announcement of third quarter earnings caused the market price of the Company's stock to decline nearly 12 percent, down $7.00 per share from the closing price on the previous day.    Cmplt. ¶ 57.    Finally, "Motorola shocked investors once again" when it announced poor fourth quarter 1990 results on January 16, 1991.    Cmplt., ¶ 62.    This announcement caused the market price of Motorola stock to decline from a closing price of $49.625 on January 16, 1991 to a closing price of $45.875 on January 17, 1991. Cmplt., ¶ 65.    Throughout this period between the announcement of third and fourth quarter results, defendants are alleged to have assured the public that profits would improve.    For instance, it is alleged that contemporaneously with the Company's announcement of third quarter earnings, management emphatically predicted a sharp snap back due to reduced research and development spending.    Cmplt., ¶ 57.

Initially, this action was brought on behalf of persons purchasing Motorola stock between July 23, 1990 [FN2] and October 8, 1990.    Consolidated Amended Complaint, ¶ 16.    As defendants see it, a class period commencing July 25, 1990 is a more appropriate one, since it was then that Company officials met with analysts to address their concerns. As already noted, the price of Motorola stock rose after that meeting.    Defendants further contend that the announcement of third quarter results, rather than fourth quarter results, should mark the end of the class period, since it is then that the market learned the truth about Motorola's predictions. Indeed, plaintiffs were apparently disabused of any misconception concerning the stock's value at the time of the third quarter announcement, since they sold their shares and sued for fraud.

*4 A number of cases provide some support for defendants' argument that the Class Period should be limited to the time period between Motorola's two announcements.    First, numerous decisions

have found that a class period ends when curative facts are publicly announced or otherwise effectively disseminated.    See, e.g., Farber v. Public Serv. Co. of New Mexico, [1990-1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,663 at 98,112 (D.N.M.1990); McFarland v. Memorex Corp., 96 F.R.D. 357, 364 (N.D.Cal.1982);    Cohen v. Uniroyal, Inc., 77 F.R.D. 685, 688 (E.D.Pa.1977). See also Piel v. Nat'l Semiconductor Corp., 86 F.R.D. 357, 369 (E.D.Pa.1980).    One of this court's own opinions acknowledges that principle. In a case when a named plaintiff purchased shares of stock after a critical announcement of reverses in the business of a corporate issuer, this court commented that the plaintiff was arguably an inappropriate representative of parties who purchased stock before the adverse reports.    Blumenthal v. Pomerantz, No. 90 C 4080, 1992 U.S.Dist. LEXIS 8461 at *26 (N.D.Ill. June 16, 1992).

In making that comment, this court relied on a decision in which the Seventh Circuit held that loss causation was not established if a plaintiff purchased corporate shares after the company's announcement of actual operating results dispelled any misconceptions created in the minds of investors by its previous predictions of earnings.    Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1419 (7th Cir.1992).    Roots Partnership further found the plaintiff had no claim based on post-purchase statements of the issuer because later statements could not have affected the price at which stock was purchased. Id. at 1420. although Roots Partnership dismissed the case before the plaintiff moved for class certification, the Seventh Circuit commented that the plaintiff would not be a proper representative of persons buying stock in reliance on later statements of the issuer.    See id. at 1420 n. 6. This court having made note of the Seventh Circuit's comment in Blumenthal, 1992 U.S.Dist. LEXIS 8461 at *27, defendants ask it to find that plaintiffs here cannot represent purchasers buying Motorola stock after they sold theirs on or shortly after October 9, 1990.

For a number of reasons, this court would not limit the Class Period as defendants ask.    First, Roots Partnership did not address the question of class certification.    The essence of the holding there was that the plaintiff lacked standing to assert a claim based on any of the corporate issuer's statements.    Having no claim whatsoever, the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

plaintiff could not represent a class that relied on those statements. Second, while the decision concerning the named plaintiff in Blumenthal impacted on class certification, the circumstances of that case were unique and no decision was made on class certification. More importantly, both the Roots Partnership and Blumenthal decisions effectively decided the merits of the claims of named plaintiffs before class certification.

