# G

Circuit Court of Maryland,
Baltimore City, Part 20.

**Gabrielle Katz HUDSON, et al., Plaintiffs,**
**v.**
**PRIME RETAIL, INC., et al., Defendants.**

**No. 24-C-03-5806.**

April 1, 2004.

Michael A. Stodghill, Esq., Rubin & Rubin, Chartered, Rockville, Charles P. Scheeler, Esq., Piper Rudnick, LLP, Baltimore, Emily Komlossy, Esq., Goodkind, Labaton, Rudoff & Sucharow, LLP, Ft. Lauderdale, FL, Andrew J. Graham, Esq., Kramon & Graham, P.A., Baltimore.

ORDER

ALBERT J. MATRICCIANI, JR., Judge.

*1 Upon consideration of all defendants' motions to dismiss and plaintiffs' oppositions thereto, arguments of counsel having been heard on March 25, 2004, it is this 1st day of April, 2004, by the Circuit Court for Baltimore City, Part 20, ORDERED, for the reasons set forth in the accompanying Memorandum Decision of this date, that dismissal is GRANTED as to each and every count of the third amended complaint, and it is further ORDERED that the motions to enforce the Court's bench decision are DENIED as moot.

MEMORANDUM DECISION

This purported class action litigation arises from the opposition mounted by several minority stockholders to the cash-out merger of Prime Retail, Inc. ("PRI"), a Maryland corporation, into Prime Outlets Acquisition Company, LLC, a New Jersey company affiliated with The Lightstone Group, LLC ("Lightstone"). Broadly stated, the plaintiffs [FN1] allege that in arranging and voting for the merger, various PRI directors [FN2] breached the duties they owed to the corporation and its stockholders. Plaintiffs also named Lightstone as an aiding and abetting defendant. Both Prime Retail and Lightstone have filed motions to dismiss the Third Amended Complaint under Maryland Rule 2-322(b).

FN1. References to "plaintiffs" in this memorandum decision include Gabrielle Katz Hudson, Thomas R. Hudson, Jolly Roger Fund LP, and Jolly Roger Offshore Fund, Ltd.

FN2. Defendant-directors are Glenn D. Reschke, Howard Amster, James R. Thompson, Gary Skoien, Kenneth A. Randall, Sharon Sharp, and Marvin S. Traub. References to "Prime Retail" include these directors, along with PRI (which no longer exists) and Prime Outlets Acquisition Company, LLC, successor in interest to PRI.

I. Factual Background Summary and Procedural History

The facts set forth here are as alleged in the Third Amended Complaint. [FN3] The purpose of this background statement is to provide a context for the analysis of the pending motions. The Court makes no findings of fact in this decision. Morris v. Osmose Wood Preserving, 99 Md.App. 646 (1994), rev'd in part on other grounds, 340 Md. 519 (1995). In considering the pending motions, of course, the Court assumes the truth of the well-pleaded allegations of the Third Amended Complaint, and fair inferences to be drawn therefrom, but inconsistencies and ambiguities in the complaint must be construed against the plaintiffs. Manikhi v. Mass Transit Admin., 360 Md. 333, 344-45 (2000); Faya v. Almaraz, 329 Md. 435, 443-44 (1993); Young v. Hartford Accident & Indem. Co., 303 Md. 182, 192 (1985).

FN3. This background summary includes material from PRI's proxy statement, but only to the extent the proxy is undisputed and consistent with the well-pleaded allegations of the Third Amended Complaint.

A. PRI and the Fortress proposal.

PRI was a Maryland corporation that owned and operated outlet shopping centers. The company had three types of stock, Series A preferred, Series B preferred, and common stock, but due to the poor performance of its shopping centers, obligations to creditors, and lack of liquidity, the company had not paid dividends to its stockholders since January 2000. Among other financial recovery (or survival)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

measures, in December 2000 the company sold four of its outlet centers and obtained a $90 million loan from an affiliate of Fortress Investment Group, LLC ("Fortress").

Fortress submitted an unsolicited proposal to PRI's board of directors on June 4, 2002, proposing that Fortress buy out all the company's outstanding stock for $48 million. Two days later the board appointed directors Kenneth A. Randall, Sharon Sharp, James R. Thompson, and Marvin Traub to serve on a Special Committee formed to evaluate the Fortress offer, as well as other recapitalization options. That same day the Special Committee selected Houlihan Lokey Howard & Zukin Capital ("Houlihan Lokey") to serve as the Committee's financial advisor. Representatives from Houlihan Lokey, along with PRI director Howard Amster (participating in his capacity as stockholder only), met with Fortress on June 21, 2002, to discuss the proposal. Five days later Fortress increased its proposed offer to a total of $66 million.

***2** At a Special Committee meeting on August 12, 2002, Houlihan Lokey presented its assessments of PRI's financial condition and value, and an analysis of the restructuring and other strategic alternatives the company might pursue. The next day Houlihan Lokey made a presentation to the entire board on essentially the same issues. The board decided it could not accept Fortress's $66 million proposal, but the board directed Houlihan Lokey to continue negotiations with Fortress while simultaneously pursuing other recovery options.

B. PRI's continued efforts to find an acceptable proposal.

On August 28, 2002, the Special Committee retained Granite Partners, LLC ("Granite"), as a second financial advisor to assist with raising capital, and from September through November 2002 Granite, Houlihan Lokey, and PRI representatives compiled information packages and an offering memorandum with financial projections. Granite contacted approximately one hundred potential investors seeking capital contributions. Meanwhile, Fortress filed a disclosure with the SEC on September 26, 2002, stating that it had purchased 10% of PRI's Series A stock from Merrill Lynch. At the conclusion of Granite's search, it reported to PRI that capital investment without a change in control was not an option, but that Lightstone, among other investors, expressed strong interest in a strategic transaction with the company, conditioned upon the investor obtaining control.

After Granite narrowed the field to twenty prospective investors, thirteen of them executed confidentiality agreements and were given an offering memorandum. On November 15, 2002, those who remained interested were instructed to submit detailed proposals. PRI, with the assistance of its financial advisors, conducted presentations for four potential buyers from late November through December 4, 2002. Those efforts attracted six written expressions of interest, four buyout bids, and two bids for all or most of PRI's assets. The buyout bids ranged from $80 million to $120 million, and Houlihan Lokey went to work evaluating the various bids during the second week of December 2002.

The Special Committee, and then the full board, met with legal and financial advisors on December 13, 2002, and the board further winnowed the field to three buyout bidders, whom the board (through Houlihan Lokey) invited to submit best final bids. Those final bids came in on December 19, 2002, and they ranged from $125 million to $138.5 million. Houlihan Lokey advised the Special Committee to pursue the highest bidder, (whose identity does not appear in the record), and the Special Committee in turn made the same recommendation to the board. On December 23, 2002, the board directed PRI's management to pursue the $138.5 million bidder, and a week later PRI and the bidder entered into an exclusivity agreement giving the bidder sufficient time to complete its due diligence investigation.

At this point $138.5 million looked like the approximate merger consideration, so the next logical step was to devise a plan to allocate that sum among the various classes of stock. To that end the Special Committee directed Houlihan Lokey to seek input from Series A and Series B stockholders. Nearly 25% of PRI's Series A stock, and just over 20% of PRI's Series B stock was represented in these initial allocation discussions. Defendant Howard Amster, along with other individuals, participated as a holder of both classes of stock. The group assumed a net merger consideration of $133 million, and based on that figure a subgroup of the

stockholders arrived at a consensus on allocations of $18.50 per Series A share, and $10.25 per Series B share, with $10 million to be divided among holders of common stock.

***3** In mid-February, however, the bidder backed out of the deal because of information gathered during its due diligence investigation. PRI was back to square one, and the board directed Houlihan Lokey to resume courting one of the other two serious bidders.

C. Lightstone's bid.

On March 1, 2003, one of those bidders (whose identity is also unknown) submitted a $117.5 million buyout proposal, which the Special Committee and the board considered at meetings two days later. Upon Houlihan Lokey's advising that it could not easily assess the value of the bid because of certain features of the deal's structure, the Special Committee recommended that the board not pursue the bid exclusively, and the board accepted the recommendation. Consequently, Houlihan Lokey invited further proposals from other interested investors.

By March 13, 2003, PRI's board had three new buyout bids in hand, the highest of them being Lightstone's $121 million bid (which, after transaction costs, would net PRI $118 million). On that date, based on the Special Committee's recommendation, PRI opted to pursue the Lightstone deal exclusively, and the parties entered into an exclusivity agreement on March 19, 2003. Lightstone reduced its bid to $113 million (net $111.5 million) on April 15, 2003, based on its due diligence investigation.

On April 18, 2003, the Special Committee met for two purposes: first, to receive Houlihan Lokey's presentation on PRI's value (including a breakdown of its various stocks), and second, to consider director Michael Reschke's proposed alternative to the Lightstone deal. Director M. Reschke [FN4] proposed that PRI stay in business and not merge. His plan entailed selling PRI's majority interests in six shopping centers (some of which were performing well), selling five under-performing shopping centers, and a rights offering to stockholders. Director M. Reschke projected this would provide PRI $70 to $90 million more than the Lightstone deal. The Special Committee recommended that the board follow two parallel paths: (1) continue pursuing the Lightstone deal, and (2) further explore director M. Reschke's proposal.

FN4. Two Reschke's served on PRI's board, Michael and Glenn, so first initials are used to distinguish between them.

Later in April 2003, Lightstone increased its bid to a figure that would net PRI $113 million. On April 29, 2003, Lightstone's president and chief executive officer David Lichtenstein met with PRI's board to discuss the proposed merger. At the same meeting director M. Reschke presented further details to the board on his alternative proposal, director Amster presented details on a possible rights offering, and director G. Reschke (with management members) presented PRI's latest five-year business plan. Regarding the five-year plan, PRI's management advised that the plan's success depended on a reversal of several lackluster trends in PRI's operations. Three directors (Amster, M. Reschke, and Skoien) expressed concerns that Lightstone's offer was too low, that a stockholder vote would be unsuccessful if based on the current allocation figures, and that the alternative proposals could be better options for PRI.

***4** These proposals and concerns were considered at a subsequent Special Committee meeting, at which it was decided that the Special Committee would meet with Mr. Lichtenstein in an effort to improve the Lightstone proposal. The Special Committee also directed its financial advisors to further evaluate director M. Reschke's alternative proposal.

Mr. Lichtenstein met with Houlihan Lokey and PRI's preferred board members prior to May 2, 2003, to discuss Lightstone's offer. Based on a total purchase price of $115 million, the preferred directors indicated their support for (or acquiescence to) an allocation of $16.04 for Series A shares, $8.93 for Series B shares, and $0.15 for shares of common stock. The preferred directors reported these figures, and Mr. Lichtenstein's unwillingness to increase the $115 million offer, to the Special Committee on May 2, 2003. The preferred directors exited that meeting and the Committee considered this report and PRI's lawyers' report on the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Lightstone negotiations. The Special Committee also considered its financial advisors' reports on their evaluation of director M. Reschke's alternative proposal. Later that day the board met and, based on the Special Committee's recommendations, the board decided not to pursue director M. Reschke's alternative proposal, but to persevere with the Lightstone deal.

Subsequently, Houlihan Lokey met again with preferred stockholders to discuss how Lightstone's merger consideration could be allocated among the various classes of stock. Houlihan Lokey asked the preferred stockholders to consider an allocation of $15.90 per Series A share, $8.80 per Series B share, and $0.17 per share of common stock. At a May 14, 2003 Special Committee meeting Houlihan Lokey advised the Committee of its opinion that $115 million was a fair price for PRI's stockholders generally, and Houlihan Lokey also presented its estimation of fair values for each class of stock. Houlihan Lokey specified that its valuation of each class was independent of its valuation of each other class; that is, Houlihan Lokey was not giving a fairness opinion on any particular allocation arrangement. The estimated ranges of values were $16.00 to $18.60 for Series A shares, $6.10 to $7.20 for Series B shares, and $0.13 to $0.14 for shares of common stock. Houlihan Lokey advised the Special Committee that, in its view, a cash-out merger with Lightstone would be better for PRI than continuing to operate as a stand-alone business.

Allocation was again discussed at a May 9, 2003 Special Committee meeting. Director G. Reschke told the board that the preferred directors would support an allocation of $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for shares of common stock. On June 2, 2003 the Special Committee directed Houlihan Lokey to seek other preferred stockholders' input on the allocation, and the Committee asked the preferred directors to be prepared to explain the basis for their proposal at the next Special Committee meeting.

***5** That next meeting was held on June 5, 2003. At the meeting the Special Committee informed the preferred directors that "their proposed allocation was problematic for the Special Committee because, under such proposal, the series A stockholders will receive an amount per share at the lower end of Houlihan Lokey's valuation range while the series B stockholders would receive an amount per share above Houlihan Lokey's valuation range." [FN5] The preferred directors stood their ground; they were excused from the rest of the meeting during which the Committee discussed the allocation proposals.

FN5. September 30, 2003 Definitive Schedule 14(a) Proxy Statement at 24.

The Special Committee's deliberations continued to a June 9, 2003 meeting, at which Houlihan Lokey reported to the committee that nearly all of PRI's preferred stockholders had expressed their desire for liquidity, at a reasonable allocation. Merrill Lynch, owner of 22% of PRI's Series A stock, would not commit to a particular allocation range, but Merrill's counsel stated that $16.00 was too low. Fortress (the company that had earlier purchased 10% of PRI's Series A stock from Merrill) stated it would consider a Series A allocation between $16.00 and $20.00 per share. The Special Committee decided to recommend to the board that PRI enter into the merger agreement with Lightstone at $115 million, and that the merger consideration be allocated at $16.25 for Series A shares, $8.66 for Series B shares, and $0.18 for common stock. Included with the recommendation was an explanation that the Special Committee factored the preferred directors' preferences into the allocation decision because of the stockholders' push for liquidity. That is to say, without the preferred directors' support the merger would probably fail, and PRI would be left with no one receiving any liquidation of their shares. The board adopted the Special Committee's recommendation on June 9, 2003.

Houlihan Lokey updated its range of estimates on July 1, 2003, and based on its most recent analysis provided ranges of $16.11 to $18.61 for Series A shares, $6.15 to $7.24 for Series B shares, and $0.14 to $0.15 for shares of common stock. The Special Committee recommended to the board no changes in the allocation. PRI and Prime Outlets Acquisition Company, LLC, executed the merger agreement on July 8, 2003. Houlihan Lokey updated its fairness opinions on that date, which included no changes.

D. Stockholder objections, and the ongoing allocation dialogue .

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The following week PRI received objections from Merrill Lynch and Fortress, both arguing that the allocation of $16.25 for Series A shares was inadequate. PRI held a teleconference moderated by Granite on August 11, 2003, at which 50% of the Series A stock, and 47% of the Series B stock were represented. The meeting did not resolve the disagreements.

Based on information provided by Granite, the Special Committee and the board found themselves in a quandary. Fortress and Merrill both appeared to need at least $20.00 per Series A share to support the merger (which obviously would require concomitant decreases elsewhere), but ROI Capital Management, a significant holder of PRI's Series B stock, would withdraw its support if the Series B allocation dipped below $8.30. Director Amster stated he could tolerate a Series B allocation as low as $8.46, but only with significant cuts in the common stock allocation and in transaction costs to PRI's management and its financial and legal advisors. Despite repeated efforts at persuading Lightstone to increase its offer beyond $115 million, PRI simply did not have enough merger consideration to satisfy everyone's demands.

***6** PRI's financial advisors tried to iron out a solution between August 13 and August 21, 2003, but were unable to bring the different stock classes to a consensus. This was reported at an August 21, 2003 Special Committee meeting, where it was also reported that director Amster could support allocations of $18.40 for Series A shares, $8.169 for Series B shares, and $0.17 for shares of common stock, but with a $0.514 million cut in transactional fees. On the Special Committee's recommendation, the board adopted this allocation the same date.

E. The plaintiffs file suit.

Just prior to those August 21 allocation decisions, the plaintiffs filed this action on August 12, 2003, seeking to enjoin the stockholders' vote on the merger. Prime Retail and Lightstone moved to dismiss the Complaint, but before any action was taken on those motions, the plaintiffs filed their First Amended Complaint on October 8, 2003, along with motions for preliminary injunction and expedited discovery. The Court held a scheduling conference with the parties on October 20, 2003, at which plaintiffs stated their intention to convert their motion for preliminary injunction into a motion for a temporary restraining order, and at which the Court set a hearing on the motions for October 24, 2003. PRI and Lightstone moved to dismiss the First Amended Complaint on October 23, 2003. The stockholders' vote was scheduled for October 30, 2003.

At the conclusion of the October 24, 2003 hearing the Court rendered a decision from the bench. The parties dispute the legal effect of the Court's bench decision, and the Court resolves this dispute by clarifying what actually happened in section II.B., below. At this point, it suffices to say (and the parties agree) that the Court's bench decision dismissed all but one of the plaintiffs' claims. The Court reserved ruling on the motion for temporary restraining order to allow plaintiffs to conduct limited discovery. On October 27, 2003, plaintiffs deposed PRI director Kenneth A. Randall, who chaired the Special Committee, and plaintiffs withdrew their motion for a temporary restraining order a day later.

F. Merger efforts continue.

PRI's stockholders did not approve the merger on October 30, 2003. A vote to merge would have required approval of at least two-thirds of each of the two preferred classes, and more than half of the common stockholders. Only 57.96% of the Series A shares were voted for the merger (both the other classes would have approved the merger). The meeting was adjourned and rescheduled for November 4, 2003. At that meeting 63.59% of the Series A shares were voted for the merger, and the meeting was adjourned and rescheduled for November 18, 2003.

