

Not Reported in A.2d

Page 76

26 Del. J. Corp. L. 806

**(Cite as: 2000 WL 710192 (Del.Ch.))**

< KeyCite Yellow Flag >

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

**In re WESTERN NATIONAL CORPORATION
SHAREHOLDERS LITIGATION**

No. 15927.

May 22, 2000.

Joseph A. Rosenthal and Norman M. Monhait, of
Rosenthal, Monhait, Gross & Goddess, P.A.,
Wilmington, Delaware; and Pamela S. Tikellis, of
Chimicles & Tikellis, Wilmington, Delaware; Sandy
A. Liebhard and Michael S. Egan, of Bernstein
Liebhard & Lifshitz, LLP, New York, New York;
Robert I. Harwood and Matthew M. Houston, of
Wechsler Harwood Halebian & Feffer LLP, New
York, New York; and Michael Jaffe, of Wolf
Haldenstein Adler Freeman & Herz LLP, New
York, New York, for Plaintiffs, of counsel.

Steven J. Rothschild and Kevin M. Maloy, of
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware, for Defendants American
General Corporation, Astro Corporation and
Western National Corporation.

Martin P. Tully, R. Judson Scaggs, Jr., and S.
Mark Hurd, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for the Individual
Defendants.

MEMORANDUM OPINION

CHANDLER, J.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                          Page   77
(Cite as: 2000 WL 710192 (Del.Ch.))

TABLE OF CONTENTS

I.     INTRODUCTION ......................................................... 1

II.    FACTUAL BACKGROUND ................................................... 4

III.   ANALYSIS ............................................................ 13
       A. Did American General Exercise Actual Control Over Western
       National's Business and Affairs? .................................. 13
              1. American General's Equity Stake ......................... 15
              2. Inter-Company Joint Ventures ............................ 16
              3. U.S. Life Merger ........................................ 18
              4. The Standstill Provision and Project Raven .............. 22
       B. Did American General Dominate Western National's Board of
       Directors? ........................................................ 26
              1. The Inside Directors .................................... 29
                     a. Did the merger pose an economic conflict of
       interest to Poulos? ............................................... 30
                     b. Was Poulos otherwise independent of American
       General? .......................................................... 31
                     % B5 i. American General's initial investment in
       Western National .................................................. 32
                     % B5 ii. The Poulos Provision ....................... 34
                     c. Were inside directors Graf and Scott independent of
       American General and disinterested in the merger? ................. 37
              2. The Outside Directors ................................... 39
                     a. Did Poulos and Hook "handpick" certain outside
       director nominees of American General? ............................ 40
                     b. Do past relationships with American General vitiate
       the Special Committee director's independence? ..................... 44
                     c. Were the remaining outside directors, Buckwalter
       and Keeble, disinterested and independent? ........................ 48
       C. Did American General Control the Special Committee And Dictate the
       Terms of the Transaction? ......................................... 55
              1. Were the Special Committee's Advisors Independent and
       Could the Committee Reasonably Rely on their Advice? .............. 55
              2. Was the Special Committee Informed? ..................... 59
              3. Was the Special Committee Process Tainted by Potentially
       Interested Inside Directors? ...................................... 60
              4. Did American General Control the Negotiation or Was the
       Committee Free to Negotiate at Arm's Length? ...................... 62
              5. Did the Special Committee Abdicate its Responsibility to
       Poulos, a Potentially Interested Director? ........................ 64
       D. The Disclosure Claims ........................................... 72

IV.    CONCLUSION .......................................................... 77

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

Page 78

(Cite as: 2000 WL 710192, *1 (Del.Ch.))

**\*1** A merger between the Western National Corporation ("Western National" or the "Company") and its 46 percent shareholder, American General Corporation ("American General"), gives rise to this purported class action lawsuit brought on behalf of all Western National shareholders other than the named defendants and their affiliates. Defendant Western National is a Delaware corporation with principal offices in Houston, Texas. Defendant American General is a Texas corporation with principal offices also in Houston, Texas. The eight individual defendants constituted Western National's entire board of directors at the time of the merger. Before the Court is defendants' motion for summary judgment.

## I. CONTENTIONS OF THE PARTIES

Shareholder plaintiffs allege that because American General was the Company's controlling shareholder at the time of the merger, holding approximately 46 percent of Western National's outstanding common stock, it owed them fiduciary duties of care, loyalty and good faith. Extensive discovery, plaintiffs claim, has revealed significant evidence that Western National's board of directors and American General violated "all precepts" of Delaware law designed to ensure substantive and procedural fairness to minority shareholders in transactions with controlling shareholders, including violations of disclosure duties.

Defendants first challenge the very premise of plaintiffs' liability theory, arguing that the claims fail ab initio because American General neither owned a majority of Western National stock, exercised actual control over the business and affairs of the Company, nor dominated the Company's board of directors. Furthermore, defendants maintain that American General did not assert actual control over the Company, its board, or the special negotiating committee during the course of the merger. American General, consequently, was not a controlling shareholder that owed fiduciary duties.

Defendants next contend that even if certain directors labored under conflicts of interest with respect to the merger in question, the existence of a well-functioning, independent special committee coupled with the absence of a controlling shareholder brings the special committee's recommendation within the purview of the business judgment rule. Finally, defendants contend that they fully complied with their disclosure duties and, moreover, that the merger was entirely fair to the public stockholders.

While plaintiffs have adduced facts that potentially cast doubt on certain Western National directors' independence from American General or, alternatively, their disinterest in the merger transaction, they have failed to demonstrate that American General, as a less than majority shareholder, exercised actual control over the Company's business and affairs. Plaintiffs also have not adduced facts or reasonable inferences to be drawn therefrom that support the notion that American General dominated the Company's board of directors generally or, specifically, that it dominated the special negotiating committee during the course of the merger.

**\*2** In light of plaintiffs' failure to raise triable issues of fact in support of these allegations, the infirmity of the three alleged disclosure violations, coupled with the fact that all of the Company's disinterested directors negotiated and recommended the merger in question, I review this transaction under the traditional business judgment standard. Because the special committee directors negotiated and recommended the merger to the full board in good faith and with requisite care, defendants' summary judgment motion will be granted. In addition, as noted immediately above, I grant summary judgment for defendants on all three alleged disclosure violations. Finally, it is noteworthy that fully informed, unaffiliated and disinterested Western National stockholders overwhelmingly approved the challenged merger, which was a product of arm's length negotiations between American General and Western National's special negotiating committee.

## II. FACTUAL BACKGROUND

Western National was organized in 1993 as a wholly-owned, indirect subsidiary of the Conseco Investment Company ("Conseco"), a large insurance and financial services company. Western National's principal line of business was the sale of single premium deferred annuities to individuals through financial institutions, primarily banks. In February 1994, Conseco sold 60 percent of the Company through an initial public offering. In connection

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**(Cite as: 2000 WL 710192, \*2 (Del.Ch.))**

with Western National's emergence as a public company, Conseco hired defendant Michael J. Poulos ("Poulos"), then a senior officer of defendant American General, to become Western National's Chairman and CEO pursuant to a five-year employment contract. Like Conseco, American General is a large, diversified insurance and financial services company.

Ten months after the IPO, Conseco sold its remaining 40 percent interest in Western National to American General for $274 million, or about $11 per share. As part of the sale, American General and Western National entered into a shareholders' agreement. This agreement, among other things, contained a standstill provision (the "Standstill Provision") limiting American General's ability to acquire additional shares of Western National or to engage in an extraordinary transaction with Western National before January 1, 1999, without approval of Western National's board of directors. [FN1] The Standstill Provision also prevented American General from nominating more than two directors to Western National's board.

> FN1. The Standstill Provision prohibited American General from acquiring more than 20 percent of Western National's outstanding shares in any twelve-month period. It also prohibited American General from beneficially owning in excess of 79 percent of the total number of Western National shares outstanding without the prior approval of Western National's board of directors.

In September 1996, Western National, in need of a capital infusion to expand its annuity business while preserving its insurance ratings, sold an additional 6 percent of its equity to American General for $130 million, or $17.92 per share. Shortly thereafter, Western National again found itself under-capitalized. This time, it appeared the Company confronted a fundamental, strategic crossroads. Sales of the Company's principal product, fixed annuities sold through banks, were increasing significantly. Western National paid commissions from annuity sales up front. Because commissions exceeded the revenue that the Company initially derived from those sales, Western National was rapidly depleting its capital. In order to maintain its impressive sales growth, while also maintaining a strong insurance rating, Western National required additional capital.

\*3 The Company's capital raising ability, however, faced other obstacles due to certain practical constraints. Debt financing was not an attractive option because additional debt would have likely caused the Company's insurance ratings to drop, which (in turn) would have made its annuity product less attractive and saleable. Because of American General's 46 percent interest, Western National's board believed that the Company could not raise equity capital from third parties on commercially reasonable terms. Finally, American General would only agree to an additional capital infusion if it could acquire absolute control of the Company.

During the latter half of 1996 and 1997, Western National and American General management devoted considerable attention to several strategic options available to Western National. Both boards undoubtedly considered whether American General should entirely subsume Western National under the American General umbrella. In case the prospect of merging the companies was not already on American General's radar, several investment banks, including Goldman Sachs, Merrill Lynch and Morgan Stanley, separately pitched the transaction to American General's senior managers and directors in 1997. In July 1997, American General's new CEO, Robert M. Devlin ("Devlin"), and Poulos discussed the possibility of a merger between American General and Western National.

Contemporaneous with these discussions, Western National management confronted several overarching operational and financial challenges. The operational challenges all seemed to center around the Company's lack of product and customer diversification. One product, single premium deferred annuities, accounted for 87 percent of Company sales. A single customer, First Union Bancorp, accounted for 37 percent of Company sales. Finally, with 82 percent of annuity sales flowing through financial institutions, management was under the impression that the Company disproportionately relied on a single distribution channel.

The Company's financial challenges, briefly described above, were senior management's chief concern. Poulos summed up the impact of the Company's funding difficulties in the following manner:

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

**Page 80**

(Cite as: 2000 WL 710192, *3 (Del.Ch.))

Our sales were so robust, they were consuming our capital.... We were faced with the-with that almost untenable situation-if we continue to go at this robust rate, we run the risk of losing our ratings. If we lose our ratings, the banks would disqualify us as a vendor. If we cut our sales, we would be sort of cutting the value of the company by virtue of the fact that the analysts would perceive this as negative....So we were-our success was our very nemesis. We were succeeding but so aggressively that it was essentially going to put us in a posture of having ... to infuse more capital in the company. [FN2]

FN2. Poulos Dep. at 74.

A final challenge confronting Western National was of a decidedly long or, at least, medium-term quality, and implicated regulatory events outside of the Company's control. The banking and insurance deregulation that Congress and the financial community had for so long discussed finally seemed genuinely imminent. Western National, an essentially mono-line company selling single premium deferred annuities through banks, faced the unpleasant prospect of potentially having its primary customers and distribution channels (i.e., retail banks) become its chief competitors, selling insurance and annuity products of their own. [FN3]

FN3. Sept. 2, 1997, Special Committee Minutes at 8 (Def.'s Tab 3).

**\*4** In this context, Poulos and his senior managers resolved to recommend that the Company's board of directors appoint a committee of outside directors to formally consider strategic alternatives, including a possible sale of the Company. In an August 21, 1997 meeting, Western National's board of directors established a special committee of three outside directors comprised of Robert M. Hermance, Donald G. Baker, and Alan Richards to explore strategic alternatives (the "Special Committee").

The fundamental strategic questions the Special Committee pondered were whether to approach American General about selling its 46 percent interest to an unrelated third party in a merger transaction or to acquire the remainder of the Company's outstanding shares. The Special Committee, with the assistance of its own financial and legal advisors, determined (or rather,

confirmed, the decision presumably reached by American General's former and current chairmen, Harold Hook ("Hook") and Devlin, [FN4] and Western National's senior management) that a sale of the Company was the optimal course of action. The Company's board concurred. That is, the Committee determined that a business combination was likely superior to other solutions to Western National's operational and financial challenges.

FN4. Devlin replaced Hook as chairman of the board for American General in April 1997. He became CEO in August 1996.

The Special Committee inquired whether American General might be interested in selling its 46 percent stake. [FN5] American General indicated it was not willing to sell its interest. Essentially, American General took the position that while it would not insist upon a merger transaction whereby Western National merged into American General, it also would not sell its stake in the course of a transaction with a third party.

FN5. It is doubtful that this was a serious query, as the Special Committee members could have hardly been unaware of American General's position in light of the "general" talks between Hook, Devlin and Poulos.

In light of American General's unwillingness to sell its interest, the Company's need for additional funding, an increasingly inhospitable regulatory environment, lack of diversity in its customer base and distribution channels, and barriers to the capital markets, the Special Committee determined that the optimal course of action for the Company was to attempt to negotiate a fair merger price with American General. The imminent expiration of the Standstill Provision in the shareholders agreement led Western National management reasonably to conclude that the optimal time to negotiate with American General was sooner rather than later.

Through a draft merger agreement submitted to American General, the Special Committee proposed $32 per share-approximately a 12% premium over Western National's then current market price of $28.19. Devlin responded that $32 was too high, noting that the Company's stock price had already recently appreciated by 46 percent on speculation of an imminent American General takeover bid and that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the Company was trading at 97 percent of its 52-week high. Like most buyers, American General expressed the view that Western National was already fully valued in the market and proposed a cash and stock transaction at the prevailing market price. The Special Committee declined to recommend such a transaction.

*5 Devlin soon moved upward to $28.75, a small increment over the prevailing market price. The Special Committee declined to recommend a transaction at that price. Devlin followed up this offer with a third offer at $29.00. Again the Special Committee declined. Devlin next communicated to the Special Committee that under no circumstances would American General accept a price that began with a "3". Negotiations bogged down and the Special Committee soon terminated them. Devlin likewise walked away from the table. All parties concerned believed discussions had terminated. When the Special Committee next convened, it resolved to ask Poulos to contact Devlin in order to find out if Devlin would return for another round of bargaining.

Poulos met with Devlin and Devlin indicated that he would return to the table but would only support a transaction fixed at $29.75 per share, subject to further negotiation of collar provisions that would adjust such value-either up or down-if the average price of American General stock were to fall outside of a given range. The Committee believed that $29.75 was the highest price American General would be willing to pay and that such a merger was superior to other strategic alternatives then available. Following further negotiation of the collar provisions, the Special Committee arranged for its legal advisors to meet with American General's counsel to work out the details of a proposed form of merger agreement for consideration at a Committee meeting to be held the following day.

Upon receipt of the proposed form of merger agreement, the Committee met with its financial advisor, Donaldson, Lufkin & Jenrette ("DLJ"). DLJ gave a presentation regarding the value of the consideration Western National shareholders would receive under the proposed merger, followed by a financial analysis of the Western National and the American General stock to be exchanged in the merger. DLJ then opined that the proposed merger transaction was fair from a financial point of view.

After further discussion, the Special Committee resolved that the merger was fair and in the best interests of the Company's shareholders and recommended it for full board approval.

The board adopted the Special Committee's recommendations and submitted the proposal for shareholder approval at a February 25, 1998 special meeting of the Company's shareholders. Of the 79.1 percent of outstanding shares represented by proxy at the special meeting, 99.98% voted to approve the merger. [FN6] By virtue of appreciation in American General's stock price during the intervening months, each Western National shareholder received cash or American General stock worth approximately $30.90 per Western National share at the closing.

FN6. Aff. of James L. Gleaves, ¶ 4 (Def.'s Tab 15).

### III. ANALYSIS

Summary judgment will be granted if the moving party demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. [FN7] On such a motion, the facts will be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that no material questions of fact exist. [FN8]

FN7. Chancery Court Rule 56(c).

FN8. Gilbert v. El Paso Co., Del.Supr., 575 A.2d 1131, 1142 (1990).

A. Did American General Exercise Actual Control Over Western National's Business and Affairs?

*6 A shareholder will be considered a fiduciary if it owns a majority interest in or exercises control over the business and affairs of the corporation. [FN9] In the absence of majority stock ownership, a plaintiff must demonstrate that the minority shareholder held a dominant position and actually controlled the corporation's conduct. [FN10]

FN9. Kahn v. Lynch Communications Sys., Inc., Del.Supr., 638 A.2d 1110, 1113-1114 (1994); Ivanhoe Partners v. Newmont Mining Corp., Del.Supr., 535 A.2d 1334, 1344 (1987).

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

FN10. Kaplan v. Centex Corp., Del. Ch., 284 A.2d 119, 122 (1971); Kahn v. Lynch at 1114; Solomon v. Armstrong, Del. Ch ., 747 A.2d 1098 (1999) (stating that domination requires "literal control of corporate conduct"), aff'd, Del.Supr., 746 A.2d 277 (2000).

Plaintiffs' briefing goes to great lengths to place every conceivable fact or event into question that might give rise to the conclusion that American General might have, in some way or in some circumstance, dominated the affairs of the Company, in order to limp past a summary judgment motion. This, of course, is entirely in keeping with summary judgment practice.

As noted above, on a summary judgment motion the defendant bears the burden of demonstrating that there is no dispute as to any issue of material fact with respect to any valid legal theory the plaintiff advances in support of its claims. The plaintiff, nevertheless, must affirmatively produce evidence demonstrating the existence of a genuine issue of fact. [FN11] In other words, if the moving party supports its summary judgment motion with sufficient undisputed evidence and points to the absence of proof corroborating the non-moving party's claims, the court properly grants the summary judgment motion. [FN12]

FN11. Liboff v. Allen, Del. Ch., C.A. No. 2669, let. op. at 9, Brown, V.C. (Jan. 14, 1975).

FN12. See, e.g., In re Liquidation of Nat'l Heritage Life Insurance Co., Del. Ch., 728 A.2d 52, 57 (1998) (citing Celotex v. Catrett, 477 U.S. 317, 324-25 (1986)).

Because plaintiffs bear this burden, they must affirmatively state facts-not guesses, innuendo or unreasonable inferences-establishing that American General exercised actual control over Western National. [FN13] Here, a thorough and careful reading of a well-developed discovery record and plaintiffs' briefing yields nary a fact that could give rise to a finding of domination and control.

FN13. Id. See also Zlotnick v. Newell Cos., Del. Ch., C.A. No. 7246, let. op. at 5, Walsh, V.C. (July 30, 1984) (stating that "conclusory allegation of fiduciary duty must be supported by facts from which the duty arises").

1. American General's Equity Stake

Plaintiffs allege that American General's 46 percent equity position coupled with its ability to purchase an additional 20 percent of Western National's common stock during any twelve month period gave it "effective control" of the Company. This argument fails for two reasons. First, and as adumbrated above, substantial non-majority stock ownership, without more, does not indicate control. [FN14] Second, the fact that American General could acquire a numerical majority stock interest in Western National in the open market is not sufficient to convert its status as a substantial minority shareholder to that of a fiduciary. [FN15]

FN14. Kaplan v. Centex, 284 A.2d at 122-23.

FN15. See In re Sea-Land Shareholders Litig., Del. Ch., C.A. No. 8453, mem. op. at 10-11, Jacobs, V.C. (May 22, 1987) ("Sea-Land I") (holding that "[t]he potential ability to exercise control is not the equivalent of the actual exercise of that ability."); see also Gilbert v. El Paso Co., Del. Ch., 490 A.2d 1050, 1056 (1984), aff'd, Del.Supr., 575 A.2d 1131 (1990) (holding that claims of breach of fiduciary duty "must subsist on the actuality of a specific relationship, not its potential" ) (emphasis added).

Finally, the Standstill Provision further militates against a finding of domination or control, as it limited to two the number of directors that American General could nominate. [FN16] Although plaintiffs deride the Standstill Provision's efficacy, nothing in the record reasonably supports a conclusion that defendants could or, in fact, did take steps to undermine its purpose or effect. [FN17]

FN16. Cf. Di Nardo v. Renzi, Del. Ch., C.A. No. 8977, mem. op. at 9, 1987 WL 10014,*3, Berger, V.C., (Apr. 24, 1987) (concluding that a majority stockholder can lack the ability to exercise control where it has contractual limitations on its ability to vote shares).

FN17. See Part III(A)(4), infra.

2. Inter-Company Joint Ventures

As a general matter American General passively invested in Western National and was not closely

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

(Cite as: 2000 WL 710192, *6 (Del.Ch.))

**Page 83**

involved in the day-to-day business affairs of the Company. The only indication of control with respect to operational matters plaintiffs point to are certain joint ventures between the two companies where Western National "borrowed" American General's ratings in order to offer products its own ratings could not support. In conclusory fashion, plaintiffs allege that because American General would have a significant say in the operation of the joint ventures, these business relationships are substantial evidence that American General exercised meaningful control over the Company. Plaintiffs fail to corroborate this unadorned allegation with specific facts. Moreover, they never explain how American General's participation in joint ventures, that by plaintiffs' own admission helped Western National offer new products, would somehow lead to American General dominating Western National operationally or controlling Western National's management or board.

*7 Finally, plaintiffs' claim is particularly infirm as a matter of economic principle. When two entities join together as co-venturers in a common enterprise, each brings to the table particular assets that will, hopefully, make the enterprise successful. Management of the enterprise and division of its profits (if indeed successful) should, presumably, bear some, direct relation to the contributions of each party. Here, all plaintiffs allege is that American General "loaned" its ratings to Western National so that Western National could offer certain insurance products. For American General to demand some input into the management of the joint venture and a share of its profits is quite in keeping with sound legal and economic principle. No record support exists for the assertion that American General forced the Company into these joint ventures, exercised disproportionate control over them, or extracted a disproportionate amount of the benefits flowing from them.

3. U.S. Life Merger

Another alleged instance of domination and control occurred two years before the merger when American General "vetoed" a potential business combination between Western National and the U.S. Life Insurance Company ("U.S.Life") and then proceeded to acquire U.S. Life itself. Indeed, Poulos stated in deposition testimony that "[s]ince they [American General] were a forty percent

owner, nothing could be done without their approval ....and [they] indicated they would not be in favor of having U.S. Life and Western National merge." [FN18] Plaintiffs analogize this testimony to the facts of Kahn v. Lynch -where the Delaware Supreme Court determined that a 43 percent shareholder's (Alcatel) veto of a proposed merger between its subsidiary, Lynch Communications, and a third party was evidence of Alcatel's control of Lynch-and likewise conclude that American General dominated and controlled Western National. [FN19]

FN18. Poulos Dep. at 38-39.

FN19. Kahn v. Lynch Communications Sys., Inc., Del.Supr., 638 A . 2d 1110 (1994).

