# Q

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.

**RIGGS PARTNERS, LLC, and David T. Atkins, on behalf of themselves and all others similarly situated, Plaintiffs,**
**v.**
**HUB GROUP, INC., Philip C. Yeager, Jay E. Parker, David P. Yeager, Thomas L. Hardin and Arthur Andersen, LLP, Defendants.**

**No. 02 C 1188.**

Oct. 25, 2002.

MEMORANDUM OPINION AND ORDER

GETTLEMAN, J.

***1** In the wake of an announcement by Hub Group, Inc. ("Hub Group") that it had overstated its earnings in 1999 and 2000, plaintiffs Riggs Partners, LLC and David T. Atkins filed an amended class action complaint against Hub Group, its auditor Arthur Andersen, LLP ("Andersen"), and various current or former officers of Hub Group (the "individual defendants"). In Count I, plaintiffs assert that defendants committed fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges a violation of § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), against individual defendants.

In separate motions to dismiss, Hub Group (on behalf of itself as well as the individual defendants) and Andersen contend that plaintiffs have not satisfactorily alleged scienter under the pleading standards established by Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act of 1995, and thus failed to state a claim under Rule 10b-5. [FN1] Andersen further contends that plaintiffs' claims against it are barred as to purchases of Hub Group stock made prior to March 29, 2000, the date on which Andersen filed its 1999 audit report with the SEC. For the reasons discussed below, both Hub Group's and Andersen's motions to dismiss are granted.

FN1. The individual defendants maintain that plaintiffs' failure to state a claim under Rule 10b-5 eviscerates the § 20(a) claims in Count II.

BACKGROUND

The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to rule on its merits. See Gibson v. City of Chicago, 910 F.2d 1510, 1520 (7th Cir.1990). When considering the motion, the court accepts the allegations of the complaint as true and views the facts in the light most favorable to plaintiffs. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F .3d 1423, 1428 (7th Cir.1996).

In distilling the factual background of the instant dispute, the court is not limited merely to the allegations in the complaint, however. Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are both central to the plaintiff's claim and referenced in the complaint. Venture Associates Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 431 (7 th Cir.1993). Moreover, the court may take judicial notice of documents filed with the SEC for the purpose of showing what statements the documents contain, but not for the proof of the facts stated therein. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-1281 (11 th Cir.1999) ( "[W]e hold that a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed."); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir.1991) ("It is highly impractical and inconsistent with Fed.R.Evid. 201 to preclude a district court from considering [SEC documents] when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions.... [T]he documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated.").

***2** Hub Group is a Delaware corporation headquartered in Lombard, Illinois, which offers intermodal, [FN2] truck brokerage, and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

comprehensive logistics services through a nationwide network of 29 offices, or "hubs." Hub Group completed its initial public offering in 1996, and in 1997 acquired a 65% ownership interest in Hub Group Distribution Services ("HGDS"). HGDS performs numerous logistical activities, including the installation, maintenance, and service of vendors' retail displays. [FN3] Alleged accounting improprieties concerning HGDS, which were incorporated into the financial statements of Hub Group over a three-year period, gave rise to the instant dispute.

FN2. Intermodal transportation involves shipping by containers which can travel by sea, on land, hitched to an 18-wheel cab, or by rail on a flat-bedded rail truck.

FN3. In at least two Hub Group press releases cited in the complaint, Hub Group distinguishes HGDS from its supply chain logistics business. For example, an October 22, 2001, press release stated in pertinent part: "The two components of logistics, Hub Group Distribution Services and the Company's supply chain logistics services, reported a 4.6% revenue decline and a 31.8% revenue increase, respectively."

According to plaintiffs, both of whom purchased Hub Group securities between April 21, 1999, and February 12, 2002 (the "class period"), defendants overstated HGDS' revenue in an effort to sell HGDS for $65 million, which is more than half of Hub Group's market capitalization. Hub Group's letter of intent to sell its interest in HGDS, signed on March 13, 2000, was terminated shortly thereafter, and this fact was subsequently disclosed in Hub Group's 10Q for the next quarter ending June 30, 2000.

Plaintiff alleges that accounting improprieties and inadequate controls were pervasive at Hub Group, and not limited solely to misstatements of HGDS' revenue:

> According to former employees, often there was great confusion as to how much money was coming in and how much was going out and as to whether various units were making a profit. According to a witness with knowledge of the relevant facts, by February of 1999, it was clear that there were no internal controls whatsoever at the [Hub Group]. Prior to and throughout the Class Period, it was widely recognized within Hub Group that [it] was having enormous problems collecting its accounts receivable. For example, at any given time, the subsidiary had millions of dollars of open receivables that were 90, 120, 160 days old.... HGDS's accounts receivables were so disorganized that the subsidiary would not even try to collect money for its services for months on end, often after customers had complained about the lack of an invoice.... The failure to implement internal controls was consistent throughout the company. According to former employees, the multiple Hubs throughout the Class Period completely failed to reconcile their accounts on an ongoing basis. Hub Group's senior management did not reconcile the balance sheet and other accounts, but instead simply scanned the numbers to see if they seemed reasonable. In addition, for much of the Class Period, there were no inventory control procedures in place at HGDS.

Moreover, plaintiffs maintain that these alleged improprieties were well-known by Hub Group management:

> According to a former Hub Group employee, the Hub Group management, including the individual defendants, was specifically aware that the revenues reported to the SEC by HGDS were inaccurate and overstated. This fact was evidenced by the fact that Hub Group's centralized accounting functions generated a computer generated sheet entitled "Cash Forecast" which was updated daily and posted at the corporate office, ranking the different Hub Group subsidiaries by their cash on hand. These posted reports informed the management at Hub Group that HGDS was not collecting money from its customers. Around headquarters, as a result of the Cash Forecast reports, employees joked that HGDS never made any money, despite the published information to the contrary.

***3** Plaintiffs further allege that Cindy Bee, a Hub Group employee, was responsible for monitoring HGDS' accounting and reporting to Hub Group management, and that senior management was furnished with information regarding accounts receivables, age of outstanding receivables, and credit sales.

In early 2001, Hub Group installed a new Transactional Processing System (TPS), which was

designed to centralize all rail billing, accounting and trace reporting. According to plaintiffs, all accounting was done at central headquarters after the 2001 installation of TPS.

At all times during the class period, Andersen served as Hub Group's auditor. To this end, Andersen's responsibilities included testing of selected transactions, period-end adjusting entries and account analysis, and inquiry and discussion with senior management regarding current and prior period accounting issues, as well as internal controls. Andersen issued unqualified audit opinions with respect to Hub Group's 1999 and 2000 10K's, asserting that the consolidated financial statements fairly presented Hub Group's financial position, in conformity with generally accepted accounting principles (GAAP). These opinions were filed with the SEC on March 29, 2000, and March 15, 2001. Plaintiffs allege that, in conducting these audits, Andersen violated numerous generally accepted auditing standards (GAAS). [FN4]

FN4. In Reiger v. Price Waterhouse Coopers LLP, 117 F.Supp.2d 1003, 1009 (S.D.Cal.2000), the court articulated the difference between GAAP and GAAS as follows: "Generally accepted accounting principles ('GAAP') comprise a set of basic postulates and broad accounting principles pertaining to business enterprises. These principles ... establish guidelines for measuring, recording and classifying the transactions of a business entity. Generally accepted auditing standards ('GAAS') embody the general standards ... for the conduct of auditors in the performance of an examination." (Citations omitted.)

In December 2001, Hub Group underwent an audit to reconcile previously unreconciled intercompany accounts, cash, accounts receivable, fixed assets, and accounts payable. According to one employee, prior to the audit, Hub Group had not required its field accountants to do reconciliations of the balance sheet accounts.

On February 12, 2002, Hub Group announced that it had "discovered certain accounting irregularities at [HGDS] ... [and] estimates that due to these irregularities the Company overstated its earnings on an after-tax, post minority interest basis by between approximately $3.0 million to $4.0 million in total over a multi-year period." The relevant press release also included statements tending to distance HGDS from Hub Group:

> Throughout the years in question, HGDS maintained its own office space, information technology systems and accounting software. Unlike the Company's other subsidiaries which are all wholly-owned and which centralized their accounting functions in Lombard in 2001, HGDS maintains its own accounting departments. The HGDS accounting department regularly reported its financial results to the Company, who then incorporated these results into its financial reports.

After this announcement, Hub Group's common stock price dropped from $10.52 per share to $8.03 per share, a one-day loss of more than 31% on volume of more than 153,700 shares traded, which is more than ten times the average trading volume.

Hub Group was required to restate its financial statements for 1999 and 2000 because those statements had not been prepared in conformity with GAAP and SEC requirements when they were issued. Ultimately, Hub Group adjusted its 1999 net income downward 13% (from $10.846 million to $9.405 million), and its 2000 net income downward 42% (from $4.617 million to $2.683 million), [FN5] and the instant suit ensued.

FN5. Operating costs for 1999 and 2000 were revised upward by $2.4 million and $3.4 million, respectively. Further, accounts receivable for 1999 and 2000 were revised downward by $1.3 million and $2.7 million, respectively, and accounts payable were revised upward by $2.0 million in 1999 and $5.9 million in 2000.

## ANALYSIS

***4** To state a claim for securities fraud under Rule 10b-5, the plaintiff must allege that the defendant, (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries. In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 280 (7 th Cir.1996). The scienter requirement for a Rule 10b-5 claim has been defined as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, n. 12, 96 S.Ct. 1375 (1976).

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Because Rule 10b-5 claims necessarily allege fraud, the heightened pleading standards embodied in Federal Rule of Civil Procedure 9(b) apply, thus requiring the plaintiff to plead the circumstances constituting fraud with particularity. According to the Seventh Circuit, "this means the who, what, when, where, and how: the first paragraph of any newspaper story." DiLco v. Ernst & Young, 901 F.2d 624, 627 (7 th Cir.1990).

Moreover, the Private Securities Litigation Reform Act of 1995 (PSLRA) requires plaintiffs seeking relief under Rule 10b-5 to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Although the Seventh Circuit has not yet articulated what types of facts give rise to an inference of scienter, a majority of courts, especially in this District, have adopted the standard espoused by the Second Circuit. See Lindelow v. Hill, No. 00-C3727, 2001 WL 830956, at *6 (N.D.Ill. July 20, 2001). Under the Second Circuit's test, a plaintiff may meet its burden by alleging either, (1) facts showing the defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. Id. In this context, recklessness requires proof that the defendant's conduct was "highly unreasonable" and involved "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Danis v. USN Communications, Inc., 73 F.Supp.2d 923, 938 (N.D.Ill.1997). Moreover, in determining whether a strong inference of scienter has been established, "a court should not consider each relevant factual allegation solely in isolation ... but rather, as a part of the overall factual picture painted by the complaint." In re Microstrategy, Inc. Sec. Litig, 115 F.Supp.2d 620, 631 (E.D.Va.2000).

In separate motions to dismiss, Hub Group and Andersen each contend that plaintiff has failed to satisfactorily allege scienter [FN6] under the foregoing pleading standards. Because the factual allegations that purportedly establish scienter with respect to each defendant focus on different activities, the court will examine each motion separately.

FN6. Neither Andersen nor Hub Group disputes that plaintiffs have adequately pled the other elements of their Rule 10b-5 claims.

Hub Group's Motion to Dismiss

*5 Plaintiffs assert two bases for demonstrating a "strong inference" of scienter with respect to Hub Group and the individual defendants, as required by the PSLRA. First, plaintiffs argue that the complaint alleges strong circumstantial evidence of conscious misbehavior or recklessness, in part because Hub Group monitored HGDS' financial reporting and thus knew of inaccuracies in its statements. Plaintiffs further allege that management knew both that reconciliations were not done and there were inadequate internal controls throughout Hub Group. Second, plaintiffs assert that the potential $65 million sale of HGDS provided Hub Group with a motive to misstate its financial results during the class period.

In response, Hub Group and the individual defendants dispute plaintiffs' allegations of conscious misbehavior or recklessness, contending that "plaintiffs have not alleged any facts to explain why it is reasonable to assume that [Hub Group executives] who were managing a multi-billion dollar business must have been aware of accounting minutiae at a partially-owned subsidiary that contributed less than 8% of its annual revenues." With respect to plaintiffs' allegations regarding motive and opportunity, Hub Group asserts that the proposed sale of HGDS fell through less than two months after the letter of intent was signed, and that plaintiffs have failed to articulate any other conceivable motive for Hub Group to inflate HGDS' financial results for the remaining eighteen months of the class period. [FN7] The individual defendants further maintain that, because plaintiffs failed to state a claim against Hub Group, the control person liability claims under § 20(a) of the Securities Exchange Act of 1934 against the individual defendants necessarily fail, as well.

FN7. Hub Group also urges the court to take judicial notice of stock purchases made by individual defendants as evidence tending to refute any motive to artificially inflate stock prices. The court declines to take judicial notice of those purchases, however. Moreover, even if the court were to consider those purchases, it would not alter the conclusion that plaintiffs have not met their

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

burden at this stage of the litigation.

The court concludes that plaintiffs' allegations with respect to conscious misbehavior or recklessness, as well as motive and opportunity, are insufficient to withstand Hub Group's 12(b)(6) motion to dismiss. The relatively minor adjustments to the financial misstatements, combined with the vagueness of plaintiffs' allegations regarding the individual defendants' knowledge of inadequate internal controls, does not establish a strong inference of scienter and therefore does not state a claim under Rule 10b-5.

Violations of accounting standards are generally insufficient, standing alone, to create a strong inference of scienter. Geinko v.. Padda, No. 00-C5070, 2001 WL 1163728, at *4 (N.D.Ill. Sept. 28, 2001); In re Allied Products Corp., Inc. Sec. Litig., No. 99-C3597, 2000 U.S. Dist. LEXIS 16781, at *10. Nonetheless, the magnitude and nature of accounting errors may belie a defendant's claim that it was unaware of any improprieties. For example, in Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1256 (N.D.Ill.1997), Judge Moran concluded that the plaintiff had adequately alleged scienter in part by noting that "the more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy." See also Chu v. Sabratek Corp., 100 F.Supp.2d 827, 839-840 (N.D.Ill.2000) (finding strong inference of recklessness when defendants improperly accounted for intangible assets, resulting in overstatement of earnings by $39 million); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir.2000) (finding strong inference of recklessness when restatement of expenses led to operational loss of $25 million in one year).

***6** In the instant case, the restatement of Hub Group's net income in 1999 and 2000 involved substantial downward revisions: 13% in 1999 and 42% in 2000. Hub Group points out in its motion to dismiss, however, that the adjustments to revenue were less substantial. For example, the 2002 restatement "caused Hub Group's total 2000 revenue to be reduced by only $1.5 million, which is less than one-tenth of one percent of the Company's total revenues for the year of $1.383 billion ... and approximately one percent of HGDS' $110 million in revenues reported in 2000." (Emphasis in original.)

Moreover, according to Hub Group's press release, which was quoted in the complaint, HGDS' accounting functions were always maintained separately from the other Hub Group subsidiaries, such that any accounting irregularities are attributable to HGDS alone, rather than the recklessness of Hub Group management. [FN8] As support for its position, Hub Group cites Chill v. General Electric, 101 F.3d 263 (2d Cir.1996), which it maintains is virtually indistinguishable from the instant case.

