

United States District Court,
N.D. California.

**In re: TEXTAINER PARTNERSHIP SECURITIES LITIGATION.**

**No. C-05-0969 MMC.**

filed March 8, 2005.
Dec. 12, 2005.
last filing Feb. 17, 2006.

Jeffrey S. Abraham, Abraham Fruchter & Twersky LLP, New York, NY, Attorney to be Noticed, for City Partnerships Co, (Plaintiff).

Brian Joseph Barry, Law Offices of Brian Barry, Los Angeles, CA, Attorney to be Noticed, for Mr. Leonard Labow, (Movant).

Solomon B. Cera, Gold Bennett Cera & Sidener LLP, San Francisco, CA, Lead Attorney, Attorney to be Noticed, for City Partnerships Co, (Plaintiff).

Gwendolyn R. Giblin, Gold Bennett Cera & Sidener LLP, San Francisco, CA, Attorney to be Noticed, for City Partnerships Co, (Plaintiff).

Terry M. Gordon, Law Offices of Terry M. Gordon, Sausalito, CA, Lead Attorney, Attorney to be Noticed, for Textainer Capital Corporation, (Defendant).

Francis M. Gregorek, Wolf Haldenstein Adler Freeman & Herz, Symphony Towers, San Diego, CA, Attorney to be Noticed, for Alan P. Gordon, (Plaintiff).

Joey Dean Horton, Quinn Emanuel Urquhart Oliver & Hedges LLP, Los Angeles, CA, Lead Attorney, Attorney to be Noticed, for RFH, Ltd, (Defendant).

Win Hwangbo, Morrison & Foerster LLP, Palo Alto, CA, Attorney to be Noticed, for TCC Equipment Income Fund, (Defendant).

John G. Jacobs, The Jacobs Law Firm, Chtd., Chicago, IL, Attorney to be Noticed, for TCC Equipment Income Fund, (Defendant).

Bryan G. Kolton, The Jacobs Law Firm, Chtd., Chicago, IL, Attorney to be Noticed, for TCC Equipment Income Fund, (Defendant).

Lawrence D. Levit, Abraham Fruchter & Twersky LLP, New York, NY, Attorney to be Noticed, for Steven L. Craig, (Plaintiff).

James R. Malone, Jr., Chimicles & Tikellis LLP, Haverford, PA, Lead Attorney, Attorney to be Noticed, for Alan P. Gordon, (Movant).

Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Herz, Symphony Towers, San Diego, CA, Attorney to be Noticed, for Alan P. Gordon, (Movant).

Janet Morgan, Clausen Law Group, Point Richmond, CA, Attorney to be Noticed, for Textainer Capital Corporation, (Defendant).

Darryl P. Rains, Morrison & Foerster LLP, Palo Alto, CA, Attorney to be Noticed, for TCC Equipment Income Fund, (Defendant).

Lawrence A. Sucharow, Labaton Sucharow & Rudoff LLP, New York, NY, Attorney to be Noticed, for Warren Heller, (Movant).

Heather L. Weaver, Quinn Emanuel Urquhart Oliver & Hedges, LLP, San Francisco, CA, Attorney to be Noticed, for RFH, LTD, (Defendant).

ORDER GRANTING IN PART AND DENYING IN PART TEXTAINER DEFENDANTS' MOTION TO DISMISS; GRANTING RFH'S MOTION TO DISMISS; VACATING HEARING; CONTINUING CASE MANAGEMENT CONFERENCE

CHESNEY, J.

*1 THIS DOCUMENT RELATES TO: ALL ACTIONS

(Docket Nos. 125, 126)

Before the Court are two separate motions to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

dismiss plaintiff Stephen L. Craig's Consolidated and Amended Class Action Complaint ("Complaint"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motions are filed, respectively, by: (1) defendants Textainer Financial Services Corporation ("Textainer Financial"), Textainer Equipment Management, Ltd. ("Textainer Equipment"), Textainer Capital Corporation ("Textainer Capital"), Textainer Group Holdings, Ltd. ("Textainer Holdings"), TCC Equipment Income Fund, L.P. ("Textainer I"), TCC Equipment Income Fund II, L.P. ("Textainer II"), TCC Equipment Income Fund III, L.P. ("Textainer III"), TCC Equipment Income Fund IV, L.P. ("Textainer IV"), TCC Equipment Income Fund V, L.P. ("Textainer V"), TCC Equipment Income Fund VI, L.P. ("Textainer VI") (collectively "Textainer Partnerships"), and John A. Maccarone ("Maccarone") (collectively, "Textainer defendants"); [FN1] and (2) defendant RFH, Ltd. ("RFH"). Plaintiff has filed a consolidated opposition to the motions, to which the Textainer defendants and RFH separately have replied. Having considered the papers submitted in support of and in opposition to the motions, the Court finds the matters appropriate for decision without oral argument, see Civil L.R. 7-1(b), VACATES the November 18, 2005 hearing, and rules as follows.

FN1. Although the Textainer defendants additionally purport to bring their motion to dismiss on behalf of Textainer Limited, no claim is asserted against that entity.

BACKGROUND

The instant action is a purported class action arising from the sale of the assets of the Textainer Partnerships to RFH ("Asset Sale"). The following background section is taken from the allegations of the Complaint.

Textainer Equipment was an associate general partner, and Textainer Financial was the managing general partner, of the Textainer Partnerships. (See Compl. ¶¶ 8-9.) Textainer Capital was the owner, and Maccarone was president, of Textainer Financial. (See id. ¶¶ 11.) Textainer Holdings was "the umbrella company for and owner of" Textainer Equipment, Textainer Financial, and Textainer Capital. (See id. ¶ 12.)

Each Textainer Partnership owned a fleet of shipping containers, which they leased to international shipping lines; the shipping containers and the leases thereof were the primary assets of the Textainer Partnerships. (See Compl. ¶¶ 2, 7, 18.) Textainer Management was responsible for management of the Textainer Partnerships' leasing operations. (See id. ¶ 8.)

Textainer Holdings created an Investment Advisory Committee ("IAC") to advise the general partners on operations and financial aspects of the Textainer Partnerships. (See id. ¶ 24.) In May 2004, the IAC decided to seek bids for the assets of the Textainer Partnerships, and sent out information packets to potential bidders. Bids were subject to the condition that the purchaser agree to accept a contract with Textainer Management for its continued management of the shipping container leases. (See id. ¶ 24.) Plaintiff alleges this condition eliminated many potential bidders who did not want or need Textainer Management to manage the leases, and had the effect of limiting the price that a potential bidder was willing to pay for the assets. (See id. ¶ 24.)

***2** The highest bid was a joint bid submitted in June 2004 by two entities, Hakman and Fortis Bank, who subsequently were joined by a third entity, P & R, to form RFH. (See id. ¶¶ 25, 28.) Accordingly to plaintiff, "[t]he original bid prices which RFH agreed to pay were effective as of July 1, 2004 and were adjusted downwards as of January 1, 2005[.]" (See id. ¶ 25.) On November 30, 2004, each of the Textainer Partnerships entered into an asset sale agreement with RFH, subject to approval by the "affirmative vote of Limited Partners holding more than 50% of units of limited partnership interest in each of the Partnerships that were outstanding" as of January 20, 2005. (See id. ¶ 30.)

To secure the approval of the limited partners, the Textainer Defendants disseminated proxy statements, which were identical in all relevant aspects, to the limited partners of each of the six partnerships. (See id. ¶ 31.) Included with the proxy statements was a cover letter, dated January 21, 2005, written by Maccarone ("Maccarone letter"), which stated that the general partners believed the Asset Sale was "fair to and in the best interests of the limited partners." (See id. ¶ 35.) On March 21, 2005, the limited partners of each of the Textainer

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Partnerships voted to approve the Asset Sale, which was completed on April 18, 2005. (See id. ¶ 37.)

Plaintiff contends that the proxy statements and the Maccarone letter were materially false and misleading because (1) they failed to disclose that, between the date the Textainer Defendants and RFH agreed on a price for the Asset Sale and the date of the proxy statements, the price of shipping containers had increased by approximately 18-20%, and (2) they failed to disclose that the assets were "being sold at less than the highest price" by reason of the Textainer Defendants' requirement that Textainer Management continue to manage the leases for the purchaser. (See id. ¶ 34.)

On August 24, 2005, plaintiff filed the instant Complaint against defendants, asserting violations of §§ 14(a) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act"), and state law claims for breach of fiduciary duty and aiding and abetting such breaches. (See id. ¶¶ 44-65.) The instant putative class action is asserted on behalf of "all persons who were limited partners of the Textainer Partnerships on the date the Proxy Statements were filed with the SEC and disseminated to the Limited Partners." (See id. ¶ 38.)

LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) cannot be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." See Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. See Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1990).

***3** Generally, a district court, in ruling on a Rule 12(b)(6) motion, may not consider any material beyond the pleadings. See Hal Roach Studios, Inc. v. Richard Feiner And Co., Inc., 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). Material that is properly submitted as part of the complaint, however, may be considered. See id. Documents whose contents are alleged in the complaint, and whose authenticity no party questions, but which are not physically attached to the pleading, also may be considered. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir.1994). In addition, the Court may consider any document "the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies," regardless of whether the document is referred to in the complaint. See Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir.1998). Finally, the Court may consider matters that are subject to judicial notice. See Mack v. South Bay Beer Distributors, Inc., 798 F.2d 1279, 1282 (9th Cir.1986). In analyzing a motion to dismiss, the Court must accept as true all material allegations in the complaint, and construe them in the light most favorable to the nonmoving party. See NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir.1986). The Court may disregard factual allegations if such allegations are contradicted by the facts established by reference to exhibits attached to the complaint. See Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir.1987). Conclusory allegations, unsupported by the facts alleged, need not be accepted as true. See Holden v. Hagopian, 978 F.2d 1115, 1121 (9th Cir.1992).

DISCUSSION

A. Section 14(a) Claim

Plaintiff's claim for violation of § 14(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder, is asserted against the Textainer Defendants only. (See Compl. ¶ 45.) The Textainer Defendants move to dismiss said claim, both for failure to state a claim and for failure to comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").

Section 14(a) makes it unlawful for any person to solicit, in violation of regulations promulgated by the SEC, "any proxy or consent or authorization in respect of any security ... registered pursuant to section 78l." See 15 U.S.C. § 78n(a). SEC Rule 14a-9 provides: "No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." See 17 C.F.R. § 240.14a-9(a). The United States Supreme Court has held that § 14(a) "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." See TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (internal quotations and citations omitted). Thus, § 14(a) acts to "ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." See id. at 448.

*4 Plaintiff alleges that the following statements in the proxy statements were materially misleading in violation of § 14(a) and Rule 14a-9:

> Market conditions at historically high levels have increased the attractiveness of the container fleet to prospective buyers.
> Selling now avoids having to liquidate assets under time constraints and uncertain market conditions in future years due to expiration of normal lives of the Textainer Partnerships.
> Selling now eliminates the risk and uncertainty of possible future downturns in market conditions for leased and used containers.

(See Compl. ¶ 33 (quoting Proxy Statements at 4); see also Textainer Defendants' Motion to Dismiss, Ex. A (Proxy Statement) at 4.) Plaintiff further alleges that the following statement in the Maccarone letter was materially false and misleading in violation of § 14(a) and Rule 14a-9: "The Asset Sale will provide you with the opportunity to liquidate your investment in the Partnership[s] for cash at a price and on terms that the general partners believe are fair to and in the best interests of the limited partners of the Partnership[s]." (See Compl. ¶ 35; see also Textainer Defendants' Motion to Dismiss, Ex. A (Maccarone Letter) at 2.)

As noted, plaintiff contends the above-referenced statements were materially false and misleading because (1) they failed to disclose that, between the date the Textainer Defendants and RFH agreed on a price for the Asset Sale and the date of the proxy statements, the price of shipping containers had increased by approximately 18-20%, and (2) they failed to disclose that the assets were "being sold at less than the highest price" as a result of the Textainer Defendants' requirement that Textainer Management continue to manage the leases for the purchaser. (See id. ¶ 34.)

