IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust, Inc., )<br>)<br>)<br>)<br>)<br>)<br>) | | |
| Plaintiffs, ) | Case No. 07 C 6174 |
| ) | |
| v. ) | Judge Robert W. Gettleman |
| ) | |
| INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., *et al.*, )<br>)<br>) | | |
| Defendants. )<br>) | | |

**DEFENDANT KPMG LLP'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

Jonathan C. Medow
John J. Tharp, Jr.
James C. Schroeder
Stephen Sanders
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 782-0600

Attorneys for KPMG LLP

August 15, 2008

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................................. 1

FACTUAL BACKGROUND .......................................................................................................... 2

ARGUMENT ..................................................................................................................................... 4

I. Under the PSLRA, A Plaintiff Purporting To State A Claim Under § 14 of the 1934 Act Against An Auditor With Whom The Plaintiff Is Not In Privity Must Allege Specific Facts Giving Rise To A Strong, Cogent, and Compelling Inference of Scienter. ............................................................................................... 4

II. The Allegations Against KPMG Are Wholly Inadequate To Plead A § 14 Claim ........... 6

    A. The Allegations Do Not Create A Strong, Cogent And Compelling Inference That KPMG Knowingly Or Recklessly (Or Even Negligently) Made False Statements ............................................................................................. 6

        1. Management Fees ................................................................................................ 7

        2. Expenses .............................................................................................................. 7

        3. Related Party Disclosures ................................................................................. 10

    B. The Success Of IWEST Provides A Far More Cogent and Compelling Explanation For The Results Reported By The Advisor And Property Managers Than Does Plaintiffs' Unsupported Theory That KPMG Engaged In Wrongdoing ............................................................................................ 11

III. Plaintiffs Also Fail To Plead Facts That Would Support Their Allegation That KPMG Aided And Abetted Breaches Of Fiduciary Duty By The Other Defendants ............................................................................................................................ 13

CONCLUSION ............................................................................................................................... 15

## TABLE OF AUTHORITIES

**CASES** **Page**

*Adams v. Standard Knitting Mills*,
   623 F.2d 422 (6th Cir. 1980) ...............................................................................................5

*Barker v. Henderson, Franklin, Starnes & Holt*,
   797 F.2d 490 (7th Cir. 1986) .............................................................................................14

*Beck ex rel. Equity Office Props. Trust v. Dobrowski*,
   2007 WL 3407132 (N.D. Ill. Nov. 14, 2007) ..................................................................5, 6

*Borsellino v. Goldman Sachs Group*,
   477 F.3d 502 (7th Cir. 2007) .............................................................................................14

*Cahaly v. Benistar Prop. Exch. Trust Co.*,
   885 N.E.2d 800 (Mass. 2008) ...........................................................................................13

*Cronau v. Asche*,
   2002 WL 832569 (N.D. Ill. May 1, 2002) ........................................................................15

*Davis v. SPSS, Inc.*,
   385 F. Supp. 2d 697 (N.D. Ill. 2005) .............................................................................8, 11

*DiLeo v. Ernst & Young*,
   901 F.2d 624 (7th Cir. 1990) .............................................................................................14

*DSAM Global Value Fund v. Altris Software*,
   288 F.3d 385 (9th Cir. 2002) ...............................................................................................5

*Eliasen v. Hamilton*,
   1987 WL 7815 (N.D. Ill. Mar. 9, 1987) .............................................................................5

*Gerstle v. Gamble-Skogmo, Inc.*,
   478 F.2d 1281 (2d Cir. 1973) ..............................................................................................5

*HealthCare Compare Corp. Sec. Litig., In re*,
   75 F.3d 276 (7th Cir. 1996) ...............................................................................................14

*JP Morgan Chase & Co. Sec. Litig., In re*,
   2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) .....................................................................5

*Lewis v. Straka*,
   2007 WL 2332421 (E.D. Wis. Aug. 13, 2007) ..............................................................9, 11

*McLeod v. Arrow Marine Transp.*,
   258 F.3d 608 (7th Cir. 2001) ...............................................................................................2

## TABLE OF AUTHORITIES
(continued)

**Page**

*Reiger v. Price Waterhouse Coopers LLP*,
  117 F. Supp. 2d 1003 (S.D. Cal. 2000),
  *aff'd sub nom. DSAM Global Value Fund v. Altris Software*,
  288 F.3d 385 (9th Cir. 2002) ..................................................................................9, 11

*Riggs Partners v. Hub Group*,
  2002 WL 31415721 (N.D. Ill. Oct. 25, 2002)......................................................2, 3, 5, 6, 9, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  127 S. Ct. 2499 (2007)...................................................................................2, 4, 5, 6, 11, 12, 13

*Thornwood, Inc. v. Jenner & Block*,
  799 N.E.2d 756 (Ill. App. Ct. 2003) ..........................................................................13

*Xerion Partners, I v. Resurgence Asset Mgmt.*,
  474 F. Supp. 2d 505 (S.D.N.Y. 2007),
  *aff'd sub nom. Bay Harbour Mgmt. v. Carothers*,
  2008 WL 2566557 (2d Cir. June 24, 2008) ...............................................................10

