# EXHIBIT A

DEFM14A 1 a07-22282_2defm14a.htm DEFM14A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material Pursuant to §240.14a-12

Inland Western Retail Real Estate Trust, Inc.
_____
(Name of Registrant as Specified In Its Charter)

_____
(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.

☒ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1) Title of each class of securities to which transaction applies:
       Common Stock, par value $.001 per share

    (2) Aggregate number of securities to which transaction applies:
       37,500,200

    (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):
       $10.00; value set forth in merger agreement

    (4) Proposed maximum aggregate value of transaction:
       $375,002,000

    (5) Total fee paid:
       $11,513

☒ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1) Amount Previously Paid:
    _____

    (2) Form, Schedule or Registration Statement No.:
    _____

    (3) Filing Party:
    _____

    (4) Date Filed:
    _____



**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC.**
**2901 BUTTERFIELD ROAD**
**OAK BROOK, ILLINOIS 60523**
**TELEPHONE: (630) 218-8000**

**September 10, 2007**

Dear Fellow Stockholder:

On August 14, 2007, the board of directors of Inland Western Retail Real Estate Trust, Inc. voted unanimously to acquire the companies that provide us with business management and advisory services and property management services via four separate mergers, collectively referred to as the Merger. The Merger includes Inland Western Retail Real Estate Advisory Services, Inc., our Business Manager/Advisor; and Inland Southwest Management Corp., Inland Northwest Management Corp., and Inland Western Management Corp., our Property Managers. Our board of directors formed a special committee comprised solely of independent directors to evaluate the Merger and its alternatives. The special committee, which retained its own independent legal and financial advisors, unanimously recommended approval of the Merger Agreement to our board of directors. I joined in the unanimous affirmative vote along with my fellow directors, and we recommend you ratify our entry into the Merger Agreement and our approval of the Merger.

Our company is a real estate investment trust, or REIT, formed in March 2003 by our sponsor Inland Real Estate Investment Corporation. Initially, our business plan provided for us to be externally managed in order to reduce the impact of a growing infrastructure and to capitalize on depth and tenure of The Inland Group Inc.'s expertise. Since our inception, we have grown dramatically to the point where, as of June 30, 2007, our portfolio consisted of 288 wholly-owned properties, 16 properties in which we have an interest of between 45% and 95%, and six development joint venture projects in which we have an investment. As of June 30, 2007, our portfolio contained approximately 46 million square feet of leasable space. Based upon our current market capitalization, we are comparable in size to the largest publicly-traded retail REITs.

As is the case with other REITs established by our sponsor, our business plan incorporates both a process for self-administration and, at a future point in time, the exploration of a liquidity event to be determined by our board of directors. A liquidity event could take the form of listing our shares on a stock exchange, merging our REIT with a publicly traded REIT, or selling our real estate assets, any one of which would provide our stockholders with an exit strategy from their investment. We believe that acquiring our Property Managers and our Business Manager/Advisor is one of the most significant steps toward achieving our goal of an effective liquidity event for our stockholders, and we expect the Merger to have a positive impact on our future financial performance.

The current stockholders of our Business Manager/Advisor and our Property Managers will collectively receive approximately 37,500,000 shares of our stock as payment for their companies, which will be approximately 7.7% of our outstanding shares upon completion of the Merger. The Merger is expected to be accretive to funds from operations. In the first full year following closing, we expect it to be accretive by $0.08 per share, and anticipate the Merger to be increasingly accretive each year thereafter.

As part of the merger consideration, the REIT will acquire over 250 experienced employees to perform the Business Manager/Advisor functions and operate the property management company. Those employees will include the executive team of Michael J. O'Hanlon, Steven P. Grimes, Shane C. Garrison, and Niall J. Byrne, who have the strategic vision to bring our company to the next level. This experienced team has been working together to solidify the foundation of our company, and they are dedicated to us and our mission. We believe they are the right team to lead and manage our continued growth. Further, our company has the benefit of three-year consulting agreements with Daniel L. Goodwin, G. Joseph Cosenza and me, without compensation, to be effective upon closing of the Merger.

Your vote is crucial to the future of our company. Our board of directors has found this transaction to be fair to you and the other stockholders of our company and has approved this Merger. We recommend that you vote **FOR** the Merger, as well as the other two proposals on the proxy card.

If you have any questions, or need help with any of the documents included in this package, please call our proxy solicitor, Morrow & Co., Inc., at 1-800-573-4804. Thank you for your continued support of and interest in our REIT. On behalf of Inland Western Retail Real Estate Trust, Inc., we wish you good health, happiness and prosperity.

Sincerely,

/s/ Robert D. Parks

Robert D. Parks
Chairman of the Board

**NOTICE OF ANNUAL MEETING OF STOCKHOLDERS**
**DATE: November 13, 2007**
**TIME:  10:00  a.m.**
**PLACE:  2901 Butterfield Road**
**Oak Brook, Illinois 60523**

To Our Stockholders:

The purposes of the annual meeting are:

- Ratification of our entry into the Merger Agreement with Inland Western Retail Real Estate Advisory Services, Inc., Inland Southwest Management Corp., Inland Northwest Management Corp., Inland Western Management Corp., and certain other parties and our approval of the Merger;

- Election of seven directors to hold office until our next annual meeting of stockholders and until their successors are elected and qualify;

- Ratification of the appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year; and

- To transact any other business as may properly come before the meeting or any adjournments or postponements of the meeting.

The Board of Directors has fixed the close of business on August 31, 2007, as the record date for determining stockholders of record entitled to notice of and to vote at the meeting.

A proxy statement and proxy card accompany this notice. We have previously provided you with a copy of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006, as amended, a copy of our Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2007 and a copy of our Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2007.

We hope to have the maximum number of stockholders present in person or by proxy at the meeting. To assure your representation at the meeting, please authorize your proxy by completing, signing, dating and mailing the enclosed proxy card. You may also authorize your proxy electronically, or by calling a toll-free telephone number, by following the procedures described in the attached proxy statement. **YOUR COOPERATION IN PROMPTLY AUTHORIZING YOUR PROXY WILL BE VERY MUCH APPRECIATED.** For specific instructions, please refer to the instructions on the proxy card.

You may use the enclosed envelope which requires no further postage if mailed in the United States to return your proxy. If you attend the meeting, you may revoke your proxy and vote in person, if you desire.

By order of the Board of Directors,

/s/ Roberta S. Matlin

Roberta S. Matlin
Vice President and Secretary



**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC.**
**2901 BUTTERFIELD ROAD**
**OAK BROOK, ILLINOIS 60523**
**TELEPHONE: (630) 218-8000**

**PROXY STATEMENT**
**FOR ANNUAL MEETING OF STOCKHOLDERS**
**TO BE HELD NOVEMBER 13, 2007**

Our board of directors, or Board, is furnishing you this proxy statement to solicit proxies on its behalf to be voted at our 2007 annual meeting of stockholders to be held on November 13, 2007, at 10:00 a.m. at our principal executive offices, and at any and all adjournments or postponements thereof, which we refer to as the Annual Meeting.  We encourage your participation in the voting at the Annual Meeting and solicit your support on each proposal to be presented.

This proxy statement and the accompanying proxy card are first being mailed to stockholders on or about September 14, 2007.

Unless the context otherwise requires, all references to "IWEST," the "Company," "our," "we" and "us" in this proxy statement relate to Inland Western Retail Real Estate Trust, Inc. and those entities owned or controlled directly or indirectly by us.  The mailing address of our principal executive offices is 2901 Butterfield Road, Oak Brook, Illinois 60523 and our telephone number is (630) 218-8000.

At the Annual Meeting you will vote upon several proposals, including a proposal to ratify our entry into an Agreement and Plan of Merger (attached hereto as **Appendix A**, and which we sometimes refer to as the Merger Agreement) and our approval of the Merger, which is one of the most significant steps that will help us achieve our goal of being self-administered. We propose to acquire, through stock-for-stock mergers, Inland Western Retail Real Estate Advisory Services, Inc., or our Business Manager/Advisor, and Inland Southwest Management Corp., or ISMC, Inland Northwest Management Corp., or INMC, and Inland Western Management Corp., or IWMC, which we refer to collectively as our Property Managers. We sometimes refer to the Business Manager/Advisor and the Property Managers collectively as the Service Providers, and to the transaction involving these mergers as the Merger. To acquire our Property Managers and our Business Manager/Advisor, we will issue approximately 37,500,000 shares of our common stock as payment for those companies, subject to the payment of no more than 200 additional shares due to rounding.  These shares are valued at $10.00 per share for a total of approximately $375.0 million. The principal executive offices of our Property Managers and our Business Manager/Advisor are located at 2901 Butterfield Road, Oak Brook, Illinois 60523, and their telephone number is: (630) 218-8000.

Because certain of our directors are subject to conflicts of interest in evaluating the Merger, our Board appointed a special committee of independent directors to, among other things, consider and make recommendations to our Board with respect to the Merger. This special committee and our Board as a whole believe that the terms of the Merger are in the best interests of our stockholders and the Board unanimously recommends that you ratify our entry into the Merger Agreement and our approval of the Merger.

Ratification of our entry into the Merger Agreement and the Merger at the Annual Meeting will require the affirmative vote of a majority of the votes cast on the matter at our Annual Meeting (if a quorum is present) other than votes cast with respect to shares held by, or held by an affiliate of, our interested directors, Inland Real Estate Investment Corporation, The Inland Group, Inc., or certain stockholders of our Property Managers. We sometimes refer to The Inland Group, Inc. as TIGI, and we sometimes refer to one or more of TIGI's affiliates as Inland.  We sometimes refer to Inland Real Estate Investment Corporation as our Sponsor. Even if our stockholders ratify our entry into the Merger Agreement and our approval of the Merger, the completion of the Merger is subject to other customary closing conditions.

STOCKHOLDERS ARE URGED TO READ AND CONSIDER CAREFULLY THE INFORMATION CONTAINED IN THIS PROXY STATEMENT AND TO CONSULT WITH THEIR PERSONAL FINANCIAL ADVISORS.

THIS TRANSACTION HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, OR THE SEC, NOR HAS THE SEC PASSED UPON THE FAIRNESS OR MERITS OF SUCH TRANSACTION NOR UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

**INSTRUCTION GUIDE FOR AUTHORIZING YOUR PROXY**

**THREE EASY WAYS TO AUTHORIZE YOUR PROXY WITHOUT ATTENDING
OUR ANNUAL MEETING**

**Authorize Your Proxy by Mail**

Simply mark, sign, date and return the enclosed proxy card as promptly as possible in the prepaid-postage envelope enclosed.

**Authorize Your Proxy by Telephone**

It is fast, convenient, and your vote is immediately confirmed and posted. Using a touch-tone phone, call the toll free number, 1-800-868-5614, which is also shown on your proxy card.

**Just Follow These Four Easy Steps:**

- Read the accompanying proxy statement and proxy card;

- Call the toll-free number provided on your proxy card;

- Enter your CONTROL NUMBER located on your proxy card; and

- Follow the simple recorded instructions.

**Your vote is important!
Call 24 hours a day**

**Authorize Your Proxy by Internet**

It is fast, convenient, and your vote is immediately confirmed and posted. Using a computer, simply go to the designated website for our stockholders:

**www.proxyvoting.com/INWEST**

**Just Follow These Four East Steps:**

- Read the accompanying proxy statement and proxy card;

- Go to the website **www.proxyvoting.com/INWEST;**

- Enter your CONTROL NUMBER located on your proxy card; and

- Follow the simple instructions.

**Your vote is important!**

**Go to www.proxyvoting.com/INWEST 24 hours a day**

i

## QUESTIONS AND ANSWERS FOR STOCKHOLDERS

We have tried to anticipate questions you may have relating to the Merger. The following questions and answers are based upon the detailed information contained in the enclosed proxy statement, which you should read and rely upon in casting your vote. You may obtain information incorporated by reference in this proxy statement without charge by following the instructions under "Information About the Annual Meeting – Where You Can Find More Information About Us" on pg. 5.

**Q:    What am I being asked to vote on at the Annual Meeting?**

A:    You are being asked to vote on the following three proposals:

- Ratification of our entry into the Merger Agreement to acquire our Business Manager/Advisor and Property Managers and our approval of the Merger;

- Election of seven directors; and

- Ratification of appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year.

**Q:    What companies are parties to the Merger Agreement?**

A:    The following companies are the parties to the Merger Agreement: IWEST Acquisition 1, Inc., IWEST Acquisition 2, Inc., IWEST Acquisition 3, Inc., IWEST Acquisition 4, Inc., each a newly formed subsidiary of ours; our Property Managers; our Business Manager/Advisor; our Sponsor; IWEST Merger Agent, LLC; and us.

You own stock in Inland Western Retail Real Estate Trust, Inc., which is a real estate investment trust, or REIT. Our business is primarily acquiring, developing, operating, leasing and managing multi-tenant shopping centers and single-user net lease properties.

Our Sponsor is Inland Real Estate Investment Corporation, which is an affiliate of Inland. Inland is comprised of a group of affiliated, privately owned companies involved in several aspects of the commercial real estate business, including investments, mortgage loan, risk and tax assessment, property management and asset management.

IWEST Merger Agent, LLC is the agent for certain stockholders of each of our Property Managers, which we refer to as the PM Stockholder Agent. The PM Stockholder has been appointed in accordance with an agent appointment agreement, to act, as summarized and described in the Merger Agreement, on behalf of the stockholders of the Property Managers who are bound to the terms of the Merger Agreement by their appointment of the PM Stockholder Agent.

As with each REIT sponsored by our Sponsor, we began operations with only a few properties. Historically, Inland has found it economically preferable to not build a large internal infrastructure initially, but rather to have the REITs externally managed at inception. We entered into contracts with our Property Managers for property management services and with our Business Manager/Advisor to counsel on and conduct the other aspects of our day-to-day business. Since our inception in 2003, our seven member Board, four of whom are independent and not affiliated with TIGI, has governed our company.

**Q:    Is the proposed Merger fair to stockholders?**

A:    Because of the related-party nature of the proposed Merger, our Board formed a special committee comprised only of independent directors to consider the Merger and alternatives to such a transaction. The special committee retained independent legal and financial advisors to assist in the evaluation and negotiation of the Merger. The special committee also obtained a fairness opinion from its independent

ii

financial advisor, William Blair & Company, LLC, which we refer to as William Blair, which concluded that, subject to certain assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid by us pursuant to the Merger Agreement to acquire our Business Manager/Advisor and Property Managers was fair, from a financial point of view, to us and our stockholders.

**Q:    What will be the impact of the Merger on the current stockholders?**

A:    If the Merger is ratified by our stockholders, we will issue approximately 37,500,000 shares of our common stock to the stockholders of our Business Manager/Advisor and Property Managers as consideration for those four companies, which is approximately 7.7% of our common stock after giving effect to the Merger.  We expect that the distributions paid on approximately 37,500,000 shares, plus the incremental general and administrative costs of self-administration, will be less than the advisory and property management fees plus cost reimbursements under our existing contracts with our Business Manager/Advisor and Property Managers.  Upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger, and it is estimated to be increasingly accretive in subsequent years.

**Q:    What are the reasons for the proposed Merger?**

A:    Many stock analysts and institutional investors have a preference for "self-administered" REITs, which have a dedicated management team and staff strictly focused on the REIT's day-to-day business. In the future, we may wish to list our shares on a national exchange. Our Board believes that such a future listing would be better received by the investment community, and potentially result in a higher valuation for our company, if we are self-administered.

In addition, acquiring our Business Manager/Advisor means that we will not have to pay fees to our Business Manager/Advisor relating to the sale of any of our properties that we choose to sell in the future.

See "The Merger – Reasons for Merger" for additional reasons for the proposed Merger.

**Q:    How was the Merger process conducted and what was the process to determine the Merger consideration?**

A:    Our Board established a special committee, comprised of four independent, non-affiliated directors, to evaluate alternatives and make recommendations with respect to the Merger.  The special committee retained its own independent counsel, the law firm of Sidley Austin LLP, and its own independent financial advisor, William Blair, who provided the special committee and our Board with a fairness opinion, the full text of which is attached in **Appendix B**.  After a more than 14 month due diligence and negotiation process, the special committee recommended entry into the Merger Agreement and approval of the Merger.

**Q:    Why is the Merger occurring now?**

A:    Our Board elected not to wait and pursue the option outlined in this proxy statement whereby we could acquire our Business Manager/Advisor and Property Managers under the terms of the existing advisory agreement and property management agreement, beginning in September and May 2008, respectively, which could have resulted in approximately 54.1 million shares issued in connection with such acquisition.

See "The Merger – Reasons for Merger" for additional information relating to the timing of the proposed Merger.

**Q:    Who will be the management team and our employees?**

A:    If the Merger is approved, our management team is expected to include Michael J. O'Hanlon as President and Chief Executive Officer, Steven P. Grimes as Chief Operating Officer and Chief Financial Officer,

iii

Shane C. Garrison as Chief Investment Officer and Niall J. Byrne as our Vice President and President of the Property Managers. Mr. O'Hanlon brings over 30 years of industry experience to the team, and as Senior Vice President, Director of Asset Management with our Sponsor since 2005, has been responsible for implementing the strategic direction and value enhancement of multiple Inland portfolios. Mr. Grimes has been our Treasurer and Principal Financial Officer, and has been the Chief Financial Officer of our Business Manager/Advisor, since 2004 and during that time has overseen the acquisition of over $7.7 billion in real estate assets and led our Sarbanes-Oxley Act compliance efforts. Mr. Garrison has been with Inland US Management since 2004; as a Vice President, he has focused his asset management skills solely on our portfolio, and has also concentrated on building the joint venture development platform for us for over two years. Mr. Byrne has been a Senior Vice President with our Property Managers, overseeing the overall property management functions for the 46 million square foot portfolio. In addition, we are acquiring more than 250 employees of Inland and our Property Managers.

**Q:**    **Are there any consulting agreements that exist in connection with the Merger?**

A:    Yes, there are three-year consulting agreements with each of Daniel L. Goodwin, G. Joseph Cosenza and Robert D. Parks, three of Inland's founding partners, without compensation, that will become effective upon the closing of the Merger.

**Q:**    **What are the tax consequences to us of the proposed Merger?**

A:    Following the Merger we expect, based in part upon an opinion of our counsel we will receive at the closing, to continue to be taxed as a REIT for federal income tax purposes.

**Q:**    **What happens if I do not vote on the proposed Merger?**

A:    Every stockholder vote is important. The Merger proposal will only pass if it receives the affirmative vote of a majority of the votes cast on the matter at our 2007 Annual Meeting (if a quorum is present) other than votes cast with respect to shares held by, or held by an affiliate of, our interested directors, TIGI, our Sponsor or certain stockholders of our Property Managers.

**Q:**    **How do I vote?**

A:    You have four options. You can mail your marked and signed proxy card in the enclosed postage-paid envelope. You can authorize your proxy to be voted by calling a toll-free telephone number. You can also access a website address which will allow you to authorize your proxy to be voted by Internet. Or, you can vote your shares in person at our Annual Meeting on November 13, 2007. See "Instruction Guide for Authorizing Your Proxy" on page i of this booklet for details.

**Q:**    **Can I change my vote?**

A:    Yes, you may change your vote electronically via the Internet at www.proxyvoting.com/INWEST until 11:59 p.m. Eastern Time on November 12, 2007, by telephone by the same deadline, or in person via a proxy card at the Annual Meeting prior to the vote tabulation.

**Q:**    **Why is this being submitted to our stockholders?**

A:    There is no legal requirement to submit the Merger to our stockholders. Because we believe it is desirable to obtain your ratification of our entry into the Merger Agreement and our approval of the Merger, we have made your ratification a condition to the closing of the Merger. If the Merger proposal is not approved, we will continue to operate under our current management structure, paying fees and cost reimbursements to our Property Managers and our Business Manager/Advisor under their contracts and our Board will examine its other alternatives.

iv

**Q:**    **How does our Board recommend that I vote on the Merger proposal?**

A:    Our Board unanimously recommends that you vote **FOR** the Merger proposal.

v

---

## TABLE OF CONTENTS

| | Page |
|---|---|
| INSTRUCTION GUIDE FOR AUTHORIZING YOUR PROXY | i |
| QUESTIONS AND ANSWERS FOR STOCKHOLDERS | ii |
| FORWARD LOOKING STATEMENTS | 1 |
| INFORMATION ABOUT THE ANNUAL MEETING | 3 |
|     Information about the Annual Meeting | 3 |
|     Information about this Proxy Statement | 3 |
|     Proposals to be Considered by You at the Annual Meeting | 3 |
|     Information about Voting | 3 |
|     Quorum; Abstentions and Broker Non-Votes | 4 |
|     Dissenters' Right of Appraisal | 4 |
|     Number of Votes Necessary for each Proposal to be Approved | 4 |
|     Costs of Proxies | 4 |
|     Other Matters | 5 |
|     Where You Can Find More Information About Us | 5 |
|     Information to Rely Upon when Casting your Vote | 5 |
| SUMMARY | 6 |
|     Ratification of our Entry into the Merger Agreement and our Approval of the Merger | 6 |
|     Election of Directors | 9 |
|     Ratification of the Appointment of our Independent Registered Public Accounting Firm | 9 |
| MERGER SUMMARY TERM SHEET | 10 |
| RISKS OF THE MERGER TO US AND OUR STOCKHOLDERS | 12 |
| THE MERGER | 14 |
|     Background of the Merger | 14 |
|     Reasons for Requiring Your Ratification | 20 |
|     Reasons for the Merger | 20 |
|     Merger Agreement | 24 |
|     Ancillary Agreements | 37 |
|     Contact Information | 42 |
|     Our Business | 42 |
|     Business of our Property Managers and our Business Manager/Advisor | 43 |
|     Our Property Management Agreements | 43 |
|     Our Advisory Agreement | 44 |
|     Shares of our Stock and Other Amounts Payable with Respect to the Merger | 47 |
|     Interest of Certain Persons in Matters to be Acted Upon | 47 |

I

| | |
|---|---|
| Opinion of the Financial Advisor | 47 |
| Accounting Treatment | 57 |
| Federal Tax Consequences | 57 |
| Regulatory Matters | 59 |
| Past Contacts, Transactions or Negotiations | 59 |
| Vote Required | 60 |
| ELECTION OF DIRECTORS | 61 |
| Nominees for Election as Directors | 61 |
| Vote Required | 64 |
| Board Meetings in 2006 | 64 |
| Committees of the Board of Directors | 64 |
| Compensation Committee Interlocks and Insider Participation | 65 |
| Nominating Committee | 65 |
| Audit Committee Report | 66 |
| Stockholder Communications | 66 |
| OUR EXECUTIVE OFFICERS | 67 |
| Our Affiliation with The Inland Real Estate Group of Companies, Inc. | 67 |
| Biographies of our Executive Officers | 67 |
| COMPENSATION PAID TO OUR DIRECTORS AND OFFICERS | 69 |
| Director Compensation | 69 |
| Report of Directors on Compensation | 70 |
| Compensation Discussion and Analysis | 70 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 71 |
| DESCRIPTION OF OUR SECURITIES | 74 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 75 |
| SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE | 76 |
| RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE 2007 FISCAL YEAR | 77 |
| Principal Accounting Fees and Services | 77 |
| Vote Required | 78 |
| SELECTED HISTORICAL FINANCIAL DATA | 79 |
| SELECTED HISTORICAL FINANCIAL DATA OF OUR BUSINESS MANAGER/ADVISOR | 81 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OF OUR BUSINESS MANAGER/ADVISOR | 82 |
| Overview | 82 |
| Significant Accounting Policies | 82 |
| Results of Operations | 82 |
| Liquidity and Capital Resources | 85 |

II

Off-Balance Sheet Arrangements and Aggregate Contractual Obligations 85
Market Information of Common Stock and Dividends 85
SELECTED HISTORICAL FINANCIAL DATA OF OUR PROPERTY MANAGERS 86
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF 87
OPERATIONS OF THE PROPERTY MANAGERS
    Overview 87
    Significant Accounting Policies 87
    Results of Operations 88
    Liquidity and Capital Resources 89
    Off-Balance Sheet Arrangements and Aggregate Contractual Obligations 90
    Market Information of Common Stock 90
SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA 91
HISTORICAL AND PRO FORMA PER SHARE DATA 93
MISCELLANEOUS AND OTHER MATTERS 94
    Advance Notice Procedures for Making Director Nominations and Stockholder Proposals 94
    Multiple Stockholders Sharing an Address 94
    Other Matters 94
    Information Incorporated by Reference 94
INDEX TO FINANCIAL STATEMENTS F-1
APPENDICES
    Merger Agreement A-1
    Opinion of Financial Advisor B-1
    Form of Registration Rights Agreement C-1
    Form of Escrow Agreement D-1
    Form of Consulting Agreement E-1
    Form of Employment Agreement F-1
    TIGI Letter Agreement G-1
    Form of Agent Appointment Agreement H-1
    Form of Sublease I-1
    IREA Letter J-1
    Form of Office and Facilities Management Services Agreement K-1-1
    Form of Insurance and Risk Management Services Agreement K-2-1
    Form of Computer Services Agreement K-3-1

III

Form of Personnel Services Agreement                                          K-4-1
Form of Property Tax Services Agreement                                       K-5-1
Form of Communications Services Agreement                                     K-6-1
Form of Loan Services Agreement                                               K-7-1
Form of Mortgage Brokerage Services Agreement                                 K-8-1
Form of Transition Property Due Diligence Services Agreement                  L-1
Form of Institutional Investor Relationships Services Agreement               M-1
Form of Legal Services Agreement                                              N-1
Form of License Agreement Modification                                        O-1
Form of License Agreement (Property Management Corporations)                  P-1

IV

## FORWARD LOOKING STATEMENTS

Because we want to provide you with more meaningful and useful information, this proxy statement includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act.  These forward-looking statements reflect our current expectations and projections about our future results, performance, prospects and opportunities.  We have attempted to identify these forward-looking statements by using words such as "may," "will," "expects," "anticipates," "believes," "intends," "estimates," "could," or similar expressions.  These forward-looking statements are based on information currently available to us and are subject to a number of risks in 2007 and beyond which may differ materially from those expressed in, or implied by, these forward-looking statements.  We believe these judgments to be reasonable, but these statements are not guarantees of any events or financial results, and due to a variety of known and unknown risks, uncertainties and other factors, our actual results, performance or achievements may be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements.  Whether actual future results and developments will conform with our expectations and predictions is subject to a number of risks and uncertainties, including the risks and uncertainties referred to in our most recent Annual Report on Form 10-K and our subsequent Quarterly Reports on Form 10-Q, under the caption "Risks of the Merger to Us and our Stockholders" in this proxy statement, and other factors, many of which are beyond our control, including, without limitation, the following:

- Our common stock is not currently listed on an exchange or trading market and cannot be readily sold;

- The level and volatility of interest rates, including the recent general trend towards rising interest rates;

- National or local economic, business, real estate and other market conditions, including the ability of the general economy to recover timely from economic downturns;

- The effect of inflation and other factors on fixed rental rates, operating expenses and real estate taxes;

- Risks of acquiring real estate, including continued competition for new properties and the downward trend on capitalization rates;

- Risks of real estate development, including the failure of pending developments and redevelopments to be completed on time and within budget and the failure of newly acquired or developed properties to perform as expected;

- Risks of joint venture activities, including development joint ventures;

- The competitive environment in which we operate and the supply of and demand for retail goods and services in our markets;

- Financial risks, such as the inability to renew existing tenant leases or obtain debt or equity financing on favorable terms, if at all;

- The increase in property and liability insurance costs and the ability to obtain appropriate insurance coverage;

- Financial stability of tenants, including the ability of tenants to pay rent, the decision of tenants to close stores and the effect of bankruptcy laws;

- The ability to maintain our status as a REIT for federal income tax purposes;

- The effects of hurricanes and other natural disasters;

1

- Environmental/safety requirements and costs;

- Certain of our officers and directors have potential conflicts of interest;

- We are dependent on Inland to provide services to us;

- We may compete with our affiliates for properties;

- Our funds from operations for the current fiscal year will decrease if the Merger is consummated in 2007;

- We may be exposed to risks to which we have not historically been exposed; and

- After the Merger, we will be dependent on our own executives and employees.

See the section of this proxy statement entitled "Risks of the Merger to Us and our Stockholders" beginning on pg. 12 for a description of these and other risks, uncertainties and other factors.

You should not place undue reliance on any forward-looking statements. Except as required by the federal securities laws, we undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events, changed circumstances, or any other reason after the date of this proxy statement.

2

## INFORMATION ABOUT THE ANNUAL MEETING

**Information about the Annual Meeting**

Our Annual Meeting will be held on November 13, 2007 at 10:00 a.m. Central Time at 2901 Butterfield Road, Oak Brook, Illinois 60523. Please contact our Vice President and Secretary, Roberta S. Matlin, at (630) 218-8000 if you plan to attend. Additionally, please contact Morrow & Co., Inc. at 1-800-573-4804 if you have any questions with respect to authorizing a proxy to vote your shares at the Annual Meeting.

**Information about this Proxy Statement**

We sent you this proxy statement and the proxy card on behalf of our Board who is soliciting a proxy from you to vote your shares at the Annual Meeting. This proxy statement summarizes information we are required to provide to you and is designed to assist you in voting your shares. On or about September 14, 2007, we began mailing the proxy materials to all stockholders of record as of the close of business on August 31, 2007, the record date fixed by our Board for determining the holders of record of our common stock, $.001 par value per share, entitled to notice of and to vote at the Annual Meeting. Each of the outstanding shares of common stock, as of the record date, is entitled to one vote on all matters to be voted upon at the Annual Meeting. On the record date, there were 451,339,585 shares of common stock issued and outstanding.

**Proposals to be Considered by You at the Annual Meeting**

At the Annual Meeting, we will be asking you to:

PROPOSAL 1:    Ratify our entry into the Merger Agreement with our Business Manager/Advisor and Property Managers and certain other parties and our approval of the Merger;

PROPOSAL 2:    Elect seven directors; and

PROPOSAL 3:    Ratify the appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year.

**Information about Voting**

VOTING OF PROXIES - Votes cast by proxy or in person at the Annual Meeting will be tabulated by an inspector of election appointed for the Annual Meeting. Each executed and timely returned proxy will be voted in accordance with the directions indicated on it. Each stockholder giving a proxy has the power to revoke it at any time before the shares it represents are voted by giving written notice of the revocation to our Vice President, by delivering a later-dated proxy (which automatically revokes the earlier proxy), or by voting in person at the Annual Meeting. Except for "broker non-votes" described below, executed but unmarked proxies will be voted by the person(s) named thereon (i) for the ratification of our entry into the Merger Agreement with our Business Manager/Advisor and Property Managers and certain other parties thereto, and for the ratification of the Merger; (ii) for the election of the nominees named herein as directors (or a substitute for a nominee if such nominee is unable or refuses to serve); (iii) for the ratification of our appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year; and (iv) in the discretion of such person(s) upon such matters not presently known or determined that properly may come before the Annual Meeting.

AUTHORIZATION OF PROXIES ELECTRONICALLY VIA THE INTERNET - Stockholders may authorize a proxy to vote via the Internet at the www.proxyvoting.com/INWEST until 11:59 p.m. Eastern Time, on November 12, 2007. The Internet proxy authorization procedures are designed to authenticate the stockholders' identity and to allow stockholders to vote their shares and confirm that their instructions have been properly recorded.

AUTHORIZATION OF PROXIES VIA TOUCH-TONE TELEPHONE — Stockholders may authorize a proxy to vote via touch-tone telephone by calling the toll-free phone number provided on their proxy card until 11:59 p.m. Eastern Time, on November 12, 2007. The touch-tone telephone proxy authorization procedures are designed to

authenticate the stockholders' identity and to allow stockholders to authorize a proxy to vote their shares and confirm that their instructions have been properly recorded.

Please refer to the proxy card enclosed for voting instructions. If you choose not to authorize your proxy by touch-tone telephone or over the Internet, please complete and return the paper proxy card in the pre-addressed, postage-paid envelope provided with this proxy statement.

## Quorum; Abstentions and Broker Non-Votes

We have hired an independent proxy solicitor, Morrow & Co., Inc., to solicit proxies on the Board's behalf with respect to the matters to be voted upon at the Annual Meeting. Votes cast by proxy or in person at the Annual Meeting will be tabulated by an inspector of election appointed by us. The inspector will determine whether or not a quorum is present. Presence in person or by proxy at the Annual Meeting of holders of a majority of our issued and outstanding shares constitutes a quorum. Abstentions and broker non-votes will count toward the presence of a quorum, but will not be counted as votes cast and will have no effect on the proposals to ratify our entry into the Merger Agreement and the Merger and our appointment of KPMG LLP, although abstentions and broker non-votes will have the effect of votes against the director election proposal. A "broker non-vote" occurs when a nominee (such as a custodian or bank) holding shares for a beneficial owner returns a signed proxy but does not vote on a particular proposal because the nominee does not have discretionary voting power with respect to that item and has not received instructions from the beneficial owner.

## Dissenters' Right of Appraisal

Under Maryland law and our existing charter, holders of our common shares will not be entitled to rights of appraisal with respect to the Merger.

## Number of Votes Necessary for each Proposal to be Approved

- *Ratification of our entry into the Merger Agreement and the Merger:* Provided a quorum is present, the affirmative vote of a majority of the votes cast on the matter at our Annual Meeting other than votes cast with respect to shares held by, or held by an affiliate of, our interested directors, TIGI, our Sponsor, or certain stockholders of our Property Managers, is required to ratify our entry into the Merger Agreement with our Business Manager/Advisor and Property Managers and certain other parties, and our approval of the Merger.

- *Election of directors:* Provided a quorum is present, the affirmative vote of a majority of the shares present in person or represented by proxy and entitled to vote is required for the election of each of the seven directors to be elected at the Annual Meeting. There are no cumulative voting rights in the election of directors.

- *Ratification of the Appointment of KPMG:* Provided a quorum is present, the affirmative vote of a majority of the votes cast on the matter at our Annual Meeting is required to ratify the appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year.

**PLEASE VOTE YOUR SHARES BY AUTHORIZING YOUR PROXY BY TELEPHONE, ELECTRONICALLY OR BY COMPLETING, SIGNING AND DATING THE ACCOMPANYING PROXY CARD AND RETURNING IT IN THE ENCLOSED POSTAGE-PAID ENVELOPE WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING.**

## Costs of Proxies

We will bear all expenses incurred in connection with the solicitation of proxies. Our officers, directors and employees, and officers and employees of Inland may solicit proxies by mail, personal contact, letter, telephone, telegram, facsimile or other electronic means. They will not receive any additional compensation for those activities,

4

but they may be reimbursed for their out-of-pocket expenses. In addition, we have hired Morrow & Co., Inc., to solicit proxies on our behalf. We expect that the fee of soliciting proxies on our behalf will be approximately $7,000 plus costs and expenses.

**Other Matters**

As of the date of this proxy statement, the above-referenced proposals are the only matters we are aware of that are to be acted upon at the Annual Meeting. If any other matter should properly come before the Annual Meeting for which we did not receive proper notice, in accordance with the requirements of our Bylaws, the persons appointed by you in your proxy will vote on those matters in accordance with the recommendation of the Board, or, in the absence of such a recommendation, in accordance with their discretion. The affirmative vote of a majority of the votes cast on any such other matter will be required for approval.

**Where You Can Find More Information About Us**

We file annual, quarterly and special reports, proxy statements and other information with the SEC. You may read and copy any reports, statements or other information we file with the SEC at the SEC's Public Reference Room located at 100 F Street, N.E., Washington, D.C. 20549. You may also obtain copies of the documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Washington D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information regarding the public reference facilities. Our SEC filings are also available to the public on the website maintained by the SEC at "http://www.sec.gov."

**Information to Rely Upon when Casting your Vote**

You should rely only on the information contained in this proxy statement or incorporated by reference herein. No person has been authorized to give any information or to make any representations other than those contained in or incorporated by reference in this proxy statement in connection with the solicitation made by this proxy statement and, if given or made, the information or representations must not be relied upon as having been authorized by us. The delivery of this proxy statement will not, under any circumstances, create an implication that there has not been a change in the facts set forth in this proxy statement or in our affairs since the date of this proxy statement. This proxy statement does not constitute a solicitation by anyone in any jurisdiction in which the solicitation is not authorized or in which the person making the solicitation is not qualified to do so or to anyone to whom it is unlawful to make a solicitation.

5

**SUMMARY**

This summary highlights the material information contained in the proxy statement, but may not contain all of the information that is important to you and, therefore, you should read carefully this entire document, including the appendices and the other documents to which we refer you, for a more complete understanding of the transactions that are the subject of this proxy statement.

**Ratification of our Entry into the Merger Agreement and our Approval of the Merger**

*Background.*  We are a real estate investment trust that was formed in 2003. We have primarily focused on acquiring, developing, operating and leasing multi-tenant shopping centers and single-user net lease properties. As of June 30, 2007, our portfolio consisted of 288 wholly-owned properties, 16 properties in which we have an interest of between 45% and 95%, and six development joint venture projects in which we have an investment, four of which we consolidate. As of June 30, 2007, our portfolio contained approximately 46 million square feet of leasable space. Our anchor tenants include nationally and regionally recognized grocers, discount retailers, financial companies, and other tenants who provide basic household goods and services. Of our total annualized revenue as of June 30, 2007, approximately 69% is generated by anchor or credit tenants, including American Express, Zurich Insurance Company, Best Buy, Ross Dress For Less, Bed Bath & Beyond, GMAC, Wal-Mart, Publix Supermarket, and several others. The term "credit tenant" is subjective and we apply the term to tenants who we believe have a substantial net worth.

Since our inception, our Property Managers have been responsible for, among other things, leasing, collecting rents and performing routine maintenance work that is not otherwise the tenant's responsibility. For our Property Managers' services, we pay a fee of 4.5% of gross operating income of each property managed by the Property Managers.  In 2006, 2005 and 2004, we paid our Property Managers property management fees of $29.8 million, $20.7 million and $5.4 million, respectively.

Likewise since inception, Inland Western Retail Real Estate Advisory Services, Inc., has served as our business manager and advisor. Since we do not have any employees, our Business Manager/Advisor has been responsible for our day-to-day operations, including negotiating the acquisition of our properties, overseeing our Property Managers, administering our bookkeeping and accounting and legal functions, investor relations and consulting with our Board on policy decisions. For these services, we can be charged by our Business Manager/Advisor an annual asset management fee of up to 1% of our average invested assets; however, our Business Manager/Advisor has historically charged us no more than 0.53% on an annual basis.  Average invested asset value is defined as the average of the total book value, including acquired intangibles, of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt or other similar non-cash reserves. We compute the values at the end of each month for which the fee is being calculated. The fee is paid quarterly in an amount equal to ¼ of the estimated annual fee based on our average invested assets as of the last day of the immediately preceding quarter. Based upon the maximum allowable advisor asset management fee of 1% of our average invested assets, maximum fees of $74.9 million, $54.9 million and $15.0 million could have been charged for the years ended December 31, 2006, 2005 and 2004, respectively. However, we paid $39.5 million and $20.9 million for the years ended December 31, 2006 and 2005, respectively. Our Business Manager/Advisor waived all asset management fees for the year ended December 31, 2004.  Our Business Manager/Advisor has agreed to forego any fees allowable but not taken on an annual basis.

In addition to the asset management fee, we are obligated to pay to our Business Manager/Advisor a property disposition fee and a subordinated incentive fee payable on sale of a property. The disposition fee is equal to the lesser of: (i) 3% of the contract sales price of the property, or (ii) 50% of the customary commission that would be paid to third parties for the property. The incentive fee is equal to 15% of the net proceeds remaining from the sale of any property after our stockholders have first received: (i) a cumulative, non-compounded return equal to 10% on an annual basis on the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties and (ii) a return of the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties.  Our obligation to pay future disposition and incentive fees terminates upon consummation of the Merger.

6

Additionally, our Business Manager/Advisor and its affiliates are entitled to be reimbursed for general and administrative costs relating to our administration and acquisition of properties. During the calendar year ended December 31, 2006, we incurred $3.4 million for these administrative costs. During the six months ended June 30, 2007, we incurred $3.1 million for these costs. Our obligation to pay such general and administrative fees terminates upon consummation of the Merger.

For more information regarding our property management agreements and our advisory agreement, see "The Merger – Our Property Management Agreements" and "The Merger – Our Advisory Agreement."

*The Merger*. Solely to facilitate the Merger, four of our newly created wholly-owned subsidiaries will merge into our Business Manager/Advisor and Property Managers. At the effective time, we will distribute 45% of the shares to the stockholders of our Business Manager/Advisor and Property Managers' and deposit the balance into an escrow account. The effective time is currently expected to occur as soon as practicable after the Annual Meeting, provided our stockholders ratify our entry into the Merger Agreement and our approval of the Merger at the Annual Meeting and all other terms and conditions of the Merger Agreement are satisfied.

*The Special Committee's and Board's Recommendation*. Two of our directors, Robert D. Parks and Brenda G. Gujral, are officers and/or directors of Inland and stockholders of our Property Managers and TIGI, the ultimate owner of our Business Manager/Advisor. Accordingly, our Board appointed a special committee, comprised of four independent, non-affiliated directors, to evaluate, negotiate and make recommendations with respect to the Merger and its alternatives. The special committee, which retained its own independent counsel and independent financial advisor, unanimously recommended approval of the Merger to our Board. Following the recommendation of the special committee, the Board unanimously approved the Merger Agreement and recommended that our stockholders ratify our entry into the Merger Agreement and our approval of the Merger. The special committee and the Board determined that the Merger is in the best interests of our stockholders. In connection with their recommendation, the special committee and our Board reviewed the analyses and findings of the special committee's financial advisor, William Blair.

*Opinion of Financial Advisor*. William Blair provided its opinion to the special committee and our Board that, as of the date of the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to the stockholders of our Property Managers and our Business Manager/Advisor is fair, from a financial point of view, to us and our stockholders.

The full text of William Blair's written opinion, dated as of August 14, 2007, which sets forth assumptions made, matters considered and limitations on the review undertaken in connection with the opinion, is attached hereto as **Appendix B**. William Blair's opinion does not constitute a recommendation as to how any stockholder should vote with respect to the Merger. You should read William Blair's opinion in its entirety. See "The Merger — Opinion of the Financial Advisor."

We will pay William Blair non-refundable fees totaling $1.0 million for its services as financial advisor to the special committee and for rendering the opinion. We have also agreed to reimburse William Blair for up to $50,000 of its reasonable out-of-pocket expenses, including attorneys' fees, and to indemnify William Blair against certain liabilities, including certain liabilities under the federal securities laws. See "The Merger — Opinion of the Financial Advisor."

*Purpose and Reasons for the Merger*. Due mainly to the growth of our portfolio of real estate assets, our Board determined to consider the benefits of becoming a largely self-administered REIT. In this regard, our Board formed a special committee of independent, non-affiliated directors to consider a transaction where we would acquire our Business Manager/Advisor and Property Managers. The special committee considered the positive and negative factors of acquiring our Business Manager/Advisor and Property Managers as well as the alternatives of (1) maintaining the status quo, (2) hiring new third parties to perform business management, advisory and property management functions and terminating our agreements with our Business Manager/Advisor and Property Managers, (3) building business management, advisory and property management functions internally and terminating our agreements with our Business Manager/Advisor and Property Managers and (4) selling our company to a third party. With respect to the alternative of acquiring our Business Manager/Advisor and Property Managers, the special committee considered, among other factors, the benefits of self-administration, reduction of operating costs, access

7

to properties identified by Inland, use of the "Inland" name and our name and logo, continuity of operations, retention of key management personnel and receipt of the opinion of its independent financial advisor. The special committee also considered risks such as the inability to become fully self-administered following such a transaction, the potential loss of key employees of our Business Manager/Advisor and Property Managers and potential unanticipated costs of services provided by our Business Manager/Advisor and Property Managers. Based upon these considerations, the special committee determined to pursue the alternative of acquiring our Business Manager/Advisor and Property Managers and, ultimately, determined that the proposed Merger is fair to and in the best interests of our stockholders and recommended that our Board and stockholders approve the transaction. See "The Merger – Reasons for the Merger."

*Conflicts of Interest.* In considering our Board's recommendation regarding the Merger, you should be aware that certain of our officers and directors have interests in connection with the Merger which may present them with actual or potential conflicts of interest. These potential conflicts are described in more detail under "The Merger — Interest of Certain Persons in the Matters to be Acted Upon."

*Conditions to the Merger that Must be Satisfied or Waived; Termination.* The Merger is subject to a number of customary conditions that must be satisfied or waived, including, without limitation, the following:

- each party's representations and warranties must be true and correct in all material respects at and as of the closing date;

- each party must have performed and complied with all of its covenants in all material respects at and as of the closing date;

- all of the ancillary agreements required by the Merger Agreement, including the registration rights agreement, the escrow agreement, the TIGI letter agreement, the sublease, the amendment to office and facilities management services agreement, the amendment to insurance and risk management services agreement, the amendment to computer services agreement, the amendment to personnel services agreement, the amendment to property tax services agreement, the amendment to communications services agreement, the amendment to the loan services agreement, the second amendment to the mortgage brokerage services agreement, the transition property due diligence services agreement, the institutional investor relationships services agreement, the legal services agreement, the license agreement modification and the license agreement (property management corporations) and any other agreement, instrument or document being or to be executed and delivered under the Merger Agreement shall have been executed and delivered;

- we must have received the required ratification of our stockholders of the Merger and our entry into the Merger Agreement; and

- the written consents previously executed by each of our Sponsor, as sole stockholder of our Business Manager/Advisor, and each of Robert H. Baum, Daniel L. Goodwin, Robert D. Parks and G. Joseph Cosenza, whom we refer to collectively as the Principal Stockholders, as stockholders of each of the Property Managers, shall remain in full force and effect.

At any time prior to the effective time, whether before or after the ratification of the Merger by our stockholders, the Merger Agreement may be terminated by the mutual written consent of the parties. In addition, the Merger Agreement may be terminated by our Sponsor and the PM Stockholder Agent, acting jointly, or by us:

- if the closing date has not occurred on or before January 31, 2008, except that a party may not terminate for this reason if that party's breach is a principal cause for the failure of the closing date to occur;

8

- if any law makes the consummation of the Merger illegal or otherwise prohibited or if a court or other governmental entity permanently enjoins, restrains or otherwise prohibits the Merger in a final and non-appealable order; or

- upon a material breach by the other parties of any of their obligations under the Merger Agreement after notice and a period for cure. See "The Merger — Merger Agreement."

*Break-up Fee*.  If our Board: (i) publicly recommends against your ratification; and (ii) your ratification is not obtained at the Annual Meeting, then we shall pay to the Service Providers an amount equal to the actual, documented, out-of-pocket expenses incurred by the Service Providers to third parties in connection with the negotiation of the Merger Agreement, up to a maximum of $1.2 million.

*Federal Income Tax Consequences*. Following the Merger we expect, based in part upon an opinion of our counsel we will receive at the closing, to continue to be taxed as a REIT for federal income tax purposes.

*Accounting Treatment*. The Merger consideration will be accounted for primarily as expense incurred in connection with terminating the property management agreements that we have with our Property Managers and the advisory agreement that we have with our Business Manager/Advisor, substantially all of which will be treated as an expense upon closing of the Merger.

*Market Prices of Common Stock and Distributions*.  There is no established public trading market for our common stock. For purposes of the Merger, we valued our common stock at $10.00 per share.  As of August 1, 2007, we had over 115,000 stockholders of record. We declared and paid distributions to our stockholders totaling $0.64 per common share during the fiscal year ended December 31, 2006. A total of $0.29 of these per share distributions were taxable as ordinary income. There was a $0.35 return of capital for tax purposes per share, which reduces each stockholder's tax basis in its shares and will cause more gain or less loss on the sale of the shares.  During the six months ended June 30 2007, we declared distributions to stockholders totaling $0.32 per common share.

**Election of Directors**

Our current governing charter requires us to have at least three, but not more than 11, directors. Our Board currently has seven members.  Each Board member serves for a term of one year and until his or her successor is elected and qualifies. We are proposing to re-elect each of our existing Board members.  Although we are not listed on the New York Stock Exchange, a majority of our directors would satisfy the definition of "independent" under the New York Stock Exchange's listing standards.  A biography for each Board member, and additional information about our Board and our management team, is contained under the heading "Election of Directors – Nominees for Election as Directors."

**Ratification of the Appointment of our Independent Registered Public Accounting Firm**

Our Board, upon recommendation of the audit committee, selects and appoints our independent registered public accounting firm annually and asks stockholders to ratify the appointment. However, even if the stockholders do not ratify the appointment, we will retain the firm appointed by our Board and our Board will take the lack of ratification into account in making its selection for the following year.

9

## MERGER SUMMARY TERM SHEET

This term sheet is a summary of the material terms of our acquisition of our Property Managers and our Business Manager/Advisor and does not contain all of the information regarding the acquisition that you may consider important. The following summary is applicable only if our stockholders ratify our entry into the Merger Agreement and our approval of the Merger, as set forth in Proposal No. 1 of this proxy statement.

- We intend on taking one of the most significant steps in achieving our goal of becoming a self-administered REIT by acquiring our Business Manager/Advisor and our Property Managers (see pgs. 14-23, "The Merger – Background of the Merger" and "The Merger – Reasons for the Merger");

- We will acquire our Property Managers and our Business Manager/Advisor through four separate stock-for-stock mergers (see pg. 24, "The Merger – Merger Agreement");

- In the Merger, we will issue: (i) to the stockholder of our Business Manager/Advisor, 18,750,000 shares of common stock; and (ii) to the stockholders of our Property Managers, an aggregate of 18,750,000 shares of common stock, for a total of approximately 37,500,000 shares, valued at $10.00 per share, totaling $375.0 million in the aggregate, subject to rounding, which is approximately 7.7% of our outstanding common stock after giving effect to the proposed issuance, in exchange for all of the outstanding equity securities of our Property Managers and our Business Manager/Advisor (see pgs. 24-25, "The Merger – Merger Agreement");

- The completion of the Merger is contingent upon ratification of our entry into the Merger Agreement and the contemplated Merger by our stockholders, and that the irrevocable written consents executed by each of our Sponsor, as sole stockholder of our Business Manager/Advisor, and Principal Stockholders, as stockholders of each of the Property Managers, concurrent with the execution of the Merger Agreement shall remain in full force and effect, as well as other customary closing conditions (see pgs. 29-32, "The Merger – Merger Agreement");

- We, and certain of our affiliates, will be indemnified by our Sponsor, the PM Stockholder Agent and the stockholders of the Property Managers against certain damages, as specified in the Merger Agreement and summarized in this proxy statement. Likewise, we will indemnify our Sponsor and the stockholders of our Property Managers, and certain of their affiliates, against certain damages, as specified in the Merger Agreement. (see pgs. 33-36, "The Merger – Merger Agreement");

- We will grant to the stockholders of our Property Managers and our Business Manager/Advisor registration rights, requiring us to register the shares we issue to them as the Merger consideration under certain circumstances (see pgs. 37-38, "The Merger – Ancillary Agreements");

- We will enter into an escrow agreement where 55% of our common shares issued in the Merger will be deposited into an escrow account and subject to two release dates, the second of which will occur on the earlier of the 30th day after receipt by us of an audit opinion from our independent registered public accounting firm covering our financial statements for the year ending December 31, 2008 and the second anniversary of the effective date of the escrow agreement. (see pg. 38, "The Merger – Ancillary Agreements");

- In connection with the Merger, we, among other things: (1) entered into employment agreements with key members of our management team that will become effective upon the closing and entered into consulting agreements with key Inland executives, without compensation, that will become effective upon the closing; (2) entered into a letter agreement with TIGI whereby TIGI agrees to perform certain obligations under the Merger Agreement; (3) will enter into a sublease for office space at our corporate headquarters; (4) received a letter from an affiliate of TIGI who, subject to its existing acquisition agreements, will make us aware of all the properties that the

10

affiliate is acquiring, with the understanding of our primary interests in certain properties; and if we choose, we will be able to bid on such properties through that affiliate; (5) will enter into a transition due diligence services agreement; (6) will enter into a legal services agreement for assistance with certain legal services; (7) will enter into an amendment to a license agreement whereby Inland agrees not to use or license our name or logo to other parties with certain limited exceptions; and (8) will enter into an agreement whereby we will receive assistance securing institutional investors (see pgs. 38-42, "The Merger – Ancillary Agreements");

•     In connection with the Merger, our Business Manager/Advisor, among other things, will enter into amendments to various existing services agreements with Inland, which will be deemed assigned to us upon closing of the Merger (see pg. 40, "The Merger – Ancillary Agreements");

•     In connection with the Merger, our Property Managers, among other things, will enter into certain license agreements with Inland (see pg. 42, "The Merger – Ancillary Agreements");

•     In the opinion of William Blair, the Merger consideration is fair, from a financial point of view, to us and our stockholders (see pgs. 47-57, "The Merger – Opinion of the Financial Advisor"); and

•     Following the Merger we expect, based in part upon an opinion of our counsel we will receive at the closing, to continue to be taxed as a REIT for federal income tax purposes (see pgs. 57-59, "The Merger – Federal Tax Consequences").

11

## RISKS OF THE MERGER TO US AND OUR STOCKHOLDERS

*Certain of our officers and directors have potential conflicts of interest.*

Certain of our directors and officers have interests in connection with the Merger, our Property Managers and our Business Manager/Advisor that are different from, and may potentially conflict with, our interests. In particular, all of our current executive officers and two of our current directors are also executive officers and/or directors of Inland. We have entered into a non-compensated consulting agreement, that will become effective upon the closing, with Robert D. Parks, our current chairman and director. Mr. Parks and Ms. Brenda G. Gujral, our chief executive officer and a director, are stockholders of our Property Managers and TIGI, the ultimate owner of our Business Manager/Advisor. As such, these individuals will receive direct and indirect substantial benefits, in the form of our payment of shares of our common stock as consideration in the Merger.

Mr. Grimes, our current Treasurer and Principal Financial Officer, has entered into an employment agreement with us, that will become effective upon the closing, and will become our Chief Operating Officer and Chief Financial Officer. Mr. Grimes is also currently a stockholder of one or more of the Property Managers. If the Merger is consummated, Mr. Grimes will receive additional economic interest in our common stock through his ownership in one or more of the Property Managers. Mr. Grimes, due to his ownership interest in one or more Property Managers, is subject to the terms of the Merger Agreement and other ancillary agreements including the agent appointment agreement and the escrow agreement. Under the terms of the escrow agreement, 55% of our common shares issued in the Merger will be deposited into an escrow account and subject to two release dates, the second of which will occur on the earlier of the 30th day after receipt by us of an audit opinion from our independent registered public accounting firm covering our financial statements for the year ending December 31, 2008 and the second anniversary of the effective date of the escrow agreement. Certain provisions of the Merger Agreement and the escrow agreement may further have a significant impact on shares owned by stockholders of the Property Managers and our Business Manager/Advisor. In particular, Mr. Grimes is subject to potential conflicts of interest in connection with the enforcement against us and the enforcement by us against one or more Property Managers of indemnification obligations under the Merger Agreement and the escrow agreement. The enforcement of the provisions of these agreements may adversely affect the financial interests of Mr. Grimes and the economic interests of Mr. Grimes may affect his judgment as to whether and to what extent we should enforce the indemnification obligations against the Property Managers or contest any attempt by the Property Managers to enforce indemnification obligations against us after the consummation of the Merger.

*We are dependent on Inland to provide services to us.*

We rely on Inland to provide certain administrative services to us. The services provided to us are described in service agreements including the ancillary agreements executed, and to be executed, pursuant to the Merger Agreement. Our ability to achieve our business objectives will depend to a large extent on the quality of Inland's performance under these service agreements. Therefore, we depend heavily on the ability of Inland to retain the services of each of its executive officers and key employees. The loss of these individuals, or similar changes, could have a material adverse effect on us.

*We may compete with our affiliates for properties.*

Certain of our affiliates could seek to acquire properties that, while not directly in our industry or geographic segment, could satisfy our acquisition criteria. For example, Inland, which provides property acquisition services to us, also provide these services to other entities, including REITs, such as Inland Real Estate Corporation and Inland American Real Estate Trust, Inc., which have superior rights to acquire certain properties identified by Inland that are of a certain type and within certain geographic areas.

*Our funds from operations for the current fiscal year will decrease if the Merger is consummated in 2007.*

If the Merger is consummated in 2007, our funds from operations for the current fiscal year will decrease as a result of the non-cash charge we will incur for the portion of the Merger consideration that pertains to the costs of terminating the advisory agreement and property management agreements. After termination of the advisory agreement, we will no longer incur certain fees previously paid to affiliates of our Business Manager/Advisor. Our

12

expenses will include the salaries and benefits of our officers and the other employees previously paid for by the affiliates of our Business Manager/Advisor, a portion of which we now reimburse under the advisory agreement. Further, our funds from operations will decrease in the year the Merger is consummated due to the additional Merger expenses recognized. If the Merger is not consummated, the amount of the fees payable to our Business Manager/Advisor or our Property Managers will depend on a number of factors, including the amount of additional equity, if any, that we are able to raise, the number of properties that we are able to purchase and the profitability of our business and the percentage fee taken by our Business Manager/Advisor, which may be as much as 1% of our average invested assets. Therefore, the exact amount of future fees that we would pay to our Business Manager/Advisor or our Property Managers cannot be estimated with certainty. If the expenses we incur on a going forward basis as a result of the Merger are higher than we anticipate, our funds from operations may be lower than we currently expect as a result of the Merger.

*We may be exposed to risks to which we have not historically been exposed.*

The Merger will expose us to risks to which we have not historically been exposed. Currently, the responsibility for overhead relating to property management and advisory services is borne by our Business Manager/Advisor and Property Managers. Thus, our overhead, on a consolidated basis, will increase as a result of our becoming self-advised and self-managed.

At present, we do not have any employees. As a result of the Merger, we will employ persons who are currently employees of our Sponsor and the Property Managers and we may establish new benefit plans for such employees. As an employer, we will be subject to those potential liabilities that are commonly faced by employers, such as workers disability and compensation claims, potential labor disputes and other employee-related liabilities and grievances and we will bear the costs of the establishment and maintenance of employee benefit plans, if established.

*After the Merger, we will be dependent on our own executives and employees.*

We rely on a small number of persons who comprise our existing senior management to carry out our business and investment strategies. While we have entered into employment agreements with certain individuals that will become effective upon the closing, these employment agreements have a short term and will terminate, if not before, on December 31, 2007. The loss of the services of any of our key management personnel, or our inability to recruit and retain qualified personnel in the future, could have an adverse effect on our business and financial results. Our executive officers are not bound by non-compete or non-solicitation agreements with us and this could further have an adverse effect on our business and financial results due to the loss of any of our executive officers. As we expand, we will continue to need to attract and retain qualified additional senior management, but may not be able to do so on acceptable terms.

13

# THE MERGER

PROPOSAL NO. 1: RATIFICATION OF OUR ENTRY INTO THE MERGER AGREEMENT WITH OUR BUSINESS MANAGER/ADVISOR AND PROPERTY MANAGERS AND CERTAIN OTHER PARTIES AND OUR APPROVAL OF THE MERGER.

## Background of the Merger

Since its inception, our Board has considered, from time to time, the possibility of becoming self-administered.  In February 2006, following discussions with representatives of Inland, our Board began to consider the strategic benefits of internalizing the services conducted for us by our Business Manager/Advisor and Property Managers.  Our advisory agreement with our Business Manager/Advisor and our property management agreements with our Property Managers each include a provision, which we refer to as the purchase options, permitting us to acquire, at our option, the business conducted by our Business Manager/Advisor, including all of its assets, and by each Property Manager, including all of their assets, in exchange for a number of shares of our common stock determined in accordance with a formula established in those agreements.  We could exercise the purchase options beginning in September 2008 for the Business Manager/Advisor and in May 2008 for the Property Managers.

In February 2006, after discussion and consultation with counsel, our Board determined that it would be advisable to form a special committee of the Board comprised only of independent directors to consider and evaluate a possible acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such a transaction.

On March 7, 2006, the special committee, initially composed of Kenneth H. Beard, Frank A. Catalano, Jr., Paul R. Gauvreau, Gerald M. Gorski, and Barbara A. Murphy, met in person with our counsel, Duane Morris LLP, which we refer to as Duane Morris, and unanimously resolved to recommend to our Board that it adopt and approve the special committee's charter.  At this meeting, Mr. Gauvreau was also elected chairman of the special committee.

On March 14, 2006, our Board adopted the charter recommended by the special committee and formally established the special committee.  The Board delegated all its power and authority to the special committee, subject to applicable law, in connection with all matters pertaining to the possible acquisition of our Business Manager/Advisor and Property Managers and the evaluation of alternative strategies. The special committee met telephonically that same day with a representative from Duane Morris to discuss the special committee process and the retention of independent financial and legal advisors to assist the special committee in evaluating the potential acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such an acquisition and negotiating any transaction.

On April 11, 2006, the special committee met in person with representatives from Duane Morris present to discuss further the process of retaining financial and legal advisors.

During April and May 2006, the special committee solicited proposals from potential financial advisors and legal advisors to assist them in evaluating and negotiating any internalization transaction.  On May 10, 2006, the special committee met in person and interviewed potential financial advisors.  On May 12, 2006, the special committee met in person and interviewed potential legal advisors.

On May 15, 2006, Silver Portal Capital, which we refer to as Silver Portal, financial advisors to the Business Manager/Advisor and Property Managers, presented to our Board and to the members of the special committee its financial analysis and valuation of the Business Manager/Advisor and Property Managers and its economic rationale for an internalization transaction.  Thereafter, Mr. Gauvreau, at the direction of the special committee, contacted Mr. Goodwin, the Chairman of TIGI and one of its principal stockholders, and requested additional information regarding the Silver Portal presentation and its valuation analysis.

The special committee met in person on June 13, 2006 and formally retained Sidley Austin LLP, which we refer to as Sidley, as legal counsel to the special committee.  The special committee's counsel reviewed with the members of the committee their legal duties and discussed the independence of each member of the special committee. At this meeting, representatives from Sidley also reviewed with the special committee applicable

14

provisions of our charter and bylaws, including the exculpatory, indemnification, advancement of expenses and insurance provisions. The special committee's counsel noted, among other things, that our charter and bylaws contained provisions different from those customarily found in the organizational documents of publicly listed and traded companies. The special committee requested that Sidley provide additional analysis of these provisions.

By letter dated June 19, 2006, the special committee engaged William Blair to serve as its financial advisor in connection with the special committee's consideration of a possible internalization transaction, including participating in negotiations relating to the possible internalization transaction, and rendering an opinion as to the fairness to us of the consideration to be paid by us in the possible internalization transaction or advising the special committee and the Board that William Blair is unable to render such an opinion.

On June 23, 2006, the special committee and its counsel met telephonically and were joined by Mr. Goodwin, as a representative of TIGI, certain of our officers, and a representative from Duane Morris. The special committee and its counsel discussed certain apparent inadvertent errors in our charter and determined to recommend to the Board that it file a certificate of correction with the state of Maryland to remedy these drafting errors. The special committee further reviewed and discussed the independence of each member of the special committee. In addition, the special committee and our representatives discussed the scheduling of our annual meeting and the need for amendments to our charter.

Our Board met on July 5, 2006. At this meeting, our Board determined to file a certificate of correction to remedy certain drafting errors in our charter. The Board also determined to seek stockholder approval of amendments to our charter at our stockholders' annual meeting to adopt indemnification, exculpatory and insurance provisions more customary with publicly listed and traded companies. The Board also discussed the composition of the special committee and considered whether Mr. Catalano, who had a then existing financial relationship with Inland, would be considered "independent" under the various definitions of independence applicable to our directors. To avoid any perceived impairment of the independence of the special committee members, Mr. Catalano resigned from the special committee.

On August 2, 2006, the special committee, then comprised of Messrs. Beard, Gauvreau and Gorski and Ms. Murphy, met telephonically, along with its legal and financial advisors. The special committee discussed with its legal and financial advisors, among other things, the actions taken by the Board and the duties of the members of the special committee under Maryland law and under our charter and bylaws in connection with evaluating whether to acquire our Business Manager/Advisor and Property Managers and alternatives to an internalization transaction. Representatives of William Blair provided preliminary comments on the financial analysis prepared by Silver Portal, the financial advisors to the Business Manager/Advisor and Property Managers. Representatives of William Blair also provided the special committee with an overview of its analytical approach to the financial valuation of potential target companies. In connection with its discussion, the special committee began to evaluate potential alternatives to an internalization of the Business Manager/Advisor and Property Managers.

On August 10, 2006, we filed with the SEC our proxy materials for the annual meeting of our stockholders, which was to be held on October 10, 2006, to consider, among other things, the amendment and restatement of our charter.

On October 10, 2006, our stockholders approved the amendment and restatement of our charter at our annual meeting and, promptly thereafter, the amended and restated charter was filed with the State Department of Assessments and Taxation for the state of Maryland. At the end of October and the beginning of November, our legal advisors commenced legal due diligence and our financial advisors commenced financial due diligence with respect to a possible internalization transaction with the Business Manager/Advisor and Property Managers and the alternatives to such a transaction.

Our Board met on November 14, 2006. At the meeting, the Board ratified its prior actions, including the formation of the special committee and the delegation of authority to it in connection with the evaluation of a possible internalization transaction with the Business Manager/Advisor and Property Managers and the alternatives to such a transaction and all actions taken by the special committee with respect to the possible internalization transaction.

15

During November and December 2006, the legal and financial advisors to the special committee continued to conduct due diligence and review materials and information provided by the Business Manager/Advisor and Property Managers.

On December 12, 2006, the special committee met in person with its financial and legal advisors. At this meeting, representatives of William Blair summarized the status of its due diligence review and provided additional perspective on the financial analysis prepared by Silver Portal for the Business Manager/Advisor and Property Managers. The members of the special committee requested that William Blair provide a preliminary valuation analysis of the Business Manager/Advisor and Property Managers and of our common stock in early January 2007.

Representatives of Sidley also provided an update on the status of its due diligence review at the December 12, 2006 meeting of the special committee, including an analysis of the existing advisory and property management agreements. The special committee also discussed possible alternatives to an internalization transaction, including the following alternatives:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

In evaluating a possible termination of our existing agreements with our Business Manager/Advisor and Property Managers, the special committee noted that it would be difficult to promptly replace the services provided by the Property Managers and also discussed the practical difficulties that termination of the advisory agreement might create, including transition costs related to the loss of experienced employees of our Business Manager/Advisor and the loss of important administrative services and assets, including the "Inland" name, licensed to us through our Business Manager/Advisor. The special committee requested that William Blair obtain additional due diligence information relating to the cost of the services provided by the Business Manager/Advisor and the Property Managers compared to such services that could be provided by third-party service providers.

On December 21, 2006, representatives from William Blair and Sidley met in person with representatives from the Business Manager/Advisor and Property Managers. At this meeting, the representatives from the Business Manager/Advisor and Property Managers presented their position on, and provided additional information related to, the services provided by the Business Manager/Advisor and Property Managers, valuation of the Business Manager/Advisor and Property Managers, valuation of our common stock, the potential advantages of an internalization to our company, and the process for proceeding with negotiations should the special committee decide to do so. In addition, our Business Manager/Advisor and Property Managers provided additional due diligence materials relating to services provided to our company directly or through our Business Manager/Advisor by Inland at this meeting and personnel and functions that would be internalized in an internalization transaction.

On January 9, 2007, representatives of our Business Manager/Advisor and Property Managers made a presentation to our Board regarding, among other things, the scope of the services that our Business Manager/Advisor and Property Managers currently provided to us including, among others, office and facilities management, insurance and risk management, computer, personnel, property tax, communications, loan, and property acquisition due diligence services, many of which are provided to our Business Manager/Advisor by Inland. Our Business Manager/Advisor and Property Managers also discussed the potential transition issues associated with terminating the advisory or property management agreements, including potential cessation of our

16

property acquisition program and the value to us of access to property acquisition services of affiliates of our Business Manager/Advisor, all of which could be provided directly or indirectly through our Business Manager/Advisor.

Immediately after the Board meeting on January 9, 2007, the special committee met with its financial and legal advisors.  The special committee reviewed and discussed the materials distributed at the Board meeting regarding the services currently provided to us by the Business Manager/Advisor and the Property Managers, the cost of such services compared to services that could be provided by third-party service providers, and the potential cost savings that might be realized by acquiring the Business Manager/Advisor and the Property Managers.  The special committee also discussed additional possible benefits of an internalization, including the ability to hire key personnel and retain key officers and employees of our Business Manager/Advisor and Property Managers, continued cost-effective access to important administrative services provided by our Business Manager/Advisor and Property Managers and their affiliates including access to the Inland property acquisition "pipeline" via agreements with Inland regarding properties located in our market area, and the use of the "Inland" name and logo. The special committee also explored the risks of building a staff internally as compared to acquiring our Business Manager/Advisor and Property Managers, including the potential risks related to a transition in management and services as well as management distractions related to such a transition, investor relations and the relationship between us, TIGI and Inland.

At this meeting, William Blair reviewed for the special committee its preliminary financial analyses with respect to our Business Manager/Advisor and Property Managers and us.  The special committee determined that the purchase options could be viewed as a ceiling on the number of shares that we might exchange to internalize the Business Manager/Advisor and Property Managers.  William Blair also provided the special committee with a preliminary financial analysis regarding the valuation of our Business Manager/Advisor and Property Managers and our per share valuation, as well as the corresponding number of shares to be included as consideration in the possible internalization transaction.  William Blair also presented to the special committee a comparison of the cost of certain services provided by the Business Manager/Advisor and the Property Managers as a percentage of our assets compared to that cost ratio for selected publicly traded REITs that have internally provided advisory and property management services.  The special committee, along with its financial and legal advisors, discussed the advantages and disadvantages of the various strategic alternatives available to the special committee, including that acquiring our Business Manager/Advisor and Property Managers could enhance stockholder value by, among other things, positioning us to list our shares on a national securities exchange, reducing the potential conflict due to the fact that fees paid to our Business Manager/Advisor and Property Managers are primarily based on a percentage of our real property asset base, and generating cost savings which could increase earnings and funds from operations.

The special committee determined that it was in our best interest and the best interest of our stockholders to pursue further discussions regarding an internalization transaction.  The committee authorized Mr. Gauvreau and representatives from William Blair to enter into discussions with representatives of the Business Manager/Advisor and Property Managers regarding the valuation of the Business Manager/Advisor and Property Managers and about our valuation, and the corresponding number of shares to be included as consideration in the possible internalization transaction.

Mr. Gauvreau and representatives of William Blair met with Mr. Goodwin and Mr. Thomas McGuinness, the President of our Property Managers, on January 26, 2007.  The special committee's representatives presented the Business Manager/Advisor and Property Managers' representatives with a summary of William Blair's preliminary valuation analysis. The representatives for both parties discussed valuation, share accretion and personnel issues.  Mr. Goodwin presented Mr. Gauvreau and the representatives of William Blair with a proposed term sheet for an internalization transaction and the parties agreed to continue discussions in early February.

At Inland's request, the special committee requested that representatives of Sidley contact representatives of Jenner & Block LLP, which we refer to as Jenner, counsel for the Business Managers/Advisors and Property Managers, to discuss the legal terms of the potential transaction.  The special committee also requested that Sidley commence drafting and negotiating a merger agreement and requested that representatives of Sidley contact representatives from Duane Morris to identify and begin drafting and negotiating the ancillary service agreements that we would need to enter into or amend in connection with the potential internalization transaction.

17

On February 14, 2007, the special committee met in person with its financial and legal advisors. The special committee discussed certain human resources and employment matters relating to the proposed internalization transaction and reviewed a draft post-internalization organizational chart provided by Mr. Grimes, the Chief Financial Officer of our Business Manager/Advisor and Mr. O'Hanlon, the Senior Vice President of Asset Management of our Sponsor.

At the invitation of the committee, Mr. Goodwin, along with Mr. McGuinness and Mr. Robert Barg, joined the meeting to present the Business Manager/Advisor's and Property Managers' views on the valuation of those entities and the accretive value to us of the proposed internalization transaction. The special committee emphasized to the representatives of our Business Manager/Advisor and Property Managers that it was important that, upon any acquisition of our Business Manager/Advisor and Property Managers, if any, we would have the key employees necessary to perform the services currently provided by our Business Manager/Advisor and Property Managers. The representatives of our Business Manager/Advisor and Property Managers indicated that Inland also would be amenable to having certain persons serve in a consulting capacity at minimal or no cost to us for a period of time to be determined.

Following the presentation by the representatives of the Business Manager/Advisor and Property Managers, the special committee met with its financial and legal advisors to discuss the valuation of the Business Manager/Advisor and Property Managers and the corresponding number of shares to be included as consideration in the possible internalization transaction. The members of the special committee also discussed the valuation of our common stock. The members of the special committee also reviewed a draft merger agreement and draft ancillary service agreements and discussed their terms. The special committee discussed the persons who would be retained on a consultancy basis, in the event that the proposed internalization transaction were accomplished, as well as information regarding transition and continuation services that Inland is expected to provide to us in connection with the acquisition.

On February 19, 2007, after additional discussion between representatives of the special committee and representatives of the Business Manager/Advisor and Property Managers, regarding the parties' respective valuation analyses, the parties preliminarily agreed to an aggregate purchase price for our Business Manager/Advisor and Property Managers of 37,500,000 shares of our common stock, subject to the negotiation of the terms and conditions set forth in the merger agreement and ancillary agreements. The draft merger agreement also was provided to Jenner on this date.

On February 22, 2007, the special committee met in person along with representatives from Sidley and Duane Morris. At the invitation of the special committee, Mr. Grimes and Mr. O'Hanlon attended the meeting. The special committee again discussed, if we acquired our Business Manager/Advisor and Property Managers, the key employees who would become our employees. Mr. O'Hanlon and Mr. Grimes presented the members of the special committee with an updated draft employee organizational chart for the proposed internalization at this meeting.

On March 1, 2007, the special committee met in person to discuss human resources matters relating to the proposed internalization transaction, including senior management positions, employment agreements and consulting agreements. On March 13, 2007, the special committee met again with Mr. O'Hanlon and Mr. Grimes regarding the persons who would become full-time employees of ours if a transaction were completed.

During March and April 2007, the legal advisors to the special committee, at the direction of the special committee, our legal advisors and the legal advisors to the Business Manager/Advisor, Property Managers and Inland met in person and telephonically on numerous occasions to negotiate the terms of the merger agreement and the ancillary service agreements with Inland. During this period, the special committee met on numerous occasions with its counsel to review the status of the negotiations and review drafts of these agreements.

On April 6, 2007 and on April 17, 2007, the special committee met telephonically with its legal advisors and reviewed the status of negotiations relating to the merger agreement and ancillary service agreements.

During the week of April 23, 2007, representatives of the Business Manager/Advisor and Property Managers proposed that they meet again with members of the special committee to discuss certain terms of the merger agreement and ancillary agreements. The members of the special committee, along with representatives of

18

Sidley and Duane Morris, met telephonically with the representatives of the Business Manager/Advisor and Property Managers and their legal advisors on May 2, 2007, at which time representatives of the Business Manager/Advisor, Property Managers and Inland presented their position on certain terms of the merger agreement, the ancillary agreements and the consulting agreements. All parties agreed to meet in person on May 8, 2007 for further discussion.

On May 8, 2007, the members of the special committee, along with representatives of Sidley and Duane Morris, met with representatives of the Business Manager/Advisor, Property Managers and Inland and their legal counsel and continued to negotiate the terms of the merger agreement, ancillary agreements and consulting agreements.

In May 2007, the special committee retained Hewitt Associates LLC, which we refer to as Hewitt, as a consultant to the special committee and to assist the special committee in its review of executive compensation in connection with the proposed internalization transaction. On May 22, 2007, Hewitt presented the members of the special committee with an analysis of executive compensation at certain peer group companies. The members of the special committee requested that Hewitt obtain additional information relating to peer group companies and discussed the terms of potential employment agreements for executive officer positions post-internalization.

Over the course of May and June 2007, the legal advisors to the special committee, representatives of Duane Morris and the legal advisors to the Business Manager/Advisor, Property Managers and Inland continued to meet in person and telephonically to negotiate the terms of the merger agreement and ancillary service agreements with Inland. During this period, the special committee met on numerous occasions with its counsel to review the status of the negotiations and review drafts of these agreements.

On June 7, 2007, the special committee, along with its legal advisors and our counsel, held a telephonic meeting to discuss executive compensation and employment agreements for senior management post-internalization. The special committee's legal advisors also reviewed the status of the draft merger agreement, draft ancillary service agreements and consulting agreements.

On June 20, 2007, the special committee met in person with its financial and legal advisors and our counsel. Representatives of William Blair reviewed the financial results for us and the Business Manager/Advisor and Property Managers through March 2007 as well as updated financial projections that it had received for us and for the Business Manager/Advisor and Property Managers and discussed current market conditions with respect to real estate investment trusts. In addition, the members of the special committee and its financial and legal advisors discussed the updated financial projections in connection with alternatives to an internalization transaction. The members of the special committee and its legal advisors also discussed employment agreements and executive compensation matters and the status of the draft merger agreement, draft ancillary agreements and consulting agreements. The special committee asked to be provided with an updated set of draft agreements and summaries on June 29, 2007, so that it could review the materials over the following week and scheduled the next meeting of the special committee for July 10, 2007.

On July 10, 2007, the special committee met, along with its legal and financial advisors, to consider the acquisition of our Business Manager/Advisor and Property Managers. Representatives of Sidley reviewed with the members of special committee legal aspects of the proposed transaction including, among other things, (i) their applicable duties, (ii) the process taken by the special committee in its consideration of an internalization transaction involving the acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such a transaction and (iii) the terms and status of the proposed Merger Agreement and the ancillary agreements. William Blair presented its updated financial analyses.

Immediately following the meeting of the special committee, our Board met to discuss the proposed transaction. Legal counsel for the special committee reviewed, with the members of our Board, the terms of the proposed Merger Agreement and the ancillary agreements. William Blair presented its updated financial analysis of the valuation of our Business Manager/Advisor and Property Managers and of our common stock to the Board and the corresponding number of shares to be included as consideration in the possible internalization transaction.

On August 14, 2007, the special committee met telephonically, along with its legal and financial advisors to review the final terms of the proposed acquisition. At the meeting, representatives of William Blair reviewed the financial results for us and the Business Manager/Advisor and Property Managers through June 30, 2007, as well as updated financial projections that it had received for us and for our Business Manager/Advisor and Property Managers and presented an update of its analysis to the special committee. Then, William Blair delivered to the special committee its oral opinion that the consideration of approximately 37,500,000 shares of our common stock to be paid by us for the acquisition of our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders. See "- Opinion of the Financial Advisor." Later that same day, William Blair delivered its written opinion to the same effect. Counsel for the special committee reviewed the various alternatives and the advantages and disadvantages considered by the special committee with respect to each alternative. These alternatives included:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

The special committee unanimously recommended that our Board and stockholders approve the Merger, subject to the terms and conditions set forth in the Merger Agreement and ancillary agreements thereto.

Following the meeting of the special committee, our Board met telephonically and unanimously approved the Merger and the Merger Agreement and ancillary agreements thereto.

**Reasons for Requiring Your Ratification**

There is no legal requirement to submit our entry into the Merger Agreement or our approval of the Merger to our stockholders for ratification. Because we believe it is desirable to obtain your ratification of our entry into the Merger Agreement and our approval of the Merger, we have made your ratification a condition to the closing of the Merger. If the Merger proposal is not approved, we will continue to operate under our current management structure, paying fees and cost reimbursements to our Property Managers and our Business Manager/Advisor under their contracts and our Board will examine its other alternatives.

**Reasons for the Merger**

The special committee recommended that our Board approve the proposed transaction based upon a variety of factors, both for and against the proposed transaction. The decision by the special committee followed numerous meetings with its legal and financial advisors as described in greater detail above in "- Background of the Merger." The special committee took into account the following positive factors without assigning relative weights, which the special committee believes favor the proposed transaction:

- *Goal of Self Administration*. The acquisition of our Business Manager/Advisor and Property Managers is one of the most significant steps in achieving our objective of becoming a fully self-administered REIT. The special committee believes that analysts and investors have shown a preference for self-administered REITs and, as a result, the consummation of the proposed transaction may better position us to raise capital or list our shares on a national securities exchange. We also believe that a self-administered REIT better aligns the interests of the

20

management of our Business Manager/Advisor and Property Managers with the interests of our stockholders. Although we will continue to obtain from Inland various services not provided by our Business Manager/Advisor or Property Managers, the special committee believes that we will obtain these services at rates at or below market and that continuity of these services is, at this time, more important than internalization of such services. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs, among other things.

- *Reduction of Operating Costs and Impact on Funds from Operations*. Our portfolio of real estate assets has grown substantially since 2003. Our Business Manager/Advisor and Property Managers are currently compensated based on a fixed percentage of our real estate assets, which results in ratable increases in the fees we pay under the advisory and property management agreements as our asset base grows. By acquiring our Business Manager/Advisor and Property Managers, we will substantially transform the costs associated with the advisory and management function to fixed costs, which we expect will allow us to benefit from the economies of scale that result in connection with the growth of our real estate portfolio. In addition, the special committee believes that upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger, and it is estimated to be increasingly accretive in subsequent years, because the costs of internalizing the advisory and property management functions plus the distributions to be paid on the shares issued is expected to be less than the advisory and property management fees expected to be paid to our Business Manager/Advisor and Property Managers.

- *Opinion of William Blair*. The special committee considered the opinion of William Blair to the effect that, as of August 14, 2007, and based upon and subject to the assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders; however, the opinion does not apply to stockholders of the Business Manager/Advisor or the Property Managers, including such stockholders who are also our stockholders.

- *Review of Material Terms of Proposed Transaction*. The special committee considered and discussed with its legal counsel and our counsel the material terms of the Merger Agreement, including the representations, warranties, covenants, conditions to closing and indemnification obligations set forth therein, together with the material terms of the ancillary agreements entered into or to be entered into in connection with the proposed transaction. The special committee believes the terms of these agreements are fair and commercially reasonable.

- *Access to Properties Identified by Inland*. The special committee believes that Inland has experienced employees who are knowledgeable in the retail real estate field and are particularly skilled at identifying, and have proprietary access to, properties within our investment guidelines. In connection with the proposed transaction, we will retain a right of first offer to acquire, on a priority basis relative to other clients of Inland, certain retail and lifestyle properties located west of the Mississippi River, but excluding that portion of such geographical area located within 400 miles of Oak Brook, Illinois. The special committee believes that access to these properties is of substantial value to us, which will be preserved as a result of the proposed transaction.

- *Rights to Inland Marks*. The "Inland" name and logo, together with our name and logo, are currently licensed from Inland to our Business Manager/Advisor on a non-exclusive basis. We are authorized to use the Inland name under the advisory agreement. In connection with the proposed transaction, the special committee negotiated an arrangement whereby we will have an exclusive right to use our name and logo, subject to the right of Inland to use our name for general marketing and communications purposes. See "- Ancillary Agreements — License Agreement Modification." The special committee believes that the goodwill associated with the Inland marks

21

and our name is of substantial value to us, which will be preserved on an exclusive basis as a result of the proposed transaction.

- *Retention of Key Management Personnel*. The proposed transaction will permit us to retain directly the services of key management of our Business Manager/Advisor and Property Managers, including the services of Messrs. O'Hanlon, Grimes, Garrison and Byrne. These knowledgeable and experienced employees have day-to-day familiarity with the management of our assets. The proposed transaction will also permit us to retain, at no cost to us, the consulting services of Messrs. Parks, Cosenza and Goodwin.

- *Access to Inland Affiliated Services*.  The special committee believes that the services provided by Inland are of a higher quality and provided at equal or lower costs than could be obtained from unaffiliated third parties. These services include office and facilities management, insurance and risk management, computer consulting, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services.  The special committee believes that access to these services is of substantial value to us, which will be preserved as a result of the proposed transaction.

The special committee also took into account the following negative factors, without assigning relative weights, which the special committee believes are outweighed by the positive factors discussed above. The negative factors considered by the special committee included:

- *Inability to Immediately Become Fully Self-Administered*.  The special committee considered whether certain administrative functions not provided directly by our Business Manager/Advisor or Property Managers could be performed internally following the Mergers. These services include office and facilities management, insurance and risk management, computer services, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services.  In order to assure the continuity of these administrative services while allowing us time to develop these service areas in-house or to hire other third-party service providers for these services, we entered into or amended several services agreements, to obtain these services, with Inland. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs.

- *Potential Loss of Key Employees*.  Through the transaction, a key asset we will acquire is knowledgeable, experienced employees.  The working knowledge of these employees is specific to our real estate portfolio, our tenants and our property acquisition processes. While the special committee considered and negotiated for employment agreements with certain key employees, there is no guarantee that those employees, or employees not subject to employment agreements, will remain with our Business Manager/Advisor or Property Managers or become our employees following the Merger.  Further, their employment agreements are short-term and do not include non-compete provisions.

- *Unanticipated Costs of Services Performed by Our Business Manager/Advisor and Property Managers*.  The special committee carefully considered the fees paid to our Business Manager/Advisor and Property Managers relative to the costs of performing these functions internally. With the growth of our asset base since 2003, the special committee determined that cost savings could likely be achieved by eliminating the advisory and management fees presently paid to our Business Manager/Advisor and Property Managers and internalizing those functions. The determination that performing services internally will be cost effective assumes knowledge of the actual costs of performing the advisory and property management services. If there are costs that were not correctly estimated or unanticipated costs in performing these services, the economic benefits to us sought to be attained through the Mergers will not be fully realized.

22

The special committee considered these factors, among others, in light of various alternatives that are described more fully below:

- *Maintain the Status Quo*. This alternative ensured continuity of operations, including the receipt of certain no cost and low cost services, and key personnel, but had the disadvantage of, among other things, requiring us to pay on-going advisory and management fees.

- *Hire New Third Parties to Provide Advisory and Property Management Services and Terminate Our Advisory and Property Management Agreements*. The advantage of this alternative was the prospect of negotiating lower fees with third-party providers, provided that the services provided by or through our Business Manager/Advisor and Property Managers could be adequately provided by a single service provider or a discrete group of service providers. The disadvantages of this alternative included, among other things, the costs associated with a lengthy transition period, the loss of the continuity and experience of our Business Manager/Advisor's and Property Managers' key employees, the loss of the right to use the "Inland" name and our name and logo, and the payment of on-going advisory and management fees.

- *Build Advisory and Property Management Functions Internally and Terminate Our Advisory And Property Management Agreements*. The benefit of this alternative was the prospect of reducing costs, on an asset basis, over time because our business management, advisory and property management costs would no longer be based on a percentage of our real property assets. The disadvantages of this alternative included, among other things, the costs associated with a lengthy transition period and risks attendant to internally developing the broad range of services provided by our Business Manager/Advisor and Property Managers, the loss of continuity and experience of our Business Manager/Advisor's and Property Managers' key employees, the potential loss of certain administrative services provided by Inland, the disruption to our property acquisition pipeline and the loss of the right to use the "Inland" name and our name and logo.

- *Acquire Our Business Manager/Advisor and Property Managers*. The advantages of this alternative were, among other things, eliminating the fees paid to our Business Manager/Advisor and Property Managers, achieving an internally managed structure appropriate to our scale, aligning more closely the interests of the management of our Business Manager/Advisor and Property Managers with our stockholders, substantially reducing transition risks associated with the termination alternatives, preserving our access to the administrative services provided by Inland, and preserving the right to use the "Inland" name and our name and logo. Under this alternative, we were able to retain, at no cost to us, the consulting services of Messrs. Goodwin, Parks and Cosenza. The disadvantage of this alternative was the difficulty in quantifying the value of the relationships with Inland as well as the business management, advisory and property management services provided by our Business Manager/Advisor and Property Managers.

- *Sell Our Company to a Third Party*. The potential advantage of this alternative was primarily the possibility of obtaining a premium from an acquiror of our company. The disadvantages were, among other things, the loss of no cost and low cost services provided by Inland due to a change in control and the loss of key personnel. The special committee also considered the value that self-administration could add to our company in anticipation of a public listing or liquidity event.

After carefully weighing the option of internalizing by acquiring our Business Manager/Advisor and Property Managers and the possible alternatives to such a transaction, and the positive and negative factors with respect to each option, the special committee determined that the acquisition of our Business Manager/Advisor and Property Managers was (i) fair to and in the best interests of our stockholders, (ii) fair, competitive and commercially reasonable and (iii) fair and reasonable to us and on terms and conditions not less favorable to us than those available from unaffiliated third parties. Accordingly, the special committee unanimously recommended to our Board the Merger Agreement and the consummation of the Merger pursuant to the terms of the Merger Agreement.

23

**Merger Agreement**

The following discussion is a summary of the material terms of the Merger Agreement.  It does not contain all of the information regarding the Merger Agreement that you may consider important.  We encourage you to read the Merger Agreement in its entirety, a copy of which is attached hereto as **Appendix A**.

*General — Structure of the Merger*.  The structure of the Merger involves four separate mergers, wherein our Business Manager/Advisor and each of the three Property Managers (each of which we refer to as a Service Provider and collectively as the Service Providers) will become our wholly-owned subsidiaries. We have incorporated four wholly-owned corporate subsidiaries,  IWEST Acquisition 1, Inc., IWEST Acquisition 2, Inc., IWEST Acquisition 3, Inc. and IWEST Acquisition 4, Inc., each of which we refer to as an Acquisition Entity, solely for the purposes of effectuating the Merger. On the closing date, the four separate mergers will take place as follows:

- IWEST Acquisition 1, Inc., will merge with and into our Business Manager/Advisor, with our Business Manager/Advisor as the surviving corporation in this merger;

- IWEST Acquisition 2, Inc., will merge with and into ISMC, with ISMC as the surviving corporation in this merger;

- IWEST Acquisition 3, Inc., will merge with and into INMC, with INMC as the surviving corporation in this merger; and

- IWEST Acquisition 4, Inc., will merge with and into IWMC, with IWMC as the surviving corporation in this merger.

Upon consummation of the Merger, each surviving corporation will continue as one of our wholly-owned subsidiaries, and will succeed to all of the assets, business and liabilities of the corresponding Service Provider, and certain employees of the Property Managers will become employees of the corresponding surviving corporation.

For each of the four separate mergers, the charter and bylaws of the Acquisition Entity will be the charter and bylaws of the corresponding surviving corporation after that merger, until later amended as provided therein and under applicable law.  In addition, the officers and directors of the involved Acquisition Entity will be the officers and directors of the corresponding surviving corporation until their resignation or such time as they may be relieved of their duties.

Under Maryland law and our existing charter, holders of our common shares will not be entitled to rights of appraisal with respect to the Merger.

*Payment of Merger Consideration*.  Upon consummation of the Merger, the stockholders of our Business Manager/Advisor and our Property Managers have the right to receive newly issued shares of our common stock according to an exchange ratio separately calculated with respect to each Service Provider. In lieu of issuing fractional common shares, all fractional common shares that any holder of the issued and outstanding shares of any of the Service Providers would otherwise be entitled to receive as a result of the respective merger will be aggregated for such stockholder, and if any fractional common share results from such aggregation, the number of our shares issued to such holder will be rounded up to the nearest whole number.  55% of the consideration for the Merger will be placed into an escrow account and the remaining 45% of the consideration will be issued directly to the stockholders of the Service Providers.  The consideration will be allocated to the stockholders of the Service Providers as follows:

- In the merger of IWEST Acquisition 1, Inc., with and into our Business Manager/Advisor, each outstanding share of the capital stock of our Business Manager/Advisor will be converted into the right to receive 18,750 shares of our common stock, and a total of 10,312,500 of these shares will be deposited into the escrow account;

24

- In the merger of IWEST Acquisition 2, Inc., with and into ISMC, each outstanding share of the capital stock of ISMC will be converted into the right to receive 620.656 shares of our common stock, and a total of 3,437,500 of these shares will be deposited into the escrow account;

- In the merger of IWEST Acquisition 3, Inc., with and into INMC, each outstanding share of the capital stock of INMC will be converted into the right to receive 620.348 shares of our common stock, and a total of 3,437,500 of these shares will be deposited into the escrow account; and

- In the merger of IWEST Acquisition 4, Inc., with and into IWMC, each outstanding share of the capital stock of IWMC will be converted into the right to receive 655.824 shares of our common stock, and a total of 3,437,500 of these shares will be deposited into the escrow account.

The total consideration to be given to the stockholders of the Service Providers will be subject to cash adjustments to reflect, in the aggregate, either positive or negative net working capital of the Service Providers as of the close of business on the closing date. Positive net working capital (if it is greater than $10,000) will be reimbursed by a cash payment by us to our Sponsor and the PM Stockholder Agent in an amount equal to the excess over $10,000. Negative net working capital (if it is below negative $10,000) will be paid to us by a cash payment from our Sponsor or the PM Stockholder Agent in an amount equal to the excess under negative $10,000.

*Closing.*  The Merger will be consummated and become effective on the closing date.

*Appointment of IWEST Merger Agent, LLC,  as Representative of Certain Stockholders of the Property Managers.*

Certain stockholders of our Property Managers have appointed IWEST Merger Agent, LLC, which we sometimes refer to as the PM Stockholder Agent, as their exclusive agent to act on their behalf with respect to the indemnification claims made by any of those stockholders against us and indemnification claims made by us against any of those stockholders, as well as for certain other purposes.

*Ancillary Agreements.*  In connection with the Merger, we have entered into, or intend to enter into as of closing, agreements with our Sponsor, the PM Stockholder Agent or the stockholders of the Property Managers including the following, each as described more fully below:

- *Registration Rights Agreement*.  We will enter into a registration rights agreement with our Sponsor and the PM Stockholder Agent;

- *Escrow Agreement*.  We will enter into an escrow agreement with our Sponsor, the PM Stockholder Agent and LaSalle Bank National Association, as the escrow agent; and

- *Consulting Agreements*.  We have entered into non-compensated consulting agreements with Daniel L. Goodwin, Robert D. Parks and G. Joseph Cosenza, to be effective upon the closing of the Merger.

In addition, we and our Business Manager/Advisor or our Property Managers have entered into, or intend to enter into as of closing, new agreements, or amend existing agreements, with TIGI or Inland or certain individuals, including the following, each as more fully described below:

- *Employment Agreements*.  We have entered into employment agreements with key individuals of our Business Manager/Advisor and Property Managers, that will become effective upon the closing of the Merger;

- *TIGI Letter Agreement*.  We have entered into a letter agreement with TIGI;

- *Sublease*.  We will enter into a sublease with our Sponsor;

25

- *IREA Letter*. We received a letter from Inland Real Estate Acquisitions, Inc., or IREA, relating to property acquisitions;

- *Amendments to Services Agreements*. Our Business Manager/Advisor will enter into amendments to various existing services agreements with Inland, which will be deemed assigned to us upon closing of the Merger;

- *Transition Property Due Diligence Services Agreement*. We will enter into a transition property due diligence services agreement with IREA;

- *Institutional Investor Relationships Services Agreement*. We will enter into an institutional investor relationships services agreement with Inland Institutional Capital Partners Corporation, which we refer to as Inland Capital Partners;

- *Legal Services Agreement*. We will enter into a legal services agreement with The Inland Real Estate Group, Inc., which we refer to as TIREG;

- *License Agreement Modification*. We will enter into a license agreement modification with TIREG; and

- *License Agreement (Property Management Corporations)*. Each Property Manager will enter into a license agreement with TIREG.

*Conduct of Business of the Service Providers Prior to Closing*. Each Service Provider will and our Sponsor and the PM Stockholder Agent will cause that Service Provider to:

- conduct its business in the ordinary course, consistent with past practice;

- not issue, sell, pledge or dispose of, or amend or modify the terms of any additional shares or equity interests of, or any options, warrants or rights of any kind to acquire any shares of the capital stock or other equity interests of, the Business Manager/Advisor and/or the Property Managers of any class or any securities convertible into or exchangeable for such equity interests;

- not: (i) incur or become contingently liable for any indebtedness; (ii) take any action which would adversely affect our status as a "real estate investment trust" under the Internal Revenue Code, which we refer to as the Code; (iii) sell or otherwise dispose of any of its assets, except in the ordinary course of business; or (iv) enter into any contract or violate any existing contract with respect to any of the foregoing;

- use commercially reasonable efforts to preserve intact its business, organization and goodwill, keep available the services of its employees and not engage in any action, directly or indirectly, with the intent to adversely impact the transactions contemplated by the Merger Agreement;

- confer with one or more of our representatives designated by the special committee when requested to report on operational matters and the status of ongoing operations of its business;

- maintain, in full force and effect, with all premiums due thereon paid, policies of insurance covering its respective insurable assets and business in amounts and as to risks substantially as in effect as of the date of the Merger Agreement;

- not declare, set aside or pay any non cash dividends or non cash distributions or purchase, redeem or otherwise acquire any shares or equity interests, except as may be permitted under the existing stockholder agreements between each Property Manager and its respective stockholders;

26

- not acquire or agree to acquire by merging or consolidating, or by purchasing a portion of equity interests or assets of, or by any other manner, any business or any corporation, partnership, joint venture, association, or other business organization or division thereof;

- not: (i) acquire or agree to acquire any assets in excess of $25,000 individually or $100,000 in the aggregate, or make or agree to make any capital expenditures subject to certain exceptions; or (ii) incur, assume or suffer to exist any lien on any asset other than permitted liens;

- not adopt, amend or terminate any employee benefit plan or employee arrangement or increase the salary, wage, rate of compensation, commission, bonus or other direct or indirect remuneration payable to those employees of the Service Providers and of our Sponsor who, upon the closing of the Merger, will become our employees or the employees of a surviving corporation, which we refer to as Service Employees, other than increases for individuals in the ordinary course of business consistent with past practice and not to exceed 10% of the sum of (i) the aggregate payroll costs of the Service Providers as of December 31, 2006 and (ii) the aggregate payroll costs of the Service Employees who are not employees of the Service Providers as of December 31, 2006 or increase the compensation or fringe benefits payable by any Service Provider to any former director or employee, in each case, other than as required by law, existing contractual obligations or in order to meet certain obligations;

- not: (i) adopt a plan of complete or partial liquidation; (ii) adopt any amendment to its articles or certificates of incorporation, bylaws or other organizational documents; (iii) enter into any contract involving more than $25,000 annually or which is not terminable without penalty on less than six months notice; (iv) make any change in its management structure, including, without limitation, the hiring of additional management employees, out of the ordinary course of business; (v) waive, release, grant, or transfer any rights of material value or modify or change in any material respect any existing license, lease, contract or other documents; (vi) engage in any conduct the nature of which is different than the business in which it is currently engaged; or (vii) enter into any agreement providing for acceleration of payment or performance or other consequences as a result of a change of control of it;

- not make any change in accounting policies or procedures, except as required by generally accepted accounting principles, which we refer to as GAAP, or a governmental authority;

- not: (i) make any material elections or change current elections with respect to taxes of any Service Provider; (ii) prepare or file any tax return required to be filed by or with respect to any Service Provider that is inconsistent with past practice or, on any such tax return, take any position or adopt any method that is inconsistent with positions taken or methods used in preparing or filing similar tax returns in prior periods; or (iii) settle any tax audit or dispute with respect to taxes of any Service Provider with any taxing or governmental authority;

- not acquire any stock, loan or other debt or equity securities of or make any advances to another entity except for advances to us under existing agreements;

- except as otherwise permitted in the Merger Agreement, not accelerate or delay collection of any notes or accounts receivable in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of the business consistent with past practice; and

- not agree or commit to do any of the prohibited actions described above.

*Conduct of Our Business Prior to Closing.*  We have agreed that prior to the closing date of the Merger, our Board shall not authorize or cause:

27

- any action that would adversely affect our status as a "real estate investment trust" under the Code; or

- any action to reclassify, combine, split or subdivide any of our capital stock or to alter any stockholder rights.

*Additional Agreements Contained in the Merger Agreement*

*General*.  Our Business Manager/Advisor and our Property Managers have agreed to provide access to its property, personnel, books, assets, operations, offices, contracts, commitments and records, to furnish certain materials to us, and to notify us and the special committee of any event that has had or would reasonably be expected to have a material adverse effect on that Service Provider's business, or has resulted in any representation or warranty of that Service Provider contained in the Merger Agreement becoming untrue or misleading, or any condition to the Merger not being satisfied.  Similarly, we have agreed to notify our Sponsor and the PM Stockholder Agent of any event that, to the actual knowledge of the special committee after reasonable inquiry of our executive officers, would reasonably be expected to have a material adverse effect on our business, or has resulted in any representation or warranty made by us becoming untrue or misleading, or any condition to the Merger not being satisfied.  Our Sponsor, Business Manager/Advisor and Property Managers have agreed to promptly deliver to us notice of all actions filed against their respective companies and any other notice in relation to a contract, license or any governmental authority that is reasonably likely to have an adverse effect on their ability to consummate the transaction contemplated by the Merger Agreement or perform respective obligations or satisfy respective conditions under the Merger Agreement; or have an adverse effect on the ownership of the equity interests in the Business Manager/Advisor or Property Managers; or have a Business Manager/Advisor or Property Manager material adverse effect.

The parties to the Merger Agreement have also agreed to keep confidential all confidential material of the other parties received in connection with the Merger for a period of one year after the closing date, subject to certain exceptions. The parties to the Merger Agreement have also agreed that, except as set forth on the unaudited balance sheet for the service providers dated as of the closing date and prepared in accordance with GAAP, which we refer to as the Closing Balance Sheet, no intercompany receivables and payables shall exist among the Service Providers, on the one hand, and any of TIGI, our Sponsor, the PM Stockholder Agent, any of the stockholders of the Property Managers or any of such parties' affiliates, on the other hand, as of the closing, subject to certain exceptions.  Other than the Services Agreements and any other agreements entered into or amended in connection with the Merger and the transactions contemplated thereby, all other agreements or arrangements between any Service Provider, on the one hand, and any of TIGI, our Sponsor, the stockholders of the Property Managers or any affiliates of any of them, on the other hand, including any oral agreements or course of business practices or understandings if any, will terminate as of the closing date and be of no further force and effect, with no further liabilities on the part of any party to these agreements, subject to the liabilities reflected on the Closing Balance Sheet.

*Stockholder Approval*.  We have agreed to approve the Merger Agreement as the sole stockholder of each Acquisition Entity, and to use our commercially reasonable efforts to obtain the ratification of our entry into the Merger Agreement and the contemplated Merger by our stockholders. Each of our Sponsor, as sole stockholder of our Business Manager/Advisor, and each of Robert H. Baum, Daniel L. Goodwin, Robert D. Parks and G. Joseph Cosenza, which we refer to collectively as the Principal Stockholders, representing in the aggregate greater than 50% of the stockholdings of each of the Property Managers, has executed an irrevocable written consent in lieu of a stockholder meeting approving the Merger Agreement and the Merger.

*Proxy Statement*.  The Service Providers, our Sponsor and the PM Stockholder Agent have agreed to furnish to us all information required by the Exchange Act and other applicable law or as we request in connection with the preparation of this proxy statement and any other filings required to be made by us prior to the closing; and (ii) that all such information furnished will be true and correct and complete in all material respects.

*Employees*.  After the closing of the Merger, TIGI or Inland shall make available to the Service Employees the opportunity to participate in employee benefit plans or programs substantially similar to those set forth in the Merger Agreement.  We, and our affiliates, will be solely responsible for certain employment obligations to the Service Employees in connection with the employee's employment with us or one of our affiliates after the closing;

however, our Sponsor and the stockholders of the Property Managers, jointly and severally, shall be solely responsible for certain employment obligations in connection with any individual's employment with the Service Providers on or before the closing.

*Covenants Not to Solicit*.  During the period from the closing date and until its second anniversary, which period we refer to as the Restricted Period, our Sponsor and the PM Stockholder Agent have agreed not to, and to cause each of their affiliates not to, directly or indirectly, hire or solicit to perform services (as an employee, consultant or otherwise) or take any actions which are intended to persuade any termination of the association of any Service Employee, subject to certain exceptions. Similarly, during the Restricted Period, we have agreed not to, and to cause our affiliates not to, directly or indirectly, hire or solicit to perform services (as an employee, consultant or otherwise) or take any actions which are intended to persuade any termination of the association of any employee of our Sponsor or its affiliates, subject to certain exceptions.

*Pre-Closing Covenants Relating to Taxes*.  Our Sponsor, the PM Stockholder Agent and, as applicable, TIGI agreed to prepare and file any tax returns for the Service Providers and all TIGI combined returns covering all tax periods ending on or before the closing date that are not part of any tax period that starts before and ends after the closing date. Our Sponsor and the PM Stockholder Agent also agreed to permit us to review and comment on each such tax return, other than any TIGI combined returns, prior to filing.

*Post-Closing Covenants Relating to Taxes*.  We agreed to prepare and file any tax returns for the Service Providers covering tax periods which begin after the closing date and those that begin before the closing date and end after the closing date. We agreed to permit our Sponsor and the PM Stockholder Agent to review and comment on tax returns relating to tax periods which begin before the closing date and end before the closing date prior to filing and we shall consider in good faith making any changes reasonably requested by our Sponsor or the PM Stockholder Agent, as the case may be.

*Director and Officer Liability*.  From and after the closing, and subject to our right to indemnification, we will indemnify and hold harmless, as and to the extent set forth in the applicable charter, bylaws and indemnity agreements, each individual who is, as of the date of the Merger Agreement, or who becomes prior to the closing, a director or officer of any of the Service Providers against any damages to which such director or officer is, or is threatened to be, made a party based in whole or in part on, or arising in whole or in part out of, or pertaining to: (i) the fact that such individual is or was a director or officer of any of the Service Providers; or (ii) the Merger Agreement or any of the transactions contemplated by the Merger Agreement, whether asserted or arising before or after the closing; provided, however, that we shall not be obligated to indemnify or hold harmless any such director or officer in respect of any claim by us or any of our affiliates.

*Estimated Service Payment*.  On the second business day immediately preceding the closing date, we will pay to our Business Manager/Advisor and each of our Property Managers an amount estimated to equal the total fees, expenses and other amounts payable pursuant to our service agreements with our Business Manager/Advisor and our Property Managers through and including the closing date, which we refer to as the Estimated Service Payment.  Any over payment or underpayment will be reimbursed through an adjustment to net working capital.  If our Business Manager/Advisor receives an Estimated Service Payment more than ten days in advance of the date that such amount would have normally been paid by us in the ordinary course of business, our Sponsor will pay us simple interest at a rate of five percent per annum on such Estimated Service Payment for the period during which such payment was paid in advance.

*Conditions to Closing*

*Conditions to Each Party's Obligation*.   The respective obligations of each party to effect the Merger and the other transactions contemplated by the Merger Agreement are subject to the fulfillment or waiver, at or prior to the closing, of the following conditions:

- No order, statute, rule, regulation, injunction or decree shall have been enacted, entered or promulgated by any court of competent jurisdiction or governmental authority that is in effect and restrains, enjoins or otherwise prohibits or makes illegal the consummation of the Merger;

29

- No action by any governmental authority shall have been initiated or threatened to restrain, prohibit or invalidate the Merger;

- All required statutory approvals, as described in the Merger Agreement, necessary to consummate the transactions shall have been obtained or satisfied; and

- We shall have received an opinion from our legal counsel that the Merger will not adversely affect our status as a "real estate investment trust" under the Code.

*Conditions to Our Obligation and that of the Acquisition Entities*.  Our obligations and those of the Acquisition Entities to effect the Merger and the other transactions contemplated by the Merger Agreement are subject to our satisfaction or waiver (as authorized in writing by the special committee in its sole and absolute discretion), at or prior to the closing, of certain additional conditions, including the following:

- The representations and warranties of our Sponsor, each Service Provider and the PM Stockholder Agent contained in the Merger Agreement shall be true and correct in all material respects;

- Each of our Sponsor, each Service Provider and the PM Stockholder Agent shall have performed and complied in all material respects with all agreements and covenants required to be performed and complied with by it under the Merger Agreement;

- We shall have received from each of our Sponsor, each Service Provider and the PM Stockholder Agent an officer certificate certifying as to such person, that the closing conditions have been satisfied;

- Our stockholders shall have ratified the Merger;

- The opinion of William Blair received as of the date of the Merger Agreement by the special committee and our Board (that the consideration to be paid by us for the Service Providers pursuant to the Merger Agreement is fair, from a financial point of view) shall not have been withdrawn or revoked;

- Since the date of the Merger Agreement, there has not been any change or any event which would, individually or in the aggregate, reasonably be expected to have a material adverse effect on our Business Manager/Advisor and our Property Managers;

- Each of our Sponsor and the PM Stockholder Agent shall have executed and delivered to us a counterpart signature page to the registration rights agreement;

- Each of our Sponsor, the PM Stockholder Agent and the escrow agent shall have executed and delivered a counterpart signature page to the escrow agreement;

- The TIGI letter agreement executed and delivered to us concurrent with the execution of the Merger Agreement shall remain in full force and effect;

- Our Sponsor shall have executed and delivered the sublease;

- Each of Inland and our Business Manager/Advisor and Property Managers, as applicable, shall have executed and delivered the amendment to office and facilities management services agreement, the amendment to insurance and risk management services agreement, the amendment to computer services agreement, the amendment to personnel services agreement, the amendment to property tax services agreement, the amendment to communications services agreement, the amendment to the loan services agreement, the second amendment to the mortgage brokerage services agreement, the transition property due diligence services agreement, the institutional

30

investor relationships services agreement, the legal services agreement, the license agreement modification and the license agreement (property management corporations);

- We shall have received certificates issued by the secretaries of state of the respective states of incorporation or formation, as applicable, of our Sponsor and each Service Provider, certifying the good standing of such entities in such states as of a date within five days of the closing date;

- We shall have received certificates executed by the respective secretaries or by assistant secretaries of our Sponsor and the Property Managers certifying as of the closing date: (i) all board and stockholder resolutions, as applicable, fully and properly executed, evidencing such entity's authorization to execute, deliver and perform under the Merger Agreement and the ancillary agreements to which it is a party; and (ii) a true and complete copy of the organizational documents of the applicable Service Provider;

- All required consents shall have been obtained;

- Each of our Sponsor and the PM Stockholder Agent shall deliver to us a certificate certifying that the transactions contemplated by the Merger Agreement are exempt from withholding under Section 1445 of the Code;

- We shall have received an opinion of Jenner regarding certain legal matters relating to the Service Providers; and

- The irrevocable written consents executed by each of our Sponsor and the Principal Stockholders concurrent with the execution of the Merger Agreement shall remain in full force and effect.

*Conditions to the Obligation of the Service Providers.*  The obligations of the Service Providers to effect the Merger and the other transactions contemplated by the Merger Agreement are subject to the satisfaction or waiver by our Sponsor or the PM Stockholder Agent, as applicable (in their sole and absolute discretion), at or prior to the closing of the following additional conditions:

- Our representations and warranties contained in the Merger Agreement shall be true and correct in all material respects, unless such representation or warranty becomes incorrect as a result, in whole or in part: (i) of any act (other than any act taken at the written direction of our Board or mandated by the Merger Agreement) or omission by our Sponsor, the PM Stockholder Agent or any Service Provider; or (ii) of any statement or omission which to the knowledge of the Service Providers as the date of the Merger Agreement was untrue;

- We shall have performed and complied in all material respects with all agreements and covenants contained in the Merger Agreement, provided that this condition shall not be deemed to be unsatisfied if such failure to perform or comply with any covenant or agreement under the Merger Agreement is caused, in whole or in part, by: (i) any action or omission by our Sponsor, the PM Stockholder Agent or any Service Provider; or (ii) by any action or inaction by any member of our management (unless such action by management was at the written direction of the special committee);

- The Service Providers shall have received from us an officer certificate certifying that the closing conditions have been satisfied;

- The Service Providers shall have received certificates issued by the secretaries of state of the respective states of incorporation of us and the Acquisition Entities, certifying the good standing of such entities in such states;

- The Service Providers shall have received certificates executed by the respective secretaries or by assistant secretaries of us and the Acquisition Entities certifying as of the closing date: (a) all

31

board and stockholder resolutions, as applicable, fully and properly executed, evidencing each entity's authorization to execute, deliver and perform under the Merger Agreement; and (b) copy of the organizational documents of each entity;

- We and the escrow agent shall have executed and delivered the escrow agreement;

- We shall have executed and delivered the registration rights agreement; and

- We and the Acquisition Entities, as applicable, shall have executed and delivered each ancillary agreement to which it is a party.

*Representations and Warranties*

*Our Representations and Warranties*.  The Merger Agreement includes various customary representations and warranties made by us as to, among other things (as applicable):

- our organization, good standing and power to enter into the Merger Agreement;

- our capitalization and our ownership of the capital stock of each Acquisition Entity;

- the duly authorized, validly issued, fully paid and non-assessable nature of the shares of our common stock to be issued in the Merger;

- authorization of our entry into the transactions contemplated by the Merger Agreement and the issuance of additional shares of our common stock as consideration for the Merger;

- no violation of any law, organizational documents of us or an Acquisition Entity, or any material contract to which we or an Acquisition Entity is a party or is bound;

- accuracy of the information to be included in this proxy statement;

- the accuracy of our filings with the SEC;

- absence of certain changes;

- brokers' or finders' fees; and

- pending or threatened litigation.

*Representations and Warranties of the Service Providers, our Sponsor and the PM Stockholder Agent*.  The Merger Agreement includes various customary representations and warranties made by the Service Providers, our Sponsor and the PM Stockholder Agent as to, among other things (as applicable):

- organization, good standing and power to enter into the Merger Agreement;

- the capitalization of the Business Manager/Advisor and our Property Managers;

- authorization of the transactions contemplated by the Merger Agreement;

- no violation of any law applicable to our Sponsor, each Service Provider, the PM Stockholder Agent or any stockholder of our Property Managers; no violation of the organizational documents of our Sponsor and each Service Provider, or any contract or other agreement;

- financial statements and internal controls of each Service Provider;

- the absence of certain changes;

- tax matters;

- undisclosed liabilities;

- pending or threatened litigation;

- compliance with laws and permits;

- insurance matters;

- certain matters with respect to employees and employee benefits;

- labor matters;

- ownership and title or license to tangible and intangible property and assets owned or used by any of the Service Providers;

- brokers' or finders' fees;

- certain matters with respect to the Investment Company Act of 1940;

- transactions with related parties;

- certain matters with respect to the shares of the Service Providers to be converted in the constituent mergers;

- title to assets and matters related to real property;

- certain corporate information and documents provided to us;

- certain contracts and leases;

- projections;

- to the actual knowledge of the Principal Stockholders, after reasonable inquiry of certain individuals, that certain of our representations and warranties are true and correct and each ancillary agreement are true and correct without regard to any knowledge qualifications contained is such representations and warranties;

- to the knowledge of the Service Providers, the knowledge of our Sponsor and the PM Stockholder Agent, since December 31, 2005 there have been no discussions or negotiations with any third party relating to a change of control of us; and

- the accuracy of certain sections of this proxy statement as of the date it is first mailed to our stockholders and as of the date of the our stockholders' meeting.

*Indemnification*

*Indemnification by our Sponsor, the PM Stockholder Agent and the Stockholders of our Property Managers.* After closing, subject to certain limitations set forth in the Merger Agreement, our Sponsor, the PM Stockholder Agent and the stockholders of our Property Managers shall jointly and severally indemnify us, certain

33

of our affiliates, successors and assigns and each of the respective officers, directors, employees and agents of the foregoing against any damages which arise out of:

- the breach or inaccuracy of any of their representations or warranties in the Merger Agreement;

- the breach of any of their covenants or agreements contained in or made pursuant to the Merger Agreement;

- any claims arising out of or relating to (x) the Merger or the other transactions contemplated in the Merger Agreement with respect to or in connection with the allocation or distribution of the shares of our common stock among our Sponsor and the stockholders of our Property Managers pursuant to the Merger, (y) the purchase, directly or indirectly, prior to the closing, by a stockholder of our Property Managers or any other person of any equity interest in any Property Manager from another stockholder or (z) any untrue statement or omission of any fact in connection with the solicitation of votes or consents from the holders of equity of the Service Providers; and

- any fraud, intentional misrepresentation or criminal acts committed by them on or prior to the closing.

The rights of the applicable indemnified parties to seek indemnification with respect to such representations and warranties, shall survive until the earlier of:  (i) 30 days after the receipt by us of the audit opinion of our independent registered public accounting firm covering our financial statements for the year ending December 31, 2008; or (ii) the second anniversary of the closing date; except that our rights to seek indemnification with respect to the following representations and warranties, survive until the expiration of the applicable statute of limitations with respect to the matters covered thereby:

- tax matters;

- litigation matters;

- employment matters;

- employee arrangements; labor matters;

- legal compliance matters to the extent related to environmental matters; and

- investment in securities,

and except that the following matters, and the rights of the applicable indemnified parties to seek indemnification with respect to such representations and warranties survive in perpetuity:

- organization and qualification

- capitalization;

- authorization; and

- title to assets.

*Indemnification by Us.*   Subject to the limitations set forth in the Merger Agreement including any items relating to taxes, we shall indemnify our Sponsor and the stockholders of our Property Managers and certain of their affiliates, successors and assigns and each of the respective officers, directors, employees and agents of the foregoing against any damages which arise out of:

- the breach or inaccuracy of any representation or warranty by us in or pursuant to the Merger Agreement;

- the breach of any covenant or agreement contained in or made pursuant to the Merger Agreement by us acting at the direction of our Board on or prior to the effective time of the Merger, or by us after the effective time of the Merger, or by the surviving entities in the Merger; and

- any fraud, intentional misrepresentation or criminal acts committed by our Board or the surviving entities in the Merger.

All covenants and agreements of the parties in the Merger Agreement, and the rights of the parties to seek indemnification with respect to such covenants and agreements, will expire on the closing date, but covenants and agreements to be performed after the closing date will not expire until all related obligations have been fully discharged.

The indemnification obligations of the parties with respect to breaches of representations and warranties are also subject to the following limitations:

- No party will have any liability for any damages with respect to breaches of representations or warranties until and only to the extent that the aggregate amount of damages that are indemnifiable exceeds $2.0 million. However, this limitation does not apply to certain damages with respect to the perpetual representations or with respect to representations regarding broker's or finder's fees, issuance of securities, or with certain other items.

- The maximum amount of damages which may be recovered from our Sponsor, the PM Stockholder Agent and the stockholders of our Property Managers shall be: (i) in the case of a breach or inaccuracy of any representation or warranty relating to organization and qualifications, capitalization, authority, investment in securities, and title to assets, or in the case of damages pursuant to other sections of the Merger Agreement, an amount equal to the aggregate value of the shares of our common stock issued in the Merger; and (ii) in cases of certain representations or warranties, an amount limited to 55% of the aggregate value of the shares of our common stock. In addition, the maximum amount of damages for which indemnity may be recovered by us or certain of our affiliates from any stockholder of our Property Managers (other than the Principal Stockholders) shall be an amount equal to the aggregate value of the shares of our common stock which such stockholder of our Property Managers has received in connection with the transactions contemplated by the Merger Agreement, except in the case of fraud or intentional misrepresentation by such Stockholder in connection with the transactions contemplated hereby.

- The maximum aggregate amount of damages for which indemnity may be recovered from us shall be: (i) in the case of a breach or inaccuracy of any representation or warranty relating to organization and qualification, capitalization, and authority, or in the case of damages not relating to other representations of the Merger Agreement, an amount equal to the aggregate value of the shares of common stock issued in the Merger; and (ii) in all other cases of a breach or inaccuracy of other representations or warranties, an amount equal to 55% of the aggregate value of the shares of our common stock issued in the Merger.

To the extent we or certain of our affiliates are entitled to indemnification we must first seek indemnification from the escrow account, and only after the distribution or allocation of the entire contents of the escrow account, shall we be entitled to seek indemnification directly from our Sponsor and the stockholders of our Property Managers. For the purposes of the Merger Agreement consideration and indemnification provisions, our common shares are deemed to have a fair market value of $10.00 per share unless they are subsequently listed on a public exchange and are used by our Sponsor or the stockholders of our Property Managers to pay a claim, in which case the shares will be deemed to have a fair market value equal to the average of the closing sale prices of our common shares on the exchange for the 20 trading days prior to delivery of the shares to us.

35

To the extent a Service Provider indemnified party is entitled to indemnification, we shall be required to satisfy its indemnification obligations solely by payment in cash. Our Sponsor and each of the stockholders of our Property Managers shall be entitled to satisfy their indemnification obligations by payment in cash, in the shares of our common stock issued in the Merger or in a combination thereof, in their sole discretion.

We will indemnify our Sponsor and the stockholders of our Property Managers and certain of their affiliates, successors and assigns and each of the respective officers, directors, employees and agents of the foregoing against all liability for taxes of the surviving corporations with respect to any post-closing tax period and any and all damages arising out of, resulting from or incident to the breach by us of any covenant contained in the tax section of the Merger Agreement.

The sole remedy for the parties, after the closing and except for claims seeking equitable relief, relating to the Merger or the other transactions contemplated by the Merger Agreement shall be pursuant to the indemnification and remedy provisions in the Merger Agreement.

*Amendments and Waiver; Assignment; Termination*

*Amendments and Waivers.* No amendment, extension or waiver of any provision shall be valid unless in writing and signed by us, our Sponsor and the PM Stockholder Agent, as applicable, all in accordance with applicable law; however, the Merger Agreement may not be amended in any material respect following the ratification of our entry into the Merger Agreement and the Merger by our stockholders.

Prior to the closing date, we may extend the time for the performance of any of the obligations or other acts of our Sponsor, the PM Stockholder Agent or the Service Providers, may waive any inaccuracies in the representations and warranties of such parties and may waive compliance with any of the agreements or conditions contained in the Merger Agreement to be complied with or satisfied by those parties.

Prior to the closing date, our Sponsor and the PM Stockholder Agent may extend the time for the performance of any of the obligations or other acts of us or the Acquisition Entities, may waive any inaccuracies in the representations and warranties of such parties contained in the Merger Agreement or in any document delivered pursuant to the Merger Agreement, and may waive compliance with any of the agreements or conditions contained in the Merger Agreement to be complied with or satisfied by those parties.

*Termination.* The Merger may be abandoned at any time prior to the closing date, before or after the approval by our stockholders, either by:

- mutual written consent of our Sponsor and the PM Stockholder Agent (acting jointly) and us;

- us, on the one hand, or our Sponsor and the PM Stockholder Agent, on the other hand, in the event the Merger has not been consummated on or before January 31, 2008, or such later date as may be mutually decided among us; but this right to terminate shall not be available to any party whose failure to fulfill any obligation under the Merger Agreement has been the cause of, or resulted in, the failure of the closing to occur on or before January 31, 2008 or such later mutually decided date;

- us, or our Sponsor and the PM Stockholder Agent, if any law makes the consummation of the Merger illegal or otherwise prohibited or any judgment, injunction, order or decree of any governmental authority having competent jurisdiction enjoining the parties hereto from consummating the Merger shall have been entered and shall have become final and nonappealable; provided, however, that this right to terminate the Merger Agreement shall not be available to any party who fails to use commercially reasonable efforts to resist, resolve or lift, as applicable, such law, judgment, injunction, order or decree;

- by us upon a material breach by our Sponsor, the PM Stockholder Agent or any Service Provider of any of their obligations under the Merger Agreement, which breach is not cured within 20 days

36

after written notice of the breach has been provided to the breaching party; but if such breach is generally capable of being cured, but cannot reasonably be cured within 20 days of the notice, this right will be delayed as long as reasonably necessary to affect such cure, but not beyond January 31, 2008 or such later mutually agreed date, so long as the breaching party diligently pursues a cure; or

- by our Sponsor and the PM Stockholder Agent, acting jointly, if there has been a breach of any representation, warranty, covenant or other agreement made by us or any of the Acquisition Entities or any such representation, warranty, covenant or other agreement contained in the Merger Agreement shall have become untrue after the date of the Merger Agreement and such breach or inaccuracy is not curable, or if curable, is not cured within 20 days after written notice of the breach has been provided to the breaching party; but if such breach is generally capable of being cured, but cannot reasonably be cured within 20 days of the notice, this right will be delayed as long as reasonably necessary to affect such cure, but not beyond January 31, 2008 or such later mutually agreed date, so long as the breaching party diligently pursues a cure. Our Sponsor and the PM Stockholder Agent will not have this right to terminate if the breach or inaccuracy was caused, in whole or in part, of an act, subject to exceptions in the Merger Agreement, or omission by TIGI, our Sponsor, the PM Stockholder Agent or any Service Provider, or of any statement or omission in our representations and warranties which to the knowledge of the Service Providers as of the date of the Merger Agreement was untrue.

Any termination of the Merger Agreement will relieve all parties of any liability or further obligation to any party under the Merger Agreement, other than with respect to the payment of expenses, confidentiality, public statements and indemnifications. No party will be relieved from liability for a willful breach of the Merger Agreement.

*Expenses*.  Whether or not the Merger is consummated, all costs and expenses incurred in connection with the Merger Agreement shall be paid by the party incurring such expenses. The reasonable costs and expenses of our special committee, including reasonable fees and expenses of its counsel and financial advisors, and all fees and expenses in connection with filing, printing and distributing this proxy statement and solicitation, shall be paid by us.

If our Board: (i) publicly recommends against your ratification; and (ii) your ratification is not obtained at the Annual Meeting, then we shall pay to the Service Providers an amount equal to the actual, documented, out-of-pocket expenses incurred by the Service Providers to third parties in connection with the negotiation of the Merger Agreement, up to a maximum of $1.2 million.

**Ancillary Agreements**

*Set forth below are  summaries of the material terms of the ancillary agreements to be executed and delivered in connection with the consummation of the Merger. The summaries set forth below are qualified in their entirety by reference to the respective agreements themselves.*

*Registration Rights Agreement*.  We will enter into a registration rights agreement with our Sponsor and the PM Stockholder Agent substantially in the form attached hereto as **Appendix C**. We will grant to the stockholders of our Business Manager/Advisor and Property Managers certain registration rights with respect to our shares of common stock that they receive in the Merger, which we refer to herein as registrable securities. We are required to give the holders of these registration rights notice at least 20 days prior to the proposed date of a filing by us of a registration statement for the offer and sale of our common stock for any other selling stockholder, and provide those holders with the opportunity to have their shares of common stock included in the registration.  We are required, on demand by either our Sponsor, or by eligible holders other than our Sponsor who in the aggregate own at least one third of the total number of shares of common stock then included in the registrable securities, to prepare and file a registration statement on Form S-3 if the registration covers the resale of all the registrable securities or the anticipated aggregate offering price for such registration is equal to at least $50.0 million within 45 days of the demand. We will bear all expenses incident to our obligations under the registration rights agreement, other than any

37

underwriting fees, discounts or commissions, or fees and disbursements of counsel to the holders of registrable securities. We have agreed to indemnify the holders of registrable securities and each person who controls any such person from and against any and all loss, liability, charge, claim, damage and expense in connection with any untrue statement of a material fact contained in any registration statement, or prospectus relating to the sale of any of the registrable securities, or in any document filed by us in any jurisdiction in order to register or qualify any of the registrable securities under the securities or blue sky laws of any state, or any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, unless (x) such statement or omission was made in reliance upon and in conformity with written information furnished to us with respect to such holder by or on behalf of such person expressly for inclusion in any such registration statement, prospectus or document, as the case may be, or (y) such loss, liability, charge, claim, damage or expense arises out of such holder's failure to comply with the terms and provisions of the registration rights agreement.

*Escrow Agreement*.  We, as well as the escrow agent, will enter into an escrow agreement with our Sponsor and the PM Stockholder Agent, substantially in the form attached hereto as **Appendix D**. At the closing of the Merger, our Sponsor and the PM Stockholder Agent will deposit 55% of the shares of our common stock to be issued to the stockholders of the Service Providers as consideration for the Merger into an escrow account. The escrow agreement provides procedures whereby we may request disbursement of escrowed shares for payment of the indemnification claims, or whereby we may object to all or any part of any disbursement to our Sponsor or the PM Stockholder Agent. The shares held in the escrow account may be released to our Sponsor and the PM Stockholder Agent upon the passage of two release dates. The first release date will occur on the first anniversary of the effective date of the escrow agreement, whereupon the escrow agent will disburse to our Sponsor and the PM Stockholder Agent the escrowed shares equal to 50% of the amount by which the value of escrow, as defined in the escrow agreement, as of the first release date, exceeds any amounts subject to pending indemnification claims made by us, with each escrowed share having a value equal to $10.00 or, if the escrowed shares are listed on a national securities exchange, the market price of such escrowed shares. The second release date will occur on the later of the 30th day after receipt by us of an audit opinion from our independent registered public accounting firm covering our financial statements for the year ending December 31, 2008 and the second anniversary of the effective date of the escrow agreement, whereupon the escrow agent will disburse the entirety of the shares then held in escrow to our Sponsor and to the PM Stockholder Agent, less any amounts subject to pending indemnification claims by us, with each escrowed share having the same value as described for the first release date.

*Consulting Agreements*.  We have entered into consulting agreements, substantially in the form attached hereto as **Appendix E**, with Daniel L. Goodwin, Robert D. Parks and G. Joseph Cosenza, referred to herein as the consultants, who will each provide us with strategic and operational assistance for the term of their respective agreement including making recommendations and providing guidance to us as to prospective investment, financing, acquisition, disposition, development, joint venture and other real estate opportunities contemplated from time to time by us and our Board.  The consultants will also provide additional services as may be reasonably requested from time to time by our Board.

The term of each of these consulting agreements is contingent on and begins on the closing date of the Merger and, unless terminated earlier, continues until the third anniversary of the closing date.  Under the consulting agreements, a consultant may terminate his or her consulting agreement prior to the expiration of its term upon the disability of the consultant, a material breach by us of his or her consulting agreement, or upon a change in control. We may terminate any consulting agreement at any time.

The consultants will not receive any compensation for their services, but we will reimburse their expenses in fulfilling their duties under the consulting agreements. We agree to indemnify these consultants for damages resulting from their actions taken in accordance with their consulting agreement to the same extent to which we indemnify our directors for actions taken in their capacity as directors.

*Employment Agreements*.  We have entered into employment agreements contingent on and to be effective upon the closing of the Merger, substantially in the form attached hereto as **Appendix F**, with Michael J. O'Hanlon, Steven P. Grimes, Shane C. Garrison and Niall J. Byrne.  Mr. O'Hanlon will be our President and Chief Executive Officer, Mr. Grimes will be our Chief Operating Officer and Chief Financial Officer, Mr. Garrison will be the Chief Investment Officer, and Mr. Byrne will be our Vice President and President of the Property Managers.

38

Mr. O'Hanlon, age 55, joined our Sponsor as Senior Vice President, Director of Asset Management, in 2005. As Director of Asset Management he is responsible for coordinating our Sponsor's resources for the strategic direction and value enhancement of its portfolio of properties. Mr. O'Hanlon has more than 30 years of industry experience in areas such as asset and property management, capital markets, joint ventures, loan restructuring, and real estate development and real estate brokerage. He has extensive national experience and has worked on numerous different types of real estate in various regions of the country. Prior to his current position, Mr. O'Hanlon was the Executive Vice President and Regional Managing Director at Grubb & Ellis Company in Chicago. There he supervised all lines of business for Grubb & Ellis Company in the Midwest including the operations of five company offices and fifteen affiliate offices. He has also held senior positions with Cushman & Wakefield, Balcor, as well as having been a Senior Credit Officer at Citibank. He has a Master's of Business Administration in Finance from Columbia University in New York and a Bachelor of Science in Accounting from Fordham University in New York. He has been an active member of the Urban Land Institute and the International Council of Shopping Centers.

For the biography of Mr. Grimes, see "Our Executive Officers – Biographies of Our Executive Officers."

Mr. Garrison, age 37, joined Inland US Management in 2004 from ECI Properties, where he was in charge of the company's real estate portfolio which included industrial and retail properties. Previously he was the General Manager of the Midwest Region for Circuit City. He has a Master's of Business Administration in Real Estate Finance from DePaul University in Chicago, and a Bachelor of Science in Business Administration from Illinois State University. He is an active member of the Urban Land Institute and the International Council of Shopping Centers.

Mr. Byrne, age 50, is a Senior Vice President with our Property Managers. He oversees the overall property management functions for our 300 plus property, 46 million square foot portfolio. He is also involved in development, acquisitions and joint venture initiatives for us. Mr. Byrne came to our Property Managers from American Landmark Properties Ltd., where he was Vice President of Asset Management for a large commercial and residential portfolio of properties. Prior to joining American Landmark Properties, LTD., Mr. Byrne was a Senior Vice President/Director of Operations for Providence Management Company, LLC (PMC Chicago). At PMC, he oversaw all aspects of property operations, daily management and asset management functions for an 8,000-unit multi-family portfolio, as well as a small commercial portfolio. He also has over fifteen years real estate experience with Chicago based Habitat Company and with American Express/Balcor. Mr. Byrne received his Bachelor of Science degree in Accounting from DePaul University. He holds an Illinois CPA Certificate, is an active member of the International Council of Shopping Centers and has completed advanced course work in Property/Asset Management, Leasing, Marketing, and Development. He also has five years public accounting experience.

The term of each of these employment agreements begins on the closing date and continues, unless earlier terminated, until December 31, 2007. The employment agreements may be terminated: (i) by the employee or us for any reason effective upon 60 days prior written notice; or (ii) by us for cause, as defined in each of the employment agreements, effective without prior written notice to the employee unless we are terminating the employee's employment for reasons relating to a failure to perform employee's duties or any material breach of the employment agreement or other agreements where we are required to give the employee notice of our intention and allow employee 15 days to cure.

During 2007, the employee will receive a base salary. We agreed to pay Mr. O'Hanlon, Mr. Grimes, Mr. Garrison and Mr. Byrne a base salary of $400,000, $300,000, $200,000 and $225,000, respectively, per year, pro-rated for the remainder of 2007. In addition to a base salary for such period, our Sponsor will determine, in its sole discretion, and may pay each of Mr. O'Hanlon, Mr. Grimes, Mr. Garrison and Mr. Byrne a bonus for 2007. Further, each employee will be eligible to participate in any retirement, pension, profit-sharing or other similar plans of us or our affiliates. The employee will also be reimbursed for all ordinary and necessary business expenses incurred by employee in connection with the employee's duties as described in the employment agreements.

Under each of the employment agreements, if employment is terminated by the employee or by us for any reason, we will pay or provide the employee's: (i) base salary accrued through the termination; (ii) reimbursable expenses; (iii) pro-rata annual bonus, if any; and (iv) any benefits required to be paid or provided under applicable law. The employee is not entitled to any other severance.

*TIGI Letter Agreement*.  TIGI, under the terms of the TIGI letter agreement, attached hereto as **Appendix G** and dated as of the date of the Merger Agreement, agrees to perform all of its actions and obligations under the Merger Agreement regarding access to information, notice of certain events, employee matters and tax matters as if it were a party to the Merger Agreement.  TIGI further covenants for itself and its affiliates to perform all actions and obligations to be performed under the Merger Agreement regarding access to information, notice of certain events and non-solicitation, as if it were a party to the Merger Agreement.

*Agent Appointment Agreement*.  Each of the Principal Stockholders has executed and delivered his respective agent appointment agreement.  Under the terms of the agent appointment agreement, substantially in the form attached hereto as **Appendix H**, IWEST Merger Agent, LLC is appointed as the agent for each of the stockholders of our Property Managers who has signed such an agreement.  The Property Managers have told us that they anticipate that all of their stockholders will sign such an agreement.  The PM Stockholder Agent is required to use commercially reasonable efforts to cause each stockholder of the Property Managers to execute an agent appointment agreement prior to closing.  The PM Stockholder Agent will act as the agent, representative and attorney-in-fact with full and exclusive power and authority to represent and bind such stockholders of our Property Managers with respect to all matters arising in connection with the Merger Agreement, the escrow agreement, the registration rights agreement and the Merger.  Such stockholders of our Property Managers irrevocably consent to any actions taken or decisions made by the PM Stockholder Agent as required or permitted under any of the foregoing agreements or any matters arising out of such agreements.  Any action taken by the PM Stockholder Agent in accordance with the agent appointment agreement is approved, ratified and confirmed in all respects as the act and deed of such stockholder of our Property Managers.  We are entitled to deal exclusively with the PM Stockholder Agent on all matters relating to the Merger with respect to the stockholders of our Property Managers.

*Sublease*.  At the closing, we will enter into a sublease, substantially in the form attached hereto as **Appendix I**, with our Sponsor, under which we will sublease from our Sponsor approximately 36,740 square feet at 2907 Butterfield Road, Oak Brook, Illinois.  The initial term of the sublease will be five years from the closing date, with one five-year extension option.  Base rent under the sublease during the initial term is $13.50 per square foot, or $41,333 per month, and will increase during any extension term based on the cumulative percentage increase of the consumer price index in each year of the initial term of the sublease.  We will also be obligated to pay a 37.33% pro rata share of all real estate taxes and expenses of managing, operating, maintaining, replacing and repairing the buildings leased under the prime lease.  Our Sponsor has agreed to reimburse us for the cost of up to $300,000 of tenant improvements to be constructed by us in the sublet premises, which amount, together with interest, will be amortized and paid as additional rent under the sublease based on a 60-month amortization schedule.

*IREA Letter*.  We received a letter from IREA, which is attached hereto as **Appendix J**.  The IREA letter formalizes the existing oral agreement between us and IREA.  In the IREA letter, IREA agrees, subject to its existing acquisition agreements, to make us aware of all the properties that IREA is acquiring, with the understanding that although we are primarily interested in retail and life-style centers, we may also be interested in commercial, office, net lease and residential properties and would be able to bid on them through IREA, if we so choose.

*Amendments to Services Agreements*.  Amendments to each of the existing service agreements with Inland, including the amendment to office and facilities management services agreement, the amendment to insurance and risk management services agreement, the amendment to computer services agreement, the amendment to personnel services agreement, the amendment to property tax services agreement, the amendment to communications services agreement, the amendment to the loan services agreement, and the second amendment to the mortgage brokerage services agreement, substantially in the forms attached as **Appendices K-1 through K-8**, respectively, will be executed as of the closing date. The amendments provide that either party can terminate without any fee or penalty, and that the services provided under the terms of the applicable services agreement are to be provided on a non-exclusive basis in that our Business Manager/Advisor shall be permitted to employ other parties to perform any one or more of the services and that the applicable counter party shall be permitted to perform any one or more of the services to other parties. Our Business Manager/Advisor shall have the right to terminate the applicable services agreement, without cause, by providing not less than 180 days prior written notice.  If we have a change of control, the applicable counter party shall have the right to terminate the applicable services agreement, without cause, upon not less than 30 days prior written notice.

40

*Transition Property Due Diligence Services Agreement with Inland Real Estate Acquisitions, Inc*. IREA will enter into a transition property due diligence services agreement with us substantially in the form attached hereto as **Appendix L**. In connection with our acquisition of new properties, IREA will, if requested, provide various services including to negotiate property acquisition transactions on our behalf and prepare suitability, due diligence, and preliminary and final pro forma analyses of properties proposed to be acquired. We will pay all reasonable, third party out-of-pocket costs incurred by IREA in providing such services; pay an overhead cost reimbursement of $11,500 per transaction; and, to the extent these services are requested by us, pay $7,000 for due diligence expenses and a negotiated fee of $25,000 for negotiation expenses per transaction. The term of the agreement begins upon execution and continues for one year and automatically renews for one year periods until either party elects not to renew. IREA may terminate the agreement at any time upon the failure by us to make payment for services, following a ten day cure period; a request by us for IREA to violate any applicable law, or to take action that would result in fraud being committed by or civil liability being imposed on IREA; or upon a change in control. We may terminate the transition property due diligence services agreement with ten days notice for cause, following a 30 day cure period, or for any reason with 60 days prior notice.

*Institutional Investor Relationships Services Agreement*. We will enter into an institutional investor relationships services agreement with Inland Capital Partners substantially in the form attached hereto as **Appendix M**. Under the terms of the agreement, Inland Capital Partners will secure institutional investor commitments by, among other things, assisting our management team with the refinement of our overall strategy for expanding our institutional investor relationships in exchange for advisory and client fees and reimbursement of project expenses.

The agreement is non-exclusive as to both parties. The terms of the agreement reflect an oral agreement between the parties as of May 2006. Although the agreement will not be signed until the closing date, the term of the agreement is four years from the effective date (May 3, 2006) and will be automatically renewed for consecutive three year terms unless terminated earlier. We may terminate for cause upon ten days prior written notice, following a 30 day cure period, or without cause by providing not less than 180 days prior written notice. If we experience a change in control, Inland Capital Partners may terminate the agreement upon 30 days written notice; otherwise, Inland Capital Partners may terminate the agreement at any time, without cause, by providing not less than 180 days prior written notice. Inland Capital Partners may terminate the agreement or decline to provide a particular service under the agreement upon ten days written notice to us upon the occurrence of certain events.

Inland Capital Partners' advisory fee will be $250 per hour for principals and $100 per hour for associates, plus expenses. Project expenses include travel, overnight document delivery and out-of-pocket expenses and will be generally in the range of 10% of the advisory fee. The client relations fee will be offset by any accrued advisory fee. The client relations fee for Inland Capital Partners obtaining investor commitments will be 35 basis points for relationships with new investors of TIGI or Inland and 25 basis points for relationships with existing investors of TIGI or Inland. If the agreement is terminated by either party, Inland Capital Partners will submit to us a schedule of investors who have been contacted on our behalf, along with a schedule of committed but un-invested capital, for which future success fees will become due upon funding. Further, if a marketing effort fails to produce a partnership acceptable to us, any accrued and unpaid advisory fees will be due and payable by us. As of the date of the agreement, we will only be responsible for potential fees to Inland Capital Partners with respect to certain identified projects, each of which may be terminated after six months of engagement with a 30 day notice resulting in no further fees due by us.

*Legal Services Agreement*. TIREG will enter into a legal services agreement with us, substantially in the form attached hereto as **Appendix N**, where TIREG will provide us with certain legal services in connection with our real estate business.

The agreement is non-exclusive as to both parties. The term of the agreement is four years from the closing date and will be automatically renewed for consecutive three year terms, unless terminated earlier. We may terminate the agreement at any time for cause upon ten days prior written notice, following a 30 day cure period. We may also terminate the agreement without cause by providing not less than 180 days prior written notice.

TIREG may terminate the agreement at any time after the first anniversary from the closing date by providing not less than 60 days prior written notice. TIREG may also terminate the agreement, or decline to provide a certain service, upon ten days prior written notice to us upon the occurrence of certain events. TIREG may also

41

terminate the agreement upon written notice to us if we have a change in control.  We will promptly make payment to TIREG for services performed prior to the date of termination.

We will pay TIREG for legal services rendered under the agreement on the basis of actual time billed by attorneys and paralegals at TIREG's hourly billing rate then in effect in increments of one-tenth of one hour.  The billing rate is subject to change on an annual basis, provided, however, that the billing rates charged by TIREG will not be greater than the billing rates charged to any other client and will not be greater than 90% of the billing rate of attorneys of similar experience and position employed by nationally recognized law firms located in Chicago, Illinois performing similar services.  We will also reimburse TIREG for reasonable, actual, out of pocket costs, expenses and charges incurred by TIREG with respect to rendering services under the agreement.

*License Agreement Modification*.  TIREG will enter into a license agreement modification with us, substantially in the form attached hereto as **Appendix O**, which modifies that certain license agreement entered into between us and TIREG as of March 5, 2003.  Under the terms of the license agreement modification, TIREG grants us the exclusive rights to use our name and logo, except TIREG can use the name and logo for certain limited marketing purposes.

*License Agreement (Property Management Corporations)*.  TIREG will enter into a license agreement, substantially in the form attached hereto as **Appendix P**, with each of the Property Managers whereby it will grant to each Property Manager a non-exclusive, non-transferable, revocable, royalty-free right to use the trade name "Inland" in connection with the management services for us.

**Contact Information**

The contact information for each party to the Merger Agreement is as follows:

Our company and the Acquisition Entities:

Inland Western Retail Real Estate Trust, Inc.
c/o Special Committee of the Board of Directors
2901 Butterfield Road
Oak Brook, Illinois 60523
Telephone: (630) 218-8000

For our Sponsor, our Business Manager/Advisor, our Property Managers, and the PM Stockholder Agent:

c/o The Inland Real Estate Group, Inc.
2901 Butterfield Road
Oak Brook, Illinois 60523
Telephone: (630) 218-8000

**Our Business**

We are a real estate investment trust that was formed in 2003. We have primarily focused on acquiring, developing, operating and leasing multi-tenant shopping centers and single-user net lease properties. As of June 30, 2007, our portfolio consisted of 288 wholly-owned properties, 16 properties in which we have an interest of between 45% and 95%, and six development joint venture projects in which we have an investment, four of which we consolidate. As of June 30, 2007, our portfolio contained approximately 46 million square feet of leasable space. Our anchor tenants include nationally and regionally recognized grocers, discount retailers, financial companies, and other tenants who provide basic household goods and services. Of our total annualized revenue as of June 30, 2007, approximately 69% is generated by anchor or credit tenants, including American Express, Zurich Insurance Company, Best Buy, Ross Dress For Less, Bed Bath & Beyond, GMAC, Wal-Mart, Publix Supermarket, and several others. The term "credit tenant" is subjective and we apply the term to tenants who we believe have a substantial net worth.  We conduct our activities primarily from offices located in Illinois.

42

**Business of our Property Managers and our Business Manager/Advisor**

Each of our Property Managers was formed in 2003 and is a Delaware corporation owned primarily by individuals affiliated with Inland.

ISMC's sole business has been to serve as property manager for certain of our investment properties located in the States of Alabama, California, Colorado, Delaware, Georgia, Kentucky, Louisiana, Mississippi, Oklahoma, Tennessee, Texas and Washington. ISMC conducts its property management activities primarily from offices located in Smyrna, Georgia; Huntsville, Alabama; and Knoxville, Tennessee.

INMC's sole business has been to serve as property manager for certain of our investment properties located in the Northeast United States. INMC conducts its property management activities primarily from offices located in Oak Brook.

IWMC's sole business has been to serve as property manager for certain of our investment properties located in the Western United States. IWMC conducts its property management activities primarily from offices located in Oak Brook.

Our Property Managers conduct their supervisory and back-office functions primarily from their principal executive offices, located in each case at 2901 Butterfield Road, Oak Brook, Illinois 60523. For more information with respect to our Property Managers' business activities, including their compensation and types of fees earned, see the section titled "– Our Property Management Agreements" below.

Our Business Manager/Advisor is an Illinois corporation and a wholly-owned subsidiary of our Sponsor. Since its formation in 2003, our Business Manager/Advisor's sole business has been to serve as our business manager and advisor responsible for overseeing our day-to-day operations, including property acquisition, maintaining stockholder books and records, providing stockholder services, administering our bookkeeping and accounting and legal functions and consulting with our Board on various business management issues. Our Business Manager/Advisor's principal executive office is located in Oak Brook, Illinois. For more information with respect to our Business Manager/Advisor's business activities, including its compensation and types of fees earned, see the section titled "– Our Advisory Agreement" below.

**Our Property Management Agreements**

*Duties of our Property Managers.* Each property in our portfolio is managed by one of our Property Managers pursuant to a property management agreement whereby it furnishes property management services (such as rental, leasing, operation and management services), including preparing a monthly income report, budget variance report and annual operating budget, for each property in our portfolio.

For each property, the responsible Property Manager has authority to:

- negotiate leases subject to the approval of our Board;

- collect rents and other monies due from tenants;

- pay various property-level expenses;

- institute and prosecute actions to evict tenants and to recover rent and other sums due, and to settle, compromise, and release such actions or suits, or reinstate such tenancies; and

- hire, supervise, discharge, and pay all labor required for the operation and maintenance of each property.

*Compensation of our Property Managers.* For our Property Managers' services, we pay a fee of 4.5% of gross operating income of each property managed by the Property Managers. For the calendar year ended December

43

31, 2006, we paid fees of $30.0 million to our Property Managers for property management.  We also reimburse our Property Managers for the salaries and expenses of their employees for due diligence activities performed on our behalf. See "Certain Relationships and Related Transactions" for a more detailed description of amounts we have paid to our Property Managers.

*Indemnification*.  We have agreed to indemnify the Property Managers for any losses incurred by that Property Manager in connection or in any way related to a property, including any liability for damage to a property and injuries to or death of any person on such property; <u>provided</u>, that the losses do not arise out of the willful misconduct, gross negligence or unlawful acts of the respective Property Manager.  In addition, we have agreed to indemnify our Property Managers for any losses and expenses involving any past, current or future allegation regarding treatment, depositing, storage, disposal or placement by any party, other than that Property Manager, of hazardous substances on any of our properties.  To date, no claims for indemnification have been made.

Additionally, with respect to each property, we are required to carry at our own expense public liability insurance, fire and extended coverage insurance, burglary and theft insurance, rental interruption insurance, flood insurance (if appropriate) and boiler insurance (if appropriate).

*Separate Management Agreements*.  There is a separate management agreement for each property in our portfolio for an initial term ending as of December 31 in the year in which the property was acquired, and each management agreement is subject to three successive three-year renewals. For certain agreements, we may terminate with 30 days prior written notice in the event of gross negligence or malfeasance by the applicable Property Manager. For other agreements we may terminate with 30 days prior written notice for any reason.  There are also three master property management agreements, one with each of our Property Managers.

## Our Advisory Agreement

*Duties of our Business Manager/Advisor*. In accordance with our advisory agreement and through its supervision of the various service agreements with Inland, our Business Manager/Advisor generally has responsibility for furnishing advice, recommendations and providing services to us with respect to all aspects of our business.  This includes the following:

- presenting to us opportunities to make investments in real properties and provide advice with respect to the making, acquiring, holding and disposition of investments and commitments of such investments;

- managing our day-to-day investment operations;

- serving as our investment advisor in connection with policy decisions to be made by our Board and furnish reports to our Board;

- investigating, selecting and conducting relations with lenders, consultants, accountants, brokers, banks, builders, underwriters, appraisers and other third parties on our behalf;

- cooperating with the management agent in connection with property management services;

- upon our request, act, or obtain, the services of others to act as our attorney-in-fact or agent in fulfilling our obligations and managing our claims including foreclosing and otherwise enforcing mortgage and other liens and security interests securing investments;

- assisting in negotiations on our behalf with investment banking firms and other institutions or investors in connection with the public or private sale of our securities;

- maintaining title insurance or other assurance of title and customary fire, casualty and public liability insurance, with respect to real property;

44

- investing and reinvesting our money upon request of our Board;

- supervising the preparation, filing and distribution of returns and reports to governmental agencies and to investors and act on our behalf in connection with investor relations;

- providing office space, equipment and personnel to carry out its services to us;

- advising us of the operating results of our properties;

- making reports to us of our performance of its services and furnish advice and recommendations with respect to other aspects of our business;

- preparing all reports and returns required by the SEC, the Internal Revenue Service, or the IRS, and other state or federal governmental agencies;

- undertaking and performing all services or other activities necessary and proper to carry out our investment objectives; and

- communicating with stockholders on our behalf in accordance with applicable law and our charter and bylaws, and providing all of our stockholder service functions, subject to certain exceptions as provided in the advisory agreement.

*Compensation of the Business Manager/Advisor.*  For the services performed by our Business Manager/Advisor we are obligated to pay the following compensation:

- an asset management fee of not more than 1% of our average invested assets to our Business Manager/Advisor. Average invested asset value is defined as the average of the total book value, including acquired intangibles, of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt or other similar non-cash reserves. We compute the values at the end of each month for which the fee is being calculated. The fee is payable quarterly in an amount equal to ¼ of up to 1% of our average invested assets as of the last day of the immediately preceding quarter. Additionally, our Business Manager/Advisor and its affiliates are entitled to be reimbursed general and administrative costs relating to our administration and acquisition of properties;

- a property disposition fee payable on sale of a property equal to the lesser of: (i) 3% of the contract sale price; or (ii) 50% of the customary commission that would be paid to third parties; and

- an incentive fee equal to 15% of the net proceeds remaining from the sale of any property after our stockholders have first received: (i) a cumulative, non-compounded return equal to 10% on an annual basis on the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties; and (ii) a return of the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties. Although we have not paid any such fees to date, if we were to dispose of a property in the future, we would be obligated to pay these fees.

Our Business Manager/Advisor is required to reimburse us for the amount, if any, that the asset management fee paid and our total operating expenses (excluding items such as taxes, interest payments, depreciation and property acquisition costs) during any year exceed the greater of: (i) 2% of the average assets for that fiscal year; or (ii) 25% of our net income excluding gains from the sale of property. In addition, our Business Manager/Advisor must reimburse us the difference between the total amount of distributions to stockholders for that year and a 6% minimum annual return on the net investment of stockholders.

45

We can be charged by our Business Manager/Advisor an annual asset management fee of up to 1% of our average invested assets; however, our Business Manager/Advisor has historically charged us no more than 0.53% on an annual basis. We compute the values at the end of each month for which the fee is being calculated. The fee is paid quarterly in an amount equal to ¼ of the estimated annual fee based on our average invested assets as of the last day of the immediately preceding quarter. Based upon the maximum allowable advisor asset management fee of 1% of our average invested assets, maximum fees of $74.9 million, $54.9 million and $15.0 million could have been charged for the years ended December 31, 2006, 2005 and 2004, respectively. However, we paid $39.5 million and $20.9 million for the years ended December 31, 2006 and 2005, respectively. Our Business Manager/Advisor waived all asset management fees for the year ended December 31, 2004.  Our Business Manager/Advisor has agreed to forego any fees allowable but not taken on an annual basis.  See "Certain Relationships and Related Transactions" for a more detailed description of amounts we have paid to our Business Manager/Advisor.

*Term and Termination of the Advisory Agreement*.  The advisory agreement provided for an initial term of one year and is renewable for successive one-year terms upon the mutual consent of the parties. It may be terminated by either party, by mutual consent of the parties or by a majority of the independent directors or our Business Manager/Advisor, as the case may be, upon 60 days written notice without cause or penalty.  The advisory agreement will terminate upon consummation of the Merger.

*Indemnification*.  We are currently required to indemnify and reimburse our Business Manager/Advisor and its affiliates, or collectively an indemnified party, to the fullest extent permitted by Maryland law, so long as: (i) the indemnified party determined, in good faith, that the course of conduct that caused the loss or liability was in our best interests; (ii) the indemnified party was acting on our behalf or performing services for us; (iii) the liability or loss was not the result of negligence or misconduct on the part of the indemnified party; and (iii) the indemnification or agreement to be held harmless is recoverable only out of our assets and not from our stockholders.  We are not required to indemnify for losses, liabilities or expenses arising from an alleged violation of federal or state securities laws unless: (i) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the indemnified party; (ii) the claims have been dismissed with prejudice on the merits; or (iii) a court approves a settlement of the claims and finds that indemnification of the settlement and related costs should be made.

*Liability and Indemnification of our Business Manager/Advisor*. Under the advisory agreement, we are also required to advance amounts to our Business Manager/Advisor and its affiliates for legal and other expenses and costs incurred as a result of any legal action for which indemnification is being sought only if:

- the legal action relates to acts or omissions relating to the performance of duties or services for us or on our behalf by the person seeking indemnification;

- the legal action is initiated by a third party who is not a stockholder or the legal action is initiated by a stockholder acting in his or her capacity as such and a court of competent jurisdiction specifically approves advancement; and

- the person seeking indemnification undertakes in writing to repay us the advanced funds, together with interest at the applicable legal rate of interest, if the person seeking indemnification is found not to be entitled to indemnification.

The liability of our Business Manager/Advisor and its affiliates is limited to the fullest extent permitted by Maryland law. As a result, our Business Manager/Advisor and its affiliates will not be liable for monetary damages unless:

- the person actually received an improper benefit or profit in money, property or services; and

- the person is adjudged to be liable based on a finding that the person's action, or failure to act, was the result of active and deliberate dishonesty and was material to the cause of action adjudicated in the proceeding.

46

Our charter authorizes and directs us to indemnify or pay or reimburse reasonable expenses in advance of a final disposition of a proceeding, to the maximum extent permitted by Maryland law in effect from time to time, our agents which includes our Business Manager/Advisor or its affiliates.

We may, with the approval of our Board or any duly authorized committee thereof, provide such indemnification and advancement of expenses to our Business Manager/Advisor. The indemnification and payment of expenses provided in our charter shall not be deemed exclusive of or limit in any way other rights to which our Business Manager/Advisor seeks indemnification or payment of expenses may be or may become entitled under any bylaw, regulation, insurance, agreement or otherwise.

Our charter further authorizes the purchase and maintenance of insurance on behalf of our Business Manager/Advisor or its affiliates against any liability asserted against it and incurred by it in such capacity, or arising out of its status as such, whether or not it is indemnified against such liability under the provisions of our charter.

**Shares of our Stock and Other Amounts Potentially Payable with Respect to the Merger**

In connection with the Merger, the stockholders of our Business Manager/Advisor and our Property Managers will receive our common stock. The allocation of shares we are issuing in the Merger was determined by our Business Manager/Advisor and our Property Managers. Immediately prior to the Merger, we will pay any fees accrued under such contractual arrangements for services rendered through the effective time of the Merger.

**Interest of Certain Persons in Matters to be Acted Upon**

Certain of our directors and officers have interests in connection with the Merger, our Property Managers and our Business Manager/Advisor that are different from, and may potentially conflict with, our interests. In particular, all of our current executive officers and two of our current directors are also executive officers and/or directors of Inland. We have entered into a non-compensated consulting agreement, that will become effective upon the closing, with Mr. Parks, our current chairman and director. Mr. Parks and Ms. Gujral, our chief executive officer and a director, are stockholders of our Property Managers and TIGI, the ultimate owner of our Business Manager/Advisor. Mr. Grimes, our current Treasurer and Principal Financial Officer, is a stockholder of one or more of our Property Managers. As such, these individuals will receive shares of our common stock as consideration in the Merger. Messrs. Parks, Grimes and Ms. Gujral will receive shares of our common stock valued at approximately $6.8 million, $380,000 and $1.3 million, respectively, as consideration in the Merger.

We have also entered into employment agreements with Messrs. O'Hanlon, Grimes, Garrison and Byrne that will become effective upon the closing. See "– Ancillary Agreements – Employment Agreements" for a further discussion of these employment agreements.

**Opinion of the Financial Advisor**

William Blair acted as financial advisor to the special committee in connection with the Merger. As part of its engagement, the special committee requested that William Blair render an opinion as to whether the Merger consideration, to be paid by us was fair, from a financial point of view, to us and our stockholders. On August 14, 2007, William Blair delivered its oral opinion to the special committee and subsequently confirmed in writing that, as of August 14, 2007 and based upon and subject to the assumptions and qualifications stated in its opinion, the Merger consideration was fair, from a financial point of view, to us and our stockholders.

**THE FULL TEXT OF WILLIAM BLAIR'S WRITTEN OPINION, DATED AUGUST 14, 2007, IS ATTACHED AS APPENDIX B TO THIS PROXY STATEMENT AND INCORPORATED INTO THIS PROXY STATEMENT BY REFERENCE. WE ENCOURAGE YOU TO READ THE ENTIRE OPINION CAREFULLY TO LEARN ABOUT THE ASSUMPTIONS MADE, PROCEDURES FOLLOWED, MATTERS CONSIDERED AND LIMITS ON THE SCOPE OF THE REVIEW UNDERTAKEN BY WILLIAM BLAIR IN RENDERING ITS OPINION. WILLIAM BLAIR'S OPINION RELATES ONLY TO THE FAIRNESS, FROM A FINANCIAL POINT OF VIEW, TO US AND OUR STOCKHOLDERS OF**

**THE CONSIDERATION TO BE PAID BY US IN THE MERGER AND DOES NOT ADDRESS ANY OTHER ASPECT OF THE PROPOSED MERGER OR ANY RELATED TRANSACTION, AND DOES NOT CONSTITUTE A RECOMMENDATION TO YOU AS TO HOW YOU SHOULD VOTE WITH RESPECT TO THE MERGER AGREEMENT OR THE MERGER. WILLIAM BLAIR DOES NOT EXPRESS AN OPINION AS TO THE FAIRNESS OF THE MERGER CONSIDERATION TO THE ADVISOR, OR THE PROPERTY MANAGERS OR THEIR STOCKHOLDERS AS THOSE TERMS ARE DEFINED IN THE OPINION. WILLIAM BLAIR'S OPINION DID NOT ADDRESS THE MERITS OF THE UNDERLYING DECISION BY US OR THE SPECIAL COMMITTEE OR THE BOARD TO ENGAGE IN THE MERGER OR OTHER BUSINESS STRATEGIES OR TRANSACTIONS CONSIDERED BY THE BOARD OR THE SPECIAL COMMITTEE, OR THE EFFECT OF ANY SUCH TRANSACTION, OR THE SPECIAL COMMITTEE'S AND THE BOARD'S DECISION TO PROCEED WITH THE MERGER. THE FOLLOWING SUMMARY OF WILLIAM BLAIR'S OPINION IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE OPINION.**

William Blair provided the opinion described above for the information and assistance of the special committee and the Board in connection with evaluating the Merger consideration. The terms of the Merger Agreement and the amount and form of the Merger consideration, however, were determined through negotiations between us and the Business Manager/Advisor and the Property Managers, and were unanimously approved by the special committee and the Board. Although William Blair provided financial advice to the special committee during such negotiations, William Blair did not recommend any specific exchange ratio or other form of consideration to us or that any specific exchange ratio or other form of consideration constituted the only appropriate consideration for the proposed Merger.  The William Blair opinion is addressed to the special committee and the Board for their use in evaluating the terms of the Merger Agreement and the amount and form of the Merger consideration.  The William Blair opinion is included in this proxy statement so you can assess the role of such opinion in the special committee's and our Board's development of its recommendation to you.

In connection with its opinion, William Blair examined or discussed, among other things:

- the Merger Agreement dated August 14, 2007;

- our audited historical financial statements and those of our Business Manager/Advisor and Property Managers for the two fiscal years ended December 31, 2005 and 2006;

- our unaudited financial statements and those of our Business Manager/Advisor and Property Managers for the six months ended June 30, 2006, and 2007;

- certain internal business, operating and financial information and forecasts of us, our Business Manager/Advisor and Property Managers, or the Forecasts, for fiscal years 2007 through 2012 prepared by our senior management and the senior management of our Business Manager/Advisor and Property Managers;

- information regarding the strategic, financial and operational benefits anticipated from the Merger prepared by our senior management;

- information regarding the amount and timing of cost savings and related expenses which our senior management expects will result from the Merger, the "Expected Cost Savings";

- the pro forma impact of the Merger on funds from our operations per share (before and after taking into consideration any Expected Cost Savings);

- information regarding publicly available financial terms of certain other business combinations William Blair deemed relevant;

- our financial position and operating results and those of our Business Manager/Advisor and Property Managers compared with those of certain other publicly traded companies William Blair deemed relevant; and

- certain other publicly available information of us and that of other publicly traded companies William Blair deemed relevant.

48

William Blair also held discussions with members of our senior management and the senior management of our Business Manager/Advisor and Property Managers to discuss the foregoing. William Blair also considered other matters, and conducted such other analyses, studies and investigations, which it deemed relevant to its inquiry, and appropriate under the circumstances for rendering its opinion, and took into account the accepted financial and investment banking procedures and considerations that it deemed relevant.   William Blair was not requested to, nor did William Blair, solicit the interest of other parties in a possible business combination transaction with us.

In rendering its opinion, William Blair assumed and relied, without independent verification, upon the accuracy and completeness of all the information examined by or otherwise reviewed or discussed with William Blair for purposes of its opinion, including without limitation the Forecasts provided by our senior management and the senior management of our Business Manager/Advisor and Property Managers. William Blair did not make or obtain an independent valuation or appraisal of the assets, liabilities or solvency of us, our Business Manager/Advisor or Property Managers. William Blair was advised by our senior management that the Forecasts and Expected Cost Savings examined by William Blair were reasonably prepared on bases reflecting the best estimates then available and judgments of our senior management and the senior management of our Business Manager/Advisor and Property Managers. In that regard, William Blair assumed, with the consent of the special committee, that (i) the Forecasts would be achieved in the amounts and at the times contemplated thereby and (ii) all of our material assets and liabilities (contingent or otherwise) and those of our Business Manager/Advisor and Property Managers were as set forth in each company's respective financial statements or other information made available to William Blair. William Blair expressed no opinion with respect to the Forecasts or Expected Cost Savings or the estimates and judgments on which they were based. William Blair was not provided with, nor did it otherwise review, any of our forecasts or the forecasts of our Business Manager/Advisor or Property Managers for periods after fiscal year 2012.

William Blair's opinion does not address the relative merits of the Merger as compared to any alternative business strategies that might exist for us or the effect of any other transaction in which we might engage. William Blair's opinion was based upon economic, market, financial and other conditions existing on, and other information disclosed to William Blair as of August 9, 2007. Although subsequent developments may affect its opinion, William Blair does not have any obligation to update, revise or reaffirm its opinion. William Blair relied, as to all legal and accounting and tax matters, on advice of our advisors and the advisors to the special committee.   William Blair assumed that the executed Merger Agreement would conform in all material respects to, and the Merger would be consummated on, the terms described in the Merger Agreement reviewed by it, without any amendment or waiver of any material terms or conditions. William Blair did not express any opinion as to the impact of the Merger on our solvency or viability or that of our Business Manager/Advisor or Property Managers.

The following is a summary of the material financial analyses performed and material factors considered by William Blair to arrive at its opinion. William Blair performed certain procedures, including each of the financial analyses described below, and reviewed with the special committee and the Board the assumptions upon which such analyses were based, as well as other factors. Although the summary does not purport to describe all of the analyses performed or factors considered by William Blair in this regard, it does set forth those considered by William Blair to be material in arriving at its opinion.

William Blair performed certain financial procedures, including each of the financial analyses described below in order to evaluate the fairness of the Merger consideration, from a financial point of view to us and our stockholders (other than our Business Manager/Advisor, Property Managers and their equityholders).  As contemplated by the Merger Agreement, we will issue approximately 37.5 million shares in the Merger.  William Blair evaluated each of the following analyses independently and on an aggregate basis in its assessment of the fairness of the proposed transaction.

### *Valuation of Our Business Manager/Advisor and Property Managers*

*Selected Public Company Analysis*.  William Blair reviewed and compared certain financial information relating to our Business Manager/Advisor and Property Managers to corresponding financial information, ratios and public market multiples for certain publicly traded companies with operations in the real estate industry that William Blair deemed relevant. The following companies were selected by William Blair:

49

- CB Richard Ellis Group, Inc.;

- Jones Lang LaSalle, Inc.; and

- Grubb & Ellis Company.

Among the information William Blair considered were earnings before interest, taxes, depreciation and amortization, or EBITDA, and net income. William Blair considered the enterprise value as a multiple of EBITDA for each company for the last twelve months, or LTM, for which results were publicly available and for the respective calendar year EBITDA estimates for 2007, and the share price as a multiple of earnings per share, or EPS, for each company for the LTM and for the respective calendar year EPS estimates for 2007 and 2008. The operating results and the corresponding derived multiples for our Business Manager/Advisor and Property Managers and each of the selected companies were based on each company's most recent available publicly disclosed financial information, closing share prices as of August 9, 2007 and consensus Wall Street analysts' EBITDA and EPS estimates for calendar years 2007 and 2008 where appropriate. William Blair noted that it did not have access to internal forecasts for any of the selected public companies, except our Business Manager/Advisor and the Property Managers.

William Blair then applied the summary imputed multiples for the publicly traded companies to our Business Manager/Advisor and Property Managers' results to determine an implied enterprise value and an implied equity value for our Business Manager/Advisor and Property Managers. Information regarding our Business Manager/Advisor and Property Managers' operating results and public company valuation multiples from William Blair's analysis of selected publicly traded companies is set forth in the following table:

| ($ in millions)<br>Multiple | Combined Advisor<br>and Property<br>Managers<br>Results | Selected Public Company<br>Valuation Multiples<br>Min | Mean | Median | Max |
|---|---|---|---|---|---|
| Enterprise Value/LTM EBITDA | $ 62.8 | 11.2x | 14.2x | 11.3x | 20.0x |
| Enterprise Value/2007E EBITDA | $ 65.9 | 9.3x | 11.1x | 11.5x | 12.5x |
| | | | | | |
| Equity Value/LTM Net Income | $ 37.6 | 17.0x | 17.6x | 17.6x | 18.2x |
| Equity Value/2007E Net Income | $ 39.5 | 13.4x | 20.4x | 14.7x | 33.1x |
| Equity Value/2008E Net Income | $ 41.2 | 11.4x | 14.3x | 13.8x | 17.6x |

William Blair determined a valuation range for our Business Manager/Advisor and Property Managers based on its analysis of selected publicly traded companies to be between $471 million and $1,308 million with a mean and median value of $736 million and $663 million, respectively.

Although William Blair analyzed the trading multiples of the selected companies at the date of its opinion and applied such multiples to our Business Manager/Advisor and Property Managers, none of the selected companies is identical to our Business Manager/Advisor and Property Managers. Accordingly, any analysis of the selected publicly traded companies necessarily involved complex considerations and judgments concerning the differences in financial and operating characteristics and other factors that would necessarily affect the analysis of trading multiples of the selected publicly traded companies.

*Selected M&A Transactions Analysis of Comparable Transactions.* William Blair performed an analysis of selected recent business combinations consisting of transactions announced subsequent to January 1, 1998 and focused primarily on the real estate industry. William Blair's analysis was based solely on publicly available information regarding such transactions. The selected transactions were not intended to be representative of the entire range of possible transactions in the respective industries. The transactions selected by William Blair were (target/acquiror):

- Grubb & Ellis Company / NNN Realty Advisors, Inc.;

- Trammell Crow Company / CB Richard Ellis Group, Inc.;

50

- LNR Property Corporation / Cerberus Capital Management, L.P. and Blackacre Institutional Capital Management, LLC;

- Insignia Financial Group, Inc. / CB Richard Ellis Group, Inc.;

- Groupe Bourdais / Insignia Financial Group, Inc.;

- CB Richard Ellis Services, Inc. / Blum Capital Partners, L.P.;

- CNL Fund Advisors, Inc. / CNL American Properties, Inc.;

- Security Capital U.S. Realty / Security Capital Group;

- Jones Lang Wootton / LaSalle Partners, Inc.; and

- Bishop Hawk, Inc. / Grubb & Ellis Company.

William Blair reviewed the consideration paid in the selected transactions in terms of the enterprise value of such transactions as a multiple of EBITDA of the target and the equity value as a multiple of net income of the target for the latest twelve months prior to the announcement of these transactions. William Blair then applied the summary imputed multiples for the selected transactions to our Business Manager/Advisor and Property Managers' results to determine an implied enterprise value and an implied equity value for our Business Manager/Advisor and Property Managers. Information regarding our Business Manager/Advisor and Property Managers operating results and multiples from William Blair's analysis of selected transactions is set forth in the following table:

| ($ in millions)<br>Multiple | Combined Advisor<br>and Property<br>Managers<br>Results | Selected Transaction<br>Valuation Multiples | | | |
|---|---|---|---|---|---|
| | | Min | Mean | Median | Max |
| Enterprise Value/LTM EBITDA | $       62.8 | 5.2x | 11.3x | 9.9x | 24.0x |
| Equity Value/LTM Net Income | $       37.6 | 9.1x | 15.7x | 13.6x | 30.8x |

William Blair determined a valuation range for our Business Manager/Advisor and Property Managers based on its analysis of selected transactions to be between $327 million and $1,507 million with a mean and median value of $649 million and $565 million, respectively.

Although William Blair analyzed the multiples implied by the selected transactions and applied such multiples to our Business Manager/Advisor and Property Managers, none of these transactions or associated companies is identical to the Merger of our Business Manager/Advisor and Property Managers. Accordingly, any analysis of the selected transactions necessarily involved complex considerations and judgments concerning the differences in financial and operating characteristics, parties involved and terms of their transactions and other factors that would necessarily affect the implied value of our Business Manager/Advisor and Property Managers versus the values of the companies in the selected transactions.

*Selected M&A Transactions Analysis of REIT Internalization Transactions.* William Blair performed an analysis of selected recent REIT internalizations consisting of transactions announced subsequent to January 1, 1999 and focused primarily on the real estate industry. William Blair's analysis was based solely on publicly available information regarding such transactions. The selected transactions were not intended to be representative of the entire range of possible transactions in the respective industries. The transactions selected by William Blair were (target/acquiror):

- Inland Retail Real Estate Advisory Services, Inc. / Inland Retail Real Estate Trust, Inc.;

- Cedar Bay Realty Advisors, Inc. / Cedar Shopping Centers, Inc.;

- Inland Commercial Property Management, Inc. / Inland Real Estate Corporation;

51

- Starwood Financial Advisors, LLC / Starwood Financial Trust; and

- CNL Restaurant Properties Inc. / CNL American Properties Fund, Inc.

William Blair reviewed the consideration paid in the selected transactions in terms of the enterprise value of such transactions as a multiple of EBITDA for the latest twelve months prior to the announcement of these transactions. William Blair then applied the summary imputed multiple for the selected transactions to our Business Manager/Advisor and the Property Managers' results to determine an implied enterprise value for our Business Manager/Advisor and Property Managers. Information regarding our Business Manager/Advisor and Property Managers operating results and multiples from William Blair's analysis of selected transactions is set forth in the following table:

| ($ in millions)<br>Multiple | Combined Advisor<br>and Property<br>Managers<br>Results | Selected Transaction<br>Valuation Multiples | | | |
|---|---|---|---|---|---|
| | | Min | Mean | Median | Max |
| Enterprise Value/LTM EBITDA | $ 62.8 | 3.9x | 7.3x | 7.8x | 10.7x |

William Blair determined a valuation range for our Business Manager/Advisor and Property Managers based on its analysis of selected transactions to be between $245 million and $671 million with a mean and median value of $459 million and $491 million, respectively.

Although William Blair analyzed the multiples implied by the selected transactions and applied such multiples to our Business Manager/Advisor and Property Managers, none of these transactions or associated companies is identical to the Merger of our Business Manager/Advisor and Property Managers. Accordingly, any analysis of the selected transactions necessarily involved complex considerations and judgments concerning the differences in financial and operating characteristics, parties involved and terms of their transactions and other factors that would necessarily affect the implied value of our Business Manager/Advisor and Property Managers versus the values of the companies in the selected transactions.

*Discounted Cash Flow Analysis.* William Blair utilized the Forecasts to perform a discounted cash flow analysis of our Business Manager/Advisor and Property Managers' projected future cash flows for the period commencing on January 1, 2007 and ending December 31, 2012. Using discounted cash flow methodology, William Blair calculated the present values of the projected free cash flows for our Business Manager/Advisor and Property Managers. In this analysis, William Blair assumed that our Business Manager/Advisor and Property Managers' free cash flows would end in a final cash flow equal to between 6.5x and 8.5x the respective 2012 EBITDA and an annual assumed discount rate ranging from 8.0% to 12.0%. William Blair determined the appropriate discount range based upon an analysis of the weighted average cost of capital of the aforementioned public company analysis. William Blair aggregated (1) the present value of the free cash flows over the applicable forecast period with (2) the present value of the range of terminal values. The aggregate present value of these items represented the enterprise value range. The implied range of enterprise values for our Business Manager/Advisor and the Property Managers implied by the discounted cash flow analysis ranged from approximately $481 million to $667 million with a mean and median value of $568 million and $567 million, respectively.

**Summary of the Aggregate Valuation for our Business Manager/Advisor and Property Managers**

William Blair performed a selected public company analysis, selected M&A transaction analysis of comparable transactions and REIT internalization transactions and a discounted cash flow analysis to determine aggregate valuation ranges for our Business Manager/Advisor and Property Managers. Based on its analysis and results as presented above, William Blair determined that a range of aggregate enterprise values for our Business Manager/Advisor and Property Managers ranged from $399 million to $990 million with a mean and median value of $609 million and $566 million, respectively.

52

*Valuation of Our Shares*

William Blair performed certain financial procedures, including each of the financial analyses described below to derive a value of our shares, on a per share basis.

*Selected Public Company Analysis.*  William Blair reviewed and compared certain financial information relating to us to corresponding financial information, ratios and public market multiples for certain publicly traded real estate investment trusts with operations in the real estate industry that William Blair deemed relevant.  The following companies were selected by William Blair:

- Kimco Realty Corporation;

- Developers Diversified Realty Corporation;

- Regency Centers Corporation;

- Federal Realty Investment Trust;

- Weingarten Realty Investors;

- Inland Real Estate Corporation; and

- Cedar Shopping Centers, Inc.

Among the information William Blair considered were funds from operations, or FFO, per share, dividend yield, implied capitalization rate and square feet. William Blair considered the equity value as a multiple of FFO per share and dividend yield for each company for the last twelve months for which results were publicly available and the share price as a multiple of FFO for each company for the LTM and for the respective calendar year EPS estimates for 2007 and 2008. William Blair considered the enterprise value as a multiple of square feet and implied cap rate for each company for the last twelve months for which results were publicly available.

The operating results and the corresponding derived multiples for us and each of the selected companies were based on each company's most recent available publicly disclosed financial information, closing share prices as of August 9, 2007 and consensus Wall Street analysts' FFO estimates for calendar years 2007 and 2008 where appropriate. William Blair noted that it did not have access to internal forecasts for any of the selected public companies, except for ours.

William Blair then applied the summary imputed multiples for the publicly traded companies to our results to determine an implied equity value per share for us.  The derived enterprise values and equity values were divided by the total number of shares outstanding as of June 30, 2007 to determine our implied per share value.  Information regarding our operating results and public company valuation multiples from William Blair's analysis of selected publicly traded companies is set forth in the following table:

| ($ actual) Valuation Metric | IWEST Results | Selected Public Company Valuation Multiples | | | |
|---|---|---|---|---|---|
| | | Min | Mean | Median | Max |
| Equity Value/LTM FFO | $ 0.67 | 10.6x | 15.2x | 14.1x | 24.1x |
| Equity Value/2007E FFO | $ 0.66 | 9.9x | 14.7x | 13.6x | 22.6x |
| Equity Value/2008E FFO | $ 0.69 | 9.2x | 13.7x | 12.7x | 20.8x |
| Equity Value/LTM Dividend Yield | $ 0.65 | 2.8% | 4.8% | 4.8% | 7.3% |
| Enterprise Value/Square Feet (000s) | 45,500 | $ 74.25 | $139.64 | $126.65 | $332.67 |
| Enterprise Value/LTM Capitilization Rate | $ 1.15 | 3.60% | 5.85% | 6.31% | 7.51% |

William Blair determined a per share valuation range for us based on its analysis of selected publicly traded companies to be between $6.30 and $33.87 per share with a mean and median per share values of $11.27 and $9.30, respectively.

53

Although William Blair compared the trading multiples of the selected companies at the date of its opinion and applied such multiples to us, none of the selected companies is identical to us. Accordingly, any analysis of the selected publicly traded companies necessarily involved complex considerations and judgments concerning the differences in financial and operating characteristics and other factors that would necessarily affect the analysis of trading multiples of the selected publicly traded companies.

*Selected M&A Transactions Analysis.* William Blair performed an analysis of selected recent business combinations consisting of transactions announced subsequent to January 1, 2000 and focused primarily on the real estate industry. William Blair's analysis was based solely on publicly available information regarding such transactions. The selected transactions were not intended to be representative of the entire range of possible transactions in the respective industries. The transactions selected by William Blair were (target/acquiror):

- Republic Property Trust / Liberty Property Trust;

- Crescent Real Estate Equities Company / Morgan Stanley Real Estate Fund;

- Beacon Capital Partners, LLC / Broadway Real Estate Partners, LLC;

- New Plan Excel Realty Trust, Inc. / Centro Properties Group;

- Columbia Equity Trust, Inc. / JP Morgan Asset Management;

- Inland Retail Real Estate Trust, Inc / Developers Diversified Realty Corporation;

- Equity Office Properties Trust / Blackstone Real Estate Partners, LP;

- Reckson Associates Realty Corp. / SL Green Realty Corp.;

- Glenborough Realty Trust Inc. / Morgan Stanley Real Estate Fund;

- Sizeler Property Investors Inc. / Revenue Properties Co. Ltd.;

- Pan Pacific Retail Properties, Inc. / Kimco Realty Corporation;

- Heritage Property Investment Trust, Inc. / Centro Properties Group;

- Kramont Realty Trust / Centro Properties Group, Watt Commercial Properties Inc;

- Price Legacy Corp. / PL Retail LLC (Kimco Realty Corporation and DRA Advisors LLC);

- Mid-Atlantic Realty Trust / Kimco Realty Corporation;

- JDN Realty Corporation / Developers Diversified Realty Corporation;

- IRT Property Co. / Equity One, Inc.;

- Center Trust Inc. / Pan Pacific Retail Properties, Inc.;

- United Investors Realty Trust / Equity One, Inc.; and

- Bradley Real Estate, Inc. / Heritage Property Investment Trust, Inc.

William Blair reviewed the consideration paid in the selected transactions in terms of the equity value of such transactions as a multiple of FFO of the target for the latest twelve months prior to the announcement of these transactions. William Blair considered the enterprise value as a multiple of square feet and implied capitalization rate for each company for the target for the latest twelve months prior to the announcement of these transactions. William Blair then applied the summary imputed multiples for the selected transactions to our results to determine

54

our implied equity value per share. Information regarding our operating results and multiples from William Blair's analysis of selected transactions is set forth in the following table:

| ($ actual) Valuation Metric | IWEST Results | Selected Transaction Valuation Multiples | | | |
|---|---|---|---|---|---|
| | | Min | Mean | Median | Max |
| Equity Value/LTM FFO | $ 0.67 | 7.7x | 21.3x | 16.3x | 73.8x |
| Enterprise Value/Square Feet (000s) | 45,500 | $ 67.27 | $160.39 | $133.63 | $377.17 |
| Enterprise Value/LTM Capitilization Rate | $ 1.15 | 1.47% | 4.61% | 4.60% | 10.20% |

William Blair determined a valuation range for us based on its analysis of selected transactions to be between $2.26 and $69.16 per share with a mean and median per share values of $15.47 and $13.58, respectively.

Although William Blair analyzed the multiples implied by the selected transactions and applied such multiples to us, none of these transactions or associated companies is identical to the Merger. Accordingly, any analysis of the selected transactions necessarily involved complex considerations and judgments concerning the differences in financial and operating characteristics, parties involved and terms of their transactions and other factors that would necessarily affect our implied value versus the values of the companies in the selected transactions.

*Discounted Cash Flow Analysis.* William Blair utilized the Forecasts to perform a discounted cash flow analysis of our projected future dividend per share for the period commencing on January 1, 2007 and ending December 31, 2012. Using discounted cash flow methodology, William Blair calculated the present values of our projected free cash flows per share. In this analysis, William Blair assumed that our FFO per share would end in a final FFO per share equal to between 15.0x and 17.0x the respective 2012 FFO per share and an annual assumed discount rate ranging from 7.0% to 9.0% with an assumed constant dividend yield of 6.32%. William Blair determined the appropriate discount range based upon an analysis of the weighted average cost of capital of the aforementioned public company analysis. William Blair aggregated (1) the present value of the dividends per share over the applicable forecast period with (2) the present value of the range of terminal values. The aggregate present value of these items represented the equity value per share range. The implied range of per share equity values for us implied by the discounted cash flow analysis ranged from approximately $9.78 to $11.35 per share.

### Summary of Our Aggregate Valuation

William Blair performed a selected public company analysis, selected M&A transaction analysis and a discounted cash flow analysis to determine independent per share equity valuation ranges for us. Based on its analysis and results as presented above, William Blair determined a mean and median per share value of $11.27 and $10.53, respectively with an approximate range of values from $9.00 to $12.00 per share.

### Analysis Conclusion

In assessing its fairness opinion, William Blair compared the approximately 37.5 million shares to be issued in the Merger with the aggregate estimated value of our Business Manager/Advisor and Property Managers divided by our estimated per share value.

Based on the preceding analysis, the aggregate estimated value of our Business Manager/Advisor and Property Managers is $245 million to $1,507 million, and our estimated per share value is $9.00 to $12.00 per share. The aggregate estimated value of our Business Manager/Advisor and Property Managers divided by our estimated per share value is a range of 20.4 million to 167.4 million shares. This is an estimate of the aggregate value of our Business Manager/Advisor and Property Managers expressed in terms of the number of our shares.

Because the number of shares to be issued in the Merger was within the range of the aggregate value of our Business Manager/Advisor and Property Managers expressed in terms of the number of our shares, William Blair concluded that the Merger consideration was fair from a financial point of view to us and our stockholders (other than our Business Manager/Advisor, Property Managers and their equityholders).

55

*Additional Analyses*

In developing its fairness opinion, William Blair also performed certain financial analyses described below.

*Internalization Formula Valuation.* Per our advisory agreement with our Business Manager/Advisor, dated December 28, 2004, William Blair calculated the number of shares that we could choose to issue to the holders of our Business Manager/Advisor and Property Managers in a merger transaction at our option beginning in September 2008 for our Business Manager/Advisor and May 2008 for the Property Managers. The number of our shares to be distributed to the stockholders of our Business Manager/Advisor and Property Managers was calculated as 90% of the annualized net income of our Business Manager/Advisor and Property Managers divided by our annualized FFO per weighted average share. Annualized net income was assumed to be 2007 projected net income of our Business Manager/Advisor and Property Managers. The implied number of shares for our Business Manager/Advisor and Property Managers implied by the internalization formula is approximately 54.1 million, as compared to the approximate 37.5 million shares to be issued in the Merger.

*Accretion/Dilution Analysis.* William Blair analyzed certain pro forma effects resulting from the Merger, including the potential impact of the Merger on projected FFO per share of us following the Merger, with Expected Cost Savings. William Blair utilized our FFO for 2007 through 2012 according to the Forecasts provided by us. William Blair's post-transaction pro forma analysis assumed 100% of our Business Manager/Advisor and Property Managers' outstanding common stock was exchanged for approximately 37.5 million shares of our common stock. William Blair's analysis indicated that the transaction would be $0.078 to $0.097 accretive on a per share basis to our 2008 through 2012 FFO when taking into consideration the Expected Cost Savings as a result of the Merger.

*General*

This summary is not a complete description of the analysis performed by William Blair but contains the material elements of the analysis. The preparation of an opinion regarding fairness is a complex process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances, and, therefore, such an opinion is not readily susceptible to partial analysis or summary description. The preparation of an opinion regarding fairness does not involve a mathematical evaluation or weighing of the results of the individual analyses performed, but requires William Blair to exercise its professional judgment, based on its experience and expertise, in considering a wide variety of analyses taken as a whole. Each of the analyses conducted by William Blair was carried out in order to provide a different perspective on the financial terms of the proposed Merger and add to the total mix of information available. The analyses were prepared solely for the purpose of William Blair providing its opinion and do not purport to be appraisals or necessarily reflect the prices at which securities actually may be sold. William Blair did not form a conclusion as to whether any individual analysis, considered in isolation, supported or failed to support an opinion about the fairness of the Merger consideration. Rather, in reaching its conclusion, William Blair considered the results of the analyses in light of each other and ultimately reached its opinion based on the results of all analyses taken as a whole. William Blair did not place particular reliance or weight on any particular analysis, but instead concluded that its analyses, taken as a whole, supported its determination. Accordingly, notwithstanding the separate factors summarized above, William Blair believes that its analyses must be considered as a whole and that selecting portions of its analyses and the factors considered by it, without considering all analyses and factors, may create an incomplete view of the evaluation process underlying its opinion. No company or transaction used in the above analyses as a comparison is directly comparable to our Business Manager/Advisor, Property Managers or the Merger. In performing its analyses, William Blair made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by William Blair are not necessarily indicative of future actual values and future results, which may be significantly more or less favorable than suggested by such analyses.

William Blair is a nationally recognized firm and, as part of its investment banking activities, is regularly engaged in the valuation of businesses and their securities in connection with merger transactions and other types of strategic combinations and acquisitions. William Blair participated in certain of the negotiations leading to the Merger Agreement.

56

The special committee hired William Blair based on its qualifications and expertise in providing financial advice to companies and its reputation as a nationally recognized investment banking firm. Pursuant to a letter agreement dated June 19, 2006, William Blair was paid a retainer fee of $100,000 and was paid $550,000 upon the delivery of its opinion, dated August 14, 2007, as to the fairness, from a financial point of view, of the Merger consideration to be paid by us. Furthermore, under the terms of the June 19, 2006, letter agreement, William Blair will be entitled to receive an additional fee of $350,000 upon consummation of the Merger. In addition, we have agreed to reimburse William Blair for certain of its out-of-pocket expenses (including fees and expenses of its counsel) reasonably incurred by it in connection with its services and will indemnify William Blair against potential liabilities arising out of its engagement.

As described above, William Blair's opinion to the special committee and to the Board was one of many factors taken into consideration by the special committee and the Board in making their determination to approve the Merger. The foregoing summary does not purport to be a complete description of the analyses performed by William Blair in connection with its fairness opinion and is qualified in its entirety by reference to the written opinion of William Blair attached as **Appendix B** to this proxy statement.

## Accounting Treatment

The Merger consideration will be accounted for primarily as expense incurred in connection with terminating the property management agreements that we have with our Property Managers and the advisory agreement that we have with our Business Manager/Advisor, substantially all of which will be treated as an expense upon closing of the Merger.

## Federal Tax Consequences

The following discussion summarizes the material federal income tax consequences in connection with the Merger to a stockholder of ours who is a U.S. citizen or resident or that is a tax exempt organization. Duane Morris LLP, our counsel, has reviewed the following discussion and believes that it fairly summarizes the federal income tax considerations that are likely to be material to our stockholders. Such discussion is based on current law. The discussion is not exhaustive of all possible tax considerations, nor does the discussion give a detailed description of any state, local, or foreign tax considerations. This discussion does not describe all of the aspects of federal income taxation that may be relevant to a stockholder in light of his or her particular circumstances or to certain types of stockholders (including insurance companies, financial institutions or broker-dealers, foreign corporations and persons who are not citizens or residents of the United States) subject to special treatment under the federal income tax laws. No ruling has been or will be requested from the IRS.

EACH STOCKHOLDER IS URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC CONSEQUENCES TO HIM OR HER OF THE OWNERSHIP OF COMMON STOCK IN AN ENTITY THAT HAS ELECTED TO BE TAXED AS A REAL ESTATE INVESTMENT TRUST, INCLUDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF SUCH OWNERSHIP AND ELECTION AND OF POTENTIAL CHANGES IN APPLICABLE TAX LAWS.

*General.* We expect to continue to be taxed as a REIT for federal income tax purposes. We believe that we were organized, have operated and, assuming consummation of the Merger, will continue to operate after the Merger in such a manner as to meet the requirements for qualification and taxation as a REIT under the Code, and we intend to continue to operate in such a manner. No assurance, however, can be given that we will continue to operate in a manner so as to remain qualified as a REIT.

In the opinion of our counsel, assuming that (i) we are currently qualified to be taxed as a REIT under the Code; (ii) the assumptions and representations referred to below are true upon and following the Merger, including that we will not succeed to any earnings and profits of the Service Providers; and (iii) following the Merger, the surviving corporations will operate in accordance with the terms described herein, following the Merger, we should continue to qualify as a REIT for our current and subsequent taxable years. This analysis is based on certain assumptions relating to our organization and operation and that of our Business Manager/Advisor and each of our Property Managers and is conditioned upon certain representations made by us as to certain factual matters relating to the Merger and the intended manner of our operation after the Merger and the operation of the surviving

57

corporations. The opinion is further conditioned upon us not otherwise being allocated more non-qualifying income than is consistent with the 95 percent gross income test. Our counsel is not aware of any facts or circumstances that are inconsistent with these assumptions and representations. Unlike a tax ruling, an analysis of counsel is not binding on the IRS, and no assurance can be given that the IRS will not challenge our status as a REIT for federal income tax purposes. Our qualification and taxation as a REIT has depended and will depend upon, among other things, our ability to meet on a continuing basis, through ownership of assets, actual annual operating results, receipt of qualifying real estate income, distribution levels and diversity of stock ownership, the various qualification tests imposed under the Code discussed below. See "– Failure to Qualify" below.

The following is a summary of material considerations concerning applicable Code sections that affect the Merger. These sections of the Code are highly technical and complex. This summary is qualified in its entirety by the applicable Code provisions, rules and regulations promulgated thereunder, which we refer to as the Treasury Regulations, and administrative and judicial interpretations thereof as currently in effect. There is no assurance that there will not be future changes in the Code, Treasury Regulations or administrative or judicial interpretations thereof that could adversely affect our ability to continue to qualify as a REIT or adversely affect the taxation of our stockholders or that could further limit the amount of income we may derive from the management and development activities to be performed after the Merger.

*Built-in Gain Rules*. Under the "Built-in Gain Rules" of Notice 88-19, 1988-1 C.B. 486, and Temporary Regulations issued thereunder, we will be subject to a corporate tax if we dispose of any of the assets acquired from our Business Manager/Advisor and any of our Property Managers in the Merger during the 10-year period beginning at the closing date, which we refer to as the restriction period. This tax is imposed at the top regular corporate rate (currently 35%) on the excess of (i) the lesser of (a) the fair market value at the closing date of the assets disposed of and (b) the selling price of such assets over (ii) our adjusted basis at the closing date in such assets, such excess being referred to as the built-in gain. We do not intend to dispose of any of the assets acquired in the Merger during the restriction period. However, on such a disposition, if the fair market value of the asset sold at the closing date exceeded the basis therein, we would be taxed at the time of the disposition on the resulting gain at the top corporate rate under the Built-in Gain Rules.

The results described above with respect to the recognition of built-in gain assume that we will make a certain election pursuant to the Built-in Gain Rules in accordance with Section 337(d) of the Code and the Treasury Regulations thereunder.

*Qualified REIT Subsidiary*. A REIT is permitted to have a wholly owned subsidiary, also referred to as a qualified REIT subsidiary, provided that such subsidiary satisfies certain conditions. A qualified REIT subsidiary is not treated as a separate entity for federal income tax purposes. Rather, all of the assets, liabilities and items of income, deduction and credit of a qualified REIT subsidiary are treated as if they were those of the REIT. Following the Merger, our Business Manager/Advisor and each of our Property Managers will be our qualified REIT subsidiaries, and the assets, liabilities and items of income of each will be treated as our assets, liabilities and items of income. Based on the foregoing, it is the opinion of our counsel that, following the Merger, each of our Business Manager/Advisor and each of our Property Managers will constitute a qualified REIT subsidiary.

*Consequences of Merger on our Qualification as a REIT - Earnings and Profits Distribution Requirements*. A REIT is not permitted to have accumulated earnings and profits attributable to a non-REIT year. A REIT has until the close of its first taxable year in which it has non-REIT earnings and profits to distribute such earnings and profits. In a corporate reorganization qualifying as a tax-free statutory merger, the acquired corporation's earnings and profits are carried over to the surviving corporation, and any earnings and profits treated as having been acquired by a REIT through such a merger will be treated as accumulated earnings and profits of the REIT attributable to non-REIT years. Accordingly, any earnings and profits of our Business Manager/Advisor and/or any of our Property Managers will carry over to us and be treated as earnings and profits attributable to non-REIT years. If we do not make distributions in accordance with the rules set forth below, we could lose our status as a REIT for federal income tax purposes.

The amount of earnings and profits of our Business Manager/Advisor and each of our Property Managers acquired by us, which we refer to as acquired earnings, will be based on the earnings and profits of each immediately prior to the effective time.  Based on our Business Manager/Advisor's intention to pay all of its

58

undistributed earnings as a dividend immediately prior to the Merger and the law existing as of the date hereof, we believe that we should not receive or be deemed to receive any earnings and profits from the Merger.  Based on such assumptions, and the most reasonable interpretation of the existing law, it appears that our Business Manager/Advisor and each of our Property Managers will have no earnings and profits as of the effective time.

If it is later determined that our Business Manager/Advisor and/or each of our Property Managers had earnings and profits at the effective time, we could maintain our status as a REIT if we distribute an amount equal to the acquired earnings before the close of the current taxable year. Only those distributions which are sourced to the acquired earnings will be treated as reducing such earnings and profits. To distribute the acquired earnings, we must distribute (or be deemed to distribute) during 2007 the sum of all of our current earnings and profits and any accumulated earnings and profits, and then the amount of the acquired earnings. Because our distributions have exceeded our REIT taxable income (determined prior to the dividends paid deduction) in each year of our existence and are expected to exceed such amount in this year, we have no earnings and profits, either from current periods or from prior periods and therefore, all distributions should first reduce acquired earnings to the extent any exist. In addition, our Board intends to declare that all distributions will first reduce acquired earnings, and then will reduce subsequent earnings and profits. We believe that this approach should prevent us from losing our status as a REIT for federal income tax purposes due to the application of these rules.

The calculation of the amount of acquired earnings is subject to challenge by the IRS. The IRS may examine prior tax returns and propose adjustments to increase the taxable income of our Business Manager/Advisor and/or our each of our Property Managers thereby increasing the amount of the acquired earnings. If the IRS determines that we have not distributed all of the acquired earnings prior to the end of 2007, we will fail to qualify as a REIT for such year. However, we may make an additional distribution within 90 days of such determination by the IRS to distribute the acquired earnings and would be required to pay to the IRS an interest charge based on 50% of the amount not previously distributed. If such additional distribution is made, we would retain our REIT status for all periods from 2007 through the year of such distribution notwithstanding our failure to have timely distributed the acquired earnings.

*Failure to Qualify.*  If we fail to qualify for taxation as a REIT in any taxable year and the relief provisions do not apply, we will be subject to tax (including any applicable corporate alternative minimum tax) on our taxable income at regular corporate rates. We will not be able to deduct distributions to stockholders in any year in which we fail to qualify as a REIT, nor will they be required to be made. In such event, to the extent of current and accumulated earnings and profits, all distributions to stockholders will be taxable to them as ordinary income, and, subject to certain limitations of the Code, corporate distributees may be eligible for the dividends received deduction. Unless entitled to relief under specific statutory provisions, we will also be disqualified from taxation as a REIT for the four taxable years following the year during which qualification was lost. It is not possible to state whether in all circumstances we would be entitled to such statutory relief.

**Regulatory Matters**

We are not aware of any license or regulatory permit which is material to our business, our Property Managers or our Business Manager/Advisor and which is likely to be adversely affected by the consummation of the Merger, or of any material approval or other action by any state, federal or foreign government agency that would be required prior to the consummation of the Merger, other than: (i) the filing of a certificate of merger with the Delaware Secretary of State with respect to each constituent merger and, with respect to the merger of IWEST Acquisition 1 with and into our Business Manager/Advisor, the acceptance for recording of articles of merger by the Illinois Secretary of State; and (ii) compliance with any applicable federal or state securities laws.

**Past Contacts, Transactions or Negotiations**

See pgs. 14-23, "The Merger – Background of the Merger" and "The Merger – Reasons for the Merger."

THE BOARD'S RECOMMENDATION

THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE

FOR

THE RATIFICATION OF OUR ENTRY INTO THE MERGER AGREEMENT
AND APPROVAL OF THE CONTEMPLATED MERGER.

**Vote Required**

Provided a quorum is present, the affirmative vote of a majority of the votes cast on the matter at our Annual Meeting other than votes cast with respect to shares held by, or held by an affiliate of, our interested directors, TIGI, our Sponsor or certain stockholders of our Property Managers, is required to ratify our entry into the Merger Agreement and our approval of the Merger as set forth above. For purposes of the vote on the approval, abstentions and broker non-votes will not be counted as votes cast and will have no effect on the vote, although, as mentioned, they will count toward the presence of a quorum.

60

## ELECTION OF DIRECTORS

PROPOSAL NO. 2: ELECTION OF SEVEN INDIVIDUALS TO SERVE AS DIRECTORS TO HOLD OFFICE UNTIL THE NEXT ANNUAL MEETING OF STOCKHOLDERS AND UNTIL THEIR SUCCESSORS ARE ELECTED AND QUALIFY.

Our Board currently consists of seven individuals. Although we are not listed on the New York Stock Exchange, all of the directors would satisfy the definition of "independent" under the New York Stock Exchange's listing standards, except for Robert D. Parks and Brenda G. Gujral.

The election of members of the Board is conducted on an annual basis. Each individual elected to the Board serves a one-year term and until his or her successor is elected and qualifies. Accordingly, the term of office of each of our current directors will expire at the Annual Meeting. At that meeting each current director will be nominated to stand for reelection as a director to hold office until our Annual Meeting to be held in 2008 and until his/her successor is elected and qualifies. We have no reason to believe that any of the nominees will be unable or unwilling to serve if elected. However, should any nominee be unable or unwilling to accept the office of director, and if the Board shall designate a substitute nominee, the persons named as proxies will vote for the election of the substitute nominee designated by the Board, and if none, for such other persons as they shall determine. Each current director has been a director since 2003. Information regarding the business experience of each nominee is provided below based upon information furnished to us by the individuals named.

### Nominees for Election as Directors

The following sets forth information with regard to the nominees for election to our Board.

| NAME, POSITIONS WITH IWEST AND AGE | BUSINESS EXPERIENCE |
|---|---|
| FRANK A. CATALANO, JR.<br><br>Director since 2003<br><br>Age 45 | **Frank A. Catalano, Jr.** has been one of our directors since our inception on March 5, 2003. He has served as president of Catalano & Associates since 1999. Catalano & Associates is a real estate company that includes brokerage, property management and rehabilitation and leasing of office buildings. Mr. Catalano's experience also includes mortgage banking. Since August 2007, he has been with HMC-Home Mortgages Co. From 2002 until August 2007, he was a vice president of American Home Mortgage Company. Prior to that, Mr. Catalano was a regional manager at Flagstar Bank. He also was president and chief executive officer of CCS Mortgage, Inc. from 1995 through 2000, when Flagstar Bank acquired it.<br><br>Mr. Catalano is a member of the Elmhurst, Illinois Chamber of Commerce and its past chairman of the board. He is also a member of the Elmhurst Jaycees, Elmhurst Hospital Board of Governors, Elmhurst Kiwanis and is currently the President of Elmhurst Historical Museum Commission. Mr. Catalano holds a mortgage broker's license. |
| KENNETH H. BEARD<br><br>Director since 2003<br><br>Age 67 | **Kenneth H. Beard** has been one of our independent directors since our inception on March 5, 2003. He is president and chief executive officer of Midwest Mechanical Group, a mechanical construction and service company. From 1999-2002 he was president and chief executive officer of Exelon Services, a subsidiary of Exelon Corporation, where he had responsibility for financial performance including being accountable for creating business strategy, growing the business through acquisition, integrating acquired companies and developing infrastructure for the combined acquired businesses. Prior to that position, from 1974 to 1999, Mr. Beard was the founder, president and |

chief executive officer of Midwest Mechanical, Inc., a heating, ventilation and air conditioning company providing innovative and cost effective construction services and solutions for commercial, industrial, and institutional facilities. From 1964 to 1974, Mr. Beard was employed by The Trane Company, a manufacturer of heating, ventilating and air conditioning equipment having positions in sales, sales management and general management.

Mr. Beard holds an MBA and a BSCE from the University of Kentucky and is a licensed mechanical engineer. He is chairman of the foundation board of the Wellness House in Hinsdale, Illinois, a cancer support organization and serves on the Dean's Advisory Council of the University of Kentucky, School of Engineering. Mr. Beard is a past member of the Oak Brook, Illinois Plan Commission (1981-1991) and a past board member of Harris Bank, Hinsdale, Illinois (1985-2004).

PAUL R. GAUVREAU

Director since 2003

Age 67

**Paul R. Gauvreau** has been one of our directors since our inception on March 5, 2003. He is the retired chief financial officer, financial vice president and treasurer of Pittway Corporation, a New York Stock Exchange listed manufacturer and distributor of professional burglar and fire alarm systems and equipment, at which was employed from 1966 until its sale to Honeywell, Inc. in 2001. He was president of Pittway's non-operating real estate and leasing subsidiaries through 2001. He was a financial consultant to Honeywell, Inc.; Genesis Cable, L.L.C.; and ADUSA, Inc. through 2004. He was a director and audit committee member of Cylink Corporation, a NASDAQ Stock Market listed manufacturer of voice and data security products from 1998 until its merger with Safenet, Inc. in February 2003.

Mr. Gauvreau holds an MBA from the University of Chicago and a BSC from Loyola University of Chicago. He is on the Board of Trustees and chairman of the finance committee of Benedictine University, Lisle, Illinois; and a member of the board of directors and vice president of the Children's Brittle Bone Foundation, Pleasant Prairie, Wisconsin.

GERALD M. GORSKI

Director since 2003

Age 64

**Gerald M. Gorski** has been one of our directors since July 1, 2003. He has been a partner in the law firm of Gorski and Good, Wheaton, Illinois, since 1978. Mr. Gorski's practice is limited to governmental law. His firm represents numerous units of local government in Illinois and Mr. Gorski has served as a Special Assistant State's Attorney and Special Assistant Attorney General in Illinois. He received a Bachelor of Arts degree from North Central College with majors in Political Science and Economics and a Juris Doctor degree from DePaul University Law School where he was placed on the Deans Honor List. Mr. Gorski serves as the Vice-Chairman of the Board of Commissioners for the DuPage Airport Authority. Further, Mr. Gorski has also served as Chairman of the Board of Directors of the DuPage National Technology Park. He has written numerous articles on various legal issues facing Illinois municipalities; has been a speaker at a number of municipal law conferences and is a member of the Illinois Bar Association, the Institute for Local Government Law and the International Municipal Lawyers Association.

62

BARBARA A. MURPHY

Director since 2003

Age 69

**Barbara A. Murphy** has been one of our directors since July 1, 2003. She is the Chairwoman of the DuPage Republican Party. Ms. Murphy is also a member of the Illinois Motor Vehicle Review Board and a member of the Matrimonial Fee Arbitration Board. Ms. Murphy is a Milton Township Trustee and a committeewoman for the Milton Township Republican Central Committee. Ms. Murphy previously served as State Central Committeewoman for the Sixth Congressional District and has also served on the DuPage Civic Center Authority Board, the DuPage County Domestic Violence Task Force, and the Illinois Toll Highway Advisory Committee. Ms. Murphy is a founding member of the Family Shelter Service Board. As an active volunteer for Central DuPage Hospital, she acted as the "surgery hostess" (cared for families while a family member was undergoing surgery). Ms. Murphy was a department manager and buyer for J.W. Robinson's and Bloomingdale's and the co-owner of Daffy Down Dilly Gift Shop prior to retiring in 1981.

ROBERT D. PARKS

Chairman and Director
since our formation in 2003

Age 63

**Robert D. Parks** has been our Chairman of the Board and a director since our inception on March 5, 2003. He is a director of TIGI and one of its four original principals; chairman of the board of our Sponsor, the parent of our Business Manager/Advisor, a director of Inland Securities Corporation, and a director of Inland Investment Advisors, Inc. Mr. Parks is chairman of the board and a director of Inland American Real Estate Trust, Inc. and president, chief executive officer and a director of Inland Real Estate Corporation, a New York Stock Exchange listed company. He is also a director of Inland Real Estate Exchange Corporation. .

Mr. Parks is responsible for the ongoing administration of existing investment programs, corporate budgeting and administration for Inland Real Estate Investment Corporation. He oversees and coordinates the marketing of all investments and investor relations

Prior to joining the Inland organization, Mr. Parks taught in Chicago's public schools. He received his B.A. Degree from Northeastern Illinois University and his M.A. Degree from the University of Chicago. He is a registered Direct Participation Program Limited Principal with the National Association of Securities Dealers. He is a member of the Real Estate Investment Association, the Financial Planning Association, the Foundation for Financial Planning as well as a member of the National Association of Real Estate Investment Trusts.

BRENDA G. GUJRAL

Chief Executive Officer since 2005 and
Director since our formation in 2003

Age 64

**Brenda G. Gujral,** our chief executive officer since 2005 and a director since our inception on March 5, 2003, is also president, chief operating officer and a director of our Sponsor. She is president, chief operating officer and a director of Inland Securities Corporation - a member firm of the National Association of Securities Dealers (NASD). Ms. Gujral is a director of Inland Investment Advisors, Inc.; chairman of the board of Inland Real Estate Exchange Corporation; and president and a director of Inland American Real Estate Trust, Inc.

Ms. Gujral has been with the Inland organization for twenty-six years, becoming an officer in 1982. Prior to joining Inland, she worked for the Land Use Planning Commission establishing an office in Portland, Oregon, to implement land use legislation for that state. She is a graduate of California State University. She holds Series 7, 22, 39 and 63 licenses from the NASD and she is a licensed real estate salesperson. Ms. Gujral is a member of the National Association of Real Estate Investment Trusts, the Financial Planning Association, the Foundation for Financial Planning and the National Association for Female Executives.

THE BOARD'S RECOMMENDATION

THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE

FOR

FRANK A. CATALANO, JR.,
KENNETH H. BEARD,
PAUL R. GAUVREAU,
GERALD M. GORSKI,
BARBARA A. MURPHY,
ROBERT D. PARKS and
BRENDA G. GUJRAL

ITS NOMINEES FOR ELECTION AS DIRECTORS

TO SERVE UNTIL THE NEXT ANNUAL MEETING OF STOCKHOLDERS

AND UNTIL THEIR SUCCESSORS ARE ELECTED AND QUALIFY.

**Vote Required**

The vote of a majority of the shares of our stock entitled to vote, present in person or by proxy at a meeting at which a quorum is present, is necessary for the election of each of the seven directors to be elected at the Annual Meeting. There are no cumulative voting rights in the election of directors. For purposes of the election of directors, abstentions and broker non-votes will have the effect of votes against the proposal, although, as mentioned, they will count toward the presence of a quorum.

**Board Meetings in 2006**

Our Board met 15 times during 2006. Each director attended more than 75% of the total number of meetings of the Board and each Committee on which he or she served. We do not have a policy with regard to Board members' attendance at annual stockholder meetings. However, each director attended the 2006 annual meeting.

**Committees of the Board of Directors**

Our bylaws provide that our Board may establish such committees as the Board believes appropriate. The Board will appoint the members of the committee in the Board's discretion.

Our Board has established an Audit Committee comprised of Messrs. Beard, Gauvreau and Gorski. Mr. Gauvreau serves as the chair of the Audit Committee and qualifies as our "financial expert" under the SEC rules. Although we are not listed on the New York Stock Exchange, each of these three directors would satisfy the definition of "independent" under the New York Stock Exchange's listing standards.

The Audit Committee is responsible for the engagement of our independent registered public accounting firm, reviewing the plans and results of the audit engagement with our independent registered public accounting firm, approving services performed by and the independence of our independent registered public accounting firm, considering the range of audit and non-audit fees, and consulting with our independent registered public accounting firm regarding the adequacy of our internal accounting controls. The Audit Committee held five meetings in 2006.

64

Our Board may establish such other committees as it deems necessary and appropriate. Although we do not have a standing nominating committee or compensation committee of the Board, the Board itself serves in those capacities. Although the Board is responsible for any compensation decisions, it does not act under a charter specifically for compensation purposes.

## Compensation Committee Interlocks and Insider Participation

We have no Compensation Committee. As we have no employees, there are no compensation decisions to be made by a compensation committee. During the year ended December 31, 2006, none of our executive officers served as a director or a member of the compensation committee of any entity that has one or more executive officers serving as a member of our Board.  After consummation of the Merger, the Board intends to establish a Compensation Committee.

## Nominating Committee

Our Board does not currently have a nominating committee nor is there a nominating committee charter. Rather, each member of our Board participates in the process of identifying and considering individuals for Board membership. Our Board believes its current process is effective since the current members of the Board are seasoned executives from a variety of backgrounds. If we were a listed company, each member of our Board would satisfy the independence requirements under the New York Stock Exchange's listing standards, other than Messrs. Parks and Ms. Gujral. The Board will consider for recommendation to the Board nominations made by stockholders that comply with the procedures described below under the caption "Advance Notice Procedures for Making Director Nominations and Stockholder Proposals."

Once one of the members of our Board has identified a possible nominee (whether through a recommendation from a stockholder or otherwise), the Board makes an initial determination as to whether to conduct a full evaluation of the candidate. This initial determination is based on the information provided to the Board when the candidate is recommended, the Board's own knowledge of the prospective candidate and information, if any, obtained by the Board's inquiries. The preliminary determination is based primarily on the need for additional Board members to fill vacancies, expand the size of the Board or obtain representation in market areas without Board representation and the likelihood that the candidate can satisfy the evaluation factors described below. If the members of the Board determine that additional consideration is warranted, the Board may gather additional information about the candidate's background and experience. The members of the Board then evaluate the prospective nominee against the following standards and qualifications:

- Achievement, experience and independence;

- Wisdom, integrity and judgment;

- Understanding of the business environment; and

- Willingness to devote adequate time to Board duties.

The members of the Board also consider such other relevant factors as they deem appropriate, including the current composition of the Board, the need for audit committee or other expertise and the evaluations of other candidates. In connection with this evaluation, the members of the Board determine whether to interview the candidate. If the members of the Board decide that an interview is warranted, one or more of those members, and others as appropriate, interview the candidate in person or by telephone. After completing this evaluation and interview, the full Board would nominate such candidates for election.

The nominees, which are the current directors, were not recommended to the Board by a security holder, third party search firm or any other source.

65

**Audit Committee Report**

The Audit Committee of the Board is responsible for providing independent, objective oversight of our accounting functions and internal controls. The Audit Committee is composed of three directors. Although we are not listed on the New York Stock Exchange, each of these three directors would satisfy the definition of "independent" under the New York Stock Exchange's listing standards. The Audit Committee operates under a written charter approved by the Board. A copy of the charter is available on our website at www.inlandwestern.com.

Management is responsible for our internal controls and financial reporting process. The independent registered public accounting firm is responsible for performing an independent audit of our consolidated financial statements and an audit of the effectiveness of our internal control over financial reporting as of December 31, 2006, in accordance with the standards of the Public Company Accounting Oversight Board (United States) and to issue reports thereon. The Audit Committee's responsibility is to monitor and oversee these processes.

In connection with these responsibilities, the Audit Committee met with management and the independent registered public accounting firm to review and discuss the December 31, 2006 audited financial statements and management's assessment of the effectiveness of internal control over financial reporting. The Audit Committee also discussed with the independent registered public accounting firm the matters required by Statement on Auditing Standards No. 61 (Communication with Audit Committees). The Audit Committee also received written disclosures and the letters from the independent registered public accounting firm required by Independence Standards Board Standard No. 1 (Independent Discussions with Audit Committees), and the Audit Committee discussed with the independent registered public accounting firm that firm's independence.

Based upon the Audit Committee's discussions with management and the independent registered public accounting firm, and the Audit Committee's review of the representations of management and the independent registered public accounting firm, the Audit Committee recommended that the Board include the audited consolidated financial statements in our Annual Report on Form 10-K, as amended, for the year ended December 31, 2006, filed with the SEC.

The members of the Audit Committee of our Board are:

> Kenneth H. Beard
> Paul R. Gauvreau
> Gerald M. Gorski

**Stockholder Communications**

We have not adopted a formal process for stockholder communications with our Board. Every effort has been made to ensure that the views of stockholders are heard by our Board or individual directors, as applicable, and that appropriate responses are provided to stockholders in a timely manner. Stockholders are free to contact any director or executive officer directly by writing in care of us, or by writing to Ms. Roberta S. Matlin, our Vice President and Secretary, at 2901 Butterfield Road, Oak Brook, IL 60523, or by sending an email to Ms. Matlin at matlin@inlandgroup.com. Stockholders can contact the Audit Committee directly by sending a letter to Mr. Paul Gauvreau, in care of us at 2901 Butterfield Road, Oak Brook, IL 60523.

All communications received as set forth in the preceding paragraph will be opened by the office of the Vice President for the sole purpose of determining the nature of the communications. Communications that constitute advertising, promotions of a product or service, or patently offensive material will not be forwarded to the directors. Other communications will be forwarded promptly to the addressee or addressees.

66

## OUR EXECUTIVE OFFICERS

**Our Affiliation with The Inland Real Estate Group of Companies, Inc.**

TIGI, together with its subsidiaries and their affiliates, which we refer to collectively as Inland Affiliated Companies, is a fully integrated real estate company providing property management, leasing, marketing, acquisition, disposition, development, redevelopment, syndication, renovation, construction, finance and other related services. We operate under the direction of our Board which is responsible for our business and management, and sets our policies and strategies. IREIC, a subsidiary of TIGI, is our Sponsor and organizer. Our Business Manager/Advisor is a wholly-owned subsidiary of our Sponsor and is responsible for the day-to-day management of our affairs and the implementation of the policies of our Board. Inland Securities Corporation, an Inland Affiliated Company, was the Managing Dealer of our initial and subsequent public offering. Inland Securities was formed in 1984 and is qualified to do business as a securities broker-dealer throughout the United States and is registered in Puerto Rico, Guam, and as of 2005 as a foreign broker-dealer in Ontario. Since its formation, Inland Securities has provided the marketing function for distribution of the investment products sponsored by our Sponsor. Inland Securities does not render such services to anyone other than Inland Affiliated Companies. Our Property Managers, which are owned principally by individuals affiliated with Inland, are responsible for collecting rent, leasing and maintaining the individual properties we own. IREA, also an Inland Affiliated Company, has extensive experience in acquiring real estate for investment and is responsible for acquiring properties. Inland Risk and Insurance Management Services, Inc., is responsible for providing insurance coverage on our properties. Inland Mortgage Corporation, Inland Mortgage Servicing Corporation and Inland Mortgage Investment Corporation, are responsible for the placing, negotiating and servicing of our mortgages. Our senior management includes executives of the previously mentioned Inland Affiliated Companies, including our Sponsor. In addition, we have agreements with our Business Manager/Advisor and the Property Managers to pay certain compensation to them and other Inland Affiliated Companies for services provided to us, of which the agreement with our Business Manager/Advisor will be terminated upon consummation of the Merger. See "Certain Relationships and Related Transactions" below.

**Biographies of our Executive Officers**

Our executive officers are appointed by, and serve at the discretion of, the Board. They will continue to serve in their respective offices until they resign or their successors are elected and qualify. There is no family relationship between any of our executive officers and any of our directors or nominated directors. None of our executive officers has a written severance agreement with us. We have entered into employment agreements with Michael J. O'Hanlon, Steven P. Grimes, Shane C. Garrison, and Niall J. Byrne that will become effective upon the closing. See "The Merger — Ancillary Agreements — Employment Agreements" for a further discussion of these employment agreements. The following sets forth information regarding our executive officers, with ages set forth as of January 1, 2007:

| NAME, POSITIONS WITH IWEST AND AGE | BUSINESS EXPERIENCE |
|---|---|
| ROBERT D. PARKS<br>Chairman and<br>Director since our<br>formation in 2003<br><br>Age 63 | The biography of Mr. Parks is included above under "Election of Directors – Nominees for Election as Directors." |
| ROBERTA S. MATLIN<br>Vice President of Administration<br>since our formation in 2003 and Secretary<br>since August 2007 | **Roberta S. Matlin** joined our Sponsor in 1984 as director of investor administration and currently serves as senior vice president of our Sponsor, directing its day-to-day internal operations. Ms. Matlin is a director of our Sponsor, a director and president of Inland Investment Advisors, Inc., and Interest |

67

Age 62

Southern Real Estate Corporation, and a director and vice president of Inland Securities Corporation. She is the president of Inland American Advisory Services, Inc. Since 2003, she has been our vice president of administration and since 2004, vice president of administration of Inland American Real Estate Trust, Inc. She was vice president of administration of Inland Real Estate Corporation from 1995 until 2000 and of Inland Retail Real Estate Trust, Inc. from 1998 until 2004. From June 2001 until April 2004, she was a trustee and executive vice president of Inland Mutual Fund Trust. Prior to joining the Inland organization, she worked for the Chicago Region of the Social Security Administration of the United States Department of Health and Human Services. Ms. Matlin is a graduate of the University of Illinois. She holds Series 7, 22, 24, 39, 63 and 65 licenses from the National Association of Securities Dealers, Inc.

STEVEN P. GRIMES

Treasurer and Principal Financial Officer since 2004

Age 40

**Steven P. Grimes** joined our Sponsor as chief financial officer of our Business Manager/Advisor, in February 2004. Since that time, Mr. Grimes has held the positions of our principal financial officer and treasurer. During his time as principal financial officer, Mr. Grimes has overseen the acquisition of over $7.7 billion in real estate assets and over $4.2 billion in financings and has led our Sarbanes-Oxley compliance efforts. Prior to joining the Inland organization, Mr. Grimes was a director with Cohen Financial, a mortgage brokerage firm, and was a senior manager with Deloitte in their Chicago-based real estate practice. Mr. Grimes received his B.S. Degree in Accounting from Indiana University and is a Certified Public Accountant (CPA). Mr. Grimes is a member of the AICPA and the Illinois CPA Society. Previously Mr. Grimes has served on accounting subcommittees of National Council of Real Estate Investment Fiduciaries and Pension Real Estate Association.

BRENDA G. GUJRAL

Chief Executive Officer since 2005 and Director since our formation in 2003

Age 64

The biography of Ms. Gujral is included above under "Election of Directors – Nominees for Election as Directors."

68

## COMPENSATION PAID TO OUR DIRECTORS AND OFFICERS

**Director Compensation**

BASE COMPENSATION.  With the exception of Mr. Parks and Ms. Gujral, we pay each of our directors an annual fee of $15,000. In addition, with the exception of Mr. Parks and Ms. Gujral, each director receives $500 for attending in person, or $350 for attending by telephone, each meeting of our Board and $1,000 for attending, whether in person or via telephone, special meetings. Messrs. Beard, Gauvreau and Gorski are members of the Audit Committee and each receive $750 for attending an audit committee meeting in person or $500 for attending via telephone.  Messrs. Beard, Gauvreau and Gorski and Ms. Murphy are the members of the special committee and receive $1,000 for attending each meeting of the special committee.

INDEPENDENT DIRECTOR STOCK OPTION PLAN. We have an Independent Director Stock Option Plan under which non-employee directors, as defined under Rule 16b-3 of the Exchange Act are eligible to participate.  Only those directors who are not employees of TIGI or Inland are eligible to participate in this plan.

We have authorized and reserved a total of 75,000 shares of our common stock for issuance under our Independent Director Stock Option Plan. The number and type of shares which could be issued under the plan may be adjusted if we are the surviving entity after a reorganization or merger or if our stock splits or is consolidated or we are recapitalized. If this occurs, the exercise price of the options will be correspondingly adjusted.

Under our Independent Director Stock Option Plan, each non-employee director is entitled to be granted an option to acquire 3,000 shares as of the date they become a director and an option to acquire an additional 500 shares on the date of each annual stockholders' meeting, commencing with the annual meeting in 2004, so long as the director remains a member of the Board on such date. The options for the initial 3,000 shares are all currently exercisable. The options granted as of each annual stockholders' meeting become fully exercisable on the second anniversary of the date of grant.  Options granted will be exercisable at $8.95 per share. As of December 31, 2006, no options to acquire shares had been exercised or expired and options to acquire 22,500 shares were outstanding.

Options granted under the Independent Director Stock Option Plan are exercisable until the first to occur of:

- the tenth anniversary of the date of grant,

- the removal for cause of the director as a director, or

- three months following the date the director ceases to be a director for any other reason except death or disability.

The options may be exercised by payment of cash or through the delivery of our common stock. They are generally exercisable in the case of death or disability for a period of one year after death or the disabling event, provided that the death or disabling event occurs while the person is a director. However, if the option is exercised within the first six months after it becomes exercisable, any shares issued pursuant to such exercise may not be sold until the six month anniversary of the date of the grant of the option. Notwithstanding any other provisions of the Independent Director Stock Option Plan to the contrary, no option issued pursuant thereto may be exercised if such exercise would jeopardize our status as a REIT under the Code.

No option may be sold, pledged, assigned or transferred by a director in any manner otherwise than by will or by the laws of descent or distribution.

Upon our dissolution, liquidation, reorganization, merger or consolidation as a result of which we are not the surviving corporation, or upon sale of all or substantially all of our property, the Independent Director Stock Option Plan will terminate, and any outstanding unexercised options will terminate and be forfeited. However, holders of options may exercise any options that are otherwise exercisable immediately prior to the dissolution,

69

liquidation, consolidation or merger. Additionally, our Board may provide for any or all of the following alternatives:

- for the assumption by the successor corporation of the options previously granted or the substitution by the corporation for the options covering the stock of the successor corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of shares and exercise prices;

- for the continuance of the Independent Director Stock Option Plan by such successor corporation in which event the Independent Director Stock Option Plan and the options will continue in the manner and under the terms so provided; or

- for the payment in cash or common stock in lieu of and in complete satisfaction of the options.

The following table sets forth a summary of the compensation we paid to our directors during 2006:

| Name (a) | Fees Earned or Paid in Cash ($) (b) | Stock Awards ($) (c) | Option Awards ($) (d) | Non-Equity Incentive Plan Compensation ($) (e) | Change in Pension Value and Nonqualified Deferred Compensation Earnings (f) | All Other Compensation ($) (g) | Total ($) (h) |
|---|---|---|---|---|---|---|---|
| Frank A. Catalano, Jr. | 30,200 | — | 350 | — | — | — | 30,550 |
| Kenneth H. Beard | 33,750 | — | 350 | — | — | — | 34,100 |
| Paul R. Gauvreau | 37,850 | — | 350 | — | — | — | 38,200 |
| Gerald M. Gorski | 34,950 | — | 350 | — | — | — | 35,300 |
| Barbara A. Murphy | 31,250 | — | 350 | — | — | — | 31,600 |
| Robert D. Parks (1) | — | — | — | — | — | — | — |
| Brenda G. Gujral (1) | — | — | — | — | — | — | — |

(1)  Mr. Parks and Ms. Gujral do not receive any fees or other remuneration for serving as our directors.

**Report of Directors on Compensation**

As discussed above, we have no employees and no Compensation Committee.

**Compensation Discussion and Analysis**

We have no employees and our executive officers do not receive any compensation in any form (either cash, equity awards or perquisites) from us for their services as our officers. Our executive officers are employees of one or more of the Inland Affiliated Companies with whom we have agreements to pay fees for services provided to us. The fees we pay to those entities are determined on an aggregate basis and we believe that the amount of fees do not directly determine the compensation ultimately paid to our executive officers (in their capacities as employees of one or more of the Inland Affiliated Companies, not in their capacities as executive officers of ours) by the relevant Inland Affiliated Company. Rather, our executive officers are compensated by the relevant Inland Affiliated Company, in part, for the services rendered by those individuals to us. We however have not been contacted by our Business Manager/Advisor or it affiliates with respect to, and have not had any input into, these compensation decisions. We pay our Business Manager/Advisor and its affiliates (which are Inland Affiliated Companies) fees for services provided to us by those entities, and those entities (none of which we own or control) determine how to use

70

those fees for compensating their employees, among other uses. Such fees are described below under "Certain Relationships and Related Transactions."

We do not own or control our Business Manager/Advisor and its affiliates. As such, we do not have any input into how they pay our executive officers in their capacities as employees or for services rendered for our business. Similarly, we do not know (or have control over) what the objectives of our Business Manager/Advisor and its affiliates are with respect to their compensation programs, what those compensation programs are designed to reward, what elements are included in those compensation programs, why those entities chose to pay each element included in their compensation programs, how those entities determine the amount (and, where applicable, the formula) for each element to pay, or how each compensation element and those entities' decisions regarding that element fit into those entities' overall compensation objectives and affect decisions regarding other elements. Further we do not currently have any policies, procedures or guidelines in place regarding employee compensation. We do not know what role if any our executive officers play in executive compensation decisions.  After consummation of the Merger, the Board intends to establish a Compensation Committee.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

*Transactions with Affiliates*

Our charter restricts transactions between us and our Business Manager/Advisor, Sponsor and any director or their affiliates as follows:

- ***Sales to Us.***  We cannot purchase property from our Sponsor, Business Manager/Advisor, directors or any of their affiliates, unless a majority or our independent directors approves it as fair and reasonable for us.  The price to us can be no greater than the cost of the asset to our Sponsor, Business Manager/Advisor, director or their affiliate.  If the price to us is greater than such cost, there must be substantial, reasonable justification for the excess cost.  In no event will our cost for the property exceed its appraised value at the time we acquired it.

- ***Sales to Sponsor, Business Manager/Advisor, Director or any Affiliate.***  Our Sponsor, Business Manager/Advisor, directors or any of their affiliates will not acquire assets from us unless a majority of independent directors approves the transaction as being fair and reasonable to us.

- ***Loans.***  We cannot make loans to our Sponsor, Business Manager/Advisor, directors, or any of their affiliates, or to our wholly owned subsidiaries except where we obtain an appraisal of the underlying property from an independent expert and where the mortgage indebtedness will not exceed the property's appraised value. Also, we may not borrow money from our Sponsor, Business Manager/Advisor, director or any of their affiliates, unless a majority of our independent  directors approves the transaction as fair, competitive and commercially reasonable and no less favorable to us than loans between unaffiliated parties under the same circumstances.

- ***Investments.***  We cannot invest in joint ventures with our Sponsor, Business Manager/Advisor, directors or any of their affiliates, unless a majority of our independent directors approves the transaction as fair and reasonable to us and on substantially the same terms and conditions as those received by the other joint ventures. We cannot invest in equity securities of related parties unless a majority of our independent directors approves the transaction as being fair, competitive and commercially reasonable.

- ***Other Transactions.***  All other transactions between us and our Sponsor, Business Manager/Advisor, directors or any of their affiliates, require approval by a majority of our independent directors as being fair and reasonable and on terms and conditions not less favorable to us than those available from unaffiliated third parties.

71

*Services Provided by Affiliates of Our Business Manager/Advisor*

During the offering periods, our Business Manager/Advisor and its affiliates were entitled to reimbursement for salaries and expenses of employees of our Business Manager/Advisor and its affiliates relating to our offerings. In addition, an affiliate of our Business Manager/Advisor was entitled to receive selling commissions, a marketing contribution and due diligence expense allowance from us in connection with the offerings. Such offering costs were offset against the stockholders' equity accounts. Such costs totaled $444.5 million at June 30, 2007 and December 31, 2006. Pursuant to the terms of the offerings, our Business Manager/Advisor guaranteed payment of all public offering expenses (excluding sales commissions, marketing contribution and due diligence expense allowance) in excess of 5.5% of the gross proceeds of the offering or all organization and offering expenses (including selling commissions) which together exceed 15% of gross proceeds. Offering costs did not exceed the 5.5% and the 15% limitations.

Our Business Manager/Advisor and its affiliates are entitled to reimbursement for general and administrative costs relating to our administration and acquisition of properties. The costs of these services are included in general and administrative expenses. During the three months ended June 30, 2007 and 2006, we incurred $1.5 million and $697,000, respectively, of these costs. Costs of $3.1 million and $1.6 million were incurred during the six months ended June 30, 2007 and 2006, respectively. Of these costs, $869,000 and $667,000 remained unpaid as of June 30, 2007 and December 31, 2006, respectively.

An affiliate of our Business Manager/Advisor provides investment advisory services to us related to our securities investments for an annual fee. The fee is incremental based upon the aggregate amount of assets invested. Based upon our assets invested at June 30, 2007, the fee was equal to 0.75% per annum (paid monthly) of aggregate assets invested. We incurred fees totaling $570,000 and $483,000 for the three months ended June 30, 2007 and 2006, respectively, and $1.1 million and $885,000 for the six months ended June 30, 2007 and 2006, respectively. As of June 30, 2007 and December 31, 2006, $376,000 and $362,000, respectively, of such costs remained unpaid.

An affiliate of our Business Manager/Advisor provides loan servicing to us for an annual fee. Effective May 1, 2005, the agreement stipulated that if the number of loans being serviced exceeded one hundred, a monthly fee was charged in the amount of $190 per month, per loan being serviced. Effective April 1, 2006, the agreement was amended so that if the number of loans being serviced exceeded one hundred, a monthly fee of $150 per month, per loan is charged. Effective May 1, 2007, the agreement was again amended so that if the number of loans being serviced exceeds two hundred a monthly fee of $125 per month, per loan is charged. Such fees totaled $150,000 and $165,000 for the three months ended June 30, 2007 and 2006, respectively. Fees totaled $321,000 and $361,000 for the six months ended June 30, 2007 and 2006, respectively. As of June 30, 2007 and December 31, 2006, $6,000 and $24,000, respectively, remained unpaid.

We use the services of an affiliate of our Business Manager/Advisor to facilitate the mortgage financing that we obtain on some of the properties purchased. We pay the affiliate 0.2% of the principal amount of each loan obtained on our behalf. Such costs are capitalized as loan fees and amortized over the respective loan term as a component of interest expense. For the three months ended June 30, 2007 and 2006, we paid loan fees totaling $196,000 and $339,000, respectively, to this affiliate. For the six months ended June 30, 2007 and 2006, we paid loan fees totaling $785,000 and $773,000, respectively, to this affiliate. As of June 30, 2007 and December 31, 2006, none remained unpaid.

Although our Business Manager/Advisor can charge us an asset management fee of up to 1% of our average invested assets, our Business Manager/Advisor has never charged us more than .53% of our average invested assets. Average invested asset value is defined as the average of the total book value, including acquired intangibles, of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt or other similar non-cash reserves. We compute the average invested assets by taking the average of these values at the end of each month for which the fee is being calculated. The fee is payable quarterly in an amount equal to ¼ of 1% of our average invested assets as of the last day of the immediately preceding quarter. Based upon the maximum allowable advisor asset management fee of 1% of our average invested assets, maximum fees of $19.1 million and $18.7 million were allowed for the three months ended June 30, 2007 and 2006, respectively, and $38.7 million and $36.7 million for the six months ended June 30, 2007 and 2006, respectively. We accrued actual fees to our Business Manager/Advisor totaling $9.5 million and $10.5 million for the three

72

months ended June 30, 2007 and 2006, respectively, and $9.5 million and $20.0 million for the six months ended June 30, 2007 and 2006, respectively. The Business Manager/Advisor elected not to be paid an advisor asset management fee for the three months ended March 31, 2007. As of June 30, 2007 and December 31, 2006, $9.5 million and $9.0 million, respectively, remained unpaid. The Business Manager/Advisor has agreed to forego any fees allowed but not taken on an annual basis. For any year in which we qualify as a REIT, our Business Manager/Advisor must reimburse us for the following amounts, if any: (1) the amounts by which total operating expenses, the sum of the advisor asset management fee plus other operating expenses paid during the previous fiscal year exceed the greater of: (i) 2% of average assets for that fiscal year, or (ii) 25% of net income for that fiscal year; plus (2) an amount, which will not exceed the advisor asset management fee for that year, equal to any difference between the total amount of distributions to stockholders for that year and a 6% minimum annual return on the net investment of stockholders. Our Business Manager/Advisor has not been required to reimburse us for any such amounts to date.

The Property Managers, entities owned principally by individuals who are affiliates of our Business Manager/Advisor, are entitled to receive property management fees totaling 4.5% of gross operating income, for management and leasing services. We incurred property management fees of $7.7 million and $7.3 million for the three months ended June 30, 2007 and 2006, respectively. Fees of $16.3 million and $14.5 million were incurred for the six months ended June 30, 2007 and 2006, respectively. As of June 30, 2007 and December 31, 2006, $2.4 million and none remained unpaid.

As of June 30, 2007, we were due funds from affiliates of $300,000 for costs paid by us on their behalf.

In 2005, we entered into a subscription agreement with Minto Builders (Florida), Inc., or MB REIT, an entity consolidated by one of our affiliates, Inland American Real Estate Trust, Inc., or Inland American, to purchase newly issued series C preferred shares at a purchase price of $1,276 per share for a total cost of $300.0 million. Under the agreement, MB REIT had the right to redeem any series C preferred shares it issued to us with the proceeds of any subsequent capital contributed by Inland American at $1,276 per share. MB REIT was required to redeem any and all outstanding series C preferred shares held by us by December 31, 2006 and did so during the fourth quarter of 2006, redeeming a total of $264.0 million we had invested. The series C preferred shares, while outstanding, entitled us to an annual dividend equal to 7.0% on the face amount of the series C preferred shares, which was paid monthly. We earned $4.6 million and $9.2 million in dividend income related to this investment during the three and six months ended June 30, 2006.

We entered into an arrangement with Inland American whereby we were paid to guarantee customary non-recourse carve out provisions of Inland American's financings until such time as Inland American reached a net worth of $300.0 million. The fee arrangement called for a fee of $50,000 annually for loans equal to and in excess of $50.0 million and $35,000 annually for loans less than $50.0 million. We recorded fees totaling $47,000 and $98,000 for the three and six months ended June 30, 2006, all of which had been received as of that date. We were released from all obligations under this arrangement during 2006.

In October 2005, an affiliate of ours acquired a freestanding office building leased to the General Services Administration (GSA) for the U.S. Joint Force Command. We provided the initial financing of approximately $24.3 million for the affiliate to acquire the property. The loan was repaid in full including accrued interest on December 6, 2005.

During 2004, our Sponsor advanced funds to us for a portion of distributions paid to our stockholders until funds available for distributions were sufficient to cover the distributions. Our Sponsor forgave $2.4 million of these amounts during the second quarter of 2004 and these funds were no longer due and were recorded as a contribution to capital in the accompanying consolidated financial statements. As of December 31, 2004, we owed funds to our Sponsor in the amount of $3.5 million for repayment of the funds advanced for payment of distributions. These funds were repaid in their entirety during 2005 and no funds were due to our Sponsor as of December 31, 2005. No funds were advanced during 2005 or 2006.

73

## DESCRIPTION OF OUR SECURITIES

We are currently authorized to issue 650,000,000 shares of capital stock comprised of 640,000,000 shares of common stock, $.001 par value per share, and 10,000,000 shares of preferred stock, $.001 par value per share. Our Board has fixed the close of business on August 31, 2007, as the record date for determining stockholders of record entitled to notice of, and to vote at, the Annual Meeting.  As of the record date, we have issued 451,339,585 shares of common stock and reserved 75,000 shares of common stock for issuance pursuant to the exercise of options granted by us. If the Merger is ratified by the stockholders, we will issue approximately 37,500,000 shares of common stock in accordance with the terms of the Merger Agreement.

Stockholders have no preemptive rights to purchase or subscribe for our securities, and our common stock is not convertible or subject to redemption at our option. Each share of common stock is entitled to one vote and shares do not have cumulative voting rights. Subject to the rights of the holders of any class of our capital stock having any preference or priority over our common stock, our common stockholders are entitled to distributions in such amounts as may be authorized by our Board and declared by us from time to time out of funds legally available for such payments and, in the event of liquidation, to share ratably in any of our assets remaining after payment in full of all creditors and provisions for any liquidation preferences on any outstanding preferred stock. We may, at the discretion of our Board, authorize the listing of our common stock on a national securities exchange or market.

Our Board, without further action by our stockholders, is authorized to issue up to 10,000,000 shares of preferred stock in one or more series and to determine and fix, as to any series, all the relative rights and preferences of shares including, without limitation, preferences, limitations or relative rights with respect to redemption rights, conversion rights, if any, voting rights, if any, dividend rights and preferences on liquidation.

All of the foregoing information about our securities will apply to the approximately 37,500,000 shares of our common stock to be issued if our stockholders ratify our entry into the Merger Agreement and the Merger, and the Merger is consummated.

The general effect of the proposed issuance of approximately 37,500,000 shares of our common stock in connection with the Merger upon the rights of existing security holders is that such existing holders will be diluted in proportion to the newly issued shares.

For additional information relating to our securities, please see "The Merger," "Index to Financial Statements" and the following financial information sections in this proxy statement.

74

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL
## OWNERS AND MANAGEMENT

The following table sets forth information as of August 1, 2007 regarding the number and percentage of shares beneficially owned by: (i) each director; (ii) each executive officer; (iii) all directors and executive officers as a group; and (iv) any person known to us to be the beneficial owner of more than 5% of our outstanding shares. As of August 1, 2007, no stockholder beneficially owned more than 5% of our outstanding shares.  As of August 1, 2007 we had over 115,000 stockholders of record and 450,546,425 shares of common stock outstanding.

| Name and Address Of Beneficial Owner (1) | Number Of Shares Beneficially Owned (2) | Percent Of Class |
|---|---|---|
| Robert D. Parks | 180,825.2503(3) | * |
| Brenda G. Gujral | — | * |
| Kenneth H. Beard | 63,320.1958(4) | * |
| Frank A. Catalano, Jr. | 7,147.9662(4) | * |
| Paul R. Gauvreau | 115,731.8440(4) | * |
| Gerald M. Gorski | 6,375.2784(4) | * |
| Barbara A. Murphy | 4,000.0000(4) | * |
| Roberta S. Matlin | 325.8398 | * |
| Steven P. Grimes | — | * |
| All Directors and Executive Officers as a group (9 persons) | 377,726.3745(3) | * |

* Less than 1%

(1)   The address of each of the persons listed above is 2901 Butterfield Road, Oak Brook, IL  60523.

(2)   Beneficial ownership includes outstanding shares and shares which are not outstanding that any person has the right to acquire within 60 days after the date of this table. However, any such shares which are not outstanding are not deemed to be outstanding for the purpose of computing the percentage of outstanding shares beneficially owned by any other person. Except as indicated in the footnotes to this table and pursuant to applicable community property laws, the persons named in the table have sole voting and investing power with respect to all shares beneficially owned by them.

(3)   Includes 20,000 shares owned by our Sponsor.  Mr. Parks is a control person of our Sponsor and disclaims beneficial ownership of the shares owned by our Sponsor.

(4)   Includes 4,000 shares issuable upon exercise of options granted under our independent director stock option plan, to the extent that such options are currently exercisable or will become exercisable within 60 days after the date of this table.

*Equity Compensation Plan Information*

The following table sets forth the following information as of December 31, 2006: (i) the number of shares of our common stock to be issued upon the exercise of outstanding options, warrants and rights, (ii) the weighted-average exercise price of such options, warrants and rights and (iii) the number of shares of our common stock

75

remaining available for future issuance under our equity compensation plans, other than the outstanding options, warrants and rights described above.

| Plan Category | Number of Securities to be Issued upon Exercise of Outstanding Options, Warrants and Rights (a) | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights (b) | Number of Securities Remaining Available for Future Issuance under Equity Compensation Plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| Equity Compensation Plans Approved by Security Holders | — | — | — |
| Equity Compensation Plans Not Approved by Security Holders | 22,500 | $ 8.95 | 52,500 |

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Exchange Act requires our officers and directors, and persons who own more than 10% of our outstanding shares, to file statements of beneficial ownership and changes in beneficial ownership of our shares with the SEC and to furnish us with copies of all statements they file. Based solely on a review of the forms we have received and on written representations from certain reporting persons that no such forms were required for them, we believe that during 2006 all Section 16 filing requirements applicable to our officers, directors and greater than 10% beneficial owners were complied with by such persons.

## RATIFICATION OF APPOINTMENT OF INDEPENDENT REGISTERED
## PUBLIC ACCOUNTING FIRM FOR 2007

PROPOSAL NO. 3: RATIFICATION OF THE APPOINTMENT OF KPMG LLP AS OUR INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE 2007 FISCAL YEAR.

KPMG LLP has served as our independent registered public accounting firm since our formation in 2003, and our management believes that they are knowledgeable about our operations and accounting practices and are well qualified to act as our independent registered public accounting firm. Therefore, the Board, upon the recommendation of its audit committee, has appointed KPMG LLP to act as our independent registered public accounting firm to examine our consolidated financial statements for the 2007 fiscal year. Although our appointment of independent registered public accounting firm does not require your approval, we believe it is desirable to obtain your concurrence with our appointment.

One or more representatives of KPMG LLP are expected to be present at the Annual Meeting. They will have the opportunity to make a statement if they desire to do so and will be available to respond to appropriate questions.

**Principal Accounting Fees and Services**

The following table presents fees for professional audit services rendered by KPMG LLP for the audit of our annual financial statements for 2006 and 2005, and fees for other services rendered by it:

|  | Fiscal Year 2006 | Fiscal Year 2005 |
|---|---|---|
| Audit Fees (1) | $ 882,700 | $ 747,400 |
| Audit Related Fees (2) | — | 475,346 |
| Tax Fees (3) | 203,150 | 141,200 |
| All Other Fees | — | — |
| Total Fees | $ 1,085,850 | $ 1,363,946 |

(1)     Audit fees include the financial statement and internal controls over financial reporting audit fees.

(2)     Audit related fees include the review of documents and issuance of accountant's consent related to documents filed with the SEC and audits related to Rule 3-14 of Regulation S-X.

(3)     Tax fees consist of fees for review of federal and state income tax returns.

The audit committee reviews and approves in advance the terms of and compensation for both audit and nonaudit services to be provided by KPMG LLP. This duty has been delegated to the Chairman of the audit committee with any such preapproval reported to the audit committee at its next regularly scheduled meeting. Approval of nonaudit services will be disclosed in periodic reports required by Section 13(a) of the Exchange Act. Prohibited Non-Audit Services shall be as set forth in the rules promulgated by the SEC, including:  (i) bookkeeping or other services related to the accounting records or financial statements of the audit client; (ii) financial information systems design and implementation; (iii) appraisal or valuation services, providing fairness opinions or preparing contribution-in-kind reports; (iv) actuarial services; (v) internal audit outsourcing services; (vi) management functions or human resources; (vii) broker or dealer, investment advisor or investment banking services; (viii) legal services and expert services unrelated to the audit; and (ix) any other service that the Public Company Accounting Oversight Board prohibits through regulation.

The audit committee approved 100% of the fees described above.

THE BOARD'S RECOMMENDATION

THE BOARD OF DIRECTORS RECOMMENDS THAT STOCKHOLDERS VOTE

FOR

THE RATIFICATION OF THE APPOINTMENT OF KPMG LLP

AS OUR INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR THE 2007 FISCAL YEAR.

**Vote Required**

Provided a quorum is present, the affirmative vote of a majority of the votes cast on the matter at our Annual Meeting is required to ratify the appointment of KPMG LLP as our independent registered public accounting firm for the 2007 fiscal year. For purposes of the vote on the appointment, abstentions and broker non-votes will not be counted as votes cast and will have no effect on the vote, although, as mentioned, they will count toward the presence of a quorum.

78

# SELECTED HISTORICAL FINANCIAL DATA

## INLAND WESTERN RETAIL REAL ESTATE TRUST, INC.

For the six months ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, 2004
and for the period from inception (March 5, 2003) to December 31, 2003

(Unaudited)
(In thousands, except per share amounts)

| | For the Six Months Ended June 30, | | For the Years Ended December 31, | | | For the Period From Inception to December 31, |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| **Statement of Operations Data:** | | | | | | |
| Total revenues | $ 377,198 | $ 344,468 | $ 710,103 | $ 518,055 | $ 130,575 | $ 745 |
| Total operating income (loss) | 97,774 | 99,590 | 195,638 | 159,232 | 47,092 | (75) |
| Net income (loss) available to common shareholders | 13,470 | 21,350 | 31,943 | 45,249 | 11,701 | (173) |
| Net income (loss) per common share, basic and diluted (1) | 0.03 | 0.05 | 0.07 | 0.13 | 0.12 | (0.07) |
| Distributions declared | 144,059 | 141,143 | 283,903 | 223,716 | 64,992 | 1,286 |
| Distributions paid | 143,875 | 141,258 | 283,769 | 211,327 | 54,542 | 358 |
| Distributions declared per common share (1) | 0.32 | 0.32 | 0.64 | 0.64 | 0.66 | 0.51 |
| **Other Data:** | | | | | | |
| Funds from operations (1) (2) | 134,674 | 145,984 | 289,747 | 232,853 | 57,713 | 19 |
| Cash flows provided by operating activities | 164,898 | 161,533 | 296,165 | 201,857 | 63,520 | 724 |
| Cash flows used in investing activities | (342,689) | (549,028) | (523,058) | (3,942,227) | (3,243,055) | (133,425) |
| Cash flows provided by financing activities | 118,523 | 273,637 | 155,797 | 3,797,993 | 3,356,378 | 197,082 |
| Weighted average number of common shares, outstanding, basic and diluted | 448,512 | 439,274 | 441,816 | 350,644 | 98,563 | 2,521 |

| | At June 30, | | At December 31, | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| **Balance Sheet Data:** | | | | | | |
| Total assets | $ 8,224,754 | $ 8,446,473 | $ 8,328,274 | $ 8,085,933 | $ 3,955,816 | $ 212,102 |
| Mortgages and notes payable | 4,364,535 | 4,327,309 | 4,313,223 | 3,941,011 | 1,783,114 | 29,627 |

The above selected financial data should be read in conjunction with the consolidated financial statements and related notes appearing in our annual report on Form 10-K filed with the SEC on March 1, 2007, our 10-K/A filed with the SEC on April 27, 2007 and our quarterly report on Form 10-Q filed with the SEC on August 10, 2007. Certain reclassifications have been made to the information above with respect to the fiscal years 2006, 2005, 2004 and 2003 in order to conform the presentation of such fiscal year data to the format contained in our quarterly report on Form 10-Q for the quarter ended June 30, 2007.

---

(1) Our net income and distributions per share are based upon the weighted average number of common shares outstanding. Our distribution of current and accumulated earnings and profits for Federal income tax purposes is taxable to shareholders as ordinary income. Distributions in excess of these earnings and profits generally are treated as a non-taxable reduction of the shareholder's basis in the shares to the extent thereof (a return of

79

capital), and thereafter as taxable gain.  The distributions in excess of earnings and profits will have the effect of deferring taxation on the amount of the distribution until the sale of the stockholder's shares.  The balance of the distribution constitutes ordinary income.  In order to maintain our qualification as a REIT, we must make annual distributions to shareholders of at least 90% of the REIT's taxable income.  REIT taxable income does not include net capital gains.  Under certain circumstances, we may be required to make distributions in excess of cash available for distribution in order to meet the REIT distribution requirements.  Distributions are determined by our board of directors and are dependent on a number of factors, including the amount of funds available for distribution, our financial condition, any decision by the board of directors to reinvest funds rather than to distribute the funds, our need for capital expenditures, the annual distribution required to maintain REIT status under the Code and other factors the board of directors may deem relevant.

(2)   One of our objectives is to provide cash distributions to our shareholders from cash generated by our operations. Cash generated from operations is not equivalent to our net income from continuing operations as determined under GAAP.  Due to certain unique operating characteristics of real estate companies, the National Association of Real Estate Investment Trusts or NAREIT, an industry trade group, has promulgated a standard known as "Funds from Operations" or "FFO," which it believes more accurately reflects the operating performance of a REIT such as us.  As defined by NAREIT, FFO means net income computed in accordance with GAAP, excluding gains (or losses) from sales of operating properties, plus depreciation on real property and amortization, and after adjustments for unconsolidated partnerships and joint ventures in which the REIT holds an interest.  We have adopted the NAREIT definition for computing FFO because management believes that, subject to the following limitations, FFO provides a basis for comparing our performance and operations to those of other REITs.  The calculation of FFO may vary from entity to entity since capitalization and expense policies tend to vary from entity to entity.  Items which are capitalized do not impact FFO, whereas items that are expensed reduce FFO.  Consequently, our presentation of FFO may not be comparable to other similarly-titled measures presented by other REITs.  FFO is not intended to be an alternative to "Net Income" as an indicator of our performance nor to "Cash Flows from Operating Activities" as determined by GAAP as a measure of our capacity to pay distributions.

| | For the Six Months Ended June 30, | | For the Years Ended December 31, | | | For the Period From Inception to December 31, |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| Net income (loss) | $    13,470 | $    21,350 | $    31,943 | $    45,249 | $    11,701 | $    (173) |
| Gain on contribution of investment properties | (11,796) | — | — | — | — | — |
| Depreciation and amortization related to investment properties, net of minority interests | 132,566 | 124,565 | 257,804 | 187,604 | 46,012 | 192 |
| Joint venture adjustments | 434 | 69 | — | — | — | — |
| Funds from operations | $    134,674 | $    145,984 | $    289,747 | $    232,853 | $    57,713 | $    19 |

80

## SELECTED HISTORICAL FINANCIAL DATA OF OUR BUSINESS MANAGER/ADVISOR

For the six months ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, 2004
and for the period from inception (February 13, 2003) to December 31, 2003

(Unaudited)
(In thousands, except per share amounts)

| | For the Six Months Ended June 30, | | For the Years Ended December 31, | | | For the Period From Inception to December 31, |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| Total revenues | $ 9,939 | $ 20,514 | $ 40,520 | $ 22,536 | $ 1,504 | $ — |
| Net income (loss) | 5,606 | 11,948 | 23,644 | 12,558 | (22) | — |
| Dividends declared | 5,680 | 13,780 | 25,405 | 10,700 | — | — |
| Cash flows provided by operating activities | 5,377 | 7,196 | 19,806 | 10,755 | 20 | 197 |
| Cash flows used in investing activities | — | — | — | — | (1) | (196) |
| Cash flows used in financing activities | (5,500) | (7,100) | (19,739) | (10,700) | — | — |
| Weighted shares outstanding basic and diluted | 1 | 1 | 1 | 1 | 1 | 1 |

| | At June 30, | | At December 31, | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| Total assets | $ 9,776 | $ 11,207 | $ 9,292 | $ 3,503 | $ 506 | $ 201 |

81

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS
## OF OUR BUSINESS MANAGER/ADVISOR

(In thousands, except per share amounts)

### Overview

Our Business Manager/Advisor was formed in 2003 and serves as our business manager and advisor.  Our Business Manager/Advisor earns an advisor fee based on our average invested asset value.  The fee rate is determined and set forth in the advisor agreement between our Business Manager/Advisor and us, which rate cannot exceed 1.0% annually of our average invested asset value.  Average invested asset value is defined in the advisor agreement as the average of the total book value, including acquired intangibles of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt, or other similar non-cash reserves.  Our Business Manager/Advisor has agreed to forego any fees allowed but not taken on an annual basis.  The quarterly average invested asset value is computed by taking the average of the invested asset value at the end of each month within the quarter.   The fee is payable on a quarterly basis in an amount up to a maximum of 1/4 of 1.0% of our average invested assets as of the last day of the immediately preceding quarter.  Advisor fees are the primary source of income for our Business Manager/Advisor.

### Significant Accounting Policies

#### *Revenue Recognition*

Our Business Manager/Advisor recognizes advisor fees in the period in which it performs the services.

#### *Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

#### *Income Taxes*

Our Business Manager/Advisor is included in the consolidated Federal and combined unitary state income tax returns of its ultimate parent company. Our Business Manager/Advisor accounts for income taxes in accordance with Statement of Financial Accounting Standards (SFAS) No. 109, Accounting for Income Taxes as though it is a separate taxable entity in accordance with its tax-sharing agreement with its ultimate parent company.

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

#### *Investment in a Real Estate Investment Trust*

Our Business Manager/Advisor has accounted for its investment in us using the equity method of accounting whereby it records its share of earnings as income from investment in real estate investment trust and records the dividends received as a reduction of its investment.

### Results of Operations

Below is a discussion of the results from operations of our Business Manager/Advisor for the six month periods ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, and 2004.

82

Substantially all of the revenue of our Business Manager/Advisor is derived from fees paid by us for business management and advisor services. The expenses of our Business Manager/Advisor are primarily comprised of general and administrative expenses related to its operations, such as rent, telephone, legal and accounting fees. Both income and expenses for our Business Manager/Advisor are proportional to and vary based on the number of properties owned by us. An increase in the number of properties we own will cause proportionate increases in average invested asset value and the advisor fee and, at the same time, such an increase in the number of properties we own will also increase expenses as more personnel are needed to provide business management and advisor services with respect to a greater number of properties, which increases the amount of rental space occupied and telephone usage.

### Results of operations for the six month period ended June 30, 2007 as compared to June 30, 2006

The net income for the six months ended June 30, 2007 was $5,606 as compared to net income of $11,948 for the six months ended June 30, 2006. The change in net income is described in more detail below. The following tables include certain selected financial information for the six month periods ended June 30, 2007 and 2006. This data should be read in conjunction with financial statements of our Business Manager/Advisor, including the notes thereto, included elsewhere in this proxy statement.

| | For the six months Ended June 30, | |
| --- | --- | --- |
| | 2007 | 2006 |
| Total revenues | $ 9,939 | $ 20,514 |
| Total expenses | 611 | 634 |
| Net income before income taxes | 9,328 | 19,880 |
| Income tax expense | 3,722 | 7,932 |
| Net income | $ 5,606 | $ 11,948 |

The following discussion relating to changes in the results of operations of our Business Manager/Advisor includes only certain of those line items within its statements of operations for which there was a material change between the six month periods ended June 30, 2007 and 2006.

For the six month period ended June 30, 2007, the total revenues of our Business Manager/Advisor decreased to $9,939 from $20,514 during the same period in 2006. Based upon the maximum allowable annual advisor fee of 1%, an advisor fee of $38,762 and $36,684 was allowed for the six months ended June 30, 2007 and 2006, respectively. Our Business Manager/Advisor elected to be paid an advisor fee of $9,500 for the six months ended June 30, 2007 and agreed to be paid an advisor fee of $20,000 for the six months ended June 30, 2006. Our Business Manager/Advisor has also agreed to forego any advisor fees allowed but not taken on an annual basis.

Total expenses decreased from $634 to $611, a decrease of $23, for the six month period ended June 30, 2007, as compared to the same period in 2006. The decrease was primarily attributable to a decrease in general and administrative expenses required to provide business and advisor services to us.

### Results of operations for the year ended December 31, 2006 as compared to December 31, 2005

Net income for the year ended December 31, 2006 was $23,644 as compared to $12,558 for the year ended December 31, 2005. The change in net income is described in more detail below. The following tables include certain selected financial information for the fiscal years ended December 31, 2006 and 2005. This data should be read in conjunction with the financial statements of our Business Manager/Advisor, including the notes thereto, included elsewhere in this proxy statement.

|                                    | For the years ended December 31, | |
|                                    | 2006    | 2005    |
| Total revenues                     | $ 40,520 | $ 22,536 |
| Total expenses                     | 1,179    | 1,641    |
| Net income before income taxes     | 39,341   | 20,895   |
| Income tax expense                 | 15,697   | 8,337    |
| Net income                         | $ 23,644 | $ 12,558 |

The following discussion relating to changes in the results of operations of our Business Manager/Advisor includes only certain of those line items within its statements of income for which there was a material change between the years ended December 31, 2006 and 2005.

For the year ended December 31, 2006, the total income of our Business Manager/Advisor increased $17,984 to $40,520 from $22,536 during the year ended December 31, 2005. Based upon the maximum allowable annual advisor fee of 1%, an advisor fee of $74,895 and $54,933 was allowed for the years ended December 31, 2006 and 2005, respectively. Our Business Manager/Advisor elected to be paid an advisor fee of $39,500 and $20,925 for the years ended December 31 2006 and 2005, respectively. Our Business Manager/Advisor has also agreed to forego any advisor fees allowed but not taken on an annual basis.

Total expenses decreased $462 from $1,641 to $1,179 for the year ended December 31, 2006, as compared to the same period in 2005. The decrease was primarily attributable to a decrease in employee salaries and benefits due to a decrease in the number of personnel as a result of our engaging a third party as our common stock transfer agent.

### Results of operations for the year ended December 31, 2005 as compared to December 31, 2004

Net income for the year ended December 31, 2005 was $12,558 as compared to a net loss of $22 for the year ended December 31, 2004. The change in net income is described in more detail below. The following tables include certain selected financial information for the fiscal years ended December 31, 2005 and 2004. This data should be read in conjunction with the financial statements of our Business Manager/Advisor, including the notes thereto, included elsewhere in this proxy statement.

|                                    | For the years ended December 31, | |
|                                    | 2005    | 2004    |
| Total revenues                     | $ 22,536 | $  1,504 |
| Total expenses                     | 1,641    | 1,539    |
| Net income (loss) before income taxes | 20,895 | (35)     |
| Income tax expense (benefit)       | 8,337    | (13)     |
| Net income (loss)                  | $ 12,558 | $   (22) |

The following discussion relating to changes in the results of operations of our Business Manager/Advisor includes only certain of those line items within its statements of income for which there was a material change between the fiscal years ended December 31, 2005 and 2004.

For the year ended December 31, 2005, the total income of our Business Manager/Advisor increased $21,032 to $22,536 from $1,504 for the year ended December 31, 2004. Based upon the maximum allowable annual advisor fee of 1%, an advisor fee of $54,933 and $14,971 was allowed for years ended December 31, 2005 and 2004, respectively. Our Business Manager/Advisor elected to be paid an advisor fee of $20,925 and none for the years ended December 31, 2005 and 2004, respectively. Our Business Manager/Advisor has also agreed to forego any advisor fees allowed but not taken on an annual basis.

Total expenses increased from $1,539 to $1,641, an increase of $102, for the year ended December 31, 2005, as compared to the same period in 2004. The increase was primarily attributable to an increase in salaries and related benefits due to an increase in the number of personnel required to provide business and advisor services.

84

**Liquidity and Capital Resources**

Sources of cash to fund operations are fees with respect to business management and advisor services. Uses of cash are primarily general and administrative expenses.

It is the policy of our Business Manager/Advisor to pay dividends to its sole shareholder on a regular basis of all income earned by our Business Manager/Advisor. Cash represents funds intended to be distributed to the sole shareholder as dividends and payments of income tax liability. Cash and cash equivalents equaled $20 and $143 as of June 30, 2007 and December 31, 2006, respectively.

**Off-Balance Sheet Arrangements and Aggregate Contractual Obligations**

*Off-Balance Sheet Arrangements*

None.

*Contractual Obligations*

None.

**Market Information of Common Stock and Dividends**

There is no established public trading market for the common stock of our Business Manager/Advisor. Our Sponsor is the Business Manager/Advisor's sole shareholder, owning 1 shares of common stock. In connection with the Merger, each outstanding share of the Business Manager/Advisor's 1 shares of common stock will be converted into the right to receive 18,750 shares of our common stock.  The Business Manager/Advisor declared and paid dividends totaling $5,680, $13,780, $25,405, $10,700 and none for the six month periods ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, and 2004, respectively.  Dividends are paid when and as declared by the Business Manager/Advisor's board of directors, typically on a quarterly basis when we remit a portion of the advisor fee.

85

**SELECTED HISTORICAL FINANCIAL DATA OF OUR PROPERTY MANAGERS**

For the six months ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, 2004
and for the period from inception (February 13, 2003) to December 31, 2003

(Unaudited)
(In thousands, except per share amounts)

| | For the Six Months Ended June, | | For the Years Ended December 31, | | | For the Period From Inception to December 31, |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| Total revenues | $ 19,544 | $ 17,175 | $ 35,477 | $ 23,047 | $ 5,385 | $ 27 |
| Net income | 11,053 | 10,431 | 20,868 | 13,475 | 2,588 | 7 |
| Dividends declared | 10,577 | 9,500 | 20,513 | 11,756 | 2,586 | — |
| Cash flows provided by operating activities | 8,433 | 10,105 | 21,238 | 13,491 | 3,164 | 96 |
| Cash flows used in investing activities | (59) | (230) | (226) | (268) | (118) | (7) |
| Cash flows used in financing activities | (10,577) | (9,500) | (20,513) | (13,380) | (879) | — |
| Weighted shares outstanding basic and diluted | 30 | 30 | 30 | 30 | 36 | 36 |

| | At June 30, | | At December 31, | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | 2006 | 2005 | 2004 | 2003 |
| Total assets | $ 3,338 | $ 3,506 | $ 3,135 | $ 2,723 | $ 2,415 | $ 95 |

86

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS
## OF THE PROPERTY MANAGERS

(In thousands, except per share amounts)

**Overview**

The Property Managers are Delaware corporations.  Inland Southwest Management, Corp. and Inland Northwest Management, Corp. were incorporated on November 10, 2003 and Inland Western Management, Corp. was incorporated on January 30, 2003.  The Property Managers manage commercial properties, most of which we own.  An additional corporation, Inland Pacific Management Corp. was incorporated on November 10, 2003 and was subsequently merged into Inland Western Management Corp. on January 24, 2005.  These corporations each own a 33.33% interest in Inland Holdco Management LLC.  These corporations are under common control and are presented on a combined consolidated basis for the purposes of this proxy statement.  The Property Managers managed a total of 312, 302, 271 and 111 commercial properties as of June 30, 2007, December 31, 2006, December 31, 2005 and December 31, 2004, respectively.  The Property Managers earn a property management fee based on the total revenue collected each month with respect to each property under management.  The fee rate paid to each Property Manager for all properties currently under management is 4.5% of such gross monthly revenue.  The management fee rate is determined and set forth in the management agreements for each of our properties managed by the Property Managers, which rate cannot exceed 4.5% pursuant to the Master Management Agreement between each Property Manager and us.  Property management fees are the significant source of revenue for the Property Managers.

**Significant Accounting Policies**

*Revenue Recognition*

The Property Managers recognize property management fees in the period in which services are performed.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

*Property and Equipment*

Property and equipment are depreciated and amortized using the straight-line method over the following estimated useful lives or lease terms:

|  | Useful Life |
|---|---|
| Computer and telephone equipment | 3-5 years |
| Furniture and equipment | 7 years |
| Leasehold improvements | 15 years |

*Income Taxes*

The Property Managers have elected to be and have at all times since inception been treated as an S corporation under the Internal Revenue Code.  Each Property Manager is not itself subject to federal income tax liability, or income tax liability in those states in which it operates which respect the S-Corporation election, and its items of taxable income, gain, deduction and loss pass through to and are reported by its stockholders.

87

**Results of Operations**

Below is a discussion of the results from operations of the Property Managers for the six month periods ended June 30, 2007 and 2006, and the years ended December 31, 2006, 2005, and 2004.

Substantially all of the revenue of the Property Managers is derived from fees paid by us for property management services. The expenses of the Property Managers are primarily comprised of payroll expenses for personnel, state and income taxes and administrative expenses related to the operations of the Property Managers. Both revenue and expenses for the Property Managers are proportional to and vary based on the number of properties managed. An increase in the number of properties managed increases revenues due to the proportionate increase in property management fees and also increases expenses as more corporate personnel are needed to oversee such additional properties.

*Results of operations for the six month period ended June 30, 2007 as compared June 30, 2006*

As of June 30, 2007, the Property Managers managed a total of 312 properties and as of June 30, 2006, the Property Managers managed a total of 302 properties.

Net income for the six months ended June 30, 2007 was $11,053 as compared to $10,431 for the six months ended June 30, 2006. The change in net income is described in more detail below. The following tables include certain selected financial information for the six month periods ended June 30, 2007 and 2006. This data should be read in conjunction with financial statements of the Property Managers, including the notes thereto.

|  | For the six months Ended June 30, | |
| --- | --- | --- |
|  | **2007** | **2006** |
| Total revenues | $ 19,544 | $ 17,175 |
| Total expenses | 8,491 | 6,744 |
| Net income | $ 11,053 | $ 10,431 |

The following discussion relating to changes in the results of operations of the Property Managers includes only certain of those line items within its statements of operations for which there was a material change between the six month periods ended June 30, 2007 and 2006.

For the six month period ended June 30, 2007, the revenues of the Property Managers increased $2,369 to $19,544 from $17,175 during the same period in 2006. The increase was attributable to the increase in the number of properties managed by the Property Managers and the resulting proportionate increase in the management fees earned by the Property Managers.

Total expenses increased from $6,744 to $8,491 an increase of $1,747 for the six month period ended June 30, 2007, as compared to the same period in 2006. The increase was primarily attributable to the increase in payroll and related benefits due to the increase in the number of properties managed by the Property Managers in addition to increases in information technology expenses and professional fees.

*Results of operations for the year ended December 31, 2006 as compared to December 31, 2005*

As of December 31, 2006, the Property Managers managed a total of 302 properties and as of December 31, 2005, the Property Managers managed a total of 271 properties.

Net income for the year ended December 31, 2006 was $20,868 as compared to $13,475 for the year ended December 31, 2005. The change in net income is described in more detail below. The following tables include certain selected financial information for the years ended December 31, 2006 and 2005. This data should be read in conjunction with the financial statements of the Property Managers, including the notes thereto.

88

|  | For the years ended December 31, | |
|  | 2006 | 2005 |
| Total revenues | $ 35,477 | $ 23,047 |
| Total expenses | 14,609 | 9,572 |
| Net income | $ 20,868 | $ 13,475 |

The following discussion relating to changes in the results of operations of the Property Managers includes only certain of those line items within their statements of income for which there was a material change between the years ended December 31, 2006 and 2005.

For the year ended December 31, 2006, the revenues of the Property Managers increased to $35,477 from $23,047 during the year ended December 31, 2005. The increase was attributable to the increase in the number of properties managed by the Property Managers and the resulting proportionate increase in the management fees earned by the Property Managers.

Total expenses increased from $9,572 to $14,609, an increase of $5,037, for the year ended December 31, 2006, as compared to the same period in 2005. The increase was primarily attributable to the increase in payroll and related amounts due to the increase in the number of properties managed by the Property Managers.

### Results of operations for the year ended December 31, 2005 as compared to December 31, 2004

As of December 31, 2005, the Property Managers managed a total of 271 properties and as of December 31, 2004, the Property Managers managed a total of 111 properties.

Net income for the year ended December 31, 2005 was $13,475 as compared to $2,588 for the year ended December 31, 2004. The change in net income is described in more detail below. The following tables include certain selected financial information for the years ended December 31, 2005 and 2004. This data should be read in conjunction with the financial statements of the Property Managers, including the notes thereto.

|  | For the years ended December 31, | |
|  | 2005 | 2004 |
| Total revenues | $ 23,047 | $ 5,385 |
| Total expenses | 9,572 | 2,797 |
| Net income | $ 13,475 | $ 2,588 |

The following discussion relating to changes in the results of operations of the Property Managers includes only certain of those line items within its statements of income for which there was a material change between the years ended December 31, 2005 and 2004.

For the year ended December 31, 2005, the revenues of the Property Managers increased $17,662 to $23,047 from $5,385 during the year ended December 31, 2004. The increase was attributable to the increase in the number of properties managed by the Property Managers and the resulting proportionate increase in the management fees earned by the Property Managers.

Total expenses increased $6,775 from $2,797 to $9,572, for the year ended December 31, 2005, as compared to the same period in 2004. The increase was primarily attributable to the increase in payroll and related amounts due to the increase in the number of properties managed by the Property Managers.

**Liquidity and Capital Resources**

Fees with respect to the management of properties are the primary source of cash to fund operations. Uses of cash are primarily employee salaries and benefits, general and administrative expenses and professional fees.

89

Cash generated by operations increased from $13,491 for the year ended December 31, 2005 to $21,238 for the year ended December 31, 2006. The increase was attributable the increase in the number of properties managed by the Property Managers. Cash generated by operations increased from $3,164 for the year ended December 31, 2004 to $13,491 for the year ended December 31, 2005. The increase was attributable to the increase in the number of properties managed by the Property Managers.

It is the policy of the Property Managers to pay dividends to its stockholders on a regular basis of all income earned by the Property Managers. Cash and cash equivalents represents funds intended to be distributed to stockholders as dividends and related to reserves. Cash and cash equivalents equaled $599 and $2,598 as of June 30, 2007 and December 31, 2006, respectively.

**Off-Balance Sheet Arrangements and Aggregate Contractual Obligations**

*Off-Balance Sheet Arrangements*

None.

*Contractual Obligations*

The following table discloses aggregate information about our contractual obligations and the periods in which payments are due:

| | | Payments Due by Period | | | |
| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| Long-term obligations | $ — | $ — | $ — | $ — | $ — |
| Capital (finance) lease obligations | — | — | — | — | — |
| Operating lease obligations | 557 | 320 | 169 | 53 | 15 |
| Purchase obligations | — | — | — | — | — |
| Other long-term liabilities | — | — | — | — | — |
| Total | $ 557 | $ 320 | $ 169 | $ 53 | $ 15 |

**Market Information of Common Stock**

If the Merger is consummated, Daniel L. Goodwin will be deemed to have direct or indirect control of 6.3% of our stock due to the combination of (1) stock purchased by him or his family, (2) stock received by him in the Merger, (3) stock purchased by Inland, of which he is considered to have share control, and (4) stock to be received by Inland as a result of the Merger, of which he is considered to have shared control.

In connection with the Merger, the stockholders of the Property Managers will receive 18,750 shares in the aggregate.

The Property Managers collectively declared and paid dividends totaling $10,577, $9,500, $20,513, $11,756 and $2,586 for the six month periods ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005 and 2004, respectively. Dividends are paid when and as declared by the board of directors of each Property Manager. Each Property Manager has declared quarterly dividends equivalent to its net income for the preceding quarter less any appropriate reserves.

90

## SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA

### INLAND WESTERN RETAIL REAL ESTATE TRUST, INC.

For the six months ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, 2004
and for the period from inception (March 5, 2003) to December 31, 2003

(Unaudited)
(In thousands, except for per share amounts)

The following table sets forth, for the periods and as of the dates indicated, our selected unaudited historical financial and pro forma financial data on a consolidated basis. The selected pro forma financial data have been derived from our unaudited pro forma consolidated financial statements, included elsewhere in this proxy statement. Pro forma and operating results for the six months ended June 30, 2007 are not necessarily indicative of results that may be expected for the entire year. The information set forth below should be read in conjunction with our consolidated financial statements and notes thereto, and our "Management's Discussion and Analysis of Financial Condition" and "Results of Operations," incorporated by reference in this proxy statement and our unaudited pro forma financial statements included elsewhere in this proxy statement.

| | For the Six Months Ended June 30, | | For the Years Ended December 31, | | | | For the Period From Inception to December 31, 2003 |
|---|---|---|---|---|---|---|---|
| | 2007 Pro Forma (1) | 2007 | 2006 Pro Forma (1) | 2006 | 2005 | 2004 | |
| **Statement of Operations Data:** | | | | | | | |
| Total revenues | $ 376,223 | $ 377,198 | $ 717,274 | $ 710,103 | $ 518,055 | $ 130,575 | $ 745 |
| Net operating income (loss) | 112,758 | 97,774 | 249,533 | 195,638 | 159,232 | 47,092 | (75) |
| Net income (loss) available to common shareholders | 29,973 | 13,470 | 85,234 | 31,943 | 45,249 | 11,701 | (173) |
| Net income (loss) per common share, basic and diluted | 0.06 | 0.03 | 0.18 | 0.07 | 0.13 | 0.12 | (0.07) |
| Distributions declared | — | 144,059 | — | 283,903 | 223,716 | 64,992 | 1,286 |
| Distributions paid | — | 143,875 | — | 283,769 | 211,327 | 54,542 | 358 |
| Distributions declared per common share | — | 0.32 | — | 0.64 | 0.64 | 0.66 | 0.51 |
| **Other Data:** | | | | | | | |
| Funds from Operations (3) | 153,514 | 134,674 | 352,392 | 289,747 | 232,853 | 57,713 | 19 |
| Cash flows provided by operating activities | 187,420 | 164,898 | 368,735 | 296,165 | 201,857 | 63,520 | 724 |
| Cash flows used in investing activities | (342,689) | (342,689) | (523,058) | (523,058) | (3,942,227) | (3,243,055) | (133,425) |
| Cash flows provided by financing activates | 118,523 | 118,523 | 155,797 | 155,797 | 3,797,993 | 3,356,378 | 197,082 |
| Weighted average number of common shares outstanding, basic and diluted | 486,012 | 448,512 | 479,316 | 441,816 | 350,644 | 98,563 | 2,521 |

| | At June 30, | | At December 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 Pro Forma (2) | 2007 | 2006 Pro Forma | 2006 | 2005 | 2004 | 2003 |
| **Balance Sheet Data:** | | | | | | | |
| Total assets | $ 8,216,114 | $ 8,224,754 | N/A | $ 8,328,274 | $ 8,085,933 | $ 3,955,816 | $ 212,102 |
| Mortgages payable | 4,364,535 | 4,364,535 | N/A | 4,313,223 | 3,941,011 | 1,783,114 | 29,627 |

91

(1) Pro forma to give effect to the combination of our Property Managers, Business Manager/Advisor and us as though it had occurred on January 1, 2006. Adjustments reflect the elimination of property management fees, advisor fees and certain salary expenses reimbursed by us and the recording of depreciation and amortization related to the property and equipment and intangible assets acquired.  The pro forma data also includes income and operating expenses for all the properties owned by us as if we had owned the properties as of January 1, 2006 for both the six month period ended June 30, 2007 and the year ended December, 31, 2006.

(2) Pro forma to give effect to the combination of our Property Managers, Business Manager/Advisor and us as though it had occurred on June 30, 2007.  Adjustments reflect the effects of recording the Merger, the allocation of the purchase price to tangible and intangible assets and the elimination of intercompany receivables and certain other balances that we did not assume in the Merger or were distributed prior to the Merger.

(3) Cash generated from operations is not equivalent to net operating income as determined under accounting principles generally accepted in the Unites States of America (GAAP).  Due to certain unique operating characteristics of real estate companies with the National Association of Real Estate Investment Trusts or NAREIT, an industry trade group, has promulgated a standard known as FFO, which it believes more accurately reflects the operating performance of a REIT such as our company.  As defined by NAREIT, FFO means net income computed in accordance with GAAP, excluding gains (or losses) from sales of property, plus depreciation and amortization of real property, after adjustments for unconsolidated partnerships and joint ventures in which the REIT holds an interest.  We have adopted the NAREIT definition for computing FFO because management believes that, subject to the following limitations, FFO provides a basis for comparing our performance and operations to those of other REITs.  The calculation of FFO may vary from entity to entity since capitalization and expense policies tend to vary from entity to entity.  Items that are capitalized do not impact FFO, whereas items that are expensed reduce FFO.  Consequently, our presentation of FFO may not be comparable to other similarly-titled measures presented by other REITs.  FFO is not intended to be an alternative to "Net Income" as an indicator of our performance nor to "Cash Flows from Operating Activities" as determined by GAAP as a measure of our capacity to pay distributions.  We use FFO to compare our performance to that of other REITs in our peer group.  Additionally, we use FFO in conjunction with our acquisition policy to determine investment strategy.  FFO is calculated as follows:

| | For the Six Months Ended June 30, | | For the Years Ended December 31, | | | | For the Period From Inception to December 31, 2003 |
|---|---|---|---|---|---|---|---|
| | 2007 Pro Forma | 2007 | 2006 Pro Forma | 2006 | 2005 | 2004 | |
| Net income (loss) | $ 29,973 | $ 13,470 | $ 85,234 | $ 31,943 | $ 45,249 | $11,701 | $        (173) |
| Gain on contribution of investment properties | (11,796) | (11,796) | — | — | — | — | — |
| Depreciation and amortization related to investment properties, net of minority interests | 134,725 | 132,566 | 265,277 | 257,804 | 187,604 | 46,012 | 192 |
| Joint venture adjustments | 612 | 434 | 1,881 | — | — | — | — |
| Funds from operations | $ 153,514 | $ 134,674 | $ 352,392 | $ 289,747 | $ 232,853 | $57,713 | $          19 |

92

## HISTORICAL AND PRO FORMA PER SHARE DATA

## INLAND WESTERN RETAIL REAL ESTATE TRUST, INC.

For the six months ended June 30, 2007 and 2006 and the years ended December 31, 2006, 2005, 2004
and the period from inception (March 5, 2003) to December 31, 2003

(Unaudited)
(In thousands, except for per share amounts)

The following table sets forth, for the periods and as of the dates indicted, our selected unaudited historical financial and pro forma per share data on a consolidated basis.  The selected pro forma per share data have been derived from our unaudited pro forma consolidated financial statements, included elsewhere in this proxy statement.  Pro forma operating results for the six months ended June 30, 2007 are not necessarily indicative of results that may be expected for the entire year.  The information set forth below should be read in conjunction with our consolidated financial statements and notes thereto, and our "Management Discussion and Analysis of Financial Condition" and "Results of Operations," incorporated by reference in this proxy statement, and our unaudited pro forma financial statements, included elsewhere in this proxy statement.

| | For the Six Months Ended June 30, | | | For the Years Ended December 31, | | | | For the Period From Inception to December 31, |
| | 2007 Pro Forma (1) | 2007 | 2006 Pro Forma (1) | 2006 | 2005 | 2004 | | 2003 |
|---|---|---|---|---|---|---|---|---|
| Cash distributions declared per weighted average share | $ 0.32 | $ 0.32 | $ 0.64 | $0.64 | $0.64 | $0.66 | $ | 0.15 |
| Net income (loss) per weighted average share | $ 0.06 | $ 0.03 | $ 0.18 | $0.07 | $0.13 | $0.12 | $ | (0.07) |

| | At June 30, | | | At December 31, | | | | |
| | 2007 Pro Forma (2) | 2007 | 2006 Pro Forma | 2006 | 2005 | 2004 | | 2003 |
|---|---|---|---|---|---|---|---|---|
| Book value per outstanding share | $ 7.00 (3) | $ 7.58 | N/A | $ 7.86 | $ 8.40 | $ 8.67 | $ | 8.71 |

(1)    Pro forma to give effect to the combination of our Property Managers, Business Manager/Advisor and us as though it had occurred on January 1, 2006. Adjustments reflect the elimination of property management fees, advisor fees and certain salary expenses reimbursed by us and the recording of depreciation and amortization related to the property and equipment and intangible assets acquired.  The pro forma data also includes income and operating expenses for all the properties owned by us as if we had owned the properties as of January 1, 2006 for both the six month period ended June 30, 2007 and the year ended December 31, 2006.

(2)    Pro forma to give effect to the combination of our Property Managers, Business Manager/Advisor and us as though it had occurred June 30, 2007.  Adjustments reflect the effects of recording the Merger, the allocation of the purchase price to tangible and intangible assets and the elimination of intercompany receivables and certain other balances that we did not assume in the Merger or were distributed prior to the Merger.

(3)    Based on pro forma stockholders' equity at June 30, 2007, shown elsewhere in this proxy statement, and pro forma shares outstanding of 486,012 which includes 37,500 shares to be issued as consideration in the Merger.

93

## MISCELLANEOUS AND OTHER MATTERS

**Advance Notice Procedures for Making Director Nominations and Stockholder Proposals**

Stockholder proposals for our annual meeting of stockholders to be held in 2008 will not be included in our proxy statement for that meeting unless the proposal is proper for inclusion in our proxy statement and for consideration at the next annual meeting of stockholders and is received by our Vice President at our executive offices located in Oak Brook, Illinois, no later than February 1, 2008. Stockholders must also follow the procedures prescribed in SEC Rule 14a-8 under the Exchange Act.

If the requirements of our bylaws are not followed, the nomination or proposal presented at an annual meeting of stockholders will be out of order and will not be acted upon. Any stockholder desiring a copy of our bylaws will be furnished one without charge upon written request to our Vice President at our principal executive offices. A copy of our bylaws, as amended, is filed as Exhibit 3.2.1 in our annual report on Form 10-K/A for the year ended December 31, 2006, filed on April 27, 2007 and is available at the SEC Internet site (http://www.sec.gov).

**Multiple Stockholders Sharing an Address**

The rules of the SEC permit companies to provide a single copy of an annual report and proxy statement to households in which more than one stockholder resides. This process is known as householding. Stockholders who share an address and who have been previously notified that their broker, bank or other intermediary will be householding their proxy materials will receive only one copy of our proxy statement and Annual Report to Stockholders unless they have affirmatively objected to the householding notice.

Stockholders sharing an address who received only one set of these materials may request a separate copy which will be sent promptly at no cost by writing or calling our Investor Relations department at: Investor Relations, Inland Western Retail Real Estate Trust, Inc., 2901 Butterfield Road, Oak Brook, IL 60523 or by contacting us by telephone at (630) 218-8000. For future annual meetings, a stockholder may request separate annual reports or proxy statements, or may request the householding of such materials, by contacting us as noted above.

**Other Matters**

As of the date of this proxy statement, the above are the only matters we are aware of that are to be acted upon at the Annual Meeting. If any other matter should properly come before the Annual Meeting for which we did not receive proper notice in accordance with the requirements of our bylaws, as presented above, the persons appointed by your proxy will vote on those matters in accordance with the recommendation of the Board, or, in the absence of such a recommendation, in accordance with their discretion. The affirmative vote of the holders of a majority of the votes cast on any such other matter will be required for approval.

**Information Incorporated by Reference**

We file annual, quarterly and current reports and other information with the SEC. The SEC permits us to incorporate by reference certain information into this proxy statement. The following information is incorporated by reference into this proxy statement:

our two Current Reports on Form 8-K, filed August 17, 2007;

our Current Report on Form 8-K/A, filed August 16, 2007;

our Current Report on Form 8-K, filed August 16, 2007;

our Quarterly Report on Form 10-Q, filed on August 10, 2007;

our Current Report on Form 8-K, filed August 10, 2007;

our Current Report on Form 8-K, filed June 26, 2007;

our Current Report on Form 8-K, filed June 19, 2007;

94

our Current Report on Form 8-K, filed on June 11, 2007;

our Quarterly Report on Form 10-Q, filed on May 15, 2007;

our Current Report on Form 8-K, filed on May 2, 2007;

our Annual Report on Form 10-K/A, filed on April 27, 2007; and

our Annual Report on Form 10-K, filed on March 1, 2007.

In addition, all documents that we file with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act, subsequent to the date of this proxy statement and prior to the date of the 2006 annual meeting, shall be deemed to be incorporated by reference into this proxy statement.

You may read and copy any materials we file with the SEC at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at http://www.sec.gov.

By the order of the Board of Directors,


/s/ Roberta S. Matlin

Roberta S. Matlin
Vice President and Secretary

Oak Brook, Illinois
September 10, 2007

YOUR VOTE IS IMPORTANT. THE PROMPT RETURN OF PROXIES, INCLUDING YOUR PROXIES AUTHORIZED VIA THE INTERNET OR VIA TOUCH-TONE TELEPHONE, WILL SAVE US THE EXPENSE OF FURTHER REQUESTS FOR PROXIES. WE ENCOURAGE YOU TO COMPLETE, SIGN, DATE AND RETURN YOUR PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE, OR AUTHORIZE YOUR PROXY VIA THE INTERNET OR VIA TOUCH-TONE TELEPHONE, BEFORE THE ANNUAL MEETING, SO THAT YOUR SHARES WILL BE REPRESENTED AND VOTED AT THE ANNUAL MEETING.

Our 2006 Annual Report on Form 10-K to stockholders includes our financial statements for the fiscal year ended December 31, 2006, our Quarterly Report on Form 10-Q includes our financial statements for the period ended March 31, 2007 and Quarterly Report on Form 10-Q includes our financial statements for the period ended June 30, 2007. Only the financial statements included in the 2006 Annual Report and the 2007 Quarterly Reports are part of the material for the solicitation of proxies.

-------------------

95

**INDEX TO FINANCIAL STATEMENTS**

|  |  | Page Number |
|---|---|---|
| 1. | **Inland Western Retail Real Estate Trust, Inc. and Subsidiaries** | |
| | (a) Pro Forma Condensed Consolidated Balance Sheet as of June 30, 2007 (unaudited) | F-2 |
| | (b) Notes to Pro Forma Condensed Consolidated Balance Sheet (unaudited) | F-3 |
| | (c) Pro Forma Condensed Consolidated Statement of Operations for the Six Months Ended June 30, 2007 (unaudited) | F-5 |
| | (d) Notes to Pro Forma Condensed Consolidated Statement of Operations (unaudited) | F-6 |
| | (e) Pro Forma Condensed Consolidated Statement of Operations for the Year Ended December 31, 2006 (unaudited) | F-8 |
| | (f) Notes to Pro Forma Condensed Consolidated Statement of Operations (unaudited) | F-9 |
| 2. | Business Manager/Advisor | |
| | (a) Independent Auditor's Report | F-11 |
| | (b) Balance Sheets as of December 31, 2006 and 2005 | F-12 |
| | (c) Statements of Income for the Years Ended December 31, 2006, 2005 and 2004 | F-13 |
| | (d) Statements of Changes in Stockholder's Equity for the Years Ended December 31, 2006, 2005 and 2004 | F-14 |
| | (e) Statements of Cash Flows for the Years Ended December 31, 2006, 2005 and 2004 | F-15 |
| | (f) Notes to Financial Statements | F-16 |
| | (g) Balance Sheet as of June 30, 2007 (unaudited) | F-19 |
| | (h) Statements of Income for the Six Months Ended June 30, 2007 and 2006 (unaudited) | F-20 |
| | (i) Statement of Changes in Stockholder's Equity for the Six Months Ended June 30, 2007 (unaudited) | F-21 |
| | (j) Statements of Cash Flows for the Six Months Ended June 30, 2007 and 2006 (unaudited) | F-22 |
| 3. | Property Managers | |
| | (a) Independent Auditor's Report | F-23 |
| | (b) Combined Consolidated Balance Sheets as of December 31, 2006 and 2005 | F-24 |
| | (c) Combined Consolidated Statements of Income for the Years Ended December 31, 2006, 2005 and 2004 | F-25 |
| | (d) Combined Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2006, 2005 and 2004 | F-26 |
| | (e) Combined Consolidated Statements of Cash Flows for the Years Ended December 31, 2006, 2005 and 2004 | F-27 |
| | (f) Notes to Combined Consolidated Financial Statements for December 31, 2006, 2005 and 2004 | F-28 |
| | (g) Combined Consolidated Balance Sheet as of June 30, 2007 (unaudited) | F-31 |
| | (h) Combined Consolidated Statements of Income for the Six Months Ended June 30, 2007 and 2006 (unaudited) | F-32 |
| | (i) Combined Consolidated Statement of Stockholders' Equity for the Six Months Ended June 30, 2007 (unaudited) | F-33 |
| | (j) Combined Consolidated Statements of Cash Flows for the Six Months Ended June 30, 2007 and 2006 (unaudited) | F-34 |

F-1

**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC. and SUBSIDIARIES**

Unaudited Pro Forma Condensed Consolidated Balance Sheet
as of June 30, 2007

(In thousands, except per share amounts)

| | IWEST (6) | Property Managers(6) | Business Manager/ Advisor (6) | Pro Forma Adjustments | Pro Forma Total |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Net investment properties | $6,854,189 | $ — | $ — | $ — | $6,854,189 |
| Cash and cash equivalents | 168,483 | 396 | 20 | (643)(3) | 156,370 |
| | | | | (8,103)(4) | |
| | | | | (3,783)(5) | |
| Investment in marketable securities | 280,701 | — | — | — | 280,701 |
| Investment in unconsolidated joint ventures | 174,577 | — | — | — | 174,577 |
| Accounts and notes receivable | 179,076 | 2,509 | 9,756 | (11,897)(1) | 179,163 |
| | | | | (281)(2) | |
| Acquired lease intangibles and customer relationship value | 487,794 | — | — | — | 487,794 |
| Intangible assets | — | — | — | 621(3) | 621 |
| Goodwill | — | — | — | 2,331(3) | 2,331 |
| Other assets | 79,934 | 434 | — | — | 80,368 |
| Total assets | 8,224,754 | 3,339 | 9,776 | (21,755) | 8,216,114 |
| | | | | | |
| **Liabilities:** | | | | | |
| Mortgages and notes payable | 4,364,535 | — | — | — | 4,364,535 |
| Accounts payable and accrued expenses | 62,422 | 484 | 311 | (11,897)(1) | 51,039 |
| | | | | (281)(2) | |
| Distributions payable | 24,085 | — | 5,680 | (5,680)(4) | 24,085 |
| Acquired below market lease intangibles | 129,232 | — | — | — | 129,232 |
| Other financings | 58,020 | — | — | — | 58,020 |
| Other liabilities | 70,384 | — | 3,783 | (3,783)(5) | 70,384 |
| Total liabilities | 4,708,678 | 484 | 9,774 | (21,641) | 4,697,295 |
| Minority interests | 105,702 | | | | 105,702 |
| Commitments and contingencies | | | | | |
| Total shareholders' equity | 3,410,374 | 2,855 | 2 | 375,857(3) | 3,413,117 |
| | | | | (373,548)(3) | |
| | | | | (2,423)(4) | |
| Total liabilities and shareholders' equity | $8,224,754 | $ 3,339 | $ 9,776 | $ (21,755) | $8,216,114 |

F-2

**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC. and SUBSIDIARIES**

**Notes to Unaudited Pro Forma Condensed Consolidated Balance Sheet
as of June 30, 2007**

(In thousands, except per share amounts)

The unaudited pro forma condensed consolidated balance sheet is presented as if the acquisition of the Business Manager/Advisor and the Property Managers had occurred on June 30, 2007. This unaudited pro forma condensed consolidated balance sheet is not necessarily indicative of what our actual financial position would have been at June 30, 2007, nor does it purport to represent our future financial position.

The purchase price for the Business Manager/Advisor and the Property Managers was determined based upon the number of shares to be exchanged and the share price of our shares determined at the date of signing, the date on which all principal terms of the merger were agreed to. The consideration for the constituent mergers will be placed into an escrow fund established in connection with the Merger and will be allocated to the shareholders of the merged companies as follows:

- The 1 outstanding shares of the capital stock of our Business Manager/Advisor will be converted into the right to receive 18,750 shares of our common stock from the escrow fund; and

- The 30 outstanding shares of the capital stock of our Property Managers will be converted into the right to receive 18,750 shares of our common stock from the escrow fund.

The combined purchase price of the Business Manager/Advisor and the Property Managers will be allocated to the respective contractual agreements, which will be terminated and expensed in accordance with EITF Issue No. 04-1, *Accounting for Preexisting Relationships between Parties to a Business Combination*, and the remainder will be allocated to acquired assets, including intangible assets, based on their respective fair value. Such assets will be depreciated and/or amortized over the estimated life of each asset. The purchase price allocation was performed by an independent valuation firm with the purchase price being allocated to property and equipment and consulting agreements. The allocation of these components is preliminary and is based on pro forma information and may vary from the final allocation at the time of the acquisitions. Certain amounts included in the unaudited pro forma condensed consolidated balance sheet above may increase or decrease. The merger consideration including estimated fees and costs paid and to be paid by us in connection with the proposed acquisition of the Business Manager/Advisor and the Property Managers and pro forma adjustments to the historical book values are as follows:

**Purchase Price Allocation**

The purchase price for the Business Manager/Advisor and Property Managers has been preliminarily allocated as follows:

| | Business Manager/Advisor | Property Managers | Total |
|---|---|---|---|
| Number of shares issued | 18,750 | 18,750 | 37,500 |
| Share consideration based on $10.00 per share | $   187,500 | $   187,500 | $   375,000 |
| Estimated transaction costs and fees | | | 1,500 |
| Total purchase price | | | $   376,500 |

F-3

The preliminary allocation of the purchase price to contract termination expense and assets, including intangible assets, acquired as a result of the acquisition of the Business Manager/Advisor and Property Managers is as follows:

|  |  |
|---|---|
| Purchase price including estimated transaction costs and fees | $ 376,500 |
|  |  |
| Purchase price allocated to: |  |
| Contract termination expense | $ 373,114 |
| Property and equipment | 434 |
| Consulting agreements | 621 |
| Goodwill | 2,331 |
| Total purchase price allocation | $ 376,500 |

(1)  Represents the elimination of the accrued advisor and property management fees at June 30, 2007 as these fees will not be incurred by us as part of our ongoing operations.  The amounts due at June 30, 2007 are reflected as paid by us and distributed to the shareholders of the Business Manager/Advisor and Property Managers prior to the closing of the Merger in order to facilitate a tax free transaction.

(2)  Reimbursement for accrued business manager/advisor payroll costs and asset management and property management payroll costs are eliminated at June 30, 2007.  These costs are typically reimbursed by us and will be paid either directly or indirectly as part of ongoing operations.

(3)  Represents the merger consideration exchanged (including estimated transaction costs and fees) for the Business Manager/Advisor and Property Mangers and the related allocation of the purchase price.

(4)  The cash and cash equivalents of the Business Manager/Advisor and Property Managers will be distributed to their owners immediately prior to the closing of the  Merger

(5)  As a result of the Merger, the Business Manager/Advisor will be merged into an entity that will be a qualified REIT subsidiary that is not expected to pay federal or state income taxes.  The amount represents the elimination of tax liabilities which have been previously reflected in the historical financial statements of the Business Manager/Advisor as such amounts will not be assumed by us.

(6)  Reflects our historical condensed balance sheet and balance sheets of our Business Manager/Advisor and our Property Managers as of June 30, 2007.  Refer to our historical consolidated financial statements and notes thereto included in our quarterly report on Form 10-Q for the six months ended June 30, 2007 and elsewhere in this section of the proxy for historical balance sheets of our Business Manager/Advisor and Property Managers.

F-4

**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC. and SUBSIDIARIES**

Unaudited Pro Forma Condensed Consolidated Statement of Operations
for the Six Months Ended June 30, 2007

(In thousands, except per share amounts)

| | IWEST (13) | Property Operations Pro Forma | Joint Venture Pro Forma (10) | Pro Forma Total Before Merger | Property Managers (13) | Business Manager/ Advisor (13) | Pro Forma Adjustments | Pro Forma Total |
|---|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | | |
| Rental income | $ 295,015 | $ 7,349(7) | $ (7,768) | $ 294,596 | $ — | $ — | $ — | $ 294,596 |
| Management fees | — | — | — | — | 16,513 | — | (16,276)(2) | 237 |
| Advisor fees | — | — | — | — | — | 9,500 | (9,500)(1) | — |
| Tenant recovery income | 75,248 | 2,989(7) | (3,680) | 74,557 | — | — | — | 74,557 |
| Other property income and expense reimbursements | 5,819 | — | (102) | 5,717 | 2,984 | 439 | (3,423)(3) | 5,717 |
| Insurance captive income | 1,116 | — | — | 1,116 | — | — | — | 1,116 |
| Total revenues | 377,198 | 10,338 | (11,550) | 375,986 | 19,497 | 9,939 | (29,199) | 376,223 |
| **Expenses:** | | | | | | | | |
| Property operating expenses | 68,917 | 2,742(7) | (1,853) | 69,806 | 8,491 | — | (16,276)(2) (2,984)(3) | 59,037 |
| Real estate taxes | 43,835 | 1,453(7) | (1,961) | 43,327 | — | — | — | 43,327 |
| Depreciation and amortization | 134,225 | 6,019(8) | (3,860) | 136,384 | — | — | 68(6) | 136,452 |
| Provision for asset impairment | 13,560 | — | — | 13,560 | — | — | — | 13,560 |
| Insurance captive expenses | 769 | — | — | 769 | — | — | — | 769 |
| General & administrative expenses | 8,618 | — | — | 8,618 | — | 611 | (439)(3) 1,530 (5) | 10,320 |
| Advisor asset management fee | 9,500 | — | — | 9,500 | — | — | (9,500)(1) | — |
| Total expenses | 279,424 | 10,214 | (7,674) | 281,964 | 8,491 | 611 | (27,601) | 263,465 |
| Operating income | 97,774 | 124 | (3,876) | 94,022 | 11,006 | 9,328 | (1,598) | 112,758 |
| Other income/(expense) | 26,460 | — | 132 | 26,592 | 47 | — | — | 26,639 |
| Interest expense | (110,764) | (1,878) (9) | 3,218 | (109,424) | — | — | — | (109,424) |
| Income tax expense | — | — | — | — | — | (3,722) | 3,722(4) | — |
| Net income | $ 13,470 | $ (1,754) | $ (526) | $ 11,190 | $ 11,053 | $ 5,606 | $ 2,124 | $ 29,973 |
| Net income per common share | $ 0.03 | | | | | | | $ 0.06 |
| Weighted average number of common shares outstanding, basic and diluted | 448,512 | | | | | | (11) | 486,012 |

F-5

**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC. and SUBSIDIARIES**

**Notes to Unaudited Pro Forma Condensed Consolidated Statement of Operations
for the Six Months Ended June 30, 2007**

(In thousands, except per share amounts)

The unaudited pro forma condensed consolidated statement of operations for the six months ended June 30, 2007 includes our historical statement of operations and gives effect to (i) operations of properties which were not owned during the entire pro forma period as though they were acquired on January 1, 2006; (ii) operations of properties which were contributed to the MS Inland Fund, LLC joint venture as though they were contributed on January 1, 2006 and (iii) the Merger of the Business Manager/Advisor and the Property Managers as though they were acquired as of January 1, 2006. The unaudited pro forma condensed consolidated statement of operations is not necessarily indicative of what our actual results of operations would have been for the six months ended June 30, 2007, nor does it purport to represent our future financial position.

(1)     Represents the elimination of advisor fees which were accrued or paid by us to the Business Manager/Advisor during the six months ended June 30, 2007 and which will not be incurred by us as part of our on going operations.

(2)     Represents the elimination of property management fees which were accrued or paid by us to the Property Managers during the six months ended June 30, 2007 and which will not be incurred by us as part of our ongoing operations.

(3)     As part of our agreement with the Business Manager/Advisor, we are obligated to reimburse certain payroll costs and other expenses incurred by the Business Manager/Advisor. These amounts were incurred in our operations and the operations of the Business Manager/Advisor during the six months ended June 30, 2007 and will be paid directly by us on an ongoing basis. The adjustment represents the elimination of reimbursements.

(4)     The Business Manager/Advisor accrued $3,722 in income taxes related to its operations, which will not be applicable to us after the combination as the business will be owned by a qualified REIT subsidiary and, therefore, will not be a taxable entity.

(5)     Represents executive or officer level salaries which will be incurred by us on an ongoing basis pursuant to employment agreements or as full time employees, who were previously employed and paid by an affiliate of the Business Manager/Advisor.

(6)     Represents depreciation and amortization of estimated purchase price allocated to property and equipment and intangible assets. Property and equipment are depreciated over their expected useful life and the intangible assets are amortized over the term of the applicable agreement.

(7)     Total pro forma adjustments for acquisitions consummated as of June 30, 2007 are reflected as though they were acquired January 1, 2006 or the date operations commenced. The combined gross income and direct operating expense are based on information provided by the seller or from other sources for the following properties:

Bangor Parkade, Battle Ridge Pavilion, Central Texas Marketplace, The Centre at Laurel, College Station II, Coppell Town Center, Cost Plus World Market, Crockett Square, East Stone Commons, Gerry Centennial, Greenwich Center, Lake Worth Towne Crossing, Northwood Crossing, Old Time Pottery, Pacheco Pass Ph II, Pavilion at King's Grant II, Riverpark Phase I & IIA, Rivery Town Crossing, Shops at Legacy, South Towne Crossing, Southlake / Grand Ave, Southlake Corners, Southpark Meadows Bldg. G, Southpark Meadows II, Suntree Square and Walters Crossing.

(8)     Pro forma adjustments for acquisitions consummated as of June 30, 2007 relating to depreciation of buildings and improvements was calculated on a straight-line basis based upon estimated useful lives of 30 years for buildings and improvements and 15 years for site improvements. The portion of the property purchase prices that were allocated to above or below market lease intangibles were amortized on a straight-line basis over the life of the related leases as a pro forma adjustment to rental income. Other leasing costs, tenant improvements and in-place intangibles are amortized on a straight-line basis over the life of the related leases as a component of pro forma amortization expense.

(9)     The pro forma adjustments for acquisitions consummated as of June 30, 2007 relating to interest expense of $1,878 was based on the actual interest rates, ranging from 4.7% to 5.6%.

(10)     The pro forma adjustments for the MS Inland Fund, LLC joint venture consummated on April 27, 2007 are reflected as though the properties were contributed to the joint venture on January 1, 2006. As a result, property related income, property operating expenses, real estate taxes, depreciation and amortization and interest expense of the contributed

properties previously reflected in our consolidated statements of operations are replaced by our equity in earnings of an unconsolidated entity for the six months ended June 30, 2007.

F-6

(11)    Pro forma weighted average shares are computed by adding 37,500 shares that will be issued as consideration in the Merger to historical weighted average shares.

(12)    The amount allocated to contract termination expense of $373,114 will be expensed at the closing of the Merger. Such amount has been excluded from the pro forma statement of operations since it is non-recurring.

(13)    Reflects our historical condensed consolidated statement of operations and those of our Business Manager/Advisor and Property Managers for the six months ended June 30, 2007. Please refer to our historical condensed consolidated financial statements and notes thereto included in our Quarterly Report on Form 10-Q, filed on May 10, 2007 and elsewhere herein this section of the proxy for historical statements of operations of our Business Manger/Advisor and Property Managers for the six months ended June 30, 2007.

F-7

**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC. and SUBSIDIARIES**

Unaudited Pro Forma Condensed
Consolidated Statement of Operations
for the Year Ended December 31, 2006

(In thousands, except per share amounts)

| | IWEST(13) | Property Operations Pro Forma | Joint Venture Pro Forma (10) | Pro Forma Total Before Merger | Property Managers (13) | Business Manager/ Advisor (13) | Pro Forma Adjustments | Pro Forma Total |
|---|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | | |
| Rental income | $ 572,868 | $ 30,636(7) | $ (24,049) | $ 579,455 | $ — | $ — | $ — | $ 579,455 |
| Management fees | — | — | — | — | 30,046 | | (29,886)(2) | 160 |
| Advisor fees | — | — | — | — | — | 39,500 | (39,500)(1) | — |
| Tenant recovery income | 125,437 | 9,078(7) | (8,264) | $ 126,251 | — | — | — | 126,251 |
| Other property income and expense reimbursements | 11,798 | — | (390) | $ 11,408 | 5,313 | 1,019 | (6,332)(3) | 11,408 |
| Total revenues | 710,103 | 39,714 | (32,703) | 717,114 | 35,359 | 40,519 | (75,718) | 717,274 |
| **Expenses:** | | | | | | | | |
| Property operating expenses | 120,212 | 7,875(7) | (5,126) | 122,961 | 14,609 | — | (29,886)(2) (5,313)(3) | 102,371 |
| Real estate taxes | 79,894 | 5,819(7) | (5,895) | 79,818 | — | — | — | 79,818 |
| Depreciation and amortization | 259,884 | 19,279(8) | (11,806) | 267,357 | — | — | 136(6) | 267,493 |
| General & administrative expenses | 14,975 | — | — | 14,975 | — | 1,178 | (1,019)(3) 2,925(5) | 18,059 |
| Advisor asset management fee | 39,500 | — | — | 39,500 | — | — | (39,500)(1) | — |
| Total expenses | 514,465 | 32,973 | (22,827) | 524,611 | 14,609 | 1,178 | (72,657) | 467,741 |
| Operating income | 195,638 | 6,741 | (9,876) | 192,503 | 20,750 | 39,341 | (3,061) | 249,533 |
| Other income/(expense) | 59,403 | — | 36 | 59,439 | 118 | — | — | 59,557 |
| Interest expense | (223,098) | (10,453)(9) | 9,695 | (223,856) | — | — | — | (223,856) |
| Income tax expense | — | — | — | — | — | (15,697) | 15,697(4) | — |
| Net income | $ 31,943 | $ (3,712) | (145) | $ 28,086 | $ 20,868 | $ 23,644 | $ 12,636 | $ 85,234 |
| Net income per common share | $ 0.07 | | | | | | | $ 0.18 |
| Weighted average number of common shares outstanding, basic and diluted | 441,816 | | | | | | (11) | 479,316 |

F-8

**INLAND WESTERN RETAIL REAL ESTATE TRUST, INC. and SUBSIDIARIES**

**Notes to Unaudited Pro Forma Condensed Consolidated Statement of Operations
for the Year Ended December 31, 2006**
(In thousands, except per share amounts)

The unaudited pro forma condensed consolidated statement of operations for the year ended December 31, 2006, includes our historical statement of operations and gives effect to (i) operations of properties which were not owned during the entire pro forma period as though they were acquired on January 1, 2006; (ii) operations of properties which were contributed to the MS Inland Fund, LLC joint venture as though they were contributed on January 1, 2006 and (iii) the Merger of the Business Manager/Advisor and the Property Managers as though they were acquired as of January 1, 2006. The unaudited pro forma condensed consolidated statement of operations is not necessarily indicative of what our actual results of operations would have been for the year ended December 31, 2006, nor does it purport to represent our future financial position.

(1)    Represents the elimination of advisor fees which were accrued or paid by us to the Business Manager/Advisor in 2006 and which will not be incurred by us as part of our on going operations.

(2)    Represents the elimination of property management fees which were accrued or paid by us to the Property Managers in 2006 and which will not be incurred by us as part of our ongoing operations.

(3)    As part of our agreement with the Business Manager/Advisor, we are obligated to reimburse certain payroll costs and other expenses incurred by the Business Manager/Advisor. These amounts were incurred in our operations and the operations of the Business Manager/Advisor in 2006 and will be paid directly by us on an ongoing basis. The adjustment represents the elimination of reimbursements.

(4)    The Business Manager/Advisor accrued $15,697 in income taxes related to its operations, which will not be applicable to us after the combination as the business will be owned by a qualified REIT subsidiary and, therefore, will not be a taxable entity.

(5)    Represents executive or officer level salaries which will be incurred by us on an ongoing basis pursuant to employment agreements or as full time employees, who were previously employed and paid by an affiliate of the Business Manager/Advisor.

(6)    Represents depreciation and amortization of estimated purchase price allocated to property and equipment and intangible assets. Property and equipment are depreciated over their expected useful life and the intangible assets are amortized over the term of the applicable agreement.

(7)    Total pro forma adjustments for acquisitions consummated as of June 30, 2007 are reflected as though they were acquired January 1, 2006 or the date operations commenced. The combined gross income and direct operating expense are based on information provided by the seller or from other sources for the following properties:

            Bangor Parkade, Battle Ridge Pavilion, Central Texas Marketplace, The Centre at Laurel, College Station II, Coppell Town Center, Cost Plus World Market, Crockett Square, East Stone Commons, Gerry Centennial, Greenwich Center, Lake Worth Towne Crossing, Northwood Crossing, Old Time Pottery, Pacheco Pass Ph II, Pavilion at King's Grant II, Riverpark Phase I & IIA, Rivery Town Crossing, Shops at Legacy, South Towne Crossing, Southlake / Grand Ave, Southlake Corners, Southpark Meadows Bldg. G, Southpark Meadows II, Suntree Square and Walters Crossing.

(8)    Pro forma adjustments for acquisitions consummated as of June 30, 2007 relating to depreciation of buildings and improvements was calculated on a straight-line basis based upon estimated useful lives of 30 years for buildings and improvements and 15 years for site improvements. The portion of the property purchase prices that were allocated to above or below market lease intangibles were amortized on a straight-line basis over the life of the related leases as a pro forma adjustment to rental income. Other leasing costs, tenant improvements and in-place intangibles are amortized on a straight-line basis over the life of the related leases as a component of pro forma amortization expense.

(9)    The pro forma adjustments for acquisitions consummated as of June 30, 2007 relating to interest expense of $10,453 was based on the actual interest rates, ranging from 4.7% to 5.6%.

(10)    The pro forma adjustments for the MS Inland Fund, LLC joint venture consummated on April 27, 2007 are reflected as though the properties were contributed to the joint venture on January 1, 2006. As a result, property related income, property operating expenses, real estate taxes, depreciation and amortization and interest expense of the contributed

properties previously reflected in our consolidated statements of operations are replaced by our equity in earnings of an unconsolidated entity for the year ended December 31, 2006.

F-9

(11)   Pro forma weighted average shares are computed by adding 37,500 shares that will be issued as consideration in the Merger to historical weighted average shares.

(12)   The amount allocated to contract termination expense of $373,114 will be expensed at the closing of the Merger. Such amount has been excluded from the pro forma statement of operations since it is non-recurring.

(13)   Reflects our historical condensed consolidated statement of operations and those of our Business Manager/Advisor and Property Managers for the year ended December 31, 2006.  Please refer to our historical consolidated financial statements and notes thereto included in our Annual Report on Form 10-K, as amended, for the year ended December 31, 2006 and refer to the audited financial statements of our Business Manager/Advisor and Property Managers for the year ended December 31, 2006 included elsewhere herein this section of the proxy.

F-10

**Independent Auditors' Report**

The Board of Directors and Stockholder
Inland Western Retail Real Estate Advisory Services, Inc.:

We have audited the accompanying balance sheets of Inland Western Retail Real Estate Advisory Services, Inc. (the Company) (wholly owned by Inland Real Estate Investment Corporation) as of December 31, 2006 and 2005, and the related statements of income, changes in stockholder's equity, and cash flows for each of the years in the three-year period ended December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Inland Western Retail Real Estate Advisory Services, Inc. as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2006 in conformity with U.S. generally accepted accounting principles.


KPMG LLP

Chicago, Illinois
April 18, 2007


F-11

**INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.**
(Wholly Owned by Inland Real Estate Investment Corp.)

Balance Sheets
December 31, 2006 and 2005

| Assets | 2006 | 2005 |
|---|---|---|
| Current assets: | | |
| Cash and cash equivalents | $ 142,579 | $ 75,982 |
| Advisor fee receivable from IWRRETI | 9,000,000 | 3,000,000 |
| Due from IWRRETI | 149,536 | 247,220 |
| Miscellaneous receivable | — | 1,091 |
| Total current assets | 9,292,115 | 3,324,293 |
| Deferred tax asset | — | 4,060 |
| Investment in IWRRETI | — | 175,091 |
| Total assets | $ 9,292,115 | $ 3,503,444 |
| | | |
| Liabilities and Stockholder's Equity | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 4,888 | $ 2,711 |
| Due to IREIC | 149,536 | 487,220 |
| Dividend payable | 5,500,000 | — |
| Income taxes payable to TIGI | 3,561,558 | 1,176,885 |
| Total liabilities (all current) | 9,215,982 | 1,666,816 |
| | | |
| Stockholder's equity: | | |
| Common stock, no par value, 100,000 shares authorized, | | |
| 1,000 shares issued and outstanding | 1,000 | 1,000 |
| Retained earnings | 36,179,846 | 12,535,628 |
| Cumulative dividends | (36,104,713) | (10,700,000) |
| Total stockholder's equity | 76,133 | 1,836,628 |
| Total liabilities and stockholder's equity | $ 9,292,115 | $ 3,503,444 |

F-12

**INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.**
(Wholly Owned by Inland Real Estate Investment Corp.)

Combined Consolidated Statements of Income
Years Ended December 31, 2006, 2005 and 2004

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenues: |  |  |  |
| Advisor fees | $39,500,000 | $20,925,000 | $ — |
| Reimbursement of salary and employee benefits | 1,018,856 | 1,608,420 | 1,502,511 |
| Total revenues | 40,518,856 | 22,533,420 | 1,502,511 |
|  |  |  |  |
| Expenses: |  |  |  |
| Salary and employee benefits | 1,019,108 | 1,608,777 | 1,503,455 |
| Depreciation expense | — | — | 1,374 |
| General and administrative expenses | 159,680 | 32,686 | 34,557 |
| Total expenses | 1,178,788 | 1,641,463 | 1,539,386 |
|  |  |  |  |
| Income (loss) before income from investment in real estate investment trust and income taxes | 39,340,068 | 20,891,957 | (36,875) |
| Income from investment in real estate investment trust | 1,392 | 2,396 | 1,306 |
| Income (loss) before income taxes | 39,341,460 | 20,894,353 | (35,569) |
| Provision for income taxes | 15,697,242 | 8,336,790 | (13,836) |
| Net income (loss) | $23,644,218 | $12,557,563 | $ (21,733) |

F-13

**INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.**
(Wholly Owned by Inland Real Estate Investment Corp.)

Statements of Changes in Stockholders' Equity
For the Years Ended December 31, 2006, 2005 and 2004

| | Common Shares Issued | Common Stock | Dividends | Retained Earnings | Total Stockholder's Equity |
|---|---|---|---|---|---|
| Balance at December 31, 2003 | 1,000 | $ 1,000 | $ — | $ (202) | $ 798 |
| Dividends declared | — | — | — | — | — |
| Net loss | — | — | — | (21,733) | (21,733) |
| Balance at December 31, 2004 | 1,000 | $ 1,000 | $ — | $ (21,935) | $ (20,935) |
| Dividends declared | — | — | (10,700,000) | — | (10,700,000) |
| Net income | — | — | — | 12,557,563 | 12,557,563 |
| Balance at December 31, 2005 | 1,000 | $ 1,000 | $(10,700,000) | $ 12,535,628 | $ 1,836,628 |
| Dividends declared | — | — | (25,404,713) | — | (25,404,713) |
| Net income | — | — | — | 23,644,218 | 23,644,218 |
| Balance at December 31, 2006 | 1,000 | $ 1,000 | $(36,104,713) | $ 36,179,846 | $ 76,133 |

See accompanying notes to combined consolidated financial statements

F-14

**INLAND WESTERN RETAIL REAL ESTATE
ADVISORY SERVICES, INC.**
(Wholly Owned by Inland Real Estate Investment Corp.)

Statements of Cash Flows
For the Years Ended December 31, 2006, 2005 and 2004

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income (loss) | $23,644,218 | $12,557,563 | $ (21,733) |
| Adjustments to reconcile net income to net cash | | | |
| provided by operating activities: | | | |
| Depreciation | — | — | 1,374 |
| Income from investment in real estate investment trust | (1,392) | (2,396) | (1,491) |
| Distributions received from investment in real estate investment trust | 10,770 | 12,726 | 13,365 |
| Deferred income tax | 4,060 | (1,852) | (2,280) |
| Changes in operating assets and liabilities: | | | |
| Accrued advisor fee receivable | (6,000,000) | (3,000,000) | — |
| Miscellaneous receivable | 1,091 | 10 | 88 |
| Due from IWRRETI | 97,684 | 37,717 | 6,078 |
| Accounts payable and accrued expenses | 2,177 | 343 | 2,368 |
| Due to IREIC | (337,684) | (37,718) | 33,922 |
| Income taxes payable to TIGI | 2,384,673 | 1,188,642 | (11,557) |
| Net cash provided by operating activities | 19,805,597 | 10,755,035 | 20,134 |
| | | | |
| Cash flows from investing activities: | | | |
| Purchase of office furniture | — | — | (13,565) |
| Proceeds from sale of office furniture | — | — | 12,191 |
| Net cash used in investing activities | — | — | (1,374) |
| | | | |
| Cash flows from financing activities: | | | |
| Dividends paid | (19,739,000) | (10,700,000) | — |
| Net cash used in financing activities | (19,739,000) | (10,700,000) | — |
| Net increase in cash and cash equivalents | 66,597 | 55,035 | 18,760 |
| Cash and cash equivalents at beginning of year | 75,982 | 20,947 | 2,187 |
| Cash and cash equivalents at end of year | $ 142,579 | $ 75,982 | $ 20,947 |
| | | | |
| Supplemental disclosure: | | | |
| Income taxes paid to TIGI | $13,308,510 | $ 7,150,000 | $ — |
| | | | |
| Noncash transactions: | | | |
| Dividend of common stock | $ 165,713 | $ — | $ — |
| Dividend declared | 5,500,000 | — | — |

See accompanying notes to combined consolidated financial statements

F-15

## INLAND WESTERN RETAIL REAL ESTATE
## ADVISORY SERVICES INC.
(Wholly Owned by Inland Real Estate Investment Corp.)
Notes to Financial Statements
December 31, 2006, 2005 and 2004

**(1)     General Information and Significant Accounting Policies**

Inland Western Retail Real Estate Advisory Services, Inc. (the Company) is a wholly owned subsidiary of Inland Real Estate Investment Corporation (IREIC). The Inland Group, Inc. (TIGI) is the ultimate parent. The Company was formed in 2003 to serve as advisor to Inland Western Retail Real Estate Trust, Inc. (IWRRETI), a real estate investment trust affiliated with IREIC.

The accompanying financial statements have been prepared in accordance with U.S. generally accepted accounting principles. The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual amounts could subsequently differ from such estimates. A description of significant accounting policies follows:

*(a)     Advisor Fees*

In connection with advising IWRRETI, the Company earns an advisory fee of not more than 1% annually of the real estate investment trust's average assets. The Company records the advisory fee revenue as earned.

*(b)     Investment in a Real Estate Investment Trust*

The Company accounts for its investment in IWRRETI using the equity method of accounting whereby it records its share of earnings as income from investment in real estate investment trust and records the dividends received as a reduction of its investment.

*(c)     Income Taxes*

The Company is included in the consolidated federal and combined unitary state income tax returns of TIGI. As such, the Company accounts for income taxes in accordance with Statement of Financial Accounting Standards (SFAS) No. 109, *Accounting for Income Taxes* as though it is a separate taxable entity in accordance with its tax-sharing agreement with TIGI.

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

*(d)     Statement of Cash Flows*

For purposes of the statement of cash flows, the Company considers interest-bearing deposits with maturity of three months or less at the date of purchase to be cash equivalents.

*(e)     Reimbursement of Salary and Employee Benefits*

Reimbursements from IWRRETI for salary and employee benefits are accrued as revenue in the period the applicable expenditures are incurred.

*(f)     Recently Issued Accounting Pronouncements*

In June 2006, the FASB issued Interpretation No. 48, *Uncertainty in Income Taxes — an Interpretation of FASB Statement No. 109*. This Interpretation defines a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. This Interpretation also provides guidance on derecognizing, classification,

F-16

interest and penalties, accounting in interim periods, disclosure and transition. This Interpretation is effective for fiscal years beginning after December 15, 2006. The Company does not expect a material impact to the financial statements.

**(2)    Related-Party Transactions**

The Company has an advisory agreement with IWRRETI to provide services for day-to-day operations and the management of IWRRETI's assets.  The advisory agreement had an initial term of one year and has been renewed for successive one-year terms upon consent of the parties.  It may be terminated by either party, by mutual consent of the parties or by a majority of the independent directors or the advisor upon 60 days' written notice.

In connection with advising IWRRETI, the Company earns an advisory fee of not more than 1% annually of the real estate investment trust's average assets. Average invested asset value is defined as the average of the total book value, including acquired intangibles, of IWRRETI's real estate assets plus IWRRETI's loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt, or other similar noncash reserves. IWRRETI computes the average invested assets by taking the average of the values at the end of each month for which the fee is being calculated. The fee is payable quarterly in an amount equal to 0.25 of 1% of IWRRETI's average assets as of the last day of the immediately preceding quarter. All amounts due as of December 31, 2006 have been collected in 2007. Based upon the maximum allowable advisor asset management fee of 1% of IWRRETI's average invested assets, maximum fees of approximately $74,895,000, $54,933,000 and $14,971,000, were allowed for the years ended December 31, 2006, 2005 and 2004, respectively.  Advisor fee income of $39,500,000, $20,925,000 and $0 for 2006, 2005 and 2004, respectively, was derived from advisory services performed for IWRRETI.  The Company has agreed to forego any fees allowed but not taken during those periods.

For any year in which IWRRETI qualifies as a REIT, the Company must reimburse IWRRETI for the following amounts, if any: (1) the amounts by which total operating expenses of the REIT, the sum of the advisor asset management fee charged plus other operating expenses of the REIT, paid during the previous fiscal year exceed the greater of: (i) 2% of average assets of the REIT for that fiscal year, or (ii) 25% of net income of the REIT for that fiscal year; plus (2) an amount, which will not exceed the advisor asset management fee for that year, equal to any difference between the total amount of distributions to stockholders for that year and a 6% minimum annual return on the net investment of stockholders. The Company has not been required to reimburse IWRRETI for any such amounts to date.

Income from investment in real estate investment trust of $1,392, $2,396 and $1,306 for 2006, 2005 and 2004, respectively, was earned from the Company's $200,000 original cash investment in common stock of IWRRETI. This investment in IWRRETI common stock was transferred to IREIC as a dividend in November 2006.

The Company is charged direct costs for specific legal, information technology services, and certain other administrative services performed by administrative departments of TIGI. Additionally, rent is allocated from IREIC and paid to TIGI. Such amounts totaled $115,066, $27,461 and $13,229 for the years ended December 31, 2006, 2005 and 2004, respectively. In the opinion of management, the aforementioned administrative costs and rent are believed to be reasonable; however, it is not necessarily indicative of the expense the Company may have incurred on its own account.

The Company is entitled to reimbursements for salaries and expenses of its employees relating to the offering and administration of IWRRETI. Such costs totaling $1,018,856, $1,608,420, $1,502,511 for 2006, 2005 and 2004, respectively, are included in reimbursement of salary and employee benefits, as well as salary and employee benefits in the accompanying statements of income. IREIC administers the salary function for the Company. As of December 31, 2006 and 2005, $149,536 and $247,220, respectively, of payroll reimbursements were due by the Company to IREIC. All amounts due to IREIC were paid in 2006.

F-17

**(3)    Income Taxes**

The Company is party to a tax sharing agreement which provides that income tax expense or benefit reflected on a separate company basis. Income tax expense from operations consists of:

|  | Current | Deferred | Total |
|---|---|---|---|
| Year ended December 31, 2006 | $ 15,697,242 | $      — | $ 15,697,242 |
| Year ended December 31, 2005 | $  8,338,642 | $   (1,852) | $  8,336,790 |
| Year ended December 31, 2004 | $   (11,557) | $   (2,279) | $   (13,836) |

Income tax expense is entirely attributable to income from continuing operations. Deferred income tax expense results entirely from the tax effects of temporary differences. The tax effects of temporary differences due to the income from the investment in IWRRETI that give rise to the deferred tax assets at December 31, 2006 and 2005 is $0 and $1,852, respectively.

Income tax expense from operations for the years ended December 31, 2006, 2005 and 2004, differs from "expected" tax expense (computed by applying the U.S. federal income tax rate of 35% and 35%, respectively, to pretax income) principally due to the effect of state and local income taxes (net of federal benefit). As of December 31, 2005, there was no valuation allowance, as management believed it was more likely than not that the deferred tax asset would be realized through future operations.

**(4)    Commitments and Contingencies**

Pursuant to the terms of the offering of IWRRETI, the Company is required to pay organizational and offering expenses (excluding sales commissions, the marketing contribution, and the due diligence expense allowance) in excess of 5.5% of the gross proceeds of the offering (Gross Offering Proceeds) or all organization and offering expenses (including selling commissions), which together exceed 15% of Gross Offering Proceeds. As of December 31, 2006 and 2005, offering costs did not exceed the 15% and 5.5% limitations.

**(5)    Subsequent Events**

On March 3, 2007, the Company paid dividends totaling $5,500,000 to IREIC.

F-18

## INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC.
### (Business Manager/Advisor)

Balance Sheet
June 30, 2007
(Unaudited)
(In thousands)

### Assets

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 20 |
| Advisor fee receivable from IWRRETI | | 9,500 |
| Due from IWRRETI | | 256 |
| Total assets | $ | 9,776 |

### Liabilities and Stockholder's Equity

| | | |
|---|---|---:|
| Liabilities: | | |
| Due to IREIC | $ | 306 |
| Accounts payable and accrued expenses | | 5 |
| Dividend payable | | 5,680 |
| Income taxes payable | | 3,783 |
| Total liabilities | | 9,774 |
| | | |
| Stockholder's equity: | | |
| Common stock, no par value, 100 shares authorized, | | |
| 1 shares issued and outstanding | | 1 |
| Retained earnings | | 41,786 |
| Cumulative dividends | | (41,785) |
| Total stockholder's equity | | 2 |
| Total liabilities and stockholder's equity | $ | 9,776 |

F-19

**INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC.**
(Business Manager/Advisor)

Income Statement
For the Six Months Ended June 30, 2007 and 2006
(Unaudited)
(In thousands)

|  | Six Months Ended June 30, | |
|---|---|---|
|  | 2007 | 2006 |
| Revenues: |  |  |
| Advisor fees | $9,500 | $20,000 |
| Reimbursement of salary and employee benefits | 439 | 514 |
| Total revenues | 9,939 | 20,514 |
| Expenses: |  |  |
| Salary and employee benefits | 439 | 514 |
| General and administrative expenses | 172 | 120 |
| Total expenses | 611 | 634 |
| Income before income taxes | 9,328 | 19,880 |
| Provision for income taxes | (3,722) | (7,932) |
| Net income | $5,606 | $11,948 |

F-20

**INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC.**
(Business Manager/Advisor)

Statement of Changes in Stockholders' Equity
For the Six Months Ended June 30, 2007
(Unaudited)
(In thousands)

| | Number of Shares | Common Stock | Dividends | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| Balance at December 31, 2006 | 1 | $ 1 | $ (36,105) | $ 36,180 | $ 76 |
| Dividends declared | — | — | (5,680) | — | (5,680) |
| Net income | — | — | — | 5,606 | 5,606 |
| Balance at June 30, 2007 | 1 | $ 1 | $ (41,785) | $ 41,786 | $ 2 |

F-21

**INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC.**
(Business Manager/Advisor)

Statement of Cash Flows
For the Six Months Ended June 30, 2007 and 2006
(Unaudited)
(In thousands)

|  | Six Months Ended June 30, | |
| --- | ---: | ---: |
|  | 2007 | 2006 |
| Cash flows from operating activities: |  |  |
| Net income | $5,606 | $11,948 |
| Adjustments to reconcile net income to net cash |  |  |
| provided by operating activities: |  |  |
| Income from investment in real estate investment trust | — | (1) |
| Distributions received from investment in real |  |  |
| estate investment trust | — | 6 |
| Changes in operating assets and liabilities: |  |  |
| Accrued advisor fee receivable | (500) | (7,500) |
| Due from IWRRETI | (37) | (112) |
| Due to affiliate | 87 | (128) |
| Accounts payable | — | (2) |
| Income taxes payable | 221 | 2,985 |
| Net cash provided by operating activities | 5,377 | 7,196 |
| Cash flows from investing activities: | — | — |
| Cash flows from financing activities: |  |  |
| Dividends paid | (5,500) | (7,100) |
| Net decrease in cash and cash equivalents | (123) | 96 |
| Cash and cash equivalents at beginning of year | 143 | 76 |
| Cash and cash equivalents at end of period | $ 20 | $ 172 |

F-22

**Independent Auditors' Report**

The Board of Directors
Inland Southwest Management Corp.
Inland Western Management Corp.
Inland Northwest Management Corp:

We have audited the accompanying combined consolidated balance sheets of Inland Southwest Management Corp., Inland Western Management Corp., and Inland Northwest Management Corp. (collectively, the "Company") as of December 31, 2006 and 2005, and the related combined consolidated statements of income, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2006.  These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the combined consolidated financial statements referred to above present fairly, in all material respects, the financial position of Inland Southwest Management Corp., Inland Western Management Corp., and Inland Northwest Management Corp. as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles.

KPMG LLP

Chicago, Illinois
June 6, 2007

F-23

**PROPERTY MANAGEMENT COMPANIES**
Combined Consolidated Balance Sheets
December 31, 2006 and 2005

|  | 2006 | 2005 |
|---|---|---|
| Assets |  |  |
| Current assets: |  |  |
| Cash and cash equivalents | $2,598,281 | $2,099,336 |
| Accounts receivable — affiliates | 94,154 | 255,132 |
| Prepaid expense | — | 17,256 |
| Security deposit | 8,061 | 6,922 |
| Total current assets | 2,700,496 | 2,378,646 |
|  |  |  |
| Property and equipment, at cost: |  |  |
| Furniture and fixtures | 329,033 | 202,821 |
| Computers | 192,443 | 159,414 |
| Telephone equipment | 10,983 | 9,871 |
| Leasehold improvements | 133,632 | 67,829 |
|  | 666,091 | 439,935 |
| Less accumulated depreciation | 231,796 | 95,983 |
|  | 434,295 | 343,952 |
| Total assets | $3,134,791 | $2,722,598 |
|  |  |  |
| Liabilities and Stockholders' Equity |  |  |
| Current liabilities: |  |  |
| Accounts payable and accrued expenses | $ 597,410 | $ 548,081 |
| Franchise tax payable | 158,589 | 151,386 |
| Total current liabilities | 755,999 | 699,467 |
| Stockholders' equity | 2,378,792 | 2,023,131 |
| Total liabilities and stockholders' equity | $3,134,791 | $2,722,598 |

See accompanying notes to combined financial statements

F-24

**PROPERTY MANAGEMENT COMPANIES**
Combined Consolidated Statements of Income
For the Years Ended December 31, 2006, 2005 and 2004

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenues: |  |  |  |
| Management fees | $30,046,069 | $20,741,549 | $ 5,370,242 |
| Reimbursement of salary and employee benefits | 5,312,801 | 2,267,891 | — |
| Interest income | 51,460 | 16,526 | — |
| Other income | 67,050 | 20,710 | 14,500 |
| Total revenues | 35,477,380 | 23,046,676 | 5,384,742 |
|  |  |  |  |
| Expenses: |  |  |  |
| Salary and employee benefits | 10,828,297 | 6,271,855 | 1,114,320 |
| Depreciation and amortization | 135,813 | 77,399 | 24,358 |
| Computer charges | 500,101 | 329,766 | 143,916 |
| General and administrative | 1,402,326 | 1,252,647 | 719,769 |
| Rent expense | 708,490 | 406,752 | 103,198 |
| Franchise tax expense | 590,228 | 374,341 | 65,993 |
| Interest expense | 547 | — | — |
| Sub-management fee | 443,367 | 858,438 | 624,776 |
| Total expenses | 14,609,169 | 9,571,198 | 2,796,330 |
| Net income | $20,868,211 | $13,475,478 | $ 2,588,412 |

See accompanying notes to combined financial statements

F-25

## PROPERTY MANAGEMENT COMPANIES
Combined Consolidated Statements of Stockholders' Equity
For the Years Ended December 31, 2006, 2005 and 2004

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balance at January 1, 2004 | 36,000 | $      360 | $          — | $        6,875 | $        7,235 |
| Net income | — | — | — | 2,588,412 | 2,588,412 |
| Additional shares issued | 2,135 | 22 | 133,800 | — | 133,822 |
| Distributions declared | — | — | — | (2,586,000) | (2,586,000) |
| Balance at December 31, 2004 | 38,135 | $      382 | $   133,800 | $        9,287 | $    143,469 |
| Net income | — | — | — | 13,475,478 | 13,475,478 |
| Merger with Inland Pacific Management Corp. | (9,000) | (90) | 5,851 | (6,856) | (1,095) |
| Additional shares issued | 540 | 5 | 161,743 | — | 161,748 |
| Distributions declared | — | — | — | (11,756,469) | (11,756,469) |
| Balance at December 31, 2005 | 29,675 | 297 | 301,394 | $ 1,721,440 | $ 2,023,131 |
| Net income | — | — | — | 20,868,211 | 20,868,211 |
| Distributions declared | — | — | — | (20,512,550) | (20,512,550) |
| Balance at December 31, 2006 | 29,675 | $      297 | $   301,394 | $ 2,077,101 | $ 2,378,792 |

See accompanying notes to combined financial statements

F-26

## PROPERTY MANAGEMENT COMPANIES

Combined Consolidated Statements of Cash Flows
For the Years Ended December 31, 2006, 2005 and 2004

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Cash flows from operating activities: |  |  |  |
| Net income | $20,868,211 | $13,475,478 | $ 2,588,412 |
| Adjustments to reconcile net income to net cash provided by operating activities: |  |  |  |
| Depreciation and amortization | 135,813 | 77,399 | 24,358 |
| Consulting services received in exchange for common stock | — | — | 133,822 |
| Changes in operating assets and liabilities: |  |  |  |
| Accounts receivable—affiliates | 160,978 | (252,813) | (1,249) |
| Prepaid expense | 17,256 | (17,256) | — |
| Security deposit | (1,139) | (6,922) | — |
| Accounts payable and accrued expenses | 49,329 | 63,444 | 419,037 |
| Franchise tax payable | 7,203 | 151,386 | — |
| Net cash provided by operating activities | 21,237,651 | 13,490,716 | 3,164,380 |
| Cash used in investing activities - |  |  |  |
| Purchase of property and equipment | (226,156) | (268,051) | (118,391) |
| Cash provided by (used in) financing activities: |  |  |  |
| Distributions to stockholders | (20,512,550) | (13,541,469) | (801,000) |
| Proceeds from issuance of common stock | — | 161,748 | — |
| Proceeds from merger with Pacific Management Corp. | — | 101 | — |
| Payment on notes payable | — | — | (78,336) |
| Net cash used in financing activities | (20,512,550) | (13,379,620) | (879,336) |
| Net increase (decrease) in cash and cash equivalents | 498,945 | (156,955) | 2,166,653 |
| Cash and cash equivalents: |  |  |  |
| Beginning of year | 2,099,336 | 2,256,291 | 89,638 |
| End of year | $ 2,598,281 | $ 2,099,336 | $ 2,256,291 |
| Supplemental disclosure of non-cash financing activity: |  |  |  |
| Consulting services received in exchange for common stock | $       — | $       — | $    133,822 |

See accompanying notes to combined financial statements

F-27

PROPERTY MANAGEMENT COMPANIES

Notes to Combined Consolidated Financial Statements

December 31, 2006, 2005 and 2004

**(1)** **Summary of Significant Accounting Policies**

    *(a)*    *Organization*

        Inland Southwest Management Corp. and Inland Northwest Management Corp. are Delaware corporations and were incorporated on November 10, 2003.  Inland Western Management Corp. is also a Delaware corporation and was incorporated on January 30, 2003.  Inland Southwest Management Corp., Inland Northwest Management Corp., and Inland Western Management Corp. are collectively referred to as the "Company".  An additional corporation, Inland Pacific Management Corp., was incorporated on November 10, 2003 and was subsequently merged into Inland Western Management Corp. on January 24, 2005.  These corporations each own a 33.33% interest in Inland Holdco Management LLC (Holdco) and are under common control, and are presented on a combined basis for the purposes of these financial statements. Holdco owns a 100% interest in and consolidates three limited liability companies (LLCs); Inland Southwest Management LLC, Inland U.S. Management LLC, and Inland Pacific Property Services LLC. The effect of all intercompany balances and transactions have been eliminated in combination and consolidation.

        The accompanying combined consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles. The preparation of the combined consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and the disclosure of contingent assets and liabilities at the date of the combined consolidated financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual amounts could subsequently differ from such estimates. A description of significant accounting policies follows:

    *(b)*    *Operations*

        The Company, through Holdco, is responsible for the management of 307 commercial properties comprising approximately 45,000,000 square feet of primarily retail and shopping center space owned by Inland Western Retail Real Estate Trust, Inc. (IWEST).  The LLCs manage properties based on geographic location. Holdco's LLC's earn property management fees equal to 4.50% of net rent collected.  The Company records the management fees as earned.

    *(c)*    *Depreciation and Amortization*

        Depreciation and amortization of property and equipment is computed on the straight-line and accelerated methods for both financial statement and income tax purposes over estimated useful lives, as follows:

| | Useful Life |
|---|---|
| Computers and telephone equipment | 3-5 years |
| Furniture and fixtures | 7 years |
| Leasehold improvements | 15 years |

    *(d)*    *Income Taxes*

        The corporations and LLC's included in the combined consolidated financial statements are non-taxable entities. In lieu of paying federal income taxes, the stockholders or members, are taxed on each corporation's or LLC's taxable income or loss. Accordingly, no provision for federal income taxes was recorded. The corporations and LLC's remain liable for various state taxes on income and some state taxes in the form of franchise taxes.

    *(e)*    *Cash and Cash Equivalents*

        For purposes of the statement of cash flows, the Company considers interest-bearing deposits with a maturity of three months or less at the date of purchase to be cash equivalents.

(f)    *Reimbursement of Salary and Employee Benefits*

Reimbursements from IWEST for salary and employee benefits are accrued as revenue in the period the applicable expenditures are incurred.

F-28

**(2)     Transactions with Affiliates**

The Company has master management agreements with IWEST to provide property management services in connection with the rental, leasing, operation and management of IWEST's properties.  There is a separate management agreement for each property for an initial term ending as of December 31 in the year in which the property is acquired, and each management agreement is subject to three successive three-year renewals, unless either party notifies the other in writing of its intent to terminate between 60 and 90 days prior to the expiration of the initial or renewal term (or by IWEST with cause upon 30 days prior written notice).

In connection with the property management services, the Company earns management fees equal to 4.5% of net rents. Such amounts totaled approximately $30,046,070, $20,741,550, and $5,370,240 for the years ended December 31, 2006, 2005 and 2004, respectively.  All related amounts have been received by the Company as of December 31, 2006 and 2005.

The Company also had agreements with affiliated Inland companies to pay sub-management fees at the market rate to sub-manage various properties. These agreements were all terminated prior to December 31, 2005. Such amounts totaled approximately $58,000 and $55,380 for the years ended December 31, 2005 and 2004, respectively.

The Company was charged direct costs for computer, payroll, legal and other services performed by administrative departments of The Inland Services Group, Inc. including Inland Payroll Servicing for payroll processing services, and the legal department of The Inland Real Estate Group, Inc., companies with common ownership. Such amounts totaled approximately $497,150, $293,880 and $593,400 for the years ended December 31, 2006, 2005 and 2004, respectively. In the opinion of management, the aforementioned administrative costs and legal fees are believed to be reasonable; however, it is not necessarily indicative of the expense the Company may have incurred if it received such services from providers not affiliated with The Inland Real Estate Group, Inc. The Company is entitled to reimbursements for certain property-level salaries incurred during 2006 and 2005.  For the years ended December 31, 2006 and 2005, reimbursement income from IWEST related to these salary expenses totaled $5,312,801 and $2,267,891, respectively. No reimbursements were made during 2004.

The Company shares office space with an affiliate of The Inland Real Estate Group, Inc.  The Company reimburses the affiliate for the Company's prorated share of expenses. For the years ended December 31, 2006, 2005 and 2004, the Company's portion of rent expense was $313,070, $150,563 and $41,031 respectively.

**(3)     Lease Commitments**

The Company leases facilities under agreements which expire through 2012.  As of December 31, 2006, the minimum aggregate future rental commitments under all noncancelable operating leases are as follows:

|                          | Amount    |
|--------------------------|-----------|
| Year ending December 31, |           |
| 2007                     | $ 176,568 |
| 2008                     | 68,171    |
| 2009                     | 20,004    |
| 2010                     | 20,004    |
| 2011                     | 20,004    |
| Thereafter               | 15,003    |
|                          | $ 319,754 |

For the years ended December 31, 2006, 2005 and 2004, rent expense was $708,490, $406,752, and $103,198, respectively (including $313,070, $150,563, and $41,031 to a related party).

F-29

**(4)    Concentration of Credit Risk**

The Company maintains cash balances in excess of those insured by the FDIC ($100,000). The Company holds its cash balances at a financial institution which is affiliated with the Company.

F-30

**INLAND SOUTHWEST MANAGEMENT CORP.**
**INLAND NORTHWEST MANAGEMENT CORP.**
**INLAND WESTERN MANAGEMENT CORP.**
(Property Managers)

Combined Consolidated Balance Sheet
June 30, 2007
(Unaudited)
(In thousands)

**Assets**

| | |
|---|---|
| Current assets: | |
| Cash and cash equivalents | $  396 |
| Accounts receivable | 2,509 |
| Security deposit | 8 |
| Total current assets | 2,913 |
| | |
| Property and equipment, at cost: | |
| Furniture and fixtures | 334 |
| Computers | 230 |
| Telephone equipment | 17 |
| Leasehold improvements | 143 |
| | 724 |
| Less accumulated depreciation | 299 |
| | 425 |
| Total assets | $3,338 |

**Liabilities and Members' Equity**

| | |
|---|---|
| Current liabilities: | |
| Accounts payable and accrued expenses | $  427 |
| Franchise tax payable | 57 |
| Total current liabilities | 484 |
| | |
| Stockholder's equity | 2,854 |
| | |
| Total liabilities and stockholder's equity | $3,338 |

F-31

**INLAND SOUTHWEST MANAGEMENT CORP.**
**INLAND NORTHWEST MANAGEMENT CORP.**
**INLAND WESTERN MANAGEMENT CORP.**
(Property Managers)

Combined Consolidated Statement of Income
For the Six Months Ended June 30, 2007 and 2006
(Unaudited)
(In thousands)

|  | Six Months Ended June 30, | |
| --- | ---: | ---: |
|  | **2007** | **2006** |
| Revenues: | | |
| Management fees | $16,513 | $14,562 |
| Reimbursement of salary and employee benefits | 2,984 | 2,586 |
| Interest income | 8 | — |
| Other income | 39 | 27 |
| Total revenues | 19,544 | 17,175 |
| | | |
| Expenses: | | |
| Salary and employee benefits | 6,227 | 5,468 |
| Depreciation and amortization | 68 | 36 |
| Computer charges | 403 | 223 |
| General and administrative | 1,012 | 565 |
| Rent expense | 379 | 133 |
| Franchise tax expense | 196 | 101 |
| Sub-management fees | 206 | 218 |
| Total expenses | 8,491 | 6,744 |
| Net income | $11,053 | $10,431 |

F-32

**INLAND SOUTHWEST MANAGEMENT CORP.**
**INLAND NORTHWEST MANAGEMENT CORP.**
**INLAND WESTERN MANAGEMENT CORP.**
(Property Managers)

Combined Consolidated Statement of Stockholders' Equity
For the Six Months Ended June 30, 2007
(Unaudited)
(In thousands)

| | Number of Shares | Common Stock | Additional Paid-In Capital | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|
| Balance at December 31, 2006 | 30 | $ — | $ 301 | $ 2,077 | $ 2,378 |
| Dividends declared | — | — | — | $ (10,577) | (10,577) |
| Net income | — | — | — | 11,053 | 11,053 |
| Balance at June 30, 2007 | 30 | $ — | $ 301 | $ 2,553 | $ 2,854 |

F-33

**INLAND SOUTHWEST MANAGEMENT CORP.**
**INLAND NORTHWEST MANAGEMENT CORP.**
**INLAND WESTERN MANAGEMENT CORP.**
(Property Managers)

Combined Consolidated Statement Cash Flows
For the Six Months Ended June 30, 2007 and 2006
(Unaudited)
(In thousands)

| | Six Months Ended June 30, | |
|---|---|---|
| | **2007** | **2006** |
| Cash flows from operating activities: | | |
| Net income | $11,053 | $10,431 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 68 | 36 |
| Changes in operating assets and liabilities: | | |
| Accounts recievable and prepaid expenses | (2,415) | (214) |
| Accounts payable and accrued expenses | (171) | (148) |
| Franchise tax payable | (101) | — |
| Net cash provided by operating activities | 8,434 | 10,105 |
| | | |
| Cash used in investing activities: | | |
| Purchase of property and equipment | (59) | (230) |
| Cash used in financing activities: | | |
| Distribution to members | (10,577) | (9,500) |
| | | |
| Net (decrease) increase in cash and cash equivalents | (2,202) | 375 |
| | | |
| Cash and cash equivalents: | | |
| Beginning period | 2,598 | 2,099 |
| End of period | $    396 | $ 2,474 |

F-34