# EXHIBIT 1B

## SUMMARY

This summary highlights the material information contained in the proxy statement, but may not contain all of the information that is important to you and, therefore, you should read carefully this entire document, including the appendices and the other documents to which we refer you, for a more complete understanding of the transactions that are the subject of this proxy statement.

**Ratification of our Entry into the Merger Agreement and our Approval of the Merger**

*Background.* We are a real estate investment trust that was formed in 2003. We have primarily focused on acquiring, developing, operating and leasing multi-tenant shopping centers and single-user net lease properties. As of June 30, 2007, our portfolio consisted of 288 wholly-owned properties, 16 properties in which we have an interest of between 45% and 95%, and six development joint venture projects in which we have an investment, four of which we consolidate. As of June 30, 2007, our portfolio contained approximately 46 million square feet of leasable space. Our anchor tenants include nationally and regionally recognized grocers, discount retailers, financial companies, and other tenants who provide basic household goods and services. Of our total annualized revenue as of June 30, 2007, approximately 69% is generated by anchor or credit tenants, including American Express, Zurich Insurance Company, Best Buy, Ross Dress For Less, Bed Bath & Beyond, GMAC, Wal-Mart, Publix Supermarket, and several others. The term "credit tenant" is subjective and we apply the term to tenants who we believe have a substantial net worth.

Since our inception, our Property Managers have been responsible for, among other things, leasing, collecting rents and performing routine maintenance work that is not otherwise the tenant's responsibility. For our Property Managers' services, we pay a fee of 4.5% of gross operating income of each property managed by the Property Managers. In 2006, 2005 and 2004, we paid our Property Managers property management fees of $29.8 million, $20.7 million and $5.4 million, respectively.

Likewise since inception, Inland Western Retail Real Estate Advisory Services, Inc., has served as our business manager and advisor. Since we do not have any employees, our Business Manager/Advisor has been responsible for our day-to-day operations, including negotiating the acquisition of our properties, overseeing our Property Managers, administering our bookkeeping and accounting and legal functions, investor relations and consulting with our Board on policy decisions. For these services, we can be charged by our Business Manager/Advisor an annual asset management fee of up to 1% of our average invested assets; however, our Business Manager/Advisor has historically charged us no more than 0.53% on an annual basis. Average invested asset value is defined as the average of the total book value, including acquired intangibles, of our real estate assets plus our loans receivable secured by real estate, before reserves for depreciation, reserves for bad debt or other similar non-cash reserves. We compute the values at the end of each month for which the fee is being calculated. The fee is paid quarterly in an amount equal to ¼ of the estimated annual fee based on our average invested assets as of the last day of the immediately preceding quarter. Based upon the maximum allowable advisor asset management fee of 1% of our average invested assets, maximum fees of $74.9 million, $54.9 million and $15.0 million could have been charged for the years ended December 31, 2006, 2005 and 2004, respectively. However, we paid $39.5 million and $20.9 million for the years ended December 31, 2006 and 2005, respectively. Our Business Manager/Advisor waived all asset management fees for the year ended December 31, 2004. Our Business Manager/Advisor has agreed to forego any fees allowable but not taken on an annual basis.

In addition to the asset management fee, we are obligated to pay to our Business Manager/Advisor a property disposition fee and a subordinated incentive fee payable on sale of a property. The disposition fee is equal to the lesser of: (i) 3% of the contract sales price of the property, or (ii) 50% of the customary commission that would be paid to third parties for the property. The incentive fee is equal to 15% of the net proceeds remaining from the sale of any property after our stockholders have first received: (i) a cumulative, non-compounded return equal to 10% on an annual basis on the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties and (ii) a return of the original issue price paid for our shares reduced by the amount of prior distributions from the sale or financing of our properties. Our obligation to pay future disposition and incentive fees terminates upon consummation of the Merger.

Additionally, our Business Manager/Advisor and its affiliates are entitled to be reimbursed for general and administrative costs relating to our administration and acquisition of properties. During the calendar year ended December 31, 2006, we incurred $3.4 million for these administrative costs. During the six months ended June 30, 2007, we incurred $3.1 million for these costs. Our obligation to pay such general and administrative fees terminates upon consummation of the Merger.

For more information regarding our property management agreements and our advisory agreement, see "The Merger – Our Property Management Agreements" and "The Merger – Our Advisory Agreement."

