# EXHIBIT 1C

## THE MERGER

PROPOSAL NO. 1: RATIFICATION OF OUR ENTRY INTO THE MERGER AGREEMENT WITH OUR BUSINESS MANAGER/ADVISOR AND PROPERTY MANAGERS AND CERTAIN OTHER PARTIES AND OUR APPROVAL OF THE MERGER.

**Background of the Merger**

Since its inception, our Board has considered, from time to time, the possibility of becoming self-administered. In February 2006, following discussions with representatives of Inland, our Board began to consider the strategic benefits of internalizing the services conducted for us by our Business Manager/Advisor and Property Managers. Our advisory agreement with our Business Manager/Advisor and our property management agreements with our Property Managers each include a provision, which we refer to as the purchase options, permitting us to acquire, at our option, the business conducted by our Business Manager/Advisor, including all of its assets, and by each Property Manager, including all of their assets, in exchange for a number of shares of our common stock determined in accordance with a formula established in those agreements. We could exercise the purchase options beginning in September 2008 for the Business Manager/Advisor and in May 2008 for the Property Managers.

In February 2006, after discussion and consultation with counsel, our Board determined that it would be advisable to form a special committee of the Board comprised only of independent directors to consider and evaluate a possible acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such a transaction.

On March 7, 2006, the special committee, initially composed of Kenneth H. Beard, Frank A. Catalano, Jr., Paul R. Gauvreau, Gerald M. Gorski, and Barbara A. Murphy, met in person with our counsel, Duane Morris LLP, which we refer to as Duane Morris, and unanimously resolved to recommend to our Board that it adopt and approve the special committee's charter. At this meeting, Mr. Gauvreau was also elected chairman of the special committee.

On March 14, 2006, our Board adopted the charter recommended by the special committee and formally established the special committee. The Board delegated all its power and authority to the special committee, subject to applicable law, in connection with all matters pertaining to the possible acquisition of our Business Manager/Advisor and Property Managers and the evaluation of alternative strategies. The special committee met telephonically that same day with a representative from Duane Morris to discuss the special committee process and the retention of independent financial and legal advisors to assist the special committee in evaluating the potential acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such an acquisition and negotiating any transaction.

On April 11, 2006, the special committee met in person with representatives from Duane Morris present to discuss further the process of retaining financial and legal advisors.

During April and May 2006, the special committee solicited proposals from potential financial advisors and legal advisors to assist them in evaluating and negotiating any internalization transaction. On May 10, 2006, the special committee met in person and interviewed potential financial advisors. On May 12, 2006, the special committee met in person and interviewed potential legal advisors.

On May 15, 2006, Silver Portal Capital, which we refer to as Silver Portal, financial advisors to the Business Manager/Advisor and Property Managers, presented to our Board and to the members of the special committee its financial analysis and valuation of the Business Manager/Advisor and Property Managers and its economic rationale for an internalization transaction. Thereafter, Mr. Gauvreau, at the direction of the special committee, contacted Mr. Goodwin, the Chairman of TIGI and one of its principal stockholders, and requested additional information regarding the Silver Portal presentation and its valuation analysis.

The special committee met in person on June 13, 2006 and formally retained Sidley Austin LLP, which we refer to as Sidley, as legal counsel to the special committee. The special committee's counsel reviewed with the members of the committee their legal duties and discussed the independence of each member of the special committee. At this meeting, representatives from Sidley also reviewed with the special committee applicable

14

provisions of our charter and bylaws, including the exculpatory, indemnification, advancement of expenses and insurance provisions. The special committee's counsel noted, among other things, that our charter and bylaws contained provisions different from those customarily found in the organizational documents of publicly listed and traded companies. The special committee requested that Sidley provide additional analysis of these provisions.

By letter dated June 19, 2006, the special committee engaged William Blair to serve as its financial advisor in connection with the special committee's consideration of a possible internalization transaction, including participating in negotiations relating to the possible internalization transaction, and rendering an opinion as to the fairness to us of the consideration to be paid by us in the possible internalization transaction or advising the special committee and the Board that William Blair is unable to render such an opinion.