**\*5** Persuasive authority holds that this kind of preliminary assessment of the merits should be deferred until after the class has been certified. See, e.g., Bally Mfg. Corp. Sec. Litig., 141 F.R.D. 262, 270 (N.D.Ill.1992) [FN3] (citing In re IGI Sec. Litig., 122 F.R.D. 451, 462 (D.N.J.1988)); Shields v. Smith, [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,001 at 94,377 (N.D.Cal.1992), Margolis v. Caterpillar, 815 F.Supp. 1150, 1153-1154 (C.D.Ill.1990); In re Lilco Sec. Litig., 111 F.R.D. 663, 668 (E.D.N.Y.1986); In re LTV Sec. Litig., 88 F.R.D. 134, 147 (N.D.Tex.1980). When there are questions of fact as to whether a particular release cured prior misrepresentations, a broader time period may be certified. In re Kirschner Medical Corp. Sec. Litig., 139 F.R.D. 74, 82 (D.Md.1991); Sherin v. Gould, 115 F.R.D. 171, 174-175 (E.D.Pa.1987). See also Nicholas v. Poughkeepsie Sav. Bank/FSB, [1990-1991 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 95,736 at 98,495 (S.D.N.Y.1990).

Here it is alleged that defendants' comments of July 25, 1990 served to confirm assurances of improving profits made in earlier statements to the public. Thus, the announcement continued a course of conduct already begun. While the October 9, 1990 announcement caused a severe decline in stock prices, defendants allegedly continued to reassure investors that there would be a turnaround. The alleged scheme, then, continued. Overall, this court concludes that there are fact questions as to the appropriate limits of the class period, and it would therefore not limit the period as defendants propose. Having reached this conclusion, the inquiry returns to the requirements of Rule 23. As discussed below, concerns relating to changes in the mix of information during the Class Period permeate defendants' challenges to plaintiffs' ability to meet the requirements of Rules 23(a)(2) and (a)(3), as well as the predominance requirement under Rule 23(b)(3).

Typicality

The analysis of typicality under Rule 23(a)(3) focuses on whether there is a similarity of legal theory between the claims of the named plaintiffs and those of other class members. A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and the claims are based on the same legal theory. Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir.1992), cert. denied, 113 S.Ct. 972 (1993) (quoting De La Fuente v. Stokley-Van Camp, Inc., 713 F.2d 225, 232 (7th Cir.1983)). Rule 23(a)(3) does not require that all class members suffer the same injury as the named class representative. Rosario, id. Rather, the court looks to the defendant's conduct and the plaintiff's legal theory to satisfy the rule. Id.

On the other hand, the presence of even an arguable defense peculiar to a named plaintiff or a small subset of a plaintiff class may destroy typicality and bring into question the adequacy of a named plaintiff's representation. J.H. Cohn and Co. Self-Employment Retirement Trust v. American Appraisal Assoc., Inc., 628 F.2d 994, 999 (7th Cir.1980). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." Id. A frequently recurring defense is not "unique," however. See Goldwater v. Alston and Bird, 116 F.R.D. 342, 352-353 (S.D.Ill.1987).

**\*6** Defendants' challenge to typicality is two-pronged. First, they argue that plaintiffs' claims are not typical of those buying Motorola stock beyond the period of their purchases because the mix of information relied on will differ. This argument has been repeatedly rejected in fraud-on-the-market cases since the decision in Basic. See, e.g., Scholes v. Stone, McGuire and Benjamin, 143 F.R.D. 181, 185 (N.D.Ill.1982); In re Scott Paper Co. Sec. Litig., 142 F.R.D. 611, 615 (E.D.Pa.1992); Alfus v. Pyramid Technology Corp., 764 F.Supp. 598, 606 (N.D.Ill.1991); see also Walsh v. Chittenden Corp., 798 F.Supp. 1043, 1055 (D.Vt.1992). As one decision has commented, were the rule otherwise, there could never be a class action in securities fraud cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 497228, *6 (N.D.Ill.))