On November 13, 2003, David Lichtenstein and PRI both disclosed that Lightstone might try purchasing PRI stock. (Lichtenstein filed a disclosure with the SEC, while PRI issued a press release.) On November 18, 2003, before the stockholder vote, Lightstone contracted to purchase shares of PRI Series A stock at $22 per share from Deephaven Capital Management. The purchase contract also obligated Deephaven to vote for merger. All three classes of stockholders approved the merger later that day.

G. The pending motions.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

***7** Plaintiffs filed their Second Amended Complaint on December 3, 2003, and Prime Retail and Lightstone filed corresponding motions to dismiss on January 9, 2003. Before any action was taken on those motions, plaintiffs filed their Third Amended Complaint on February 4, 2004, and the defendants filed their corresponding dismissal motions on February 23, 2004. [FN6] Prime Retail's motion argues that all but one of the plaintiffs' claims are precluded by virtue of the prior bench decision, and that the entirety of the Third Amended Complaint fails to state a cause of action for which relief can be granted. Lightstone adopts Prime Retail's arguments, and also moves for dismissal arguing that the Third Amended Complaint fails to state a cause of action for aiding and abetting. The Court heard arguments of counsel on March 25, 2004.

FN6. The defendants also filed motions to enforce the October 24 bench decision, which plaintiffs opposed, but those motions become moot upon resolution of the present motions.

II. Analysis

To analyze the defendants' motions it must first be determined, in procedural terms, how to treat the motions appropriately under the Maryland Rules and in the context within which they were presented to the Court. Then it is necessary to resolve the parties' dispute over the legal effect of the Court's late-October bench decision, before finally moving to the merits of the motions.

A. Motions to dismiss--with exhibits.

The defendants submitted motions styled "Motion to Dismiss," and all parties have presented to the Court and relied upon various documentary exhibits including Prime Retail's filings with the SEC. However, in ruling on motions to dismiss the Court may only consider matters presented within the plaintiffs' Third Amended Complaint, and the Court assumes the truth of the well-pleaded facts and inferences fairly drawn therefrom. Bennett Heating v. NationsBank, 342 Md. 169, 174 (1996).

Prime Retail argues, "Even on a motion to dismiss, the Court may properly consider documents integral to the complaint, relied upon in the complaint, incorporated into the complaint, or that the plaintiff had knowledge of in framing the complaint, as well as public documents filed with the SEC," citing In re Merrill Lynch & Co., 273 F.Supp.2d 351, 355 (S.D.N.Y.2003). Essentially the same rule applies in Delaware. E.g., Orman v. Cullman, 794 A.2d 5, 15-17 (Del. Ch.2002) (Chandler, C.). Although one portion of Prime Retail's proposed rule applies in Maryland, see Md. R. 2-303(d) ("any written instrument that is an exhibit to a pleading is a part thereof"), the rest of the proposed rule runs counter to Maryland law. See Muthukumarana v. Montgomery County, 370 Md. 447, 474-75 (2002); Hrehorovich v. Harbor Hosp., 93 Md.App. 772, 779-89 (1992); see also Faya, 329 Md. at 444 (taking judicial notice on motion to dismiss).

At the March 25 argument, however, plaintiffs' counsel joined in the defendants' position that the Court could, on a motion to dismiss, consider PRI's SEC filings as incorporated into the Third Amended Complaint. The Court accepts plaintiffs' counsel's statement as an oral amendment to the pleadings, incorporating into the complaint those documents on which it relies. See Nichols v. Wilson, 296 Md. 154, 156 n. 3 (1983); RTKL Assocs, Inc. v. Four Villages Ltd. P'ship, 95 Md.App. 135, 138 (1993); Hoffman v. Hoffman, 93 Md.App. 704, 709 (1992). The Court excludes from its consideration all other documents the parties submitted, and consequently will treat the pending motions as motions to dismiss.

B. The effect of the bench decision on the Third Amended Complaint.

***8** The plaintiffs' initial complaint did not set forth causes of action in separately numbered counts, and thus it was improper in form and not in compliance with the pleading requirements of Maryland Rule 2-303(a). [FN7] At the October 24 hearing the Court stated:

FN7. See Paul V. Niemeyer & Linda M. Schuett, Maryland Rules Commentary 178-79 (3d ed. 2003) ("When separate causes of action are not pleaded in separate counts ... the appropriate response to the pleading is a preliminary motion under Rule 2-322(b)(2)."); Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland § 1.4 (2d ed. 1998) ("The failure to state separate causes of action in separate counts ... subject[s] [the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

complaint] to a motion to dismiss for failure to state a claim upon which relief can be granted.").

[T]he complaint itself is not set forth in counts, at least they aren't delineated in the traditional fashion, and I am going to say that it appears to me to attempt to set forth causes of action for both a breach of fiduciary duty and a breach of, to the extent that these are different, the duty of candor with respect to the material nondisclosures, the first issue going, I suppose, to the independence of the special committee and the second going to, whether they were independent or not, whether there is sufficient material and information contained in the proxy materials to allow the shareholders in the mix of it all to make reasoned decisions about the vote that they are to undertake next Thursday.... Am I missing something?

Plaintiffs' counsel then confirmed that the Court's understanding was correct. In part because of the lack of enumerated counts, the Court rendered an ambiguous bench decision:

[D]efendants' motion [to dismiss] ... should be denied with respect to this aspect of the complaint [i.e., the nondisclosure of allocation analysis] with, I think, leave to amend because I don't know that the complaint actually clearly sets forth the appropriate cause of action, but granted as to all other aspects and claims of material nondisclosure.

The Court's denial of the motion to dismiss the allocation nondisclosure claim, with leave to amend that claim, is inconsistent on its face. Although not articulated precisely this way from the bench, what the Court intended in that statement was to grant the motions to dismiss with leave to amend on the nondisclosure of allocation analysis count and to grant the motions to dismiss as to the remaining counts. The plaintiffs did amend their complaint, and in the Third Amended Complaint the plaintiffs have re-alleged causes of action which were dismissed at the October hearing.

Prime Retail argues that the doctrine of res judicata bars the plaintiffs from re-alleging in the Third Amended Complaint those claims which were previously dismissed. The sum total of legal authority cited by Prime Retail in support of that argument is Poteet v. Sauter, 136 Md.App. 383 (2001). In Poteet, Judge Hollander wrote for the Court of Special Appeals:

In determining whether res judicata is applicable, a court must consider:

(1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;
(2) whether the cause of action presented is identical to the one determined in the prior adjudication; and,
(3) whether there was a final judgment on the merits in the initial action.

Id. at 411. Poteet, like every other res judicata case reviewed by this Court, spoke in terms of "final judgments" in "initial actions" as barring relitigation in a "subsequent action ." Poteet provides no support for the proposition that res judicata bars a plaintiff from re-alleging in an amended complaint, within a single civil action, claims which were previously disposed of on preliminary motions attacking the initial complaint.

***9** Because the bench decision left at least one claim in the case, that decision "is not a final judgment," it did not "terminate the action as to any of the claims or any of the parties," and it is "subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties." Md. R. 2-602(a) (emphasis added). Also, in addition to the three res judicata requirements described by Judge Hollander in Poteet, the doctrine presumes an additional element: two distinct lawsuits. In this case we have only one civil action, in which the Court has rendered a non-final decision on less than all the claims; res judicata has no application here.

As explained in section II.A., above, generally motions to dismiss which present additional materials not contained in the complaint require the Court to treat the motions as motions for summary judgment. All the parties assume (as did the Court, at the time), that the October 24 bench decision granted dismissal, but because the Court considered additional materials submitted by both parties, the Court was actually granting defense motions for summary judgment on all but one of the plaintiffs' claims. [FN8] See, e.g., Fairfax Sav., F.S.B. v. Kris Jen Ltd. P'ship, 338 Md. 1, 9-10 (1995); Hrehorvich, 93 Md.App. at 783. Therefore, the rules governing plaintiffs' latest amendments would be rules governing amendments after a court grants defense motions for partial summary judgment, not dismissal.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN8. Although the present motions came before the Court in the identical posture, the record has now been clarified as to which materials are being considered by the Court and which are not. See pages 13 to 14, above. Thus, the Maryland Rules compel different treatment of the pending motions.

Plaintiffs' memorandum in opposition to the defense motions posits that "dismissal is without prejudice, unless otherwise specified," citing Williams v. Snyder, 221 Md. 262, 267 (1960), and plaintiffs conclude that because "the Court's dismissal was unspecified," their amended pleading is proper. Williams, however, was a voluntary dismissal case where the Court applied the predecessor to current Rule 2-506(c). Unlike Williams, the plaintiffs here have not voluntarily dismissed their case. Williams and Rule 2-506(c) have no application here.

Plaintiffs also invoke Maryland Rule 2-341, the general rule governing amending pleadings. Under subparagraph (a) of that rule, "A party may file an amendment to a pleading at any time prior to 15 days of a scheduled trial date." Subparagraph (c) limits the scope of permissible amendments:

> An amendment may seek to (1) change the nature of the action or defense, (2) set forth a better statement of facts concerning any matter already raised in a pleading, (3) set forth transactions or events that have occurred since the filing of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct misjoinder or nonjoinder of a party so long as one of the original plaintiffs and one of the original defendants remain as parties to the action, (6) add a party or parties, (7) make any other appropriate change. Amendments shall be freely allowed when justice so permits. Errors or defects in a pleading not corrected by an amendment shall be disregarded unless they affect the substantial rights of the parties.

***10** Before applying Rule 2-341 to this case, the Court must inquire whether this general rule, and not a more specific rule, controls whether plaintiffs may resubmit by amendment claims on which the Court previously granted defense motions for summary judgment. For example, had this Court actually been granting defense motions to dismiss at the October 24 hearing, then under Rule 2-322(c) the plaintiffs could not file an amended complaint on all counts because the Court did not expressly grant leave to amend any claim other the count for nondisclosure of merger allocation analysis. [FN9] Thus, in the context of a motion to dismiss, Rule 2-322(c) takes away the broad freedom to amend generally granted by Rule 2-341.

FN9. The third sentence of Rule 2-322(c) states, "If the court orders dismissal, an amended complaint may be filed only if the court expressly grants leave to amend."

In legal terms, however, the Court granted defense motions for partial summary judgment under Rule 2-501, and that rule contains no corollary to Rule 2-322(c)'s amendment provision. [FN10] Unlike Rule 2-322(c), Rule 2-501 on summary judgments contains no specific restriction to limit the liberal amendment provisions of Rule 2-341. Even so, under the general amendment rule a plaintiff may not re-allege the very same claims on which summary judgment has already been granted, because such an amendment does not fall within one of the seven types of amendments in Rule 2-341(c). Although amendments "shall be freely allowed when justice so permits," for the same policy reasons underlying the doctrines of res judicata, collateral estoppel, and law of the case, justice does not permit a plaintiff to beset the Court and defendants with duplicitous, meritless claims. See generally John A. Lynch & Richard W. Bourne, Modern Maryland Civil Procedure §§ 12.1--12.3 (1993 & Supp.2003).

FN10. But compare Davis v. DiPino, 337 Md. 642, 648-49 (1995) (Chasanow, J.) ("When a trial court grants a motion to dismiss ... the court has the discretionary authority to grant the plaintiff leave to amend the complaint ... [but there] is no such discretionary authority to permit the amendment of the complaint subsequent to the grant of summary judgment."), with Fairfax Sav., F.S.B., 338 Md. at 9-10 (Rodowsky, J.) (describing without criticism trial court's grant of partial summary judgment with leave to amend); Kee v. State Highway Admin., 313 Md. 445, 452-55, 459-60 (1988) (Eldridge, J.) (sanctioning filing of amended complaint after grant of partial summary judgment as proper under Rule 2-341); Preissman v. Harmatz, 264 Md. 715, 718-20 (1972) (same).

To determine whether the plaintiffs' Third Amended Complaint falls within the scope of Rule 4-341(c), the Court must compare the First

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Amended Complaint with the Third, and to the extent that the comparison reveals that plaintiffs have re-alleged in the Third Amended Complaint causes of action on which summary judgment has already been granted for the defendants, the Court could strike those amendments on its own initiative under Rule 2-322(e) as being "improper" and "not in compliance with" Rule 2-341. The Court would then consider the defendants' motions to dismiss whatever remains after that comparison. But perhaps due to the lack of clarity in the Court's bench decision, the defendants have not moved to strike the amended complaint under Rule 2-341(a), (c), and Rule 2-322(e), and, of course, plaintiffs have not confronted such a motion. Although Rule 2-322(e) empowers the Court to strike pleadings on its own initiative, under the circumstances, here the Court declines to do so. To cleanse the record of further confusion stemming from the Court's October 24 decision, the Court will proceed to address here the viability of each of the Third Amended Complaint's counts.

C. Third Amended Complaint.

Plaintiffs' Third Amended Complaint alleges that the director-defendants breached the duties of good faith, loyalty, and care, which they owed to the corporation and its stockholders. The plaintiffs allege that various directors' decisions were not independent, that directors were interested in transactions they were addressing, and that the directors failed to disclose material facts to the stockholders who were to vote on the merger. Before addressing each count, it will be helpful to review generally the duties imposed upon directors, and the standards by which courts review director actions.

1. Corporate directors' duties and the business judgment rule.

***11** In Maryland, corporate directors must perform their duties (1) in good faith, (2) in a manner [the director] reasonably believes to be in the best interests of the corporation, and (3) with the care that an ordinarily prudent person in a like position would use under similar circumstances. Md.Code Ann. Corps. & Ass'ns § 2-405.1(a) (1999). [FN11] Under section 2-405.1(c), directors who fulfill these duties enjoy the immunity from liability defined in section 5-417 of the Courts and Judicial Proceedings Article. [FN12] Maryland has codified the "business judgment rule" at section 2-405.1(e), which provides, "An act of a director of a corporation is presumed to satisfy the standards" imposed by section 2-405.1(a). In the context of mergers Delaware law imposes upon directors what have become known as "Revlon duties," after Revlon v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173, 182, (Del.1985), requiring directors to try to secure the best merger terms available for stockholders. Maryland law appears to impose the same duty, Wittman v. Crooke, 120 Md.App. 369, 376-77 (1998), but the business judgment rule presumes that directors satisfied this duty. [FN13] See § 2-405.1(f).

FN11. Unless otherwise stated, all statutory citations are to the Corporations and Associations Article.

FN12. Section 5-417 states, "A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."

FN13. Delaware courts reviewing certain change-in-control transactions preliminarily disregard the business judgment rule and employ a heightened level of scrutiny. See, e.g., Orman, 794 A.2d at 20-23. Unlike Delaware law, in Maryland the business judgment rule applies even to directors' change-in-control decisions. See Hanks, Maryland Corporation Law § 6.6[b], 176.1 (Supp.2003) ("[T]he decisions of the Supreme Court of Delaware in Unocal v. Mesa Petroleum Co., 493 A.2d 946 (1985), and Weinberger v. UOP, Inc., 457 A.2d 701 (1983), should not be applied in Maryland.").

The business judgment rule's presumption that directors fulfilled their duties does not render directors impervious to a plaintiff's claims. See NAACP v. Golding, 342 Md. 663, 673 (1996). Rather, the business judgment rule merely places upon plaintiffs the burden of rebutting the presumption. Id. To survive the motions to dismiss, therefore, the Third Amended Complaint must allege facts showing a failure of the directors to adhere to their duties.

Finally, in performing their duties directors may

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

rely on information from (1) officers or employees of the corporation, to the extent the director reasonably believes the person is reliable and competent in the matter presented; (2) lawyers, CPAs, or other persons on matters the director reasonably believes to be within the person's professional or expert competence; and (3) a subcommittee of the board on which the director did not serve, as to a matter within the subcommittee's authority, to the extent the director reasonably believes the committee to merit confidence. Corps. & Ass'ns § 2-405.1(b).

2. Duty of Loyalty.

Directors' obligations to perform their duties "in good faith" and in a manner reasonably believed to be "in the best interests of the corporation" impose a duty of loyalty to the corporation. United Wire, Metal & Machine Health & Welfare Fund v. Bd. of Sav. & Loan, 316 Md. 236, 245 (1989); Hanks, supra, 6.6[c], at 177. The duty of loyalty embodies two related but distinct requirements relevant to this case: first, in exercising their judgment directors must decide matters independently, and second, directors generally may not have a material personal interest in the transaction. See Orman, 794 A.2d at 19-25 & n. 50; see also Shapiro v. Greenfield, 136 Md.App. 1, 13-15 (2000); Wittman, 120 Md.App. at 377-78 (1998).

***12** A director's "independent" exercise of the director's judgment "means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Orman, 794 A.2d at 24. Chancellor Chandler, of Delaware's Court of Chancery, has explained,

> Such extraneous considerations or influences may exist when the challenged director is controlled by another. To raise a question concerning the independence of a particular board member, a plaintiff asserting the control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. The shorthand shibboleth of "dominated and controlled directors" is insufficient.

Id. (most internal quotation marks omitted); see also Corps. & Ass'ns § 2-401(b); Wharton v. Fidelity-Baltimore Nat'l Bank, 222 Md. 177, 185 (1960); Warren v. Fitzgerald, 189 Md. 476, 488-89 (1948); Martin Marietta Corp. v. Bendix, 549 F.Supp. 623, 633 n. 5 (D.Md.1982). Under Maryland law,

> [W]hen a director does not personally benefit from the transaction but, because of that director's relationship to a party interested in the transaction, it would reasonably be expected that the director's exercise of independent judgment would be compromised, that director will be deemed an interested director within the meaning of the statute.