Defendants argue that the Supreme Court's analysis of the control issue in Kahn v. Lynch was far more contextualized than plaintiffs let on. Among other factors, defendants observe that Alcatel held five of eleven board seats, threatened to employ a tender offer if a "negotiated" agreement could not be reached and, finally, the Alcatel designees on the Lynch board rather colorfully stated that the other directors must comport with their demands: "We are a forty-three percent owner. You have to do what we tell you ... you are pushing us very much to take control of the company." [FN20]

FN20. Id. at 1112-1114.

I consider these other factual circumstances in Kahn v. Lynch central to the Supreme Court's finding of control. In the present matter, by contrast, plaintiffs have offered not a scintilla of evidence that American General threatened Western National when the U.S. Life merger was under consideration or two years later when Western National and American General merged. Also in stark contrast to Lynch, no American General managers, employees, agents, or even nominees sat on Western National's board of directors. [FN21]

FN21. See Part III(B)(1), infra.

*8 Moreover, under the terms of the Standstill Provision, American General could not plausibly (or at least easily) "threaten" the Western National board as it was prohibited from appointing more than two directors and could not acquire more than

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *8 (Del.Ch.))

Page  84

79% of the Company's shares through a tender offer or otherwise. Nothing in the record suggests that American General ever threatened or even contemplated a tender offer.

The mere fact that Western National management solicited the view of a 40 percent shareholder with respect to an extraordinary business transaction and ultimately agreed with the view expressed by that shareholder does not indicate a relationship of domination and control. [FN22] Indeed, in Ivanhoe v. Newmont Mining Corp., the Supreme Court stated "it is well established law that nothing precludes [a 49.7 percent stockholder] as a stockholder from acting in its own self interest." [FN23] This well established legal principle, enabling a non-majority shareholder to act in its self interest, seems particularly relevant in the context of a merger. A broad examination of the Delaware corporation statute and relevant precedent governing parent-subsidiary mergers tellingly bears out this conclusion.

> FN22. See, e.g., Citron v. Steego, Del. Ch., C.A. No. 10171, mem. op. at 14, Allen, C., (Sept. 9, 1988) (finding that consultation with a 48.8 percent shareholder regarding, among other things, board representation and corporation's executive employment contracts fell "far short of establishing control that gives rise to a fiduciary duty."); cf. Sea-Land I at 10-11 (holding that fiduciary obligation could not be imposed on corporation merely because, as 39 .5 percent stockholder, it had the potential ability to "frustrate" a competing bid for the target company).

> FN23. Ivanhoe v. Newmont Mining Corp., Del.Supr., 535 A.2d 1334, 1344 (1987).

The fact that a large shareholder, the putative parent, takes steps to "veto" a business combination between the putative subsidiary corporation and a proposed merger partner, is not particularly probative of whether the large shareholder exercises actual control over the business and affairs of the corporation. Section 141(a) of Delaware's corporation statute provides that the business and affairs of a Delaware corporation fall under the direction of its board of directors. Similarly, the standard for determining whether a large, though non-majority shareholder, exercises control over the corporation requires a judicial finding of actual

control over the business and affairs of the corporation. Notwithstanding the explicit statutory grant of authority over the business and affairs of a Delaware corporation to its board of directors, certain events in the life of the corporation, such as a merger, require the affirmative participation of the corporation's shareholders. [FN24] The shareholders' right to voice their view as to the advisability of a proposed merger, however, does not indicate that they exercise actual control over the corporation's business and affairs.

> FN24. See 8 Del. C. § 251(c).

Here, in 1995, the Western National board contemplated a merger with U.S. Life. American General, as a shareholder, expressed its views with respect to the merger. The fact that American General spoke out against the merger is completely in keeping with its statutory rights and does not establish the proposition that American General exercised actual control over Western National's business and affairs. Considering the complete absence of factors akin to those found in Kahn v. Lynch in this case, American General's exercise of its statutory rights as a stockholder to oppose a merger with U.S. Life is of no legal consequence.

4. The Standstill Provision and Project Raven

*9 As I have noted, the Standstill Provision entered into between American General and Western National was intended, among other things, to protect the public shareholders by proscribing American General's ability to buy them out without the approval of Western National's board. Plaintiffs allege that American General effectuated a plan to circumvent the Standstill Provision and neutralize its protections.

In support of this theory, plaintiffs rely on a document dated July 21, 1997, titled "Project Raven." Project Raven is a pitch book prepared by Morgan Stanley which, according to plaintiffs, sets forth a "plan" and "scheme" explaining how American General should go about eliminating Western National's public shareholders at a less than premium price. I have read the Project Raven pitch book. I did not discover any materials that explicitly (or otherwise) suggest that American General should or could effectuate a squeeze-out merger transaction for inadequate consideration.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *9 (Del.Ch.))

Page  85

Plaintiffs' quote selectively. The pitch book indeed notes that a "carefully orchestrated dialogue [is] critical" and that American General must "avoid [the] appearance of first striking a deal with [Western National's] CEO." [FN25] These two excerpts do not establish domination and control. Moreover, they do not indicate that the Standstill Provision was "avoided," "circumvented," or otherwise "rendered ineffectual."

FN25. Devlin Dep. Ex 4, at 7; Pls.App. Tab 1.

Plaintiffs' overarching theory misapprehends the purpose of the Standstill Provision. The Standstill Provision was not intended to completely foreclose the possibility of a merger between American General and Western National. In fact, the Standstill Provision specifically carved out the possibility of a merger if Western National's board of directors believed such a transaction to be in the Company's best interest.

The Morgan Stanley document outlines the "Strategy and Tactics" American General might employ, in light of the Standstill Provision, to achieve a "Negotiated Deal" with Western National. The fact that American General contemplated, mulled over, or hypothesized potential circumstances in which it would enter into a strategic merger with a 46 percent subsidiary violates neither the letter nor the spirit of the Standstill Provision. It also does not establish domination and control of the subsidiary. Moreover, where a merger transaction is in both parties' interests, the concerns described in the Morgan Stanley document are perfectly legitimate. That is, in the event that both parties desire a merger, the Standstill Provision poses a legal obstacle that must be navigated, especially given the likelihood of litigation attendant to this type of transaction.

More specifically, plaintiffs allege that certain notes Nicholas Rasmussen, senior vice president of corporate development for American General, made in the margin of the Project Raven pitch book demonstrate incontrovertible evidence of control. The margin notation plaintiffs allude to states "they must make us an offer." [FN26] Plaintiffs' conclusion as to the significance of this language is unfounded. Rasmussen's margin notation, read in context, underscores the importance of the Standstill Provision and demonstrates American General's

willingness to respect it.

FN26. Id.

*10 The notation expresses the simple recognition that if American General is to merge with Western National, Western National must initiate the process. Implicit in this procedure is the fact that Western National must willingly consent to, and affirmatively agree with, the desirability of the transaction. When examined as a whole, it is clear that the pitch book recognizes that American General does not control the Company. Indeed, the document identifies six of Western National's eight directors as "independent." Furthermore, it states that "all substantive deal discussions must include 'independent' directors (or their representatives)" and that any "[p]roposal will require approval by [Western National's] independent directors." [FN27]

FN27. Id. at 8.

Finally, defendants observe that the analysis contained in the pitch book, whatever that analysis may be, is largely irrelevant because Morgan Stanley independently generated the document and American General did not solicit it. Rasmussen's deposition testimony states that the Morgan Stanley pitch book was just one of many unsolicited pitches American General received from a host of investment banks seeking to provide their services should American General ever decide to merge with Western National. The testimony also demonstrates that Rasmussen did little more than listen to Morgan Stanley's presentation. [FN28]

FN28. Rasmussen Dep. at 68 ("I was listening-it was not something that I've put much weight in, I don't think it was particularly well done. And like most of these, I listen and file it").

Ultimately, no evidence suggests that the allegedly sinister Project Raven played any role in the merger process. To blindly impute the Morgan Stanley document to American General when American General did not solicit it (nor retain Morgan Stanley as an advisor) is entirely unwarranted. The proposition that American General improperly circumvented the Standstill Provision, or exercised "actual control" over Western National, finds no support in the record.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *10 (Del.Ch.))

B. Did American General Dominate Western National's Board of Directors? [FN29]

FN29. While this section of the opinion focuses on the issue of board domination, I will also discuss directors' potential or actual conflicts of interest with respect to the merger transaction in question.

Plaintiffs allege that American General dominated a majority of Western National directors or that disabling conflicts of interest burdened a majority of Western National directors-with the result that they were incapable of exercising independent judgment regarding the merger. Plaintiffs make these allegations in the face of multiple, undisputed contrary facts.

As a prefatory matter, I note that none of the Company's eight directors, at the time of the merger, were employed by or directly under American General's control. This simple fact renders counterintuitive plaintiffs' several assertions of board conflict of interest and domination. The suspicions plaintiffs raise with respect to director independence and conflict of interest are of the mildest variety. In stark contrast to Kahn v. Lynch and Tri-Star Pictures, [FN30] this is not a case where a parent corporation assigned its managers to the subsidiary's board to play the part of provincial governors. I also note that six of eight Western National directors sat on the board before American General acquired its stake in the Company. Two board members were appointed-at a time when American General was a 40 percent shareholder-with their independence from both companies specifically in mind. [FN31]

FN30. In re Tri-Star Pictures, Inc., Del.Supr., 634 A.2d 319 (1993).

FN31. See Part III(B)(2)(a), fn. 51, infra.

*11 As a final preface, I note that no one from American General, as a general matter, played an active role in the conduct of Western National's board before (or during for that matter) the merger. Plaintiffs allege (wrongly) that Rasmussen, American General's Vice President for Corporate Development, regularly attended Western National board meetings. It seems that plaintiffs seized a portion of a Western National director's deposition testimony [FN32] mistakenly referring to Western

National's CFO, McGimsey, who regularly attended Company board meetings, as Rasmussen, who did not, to support their allegation. Given the context of the statement, it is eminently clear to anyone with a rudimentary understanding of the facts of this case that the deponent misspoke (even without the benefit of errata sheets proffered by defendants replacing "Rasmussen" with "McGimsey"). Whether plaintiffs were excessively opportunistic in seizing the deponent's misstatement or genuinely misconstrued the testimony is unclear.

FN32. Hermance Dep. at 45.

The Delaware Supreme Court broadly set forth the inquiry for questions regarding director disinterest and independence in Aronson v. Lewis. [FN33] There, the Court held that a director is considered interested when he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders or when a corporate decision will have a materially detrimental impact on a director, but not the corporation or its stockholders. [FN34] Independence, the Aronson Court held, means that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influences. [FN35] To establish lack of independence, a plaintiff meets his burden by showing that the directors are either beholden to the controlling shareholder or so under its influence that their discretion is sterilized. [FN36]

FN33. Del.Supr., 473 A.2d 805, 812 (1984).

FN34. Id. at 812.

FN35. Id. at 816.

FN36. Id. at 815; see also Levine v. Smith, Del.Supr., 591 A.2d 194, 205 (1991).

1. The Inside Directors

Although plaintiffs assert ipse dixit that American General dominated the Company's board, their key theory relies on a strained factual predicate. In light of the fact that no employees or agents of American General sat on Western National's board, plaintiffs argue that American General dominated the board through Poulos, its de facto agent. Essentially, this is a structural bias theory which posits that Poulos

Not Reported in A.2d                                              Page   87
**(Cite as: 2000 WL 710192, \*11 (Del.Ch.))**

was so enamored of American General and so influenced by its corporate leaders (primarily Messrs. Devlin and Hook), that he preferred American General to his own company, even to the point that he subordinated his own economic self-interest and the interests of Western National's shareholders to those of American General. This theory labors under two burdens. First, plaintiffs must adduce some evidence demonstrating Poulos's bias. Second, they also must show that he imposed his bias on other board members such that they were beholden to him and (by extension) American General.

Somewhat more credibly, plaintiffs attack Western National's two other inside directors' disinterest in the merger on grounds that they entered into employment contracts with American General during the course of merger negotiations.

a. Did the merger pose an economic conflict of interest to Poulos?

**\*12** There is slim evidence that the merger posed an economic conflict of interest to Poulos; indeed, the evidence points to the contrary. The record indicates that upon consummation of the merger, Poulos would retire his chief executive post, become a non-executive director of American General, receive a $4.5 million cash severance payment and accelerated vesting of certain options. Although plaintiffs try to color the severance payment and accelerated vesting schedule as improper incentives to accomplish the merger, I note two important facts. First, the severance payment and the accelerated vesting schedule are legitimate contractual benefits emanating from a 1994 employment agreement-negotiated before American General became a shareholder. Second, they were the subject of arm's length bargaining and mutual consideration. More importantly, the record also shows that at the time of the merger, Poulos owned equity in both companies, though his interest in Western National significantly outweighed his interest in American General. [FN37]

> FN37. A: By far, the interest that I had in Western National was many, many fold greater than my [interest] in American General. Q: By virtue of your stock interest in American General, did you have any economic incentive to favor the sale of Western National to American General at less than

the highest price that could be obtained? A: Only if I were a fool.... Poulos Dep. at 151.

These facts cannot possibly indicate (i.e., under any interpretation) that Poulos's personal economic and professional incentives were other than aligned with the public shareholders of Western National. That is, Poulos's significant equity interest in the Company aligned him economically with the public shareholders; his willingness to step aside from the Company's helm demonstrates, in my view, the absence of improper motivations such as a desire to maintain the perquisites and prestige attendant to the role of executive chairman. Finally, a $4.5 million cash severance payment coupled with accelerated vesting of certain options to an executive chairman of a large corporation does not strike me as so far beyond the pale that it would give rise to an improper motive to accomplish a merger.

b. Was Poulos otherwise independent of American General?

Plaintiffs are thus left to argue that Poulos's former employment by American General coupled with his personal friendships with American General executives caused him to improperly favor that company in the merger. [FN38] It may indeed be true that Poulos enjoys fond recollections of his twenty-three year career at American General (prior to joining Western National) and it is undoubtedly true that he maintained close social and professional ties with his colleagues there. Nevertheless, such facts do not warrant the inference that Poulos favored the fortunes of American General over those of a company in which he holds substantial equity and has served as executive chairman for its entire existence as a publicly-held entity.

> FN38. Under plaintiffs' theory, Poulos "was inherently conflicted by virtue of his executive positions with the Company and long association with American General." Am. Compl. ¶ 32.

Plaintiffs' claim that Poulos's status as an executive officer at Western National also somehow undermined his independence strains credulity and logic. Perhaps if he were an officer at American General plaintiffs' allegation might facilitate a logical inference that he was beholden to American General but this fact, of course, does not prevail. Despite the inherent frailty of a liability theory

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *12 (Del.Ch.))

predicated on an executive chairman preferring his friends' and colleagues' professional and economic interests over his own similar interests, let alone his fiduciary duty to shareholders, plaintiffs point to two facts with respect to Poulos's relationship with American General that give me some pause, particularly at summary judgment stage.

i. American General's initial investment in Western National

*13 The first fact touches upon the circumstances of American General's initial 40 percent acquisition of Western National stock from Conseco. The circumstances surrounding this transaction are unorthodox. Essentially, Poulos exclusively facilitated the sale of Conseco's 40 percent stake to American General. Aware that Conseco was "rather anxious to sell" its Western National shares, Poulos solicited his former colleagues at American General. Never informing Conseco that American General was the buyer, Poulos negotiated the transaction on behalf of both parties. The parties never met and no investment or legal advisors were involved.

While this transaction is certainly peculiar, I am not entirely sure what plaintiffs would have me infer from it. Does it establish that Poulos favored American General? Does it indicate some special relationship between Poulos and American General? If it does, I am at a loss as to how; and neither plaintiffs' complaint nor post-discovery briefing provides much by way of explanation. It appears that plaintiffs simply did not engage in any fact finding with respect to the Conseco-American General transaction beyond the Poulos deposition that established the facts recited above.

Defendants argue that the only reasonable, indeed plausible, understanding of Poulos's role in the Conseco-American General transaction is far less malevolent than the essentially unsupported inference plaintiffs urge. Surely Conseco, a sophisticated market participant, would not casually leave itself exposed to double-dealing and opportunism from Poulos in a significant, multi-million dollar transaction such as the sale of a 40 percent equity stake in a sizeable company. Why would Conseco allow Poulos to negotiate Western National's sale under such peculiar constraints-without professional advisors and without Conseco knowing the buyer's identity-if it did not have

complete trust and confidence in him and was not completely satisfied with the consideration the undisclosed American General paid?

While that question is obviously rhetorical, the record does not conclusively establish the answer defendants rhetorically imply. In my view, however, the inference defendants urge me to make is far more compelling than plaintiffs' and, again, I note plaintiffs studied failure to develop this portion of the record. Nevertheless, acknowledging that plaintiffs have raised a factual issue, I will, for purposes of this motion, give some credence to plaintiff's sinister, though thinly supported hypothesis that Conseco's sale to American General evidenced a special relationship or some type of impermissible "understanding" between Poulos and American General.

ii. The Poulos Provision

The second fact that I find somewhat troubling is what plaintiffs style as the "Poulos Provision." The Poulos Provision was a clause in the same shareholders' agreement giving rise to the Standstill Provision. The Poulos Provision, as plaintiffs describe it, permitted American General to acquire Western National without the consent of the Western National board if Poulos ceased to serve as its chairman. In other words, it served to suspend the protections of the Standstill Provision.

*14 Plaintiffs contend that "presumably" the Poulos Provision indicates that American General executives believed Poulos was, so to speak, their man at Western National. This presumption is not well developed in the extensive deposition testimony or other evidence plaintiffs proffered. Indeed, the provision is mentioned only once and, there, plaintiffs primarily inquired as to its existence. [FN39] When asked the purpose of the Provision in the scheme of the shareholders' agreement, Poulos responded that he could not specifically recollect. When asked why Hook, American General's chairman, wanted the provision, Poulos responded, "I guess he wanted the right to be able to close in if anything happened to me." [FN40]

FN39. See Poulos Dep. at 30.

FN40. Id.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    **Page  89**
**(Cite as: 2000 WL 710192, \*14 (Del.Ch.))**

This statement, in my view, is subject to at least two plausible interpretations. The first is that advanced by plaintiffs above: that Poulos was American General's de facto agent at Western National, impermissibly looking after its interest to the exclusion of all other shareholders (including himself). The second is that Hook and American General had tremendous confidence in Poulos's management skills and wanted to reevaluate their investment should Poulos leave the Company. Because I am considering a summary judgment motion, and the record is not fully developed with respect to this issue, I will give consideration to plaintiffs' more alarmist view.

In light of the peculiar circumstances surrounding American General's initial investment in Western National and the not totally implausible inferences plaintiffs ask me to draw with respect to the so-called Poulos Provision, I cannot (at this stage) conclude that Poulos was entirely independent of American General. That is, plaintiffs have adduced some evidence, although fairly tame, that Poulos might have considered this transaction not entirely as an advocate of Western National and its shareholders. But that is as far as it goes. Nothing in the record supports plaintiffs' allegation that Poulos dominated other members of the Western National board or that the other directors were beholden to him in any way. [FN41] The allegation that Poulos exercised undue influence or tainted the merger negotiations similarly falls short. [FN42]

FN41. See Part III(B)(2)(a), infra.

FN42. See Part III(C)(4) and (5), infra.

c.  Were inside directors Graf and Scott independent of American General and disinterested in the merger?

Plaintiffs seek to impeach the disinterest of inside directors John A. Graf ("Graf"), Western National's Chief Marketing Officer, and Richard W. Scott ("Scott"), Western National's General Counsel and Chief Investment Officer, on grounds that they had entered into employment contracts with American General at the time of the merger. These employment contracts, plaintiffs reason, impaired Graf's and Scott's ability to honestly weigh the merits of the merger as their interests at that point became aligned with American General.  Plaintiffs

allude to the Delaware Supreme Court's opinion in In re Tri-Star Pictures [FN43] to support this proposition. Tri-Star, however, is not entirely analogous to the facts here. Importantly, Tri-Star involved a de jure parent-subsidiary merger where the parent corporation, Coca-Cola, held a 56 percent interest in Tri-Star (measured by direct holdings and voting agreements) and Coca-Cola executives filled four of Tri-Star's ten director slots. In the context of an appeal from a Rule 12(b)(6) dismissal, the Supreme Court stated that two Tri-Star executive directors, with ties to Coca-Cola affiliates, who would participate in the management of the combined entity (i.e., Coca-Cola's augmented entertainment unit) appeared interested.

FN43. 634 A.2d at 329.

**\*15** I do not read Tri-Star to stand for the proposition that a subsidiary inside director who continues to participate in the combined company is automatically interested in the transaction, particularly at the summary judgment stage after plaintiffs have had an opportunity to engage in substantial discovery. [FN44] Here, plaintiffs chose not to depose either Graf or Scott; nor have plaintiffs adduced any other credible evidence to impugn their independence and impartiality. Yet despite the dearth of evidence sullying these inside directors' independence from American General, I will not consider Graf and Scott disinterested based on the stipulated facts outlined above for purposes of this summary judgment motion.

FN44. Cf. Goodwin v. Live Entertainment, Inc., Del. Ch., C.A. No. 15765, mem. op. at 53, Strine, V.C. (Jan. 22, 1999) (stating that two directors' continuing employment relationship with combined entity raises triable issue of fact at summary judgment but expressing doubt that such relationship would constitute actual material conflict of interest after full evidentiary hearing), aff'd, Del.Supr., No. 72, 1999, Veasey, C.J. (July 23, 1999) (Order).

Regardless of my decision not to consider Graf or Scott disinterested in the merger transaction at issue, I note the absence of evidence suggesting that either Graf or Scott pressured, coerced or directed other board members into accepting merger terms unfavorable to Western National. Indeed, they were not actively involved in the merger negotiations and

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *15 (Del.Ch.))

merely concurred in the judgment of the Special Committee. [FN45]

> FN45. Plaintiffs allege that Scott participated in the negotiation of the merger agreement's collar provision. The significance of this fact is far from clear as the collar provision did not cut against Western National shareholders in terms of dollar value received. Moreover, the Special Committee had to cajole Devlin into accepting a fixed price transaction (with collars) in lieu of the fixed exchange ratio transaction that Devlin initially wanted. That is, price collars were part of the Special Committee's merger proposal and Scott merely aided the Special Committee in negotiating the collars' parameters.

In sum, the only evidence plaintiffs proffer to establish Graf's and Scott's conflict of interest is that they retained their jobs after the merger. While I suppose this technically placed them on both sides of the transaction, as conflicts of interest go, this one does not seem particularly egregious.