FN8. The court notes that Hub Group's public attempts to distance itself from HGDS arose after its acknowledgment of accounting irregularities, not before.

In Chill, the Second Circuit upheld the district court's 12(b)(6) dismissal of a securities fraud action against General Electric (GE), due to the plaintiffs' failure to adequately plead scienter. Id. at 266. That case arose when GE incorporated financial misstatements from Kidder, Peabody & Co. (Kidder), one of twenty-four businesses comprising GE Capital (which, in turn, is one of General Electric's twelve major, separately managed businesses). These misstatements involved a scheme of "phantom" trades by an employee at Kidder, which resulted in a $350 million overstatement of profits between late 1991 and March 1994. Id. In upholding the district court, the Second Circuit noted that fraud cannot be inferred "simply because GE might have been more curious or concerned about the activity at Kidder," and concluded that recklessness cannot be presumed from a parent company's reliance on its subsidiary's internal controls. Id. at 270-271.

Although Chill is not binding authority on this court, its reasoning is nonetheless persuasive. In the instant case, Hub Group owns 65% of HGDS, which performs niche logistics services on behalf of Hub Group's intermodal clients. Although the magnitude of the downward revisions of net income in the instant case are indeed substantial--13% in 1999 and 42% in 2000--and belie Hub Group's characterization of HGDS as a stand-alone, inconsequential subsidiary, the court cannot conclude that management must have, or should

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

have, recognized the accounting errors at issue. Indeed, in the instant case, the actual adjustments to accounts receivable, accounts payable and total shareholder's equity were considerably smaller than those alleged in Chill. In the Hub Group's restatement for 1999, for example, accounts receivable were reduced by 0.7%, accounts payable were increased by 1.4%, and total shareholder's equity was reduced by 1.0%. Though not insubstantial, these figures do not suggest that management's conduct was "highly unreasonable" or involved "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Danis, 73 F.Supp.2d at 938.

*7 Plaintiffs have also alleged a pervasive lack of controls throughout Hub Group, presumably to bolster their claims that management was reckless in allowing, or perhaps not detecting, the accounting irregularities at issue. [FN9] To this end, plaintiffs provide vague allegations regarding management's knowledge of improprieties with inventory and accounts receivable, seemingly conflating HGDS and Hub Group throughout the complaint. For example, at one point, plaintiffs allege, "[I]t was widely recognized within Hub Group that the Company [Hub Group] was having enormous problems collecting its accounts receivable. For example, at any given time, the subsidiary had millions of dollars of open receivables that were 90, 120, 160 days old." (Emphasis added.) Moreover, although the crux of plaintiff's complaint is that HGDS' revenues, as reported by Hub Group to the SEC, were materially overstated, plaintiffs nonetheless allege that the "Hub Group management, including the individual defendants, was specifically aware that the revenues reported to the SEC by HGDS were inaccurate and overstated." [FN10] (Emphasis added.)

FN9. Plaintiffs also allege that HGDS' cash forecasts suggested that it was not making any money. The court notes, however, that cash forecasts are distinct from revenues, and that a company may indeed post significant revenues without being awash in cash.

FN10. The court also notes that the source of this statement was "a former Hub Group employee." Although plaintiffs are entitled to plead upon information and belief, the court is troubled by plaintiffs' failure to identify the source of this allegation, as well as others, with greater particularity. See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir.2000) (finding that heightened pleading requirements of PSLRA are satisfied when allegations in complaint are based on either adequate documentary evidence or personal sources who are identified with sufficient detail "to support the probability that a person in the position occupied by the source would possess the information alleged").

Plaintiffs also fail to distinguish adequately between HGDS and the "hubs." At one point in the complaint, plaintiffs cite to a "monthly metrics reporting package which ranked the 'Hubs' in terms of performance" as evidence of management's knowledge regarding HGDS' finances, notwithstanding the fact that HGDS was not "hub" but rather was a stand-alone subsidiary engaged in a distinct line of business. Plaintiffs' allegations regarding the centralized accounting of Hub Group's subsidiaries are similarly deficient. For example, as confirmation of "centralized control of management over Hub Group's various divisions and subsidiaries," plaintiffs cite an article published on the University of Chicago's Graduate School of Business website during the winter of 2000, which stated that "David Yeager [MBA '97] just completed a five year consolidation of the Hub Group, turning a loosely connected network of 35 independent branches into a more tightly controlled system managed at company headquarters." Four pages later in the complaint, however, plaintiffs contradict this allegation by quoting the following language from Hub Group's February 12, 2002, press release, which belies their earlier allegations regarding Hub Group's centralization of HGDS' accounting:

> Throughout the years in question, HGDS maintained its own office space, information technology systems and accounting software. Unlike the Company's other subsidiaries which are all wholly owned and which centralized their accounting function in Lombard in 2001, HGDS maintains its own accounting department. The HGDS accounting department regularly reported its financial results to the Company, who then incorporated these results into its financial reports. [Emphasis added.]

Plaintiffs' failure to adequately distinguish

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

between Hub Group, its "hubs," and HGDS undermines the court's ability to decipher the contours of plaintiffs' allegations, and prevents the court from finding a strong inference of scienter on the part of Hub Group with respect to its overstatement of HGDS' revenues. Of course, the court recognizes that plaintiffs in a securities class action are constrained by an obvious inability to access underlying information that is uniquely and exclusively within the possession of defendants. See, e.g., In re First Merchants Sec. Litig., No. 97-C2715, 1998 U.S. Dist. LEXIS 17760, at *22 (N.D.Ill. November 2, 1998) ("The fact that Plaintiffs do not have all of the specific documents to support their claims at this time is not fatal to their complaint."). Nonetheless, the factual allegations asserted by plaintiffs in the instant case are simply too vague and conclusory to convince this court that plaintiffs have established a strong inference of scienter, based on circumstantial evidence of conscious misbehavior or recklessness.

***8** Plaintiffs' allegations regarding opportunity and motive are similarly unavailing. Plaintiffs allege that Hub Group's plan to sell HGDS for $65 million, which is more than one-half of Hub Group's market capitalization, motivated management to misstate HGDS' revenues. The plaintiffs do not dispute, however, that within two months of signing the letter of intent, Hub Group terminated its plan to execute the sale. This fact was promptly disclosed in Hub Group's next 10Q, and plaintiffs have not alleged that Hub Group contemplated subsequent sales or courted other purchasers at any other point during the class period. Moreover, as stated earlier, Hub Group readily conceded in press releases during the relevant time period that HGDS' revenues were down, thus belying a strong inference that Hub Group intended to dupe potential acquirers.

Because the defects in the complaint discussed above lead the court to conclude that plaintiffs have failed to adequately plead recklessness or motive and opportunity that would provide a strong inference of Hub Group's scienter under the PSLRA, Hub Group's 12(b)(6) motion to dismiss is granted without prejudice. Moreover, because Rule 10(b)-5 liability is a predicate to § 20(a) liability, see, e.g., Geinko, 2001 WL 1163728, at *9, the latter claims against individual defendants must also be dismissed.

Andersen's Motion to Dismiss

According to plaintiffs, in its audit of Hub Group, "Andersen persistently refused to see the obvious, to investigate the doubtful, and its accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts." More specifically, plaintiffs allege that Andersen violated GAAS because it "knew or recklessly disregarded the existence of a variety of material weaknesses in [Hub Group's] internal controls but failed to quantify the severity of those weaknesses." Plaintiffs contend that these GAAS violations, taken together with several "red flags" that signaled inadequate controls at Hub Group, provide a strong inference of scienter that is sufficient to withstand Andersen's 12(b)(6) motion.

In response, Andersen maintains that plaintiffs have failed to plead with sufficient particularity the facts giving rise to Andersen's alleged recklessness. To the extent that the complaint attributes knowledge of "red flags" to the defendants, Andersen maintains that such knowledge was attributed solely to Hub Group management, not Andersen. The crux of Andersen's argument is that alleged malfeasance by Hub Group management should not be imputed to Andersen simply because it was Hub Group's auditor. Morever, Andersen contends that to the extent plaintiffs have adequately alleged scienter, plaintiffs' claims against it are barred as to purchases of Hub Group stock made before March 29, 2000, the date on which Andersen filed its unqualified audit opinion with the SEC (as part of Hub Group's 1999 10-K). [FN11]

FN11. In their response to Andersen's motion to dismiss, plaintiffs did not address the latter argument.

***9** For the reasons discussed below, the court concludes that plaintiffs have not adequately pled scienter and grants Andersen's motion to dismiss.

As noted above, in the context of securities fraud, recklessness requires proof that the defendant's conduct was "highly unreasonable" and involved "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Danis, 73 F.Supp.2d at 938 (N.D.Ill.1997). As applied

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

specifically to outside auditors, this requirement has been interpreted to mean that "the accounting practices amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts ." First Merchants, 1998 U.S. Dist. LEXIS 17760, at *29 (citations omitted).

Allegations of GAAP and GAAS violations, standing alone, are generally insufficient to meet this higher pleading standard. Nonetheless, such violations are relevant to prove scienter when the complaint also identifies "red flags," or specific, highly suspicious facts and circumstances available to the auditor at the time of the audit, and alleges that these facts were ignored, either deliberately or recklessly. See, e.g., In re SmarTalk Teleservices Sec. Litig., 124 F.Supp.2d 505, 515 (S.D.Ohio 2000).

Applying this higher standard, some courts have concluded that "the failure of a non-fiduciary accounting firm to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.2000). See also Reiger, 117 F.Supp.2d at 1009, n. 5 (allegation that the audited company had weak internal accounting controls was a "boilerplate" red flag, present in almost every securities fraud action, and did not meet particularity and strong inference requirements of PSLRA).

The court finds that the inadequate internal control mechanisms and lack of reconciliations repeatedly emphasized by plaintiffs fail to meet this higher pleading standard. Plaintiffs have merely alleged a number of GAAS and GAAP violations, without identifying any red flags that would suggest that Andersen was indeed reckless. Further, as noted in the court's discussion of Hub Group's motion to dismiss, the nature and magnitude of accounting errors at issue in the instant case are not so egregious as to merit a strong inference of recklessness.

To the extent that plaintiffs have provided any persuasive authority for their position, the court concludes that those cases are inapposite. For example, in Miller v. Material Sciences Corp., 9 F.Supp.2d 925 (N.D.Ill.1998), in which the defendant was the company itself, rather than an independent auditor, the plaintiffs alleged that an employee-controller artificially increased the value of the company's inventory and underreported accounts payable, thus inflating earnings. Id. at 927. In denying the defendant company's motion to dismiss for failure to adequately plead scienter, the court noted that the employee accused of falsely inflating inventory had previously received poor performance reviews, a controller at another division of the defendant company had engaged in similar misconduct before, and that discrepancies between inventory and financial documents were discussed repeatedly at quarterly business reviews. Id. at 928.

***10** For a number of reasons, the instant case is distinguishable from Miller. First, and most important, Miller did not involve an independent auditor as the defendant. As noted in Reiger, an independent accountant's relationship with his client "does not impute the accountant with knowledge of every idiosyncratic detail associated with the client's business." Reiger, 117 F.Supp.2d at 1009. Moreover, the allegations of red flags in Miller were far more specific, and hence suspicious, than anything alluded to by the plaintiffs in the instant case. Miller did not involve simply a misapplication of accounting principles, but rather significant discrepancies that were identified and discussed at length, on more than one occasion.

Plaintiffs' reliance on In re Oxford Health Plans, Inc. Sec. Litig., 51 F.Supp.2d 290 (S.D.N.Y.1999), is also misplaced. In Oxford, the court denied the defendant auditor's motion to dismiss for failure to adequately plead scienter, finding a strong inference of recklessness with respect to its disregard of "extreme accounting irregularities, particularly Oxford's complete lack of internal controls and utterly ineffective computer system." Id. at 294. In reaching this conclusion, the court pointed to a number of "red flags," including the fact that an investigation of Oxford by the New York State Insurance Department found that Oxford's internal controls and accounting practices were deficient, resulting in a $3 million fine and a recommendation that the two leaders of the auditing team be removed. Id. at 295. Plaintiffs'

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

characterization of the instant case as "analogous" is entirely without merit.

Indeed, in most cases in which courts have been willing to find a strong inference of scienter, the plaintiffs have pointed to far more suspicious circumstances than those alleged here, and often included allegations that the defendant accountant had reason to know of the accounting irregularities. See, e.g., Danis, 73 F.Supp.2d at 942 (finding inference of recklessness when auditor was "brought on specifically to evaluate [company's] internal accounting and billing controls and to design a system for their improvement"); Retsky v. Price Waterhouse, 1998 WL 774678, at *10 (N.D.Ill. Oct. 21, 1998) (finding strong inference of scienter when plaintiff alleged that "the accounting firm was aware of the financial irregularities in each contract, noted in each case the GAAP which barred revenue recognition, and specifically concluded in at least one case that the premature revenue recognition ultimately taken was inappropriate"). The allegations in the instant case are simply insufficient to give rise to a strong inference of scienter.

For the foregoing reasons, the court concludes that plaintiffs have not pled scienter against Andersen with sufficient particularity to withstand the instant 12(b)(6) motion to dismiss. Thus, Andersen's 12(b)(6) motion to dismiss is granted without prejudice.

CONCLUSION

***11** For the foregoing reasons, the court grants Hub Group's and Andersen's motions to dismiss without prejudice, and grants plaintiff leave to file an amended complaint on or before November 22, 2002. This matter is set for a report on status November 26, 2002 at 9:00 a.m.

2002 WL 31415721 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# R

United States District Court,
N.D. California.

**Peter RUDOLPH, individually and on behalf of all others similarly situated,**
**v.**
**UTSTARCOM, Hong Liang Lu, Ying Wu, Michael Sophie, Francis Barton, and THomas Toy, Defendants.**

**No. C 07-04578 SI.**

April 14, 2008.

Christine Pedigo Bartholomew, Mark Punzalan, Finkelstein Thompson LLP, San Francisco, CA, Donald J. Enright, Finkelstein Thompson LLP, Washington, DC, Elizabeth K. Tripodi, Attorney at Law, Washington, DC, for Plaintiff.

Bahram Seyedin-Noor, Boris Feldman, Cheryl Weisbard Foung, Terry T. Johnson, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Bryan Jacob Ketroser, Wilson Sonsini Goodrich & Rosati, San Francisco, CA, for Defendants.

Ashley Kim, Christopher Lometti, Jay P. Saltzman, Schoengold Sporn Laitman & Lomett, P.C., New York, NY, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA, for Movant.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS COMPLAINT

SUSAN ILLSTON, District Judge.

***1** Defendants have filed a motion to dismiss plaintiff's complaint. The motion is scheduled for hearing on April 18, 2008. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument, and hereby VACATES the hearing. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court hereby GRANTS defendants' motion to dismiss.