1. Applicability of PSLRA's Heightened Pleading Standard for Misleading Statements and Omissions

The Textainer Defendants argue that because plaintiff's complaint alleges the proxy statements were false or misleading, it is subject to the heightened pleading standard imposed by the PSLRA at 15 U.S.C. § 78u-4(b)(1). In response, plaintiff argues that the PSLRA pleading standard applies only to claims alleging fraud, and that it is inapplicable here because plaintiff's § 14(a) claim is based on negligent conduct. For the reasons set forth below, the Court agrees with the Textainer Defendants.

The relevant section of the PSLRA sets forth two heightened pleading standards, one with respect to misleading statements and omissions, and one with respect to allegations of the requisite state of mind: [FN2]

> FN2. Because the Textainer Defendants do not argue that the complaint fails to comply with the PSLRA's heightened pleading standard with respect to allegations of state of mind, the Court does not address whether that pleading standard is applicable to the instant case.

> (b) Requirements for securities fraud actions
> (1) Misleading statements and omissions
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
> *5 the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
> (2) Required state of mind
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

See 15 U.S.C. § 78u-4(b).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The PSLRA expressly states that its heightened pleading standard for misleading statements and omissions applies to "any private action arising under [the Exchange Act]." See 15 U.S.C. § 78u-4(b)(1) (emphasis added). As noted above, § 14(a) is part of the Exchange Act. "If the language [of the statute] is plain and its meaning clear, that is the end of [the Court's] inquiry." In re Silicon Graphics, Inc. Securities Litigation, 183 F.3d 970, 975 (9th Cir.1999).

Numerous courts have held that § 14(a) claims may be based on negligent conduct. See, e.g., Wilson v. Great American Industries, Inc., 855 F.2d 987, 995 (2d Cir.1988); Gould v. American Steamship Co., 535 F.2d 761, 777 (3d Cir.1976); In re McKesson HBOC Inc. Securities Litigation, 126 F.Supp.2d 1248, 1263 (N.D.Cal.2000). Although the heading to § 78u-4(b), "Requirements for securities fraud actions," see 15 U.S.C. § 78u-4(b), might suggest that the heightened pleading standards therein apply only to securities fraud actions, the Supreme Court has held that "the title of a statute and the heading of a section cannot limit the plain meaning of the text." See Brotherhood of Railroad Trainmen v. Baltimore & O.R. Co., 331 U.S. 519, 528-29 (1947). Here, as noted, the text of the PSLRA expressly states that the heightened pleading standard for misleading statements and omissions applies to "any private action" arising under the Exchange Act. See 15 U.S.C. § 78u-4(b)(1). Accordingly, the Court finds the heightened pleading standard applies to § 14(a) claims and, consequently, plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(b)(1). [FN3]

FN3. Other courts that have considered the issue likewise have held that the PSLRA's heightened pleading standard for misleading statements and omissions applies to § 14(a) claims predicated on negligence. See In re JP Morgan Chase Securities Litigation, 363 F.Supp.2d 595, 636 (S.D.N.Y.2005) ("Even if plaintiffs had not brought a Section 14(a) claim sounding in fraud, pursuant to the PSLRA, 15 U.S.C. § 78u-4(b)(1), they would still have had to plead facts indicating why the alleged misrepresentations were misleading."); Bond Opportunity Fund v. Unilab Corp., 2003 WL 21058251 at *5 (S.D.N.Y.2003) (dismissing negligence-based § 14(a) claims for failing to adequately allege false and misleading statement under PSLRA pleading standard); In re U.S. West, Inc. Securities Litigation, 201 F.Supp.2d 302, 305-06 (D.Del.2002) (holding § 78u-4(b)(1) applied to plaintiffs' § 14(a) claims based on negligence); Giarraputo v. UNUMProvident Corp., 2000 WL 1701294 at *10 (D.Me.2000) (applying § 78u-4(b)(1) pleading standard to § 14(a) claim "even though it does not allege fraud").

2. Failure to Disclose Alleged Increase In Market Price

Plaintiff alleges the Textainer Defendants' failure to disclose that, between the date the Textainer Defendants and RFH agreed on a price for the Asset Sale and the date of the proxy statements, the price of shipping containers had increased by approximately 18-20%, rendered materially misleading the three statements in the proxy statements quoted above. For the reasons set forth below, however, plaintiff's complaint fails to articulate with the requisite particularity why the statements made in the proxy statements were materially misleading as opposed to merely incomplete. See Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 (9th Cir.2002) ("plaintiffs' complaint must specify the reason or reasons why the statements made by [defendant] were misleading or untrue, not simply why the statements were incomplete.").

***6** The proxy statements disclosed that "[b]eginning in 2004, a worldwide steel shortage caused significant increases in new container prices and limited the number of new containers being built. As a result, demand for leased containers increased in the first quarter of 2004 and has remained strong through all of 2004." (See Textainer Defendants' Motion to Dismiss, Ex. A (Proxy Statement) at 14.) The proxy statements also stated that, as of the first and second quarters of 2004, "the container utilization levels of the leasing market had reached record highs" and that "[a]t the date of th[e] Proxy Statement, usage levels remain[ed] high." (See id. at 22.) Although the proxy statements disclosed significant increases in container prices in 2004 and the continuing high demand for them as of the date of the proxy

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

statements, plaintiff contends that the proxy statements were materially misleading because the Textainer Defendants omitted to state the precise amount of the increase in market prices.

The three statements plaintiff alleges are materially misleading--"[m]arket conditions at historically high levels have increased the attractiveness of the container fleet to prospective buyers," "[s]elling now avoids having to liquidate assets under time constraints and uncertain market conditions in future years due to expiration of normal lives of the Textainer Partnerships," and "[s]elling now eliminates the risk and uncertainty of possible future downturns in market conditions for leased and used containers" (see Compl. ¶ 33)--are not alleged by plaintiff to be untrue. Although the Ninth Circuit has recognized that "a statement that is literally true can be misleading and thus actionable under the securities laws," it has further noted that "[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts." See Brody, 280 F.3d at 1006. In Brody, the plaintiffs therein argued that once a disclosure is made, there is a duty to make it complete and accurate; the Ninth Circuit rejected that argument, noting that "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." See id. The Ninth Circuit held that "[t]o be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." Id.

Here, plaintiff has not identified, with the particularity required by the PSLRA, why, in light of the disclosures noted above with respect to the market for containers in 2004, the Textainer Defendants' omission of the degree of increase in the price of containers caused the three identified statements to be materially misleading. First, plaintiff fails to allege that the market prices for containers were not readily publicly available. An omitted fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total' mix of information made available." See TSC Industries, 426 U.S. at 449. "The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." Kapps v. Torch Offshore, Inc., 379 F.3d 207, 216 (5th Cir.2004) (citation omitted). Consequently, it has been held that the securities laws do not require disclosure of information that is readily available in the public domain. See, e.g., In re Adams Golf, Inc. Securities Litigation, 381 F.3d 267, 279 (3d Cir.2004) (holding defendant "not duty-bound to disclose general industry-wide trends easily discernable from information already available in the public domain"); see also Whirlpool Financial Corp. v. GN Holdings, Inc., 67 F.3d 605, 609 (7th Cir.1995) (noting "securities laws require the disclosure of information that is not otherwise in the public domain"). One ordinarily would expect that investors in a limited partnership whose sole assets were shipping containers would be aware of general trends in the market for such containers. As noted, plaintiff has not alleged that such information was not readily available to the limited partners.

*7 Additionally, plaintiff fails to allege the source of his information that there was an 18-20% increase in the price of containers during the relevant time period, and fails to allege that the alleged price increase applies to the particular type of containers owned by the Textainer Partnerships. He alleges only that the complaint is based "upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters based upon the investigation made by and through his attorneys, which included (among other things) a review of public filings with the Securities and Exchange Commission." (See Compl. at 1.) When an allegation about a purportedly misleading statement or omission "is made on information and belief, the PSLRA requires that the complaint "state with particularity all facts on which that belief is formed." See 15 U.S.C. § 78u-4(b)(1). The Ninth Circuit has held that the above-referenced section of the PLSRA requires a complaint to "provide all the facts forming the basis for [that] belief in great detail" and to "provide a list of all relevant circumstances in great detail." See Silicon Graphics, 183 F.3d at 983-84. Additionally, the PSLRA requires a complaint to reveal the "sources of [plaintiff's] information," "corroborating details," and facts demonstrating the reliability of his assertions. See id. at 985. Here, plaintiff does not allege the source of his allegation that the price RFH paid for the assets of the Textainer Partnerships was "at least 18-20% less than the fair market price."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(See id. ¶ 2.) Although plaintiff cites a Wall Street Journal article, dated March 7, 2005, for the proposition that new container prices rose 40% in 2004, (see Compl. ¶ 29), he cites no source for his contention that container prices rose 18-20% between July 2004 and January 2005. Moreover, although plaintiff alleges that "[t]he prices for used shipping containers ... enjoyed an even greater increase in value since prices for used containers are directly related to the cost of replacement by new containers," plaintiff fails to allege the source of that information, or to allege whether, and why, he contends the general increase in the market price for new and used containers applied to the specific containers owned by the Textainer Partnerships. As defendants note, the complaint alleges that many of the containers owned by the Textainer Partnerships are subject to "master operating leases" and "long-term lease agreements." (See Compl. ¶¶ 19-20.) The Court cannot assume that general market prices for new and/or used containers necessarily would apply to containers encumbered by long-term leases. Accordingly, plaintiff has not alleged with particularity the source of his information that prices for containers increased 18-20% between July 2004 and January 2005, or that the general market price for new and/or used containers applies to the particular containers owned by the Textainer Partnerships. [FN4]

FN4. The Court does not reach the Textainer Defendants' argument that the alleged missing information was disclosed to the limited partners, prior to their vote approving the Asset Sale, in a March 14, 2005 Supplement to the Proxy Statement ("Supplement"). As the Supplement is not mentioned in the complaint, the Court may not consider it in ruling on the instant motion to dismiss.

***8** Accordingly, the Court finds that plaintiff has failed to plead, with the requisite particularity, his claim under § 14(a) that the proxy statements were materially misleading by reason of a failure to disclose that the market price for containers had increased 18-20% during the relevant time period. The Court will dismiss such claim with leave to amend.

3. Failure to Disclose Sale Price Was Lower Due to Requirement Textainer Management Continue to Manage Leases

The Textainer Defendants further argue that plaintiff cannot state a § 14(a) claim based on the Textainer Defendants' failure to inform the limited partners, in the proxy statements, that the sale price allegedly was lower than it otherwise would have been as a result of the requirement that Textainer Management continue to manage the leases for the purchaser. The Textainer Defendants point out that the proxy statements disclosed the requirement that the prospective purchaser enter into a contract with Textainer Management to manage the leases, and argue that, under Brody, there was no duty to disclose how that requirement might have affected the sale price.

In the proxy statements, the Textainer Defendants disclosed that "acceptance of a management agreement with [Textainer Management] was one of the conditions to an acceptable bid during the bidding process and is one of the conditions to the Asset Sale Agreement." (See Defs.' Mot. to Dismiss, Ex. A (Proxy Statement) at 20.) Additionally, the Textainer Defendants disclosed the principal terms of the management agreement and how the amount of their management fees would change if the Asset Sale were approved. (See id. at 20-21.) [FN5]

FN5. Pursuant to the Proxy Statements, Textainer Management expected to earn approximately 4% less in management fees if the Asset Sale were approved than if the Textainer Partnerships continued in operation. (See id. at 21.)

As noted, the Ninth Circuit has held that true, but incomplete, statements do not violate the securities laws unless they are also misleading. See Brody, 280 F.3d at 1006. Moreover, "[s]ection 14(a) and Rule 14a-9 do not obligate corporate officials to present, no matter how unlikely, every conceivable argument against their own recommendations," as long as they "disclose all known material facts so that shareholders can make informed choices." See Desaigoudar v. Meyercord, 223 F.3d 1020, 1024 (9th Cir.2000). Indeed, "federal law is satisfied as long as the proxy materials fully and fairly set forth the relevant and material facts from which a reasonable shareholder may draw his own conclusions as to how to vote." See New England Anti-Vivisection Society, Inc. v. U.S. Surgical Corp., Inc., 889 F .2d 1198, 1202 (1st Cir.1989). Here, the Textainer Defendants set forth in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

proxy statements the material facts as to the requirement that bidders retain a management contract with Textainer Management, and the key terms of that management contract. Based on these disclosed facts, any Textainer limited partner could infer that the requirement that the purchaser accept a management contract with Textainer Management may have affected the ultimate bid price in some fashion, but not necessarily downward. Without further details, one could as easily assume that the availability of a seasoned lease manager would result in a higher bid than would otherwise be the case. Consequently, the limited partners would not necessarily be aware that the sales price was adversely affected.