*Zatkin v. Primuth*,
  551 F. Supp. 39 (S.D. Cal. 1982).................................................................................5


**STATUTES, REGULATIONS AND RULES**

15 U.S.C. § 78n(a) ...............................................................................................................4

15 U.S.C. § 78u-4(b)(2) .......................................................................................................5

17 C.F.R. § 240.14a-9 ..........................................................................................................4

17 C.F.R. § 240.14a-9(a) .....................................................................................................7

Fed. R. Civ. P. 9(b) .....................................................................................................1, 14, 15

Fed. R. Civ. P. 12(b)(6).......................................................................................................1, 2


**OTHER AUTHORITIES**

Statement of Financial Accounting Standards No. 57 ............................................................10

## INTRODUCTION

This is a case in which plaintiffs base their claims on nothing more than their supposition that certain audited financial results were too good to be true. The dispute arises out of an acquisition by Inland Western Retail Real Estate Trust, Inc. ("IWEST") of its former business advisor, Inland Western Real Estate Advisory Services, Inc. ("Advisor"), and its former property managers, Inland Southwest Management Corp., Inland Northwest Management Corp., and Inland Western Management Corp. ("Property Managers"). Plaintiffs, both shareholders of IWEST, complain that IWEST overpaid for these entities, and now seek to pin the blame on, among others, defendant KPMG LLP ("KMPG"). The theory espoused against KPMG is that KPMG wrongfully issued unqualified audit opinions on the financial statements prepared by the Advisor and Property Managers—financial statements that plaintiffs say were used to justify the price IWEST paid. Because plaintiffs contend that it was "impossible" for those firms' audited results to be true, they conclude that KPMG must have done something wrong.

Such conclusory pleading plainly fails to pass muster under the Private Securities Litigation Reform Act ("PSLRA") and Federal Rules 9(b) and 12(b)(6), which govern, respectively, plaintiffs' claims under Section 14 of the Securities Exchange Act of 1934 and for aiding and abetting a breach of fiduciary duty. Because plaintiffs' claim under Section 14 requires proof of scienter, plaintiffs must allege, consistent with the PSLRA, particular facts giving rise to a strong, cogent, and compelling inference that KPMG knowingly or recklessly made false statements in its audit reports. Plaintiffs have not done so.

Plaintiffs say the Advisor and Property Managers inflated their financial results by omitting expenses, but plaintiffs never once identify what those missing expenses were, much less allege—as they must—that KPMG turned a blind eye, during the course of its audit, to specific, suspicious facts that put the firm on notice that material expenses had been overlooked. Equally unavailing is the claim that the Property Managers booked inflated management fees. To the contrary, the underlying management agreement makes clear that the Property Managers received (and recorded) exactly what they were due. Likewise, the claim that the Advisor's and Property Managers' financial statements failed to make all necessary disclosures regarding transactions with related parties is difficult to take seriously. To begin with, plaintiffs avowedly base their claims on information found in *public* documents. See Amended Class Action Complaint ("Compl.") at 1. So if the "truth" was not disclosed, how did plaintiffs "uncover" it

1

from public sources? Regardless, both the financial statements and the proxy statement sent to IWEST's shareholders in connection with the proposed acquisition ("Proxy") (Ex. A) disclosed, in unambiguous terms, the agreements the Advisor and Property Managers had entered into with related parties, the amounts involved, and the fact that their terms were not necessarily reflective of those negotiated at arm's-length.

Indeed, what the financial statements and Proxy make clear is that, pursuant to those contractual arrangements, both the Advisor and Property Managers prospered (along with IWEST and its shareholders, including plaintiffs) as a result of the phenomenal growth IWEST experienced. *That* was the source of the profits the Advisor and Property Managers reported in the financial statements KPMG audited. Plaintiffs complain that those results are incredible, but under binding Supreme Court authority, a complaint governed by the PSLRA must be dismissed unless its allegations raise an inference of wrongdoing that is at least as cogent and compelling as a competing nonculpable inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007). Thus, to sustain the Amended Complaint, this Court must conclude that it is at least equally probable that the Advisor and Property Managers reported the profits they did not because of IWEST's growth but because of deliberate manipulation. Yet plaintiffs cannot back up their claim of manipulation with a single particular—they cannot, for example, identify *any* expense they now say was omitted—and their whole theory frankly makes no sense. As was plainly disclosed in the documents on which plaintiffs now sue, the Advisor, prior to being acquired by IWEST, voluntarily agreed to forbear from collecting *more than $84 million* to which it was contractually entitled. Had there been a desire to boost reported results, $84 million was available for the taking. There was no need to play games.[1]

## FACTUAL BACKGROUND

In considering KPMG's Rule 12(b)(6) motion, the Court need only accept "well-pleaded facts"—not "conclusory" allegations—and draw inferences in plaintiffs' favor only if "reasonable." *McLeod v. Arrow Marine Transport*, 258 F.3d 608, 614 (7th Cir. 2001). Applying these standards, the following facts and allegations pertinent to KPMG are contained in the complaint and the Proxy on which it is based; because the Proxy is central to plaintiffs' claims and was filed with the SEC, it is appropriately considered on this motion to dismiss. *Riggs*

---

[1] Plaintiffs' claims against KPMG further fail for the additional reasons set forth in the motions to dismiss filed by KPMG's co-defendants.