*The Merger.* Solely to facilitate the Merger, four of our newly created wholly-owned subsidiaries will merge into our Business Manager/Advisor and Property Managers. At the effective time, we will distribute 45% of the shares to the stockholders of our Business Manager/Advisor and Property Managers' and deposit the balance into an escrow account. The effective time is currently expected to occur as soon as practicable after the Annual Meeting, provided our stockholders ratify our entry into the Merger Agreement and our approval of the Merger at the Annual Meeting and all other terms and conditions of the Merger Agreement are satisfied.

*The Special Committee's and Board's Recommendation.* Two of our directors, Robert D. Parks and Brenda G. Gujral, are officers and/or directors of Inland and stockholders of our Property Managers and TIGI, the ultimate owner of our Business Manager/Advisor. Accordingly, our Board appointed a special committee, comprised of four independent, non-affiliated directors, to evaluate, negotiate and make recommendations with respect to the Merger and its alternatives. The special committee, which retained its own independent counsel and independent financial advisor, unanimously recommended approval of the Merger to our Board. Following the recommendation of the special committee, the Board unanimously approved the Merger Agreement and recommended that our stockholders ratify our entry into the Merger Agreement and our approval of the Merger. The special committee and the Board determined that the Merger is in the best interests of our stockholders. In connection with their recommendation, the special committee and our Board reviewed the analyses and findings of the special committee's financial advisor, William Blair.

*Opinion of Financial Advisor.* William Blair provided its opinion to the special committee and our Board that, as of the date of the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to the stockholders of our Property Managers and our Business Manager/Advisor is fair, from a financial point of view, to us and our stockholders.

The full text of William Blair's written opinion, dated as of August 14, 2007, which sets forth assumptions made, matters considered and limitations on the review undertaken in connection with the opinion, is attached hereto as **Appendix B**. William Blair's opinion does not constitute a recommendation as to how any stockholder should vote with respect to the Merger. You should read William Blair's opinion in its entirety. See "The Merger – Opinion of the Financial Advisor."

We will pay William Blair non-refundable fees totaling $1.0 million for its services as financial advisor to the special committee and for rendering the opinion. We have also agreed to reimburse William Blair for up to $50,000 of its reasonable out-of-pocket expenses, including attorneys' fees, and to indemnify William Blair against certain liabilities, including certain liabilities under the federal securities laws. See "The Merger – Opinion of the Financial Advisor."

*Purpose and Reasons for the Merger.* Due mainly to the growth of our portfolio of real estate assets, our Board determined to consider the benefits of becoming a largely self-administered REIT. In this regard, our Board formed a special committee of independent, non-affiliated directors to consider a transaction where we would acquire our Business Manager/Advisor and Property Managers. The special committee considered the positive and negative factors of acquiring our Business Manager/Advisor and Property Managers as well as the alternatives of (1) maintaining the status quo, (2) hiring new third parties to perform business management, advisory and property management functions and terminating our agreements with our Business Manager/Advisor and Property Managers, (3) building business management, advisory and property management functions internally and terminating our agreements with our Business Manager/Advisor and Property Managers and (4) selling our company to a third party. With respect to the alternative of acquiring our Business Manager/Advisor and Property Managers, the special committee considered, among other factors, the benefits of self-administration, reduction of operating costs, access

7

to properties identified by Inland, use of the "Inland" trademark and our name and logo, continuity of operations, retention of key management personnel and receipt of the opinion of its independent financial advisor. The special committee also considered risks such as the inability to become fully self-administered following such a transaction, the potential loss of key employees of our Business Manager/Advisor and Property Managers and potential unanticipated costs of services provided by our Business Manager/Advisor and Property Managers. Based upon these considerations, the special committee determined to pursue the alternative of acquiring our Business Manager/Advisor and Property Managers and, ultimately, determined that the proposed Merger is fair to and in the best interests of our stockholders and recommended that our Board and stockholders approve the transaction. See "The Merger – Reasons for the Merger."

*Conflicts of Interest.* In considering our Board's recommendation regarding the Merger, you should be aware that certain of our officers and directors have interests in connection with the Merger which may present them with actual or potential conflicts of interest. These potential conflicts are described in more detail under "The Merger — Interest of Certain Persons in the Matters to be Acted Upon."