On June 23, 2006, the special committee and its counsel met telephonically and were joined by Mr. Goodwin, as a representative of TIGI, certain of our officers, and a representative from Duane Morris. The special committee and its counsel discussed certain apparent inadvertent errors in our charter and determined to recommend to the Board that it file a certificate of correction with the state of Maryland to remedy these drafting errors. The special committee further reviewed and discussed the independence of each member of the special committee. In addition, the special committee and our representatives discussed the scheduling of our annual meeting and the need for amendments to our charter.

Our Board met on July 5, 2006. At this meeting, our Board determined to file a certificate of correction to remedy certain drafting errors in our charter. The Board also determined to seek stockholder approval of amendments to our charter at our stockholders' annual meeting to adopt indemnification, exculpatory and insurance provisions more customary with publicly listed and traded companies. The Board also discussed the composition of the special committee and considered whether Mr. Catalano, who had a then existing financial relationship with Inland, would be considered "independent" under the various definitions of independence applicable to our directors. To avoid any perceived impairment of the independence of the special committee members, Mr. Catalano resigned from the special committee.

On August 2, 2006, the special committee, then comprised of Messrs. Beard, Gauvreau and Gorski and Ms. Murphy, met telephonically, along with its legal and financial advisors. The special committee discussed with its legal and financial advisors, among other things, the actions taken by the Board and the duties of the members of the special committee under Maryland law and under our charter and bylaws in connection with evaluating whether to acquire our Business Manager/Advisor and Property Managers and alternatives to an internalization transaction. Representatives of William Blair provided preliminary comments on the financial analysis prepared by Silver Portal, the financial advisors to the Business Manager/Advisor and Property Managers. Representatives of William Blair also provided the special committee with an overview of its analytical approach to the financial valuation of potential target companies. In connection with its discussion, the special committee began to evaluate potential alternatives to an internalization of the Business Manager/Advisor and Property Managers.

On August 10, 2006, we filed with the SEC our proxy materials for the annual meeting of our stockholders, which was to be held on October 10, 2006, to consider, among other things, the amendment and restatement of our charter.

On October 10, 2006, our stockholders approved the amendment and restatement of our charter at our annual meeting and, promptly thereafter, the amended and restated charter was filed with the State Department of Assessments and Taxation for the state of Maryland. At the end of October and the beginning of November, our legal advisors commenced legal due diligence and our financial advisors commenced financial due diligence with respect to a possible internalization transaction with the Business Manager/Advisor and Property Managers and the alternatives to such a transaction.

Our Board met on November 14, 2006. At the meeting, the Board ratified its prior actions, including the formation of the special committee and the delegation of authority to it in connection with the evaluation of a possible internalization transaction with the Business Manager/Advisor and Property Managers and the alternatives to such a transaction and all actions taken by the special committee with respect to the possible internalization transaction.

15

During November and December 2006, the special committee's financial advisors continued to conduct due diligence and review materials and information provided by the Business Manager/Advisor and Property Managers.

On December 12, 2006, the special committee met in person with its financial and legal advisors. At this meeting, representatives of William Blair summarized the status of its due diligence review and provided additional perspective on the financial analysis prepared by Silver Portal for the Business Manager/Advisor and Property Managers. The members of the special committee requested that William Blair provide a preliminary valuation analysis of the Business Manager/Advisor and Property Managers and of our common stock in early January 2007.

Representatives of Sidley also provided an update on the status of its due diligence review at the December 12, 2006 meeting of the special committee, including an analysis of the existing advisory and property management agreements. The special committee also discussed possible alternatives to an internalization transaction, including the following alternatives:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

In evaluating a possible termination of our existing agreements with our Business Manager/Advisor and Property Managers, the special committee noted that it would be difficult to promptly replace the services provided by the Property Managers and also discussed the practical difficulties that termination of the advisory agreement might create, including transition costs related to the loss of experienced employees of our Business Manager/Advisor and the loss of important administrative services and assets, including the "Inland" name, licensed to us through our Business Manager/Advisor. The special committee requested that William Blair obtain additional due diligence information relating to the cost of the services provided by the Business Manager/Advisor and the Property Managers compared to such services that could be provided by third-party service providers.