Page   31

because a representative plaintiff would potentially be needed for each day of the class period, since on each day the mix of information available to the public would vary. Farber v. Public Serv. Co. of New Mexico, [1990-1991 Transfer Binder] Fed.Sec.L.Rep. (CCH), § 95,663 at 98,112 (D.N.M.1990).

Defendants also argue that plaintiff Saul Pearl ("Pearl") is subject to a unique defense in that he did not rely on the market in deciding to purchase shares of Motorola common stock after October 9, 1990. (This purchase is not alleged in the complaint. See Cmplt., ¶ 5(c).) Pearl has testified at deposition that he bought shares after the October 9, 1990 announcement because he felt Motorola stock was undervalued. His strategy was to "average down" his purchases, and he even made a slight profit when he later sold the shares in question.

The fact that a named plaintiff has made a profit on a sale of securities does not preclude his or her participation in a class action for securities fraud. In re VMS Sec. Litig., 136 F.R.D. 466, 481-482 (N.D.Ill.1991). Nor are class representatives required to rely exclusively on the integrity of the market. In re Bally Mfg. Corp. Sec. Litig., 141 F.R.D. 262, 269 (N.D.Ill.1992). Bally further opines that to delve into a named plaintiff's investment strategy at this point in a lawsuit would entail an impermissible consideration of the merits. Id. Also, different traders may use market information differently, all the while relying on it. See Moskowitz v. Lopp, 128 F.R.D. 624, 631 (E.D.Pa.1989). The fact that investors have divergent motivations in purchasing securities should not defeat the fraud-on-the market presumption absent convincing proof that price played no part whatsoever in their decisionmaking. Id. See also Nicholas v. Poughkeepsie Sav. Bank/ FSB, [1990-1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,736 at 98,493-98,494 (S.D.N.Y.1990). Because the evidence of record does not establish that Pearl or any other of the named plaintiffs here employed a strategy that did not take into account market factors, none are subject to the kind of unique defense that would preclude a finding of typicality. This court finds that the typicality requirement is satisfied.

Commonality and Predominance of Common Issues
Over Individual Questions

*7 Under Rule 23(a)(2), a class may not be certified unless "there are questions of law or fact common to the class." A common nucleus of operative fact is normally sufficient to satisfy this requirement, despite some factual variation among class grievances. Rosario v. Livaditis, 963 F.2d 1013, 1017-1018 (7th Cir.1992), cert. denied, 113 S.Ct. 972 (1993). In the context of a fraud-on-the-market action, commonality is met when defendants allegedly engaged in a common cause of conduct by making substantially similar misrepresentations and omissions concerning a security. See VMS, 136 F.R.D. at 474.

The questions of commonality under Rule 23(a)(2) and predominance of common issues under Rule 23(b)(3) are closely related. Heastie v. Community Bank of Greater Peoria, 125 F.R.D. 669, 674 (N.D.Ill.1989); United Energy Corp. Solar Power Modules Tax Shelter Invest. Sec. Litig., 122 F.R.D. 251, 254 (C.D.Cal.1988) (finding of predominance implies that common questions exist). In determining whether common issues predominate over questions affecting only individual members, the court ascertains "the existence of a group which is more bound together by a mutual interest in the settlement of common questions than it is divided by the individual members' interest in matters peculiar to them. Spicer v. Chicago Bd. Options Exchange, [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,943 at 95,254 (N.D.Ill.1990). The court is not required to mechanically sum up the common and individual issues and predict which will consume more time, a result that would unduly block class actions because only the most complex of common questions would require more litigation time than a series of mini-trials. Simer v. Rios, 661 F.2d 655, 672 (7th Cir.1981), cert. denied, 456 U.S. 917 (1982). Instead, resolution of the predominance question tends to focus on the form trial would take, with consideration of whether the action would be manageable. See id. at 672-673.

In actions involving a widely held security, the court is not unaware that a potentially very large class size could make the litigation unmanageable. See Bally, 141 F.R.D. at 268. However, that risk is better addressed down the road, if necessary, by altering or amending the class. Id. To prohibit certification on the basis of such speculation would undermine the utility of the class action device and the policy that Rule 23 is intended to promote.

Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,023 at 94,506 (S.D.N.Y.1992).