Shapiro, 136 Md.App. at 24.

Related, but distinct loyalty issues arise in cases where directors stand to receive benefits from a transaction that are not generally enjoyed by the stockholders, or where a director stands on both sides of a corporate transaction. Orman, 794 A.2d at 23; Shapiro, 136 Md.App. at 15. By implication of section 2-419(a), the benefit must be "material" to the director to render the director even arguably interested in the transaction. The requirement of materiality imposes upon plaintiffs the burden of pleading facts to show that "the alleged benefit was significant enough in the context of the director's economic circumstances, as to have made it improbable that the director could perform [the director's] fiduciary duties to the ... shareholders without being influenced by [the] overriding personal interest." Orman, 794 A.2d at 23 & n. 44 (internal quotation marks omitted); In re General Motors Class H Shareholders Litigation, 734 A.2d 611, 617-18 (Del. Ch.1999). The duty of loyalty imposes only a general prohibition of such transactions, but section 2-419 establishes procedures by which such transactions may be validly accomplished.

Section 2-419 "provides that an interested director transaction is not void or voidable solely because of the conflict of interest and creates a 'safe harbor' for certain transactions which satisfy the statute." Id. at 14. Section 2-419 clearly applies to protect transactions in which directors were materially interested, and the Court of Special Appeals has held section 2-419 applicable to transactions in which extraneous forces influence a director's decision, rendering the director "non-independent." Shapiro, 136 Md.App. at 18-24. To qualify for the statute's protections, "an interested director could inform the shareholders or directors of [the director's]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

conflicting interests and give the board of directors or shareholders an opportunity to approve or ratify the transaction." [FN14] Id. at 15.

FN14. Alternatively, a director who did not comply with the disclosure provisions may attempt to show that the transaction was "fair and reasonable to the corporation" under section 2-419(b)(2). Shapiro, 136 Md.App. at 15. The parties to this litigation have not raised that provision.

3. Duty to disclose.

***13** Directors also owe a duty to disclose to stockholders material information within the directors' control regarding transactions on which the stockholders will vote. Contemporary Maryland caselaw has not had occasion to develop this duty of candor, but none of the parties to this action dispute that some such duty exists under Maryland law. See Parish v. Milk Producers Ass'n, 250 Md. 24, 72-74 (1968); Homer v. Crown Cork & Seal Co., 155 Md. 66 (1928); Paskowitz v. Wohlstadter, 151 Md.App. 1, 10-11 (2003) (applying Delaware law); Wilcom v. Wilcom, 66 Md.App. 84, 95 (1986) (assuming a duty to inform existed, no breach found). [FN15] Because of the paucity of Maryland law on the subject the parties direct the Court's attention to Delaware's well-developed corporate law, so the Court will rely primarily on that body of law to resolve the nondisclosure allegations in this action.

FN15. The leading Maryland corporations law treatise grounds the duty of disclosure in directors' duty to act in good faith, Hanks, supra, § 6.6 [b], at 165, whereas Delaware law views this duty as underlying the duties of good faith, loyalty, and care, Orman, 794 A.2d at 41.

The current state of Delaware's disclosure requirements can be gleaned from a trio of decisions authored by the Delaware Supreme Court's Chief Justice Veasey: Malpiede v. Townson, 780 A.2d 1075 (Del.2001); Loudon v. Archer-Daniels-Midland Co., 700 A.2d 135 (Del.1997); and Arnold v. Society for Savings Bancorp, Inc., 650 A.2d 1270 (Del.1994). Under those decisions, information is material and must be disclosed if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Malpiede, 780 A.2d at 1086. The disclosure duty has its limits:

> The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.... [A] board is not required to engage in selfflagellation and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication on the matter.

Loudon, 700 A.2d at 143. Also, because directors' roles differ significantly from the roles of stockholders, Werbowsky v. Collomb, 362 Md. 581, 599 (2001), the disclosure duty does not entitle stockholders to so much information as to enable them to replicate the directors' efforts, see In re Staples, Inc. Shareholders Litigation, 792 A.2d 934, 953-54 (Del. Ch.2001). Rather, directors must disclose sufficient information to enable a "reasonable investor" to make an informed decision on the matter presented. Arnold, 650 A.2d 1277. Chief Justice Veasey has had occasion to clarify that disclosure duties do not rise and fall with the level of sophistication of the individual investors; rather, the standard remains an objective "reasonable investor" standard. Hubbard v. Hibbard Brown & Co., 633 A.2d 345, 352-53 (Del.1993).

Finally, Delaware law provides plaintiffs with a useful analytical framework for pleading causes of action for nondisclosure, requiring plaintiffs to:

(1) "allege that facts are missing from the proxy statement,"
***14** (2) "identify those facts,"
(3) "state why they meet the materiality standard," and
(4) "how the omission caused injury."

Loudon, 700 A.2d at 141. This Court would add one additional pleading requirement: The plaintiff must allege that the information was known to the directors, or within the directors' control. Id. at 143.

4. Stockholder ratification.

As explained in section II.C.2., above, section 2-419 provides a procedure for informed stockholder ratification of interested and non-independent director transactions. In addition to that specialized statutory ratification provision, Maryland common law provides that generally directors cannot be held

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

liable for acts which were ratified by informed stockholders. Coffman v. Md. Pub'g Co., 167 Md. 275, 289 (1934); Wittman, 120 Md.App. at 377-78. Stockholder ratification is only as good as the disclosure which preceded it, id., and such disclosures must comply with the standards described in section II.C.3., above.

5. The allegations.

a. Count 1: "Improper Diversion of Merger Consideration."

The plaintiffs entitled count 1, "Breach of Fiduciary Duty (Improper Diversion of Merger Consideration)," and the plaintiffs' memorandum in opposition to dismissal illuminates the theories underlying this count:

> [I]t is not simply attacking the allocation of merger consideration.... It challenges the manner by which the negotiations were handled by interested defendants, not the Special Committee, and the diversion of money from the public stockholders to executives and advisors through extremely lucrative change of control agreements and exorbitant fees to advisors.

The defendants argue that count one must be dismissed because, assuming its allegations amount to a breach of the directors' duties, PRI's stockholders ratified the directors' actions after full disclosure.

The bulk of the facts alleged in count 1 were fully disclosed in the September 30 proxy statement. Paragraph 99 of the Third Amended Complaint contains no allegations of fact; rather, it contains only conclusory characterizations. Md. R. 2-303(b); Read Drug & Chem. Co. v. Colwill Constr. Co., 250 Md. 406, 412-16 (1968). To the extent paragraphs 101-104 contain facts rather than plaintiffs' conclusory characterizations of fact, those facts were also disclosed in the proxy materials at pages 15 through 28 ("Background to the Merger"), 66 through 69 ("Interests of Certain Persons in the Merger"), and 77 ("Security Ownership of Management and Certain Beneficial Owners"). Thus, even assuming those facts were actionable, the informed stockholders' vote for the merger to which those allegations relate ratified the board's actions and extinguished the prospect of director liability for those acts. Wittman, 120 Md.App. at 377-78.

The remaining, undisclosed allegation is that, "The Deephaven transaction was improper and the Individual Defendants turned a blind eye to Lightstone's actions." [FN16] Paragraphs 71 through 81 of the Third Amended Complaint describe the Deephaven stock sale. Plaintiffs allege that Lichtenstein paid $22 per share for Deephaven's Series A stock, and the agreement also bound Deephaven to vote in favor of the merger at the stockholder's meeting. [FN17] In support of their contention that the transaction was improper, plaintiffs cite Schreiber v. Carney, 447 A.2d 17 (Del. Ch.1982) and Hewlett v. Hewlett-Packard Co., C.A. No. 19513-NC, 2002 WL 549137 (Del. Ch. Apr. 8, 2002). However, for the same reasons explained in the Chancery Court's decision in In re IXC Communications, Inc. Shareholders Litigation, C.A. No. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999) (permitting acquiring corporation's purchase of a minority of target's shares, with votes, in a "side deal"), the Deephaven sale was not improper under Schreiber. [FN18] Despite the "discordant ring" of the term "vote-buying," Maryland stockholders have the right "to cast [their] votes, or to grant a proxy or otherwise transfer [their] right to vote, in any way [they] decide[ ] and for any reason or no reason." Hanks, supra, § 7.15, at 253. Lightstone purchased from Deephaven only 3.9% of PRI's Series A stock, and thus the acquiring company did not "lock up" the vote, and the transaction did not disenfranchise plaintiffs.

FN16. Plaintiffs also alleged in paragraph 68 that the directors owed a duty "to ascertain Lightstone's intentions regarding its announcement of purchases of PRI securities," but neither plaintiffs' memorandum, nor the law, provides any support for that contention.

FN17. Under Section 2-507(b)(3), "if a person is the record holder on the record date but subsequently transfers the stock to another person prior to the time of voting, the transferee is entitled to require the transferor to issue a proxy to the transferee." Hanks, supra, § 7.09, at 242. Here, according to plaintiffs' complaint, it appears that Lichtenstein declined to require Deephaven to transfer its proxy, and opted to have Deephaven vote at the meeting instead.

FN18. Interestingly, while Maryland Rule 1-104 generally prohibits citation to unreported decisions

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of Maryland's appellate courts, the rule is silent on whether extra-jurisdictional unreported decisions may be cited. In Alternatives Unlimited, Inc. v. New Baltimore City Board of School Commissioners, No. 2818, Sept. Term, 2002, slip op. at 45 n. 4 (Md.Ct.Spec.App. Mar. 3, 2004), Judge Moylan decided not to consider an unreported Fourth Circuit decision cited by a party because such citations are "disfavored" under the Fourth Circuit's rules. Upon reviewing Delaware's procedural rules and caselaw, it appears that Delaware courts do not disfavor, much less prohibit citation to unreported decisions, as long as counsel submits hard copies to the court. See Chancery Ct. R. 171(h) (this same provision appears in the rules of Delaware's Supreme Court [R. 14], Superior Court [R. 107], Court of Common Pleas [R. 107], and Family Court [R. 107], as well as the United States District Court for the District of Delaware [R. 7.1.3] ). In any event, the Court gives no weight to the unreported Delaware decisions "beyond the weight merited by the persuasive force of the reasoning employed." Cf. E. Outdoor Adver. Co. v. Mayor of Balt ., 128 Md.App. 494, 515 (1999) (Harrell, J.).

b. Count 2: "Failure to Offer Fair Price."

***15** The second count proceeds on a theory that the defendant-directors failed to offer a fair price to Series A stockholders because (1) the committee and board arrived at a merger allocation based in part on internal corporate politics rather than a purely economic analysis; (2) conflicts among board members rendered them incapable of independently exercising their judgment; (3) the directors failed to obtain the highest value reasonably available for Series A shares; (4) the merger price includes a "wrongful diversion of consideration;" and (5) the merger price is based on "an analysis of fair value that does not comply with applicable law." The facts underlying these characterizations fail to state a claim for relief. Wittman, 120 Md.App. at 377-78.

The proxy disclosed at least six times that Houlihan Lokey's fairness opinion did not include an opinion as to any particular allocation of the aggregate consideration among the various stock classes or series. September 30 Proxy at 6, 23, 44-45, 46-47, 49, and C-3. Nevertheless, the proxy included an allocation arrangement. Pages 18 through 28 of the proxy describe the Special Committee's ongoing dialogue among its advisors, Lightstone, the stockholders, and the board regarding an acceptable allocation. The most poignant of these discussions appears on page 24, where Houlihan Lokey reported to the Special Committee and the board that "substantially all of the series A and series B preferred stockholders ... expressed a desire for liquidity at a reasonable allocation," and the Special Committee reported to the board that it factored the preferred directors' allocation preferences into its recommendation because,

> given the size of Mr. Amster's holdings and the likely influence that a "no" vote by the preferred board representatives would have over the other preferred stockholders, it believed that the support of the preferred board representatives was crucial to having the transaction approved by the Company's preferred stockholders.

The proxy thus fully disclosed what did, and did not form the basis for the allocation, and, assuming plaintiffs' alleged a breach of duty, under Wittman the subsequent informed stockholder vote ratified this methodology. [FN19]

FN19. If count 2 is read as a claim that the aggregate merger consideration, or the board's analysis and evaluation of the aggregate price were actionable, the same conclusion would obtain. The Court has made every effort to understand the precise nature of each count but, as Delaware's Chancellor Chandler has said, "it is not for the Court to divine the claims being made. A plaintiff must make clear to the Court the bases upon which his claims rest." Orman, 794 A.2d at 24 n. 47.

The first sentence of the Third Amended Complaint's paragraph 108 merely recapitulates in slightly modified language allegations contained in paragraphs 101 and 103, which the Court has already disposed of in analyzing count 1. The second sentence alleges that "a majority of the Individual Defendants" suffered from disabling conflicts of interest. Relying on Delaware law, plaintiffs' opposition memorandum erroneously stated that "while alleged breaches of the duty of care may be extinguished by a fully-informed vote, breaches of the duty of loyalty cannot." On the contrary, Maryland's Court of Special Appeals has held that stockholders can ratify alleged breaches of the duty of loyalty. Wittman, 120 Md.App. at 378. Therefore, the facts supporting the plaintiffs'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

conflict of interest claims cannot state a claim if they appear in the proxy because they were ratified. [FN20]

FN20. The following facts were disclosed in the September 30 proxy: (1) director G. Reschke's change-in-control payments (at 66); (2) director Amster's PRI stock ownership (at 77-80); (3) director Amster's stock in Horizon Group Properties, Inc. (at 68-69); (4) director Skoien's position within PRI and Horizon, and Horizon's relationship to PRI (at 68-69); (5) director Thompson's relationship with Winston and Strawn, and that law firm's relationship to PRI (at 68); (6) director Traub's consulting arrangement with PRI (at 69); (7) details regarding Fine Furniture Direct, Inc. (at 69).

***16** The facts which the Court has not located in the proxy disclosures, which must be evaluated on the merits, are as follows:

Amster nominated Skoien to PRI's board.

Skoien served as an aide to director Thompson when Thompson was governor of Illinois (from 1977 through 1991), "thus Skoien and Thompson have enjoyed a relationship spanning over 24 years."

Thompson is also a director in Prime Group Realty Trust, an entity which is affiliated with "the Reschke family."

Thompson, as governor, appointed Skoien and Sharp to state government positions, and has had long-standing relationships spanning over twenty years with both individuals.

Sharp served as the director of Illinois's lottery in Thompson's administration.

Director Randall was a PRI director for more than ten years.

As to all of these facts the Court can say with certainty that, as a matter of law, they do not give rise to a reasonable expectation that these directors' independent judgment was compromised. See Shapiro, 136 Md.App. at 24; cf. Orman, 794 A.2d at 27 ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

The plaintiffs allege, in paragraph 109, that they "lost their Series A shares without the defendants discharging their duty to obtain the highest value reasonably available for those shares." The short answer to this allegation is that the directors had no such duty. The language of this allegation demonstrates a misunderstanding of the duties imposed by § 2-405.1(a). As observed in Hanks, supra, § 6.6[b], at 164.1, the director's duties "are directed solely at the manner, or process, by which a director makes decisions rather than at the results of those decisions." In Wittman, the Court of Special Appeals quoted with approval from the trial judge's decision:

> [The stockholder] argues that [the corporation] could have gotten a better deal. But that is really not a cause of action. Maybe they could have. Maybe they couldn't have. But that doesn't constitute a cause of action. That's something stockholders can decide. What would get the court to intervene would be evidence of facts of the board and/or management violating its duty of loyalty and duty of care.

Wittman, 120 Md.App. at 378. Here, the processes by which the directors arrived at the merger consideration and allocation were disclosed in the proxy materials, were ratified by the informed stockholders, and therefore are not actionable. Id. at 377-78.

Paragraph 109 included redundant allegations of a "wrongful diversion of consideration," which the Court has already dealt with, and an allegation that "the merger price is the result of ... an analysis of fair value that does not comply with applicable law." Again, where economic valuation analyses were performed, those analyses were sufficiently disclosed in the proxy materials, and the stockholders' subsequent ratification extinguished any liability arising from these facts. Id.

c. Count 3: "Duty of Loyalty Resulting in Unfair Process."

***17** Count 3 purports to allege that the directors breached their duty of loyalty based on (1) the mere occurrence of the Deephaven-Lightstone stock sale; (2) the alleged conflicts between the Special Committee and Series B-owning directors; (3) G. Reschke's change-in-control payments; (4) "the complete failure of the Special Committee to attempt to negotiate on price or the allocations demanded by Amster;" and (5) Houlihan Lokey's "success fee." As explained above, the Deephaven-Lightstone transaction was not improper, and the board informed the stockholders of the board's stock holdings and any change-in-control payments, so

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

none of those facts can give rise to a cause of action under Wittman.

The plaintiffs allege a "complete failure of the Special Committee to attempt to negotiate," but the plaintiffs fail to allege well-pleaded facts supporting that conclusory characterization. The Third Amended Complaint closely tracks the chronology included in the proxy statement, and that chronology details the ongoing dialogue among the Special Committee, its advisors, and various interested parties. Notwithstanding plaintiffs' characterizations of those events, the Third Amended Complaint fails to allege supporting facts giving rise to a cause of action.