### 2. The Outside Directors

Western National or American General did not employ any of the five remaining members of the Western National board of directors at the time of the merger. That is, all five were outside directors-presumptively disinterested and independent.

Plaintiffs nonetheless challenge two of the five outside directors' independence because of circumstances surrounding their appointment to the Western National board. Next, plaintiffs allege that past relationships with American General compromised the independence of the three outside directors sitting on the Special Committee. Finally, they contend that the two remaining outside directors, who did not sit on the Special Committee, were incapable of evaluating the merger in good faith because they lacked complete independence and disinterest.

#### a. Did Poulos and Hook "handpick" certain outside director nominees of American General?

Previously I noted that six of eight Western National directors were elected to the board before American General purchased its 40 percent equity interest. Plaintiffs attack the independence of the

two directors elected to the Company's board after the American General purchase through unsubstantiated assertions that American General unilaterally appointed them or, alternatively, that they were jointly appointed (or "hand-picked," to borrow plaintiffs' language) through the tacit cooperation of Poulos and Hook (then chairman of American General).

As a preliminary matter, I note that even if American General nominated some of the outside directors or if Poulos and Hook jointly nominated them, such nomination, without more, does not mandate a finding that these directors were beholden to American General, Poulos, or Hook, and incapable of exercising their independent business judgment with respect to the merger or otherwise. Directors must be nominated and elected to the board in one fashion or another. The fact that a company's executive chairman or a large shareholder played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence. [FN46] Essentially, plaintiffs ask that I declare these two outside directors incapable of exercising independent, good faith business judgment merely because they did not find their way onto the Company's board through an independent nominating committee. Although independent nominating committees may indeed have a salutary effect on board efficacy and independence, and are surely a "best practice" which the corporate governance community endorses, they are not a sine qua non for director independence under Delaware law. [FN47]

> FN46. See Aronson v. Lewis, Del.Supr., 473 A.2d 805, 815 (1984)(observing that a 47 percent stockholder who personally selected all of the directors of the corporation was not sufficient to establish that the stockholder dominated and controlled the corporation's board of directors); see also Andreae v. Andreae, Del. Ch., C.A. No. 11905, mem. op. at 12-13, Hartnett, V.C. (Mar. 3, revised, Mar. 5, 1992)(noting that Delaware courts have consistently rejected the notion that a director cannot act independently of the entity that appointed him or her to the board).

> FN47. Cf. Brehm v. Eisner, Del.Supr., 746 A.2d 244 (2000) (commenting on distinction between corporate governance "best practices" and legal

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                                    **Page  91**
**(Cite as: 2000 WL 710192, *15 (Del.Ch.))**

requirements).

**\*16** Plaintiffs level their attacks on director independence based on alleged defects in the nominating process at Donald Baker ("Baker") and Alan R. Buckwalter ("Buckwalter"). Specifically, plaintiffs allege that Baker, a member of the Special Committee, and Buckwalter were appointed to the Western National board only with the approval of both Hook and Poulos, and thus are not independent.

The record does not, however, support the contention that American General unilaterally appointed any of the Company's directors:

Q: Did American General ever indicate that they were considering exercising their right to appoint two directors to Western National's board?
A: I asked Mr. Hook at each, prior to each annual meeting if in fact they wanted to advance two names to be included on the ballot and he declined.
Q: Did the Western National board have a nominating committee?
A: The board was so small, it served as the nominating committee.
Q: Did American General propose any nominees?
A: No, they didn't.
Q: Did American General ever express any opinion as to any of the nominees?
A: No, they didn't.
Q: Did American General ever ask that anyone not be nominated?
A: No. [FN48]

> FN48. Poulos Dep. at 31. The deposition testimony of Robert Devlin, Hook's successor at American General, is consistent with Poulos's: Q: Has American General ever exercised its right to appoint two directors? A: No. Q: Has any Western National director or senior manager ever solicited your opinion on prospective nominees for its board? A: No. Devlin Dep. at 33-34. Notwithstanding Poulos's unambiguous testimony recounting Western National's director nominating process, plaintiffs allude to what might be viewed as contradictory testimony in Baker's deposition: "All that Mike [Poulos] told me at the time was that he and Harold [Hook] had agreed that the two board members they added to the board would be somebody that they mutually know and trusted. And that's the reason Alan [Buckwalter] and I were

chosen, because we both know both of them." [FN49]

> FN49. Baker Dep. at 33.

Baker's testimony clearly corroborates that American General did not unilaterally appoint Baker and Buckwalter to the Company's board let alone impinge upon their discretion and independence. At most, it indicates that Poulos conferred with Hook before the Western National board nominated two new members. Baker's testimony also indicates that American General's and Western National's executive chairmen knew and trusted these two prospective directors. This testimony, contrary to plaintiffs argument, does not support a conclusion that these two directors were beholden to Hook and Poulos or were incapable of making independent judgments and exercising the discretion of a fiduciary with respect to the merger. [FN50] It merely establishes that Baker and Buckwalter were "known and trusted" by the Company's executive chairman and by the executive chairman of a large shareholder.

> FN50. See fn. 43, supra. See also Citron v. Steego Corp., at 14 (stating that where a board of directors was agreeable to a 48.8 percent stockholder designating two members of a nine member board "shows little more than the fact that the board recognized the interest of a large stockholder in having board representation"); Sea-Land I, at 9-11 (stating that 40 percent stock ownership and the ability to have nominees elected to board does not establish actual domination or control).

Plaintiffs cannot point to any evidence to support a reasonable inference that Baker and Buckwalter could not act independently. [FN51] Mere insinuation is unfair and improper. Plaintiffs had an opportunity to depose these directors and elicit facts that would support that they were beholden to American General. They deposed Baker and, as explained here (and in the section immediately below), failed to cast doubt on his independence. Plaintiffs did not bother to depose Buckwalter.

> FN51. Plaintiffs' effort to cast Baker and Buckwalter as Poulos's and Hook's lackeys is entirely built around Baker's testimony that they were brought on the Western National board because they were "known and trusted" by Poulos

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and Hook. Defendants, however, note that Baker also testified that he and Buckwalter were brought on to the board because neither "had any particularly close relationship with either company." Baker Dep. at 17.

b. Do past relationships with American General vitiate the Special Committee directors' independence?

*17 Plaintiffs seek to impeach the independence of all three members of Western National's Special Committee, Baker, Alan Richards ("Richards"), and Robert Hermance ("Hermance") on the basis of past relationships with American General. Before examining each director's past ties to American General, I note that under Delaware law a director's past employment with the company on whose board he sits does not alone establish that director's lack of independence. [FN52] Consequently, in my view, for a court to conclude that a director lacks independence based on a past consulting relationship is an even more dubious proposition.

> FN52. Oddyssey Partners v. Flemming Cos., Del. Ch., C.A. No. 14770, mem. op. at 47, Lamb, V.C. (May 13, 1999) (stating that director's status as a former officer of Fleming "is not alone, a sufficient basis for a finding that he was controlled by Fleming").

Plaintiffs first point to certain consulting work Baker performed for American General while he was a partner at Arthur Andersen. Baker retired from Arthur Andersen in 1990, seven years before he served on the Special Committee. He supervised a single project for an American General subsidiary that lasted a year or two during the late 1970s and early 80s --- over fifteen years before the merger. This work certainly does not undermine Baker's independence, standing alone or coupled with the facts surrounding his nomination to the Company's board.

Plaintiffs' challenge to Richards's independence and disinterest on similar grounds also falls short. They again invoke nebulous allegations based on past consulting work performed for American General. The undisputed record, however, indicates that Richards only performed a single, three-week consulting job for American General in the spring of 1987 and has not worked for American General

since that time. I obviously cannot conclude that Richards labored under an improper preference for American General, that American General controlled him, or that he acted disloyally toward Western National as a result of a three-week consulting engagement ten years before the merger.

Plaintiffs also point to the fact that Richards performed periodic consulting work for Western National from October 1993 until June 1996 and a single, two-day assignment thereafter. This relationship, however, should have no bearing on his views of the merger. Indeed, if Richards harbored any self-interested motivation as a result of past consulting work for Western National (of which there is no indication) he would, if anything, likely resist American General's overtures to merge, as a combination with the much larger entity would terminate his relationship with the Company. Once no longer in the corporate inner sanctum, the prospects for influencing future consulting arrangements are obviously diminished. In other words, plaintiffs' allegation lacks logical support.

Robert Hermance, chairman of the Special Committee, is a retired partner of the accounting firm, Ernst & Young. Plaintiffs argue that because Hermance, at one time, was Ernst & Young's engagement partner for the American General audit, his ability to function free from American General's influence was "questionable." Hermance retired from Ernst & Young in 1994 and had not been directly responsible for the American General audit since 1985. At the time of the merger, any dealings Hermance might have had with American General or Ernst & Young were twelve and three years stale respectively. Moreover, the record does not support the notion that Hermance was at all interested in rekindling contact, let alone business, with either entity. Based on these facts, as a matter of law I cannot conclude that Hermance was interested or lacked independence.

*18 Plaintiffs fail to impugn any of the Special Committee members' independence or disinterest based on past relationships with American General. Those relationships, in my view, could not have exercised any material effect on the Special Committee members' ability to independently evaluate the business merits of the merger. As plaintiffs have offered no other challenges to the Special Committee directors' independence (save the

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

alleged, though unsupported, defects in Baker's nomination to the Company's board, [FN53] I conclude as a legal matter that plaintiffs have failed to point to facts, or reasonable inferences from such facts, that any of them were interested in the transaction or lacked independence from American General or its purported de facto agent, Michael Poulos.

FN53. See Part III(B)(2)(a), supra.

c. Were the remaining outside directors, Buckwalter and Keeble, disinterested and independent?

The independence and disinterest of the two remaining outside directors, Buckwalter and Sidney Keeble ("Keeble"), are not as crystal clear as that of the Special Committee members. In addition to the unsupported allegation that Buckwalter was under the control of Hook and Poulos as their "hand-picked" designee, [FN54] plaintiffs allege that because Buckwalter was President of Chase Texas Bank, one of American General's lenders, there is a material issue of fact as to whether he would consider Western National's interests without regard to his employer's interest in its client relationship with American General.

FN54. Id.

Defendants argue that simply because a director is an employee of a company that has a commercial relationship with the other party in a merger does not mean that the director lacks independence. [FN55] Rather, the burden is on plaintiffs to show that the relationship between the director's employer and the merger partner affected the director's decision making process. [FN56] Here, plaintiffs have not proffered any additional evidence that the banking relationship between Chase Texas and American General sterilized Buckwalter's discretion or subverted his good faith evaluation of the merger's underlying corporate merits.

FN55. Cf. Kaplan v. Wyatt, Del.Supr., 499 A.2d 1184, 1189 (1985) (finding a director who was an affiliate of a number of companies with which the nominal corporate defendant transacted significant business to be independent).

FN56. See Rales v. Blasband, Del.Supr., 634 A.2d

927, 936 (1993).

Plaintiffs seek to impeach Keeble's competence to evaluate the merger on its merits and in good faith (i.e., as a fiduciary) because he is a retired senior vice president of an American General subsidiary and holds a substantial amount of American General stock. [FN57] Keeble's large holdings of American General stock, constituting approximately 40 percent of his total wealth at the time of the merger, are troublesome. Defendants insist, however, there is no evidence that he had a direct interest in the merger or that his American General stock ownership was in fact material to his decision to approve the recommendation of the Special Committee and put the merger to the shareholders. [FN58] In an effort to corroborate his independence, Keeble submitted an affidavit swearing to a net worth of approximately $20 million outside of his holdings in American General and stating that any speculative effect the merger might have had on the value of his American General stock played no role in his decision. [FN59]

FN57. At the time of the merger, Keeble owned approximately 328,212 shares of American General common stock.

FN58. See Cede & Co. v. Technicolor, Inc., Del.Supr., 634 A.2d 345, 363-64 (1993).

FN59. Keeble Aff. ¶¶ 2 and 3.

*19 Although I ordinarily attach little if any weight to such inherently self-serving and non-adversarial proffers, I note that plaintiffs made no effort to establish that Keeble was improperly motivated as a result of his American General holdings. Plaintiffs chose not to depose Keeble, or Buckwalter for that matter, and failed to probe meaningfully what potential effects (if any) Keeble's stock ownership and Buckwalter's employment relationship might have had on their views of the merger transaction. Plaintiffs similarly did not bother to depose inside directors Graf and Scott. Now, however, plaintiffs ask me to conclude that all four of these directors, who were never deposed, either labored under personal conflicts of interest or were not independent of American General.

When defendants seek a judicial finding as to director disinterest and independence before

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

substantial discovery has been taken, typically in the context of a motion to dismiss, the Court will accept plaintiffs' characterization of all well-pleaded facts. Here, discovery has proceeded for over two years and plaintiffs have had substantial opportunity to establish facts supporting their allegations. The grounds for Graf's and Scott's conflict of interest-continued employment in the combined entity-and Buckwalter's lack of independence-an employment relationship with one of the parent company's lenders-are the sort of fiduciary problems that typically require additional evidence before the court will consider such directors interested in the transaction or beholden to the parent company. [FN60]

FN60. Despite Keeble's affidavit and plaintiffs' failure to depose him, his substantial American General stock holdings, at this point, cast sufficient doubt as to his independence from American General.

In spite of these procedural and evidentiary burdens, plaintiffs partially build their case around Graf's, Scott's, and Buckwalter's conflicts of interest and lack of independence exclusively through the facts alluded to above. The United States Supreme Court has held that "production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character." [FN61] I could plausibly conclude that depositions of Graf, Scott, and Buckwalter would not have yielded evidence corroborating the inferences plaintiffs ask me to draw. That is, I might reasonably conclude that plaintiffs strategically chose not to depose these directors.

FN61. Interstate Circuit, Inc. v. United States, 306 U.S, 208, 226 (1939). See also Smith v. Van Gorkom, Del.Supr., 488 A.2d 858, 878-79 (1985) (concluding that "it is a well established principle that the production of weak evidence when strong is, or should have been, available can lead only to the conclusion that the strong would have been adverse").

In that event, plaintiffs failure to impeach these three directors disinterest and independence, coupled with their failure to establish that any of the Special Committee members labored under conflicts of

interest or were in fact beholden to American General, would comfortably result in finding a disinterested and independent majority on the Western National board of directors. Despite this strong possibility, I will nevertheless give some weight to the evidence casting doubt on Graf's and Scott's disinterest-their continued employment in the combined entity-and Buckwalter's lack of independence-his employment relationship with Chase Texas-and not consider them wholly disinterested and independent, solely for purposes of this summary judgment motion. As noted in footnote 60, I also will not consider Keeble, on account of his significant American General stockholdings, independent for purposes of this motion.

*20 This, of course, does not end the analysis. As I have previously noted, American General did not exercise actual control over the Company's business and affairs. That is, American General was generally a passive investor, only expressing its views with respect to extraordinary transactions such as the U.S. Life merger and appropriately engaged in the comanagement of Western National-American General joint ventures.

There also is no evidence to suggest that American General directly or indirectly participated, or was in any way involved, in the functioning of the Western National board of directors before the merger. In other words, to use the familiar language deployed in non-majority shareholder control inquiries, no evidence indicates that American General dominated the Western National board of directors. As noted in sections III(B)(1)(b)(i) and (ii) and III(B)(2)(c), plaintiffs have cast some doubt as to the ties of Poulos, Buckwalter and Keeble to American General. These doubts are, however, speculative and largely beside the point as plaintiffs have not adduced evidence indicating that any of these directors exerted pressure on other directors to favor American General.

Ultimately, focusing exclusively on each director's relationship to American General outside the context of the merger, plaintiffs have raised (if barely so) triable issues of fact with respect to the independence of three of eight directors. Plaintiffs also have established that two other board members (otherwise totally unconnected to American General) might be burdened by potential conflicts of interest

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *20 (Del.Ch.))

exclusively with respect to the merger transaction in question-specifically, inside directors Graf and Scott, who entered into employment contracts with American General around the time of the merger negotiations.

These five potentially conflicted directors, Poulos, Buckwalter, Keeble, Graf and Scott, however, were not particularly involved in the merger process. Indeed, plaintiffs have adduced no evidence that Graf, Buckwalter, or Keeble played any role whatsoever (besides considering and approving the Special Committee's recommendation) while Poulos's and Scott's involvement was de minimis. The record, in fact, demonstrates that the Special Committee-whose disinterest and independence is above reproach-and its advisors performed the bulk of the heavy lifting during the course of merger negotiations.

Here, however, plaintiffs properly observe that a significant stockholder that does not, as a general matter, exercise actual control over the investee's business and affairs or over the investee's board of directors but does, in fact, exercise actual control over the board of directors during the course of a particular transaction, can assume fiduciary duties for purposes of that transaction. [FN62] With this in mind, I turn to the process by which the Special Committee negotiated and recommended the merger to the full board and whether American General actually controlled the Special Committee or dictated the terms of the transaction. Then, I will consider the legal effects of this process.

FN62. Kahn v. Lynch, 638 A.2d at 1114-15.

C. Did American General Control the Special Committee and Dictate the Terms of the Transaction?

*21 Plaintiffs attack the Special Committee process on two grounds. They first allege that the Special Committee could not have relied on the advice of its expert advisors because the advisors were not independent of American General. The gist of their second, more general criticism is that the Special Committee was unqualified, uninformed, generally passive, and allowed American General to assert control over the transaction and dictate its terms. Neither allegation withstands scrutiny.

1. Were the Special Committee's Advisors Independent and Could the Committee Reasonably Rely on their Advice?

Plaintiffs' assertion that Donaldson, Lufkin & Jenrette was not independent of American General because it provided investment banking services to American General both before and after the transaction does not find support in the record. The fact of the matter is that American General had never hired DLJ directly. Rather, DLJ merely agreed to participate as one of ten or twelve co-managers in an offering of American General debt securities at the request of Goldman Sachs, the lead underwriter, two years before the merger. A one-tenth or one-twelfth participation in an underwriting syndicate two years before the merger does not undermine DLJ's independence from American General.

Plaintiffs' contention that DLJ provided services to American General after the merger, suggesting a quid pro quo for providing a low-ball valuation of Western National during the merger, is both false and misleading. Plaintiffs cite to Devlin's deposition testimony that DLJ provided acquisition advisory services for American General in 1999. What plaintiffs fail to point out is that the group of bankers providing these services were employed by Union Bank of Switzerland when retained by American General and transferred mid-stream to DLJ. In other words, the bankers became affiliated with DLJ after American General hired them. These facts do not establish that DLJ had any reason to favor American General in the merger negotiations.

Plaintiffs' effort to impeach the independence of the Special Committee's legal advisor, Sullivan & Cromwell, lacks record and logical support. Plaintiffs contend that Sullivan & Cromwell improperly advised the Special Committee because it later served as Western National's "tax counsel." The tax advice that Sullivan & Cromwell provided to Western National, however, only concerned the merger. In the course of its normal work on behalf of the Special Committee, Sullivan & Cromwell provided advice on the tax consequences of the merger. That advice was also used in drafting a Registration Statement under the Securities Act of 1933. The tax advice provided to Western National was consistent with, and an integral part of, Sullivan & Cromwell's work for the Special Committee.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Because the Special Committee was working on behalf of Western National's shareholders (to whom Sullivan & Cromwell provided its tax advice), there was obviously no conflict of interest.

**\*22** Plaintiffs allegation that the Special Committee selected its advisors through a defective process is similarly unavailing. Here, plaintiffs allege that two inside directors, Scott and Poulos, selected the advisors as the Special Committee sat idly by. The record indeed supports plaintiffs' assertion that Western National management, including Poulos and Scott, recommended DLJ and Sullivan & Cromwell to the Special Committee. Western National's management, however, recommended these firms for the perfectly appropriate reasons that they were highly qualified and independent of American General. Hermance's deposition testimony very clearly bears this out:

Q: And do you recall who recommended DLJ to the Special Committee?
A: The management of the company.
Q: Okay. Do you specifically recall who among the management proposed DLJ?
A: It was Mr. Poulos.
Q: And do you recall what he said about DLJ?
A: He expressed confidence in them, briefly outlined some of their experience in the insurance industry, mergers and acquisitions; and indicated that finding an advisor who was not already affiliated or associated in some way with American General was important and that they fit that-that requirement. [FN63]

FN63. Hermance Dep. at 59.

Scott recommended Sullivan & Cromwell to the Special Committee for similar reasons. The Special Committee interviewed representatives of both firms and inquired as to their experience in insurance company M & A, their experience representing special committees, and their independence from American General. The Special Committee then concurred in the judgment of other members of Western National's board and management that DLJ and Sullivan & Cromwell would provide useful and independent advice during the course of merger negotiations. Based on the undisputed evidence of record, the Special Committee selected its advisors in a substantively and procedurally sound manner.

This Special Committee's selection of advisors is

markedly different from the Dairy Mart and Tremont cases the plaintiffs cite. In Dairy Mart, the attorney for the controlling shareholder recommended the advisors. [FN64] In Tremont, the corporation's general counsel recommended a law firm that had strong financial connections to the controlling shareholder. [FN65] In this case, management merely arranged for the committee to interview advisors that appeared qualified and did not have any connection to Western National or American General.

FN64. Kahn v. Dairy Mart Convenience Stores, Inc., Del. Ch., C.A. No. 12489, mem. op. at 17, n. 6, Jacobs, V.C. (Mar. 29, 1996).

FN65. Kahn v. Tremont Corp., Del.Supr., 694 A.2d 422, 429-30 (1997).

2. Was the Special Committee Informed?

Having concluded as a matter of law that the Special Committee directors and their advisors were disinterested, independent, and appropriately selected, I will now inquire whether the Special Committee was fully informed of all material information reasonably available.

The only evidence Plaintiffs offer in support of their assertion that the Special Committee was not fully informed is a sound-bite of Hermance's deposition testimony where he indicates that he did not personally request any specific information from management with respect to Western National's current financial condition. From this, plaintiffs conclude that the Special Committee members were inexperienced, uninformed and unsure how to carry out their duties. That inference is unreasonable and at odds with the record.

**\*23** The Special Committee had full access to all Company information under the terms of the board resolution setting forth its mandate. Furthermore, Richards unequivocally testified that the Special Committee indeed received full access to all Company documents. [FN66] Finally, as a legal and practical proposition, the Special Committee could and did reasonably rely on its expert advisor to obtain and analyze the specific information needed to value the Company. [FN67] And as Baker's testimony bears out, the Committee then appropriately incorporated this analysis into its

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
(Cite as: 2000 WL 710192, *23 (Del.Ch.))

overall assessment of the soundness of the merger. [FN68]

    FN66. Richards Dep. at 71.