BACKGROUND [FN1]

This is a securities class action against UTStarcom and certain of its officers and directors under Sections 10(b), 14(a), 20(a), Rule 10b-5, and Rule 14a-9 of the Securities Exchange Act of 1934 (the "Exchange Act"). The case is brought by lead plaintiff Peter Rudolph on behalf all purchasers of UTStarcom securities between September 4, 2002, and July 24, 2007 ("the class period").

UTStarcom is a publicly-traded company based out of Alameda, California, which "manufactures, integrates and supports IP-based, end-to-end networking and telecommunications solutions." In layperson's terms, UTStarcom sells broadband wireless and Internet television products. On November 7, 2006, the company issued a press release announcing that it had begun to review its prior practices concerning the granting of stock options. On February 1, 2007, defendants issued a second press release stating that this review was ongoing, but that the review had revealed that the company had used incorrect measurement dates for certain stock option grants. In another announcement on May 16, 2007, defendants stated that the use of improper measurement dates likely meant that the company failed to report roughly $35 million in non-cash compensation. In a press release dated July 24, 2007, defendants revised that amount to $28 million. Based on these disclosures, plaintiff alleges that defendants engaged in a fraudulent scheme of intentionally backdating stock options. Plaintiff alleges that by backdating stock options, defendants overstated the company's net income and earnings, thereby artificially inflating the stock price. Specifically, plaintiff alleges that 17.9 million stock options out of a total of 28.8 million stock options granted by defendants between 2000 and 2005 had incorrect measurement dates. Of these 17.9 million, 7.6 million had exercise prices that were higher than the prices on the actual grant date, while 10.3 million had exercise prices that were lower than the prices on the actual grant date. That is, 10.3 million of the backdated stock options were "in-the-money" options because they had intrinsic value on the day they were granted, while 7.9 million of the backdated options actually left the grantees with a loss on the day they were granted. Plaintiff further alleges that once the backdating scheme was revealed to the public through the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

company's restatements, the price of UTStarcom stock declined to the detriment of investors in the class. After defendants' November 7, 2006 announcement that it had commenced a voluntary review of its stock option practices, UTStarcom stock fell 9%, from $10.23 on November 7, 2006, to $9.32 on November 9, 2006. In addition, after defendants' July 24, 2007 announcement of the likely $28 million restatement (in addition to other negative news), UTStarcom stock fell 22%, from $4.73 on July 22, 2007, to $3.70 on July 25, 2007.

***2** Plaintiff filed this lawsuit on September 4, 2007, and filed an amended complaint on January 25, 2008. Now before the Court is defendants' motion to dismiss the amended complaint in its entirety.

LEGAL STANDARD

I. Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir.1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. See United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir.1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir.2000) (citations and internal quotation marks omitted).

II. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a 3 fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In order to state a claim under section 10(b) and Rule 10b-5, the plaintiff must allege (1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately caused the alleged loss. See Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir.1999).

III. Heightened pleading standard for § 10(b) claims

***3** A securities class action alleging violation of § 10(b) of the Exchange Act must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) and the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). The Federal Rules of Civil Procedure require that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Federal securities fraud claims, like common law fraud claims, are subject to the special pleading requirements of Rule 9(b). Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir.1985). To comply with

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Rule 9(b) in a securities action, a plaintiff must allege the time, place, and content of the alleged fraud, as well as the "circumstances indicating falseness" or "the manner in which [the] representations [or omissions at issue] were false and misleading." In re GlenFed Sec. Litig., 42 F.3d 1541, 1544 (9th Cir. 1994) (en banc) (alterations in the original).

The PSLRA was enacted as an amendment to the Exchange Act. See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 973 n. 2 (9th Cir.1999). Under the PSLRA:

> In any private action arising under his chapter under which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). The required state of mind is "at a minimum, deliberate recklessness." In re Silicon Graphics, 183 F.3 at 983. Scienter may be pled and proven by reference to circumstantial evidence. See In re Peoplesoft Sec. Litig., 2000 WL 1737936, *3 (N.D.Cal. May 25, 2000). However, when pleading on information and belief, a plaintiff must plead with "particularity" by "provid[ing] all facts forming the basis for [plaintiff's] belief in great detail." In re Silicon Graphics, 183 F.3d at 983; see also 15 U.S.C. § 78u-4(b)(1). Therefore, the Reform Act has strengthened the pleading requirements of Rule 9(b).

IV. Section 14(a) and Rule 14a-9

To establish a claim under § 14(a) of the Exchange Act, plaintiffs must allege that some part of a proxy statement "contain[s] any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not misleading ...." 17 C.F.R. § 240.14a-9; see also Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir.2000). The requisite state of mind under this section is negligence. See In re McKesson HBOC, Inc. Sec. Litig., 126 F.Supp.2d 1248, 1263 (N.D.Cal.2000); Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir.1988); Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281-1301 (2d Cir.1973).

IV. Request for judicial notice

*4 Generally, when considering a motion to dismiss, a district court must consider only the facts stated in the plaintiffs' complaint, or in documents attached to the complaint as exhibits or incorporated into the complaint by reference. Under certain circumstances, the court may also consider matters that are appropriate subjects of judicial notice under Federal Rule of Evidence 201. Kramer v. Time Warner, 937 F.2d 767, 773 (2d Cir.1991). While the general rule is that "[m]atters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss," in a securities action a court may also consider documents that the defendant has attached to its motion to dismiss either as exhibits or accompanied by a request for judicial notice, Weiner v. Klais and Co., Inc., 108 F.3d 86, 88 (6th Cir.1997).

DISCUSSION

I. Motion to dismiss Section 10(b) claims

Defendants move to dismiss plaintiff's § 10(b) and Rule 10b-5 claim. Defendants do not take issue with plaintiff's allegations regarding certain elements of a § 10(b) claim, but focus on whether plaintiff has failed to adequately plead loss causation and scienter. The Court finds that plaintiff has adequately plead loss causation but has not adequately plead scienter.

A. Loss causation

A plaintiff bringing a securities claim must show some causal connection between the alleged fraud and the securities transaction in question. In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir.2005). "[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." Id. (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

Plaintiff alleges that "two specific pronouncements from the Company," AC at ¶ 146, revealed the truth about defendants' fraudulent backdating practices

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and caused a decline in UTStarcom's stock prices. The first pronouncement relied upon by plaintiff is the November 7, 2006 press release announcing that the company had "commenced a voluntary review of its historical equity award grant practices." Id. at ¶ 147. Following this announcement, stock prices fell from $10.23 to $9.32. Id. Defendants argue that this press release cannot support the element of loss causation because an announcement of an internal investigation, without more, does not reveal to the market that prior statements made by the company were untrue. The press release specifically stated that "no conclusions have been reached about whether the Company will need to record any non-cash adjustments to its financial statements related to prior equity grants." Ketroser Decl. ex. A. [FN2] The Court finds that at that point in time, prior to any revelation by defendants of actual backdating, the "true nature of [the company's] financial condition had not yet been disclosed." Daou Sys., 411 F.3d at 1027. The Court therefore agrees with the other courts that have reached this question that the announcement of an internal investigation cannot support an allegation of loss causation. See, e.g., In re Hansen Natural Corp. Sec. Litig., 527 F.Supp.2d 1142, 1162 (C.D.Cal.2007) (rejecting loss causation based on a similar announcement because "the November 6, 2006, press release simply stated that Hansen had formed a Special Committee to conduct an investigation into the same matters the SEC was investigating"); Weiss v. Amkor Tech., Inc., 527 F.Supp.2d 938, 947 (D.Ariz.2007); see also In re Avista Corp. Sec. Litig., 415 F.Supp.2d 1214, 1221 (E.D.Wash.2005) ("[T]he announcement by a regulatory agency that it intends to investigate is insufficient, on its own, to plead loss causation.").

*5 The second pronouncement upon which plaintiff relies is the July 24, 2007 press release that announced, among other things, "the preliminary results of its review of historical equity award practices, requiring the Company to restate approximately $28 million of non-cash compensation expenses over the years 2000 through 2006." AC at ¶ 148. Following this announcement, stock prices fell from $4.73 to $3.70. Id. Defendants argue that this disclosure cannot support the element of loss causation because (1) other information in the July 24 release could have caused stock prices to drop, and (2) in comparison to prior press releases regarding the ongoing stock option investigation, the news announced on July 24 was actually positive, not negative. As to defendants' first argument, the Ninth Circuit has made clear that "[a] plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation." Daou Sys., 411 F.3d at 1025 (quoting Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 n. 5 (11th Cir.1997)). Rather, the misrepresentation need only be one substantial cause of the stock's decline. Id.

As to defendants' second argument, they are correct that the company announced, prior to July 24, 2007, that previous financial statements should no longer be relied upon and that the company would need to restate additional non-cash compensation charges of approximately $50 million, on February 1, 2007, and then $35 million, on May 16, 2007. See id. at ¶¶ 16, 17, 115. In comparison to restatements of $50 million and $35 million, it could be argued that $28 million was actually good news, but the Court finds that plaintiff has adequately pled loss causation based on the July 24, 2007 disclosure because this disclosure was significantly more definite than the prior disclosures. The February 1, 2007 disclosure, for instance, stated that the "investigation is on-going," that "the Company is not yet able to determine with finality the amount of additional non-cash stock-based compensation charge to be recognized," and that the $50 million restatement was "based on preliminary information." Id. at ¶ 16. By contrast, the July 24, 2007 disclosure was cast in far more definitive terms. Although it did state that the results were preliminary and approximate, it did not state that the investigation was ongoing or that the Company was not able to make a final determination. See Ketroser Decl. at ex. D. The Court finds this disclosure sufficient to satisfy the pleading requirements for loss causation. Accordingly, the Court GRANTS defendants' motion to dismiss as to the November 7, 2006 press release, and DENIES defendants' motion to dismiss as to the July 24, 2007 press release.

B. Scienter

"[T]he PSLRA requires that the Complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' or scienter." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1230 (9th Cir.2004) (quoting 15 U.S.C. § 78u-4(b)(2)). This inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard ." Tellabs, Inc. v. Makor Issues & Rights, Ltd., --- U.S. ----, ----, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). Here, the required state of mind is at least "deliberate recklessness," meaning recklessness that "reflects some degree of intentional or conscious misconduct." Nursing Home Pension Fund, 380 F.3d at 1230 (internal quotation marks omitted). The PSLRA's heightened pleading standard requires the plaintiff to plead "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct," Silicon Graphics, 183 F.3d at 974, such that the inference of scienter is "more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations," Tellabs, 127 S.Ct. at 2510.

***6** " '[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.' " DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir.2002) (quoting In re Software Toolworks Inc., 50 F.3d 615, 627 (9th Cir.1994)); see also Hockey v. Medheker, 30 F.Supp.2d 1209, 1224 (N.D.Cal.1998) ("Merely alleging that fraudulent accounting practices have occurred, without more, does not create a strong inference of scienter."). "Rather, to plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent." Morgan v. AXT, Inc., 2005 WL 2347125, * 14 (N.D.Cal. Sept.23, 2005) (citing DSAM Global Value Fund, 288 F.3d at 390-391). Similarly, the signing of quarterly certifications of financial statements mandated by the Sarbanes-Oxley Act does not, without more, support an inference of scienter. See In re Hypercom Corp. Sec. Litig., 2006 WL 1836181 *11 (D.Ariz. July 5, 2006) ("However, an incorrect Sarbanes-Oxley certification does not, by itself, create a strong inference of scienter."); In re Invision Techs., Inc. Sec. Litig., 2006 WL 538752 *7 n. 3 (N.D.Cal. Jan.24, 2006); In re Watchguard Sec. Litig., 2006 WL 2038656 *11 (W.D.Wash. April 21, 2006); Morgan v. AXT, Inc., 2005 WL 2347125 *15 (N.D.Cal. Sept.23, 2005). In addition, courts in this Circuit have held that general allegations of intent based upon generalized financial motives are insufficient to establish scienter. See, e.g., Kane v. Madge Networks N.V., 2000 WL 33208116, *11 (N.D.Cal. May 26, 2000) (holding that motive to avoid stock dilution is a motive for fraud, but would not create a "strong inference" of scienter); In re PETsMART, Inc. Sec. Litig., 61 F.Supp.2d 982, 999 (D.Ariz.1999).

Here, plaintiff's scienter pleading is based on numerous factual allegations, many of which cannot support--either alone or taken collectively--an inference of scienter. For instance, plaintiff relies on the company's admission in its restatement that some options had been backdated, defendants' responsibility for approving stock option grants, defendants' certification of the company's financial reports, and defendants' receipt and exercise of backdated stock options. As shown in the cases cited above, none of these factual allegations is cogent and compelling, see, e.g., DSAM Global Value Fund, 288 F.3d at 390-91, because each could equally support the inference that stock options had been backdated through innocent bookkeeping error, see In re CNET Networks, Inc., 483 F.Supp.2d 947, 955-56 (N.D.Cal.2007); Nach v. Baldwin, 2008 WL 410261, *4, 7 (N.D.Cal. Feb.12, 2008). This is particularly so where a full 7.6 million stock options--or 42% of all incorrectly-dated stock options--were backdated to dates that left the recipients in the red on the date they were granted. AC at ¶ 120. Thus, plaintiff must point to other facts which provide cogent and compelling evidence of deliberate recklessness or intentional misconduct, rather than innocent bookkeeping error. Plaintiff cannot make that showing based on a statistical analysis of the likelihood that UTStarcom's stock options were deliberately backdated because plaintiff points to only two or three specific grant dates that fell on days when stock prices were particularly low, see id. at ¶ 61, without providing any evidence of the total number of grant dates or other information to place these grant dates in context, see In re Openwave Sys. Inc. Shareholder Derivative Litig., 503 F.Supp.2d 1341, 1348, 1350-51 (N.D.Cal.2007); Nach, 2008 WL 410261 at *5-6.

***7** Instead, plaintiff relies on the observations of two confidential witnesses, who apparently can confirm that defendants actively and intentionally

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

backdated stock option grants in order to provide additional compensation to senior executives. AC at ¶¶ 57-60, 62. The statements of these witnesses, in combination with plaintiff's other allegations, might be sufficient to survive defendants' motion to dismiss. The problem, as defendants point out, is that plaintiff has not provided sufficient information about these confidential witnesses. Courts in this District have rejected statements by confidential witnesses in which, as is the case here, only the witness' job title and period of employment was provided. See, e.g., In re Northpoint Comm Group, Inc. Sec. Litig., 184 F.Supp.2d 991, 1001 (N.D.Cal.2001) (finding that use of eight confidential witnesses could not overcome the PSLRA's particularity requirement where the complaint did not describe the witnesses' duties or how they learned the information in the complaint); In re Network Assocs., Inc. Sec. Litig., 2003 WL 24051280, *9 (N.D.Cal. March 25, 2003). One example of a case in which plaintiffs provided sufficient information about each confidential witness is In re Adaptive Broadband Sec. Litig., 2002 WL989478 (N.D.Cal. Apr. 2, 2002). In that case, the court found that plaintiffs provided sufficient detail where the complaint set forth information including the period during which the witness had been employed, a clearer explanation of the witness' job duties, and how the witness came to know the information he or she describes. Plaintiffs must reveal all facts about that witness that were material to the formation of their belief that the witness' statement is accurate. See In re Secure Computing Corp. Sec. Litig., 120 F.Supp.2d 810, 817 (N.D.Cal.2000). At the very least, plaintiff must describe the witnesses' period of employment, what the witnesses' job duties were, their expertise, and how they had access to the information being provided.