***9** Plaintiff, however, has not alleged, with the particularity required by the PSLRA, the basis for his contention that the bid requirement "had the effect of eliminating many potential bidders for the Partnerships' assets as these potential purchasers did not want or need Textainer Management to be granted a management contract in connection with any sale of the Partnership's assets and/or had the effect of limiting the price that a potential bidder was willing to pay for the Partnerships' assets." (See Compl. ¶ 24.) Plaintiff does not allege, for example, that the Textainer Defendants failed to disclose they received and rejected higher bids because the bidder would not accept a management contract with Textainer Management, or that the Textainer Defendants were aware that a particular bidder reduced the amount of its bid because of the requirement that it enter into a contract with Textainer Management.

Accordingly, the Court finds plaintiff has not adequately pleaded his § 14(a) claim based on the Textainer Defendants' alleged failure to inform the limited partners in the proxy statements that the sale price was lower than it otherwise would have been because of the requirement that Textainer Management continue to manage the leases for the purchaser. The Court will dismiss said claim with leave to amend.

4. Statement About Fairness of Asset Sale

Plaintiff alleges that the Textainer Defendants are liable under § 14(a) because the Maccarone Letter, which states that the Asset Sale was on terms that "the general partners believe are fair and in the best interests of the limited partners," is materially false or misleading because the Asset Sale was priced below prevailing market value and therefore was not in the best interests of the limited partners. (See Compl. ¶ 36.) The Textainer Defendants contend plaintiff has failed to plead, with the requisite specificity, that the statement was objectively false and that the Textainer Defendants disbelieved the opinion. The Court again agrees with defendants.

The statement at issue in the Maccarone Letter is an opinion. The Supreme Court has recognized that "a statement of belief by corporate directors about a recommended course of action" may be material, and thus, actionable under § 14(a), but such liability cannot be based merely on the defendant's subjective disbelief of the stated opinion, without "objective evidence ... that the statement also expressly or impliedly asserted something false or misleading about its subject matter." See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095-96 (1991). All of the cases the Court has located that have addressed the issue since Virginia Bankshares have concluded that a defendant may be liable for statements of opinion only if (1) the speaker did not actually hold the opinion, and (2) the opinion was objectively false or misleading. See In re AOL Time Warner, Inc. Securities and "ERISA" Litigation, 381 F.Supp.2d 192, 243 (S.D.N.Y.2004); In re Reliance Securities Litigation, 135 F.Supp.2d 480, 515 (D.Del.2001); In re McKesson HBOC, Inc. Securities Litigation, 126 F.Supp.2d at 1265. This Court agrees that plaintiff must allege both elements to state a § 14(a) claim against the Textainer Defendants based on a materially false or misleading statement of opinion in the Maccarone Letter.

***10** Plaintiff, however, fails to allege that the Textainer Defendants did not actually hold the opinion stated in the Maccarone letter. Moreover, for the reasons set forth above in sections A.2 and A.3, plaintiff fails to adequately allege objective falsity. Accordingly, plaintiff has failed to state a § 14(a) claim based on the statement of opinion in the Maccarone Letter that the Asset Sale was on terms that "the general partners believe are fair and in the best interests of the limited partners," and the Court will dismiss said claim with leave to amend.

5. Standing as to Claims on Behalf of Limited Partners of Textainer I and Textainer II

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The Textainer Defendants argue that plaintiff lacks standing to assert any claims on behalf of the limited partners of Textainer I and Textainer II, because plaintiff's certification, previously filed in this action, states that he owns units only in Textainer III, IV, V, and VI. (See Cera Decl., filed May 20, 2005, Ex. A (Certification of Plaintiff.)) The Textainer Defendants note that a § 14(a) claim may be brought only by "interest-holders with voting rights." See 7547 Corp. v. Parker & Paisley Development Partners, L.P., 38 F.3d 211 (5th Cir.1994). Plaintiff, who has voting rights in four of the six Textainer Partnerships, argues he has standing to assert claims on behalf of the limited partners in all six partnerships because the facts and issues relating to each partnership are identical.

In support of this argument, plaintiff relies on La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir.1973). La Mar involved two separate cases, one in which the plaintiff filed a class action for violations of the Truth in Lending Act against all pawn brokers licensed to conduct business in Oregon, although the plaintiff personally had engaged in business with only one such pawn broker, and a second case in which the plaintiff filed a class action against eight airlines for violation of the Federal Aviation Act, to recover overcharges with respect to ticket prices, although he had purchased tickets from only two of the eight airlines. See id. at 463. The Ninth Circuit stated that it assumed the plaintiffs had standing in each case because each plaintiff was "injured by a method of dealing more or less common to all defendants." See id. at 464. Although the Court found class certification inappropriate, pursuant to Rule 23 of the Federal Rules of Civil Procedure, because "typicality is lacking when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lies," see id. at 465, the court also stated its holding with respect to Rule 23 was not intended to "embrace situations in which all injuries are the result of a conspiracy or concerted schemes between the defendants at whose hands the class suffered injury" or to "instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." See id. at 466. In the instant case, all of plaintiff's claims are based on "a method of dealing more or less common to all defendants," see id. at 464, and a "concerted scheme between the defendants at whose hands the class suffered injury," see id. at 454, specifically, the manner in which the Asset Sale was conducted, including the dissemination of purportedly misleading Proxy Statements. [FN6]

FN6. Although plaintiff argues the Asset Sale was contingent on the approval of the investors in all of the Textainer Partnerships, defendants correctly note the Proxy Statements provide to the contrary. (See Textainer Defendants' Motion to Dismiss Ex. A (Proxy Statement) at 6-7 ("It is not a condition to the participation of any Partnership in the Asset Sale that all six Textainer Partnerships must participate in the Asset Sale.")). The Court does not find a lack of such contingency to be dispositive, however.

***11** Accordingly, the Court will deny the Textainer Defendants' motion to dismiss all claims asserted on behalf of the limited partners of Textainer I and Textainer II.

B. Section 20 Claim

Plaintiff alleges the Textainer Defendants are additionally liable for violating § 20(a) of the Exchange Act. (See Compl. ¶¶ 63-65.) Section 20(a) provides that "every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." See 15 U.S.C. § 78t(a). "In order to prove a prima facie case under § 20(a), a plaintiff must prove: (1) a primary violation of federal securities laws ... and (2) that the defendant exercised actual power or control over the primary violator." Howard v. Everex Systems, Inc., 228 F.3d 1057, 1065 (9th Cir.2000). Because, as discussed above, plaintiff has failed to allege "an actionable independent underlying violation of the [Exchange] Act," he has not stated a claim for violation of § 20(a). See In re VeriFone Securities Litigation, 11 F.3d 865, 872 (9th Cir.1993).

C. State Law Claims for Breach of Fiduciary Duty

In addition to his federal claims, plaintiff alleges the Textainer Defendants breached their fiduciary duties of loyalty, care, and candor under state law

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

by making the above-referenced assertedly misleading statements in the proxy statement and the Maccarone Letter. (See Compl. ¶¶ 50-62.) Defendants do not contend that a heightened pleading standard applies to plaintiff's state law claims for breach of fiduciary duty. Consequently, the Court finds plaintiff's complaint "must satisfy only the minimal notice pleading requirements of Rule 8(a)(2)"; Rule 8(a)(2) "requires only that the complaint include a 'short and plain statement of the claim showing that the pleader is entitled to relief." ' Seee Porter v. Jones, 319 F.3d 483, 494 (9th Cir.2003) (quoting Rule 8(a) of the Federal Rules of Civil Procedure); see also Concha v. London, 62 F.3d 1493, 1503 (9th Cir.1995) (holding claim for breach of fiduciary duty subject to notice pleading standard of Rule 8(a)).

1. Claims Against Maccarone, Textainer Capital, and Textainer Holdings

The Textainer Defendants argue that plaintiff's claims for breach of fiduciary duty must be dismissed to the extent they are asserted against Maccarone, Textainer Capital, and Textainer Holdings because said defendants are not alleged to be partners of the Textainer Partnerships and, thus, as a matter of law, owed no fiduciary duty to plaintiff or the other limited partners.

As noted above, plaintiff alleges that Textainer Equipment and Textainer Financial are general partners of the Textainer Partnerships. (See Compl. ¶¶ 8-9.) Maccarone is alleged to have been president of Textainer Financial, Textainer Capital is alleged to have "owned" Textainer Financial, and Textainer Holdings is alleged to have been "the umbrella company for and owner of Textainer Management, Textainer Financial and Textainer Capital." (See id. ¶ ¶ 10-12, 54-56.)

***12** Under California law, partners owe fiduciary duties to the partnership and the other partners. See Cal. Corp.Code § 16404(a). Under certain circumstances, however, persons who are not partners may nonetheless owe fiduciary duties to the partners and the partnership as a result of their relationship with a partner. For example, the Ninth Circuit Bankruptcy Appellate Panel, interpreting California law, has held a general partner of a general partner in a limited partnership to be a fiduciary of the limited partnership where such defendant exercised a "high degree of control" over the limited partnership. See In re Abrams, 229 B.R. 784, 791-92 (9th Cir. BAP1999). On the other hand, In re Real Estate Associates Ltd. Partnership Litigation, 223 F.Supp.2d 1109, 1133-34 (C.D.Cal.2002), on which the Textainer Defendants rely, held certain officers and directors of a managing general partner did not owe a fiduciary duty to the limited partners because plaintiffs therein had failed to set forth facts sufficient to raise a triable issue as to whether such officers and directors exercised sufficient control over the managing general partner, within the meaning of Abrams; and, accordingly, the district court found it inappropriate to "pierce the partnership veil." See id.

Here, there is no allegation that Maccarone, Textainer Capital, or Textainer Holdings controlled Textainer Equipment, Textainer Financial, or the Textainer Partnerships. Accordingly, the Court will grant the Textainer Defendants' motion to dismiss the claims for breach of fiduciary duty asserted against Maccarone, Textainer Capital, and Textainer Holdings, with leave to amend.

2. Duty of Loyalty

Plaintiff alleges the Textainer Defendants breached their duty of loyalty owed to the limited partners because such defendants "engaged in self-dealing and conflicted transactions that were unfair to the Limited Partners by requiring that any purchaser of the assets of the Textainer Partnerships continue to retain the Textainer Defendants as managing agents for those assets." (See Compl. ¶ 57.)

Section 16404(b) of the California Corporations Code provides:

> A partner's duty of loyalty to the partnership and the other partners includes all of the following:
> (1) To account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity.
> (2) To refrain from dealing with the partnership in the conduct or winding up of the partnership business as or on behalf of a party having an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

interest adverse to the partnership.

(3) To refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership.

See Cal. Corp.Code § 16404(b). Recently, a California court held that § 16404(b) does not set forth an exclusive statement of a partner's obligation to the partnership under the duty of loyalty, noting that the statute "leav[es] the articulation of the duty of loyalty to traditional common law processes." See Enea v. Superior Court, 132 Cal.App. 4th 1559, 1565 (2005). The same court succinctly summarized the duty of loyalty as follows: " '[P]artners may not take advantages for themselves at the expense of the partnership." ' See id. at 1564 (quoting Jones v. Wells Fargo Bank, 112 Cal.App. 4th 1527, 1540 (2003)).

a. Ratification of alleged breach of duty of loyalty

***13** At the outset, the Textainer Defendants argue that the limited partners approved the Asset Sale with full knowledge of the bidding process, in particular the requirement that the purchaser enter into a management contract with Textainer Management, and that such ratification cures any breach of the duty of loyalty that otherwise might have occurred. In response, plaintiff argues, citing BT-I v. Equitable Life Assurance Society, 75 Cal.App. 4th 1406 (1999), that limited partners cannot waive, in a limited partnership agreement, fiduciary duties owed to them. See id. at 1412 (holding "limited partnership agreement cannot relieve the general partner of its fiduciary duties in matters fundamentally related to the partnership business"). The Textainer Defendants have not argued, however, that the limited partners waived, in the limited partnership agreements, any fiduciary duties owed to them, but rather, as noted, that the limited partners ratified the Textainer Defendants' conduct at a later time.