2

*Partners v. Hub Group*, 2002 WL 31415721, at *1 (N.D. Ill. Oct. 25, 2002) (Gettleman, J.).

As IWEST considered whether to acquire the Advisor and Property Managers, it asked KPMG to audit their financial statements. Compl. ¶ 186. KPMG's audit reports were included in the Proxy sent to IWEST's shareholders. *Id*. ¶ 188. Although IWEST was not legally obligated to put the transaction up to a shareholder vote, it nevertheless chose to seek shareholder ratification. Proxy at iv. Plaintiffs do not allege that KPMG communicated directly with them or with any other shareholder.

The Proxy disclosed the sources of the Advisor's and Property Managers' revenues, the nature of their expenses, and the arrangements by which the Advisor and Property Managers, or their affiliates, were reimbursed directly by IWEST for certain services. *E.g*., *id*. at 81-90. As to the Advisor, the Proxy explained that the Advisor earned the vast majority of its revenue from a fee capped at 1% of IWEST's average invested asset value. *Id*. at 82. As IWEST's total assets grew rapidly from more than $3.9 billion in 2004 to more than $8.3 billion in 2006 (*id*. at 91), the Advisor's revenues grew rapidly as well. Although the Advisor was entitled to maximum fees of approximately $74.9 million, $54.9 million, and $15 million for the years ended December 31, 2006, 2005, and 2004, respectively, it elected to accept only $39.5 million for 2006, $20.9 million for 2005, and nothing for 2004. *Id*. at 6, 46, F-17. In other words, the Proxy disclosed that during the periods covered by KPMG's audit, the Advisor left more than $84 million on the table by charging IWEST a management fee of only 0.53%. *Id*. at 6, 72-73.

The Advisor's expenses consisted primarily of "general and administrative expenses… such as rent, telephone, legal and accounting fees"; IWEST reimbursed the Advisor for virtually all of its expenses for salaries and employee benefits. *Id*. at 83, F-13, F-17. Separate affiliates of the Advisor provided IWEST with services such as due diligence, investment advice, loan servicing, and acquisition of mortgage financing; these affiliates were paid or reimbursed directly by IWEST in amounts specified in the Proxy—those services were not performed for or paid by the Advisor, and thus were not included in the Advisor's financial statements. *Id*. at 72.

The Property Managers' revenues came primarily from a fee of 4.5% of the rents received from IWEST's properties. *Id*. at 6, 87. As the number of properties grew from 111 (year-end 2004) to 302 (year-end 2006), the Property Managers' management fees grew as well, from $5.37 million in 2004 to $20.74 million in 2005 and $30.05 million in 2006. *Id*. at 88-89, F-25. The Property Managers' expenses also increased substantially, from $2.8 million in 2004

3

to $9.57 million in 2005 and $14.61 million in 2006. *Id*. at F-25.

The Proxy and the financial statements contained detailed disclosures of related-party transactions in which IWEST, the Advisor, the Property Managers, and other Inland affiliates engaged. See *id*. at 71-73, F-17, F-29. The "Related-Party Transactions" section in the financial statements for the Advisor explained that the Advisor was entitled to an annual advisory fee of 1% of IWEST's average assets (but had elected to forego $84 million in fees); the Advisor was charged direct costs for legal, information technology, and other administrative services performed by The Inland Group; another Inland entity charged the Advisor rent; the administrative expenses and rent were "believed to be reasonable" but were "not necessarily indicative of the expense the [Advisor] may have incurred on its own account"; and the Advisor was entitled to be reimbursed for virtually all employee expenses, including salaries. *Id*. at F-17.

As to the Property Managers' related-party transactions, the financial statements explained that the Property Managers were entitled to management fees of 4.5% of rents; the Property Managers were charged direct costs for computer, payroll, legal and other services performed by administrative departments of The Inland Services Group; those amounts were "believed to be reasonable" but were "not necessarily indicative of the expense" the Property Managers may have incurred if they received such services from unrelated providers; IWEST reimbursed the Property Managers in specified amounts for certain salary and benefit expenses; and the Property Managers shared office space with an affiliate, which the Property Managers reimbursed for a prorated share of the rent. *Id*. at F-25, F-29.

Plaintiffs allege that KPMG (1) violated § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and (2) aided and abetted its co-defendants' breaches of fiduciary duties. Compl. ¶¶ 291-301 (count I), 317-27 (count IV). Both counts challenge KPMG's decision to allow the Proxy to include its unqualified audit opinions on the financial statements prepared by the Advisor and Property Managers, financial statements that plaintiffs now say were materially misstated. *Id*. ¶¶ 47, 168-216.