*Conditions to the Merger that Must be Satisfied or Waived; Termination.* The Merger is subject to a number of customary conditions that must be satisfied or waived, including, without limitation, the following:

- each party's representations and warranties must be true and correct in all material respects at and as of the closing date;

- each party must have performed and complied with all of its covenants in all material respects at and as of the closing date;

- all of the ancillary agreements required by the Merger Agreement, including the registration rights agreement, the escrow agreement, the TIGI letter agreement, the sublease, the amendment to office and facilities management services agreement, the amendment to insurance and risk management services agreement, the amendment to computer services agreement, the amendment to personnel services agreement, the amendment to property tax services agreement, the amendment to communications services agreement, the amendment to the loan services agreement, the second amendment to the mortgage brokerage services agreement, the transition property due diligence services agreement, the institutional investor relationships services agreement, the legal services agreement, the license agreement modification and the license agreement (property management corporations) and any other agreement, instrument or document being or to be executed and delivered under the Merger Agreement shall have been executed and delivered;

- we must have received the required ratification of our stockholders of the Merger and our entry into the Merger Agreement; and

- the written consents previously executed by each of our Sponsor, as sole stockholder of our Business Manager/Advisor, and each of Robert H. Baum, Daniel L. Goodwin, Robert D. Parks and G. Joseph Cosenza, whom we refer to collectively as the Principal Stockholders, as stockholders of each of the Property Managers, shall remain in full force and effect.

At any time prior to the effective time, whether before or after the ratification of the Merger by our stockholders, the Merger Agreement may be terminated by the mutual written consent of the parties. In addition, the Merger Agreement may be terminated by our Sponsor and the PM Stockholder Agent, acting jointly, or by us:

- if the closing date has not occurred on or before January 31, 2008, except that a party may not terminate for this reason if that party's breach is a principal cause for the failure of the closing date to occur;

8

- if any law makes the consummation of the Merger illegal or otherwise prohibited or if a court or other governmental entity permanently enjoins, restrains or otherwise prohibits the Merger in a final and non-appealable order; or

- upon a material breach by the other parties of any of their obligations under the Merger Agreement after notice and a period for cure. See "The Merger — Merger Agreement."

*Break-up Fee.* If our Board: (i) publicly recommends against your ratification; and (ii) your ratification is not obtained at the Annual Meeting, then we shall pay to the Service Providers an amount equal to the actual, documented, out-of-pocket expenses incurred by the Service Providers to third parties in connection with the negotiation of the Merger Agreement, up to a maximum of $1.2 million.

*Federal Income Tax Consequences.* Following the Merger we expect, based in part upon an opinion of our counsel we will receive at the closing, to continue to be taxed as a REIT for federal income tax purposes.

*Accounting Treatment.* The Merger consideration will be accounted for primarily as expense incurred in connection with terminating the property management agreements that we have with our Property Managers and the advisory agreement that we have with our Business Manager/Advisor, substantially all of which will be treated as an expense upon closing of the Merger.

*Market Prices of Common Stock and Distributions.* There is no established public trading market for our common stock. For purposes of the Merger, we valued our common stock at $10.00 per share. As of August 1, 2007, we had over 115,000 stockholders of record. We declared and paid distributions to our stockholders totaling $0.64 per common share during the fiscal year ended December 31, 2006. A total of $0.29 of these per share distributions were taxable as ordinary income. There was a $0.35 return of capital for tax purposes per share, which reduces each stockholder's tax basis in its shares and will cause more gain or less loss on the sale of the shares. During the six months ended June 30 2007, we declared distributions to stockholders totaling $0.32 per common share.

**Election of Directors**

Our current governing charter requires us to have at least three, but not more than 11, directors. Our Board currently has seven members. Each Board member serves for a term of one year and until his or her successor is elected and qualifies. We are proposing to re-elect each of our existing Board members. Although we are not listed on the New York Stock Exchange, a majority of our directors would satisfy the definition of "independent" under the New York Stock Exchange's listing standards. A biography for each Board member, and additional information about our Board and our management team, is contained under the heading "Election of Directors – Nominees for Election as Directors."

**Ratification of the Appointment of our Independent Registered Public Accounting Firm**

Our Board, upon recommendation of the audit committee, selects and appoints our independent registered public accounting firm annually and asks stockholders to ratify the appointment. However, even if the stockholders do not ratify the appointment, we will retain the firm appointed by our Board and our Board will take the lack of ratification into account in making its selection for the following year.