On December 21, 2006, representatives from William Blair and Sidley met in person with representatives from the Business Manager/Advisor and Property Managers. At this meeting, the representatives from the Business Manager/Advisor and Property Managers presented their position on, and provided additional information related to, the services provided by the Business Manager/Advisor and Property Managers, valuation of the Business Manager/Advisor and Property Managers, valuation of our common stock, the potential advantages of an internalization to our company, and the process for proceeding with negotiations should the special committee decide to do so. In addition, our Business Manager/Advisor and Property Managers provided additional due diligence materials relating to services provided to our company directly or through our Business Manager/Advisor by Inland at this meeting and personnel and functions that would be internalized in an internalization transaction.

On January 9, 2007, representatives of our Business Manager/Advisor and Property Managers made a presentation to our Board regarding, among other things, the scope of the services that our Business Manager/Advisor and Property Managers currently provided to us including, among others, office and facilities management, insurance and risk management, computer, personnel, property tax, communications, loan, and property acquisition due diligence services, many of which are provided to our Business Manager/Advisor by Inland. Our Business Manager/Advisor and Property Managers also discussed the potential transition issues associated with terminating the advisory or property management agreements, including potential cessation of our

16

property acquisition program and the value to us of access to property acquisition services of affiliates of our Business Manager/Advisor, all of which could be provided directly or indirectly through our Business Manager/Advisor.

Immediately after the Board meeting on January 9, 2007, the special committee met with its financial and legal advisors. The special committee reviewed and discussed the materials distributed at the Board meeting regarding the services currently provided to us by the Business Manager/Advisor and the Property Managers, the cost of such services compared to services that could be provided by third-party service providers, and the potential cost savings that might be realized by acquiring the Business Manager/Advisor and the Property Managers. The special committee also discussed additional possible benefits of an internalization, including the ability to hire key personnel and retain key officers and employees of our Business Manager/Advisor and Property Managers, continued cost-effective access to important administrative services provided by our Business Manager/Advisor and Property Managers and their affiliates including access to the Inland property acquisition "pipeline" via agreements with Inland regarding properties located in our market area, and the use of the "Inland" name and logo. The special committee also explored the risks of building a staff internally as compared to acquiring our Business Manager/Advisor and Property Managers, including the potential risks related to a transition in management and services as well as management distractions related to such a transition, investor relations and the relationship between us, TIGI and Inland.

At this meeting, William Blair reviewed for the special committee its preliminary financial analyses with respect to our Business Manager/Advisor and Property Managers and us. The special committee determined that the purchase options could be viewed as a ceiling on the number of shares that we might exchange to internalize the Business Manager/Advisor and Property Managers. William Blair also provided the special committee with a preliminary financial analysis regarding the valuation of our Business Manager/Advisor and Property Managers and our per share valuation, as well as the corresponding number of shares to be included as consideration in the possible internalization transaction. William Blair also presented to the special committee a comparison of the cost of certain services provided by the Business Manager/Advisor and the Property Managers as a percentage of our assets compared to that cost ratio for selected publicly traded REITs that have internally provided advisory and property management services. The special committee, along with its financial and legal advisors, discussed the advantages and disadvantages of the various strategic alternatives available to the special committee, including that acquiring our Business Manager/Advisor and Property Managers could enhance stockholder value by, among other things, positioning us to list our shares on a national securities exchange, reducing the potential conflict due to the fact that fees paid to our Business Manager/Advisor and Property Managers are primarily based on a percentage of our real property asset base, and generating cost savings which could increase earnings and funds from operations.

The special committee determined that it was in our best interest and the best interest of our stockholders to pursue further discussions regarding an internalization transaction. The committee authorized Mr. Gauvreau and representatives from William Blair to enter into discussions with representatives of the Business Manager/Advisor and Property Managers regarding the valuation of the Business Manager/Advisor and Property Managers and about our valuation, and the corresponding number of shares to be included as consideration in the possible internalization transaction.