Defendants' arguments concerning commonality and predominance tend to reiterate their concern that not all class members were influenced by the same factors in their decisions to purchase stock. Besides noting that changes would have occurred within the Company during the Class Period, defendants argue that significant changes in the American economy during the summer of 1990 would have impacted on investment decisions. Overall, they suggest that the trial would be an amalgam of mini-trials on the essential elements of liability, as people purchasing at different times would have wholly different sets of proof. As plaintiffs correctly note, however, defendants make no allegations of misrepresentations directed at any individual plaintiff. As has been the case throughout this litigation, the only statements on which liability would be premised were directed at the public generally.

**\*8** This court agrees with the many decisions cited in this opinion which conclude that both the commonality and predominance requirements are met in an action such as this one. It further considers it rather unlikely that this case will degenerate into an uncontrollable series of mini-trials, as this action is based on a rather limited group of statements made by defendants. On the present record, those statements are alleged to have been substantially similar, and made as part of a single scheme. While not unmindful that differences in investment strategy or other defenses might ultimately necessitate subclassing or changes in the class definition, the court believes that a class action will be manageable. Accordingly, it concludes that the elements under Rule 23(a)(2) and (b)(3) have been met. Having found that plaintiffs have satisfied all the requirements for certification under Rule 23(b)(3), the court recommends that their motion for class certification be granted.

## MOTION TO DISMISS IN PART THE SECOND CONSOLIDATED AMENDED COMPLAINT

In this motion, defendants seek to eliminate a number of issues from this litigation. Two of the three arguments made on the motion relate to allegations in Count I. If successful, defendants'

third argument would result in the dismissal of a number of the insider trading claims in Count II. Since the court considers these arguments on a motion to dismiss, it accepts as true all well-pleaded factual allegations, and construes those allegations in plaintiffs' favor. Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1416 (7th Cir.1992). Dismissal of the complaint is proper only if it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. Id. For instance, a claim may be dismissed if the complaint fails to allege an essential element of that claim. Id.

### Regulation S-K

Plaintiffs allege that Motorola's second quarter reports to the SEC on Form 10-Q failed to disclose that Motorola expected that its expenses would increase more than its revenues, and that certain research and development ("R & D") expenditures would rise dramatically, causing the Company's profit margins and income to decline materially. According to plaintiffs, the failure to disclose these facts "violated Item 303(b) of SEC Regulation S-K, 17 C.F.R. § 229.303(b), which requires, inter alia, that a company disclose anticipated changes 'in the relationship between costs and revenues.' " Cmplt. ¶ 42. Similarly, they allege that Motorola's third quarter 1990 Form 10-Q failed to disclose that R & D spending was continuing to increase sharply, with material increases in R & D spending budgeted for the fourth quarter. Again, the Form 10-Q allegedly failed to disclose that profit margins were declining. Plaintiffs allege that the third quarter Form 10-Q "violated Item 303(b) of SEC Regulation S-K by failing to disclose the foregoing trends and changes in the relationship between the Company's costs and revenues." Cmplt. ¶ 60.

**\*9** Defendants take issue with plaintiffs' characterization of the Company's obligation to make disclosure of forward-looking information in Form 10-Q, and they argue that under existing law the Company had no obligation to disclose internal projections. Plaintiffs for their part counter that the omitted information was the kind of forward-looking information required to be disclosed under SEC rules. Much of the argument concerns whether the information concerned an "existing trend" or an internal prediction of the future.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 497228, *9 (N.D.Ill.))