For example, paragraph 21 merely alleges that the allocations approved by the Special Committee and board coincided with the allocations proposed by director Amster, but paragraph 21 does not allege that Amster "dictated" the Special Committee's or the board's decisions. Nor are there any well-pleaded factual allegations of Amster's "strong-arming" other directors in paragraphs 34, 36, 40, 52, 101, and 108. In reality, as described in the proxy materials incorporated within plaintiffs' complaint, Amster played a significant role throughout the process in his capacity as an interested holder of preferred stock. September 30 proxy at 18, 21, 22, 23, 24, 25, 26, and 27. The proxy disclosed the Special Committee's belief that (1) the proposed merger presented the best route to the liquidity desired by nearly all of PRI's stockholders, and (2) without Amster's support, the merger probably would not happen. Director Amster's actions, as well as those of the Special Committee, were made plain to the stockholders, who in turn ratified those actions and extinguished any possible director liability. Wittman, 120 Md.App. at 377-78.

Finally, the Court need only briefly address plaintiffs' allegation regarding Houlihan Lokey's fee. Paragraph 24 alleges that PRI was to pay Houlihan Lokey $900,000 for its services, and if a merger were consummated, Houlihan would also receive approximately $2 million as a "success fee," to be paid by the acquisition company. Plaintiffs do not allege that these terms were not disclosed to the stockholders, and because they were disclosed, the informed stockholder vote ratified these acts under Wittman. In any event, without more these fees do not give rise to a cause of action. Wittman, 120 Md.App. at 378.

d. Count 4: "Breach of Duty of Disclosure"

***18** Plaintiffs present four nondisclosure allegations: (1) "Deephaven was paid $22 per share while the rest of the Series A stockholders received $18.40 per share; (2) the Deephaven stock sale was not disclosed; (3) Amster's role in allocation negotiations was never disclosed; and (4) the board did not disclose that HLHZ's analysis "had virtually no relevance in the deliberations of the Special Committee or the Board."

The plaintiffs' first alleged nondisclosure simply misstates the plaintiffs' own allegations. Plaintiffs suggest in paragraphs 73, 74 and 75, 82, and 116, that as a result of the merger, Deephaven would receive $22 per Series A share, while all other Series A stockholders would receive only $18.40. That characterization of the Deephaven-Lightstone sale conflicts with the plaintiffs' own statement of the facts. Upon execution of the November 18 Deephaven-Lightstone contract, Deephaven became entitled to $22 for each share sold under that transaction; upon completion of the merger, Deephaven became entitled to $18.40 per Series A share that it then held, just like every other Series A stockholder. These were two distinct transactions. Plaintiffs' characterizations to the contrary do not qualify as well-pleaded allegations of fact, and do not state a claim upon which relief can be granted.

The second nondisclosure allegation fails because plaintiffs' never allege that information regarding the stock sale was known to or within the directors' control. Loudon, 700 A.2d at 143. The plaintiffs' implicitly concede this point by alleging that the directors breached their duties by not knowing about the Deephaven sale. See Third Amended Complaint ¶¶ 68, 100. As for the viability of that claimed duty, see footnote 16, above.

In count 3, analyzed above, plaintiffs argued that the board violated its duties by allowing director Amster to control the merger negotiations, and the Court's analysis showed that plaintiffs' conclusory characterizations did not amount to well-pleaded facts stating a cause of action. Essentially, the plaintiffs failed to plead facts (as opposed to characterizations) showing what role Amster played

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in addition to, or apart from, what is described in the proxy incorporated into plaintiffs' complaint. Here, count 4 alleges that the board breached its disclosure duty by failing to disclose that Amster's role in the negotiations was as described in plaintiffs' paragraph 112. However, as explained in the Court's analysis on count 3, the Third Amended Complaint fails to present well-pleaded allegations showing Amster's role (or the Special Committee's) to have been anything other than that described in the proxy on which the Complaint relies. The board fulfilled its disclosure obligations, and plaintiffs have not pleaded facts showing omission or misrepresentation.

Similarly, the plaintiffs' final nondisclosure allegation recapitulates a claim already resolved in count 2. Plaintiffs argued in count 2 that the board breached its duties by approving an allocation based in part on whether it would garner enough votes for the merger, rather than on the basis of a purely economic analysis. The Court's resolution of that count explained that the nondisclosure alleged here (i.e., that no advisor expressed a financial opinion on the relative fairness of the allocation arrangement), actually was fully disclosed in the proxy materials incorporated into the complaint. Accordingly, this part of count 4 fails to state a nondisclosure claim.

e. Count 5: Aiding and Abetting by Lightstone and Acquisition

***19** Pleading this aiding and abetting theory as a separate count may be improper in form. See Manikhi, 360 Md. at 360 n. 6. At any rate, count five fails because the underlying counts fail. See Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc., 340 Md. 176, 200-201 (1995).

III. Conclusion

For the reasons set forth in detail above, defendants' motions to dismiss the Third Amended Complaint will be granted.

2004 WL 1982383 (Md.Cir.Ct.), 2004 MDBT 2

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# H

Only the Westlaw citation is currently available.

United States District Court,
M.D. Florida.

**In re CNL HOTELS & RESORTS, INC. SECURITIES LITIGATION**

**No. 604CV1231ORL31KRS, 604CV1341ORL19JGG.**

Sept. 13, 2005.

Beth Hoffman, Lawrence A. Sucharow, Goodkind Labaton Rudoff & Sucharow LLP, Lawrence P. Kolker, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, George E. Ridge, Cooper, Ridge & Lantinberg, P.A., Jacksonville, FL, Kimberly Marie Donaldson, Nicholas E. Chimicles, Chimicles & Tikellis LLP, Haverford, PA, Chris A. Barker, Barker, Rodems & Cook, P.A., Tampa, FL, Marc A. Topaz, Schiffrin & Barroway, LLC, Radnor, PA, for Plaintiffs.

David B. King, King, Thomas A. Zehnder, Blackwell & Downs, P.A., Terry C. Young, Thomas Todd Pittenger, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Frank Moor Bedell, Winderweedle, Haines, Ward & Woodman, P.A., Darryl M. Bloodworth, Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, FL, Kenneth A. Lapatine, Mark Herman Budoff, Toby S. Soli, Greenberg Traurig, LLP, Brooks R. Burdette, David K. Momborquette, Schulte Roth & Zabel, LLP, New York, NY, John C. Massaro, Justin Antonipillai, Scott Schreiber, Arnold & Porter LLP, George H. Mernick, III, Joseph M. Hassett, Hogan & Hartson L.L.P., Washington, DC, for Defendants.

ORDER

PRESNELL, J.

*1 This matter comes before the Court on Motions to Dismiss filed by various Defendants concerning the Plaintiffs' claim in Count IV of their Amended Complaint that these Defendants breached their fiduciary duty to CNL and to CNL's shareholders. [FN1] By a previous Order (Doc. 166), the Court dismissed this same claim and granted the Plaintiffs leave to amend, which they did by filing their Amended Complaint (Doc. 172). The Advisor and the Individual Defendants again move to dismiss this claim. [FN2] The parties have all filed supporting memoranda, [FN3] and the Court held a hearing on this matter on September 9, 2005, at which the parties presented oral argument. For the reasons stated herein, the Defendants' Motions to Dismiss are granted.

FN1. This Order is limited to the issue of the Plaintiffs' claim of breach of fiduciary duty. By separate Order dated September 9, 2005, the Court dismissed Count III of the Amended Complaint. (Doc. 204). The Plaintiffs' remaining claims will be addressed by a separate Order in due course. (See Doc. 205).

FN2. See Docs. 185 and 186, CNL's Motion to Dismiss and Memorandum in support thereof, respectively; Doc. 187, Lawrence Dustin, Craig McAllaster, Charles Adams and Robert Parsons' Joinder in CNL's Motion; Doc. 188, John Griswold and Thomas Hutchison's Joinder in CNL's Motion and Memorandum of Law; Doc. 190, James Seneff and Robert Bourne's Motion to Dismiss; Docs. 191 and 192, CNL Hospitality Corporation's Motion to Dismiss and Memorandum in support thereof. See also the Defendants' Consolidated Reply Brief at Doc. 200.

FN3. The Plaintiffs' Memorandum in opposition to the Defendants' Motions appears at Doc. 197.

I. Background

A. Facts

The facts underlying this case are set out in detail in the Court's Order of May 9, 2005, (Doc. 166), familiarity with which is presumed at present. Briefly, this case involves the claims of investor plaintiffs who purchased CNL stock. The Plaintiffs allege, inter alia, that they acquired their CNL securities pursuant to CNL's prospectuses and registration statements, that those documents contained materially false and misleading statements, and that the Plaintiffs have been damaged as a result. [FN4]

FN4. Because the Court dismissed the claims of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Proxy Class in Count III, the Court does not address the allegations related to Count III to the extent those same allegations are asserted to be relevant to the derivative action claim in Count IV.

B. Defendants

The Plaintiffs bring Count IV against CNL Hospitality Corporation ("CHC" or the "Advisor") and a group of individuals known as the "Individual Defendants." [FN5] The Advisor is a Florida corporation that provides management, advisory and administrative services to CNL. The Advisor conducts CNL's day-to-day operations, under the authority delegated to it by CNL's Articles of Incorporation, an Advisory Agreement, and policies established by CNL's Board of Directors (the "Board"). CNL originally entered into the Advisory Agreement with the Advisor on July 9, 1997, and that Agreement has been renewed annually for successive one year terms. Under that Agreement, the Advisor locates, analyzes and negotiates investment opportunities for CNL, arranges financing for CNL, administers CNL's bookkeeping and accounting functions, consults on policy decisions made by CNL's Board, and renders a variety of other services to CNL. In exchange for its services, the Advisor is entitled to receive fees, including asset management fees, acquisition fees, and development fees. [FN6] All of the Advisor's officers, and a majority of its directors, are also officers and/or directors of CNL.

FN5. The Advisor and the Individual Defendants will be collectively referred to, where appropriate, as the "Defendants."

FN6. Since 1997, the Advisor has received payment of more than $267 million in fees, including asset management, acquisition and development fees, as well as fees related to the securing of permanent financing.

The Individual Defendants include James Seneff, Jr. ("Seneff"), Robert A. Bourne ("Bourne"), Thomas J. Hutchison III ("Hutchison"), John A Griswold ("Griswold"), Charles E. Adams ("Adams"), Lawrence A. Dustin ("Dustin"), Craig M. McAllaster ("McAllaster"), and Robert E. Parsons ("Parsons"). Seneff is the Chairman of the Board of CNL and owns 15.3% of the outstanding common stock of the Advisor. [FN7] Bourne is the Vice-Chairman of CNL's Board and also owns 15.3% of the Advisor's outstanding common stock. Hutchison is the Chief Executive Officer of CNL, and the co-Chief Executive Officer and a director of the Advisor. In the past, he has served as both the president and executive vice president of both CNL and the Advisor. Along with Griswold and three other individuals, he owns 6.1% of the outstanding common stock of the Advisor. Griswold is CNL's president and Chief Operating Officer, and also serves on CNL's Board. In the past, he was both a director and president of the Advisor. Adams, Dustin, McAllaster and Parsons are all directors of CNL.

FN7. Seneff also has indirect ownership interests in the Advisor as follows: CNL Financial Group, Inc. ("CFG"), a Florida corporation, was a direct stockholder of the Advisor until January 1, 2000, when it became an indirect stockholder. CFG is a wholly-owned subsidiary of CNL Holdings, Inc., which is controlled jointly by Defendant James Seneff Jr. and his wife. CNL Holdings, Inc. is not a defendant in this case. CNL Real Estate Group, Inc. ("CREG"), a Florida corporation, is a wholly-owned subsidiary of CFG. CREG owns approximately 53.5 percent of the shares of the Advisor's outstanding common stock.

C. Count IV--Breach of Fiduciary Duty

***2** The Plaintiffs allege that the Advisor and the Individual Defendants have breached their fiduciary duty to CNL and to CNL's shareholders in a number of ways. First, they caused CNL to invest in and enter into bad deals, including: (1) the acquisition of the outstanding capital stock of KSL Recreation Corporation, for which CNL overpaid due to the amount of goodwill included, and as a result of which CNL acquired an enormous tax exposure; and (2) the Marriott acquisitions, which have caused the Plaintiffs to question the independence of the Individual Directors and the Advisor, and as a result of certain aspects of those transactions the possibility for CNL to recover its purchase price is greatly diminished. Second, the Individual Defendants failed to implement appropriate measures to ensure that the Advisor did not become a vehicle for wrongful self-dealing, and thus caused CNL to pay fees to the Advisor far in excess of the average industry rate, and also caused CNL to renew the Advisory Agreement with the Advisor

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

notwithstanding the Advisor's poor performance as measured by CNL's poor financial performance and by certain enumerated criteria. Third, the Individual Defendants and the Advisor caused CNL to potentially incur an illegitimate $83 million fee to the Advisor in connection with the KSL acquisition. The Plaintiffs allege that many of the actions of the Advisor and the Individual Defendants were undertaken not only to the detriment of CNL, but also for the purpose of benefitting the Advisor and its owners.

D. History and Arguments

In a previous Order, the Court determined that these claims constitute a derivative action. [FN8] (Doc. 166 at 30). Under Maryland law, [FN9] a stockholder cannot initiate a derivative action unless he has "alleged the following with particularity: (1)[his] efforts to make a demand on the Board, and shareholders, if necessary, and the reasons for [his] failure to obtain action; or (2) the reasons why demand would have been futile." Edge Partners, L.P. v. Dockser, 944 F.Supp. 438, 442 (D.Md.1996); Byington v. Vega Biotechnologies, Inc., 869 F.Supp. 338, 343 (D.Md.1994) (as a general rule, Federal Rule of Civil Procedure 23.1 requires either demand or pleading of futility); Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123, 133 (Md.2001) ("[A] shareholder [must] make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed.").

FN8. "A derivative action is a claim asserted by a shareholder plaintiff on behalf of the corporation to redress a wrong against the corporation.... By contrast, a direct action is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder." Paskowitz v. Wohlstadter, 151 Md.App. 1, 822 A.2d 1272, 1276 (Md.Ct.Spec.App.2003) (internal citations and quotations omitted).

FN9. In its previous Order regarding Motions to Dismiss, the Court determined that Maryland law applied to these claims. (Doc. 166 at 29 n. 43).

The Plaintiffs concede that they have not made a demand upon the Board of Directors of CNL to bring action against the directors and officers of CNL, but they assert that doing so would have been futile. (Doc. 172 at 34). The Plaintiffs allege that the "majority of the CNL directors serving on the Original Board and the majority of the CNL directors serving on the Current Board are so personally and directly conflicted or committed to the decisions in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgement rule," and thus assert that any demand made prior to the beginning of this litigation would have been futile. (Doc. 172 at 35-35, 37).

***3** The Original Board was composed of Seneff, Bourne, Adams, Dustin, McAllaster and Parsons. The Plaintiffs allege that a majority of the Original Board (Seneff, Bourne, Adams, McAllaster and Parsons) are conflicted and thus would not respond to a demand in good faith because: (1) Seneff directly or indirectly owns 68% of the Advisor; [FN10] (2) Bourne directly owns 15.3% of the Advisor; [FN11] (3) Adams, McAllaster and Parsons are members of CNL's Audit Committee; (4) these individuals oversaw CNL's "exclusive acquisition strategy of Marriott properties" and Parsons formerly served as executive vice president and Chief Financial Officer of Marriott; and (5) all of the directors on the Original Board were signatories to certain offering documents alleged to contain materially false and misleading statements.

FN10. Seneff and his wife also control a majority of the interests in CFG, the owner and parent of the Advisor.

FN11. The Plaintiffs allege that Seneff and Bourne sought to conceal certain breaches of fiduciary duty so that they could capitalize on their ownership of the Advisor by exploiting those breaches in the Advisor's favor.

CNL's Current Board is composed of Seneff, Bourne, Griswold, Hutchison, McAllaster and Parsons, as well as several non-defendants: Douglas Holladay, Jack Kemp and Diana Morgan. The Plaintiffs allege that a majority of the Current Board are conflicted and thus would not respond to a demand in good faith because: (1) of the reasons discussed above regarding Seneff, Bourne, McAllaster and Parsons; and (2) Griswold (currently the Chief Executive Officer and President of CNL) and Hutchison (currently the Chief Operating

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Officer of CNL) are signatories to certain offering documents alleged to contain materially false and misleading statements.

In addition, the Plaintiffs allege that a majority of the Original Board and/or a majority of the Current Board are directly involved in the mismanagement of, and self-dealing practices within, CNL, and thus are implicated in the alleged breaches of fiduciary duties because they: (1) caused or permitted offering documents to contain materially false and misleading statements in violation of Sections 11 and 12; (2) caused or permitted CNL to engage in transactions that financially harmed CNL while benefitting certain Individual Defendants; (3) failed to take action to investigate the alleged wrongful acts or to put in place proper supervision and control mechanisms; [FN12] and (4) allowed CNL to pay unwarranted fees to the Advisor and to renew the Advisory Agreement notwithstanding the Advisor's mismanagement of CNL and other improper conduct.

FN12. The Plaintiffs allege that a majority of CNL's directors knew that certain of the CNL directors derived substantial benefits from the Advisor's management of CNL and yet failed to implement a proper system of oversight or monitoring to prevent self-dealing.

The Defendants move to dismiss this claim arguing that the Plaintiffs have failed to show futility in a manner that satisfies the requirements of Maryland law. More specifically, the Defendants argue that: (1) allegations of wrongdoing by existing directors is not sufficient to establish futility; (2) the Plaintiffs can only speculate that the independent directors have failed to investigate the alleged wrongful acts, which is legally insufficient to satisfy the pleading requirements for futility; and (3) the Plaintiffs' allegation that the independent directors' failure to either hire a different advisor or reduce the Advisor's fees is not sufficient to deprive the directors of their statutory power and thus does not establish futility. [FN13]

FN13. The Advisor also asserts that this claim fails as to the Advisor because it is barred by Florida's economic loss rule, arguing that a claim for breach of fiduciary duty does not lie where, as here, the claim is dependent upon a contractual relationship between the parties.