    FN67. 8 Del. C. § 141(e); Cinerama Inc. v. Technicolor, Inc., Del. Ch., 663 A.2d 1134, 1142 (1994), aff'd, Del.Supr., 663 A.2d 1156 (1995) (reliance on experienced advisor is not only allowed, but is "evidence [of] good faith and the overall fairness of the process").

    FN68. Baker Dep. at 72.

3. Was the Special Committee Process Tainted by Potentially Interested Inside Directors?

The next alleged defect in the Special Committee process sits somewhat awkwardly next to plaintiffs' previous allegation that the Committee did not solicit sufficient information from management. Here, plaintiffs contend that the presence of inside directors Scott and Poulos during portions of due diligence and during one of DLJ's presentations spoiled the integrity of the Special Committee process. Distilled to its core, plaintiffs' claim is that management was too involved with the Special Committee. Plaintiffs must decide whether management and inside directors were excessively or insufficiently involved-it cannot be both.

In any event, I am unable to find fault with some management participation or input into the Special Committee process, particularly in these circumstances where the inside directors' alleged conflicts of interest range from mild to immaterial. I also note that this case does not involve the set of concerns management buyout transactions raise where it is most vital to maintain a firewall between managers participating in the buyout group and the special committee. Nor is this a case where the record indicates interested managers attempting to influence a special committee's decision-making process.

Defendants plausibly contend that management directors were present at DLJ's presentation to comment on the accuracy and soundness of its valuation; essentially, they were there to make sure DLJ did not miss anything, so to speak. In oral argument, plaintiffs suggested that Poulos's and Scott's presence at this valuation wholly undermined the efficacy of the Special Committee, suggesting that it was equivalent to disclosing Western National's bargaining range and reservation price to American General. Again, plaintiffs ask that I draw an inference that the record does not support. There is simply no evidence to support the contention that Scott or Poulos tipped the Special Committee's hand to American General. None.

4. Did American General Control the Negotiation or Was the Committee Free to Negotiate at Arm's Length?

Finally, and predictably, plaintiffs allege a "quick surrender" by the Special Committee. In reality, the record not only illustrates arm's length bargaining but also demonstrates that American General never improperly forced a merger transaction, one way or another, onto the Special Committee. Indeed, to the extent that Western National felt pressured to do a deal, that pressure emanated from regulatory constraints and product and capital markets, not from American General.

*24 After DLJ opined that the $30-$31 per share represented the high end of Western National's value, the Special Committee offered American General (through Devlin) $32 per share pursuant to a fixed price formula. Several days later, Devlin phoned Hermance informing him that American General would only accept a fixed exchange ratio formula at the then market price of approximately $28.19. By the end of that telephone conversation Devlin had adjusted American General's price upward to $28.75 (still based on a fixed exchange ratio formula) and also agreed to accept an expense reimbursement provision in lieu of American General's earlier request for a three percent breakup fee. After discussing Devlin's offer with the Special Committee, Hermance informed Devlin that the Committee would not be willing to recommend a fixed exchange ratio at $28.75.

The following day, Devlin returned to the negotiating table, this time with a fixed price offer at $29.00 per share, subject to certain collars that would result in the value being adjusted up or down within a yet to be specified range, based on movements in American General's stock price. The Special Committee indicated it would not recommend a deal at $29.00 per share and counter-offered $31.00 per share. Devlin rejected $31.00 per

Not Reported in A.2d

**(Cite as: 2000 WL 710192, \*24 (Del.Ch.))**

share and walked away. At this point, the record indicates, all parties concerned believed the negotiations had permanently broken down.

These events, to my mind, reasonably imply two legally significant conclusions. First, the Special Committee had the power to say no. Indeed, the Special Committee said it three times. Second, and more importantly, the fact that American General was willing to terminate the negotiations and place Western National in a status quo ante posture indicates that the Special Committee had a genuine choice as to the ultimate fate of the Company. That is, American General was simply not going to force a deal on Western National if the Special Committee did not accept its terms. Plaintiffs derisively scoff at this sequence of events as a sham or faux negotiation (repeatedly placing the word negotiation between quotation marks) and argue that the entire exchange between the Special Committee and American General was merely a splendid dance meant only to charm a reviewing court. But calling something a sham over and over again does not make it a sham. Plaintiffs would have me defer to shrill invective, and ignore the undisputed record developed during two years of discovery into the circumstances of this merger. Ultimately, I am no more charmed by the carefully orchestrated dance of a special committee than I am by the use of baseless innuendo and unreasonable inferences to bolster a deflated legal theory. In this instance, plaintiffs have not pointed to record facts that would lead a court-even a naturally suspicious court-to question the conduct of an independent, disinterested special committee charged with negotiating a third party merger agreement.

5. Did the Special Committee Abdicate its Responsibility to Poulos, a Potentially Interested Director?

**\*25** It is at this point in the negotiation process that plaintiffs make a final assault on the Special Committee. After Devlin terminated negotiations, Hermance and Richards resolved to make one last effort to jump-start the talks, presumably thinking that a merger with American General was truly in Western National's interests and still potentially superior to other strategic options. They asked Poulos to contact Devlin and invite him back to the negotiating table. Poulos obliged.

In a short conversation, Devlin told Poulos that he would only come back to the table at a deal price of $29.75, based on a fixed price formula subject to collar provisions. Poulos reported the substance of this conversation to the Special Committee members. At this point, the Special Committee members, in the exercise of their good faith judgment, apparently determined that this offer represented the best option available to the Company. Upon conferring with its advisors, the Special Committee negotiated the merger's last details, including finalizing the range of the collar provisions. The Committee again met with DLJ which opined that the proposed merger transaction was fair from a financial point of view. After further discussion, the Special Committee resolved that the merger was fair and in the best interests of the Company's shareholders and recommended the transaction to the Company's full board of directors.

Based on these undisputed facts, plaintiffs allege that the Special Committee "abdicated" its duty to negotiate vigorously on behalf of the Company and its public shareholders to Poulos. Again, the facts do not come close to supporting the finding that plaintiffs urge. The Special Committee did not abdicate its responsibility; it simply used a negotiating tactic that plaintiffs thought unwise and unduly passive. Even if correct, plaintiffs cannot prevail on their abdication theory because the uncontested facts indicate that the Special Committee, which Hermance led, carried out the bulk (if not all) of the negotiation and, more importantly, made every decision in the negotiating process. When shorn of all rhetoric, plaintiffs have not alleged facts that give rise to a conclusion that this merger transaction was other than the product of arm's length bargaining between a non-controlling 46 percent shareholder and a well-functioning independent special committee.

Nothing in the record indicates that American General controlled the Company's business and affairs. Nor does the record indicate that it dominated the Company's board of directors. Although the evidence does not conclusively show, at this juncture, that a majority of the Company's board was disinterested in the merger or not completely independent of American General, the doubt plaintiffs cast with respect to these issues is mild at most.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                      **Page   99**
**(Cite as: 2000 WL 710192, \*25 (Del.Ch.))**

Perhaps in recognition of this eventuality, however, the Western National board prudently designated its three most clearly independent directors to serve on a special committee and charged the committee with guiding the Company at a point that genuinely appeared to be a strategic crossroads. This Special Committee appeared mindful of the fact that a merger with American General was merely one strategic option available. More importantly, American General realized the same.

**\*26** With the aid of its expert advisors, the Committee apprised itself of all reasonably available information, negotiated with American General at arm's length and, ultimately, determined that the merger transaction was in the best interests of the Company and its public shareholders. In light of these facts, I conclude that the most appropriate analytical standard to apply to this transaction is the business judgment rule.

Business judgment rule review is appropriate, it seems to me, for two broad reasons. First, Delaware law will not attach liability to decisions of independent, disinterested and informed directors. Second, Delaware law generally respects the committee process as a legitimate method to produce disinterested and independent decisions, where some directors on the board, but not on the committee, arguably have conflicting interests. [FN69] The synthesis of these two principles, in my opinion, produces a general principle that liability will not attach to disinterested, independent and informed directors sitting on a special committee who recommend a merger, even if other directors on the board may have actual or potential conflicts of interest, where the board as a whole follows and accepts the committee's good faith recommendation. [FN70]

FN69. Kahn v. Lynch, Del.Supr., 638 A.2d 1110 (1994). See also Weinberger v. UOP, Inc., Del.Supr., 457 A.2d 701 (1983).

FN70. This maxim is by no means profound for its novelty. It is analogous to 8 Del. C. § 144(a)(1).

The use of an independent special committee, bargaining at arm's length with a controlling shareholder, to shift the burden of proving entire fairness is well noted. [FN71] The Supreme Court

declined to bring such a transaction fully within the purview of the director-protective business judgment rule because the presence of a controlling shareholder "has the potential to influence, however subtly, the vote of [ratifying] minority stockholders in a manner that is not likely to occur in a transaction with a non-controlling party." [FN72]

FN71. Kahn v. Lynch, at 1117.

FN72. Id. at 1116 (citing Citron v. E.I. du Pont de Nemours & Co., Del. Ch., 584 A.2d 490, 502) (1990).

The policy rationale requiring some variant of entire fairness review, to my mind, substantially, if not entirely, abates if the transaction in question involves a large though not controlling shareholder. In other words, because the absence of a controlling shareholder removes the prospect of retaliation, the business judgment rule should apply to an independent special committee's good faith and fully informed recommendation. [FN73]

FN73. It is also noteworthy, in my opinion, that of the 79.1 percent of Western National's outstanding shares represented by proxy at the February 25, 1998 stockholders special meeting, 99.98 percent voted to approve the merger. See Affidavit of James L. Gleaves (Vice President and Treasurer of American General), ¶ 4 (Def.'s Tab 15). Assuming that all 46 percent of American General's shares were voted for the merger, I can extrapolate that the roughly 33 percent remaining votes were cast by unaffiliated, disinterested stockholders. Of that 33 percent, about 32.8 percent voted in favor of the merger-an overwhelming majority of those actually voting and a clear majority of all outstanding unaffiliated stockholders. Where the unaffiliated, majority owners of a company vote so resoundingly in favor of a transaction, and where that vote was fully informed and uncoerced (as it was here, for all the reasons set forth in this decision), I think one could reasonably ask why a corporate plebiscite on a transaction that has no elements of fraud, waste, or other inequitable conduct, should not be determinative of the claims raised here. This seems all the more so, to my mind, where potential dissenters have a full and complete appraisal remedy. Although this question has been raised before, see Solomon v. Armstrong, Del. Ch., 747 A.2d 1098 (1999), aff'd, Del.Supr., 746 A.2d 277

Not Reported in A.2d
(Cite as: 2000 WL 710192, *26 (Del.Ch.))

Page 100

(2000), it has yet to be answered definitively.

The facts of this case, in my opinion, hold out little if any prospect for retaliation against the Company's public shareholders. If Western National's Special Committee refused to recommend the merger to the full board because they believed it was not in the best interests of the Company's public shareholders, if the board did not approve it for similar reasons, or if the shareholders voted down the merger at the special meeting, it is far from clear that American General would be able to retaliate against such refusal, even if it wished. American General did not have representatives on Western National's board, so it is difficult to understand how it would implement some onerous and oppressive policy upon the public shareholders through board action. Moreover, under the terms of the Standstill Provision, American General was barred from nominating more than two Western National directors-even if it chose to go into the open market and purchase up to the Standstill's 79 percent limit of Western National's outstanding equity. In the light of such strictures, and the history of arm's length though amicable course of dealing between the two companies, the sort of retaliation the Court in Kahn v. Lynch contemplated is lacking here. [FN74]

> FN74. Plaintiffs have pleaded facts that might lead me to conclude that five of Western National's directors harbored interests not perfectly aligned with those of the public shareholders for purposes of this transaction. These directors, quite reasonably and purposefully, though not required to as a matter of law, absented themselves from the transaction, leaving its negotiation to three clearly disinterested and independent directors. While I can accept plaintiffs' argument that the five potentially interested directors might not be able to evaluate this transaction entirely as advocates of Western National, I cannot accept the notion that if the transaction were to fall through, for whatever reason, they would undertake some action adverse to the Company's public shareholders in retaliation-independently or at the behest of American General.

**\*27** The facts of this case are analogous to Puma v. Marriott. [FN75] There, a Marriott shareholder sued derivatively challenging the fairness of a transaction in which the Marriott Corporation exchanged 313,000 shares of its common stock for all the stock of six corporations primarily owned by members of the Marriott family, who also (before the transaction) collectively owned 46 percent of the Marriott Corporation's outstanding stock. The Court held that the business judgment rule and not entire fairness governed the transaction because a unanimous resolution of the corporation's five outside directors, who constituted a majority of Marriott's nine-member board, authorized the acquisition. Because there was no showing of domination of the outside directors, nor any evidence to impugn the good faith and integrity of the outside directors, and no indication that the Marriott family dictated the transaction's terms, the Court evaluated the transaction under the business judgment rule and granted defendants' summary judgment motion.

> FN75. Del. Ch., 283 A.2d 693 (1971).

All those factors apply to this case. The only difference between Puma v. Marriot and this case is that Western National deployed a special committee of three outside, independent directors (from an eight-member board) while Marriott relied on five outside, independent directors (from a nine-member board). I do not think this variation, in the circumstances of this case, should trigger a higher review standard for the Special Committee's recommendation than the business judgment rule. The decision of the remaining five potentially interested directors to absent themselves from the negotiations, as noted above in footnote 74, was reasonable though not required and, in my view, made in good faith with the best interests of the Company in mind. Because the Committee's recommendation, and the full board's approval, of the merger were made in good faith and in a fully informed manner, I must conclude that the presumptions of the business judgment rule apply to these actions. Nothing in the undisputed record, moreover, indicates fraud, waste or other inequitable conduct sufficient to rebut the presumption in these circumstances. Accordingly, I now turn to plaintiffs' last gasp challenge to the merger.

D. The Disclosure Claims

Directors of Delaware corporations owe a fiduciary duty "to disclose fully and fairly all material information within the board's control

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d

(Cite as: 2000 WL 710192, *27 (Del.Ch.))

Page 101

when [the corporation] seeks shareholder action." [FN76] Plaintiffs allege defendants omitted material facts regarding pending litigation against certain American General subsidiaries, Special Committee directors' and their advisors' conflicts of interest, and Western National's Fourth Quarter 1997 financial results.

> FN76. Stroud v. Grace, Del.Supr., 606 A.2d 75, 84 (1992).

An omitted fact is material under Delaware law if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." [FN77] For an alleged omission to be actionable, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [FN78]

> FN77. Zirn v. VLI Corp., Del.Supr., 681 A.2d 1050, 1056 (1996).

> FN78. Id.

*28 Plaintiffs first argue that the Proxy Statement mailed to Western National shareholders failed to disclose sufficiently that alleged victims of fraudulent sales practices have sued American General's subsidiaries in major class actions. Although plaintiffs concede that the pending litigation was disclosed "in various public filings" [FN79] they claim that because it was so disclosed, the litigation must be material to a Western National shareholder's decision whether to opt for American General stock or seek appraisal. Given its materiality, plaintiffs then argue that a full description of these claims was necessary and the Proxy Statement's "limited" disclosure was misleading. Essentially, plaintiffs claim is only that defendants failed to fully disclose the potential losses that might result from the litigation.

> FN79. For example, American General's 10-Q for the Third Quarter 1997 (Def.'s Tab 11), which was specifically incorporated by reference in the Proxy Statement, provides: "Given the uncertain nature and the early stages of the litigation, the outcome of these actions cannot be predicted at this time.

American General nonetheless believes that the ultimate outcome of all such pending litigation should not have a material adverse effect on American General's consolidated financial position; however, it is possible that settlements or adverse determinations in one or more of these actions or other future proceedings could have a material adverse effect on American General's consolidated results of operations for a given period. No provision has been made in the consolidated financial statements related to this pending litigation because the amount of loss, if any, from these actions cannot be reasonably estimated at this time."

This argument fails for several reasons. First, disclosure duties under Delaware law arise from fiduciary relationships. [FN80] Once a fiduciary relationship is established, a fiduciary must deal honestly, openly and fairly with his beneficiary. [FN81] Under the facts of this case, I have concluded that American General did not control Western National, its board, or the Special Committee, and thus did not stand in a fiduciary relationship with Western National shareholders. Consequently, I do not see how plaintiffs can maintain this claim against American General. Furthermore, no basis exists to hold Western National and its board liable for failing to speculate as to the amount of a potential judgment against American General.

> FN80. Turner v. Bernstein, Del. Ch., C.A. No. 16190, mem. op. at 24-27, Jacobs, V.C. (Feb. 9, 1999).

> FN81. See Zirn v. VLI Corp., Del.Supr., 621 A.2d 773, 778 (1993).

More generally, this claim fails to the extent that it simply ignores the long line of Delaware cases holding that there is no duty to speculate in a proxy statement. [FN82] American General's public filings, incorporated by reference into the Proxy Statement, plainly disclosed the existence of the litigation and further disclosed the fact that it did not believe that the litigation would have a material impact on its consolidated financial position. Moreover, the public filings stated that it was impossible to predict the outcome of the litigation because it was uncertain and still in the early stages. Any attempt by Western National directors or American General, for that matter, to disclose

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

through the Proxy Statement the amounts of future settlements or judgments would have been utter speculation and, thus, need not have been disclosed.

> FN82. See, e.g., TCG Secs., Inc. v. Southern Union Co., Del. Ch., C.A. No. 11282, mem. op. at 13, Chandler, V.C. (Jan. 31, 1990) (further disclosure of pending litigation not required because of speculative nature); Bragger v. Budacz, Del. Ch., C.A. No. 13376, mem. op. at 14, Allen, C. (Dec. 7, 1994) (dismissing as speculative disclosure that "it is possible" that individuals' continued service as directors would result in antitrust violations).

Plaintiffs attempt to bolster this disclosure claim by pointing to the fact that on December 16, 1998-nearly eleven months after the Proxy Statement was sent to Western National shareholders-American General announced settlements of the litigation and took an allegedly material, $246 million after-tax charge to its earnings for the fourth quarter of 1998. This observation is legally irrelevant because plaintiffs cannot prove a disclosure claim by hindsight. [FN83] In other words, the fact that the litigation was settled for an allegedly material amount eleven months after Western National disseminated the Proxy Statement cannot give rise to an actionable nondisclosure claim at the time Western National sent the Proxy Statement when such amount was reasonably viewed as speculative.

> FN83. See, e.g., Lewis v. Austen, Del. Ch., C.A. No. 12937, mem. op. at 13-14, Jacobs, V.C. (June 2, 1999); Noerr v. Greenwood, Del. Ch., C.A. No. 14320, mem. op. at 12-13, Jacobs, V.C. (July 16, 1997).

*29 Plaintiffs next allege that Western National omitted material facts regarding Special Committee members' and Special Committee advisors' conflicts of interest. These bootstrap claims fail for reasons stated earlier in this opinion: neither the Special Committee nor its advisors labored under conflicts of interest.

Plaintiffs' final disclosure claim alleges that Western National's failure to provide its shareholders unaudited Fourth Quarter 1997 operating earnings amounted to a material omission. Plaintiffs concede that applicable SEC regulations governing when disclosures of financial statements must take place did not require the disclosure they demand. Specifically, the applicable regulation provides that if a proxy statement is mailed less than forty-five days after the close of the fiscal year, the proxy statement need only disclose the third quarter financial statements, unless an audited statement has already been prepared. [FN84]

> FN84. Regulation S-X, Rule 3-12(b); 17 C.F.R. § 210.3-12.

Plaintiffs do not allege that Western National's financial statements covering the Fourth Quarter 1997 were audited at the time the Proxy Statement was disseminated. Nonetheless, they assert that Delaware law required this disclosure. This Court rejected an identical claim in Skeen v. Jo-Ann Stores, Inc. [FN85] Like the Skeen plaintiffs, plaintiffs here allege that Western National did not (but should have) disclose the most up-to-date financial statements available. The Skeen Court dismissed plaintiffs' disclosure claims because "plaintiffs have presented no persuasive authority or argument why this Court should expand Delaware disclosure requirements beyond those presently mandated by Federal law." [FN86] Plaintiffs claim here fails for the same reason.

> FN85. Del. Ch., C.A. No. 16836, Jacobs, V.C. (Sept. 27, 1999), aff'd, Del.Supr., No. 448, 199 (May 3, 2000).

> FN86. Id. at 18.

## IV. CONCLUSION

Based on the undisputed evidence as presented in the developed record of this three-year-old case, I reach the following conclusions as a matter of law. First, although American General is a large (46 percent) stockholder in Western National, it neither controlled nor dominated Western National. Second, Western National's three person Special Committee negotiated, at arm's length and in good faith, a merger transaction with American General that was in the best interests of the Company and its stockholders. The Special Committee was composed entirely of independent, disinterested directors who retained, and relied upon, qualified, independent experts regarding the merger negotiations. Third, in good faith and on a fully informed basis, the Special Committee recommended the merger agreement to

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
**(Cite as: 2000 WL 710192, \*29 (Del.Ch.))**

Western National's board of directors. Fourth, Western National's board approved the Committee's recommendation. Fifth, the Company's board then submitted the merger agreement, pursuant to 8 Del. C. § 251(c), to the stockholders who approved it by an overwhelming vote with no evidence of fraud, waste, bad faith or other inequitable conduct. This corporate plebiscite was valid and is entitled to judicial deference because it was fully informed and uncoerced. As a result, I conclude as a matter of law that the business judgment rule protects the decision to approve and to recommend the merger agreement. Because plaintiffs have failed to point to evidence of fraud, waste, or other inequitable conduct that would rebut the rule's presumption, I grant summary judgment in favor of defendants.

\* \* \*

**\*30** Plaintiffs have amended their complaint once. Full discovery has been taken regarding all issues, and no request was made at oral argument to amend the pleadings yet again. From this, I assume it is safe (to the extent one is ever safe to assume anything pre-appeal) for this Court to enter a final Order. In any event, I have entered the attached Order.

### ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that summary judgment of dismissal is entered, pursuant to Court of Chancery Rule 56, in favor of defendants and against plaintiffs on all claims asserted in the amended complaint.