In short, the Court agrees with defendants that plaintiff's complaint, as written, fails to adequately plead scienter. Plaintiff must either provide additional information about the confidential witnesses, or put forth other evidence demonstrating that defendants intentionally engaged in backdating or acted with deliberate recklessness. In so doing, plaintiff must plead facts showing that each individual defendant acted with scienter, not only the one or two defendants currently implicated by the confidential witnesses. See Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 364-65 (5th Cir.2004); In re Silicon Storage Tech., Inc., 2006 WL 648683 *21-22 (N.D.Cal. March 10, 2006) ("Until such time as the Ninth Circuit does speak on this issue, this court interprets the above-cited provision of the PSLRA as requiring that plaintiffs plead facts showing scienter as to each defendant individually."). For these reasons, the Court GRANTS defendants' motion to dismiss plaintiff's first cause of action.

II. Motion to dismiss Section 14(a) claim

***8** Defendants next argue that plaintiff's claim under Section 14(a) of the Exchange Act must be dismissed for multiple reasons. Section 14(a) and Rule 14a-9 "disallow the solicitation of a proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." Desaigoudar, 223 F.3d at 1022. In addition, a plaintiff bringing a claim under this section "must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." Id.

Defendants first argue that plaintiff fails to identify any false or misleading statements contained in defendants' proxies. The PSLRA requires that a securities fraud plaintiff must identify each misleading statement when seeking relief under § 14(a). Id. at 1023; 15 U.S.C. § 78u-4(b)(1). In response to defendants' motion, plaintiff points to sections of his complaint that state that "UTStarcom's annual Proxy Statements for fiscal years 2002 through 2006 contained false statements about the compensation of UTStarcom's officers," AC at ¶ 66, and that "Defendants negligently omitted the material facts about option grant backdating and negligently misrepresented the terms of the Individual Defendants' compensation and management integrity," id. at ¶ 164. Defendants are correct that plaintiff's complaint manifestly fails to identify what statements in the proxies are alleged to have been misleading. Merely stating that the proxies "contained false statements" obviously does not comply with the PSLRA. In addition, to the extent plaintiff also argues that defendants violated § 14(a) by omitted material facts, plaintiff must provide additional details about what facts were omitted and must identify what statements in the proxies were rendered misleading by virtue of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

defendants' material omission.

Second, defendants argue that plaintiff's complaint fails to satisfy the "essential link" element of a § 14(a) claim. Plaintiff must allege that defendants' misleading statements or omissions were an "essential link" in the accomplishment of the transaction proposed in the proxy statement. Desaigoudar, 223 F.3d at 1022. Plaintiff essentially concedes that the complaint, as written, does not allege the essential link element, and instead makes new arguments in his opposition brief regarding his injury and the essential link. The Court will not consider these new allegations, but will instead permit plaintiff to amend his complaint to include the necessary allegations. The Court does not reach any of defendants' other contentions regarding the essential link element.

Third, defendants argue that plaintiff's complaint fails to plead that defendants acted negligently. Plaintiff relies solely on his showing of defendants' scienter to plead that defendants acted negligently. See Plaintiff's Opposition at 24. As discussed above, the Court finds that plaintiff fails to adequately plead scienter. Accordingly, if plaintiff chooses to amend his complaint to plead scienter, the Court will consider whether plaintiff's new allegations adequately allege defendants' negligence.

***9** Finally, defendants argue that plaintiff's § 14(a) claim is partially time-barred as it relates to proxy statements filed in 2003 and 2004. Plaintiff does not dispute the proxy dates on which defendants rely, but instead argues that defendants rely on the wrong statute of limitations. The statute of limitations for claims brought under § 14(a) "is one year from the discovery of the occurrences giving rise to the claim, but no later than three years from the date of the violation." In re Verisign, Inc., Derivative Litig., 531 F.Supp.2d 1173, 1212 (N.D.Cal.2007); see also Westinghouse Elec. Corp. by Levit v. Franklin, 993 F.2d 349, 353 (3d Cir.1993); Stoll v. Ardizzone, 2007 WL 2982250, *2 (S.D.N.Y. Oct.9, 2007). On the other hand, pursuant to the Sarbanes-Oxley Act, the statute of limitations for a cause of action "that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" is two years after discovery or five years after the violation. 28 U.S.C. § 1658(b). Plaintiff argues that the Court should apply the longer statute of limitations for fraud claims. The Court disagrees. Plaintiff provides no citation for this proposition, and every court that has considered the issue, including courts in this district, has held that § 1658(b) does not apply to claims brought under § 14(a). See, e.g., Verisign, 531 F.Supp.2d at 1212 ("A Section 14(a) claim is not a claim that 'sounds in fraud' under the Sarbanes-Oxley Act of 2002, so its statute of limitations was not extended by 28 U.S.C. § 1658(b) (2)."). Indeed, the Third Circuit recently rejected plaintiff's argument because § 14(a) claims do not require proof of fraudulent intent. In re Exxon Mobil Corp. Sec. Litig., 500 F.3d 189, 196-97 (3d Cir.2007) ("[W]e conclude that Congress did not intend to include § 14(a) claims within the scope of § 1658(b), but rather intended that provision to apply to § 10(b) claims and other claims requiring proof of fraudulent intent."). The Third Circuit also explicitly rejected the argument, also made by plaintiff here, that even if § 1658(b) does not apply generally to § 14(a) claims, it might apply to particular § 14(a) claims that sound in fraud. Id. at 197-98. For these reasons, the Court holds that the applicable statute of limitations is three years. Plaintiff filed this complaint on September 4, 2007, making his § 14(a) claim time-barred as to proxy statements issued on April 2, 2003, August 22, 2003, and April 7, 2004. Should plaintiff wish to amend his complaint, he may move forward on his § 14(a) claim with regard to the later-issued proxies.

For these reasons, the Court GRANTS defendants' motion to dismiss the § 14(a) claim for failure to comply with the PSLRA.

III. Motion to dismiss Section 20(a) claim

Because plaintiff has not adequately alleged a primary violation of federal securities laws, the Court also GRANTS defendants' motion to dismiss plaintiff's claim for control person liability under § 20(a). See Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1035 n. 15 (9th Cir.2002) ("[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b-5.").

CONCLUSION

***10** For all of the foregoing reasons, the Court hereby GRANTS defendants' motion to dismiss

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

plaintiff's complaint [Docket No. 54]. Should he wish to do so, plaintiff may file an amended complaint no later than May 16, 2008.

IT IS SO ORDERED.

FN1. The following background facts are taken from the allegations of plaintiffs' complaint, which for purposes of this motion, must be taken as true.

FN2. The Court GRANTS defendants' request for judicial notice.

2008 WL 1734763 (N.D.Cal.), Fed. Sec. L. Rep. P 94,643

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# S

Circuit Court of Maryland,
Baltimore City.

**SEKUK GLOBAL ENTERPRISES PROFIT SHARING PLAN, Plaintiff,**
**v.**
**Herve A. KEVENIDES, et al., Defendants.**
**Charles D. Hoffman, et al., Plaintiffs,**
**v.**
**Donald J. Rechler, et al., Defendants.**
**Robeta Chirko, Plaintiff,**
**v.**
**Reckson Associates Reality Corp., et al., Defendants.**

**Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010.**

May 25, 2004.

MEMORANDUM OPINION

EVELYN OMEGA CANNON, Judge.

***1** This is a shareholder derivative action challenging the business judgment of the Independent Directors in approving a series of transactions involving the sale of a New York industrial portfolio to members of the Rechler family (herein referred to as the "Transaction"). The action is the consolidation of three lawsuits brought on behalf of shareholders of Reckson Associates Reality Corp. ("Reckson Associates") alleging substantially the same facts and claims. [FN1] On October 29, 2003, Plaintiff Sekuk Global Enterprises Profit Sharing Plan ("Sekuk"), which brought the first of these actions, moved for a temporary restraining order or preliminary injunction to enjoin the Transaction but decided not to forward on the motion.

FN1. On October 16, 2003, Plaintiff Sekuk Global Enterprises Profit Sharing Plan filed a complaint. On October 27, 2003, Charles D. Hoffman and Lydia J. Hoffman filed a complaint and on October 30, 2003, Roberta Chirko filed her complaint. On October 31, 2003, the cases were designated for the Business and Technology Case Management Program.

On January 20, 2004, Plaintiffs in all the actions filed a Consolidated Amended Complaint ("Complaint") alleging that Defendants breached their fiduciary duties of care, reasonable inquiry, oversight, good faith, supervision and loyalty. [FN2] The Independent Directors, Chairman of the Board Emeritus Walter Gross, and nominal defendant Reckson Associates Realty Corp. have filed Motions to Dismiss alleging that all of the claims are derivative and that Plaintiffs failed to make a demand on the Board to take remedial action before filing suit and failed to allege facts to show that making a demand would have been futile.

FN2. The first of several shareholder derivative suits in response to the sale of certain industrial properties to the Rechlers was filed in the Supreme Court of New York, County of Nassau, on September 16, 2003. Lowinger v. Rechler, et al., Index No. 03-014162 (Warshawsky, J.). Two additional suits were filed in Supreme Court of New York, County of Suffolk, on October 2 and 3, 2003. There are three consolidated actions pending in the United States District Court for the Eastern District of New York, the first of which was filed on September 26, 2003. Tucker, et al. v. Rechler, et al., Case Nos. 03-CV-4917, 03-CV-4917, 03-CV-5008 and 03-CV-5718 (Platt, J.).

STATEMENT OF FACTS

Reckson Associates, along with Reckson Operating Partnership, L.P. and its affiliates, operates as a real estate investment trust that owns, develops and manages offices and industrial properties in New York Tri-State area. The Rechler family founded Reckson Associates which is a Maryland Corporation. Plaintiffs Sekuk, Charles D. and Lydia J. Hoffman, and Roberta Chirko have owned equity securities in Reckson Associates at all times relevant to this action.

As of September 10, 2003, Reckson Associates had eleven voting directors. Five of those directors--Donald Rechler, Gregg Rechler, Roger Rechler, Mitchell Rechler, and Scott Rechler (the "Rechler Defendants")--were part of the Rechler family and served as executive officers of Reckson Associates. The Independent Directors, who were not members of the Rechler family, included Ronald H. Manaker

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

("Menaker"), Peter Quick ("Quick"), Herve A. Kevenides ("Kevenides"), Conrad D. Stephenson ("Stephenson"), Lewis S. Ranieri ("Ranieri"), and John V.N. Klein ("Klein"), and Walter Gross ("Gross"), who has served as Chairman of the Board Emeritus since the formation of Reckson Associates. Thus the Independent Directors made up a majority of the eleven-member Board of Directors.

On September 10, 2003, Reckson Associates announced a strategic plan that involved the sale of certain industrial properties to the Rechler family, the resignation of several Rechler family members from executive management and board positions, and various other corporate governance changes. In connection with this strategic plan, the Reckson Operating Partnership agreed to sell 95 industrial properties on Long Island (the "industrial properties") to the Rechler family for approximately $315.5 million--roughly $225.1 million in cash and debt assumption and $90.4 million in Reckson Operating Partnership units (3,932,111 units, valued by Citigroup at $23,00. per unit). The Transaction provided that the Rechler family would no longer own any Reckson Operating Partnership units. In addition, Gregg, Roger, and Mitchell Rechler were to resign as officers and directors, and Donald Rechler was to resign from management but still serve as non-executive Chairman of the Board. Reckson Associates was to settle some pre-existing financial obligations to the four resigning Rechlers.

***2** The Transaction was reviewed by the Independent Directors, who, in turn, engaged Citigroup to provide a detailed fairness opinion for a special committee of the Board. All of the Directors voted to approve the Transaction.

DISCUSSION

"In reviewing the grant of a motion to dismiss pursuant to Maryland Rule 2-322(b)," the Court must assume "the truth of all well pleaded facts and all inferences that can reasonably be drawn from [them]." Bennett Heating & Air Conditioning, Inc. v. Nations Bank, 103 Md.App. 749 (1995), rev'd in part on other grounds, 342 Md. 169 (1996). "Any ambiguity or want of certainty in [the] allegations must be construed against the pleader," Manikhi v. Mass Transit Admin., 360 Md. 333,345 (2000) (internal citations omitted) because in "moving to dismiss, a defendant is asserting that, even if the allegations of the complaint are true, the plaintiff is not entitled to relief as a matter of law." Hrehorovich v. Harbor Hosp. Ctr., 93 Md.App. 772, 784 (1992). "Thus, in considering a motion to dismiss for failure to state a claim, the circuit court examines only the sufficiency of the pleading." Id. "The complaint should not be dismissed unless it appears that no set of facts can be proven in support of the claim set forth therein." Bennett, 103 Md.App. at 749. Thus, all of the facts considered in this Opinion are drawn from the Complaint and the Court did not consider any of the documents or affidavits filed by any of the parties.

It is well-established that courts will not ordinarily consider a derivative action by a shareholder on behalf of a corporation "until it appears that the intra corporate remedies have been unsuccessfully pursued by the complaining stockholder," which means that "generally speaking, the complaining stockholder must make a demand upon the corporation itself to commence the action, and show that this demand has been refused or ignored." Parish v. Milk Producers Assn., 250 Md. 24, 81-82 (1968). Because no such demand was made by Plaintiffs, Defendants urge that the complaint must be dismissed.

Noting that a shareholder derivative suit "necessarily intrudes upon the managerial prerogatives ordinarily vested in the directors," and because such actions may be abused by "disgruntled shareholders," the Court of Appeals recently adopted a strict pre-suit demand requirement for derivative actions. Werbowsky v. Collomb, 362 Md. 581, 600 (2001). The Court noted that in most instances, the pre-suit demand "is not an onerous requirement" and explained that the demand requirement provides an opportunity for the directors--"even interested, non-independent directors" to consider, or reconsider the disputed issue. Id. at 619. After receiving a demand, the Directors may decide "to seek the advice of a special litigation committee of independent directors ... or they may decide ... to accede to the demand rather than risk embarrassing litigation." Id. at 619.

***3** The Court noted that a futility exception often "assures extensive and expensive judicial wrangling over a peripheral issue that may result in preliminary determinations regarding director culpability that, after trial on the merits, turn out to

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

be unsupportable," id. at 600-02, whereas if a demand is made and refused, it can be reviewed under the business judgment rule standard. Id. In recognition of this fact, the Court crafted a "very limited" exception, id., and held that a demand is futile only when the allegations "clearly demonstrate, in a very particular manner" that:

(1) making a demand, or the delay in waiting for a response to the demand, "would cause irreparable harm to the corporation; " or

(2) a majority of the directors are so personally and directly conflicted or committed to the disputed decision that they cannot reasonably be expected to respond to a demand in good faith and in accordance with the business judgment rule.

Id. at 620. (emphasis added).