Section 16103 of the California Corporations Code provides: "All of the partners or a number or percentage specified in the partnership agreement may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty," as long as it is not manifestly unreasonable to do so. See Cal. Corp.Code § 16103(b)(3)(B). As discussed above, however, the limited partners did not necessarily receive such "full disclosure," as a condition of the nature here at issue would not necessarily result in a decreased sales price.

Accordingly, the Court cannot find as a matter of law that any breach of the duty of loyalty was ratified by the limited partners, and the Textainer Defendants are not entitled to dismissal of this claim. [FN7]

FN7. The Court is aware that it has found a similar claim under § 14(a) subject to dismissal. That claim, however, is subject to the heightened pleading standards of the PSLRA.

b. Sufficiency of allegations

The Textainer Defendants next argue that plaintiff's allegations are too conclusory to state a claim for breach of the fiduciary duty of loyalty. As noted, plaintiff alleges the Textainer Defendants "engaged in self-dealing and conflicted transactions that were unfair to the Limited Partners by requiring that any purchaser of the assets of the Textainer Partnerships continue to retain the Textainer Defendants as managing agents for those assets," (see Compl. ¶ 57), and that said requirement "had the effect of either eliminating possible bidders or artificially depressing the amounts purchasers were willing to bid," (see id. ¶ 34). Consequently, according to plaintiffs, "the sale of the Textainer Partnerships' assets on the terms proposed represented a sale at a price below prevailing market values and was, therefore, not in the best interests of the Limited Partners." (See id. ¶ 36.) In essence, plaintiff contends the Textainer Defendants deprived the limited partners of the best price for the Textainer Partnerships' assets by requiring bidders to enter into a management contract that benefitted the Textainer Defendants.

***14** It is true, as the Textainer Defendants note, that a partner does not violate the duty of loyalty "merely because the partner's conduct furthers the partner's own interest." See Cal.Corp.Code § 16404(e). The purpose of § 16404(e), however, is "to excuse partners from accounting for incidental benefits obtained in the course of partnership activities without detriment to the partnership." See Enea, 132 Cal.App. 4th at 1566 (emphasis in original). Here, plaintiff has alleged that the Textainer Defendants' actions harmed the partnerships by reducing the price obtained for the

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

assets of the Textainer Partnerships. Consequently, § 16404(e) does not apply.

Similarly unpersuasive is the Textainer Defendants' argument that the proxy statements demonstrate they did not profit from the Asset Sale. The proxy statements do indicate that the Textainer Defendants expected to make slightly less in management fees under the new contract with RFH than they would have expected to earn if the Asset Sale had not been approved. (See Textainer Defendants' Motion to Dismiss, Ex. A at 21.) Under plaintiff's theory, however, the Textainer Defendants were not entitled to earn any management fees after the Asset Sale, because the requirement that the purchaser enter into a management contract with Textainer Management served to reduce the price realized in the Asset Sale.

Accordingly, taking the allegations as true, and given the notice pleading standard set forth in Rule 8(a), plaintiff's complaint states a claim for breach of the fiduciary duty of loyalty. See, e.g., Enea, 132 Cal.App. 4th at 1561, 1566 (finding breach of duty of loyalty where general partners rented partnership property at below market rates); see also Everett Investors 8 v. McNeil Partners, 114 Cal.App. 4th 411, 424 (2003) (noting "an obvious and essential unfairness in one partner's attempted exploitation of a partnership opportunity for his own personal benefit and to the resulting detriment of his copartners") (internal quotation and citation omitted).

2. Duty of Care

Plaintiff alleges that the Textainer Defendants breached the duty of care owed to the limited partners by engaging in the Asset Sale, albeit without alleging precisely how that duty was breached. (See Compl. ¶¶ 52-56.) The Textainer Defendants move to dismiss this claim, for failure to plead said defendants acted with the requisite lack of care.

Under California law, "[a] partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law." See Cal. Corp.Code § 16404(c). Although plaintiff's complaint does not expressly allege that the Textainer Defendants were "grossly negligent or reckless," or that they "engaged in intentional misconduct" or a "knowing violation of the law," plaintiff's allegation that the Textainer Defendants "engaged in self-dealing," (see Compl. ¶ 59), to the detriment of the limited partners, (see id. ¶ 36), is, in essence, the equivalent of such.

***15** Accordingly, the Textainer Defendants are not entitled to dismissal of this claim.

3. Duty of Candor/Full Disclosure

Plaintiff alleges that the Textainer Defendants are liable for breaching their "duty of candor" in connection with "the representations made in the Proxy Statements and the Maccarone Letter soliciting [the] Limited Partners' approval of the Asset Sale," and incorporates the allegations previously set forth in support of his claim for violation of § 14(a). (See Compl. ¶¶ 60-62.)

Of the fiduciary duties owed by partners, "[o]ne of the most important duties created is each partner's duty of full disclosure." See McCain v. Phoenix Resources, Inc., 185 Cal.App.3d 575, 579 (1986). "Partners are trustees for each other, and in all proceedings connected with the conduct of the partnership every partner is bound to act in the highest good faith to his copartner and may not obtain any advantage over him in the partnership affairs by the slightest misrepresentation [or] concealment." See id. (internal quotation and citation omitted). As a consequence, "partners have a duty to make a full and fair disclosure of all matters substantially affecting the value of the partnership." See id.; see also Neal v. Magana, Olney, Levy, Cathcart & Gelfand, 6 Cal.3d 176, 188-89 (1971) (holding, in attorney malpractice action, "[t]he duty of a fiduciary embraces the obligation to render a full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests."); cf. Neubauer v. Goldfarb, 108 Cal.App. 4th 47, 62-63 (2003) (noting, under Delaware law, majority shareholder breaches duty of candor owed to minority shareholder by failing to disclose fully all facts and circumstances surrounding transaction involving minority shareholder).

Here, as noted, plaintiff has alleged that the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Textainer Defendants failed to disclose (1) that prices for shipping containers rose 18-20% between July 2004, the date the terms of the sale were first agreed to, and January 2005, the date the proxy statements were distributed; and (2) that the price obtained for the assets of the Textainer Partnerships was depressed as a result of the Textainer Defendants' requirement that the purchaser enter into a management contract with Textainer Management. (See Compl. ¶¶ 32, 34.) The Textainer Defendants argue that plaintiff's claim for breach of the duty of candor/full disclosure fails for the same reasons plaintiff's claims fail under § 14(a).

As discussed, § 14(a) claims are subject to a heightened pleading standard under the PSLRA, while a plaintiff asserting a claim for breach of fiduciary duty is required only to set forth a "short and plain" statement of his claim, pursuant to Rule 8 of the Federal Rules of Civil Procedure. Nevertheless, the first of the above two allegations fails for one of the reasons the Court dismissed the § 14(a) claim, specifically, plaintiff's failure to allege that the assertedly nondisclosed information was not readily available in the public domain. See, e.g., Vega v. Jones, Day, Reavis & Pogue, 121 Cal.App. 4th 282, 295 (2004) (noting, in fraudulent concealment action, "the question in a nondisclosure case is whether the defendant knows of material facts, and also knows that those facts are neither known nor readily accessible to the plaintiff"; further noting "the point of disclosing material information in a transaction is that it is not otherwise available to the other side"). As to the latter allegation, however, plaintiff has adequately alleged the nondisclosure of a material fact, specifically, that the price obtained from the Asset Sale was lower than it would have been if the Textainer Defendants had not required the purchaser to enter into a management agreement with Textainer Management.

***16** Accordingly, the Court will grant the motion to dismiss plaintiff's claim for breach of the fiduciary duty of candor/full disclosure to the extent such claim is based on the Textainer Defendants' failure to disclose changes in market prices between July 2004 and January 2005, with leave to amend. The Court will deny the motion to dismiss plaintiff's claim for breach of the fiduciary duty of candor/full disclosure to the extent such claim is based on the Textainer Defendants' failure to disclose that the price obtained from the Asset Sale was lower than it would have been if the Textainer Defendants had not required the purchaser to enter into a management agreement with Textainer Management.

4. Aiding and Abetting Liability: RFH

RFH argues that the sole claim alleged against it is subject to dismissal for failure to state a claim. Plaintiff alleges that RFH, as the purchaser of the assets, "knowingly aided and abetted the Textainer Defendants in their breach of their fiduciary duties to the Limited Partners by agreeing to the management contract provided to the Textainer Defendants and agreeing to the terms of the Asset Sale and seeking approval through the Proxy Statements." (See Compl. ¶ 58.) Plaintiff further alleges that "[g]iven RFH's involvement in the purchases, it is reasonable to infer that the Proxy Statements were approved by RFH prior to distribution to the Limited Partners." (See id. ¶ 31.)

To state a prima facie case based on aiding and abetting a breach of fiduciary duty, plaintiff must allege that RFH: (1) knew the Textainer Defendants' conduct constituted a breach of fiduciary duty; and (2) gave "substantial assistance or encouragement" to the Textainer Defendants to accomplish the breach. See Casey v.. U.S. Bank Nat'l Ass'n, 127 Cal.App. 4th 1138, 1144 (2005). Plaintiff's complaint does not sufficiently allege either of the requisite elements.

Plaintiff's allegation that RFH "knowingly" aided and abetted the Textainer Defendants, (see Compl. ¶ 58), is conclusory in nature and, as such, is insufficient to plead the first requisite element. See Holden, 978 F.2d at 1121 (holding court, in ruling on motion to dismiss, need not accept as true conclusory allegations unsupported by the facts alleged); see also Casey, 127 Cal.App. 4th at 1153 (holding "conclusory allegation" that defendants "acted with knowledge of the primary wrongdoing" insufficient to plead actual knowledge). Plaintiff alleges no facts to support an inference that RFH had actual knowledge of the alleged breach.

Plaintiff also fails to allege that RFH substantially assisted or encouraged the Textainer Defendants in their alleged breach of their fiduciary duties. Plaintiff's complaint simply states that "it is

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

reasonable to infer that the Proxy Statements were approved by RFH." (See Compl. ¶ 31.) A failure to object to the content of the Proxy Statements, however, does not constitute substantial assistance or encouragement. See, e.g., Fiol v. Doellstedt, 50 Cal.App. 4th 1318, 1326 (1996) (holding "mere failure to act does not constitute the giving of 'substantial assistance or encouragement' to the tortfeasor"); see also Janken v. GM Hughes Electronics, 46 Cal.App. 4th 55, 78 (1996) (noting aiding and abetting "occurs when one helps another commit a prohibited act"). Moreover, even assuming RFH expressly approved the content of the Proxy Statements, a fact that is not directly alleged in the complaint, there is no allegation that such approval of the Proxy Statements contributed in any way to the Textainer Defendants' distribution of the Proxy Statements. See, e.g., Restatement (2nd) Torts § 876 (noting encouragement or assistance must be "substantial factor in causing the resulting tort"); see also Frame v. PricewaterhouseCoopers LLP, 2005 WL 3149697 at *9 (Cal.App. Nov. 28, 2005) (finding triable issue as to aiding and abetting where defendants "enable[d]" wrongdoers to commit tort). Plaintiff's complaint is devoid of any allegation as to how RFH's alleged approval of the Proxy Statements assisted or encouraged the Textainer Defendants to breach their fiduciary duties to the limited partners.

***17** Accordingly, the Court finds plaintiff has failed to state a claim against RFH for aiding and abetting any breach of fiduciary duty committed by the Textainer Defendants, and will dismiss the claim with leave to amend.