## ARGUMENT

I. **Under the PSLRA, A Plaintiff Purporting To State A Claim Under § 14 of the 1934 Act Against An Auditor With Whom The Plaintiff Is Not In Privity Must Allege Specific Facts Giving Rise To A Strong, Cogent, and Compelling Inference of Scienter.**

The PSLRA is intended to "curb frivolous, lawyer-driven" securities litigation, including

4

"'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Tellabs*, 127 S. Ct. at 2508-09. The PSLRA's "[e]xacting pleading requirements," *id*. at 2504, apply to "*any* private action arising under" the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(b)(2) (emphasis added). Thus, the PSLRA's heightened pleading standards apply to the plaintiffs' first claim against KPMG, which is brought under the 1934 Act's proxy solicitation provision, § 14(a) and Rule 14a-9. *In re JP Morgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *7-8 (N.D. Ill. Dec. 18, 2007); *Beck ex rel. Equity Office Props. Trust v. Dobrowski*, 2007 WL 3407132, at *3-4 (N.D. Ill. Nov. 14, 2007). The PSLRA requires, for "each act or omission alleged to violate this chapter," that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

KPMG was not in privity with plaintiffs (plaintiffs were not KPMG's audit client), and when a plaintiff outside of privity seeks damages from an auditor under § 14 and Rule 14a-9, the standard of liability—that is, the state of mind for which the facts alleged must provide a "strong inference"—is scienter. *Adams v. Standard Knitting Mills*, 623 F.2d 422, 428-30 (6th Cir. 1980); *Zatkin v. Primuth*, 551 F. Supp. 39, 45 (S.D. Cal. 1982). Depending on the allegations, a negligence standard *may* apply to the corporate issuer of a proxy statement, but "the securities laws require[] scienter before outside accountants would be held liable for proxy omissions or misrepresentations." *Eliasen v. Hamilton*, 1987 WL 7815, at *7 (N.D. Ill. Mar. 9, 1987). Unlike a corporate issuer of a proxy statement, which is in direct privity with its own shareholders, see *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1300-01 (2d Cir. 1973) (Friendly, J.), an auditor "does not directly benefit from the proxy vote and is not in privity with the stockholder." *Adams*, 623 F.2d at 428. Moreover, "the accountant's potential liability for relatively minor mistakes would be enormous under a negligence standard." *Id*.

Plaintiffs purport to allege scienter here by parroting language from prior cases. They say KPMG's work was "so deficient that the audit amounted to no audit at all" and was characterized by "an egregious refusal to…see the obvious," Compl. ¶ 288—the exact definition of intentional or reckless wrongdoing as applied to auditors. See *Riggs*, 2002 WL 31415721, at *9; *DSAM Global Value Fund v. Altris Software*, 288 F.3d 385, 390 (9th Cir. 2002). But merely throwing around conclusory labels without supporting factual details plainly does not suffice. To survive a motion to dismiss, claims subject to the PSLRA must contain *particularized factual*

5

*allegations* that give rise to a "strong," "cogent and compelling" inference of scienter. *Tellabs*, 127 S. Ct. at 2510.[2] And in deciding whether the factual allegations in a pleading satisfy this stringent standard, "the court must take into account plausible opposing inferences." *Id.* at 2509. As the Supreme Court explained:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court *must consider plausible nonculpable explanations* for the defendant's conduct, as well as inferences favoring the plaintiff. …[T]he inference of scienter must be more than merely "reasonable" or "permissible"—it *must be cogent and compelling, thus strong in light of other explanations*. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter *cogent and at least as compelling as any opposing inference one could draw from the facts alleged*.

*Id.* at 2510 (emphasis added).

II. **The Allegations Against KPMG Are Wholly Inadequate To Plead A § 14 Claim.**

   A. **The Allegations Do Not Create A Strong, Cogent And Compelling Inference That KPMG Knowingly Or Recklessly (Or Even Negligently) Made False Statements.**

Plaintiffs accuse KPMG of issuing unqualified opinions on financial statements that they say were materially misstated. According to plaintiffs, (1) the Property Managers' revenues were overstated; (2) the Advisor's and Property Managers' expenses were understated; and (3) related-party transactions were disclosed inadequately or not at all. To satisfy the requirement that the inference of scienter be "strong," "cogent and compelling," *Tellabs*, 127 S. Ct. at 2510, the complaint must allege "specific, highly suspicious facts and circumstances"—known to KPMG "at the time of the audit"—that called the financial statements into question, but that KPMG "ignored, either deliberately or recklessly." *Riggs*, 2002 WL 31415721, at *9.

The complaint does not come close to doing that. From the beginning to the end of plaintiffs' allegations concerning KPMG (see Compl. ¶¶ 168-216), no particular facts are alleged from which one could draw a strong inference that KPMG knowingly, recklessly, or even negligently made a false statement in its audit reports.

---

[2] In cases where negligence sets the applicable standard of liability, a complaint must similarly "state with particularity facts giving rise to a strong inference that Defendants acted at least negligently." *Beck*, 2007 WL 3407132, at *6.

6

1. *Management Fees*.  Plaintiffs contend that the Property Managers' revenues were inflated because the Property Managers were paid higher fees than they were entitled to receive. See Compl. ¶ 214 (financial statements reflected "inflated management fees"); ¶ 183 (alleging "tens of millions in excessive Property Management Fees"). Plaintiffs assert that certain offering documents, issued by IWEST years before the Proxy, stated that the Property Managers' "Management Fees" were capped at no more than 90% of what would be paid to unrelated parties providing such services. *Id*. ¶ 134; see generally *id*. ¶¶ 130-140.