Mr. Gauvreau and representatives of William Blair met with Mr. Goodwin and Mr. Thomas McGuinness, the President of our Property Managers, on January 26, 2007. The special committee's representatives presented the Business Manager/Advisor and Property Managers' representatives with a summary of William Blair's preliminary valuation analysis. The representatives for both parties discussed valuation, share accretion and personnel issues. Mr. Goodwin presented Mr. Gauvreau and the representatives of William Blair with a proposed term sheet for an internalization transaction and the parties agreed to continue discussions in early February.

At Inland's request, the special committee requested that representatives of Sidley contact representatives of Jenner & Block LLP, which we refer to as Jenner, counsel for the Business Managers/Advisors and Property Managers, to discuss the legal terms of the potential transaction. The special committee also requested that Sidley commence drafting and negotiating a merger agreement and requested that representatives of Sidley contact representatives from Duane Morris to identify and begin drafting and negotiating the ancillary service agreements that we would need to enter into or amend in connection with the potential internalization transaction.

17

On February 7, 2007, the special committee met in person with its financial and legal advisors. The special committee discussed certain human resources and employment matters relating to the proposed internalization transaction and reviewed a draft post-internalization organizational chart provided by Mr. Grimes, the Chief Financial Officer of our Business Manager/Advisor and Mr. O'Hanlon, the Senior Vice President of Asset Management of our Sponsor.

At the invitation of the committee, Mr. Goodwin, along with Mr. McGuinness and Mr. Robert Barg, joined the meeting to present the Business Manager/Advisor's and Property Managers' views on the valuation of those entities and the accretive value to us of the proposed internalization transaction. The special committee emphasized to the representatives of our Business Manager/Advisor and Property Managers that it was important that, upon any acquisition of our Business Manager/Advisor and Property Managers, if any, we would have the key employees necessary to perform the services currently provided by our Business Manager/Advisor and Property Managers. The representatives of our Business Manager/Advisor and Property Managers indicated that Inland also would be amenable to having certain persons serve in a consulting capacity at minimal or no cost to us for a period of time to be determined.

Following the presentation by the representatives of the Business Manager/Advisor and Property Managers, the special committee met with its financial and legal advisors to discuss the valuation of the Business Manager/Advisor and Property Managers and the corresponding number of shares to be included as consideration in the possible internalization transaction. The members of the special committee also discussed the valuation of our common stock. The members of the special committee also reviewed a draft merger agreement and draft ancillary service agreements and discussed their terms. The special committee discussed the persons who would be retained on a consultancy basis, in the event that the proposed internalization transaction were accomplished, as well as information regarding transition and continuation services that Inland is expected to provide to us in connection with the acquisition.

On February 19, 2007, after additional discussion between representatives of the special committee and representatives of the Business Manager/Advisor and Property Managers, regarding the parties' respective valuation analyses, the parties preliminarily agreed to an aggregate purchase price for our Business Manager/Advisor and Property Managers of 37,500,000 shares of our common stock, subject to the negotiation of the terms and conditions set forth in the merger agreement and ancillary agreements. The draft merger agreement also was provided to Jenner on this date.

On February 22, 2007, the special committee met in person along with representatives from Sidley and Duane Morris. At the invitation of the special committee, Mr. Grimes and Mr. O'Hanlon attended the meeting. The special committee again discussed, if we acquired our Business Manager/Advisor and Property Managers, the key employees who would become our employees. Mr. O'Hanlon and Mr. Grimes presented the members of the special committee with an updated draft employee organizational chart for the proposed internalization at this meeting.

On March 1, 2007, the special committee met in person to discuss human resources matters relating to the proposed internalization transaction, including senior management positions, employment agreements and consulting agreements. On March 13, 2007, the special committee met again with Mr. O'Hanlon and Mr. Grimes regarding the persons who would become full-time employees of ours if a transaction were completed.