Although plaintiffs have not sought to imply a cause of action under SEC regulations, defendants ask for a declaration that Motorola had no duty under Regulation S-X to disclose internal projections or budgets. Two of defendants' cases in fact state that there is no duty to disclose internal projections, but they made that finding under the securities statutes and cases interpreting them. In re Lyondell Petrochemical Sec. Litig., 984 F.2d 1050, [1992-1993 Transfer Binder] FED.SEC.L.REP. (CCH) ¶ 97,335 at 95,704 (9th Cir.1993); In re Verifone Sec. Litig., 784 F.Supp. 1471, [1992-1993 Transfer Binder] FED.SEC.L.REP. (CCH) ¶ 97,368 at 95,933 (N.D.Cal.1992). Both decisions consider in passing the question of whether Item 303 of Regulation S-K creates an alternative source of a duty to disclose, but their conclusions are not, in this court's view, particularly helpful to defendants' argument here. Lyondell states that SEC regulations do not require disclosure of internal projections, while acknowledging that "known trends of uncertainties" must be disclosed. Lyondell, supra, ¶ 97,335 at 95,704-95,705. For its part, Verifone states that Regulation S-K "governs the disclosure of known historic trends, but does not provide a basis of liability when a corporation fails to 'disclose' the future." Verifone, supra, ¶ 97,368 at 95,933. Given their dispute over the characterization of the information omitted from Motorola's Form 10-Q, each of the parties could argue that Lyondell and Verifone support its theory of the case. Since this court has not seen the omitted information, it cannot say which side's characterization is the better one.

It has been held that demonstration of a violation of the disclosure requirements of Item 303 does not inevitably lead to the conclusion that such disclosure would be required under Rule 10b-5. Alfus v. Pyramid Technology Corp., 764 F.Supp. 598, 608 (N.D.Cal.1991). Because plaintiffs have only asserted a claim under § 10(b) and Rule 10(b)(5) in this lawsuit, it is unnecessary on this motion to dismiss to determine whether Motorola violated the requirements of Item 303. While failure to comply with disclosure requirements under Regulation S-K may be probative of the presence or absence of intent to defraud in making a public pronouncement, on the present record the court is unable to determine compliance with obligations under SEC regulations. Accordingly, it is recommended that this portion of the motion to dismiss be denied.

Theories of Secondary Liability

*10 All of the individual defendants in this case are officers or directors of Motorola. Among those defendants, George M.C. Fisher is alleged to have made a number of misleading statements concerning the Company's business. In addition, defendants Gary L. Tooker, Donald R. Jones, and Morgan L. Topfer allegedly made misleading statements on that topic at Motorola's July 25, 1990 meeting with securities analysts. Cmplt., ¶ 43. Only Robert W. Galvin and John F. Mitchell, two of the three insider trading defendants, are not alleged to have made statements to the public concerning Motorola. Galvin is a former Chairman of Motorola's Board of Directors, who assumed the position of Chairman of the Board's Executive Committee in January 1990. Cmplt., ¶ 10. Mitchell is Vice-President of the Board of Directors. Cmplt., ¶ 11. Plaintiffs allege that all the individual defendants are "control persons" of the Company. Cmplt., ¶ 13. They further contend "each of the control person defendants is liable as a direct participant in and/or as an aider and abettor of the wrongs complained of herein." Cmplt., ¶ 14.

Defendants move to dismiss all Count I claims against all individual defendants except Fisher. In addition, they argue that the claims of secondary liability against Fisher should be dismissed. Since defendants have not addressed the question of primary liability in their briefs, this court addresses only the questions of secondary liability. Also, because all defendants except Galvin and Mitchell allegedly made statements to analysts at the July 25 meeting, it will be assumed that plaintiffs have sufficiently alleged that Fisher, Tooker, Jones, and Topfer were participants in an act of securities fraud. Having made that threshold determination, the court turns to the questions of secondary liability presented.

Control person liability

To establish control person liability under § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), the Seventh Circuit requires that a plaintiff "show that the defendant has 'the practical ability to direct the actions of the people who issue or sell the securities.' " Donohoe v. Consolidated Operating and Production Corp., 982 F.2d 1130, 1138 (7th Cir.1992) (quoting Barker v. Henderson, Franklin,

Starnes and Holt, 797 F.2d 490, 494 (7th Cir.1986)). The ability to control depends not on the qualifications of the control people, but on their authority. Id. Control person liability will attach if a control person possessed the power or ability to control the specific transaction or activity on which the primary violation was based, even if that power was not exercised. Id. This circuit has explicitly rejected a requirement that the control person actually participate in the transaction. Donohoe, id., at 1138-1139 n. 7 (citing Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 880-881 (7th Cir.1992) cert. denied, 113 S.Ct. 2994 (1993).