II. Standard of Review

***4** In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff, Cannon v. Macon County, 1 F.3d 1558, 1565 (11th Cir.1993), and must limit its consideration to the pleadings and any exhibits attached thereto. Fed. R. Civ. P. 10(c); see also GSW, Inc. v. Long County, Ga., 999 F.2d 1508, 1510 (11th Cir.1993). The Court will liberally construe the complaint's allegations in the Plaintiff's favor, Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir.2003).

In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), the rule to be applied is that, "courts must be mindful that the Federal Rules require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." U.S. v. Baxter Intern., Inc., 345 F.3d 866, 880 (11th Cir.2003) (citing Fed. R. Civ. P. 8(a)). This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir.2001). Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Id. (internal citation and quotation omitted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." Sams v. United Food and Comm'l Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir.1989).

III. Legal Analysis

Maryland law provides that the futility exception to the demand requirement

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

is a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

Werbowsky, 766 A.2d at 144; see also Danielewicz v. Arnold, 137 Md.App. 601, 769 A.2d 274, 291-92 (Md.Ct.Spec.App.2001) (noting that any liberal approach to the futility requirement has become more stringent as a result of Werbowsky, and thus futility must be demonstrated "in a very particular manner"); Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 140 (2nd Cir.2004) (noting that Maryland law characterizes the futility exception as "a narrow one"). Further, applying this law, a court should not

*5 excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action.

Werbowsky, 766 A.2d at 143-44.

Neither the Plaintiffs nor the Defendants identified with particularity the members of the Board at the time this action was filed. Accordingly, the Court examines both the current Board and the previous makeup of the Board. [FN14]

FN14. It appears, at least from CNL's Memorandum, that the Defendants believe that demand should have been made to the current Board. (See Doc. 186 at 25). However, in an abundance of caution, the Court will examine both the current and the previous Board.

A. Previous Board

The Court assumes that Seneff and Bourne's ownership interests in the Advisor make them interested and non-independent, [FN15] rendering them unable to respond in good faith to a pre-suit demand, thus leaving four of the six directors. [FN16] As to these directors, the only allegations are that they were members of CNL's Audit Committee, participated in the alleged wrongdoing, and Parsons formerly worked for Marriott. Maryland law specifically rejects the excusing of demand "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision...." Werbowsky, 766 A.2d at 143. Maryland law also rejects general allegations of hostility as insufficient to excuse demand, id. at 144, but such general allegations are all that the Plaintiffs offer. [FN17] Finally, the Plaintiffs have given neither factual nor legal support for their theory that because certain directors served on a management and oversight committee or previously worked for a company with whom CNL now conducts business, they could not have been expected to respond to a demand in good faith. Accordingly, as to these individuals, the Plaintiffs have failed to clearly establish in a particular manner that a pre-suit demand would have been futile. [FN18]

FN15. "A director is considered interested when, for example, he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders...." McCall v. Scott, 239 F.3d 808, 817 (6th Cir.2001). Seneff and Bourne are also alleged to own a "de minimis number of CNL shares either directly or indirectly." (Doc. 172 at 38). The Plaintiffs do not, however, appear to allege that their ownership of CNL shares factors into the futility analysis.

FN16. The court in Werbowsky noted, however, that the demand requirement does not necessarily exclude interested non-independent directors: [Pre-suit demand] gives the directors--even interested, non-independent directors--an opportunity to consider, or reconsider, the issue in dispute. It may be their first knowledge that a decision or transaction they made or approved is being questioned, and they may choose to seek the advice of a special litigation committee of independent directors ... or they may decide, as a business matter, to accede to the demand rather than risk embarrassing litigation.... If a demand is made and refused, that decision, and the basis for it, can be reviewed by a court under the business judgment rule standard. Werbowsky, 766 A.2d at 144.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN17. See Doc. 172 at 36: A majority of the Original Board, and alternatively, a majority of the Current Board, cannot be expected to have acted in the best interest of CNL in their consideration of a demand because they are directly involved in the mismanagement of CNL and self-dealing practices within CNL as alleged herein and by their actions, are deeply implicated in the breach of fiduciary duty claims brought derivatively in this action. See also id. at 37, 766 A.2d 123: Because the majority of CNL Directors is deeply and directly involved in the wrongdoing alleged herein, and had ample opportunity to consider and reconsider the Advisor's self-dealing misconduct in managing CNL, it is highly unlikely that a demand by the Plaintiffs would have led to a resolution of the dispute prior to litigation.

FN18. In support of their argument, the Plaintiffs cite Felker v. Anderson, 2005 WL 602974 (W.D.Mo. Feb.11, 2005), wherein the court denied a motion to dismiss for the plaintiff's failure to make a pre-suit demand because the plaintiff alleged with particularity that the defendants approved of the dissemination of false or misleading press releases, violated state law and fiduciary duties, did not seek to recover the damages suffered by the company, and concealed information from the public. Id. at *3. The Court does not find this opinion persuasive for two reasons. First, it is not clear how to square that holding with Werbowsky' s clear admonition that a court should not "excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision." Werbowsky, 766 A.2d at 143-44. Second, the Court cannot find that sort of allegation sufficient in this case because the Plaintiffs have failed to provide any factual support as to how the Defendants' participation in the alleged wrongdoing renders them unable to respond to a pre-suit demand in good faith. Merely alleging participation in allegedly wrongful acts cannot, without more, be sufficient, especially because, as the court in Werbowsky noted, the demand itself may actually provide the directors with notice that the action in question is being challenged and give them an opportunity to investigate the matter or seek legal advice prior to being forced to engage in litigation. See Werbowsky, 766 A.2d at 144.

B. Current Board

Assuming that Seneff and Bourne are interested and non-independent based on their ownership interests in the Advisor, [FN19] that leaves seven of the nine Board members against whom the Plaintiffs do not present any allegations other than those that are either the same as, or essentially the same as, those the Court has already rejected as insufficient. [FN20] Therefore, the Plaintiffs have failed to clearly establish that it would have been futile to present a pre-suit demand to the current Board of CNL.

FN19. Seneff, Bourne, Griswold and Hutchison are also alleged to own a "de minimis number of CNL shares either directly or indirectly." (Doc. 172 at 38). The Plaintiffs do not, however, appear to allege that their ownership of CNL shares factors into the futility analysis.

FN20. Alternatively, the Court could assume that Seneff, Bourne, Hutchison and Griswold are all interested and non-independent due to their ownership interests in the Advisor. However, that would still leave five of the nine Board members, and thus the resulting analysis would be the same.

IV. Conclusion

The Plaintiffs argue that any pre-suit demand on CNL's Board would have been futile. Ultimately, however, their arguments are long on rhetoric and short on concrete factual support. Instead of offering the clear demonstration, supported with particular factual evidence as is required by Maryland law, the Plaintiffs instead point to certain factors (which, under Maryland law, are insufficient) and simply repeatedly state that based on those factors, demand would have been futile. [FN21] Not only are the Plaintiffs' asserted bases for futility insufficient, but even assuming they were sufficient to establish a conflict, the Plaintiffs wholly failed to offer any factual support demonstrating how or why those bases clearly demonstrate that a majority of the directors could not reasonably have been expected to respond in good faith and within the ambit of the business judgment rule to a pre-suit demand. [FN22] Because the Plaintiffs failed to make a pre-suit demand before bringing this derivative action, and because they have failed to establish that such demand would have been futile, their breach of fiduciary duty claim against the Individual Defendants and the Advisor must be dismissed.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Accordingly, it is

FN21. Indeed, in the space of less than four pages in their Complaint, the Plaintiffs repeat essentially the same allegation--that a majority of CNL's directors were either so conflicted or so committed to the alleged wrongdoing that they would not have responded in good faith to a pre-suit demand--at least seven times.

FN22. The Plaintiffs' approach here, their failure to make a pre-suit demand and their post-hoc attempt to justify that failure violates the spirit of the reason why a pre-suit demand is required: To prevent abuse of this remedy [the derivative form of action] ... equity courts established as a precondition "for the suit" that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions.... The purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right. Kamen v. Kemper Fin. Serv., Inc., 500 U.S. 90, 95-96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (internal citations, quotations and punctuation omitted); see also Scalisi, 380 F.3d at 140 ("[T]he demand requirement is an important device in preventing minority shareholders from controlling corporate litigation against the interests of the corporation and the judgment of the directors.").

***6** ORDERED THAT the Defendants' Motions to Dismiss Count IV (Docs. 185, 187, 188, 190, and 191) are GRANTED. Because the Plaintiffs have had an opportunity to amend their Complaint to properly allege futility and have failed to do so, Count IV is dismissed with prejudice.

DONE and ORDERED.

2005 WL 2219283 (M.D.Fla.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# I

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

**In re COMPUCOM SYSTEMS, INC. STOCKHOLDERS LITIGATION**

**No. Civ.A. 499-N.**

Submitted June 1, 2005.
Decided Sept. 29, 2005.

R. Bruce McNew, Taylor & McNew LLP, Greenville, Delaware; Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; for the Plaintiff.

Darren J. Robbins, Randall J. Baron, A. Rick Atwood, Jr., Shaun L. Grove, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, California; Samuel H. Rudman, David A. Rosenfeld,, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Melville, New York, for the Plaintiff.

Wolf Popper LLP; Marc A. Topaz, Schiffrin & Barroway, LLP, Radnor, Pennsylvania, for the Plaintiff's Executive Committee Members.

Bruce L. Silverstein, Martin S. Lessner, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, for Defendants Coleman, Smith, Musser, Johnson and CompuCom Systems, Inc.

Richard M. Donaldson, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, Delaware; William F. Drake, Jr., Charles B. Casper, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, Pennsylvania, for Defendants Emmi, Ford, Harper, Loewenberg, Paoni, and Patrone.

Alan J. Stone, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for Defendant Safeguard Scientifics, Inc.

MEMORANDUM OPINION AND ORDER

LAMB, Vice Chancellor.

I.

***1** Former minority shareholders of a Delaware corporation bring this purported class action suit against the company, its directors, and the controlling shareholder alleging a breach of fiduciary duty in connection with the sale of the company to a third party on terms that treated all stockholders equally. The complaint alleges that, when the defendant directors sold the company, they were dominated and controlled by the majority shareholder and improperly agreed to sell the company for an inadequate price in order to satisfy the majority shareholder's pressing need for cash.

The defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, in accordance with Rule 12(b)(6) of the Court of Chancery Rules. The issue presented is whether the complaint adequately alleges facts which, if true, would overcome the business judgment rule presumption that the directors acted in good faith and after a careful investigation when they voted to authorize the transaction. [FN1] The court finds that the well-pleaded allegations of fact found in the complaint, if true, could not support a reasonable inference that the board breached its fiduciary duties. Therefore, the defendants' motion to dismiss will be granted.

FN1. The facts recited in this opinion are taken from the well-pleaded allegations of the complaint, unless otherwise noted, and are presumed to be true for the purpose of this motion.

II.

The plaintiff brings this purported class action against CompuCom, its former board of directors, and CompuCom's former controlling shareholder, Safeguard Scientifics, Inc., alleging breach of fiduciary duty in connection with the sale of CompuCom to Platinum Equity Capital Partners, L.P. Specifically, the plaintiff alleges that the CompuCom board of directors failed to comply with its fiduciary duties when it structured a sale of the company to Platinum [FN2] under terms that are alleged to have improperly favored Safeguard, the majority shareholder, to the detriment of the minority shareholders. The plaintiff also alleges that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the defendants sought to discourage CompuCom shareholders from pursuing their statutory right to an appraisal by disseminating a materially false and misleading proxy statement.

FN2. Prior to the acquisition, CompuCom and Platinum were unaffiliated third parties.

A. The Parties

CompuCom is a Delaware corporation with its principal executive offices located in Dallas, Texas. CompuCom is regarded as a leading IT service provider and has been profitable since its formation in 1987. CompuCom's controlling shareholder, Safeguard, is a corporation duly existing and organized under the laws of the Commonwealth of Pennsylvania, having its principal executive offices in Wayne, Pennsylvania. At the time of the disputed transaction, Safeguard owned approximately 48% of CompuCom's common stock and 100% of CompuCom's preferred stock. Due to a super voting provision in the preferred stock agreement, Safeguard held 51% of the voting rights of CompuCom's stock entitled to vote on the acquisition and 58% of the voting rights with respect to the election of CompuCom's directors.

The plaintiff in Civil Action No. 499-N, Central Laborer's Pension Fund, is a trust fund created to provide retirement and other benefits for approximately 14,000 active and inactive union laborers and their beneficiaries. The Pension Fund was a beneficial owner of over 72,000 shares of CompuCom stock.

B. The Sale Of CompuCom

*2 The complaint alleges that the CompuCom board, acting at the behest of Safeguard, timed and structured the sale of CompuCom to benefit Safeguard, a company that was in serious need of cash. According to the complaint, Warren V. Musser, Safeguard's founder and former CEO, personally invested and caused Safeguard to invest millions of dollars in risky Internet and technology companies. When the Internet bubble burst, the value of Safeguard's and Musser's investments in those companies plummeted, leaving Musser in dire straits. Making matters worse, in September 2000, Safeguard guaranteed Musser's margin loans on the failing investments. In May 2001, when Musser was unable to pay back the margin loans, Safeguard bailed him out, loaning him $26.5 million. On January 1, 2003, this loan became payable, but Musser did not have sufficient assets to satisfy the outstanding balance due. [FN3] Thus, allegedly to end the embarrassment of being unable to collect on a loan against its founder and former CEO, coupled with the need for cash to fund its operating costs and ongoing corporate transactions, [FN4] Safeguard began liquidating investment assets in companies in which Musser also invested, which included CompuCom, at "fire sale" prices. [FN5] This provided the impetus for the sale of CompuCom.

FN3. Pl.'s Second Am. Class Action Compl. ("Compl.") ¶ 48. "Safeguard's loans to Musser bear interest at a default annual rate of 9% and became payable on January 1, 2003.... According to Safeguard's March 2004 Annual Report to Shareholders, based on the information then available to Safeguard, Safeguard has concluded that Musser may not have sufficient personal assets to satisfy the outstanding balance due under the loan when the loan became full recourse against Mr. Musser on April 30, 2006."

FN4. Due to Musser's failed investment strategies at Safeguard, the value of Safeguard's assets fell from approximately $1.65 billion on December 31, 2000 to $836 million on December 31, 2003. Its shareholders' equity fell from $904.4 million on December 31, 2000 to $236.2 million on December 31, 2003.

FN5. Compl. ¶ 49. In May 2003, Safeguard sold its interest in Pac-West Telecom and collected approximately $1 million from Musser, who also owned an interest in Pac-West, which was applied towards the unpaid balance of Musser's loan. Additionally, in April 2004, Safeguard received a total of $4.5 million in net cash proceeds from Musser as a result of the sale of Safeguard's and Musser's interest in Sanchez Computer Associates.

On August 1, 2002, the CompuCom board organized a Special Committee comprised of four purportedly independent directors, Richard F. Ford, Edwin L. Harper, Anthony J. Paoni, and Edward N. Patrone, to sell Safeguard's shares of CompuCom, or, in the alternative, put CompuCom up for sale. The Special Committee was charged with evaluating indications of interest received from

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

potential acquirers, reviewing CompuCom's strategic alternatives, and making recommendations to the full board of directors. In connection with this sale process, the Special Committee retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. as its financial advisor to render a fairness opinion to the Special Committee on any proposed transaction. In addition, the Special Committee independently selected and retained legal and financial advisors to assist the committee in considering strategic alternatives available to CompuCom. The company retained Broadview International LLC to act as the financial adviser to the full board. After over 18 months of exploring various strategic alternatives, the Special Committee had not located a suitable deal.

The complaint does not discuss the committee's efforts over those 18 months and does not allege any specific defect in the sale process pursued by the Special Committee. In fact, the complaint makes no allegations at all about any deficiencies in the actions of the Special Committee in the sale of CompuCom. Instead, the complaint focuses on attacking the independence of the committee members.

In February of 2004, the CompuCom board added two members, Michael J. Emmi and John D. Loewenberg, to the Special Committee. At this time, negotiations with Platinum were underway. On March 24, 2004, Platinum proposed to pay $5 per share in cash to the non-Safeguard common stockholders, $4.50 in cash for the shares of CompuCom common stock held by Safeguard, and $8 million for the shares of CompuCom preferred stock, all of which was held by Safeguard. This offer was rejected by Safeguard and the Special Committee. Then, on May 27, 2004, CompuCom and Platinum entered into an Agreement and Plan of Merger (the "Merger Agreement") which provided that each outstanding share of CompuCom's common stock, in a non-discriminatory manner, would be converted into the right to receive $4.60 in cash, and each outstanding share of CompuCom's preferred stock would be converted into the right to receive the par value of the preferred ($15 million in the aggregate), plus accrued and unpaid dividends. The total consideration for the transaction was valued at $254 million, of which Safeguard received approximately $128 million.