\* \* \*

2000 WL 710192 (Del.Ch.), 26 Del. J. Corp. L. 806

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

L

Not Reported in F.Supp.2d
(Cite as: 2007 WL 433143 (N.D.Ill.))
<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

**Talmitch JACKSON, Plaintiff,**
v.
**FEDERAL BUREAU OF INVESTIGATION;
Department of Justice; Alberto R. Gonzales,
U.S. Attorney General; Steven L. Pomerantz;
William E. Colombell; Joseph C.
Jackson; Jonathan C. Haile; Donald A. Flynn;
Alan J. Medina; and James H. Mann,
et al., Defendants.**

No. 02 C 3957.

Jan. 31, 2007.

Howard Peritz, Paul B. Wharton & Assoc.,
Chicago, IL, for Plaintiff.

AUSA, Jonathan C. Haile, United States
Attorney's Office, NDIL, Chicago, IL, William E.
Coonan, United States Attorney's Office, Fairview
Heights, IL, for Defendants.

MEMORANDUM OPINION AND ORDER

DARRAH, J.

*1 In June 2002, Plaintiff filed a Complaint, pro
se. In April 2003, Defendants moved to dismiss
Plaintiff's Complaint. In response to Defendants'
Motion to Dismiss, Plaintiff sought, and received,
leave to file an Amended Complaint by August 28,
2003. On August 26, 2003, Plaintiff moved for an
extension of time to file the amended complaint. On
August 28, 2003, the Court granted Plaintiff's
motion, granting Plaintiff until September 26, 2003,
to file the amended complaint. On September 29,
2003, Plaintiff again moved to file the amended
complaint instanter because of the missed deadline.
The Court granted Plaintiff's motion; however,
Plaintiff did not file his pro se First Amended
Complaint until November 2003.

In January 2004, Plaintiff was given leave to file a
Second Amended Complaint. In June 2004,
Plaintiff filed his Second Amended Complaint, pro
se. Subsequently, Defendants moved to dismiss the
Second Amended Complaint. In October 2004, the
Court granted Defendants' Motion to Dismiss,
finding that Plaintiff's Second Amended Complaint
failed to comply with Federal Rule of Civil
Procedure 8(a). The Court also granted Plaintiff
thirty days to file a third amended complaint if he
could do so consistent with Fed.R.Civ.P. 11.
Plaintiff failed to file a third amended complaint,
and the case was dismissed in January 2005.

Plaintiff moved to vacate the January 2005
dismissal and sought leave to file a third amended
complaint. In February 2005, Plaintiff filed, pro se,
his Third Amended Complaint. Defendants again
moved to dismiss Plaintiff's Third Amended
Complaint for failure to comply with Federal Rule
of Civil Procedure 8(a). In April and May 2005,
the Court granted Plaintiff's motions for extension
of time to respond to Defendants' Motion to
Dismiss. In July 2005, the Court granted
Defendants' Motion to Dismiss, finding that
Plaintiff's Third Amended Complaint still failed to
comply with Federal Rule of Civil Procedure 8(a).
The Court granted Plaintiff thirty days to file a
fourth amended complaint if he could do so
consistent with Fed.R.Civ.P. 8(a) and 11. The
Court also indicated that Plaintiff's continued failure
to comply with Rule 8(a) may result in dismissal of
Plaintiff's future amended complaint with prejudice.

In August and September 2005, the Court granted
Plaintiff's motions for extension of time to file an
amended complaint. Plaintiff was given leave to file
the amended complaint on or before September 9,
2005. Plaintiff did not file a fourth amended
complaint and did not move for an extension of time
to file such a complaint on or before September 9,
2005. On September 23, 2005, Defendants moved to
dismiss the case for Plaintiff's failure to prosecute
the case and/or for Plaintiff's failure to follow the
Court's order to file an amended complaint on or
before September 9, 2005. On September 28, 2005,
the Court entered a briefing schedule on Defendants'
Motion to Dismiss, allowing Plaintiff until
November 2, 2005, to file his response brief. On
November 4, 2005, Plaintiff moved for an extension
of time to file his response brief. Plaintiff was
granted an extension of time to file his response
brief; and a status hearing was scheduled for January
19, 2006.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 433143, *2 (N.D.Ill.))

**\*2** On December 13, 2005, the Court denied Defendants' Motion to Dismiss and gave Plaintiff leave to file a fourth amended complaint. Specifically, the Court ruled:

Plaintiff is given leave to file a Fourth Amended Complaint within thirty days of this Order, provided Plaintiff can do so consistent with Fed.R.Civ.P. 8(a) and 11. This is the final extension of time to file an amended complaint. Plaintiff's failure to file the amended complaint within thirty days of this Order may result in dismissal with prejudice for failure to prosecute the case and/or failure to comply with the Court's Orders.

Per the Court's ruling, Plaintiff's Fourth Amended Complaint was to be filed on or before January 12, 2006. Plaintiff did not file a Fourth Amended Complaint on or before January 12, 2006. On January 13, 2006, Plaintiff placed a copy of the Fourth Amended Complaint outside the Courtroom Deputy's office.   [FN1] On January 17, 2006, Plaintiff filed a motion to file his Fourth Amended Complaint, instanter. In his motion, Plaintiff contended that he wanted to file the Fourth Amended Complaint on January 12, 2006, via the drop box; but he did not do so because of the large size of the document and the chance that an enclosed DVD disc could be damaged. On January 19, 2006, Plaintiff failed to appear at the status hearing; and his motion for leave to file his Fourth Amended Complaint was denied.

> FN1. Court was not in session on January 16, 2006, in observance of the Martin Luther King, Jr. holiday.

In March 2006, the Court granted Plaintiff's motion to reconsider the denial of his motion for leave to file his Fourth Amended Complaint, giving Plaintiff leave to file his Fourth Amended Complaint. Plaintiff filed a Fourth Amended Complaint, and Defendants moved to dismiss Plaintiff's Fourth Amended Complaint. A briefing schedule was entered on the pending motion, but Plaintiff failed to timely file a response to Defendants' motion to dismiss; instead, he belatedly filed a motion to extend the time to file a response to the motion. Plaintiff's motion to extend time to file a response was granted. Plaintiff retained counsel and, instead of filing a response to the pending motion, belatedly filed a motion to file a

fifth amended complaint. Plaintiff's motion to file a fifth amended complaint was granted. Defendants again moved to dismiss Plaintiff's amended complaint, and a briefing schedule was entered. Plaintiff did not file a response to the motion, and the motion is presently pending.

Defendants move to dismiss Plaintiff's Fifth Amended Complaint for failure to comply with Rule 8(a).

Rule 8(a) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Rule 10 requires that the title of the complaint include the names of all of the parties and that "[e]ach claim founded upon a separate transaction or occurrence ... shall be stated in a separate count." Fed.R.Civ.P. 10(b), (c). Failure to comply with the pleading requirements of the Federal Rules of Civil Procedure may result in dismissal of the complaint. A complaint that is unintelligible because of lack of clarity may be dismissed under Fed.R.Civ.P. 8(a). See Lindell v. McCallum, 352 F.3d 1107, 1110 (7th Cir.2003); United States v. Lockheed-Martin Corp., 328 F.3d 374, 378-79 (7th Cir.2003) (Lockheed-Martin ) (affirming dismissal of complaint with prejudice following plaintiff's filing two amended complaints and a more definite statement that failed to make complaint discernable). "Rule 8(a) requires parties to make their pleadings straightforward.... Length may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies, the few allegations that matter." Lockheed-Martin, 328 F.3d at 378.

**\*3** Plaintiff's 25-page Fifth Amended Complaint consists of approximately 140 numbered paragraphs, sub-paragraphs, and sub-sub paragraphs. Plaintiff brings six counts: Count I--race discrimination in violation of Title VII; Count II--retaliation in violation of Title VII; Count III--violation of the Freedom of Information Act; Count IV--violation of the Privacy Act; Count V--violation of Plaintiff's First Amendment rights; and Count VI--violation of Plaintiff's Fifth Amendment rights. In the caption and introductory paragraph of the Fifth Amended Complaint, Plaintiff identifies ten defendants by name and includes "et al." With the exception of Count IV, which is brought only against Jonathan Haile, virtually all of the other paragraphs of the Fifth Amended Complaint allege conduct by

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 433143, *3 (N.D.Ill.))

"defendant" and/or "defendants," and fails to properly identify which of the multiple defendants engaged in the alleged conduct, which dates back to 1991. The Fifth Amended Complaint fails to notify the Defendants (with the exception of Count IV) of the principal events complained of to allow the Defendants to file an answer. See Hoskins v. Poelstra, 320 F.3d 761, 764 (7th Cir.2003) (allegations should be "short and plain" and are sufficient if they notify the defendant of the principal events).

As to Count IV, Plaintiff alleges that Haile violated the Privacy Act, 5 U.S.C. § 552a. Count IV is only pled as to Haile. However, the Privacy Act provides that a civil action may only be brought against an "agency," not an individual. 5 U.S.C. § 552a(g)(1); Brown-Bey v. United States, 720 F.2d 467, 469 (7th Cir.1983). Thus, Haile, the only identified Defendant in Count IV, must be dismissed. Although on notice (by way of the present motion) of filing Count IV against the wrong Defendant, Plaintiff has not attempted to substitute the correct Defendant. Accordingly, Count IV is also dismissed without prejudice. See Hughes v. United States, 710 F.2d 56, 58 (7th Cir.1982) (affirming the dismissal of claim because Plaintiff failed to name the proper party (the United States) until after the statute of limitations had expired); Rubio v. United States Dep't of Housing & Urban Development, 1986 WL 2520 (N.D.Ill. Feb.7, 1986) (dismissing suit where plaintiff named the wrong defendant and made no attempt to substitute a suitable entity).

In addition, Plaintiff has failed to serve any of the individual Defendants. Based on the allegations in the Fifth Amended Complaint, it is unclear which claims, if any, are brought against which Defendants, if any, in their individual capacities. Pursuant to Federal Rule of Civil Procedure 4(m), service of the complaint and summons is to be made within 120 days after the filing of the complaint. If the 120-day time period is not met, the court "shall dismiss the action without prejudice ... or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period." Fed.R.Civ.P. 4(m). Furthermore, if the plaintiff cannot show good cause for the defect in service, the court still has discretion to direct that service be effected within a specified

time. See Panaras v. Liquid Carbonic Indus., Inc., 94 F.3d 338, 340-41 (7th Cir.1996).

**\*4** In this case, Plaintiff filed his first Complaint on June 3, 2002. Summons did not issue on the Complaint until February 10, 2003; and Plaintiff has not filed any proof of service. In October 2004, Plaintiff had not yet served the Defendants; and Plaintiff was given thirty days from the filing of the Third Amended Complaint to properly serve the Defendants. Since that time, only the U.S. Attorney General has been served. Plaintiff provides no explanation for the failure to serve the remaining Defendants. Accordingly, the claims against the individual Defendants are dismissed without prejudice. See Fed.R.Civ.P. 4(m).

Defendants present several additional grounds for dismissal. In light of the above findings, the Court need not address these arguments at this time. However, Plaintiff should take these alleged deficiencies into account if a Sixth Amended Complaint is filed.

For the foregoing reasons, Defendants' Motion to Dismiss is granted. Plaintiff's Fifth Amended Complaint is dismissed without prejudice. Plaintiff is given leave to file a Sixth Amended Complaint within 30 days of this Order, provided Plaintiff can do so consistent with Fed.R.Civ.P. 11. Plaintiff is given thirty days after filing his amended complaint, if any, to properly effect service on all Defendants. Plaintiff's failure to file the amended complaint within thirty days of this Order and to properly serve all Defendants shall result in dismissal with prejudice for failure to prosecute the case and/or failure to comply with the Court's Orders.

2007 WL 433143 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

M

Not Reported in F.Supp.2d
(Cite as: 2007 WL 4531794 (N.D.Ill.))
<KeyCite History >

Page   43

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.

**In re JPMORGAN CHASE & CO. SECURITIES LITIGATION.**
**This document relates to**
**Hyland v. Harrison, C.A. No. 06 C 4675**
**Hyland v. J.P. Morgan Securities, Inc. C.A. No.**
**06 C 4676.**

**MDL No. 1783.**
**C.A. No. 06 C 4674.**

Dec. 18, 2007.

MEMORANDUM OPINION AND ORDER

DAVID H. COAR, District Judge.

*1 This is a Multi-District Litigation, under Master Docket No. 06 C 4674, consisting of three separate cases: Blau, et al. v. Harrison, et al., No. 04 C 6592 (or "Blau"); Hyland v. Harrison et al., No. 06 C 4675 (or "Hyland I"); and Hyland v. J.P. Morgan Securities Inc., No. 06 C 4674 (or "Hyland II"). To date, these three cases have been consolidated for discovery purposes only. On April 4, 2006, Blau filed the Second Amended Class Action Complaint For Violations of Federal Securities Laws, alleging two claims: (I) Violations of Section 14(a) of the Exchange Act and Rule 14a-9 of the SEC (Against All Defendants) and (II) Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants). Hyland I and Hyland II consolidated their cases, and on September 25, 2006, they filed their Consolidated Amended Class Action Complaint, alleging six counts: (I) Against JPMC and the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 Thereunder; (II) Against Harrison, JPMC, JPMSI and Dimon for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder; (III) Against Individual Defendants for Liability Under Section 20(a) of the Exchange Act; (IV) Against the Director Defendants for Breach of Fiduciary Duty; (V) Against JPMSI For Aiding and Abetting Breach of Fiduciary Duty; and (VI)

Against JPMSI For Civil Conspiracy.

On October 23, 2006, Defendants filed a Motion to Dismiss Hyland Plaintiffs' Consolidated Amended Complaint. This action is against the Hyland Plaintiffs only, and does not affect the Blau case. This opinion addresses solely Defendants' Motion to Dismiss Hyland Plaintiffs' Consolidated Amended Complaint. For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

I. FACTS

The Parties

Hyland Plaintiffs claim in this case that there was a deceptive scheme executed by the Chief Executive Officers of J.P. Morgan Chase & Co. ("JPMC") and Bank One Corporation ("Bank One") in connection with the 2004 merger of those two companies. This court takes as true the following facts asserted by the Plaintiffs. This case pertains to the merger between JPMC and Bank One in 2004.

The Hyland Plaintiffs owned JPMC common stock at all relevant times, including on April 2, 2004. Plaintiff Samuel I. Hyland sold his JPMC shares on August 13, 2004.

JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices in New York, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity. As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding. JPMC common stock is listed and traded on the New York Stock Exchange.

*2 Defendant J.P. Morgan Securities, Inc. ("JPMSI"), a Delaware corporation, is a wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC, which, in turn, is a wholly-owned subsidiary of JPMC. JPMSI is a broker-dealer registered with the Securities and Exchange Commission and is a member of the National Association of Securities Dealers, Inc., the New

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

**(Cite as: 2007 WL 4531794, *2 (N.D.Ill.))**

York Stock Exchange and other exchanges. JPMSI acts as a primary dealer in U.S. government securities; advises on business strategies; makes markets in money market instruments and U.S. government agency securities; underwrites and trades corporate debt- and asset-backed securities, municipal bonds and notes, common and preferred stock, and convertible bonds offerings; and structures derivative transactions.

Defendant Harrison served as CEO and Chairman of the Board of Directors of JPMC since 1999, and was instrumental in negotiating the 2004 merger ("Merger") and signed the Proxy Statement issued in connection therewith. Harrison relinquished the CEO title at the end of 2005.

Defendant Dimon was Chairman and CEO of Bank One prior to the Merger and currently serves as the CEO of JPMC. Other named Defendants were, during the relevant time, directors of JPMC ("Director Defendants") and signed the Proxy Statement issued in connection with the Merger. Defendant Dimon and the Director Defendants are collectively referred to as "Individual Defendants."

The Negotiations

In November 2003, Harrison and Dimon commenced negotiations concerning the possibility of a merger between JPMC and Bank One. The negotiations took place at an apartment in the Waldorf Towers, a few blocks from JPMC's midtown headquarters. The meetings were conducted in "secret." According to the Proxy Statement, Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations. Plaintiffs assert that the Director Defendants either were fully aware of the details of the negotiations between Harrison and Dimon or, as directors, had the opportunity and obligation to monitor and inquire into the details of such negotiations.

On November 18, 2003, Harrison briefed the full Board on his discussions with Dimon, and the Board, consisting of Director Defendants, authorized Harrison to continue discussions regarding a possible business combination with Bank One. At some point in November 2003, each party retained legal and financial advisors in connection with the merger discussions. JPMC retained JPMSI

as its financial advisor for a $40 million fee.

During December 2003, Dimon and Harrison continued their negotiations on the key terms of the financial transaction, and periodically updated their respective boards on these communications. During the course of these discussions, Bank One CEO James Dimon offered to do the deal with no premium (the additional price paid above the value of the stock) if he could become the chief executive officer immediately. However, Harrison wanted to keep his CEO title for two more years, and agreed to a deal with a 14 percent (approximately $7 billion) premium in exchange for retaining his CEO position for another two years. Hyland Plaintiffs allege this to be an unfair exchange ratio.

Shareholder Approval

**\*3** Shareholder approval was necessary to complete the Merger. Despite the alleged rejection of the zero premium opportunity, JPMSI recommended the merger to the shareholders as economically fair. The Director Defendants also approved the Merger. After the close of trading on January 14, 2004, JPMC and Bank One issued a joint press release ("Press Release"). The press release reported the details of the deal, including the 14 percent premium, but omitted the no-premium offer. On April 21, 2004, the JPMC Board of Directors disseminated the Proxy Statement to the shareholders. The Proxy Statement listed the factors that the board considered in approving the merger, but did not disclose Dimon's offer to transact the merger without a premium if Dimon were appointed CEO of the merged company immediately. The shareholders voted on the Merger without knowledge of the no-premium offer. On May 25, 2004, JPMC released the results that shareholders approved the merger with 68 percent of the votes outstanding.  On July 1, 2004, the merger was completed, including a premium of approximately 14 percent for Bank One shares. The merger agreement included a provision that Harrison would remain CEO of JPMC for two years after completion of the merger, and Dimon would serve as President and Chief Operating Officer until Harrison's CEO tenure was up, at which point Dimon would become CEO of the merged company.

Newspaper Articles

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

On June 27, 2004, a New York Times article by journalist Landon Thomas, Jr. reported that:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so. Mr. Dimon, always the tough deal maker, offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal. When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations.

Hyland Plaintiffs allege that this was the first opportunity for JPMC stockholders to discover that Harrison had turned down a no-premium opportunity and engaged in a deceptive entrenchment scheme. Landon Thomas, Jr. conducted an independent investigation by interviewing individuals with personal knowledge of the Merger negotiations. Hyland Plaintiffs assert that this account of the "no premium deal" and the "two-year compromise" were corroborated by other articles, including, inter alia, a January 15, 2004 CBS Marketwatch.com article, a January 26, 2004 FORTUNE article, a July 3, 2004 The Financial Times (London) article, and a December 29, 2004 Wall Street Journal article.

### Damages

Plaintiffs assert that the omission of the no-premium offer harmed JPMC share holders who were duped into funding a Merger exchange ratio that heavily favored Bank One's shareholders. Instead of owning 61 percent of the combined company, they ended up with 58 percent. Plaintiffs assert that omission of negotiations and the rejected nil-premium opportunity throughout the solicitation of votes violated the JPMC directors' fiduciary duty to disclose all material facts about the Merger to allow shareholders to vote for or against it with full knowledge of relevant information. As outlined above, Plaintiffs also seek relief in connection with Defendants' violations of federal securities laws.

### II. LEGAL STANDARD

*4 In deciding a motion under 12(b)(6), the court considers the allegations in the complaint to be true and views all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. See Maple Lanes, Inc. v. Messer, 186 F.3d 823, 824-5 (7th Cir.1999). The court should grant a motion to dismiss for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See id. at 825 (quoting Conley v. Gibson, 355 U.S. 41, 45-6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir.1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Nevertheless, in deciding upon a motion to dismiss for failure to state a claim, the court need not ignore allegations that undermine the plaintiff's complaint, or assign any weight to unsupported conclusions of law. See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 452 (7th Cir.1998).

### III. ANALYSIS

#### A. Newspaper sources under PSLRA

Defendant moves to dismiss the Consolidated Amended Class Action Complaint on the ground that the Plaintiffs did not plead with sufficient particularity so as to satisfy the heightened pleading requirements under the Private Securities Litigation Reform Act of 1995 ("PSLRA" or "the Reform Act"). The PSLRA requires that "in any private action arising under [the Exchange Act] in which the plaintiff alleges that the defendant made an untrue statement of a material fact ... the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 USCS § 78u-4(b)(1). Further, the Reform Act requires particularized pleading of scienter: "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(a)(2).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Defendants claim that the New York Times article reporting the alleged omission does not satisfy the pleading requirements under the PSLRA. The Seventh Circuit has not specifically addressed whether media and newspaper reports satisfy the heightened PSLRA pleading requirements of "particularity." However, other district courts have considered this issue. In particular, Third Circuit district courts have treated this issue at length. In Tracinda Corp. v. DaimlerChrysler AG (In re DaimlerChrysler AG Sec. Litig.), a Delaware district court found that "Class Plaintiffs' allegations, to the extent that they clearly identify the media sources upon which they rely, are sufficient … to satisfy the heightened pleading standard under the securities laws." 197 F.Supp.2d 42, 79 (D.Del.2002). The court in Tracinda Corp. relies on Third Circuit precedent, which reasoned that "reliance on an article in The Wall Street Journal is not reliance on an insubstantial or meaningless investigation. Plaintiffs and their attorneys need not make further expenditures to prove independently that which may be read with some confidence of truthfulness and accuracy in a respected financial journal." Lewis v. Curtis, 671 F.2d 779, 788 (3d Cir.1982). The Lewis decision addressed pleading verification under Rule 23.1. Its rationale was applied to the heightened pleading requirement under the PSLRA in Tracinda Corp. Tracinda, to the effect that a reputable newspaper article by itself may be sufficient to satisfy the PSLRA requirement. Even if it does not go so far, Tracinda Corp. Tracinda concluded that when class plaintiffs do not solely rely on newspaper articles, but conduct an independent investigation which corroborated the articles, the complaint allegations derived from reputable media sources were sufficient to meet the requirement of the PSLRA. 197 F.Supp.2d 42, 81 (D.Del.2002).

*5 A Northern California district court has also opined that newspaper articles that "corroborate plaintiff's own investigation and provides detailed factual allegations" may be used as a basis for an inference of scienter. In re McKesson Hboc Secs. Litig., 126 F.Supp.2d 1248, 1271 (D.Cal.2000). In re McKesson Hboc cautions, however, that "newspaper articles should be credited only to the extent that other factual allegations would be--if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." Id. Nonetheless, "if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited in determining whether plaintiffs have alleged facts sufficient to raise a strong inference of scienter."