In Werbowsky, the Court affirmed the trial court's grant of summary judgment on the basis that a demand was not excused. Although Werbowsky involved a summary judgment, the Court made clear that the same standard applies to a motion to dismiss: "[o]bviously, if the complaint fails to allege sufficient facts which, if true, would demonstrate the futility of a demand, it is entirely appropriate to terminate the action on a motion to dismiss." Id. at 620-21.

Thus in determining whether to grant the motion to dismiss, the Court must determine whether Plaintiffs have alleged facts that "clearly demonstrate, in a very particular manner" that: (1) the issuance of a demand, or the delay in waiting for a response to the demand would have caused irreparable harm to Reckson Associates, or (2) a majority of the directors were "so personally and directly conflicted or committed to the decision ... that they could not have reasonably been expected to respond to a demand in good faith and within the ambit of the business judgment rule." Id. at 620.

1. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT MAKING A DEMAND OR AWAITING THE BOARD'S RESPONSE WOULD HAVE CAUSED IRREPARABLE HARM.

It is unclear whether Plaintiffs contend that making a demand, or awaiting the Board's response would have caused irreparable harm, but it is clear that the Complaint fails to clearly demonstrate "irreparable harm." Parties may not create their own irreparable harm. See, e.g., Quince Orchard Valley Citizens Ass'n v. Hodel, 872 F.2d 75,79 (4th Cir.1989) (affirming district court's denial of a preliminary injunction because "much of [plaintiffs'] potential harm was a product of its own delay in pursuing this action."). See also, e.g., Vantico Holdings S.A. v. Apollo Mgmt, 247 F.Supp.2d 437, 454 (S.D.N.Y.2003) (asserting that "[plaintiff] cannot rely on its own actions to create the risk of irreparable injury which it then seeks to avoid by the issuance of a preliminary injunction."); Minzer v. Keegan, 1997 U.S. Dist LEXIS 16445, at *18 (E.D.N.Y. Sept. 22, 1997) ("Because preliminary injunctions are predicated upon 'urgent need for speedy action,' delay in seeking the remedy suggests that the remedy is not really needed or that the harm is not really irreparable.") (citations omitted).

***4** The sale of the industrial properties was announced on September 10, 2003, with an expected closing date in the fourth quarter of 2003. Plaintiffs could have made a demand on the Board on September 11th or shortly thereafter. Instead Plaintiffs filed the first of these consolidated cases on October 16th, over five weeks later and over four weeks after another Reckson Associates shareholder brought virtually the same derivative suit in New York (see note 2.). When Plaintiffs decided to not go forward on their request for injunctive relief, they effectively conceded that there was no irreparable harm.

Finally, "irreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate," and Plaintiffs have failed to allege that they could not be adequately compensated for any breach through an award of money damages. Chestnut Real Estate P'ship v. Huber, 148 Md.App. 190, 205 (2002) (citation omitted)). See also Coster v. Department of Personnel, 36 Md.App. 523, 526 (1977) ("an injury is irreparable ... where ... it cannot be readily, adequately, and completely compensated for with money") (citation omitted).

In sum, Plaintiffs have failed to "clearly demonstrate, in a very particular manner" that "a demand, or a delay in awaiting a response to a demand, would [have] cause[d] irreparable harm to the corporation." Werbowsky, 362 Md. at 620.

2. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT A

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

MAJORITY OF THE DIRECTORS ARE SO PERSONALLY AND DIRECTLY CONFLICTED THAT THEY COULD NOT HAVE REASONABLY BEEN EXPECTED TO RESPOND TO A DEMAND IN GOOD FAITH AND WITHIN THE AMBIT OF THE BUSINESS JUDGMENT RULE.

In support of their argument that Defendants were conflicted, Plaintiffs allege that Defendants were hand picked to sit on the Board by the Rechlers; had social and business relationships with the Rechlers; had a history of taking steps to protect the interests of the Rechlers at the expense Reckson Associates; and that after approval of the Transaction, the Board instituted a number of corporate governance changes to protect the Company from these alleged conflicts.

Werbowsky makes clear that a demand will not be excused lightly. Thus a conflict is not shown simply by alleging that the directors "were chosen ... at the behest of controlling stockholders." 362 Md. at 618. Nor will it be excused because "a majority of the directors approved or participated in some way in the challenged transaction or decision," or based on "allegations that [the directors] are conflicted or are controlled by other conflicted persons." Id. In fact a simple allegation that the directors will be "hostile to the action" is not sufficient to excuse a demand. Id. Because "[d]irectors are presumed to act properly and in the best interest of the corporation," id. at 618-19, a conflict will not be found based on "non-specific or speculative allegations of wrongdoing." Id. at 619.

*5 As the Court noted in Danielewicz v. Arnold, 137 Md.App. 601, 631 (2001), Werbowsky requires that a complaint "demonstrate, [any alleged conflict by the directors] ... 'in a very particular manner.' " (emphasis added). In Danielewicz, the directors were the plaintiff's husband, a director the Court assumed arguendo was conflicted, and the alleged conflicted director's son. Id. at 629. The Court held that the allegations of a conflict were "conjecture and speculation ." Id. at 631. The Court assumed the plaintiff's husband would have responded to her demand, and in reference to the conflicted director's son held that the plaintiff "has not presented sufficient evidence indicating that he would not have responded to [the plaintiff's] demand." Id. at 631. Thus evidence of familial relations, without more, is not sufficient to excuse a demand.

Nor is "[e]vidence of personal and/or business relationships" sufficient to excuse a demand even under the more permissive Delaware standard. [FN3] Kohls v. Duthie, 765 A.2d 1274, 1284 (Del.Ch.2000) (citation omitted). There the Court held that the fact that the company's president, CEO, and inside director provided a summer job to an outside director when he was in business school and also played a role in his board appointment, did not show that the outside director lacked independence. Id. Nor was a conflict shown by alleging that a director had previously voted in favor of a generous cash severance payment that was paid to the CEO, despite the fact that the latter did not leave or change his job with the company. Kohls v. Duthie, 765 A.2d 772, 781 (Del. Ch.2000). See also Orman v. Cullman, 794 A.2d 5, 28 (Del. Ch.2002) (holding that outside director's former affiliation with the underwriter of a company's initial public offering and its present investment bank did not render director non-independent).

FN3. Because the requirement for pleading and proving demand futility articulated in Werbowsky is so recent, there are few Maryland cases applying it. The Delaware cases holding that a demand was not futile are helpful because the Delaware standard is more permissive and excuses a demand where Maryland would not. Delaware looks to determine if the facts alleged create a reasonable doubt that "(1) the directors are disinterested and independent, and (2) the challenged transaction was the product of a valid exercise of business judgment." Werbowsky, 362 Md. at 593 citing Pogostin v. Rice, 480 A.2d 619, 624 (Del.1984).

The requirement of specific evidence of an actual conflict was recently reiterated in Beam v. Stewart, 845 A.2d 1040 (Del.2004). In rejecting the plaintiff's argument that a demand was futile because of an alleged conflict the Court stated that "to render a director unable to consider a demand, a relationship must be of a bias-producing nature. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." Id. at 1050 (emphasis added). One of the allegations in Beam was that one of the directors (i) was a long-standing personal friend of the controlling stockholder and the president and chief operating officer; (ii) had a prior business relationship with the company (through his

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

position at Sears, which marketed a substantial volume of the company's products); and (iii) was recruited for the board by a longtime personal friend of the controlling director. Id. at 1045. The Court held that "[a]llegations that Stewart [the controlling stockholder] and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power," failed to rebut the presumption of independence. Id. at 1051. The Court made clear that an inference of a conflict that excuses a demand must be such that "the non-interested director would be more willing to risk his or her reputation than risk the relationship with the interested director." Id. at 1052.

PLAINTIFFS' ALLEGATIONS OF ALLEGED CONFLICT

***6** Plaintiffs allege that four of the seven Independent Directors had specific conflicts and that all seven were conflicted because they had a history of approving financial deals and payments to the Rechlers that favored the Rechlers and harmed Reckson Associates.

MENAKER

Plaintiffs allege that Menaker worked for JP Morgan & Co. Inc. ("JP Morgan") from 1966-99 holding various positions, including president, and that when he retired in 1999 he was managing director and head of Corporate Services of JP Morgan & Co. Inc. of New York. J.P. Morgan is the administrative agent that oversees the group of 14 banks that provides Reckson Associates a $500 million line of credit. A portion of the proceeds of the sale of the industrial properties was earmarked by Reckson Associates to pay down a portion of that outstanding credit facility. Assuming that J.P. Morgan benefitted from the Transaction because of a pay down of the credit facility, these facts do not show that Menaker had a conflict.

QUICK

Plaintiffs allege that Quick worked for Quick and Reilly, Inc. from 1982 to 2000, and that Quick and Reilly is now an affiliate of Fleet Boston Financial which does mortgage and financial business with Reckson Associates. This past and indirect business relationship fails to establish a conflict.

RANIERI

Plaintiffs allege that Ranieri was a former vice president of Salomon Brothers, Inc., which was one of the underwriters of Reckson Associates' 1996 public offering, and that Salomon Smith Barney (Salomon Brothers' successor), later merged into Citgroup, which participated in the valuation of the industrial properties. Plaintiffs also allege that a company related to Ranieri is a tenant in one of Reckson Associates' 178 properties. There are no allegations that the terms of the lease were unfair or not at arm's length. Plaintiffs also allege that Ranieri was "hand-picked" by the Rechlers. None of these allegations provide a factual basis of a conflict that would excuse a demand.

KLEIN

Plaintiffs allege that Klein assisted the late William Rechler and Defendant Gross in developing the first industrial park on Long Island when Klein was Smithtown's Supervisor in the 1960s, and that from 1988 Klein served as counsel to the Association for a Better Long Island (the "Association"), an organization founded by Donald Rechler, of which he was a former president and chairman of the board. The fact that 40 years ago, Mr. Klein, in his capacity as a town administrator, may have helped another Rechler family member--who is now deceased--and defendant Gross--in their pursuit of a successful business venture is not evidence of a conflict. Nor does the fact that he is or was counsel to an organization founded by Donald Rechler. [FN4]

FN4. Plaintiffs allegation that "from at least 1988, Klein acted" as counsel, makes it impossible to determine if Plaintiffs are alleging that he is still counsel. Thus, for purposes of this motion, the Court assumes that he still is counsel.

GROSS

As discussed in the proceeding paragraph, Plaintiffs allege that in 1961, Gross together with the late William Rechler, and Defendant Klein, conceived and developed Vanderbilt Industrial Park on Long Island. This allegation is not sufficient to

show a conflict

HAND-PICKED BY THE RECHLERS AND HISTORY OF APPROVING FINANCIAL TRANSACTIONS

*7 Plaintiffs allege Gross, Klein, Kevenides, Stephenson and Ranieri were "hand-picked" by the Rechlers. For the reasons discussed above, that allegation does not show that there was a conflict. Plaintiffs also allege that Gross, Kevenides, Stephenson and Ranieri had a history of consistently approving financial deals, and the payment of millions of dollars in employment benefits to the Rechlers, which served no legitimate business and hurt the company. These allegations do not show a conflict under the cases discussed above and are simply an indirect way to attack the business judgment of these Directors, which is not properly considered in determining demand futility. See discussion below at page 14.

NO ALLEGATIONS OF A CONFLICT

In sum, Plaintiffs have failed to "clearly demonstrate, in a very particular manner" that the Directors were "so personally and directly conflicted" that they could not have been reasonably "expected to respond to a demand in good faith." Werbowsky, 362 Md. at 620.

3. PLAINTIFFS' ALLEGATIONS FAIL TO CLEARLY DEMONSTRATE THAT A MAJORITY OF THE DIRECTORS WERE SO COMMITTED TO THE DECISION THAT THEY COULD NOT HAVE REASONABLY BEEN EXPECTED TO RESPOND TO A DEMAND IN GOOD FAITH AND WITHIN THE AMBIT OF THE BUSINESS JUDGMENT RULE.

Plaintiffs argue that the Directors were "so ... committed to the decision ... that they could not have reasonably been expected to respond to a demand in good faith and within the ambit of the business judgment rule." Werbowsky, 362 Md. at 620. In support of their arguments, Plaintiffs allege that the Defendants acted in bad faith and outside the ambit of the business judgment rule; that they had already committed the proceeds of the Transaction; and that the Directors would have been subject to personal liability if they did not go forward on the Transaction.

BAD FAITH AND OUTSIDE BUSINESS JUDGMENT RULE

The Werbowsky Court held that in determining if a demand was futile, a court should not address "issues that go to the merits of the complaint B whether there was, in fact, self dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack." 362 Md. at 620. Thus a demand is not excused by allegations that the "[d]efendants' approval of the [t]ransaction constitutes a breach of both their common law and statutory duties." Therefore, Plaintiffs' allegations that the Transaction was "facially inadequate, and unfair to Reckson" is not properly considered in determining the narrow issue of demand futility.

THE PROCEEDS WERE ALREADY COMMITTED

Plaintiffs argue that a demand was too late once the decision was announced because Rcskson Associates was committed at the time of the September 10th announcement to use the funds received to purchase 1185. According to Plaintiffs, "Defendants are asking the Court to find that the decision and subsequent negotiations to purchase 1185 occurred only after the September 10th announcement of the Transaction, and therefore, reflected a wholesale change in Reckson's business strategy concerning use of the Transaction's proceeds." To the contrary, Plaintiffs argue that the decision to buy 1185 was "irretrievably" made before the proposed Transaction.

*8 Because this is a Motion to Dismiss, the Court is not basing its decision upon either of those suppositions but only on the allegations in the Complaint. In Paragraph 15, Plaintiffs allege that an agreement to purchase 1185 was made on November 10th:

> On November 10, 2003, Defendants entered into an agreement to purchase the office building at 1185 Avenue of the Americas in New York ("1185"), which it could not otherwise close upon without the proceeds from the sale of the Industrial Portfolio, which were used as a contract deposit for the purchase of that property.

Arguing that in order to sign a contract on November 10th for property in Manhattan, the deal had to have been negotiated long before then, Plaintiffs ask this Court to ignore the allegation in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Paragraph 15 of the Complaint. As further evidence that the deal was complete at the time of the September 10th announcement, Plaintiffs point to an alleged representation made on November 4, 2003 by one of Defendants' attorneys at a scheduling conference. [FN5]

FN5. Plaintiffs claim that one of the Defendants' attorneys represented to the Court at the November 4, 2003 scheduling conference that absent an injunction, the Transaction was scheduled to close immediately due to the necessity to use the funds to purchase 1185. Defendants dispute this allegation. Because this was not a hearing, and no request was made, the scheduling conference was not recorded. For the reasons discussed above, the Court finds it unnecessary to decide what was or was not said.

However, neither the facts alleged in the Complaint nor the facts that Plaintiffs ask the Court to assume show that Defendants were so committed to the decision that they could not respond to a demand in good faith and within the ambit of the business judgment rule. Under the facts alleged in the Complaint, which the Court must accept as true for purposes of ruling on a motion to dismiss, the contract to purchase 1185 was entered into on November 10th, which was after the suit was filed and 2 months after the announcement of the Transaction. Under the facts Plaintiffs ask the Court to assume that negotiations to purchase property is not an "irretrievable commitment." Defendants may well have decided to purchase 1185 with the proceeds of the Transaction but that "decision" would not have prevented the Board from responding to a demand in good faith and within the ambit of the business judgment rule. [FN6] Finally, Plaintiffs fail to explain how they were excused from making a demand on September 11th based on facts they learned on November 4th.