CONCLUSION

For the reasons set forth above:

1. The Textainer Defendants' motion to dismiss is hereby GRANTED IN PART and DENIED IN PART as follows:

a. The motion to dismiss plaintiff's § 14(a) claim is GRANTED and such claim is DISMISSED with leave to amend.

b. The motion to dismiss all claims asserted on behalf of the limited partners of Textainer I and II is DENIED.

c. The motion to dismiss plaintiff's § 20(a) claim is GRANTED and such claim is DISMISSED with leave to amend.

d. The motion to dismiss plaintiff's claims for breach of the fiduciary duties of loyalty, care and candor/full disclosure, to the extent asserted against Maccarone, Textainer Capital, and Textainer Holdings, is GRANTED and such claims are DISMISSED with leave to amend.

e. The motion to dismiss the claim for breach of the fiduciary duty of loyalty, as asserted against the remainder of the Textainer Defendants, is DENIED.

f. The motion to dismiss the claim for breach of the fiduciary duty of care, as asserted against the remainder of the Textainer Defendants, is DENIED.

g. The motion to dismiss the claim for breach of the fiduciary duty of candor/full disclosure, as asserted against the remainder of the Textainer Defendants, is GRANTED and such claim is DISMISSED with leave to amend to the extent such claim is based on a failure to disclose changes in market prices between July 2004 and January 2005. The motion to dismiss plaintiff's claim for breach of the fiduciary duty of full disclosure, as asserted against the remainder of the Textainer Defendants, to the extent such claim is based on a failure to disclose that the price obtained from the Asset Sale was lower than it would have been if the Textainer Defendants had not required the purchaser to enter into a management agreement with Textainer Management is DENIED.

2. RFH's motion to dismiss the aiding and abetting claim, as asserted against RFH, is hereby GRANTED, and said claim is DISMISSED with leave to amend.

3. Plaintiff may file an amended complaint no later than 20 days from the date of this order.

4. In light of the above rulings, the Case Management Conference previously scheduled for December 16, 2005 is hereby CONTINUED to March 31, 2006 at 10:30 a.m. A Joint Case Management Statement shall be filed no later than March 24, 2006.

This order terminates Docket Nos. 125 and 126.

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

IT IS SO ORDERED.

2005 WL 3801596 (N.D.Cal.), Fed. Sec. L. Rep. P 93,634

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. Georgia,
Atlanta Division.

**WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, and derivatively on behalf of Wells Real Estate Investment Trust, Inc., Plaintiff,**
**v.**
**WELLS REAL ESTATE INVESTMENT TRUST, INC., et al., Defendants.**

**Civil Action No. 1:07-CV-862-CAP.**

March 31, 2008.

Alexandra R. Silverberg, Lawrence P. Kolker, Wolf Haldenstein Adler Freeman & Herz, Christopher J. Keller, Joseph Sternberg, Lawrence A. Sucharow, Labaton Sucharow LLP, New York, NY, Conor R. Crowley, Finkelstein Thompson & Loughran, Washington, DC, Gregory E. Keller, Chitwood Harley Harnes, LLP, John F. Harnes, Chitwood Harley Harnes, LLP, Great Neck, NY, H. Russell Smouse, Office Of Peter G. Angelos, Towson, MD, Kimberly M. Donaldson, Kimberly Litman Kimmel, Nicholas E. Chimicles, Chimicles & Tikellis, LLP, Haverford, PA, Martin D. Chitwood, Meryl W. Edelstein, Michael Ryan Peacock, Robert Ware Killorin, Chitwood Harley Harnes, Atlanta, GA, for Plaintiff.

Dan Shamus McDevitt, Michael J. Cates, Michael R. Smith, Bethany Marie Rezek, Jaime L. Theriot, Dan Shamus McDevitt, Michael J. Cates, King & Spalding, LLP, J. Timothy Mast, J. Kirk Quillian, Troutman Sanders, LLP, Tony Glen Powers, Kimberly Lillian Myers, Rogers & Hardin, Atlanta, GA, for Defendants.

ORDER

CHARLES A. PANNELL, JR., District Judge.

***1** This matter is before the court on the defendants' motion to dismiss the amended complaint [Doc. No. 106] and the plaintiff's motion for oral argument [Doc. No. 113]. As an initial matter, the court has reviewed the briefs filed by the parties and finds that a hearing is not necessary. Therefore, the motion for oral argument [Doc. No. 113] is DENIED.

BACKGROUND

This action was filed in the District Court of Maryland on March 12, 2007 [Doc. No. 1], as a purported class action and derivative complaint against the Wells Real Estate Investment Trust, Inc. ("Wells REIT" or "Company"), certain Wells REIT directors and officers, and the Company's advisor ("Advisor"). The lead plaintiff is Washtenaw County Employees' Retirement System, an entity that held 1,274,794 shares of Wells REIT stock on February 28, 2007, and continues to hold shares of Wells REIT stock.

Wells REIT is a Maryland corporation with its principal executive offices located in Norcross, Georgia. Wells REIT is primarily engaged in the acquisition and ownership of commercial real estate properties. It is a public unlisted REIT, which means that (1) it is public because it is registered with the Securities and Exchange Commission ("SEC"), can sell to the investing public rather than only to "qualified investors," and is required to file reports with the SEC; and (2) it is unlisted because its securities are not listed on a national stock exchange. Because of this business model, Wells REIT has a fixed life. According to the Articles of Incorporation, if its stock is not listed on a national securities exchange by January 30, 2008, Wells REIT must sell its assets and distribute the proceeds. [FN1]

FN1. This liquidation deadline has been extended through an amendment to the Company's Articles of Incorporation.

The Advisor is made up of third parties who contracted with Wells REIT to provide real estate management, advisory services, and administrative functions. Specifically, the following entities comprised the Advisor: (1) Wells Capital, Inc.; (2) Wells Management Company, Inc.; (3) Wells Real Estate Funds, Inc.; (4) Wells Real Estate Advisory Services, Inc.; (5) Wells Advisory Services I, LLC; and (6) Wells Government Services, Inc. All of the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

officers and some of the directors of the Advisor were Wells REIT's officers and directors. The Advisor's authority to conduct the day-to-day operations of Wells REIT was delegated through the Wells REIT's Articles of Incorporation and a series of Advisory Agreements.

The Individual Defendants are comprised of eleven individuals who fall into three categories. The first category of Individual Defendants is the Management Director Defendants and consists of: (1) Leo F. Wells, III; (2) Douglas P. Williams; (3) Randall D. Fretz; and (4) Donald A. Miller. The second category of Individual Defendants is the Non-Management Director Defendants and consists of: (1) Bud Carter; (2) Donald S. Moss; and (3) Neil H. Strickland. The third category of Individual Defendants is the Non-Management Director Defendants & Members of the Special Committee [FN2] and consists of: (1) Michael R. Buchanan; (2) Richard W. Carpenter; (3) William H. Keogler, Jr.; and (4) W. Wayne Woody.

FN2. The Special Committee was appointed by the Wells REIT Board in December 2004 to evaluate strategic alternatives available to the company, including internalization of the Advisor.

*2 Finally, the plaintiff has named as a party defendant Robert E. Bowers. Bowers has served as the CFO of Wells REIT since April 16, 2007.

On February 5, 2007, Wells REIT announced that it had entered into an agreement with the Advisor to internalize the Advisor ("Internalization"). The proposed consideration for the acquisition was to be the issuance of Wells REIT stock representing just over 4% of the outstanding shares of Wells REIT, which amounted to approximately $175 million ("Internalization Consideration"). This proposed transaction was to be submitted to a vote by the Wells REIT stockholders on April 11, 2007. In advance of the vote, Wells REIT filed the definitive proxy ("Proxy") and a supplement ("Supplemental Proxy") with the SEC regarding the proposed Internalization.

The plaintiff's original complaint asserted two claims: (1) the Proxy was misleading by omission in violation of Section 14(a) of the Exchange Act; and (2) the defendants breached their fiduciary duties by pursuing Internalization [Doc. No. 1]. On March 30, 2007, the plaintiff filed a motion for temporary restraining order ("TRO") and for expedited discovery [Doc. No. 16]. In this motion, the plaintiff sought to enjoin the scheduled vote and to obtain expedited discovery to support its motion for injunctive relief.

On April 9, 2007, the Maryland District Court held a hearing on the plaintiff's motions for TRO and for expedited discovery. The motions were denied [Doc. No. 49], and the scheduled stockholders' meeting was allowed to proceed. At the stockholders' meeting on April 16, 2007, the proposed Internalization was approved. On April 17, 2007, the lawsuit was transferred to this court [Doc. No. 51].

On June 27, 2007, the plaintiff filed its amended class action complaint [Doc. No. 103]. The amended complaint contains seven counts: (1) a class action claim against the Advisor and the Individual Defendants asserting a violation of § 14(a) of the Exchange Act, 15 U.S.C. § 78n (a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 (Count I); (2) a class action claim against the Advisor and Individual Defendants asserting a violation of § 20(a) of the Exchange Act 15 U.S.C. § 78t (a) (Count II); (3) a class action claim against the Advisor and Individual Defendants asserting a breach of fiduciary duty (Count III); (4) a class action claim against the Individual Defendants and Defendant Bowers asserting the aiding and abetting of the breach of fiduciary duty (Count IV); (5) a shareholders' derivative claim against the Advisor and Director Defendants asserting a violation of § 14(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 781 (Count V); (6) a shareholders' derivative claim against the Advisor and the Individual Defendants asserting a breach of fiduciary duty (Count VI); and (7) a class action and shareholders' derivative claim against Wells, Williams, Miller, Bowers, and Fretz asserting unjust enrichment (Count VII).

*3 The defendants have moved to dismiss the Amended Complaint [Doc. No. 106]. The defendants argue that Counts I and II do not adequately state a claim for breach of the duty of disclosure and that the plaintiff failed to meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). As to Counts III

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

through VII, the defendants argue that these are derivative claims and the plaintiff failed to meet the pre-suit demand requirements for derivative claims. Alternatively, the defendants argue that the decisions challenged in Counts III through VII are subject to the protection of the business judgment rule.

LEGAL ANALYSIS

The defendants move for dismissal under Federal Rule of Civil Procedure 12(b)(6), which requires an assessment of whether the plaintiff has set forth claims upon which this court may grant relief. Under the United States Supreme Court's recent articulation of the analytic standard involved in applying this rule, this court must construe the amended complaint in favor of plaintiff, accept the factual allegations contained in the Amended Complaint as true, and determine whether the plaintiff's factual allegations present plausible claims. See Bell Atlantic Corp. v. Twombly, 550 U.S. ----, ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007). To be considered plausible, a claim must be more than merely conceivable. Bell Atlantic Corp., 550 U.S. at ----, 127 S.Ct. at 1974. Thus, "[d]ismissal is warranted if the complaint lacks an allegation as to a necessary element of the claim raised." Id.

In considering a motion to dismiss under Rule 12(b)(6), "the Court may take judicial notice of the contents of relevant public documents that were required to be filed with the Securities Exchange Commission ("SEC") and were actually filed." In re Bellsouth Corp. Securities Litigation, 355 F.Supp.2d 1350, 1361 (N.D.Ga.2005) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir.1999)). Additionally, the court may consider evidence outside the pleadings that is undisputedly authentic and on which plaintiffs specifically relied in the complaint. Harris v. Ivax Corp., 182 F.3d 799, 802 n. 2 (11th Cir.1999). In the instant case, the Proxy and the Lexington offers were filed with the SEC and specifically relied upon by the plaintiffs in the Amended Complaint. Accordingly, this evidence will considered by this court in resolving the motion to dismiss.

A. Section 14(a) claims (Counts I and V)

Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder prohibit the inclusion of false or misleading material, including omissions, which render the material false or misleading, in proxy statements or other communications soliciting proxies. 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9(a). The defendants argue that the plaintiff's § 14(a) claims fail because (1) the Proxy included all material information, and (2) the plaintiff did not comply with the heightened pleading requirements of the PSLRA and Rule of Civil Procedure 9(b). In response, the plaintiff argues that the alleged omissions to the Proxy were material and that its § 14(a) claims do not sound in fraud, removing those claims from heightened pleading requirements of the PSLRA and Rule 9(b).

***4** First, the court notes that many of the facts that the plaintiff alleges were omitted from the Proxy were actually contained in the Proxy. In these instances, there can be no § 14(a) violation. Second, with regard to facts that were actually omitted from the Proxy, there is a § 14(a) violation only when the facts omitted were material.