The offering documents are irrelevant to a § 14 claim, which is limited to "false or misleading" material statements in a "proxy statement." 17 C.F.R. § 240.14a-9(a). There was nothing false or misleading about the Proxy's summary of the Management Agreement between IWEST and the Property Managers. The Proxy states that the Property Managers were entitled to receive management fees of 4.5% of the properties' income. Proxy at 73, 87. That is exactly what the Management Agreement says: it provides for a "monthly management fee" of 4.5% of the monthly income. IWEST Defs. Ex. 3 at 11. The Agreement further provides for additional compensation for "services beyond those specified herein"—such as for "sales brokerage, construction management, loan origination and servicing, property tax reduction and risk management services"—and it states that *those fees* cannot exceed 90% of what an unrelated party would charge. *Id*. But the agreement is crystal clear that the 90% cap does *not* apply to the standard monthly management fee payable to the Property Managers. *Id*.

Given the unambiguous language of the Management Agreement, KPMG can hardly be faulted for not questioning financial statements that repeat the 4.5% figure. Proxy at F-29. Plaintiffs do not allege any particular facts suggesting that KPMG was negligent, much less intentionally or recklessly deficient, in not challenging account balances based on the 4.5% figure set forth in the actual agreement between IWEST and the Property Managers.

2. *Expenses*. Plaintiffs allege that the Advisor and Property Managers both failed to report expenses, and that such omissions rendered their financial statements "patently inflated [and] unrealistic." Compl. ¶ 174(b); see also *id*. ¶¶ 175-77. According to ¶ 171:

> the financial statements of the Advisor do not reflect the Advisor having incurred any amount of expenses that would be required or necessary in order to perform and carry out [the Advisor's] numerous services and duties, including the amount of expenses sufficient to cover necessary salaries and benefits. A business operating with EBITDA of nearly 100% of Total Revenues is impossible.

7

But plaintiffs never provide any particulars. Which "expenses" were not reported? Which "salaries and benefits" should have been included in the Advisor's financial statements but were not?[3] Plaintiffs *never specify* the expenses (or even the categories of expenses) that the Advisor supposedly incurred but failed to reflect on its books; nor do plaintiffs identify the "services and duties" for which expenses were allegedly not reported.[4] These omissions are not surprising, as the Advisor's financial statements account for all significant expense categories, including salaries, benefits, rent, and administrative expenses. Proxy at F-13, F-17.

The expense allegations concerning the Property Managers are equally devoid of substance:

> The levels of expenses and reimbursements reflected on the Property Managers' financial statements are materially less than the magnitude of expenses and reimbursements required to provide adequate property management services for the Properties. Such property management services were therefore either provided by Inland-affiliated entities or the Property Managers, but those services and expenses were not accurately, or never [sic], reflected on the Property Managers' financial statements.

Compl. ¶ 177. Again, plaintiffs do not identify which "expenses and reimbursements" were omitted. Nor do they explain which "property management services" should have been "reflected on the Property Managers' financial statements" but allegedly were not. Plaintiffs' silence is striking, for the financial statements already include the types of expenses one would expect a property management company to incur: salaries, rent, computer costs, legal fees and other general and administrative expenses. Proxy at F-25, F-29.

Moreover, plaintiffs further fail to allege any particular facts concerning missing

---

[3] Even if the Advisor had reported additional salaries and benefits on its financial statements, it would not have made a material difference. As the Proxy and the Advisor's financial statements disclosed, IWEST reimbursed virtually all of the Advisor's salary and benefit expenses; as a result, any incremental increase in expense would have been offset by a reimbursement reported as part of the Advisor's revenue. See Proxy at 72, F-13, F-17.

[4] In ¶ 174(d), plaintiffs allege that the Advisor's financial statements "[f]ail[ed] to report, for the years ended December 31, 2006, 2005, and 2004, reimbursements from Inland REIT for $3.4 million, $4.5 million and $1.5 million of general and administrative costs, respectively." Of course, a failure to "report…reimbursements" would have *depressed* the Advisor's reported results rather than enhanced them. In any event, these numbers appear to have been plucked out of thin air. Plaintiffs provide no particularized allegations indicating where these numbers came from; the basis on which plaintiffs believe these reimbursements should have been reported but were not; or why plaintiffs believe KPMG ignored such reimbursements.

8

expenses that KPMG supposedly knew about at the time of its audit, but ignored. And that is fatal. See *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 718 (N.D. Ill. 2005) (dismissing claim against an auditor where there were no factual allegations concerning "the materials and evidence [defendants] reviewed during their audit"); *Lewis v. Straka*, 2007 WL 2332421, at *2 (E.D. Wis. Aug. 13, 2007) (dismissing complaint where "plaintiffs allege no facts indicating how KPMG could have discovered the GAAP violations, much less facts suggesting that KPMG fraudulently or recklessly concealed them"); *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1012 (S.D. Cal. 2000) (dismissing complaint against auditor where "Plaintiffs cannot identify any facts suggesting actual awareness of Altris' revenue improprieties"), *aff'd sub nom. DSAM Global Value Fund v. Altris Software*, 288 F.3d 385 (9th Cir. 2002). Plaintiffs never allege any "specific, highly suspicious facts and circumstances available to the auditor at the time of the audit" indicating that expenses should have been included in the Advisor's or Property Managers' financial statements, but that KPMG "ignored, either deliberately or recklessly." *Riggs*, 2002 WL 31415721, at *9.