During March and April 2007, the legal advisors to the special committee, at the direction of the special committee, our legal advisors and the legal advisors to the Business Manager/Advisor, Property Managers and Inland met in person and telephonically on numerous occasions to negotiate the terms of the merger agreement and the ancillary service agreements with Inland. During this period, the special committee met on numerous occasions with its counsel to review the status of the negotiations and review drafts of these agreements.

On April 6, 2007 and on April 17, 2007, the special committee met telephonically with its legal advisors and reviewed the status of negotiations relating to the merger agreement and ancillary service agreements.

During the week of April 23, 2007, representatives of the Business Manager/Advisor and Property Managers proposed that they meet again with members of the special committee to discuss certain terms of the merger agreement and ancillary agreements. The members of the special committee, along with representatives of

18

Sidley and Duane Morris, met telephonically with representatives of the Business Manager/Advisor and Property Managers and their legal advisors on May 2, 2007, at which time representatives of the Business Manager/Advisor, Property Managers and Inland presented their position on certain terms of the merger agreement, the ancillary agreements and the consulting agreements. All parties agreed to meet in person on May 8, 2007 for further discussion.

On May 8, 2007, the members of the special committee, along with representatives of Sidley and Duane Morris, met with representatives of the Business Manager/Advisor, Property Managers and Inland and their legal counsel and continued to negotiate the terms of the merger agreement, ancillary agreements and consulting agreements.

In May 2007, the special committee retained Hewitt Associates LLC, which we refer to as Hewitt, as a consultant to the special committee and to assist the special committee in its review of executive compensation in connection with the proposed internalization transaction. On May 22, 2007, Hewitt presented the members of the special committee with an analysis of executive compensation at certain peer group companies. The members of the special committee requested that Hewitt obtain additional information relating to peer group companies and discussed the terms of potential employment agreements for executive officer positions post-internalization.

Over the course of May and June 2007, the legal advisors to the special committee, representatives of Duane Morris and the legal advisors to the Business Manager/Advisor, Property Managers and Inland continued to meet in person and telephonically to negotiate the terms of the merger agreement and ancillary service agreements with Inland. During this period, the special committee met on numerous occasions with its counsel to review the status of the negotiations and review drafts of these agreements.

On June 7, 2007, the special committee, along with its legal advisors and our counsel, held a telephonic meeting to discuss executive compensation and employment agreements for senior management post-internalization. The special committee's legal advisors also reviewed the status of the draft merger agreement, draft ancillary service agreements and consulting agreements.

On June 20, 2007, the special committee met in person with its financial and legal advisors and our counsel. Representatives of William Blair reviewed the financial results for us and the Business Manager/Advisor and Property Managers through March 2007 as well as updated financial projections that it had received for us and for the Business Manager/Advisor and Property Managers and discussed current market conditions with respect to real estate investment trusts. In addition, the members of the special committee and its financial and legal advisors discussed the updated financial projections in connection with alternatives to an internalization transaction. The members of the special committee and its legal advisors also discussed employment agreements and executive compensation matters and the status of the draft merger agreement, draft ancillary agreements and consulting agreements. The special committee asked to be provided with an updated set of draft agreements and summaries on June 29, 2007, so that it could review the materials over the following week and scheduled the next meeting of the special committee for July 10, 2007.

On July 10, 2007, the special committee met, along with its legal and financial advisors, to consider the acquisition of our Business Manager/Advisor and Property Managers. Representatives of Sidley reviewed with the members of special committee legal aspects of the proposed transaction including, among other things, (i) their applicable duties, (ii) the process taken by the special committee in its consideration of an internalization transaction involving the acquisition of our Business Manager/Advisor and Property Managers and the alternatives to such a transaction and (iii) the terms and status of the proposed Merger Agreement and the ancillary agreements. William Blair presented its updated financial analyses.

Immediately following the meeting of the special committee, our Board met to discuss the proposed transaction. Legal counsel for the special committee reviewed, with the members of our Board, the terms of the proposed Merger Agreement and the ancillary agreements. William Blair presented its updated financial analysis of the valuation of our Business Manager/Advisor and Property Managers and of our common stock to the Board and the corresponding number of shares to be included as consideration in the possible internalization transaction.