Plaintiffs' allegations of control person liability are found at ¶¶ 14-15 of their complaint. There they allege that the individual defendants, by reason of their positions of control and authority as principal executive officers, controlled the dissemination of information to securities analysts and the investing public. Other than to make these sweeping conclusions, however, plaintiffs allege no facts detailing the individual defendants' place in the flow of corporate information. Without these details, control person liability is premised solely on status within the Company. Although the Seventh Circuit has not enunciated a requirement that facts underlying control person liability be alleged with particularity, district courts employing the since-rejected "culpable participation" test have in the past dismissed claims where allegations of control person status did not explain a control person's role in the alleged fraud. Koplin v. Labe Federal Sav. and Loan Ass'n., 748 F.Supp. 1336, 1341-1342 (N.D.Ill.1990); Brickman v. Tyco Toys, Inc., 731 F.Supp. 101, 106 (S.D.N.Y.1990); Beck v. Cantor, Fitzgerald and Co., Inc., 621 F.Supp. 1547, 1564 (N.D.Ill.1985). Plaintiffs would not have the court require that level of detail here. Instead, they advance conclusory allegations of ability to control disclosures to analysts and the public.

*11 In the case of the four individual defendants alleged to have made statements to analysts, this court concludes that plaintiffs' allegations of control person liability are sufficient. These defendants not only possessed the power or authority to control the dissemination of news to the public--they themselves made statements. However, as to Galvin and Mitchell, there are not allegations, other than their job titles, to support an inference of control over

Motorola's statements to the public. Bearing in mind that fraud must be pleaded with particularity and that the liability to be imposed here is vicarious, this court would recommend that the allegations that Galvin and Mitchell were control persons be stricken.

Aiding and abetting liability

Decisions addressing the standard for aiding and abetting liability have most frequently considered claims against third parties, such as a corporation's attorneys and accountants. Aider and abettor liability requires, at a minimum, (1) that the defendants commit a manipulative or deceptive act within the meaning of § 10(b) and Rule 10b-5, and (2) that the act be committed with the same degree of scienter that primary liability requires. E.g., Robin v. Arthur Young and Co., 915 F.2d 1120, 1123 (7th Cir.1990), cert. denied, 111 S.Ct. 1317 (1991); Renovitch v. Kaufman, 905 F.2d 1040, 1045 (7th Cir.1990). Where the wrong complained of is a failure to disclose the truth, there is an additional requirement. The test in these instances is three-pronged, comprising the following elements: (1) someone committed a primary violation; (2) positive law obliges the abettor to disclose the truth; and (3) the abettor fails to do this, with the same degree of scienter necessary for the primary violation. E.g., DiLeo v. Ernst and Young, 901 F.2d 624, 628 (7th Cir.) cert. denied, 498 U.S. 941 (1990). The difference, then, is a legal duty to speak. Robin, 915 F.2d at 1125. Such a duty does not find its source in securities law, but comes from a fiduciary relation outside securities law. Id.

As already noted, defendants Galvin and Mitchell are not alleged to have made any statements to analysts or to the public concerning Motorola. As a consequence, the wrong complained of is a "duty to blow the whistle." Plaintiffs contend that this duty had its source in the individual defendants' status as officers and directors with access to internal financial information, but they have provided no authority establishing that corporate officers have such a duty to speak. Plaintiffs having failed to establish this essential element of their aiding and abetting claim against Galvin and Mitchell, this court would strike these claims. There being no allegations of direct participation in a violation of the securities law, and because the

court has already recommended dismissal of the control person claims against these two individuals, it would recommend that the claims against them in Count I of the complaint be dismissed.

**\*12** Looking to the remaining individual defendants, plaintiffs' claims of aiding and abetting liability would similarly have to be dismissed if the offense is construed as a failure to disclose. Nonetheless, albeit somewhat redundantly, one can infer that they aided one another in the affirmative action of making statements to analysts and the public. Assuming, then, that the problem of duty is overcome, there remains the question of scienter. Scienter must be pleaded with particularity, although it can be inferred when the fraud or cover-up was in the interest of the defendants. Robin, 915 F.2d at 1127-1128. For instance, scienter can be inferred from the selling of large quantities of stock during a class period. In re Abbott Lab. Sec. Litig., 813 F.Supp. 1315, 1320 (N.D.Ill.1992).