*3 Houlihan Lokey and Broadview made formal presentations to the Special Committee and the CompuCom board stating their opinion that the proposed merger consideration of $4.60 in cash for the common stock was fair to CompuCom's public stockholders. [FN6] Houlihan Lokey's and Broadview's fairness opinions were supported by a number of financial analyses that were disclosed in the proxy statement distributed to CompuCom's stockholders in connection with the merger. After reviewing the terms of the Merger Agreement and Houlihan Lokey's fairness opinion, the Special Committee unanimously resolved to recommend the Merger Agreement to the full board. Thereafter, in reliance on the Special Committee's recommendation and Broadview's fairness opinion, the board unanimously approved the Merger Agreement.

FN6. Compl. ¶ 77.

The complaint attacks the adequacy of the acquisition price. First, the plaintiff alleges that the deal provided no premium to the public shareholders for their shares of common stock. Indeed, the price of $4.60 in cash per common share paid by Platinum represented a discount to CompuCom's closing price of $4.84 on May 27, 2004, the day before the proposed acquisition was announced. [FN7] As negotiations were in progress, however, the public trading price for CompuCom's shares ranged from as low as $4.16 to as high as $5.99. [FN8] Second, the plaintiff points to CompuCom's profitability at the time of the acquisition, alleging that CompuCom had more than $264 million in current assets, including cash, cash equivalents, and inventory, and approximately $400 million in total assets on its balance sheet. According to the complaint, "the Company has been profitable each of its seventeen years of operation." [FN9] Lastly, the plaintiff alleges that the unfair terms of the acquisition raised the "ire of the investment community." [FN10] To support this contention, the plaintiff cites to news articles in which portfolio managers called the acquisition an "unappealing proposition ... at a price for a stock that's extremely undervalued" and a deal "so out of whack that it fails to pass the smell test." [FN11]

FN7. Compl. ¶ 75.

FN8. Id.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN9. Compl. ¶ 2.

FN10. Compl. ¶ 80.

FN11. Compl. ¶¶ 80-84.

Although the complaint attacks the adequacy of the deal price, it does not claim that the Merger Agreement contained strong lock-ups or other deal protection provisions that prevented the emergence of a competing bid. [FN12] Indeed, the complaint refers to the fact that, although Safeguard agreed to vote in favor of the merger, its obligation to do so was conditioned on the approval of its own stockholders. From this allegation, it is obvious that any superior competing proposal could have succeeded. Nonetheless, the complaint fails to allege that any higher or better alternative to the Platinum proposal ever emerged.

FN12. The Platinum/CompuCom Merger Agreement contained a break-up fee in which CompuCom agreed to pay a termination fee of $8.88 million to Platinum if the CompuCom board of directors canceled the sale of CompuCom, or, in the alternative, CompuCom was to pay Platinum's fees and expenses incurred in the transaction up to $4 million if the merger was terminated because either CompuCom's or Safeguard's shareholders did not approve the merger. The Merger Agreement also contained a "No Solicitation" provision prohibiting any CompuCom employee, director, officer, accountant, lawyer or other representative from engaging in discussions with any third party concerning the sale of CompuCom to an alternative purchaser--including potential alternative purchasers who express an interest in making a superior offer to Platinum's--until and unless a third party's interest is reduced to a written proposal, communicated to Platinum, and Platinum is given two days to meet or exceed the proposal.

On July 15, 2004, the company issued a definitive proxy statement that solicited its shareholders' approval of the merger. Then, on August 19, 2004, several weeks after the filing of the amended complaint in this action, the defendants issued a supplement to the proxy statement and postponed the shareholder meeting and vote. The proxy supplement was issued to "avoid any argument that the proxy statement should have included factual information on the issues identified by the plaintiffs." [FN13] The proxy supplement provided additional disclosures about, among other things, the relationship between Safeguard and CompuCom's Special Committee members and information regarding the board's efforts to find alternative value-maximizing transactions. Thereafter, on September 9, 2004, the company issued a press release announcing the merger had been approved by the company's stockholders.

FN13. Compl. ¶ 8.

C. The Individual Defendants

***4** Before the transaction at issue, CompuCom had an 11-member board of directors consisting of defendants J. Edward Coleman, Anthony L. Craig, Michael J. Emmi, Richard F. Ford, Edwin L. Harper, Delbert W. Johnson, John D. Loewenberg, Warren V. Musser, Anthony J. Paoni, Edward N. Patrone, and M. Lazane Smith. The complaint alleges that,

> Safeguard has used its voting power to pack CompuCom's 11 member Board of Directors, and the so called "Special Committee," that ostensibly was created to evaluate the Proposed Acquisition on behalf of the minority shareholders of CompuCom, with individuals dominated and controlled by Safeguard. [FN14]

FN14. Compl. ¶ 2. The plaintiff contends that the CompuCom board and the Special Committee were beholden to Safeguard, and thus dominated and controlled by it, based on numerous connections between the individual defendant directors and Safeguard. [FN15] The complaint makes specific factual allegations that at least a majority of its 11 directors served as directors and/or officers of Safeguard, had other substantial associations with Safeguard's affiliates and/or subsidiaries, and/or previously served on multiple Safeguard portfolio company boards in which Safeguard held large equity interests.

FN15. Compl. ¶ 45.

First, as to the five non-Special Committee director defendants, Coleman, Smith, Musser, Craig, and Johnson, the plaintiff alleges that they were dominated and controlled by Safeguard because they were placed on the CompuCom board through Safeguard's voting power. In addition, Coleman and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Smith obtained a new employment agreement and other monetary benefits as a result of the acquisition. [FN16] Musser was the founder and former chairman of Safeguard, and Craig was the current president, chief executive officer, and director of Safeguard. Johnson served as an executive of Safeguard for 30 years and as a director emeritus of Safeguard and was chairman of the board and chief executive officer of Pioneer Metal Finishing, a former division of Safeguard.

FN16. Coleman received over $5 million and Smith received over $2 million as a result of the acquisition.

Second, as to the six Special Committee members, the plaintiff contends that, while the members were not at the time employed by Safeguard, they were sufficiently connected to Safeguard to make them beholden to Safeguard. Specifically, the plaintiff alleges that between May 1993 and April 2000, Special Committee directors Paoni, Patrone, Ford, Emmi, and Loewenberg purchased, or were given the opportunity to purchase, shares in the initial public offerings of several Safeguard portfolio companies. [FN17] These IPO allocation benefits allegedly enabled the directors to receive profitable financial opportunities through their association with Safeguard. Additionally, Harper was an employee of Fortis, Inc., which had a business relationship with DocuCorp, a company in which Safeguard formerly held a significant equity interest. Paoni held outside directorships with two portfolio companies of Safeguard, Arista Knowledge Systems, Inc., and e-Certify, and was vice chairman of DiamondCluster International, Inc., a company previously taken public by Safeguard. Emmi served on the Safeguard board of directors from 1998 to 2002 and was a director of Metallurg, Inc., a majority-owned subsidiary of Safeguard. Loewenberg is alleged to have served as an advisor to Safeguard through an independent consulting firm, JDL Enterprises, where he is the managing partner. Moreover, Loewenberg previously served on boards of directors of several companies in which Safeguard at one time owned substantial equity interests. [FN18]

FN17. Compl. ¶ 8. These companies included: Artemis International Solutions Corporation, Cambridge Technology Partners, Inc., Coherent Communications Systems Corporation, Chroma Vision Medical Systems Inc., DocuCorp, DTP, eMerge Interactive, Inc., Internet Capital Group, Inc., OAO Technology Solutions, Inc., Pac-West Telecom, Inc., Sanchez, and USDATA Corporation.

FN18. Loewenberg was a director of DocuCorp International, Inc., Diamond Technology Partners, Inc., and Sanchez Computer Associates, companies in which Safeguard formerly maintained significant equity positions.

III.

*5 The standard for dismissal pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. A motion to dismiss will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading. [FN19] That determination is generally limited to the factual allegations contained in the complaint. In considering this motion, the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint. [FN20] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true. [FN21] However, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences. [FN22]

FN19. Kohls v. Kenetech Corp., 791 A.2d 763, 767 (Del.Ch.2000).

FN20. Growbow v. Perot, 539 A.2d 180, 188 n. 6 (Del.1988).

FN21. Id.

FN22. In re Lukens Inc. Shareholders Litig., 757 A.2d 720, 727 (Del.Ch.1999).

IV.

The court begins its analysis with the presumption of the business judgment rule. At the core of Delaware corporate law is the presumption that, in making a business decision, the directors of a corporation act on an informed basis, in good faith, and in the honest belief that the action taken is in the best interest of the company. [FN23] "Absent an abuse of discretion, that judgment will be respected

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

by the courts. The burden is on the party challenging the decision to establish facts rebutting the presumption." [FN24] In this way, the business judgment rule serves to promote the role of the board, and not the court, as the ultimate manager of the business and affairs of the corporation. [FN25]

FN23. Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984).

FN24. Id.

FN25. 8 Del. C. § 141(a).

When a board of directors determines to put the corporation up for sale, its responsibility is to endeavor to secure the highest value reasonably attainable for the stockholders. [FN26] Thus, when the CompuCom board, at the suggestion of Safeguard, undertook to find a buyer for the whole enterprise, the CompuCom board and the Special Committee were charged with getting the maximum value reasonably attainable for the stockholders. "This obligation is a contextually-specific application of the director's duty to act in accordance with their fiduciary obligations, and there is no single blueprint that a board must follow to fulfill its [Revlon ] duties." [FN27] Rather, the court must take into account the relevant circumstances to determine whether the CompuCom board and the Special Committee acted faithfully and with due diligence. If the court concludes that the facts do not support an inference of disloyalty or lack of due care, the board's actions are entitled to the protections of the business judgment rule.

FN26. McMillan v. Intercargo Corp., 768 A.2d 492, 502 (Del.Ch.2000) (citing Revlon, Inc. v. MacAndrews & Forbes Holding, Inc., 506 A.2d 173, 182 (Del.1986)).

FN27. Id.

The plaintiff asserts that it has pleaded facts sufficient to rebut the presumption of the business judgment rule, and that this court should refuse dismissal at this stage of the proceedings. The court disagrees. Taking the plaintiff's allegations as true, the plaintiff has not alleged sufficient facts to support a reasonable inference that the CompuCom board and the Special Committee were dominated and controlled by Safeguard. Similarly, the plaintiff's factual allegations contained in the complaint do not overcome the presumption that the CompuCom board acted on an informed basis, in good faith, and in an honest belief that the Platinum transaction was in the best interest of CompuCom and all its shareholders.

A. Sale Of CompuCom

***6** The plaintiff's factual allegations that the defendant directors breached their fiduciary duties in the sale of CompuCom are threefold: (1) that the board orchestrated a "fire sale" in order to address Safeguard's desperate need for cash; (2) that the board, at the behest of Safeguard, refused to accept less consideration for Safeguard's controlling shares than was to be paid for the shares owned by the public stockholders; and (3) that the $4.60 sale price was inadequate.

Generally speaking, a controlling shareholder has the right to sell his control share without regard to the interests of any minority shareholder, so long as the transaction is undertaken in good faith. [FN28] The same has long been true as a general proposition when a parent chooses to negotiate for the sale of a subsidiary corporation to an independent third party. The reasons for the law's tolerance of such sales is clear--as the owner of a majority share, the controlling shareholder's interest in maximizing value is directly aligned with that of the minority.

FN28. See Harris v. Carter, 582 A.2d 222, 234 (Del.Ch.1990) (stating that "it is [a] principle [of Delaware law] that a shareholder has a right to sell his or her stock and in the ordinary case owes no duty in that connection to other shareholders when acting in good faith").

In McMullin v. Beran, the Delaware Supreme Court held that in the context of such a transaction, the board of the subsidiary corporation cannot entirely abdicate its responsibilities to its minority shareholders. [FN29] It cannot, as the board did in that case, simply leave everything to the management of a different corporation. [FN30] As discussed in McMullin, the Chemical board delegated full control of the sales process to the controlling shareholder, ARCO. ARCO hired an investment bank, solicited bids, and reviewed and rejected bids. The Chemical board permitted ARCO to unilaterally initiate, structure, and negotiate the

merger agreement without establishing any procedural safeguards to protect the interests of the Chemical minority shareholders. [FN31] The Chemical board also did not conduct a critical assessment of the third party transaction, nor did it make an independent determination as to whether the transaction maximized value for all shareholders. [FN32]

FN29. 765 A.2d 910, 919 (Del.2000).

FN30. See In re Siliconix Inc., 2001 Del. Ch. LEXIS 83, at *29-30, 2001 WL 716787 (Del. Ch. June 19, 2001). McMullin teaches, inter alia, that in the context of a merger of a subsidiary with a third party (thereby effecting a complete sale of the subsidiary) where the controlling shareholder wants the merger to occur and the minority shareholders are powerless to prevent it: (i) the directors of the subsidiary have an 'affirmative duty to protect those minority shareholders' interests;' (ii) the board cannot 'abdicate [its] duty by leaving it to the shareholders alone' to determine how to respond; and (iii) the board has a duty to assist the minority shareholders by ascertaining the subsidiary's value as a going concern so that the shareholders may be better able to assess the acquiring party's offer and, thus, to assist in determining whether to pursue appraisal rights.

FN31. McMullin, 768 A.2d at 921 (emphasis added).

FN32. Id. at 920.

Such neglect is inconsistent, the Supreme Court explained, with the important bonds of fiduciary duty that tie directors to those who rely on them for protection from potentially overbearing controllers. When faced with such a transaction, therefore, this court has a duty to test the actions of the board against the business judgment rule. The business judgment rule's presumption may be rebutted by an allegation of a breach of the duty of due care, as when a board is rushed or uninformed. More important for the instant case, however, the presumption that the board acted in good faith can be rebutted if the court finds that the plaintiff has alleged sufficient facts that, if true, permit a reasonable inference that (1) the board was dominated by the controlling shareholder, and (2) this domination led the board to accommodate the controller rather than act in the best interest of all the subsidiary's shareholders. The latter test may be met, for example, by precisely the kind of allegation made in McMullin--that the subsidiary board allowed the parent to independently negotiate a deal uniquely advantageous to itself, without regard to conflicting the interests of the subsidiary's minority shareholders. [FN33]

FN33. Id.

*7 Unlike McMullin, the complaint itself reveals that the board of CompuCom undertook its fiduciary duty of care with all the seriousness and diligence that was required. The CompuCom board formed a Special Committee of outside directors to negotiate the sale with Platinum. [FN34] This Special Committee evaluated indications of interest received from potential acquirers, reviewed CompuCom's strategic alternatives, negotiated the deal with Platinum, and made recommendations to the full CompuCom board. All this was done with the aid of independently selected and retained legal and financial advisors. The CompuCom board reasonably relied on Houlihan Lokey's and Broadview's fairness opinions, which concluded that the $4.60 in cash consideration for CompuCom common stock was fair to the CompuCom public stockholders. These fairness opinions were supported by a number of financial analyses.

FN34. Id. at n. 48 The Supreme Court in McMullin criticizes the board for not involving the company's Special Committee in the sale process when it states, "[t]he Board failed, however, to authorize the Special Committee to protect and enhance the interests of the Company and its public shareholders in connection with the subsequent sale of the Company to Lyondell.... The Board's failure to empower the Special Committee to actively participate in the sale of the Company is inexplicable."

Moreover, the CompuCom board did not hastily approve a transaction about which it was not fully informed. In McMullin, the board met once to consider the transaction. [FN35] Here, by contrast, the plaintiff itself concedes that the sale of CompuCom was the culmination of a multi-year process, beginning in 2002 and coming to agreement in 2004, in which the Special Committee explored various strategic alternatives to maximize

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

stockholder value. [FN36] Thus, the plaintiff's claim that the CompuCom board orchestrated a "fire sale" and rashly sold CompuCom for a discounted price rings particularly hollow. [FN37]

FN35. Id. at 922.

FN36. Compl. ¶ 58.

FN37. Compl. ¶ 49. The plaintiff also claims that the board breached its fiduciary duties by agreeing to equal consideration amongst the common stockholders. Specifically, the complaint alleges that Safeguard originally agreed to structure the transaction in such a way that it received less per-share consideration than CompuCom's non-Safeguard shareholders (with those non-Safeguard shareholders to receive at least $5 per share for their CompuCom stock), but through its control of the special committee, Safeguard was able to obtain a larger share of the total merger consideration, ultimately getting the same $4.60 per share as the Company's non-Safeguard shareholders. Compl. ¶ 60. This claim, that the minority shareholders were entitled to more per share consideration than Safeguard, the controlling shareholder, is not supported by Delaware law. Mendel v. Caroll, 651 A.2d 297, 305 (Del.Ch.1994) ("The law has acknowledged ... the legitimacy of the acceptance by controlling shareholders of a control premium.); c.f. Paramount Communications v. QVC Network, 637 A.2d 34, 45 (Del.1994) (Revlon requires an auction because "an asset belonging to public stockholders [a control premium] is being sold and may never be available again.").

Nor can the court infer that the price of the challenged merger was so inadequate as to overcome the business judgment rule. It is not enough to argue that the financial press published objections to the adequacy of the $4.60 price. [FN38] Nor is the fact that the final price per share was below the market price on the day of sale enough to rebut the business judgment presumption. As the plaintiff concedes in its complaint, the public trading price for CompuCom's shares ranged from as low as $4.16 (9.6% below the offer price) to as high as $5.99 (30.2% above the offer price) during the period that negotiations were underway with Platinum. Simply put, the mere fact that the deal price was 24 cents below a market price buffeted by the force of entirely predictable volatility does not state a claim for breach of fiduciary duty. Moreover, if the plaintiff was dissatisfied with the price, it could have exercised its appraisal remedy.

FN38. To support this allegation, the plaintiff points to the market price of CompuCom prior to the announcement of the transaction and news articles in the Wall Street Journal in which portfolio managers called the acquisition an "unappealing proposition ... at a price for a stock that's extremely undervalued." Compl. ¶ 80.