Taking these rationales into account, at a minimum, newspaper articles satisfy the heightened PSLRA pleading requirements if (1) they are based on an independent investigative effort, (2) they are sufficiently particular and detailed to indicate their reliability, and (3) Plaintiffs' counsel conducted its own independent investigation which corroborates the information in the article.

In the present case, the Plaintiffs have asserted, which this court must accept as true, that an independent investigation was conducted by journalist Landon Thomas, Jr., who interviewed several individuals with personal knowledge of the merger. The article provided detail about the people involved (Mr. Dimon and Mr. Harrison) and the details of the negotiations, including where and when the negotiations took place, the existence of the no-premium offer, and terms of the final deal: Mr. Harrison would remain CEO for two years in exchange for a 14 percent premium. The article did not simply state that securities fraud or a misstatement was committed, but gave the details of the deal, indicating reliability. Further, the New York Times is a well-known and reputable paper, read nationally and internationally. The newspaper article is both independent and reliable. Finally, Hyland Plaintiffs' counsel has alleged that they conducted a thorough investigation of all reasonably available sources of information, including: public filings of JPMC, JPMSI and Bank One, securities analysts' reports and investor advisory services concerning JPMC and Bank One, pleadings in other related cases, JPMC and Bank One press releases and other publically disseminated statements, reports concerning JPMC, JPMSI and Bank One in print and electronic media, and interviews of relevant witnesses. Plaintiffs present evidence of email correspondences, other articles and related documents that corroborate the article's allegations. Accordingly, Plaintiffs allegations satisfy the heightened pleading requirements under the PSLRA.

Defendants rely on Makor Issues & Rights, Ltd.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

**Page 47**

(Cite as: 2007 WL 4531794, \*5 (N.D.Ill.))

v. Tellabs, Inc., 437 F.3d 588 (7th Cir.2006), in arguing that Plaintiffs must describe confidential sources with "sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged.' " Defendants argue that because the sources of the New York Times are confidential, they do not meet this requirement. Makor, however, is not directly applicable to the present case. In Makor, the standard is applied to plaintiffs counsels' confidential sources, not the confidential sources of a reliable and independent newspaper. A reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting. Further, the confidential nature of a journalist's source is used to encourage reporting and accuracy. In the present case, the confidential source is the informant to a newspaper, not to the Plaintiffs' counsel directly. In such a case, Makor is inapposite, and the Third Circuit cases are more appropriately applied.

B. Rule 9(b) Pleading Requirements

**\*6** Defendants move to dismiss on the ground that Plaintiffs' claims sounding in fraud lack the particularity required by Rule 9(b). Rule 9(b) applies to "all averments of fraud or mistake." In such cases, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). With respect to securities fraud cases, Rule 9(b) requires that the essential element of scienter be pled with a sufficient level of factual support: "the complaint … must afford a basis for believing that plaintiffs could prove scienter." DiLeo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir.1990), Moss v. HealthCare Compare Corp. (In re HealthCare Compare Corp. Sec. Litig.), 75 F.3d 276, 281 (7th Cir.1996). The Seventh Circuit states, "We have said that a sufficient level of factual support may be found where the circumstances are pled "in detail." This means the who, what, when, where, and how: the first paragraph of any newspaper story." Id.

As an initial matter, Hyland Plaintiffs suggest that Defendants ask this court to apply Rule 9(b) indiscriminately to all claims. This is incorrect. Defendants have asked to apply Rule 9(b) to claims sounding in fraud only. Further, according to this court's reading to the Consolidated Amended Complaint, Hyland Plaintiffs have specifically segregated the negligence claims (Count I, alleging violations of § 14(a), "not sounding in fraud") from fraud claims (Count II, alleging violations of § 10(b) against Harrison, Dimon, JPMC and JPMSI).

The Defendants contend that every claim that sounds in fraud is subject to the heightened pleading requirement of Rule 9(b) and must be stated with particularity. In the Seventh Circuit, this means that the complaint must include the "who, what when, where and how" of the alleged fraud in order to give sufficient factual support for the scienter. The Consolidated Amended Class Action Complaint fulfills this requirement. The "who" are Harrison, Dimon, JPMSI and JPMC. The "what" and "when" surrounds the negotiations between Harrison and Dimon in December of 2003, and the non-disclosure of the alleged no-premium offer to the shareholders. The merger deal that was presented for shareholder approval included a 14 percent premium in exchange for Harrison remaining as CEO for two additional years. The "where" includes the Waldorf Tower apartments and the conference room of Bank One's M & A law firm, Wachtell Lipton Rosen & Katz. The "how" involved the negotiations, the communication with the Directors, the Proxy Statement and Press release, and the non-disclosure of the alleged no-premium deal to the shareholders. The complaint includes sufficient detail and factual support to satisfy Rule 9(b) pleading requirements for claims of fraud or mistake.

C. Mental States of Negligence

Defendants move to dismiss the Director Defendants from charges under Count I of the Consolidated Amended Complaint ("CAC") on the ground that Plaintiffs failed to allege with particularity of fact to give rise to a strong inference that the Director Defendants acted with the required state of mind, specifically, negligence. Count I of the CAC alleges that JPMC and the Individual Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder, when they negligently omitted to state material facts necessary (namely, the no-premium offer) in the Proxy Statement. Under the PSLRA, any action brought under the Exchange Act, "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate the [Act], state with particularity

Not Reported in F.Supp.2d
(Cite as: 2007 WL 4531794, *6 (N.D.Ill.))

facts giving rise to a strong inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Defendants claim that Plaintiffs did not allege with particularity to give a strong inference of negligence.

*7 Plaintiffs argue that (1) negligence is not a state of mind, and therefore does not require a pleading of particular facts to give strong inference, and (2) even if it were, the pleadings are sufficient. There seems to be some discrepancy on how a 14(a) negligence allegation should be treated under 15 U.S.C. § 78u-4(b) (2). The Seventh Circuit has not ruled on whether the PSLRA applies to Section 14(a) cases. The district courts in this circuit have been split on the issue. In Blau v. Harrison, Judge Hibbler stated that "Plaintiffs' Section 14(a) allegations are not required to meet the PSLRA particularity requirement because these claims are based on averments of negligence." 2006 U.S. Dist. LEXIS 18785, 2006 WL 644016 (N.D.Ill., 2006). Judge Hibbler reasoned that because the Seventh Circuit ruled that Rule 9(b) pleading requirements were not applicable to negligence claims, the PSLRA heightened requirements would not be applicable either. Id.; Kennedy v. Venrock Assocs., 348 F.3d 584, 593 (7th Cir.2003). Judge Leinenweber disagreed with the ruling in Blau, concluding that "the Seventh Circuit's opinion in [Kennedy ] ... never addressed the PSLRA at all," but only stated that Rule 9(b)'s heightened pleading standards did not apply to Section 14(a) claims unless those claims charged fraud, as opposed to negligence. Beck v. Dobrowski, et al ., 2007 U.S. Dist. LEXIS 84093, 2007 WL 3407132 (N.D.Ill.2007). Judge Leinenweber found that this analysis was inapplicable to the PSLRA, because Rule 9(b) was "expressly limited to claims of fraud or mistake," whereas the PSLRA encompasses negligence claims as well. Id. Judge Leinenweber states the following, specifically finding that negligence constitutes a "state of mind":

The Court concludes that the PSLRA governs Plaintiff's claim. Although the Seventh Circuit has not decided whether the PSLRA applies to Section 14(a) cases, the statutory language is unambiguous. All relevant sections of the Act commence with the phrase, "in any private action arising under this chapter," 15 U.S.C. § 78u-4(b)(1),(2). & (4) (emphasis added). The Act contains no exceptions based on considerations of scienter or previous common law causation rules.

Indeed, the Act's pleading standard provisions are to the contrary. Section(b)(2) applies to actions for money damages requiring proof of only "a particular state of mind." Since negligence is a state of mind, the language of Section (b) (2) by its terms encompasses negligence-based securities actions.

Id. The circuit courts have not definitively addressed the issue of whether negligence constitutes a "state of mind" under the PSLRA, but the majority have applied 15 U.S.C. § 78u-4(b)(2) to Rule 14(a) claims of negligence. See, e.g., Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674, 682 (9th Cir.2005); Hayes v. Crown Cent. Petroleum Corp., No. 02-2190, 78 Fed. Appx. 857, 861 (4th Cir.2003); Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir.2004). This court agrees with the reasoning and conclusion of Beck v. Dobrowski, et al., and joins the majority of courts in finding that the PSLRA standards apply to all claims under the Exchange Act, including Section 14(a) claims of negligence.

*8 The question then becomes whether Plaintiffs' pleadings are sufficient to give rise to a strong inference of negligence on the part of the Director Defendants. Paragraph 78 of the CAC allege that "Dimon and Harrison periodically updated members of their respective Boards of Directors about their negotiations," and that the Director Defendants were "either fully aware of the details of the negotiations between Harrison and Dimon or, as directors, had the opportunity and obligation to monitor and inquire into the details of such negotiations." That is, Plaintiffs have alleged that Director Defendants were in regular contact with Harrison and Dimon, and had opportunity to monitor and inquire. Whether or not they actually inquired, or acted reasonably in their roles as Director, are questions on the merits. The pleadings allege sufficient facts regarding the interaction between the Directors and Harrison and Dimon to support an inference that the Director Defendants "knew or should have known" about the no-premium offer. The Plaintiffs' CAC sufficiently pled violations of Section 14(a).

D. Mental States of Scienter

As to Count II claims of fraud or deceit against Harrison, Dimon, JPMC and JPMSI, Plaintiffs are required to "state with particularity facts giving rise to a strong inference that the defendants acted with

[a fraudulent] state of mind." 15 U.S.C. § 78u-4(b)(2). The Seventh Circuit has concluded that "the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 601 (7th Cir.2006). Motive and opportunity are useful indicators of a fraudulent state of mind, though they may not be necessary or sufficient. Id.

Defendants argue that the claims against Harrison and Dimon fail to adequately plead scienter because they are based on no more than supposed motives to increase incentive compensation and reputation/prestige. First, the Seventh Circuit has established motive as a "useful indicator," and should not be taken lightly. In fact, the Second and Third Circuit found that motive and opportunity alone are sufficient to satisfy 15 U.S.C. § 78u-4(b)(2). Although the Seventh Circuit does not take this position, it does acknowledge motive and opportunity to be important factors. As such, the fact that the pleadings allege that Harrison was motived to increase his incentive compensation and to guild his reputation are important considerations. Further, Plaintiffs allege that Dimon wanted to "reclaim the mantle of Wall Street superstar," and was motivated to increase his prestige and reputation. While these facts taken separately may not be sufficient, they do go to show motive for engaging in the alleged fraud, and serve as "useful indicators." In addition to motive, Plaintiffs have also alleged opportunity and acts of concealment by Harrison and Dimon. As mentioned above in the Rule 9(b) discussion, Plaintiffs have alleged the who, what, where, when and how of the no-premium offer and concealment, and has shown that Harrison and Dimon had the opportunity to negotiate in secret. Further, Plaintiffs include in their complaint specific incidents where Harrison and Dimon allegedly evaded and failed to disclose the no-premium offer and the two-year compromise, even when asked directly about it. See CAC ¶¶ 134-141. Plaintiffs specifically claim that this shows "they were conscious of their wrongdoing, and, in particular, well aware of the need to conceal their [secret] deal." CAC ¶ 139. Taking Plaintiffs allegations as true, and viewing the allegations collectively--that Harrison and Dimon had motive and opportunity to deceive, and that they took steps towards concealing and deceiving to their own

advantage-this court finds that the Hyland Plaintiffs have alleged with particularity facts giving rise to a strong inference that Harrison and Dimon acted with an intent to deceive, manipulate or defraud.

*9 Defendants also argue that Plaintiffs failed to allege scienter for JPMC, because the scienter of Harrison cannot be imputed on JPMC. This issue was directly addressed in In re Sourcecorp Sec. Litig ., 2006 U.S. Dist.  LEXIS 41381 (D.Tex.2006). Although this court is not bound by the decision of other district courts, it will give due weight to their reasoning. In In re Sourcecorp Sec. Litig., the court concluded, "In determining whether to impute an executive's scienter to the company, this Court looks to whether an executive's fraud operates to benefit the company or whether the fraud is committed against the company." Id.; see also FDIC v. Shrader & York, 991 F.2d 216, 224-25 (5th Cir.1993); In re Cendant Corp. Sec. Litigation, 109 F.Supp.2d 225, 233 (D.N.J.2000) (fraud imputed when officer's conduct was "for the benefit of the corporation."); In re Kidder Peabody Securities Litig., 10 F.Supp.2d 398, 415-417 & n. 17 (S.D.N.Y.1998) (finding evidence to support a reasonable inference of corporation's scienter where a securities analyst had openly reported hundreds of millions of dollars in false profits, but not deciding imputation issue because of dispute as to whether trader was acting adversely to corporation's interests). This court finds this rational and analysis persuasive. In the present case, Plaintiffs allegations that Harrison agreed to remain as CEO for two years in exchange for a 14 percent premium against JPMC in the merger clearly did not benefit the company. In fact, the allegations suggest that Harrison enriched himself at the expense of the corporate entity. Therefore, Count II is dismissed as to Defendant JPMC only.

Defendants further assert that Plaintiffs failed to allege scienter for JPMSI, because they only pleaded motive for compensation (a high fee) and reputation (to increase their ranking based on the dollar value of deals they participated in). See CAC ¶ 170-77. Pleading motive for compensation and reputation alone may not be sufficient to satisfy the PSLRA heightened pleading requirements on scienter. However, Defendants misstate Plaintiffs' claim: they also allege facts that suggest that the Merger exchange ratio exceeded a range of reasonableness under various objective metrics (see CAC ¶ 114-20),

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 4531794, *9 (N.D.Ill.))

Page 50

and yet was still approved by JPMSI. This allegation that JPMSI endorsed an "unfair" ratio, together with the allegations that give rise to motive, suggest a strong inference of a fraudulent state of mind, sufficient to satisfy the PSLRA pleading requirements under 15 U.S.C. § 78u-4(b)(2).

E. Losses, Loss Causation, or Reliance

Defendants move to dismiss on the ground that Plaintiffs failed to allege any cognizable losses in their § 10(b) claim. Defendants argue that federal securities laws only allow victims to recover actual damages, not merely stock prices that are not as high as they otherwise could be. Defendants cite to Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp. in arguing that damages cannot encompass potential "profit," but only "out of pocket" losses. 910 F.2d 1540, 1552 (7th Cir.1990). In the present case, unlike Astor Chauffeured Limousine Co., the damages alleged are not hypothetical investment profits, but rather are clear figures negotiated in exchange for Harrison's two year CEO tenure. In other words, according to Plaintiffs' allegations, in exchange for Harrison's two year CEO tenure, Plaintiffs had to pay "out-of-pocket" a 14 percent premium. The Supreme Court has concluded that damages should be measured by "the difference between the fair value of all ... that the seller received and the fair value of what he would have received had there been no fraudulent conduct." Affiliated Ute Citizens v. United States, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (U.S.1972). In the present case, the actual loss is quantifiable and cognizable. Taking Plaintiffs' allegations as true, the shareholders received 58 percent of the combined company in the Merger with the alleged fraudulent omission, but they would have received 61 percent if they had known about the no-premium offer and voted in favor of the no-premium deal. Put another way, JPMC stock sellers would have received $7 billion more had there been no fraudulent conduct. This allegation constitutes a cognizable loss.

*10 Defendants further claim that Plaintiffs did not show loss causation. Under the PSLRA, a plaintiff must prove that the "omission of the defendant alleged to violate [the Exchange Act] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Plaintiffs allege that the omission of the no-premium

offer caused the shareholders to approve the 14 percent premium deal instead of the no-premium deal. As a result of the omission, the Plaintiffs received 58 percent of the combined company instead of 61 percent, an amount approximately $7 billion in value. The CAC clearly alleges the causal connection between the loss ($7 billion) and the fraudulent omission. Defendants cite to several cases that are fact-specific, and not applicable to the present case.

Finally, Defendants argue that Plaintiffs must also plead reliance. Defendants cite to Dura Pharms., Inc. v. Broudo, in arguing that Plaintiff must allege that they bought their shares in reliance of the no-premium offer omission. 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (U.S.2005). As an initial matter, the facts in Dura Pharms., Inc. differ from the present case. In Dura Pharms., Inc., the plaintiffs bought stock after an alleged misrepresentation caused the stock prices to be artificially inflated. After they bought the stock in reliance of the misrepresentation, the stock prices fell. The loss suffered by the plaintiffs in Dura Pharms., Inc were due to the fact that they bought stock in reliance of the misrepresentation. The fact scenario is different in the present case, where Plaintiffs approved the terms of the merger in reliance of a misrepresentation (or omission). Under Plaintiffs' theory, the omission cost the shareholders collectively approximately $7 billion in stock value, because the Plaintiffs allege they would not have approved the merger had they known about the availability of the no-premium option. Reliance is satisfied in this case, because the loss was not from purchasing stock, but from the terms of the merger itself. Thus, the fact that plaintiffs purchased their stock prior to January 2004 is not relevant in this case. This court finds that Plaintiffs sufficiently pleaded reliance.

F. Fairness Opinion by JPMSI

Defendants claim that Plaintiffs failed to plead misstatement in its § 10(b) claim against JPMSI on the fairness opinion prepared by JPMSI in the Proxy Statement. Statements of opinion or belief are actionable only if they are both objective and subjectively false. Va. Bankshares v. Sandberg, 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed.2d 929 (U.S.1991). "To plead the falsity of a statement of opinion, a plaintiff must plead with particularity

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

(Cite as: 2007 WL 4531794, *10 (N.D.Ill.))

why the statement of opinion was objectively and subjectively false. A fairness opinion is objectively false if the subject matter of the opinion is not, in fact, fair, and is subjectively false if the speaker does not, in fact, believe the subject matter of the opinion to be fair." Shurkin v. Golden State Vintners, Inc., 2005 U.S. Dist. LEXIS 39301, 2005 WL 1926620 (D.Cal.2005). In the present case, Plaintiffs have pled both. First, Plaintiffs have pled that the subject matter of JPMSI's fairness opinion is objectively false. Plaintiffs present figure charts that show JPMSI's analysis provided that the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness despite JPMSI's endorsement of the Merger. Second, Plaintiffs also pled subjective falsity, alleging that JPMSI knew of the unfair ratio but endorsed the merger in an effort to collect compensation and further its own ranking amongst its competitors. Whether these allegations are true, and to what extent the numbers are accurate, are questions on the merits. As to the pleading requirements at issue in a motion to dismiss, Plaintiffs have sufficiently pleaded misstatement by JPMSI for a § 10(b) claim.

G. Materiality

*11 Defendants move to dismiss on the ground that the omission of the no-premium offer is not material. The Supreme Court teaches that

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with Mills' general description of materiality as a requirement that "the defect have a significant propensity to affect the voting process." It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Tsc Indus. v. Northway, 426 U.S. 438, 448, 96 S.Ct. 2126, 48 L.Ed.2d 757 (U.S.1976). Under this standard, an omission of an offer that would have

resulted in a $7 billion difference in merger compensation would be considered important in deciding how to vote. Further, if, as Plaintiffs allege, Dimon offered to consummate the transaction for no premium and the only reason Harrison rejected the offer was to retain a position as CEO of the merged company, that may be a fact that has a "substantial likelihood" of changing a reasonable shareholder's vote. While not every detail of the negotiations is required to be disclosed, given the large dollar amount involved and the personal nature of the two-year compromise, there is a substantial likelihood that the omission of the no-premium offer in the Proxy Statement would have altered the mix of available information. The alleged omission is material.

H. State Claims

Count IV of the CAC alleges breach of fiduciary duty against the Director Defendants. This claim is brought pursuant to Delaware common law. In Delaware state court, Plaintiffs brought a similar suit alleging breach of fiduciary duty by the Director Defendants. See In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 818 (Del.Ch.2005). This claim was dismissed by the state court because Plaintiffs failed to first make a demand on the Board, as required by Delaware's Court of Chancery Rule 23.1. Under Rule 23.1, a plaintiff shareholder must make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf. The plaintiff may argue demand futility under the two-prong test of Aronson v. Lewis, 473 A.2d 805, 813 (Del.1984). The first prong of the Aronson test is whether "a shareholder [has pled] with particularity facts that establish that demand would be futile because the directors are not independent or disinterested." Id. The second prong of the test is whether "a reasonable doubt is created that ... the challenged transaction was otherwise the product of a valid exercise of business judgment." Id. The two prongs of the Aronson test are disjunctive, meaning that if either part is satisfied, demand is excused." Id.

*12 The Delaware Court of Chancery determined that the suit was derivative, despite Plaintiffs attempt to frame it as a direct challenge. The alleged harm (loss of $7 billion worth of stock) was against

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

**(Cite as: 2007 WL 4531794, \*12 (N.D.Ill.))**

JPMC, and any potential recovery of stock would be received by JPMC, not the shareholders directly. The Delaware Court of Chancery also determined that the Plaintiffs did not meet the demand futility requirements. Conducting a thorough analysis of the Director Defendants, the Delaware Court of Chancery determined that the majority of the board of JPMC were independent. Thus, Plaintiffs failed to satisfy the first prong of the Aronson test that shareholders must plead with particularity of facts establishing that demand would be futile because the directors were not independent or disinterested. The Delaware Court of Chancery also found that the Plaintiffs failed to call into question the Directors' good faith, honesty or lack of adequate information, and thus did not show why the board's decision is not protected by the business judgment rule. As such, Plaintiffs failed to satisfy prong two of ths Aronson test, and the demand was found not to be futile. Because the suit was derivative, and the demand was not futile, Plaintiffs were required to place a demand with the current board before bringing legal action. The Delaware Court of Chancery dismissed the breach of fiduciary claim, because Plaintiffs had not made such a demand. In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 818 (Del.Ch.2005).

This ruling is applicable to the present case. Plaintiffs make essentially the same breach of duty claim. The facts alleged on the individual Directors are essentially the same. While the federal complaint may include some more details, the pertinent facts are sufficiently similar that this court's analysis mirrors that of the state court. See In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 808, 818 (Del.Ch.2005). The differences between the federal complaint and the state complaint listed by Vice Chancellor Lamb do not change the analysis or conclusion of the Delaware Court of Chancery. Thus, Count IV of the complaint is dismissed, as legal action is not sanctioned before a demand is made on the current board.