FN6. Frankly it would be difficult to conclude that Defendants were "irretrievably committed" even if there had been a contract to purchase 1185 signed simultaneously with the contract to enter into the Transaction. Contracts are broken regularly.

The Werbowsky Court noted that "a pre-suit demand on the directors is not an onerous requirement." 362 Md. at 619. In fact, the making of such a demand is far less onerous than the preparation and filing of a shareholder derivative complaint B a task that lawyers for nine different plaintiffs, including the three Plaintiffs before this Court, managed to accomplish in far less than two months.

LACK OF FIDUCIARY OUT CLAUSE

Plaintiffs point out that the Transaction with the Rechlors had no fiduciary out clause that would allow the Directors to exit the contract if faced with a challenge to the Director Defendants' decision to approve the sale. If the Directors subsequently terminated the contract, the beneficiaries of the contract, in particular the Rechler family members who were not directors of Reckson Associates, could have brought suit against Reckson Associates for breach of contract. And if such a suit was filed and won, Plaintiffs contend that Reckson Associates would in turn sue the Independent Directors for contribution and the Directors' and Officers' ("D & O") insurance coverage would probably not cover any judgement against the directors and officers because D & O policies commonly contain an "insured versus insured" exclusion. That exclusion would preclude the insurance carrier from paying for any breach of contract claim by Reckson Associates against its own directors. Thus, such a suit would expose the Independent Directors to "ruinous personal liability," and thus they would not respond to any demand in good faith and within the ambit of the business judgment rule.

***9** In Werbowky one of the allegations was that "it was likely that, by reason of language in the corporation's directors' and officers' liability insurance policies, the corporation would be precluded from bringing an action against the directors." 362 Md. at 590. See also id. at 592. Although the issue was not directly addressed by the appellate court, that Court noted that the trial court had "rejected the notion, drawn from Edge Partners, L .P. v. Dockser, 944 F.Supp. 438 (D.Md.1996), that a lack of insurance coverage for named directors can excuse a demand." 362 Md. at 594. Based on the rationale of Werbowsky, this Court concludes that that when it does directly address the issue, the Court of Appeals will most likely follow the lead of other courts which have held that an insured-versus-insured provision does not excuse a pre-suit demand. See, e.g., In re Prudential Ins.Co. Derivative Litig., 659 A.2d 961, 973 (N.J. Ch. Ct.1995) ("routine excuse of demand based on the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

existence of such standard exclusions would eviscerate the demand requirement"); Stoner v. Walsh, 772 F.Supp. 790, 805 (S.D.N.Y.1991) (rejecting argument that liability insurance policy exclusion rendered board "interested").

Plaintiffs' reliance on Rales v. Blasband, 634 A.2d 927, 936 (Del.1993) does not suggest a different result. First, as discussed previously Delaware excuses a demand where one would be required by Maryland. See note 3. Second, even the Rales Court recognized that the "mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors...." Id. at 936 (citing Aronson v. Lewis, 473 A.2d 805, 815 (1984). Third, the Plaintiffs do not include allegations concerning the lack of a fiduciary out clause and the inclusion of an insured-versus-insured provision.

Finally this argument is based on a lot of "ifs," "ands,' and "buts." It assumes that if a demand had been made, the Outside Directors would have decided to delay or terminate the contract with the Family Group [FN7]; if the contract with the Family Group was delayed or terminated, the Family Group would not renegotiate the contract, but file suit to enforce the contract; if suit were filed, Reckson Associates would be found liable for the contract damages; if Reckson Associates were found liable, it would sue the directors for contribution; if Recskon Associates sued the Directors for contribution, the suit would be successful; and if it is successful the Directors would not be covered by insurance. And finally and most importantly based on that potential liability, the Directors would not have considered a demand in good faith and within the ambit of the business judgment rule. Well as my mother often said, "if 'if' were a skiff, we'd all drown."

FN7. The Family Group is members of the Rechler family who, according to the allegations in the Complaint, "controlled" Reckson Associates' Board.

CONCLUSION

For all the reasons stated above, the Court will enter an order granting the Independent Director Defendants' and Walter Gross's Motion to Dismiss and Reckson Associates Realty Corporation's Motion to Dismiss.

2004 WL 1982508 (Md.Cir.Ct.), 2004 MDBT 4

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# T

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

**Fred SPAGNOLA, individually, and on behalf of all those similarly situated, Plaintiff,**
**v.**
**THE CHUBB CORPORATION, Federal Insurance Company, Great Northern Insurance Company, John D. Finnegan, and, Thomas F. Motamed, Defendants.**

**No. 06 Civ. 9960(HB).**

March 27, 2007.

OPINION & ORDER

Hon. HAROLD BAER, JR., District Judge.

*1 Fred Spagnola ("Plaintiff") brings this putative class action for breach of contract against The Chubb Corporation ("Chubb"), Federal Insurance Company ("FIC"), Great Northern Insurance Company ("Great Northern"), John D. Finnegan ("Finnegan"), and Thomas F. Motamed ("Motamed") (collectively, "Defendants").

The Amended Complaint [FN1] alleges five separate causes of action: (1) breach of contract; (2) violation of N.Y. INSURANCE LAW § 3425; (3) violation of N.Y. GENERAL BUSINESS LAW § 349; (4) unjust enrichment; and (5) injunctive relief. Defendants have moved to dismiss Plaintiff's complaint against all Defendants pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons that follow, Defendants' Motion to Dismiss is GRANTED in its entirety.

FN1. Plaintiff has amended his complaint on at least two occasions since this case was first removed from state court--November 30, 2006 and December 29, 2006.

I. FACTUAL BACKGROUND

Plaintiff and his wife purchased an extended replacement cost homeowner's insurance policy ("Policy") [FN2] issued by Defendant Great Northern for a one-year term in 2001. [FN3] Compl. ¶ 11. The Policy states that Great Northern would pay the costs of reconstruction "even if this amount is greater than the amount of coverage shown in [Plaintiff's] policy." Policy at B-1. In light of fluctuating "reconstruction costs," [FN4] the Policy provides that, with the insured's consent, the insurer may change the coverage amount "when appraisals are conducted and when the policy is renewed, to reflect current costs and values." Id. Thereafter, for five consecutive years, and with knowledge that the premium was raised in each of those years, Plaintiff paid the sought for premium, and the Policy was renewed.

FN2. The Masterpiece Policy offers three different types of coverage: (1) an "extended replacement cost" policy where the insurer pays the cost of reconstruction even if that cost exceeds the insured's amount of coverage; (2) a "verified replacement cost" policy where the insurer pays only the reconstruction cost up to the specified amount of coverage; and (3) a "conditional replacement cost" policy where the insurer pays only a portion of the reconstruction costs which cannot exceed the amount of coverage. Policy at B-1 and B-2.

FN3. During oral argument, Plaintiff noted that he purchased Great Northern's insurance policy through a broker. This information is irrelevant to the disposition of this motion.

FN4. According to the Policy, the "reconstruction cost" is defined as the "amount required at the time of loss to repair or rebuild the house whichever is less, at the same location, with the same quality of materials and workmanship which existed before the loss." Policy at B-1. Such costs will vary to the extent that improvements have been made on the home (Id.) and, logically, as the costs of construction materials fluctuate (e.g., wood, labor, etc.).

Defendant Great Northern is one of several insurance companies within the "Chubb Group" of insurance companies, and the company who issued Spagnola's Masterpiece Policy. Compl. ¶ 11. The Chubb Corporation, the overarching parent of the Chubb Group and the companies within, is named as

a Defendant in this case. Id. ¶ 12. Plaintiff alleges that the Chubb Corporation established uniform contract language and practices that were of "material assistance in the perpetration of the wrongs" complained of and that "participation in the creation of contracts and practices with respect to their implementation, make [ ] it a party to the policies between [Plaintiff and Defendant Great Northern]." Id. ¶¶ 18, 20. Defendant FIC is the largest of the insurance companies within the Chubb Group, and manages the other companies. Id. ¶ 13. Plaintiff asserts that there is significant overlap between senior management of the Chubb Corporation, FIC and Great Northern, and that the three share the same principal place of business. Id. ¶¶ 13, 14.

Plaintiff also names two executives individually--John D. Finnegan, the President, CEO and Director of Chubb, Chairman of the Board and CEO of FIC, and Thomas F. Motamed, Vice Chairman and COO of Chubb, and President of FIC. Plaintiff alleges that each has participated, aided and abetted or conspired in the wrongs alleged in the Complaint. Id. ¶¶ 21-22.

## II. STANDARD OF REVIEW

*2 Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the movant must establish that the plaintiff has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, this Court must construe all factual allegations in the complaint in favor of the non-moving party. See Krimstock v. Kelly, 306 F.3d 40, 47-48 (2d Cir.2002). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir.2004) (quoting McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir.2004)). The court's consideration is normally limited to facts alleged in the complaint, documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. Leonard F. v. Israel Discount Bank, 199 F.3d 99, 107 (2d Cir.1999) (citation omitted). However, "even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002) (citations and internal quotations omitted). [FN5]

FN5. The Court has reviewed the Complaint, all moving papers, opposition, and exhibits, including Policy forms.

## III. DISCUSSION

I address Plaintiff's allegations against Defendant Great Northern first, followed by a discussion of the remaining corporate and individual Defendants.

### Claims Against Great Northern

a. Count I: Breach of Contract

The Policy explicitly addresses the "Amount of Coverage":

> With your consent, we may change this amount when appraisals are conducted and when the policy is renewed to reflect current costs and values.
>
> During the policy period, the amount of coverage will be increased daily to reflect the current effect of inflation. At the time of a covered loss, your amount of house coverage will include any increase in the United States Consumer Price Index from the beginning of the policy period ...

Policy at B-1 (emphasis added). With respect to "consent" and "renewal," the insurer (or its agent):

> ... may offer to renew this policy at the premiums and under the policy provisions in effect at the date of renewal. We can do this by mailing you a bill for the premium ... along with any changes in the policy provisions or the amounts of coverage. If you do not accept our offer, the policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal premium when due shall mean that you have not accepted our offer.

Id. at Y-1 (emphasis added).

Plaintiff claims that Great Northern breached the terms of the Policy by improperly increasing coverage (and premiums) (1) without the consent of the insured, (2) in excess of the Consumer Price Index ("CPI"), and (3) in violation of the Policy's stated adherence to New York Insurance Law § 3425. [FN6] Compl. ¶¶ 103-13. In the alternative, Plaintiff states that the Policy is a contract of

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

adhesion and, therefore, to the extent its terms are "ambiguous," New York law requires construction in Plaintiff's favor. Id. at ¶¶ 114-15; Pl's Opp. to Defs' Mot. to Dismiss at 10-11. Defendants, in turn, argue that Plaintiff's claim fails for at least three reasons: (1) the alleged contractual terms on which he sues do not exist; (2) his current objection to past premiums are barred by his repeated, voluntary payment of them and (3) the filed rate doctrine bars recovery. Defs' Mem. in Support of Mot. to Dismiss at 8-9.

FN6. The Court will address this assertion in the following section.

*3 Plaintiff's first contention, that Defendant breached the terms of the insurance Policy is unsustainable because the contract terms upon which he sued do not exist and the Policy terms which do address his claims are not ambiguous. This Court declines to "read an ambiguity into [the Policy] because one of the parties [has] become[ ] dissatisfied with its position under the plain terms of the agreement." Yucyco, Ltd. v. Republic of Slovenia, 984 F.Supp. 209, 222 (S.D.N.Y.1997) (citation omitted). "Clear and unambiguous terms should be understood in their plain, ordinary, popular and nontechnical sense." National Union Fire Ins. Co. v. Cohen, No. 92-CV-9500 (LMM), 1994 U.S. Dist. LEXIS 18456, *13 (S.D .N.Y. Dec. 23, 1994) (citation omitted). The Policy explicitly notifies the insured that (1) Great Northern may increase coverage and premiums annually (Policy at B-1), (2) the amount of such increases will "reflect current costs and values," (Id.) (defined as the "reconstruction costs" on the same page, not the CPI (Id.)), (3) Great Northern will provide an annual bill for the premium with any changes in policy provisions or coverage (Id. at Y-1), (4) payment of the annual premium reflects the insured's consent (Id.), and (5) the CPI applies to interim period adjustments (Id. at B-1).

Further, Plaintiff's breach of contract claim is barred by the voluntary payment doctrine which "bars recovery of payments voluntarily made 'with full knowledge of the facts.' " Newman v. RCN Telecom Servs., Inc., 238 F.R.D. 57, 79 (S.D.N.Y.2006) (noting that the doctrine would bar recovery by internet subscribers who, alleging slower than advertised service, continued to pay for and use the (citations omitted); Gimbel Bros. v. Brook Shopping Ctrs., Inc., 499 N.Y.S.2d 435, 439 (N.Y.1986) ("When a party intends to resort to litigation in order to resist paying an unjust demand, that party should take its position at the time of the demand, and litigate the issue before, rather than after, payment is made."). See also CJS Payment § 104 (West 2007) ("Except where otherwise provided by statute, a person generally cannot recover money he or she has voluntarily paid, with full knowledge of all the relevant facts, and without any unjust enrichment, fraud, duress, or extortion ... This rule exists to protect persons who have had unsolicited "benefits" thrust upon them, and places upon a party who wishes to challenge the validity or legality of a bill for payment the obligation to challenge the bill either before voluntarily making payment, or at the time of voluntarily making payment."). Defendants correctly point out that Plaintiff had full knowledge of the facts regarding coverage and premium at the time of his first renewal in 2002 and yet continued (without objection) [FN7] to pay increased premium amounts on each of the five succeeding anniversary dates. Plaintiff could have elected, at any time, not to pay the premium and, thereby terminate coverage with Great Northern, and could have searched for a new provider within a well-developed insurance market. It is a little late now, after he has enjoyed the benefits and protections of Great Northern's coverage for more than five years, to come by and successfully challenge the propriety of such coverage. Plaintiff's claim for breach of contract must be dismissed. I need not address Defendants' argument in support of dismissal on the basis of the filed rate doctrine.

FN7. The Complaint does not allege, nor did Plaintiff's counsel offer at oral argument any facts to indicate that Plaintiff made any affirmative objection(s) to the Policy before filing this suit.

b. Count II: Violation of N.Y. Insurance Law § 3425

*4 Plaintiff argues that Great Northern violated N.Y. INSURANCE LAW §§ 3425(d)(1) and (e) because, in his view, pursuant to those sections, the Defendant (1) could not condition the renewal of the policy on the insured's acceptance of the increased premiums for the first three years of the Policy (§ 3425(e)) and (2) thereafter, was required to issue a written notice explaining the reasons for the conditional renewal (§ 3425(d)(1)). Defendants

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

argue that §§ 3425(d)(1) and (e) are inapplicable to Plaintiff's extended replacement policy.