1. Allegations of Omissions or Falsehoods

In Count I of the Amended Complaint, the plaintiff alleges six categories of information that were misrepresented or omitted from the Proxy:

(a) third-party offers to purchase Wells REIT and the details of these offers;
(b) the likelihood that a Listing would even occur;
(c) the reasons for the Internalization and whether the Internalization is in the best interests of the shareholders and the Company if some exit strategy other than a Listing materializes;
(d) the alternatives to a listing that were explored in context of evaluating and recommending the Internalization, such as the Company liquidating, or the Company engaging in business combination, or buyout of the shareholders' stock;
(e) that the defendants could have provided (but did not) a mechanism by which, if the Company did not List by the January 30, 2008 deadline, the Internalization would be reversed or rescinded;
(f) that the defendants could have provided (but did not) a mechanism whereby the Internalization Consideration and the dilutive effect of the Merger and Internalization on the Company's shareholders would have to be appropriately adjusted to more completely reflect the benefit the self-advisement conferred on the Company if an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

alternative exit strategy to a Listing is effectuated. [Doc. No. 103 at 128-29].

Additionally, in another section [FN3] of the Amended Complaint, the plaintiff raised nine allegations of omissions in the Proxy [Doc. No. 103 at 76-117]. To the extent that these additional allegations are not duplicative of those properly raised within Count I, the Amended Complaint alleges that:

FN3. These allegations were not specifically addressed in the defendants' motion to dismiss. In the response brief, the plaintiff took the position that the defendants did not seek dismissal of these additional allegations and argued that this failure foreclosed the defendants from moving to the dismiss these additional allegations in the future. The court notes that the defendants moved to dismiss Count I in its entirety. The fact that the plaintiff failed to specifically allege within Count I all the facts it contends support that ground for relief cannot be used by the plaintiff to prevent a challenge to its claims. In fact, the plaintiff's complaint seems to be the kind of verbose, shotgun pleading that the Eleventh Circuit has repeatedly condemned. See Davis v. Coca-Cola Bottling Co. Consolidated, No. 05-12988, 2008 WL 314962 (11th Cir. February 6, 2008); Strategic Income Fund. L.L .C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293 (11th Cir.2002); Byrne v. Nezhat, 261 F.3d 1075 (11th Cir.2001). Regretfully, the court did not require the plaintiff to file a recast complaint as the Eleventh Circuit has strongly suggested be done. The court will, however, address the grounds for dismissal raised in the defendants' reply brief with respect to those allegations outside of Count I.

(g) the Proxy contained materially false and misleading statements concerning the pricing of Wells REIT's stock;
(h) the Proxy contained materially false and misleading statements concerning several ancillary service agreements which will provide additional fees to affiliates of the Advisor;
(i) the Proxy contained materially false and misleading statements concerning the subordinated incentive fee;
(j) the fairness opinion was false and misleading;
(k) the Proxy contained materially false and misleading statements about a prior valuation done of the Advisor;
(l) the Proxy contained materially false and misleading statements about the Advisor's performance;
(m) the Proxy failed to disclose which, if any, strategic alternatives were considered by the Board.

The court will examine the allegations of omission and the Proxy itself to determine whether material facts were omitted. An omitted fact is immaterial unless "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and unless its "disclosure ... would have been viewed by the reasonable shareholder as having significantly altered the 'total mix' of information made available." Id. "While materiality is generally a question of fact reserved for the jury, alleged misrepresentations are immaterial as a matter of law where a court determines that no reasonable investor could have been swayed by the alleged misrepresentation." In re Amdocs Ltd. Securities Litigation, 390 F.3d 542, 547 (8th Cir.2004).

a. Third-Party Offers

***5** In the Amended Complaint, the plaintiff alleges that the offers made by Lexington Realty Trust ("Lexington") in letters dated March 5, 2007 and April 5, 2007, were material facts that should have been contained in the Proxy or the Supplement [Doc. No. 103 at 68-72]. The defendants argue that the Lexington offers were not material because they were merely tentative expressions of interest of an acquisition of Wells REIT, while the subject matter of the Proxy, the Internalization, was a proposed acquisition by Wells REIT.

The defendants oversimplify the contents of the Lexington offers. The crucial information that was material to shareholders was that a higher stock price was offered if Internalization did not occur. See Exs. 3 and 4 to the motion to dismiss [Doc. No. 106]. There can be no doubt that this information is material, as it would be considered important by a reasonable shareholder in deciding whether to vote for or against Internalization.

b. Likelihood Listing Would Occur

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The plaintiff alleges that "based on industry trends, at the time the Proxy was filed, it was at least as likely that the Company would not list, as it was the Company would list" [Doc. No. 103 at 80]. The plaintiff contends that this was a material fact that should have been included in the Proxy.

The defendants, on the other hand, contend that the Proxy and the Proxy Supplement repeatedly disclosed that "[t]here can be no assurance that we will determine to list." See Proxy Statement at ii, 3, 18, 26 and 44 [Ex. 1 to Doc. No. 106]; Proxy Supplement at unnumbered pages 1-2 [Ex. 2 to Doc. No. 106]. Additionally, the Proxy informed shareholders that in the event the listing did not occur, the Board was required to undertake an orderly liquidation and sale of assets. See Proxy at 3 [Ex. 1 to Doc. No. 106]. The Proxy Supplement went further to inform shareholders that if a listing does not occur, potential options include: "commencing a liquidation of our assets, pursuing a merger or other business combination with a third party or seeking stockholder approval to amend our articles of incorporation to extend the date by which we must either complete a Listing or commence a liquidation of our assets." See Proxy Supplement at 1 [Ex. 2 to Doc. No. 106].

Thus, it appears that the information the plaintiff claims was omitted from the Proxy was in fact contained therein. While the Proxy did not undertake an analysis of "industry trends," in order to inform shareholders of what similarly-situated companies were doing, the Proxy did sufficiently inform shareholders that the listing may or may not occur. Additionally, the Proxy Supplement explained to shareholders what avenues would be available to the Company should the listing not occur. Accordingly, the plaintiff fails to state a claim for relief on this issue.

c. Reasons for the Internalization/ Value of Internalization if Listing Does Not Occur

First, the plaintiff alleges that the Proxy failed to give shareholders meaningful reasons for the Internalization. Second, the plaintiff alleges that the Proxy failed to explain to shareholders how the Internalization would serve their best interests if some exit strategy other than a Listing materialized.

*6 A review of the Proxy demonstrates that it contained detailed information regarding reasons for the Internalization. See Proxy at 44-45 [Ex. 1 to Doc. No. 106]. Additionally, the Proxy Supplement disclosed to shareholders that the anticipated benefits of the Internalization may not be realized if a strategy other than listing is pursued. See Proxy Supplement at 1-2 [Ex. 2 to Doc. No. 106]. Thus, the court finds that the shareholders were adequately informed regarding the reasons for the proposed Internalization as well as the possibility that Internalization may not be beneficial should the listing not occur. Accordingly, the plaintiff fails to state a § 14(a) claim as to this issue.

d. Benefits of Internalization Under An Alternative Exit Strategy

The plaintiff alleged that the Proxy failed to provide shareholders with any information regarding the costs or benefits that would result from Internalization in the event the Company took an alternative to listing, i.e., a liquidation of assets, a merger or other business combination with a third party, or an extension of the date by which the Company must list or liquidate. A review of the Proxy indicates, however, that shareholders were informed that even if a listing does not occur, the Internalization would be beneficial because there would be a reduction in operating costs when the Company no longer has to pay advisory, property management, and other fees and expenses related to the external Advisor. See Proxy at 2 [Ex. 1 to Doc. No. 106]. Thus, the information regarding benefits of the Internalization absent a listing was contained in the Proxy. Accordingly, the plaintiff has failed to state a claim for relief with regard to this alleged omission.

e. The Viability of a Mechanism to Reverse the Internalization, if the Company Did Not List by January 30, 2008

The plaintiffs complain that the Proxy failed to inform shareholders that the Board could have provided a mechanism to reverse Internalization if the listing did not occur. A proxy statement, however, need not include the "panoply of possible alternatives" in the course of the action proposed. Behrens v. Wometco Enterprises, Inc., 118 F.R.D. 534, 540 (S.D.Fla.1988) (citing Umbriac v. Kaiser, 467 F.Supp. 548, 553 (D.Nev.1979)). The court finds that this information is merely one of many

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

possible alternatives to the action proposed in the Proxy and is therefore unnecessary. Therefore, the plaintiff fails to state a claim for relief on this issue.

f. Viability of a Mechanism to Alter the Internalization Consideration and the Dilutive Effect of the Merger and Internalization if the Listing Is Not Effectuated

Like subsection (e) above, the plaintiff is complaining that the Proxy did not inform shareholders that it was possible to put a mechanism in place to reduce the amount paid for Internalization if the listing did not occur. This information is nothing more than an alternative to the action proposed in the Proxy. See Behrens, 118 F.R.D. at 540. This information, which the plaintiff alleges was wrongfully omitted from the Proxy, is not material. Accordingly, the plaintiff fails to state a claim for relief on this issue.

g. Pricing of Wells REIT's Stock

*7 The plaintiff alleges that the Proxy should have included information on the trading prices of comparable REITs' stock and the quantification of the effect of different valuations on the Internalization Consideration. Additionally, the plaintiff complains that the Proxy did not inform shareholders of the Lexington offers or of the fact that the price per share offered therein exceeded the defendant's per share price related to the Internalization Consideration. Because the court has already concluded that the Lexington offers as well as the per share prices offered therein were material facts that should have been disclosed in the Proxy, the court will only consider the plaintiff's argument regarding the trading prices of comparable REIT's stock.

A review of the Proxy indicates that it contained a thorough discussion of comparable REIT's involved in internalization transactions, including a comparison of purchase prices paid for advisory services. See Proxy at 62-66 [Ex. 1 to Doc. No. 106]. Accordingly, the Proxy contained the material information regarding pricing of the Wells REIT's stock. Therefore, the plaintiff fails to state a claim for relief on this issue.

h. Ancillary Service Agreements

The plaintiff contends that the Proxy falsely states that after Internalization, Wells REIT will no longer pay advisory and property management fees. According to the plaintiff. Wells REIT continues to pay the Advisor's affiliates for these services.

A review of the Proxy indicates, however, that shareholders were informed that upon Internalization, the existing management agreements would terminate and that Wells REIT would enter into new agreements including the Transition Services and Support Services Agreements. See Proxy at 89-92 [Ex. 1 to Doc. No. 106]. The Proxy even provided the fees that would be paid pursuant to these agreements. See id. Accordingly, the Proxy contained the material information regarding the ancillary services agreements. Therefore, the plaintiff fails to state a claim for relief on this issue.

i. Subordinated Incentive Fee

The plaintiff argues that the Proxy made false statements regarding the contractually-agreed-upon Subordinated Incentive Fee, a payment to be made to the Advisor upon listing. According to the plaintiff, this fee served as an objective compensation formula under which the Advisor would be compensated based on the Company's performance upon listing. The result of the Internalization was to terminate the Advisor and eliminate this provision. Apparently, the plaintiff contends that shareholders should have been told that the actual purpose of the Internalization was to circumvent the incentive fee agreement and provide a guaranteed payment.

There is no merit to the plaintiff's argument. It appears that it is the offering and prospectus documents to which the plaintiff takes exception on this point. The incentive fee was to be an objectively determined payment to the Advisor, as an outside entity, upon listing. The Internalization was a purchase of the Advisor that occurred prior to a listing. Therefore the incentive fee was no longer payable upon listing. The plaintiff complains that shareholders were not told in the offering and prospectus documents that Wells REIT would have to purchase the Advisor prior to a listing. This assertion completely misconstrues the Internalization as it is proposed in the Proxy. The Proxy informs shareholders that the Board believed Internalization would be beneficial to the Company should the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

listing occur. Therefore, there is no false or misleading information within the Proxy pertaining the subordinated incentive fees. Accordingly, the plaintiff fails to state a claim for relief on this issue.

j. Fairness Opinion

***8** The Proxy included the Houlihan Lokey Fairness Opinion, which concluded that the Internalization Consideration was fair to Wells REIT from a financial point of view. The plaintiff argues that the inclusion of this Fairness Opinion in the Proxy served to mislead shareholders by suggesting that some purportedly independent entity had conducted an assessment of the Internalization. Instead, according to the plaintiff, the Fairness Opinion was flawed, devoid of credibility and reliability, and was used to mask the defendants' wrongdoing.