And not only do plaintiffs fail to provide specifics on what KPMG supposedly missed, but plaintiffs themselves ignore items that were fully disclosed. The Advisor's allegedly low expenses are explained by two facts known to anyone reading the Proxy. First, many of the Advisor's expenses—including nearly all salaries and benefits, as well as all expenses related to the "administration and acquisition of properties"—were reimbursed by IWEST. See Proxy at 72, F-17. Second, separate affiliates provided a host of related services for IWEST that were paid for by IWEST directly. *Id.* at 40 (describing amendments to eight "existing service agreements with Inland"); 72 (describing "Services Provided by Affiliates of our Business Manager/Advisor"). Those expenses were not included in the Advisor's financial statements for the simple reason that those services were not performed for the Advisor and the Advisor did not incur those expenses. As for the Property Managers, their expenses rose concomitantly (or more) as their management fees increased—as the Property Managers' financial statements plainly indicated.[5] Plaintiffs offer no particulars to explain why the vastly increased expenses

---

[5] The financial statements indicate that from 2004 to 2005 the Property Managers' management fees rose from $5.37 million to $20.74 million, a 286% increase, while total expenses in the same period increased by 242%, from $2.8 million to $9.57 million. Proxy at F-25. In 2006, management fees increased to $30.05 million (a 45% increase over the 2005 numbers), while expenses increased to $14.61 million (a 53% increase over 2005). *Id.* For the

the Property Managers reported should have been even higher.

At bottom, plaintiffs' gripe about expenses reduces to this: KPMG must have known that the Advisor and the Property Managers were doing something improper because they made too much money. Unfortunately for plaintiffs, that simply is not a cognizable basis for asserting liability under the PSLRA. See *Xerion Partners v. Resurgence Asset Mgmt.*, 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007) (dismissing complaint where plaintiff "ha[d] not alleged a single fact to support its claim that the EBITDA number was inflated—instead, it has simply concluded that it was"), *aff'd sub nom. Bay Harbour Mgmt. v. Carothers*, 2008 WL 2566557 (2d Cir. June 24, 2008).

**3. *Related Party Disclosures*.** The disclosure allegations are even more deficient. The footnotes to the financial statements (Proxy at F-17 and F-29) plainly describe the related party transactions in question and the dollar amounts involved, which is precisely what plaintiffs say the relevant accounting standards required. Compl. ¶ 198; see Statement of Financial Accounting Standards ("FAS") No. 57 ¶ 2 (Ex. B). The same footnotes further make clear that while management believed that certain charges assessed against the Advisor and Property Managers were "reasonable," those amounts "were not necessarily indicative" of the costs the Advisor and Property Managers would have incurred were they dealing with third parties at arm's-length. See Proxy at F-17 (certain costs for administrative services and rent charged to the Advisor by an Inland affiliate are, in the opinion of management, reasonable but are "not necessarily indicative of the expense the [Advisor] may have incurred on its own account"); F-29 (certain costs for administrative services charged to the Property Managers by an Inland affiliate are, in the opinion of management, reasonable but are "not necessarily indicative of the expense the [Property Managers] may have incurred if [they] received such services from providers not affiliated with [Inland]"). These disclosures plainly complied with professional standards,[6] and aside from a noting a pro forma (and wholly unsupported) objection that they were somehow "[m]isleading," plaintiffs do not even try to argue to the contrary. See Compl. ¶ 174(e).

---

first six months of 2007, management fees increased by 13% (from $14.56 million during the first six months of 2006 to $16.51 million) and expenses increased by 26% (from $6.74 million in 2006 to $8.49 million). See *id*. at F-32.

[6]    See FAS No. 57 ¶ 3 ("Representations about transactions with related parties, if made, shall not imply that the related party transactions were consummated on terms equivalent to those that prevail in arm's-length transactions unless such representations can be substantiated").

10

Instead, plaintiffs complain of a failure to disclose "details" of "expense allocations and payments of salaries." *Id*. ¶ 199. And they further allege inadequate disclosure regarding transactions that did not necessarily involve the Advisor or Property Managers but with respect to which they purportedly were "beneficiaries"—transactions in which "officer and employee salaries, rent, advertising, accounting and legal, [and] other administrative expenses" were paid by "The Inland Group, the Sponsor, and their affiliates." *Id*. ¶ 200. The simple answer to all this is that the requisite "detail" *was* disclosed. See Proxy at 71-73, F-17, F-29. It is hardly surprising, then, that plaintiffs' failure-to-disclose charges are not supported by any particularized allegations: plaintiffs never identify what specific information was omitted, particularly given the extensive disclosures that were made.