19

On August 2, 2007, the special committee met again, along with its legal and financial advisors, to review the final terms of the proposed acquisition. At the meeting, representatives of William Blair reviewed the financial results for us and the Business Manager/Advisor and Property Managers through June 30, 2007, as well as updated financial projections that it had received for us and for our Business Manager/Advisor and Property Managers and presented an update of its analysis to the special committee. Then, William Blair delivered to the special committee its oral opinion that the consideration of approximately 37,500,000 shares of our common stock to be paid by us for the acquisition of our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders. See "- Opinion of the Financial Advisor." Later that same day, William Blair delivered its written opinion to the same effect. Counsel for the special committee reviewed the various alternatives and the advantages and disadvantages considered by the special committee with respect to each alternative. These alternatives included:

- maintain the status quo and continue to obtain advisory and property management services under our existing agreements;

- hire new third parties to provide advisory and property management services and terminate our advisory and property management agreements;

- build advisory and property management functions internally and terminate our advisory and property management agreements;

- acquire our Business Manager/Advisor and Property Managers (prior to or at the effective time of the purchase options); and

- sell our company to a third party.

The special committee unanimously recommended that our Board and stockholders approve the Merger, subject to the terms and conditions set forth in the Merger Agreement and ancillary agreements thereto.

Following the meeting of the special committee, our Board met telephonically and unanimously approved the Merger and the Merger Agreement and ancillary agreements thereto.

**Reasons for Requiring Your Ratification**

There is no legal requirement to submit our entry into the Merger Agreement or our approval of the Merger to our stockholders for ratification. Because we believe it is desirable to obtain your ratification of our entry into the Merger Agreement and our approval of the Merger, we have made your ratification a condition to the closing of the Merger. If the Merger proposal is not approved, we will continue to operate under our current management structure, paying fees and cost reimbursements to our Property Managers and our Business Manager/Advisor under their contracts and our Board will examine its other alternatives.

**Reasons for the Merger**

The special committee recommended that our Board approve the proposed transaction based upon a variety of factors, both for and against the proposed transaction. The decision by the special committee followed numerous meetings with its legal and financial advisors as described in greater detail above in "- Background of the Merger." The special committee took into account the following positive factors without assigning relative weights, which the special committee believes favor the proposed transaction:

- *Goal of Self Administration.* The acquisition of our Business Manager/Advisor and Property Managers is one of the most significant steps in achieving our objective of becoming a fully self-administered REIT. The special committee believes that analysts and investors have shown a preference for self-administered REITs and, as a result, the consummation of the proposed transaction may better position us to raise capital or list our shares on a national securities exchange. We also believe that a self-administered REIT better aligns the interests of the

20

management of our Business Manager/Advisor and Property Managers with the interests of our stockholders. Although we will continue to obtain from Inland various services not provided by our Business Manager/Advisor or Property Managers, the special committee believes that we will obtain these services at rates at or below market and that continuity of these services is, at this time, more important than internalization of such services. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs, among other things.

- *Reduction of Operating Costs and Impact on Funds from Operations.* Our portfolio of real estate assets has grown substantially since 2003. Our Business Manager/Advisor and Property Managers are currently compensated based on a fixed percentage of our real estate assets, which results in ratable increases in the fees we pay under the advisory and property management agreements as our asset base grows. By acquiring our Business Manager/Advisor and Property Managers, we will substantially transform the costs associated with the advisory and management function to fixed costs, which we expect will allow us to benefit from the economies of scale that result in connection with the growth of our real estate portfolio. In addition, the special committee believes that upon closing, the Merger is expected to be accretive to funds from operations by at least $0.08 per share for the first full year following the Merger, and it is estimated to be increasingly accretive in subsequent years, because the costs of internalizing the advisory and property management functions plus the distributions to be paid on the shares issued is expected to be less than the advisory and property management fees expected to be paid to our Business Manager/Advisor and Property Managers.