In their allegations concerning Motorola's disclosures, plaintiffs consistently allege that statements were made without a reasonable basis or in reckless disregard for the truth. Plaintiffs also allege that individual defendants received large sums of money as compensation from the Company and that they traded in Motorola stock at a profit. Overall, this court considers scienter to have been sufficiently alleged. While the claims of aiding and abetting are arguably redundant of plaintiffs' claims of primary liability, this court would not dismiss the aiding and abetting claims against Fisher, Tooker, Jones and Topfer.

### Insider Trading

Count II is brought under § 20A of the Securities Exchange Act, 15 U.S.C. § 78t-1, which contains the following provision for a right of action based on contemporaneous trading:

Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material nonpublic information shall be liable in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of

securities) securities of the same class.

15 U.S.C. ¶ 78t-1(a). The total amount of liability for any such violation "shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation." 15 U.S.C. ¶ 78t-1(b).

The duty imposed on a person possessing material nonpublic information is to either disclose the information or abstain from trading in the securities concerned while the inside information remains undisclosed. Wilson v. Comtech Telecommunications Corp., 648 F.2d 88, 94 (2d Cir.1981). The duty is owed only to those trading contemporaneously with the insider, however. Id. Non-contemporaneous traders do not require the protection of the "disclose or abstain" rule, since they do not suffer disadvantage of trading with someone who has superior access to information. Id. at 94-95. Contemporaneous trading is a required element of an insider trading claim in order to substitute for the privity requirement of common law. Since there is no practical method of matching purchases and sales in the open market, to require privity in the common law sense as an element of the cause of action would create an insurmountable obstacle to a plaintiff. Fridrich v. Bradford, 542 F.2d 307, 325 (6th Cir.1976) (Celebrezze, J., concurring), cert. denied, 429 U.S. 1053 (1977).

**\*13** Decisions on the question of contemporaneity recognize that liability does not extend beyond the period of contemporaneous trading; otherwise, it could go on indefinitely if the material nonpublic information was never disclosed. See Wilson, 648 F.2d at 94. The duration of the "contemporaneous trading" period is not fixed under the case law, although it is not met if a plaintiff's trading occurred before the wrongful insider transaction. See Alfus v. Pyramid Technology Corp., 745 F.Supp. 1511, 1522 (N.D.Cal.1990); Backman v. Polaroid Corp., 540 F.Supp. 667, 670 (D.Mass.1982). Generally, the contemporaneity requirement is not met if a plaintiff's trades occurred more than a few days apart from a defendant's transactions. Alfus, id. In the context of stock heavily traded on a daily basis, it has been held that trades are not contemporaneous unless they take place on the same day. Aldus Sec. Litig., [1992-1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,376 at 95,987 (W.D.Wash.1993). The question of whether a plaintiff has traded contemporaneously with insiders

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 497228, *13 (N.D.Ill.))

is a significant one in a lawsuit like this, as a plaintiff not meeting the requirement lacks standing to represent putative class members that did trade contemporaneously with insiders. In re Verifone Sec. Litig., 784 F.Supp. 1471, [1992-1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,368 at 95,938-95,939 (N.D.Cal.1992); Aldus, supra, ¶ 97,376 at 95,987; Alfus, 745 F.Supp. at 1523.

The insider trading defendants are Robert Galvin, John F. Mitchell, and Morton L. Topfer. Galvin sold Motorola stock on August 7, 1990, Cmplt., ¶ 10; Mitchell sold stock on August 3, 1990, Cmplt. ¶ 11, and Topfer sold stock on the following days in 1990: July 24, July 26, July 27, July 31, August 1, August 3, August 7, and August 16, Cmplt., ¶ 12. Significantly, only plaintiff Harold Sucher traded on one of these days, July 26, 1990. Cmplt., ¶ 5(a). Plaintiffs Saul Pearl and Meyer Feldman traded on days before and after insider trades, having respectively purchased stock on August 2 and August 6, 1990. Cmplt., ¶ 5(c)-(d). However, plaintiff Albert Feldman purchased shares in Motorola over a month after the last insider trade alleged, having bought his shares on September 24, 1990. Cmplt., ¶ 5(f).