Lastly, the plaintiff does not contend that the Merger Agreement contained any strong lock-ups or other deal protection measures that would unduly impede a bidder willing to pay a higher price from coming forward. [FN39] The plaintiff also does not allege that a better offer was available. Not surprisingly, after several years of actively seeking to sell the company, no higher bid emerged. Stated briefly, the well-pleaded allegations do not support a reasonable inference that the CompuCom directors were inadequately informed, acted irrationally, or did not fulfill their obligation to seek the best value reasonably available to the stockholders. [FN40]

FN39. Compl. ¶¶ 64-65; See Paramount, 637 A.2d at 49.

FN40. The court notes that the CompuCom Restated Certificate of Incorporation contains an exculpatory provision pursuant to Section 102(b)(7). The complaint does not contest the existence or authenticity of CompuCom's 102(b)(7) provision. As to the plaintiff's duty of care claim, the plaintiff does not allege conduct on the part of the Special Committee members that could be viewed as rising to the level of gross negligence or bad faith. See In re Walt Disney Co. Deriv. Litig., 825 A.2d 275, 289 (Del.Ch.2003).

***8** Because the plaintiff has not alleged sufficient facts to show that the CompuCom board neglected its duty of care in the sale transaction, the plaintiff must alternatively show that the Compucom board was dominated and controlled by Safeguard to such an extent as to overcome the business judgment presumption. A party alleging domination and control of a company's board of directors bears the burden of proving such control by showing a lack of independence on the part of the directors. [FN41] In assessing director independence, the court is called

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

upon to apply a subjective "actual person" standard, instead of an objective "reasonable director" standard in making its determination. [FN42] An independent director is one whose decision "is based on the corporate merits of the subject before the board rather than extraneous considerations or influence," [FN43] while a director who is not independent is "dominated or otherwise controlled by an individual or entity interested in the transaction." [FN44] Control over individual directors is established by facts demonstrating that "through personal or other relationships the directors are beholden to the controlling person" [FN45] or so under their influence that "their discretion would be sterilized." [FN46]

FN41. Odyssey Partners, L.P. v. Fleming Co., 735 A.2d 386, 407 (Del.Ch.1999).

FN42. Orman v. Cullman, 794 A.2d 5, 24 (Del.Ch.2002); Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1167 (Del.1995).

FN43. Aronson, 473 A.2d at 816.

FN44. In re Maxxam, Inc., 659 A.2d 760, 773 (Del.Ch.1995).

FN45. Aronson, 473 A.2d at 815.

FN46. Rales v. Blasband, 634 A.2d 927, 936 (Del.1993).

Based on the aforementioned standard and the main factual allegations in the plaintiff's complaint, the court cannot reasonably infer that the Special Committee directors were improperly influenced or controlled by Safeguard. First, as to the alleged IPO allocation benefits, the complaint does not explain why having received these benefits in years past would constitute a disabling conflict for the members of the Special Committee. The complaint does not address how much the IPO opportunities were worth, why the members of the Special Committee received them, and which (if any) of the members of the Special Committee actually invested in the IPOs. The complaint simply does not allege that these IPO allocation benefits were material to the directors. Moreover, the complaint does not allege that Safeguard gave the members of the Special Committee the IPO opportunities. Instead, the complaint simply repeats the words of the proxy supplement and then alleges that the Special Committee members were able to purchase shares in these IPOs "through their relationship with Safeguard." [FN47] This bare allegation, without more, is insufficient to reasonably infer that the Special Committee lacked independence from Safeguard. [FN48]

FN47. Compl. ¶¶ 8, 88.

FN48. One can certainly imagine a situation where receiving the current opportunity to invest in an IPO would be sufficient to prove, or at least raise a reasonable inference of, a lack of independence. For example, a complaint alleging that the opportunity was extremely valuable, or that the director was in desperate need of cash, or some combination of the two.

Second, as to the directors' connections to Safeguard, it is significant that, at the time the sale to Platinum was negotiated, none of the members of the Special Committee had employment relationships with CompuCom, Safeguard, or Platinum. [FN49] The plaintiff does not allege that any of the Special Committee board members received special benefits as a result of the transaction or were given improper incentives to favor Safeguard. Instead, the plaintiff claims that the Special Committee lacked independence because a majority of the Special Committee members served as directors and executives in companies in which Safeguard formerly held an equity interest.

FN49. The plaintiff quotes McMullin as controlling precedent; however, McMullin found that 8 of the 12 Chemical directors were not independent because 6 of the Chemical directors were currently employed by ARCO, to wit, ARCO's chief financial officer and executive vice-president, another ARCO executive vice-president, and 4 senior vice-presidents of ARCO. The remaining 2 directors were alleged to have prior affiliations with ARCO as officers of other ARCO subsidiaries. Unlike McMullin, the complaint here does not allege that any of the Special Committee members were employed by Safeguard when the Platinum transaction was consummated.

***9** The court recognizes that under certain circumstances, professional, financial, and personal relationships of directors may preclude a finding of

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

independence. [FN50] However, the plaintiff's factual allegations do not meet the relevant standard. [FN51] According to Tremont, "the independence or not of the member of a special committee is a question of fact that turns not simply upon formality but upon the reality of the interests and incentives affecting the independent directors." [FN52] Here, the plaintiff does not allege that these former business relationships were material to the directors or that Safeguard has or ever had an ability to influence or exert any control over these directors. [FN53] "Our cases have determined that personal friendships, without more; outside business relationships, without more ... are each insufficient to raise a reasonable doubt of a director's ability to exercise independent business judgment." [FN54] Thus, the court cannot infer that Safeguard had the ability to influence and impair the business judgment of these directors because they formerly served as outside directors for companies in which Safeguard held an equity interest.

FN50. See Krasner v. Moffet, 826 A.2d 277, 283 (Del.2003) (finding that at the pleading stage, the plaintiff's allegations that two directors were interested when they "received substantial income from other entities within the interlocking directorates of Freeport-McMoRan companies and arguably had an interest in appeasing the MOXY and FSC insiders who also served" with them "on the boards of other Freeport companies" was sufficient to sustain an inference of interestedness).

FN51. Beam v. Stewart, 845 A.2d 1040, 1052 (Del.2004). (stating that "to create a reasonable doubt about an outside director's independence, a plaintiff must plead facts that would support the inference that ... the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director"). Although Beam involved a review of the sufficiency of the plaintiff's allegations under Rule 23.1, the Supreme Court's interpretation of the type of relationship required to rebut the presumptive independence of an outside director provides insight in the context of this dismissal motion brought pursuant to Rule 12(b)(6).

FN52. Kahn v. Tremont, 1992 Del. Ch. LEXIS 165, 1992 WL 205637 *3, 1992 WL 205637 (Del. Ch. Aug. 21, 1992), rev'd on other grounds, 694 A.2d 422 (Del.1997).

FN53. Official Comm. Of Unsecured Creditors of Integrated Health Servs. v. Elkins, Del. Ch. C.A. No. 20228, Noble, V.C. (Aug. 24, 2004) ("General allegations of domination over a Board are simply not sufficient under Delaware law to state a tradition duty of loyalty claim.").

FN54. Cal. Pub. Employee's Ret. Sys. v. Coulter, 2002 WL 31888343, at *9 (Del.Ch. Dec.18, 2002) (emphasis added).

The plaintiff makes additional allegations about Emmi and Loewenberg, the directors added to the Special Committee in 2004. In particular, Emmi was a non-management director of Mettullurg, Inc., which was a majority-owned subsidiary of Safeguard, and he was also a former director of Safeguard from 1999 to 2002. Loewenberg served as an advisor to Safeguard through an independent consulting firm, JDL Enterprises, of which he was the managing partner.

The allegation that Emmi was a director of another majority-owned subsidiary of Safeguard does not support an inference that he was dominated and controlled by Safeguard in the transaction to sell CompuCom. The complaint does not allege that Emmi received material compensation for serving as a director, that Emmi felt beholden to Safeguard, or that Emmi was conflicted in his loyalties with respect to the challenged board action. [FN55] In addition, the fact that Emmi was a former non-management Safeguard director does not mean he could not assert independent judgment in this transaction. Therefore, the court concludes that the plaintiff's allegations are insufficient to rebut Emmi's presumptive independence from Safeguard.

FN55. Litt v. Wycoff, 2003 WL 1794724, at *4 (Del.Ch. Mar.28, 2003).

The complaint does not allege sufficient facts as to Lowenberg to support an inference that he was dominated and controlled by Safeguard. The plaintiff does not allege what compensation Loewenberg and/or JDL Enterprises obtained for Loewenberg's advisory services, nor does the complaint allege that such fees constituted such a large part of his or the firm's income so as to be material to Loewenberg or JDL Enterprises. The plaintiff merely states conclusory allegations which do not support a reasonable inference that

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Loewenberg lacked independence.

In summary, the court finds that the factual allegations do not suffice to rebut the business judgment rule's presumption of director independence. The plaintiff has not alleged facts sufficient to establish that the Special Committee lacked the independence to consider objectively whether the transaction was in the best interest of CompuCom and all of its shareholders.

***10** Furthermore, the complaint does not contain enough well-pleaded factual allegations to support a reasonable inference that Safeguard's, the Special Committee's, or the CompuCom board's interests were not aligned with the plaintiff. The plaintiff's theory that Safeguard improperly forced an immediate sale of CompuCom at a "fire sale price" because of its desperate need for cash simply does not hold water, especially since the process of finding a suitable transaction dragged on for more than two years. Nor does the complaint allege that Safeguard or any other holder of CompuCom's common stock received different consideration for its shares in the merger. The plaintiff does not allege that Safeguard received any special benefits in the transaction at the expense of the minority shareholders. In other words, the plaintiff does not adequately allege that the merger was anything other than an arms-length transaction with an unaffiliated third party pursuant to the goal of maximizing shareholder value by attaining the best possible price. [FN56]

FN56. The plaintiff just makes a blanket statement in the complaint that "the Acquisition is the product of a hopelessly flawed process that was designed to ensure the sale of CompuCom to one buyer and one buyer only, on terms preferential to Platinum and to subvert interests of the plaintiff and the other public stockholders of CompuCom." Compl. ¶ 73.

It appears that the plaintiff is merely expressing its disagreement with the business judgment of the members of the CompuCom board regarding the merits of the Merger Agreement. This does not provide a basis for liability. Thus, for all of the foregoing reasons, the court concludes that the complaint does not allege sufficient facts of a violation of the defendants' fiduciary duties to overcome the presumption of the business judgment rule.

B. Misleading Proxy

Finally, the plaintiff claims that the defendants sought to discourage the CompuCom shareholders from pursuing its statutory right to an appraisal by failing to adequately disclose all material information to CompuCom's shareholders. [FN57] The operative complaint (which is the second amended complaint) contains allegations regarding the defendants' alleged failure to make adequate disclosures in the original proxy statement distributed to CompuCom's stockholders. That complaint also acknowledges that, after the filing of the first amended complaint, CompuCom issued a proxy supplement that addressed several, if not all, of the plaintiff's non-disclosure allegations, disclosing information about the Special Committee directors' ties to Safeguard and the CompuCom board's efforts to find alternative value-maximizing transactions. [FN58] What the operative complaint does not do is explain why the disclosures made in the proxy supplement are insufficient to cure the alleged disclosure violations the plaintiff previously advanced with respect to the original proxy statement. The plaintiff's brief in response to the motion to dismiss also makes little effort to argue for the continued existence of any material issue relating to the proxy materials. [FN59] Indeed, a review of the complaint and all the relevant proxy materials leads the court to conclude that the proxy supplement cured whatever well pleaded disclosure claims the plaintiff originally alleged.

FN57. Compl. ¶ 98.

FN58. Compl. ¶¶ 85-88.

FN59. The plaintiff argues in its brief in opposition to the defendants' motion to dismiss that the Broadview and Houlihan Lokey fairness opinions were materially inadequate, without any specification, because they failed to adequately disclose the work performed and analysis underlying their opinions. After reviewing the proxy, the court cannot infer that the defendants did not adequately disclose the underlying analysis of their opinions.

V.

***11** For the foregoing reasons, the defendants' motion to dismiss pursuant to Rule 12(b)(6) is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

GRANTED. IT IS SO ORDERED.

2005 WL 2481325 (Del.Ch.), 31 Del. J. Corp. L. 687

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# J

Only the Westlaw citation is currently available.

United States District Court,
S.D. California.

**In re INFOSONICS CORPORATION DERIVATIVE LITIGATION.**

**No. 06cv1336 BTM(WMc).**

Sept. 4, 2007.

Hassan Elrakabawy, Kimberly Arouh Hicks, Peter H. Benzian, Latham and Watkins, San Diego, CA, for Infosonics Corporation Derivative Litigation.

ORDER DENYING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, GRANTING MOTION TO DISMISS FOR FAILURE TO MAKE A DEMAND ON THE BOARD OF DIRECTORS, AND GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FOR LACK OF STANDING AND FAILURE TO STATE A CLAIM

BARRY TED MOSKOWITZ, United States District Judge.

***1** Specially appearing Defendants Robert S. Picow ("Picow") and Randall P. Marx ("Marx") have filed a motion to dismiss for lack of personal jurisdiction. Nominal Defendant InfoSonics Corporation and individual Defendants Joseph Ram ("Ram"), Jeffrey A. Klausner ("Klausner"), Joseph C. Murgo ("Murgo"), Abraham G. Rosler ("Rosler") and Kirk A. Waldron ("Waldron") have filed a motion to dismiss for failure to make a demand on the Board of Directors, and a motion to dismiss for lack of standing and failure to state a claim. For the reasons discussed below, Picow and Marx's motion to dismiss for lack of personal jurisdiction is DENIED. Defendants' motion to dismiss for failure to make a demand on the Board of Directors is GRANTED, and Defendants' motion to dismiss for lack of standing and failure to state a claim is GRANTED IN PART AND DENIED IN PART.

I. BACKGROUND

This action is a derivative lawsuit brought by shareholders of InfoSonics Corporation ("InfoSonics" or the "Company") on behalf of the Company. InfoSonics is a Maryland corporation with headquarters in San Diego, California. Defendant Ram is the Chairman of the Board, President, CEO and a director of InfoSonics. Defendant Klausner is the CFO of InfoSonics. Defendant Murgo is the Vice President of Sales of InfoSonics. Defendant Rosler is the Executive Vice President and a director of InfoSonics. Defendant Marx is a director of Infosonics. Marx is also a Chairman of the Board's Audit and Compensation Committees and is a member of the Board's Nominating and Corporate Governance Committee. Defendant Picow is a director of InfoSonics and is also a member of the Board's Audit, Compensation, and Nominating and Corporate Governance Committees. Defendant Waldron is a director of InfoSonics and is a member of the Board's Audit, Compensation and Nominating and Corporate Governance Committees.

This action arises out of allegedly "backdated" stock options granted in December 2005 and the misclassification of warrants issued by InfoSonics, which later led to a restatement of its net income for the first quarter of fiscal year 2006.

A. Backdating of Stock Options

In a proxy statement filed with the SEC on July 8, 2005, the Company proposed to amend its 2003 stock option plan, and explained: "The Plan provides that the exercise price of incentive options granted cannot be less than the fair market value of the underlying common stock on the date the incentive options are granted." (Verified Consolidated Shareholder Derivative Complaint ("Compl.") ¶ 24.)

The Form 10-K filed on behalf of InfoSonics for fiscal year 2005, stated that "[o]n December 30, 2005, the Company granted options to purchase 220,500 shares of the Company's common stock to its executives and employees. The exercise price is $16.24. These options vest on the date of the grant. A compensation charge was not recorded in connection with the issuance of such options as the exercise price for the stock options granted was not less than the fair market value of the Company's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

common stock as of the date of the grant." (Compl.¶ 25.)

***2** However, Defendants Ram, Rosler, Klausner, Marx, Waldron, and Murgo did not disclose their stock option grants on a Form 4 until January 17, 2006. (Compl.¶ 26.) Defendant Picow did not disclose his grant on a Form 4 until January 18, 2006. (Id.) The stock options were granted at the lowest price at which the Company's stock had been trading during the period from December 27, 2005 through January 20, 2006. (Compl.¶ 26.) Plaintiffs allege that the InfoSonics' Board of Directors approved the grants of the options to Defendants even though the options were improperly backdated. (Id.)

According to Plaintiffs, Defendants took affirmative steps to conceal their backdating actions by authorizing or otherwise causing the Company to issue various SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to InfoSonics insiders. (Compl.¶ 92.) Plaintiffs allege that because InfoSonics failed to properly record the costs associated with the extra compensation given to Defendants and other insiders, its profits were overstated during the fiscal period in which the options were granted, necessitating a restatement of the Company's past financial results. (Compl.¶ 60.) Plaintiffs further allege that the backdating of stock options can have severe tax consequences. (Compl.¶ 61.)

B. Misclassification of Warrants

On January 30, 2006, InfoSonics issued warrants in connection with the private placement of common stock. The warrants were initially treated as a derivative liability.

On February 17, 2006, the SEC declared effective the Company's registration statement registering the shares underlying the warrants. (Compl.¶ 28.) Consequently, the Company was required under the GAAP to reclassify the warrants as equity. (Id.) However, Defendants, including the members of InfoSonics' Audit Committee, directed InfoSonics to maintain the warrants' classification as a liability. (Id.) As a result of the misclassification of the warrants, InfoSonics improperly booked $564,342 in net income for the period from February 17, 2006 to March 31, 2006. (Id.)