Because Count IV is dismissed, Count V against JPMSI for aiding and abetting the breach of fiduciary duty and Count VI against JPMSI for civil conspiracy are similarly dismissed.

IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part. Defendant's motion to dismiss is granted as to Count II against JPMC only. Defendant's motion to dismiss is also granted as to Count IV, V and VI. Defendant's motion to dismiss is denied as to all other claims.

2007 WL 4531794 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

N

Not Reported in F.Supp.
**(Cite as: 1996 WL 224515 (N.D.Ill.))**
< KeyCite Citations >

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

**Michael J. LAMBERT, Timothy Anderson, William Lopez, Richard Newell, Carol Suchocki, and Cheryl Suchocki, Plaintiffs,**
v.
**CALPROTRACK, INC., Michael O'Malley, Jr., Terrence O'Malley, Daniel O'Malley, Timothy Monahan, Midwest Gas Energy, Inc., Midwest Gas Storage, Midwest Energy Holding and #1 G.B. Hamilton Well, Defendants.**

**No. 95 C 4076.**

May 1, 1996.

MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge:

**\*1** Plaintiffs are six individuals who purchased an aggregate $183,000 of joint venture interests in an unsuccessful oil and gas venture known as the #1 G.B. Hamilton Well (Hamilton Well). Plaintiffs claim they were induced by false and misleading statements to invest in Hamilton Well. Plaintiffs purchased their interests in Hamilton Well through defendant Calprotrack, Inc., the selling agent, an entity in which defendant, Timothy Monahan, is the president, and defendant, Michael O'Malley, is a principal. When plaintiffs' investment went belly-up, they demanded that Monahan and Michael O'Malley refund their monies. Monahan agreed to do so by August 15, 1994, and executed an agreement by which he pledged his shares in Midwest Gas Storage to guarantee his performance. Monahan defaulted on that agreement. Plaintiffs then filed this action suing these defendants for primary liability under the federal securities laws. Plaintiffs claim to have relied upon false and misleading statements contained in a collection of documents known as the "Offering Materials." In addition, plaintiffs have sued defendants Terrence O'Malley, Daniel O'Malley, Midwest Gas Energy, Inc., Midwest Gas Storage, and Midwest Energy Holding (collectively the Midwest Corporations) for secondary liability as "controlling persons" of Hamilton Well under Section 20(a) of the Securities

Exchange Act. 15 U.S.C. § 78t. Defendants Terrence O'Malley, Daniel O'Malley and the Midwest Corporations have moved to dismiss the complaint for failure to allege any facts sufficient to support an inference that they controlled the operations of Hamilton Well or that they had any power or ability to exercise control over the sale of interests in Hamilton Well to plaintiffs. [FN1]

Discussion

A complaint should not be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Leahy v. Board of Trustees of Community College Dist. No. 508, County of Cook, State of Ill., 912 F.2d 917, 921 (7th Cir. 1990), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). In analyzing the sufficiency of plaintiffs' complaint, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir. 1991). However, "[c]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Cushing v. City of Chicago, 3 F.3d 1156, 1160-61 n.5 (7th Cir. 1993), quoting, Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd 460 U.S. 325 (1983).

To establish a violation of Section 20(a) for secondary liability as "controlling persons" of Hamilton Well, plaintiffs must meet a two-pronged test. First, the alleged control-person must actually participate in, that is, exercise control over the operations of the person in general. Second, the alleged control-person must have possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not the power was exercised. Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992), cert. denied, 113 S.Ct. 2994 (1993).

**\*2** Defendants claim that the First Amended Complaint contains no allegations of fact to support the assertion that they controlled the operations of Hamilton Well. Plaintiffs claim they have evidence to support the fact that the Midwest Corporations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
(Cite as: 1996 WL 224515, *2 (N.D.Ill.))

Page 55

directly and indirectly controlled Hamilton Well and that Terrence O'Malley and Daniel O'Malley controlled Hamilton Well through their positions at defendant Midwest Gas Energy, Inc.

Plaintiffs offer the Financing Memorandum for Midwest Gas Energy, Inc. to establish direct control of Hamilton Well by the Midwest Corporations. The Financing Memorandum states: "The G.B. Hamilton #1 is a prime example of the type of target acquisition by which Midwest Gas Production will expand its natural gas production reserve base." The memorandum also states that non-defendant Midwest Gas Production has a 20% working interest in Hamilton Well. Plaintiffs contend that a 20% working interest does not mean that Midwest Gas Production or one of the other Midwest Corporations did not have another type of interest in Hamilton Well such as a joint venture or management interest and, in any event, that a 20% interest can evidence control.

The quoted sentence does not aid plaintiffs in proving direct control by the Midwest Corporations. The quote refers to non-defendant Midwest Gas Production, a subsidiary of defendant Midwest Gas Energy, Inc. and non-defendant Midwest Gas Production has only a 20% interest in Hamilton Well. The cases which plaintiffs cite only hold that a significant minority interest can or may evidence control, and none of the cases are binding in this district. Furthermore, a 20% interest by a subsidiary of a defendant corporation is not enough to establish control. See Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989), citing Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985) ("lending bank not a controlling person of an investment company selling limited shares in real estate programs despite facts that the bank was the primary lender, held nearly 20% of the company's stock, held a proxy on a 51% block of the company's subsidiary, sent personnel to the company's board meetings and had certain authority over the company's issuance of capital stock"). This claim, that the Midwest Corporations may have additional interests in Hamilton Well, is wholly speculative and cannot withstand a motion to dismiss. Cushing v. City of Chicago, 3 F.3d 1156, 1160-61 n.5 (7th Cir. 1993).

Plaintiffs allege indirect control in two ways, through the Midwest Corporations' control of Calprotrack, which owned Hamilton Well, and Midwest Energy Holding's controlling interest in Calprotrack, Hamilton Well and Midwest Gas Storage.

Plaintiffs again turn to the Financing Memorandum which describes Calprotrack as the "consultant and operations company for Midwest Gas Storage." Defendants' argue that the Financing Memorandum's organizational chart does not indicate ownership of Calprotrack by any of the Midwest Corporations. Defendants' argument fails. The fact that Calprotrack owned Hamilton Well and the Financing Memorandum sets Calprotrack out as the operations company for Midwest Gas Storage, indicates Midwest Gas Storage's ability to exercise control over the operations of the Hamilton Well. However, it does not indicate control by all the Midwest Corporations.

*3 Plaintiffs state in their complaint that Midwest Energy Holding acquired its controlling interests in Calprotrack, Hamilton Well and Midwest Gas Storage prior to February 1993. Defendants submitted a copy of the Delaware Corporation/ Limited Partnership Record which establishes that Midwest Energy Holding was not even incorporated until November 24, 1993. While the district court is not to look beyond the pleadings in a motion to dismiss, the court may take judicial notice of matters of public record. United States v. Wood, 925 F.2d 1580, 1581-82 (7th Cir. 1991). "[S]ection 20(a) requires control at the time of the alleged violation; activities and events that occur later cannot support a claim of liability." Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989). Therefore, I find defendant Midwest Energy Holding could not have had control prior to February 1993.

Plaintiffs finally allege that Terrence O'Malley, as President and Chief Operating Officer, and Daniel O'Malley, as Chief Financial Officer, of Midwest Gas Energy controlled Hamilton Well. Plaintiffs assert, "[t]he prominent positioning of these individuals in a sales memorandum alongside a discussion of the Hamilton Well certainly suggests a power to control all aspects of the Hamilton Well, including sales of its interests." I doubt the value of this argument based on semiotic theory. Furthermore, it is not enough to establish control by merely claiming the person occupies a position of control within an organization. Koplin v. Labe

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                  **Page  56**
**(Cite as: 1996 WL 224515, \*3 (N.D.Ill.))**

Federal Sav. and Loan, 748 F. Supp. 1336, 1341
(N.D. Ill. 1990).

   Plaintiffs have satisfied the first prong of the
control test solely as to Midwest Gas Storage.
However, to survive the motion to dismiss,
plaintiffs must further allege that the control-person
possessed the power or ability to control the specific
transaction or activity upon which the primary
violation was predicated, whether or not the power
was exercised. Harrison v. Dean Witter Reynolds,
Inc., 974 F.2d 873, 881 (7th Cir. 1992). Plaintiffs
must thus allege that Midwest Gas Storage possessed
the power or ability to control the sale of interest in
the Hamilton Well to plaintiffs. Plaintiffs have
failed to satisfy the second prong of the test with
any factual assertions. Rather, plaintiffs simply state
that the Midwest Corporations "had the power to
control the underlying parties who were liable."
Again, this is a conclusory allegation that cannot
withstand a motion to dismiss. Cushing v. City of
Chicago, 3 F.3d 1156, 1160-61 n.5 (7th Cir. 1993).

   The motion to dismiss is granted.

      FN1.  Defendants also move to dismiss on the
      grounds plaintiffs have failed to allege any primary
      violation by the alleged controlled persons.   "A
      defendant may be liable as a 'controlling person'
      under § 20(a) only if a primary violation of the
      securities laws is adequately alleged." FMC Corp.
      v. Boesky, 727 F. Supp. 1182, 1199 n. 19 (N.D.
      Ill. 1989). For purposes of this motion, I assume
      plaintiffs have adequately alleged a primary
      violation of the securities laws.

   1996 WL 224515 (N.D.Ill.)

**END OF DOCUMENT**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
Fed. Sec. L. Rep. P 94,400
**(Cite as: 2007 WL 2695787 (D.Minn.))**
<KeyCite History>

Page 105

United States District Court,
D. Minnesota.

**LITTLE GEM LIFE SCIENCES LLC,
individually and on behalf of a class of persons
similarly situated, Plaintiff,
v.
ORPHAN MEDICAL, INC., John H. Bullion,
and Timothy G. McGrath, Defendants.**

**Civil No. 06-1377 ADM/AJB.**

Sept. 13, 2007.

Joel C. Feffer, Esq., Harwood Feffer LLP, New York, NY, and Gregg M. Fishbein, Esq., Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, on behalf of Plaintiff.

Peter W. Carter, Esq., Dorsey & Whitney LLP, Minneapolis, MN, on behalf of John H. Bullion and Timothy G. McGrath, and Richard G. Wilson, Esq., Maslon Edelman Borman & Brand LLP, Minneapolis, MN, on behalf of Orphan Medical, Inc.

MEMORANDUM OPINION AND ORDER

ANN D. MONTGOMERY, U.S. District Judge.

**I. INTRODUCTION**

*1 On June 8, 2006, the undersigned United States District Judge heard oral argument on Defendants Orphan Medical, Inc. ("Orphan Medical"), John H. Bullion ("Bullion"), and Timothy G. McGrath's ("McGrath") (collectively "Defendants") Motion to Dismiss [Docket No. 35] Plaintiff Little Gem Life Sciences LLC's Amended Complaint ("Little Gem") [Docket No. 33]. In its Amended Complaint, Little Gem alleges that Defendants violated federal securities laws by negligently making a false statement and omitting certain information from a proxy statement issued in connection with a merger transaction. For the reasons set forth herein, Defendants' Motion to Dismiss is granted.

**II. BACKGROUND [FN1]**

FN1. In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d 110, 112 (8th Cir.1994).

On February 16, 2007, this Court issued an Order [Docket No. 32] dismissing without prejudice Little Gem's initial Complaint [Docket No. 1] for failure to plead an omission with the particularity required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 109 Stat. 737. The facts alleged in Little Gem's Amended Complaint largely repeat the allegations of the initial Complaint, which were discussed in the February 2007 Order. Therefore, only a brief summary of the previously discussed facts is necessary here.

Orphan Medical is a specialty pharmaceutical company whose focus is on sleep disorders, pain, and other central nervous system disorders. Am. Compl. ¶ 9. Bullion was Orphan Medical's Chief Executive Officer and served on its Board of Directors. Id. ¶ 10. McGrath was Orphan Medical's Chief Financial Officer, Principal Accounting Officer, and a Vice President. Id. ¶ 11.

Orphan Medical's lead product is Xyrem, an oral solution for the treatment of cataplexy associated with narcolepsy. Id. ¶ 25; Leventhal Decl. [Docket No. 19] Ex. B at 2. [FN2] In June 2004, Orphan Medical initiated a clinical trial to assess Xyrem for the treatment of fibromyalgia. Leventhal Decl. Ex. B at 2. Orphan Medical's March 16, 2005, Form 10-K states that Orphan Medical expected to announce the results of the fibromyalgia trial in the second half of 2005. Id.

FN2. The following documents provided by Defendants in the Leventhal Declaration are considered as central to the Amended Complaint: Exhibits A (Orphan Medical's May 20, 2005, Proxy Statement) and E (a transcript of an April 26, 2005, conference call). See Stahl v. Dep't of Agric., 327 F.3d 697, 700-01 (8th Cir.2003) (discussing documents a court may consider on a motion to dismiss). Exhibit B (the March 16, 2005, 10-K) is not central to the Amended Complaint, but provides useful dates and details. The Court refers to Exhibit B only to establish context regarding the Xyrem

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 2695787, *1 (D.Minn.))

clinical trial.

On April 18, 2005, Orphan Medical's board of directors approved a merger agreement whereby almost all of Orphan Medical's publicly owned stock would be purchased and Orphan Medical would become a subsidiary of Jazz Pharmaceuticals, Inc. ("Jazz"). Leventhal Decl. Ex. A at 16. On May 20, 2005, Orphan Medical filed a Proxy Statement announcing a June 22, 2005, shareholder meeting to vote on the proposed merger. Id. Ex. A. Under the merger agreement, each Orphan Medical stockholder would receive $10.75 per share of common stock. Id.

The Proxy Statement refers to an opinion prepared by Banc of America Securities LLC ("Banc of America"), the financial advisor to Orphan Medical's board of directors, that the proposed merger was financially fair to holders of Orphan Medical's common stock. Id. at 3-4, 16-24. Banc of America's two-page fairness opinion, reproduced in full as Appendix C to the Proxy Statement, states that Banc of America reviewed financial forecasts prepared by Orphan Medical's management as of April 18, 2005. Id. at C-2.

*2 The merger was approved by a majority of Orphan Medical's shareholders at the June 22, 2005, shareholder meeting. Little Gem, an Orphan Medical shareholder at the time of the merger, filed its initial Complaint on April 10, 2006, on behalf of itself and a class of holders of Orphan Medical common stock as of May 23, 2005. The initial Complaint asserted claims against Defendants under sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging that "[t]he Proxy Statement's repeated references to the Financial Advisor's opinion are materially false and misleading because the Proxy Statement omits to disclose that the financial advisor failed to consider the full impact of likely significant expansions of the prospective patient base for Xyrem." Compl. ¶ 26. This Court's February 2007 Order found that the initial Complaint failed to satisfy the PSLRA's heightened pleading requirements. Little Gem's Amended Complaint attempts to remedy the deficiencies of the original Complaint.

## III. DISCUSSION

### A. Motion to Dismiss and Pleading Standards

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). In considering a motion to dismiss, the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. Hamm v. Groose, 15 F.3d at 112; Ossman v. Diana Corp., 825 F.Supp. 870, 879-80 (D.Minn.1993). Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party. Ossman, 825 F.Supp. at 880. "A motion to dismiss should be granted as a practical matter ... only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir.1995).

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief." A pleading must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007).

### B. Defendants' Motion to Dismiss [FN3]

> FN3. Little Gem argues that Defendants improperly rely on matters outside the Amended Complaint and therefore Defendants' Motion to Dismiss should be considered a motion for summary judgment. See Fed.R.Civ.P. 12(b) ("If ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment ... and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). Defendants have made factual assertions that go beyond the allegations of the Amended Complaint. However, the Court has not considered those assertions in deciding the instant Motion to Dismiss.

### 1. Claims under Section 14(a) of the Exchange Act

Section 14(a) of the Exchange Act aims "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

solicitation." J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964). Section 14(a) prohibits proxy solicitations that violate rules promulgated by the SEC. 15 U.S.C. § 78n(a). SEC Rule 14a-9 prohibits a proxy solicitation by means of a proxy statement that "contain[s] any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Plaintiffs establish a violation of § 14(a) and Rule 14a-9 by showing: (1) the proxy statement contains a material omission; (2) the defendants negligently drafted the proxy statement; and (3) the proxy caused an injury to plaintiffs. In re BankAmerica Corp. Sec. Litig., 78 F.Supp.2d 976, 988-89 (E.D.Mo.1999).

**\*3** Defendants argue that Little Gem's Amended Complaint must be dismissed because it fails to plead a false statement or an omission with the particularity required by the PSLRA. In response, Little Gem contends that the heightened pleading requirements of the PSLRA do not apply to claims under § 14(a) of the Exchange Act. In the alternative, Little Gem argues that it has pled a false statement and an omission with the requisite particularity.

a. Whether the PSLRA's Heightened Pleading Requirements Apply to Claims Under Section 14(a) of the Exchange Act

The February 2007 Order held that Little Gem's initial Complaint failed to plead an omission with the particularity required by the PSLRA. In support of its argument that the Amended Complaint survives Defendants' Motion to Dismiss, Little Gem seeks to revisit the issue of whether the PSLRA applies to claims under § 14(a) of the Exchange Act. However, under the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." First Union Nat'l Bank v. Pictet Overseas Trust Corp., 477 F.3d 616, 620 (8th Cir.2007) (quotation marks and citation omitted). Although it is unnecessary to revisit the issue, Little Gem's arguments will be briefly addressed.

The PSLRA's heightened pleading provision, 15

U.S.C. § 78u-4(b)(1), specifies that:

In any private action arising under this chapter in which the plaintiff alleges that the defendant--
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

Little Gem's claim is premised on a violation of § 14(a) of the Exchange Act, which is codified at 15 U.S.C. § 78n(a). The PSLRA's heightened pleading provision and § 14(a) of the Exchange Act are both codified in Chapter 2B of Title 15 of the United States Code, and Little Gem has alleged that Defendants made false statements of material fact and omitted material information that made the inclusion of Banc of America's fairness opinion misleading. Therefore, the PSLRA's heightened pleading provision applies to Little Gem's allegations.

Arguing against this result, Little Gem refers to the heading of 15 U.S.C. § 78u-4(b), which is "Requirements for securities fraud actions." Little Gem argues that its § 14(a) claim is based on negligence as opposed to fraud, and therefore only the "short and plain statement" pleading requirement of Federal Rule of Civil Procedure 8 applies. However, it is a well-settled rule of statutory construction that "the title of a statute and the heading of a section cannot limit the plain meaning of the text." Bhd. of R.R. Trainmen v. Baltimore & Ohio R.R., 331 U.S. 519, 528-29 (1947). "Section and subchapter titles ... can only assist in clarifying ambiguity." Owner-Operated Indep. Drivers Ass'n v. New Prime, Inc., 192 F.3d 778, 784 (8th Cir.1999) (quotation marks and citation omitted). There is no ambiguity in 15 U.S.C. § 78u-4(b); therefore heightened pleading requirements apply in this case. [FN4]

FN4. Most courts to address the issue have reached the same conclusion. See Knollenberg v. Harmonic, Inc., 152 Fed. Appx. 674, 682-83 (9th Cir. Nov. 8, 2005) (stating that "the PSLRA pleading requirements apply to claims brought under Section

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

14(a) and Rule 14a-9"); In re U.S. West, Inc. Sec.
Litig., 65 Fed Appx. 856, 860 (3d Cir. May 30,
2003); Fisher v. Kanas, 467 F.Supp.2d 275, 281
(E.D.N.Y.2006); Bond Opportunity Fund v. Unilab
Corp., 2003 WL 21058251, *3 (S.D.N.Y. May 9,
2003). But see Blau v. Harrison, 2006 WL 850959,
*6 (N.D.Ill. March 24, 2006) (concluding that §
14(a) claims based on negligence are not subject to
PSLRA's heightened pleading requirements). Little
Gem's reliance on Kennedy v. Venrock Associates,
348 F.3d 584 (7th Cir.2003) for the proposition that
the PSLRA's heightened pleading requirements do
not apply to § 14(a) claims is misplaced because
Kennedy does not address the PSLRA.

b. Whether Little Gem's Allegations Satisfy the
PSLRA

**\*4** Little Gem's Amended Complaint alleges that
the May 20, 2005, Proxy Statement's claim that
"Orphan Medical is currently conducting a proof-of-
principle clinical trial to assess Xyrem as a treatment
for the symptoms of fibromyalgia syndrome" is
materially false and misleading because:

By mid-January 2005, patient enrollment in the
trial was completed. The trial itself was to last
three months, consisting of a one-month "washout
period," during which enrolled patients were to be
drug-free, followed by an eight-week treatment
period. Accordingly, the fibromyalgia clinical
trial was completed, and the data available, on or
about April 15, 2005, more than a month before
Orphan Medical disseminated the Proxy
Statement.
Moreover, because the clinical trial's enrollment
was less than 200 patients, lengthy analysis of the
data was not required and the positive results of
the trial were available to defendants, if not at the
time the Proxy Statement was first disseminated
on May 25, 2005, at least by the time of Orphan
Medical's stockholders' meeting on June 22,
2005.
Am. Compl. ¶¶ 27-28.

However, these allegations, which are based on
information and belief, suffer from the same
deficiencies as the allegations in the initial
Complaint. Little Gem has failed to adequately
allege (1) when the results from the trial were
prepared, (2) who prepared the results, (3) whether
the results were in preliminary or final form, (4)
when the results were reviewed by Orphan

Medical's officers; and (5) which Orphan Medical
officers reviewed the results. See Cal. Pub.
Employees' Ret. Sys. v. Chubb Corp., 394 F.3d
126, 154 (3d Cir.2004) (finding conclusory
assertion that defendants had access to undisclosed
information before merger vote was "patently
insufficient").

To support its assertion that the positive Xyrem
results were available by June 22, 2005, Little Gem
relies on allegations that:

Depomed, Inc., also a NASDAQ-listed company,
conducted a similarly sized clinical trial to
evaluate one of its drugs. Enrollment was
completed October 5, 2006, the last person in the
four-week study was treated on November 5,
2006, and the data was analyzed and distributed in
approximately one month and publicly released on
December 12, 2006.
Am. Compl. ¶ 29. However, these meager
allegations fail to show that the Depomed clinical
trial is relevant in determining how long Orphan
Medical needed to analyze the Xyrem data. The only
obvious similarity between the two trials is that both
involved approximately two-hundred patients.
However, the Depomed clinical trial lasted one
month, whereas Orphan Medical's Xyrem clinical
trial lasted three months. Further, there is no
allegation that the Depomed study and the Xyrem
study were performed under similar conditions and
required analysis of similar volumes of data. Little
Gem's vague allegations using the Depomed analogy
provide no basis for a conclusion that the formal
results of the Xyrem clinical trial for fibromyalgia
were available by April 15, 2005, May 20, 2005
(the date of the Proxy Statement), or June 22, 2005
(the date of merger vote).