N.Y. Insurance Law § 3425(e) states, in relevant part, with respect to personal lines of insurance (of which homeowner's insurance is one type), that "no notice of nonrenewal or conditional renewal of a covered policy shall be issued to become effective during the required policy period [FN8] unless it is based upon a ground for which the policy could have been cancelled." N.Y. Insurance Law § 3425(d)(1) states, in relevant part, that the "specific reason or reasons for nonrenewal or conditioned renewal shall be stated in or shall accompany the notice." The drafters intended the Section to "regulate insurers' efforts to eliminate policyholders, so as to protect the public from having their policies routinely cancelled for improper reasons, such as filing claims based on legitimate losses." Iaia v. Graphic Arts Mut. Ins. Co., 670 N.Y. S.2d 683, 684 (N.Y.1997).

FN8. N.Y. Insurance Law § 3425(a)(2)(C)(7) defines the "required policy period" for personal lines of insurance as "three years from the date as of which a covered policy is first issued or is voluntarily renewed."

While case law provides little guidance on these two subsections from N.Y. Insurance Law, Defendants direct the Court's attention to two N.Y. Insurance Department opinions. [FN9] Each supports the proposition that Section 3425 is inapplicable to this particular policy. The first answers the question: can an insurer renew a homeowner's policy with a six-month term despite the Section's required period of three years? The Department answered affirmatively writing that "required policy periods ... do not have any effect upon the ability of an insurer to renew policies with a premium change." Op. re: Rate Changes and N.Y. Insurance Law § 3425, Office of the General Counsel, N.Y. State Insurance Dep't, Jul. 23, 2003. Plaintiff's attempt to distinguish the instant case from the facts presented to the Insurance Department fails. While it may not present the actual increase in premium, like the policy in the opinion, Plaintiff's Policy explicitly indicates that coverage (and premiums) will increase annually to "reflect current costs and values." Policy at B-1. An extended replacement cost policy is designed to keep pace with inflation and prevent underinsurance, and therefore, does not, and for the insured's protection, cannot specify the exact amount of coverage or premium increase at the time of the Policy's renewal. [FN10] Plaintiff points to no authority to the contrary.

FN9. Plaintiff contends such opinions have no precedential value and may not be relied upon by the Court but I see and he cites no authority which would preclude consideration of an "informal" opinion issued by the New York Insurance Department. Preferred Medical Imaging v. Liberty Mutual Fire Ins. Co., 815 N.Y.S.2d 496 (Suffolk Dist.2006) and In the Matter of Park Radiology, P.C., 2 Misc.3d 621, 2003 Slip Op. 23910 (Rich.Co.2003) are distinguishable from the instant case because, as Defendants point out, significant contrary case law existed and was presented to contradict the informal opinion. Plaintiff presents no authority to the contrary. Neither case forwards Plaintiff's sweeping statement that informal opinions carry "no precedential value" and are irrelevant to the decision at bar. Further, Plaintiff contends that this Court should treat Department of Insurance opinions like Securities Exchange Commission ("SEC") "no action" letters. Courts in this Circuit have routinely held that "[w]hile no-action letters lack precedential value, courts routinely consider the SEC's opinion and may or may not chose to rely on them." Gryl v. Shire Pharms. Group PLC, No. 00-CV-9173(HB), 2001 U.S. Dist. LEXIS 13371, at *11 n. 9 (S.D.N.Y. Aug. 30, 2001).

FN10. See Bruce Mohl, Being Underinsured Can Really Hit Home, Boston Globe, Jun. 17, 2001, at GL-CONSUMER-COL (attributing the pervasive problem of underinsurance, in part, to a "failure to properly account for construction-cost inflation," "consumers [who] confuse the insured value of a home with its market value," and praising extended replacement coverage [by name] for meeting a particular need); Hundreds of Claims Adjusters Pour Into Florida to Assess Charley's Damage, BESTWIRE, Aug. 19, 2004 (discussing the problem of underinsurance in the wake of hurricane Charley and how it may not be a problem because "most homeowner's insurance has inflationary coverage and once insurers set the price, they automatically increase it every year").

Second, on the issue of notice, the Department has opined that no notice was required "when a change

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of limit is the result of the application of an inflation guard....because the increase in coverage is required by the terms of the policy [and] the premium increase is tied to an increase in coverage amount." Op. re: Conditional Renewal Notices, Office of the General Counsel, N.Y. State Insurance Dep't, Apr. 8, 2002. Plaintiff's objection misunderstands the underlying purpose of section 3425 and the protection afforded by the extended replacement cost policy. Therefore, Plaintiff's section 3425 claim fails as a matter of law.

c. Count III: Deceptive Trade Practices under N.Y. Gen. Bus. Law § 349

*5 N.Y. Gen. Bus. Law § 349(a) states that "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state are hereby declared unlawful." To state a claim under N.Y. Gen. Bus. Law § 349, a plaintiff must allege (1) the act or practice was consumer-oriented, (2) the act or practice was misleading in a material respect, and (3) the plaintiff was injured as a result. Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir.2002). Plaintiff claims that Great Northern's alleged conduct in raising premiums and coverage "on specious grounds in violation of its duty under law and the form policy is 'misleading in a material way' to consumers." Compl. ¶ 90; Pl's Mem. in Opp. to Defs' Mot. to Dismiss at 23. Not surprisingly, Defendants have a different view and argue that Plaintiff's claim here fails on four grounds: (1) Plaintiff has not adequately alleged the elements of a Section 349 claim; (2) the claim is barred by the voluntary payment doctrine; (3) the claim is barred by the filed rate doctrine; and (4) the claim is barred by the statute of limitations.

Turning to Plaintiff's Section 349 claim and Defendants' contention that this claim is unsustainable, I agree. Plaintiff has failed to allege facts sufficient to support a claim that Great Northern's Policy was "misleading in a material respect," secondly, that he or any other member of the putative class was "injured" as a result of Great Northern's Policy, and, finally, as required by Section 349, that Great Northern's coverage and premium increases reflect a uniform, "consumer-oriented practice." Therefore, this claim must fail. I need not address Defendants' three additional arguments in support of dismissal of Plaintiff's Section 349 claim.

d. Count IV: Unjust Enrichment

Defendants argue that Plaintiff's unjust enrichment claim fails because (1) the existence of an express contract bars this quasi-contractual claim and (2) the voluntary payment and filed rate doctrines also bar this claim. Plaintiff does not dispute that a valid contract claim will bar unjust enrichment, but instead, pleads unjust enrichment as an alternative to his contract claim.

Because Plaintiff does not challenge the overall validity of the insurance policy, but rather, particular provisions, his claim for unjust enrichment fails. It is well established that a plaintiff "clearly may not recover under a theory of unjust enrichment" where a "valid and enforceable written [contract] govern[s] the particular subject matter of [the] case." Beth Israel Medical Ctr. v. Horizon Blue Cross & Blue Shield, 448 F.3d 573, 587 (2d Cir.2006) (dismissing claim for unjust enrichment). In the presence of an insurance contract, courts in this Circuit have regularly dismissed insured's claims for unjust enrichment. See, e.g., Id.; Page Mill Asset Mgmt. v. Credit Suisse First Boston, Corp ., No. 98-CV-6907(MBM), 2000 U.S. Dist. LEXIS 3941, *28-29 (S.D.N.Y. Mar. 29, 2000) ("[B]ecause unjust enrichment is a quasi-contractual remedy, 'the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery ... for events arising out of the same subject matter.' ") (citation omitted); Goldman v. Metropolitan Life Ins. Co., 841 N.E.2d 742, 747 (N.Y.2005) ("Given that the disputed terms and conditions fall entirely within the insurance contract, there is no valid claim for unjust enrichment."). This claim is dismissed.

e. Count V: Injunctive Relief

*6 Plaintiff does not assert a claim under Count V. Instead, Pl. "repeats and realleges the prior allegations" and states that "[t]he ongoing misconduct warrants the imposition of injunctive relief." Compl. ¶¶ 133-34. However, an injunction is a remedy and not a separate cause of action sustainable on its own. Lekki Capital Corp. v. Automatic Data Processing, Inc., No. 01-7421, 2002 U.S. Dist. LEXIS 8538, *11 (S.D.N.Y. May 13, 2002). Count V is dismissed.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Claims Against The Other Named Defendants
Because Plaintiff has not shown on the face of the Complaint facts or allegations which would lead to any cognizable recovery under the law against Great Northern, the signatory to the insurance contract, the Court need not reach the question of agency theory or veil piercing for the other corporate and individual defendants. [FN11]

FN11. Plaintiff also alleges that Defendants have each "aided, abetted, and conspired with one another in all of the practices complained of" and that "[t]he purpose of the conspiracy is to secure greater premiums than otherwise would be obtained, and actual concert is demonstrated ... respecting uniform acts, practices, documents, breaches of contract, violations of New York Insurance Law, and deceptive practices." Compl. ¶ 89. However, other than this single reference in the Complaint, Plaintiff alleges no facts to support a violation or stated cause of action for common law fraud, conspiracy or aiding and abetting under New York law or pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq. Consequently, this Court need not explore Plaintiff's musings in this area.

## IV. CONCLUSION

For the foregoing reasons, I hold that Plaintiff has not stated a claim for which relief may be granted, and, therefore, pursuant to Fed.R.Civ.P. 12(b)(6), this case is dismissed in its entirety against all Defendants.

The Clerk of the Court is instructed to close this matter and remove it from my docket.

IT IS SO ORDERED.

2007 WL 927198 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# U

United States District Court,
N.D. Illinois, Eastern Division.

**David A. STARR, Plaintiff,**
**v.**
**!HEY, INC., a Delaware corporation; Icontact.Com,Inc., a Delaware corporation; William G. Christie; Robert A. Bowman; Richard Ward; Rahul Prakash; Roger Dow; Telcom-Internet Investors, LLC; Telcom-Online Investors, LLC; Telcom Ventures, LLC; Harbor Capital, LLC; and Duncan Mackay, Defendants.**

**No. 01 C 6087.**

May 23, 2003.

Shareholder brought action under Securities Act and common law alleging that officers of corporation sold him unregistered securities in connection with merger, and, thus, were liable for diminution in value. On defendants' motions to dismiss, the District Court, Hibbler, J., held that: (1) mere diminution in value of corporate assets was insufficient direct harm to give shareholder standing to sue in his own right; (2) burden of demonstrating application of exemption from Securities Act registration requirement rested upon party invoking that exemption; (3) officers and directors of corporate seller were not "sellers"; and (4) shareholder's sweeping and self-serving statement, that defendants were liable as control persons solely by virtue of their shareholder status or directorships, was insufficient to state claim for control person liability.

Motions granted.

West Headnotes

**[1] Corporations 202**
101k202
As a general principle, a corporate shareholder does not have an individual right of action against third parties for damages to the shareholder resulting indirectly from injury to the corporation; there are certain exceptions to this general rule, such as when the shareholder's injuries are distinct from those of other shareholders, but the mere diminution in the value of corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right, because the corporation alone is the directly injured party.

**[2] Securities Regulation 14.35**
349Bk14.35

**[2] Securities Regulation 18.25**
349Bk18.25
The burden of demonstrating the application of an exemption from the Securities Act registration requirement rests upon the party invoking the exemption. Securities Act of 1933, § 4, as amended, 15 U.S.C.A. § 77d.

**[3] Securities Regulation 11.15**
349Bk11.15
Officers and directors of a corporate seller are not "sellers," for purposes of the statute governing the sale or delivery after sale of unregistered securities, solely by virtue of their positions within the company; only those who actively solicit the purchase of unregistered securities can be liable under that statute. Securities Act of 1933, § 5 as amended, 15 U.S.C.A. § 77e.

**[4] Securities Regulation 11.19**
349Bk11.19
Shareholder's sweeping and self-serving statement, that defendants were liable as control persons solely by virtue of their shareholder status or directorships, was insufficient to state claim for control person liability. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o.

MEMORANDUM OPINION AND ORDER

HIBBLER, J.

***1** David Starr filed this five-count complaint pursuant to § 12(a)(1) of the 1933 Securities Act, 15 U.S.C. § 77l(a)(1), § 5 and Regulation D of the 1933 Securities Act, 15 U.S.C. § 77e, and principles of common law. According to Starr, the Defendants sold him unregistered securities in connection with the merger of icontact.com, inc. and !hey, inc., and thus are liable for the diminution in its value. Rahul Prakash, Telcom-Internet Investors, Telcom-Online Investors, and Telcom

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Ventures (Prakash and Telcom Entities) have filed a motion to dismiss all claims against them pursuant to Fed.R.Civ.P. 12(b)(6). Robert Bowman and Harbor Capital filed a similar motion to dismiss. For the reasons stated herein, the Court GRANTS both motions and dimisses with prejudice all counts against Rahul Prakash, Telcom-Internet Investors, Telcom-Online Investors, Telcom Ventures, Robert Bowman, and Harbor Capital.

I. Factual Background

David Starr was employed by icontact as a software developer and by August 8, 2000, had accumulated 64,883 shares of icontact common stock. Pursuant to a "Stock Option Grant Certificate," Starr exercised an option to purchase additional shares on a cashless basis, and by September 8, 2000, had increased his total shareholding to 102,277. Starr began exercising his options shortly after receiving a mailing from icontact and its CEO, William Christie, notifying him of a proposed merger between icontact and !hey. The merger was approved by a majority of icontact shareholders, and Starr's icontact shares were converted into approximately 110,000 !hey shares. According to Starr, !hey represented to him on August 18, 2000, that his icontact shares were valued at $3.3127 per share, but in October 2000 represented to him that the converted icontact shares were in fact valued at only $0.30 per share.

In the five-count complaint, Starr seeks the difference between the value of shares as represented on August 18, 2000 and during October 2000. Starr alleges in Count I that icontact, !hey, and the individual Board members of icontact and !hey (including Prakash and Bowman) violated Sections 5 & 12(1) of the 1933 Securities Act (the Act) because they sold unregistered securities to him. In Count II, Starr alleges that by reason of their status as controlling persons the individual Board members of icontact (including Prakash and Bowman) as well as other shareholders (including the Telcom entities and Harbor Capital) had the power to cause icontact and !hey to engage in the sale of unregistered securities and thus are liable for its acts. Count III alleges a breach of fiduciary duty. Count IV alleges a breach of contract because !hey did not redeem his shares at the price promised. Count V alleges that the individual Defendants converted Starr's property by refusing to redeem his shares.

II. Standard of Review

Motions to dismiss test the sufficiency of the complaint, not the merits of the case. Pickrel v. City of Springfield, Ill., 45 F.3d 1115 (7th Cir.1995). The Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences from them. Id. The Court will dismiss a complaint under Rule 12(b)(6) only if it appears that the plaintiffs can prove no set of facts that would entitle them to relief. Conley v. Gibson, 335 U .S. 41 (1957).