Statements of opinion or belief are actionable only if they are both objectively and subjectively false. Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1095, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). "To plead the falsity of a statement of opinion, a plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false. A fairness opinion is objectively false if the subject matter of the opinion is not, in fact, fair, and is subjectively false if the speaker does not, in fact, believe the subject matter of the opinion to be fair. Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074(JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003). In this case, the plaintiff has failed to allege that Houlihan Lokey did not believe the subject matter of the opinion to be fair. Rather, the plaintiff takes issue with the assumptions upon which the fairness opinion is based. But, the plaintiff concedes that these assumptions were disclosed to shareholders in the Proxy. Accordingly, the plaintiff's allegations regarding the Houlihan Lokey Fairness Opinion fail to state a claim for relief.

k. Prior Valuation of the Advisor

The plaintiff alleges that the Proxy was misleading because it stated that there had been a prior valuation done of the Advisor but never explained the increase from that prior value to the amount that served as the Internalization Consideration. A review of the Proxy indicates that the 2005 valuation of the Asset Management Advisory Agreement, the Acquisition Advisory Agreement, and the Master Property Management Agreement was done as a result of the restructuring of the companies composing the Advisor. The purpose of this valuation, according to the Proxy, was to project a cash flow expected to be generated by the three agreements between Wells REIT and the Advisor. See Proxy at 43 [Ex. 1 to Doc. No. 106].

When Wells REIT became interested in acquiring the Advisor, the amount of the Internalization Consideration was determined through a series of negotiations, which were thoroughly disclosed in the Proxy. See Proxy at 55 [Ex. 1 to Doc. No. 106]. While the plaintiff complains that the difference in the cash flow valuation of $71 million and the Internalization Consideration of $175 should have been explained to shareholders, these value estimates are not comparable. Perhaps the plaintiff could make a valid argument regarding a failure to explain differences in valuations of the Advisor if both estimates were within the context of acquiring the Advisor. This is not the case here. Therefore, the plaintiff's allegations regarding the difference in the Internalization Consideration and the 2005 valuation fails to state a claim for relief.

l. The Advisor's Performance

***9** The plaintiff alleges that the Proxy omitted information on how the Advisor had performed based on industry and role specific criteria. A review of the Proxy indicates that the Advisor's financial performance as well as the quality of services provided by the Advisor was explicitly discussed in the Proxy. See Proxy at 33-38, 128-35 [Ex. 1 to Doc. No. 106]. The plaintiff completely ignores these disclosures and offers the court no basis for a claim regarding the omission of information on the Advisor's performance. Accordingly, the allegations in the Amended Complaint as to a lack of information on the Advisor's performance fail to state a claim for relief.

m. Strategic Alternatives

The plaintiff alleges that the Proxy failed to provide meaningful information, evaluation, or discussion concerning strategic alternatives considered by the Special Committee in approving

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

and recommending the Internalization. A review of the Proxy reveals otherwise. Shareholders were informed that after considering alternatives such as continuing as a going concern, potential liquidation of assets, or potential Listing, the Board recommended the Internalization. See Proxy at 45 [Ex. 1 to Doc. No. 106]. It appears that the plaintiff is merely arguing that more detail should have been given about the viability of the alternatives to listing. The court finds, however, that the Proxy disclosed all material information on the consideration of alternatives for the Company. [FN4] Accordingly, the allegations regarding disclosure of strategic alternatives fail to state a claim for relief.

FN4. The plaintiff reiterates its allegations related to disclosure of the Lexington Offers in this section of the Amended Complaint. The court considers these allegations to be subsumed by ¶ 304 of the Amended Complaint. Therefore, dismissal of the general allegations regarding the omission of strategic alternatives from the Proxy does not include the allegations regarding the Lexington offers and the underlying details.

2. Heightened Pleading Requirement

The counts within the Amended Complaint setting forth § 14(a) violations clearly allege that the defendants acted negligently. There is no allegation of the intent necessary to state a cause of action for fraud. Courts have held that § 14(a) claims can be based on negligent misrepresentation rather than solely upon fraud. In re Premiere Technologies Inc., No. 1:98-CV-1804-JOF, 2000 WL 33231639, at *8 n. 5 (N.D.Ga. Dec.8, 2000). Moreover, the defendants concede that a § 14(a) claim may be based on negligent conduct. See Br. in Support of the Defs' M. to Dismiss the Am. Compl. at 10 [Doc. No. 106-2]. Therefore, the heightened pleading requirements of the PSLRA and Rule 9(b) are not applicable to the plaintiff's § 14(a) claims. Accordingly, the motion to dismiss on this basis is DENIED.

B. Section 20(a) claim (Count II)

Section 20(a) of the Exchange Act, extends liability to a "controlling person" where a securities violation is found. 15 U.S.C. § 78t(a); Brown v. Enstar Group, Inc., 84 F.3d 393, 395-97 (11th Cir.1996). Because the court has determined that portions of the § 14(a) claims in the Amended Complaint state a claim for relief, these remaining allegations are sufficient to support a § 20(a) claim. Therefore, the motion to dismiss regarding Count II is DENIED.

C. Derivative Claims

***10** Federal Rule of Civil Procedure 23.1 provides that a complaint in a derivative action "shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Substantively, a shareholder derivative suit is governed by the law of the state of incorporation. Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 108-09, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). Because Wells REIT is a Maryland corporation, Maryland law controls its actions. Before bringing a derivative suit under Maryland law, the shareholder must either make a demand on the board of directors that the corporation bring the suit, or show that demand is excused as futile. Kamen, 500 U.S. at 96; Waller v. Waller, 187 Md. 185, 49 A.2d 449, 453 (Md.1946).

In this action, the defendants argue that Counts III through VII are derivative and are subject to the demand requirement. While Count V and VI are pled only as derivative claims, the plaintiff argues, however, that the breach of fiduciary claims (Counts III and IV) and unjust enrichment claim (Count VII) are properly brought as both direct and derivative claims. First, the court will analyze each disputed claim to determine whether the claims are solely derivative. Next, because it is undisputed that the plaintiff did not make a demand on the board, the court will determine whether the derivative claims asserted by the plaintiff are subject to the demand futility exception.

1. Whether Breach of Fiduciary Duty and Unjust Enrichment Claims are Solely Derivative in Nature

Counts III and IV are labeled by the plaintiff as direct claims brought on behalf of the class alleging breach of fiduciary duty (III) and aiding and abetting the breach of fiduciary duty (IV). The plaintiff

labels Count VII as a direct and derivative claim predicated on unjust enrichment. The defendants argue that despite the plaintiff's characterization of these claims as, at least in part, direct, all of these claims are derivative in nature.

Determining whether a claim is direct or derivative does not depend on the label given to the claim by the plaintiff. Rather, the court must analyze the nature of the claims raised in the complaint under the applicable law. Paskowitz v. Wohlstadter, 151 Md.App. 1, 822 A.2d 1272, 1276 (Md.Ct.Spec.App.2003). State law governs the question of whether a claim is direct or derivative. Kamen, 500 U.S. at 108-09. Because Wells REIT is a Maryland corporation, this court will apply Maryland law to make this determination.

In Waller, 49 A.2d at 452, the Maryland Court of Appeals explained the Maryland common law of shareholder derivative actions:

> It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.
>
> ***11** Generally, therefore, a stockholder cannot maintain an action at law against an officer or director of the corporation to recover damages for fraud, embezzlement, or other breach of trust which depreciated the capital stock or rendered it valueless. Where directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity.... The rule is applicable even when the wrongful acts were done maliciously with intent to injure a particular stockholder. It is immaterial whether the directors were animated merely by greed or by hostility toward a particular stockholder, for the wrongdoing affects all the stockholders alike. It is accordingly held that a stockholder cannot sue individually to recover damages for injuries to the corporation, notwithstanding that the directors may have entered into an unlawful conspiracy for the specific purpose of ruining the corporation ....

(Citations omitted.) See also Danielewicz v. Arnold, 137 Md.App. 601, 769 A.2d 274, 283-87 (Md.App.2001).

"In deciding whether a shareholder may bring a direct suit, the question the Maryland courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too. The inquiry, instead, is whether the shareholders' injury is distinct from that suffered by the corporation." Struogo v. Bassini, 282 F.3d 162, 170 (2nd Cir.2002) (citing Tafflin v. Levitt, 92 Md.App. 375, 608 A.2d 817, 820 (Md.App.1992)).

With regard to the unjust enrichment claim (Count VII), the plaintiff alleged that defendants Wells, Williams, Miller, Bowers, and Fretz were unjustly enriched at the expense of and to the detriment of the company and its shareholders [Doc. No. 103 at 152]. In this claim, the plaintiff has not alleged any injury to shareholders that is distinct from the injury to the company itself. Accordingly, the unjust enrichment claim is derivative in nature and is subject to the demand requirement.

The breach of fiduciary duty claims (Counts III and IV) are more difficult to classify. Both claims contain allegations of harm to the corporation and harm to the shareholders directly. The court will examine each count in detail to determine what parts are direct and what parts are derivative.

a. Count III

In Count III of the Amended Complaint, the plaintiff asserted a claim on behalf of the class against the Advisor and the Individual Defendants

alleging a breach of fiduciary duty. According to the plaintiff, the following harm resulted from the breach of fiduciary duty: "The shareholders suffered injury to their individual economic interests and their voting rights as a result of the wrongful conduct of the Individual Defendants and the Advisor, and several Individual Defendants received unfair benefits, at the expense of the shareholders." Amended Compl. at 139 [Doc. No. 103]. The portion of the claim asserting a cause of action for the harm to shareholders' voting rights is properly brought as a direct claim. See, e.g., Gentile v. Rossette, 906 A.2d 91, 100 (Del.Supr.2006). [FN5] But, many of the allegations contained within Count III are not related to this harm.

FN5. With respect to issues of corporate law, Maryland courts often look to Delaware caselaw. See generally Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123, 143 (Md.2001)(noting respect properly accorded Delaware decisions on corporate law).

***12** The specific allegations of wrongdoing within Count III are:

[B]ased upon Wells REIT's dismal financial performance and condition, had the Individual Defendants properly evaluated the performance of the Advisor, the Director Defendants should not have renewed the Advisory Agreements or, if renewed, should have a significantly modified fee structure that reduced the Advisor's fees dramatically.

[E]ach of the Director Defendants breached his fiduciary duties to the Class members by failing to evaluate the performance of the Advisor and permitting and causing Wells REIT to enter into the proposed Merger and Internalization, which places the Advisor's and Director Defendants' own personal self-interests above the Class members' best interests.

[E]ach of the Director Defendants breached his fiduciary duties to the Class members by failing to implement appropriate measures to ensure that the Advisor and the Advisory Agreements did not become a vehicle for wrongful self-dealing.

Each of the Director Defendants breached his fiduciary duties to the Class members by failing to monitor the Advisor to assure that the administrative procedures, operations and programs of the Company are in the best interests of the shareholders and are fulfilled.

Each of the Director Defendants breached his fiduciary duties to the Class members by failing to determine whether the compensation provided for the Advisor in its contract with the Company is justified.

Each of the Individual Defendants and the Advisor breached his or its fiduciary duties to Class members by causing Wells REIT to enter into the proposed Merger and Internalization, which placed the Advisor's and Individual Defendants' own personal self-interests above the Class members' best interests, and by seeking to accomplish the Merger by means of a false and misleading Proxy statement.

[Doc. No. 103 at 138-39].