Equally frivolous is the assertion that "KPMG failed to conduct a sufficient review to attempt to discover the existence of related party transactions." Compl. ¶ 207. This claim derives completely from whole cloth. There are absolutely *no* facts alleged to suggest that there were additional related-party transactions lurking somewhere in the background that KPMG failed to detect. Nor do plaintiffs get anywhere by claiming that the "related nature of the relationships…should have set off red flags" to KPMG about "the possible existence of either material related party transactions…[or] of common ownership or management control relationships for which disclosure was required." *Id*. ¶ 209. Again, plaintiffs are at a loss to explain what specific "red flags" KPMG missed, let alone identify particular facts available to KPMG at the time of its audits that it ignored. The absence of any such allegations requires dismissal. See *Riggs*, 2002 WL 31415721, at *9; *Davis*, 385 F. Supp. 2d at 718; *Lewis*, 2007 WL 2332421, at *2-3; *Reiger*, 117 F. Supp. 2d at 1012.

> B. **The Success Of IWEST Provides A Far More Cogent and Compelling Explanation For The Results Reported By The Advisor And Property Managers Than Does Plaintiffs' Unsupported Theory That KPMG Engaged In Wrongdoing.**

This case cries out for dismissal not only because of what the Amended Complaint fails to allege, but because of what it affirmatively says. Stripped to its essentials, plaintiffs' theory is that the Advisor's and Property Managers' financial statements reflected performance levels that were impossible to achieve, and that KPMG therefore must have turned a blind eye to fraud (or was, at a minimum, incompetent) in failing to recognize as much. But in fact, the Proxy and financial statements provide an alternative and compelling explanation for the results the Advisor

11

and Property Managers reported—an explanation this Court must take into account when it weighs, in accordance with *Tellabs*, "plausible nonculpable explanations for the defendant's conduct." 127 S. Ct. at 2510.

From the outset, IWEST, the Advisor, and the Property Managers were related entities bound by agreements not negotiated at arm's length. As stated in the financial statements, the Advisor and Property Managers enjoyed terms that could not necessarily be duplicated outside the Inland structure. Proxy at F-17, F-29.

Pursuant to those terms, the Advisor and the Property Managers stood to profit significantly if IWEST prospered. Their revenues were based on either a percentage of IWEST's assets (in the case of the Advisor) or a percentage of the revenues derived from IWEST's properties (in the case of the Property Managers). *Id*. at 6, 72-73, 82, 87, F-17, F-29. At the same time, IWEST and its affiliates agreed to bear the costs of various administrative expenses, salaries, and benefits incurred by the Advisor and the Property Managers; IWEST and the affiliates also agreed to pay for related services, such as due diligence, investment advice, loan servicing, and the acquisition of mortgage financing. *Id*. at 7, 44, 72, F-13, F-17, F-25, F-29.

Over the years, IWEST proved to be highly successful. Created in 2003, by the end of the following year IWEST had assets of nearly $4 billion, revenues exceeding $130 million and net income of $47 million. *Id*. at 91. By the end of 2006, its assets had more than doubled (to $8.3 billion), its annual revenues had increased to $710 million, and its net income approached $200 million. *Id*.

The resulting impact on the Advisor and Property Managers was entirely predictable. The Advisor saw its total revenues grow from $1.5 million in 2004 to $22.5 million in 2005 and $40.5 million in 2006. Proxy at F-13. The Advisor reported a slight loss in 2004, but by 2005 its net income had risen to $12.6 million, and by 2006 to $23.6 million. *Id*. Likewise, the Property Managers' total revenues grew from $5.4 million in 2004 to $23 million in 2005 and $35.4 million in 2006. *Id*. at F-25. Net income followed suit: it grew from $2.6 million in 2004 to $13.5 million in 2005 and $20.9 million in 2006. Given IWEST's growth and the contractual environment in which the Advisor and Property Managers operated, any other results would have been extraordinary.

But plaintiffs say the Court should ignore all this and believe instead that the Advisor's and the Property Managers' reported profits were a mirage, the product of inflated revenues and

omitted expenses. Yet in their 116-page Amended Complaint, plaintiffs nowhere allege *any* facts supporting a theory of manipulation. Indeed, they cannot even identify a single expense—even by category—that supposedly was omitted through inadvertence or design.

Whatever the law may have been prior to the Supreme Court's decision in *Tellabs*, it plainly no longer tolerates such a baseless pleading. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs*, 127 S. Ct. at 2510. Plaintiffs' theory of "manipulate[d] expense allocations" (Compl. ¶ 192) is anything but that. Not only does it appear to derive solely from plaintiffs' imagination—hence, their inability to come up with *any* factual particulars in support —but it flies in the face of a number of undisputed facts of record. The Advisor left more than $84 million on the table by voluntarily forbearing from collecting fees it was owed. Proxy at 6, 72-73, F-17. Obviously, had the Advisor wished to burnish its results, it could have simply collected these amounts, and avoided all risks associated with a purported scheme to cook its books; to act otherwise would have been irrational. Likewise, IWEST voluntarily submitted the acquisition to a shareholder vote even though no such vote was required. Proxy at iv. Why would IWEST have defrauded its shareholders on a vote that was not even necessary?