- *Opinion of William Blair.* The special committee considered the opinion of William Blair to the effect that, as of August 14, 2007, and based upon and subject to the assumptions, limitations and qualifications set forth in the opinion, the aggregate share consideration to be paid pursuant to the Merger Agreement to our Business Manager/Advisor and Property Managers is fair, from a financial point of view, to us and our stockholders; however, the opinion does not apply to stockholders of the Business Manager/Advisor or the Property Managers, including such stockholders who are also our stockholders.

- *Review of Material Terms of Proposed Transaction.* The special committee considered and discussed with its legal counsel and our counsel the material terms of the Merger Agreement, including the representations, warranties, covenants, conditions to closing and indemnification obligations set forth therein, together with the material terms of the ancillary agreements entered into or to be entered into in connection with the proposed transaction. The special committee believes the terms of these agreements are fair and commercially reasonable.

- *Access to Properties Identified by Inland.* The special committee believes that Inland has experienced employees who are knowledgeable in the retail real estate field and are particularly skilled at identifying, and have proprietary access to, properties within our investment guidelines. In connection with the proposed transaction, we will retain a right of first offer to acquire, on a priority basis relative to other clients of Inland, certain retail and lifestyle properties located west of the Mississippi River, but excluding that portion of such geographical area located within 400 miles of Oak Brook, Illinois. The special committee believes that access to these properties is of substantial value to us, which will be preserved as a result of the proposed transaction.

- *Rights to Inland Marks.* The "Inland" name and logo, together with our name and logo, are currently licensed from Inland to our Business Manager/Advisor on a non-exclusive basis. We are authorized to use the Inland name under the advisory agreement. In connection with the proposed transaction, the special committee negotiated an arrangement whereby we will have an exclusive right to use our name and logo, subject to the right of Inland to use our name for general marketing and communications purposes. See "- Ancillary Agreements — License Agreement Modification." The special committee believes that the goodwill associated with the Inland marks

21

and our name is of substantial value to us, which will be preserved on an exclusive basis as a result of the proposed transaction.

- *Retention of Key Management Personnel.* The proposed transaction will permit us to retain directly the services of key management of our Business Manager/Advisor and Property Managers, including the services of Messrs. O'Hanlon, Grimes, Garrison and Byrne. These knowledgeable and experienced employees have day-to-day familiarity with the management of our assets. The proposed transaction will also permit us to retain, at no cost to us, the consulting services of Messrs. Parks, Cosenza and Goodwin.

- *Access to Inland Affiliated Services.* The special committee believes that the services provided by Inland are of a higher quality and provided at equal or lower costs than could be obtained from unaffiliated third parties. These services include office and facilities management, insurance and risk management, computer consulting, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services. The special committee believes that access to these services is of substantial value to us, which will be preserved as a result of the proposed transaction.

The special committee also took into account the following negative factors, without assigning relative weights, which the special committee believes are outweighed by the positive factors discussed above. The negative factors considered by the special committee included:

- *Inability to Immediately Become Fully Self-Administered.* The special committee considered whether certain administrative functions not provided directly by our Business Manager/Advisor or Property Managers could be performed internally following the Mergers. These services include office and facilities management, insurance and risk management, computer services, legal, personnel, property tax, communications, loan, institutional investor relationship management, and property acquisition due diligence services. In order to assure the continuity of these administrative services while allowing us time to develop these service areas in-house or to hire other third-party service providers for these services, we entered into or amended several services agreements, to obtain these services, with Inland. These services are subject to agreements that are terminable by us, without penalty, generally on 180 days notice. We intend to evaluate our need for such services, as well as consider internalization of such services, from time to time in light of costs and operating needs.

- *Potential Loss of Key Employees.* Through the transaction, a key asset we will acquire is knowledgeable, experienced employees. The working knowledge of these employees is specific to our real estate portfolio, our tenants and our property acquisition processes. While the special committee considered and negotiated for employment agreements with certain key employees, there is no guarantee that those employees, or employees not subject to employment agreements, will remain with our Business Manager/Advisor or Property Managers or become our employees following the Merger. Further, their employment agreements are short-term and do not include non-compete provisions.