Under the above authorities, defendants ask that all the insider trading claims except Sucher's claim against Topfer be dismissed. As support for the use of a same-day contemporaneous trading limitation, they cite authority that trades on the New York Stock Exchange are consummated within a single trading day. Facts concerning the operation of the stock exchange are not alleged in the complaint, however, and plaintiffs have not included in their complaint any allegations concerning volume of trading on the days of the insider trades here. On this motion to dismiss, the court may not consider facts outside the complaint and the exhibits thereto.

*14 Several cases have declined to determine the parameters of a contemporaneous trading period on motions for class certification, concluding that such question is better decided on a more developed record. In re Genentech Sec. Litig., [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,347 at 96,682 (N.D.Cal.1990); In re Worlds of Wonder Sec. Litig., [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,004 at 95,631 (N.D.Cal.1990). While this court is not so certain that to do so is inappropriate on a motion for class certification, this

question has been raised on a motion to dismiss. Given the lapse of over a month between the last of the insider defendants' trades and September 24, 1990, this court concludes that Albert Feldman cannot establish an insider trading claim. However, this court would not dismiss the claims of Sucher, Pearl, and Meyer Feldman, as all purchased stock in Motorola within one day of an insider trade. Rather, this court would defer any such determination, allowing plaintiffs to present proof of trading volume and market conditions in connection with the certification of Count II.

Certification of Insider Trading Claims

It has been held that a common course of conduct in selling stock at inflated prices based on inside information creates the common question required for certification of an insider trading claim. Genetech, supra, ¶ 95,347 at 96,680. Also, common questions of duty to disclose or abstain from trading predominate over individual issues of contemporaneity and damages. Worlds of Wonder, supra. ¶ 95,004 at 95,631. While these facts militate in favor of certification, this court cannot at the present make the requisite finding as to numerosity, since relevant information concerning trading on the days at issue has not been presented. See Genetech, supra, ¶ 95,347 at 96,680. For that reason, at this point in time, this court recommends only the certification of Count I.

CONCLUSION

For the reasons set forth above, this court recommends that plaintiffs' motion for class certification be granted as to Count I, and that decision be deferred as to Count II. The court further recommends that defendants' motion to dismiss be granted in part and denied in part. The court would grant the motion to dismiss with respect to the claims against Galvin and Mitchell in Count I, and it would dismiss Albert Feldman as a plaintiff in Count II.

Counsel are given ten days from the date hereof to file objections to this Report and Recommendation with the Honorable Charles R. Norgle, Sr. Failure to object waives the right to appeal.

FN1. Defendants and certain others are excluded from both the class bringing Count I, and the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                              **Page  37**
**(Cite as: 1993 WL 497228, \*14 (N.D.Ill.))**

subclass bringing Count II.    Second Consolidated
Amended Complaint ("Cmplt."), ¶ 16.

FN2. July 23, 1990 is the date Motorola filed its
second quarter Form 10-Q with the Securities and
Exchange Commission ("SEC").    That statement is
alleged to have violated Item 303(b) of SEC
Regulation S-K, 17 C.F.R. § 229.303(b), in that it
did not disclose anticipated changes in the
relationship between costs and revenues.    Cmplt. ¶
42.

FN3. The plaintiffs in Bally moved unsuccessfully
for reconsideration of a different aspect of Judge
Aspen's decision.    144 F.R.D. 78 (N.D.Ill.1992).
Although that decision was recently upheld on
appeal, see Arazie v. Mullane, No. 92-3667 (7th
Cir. Aug. 17, 1993), the question of an appropriate
class period was not addressed on the appeal.
Consequently, an opportunity for clarification of the
Seventh Circuit's dicta in Roots Partnership did not
present itself.

1993 WL 497228 (N.D.Ill.), Fed. Sec. L. Rep. P
97,806

**END OF DOCUMENT**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.