On May 8, 2006, InfoSonics issued a press release announcing its financial results for the first quarter of 2006. The press release noted that "the Company had income from a non-cash change in fair value of derivative liability (for financing related warrants) of $963,000 and non-cash expense related to stock-option compensation of $52,000." (Compl.¶ 71.) The misclassification of the warrants and inaccurately-stated financial results were repeated in the Company's Form 10-Q filed on May 15, 2006. (Compl.¶ 73.)

On June 12, 2006, InfoSonics revealed that it would need to restate its reported net income for the first quarter of 2006 because the Company had improperly treated the warrants as a derivative liability. (Compl.¶¶ 74-76.) On that same day, the company filed a Form10-Q/A, which stated: "Since these warrants became part of permanent equity on February 17, 2006, InfoSonics should have ceased applying the mark to market provisions of EITF 00-19, on that date. Accordingly, the net income for the quarter ended March 31, 2006 has been reduced by a non-cash amount of $564,000." (Compl.¶ 76.)

***3** Market reaction to the restatement was swift and severe. (Compl.¶ 32.) InfoSonics' stock fell from a close of $24.22 on Friday, June 9, 2006 to a close of $17.38 on June 12, 2006. (Compl.¶ 32.)

Plaintiffs allege that the misclassification of the warrants resulted in an artificial inflation of the Company's stock price, which Ram, Klausner, Murgo and Rosler utilized to their advantage. (Compl.¶ 30.) From May through early June 2006, these defendants sold some 136,000 of their personally-held shares for over $2.9 million in proceeds. (Compl.¶ 30.)

C. Claims Asserted

The Complaint asserts the following claims (1) Disgorgement under the Sarbanes-Oxley Act of 2002 against Defendants Ram and Klausner; (2) Violation of Section 14(a) of the Exchange Act against Ram, Rosler, Marx, Picow, and Waldron (the "Director Defendants"); (3) Violation of Cal. Corp.Code § 25402 (insider selling) against Ram, Klausner, Murgo, and Rosler; (4) Violation of Cal. Corp.Code § 25403 against the Director Defendants;

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(5) Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information against Ram, Klausner, Murgo, and Rosler; (6) Breach of Fiduciary Duty against all Defendants; (7) Abuse of Control against all Defendants; (8) Gross Mismanagement against all Defendants; (9) Waste of Corporate Assets against all Defendants; (10) Unjust Enrichment against all Defendants; (11) Accounting against all Defendants; (12) Rescission against all Defendants; (13) Constructive Trust against all Defendants.

II. DISCUSSION

A. Personal Jurisdiction

Marx and Picow move to dismiss the action against them on the ground that the Court lacks personal jurisdiction over them. Marx and Picow's motion is DENIED because the Court finds that it has specific jurisdiction over them.

Both the California long-arm statute and Fed.R.Civ.P. 4(k)(2) require that the exercise of personal jurisdiction comply with federal due process requirements. Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1155 (9th Cir.2006). Generally, a court may exercise jurisdiction over a nonresident defendant where the defendant's minimum contacts with the forum state render the maintenance of the action inoffensive to traditional concepts of fair play and substantial justice. Int'l Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

There are two types of personal jurisdiction--general and specific. General jurisdiction exists where a defendant's contacts with the forum state are "substantial" or "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). A defendant whose contacts are substantial or continuous and systematic is subject to the jurisdiction of the forum even where the cause of action is unrelated to the contacts. Id.

Specific jurisdiction exists where (1) the defendant has performed some act or consummated some transaction within the forum or otherwise purposefully availed himself of the privileges of conducting activities in the forum; (2) the claim arises out of or results from the defendant's forum-related activities, and (3) the exercise of jurisdiction is reasonable. Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir.2000).

***4** In determining whether "purposeful availment" has occurred in tort cases, the Ninth Circuit typically inquires whether a defendant purposefully directed his activities at the forum state. Yahoo! v. La Ligue Contre Le Racisme, 433 F.3d 1199, 1206 (9th Cir.2006). Under the effects test of Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the defendant must have (1) committed an intentional act, (2) expressly aimed at the forum state, and (3) caused harm that the defendant knows is likely to be suffered in the forum state. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 803 (9th Cir.2004). The "brunt" of the harm need not be suffered in the forum state. Yahoo!, 433 F.3d at 1207. "If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." Id.

Here, Marx and Picow's contacts with California, though not infrequent, are insufficient to support general jurisdiction. However, Plaintiffs have made out a prima facie case of specific jurisdiction.

Plaintiffs allege that Picow and Marx, as Board members and members of the Compensation and Audit Committees were involved in the backdating of the stock options, the misclassification of the warrants, and the issuance of misleading SEC filings and public statements with respect to these issues. Picow and Marx have attended Board meetings and Committee meetings in person in San Diego as well as by telephone. (Exhs. 2 & 3 to Bottini Decl.)

Given that InfoSonics' principal place of business is California, Picow and Marx's alleged wrongful acts, which were intended to benefit themselves to the detriment of the Company, were expressly aimed at California and caused harm in California. In Mehlenbacher v. Jitaru, 2005 WL 4585859 (M.D.Fla.2005), a derivative action, the court held that it had specific jurisdiction over a defendant director of the corporation. Even though there were no allegations that the director ever visited Florida, the complaint alleged that the director breached his fiduciary duty, thereby harming the corporation which maintained a principal place of business in Florida. The court explained that these allegations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

were sufficient to satisfy the due process requirements as interpreted in Calder.

Picow and Marx argue that actions they took while performing their duties as directors of InfoSonics cannot be used to establish personal jurisdiction. Although a court cannot rely solely on the status of a defendant as a director or officer to find the existence of personal jurisdiction, it can base personal jurisdiction on acts that a corporate officer personally authorizes, directs, or meaningfully participates in. Seagate Tech. v. A.J. Kogyo Co., Ltd., 219 Cal.App.3d 696, 702-03, 268 Cal.Rptr. 586 (1990). "Director status therefore neither immunizes a person from individual liability not subjects him or her to vicarious liability." Frances T. v. Green Owners Assn., 42 Cal.3d 490, 503-05, 229 Cal.Rptr. 456, 723 P.2d 573 (1986) (emphasis added).

***5** The Court properly relies on the tortious acts allegedly committed by Picow and Marx in concluding that Plaintiffs have satisfied the "purposeful availment" prong of specific jurisdiction. The second prong of the test is also satisfied because Plaintiffs' claims arise out of the acts that were directed at California. The third and final prong is met because the exercise of jurisdiction is reasonable in this case.

We consider seven factors in determining the reasonableness of jurisdiction: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. CE Dist., LLC v. New Sensor Corp., 380 F.3d 1107, 1112 (9th Cir.2004).

These factors weigh in favor of the exercise of jurisdiction. Marx and Picow interjected themselves in the forum state's affairs by voluntarily serving on the Board of a company that has a principal place of business in California. California has an interest in adjudicating the dispute because InfoSonics, a California citizen, was allegedly harmed. The home states of the defendants, Colorado and Florida, do not have an interest in the litigation. A majority of the defendants are California citizens, and it would be most efficient for Plaintiffs' claims against Defendants to be litigated in a single action. Although it might be somewhat inconvenient for Marx and Picow to have to travel to California for certain proceedings in this action, the Court does not believe that it would be unduly burdensome. As noted by Plaintiffs, Marx and Picow travel quite frequently for business purposes.

Furthermore, the exercise of personal jurisdiction in this case comports with a basic sense of fairness. In Mehlenbacher, the court found that the exercise of personal jurisdiction over the defendant director comported with due process, explaining:

> He is accused of intentional wrongdoing directed at a corporation headquartered in Florida, which injured that company in Florida. Further, Bujoreanu is no ordinary (alleged) third-party tortfeasor. He is a corporate director and audit committee member of a Florida-based company. Based on "common sense and everyday experience," these are significant positions customarily associated with a company's governance. Further, these positions are voluntarily assumed and held; it was Bujoreanu's choice to accept leadership positions in a corporation headquartered in this state. Hence, Bujoreanu's contacts with Florida are not random, fortuitous or attenuated; he can hardly claim surprise at being haled into a Florida court to answer to the kind of allegations levied against him in the Amended Complaint.

***6** Mehlenbacher, 2005 WL 4585859 at *14. Similarly, here, Marx and Picow held positions of power in a corporation headquartered in California and attended Board and Committee meetings here. Their contacts with the state are of such a nature that it is undoubtedly just for this Court to exercise personal jurisdiction over them.

B. Demand on Board of Directors

Nominal Defendant InfoSonics and Defendants Ram, Klausner, Murgo, Rosler, and Waldron have filed a motion to dismiss on the ground that Plaintiffs failed to make a demand on the Board of Directors as required by Fed.R.Civ.P. 23.1 and Maryland Law. The Court agrees that dismissal is required so that Plaintiffs may either make a demand on the Board of Directors or amend their Complaint

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

to demonstrate that such a demand would be futile.

Federal Rule of Civil Procedure 23.1 provides that a complaint in a derivative action "shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement is governed by the law of the state in which the nominal corporate defendant is incorporated. Kamen v. Kemper Fin. Servs., 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991).

Maryland law governing demand futility is set forth in Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123 (2001). In Werbowsky, the Maryland Court of Appeals declined to eliminate the futility exception altogether, but made it clear that it was "a very limited exception, to be applied only when the allegations or evidence clearly demonstrate, in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (3) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." Id. at 620, 766 A.2d 123 (emphasis added).

The court in Werbowsky explained that the demand requirement could not be skirted by general allegations that a majority of the directors approved the challenged transaction and/or would not be receptive to filing suit:

> We ... are not willing to excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action. The demand requirement is important. Directors are presumed to act properly and in the best interest of the corporation. They enjoy the benefit and protection of the business judgment rule, and their control of corporate affairs should not be impinged based on non-specific or speculative allegations of wrongdoing.... We agree, moreover, with the ABA/ALI that, in most cases, a pre-suit demand on the directors is not an onerous requirement. As the Seventh Circuit court noted, it gives the directors--even interested, non-independent directors--an opportunity to consider, or reconsider, the issue in dispute. It may be their first knowledge that a decision or transaction they made or approved is being questioned, and they may choose to seek the advice of a special litigation committee of independent directors, which has become a common practice, or they may decide, as a business matter, to accede to the demand rather than risk embarrassing litigation.

*7 Id. at 618-19, 766 A.2d 123.

Plaintiffs have not satisfied Maryland's strict requirement for establishing demand futility. Plaintiffs contend that a majority of the directors are so personally conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith. However, Plaintiffs have not come forward with specific facts demonstrating that when faced with a demand, the directors would not act in the best interest of InfoSonics.

With respect to the allegedly "backdated" stock options, Plaintiffs argue that a demand would be futile because three members (Marx, Picow, and Waldron) of the five-person Board were on the Compensation Committee that approved the grants, and all of the Board members received the stock options. Plaintiffs also claim that Marx, Picow, and Waldron, as members of the Audit Committee, failed to implement adequate internal controls to prevent improper backdating. Plaintiffs rely on Ryan v. Gifford, 2007 WL 416162 (Del.Ch.2007), in which the Delaware court held that the plaintiff had sufficiently established demand futility where three members of a board approved backdated options and another board member accepted them. However, Ryan does not govern this Court's decision because it applied Delaware law. Delaware's requirements for demand futility are more permissive than Maryland's, requiring only that the facts alleged create a "reasonable doubt" that the directors are disinterested and independent. Sekuk Global Enter. Profit Sharing Plan v. Kevenides, 2004 WL 1982508 (Md.Cir.Ct.2004).

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

See also Werbowsky, 362 Md. at 143, 763 A.2d 185 (declining to adopt in full the Delaware approach).

As mentioned above, the fact that the majority of the directors approved or participated in some way in the challenged transaction is not sufficient to establish futility. The Board could seek the advice of a special litigation committee or could even accede to the demand. Plaintiffs place much reliance on the "substantial likelihood of liability" on the part of Defendants. However, the Court does not believe that the "likelihood of liability" is a proper reason for finding demand on the Board to be futile. If "likelihood of liability" is based on the allegations of the Complaint, all well-pled complaints would be able to establish demand futility. If facts outside of the pleadings may be considered in determining "likelihood of liability," a trial on the merits would be needed to determine whether to apply the futility exception. In Werbowsky, 362 Md. at 620, 766 A.2d 123, the court made it clear that the issue of futility is discrete and does not go to the merits of the underlying complaint--i.e., whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the challenged decision or transaction. [FN1]

FN1. Similarly, the Court does not find persuasive Plaintiffs' argument that Defendants are conflicted because InfoSonics' insurance policies contain an "insured versus insured exclusion." See Sekuk, 2004 WL 1082508 at *9 ("Based on the rationale of Werbowsky, this Court concludes that when it does directly address the issue, the Court of Appeals will most likely follow the lead of other courts which have held that an insured-versus-insured provision does not excuse a pre-suit demand.")

The fact that Defendants received allegedly back-dated stock options does not render them financially interested and thus, conflicted. Defendants never exercised their options, and, prior to the commencement of this action, the stock price fell below the exercise price for all of the December 2005 option grants. (Def.'s Notice of Lodgment, Exhs. F, L, M, N, O, P, Q, and R.)

***8** With respect to the misclassification of the warrants, Plaintiffs argue that Marx, Picow, and Waldron, as members of the Audit Committee, allegedly breached their fiduciary duties by failing to investigate and review relevant materials in a timely manner to ensure proper accounting for the warrants, and by choosing to maintain the improper classification of the warrants. Again, the fact that a majority of the Board participated in the challenged decision does not satisfy Maryland's stringent requirements for demand futility. Furthermore, InfoSonics' officers and directors voluntarily initiated an investigation into the classification of the warrants, retaining outside firms. These actions by the Board undermine Plaintiffs' argument that Defendants are incapable of acting in the best interest of the Company.

Plaintiffs' general allegation that each of the Defendants breached their fiduciary duty by failing to prevent and correct improper financials with respect to the warrants and backdated options, similarly fails to demonstrate futility. The futility exception would eviscerate the demand requirement if demand were deemed futile anytime a derivative suit alleged breach of fiduciary duty in connection with the issuance of SEC filings or other financial statements.

The Complaint also alleges that Ram dominates and controls each of the individual Defendants on the Board and that Marx, Picow, and Waldron receive substantial compensation for service on the Board. (Complaint, ¶¶ 108-09.) However, the allegations regarding Ram's control and domination are conclusory. The allegations that Marx, Picow, and Waldron are paid well and would want to keep their jobs also fall short of establishing futility. See Werbowsky, 362 Md. at 618, 766 A.2d 123.

Plaintiffs have not met their burden of clearly demonstrating that the Director Defendants are so personally and directly conflicted or committed to the challenged decision that they cannot reasonably be expected to respond to a demand in good faith and within the scope of the business judgment rule. Therefore, the Court dismisses the Complaint for failure to make a demand on the Board. The Court will grant Plaintiffs leave to file an amended complaint. However, Plaintiffs are cautioned that the Court heeds Werbowsky' s admonition that the futility exception is a "very limited exception."

C. Failure to State a Claim/Lack of Standing

1. Section 304 of Sarbanes-Oxley

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Defendants contend that there is no explicit or implicit private right of action under section 304 of the Sarbanes-Oxley Act. The Court agrees.

Section 304 does not explicitly grant a private right of action, remaining silent on the issue of enforcement. As for whether section 304 implies a private remedy, the Court agrees with the reasoning of Kogan v. Robinson, 432 F.Supp.2d 1075 (S.D.Cal.2006) and Neer v. Pelino, 389 F.Supp.2d 648 (E.D.Pa.2005), and concludes that Congress did not intend to create an implied right of action in section 304.

***9** The Court is not persuaded by Plaintiffs' argument that an implied right of action is supported by evidence that Congress rejected alternate language that would have expressly limited enforcement of section 304 to the SEC. That such language may have been proposed along the way and was not included in the final version of the Act, for whatever reason, does not mean that Congress meant to create a private right of action. If Congress intended to create a private right of action, it could have included language doing so, just as it did in section 306.

Because there is no private right of action under section 304, the Court DISMISSES Count One WITH PREJUDICE.

2. California Corporations Code § 25402

Defendants contend that Plaintiffs' insider trading claims under Cal. Corp.Code § 24502 are governed by Maryland law under the "internal affairs" doctrine. Defendants further contend that Plaintiffs have failed to state a claim under Maryland law.

The California Court of Appeal has held that the "internal affairs" doctrine does not bar an action for insider trading under the California Corporate Securities Law of 1968 against a corporation incorporated in a different state. Friese v. Superior Court, 134 Cal.App.4th 693, 36 Cal.Rptr.3d 558 (2005). Plaintiffs have sufficiently stated a claim for insider trading under California law. Ram, Klausner, and Rosler argue that their 10b5-1 trading plans insulate them from liability for insider trading. However, whether these trading plans were legitimately adopted or were put in place after learning of material, nonpublic information that could affect the price of stock, can not be resolved at the pleading stage.

III. CONCLUSION

For the reasons discussed above, Marx and Picow's motion to dismiss for lack of personal jurisdiction [13] is DENIED. The motion to dismiss for failure to make a demand on the Board of Directors [19] is GRANTED. The Complaint is DISMISSED in its entirety with leave to amend. Any amended complaint must be filed on or before October 5, 2007. The motion to dismiss for failure to state a claim [19] is GRANTED IN PART and DENIED IN PART. The motion is denied as to the insider trading claims and is granted as to Count One for violation of section 304 of the Sarbanes-Oxley Act, which is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

2007 WL 2572276 (S.D.Cal.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.