**\*5** In the alternative, Little Gem alleges that
"[e]ven if the analysis of the fibromyalgia clinical
trial data was not formally available by June 22,
2005, Orphan Medical's management could easily
have known the results because Xyrem has a well-
known dose dependent side effect profile. Thus even
without unblinding, professionals could reasonably
be expected to determine who was taking Xyrem and
who was taking the placebo...." Id. ¶ 30. However,
these speculative allegations fail to describe any
circumstances under which Orphan Medical's
management allegedly viewed raw trial data before
the formal data analysis was complete. Further,
Little Gem's assertion that "professionals could

(Cite as: 2007 WL 2695787, *5 (D.Minn.))

reasonably be expected to determine who was taking Xyrem" would effectively amount to unblinding the study before it was completed. Little Gem has provided no factual basis to support its conjecture that "professionals" would disregard protocol by unblinding the study and prematurely disclosing the unblinded information to Orphan Medical's senior management. See 21 C.F.R. § 314.126(b)(5) ("An adequate and well-controlled study has the following characteristics: ... Adequate measures are taken to minimize bias on the part of the subjects, observers, and analysts of the data. The protocol and report of the study should describe the procedures used to accomplish this, such as blinding.").

Little Gem also suggests that because Bullion and McGrath "were required to provide Jazz with a certificate of compliance at the closing of the merger ... it was incumbent upon both of them to keep apprised of the developments in the fibromyalgia trial." Am. Compl. ¶ 30; see Leventhal Decl. Ex. A at A-35. However, Little Gem has not explained how Bullion and McGrath's obligation to certify that Orphan Medical had performed its contractual obligations to Jazz, and that Orphan Medical's representations and warranties to Jazz were still true, amounted to a duty to violate the clinical trial protocol and view the blinded trial results before the merger closed.

Little Gem also argues that the merger agreement's "Material Adverse Effect" clause provides support for the conclusion that Defendants knew the positive results of the Xyrem clinical trial at the time of the merger. Am. Compl. ¶ 31. To reach this conclusion, Little Gem first argues that under the merger agreement, "Jazz, as a practical matter, had the ability to delay the consummation of the merger until November 30, 2005." Id. Second, Little Gem relies on language in the merger agreement imposing a condition precedent on the merger that "[n]o Material Adverse Effect shall have occurred and be continuing." Leventhal Decl. Ex. A at A-35. Third, Little Gem construes the merger agreement's definition of Material Adverse Effect as including negative "data relating solely to the efficacy of Xyrem in the treatment of fibromyalgia in [Orphan Medical's] pending ... proof of principle clinical trial." Am. Compl. ¶ 31. Therefore, Little Gem concludes that "[t]he merger agreement, in effect, gave Jazz an option to acquire Orphan Medical, contingent on the results of the

fibromyalgia proof-of-principle clinical trial," and Jazz would not have closed the merger on June 24, 2005, unless Defendants had disclosed positive results regarding Xyrem. Id.

*6 However, Little Gem's argument finds no support in the language of the merger agreement. The merger agreement's definition of "Material Adverse Effect" provides in relevant part:

Notwithstanding any of the foregoing, (1) any change, event or occurrence (except with respect to any data relating solely to the efficacy of Xyrem in the treatment of fibromyalgia in the Company's pending SXB-26 proof of principle clinical trial) which, individually or in the aggregate, would reasonably be expected to have a material adverse effect on the results or prospects of Xyrem ... shall ... be deemed to be a Material Adverse Effect.

Leventhal Decl. Ex. A at A-7. Under the plain language of this clause, data from the Xyrem fibromyalgia proof of principle clinical trial was expressly carved out from the definition of a Material Adverse Effect. Therefore, Little Gem's argument that the Material Adverse Effect Clause supports an inference that Defendants accessed and disclosed data from the fibromyalgia trial to Jazz prior to the merger closing date is rejected.

Next, Little Gem alleges that "just two days before Orphan Medical's stockholders voted on the proposed merger, i.e. June 20, 2005, Jazz raised $100,000,000 in additional capital in order to finance the development of Xyrem as a treatment for fibromyalgia." Am. Compl. ¶ 3 1. Based on this allegation, Little Gem argues that a finder of fact could infer that Defendants provided Jazz with the results of the clinical trial by June 22, 2005. However, Little Gem's Amended Complaint provides no basis for the speculative conclusion that Jazz raised the $100 million to finance the development of Xyrem as a treatment for fibromyalgia. Little Gem has failed to plead with particularity facts that support its belief that Defendants were aware of positive Xyrem trial data before the merger vote on June 22, 2005.

Little Gem has also alleged that the Proxy Statement's references to Banc of America's fairness opinion "are materially false and misleading because the Proxy Statement omits to disclose that [Banc of America] failed to consider the positive results from

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 2695787, *6 (D.Minn.))

the fibromyalgia clinical trial." Id. ¶ 34. However, this allegation cannot survive Defendants' Motion to Dismiss because Little Gem has not adequately pled with particularity that Defendants were aware of positive results before the merger vote.

Finally, Little Gem alleges that during a conference call in April 2005, Bullion promised that the fibromyalgia data would be released in the Proxy Statement. Id. ¶ 35; see Leventhal Decl. Ex. E. However, the Court has previously determined that Bullion's statements during the conference call cannot be read as a promise that specific data regarding the fibromyalgia clinical trial would be disclosed in the Proxy Statement. See February 16, 2007, Order at 9. Little Gem's Amended Complaint fails to plead the facts underlying a material false statement or a material omission with the particularity required by the PSLRA. Therefore, Little Gem's § 14(a) claims must be dismissed and it is unnecessary to address the remaining grounds for dismissal raised by Defendants.

### 2. Claims under Section 20(a) of the Exchange Act

*7 The Amended Complaint asserts that Bullion and McGrath are individually liable as controlling persons within the meaning of § 20(a) of the Exchange Act. [FN5] Little Gem recognizes that liability under § 20(a) is premised upon liability under § 14(a). Since Defendants' Motion to Dismiss is granted regarding the § 14(a) claims, the § 20(a) claims must also be dismissed.

> FN5. "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

### 3. Dismissal With Prejudice

Little Gem has now twice failed to plead a false statement or an omission with the particularity required by the PSLRA. Under these circumstances, the Court finds that further amendment would be futile. Therefore, Little Gem's Amended Complaint

is dismissed with prejudice. See Knapp v. Hanson, 183 F.3d 786, 790 (8th Cir.1999) (noting that "futility constitutes a valid reason for denial of a motion to amend").

### IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:
1. Defendants' Motion to Dismiss [Docket No. 35] is GRANTED: and
2. Plaintiff's Amended Complaint [Docket No. 33] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

2007 WL 2695787 (D.Minn.), Fed. Sec. L. Rep. P 94,400

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**P**

Not Reported in F.Supp.2d
(Cite as: 2007 WL 684123 (N.D.Ill.))
<KeyCite History>

Page 112

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

**Scott MCSPARRAN and Laura Ulrich,
Derivatively On Behalf of Career Education
Corporation Plaintiffs,
v.
John M. LARSON, Patrick K. Pesch, Wallace O.
Laub, Keith K. Ogata, Dennis H.
Chookaszian, Robert E. Dowdell, Thomas B.
Lally, Nick Fluge, Jacob P. Gruver,
and Todd H. Steele, Defendants,
and
CAREER EDUCATION CORPORATION, a
Delaware Corporation, Nominal Defendant.**

**No. 04 C 0041, 04 C 4778.**

Feb. 28, 2007.

Brian O. O'Mara, Travis E. Downs, III, William S. Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins, Brian J. Robbins, Marc M. Umeda, Robbins Umeda & Fink, LLP, San Diego, CA, George Barrett, Barrett, Johnston & Parsley, Nashville, TN, Patrick J. Sherlock, Attorney At Law, Chicago, IL, Nadeem Faruqi, Faruqi & Faruqi, LLP, New York, NY, for Plaintiffs.

David H. Kistenbroker, Karl Richard Barnickol, Mary Ellen Hennessy, Joni S. Jacobsen, Katten Muchin Rosenman LLP, Daniel E. Reidy, Lee Ann Russo, Alicia Marie Hawley, James Cordray Dunlop, Jones Day, Walter C. Carlson, Courtney Ann Rosen, Rebecca D. Ray, Richard Bradshaw Kapnick, Tara Kocheran Charnes, Sidley Austin LLP, Chicago, IL, Scott D. Levine, Career Education Corporation, Hoffman Estates, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ANDERSEN, J.

**\*1** This matter is before the court on the defendants' motion to dismiss plaintiffs' verified shareholders' amended derivative complaint. For the reasons stated below, defendants' motion to dismiss with prejudice is granted.

## PROCEDURAL HISTORY

On January 5, 2004, plaintiff Scott McSparran filed a verified shareholder's derivative complaint on behalf of Career Education Corporation ("CEC") against every member of CEC's Board of Directors and certain key officers, alleging breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and breach of fiduciary duties for insider selling and misappropriation of information. After this case was consolidated with Ulrich v. Larson et. al, 04 C 4778, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, plaintiffs filed a consolidated complaint.

On January 27, 2006, this court denied defendants' Rule 12(b)(6) motion to dismiss, concluding that plaintiffs had met their Rule 23.1 burden to plead with particularity their claims of demand futility. The court based much of this opinion on our reading of In Re Abbott Laboratories Derivative Shareholders Litigation, 325 F.3d 795, 803 (7th Cir.2001) ("In Re Abbott Labs" ). On May 3, 2006, however, this court granted defendants' motion to reconsider, stating that its analysis under In re Abbott Labs was mistaken, and that demand futility arises only when a majority of the directors are interested in the outcome of the litigation. The complaint was dismissed. McSparran v. Larson, No.2006 WL 2052057 at \*5 (N.D.Ill. May 3, 2006).

Before the court now is Scott McSparran and Laura Ulrich's (hereinafter collectively "plaintiffs") Verified Shareholders' Amended Derivative Complaint ("Amended Complaint") on behalf of Career Education Corporation ("CEC"), which re-alleges claims of breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and breach of fiduciary duty for insider selling and misappropriation of information against all defendants. The Amended Complaint adds the claim of constructive fraud against all defendants and a claim of usurpation of corporate opportunity against defendants Larson, Pesch, Dowdell, Fluge, Grover, Lally, Laub, Ogata and Steele.

The court now considers defendants' motion to dismiss. The facts set forth herein are those alleged

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 684123, *1 (N.D.Ill.))

in the Amended Complaint, which we take as true, as we must in addressing a motion to dismiss. Much of plaintiffs' 138-page, 318-paragraph Amended Complaint contains allegations we need not analyze at this stage in the litigation. We reach the decision laid out below based solely on the facts alleged in the Amended Complaint.

## BACKGROUND

CEC is a provider of private, for-profit post secondary education, with 51 campuses located throughout the United States, Canada, France, the United Kingdom, and the United Arab Emirates. In addition to its physical locations, CEC maintains an on-line presence through its e-learning division, American InterContinental University-Online. While CEC is formally incorporated in Delaware, plaintiffs maintain that CEC is headquartered in this District, which is also where a significant portion of the alleged wrongs and transactions the plaintiffs set forth in the Amended Complaint occurred.

*2 Plaintiffs allege that defendants violated their fiduciary duty by maintaining a continual and systematic "top-down" policy of wrongful conduct which resulted in millions of dollars in damages to CEC and a significantly diminished business reputation. The essence of plaintiffs' Amended Complaint is that defendants artificially inflated CEC's stock price so that they could sell their holdings of CEC's stock at a higher price than the true value of the company would warrant. The plaintiffs allege defendants engaged in various instances of improper conduct, including misrepresenting its business and financial performance, to implement this scheme. For example, according to the plaintiffs, one of defendants' misrepresentations was basing CEC's performance on falsified student records designed to "increase reported graduation rates and enrollment rates, and to conceal problems that were threatening the accreditation of its schools." Plaintiffs claim defendants were aware of this practice by CEC schools. In the alternative, the plaintiffs plead that defendants should have known about the alleged fraud at CEC by virtue of their director and officer positions and therefore failed at fulfilling their oversight duties.

As in the original complaint, many of the plaintiffs' allegations are pled without reference to the specific time the alleged wrongs were perpetrated, the place they occurred, or the specific CEC employees engaged in the allegedly conspiratorial conduct. For example, the Amended Complaint states that "defendants' conduct is also under investigation by several federal and state agencies" but fails to name the federal or state agencies, provide any details about the investigations or even identify which defendants are under investigation. The Amended Complaint alleges that defendants Larson and Pesch received non-public information from "lower level employees," and that "senior CEC executives" communicated with "school representatives" about "efforts" required to achieve projected quarter ending levels, but fails to name the employees, executives or representatives, or when these events occurred. The Amended Complaint also contains allegations that pertain only to defendants Larson and Pesch, whom the plaintiffs claim "dominated and controlled Career Education by creating an atmosphere of deceit intended to conceal the Company's true financial condition."

As in the original complaint, the Amended Complaint also alleges that defendants sold significant stock holdings while CEC's stock was artificially inflated by the false numbers reported by CEC. The Amended Complaint lists the proceeds gained from each stock sale by individual defendants. According to the plaintiffs, defendants disposed of more than 2.9 million shares of CEC stock for proceeds of more than $136 million. The Amended Complaint also reports the amount each defendant was paid for their services to CEC and, as in the original complaint, details the business relationships existing between CEC's CEO and Chairman of the Board, and each and every other member of CEC's Board of Directors. While CEC's CEO and Chairman of the Board unquestionably had some degree of control over the compensation of officers of CEC, the Amended Complaint, like the original complaint, does not allege other business relationships that would allow him to control the compensation of outside directors. Instead, the Amended Complaint details social and business relationships common in executive circles.

## DISCUSSION

*3 Before the Court is a shareholder derivative complaint. A derivative action is brought by

individual shareholders on behalf of a corporation. However, a hallmark of corporation law is that directors, rather than shareholders, manage the business affairs of the corporation. See, e.g., 8 Del. C. § 141(a) ("The business and affairs of a corporation organized under this chapter shall be managed by or under the direction of a board of directors except as may otherwise [be provided].") Derivative actions "impinge on the managerial freedom of directors. Hence, the [requirement that a plaintiff demand that a company's board of directors bring suit prior to initiating their own action on behalf of the company] ... exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies and then to provide a safeguard against strike suits." Aronson v. Lewis, 473 A.2d 805, 811 (Del.1984), overruled on other grounds by Brehm v. Eisner, 746 A.2d 244, 253 (Del.2000). Nevertheless, the requirement that a plaintiff pleading a derivative complaint must make a demand upon a corporation's board is excused when such a demand would be futile. Heineman v. Datapoint Corp., 611 A.2d 950, 952 (Del.1992) ("Equity will not require a useless act" and thus when "demand upon the board would be 'futile,' the demand requirement will be excused.")

In determining the plaintiffs' pleading requirements we will follow the Federal Rules of Civil Procedure. Pursuant to Federal Rule of Civil Procedure 12(b)(6), when deciding a motion to dismiss, the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. Jones v. General Electric Co., 87 F.3d 209, 211 (7th Cir.1996); Wilson v. Formigoni, 42 F.3d 1060, 1062 (7th Cir.1994). However, the normally liberal pleading standards of the Federal Rules of Civil Procedure are heightened in this case by Rule 23.1, which requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1. Pleading with particularity means that a plaintiff must include "the who, what, when, where, and how: the first paragraph of any newspaper story." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990).

Demand Futility

Because CEC was incorporated under the laws of Delaware, we will apply Delaware law in determining whether plaintiffs are excused from making a demand upon CEC's Board of Directors prior to initiating a suit. (As noted previously, Illinois case law follows Delaware case law in determining the proper tests for demand futility.) In Re Abbott Laboratories Derivative Shareholders Litigation, 325 F.3d 795, 803 (7th Cir.2001) ("In Re Abbott Labs" ). The Supreme Court of Delaware created a two-part test for demand futility in Aronson v. Lewis. Under this test, we ask whether "a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgement." Aronson, 473 A.2d at 814. Plaintiffs assert two main grounds for demand futility: (i) the Board of Directors is dominated and controlled by CEC's CEO and Chairman of the Board; and (ii) a majority of the Board of Directors are interested in the outcome of this litigation because they face a substantial likelihood of liability for claims predicated on the fact their decisions were not protected by the business judgment rule. Given the allegations of the Amended Complaint, the two-part test laid out in Aronson is distilled in the present case into questions of independence and interest.

1. Independence of Directors

*4 Delaware courts have noted that "[a]t bottom, the question of independence turns on whether a director is, for any substantial reason, incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity." In re Oracle Corp. Derivative Litigation, 824 A.2d 917, 938 (Del.Ch.2003), quoting Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1232 (Del.Ch.2001), rev'd in part on other grounds, 817 A.2d 149 (Del.2002), cert. denied, 538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003) (emphasis in original). However, "neither mere personal friendships alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence." Litt v. Wycoff, No. 19083-NC, 2003 Del. Ch. LEXIS 23, 16 (Del. Ch. Mar. 25, 2003). Nor does the fact that directors

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
(Cite as: 2007 WL 684123, *4 (N.D.Ill.))

Page 115

receive directorial fees destroy their independence. Grobow v. Perot, 539 A.2d 180, 188 (Del.1988), overruled on other grounds by Brehm, 746 A.2d at 253-54; see also White v. Panic, 793 A.2d 356, 366 (Del.Ch.2000) ("[T]he fact that each [director] is paid an annual retainer of $30,000 plus a fee of $1000 for each meeting attended and annual grants of stock options does not make them beholden to [the company's CEO].").

The Amended Complaint provides no substantial reason to question the independence of a majority of CEC's Board of Directors. Plaintiffs have again failed to make any allegations that outside directors have their salary set by any board member, or are otherwise financially dependent upon other directors. While most of the board members maintained social and business relationships with other board members, such relationships are de rigueur in today's executive circles; indeed, if these relationships destroyed a board member's independence, few boards would have any independent members. While certain directors are officers of CEC and therefore have their salaries set by other directors, thereby eliminating their independence, the majority of the directors remain independent. We need not analyze each individual director's independence, because plaintiffs' assertions that the outside directors (who make up the majority of the board) lack independence run contrary to Delaware law. No outside directors have their compensation controlled by, or are otherwise subject to a disqualifying influence with, inside directors.

2. Interest of Directors

In determining whether the defendants have an interest in the litigation that would render a demand upon them futile we look to whether the factual allegations in the Amended Complaint "create a reasonable doubt as to the disinterestedness of the directors at the time the Complaint was filed." Blasband v. Rales, 971 F.2d 1034, 1048 (3rd Cir.1992) (applying Delaware law). A reasonable doubt regarding a director's interest is raised when a corporate decision "will have a materially detrimental impact on a director, but not on the corporation or the stockholders." Rales v. Balasband, 634 A.2d 927, 936 (Del.1993). If plaintiffs' Amended Complaint pleads facts that indicate a majority of CEC's Board of Directors face

a "substantial likelihood" of personal liability, a demand upon the Board of Directors is futile. Aronson, 473 A.2d at 815.

*5 Generally, board members are protected from individual liability by the business judgment rule, which provides a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts." Aronson, 473 A.2d at 812. Nevertheless, individual liability for directors can result from two possible contexts: (i) such liability can "follow from a board decision that results in a loss because that decision was ill advised[,] 'negligent,' " or intentionally adverse to the best interests of the company; and (ii) that liability may "arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." In re Caremark International Inc. Derivative Litigation. 698 A.2d 959, 964 (Del.Ch.1996).

Despite an extensive collection of allegations about the actions of mostly unnamed employees of Career Education Corporation, there is a scarcity of specifically pled "actions" taken by the board in the instant case. Instead, as noted previously, the plaintiffs rely on the board's alleged failure to act in the face of allegations of wrongdoing by CEC employees. Therefore, we focus on the second part of the test laid out above, which establishes that a board's extreme indifference or failure to act may create individual liability for board members. In re Caremark, 698 A.2d at 970 ("a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards.")

The Amended Complaint pleads that the defendants improperly overvalued the company in order to raise the stock price and then sold their stock for a large profit. Although it is alleged that all but one of the defendants sold their stock, plaintiffs still fail to plead with particularity that a majority of CEC's Board of Directors face a substantial likelihood of personal liability for

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page  116
(Cite as: 2007 WL 684123, *5 (N.D.Ill.))

reasons other than their stock sale or generalized inferences about their roles as directors. As support for its allegations, the Amended Complaint makes much of additional investigations about CEC's board and lawsuits which have been filed since the original complaint. As noted previously, however, if the simple existence of a class action complaint and investigation by the SEC gave rise to the type of extreme indifference and failure to act that Abbott says creates enough of a likelihood of board member liability to justify a finding of demand futility, any board of any company with multiple operating units would constantly face liability. By the plaintiffs' own measure, CEC is a large corporation controlling more than 51 schools. The claims about misconduct in the Amended Complaint simply fail to establish a systematic lack of board oversight. To allow these claims to give rise to demand futility would significantly diminish the protections of the demand requirement for all large corporations, which likely have several lawsuits and employee claims pending at any given time.

*6 Plaintiffs' Amended Complaint contains two alternative allegations.  Defendants were allegedly either active participants in a scheme to report false accounting of revenues and enrollment figures so that they could sell their holdings of CEC stock at inflated prices, or they failed to act in the face of evidence that should have prompted remedial measures. Either of these two scenarios could result in personal liability for the defendants. However, neither is established with the requisite level of particularity in the Amended Complaint.

Finally, as noted previously, even if plaintiffs pled with particularity certain allegations about a minority of the directors, the court need not consider the allegations because demand futility arises only when a majority of the directors are interested in the outcome of the litigation. Because the Amended Complaint fails to establish that a majority of CEC's directors face a substantial likelihood of personal liability, the plaintiffs cannot show demand futility, and the Amended Complaint must be dismissed.

CONCLUSION

For all the foregoing reasons, defendants' motion to dismiss plaintiffs' verified shareholders' amended derivative complaint [122] with prejudice is granted.

This case is hereby terminated.

It is so ordered.

2007 WL 684123 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.