III. Analysis

A. Standing

***2** [1] At the outset, the Court holds that Starr lacks standing to bring this suit against the moving Defendants. As a general principle, a corporate shareholder does not have an individual right of action against third parties for damages to the shareholder resulting indirectly from injury to the corporation. Flynn v. Merrick, 881 F.2d 446, 449 (7th Cir.1989); Twohy v. First Nat'l Bank of Chicago, 758 F.2d 1185, 1194 (7th Cir.1985). There are certain exceptions to this general rule, such as when the shareholder's injuries are distinct from those of other shareholders. Twohy, 758 F.2d at 1194. But the mere diminution in the value of corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right, because the corporation alone is the directly injured party. Flynn, 881 F.2d at 449. A derivative suit brought on behalf of the corporation is the proper vehicle for an individual shareholder to address the diminution of the value of his stock caused by alleged third-person malfeasance.

The Court agrees with Prakash and the Telcom Entities that Starr's claims, for the most part, are derivative. Counts I, II, and III all allege that the Defendants caused the value of Starr's stocks to be diminished as a result of their actions in the merger of icontact and !hey, and thus are derivative in nature. The language contained within Starr's complaint demonstrates beyond doubt the derivative nature of his suit. Starr alleges that the "value of [his] converted shares were valued at the equivalent of $ .30 per share of icontact ... substantially below [the] $3.3127" they were previously valued. Starr further alleges that the Defendants' "attempt[ed] to

secure certain rights and benefits for themselves alone, at the expense of minority shareholders." (emphasis added). By the very allegations of his complaint, Starr demonstrates that his injury is one that results from the diminution of the value of his shares and one that he has in common with other shareholders. Accordingly, Starr lacks standing to assert Counts I, II, and III against the moving Defendants and those counts must be dismissed as to Prakash, Bowman, the Telcom Entities, and Harbor Capital on this ground alone. Even if Starr did have standing to pursue Counts I, II, and III, they would still fail for the reasons stated below.

B. Count I - Section 12(1) Claim

Prakash moves to dismiss Count I of Starr's claim, arguing that he was exempt from the disclosure and registration requirements because: (1) the stocks were issued to Starr as part of an employee stock option plan, 15 U.S.C. § 77c(a)(2); (2) the transaction did not involve a public offering, 15 U.S.C. § 77d(2). Bowman moves to dismiss Count I of Starr's claim, arguing that he was not a seller for purposes of Section 12(1), and therefore Starr cannot state a claim against him.

If a security or transaction is exempted under § 77c then a person cannot incur section 12(1) liability pursuant to § 77c. Donohoe v. Consolidated Operating & Prod. Corp., 982 F.2d 1130, 1140 (7th Cir.1992) (observing that § 77e is subject to a number of exceptions and limitations); see also Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc., 3 F.3d 208, 209 (7th Cir.1993) (discussing exemption from securities regulation of most governmental securities); American Deposit Corp. v. Schacht, 84 F.3d 834, 856 (7th Cir.1996) (Flaum, J., dissenting) (observing that Congress recognizes distinct nature of annuities and insurance contracts and exempts them from securities regulation). Section 77c(a)(2) provides that "except as hereinafter expressly provided, the provisions of this subchapter shall not apply to any of the following classes of securities: ... a stock bonus, pension, or profit-sharing plan which meets the requirements under section 401 of Title 26." 15 U.S.C. § 77c(a)(2). Thus, stocks acquired pursuant to an employee stock option plan are generally exempt from the registration requirements of the Act, and therefore if Starr's shares were issued pursuant to such a plan his claim must necessarily fail.

*3 Starr argues, however, that § 77c does not apply, pointing to paragraph forty-eight of his complaint, which reads "icontact and !hey failed to file a registration statement for the merger ... and failed to rely on any exemption from registration." Stark argues that his allegation must be taken as true and therefore Prakash's motion must be denied. But paragraph forty-eight contains a bare legal conclusion-that no exemption excuses icontact's and ! hey's failure to register the securities-not a statement of fact, and thus the Court need not accept it as true. Panaras v. Liquid Carbonic Ind. Corp., 74 F.3d 786, 792 (7th Cir.1996). In support of his motion, Prakash invites the Court to dismiss Count I of Starr's complaint against him because Starr's holdings in icontact and !hey were acquired pursuant to a stock option plan, attaching an affidavit of icontact's CEO, William Christie averring that Starr's shares were issued pursuant to such a plan. Starr protests that the Court should not consider the affidavit in ruling on a 12(b)(6) motion and steadfastly denies that he "acquire[d] his securities pursuant to [an Employee Stock Option Plan]." Generally, Starr is correct that the Court may not consider materials outside the pleadings without converting the motion into one for summary judgment, which the Court declines to do. See Covington v. Illinois Sec. Serv., Inc., 269 F.3d 863, 864-65 (7th Cir.2001).

But the exhibits that Starr attaches to his complaint are fair game. Menominee Indian Tribe of Wisc. v. Thompson, 11 F.3d 449, 456 (7th Cir.1998). Starr attaches to his complaint a "Stock Option Grant Certificate." It is clear from reading the document that the certificate is part of an employee stock option plan, for it contains a provision alerting Starr that the option is not a guarantee of continued employment rights. Thus, at a minimum, it appears from the face of the complaint that some of Starr's shares were acquired through an employee stock option plan, contrary to his assertion in his brief. Nevertheless, the document does not, on its face, demonstrate that it meets the requirements of 26 U.S.C. § 401, as the exemption mandates. Further, merely because some of Starr's shares were acquired through an employee stock option plan does not mean that all of the shares were so acquired. Starr insists in his brief that his initial acquisition of shares was a direct

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

investment in icontact, and thus the exemption listed in § 77c would not apply. At this stage of the litigation, the Court must accept this allegation as true and dismissal on § 77c grounds is thus improper at this time.

[2] Prakash also argues that the securities were not issued in a public offering, and thus exempt from the Securities Act registration requirement by 15 U.S.C. § 77d. But nothing in the complaint (or in Prakash's brief for that matter) demonstrates whether the securities were issued in a public or a private offering. Prakash argues that the burden is on Starr to plead that the securities were involved in a public offering and not on him to prove that they were involved in a private offering. Prakash's argument has no merit. The burden of demonstrating that an exemption applies rests upon the party invoking the exemption, and thus Starr need not plead facts to demonstrate that it does not apply. SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953). Starr has not pleaded himself out of Court. Nothing in the amended complaint demonstrates that § 77c or § 77d are applicable, and at this stage of the litigation, the Court takes Starr's well-pleaded allegation that the securities were unregistered as true. However, given the language of the Stock Option Grant Certificate as well as the restrictive legend on the reverse of Starr's stock certificates informing him that they have not been registered, the Court cautions Starr that, should it later be revealed that he knowingly misrepresented material facts (for example, facts that demonstrate the securities were issued pursuant to an employee stock option plan or that they were privately issued, and thus that the § 77c or § 77d exemptions are applicable), the Court will consider sanctions against him.

*4 Despite the fact that § 77c and ] 77d provide no grounds to warrant dismissal at this stage of the litigation, Count I must still be dismissed as to both Prakash and Bowman. Liability under Section 12(1) [FN1] of the Securities Act is limited to those who pass or offer securities. Pinter v. Dahl, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Collateral participants in the sale of securities are not liable as sellers under section 12(1). Id. at 650. Instead, liability extends only to those either sell unregistered securities or who actively solicit a purchase motivated in part by a desire to serve his own financial interest or those of the seller. Id. at 645-47; see also Danis v. USN Communications, Inc., 73 F.Supp.2d 923, 936 (N.D.Ill.1999); Wheaten v. Mathews Holmquist & Assoc., Inc., No. 94 C 1134, 1996 WL 494245, *11 (N.D.Ill. Aug.28, 1996); Endo v. Albertine, 812 F.Supp. 1479, 1494 (N.D.Ill.1993). In other words, a person who solicits an offer to buy a security, while acting as the agent of the issuer of the security, shares the status of statutory seller. Pinter, 486 U.S. 643-45. Thus, in order to be liable under section 12(1), Prakash and Bowman must have either sold the securities to Starr or actively solicited the purchase.

FN1. In his brief, Bowman refers to Section 12(2). But Section 12(2) regulates the use of fraud in the sale of securities. 15 U.S.C. § 77l(a)(2). Section 12(1) governs the sale of securities in violation of 15 U.S.C. § 77e, which is at issue in this case. 15 U.S.C. § 77l(a)(1).

[3] Starr's complaint alleges that Prakash and Bowman as board members of icontact "solicited Starr, through Christie," and thus are liable under section 12(1) for the sale of an unregistered security. But officers and directors of a corporate seller are not "sellers" for purposes of section 12(1) solely by virtue of their positions within the company. See Royal American Managers, Inc. v. IRC Holding Corp., 885 F.2d 1011, 1017 (2nd Cir.1989). Here, the complaint contains no allegations that demonstrate that Bowman and Prakash did any active solicitation. Indeed the complaint does not allege any contact whatsoever between Starr and Bowman or Prakash. Starr's complaint contains only the conclusory allegation that because icontact CEO Christie solicited his approval of the merger that Bowman and Prakash, as board members, also solicited him. The Court is not convinced. The guidance in Pinter is clear: only those who actively solicit the purchase of unregistered securities can be liable under Section 12(1). Pinter, 486 U.S. 643-47; see also Endo, 812 F.Supp. at 1494. Starr's complaint fails to allege that Bowman and Prakash actively participated in the solicitation or sale of unregistered securities and therefore Count I must be dismissed as to them.

C. Count II - Controlling Persons Liability

[4] Count II of the complaint alleges that Prakash, Bowman, the Telcom Entities, and Harbor Capital

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

are liable under 15 U.S.C. § 77o as control persons of icontact or !hey. The Act provides, in relevant part, that "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable...." 15 U.S.C. § 78o. In order to state a claim for control person liability, a plaintiff must allege: (1) a primary violation; (2) that the defendant actually exercised control over the general operations of the primary violator; and (3) that the control person had the power or ability (even if not exercised) to control the specific transaction that is alleged to give rise to liability. Donohoe v. Consolidated Operating & Prod. Corp., 30 F.3d 907, 911-12 (7th Cir.1994); Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 880 (7th Cir.1992). Starr's allegations in this regard consist of but a single paragraph: "By reason of their shareholder status, senior management positions and/or directorships as alleged above, these individual and corporate defendants had the power to influence, and exercised such power, to cause icontact and !hey to engage in the unlawful acts and conduct complained of herein." Starr self-servingly pleads a bare legal conclusion-that the individual and corporate defendants were control persons. But Starr alleges no facts, other than the Defendants' status as shareholders, senior managers, or directors, to support his conclusion. Courts within this District have consistently held that a plaintiff may not premise control person liability solely upon status within the company. See, e.g., Donovan v. ABC-NACO, Inc., No. 02 C 1951, 2002 WL 1553259, * 6 (N.D.Ill. Jul.15, 2002); In re Westell Tech ., Inc., Sec. Litig., No. 00 C 6735, 2001 WL 1313785, *12 (N.D.Ill. Oct.26, 2001); Kaufman v. Motorola, Inc., No. 95 C 1069, 1999 WL 688780, * 16 (N.D. Ill. Apr. 16 1999); Whirlpool Fin. Corp. v. GN Holdings, Inc., 873 F.Supp. 111, 120 (N.D.Ill.1995); Feldman v. Motorola, Inc., No. 90 C 5887, 1993 WL 497228, * 10 (N.D.Ill. Oct.14, 1993); Craig v. First American Capital Res., 740 F.Supp. 530, 537 (N.D.Ill.1990). Instead, courts have required plaintiffs to plead sufficient facts to meet the two-part test announced in Harrison: (1) that defendants exercised control over the primary violator; and (2) that defendants exercised control over the operations constituting the specific violation. For example, a plaintiff sufficiently pleaded control person liability where the complaint alleged that the defendant was the majority shareholder (and therefore had control over the directors) and other defendants caused the corporation to disseminate to its minority shareholders information containing false and misleading statements. Canel v. Lincoln Nat'l Bank, No. 96 C 6595, 1997 WL 321679, *7 (N.D.Ill. Jun.6, 1997). Another plaintiff successfully avoided dismissal because the complaint alleged that the directors had day-to-day control over the operations of the corporation and the power to control the particular transaction in question. In re Nanophase Tech. Corp. Sec. Litig., No. 98 C 3450, 2000 WL 1154631, *7 (N.D.Ill. Aug.14, 2000). Similarly, a court denied the motion to dismiss of directors who allegedly could have, but had not, prevented the dissemination of misleading information. In re First Merch. Acceptance Corp. Sec. Litig., No. 97 C. 2715, 1998 WL 781118, *12-13 (N.D.Ill. Nov.4, 1998). Here, Starr presents nothing to support his claim that the individual defendants were control persons other than his sweeping and self-serving statement that the defendants should be liable solely by virtue of shareholder status or directorships. Such allegations are insufficient to state a claim for control person liability, and the Defendants' motions to dismiss Count II as to Prakash, Bowman, the Telcom Entities, and Harbor Capital is GRANTED.

D. Counts III & v. - Common Law Claims

***5** Starr's common law claims are frivolous at best. First, Starr claims that Prakash, Bowman, the Telcom Entities, and Harbor Capital breached a fiduciary duty they owed him because they failed to disclose to him sufficient information in regards to the merger. Starr's claim is predicated on the assumption that the Defendants had some duty under the Act to disclose to him information about the merger by registering the securities that icontact and ! hey issued to him. At the outset, the Court is hard pressed to see how the Telcom Entities and Harbor Capital, both shareholders in icontact or !hey just as Starr was, would owe him any fiduciary duty whatsoever. But in any event, as noted in the Court's discussion of Counts I and II, none of the individual Defendants had any duty to Starr under the Securities Act. The Defendants' motion to dismiss Count III is GRANTED as to Prakash, Bowman, the Telcom Entities, and Harbor Capital.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

In Count V, Starr alleges that the named Defendants converted his shares of ! hey when they refused to redeem his shares. Conversion requires a plaintiff to show that: (1) the defendant wrongfully assumed control over property; (2) his right to immediate possession of the property has been denied by the defendants; and (3) he has made a demand for the property. But the only entity that would be required to redeem Starr's shares of !hey would be !hey itself; Starr has no right to immediate redemption of the shares from the named Defendants. In other words, only !hey was obligated to redeem the shares and so only !hey could conceivably be liable for a refusal to redeem them. Starr could perhaps state a claim for conversion against the moving defendants if he alleged, for example, that Prakash, Bowman, the Telcom Entities, or Harbor Capital had swiped his stock certificates and refused to return them (but that clearly is not what happened). Defendants' motions to dismiss Count V of Starr's complaint is GRANTED as to Prakash, Bowman, the Telcom Entities, and Harbor Capital.

IV. Conclusion

For the foregoing reasons, the motions to dismiss of Prakash, Bowman, the Telcom Entities, and Harbor Capital are GRANTED and the Court dismisses with prejudice all counts against the moving Defendants. Starr's complaint remains pending against the non-moving Defendants, but as this opinion makes clear, Starr is skating on thin ice. Should it later be revealed that Starr's claims in response to Prakash's § 77c and § 77d are false, and Starr knew them to be false, Starr risks the possibility of Rule 11 sanctions against him.

IT IS SO ORDERED.

2003 WL 21212596 (N.D.Ill.), Fed. Sec. L. Rep. P 92,427

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.