Only that portion of the final allegation that claims the Individual Defendants and the Advisor caused Wells REIT to enter into the proposed Merger and Internalization though means of a false and misleading Proxy statement relates to harm that can be redressed through a direct shareholder action. Accordingly, the defendants' motion to dismiss as it applies to Count III is DENIED to the extent that the allegations of damage to voting rights, which was caused by the false and misleading Proxy statements. The remaining allegations are derivative in nature because these allegations relate to harm to the corporation alleged to have been caused by the Individual Defendants and Advisor overpaying for the Advisor's services. All allegations that are derivative in nature are subject to the demand requirements.

b. Count IV

In Count IV of the Amended Complaint, the plaintiff asserts a claim by the class against the Individual Defendants, Defendant Bowers, and the Advisor for aiding and abetting a breach of fiduciary duty. In this count, the plaintiff makes a general allegation of harm [Doc. No. 103 at 143]. However, contained within Count IV are allegations that the Individual Defendants, Defendant Bowers, and the Advisor knew that the Director Defendants disseminated a Proxy Statement which contained false and misleading statements [Doc. No. 103 at 141-42]. Thus, the harm associated with this action, despite the plaintiff's failure to delineate it specifically, is to the voting rights of shareholders. Accordingly, the defendants' motion to dismiss as it applies to Count IV is DENIED to the extent that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the allegations relate to harm to voting rights. The remaining allegations are derivative in nature because these allegations relate to harm to the corporation rather than directly to the shareholders. All allegations that are derivative in nature are subject to the demand requirements.

2. Demand Futility

***13** In a shareholder derivative suit, the making of a pre-suit demand is both a procedural requirement and a matter of Maryland substantive corporate law; the demand requirement is not simply a procedural nicety. Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123, 134 (Md.2001). As with most jurisdictions, however, Maryland recognizes a demand futility exception. In 2001, the Maryland Court of Appeals took an exhaustive look at the demand utility exception and clarified that it is a "very limited" exception and held that a demand is futile only when the allegations "clearly demonstrate, in a very particular manner" that:

(1) making a demand, or the delay in waiting for a response to the demand, "would cause irreparable harm to the corporation,-" or

(2) a majority of the directors are so personally and directly conflicted or committed to the disputed decision that they cannot reasonably be expected to respond to a demand in good faith and in accordance with the business judgment rule.

Id. at 144.

In this action, the defendants contend that the plaintiff has failed set forth allegations sufficient to invoke the demand futility exception. The plaintiff on the other hand argues that it has alleged particularized facts sufficient to satisfy either prong of Werbosky.

a. Irreparable Harm

The plaintiff contends that the Wells REIT shareholders were faced with imminent irreparable harm because the defendants waited until 11 months before the deadline to list or liquidate to propose the Internalization to shareholders without telling them whether the listing would occur. According to the plaintiff, there was no time to wait for a response to any demand.

The court notes initially that the plaintiff did not assert irreparable harm as a part of the "Derivative Demand Allegations" in the Amended Complaint [Doc. No. 103 at 43-53]. Moreover, as both the Maryland court and this court have held, the plaintiff has not established that any damages resulting from the actions complained of in this case will result in irreparable harm. The harm alleged is monetary in nature and can be compensated through monetary damages. See Transcript of April 9, 2007 Proceedings at 101 [Doc. No. 90]; July 9, 2007 Order at 6 [Doc. No. 104]. Thus, the conclusory arguments in the response to the motion to dismiss regarding the lack of time to file the required demand are insufficient to meet the Werbosky standard. See Sekuk Global Enterprises Profit Sharing Plan v. Kevenides, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508, *4 (Md.Cir.Ct., May 25, 2004).

b. Board Members Personally or Directly Conflicted

As to the second prong of Werbosky standard, the plaintiff argues that the following allegations from the Amended Complaint [Doc. No. 103 at 43-53] are sufficient to establish the demand would have been futile:

(1) three of the ten members of the Wells REIT Board of Directors directly or indirectly owned percentages of the Advisor (Wells 92%, Williams 1%, and Miller 1%).

***14** (2) five of the ten members of the Wells REIT Board of Directors served on multiple boards of Wells-affiliated entities in addition to the Wells REIT Board;

(3) two of the ten members of the Wells REIT Board of Directors served as Trustees of the Wells Family of Real Estate Funds; and

(4) all directors had a predetermined objective to consummate the Internalization as evidenced by the Board's failure to disclose in the Proxy the negotiations and offers by Lexington.

The Werbosky court made it clear that the issue of futility is discrete and does not go to the merits of the underlying complaint--i.e., whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the challenged decision or transaction. Werbowsky, 766 A.2d at 144. Thus, the allegations regarding the omission of the Lexington offers from the Proxy, a component of the challenged action that is the subject of this lawsuit, cannot be considered as a factor in

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

determining whether demand was futile. Thus, the court is left with nothing more than allegations that each member of the Board did not have the independence required to exercise proper business judgment in the face of a demand.

In assessing whether these allegations are sufficient, this court is mindful that the Werbosky court emphasized that the futility exception must be narrowly construed because it "essentially eliminates any chance at meaningful pre-litigation alternative dispute resolution." Id. Furthermore, this court finds the Second Circuit's application of the Werbowsky framework instructive. In Scalisi v. Fund Asset Management, L.P., 380 F.3d 133 (2d Cir.2004), the plaintiffs based their futility arguments on the fact that the directors of the Merrill Lynch Focus Twenty Fund, Inc., were appointed by the fund's investment adviser and were therefore beholden to it for their large salaries. Id. at 136-37. The Second Circuit, however, would not excuse the plaintiffs' failure to make a demand, noting "the importance of the demand requirement even when a director would be hostile to the action." Id. at 141. The Second Circuit focused on the usefulness of the demand requirement in providing "directors--even interested, non-independent directors--the opportunity to consider, or reconsider, the issue in dispute." Id. at 141 (citing Werbowsky, 766 A.2d at 144).

The plaintiff urges the court to rely on Felker v. Anderson, No. 04-0372-CV, 2005 WL 602974 (W.D.Mo.2005), in determining whether the allegations in the complaint are sufficient to meet the Werbosky standard. Notably, the Felker case is the only post-Werbosky case reviewing demand futility under Maryland law to find that demand was futile. [FN6] Moreover, Felker appears to ignore Werbowsky's clear admonition that a court should not "excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision." In re CNL Hotels & Resorts, Inc., 2005 WL 2219283, at *5 n. 18 (M.D.Fla. Sept.13, 2005) (quoting Werbowsky, 766 A.2d at 143-44). Accordingly, this court does not find Felker to be persuasive.

FN6. See In re Infosonics Corporation Derivative Litigation, No. 06cv1336 ETM, 2007 WL 2572276, at * 7 (S.D.Cal. Sept.4, 2007); In re Merrill Lynch Investment Management Funds Securities Litigation, 434 F.Supp.2d 233, 241 (S.D.N.Y., 2006); Moonlight Investments, Ltd. v. John, 192 S.W.3d 890, 893 (Tex.App., 2006); In re Morgan Stanley and Van Kampen Mutual Fund Securities Litigation, No. 03 Civ. 8208(RO), 2006 WL 1008138, *13 (S.D.N.Y. April 18, 2006); In re Oppenheimer Funds Fees Litigation, 419 F.Supp.2d 593, 596 (S.D.N.Y., 2006); In re American Mut. Funds Fee Litigation, No. CV 04-5593-GAFRNBX, 2005 WL 3989803, at *5-6 (C.D.Cal., Dec.16, 2005); In re Alliance Bernstein Mutual Fund Excessive Fee Litigation, No. 04 Civ. 4885(SWK), 2005 WL 2677753, at *7 (S.D.N.Y., Oct.19, 2005); In re Davis Selected Mutual Funds Litigation, No. 04 Civ. 4186(MGC), 2005 WL 2509732, *4 (S.D.N.Y., Oct.11, 2005); In re Dreyfus Mutual Funds Fee Litigation, 428 F.Supp.2d 342, 353-54 (W.D.Pa., 2005); In re CNL Hotels & Resorts, Inc. Securities Litigation, Nos. 604CV1231ORL31KRS, 604CV1341ORL19JGG, 2005 WL 2219283, at *5 (M.D.Fla. Sept.13, 2005); In re Franklin Mutual Funds Fee Litigation, 388 F.Supp.2d 451, 470 (D.N.J., 2005); Benak v. Alliance Capital Management L.P., No. Civ.A.01-CV-5734 (JLL), 2005 WL 1285652, at *2-3 (D.N.J. May 23, 2005); Scalisi, 380 F.3d at 141-42; Sekuk Global Enterprises, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508, at *3-6; In re Merrill Lynch Focus Twenty Fund Investment Company Act Litigation, 218 F.R.D. 377, 381 (E.D.N.Y., 2003).

***15** Based on the foregoing, the plaintiff has not met its burden of clearly demonstrating that the members of the Board of Directors were so personally and directly conflicted or committed to the challenged decision that they could not reasonably be expected to respond to a demand in good faith and within the scope of the business judgment rule. Therefore, the court dismisses Counts V, IV, and VII of the Amended Complaint for failure to make a demand on the Board. Additionally, the court dismisses the portions of Count III and IV containing allegations that relate to harm to the corporation rather than directly to the shareholders.

3. Business Judgment Rule

As set forth above, Counts III and IV contain

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

allegations regarding the contents of the Proxy that are properly brought as direct claims. Therefore, these portions of Counts III and IV are not precluded by the failure to make a demand. The defendants contend alternatively, that these claims should be dismissed because the plaintiff has failed to plead facts sufficient to overcome the protections of the business judgment rule.

Maryland has codified the business judgment rule, which provides that an act by a director or corporation is presumed to be in good faith and in the best interests of the corporation. See Md.Code Ann., Corps. & Ass'ns § 2-405.1(e) (2007). In order to rebut the business judgment rule's presumption that a board acted in good faith the plaintiff must allege facts which, if accepted as true, establish that the board was either interested in the outcome of the transaction or lacked the independence to consider objectively whether the transaction was in the best interest of its company and all of its shareholders. Orman v. Cullman, 794 A.2d 5, 22 (Del.Ch.2002).

> To establish that a board was interested or lacked independence, a plaintiff must allege facts as to the interest and lack of independence of the individual members of that board. To rebut successfully business judgment presumptions in this manner, thereby leading to the application of the entire fairness standard, a plaintiff must normally plead facts demonstrating that a majority of the director defendants have a financial interest in the transaction or were dominated or controlled by a materially interested director.

Id. (Citations omitted).

Here the plaintiff has alleged that three of ten of the Director Defendants, Wells, Miller, and Williams had financial interest in the Internalization. And, according to the allegations of the Amended Complaint, the remaining Director Defendants, Buchanan, Carpenter, Carter Keogler, Moss, Strickland, and Woody (collectively "the Independent Directors"), lacked independence and acted bad faith.

However, the only portions of Counts III and IV to survive this motion to dismiss relate to the statements contained in the Proxy. There are no specific allegations in the complaint regarding the Independent Directors lack of independence in drafting, producing, ratifying, and disseminating the Proxy. Moreover, all the allegations related to the statements made in the Proxy specifically allege negligence on the part of the Director Defendants rather than bad faith. Accordingly, the plaintiff has failed to make allegations sufficient to rebut the presumption of the business judgment rule with respect to the direct shareholder claims for breach of fiduciary duty and aiding and abetting the breach of fiduciary duty. Therefore, Counts III and IV are dismissed in their entirety.

CONCLUSION

***16** (1) The plaintiff's motion for oral argument [Doc. No. 113] is DENIED;

(2) The defendants' motion to dismiss the amended complaint [Doc. No. 106] is GRANTED IN PART and DENIED IN PART: Counts III through VII are dismissed in their entirety; Counts I and II are dismissed with the exception of the allegations of failure to disclose the details of the Lexington offers;

(3) The plaintiff is DIRECTED to file within twenty days a recast complaint setting forth only those causes of action and supporting allegations that have been found to survive the defendants' motion to dismiss. The court suggests that, in recasting its complaint, the plaintiff avoid those tactics that result in a shotgun pleading. Specifically, the plaintiff shall: (1) refrain from incorporating factual allegations by reference into the legal claims for relief; (2) refrain from using the term inter alia to precede a list of factual allegations; and (3) specify which allegations of fact support which causes of action. The defendants shall have twenty days to file their answer to the recast complaint.

SO ORDERED.

2008 WL 2302679 (N.D.Ga.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.