Ultimately, the Court must weigh the competing inferences to see if plaintiffs' theory is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. This case is not close. On the one hand, there is an explanation for the Advisor's and Property Managers' reported results that finds support in the terms of their agreements, the undisputed facts surrounding IWEST's growth and the inexorable laws of arithmetic. On the other hand, plaintiffs offer fervent speculation that a wrong has been committed, but nothing more. This is precisely the type of case that *Tellabs* teaches must be dismissed.

### III. Plaintiffs Also Fail To Plead Facts That Would Support Their Allegation That KPMG Aided And Abetted Breaches Of Fiduciary Duty By The Other Defendants.

Plaintiffs also allege that KPMG aided and abetted breaches of fiduciary duty by the other defendants. Compl. ¶¶ 279-290. Just as the complaint fails to plead facts that would support plaintiffs' federal § 14(a) claim, so it fails to plead facts that would support a cause of action for aiding and abetting a breach of fiduciary duty.

In Illinois, a claim for aiding and abetting breach of fiduciary duty must include the

following elements: "(1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003). Because aiding and abetting breach of fiduciary duty requires proof that the defendant acted "knowingly" (*id*.), it requires deliberate misconduct by the defendant. See also *Cahaly v. Benistar Prop. Exch. Trust Co.*, 885 N.E.2d 800, 810 (Mass. 2008) (the knowledge requirement for a claim of aiding and abetting a breach of fiduciary duty "demands a showing of 'actual knowledge' of the underlying wrongdoing").

Here, the aiding and abetting claim against KPMG is based on allegations of knowing misrepresentations. Plaintiffs allege that KPMG "*knew*" that the Proxy "contained *false and misleading* statements" (Compl. ¶¶ 322, 322(a)) (emphasis added); that KPMG's audit reports "only amounted to vehicles to *mask and aid* Defendants' breaches of fiduciary duty" (*id*. ¶ 289) (emphasis added); and that KPMG "rendered substantial and *knowing* assistance" to other culpable defendants (*id*. ¶ 324) (emphasis added). Given these allegations, the complaint must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b); "Rule 9(b) applies to 'averments of fraud,' not claims of fraud." *Borsellino v. Goldman Sachs Group*, 477 F.3d 502, 507 (7th Cir. 2007) (applying Rule 9(b) to a claim for tortious inducement of a breach of fiduciary duty). See also *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) (Rule 9(b) applies to a claim that an accounting firm "aided and abetted Continental Bank's violation of the securities laws" by "keeping its mouth shut about what was really going on"). Rule 9(b) requires plaintiffs to state "with particularity" the facts that they believe constitute fraud: "This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Id*. at 627. This is especially important in cases involving accountants. Because "[a]n accountant's greatest asset is its reputation for honesty, followed closely by its reputation for careful work," a complaint does not satisfy Rule 9(b) if it "'rest[s] on a bare inference that the defendant "must have had" knowledge of the fact. The plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary violators.'" *Id*. at 629 (quoting *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir. 1986)).

Because plaintiffs' aiding and abetting claim is based on the same allegations on which the § 14(a) claim rests (see Compl. ¶¶ 286-88), the aiding and abetting allegations do not satisfy

14

the heightened pleading requirements of Rule 9(b) for the same reasons that they do not satisfy the PSLRA; the facts concerning KPMG's alleged misrepresentations are not stated with any degree of particularity. There are no particular factual allegations indicating how KPMG supposedly knew at the time of its audits that the financial statements were false and misleading, what KPMG supposedly did to collude with the other defendants, or why KPMG would have had any motive to do so. See, *e.g.*, *DiLeo*, 901 F.2d at 626 (the complaint is deficient because it "does not…give examples of problem loans that E&W should have caught, or explain how it did or should have recognized that the provisions for reserves established by Continental's loan officers were inaccurate"); *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 282 (7th Cir. 1996) (an allegation is "insufficient" under Rule 9(b) because "it fails to demonstrate that HealthCare knew on February 2 and 9…that total revenues for the year-end would be materially lower than analysts' projections"); *Cronau v. Asche*, 2002 WL 832569, at *2 (N.D. Ill. May 1, 2002) (complaint dismissed under Rule 9(b) where plaintiffs failed to plead, *inter alia*, "what procedures the auditors followed or what information they discovered and did not disclose or why the procedures followed were so inadequate as to be reckless"). In short, nothing in the complaint states with particularity any facts to support the allegation that KPMG gave knowing and substantial assistance to the other defendants in breaching their fiduciary duties.

## CONCLUSION

The claims against KPMG (counts I and IV) should be dismissed.

August 15, 2008                                         Respectfully submitted,

                                                        s/ John J. Tharp, Jr.
                                                        Jonathan C. Medow
                                                        John J. Tharp, Jr.
                                                        James C. Schroeder
                                                        Stephen Sanders
                                                        MAYER BROWN LLP
                                                        71 S. Wacker Dr.
                                                        Chicago, IL  60606
                                                        (312)782-0600

                                                        Attorneys for Defendant KPMG LLP