- *Unanticipated Costs of Services Performed by Our Business Manager/Advisor and Property Managers.* The special committee carefully considered the fees paid to our Business Manager/Advisor and Property Managers relative to the costs of performing these functions internally. With the growth of our asset base since 2003, the special committee determined that cost savings could likely be achieved by eliminating the advisory and management fees presently paid to our Business Manager/Advisor and Property Managers and internalizing those functions. The determination that performing services internally will be cost effective assumes knowledge of the actual costs of performing the advisory and property management services. If there are costs that were not correctly estimated or unanticipated costs in performing these services, the economic benefits to us sought to be attained through the Mergers will not be fully realized.

22

The special committee considered these factors, among others, in light of various alternatives that are described more fully below:

- *Maintain the Status Quo.* This alternative ensured continuity of operations, including the receipt of certain no cost and low cost services, and key personnel, but had the disadvantage of, among other things, requiring us to pay on-going advisory and management fees.

- *Hire New Third Parties to Provide Advisory and Property Management Services and Terminate Our Advisory and Property Management Agreements.* The advantage of this alternative was the prospect of negotiating lower fees with third-party providers, provided that the services provided by or through our Business Manager/Advisor and Property Managers could be adequately provided by a single service provider or a discrete group of service providers. The disadvantages of this alternative included, among other things, the costs associated with a lengthy transition period, the loss of the continuity and experience of our Business Manager/Advisor's and Property Managers' key employees, the loss of the right to use the "Inland" name and our name and logo, and the payment of on-going advisory and management fees.

- *Build Advisory and Property Management Functions Internally and Terminate Our Advisory And Property Management Agreements.* The benefit of this alternative was the prospect of reducing costs, on an asset basis, over time because our business management, advisory and property management costs would no longer be based on a percentage of our real property assets. The disadvantages of this alternative included, among other things, the costs associated with a lengthy transition period and risks attendant to internally developing the broad range of services provided by our Business Manager/Advisor and Property Managers, the loss of continuity and experience of our Business Manager/Advisor's and Property Managers' key employees, the potential loss of certain administrative services provided by Inland, the disruption to our property acquisition pipeline and the loss of the right to use the "Inland" name and our name and logo.

- *Acquire Our Business Manager/Advisor and Property Managers.* The advantages of this alternative were, among other things, eliminating the fees paid to our Business Manager/Advisor and Property Managers, achieving an internally managed structure appropriate to our scale, aligning more closely the interests of the management of our Business Manager/Advisor and Property Managers with our stockholders, substantially reducing transition risks associated with the termination alternatives, preserving our access to the administrative services provided by Inland, and preserving the right to use the "Inland" name and our name and logo. Under this alternative, we were able to retain, at no cost to us, the consulting services of Messrs. Goodwin, Parks and Cosenza. The disadvantage of this alternative was the difficulty in quantifying the value of the relationships with Inland as well as the business management, advisory and property management services provided by our Business Manager/Advisor and Property Managers.

- *Sell Our Company to a Third Party.* The potential advantage of this alternative was primarily the possibility of obtaining a premium from an acquiror of our company. The disadvantages were, among other things, the loss of no cost and low cost services provided by Inland due to a change in control and the loss of key personnel. The special committee also considered the value that self-administration could add to our company in anticipation of a public listing or liquidity event.

After carefully weighing the option of internalizing by acquiring our Business Manager/Advisor and Property Managers and the possible alternatives to such a transaction, and the positive and negative factors with respect to each option, the special committee determined that the acquisition of our Business Manager/Advisor and Property Managers was (i) fair to and in the best interests of our stockholders, (ii) fair, competitive and commercially reasonable and (iii) fair and reasonable to us and on terms and conditions not less favorable to us than those available from unaffiliated third parties. Accordingly, the special committee unanimously recommended to our Board the Merger Agreement and the consummation of the Merger pursuant to the terms of the Merger Agreement.

23