## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust, Inc., | |
| Plaintiffs | **CASE NO. 07 C 6174** |
| v. | |
| INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION; THE INLAND GROUP, INC.,   INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP.,   INLAND   WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL A. GOODWIN, ROBERT A. BAUM, G. JOSEPH COSENZA, KPMG LLP , AND WILLIAM BLAIR & COMPANY, L.L.C, | |
| Defendants. | |

## LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE NON-KPMG/WILLIAM BLAIR DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

I.   INTRODUCTION ........................................................................................... 1

II.  PERTINENT FACTUAL BACKGROUND ..................................................... 3

     A.   The Advisor ........................................................................................ 3

     B.   The Property Managers ...................................................................... 5

     C.   Purchase Option Formulas ................................................................. 6

     D.   Internalization of the Advisor and Property Managers ..................... 6

     E.   Defendants ......................................................................................... 7

III. PLEADING STANDARDS UNDER RULE 12(b)(6) ...................................... 9

IV.  PLAINTIFFS ASSERT LEGALLY ACTIONABLE CLAIMS
     UNDER SECTION 14(a) OF THE EXCHANGE ACT. .................................. 9

     A.   Allegations Required To State Claim Under Section 14(a). ................ 9

     B.   Defendants' Material Misrepresentations and Omissions of
          Material Facts Rendered the Proxy False and Misleading ............... 11

          1.   The Advisor's Financial Statements Failed to Report Expenses ........... 12

          2.   The Property Managers' Financial Statements Reported
               Inflated Fees ........................................................................... 14

          3.   The Property Managers' Financial Statements Understated
               Expenses ................................................................................. 16

          4.   The Proxy Contained Materially False and Misleading Statements
               About the Fairness of Internalization Consideration ............................ 17

          5.   The Proxy Contained Materially False and Misleading Statements
               About the Purchase Options. .................................................... 17

          6.   The Independent Auditors' Reports Were Materially False and
               Misleading ............................................................................... 18

          7.   The Fairness Opinion Was Materially False and Misleading ............... 19

8.    *The Proxy Failed to Disclose Strategic Alternatives to the Internalization.* ........................................................................ 20

9.    *The Proxy Failed to Disclose Material Facts About the Advisor and the Property Managers' Past Performances.* ...................... 21

C.    **Heightened Pleading Standards Do Not Apply to Section 14(a) Proxy Claims.** ........................................................................ 22

1.    *The Amended Complaint Does Not Sound in Fraud* ............................ 23

2.    *Even if the Heightened Pleading Requirements of the PSLRA Applies to Plaintiffs' Negligence Claims, Plaintiffs Allege a Strong Inference of Negligence.* .............................. 25

V.    **PLAINTIFFS STATE A CLAIM FOR CONTROL PERSON LIABILITY** ............ 27

VI.   **PLAINTIFFS STATE DIRECT BREACH OF FIDUCIARY DUTY CLAIMS** ...... 28

A.    <u>Plaintiffs Have Standing to Assert Direct Breach of Fiduciary Duty and Aiding and Abetting Fiduciary Duty Claims.</u> ................... 28

B.    <u>Plaintiffs Adequately Allege Direct Breaches of Fiduciary Duties.</u> ............. 30

VII.  **PLAINTIFFS STATE DERIVATIVE CLAIMS** ........................................ 32

A.    <u>Plaintiffs Have Properly Pled That Demand on The Board Was Futile</u> ........ 32

B.    <u>Plaintiffs State Derivative Claims for Breaches of Fiduciary Duties</u> ............. 36

C.    <u>Plaintiffs State a Derivative Claim For Breach of Contract</u> ........................... 36

1.    *Plaintiffs Adequately Allege Breaches of the Advisory and Property Management Agreements and the Charter.* ........................................... 36

2.    *The Inland Group, the Sponsor, Goodwin, Parks, Baum, Cosenza and Grimes are Alter-Egos of the Advisor and/or the Property Managers* ............................................................................. 37

D.    <u>Plaintiffs State a Derivative Claim for Unjust Enrichment</u> ............................ 38

E.    <u>The "Voluntary Payment Doctrine" Is Inapplicable to the Derivative Breach of Contract and Unjust Enrichment Claims.</u> ......................................... 40

VIII. **DEFENDANTS CANNOT CLAIM THE BENEFIT OF THE BUSINESS JUDGMENT RULE** ............................................................................ 41

A.    Allegations of Breaches of the Duty of Disclosure Are Not
      Subject to the Business Judgment Rule. ............................................................. 42

B.    Allegations of Bad Faith Rebut any Business Judgment Rule. ......................... 43

IX.    CONCLUSION .................................................................................................................... 44

## TABLE OF AUTHORITIES

### Cases

*Albert v. Alex Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 133 (Del. Ch. 2005) ......................... 29

*Alexian Bros. Health Providers Ass'n. Inc. v. Humana Health Plan, Inc.,*
    277 F. Supp. 2d 880 (N.D. Ill. 2003) ............................................................. 40, 41

*Alleco Inc. v. Harry and Jeanette Weinberg Found., Inc.,* 665 A.2d 1038 (Md. 1995) ............... 30

*Anderson v. Dist. Bd. Of Trs. Of Cent. Fla. Cmt. Coll.,* 77 F.3d 364 (11th Cir. 1996) ................. 9

*In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669 (Del. Ch. 1986) ............................. 42, 43

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)......................................................................... 41, 44

*Avianca, Inc. v. Corriea*, 1992 U.S. Dist. LEXIS 4709 (D.D.C. Apr. 13, 1992).......................... 40

*In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 989 (E.D. Mo. 1999) .................. 10, 24

*Beck v. Dobrowski*, 2007 U.S. Dist. LEXIS 84093 (N.D. Ill. Nov. 14, 2007) ............................. 23

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007), ....................................................... 9

*Benda v. Per-Se Tech., Inc.*, 2005 WL 1563214 (N.D. Ill. Jun. 2, 2005) ...................................... 37

*Berman v. Thomson*, 403 F. Supp. 695 (N.D. Ill. 1975) ............................................................... 27

*Blau v. Harrison,* 2006 U.S. Dist. LEXIS 19795, *16 (N.D. Ill. Mar. 24, 2006) ........................ 23

*Bloomington Partners, LLC v. City of Bloomington*, 2005 U.S. Dist. LEXIS 38004,
    (C.D. Ill. Nov. 23, 2005) ................................................................................................... 31

*In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.,*
    155 F. Supp. 2d 1069 (S.D. Ind. 2001) ................................................................. 39

*Brown v. Enstar Group, Inc.*, 84 F.3d 393 (11th Cir. 1996) .......................................................... 28

*Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001) ...................................................................... 25

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. N.J. 1997)............................. 13

*In re Cencom Cable Income Partners, L.P. Litig.,*
    2000 Del. Ch. LEXIS 10 (Del. Ch. 2000)............................................................... 30

*In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999) ....................................................... 23

*Clark Enters., Inc. v. Holywell Corp.*, 559 F. Supp. 1307 (E.D. Va. 1983).................................... 33

*In re CNL Hotels & Resorts Secs. Litig., Inc.,*
    2005 U.S. Dist. LEXIS 38876 (M.D. Fla. Sept. 13, 2005) ............................. 25, 33

*Cont'l Cas. Co. v. Steelcase Inc.*, 2004 WL 1965699 (N.D. Ill. Aug. 23, 2004) ........................... 37

*In re Convergent Technologies Sec. Litigation*, 948 F.2d 507 (9th Cir. 1991).............................. 14

*Cumberland Coal & Iron Co. v. Parish,* 42 Md. 598 (1875)......................................................... 41

*Daniels v. New Germany Fund, Inc.*, 2006 U.S. Dist. LEXIS 96145 (D. Md. 2006)................... 43

*Dasho v. Susquehanna Corp.*, 461 F.2d 11 (7th Cir. 1972).......................................................... 10

*Della Ratta v. Larkin*, 382 Md. 553 (Md. 2004) .......................................................................... 43

*In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924N.D. Ill. 1996) ............................................... 13

*Dolphin & Bradbury, Inc. v. SEC*, 379 U.S. App. D.C. 200 (D.C. Cir. 2008) .............................. 15

*Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996) ........................................ 43

*EEOC v. Concentra Health Servs.*, 496 F.3d 773 (7th Cir. 2007) .................................................. 9

*FASTI USA v. FASTI Farrag & Stipsits GmbH,*
    2003 WL 1581472 (N.D. Ill., Mar. 26, 2003) ....................................................... 38

*F.D.I.C. v. Wabick*, 2004 WL 20323156 (N.D. Ill. Sep. 9, 2004)................................................. 38

*Feldman v. Bahn*, 12 F.3d 730, 734 (7th Cir. 1993) ...................................................................... 9

*Felker v. Anderson,* 2005 U.S. Dist. LEXIS 4236 (W.D. Mo. Feb. 11, 2005) ....................... 34, 35

*Forge Indus. Staffing, Inc. v. De La Fuente*, 2006 WL 2982139 (N.D. Ill. Oct. 16, 2006).......... 38

*Froelich v. Erickson*, 96 F. Supp. 2d 507 (D. Md. 2000)............................................................... 43

*FSLIC v. Williams*, 599 F. Supp. 1184 (D. Md. 1984)................................................................. 42

*Gans v. Filmways, Inc.*, 453 F. Supp. 1116 (E.D. Pa. 1978) ....................................................... 11

*Gentile v. Rossette*, 906 A.2d 91 (Del. Supr. 2006). .................................................................... 30

*Gray v. McCormick*, 2008 U.S. App. LEXIS 12620 (7th Cir. Jun. 12, 2008). ............................... 9

*Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260 (S.D. Fla. 1995) .............. 10

*Heavey v. Ehret*, 519 N.E.2d 996 (Ill. App. 1988) ........................................................................ 39

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) .................................................................... 11

*Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179 (3d Cir. 1988) ..................................................... 20

*In re Hollinger Int'l, Inc. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 47173 (N.D. Ill. June 28, 2006) ....................................... 27

*Hudson v. Prime Retail, Inc.*, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ....................... 41, 42

*Indurated Concrete Corp. v. Abbott*, 74 A.2d 17 (Md. 1950) ................................................... 28-29

*In re Infosonics Corp. Deriv. Litig.*, 2007 U.S. Dist. LEXIS 66043
    (S.D. Ca. Sept. 4, 2007) ................................................................................... 34-35

*Jackson v. F.B.I.*, No 02 C 3957, 2007 WL 433143, at *2 (N.D. Ill. Jan. 31, 2007). .................. 9

*J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) ................................................................... 10, 11

*Joyce v. Morgan Stanley & Co.*, 2007 U.S. Dist. LEXIS 22814
    (N.D. Ill. Mar. 29, 2007) ....................................................................................... 24

*In re JP Morgan Chase & Co. Secs. Litig.*,
    2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007) .......................... 23, 25, 27

*Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991) .................................................................. 32, 33

*Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003) ............................................ 10, 24

*Kerr S.S. Co. v. Chicago Title & Trust Co.*, 458 N.E.2d 1009 (Ill. App. 1983) ........................... 41

*Khanna v. McMinn*, 2006 Del. Ch. LEXIS 86 (Del. Ch. May 9, 2006) .................................... 32-33

*Lone Star Ladies Investment Club v. Schlotzsky's Inc.*, 238 F.3d 363 (5th Cir. 2001) ........... 24, 25

*Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135 (Del. 1997) ............................................ 41

*Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*,
    927 F. Supp. 1297 (C.D. Cal. 1996) ....................................................................... 13

*In re Marsh & McLennan Companies, Inc. Sec. Litig.,*
    536 F. Supp. 2d 313 (S.D.N.Y. 2007)............................................................ 19, 20

*In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000)................. 10, 24

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) ....................................................... 10

*Minzer v. Keegan*, 218 F.3d 144 (2d Cir. 2000)............................................................ 20

*In re Moustafi*, 371 B.R. 434 (Bankr. D. Ariz. 2007) ................................................... 13

*In re Nationsmart Corp. Sec. Litig.*, 130 F.3d 309 (8th Cir. 1997 ...........................24-25

*NCAAP v. Golding*, 679 A.2d 554 (Md. 1996) ...................................................... 41, 43

*N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119 (D. Kan. 2004 ........................................... 21

*Parish v. Maryland and Virginia Milk Producers Ass'n,*
    242 A.2d 512 (Ct. App. Md. 1968) .......................................................... 32, 41, 43

*Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 679 (M.D.N.C. 1992)......................................... 10

*Paskowitz v. Wohlstadter*, 822 A.2d 1272 (Md. Ct. Spec. App. 2003)......................................... 29

*Peregring Emerging CTA Fund, LLC v. Tradersource, Inc.,*
    2008 U.S. Dist. LEXIS 11860, *10 (N.D. Ill. Feb. 19, 2008)................................ 30

*PPM Am., Inc. v. Marriott Corp.*, 853 F. Supp. 860 (D. Md. 1994 ................................... 11, 20, 22

*Pugh v. Tribune Co.*, 521 F.3d 686 (7th Cir. 2008) .................................................... 26

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993)............................................................. 33

*Ramirez v. Smart Corp.*, 863 N.E.2d 800 (Ill. App. 2007)............................................. 40

*Reis Robotics USA, Inc. v. Concept Indust., Inc.*, 462 F. Supp. 2d 897 (N.D. Ill. 2006).............. 39

*Resolution Trust Corp. v. Hecht*, 818 F. Supp. 894 (D. Md. 1992) .............................................. 42

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22 (1st Cir. 1987) ............................................. 21

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ....................................................... 23

*Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040 (11th Cir. 1986)............................................ 22

*In re Sears, Roebuck and Co. Securities Litigation*, 291 F.Supp.2d 722 (N.D.Ill. 2003).............. 27

*SEC v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1999)....................................................... 11, 14, 16, 17

*SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938 (C.D. Cal. Mar. 16, 2006) ........................................ 11

*Segal v. Geisha NYC LLC*, 517 F.3d 501 (7th Cir. Ill. 2008)............................................................. 9

*Sekuk Global Enters. Profit Sharing Plan v. Kevenides*,
    2004 Md. Cir. Ct. LEXIS 20 (Md. Cir. Ct. May 25, 2004)................................... 34

*Shaev v. Saper*, 320 F.3d 373 (3d Cir. 2003) ........................................................................... 15, 22

*Shah v. Inter-Cont'l Hotel Chicago Operating Corp.*, 314 F. 3d 278 (7th Cir. 2002)................. 39

*Simmons v. Abruzzo*, 49 F.3d 83 (2d Cir. 1995)............................................................................. 22

*St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, 2006 WL 2849783
    (S.D.N.Y. Oct. 4, 2006)........................................................................................ 42

*Storetrax.com, Inc, v. Gurland*, 915 A.2d 991 (Md. 2007) ........................................................... 29

*Strategic Reimbursement, Inc. v. HCA, Inc.*, 2007 WL 2274709 (N.D. Ill., Aug. 2, 2007) ....39-40

*Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002).......................................................................... 29

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
    964 F. Supp. 783 (S.D.N.Y. 1997).................................................................. 42, 43

*Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960 (N.D. Ill. 2006). ............................................... 27

*Tellabs v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007...................................................... 10

*In re Time Warner Sec. Litig.*, 9 F.3d 259 (2d Cir. N.Y. 1993) ..................................................... 21

*In re Tri-Star Pictures, Inc. Litig.*, 1990 WL 82734 (Del. Ch. Jun. 14, 1990) .............................. 43

*In re Trump Hotels Shareholder Derivative Litig.*,
    2000 U.S. Dist. LEXIS 13550 (S.D.N.Y. Sept. 21, 2000) ...................................... 23

*TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F. 3d 822 (7th Cir. 1998) ........................... 38

*TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438 (1976............................................... 11, 14, 16, 18

*United States v. Rigas*, 2008 U.S. Dist. LEXIS 53605 (M.D. Pa. July 11, 2008 ................... 12, 17

*Vides v. Amelio*, 265 F. Supp. 2d 273, 275 (S.D.N.Y. 2003).....................................................42-43

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991)..................................... 10, 17, 19, 20

*Waller v. Waller*, 49 A.2d 449 (Md. 1946) ................................................................. 29

*Washtenaw County Emples. Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*,
      2008 U.S. Dist. LEXIS 53652 (N.D. Ga. Mar. 31, 2008) .................... 29-30, 33, 34

*Werbowsky v. Collomb*, 766 A.2d 123 (Md. Ct. App. 2001) ............................................ 32, 33, 35

*Wilson v. Great Am. Indus.*, 855 F.2d 987 (2d Cir. 1988) ................................................. 10, 23, 24

*Wolf v. Liberis*, 505 N.E.2d 1202 (Ill. App. Ct. 1987) .................................................... 31

*Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*,
      474 F. Supp. 2d 505 (S.D.N.Y. 2007) ..................................................................... 12

*Yost v. Early*, 589 A.2d 1291 (Md. 1991) .............................................................. 42, 43

*Zurich Capital Mkts. Inc. v. Coglianese*, 332 F. Supp. 2d 1087 (N.D. Ill. 2004) ..................... 38-39

## Other

17 C.F.R. § 230.405 ...................................................................................................... 28

17 C.F.R. § 240.14a....................................................................................................... 10

Fed. R. Civ. P. 8(a) ................................................................................................. 9, 39

Fed. R. Civ. P. 9(b)............................................................................................... 10, 23, 24

Fed. R. Civ. P. 12(b)(6)................................................................................................... 9

Fed. R. Civ. P. 23.1 ...................................................................................................... 32

Md. Code Ann., Corps & Ass'ns § 2-405.1. ........................................................... 41, 42

Md. Code Ann., Cts. & Jud. Proc. § 5-417 .............................................................. 41-42

4 A.L.R. Fed. 1021, §4.................................................................................................... 10

Hanks, Maryland Corporation Law, § 6.6(b) ............................................................... 43

Co-Lead Plaintiffs, City of St. Clair Shores General Employees Retirement System and Madison Investment Trust, shareholders of Inland Western Retail Real Estate Trust, Inc. ("Inland REIT" or "the Company") respectfully submit this Memorandum in Opposition to the Non-KPMG/William Blair Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("IW Defendants' Motion") and Memorandum in Support thereof [Docs. 56 and 57] ("Defs. Mem.").

## I.    INTRODUCTION

This Action[1] arises from a self-dealing transaction by which Inland REIT acquired its affiliates, an external Advisor and its three external Property Managers, for 37.5 million shares of the Company's stock having a deemed value of $375 million ("Internalization"). These entities, which provided Inland REIT with property management services ("the Property Managers") and acted as its business manager and supervisor of daily operations ("Advisor"), were private companies that were wholly-owned directly or indirectly by officers, directors and/or affiliates of Inland REIT.

Inland REIT, the Advisor and the Property Managers were complex entities with a complex relationship. They had multiple tiers of ownership, were involved in multiple related party-transactions and were owned and run by individuals who wore multiple hats as directors, officers and fiduciaries to Inland REIT's shareholders. It was through this structure that the Advisor and the Property Managers became a vehicle for wrongful self-dealing, to the detriment of REIT's shareholders.  Certain Defendants operated the Advisor and Property Managers with an eye towards generating for themselves a lucrative exit-strategy.  That is, the more "profitable" the Advisor and Property Managers' operations appeared, the more value and consideration these Defendants could secure from the shareholders and Inland REIT in the Internalization.

The shareholders of Inland REIT were asked to vote in favor of the Internalization solely based on Inland REIT's Schedule 14A Proxy Statement filed with the SEC on September 10, 2007 (the "Proxy"), which touted the benefits of the Internalization to the shareholders, despite the hefty price-tag. The Proxy stated that the proposed Internalization would circumvent contractual provisions by which Inland REIT could have purchased the Advisor and the Property Managers for a price derived by a pre-set formula ("Purchase Option Formula"). To demonstrate that the $375 million Internalization was a "good deal," Defendants stated that under the

---

[1]    Capitalized terms used herein have the same meaning as set out in the Amended Class Action Complaint for Violations of Federal Securities Laws and For Breaches of Fiduciary Duties [Doc. 38], ("Amended Complaint" or "Am. Cmplt."), filed in this Action.

Purchase Option Formula, the deal would have cost shareholders approximately $541 million. That statement was false because the Purchase Option Formula, if properly executed, would have garnered only a fraction of the $375 million Internalization Consideration Defendants received.

Instead of the Purchase Option Formula, Defendants utilized the Advisor's and Property Managers' historical, and theretofore undisclosed, financial statements to purportedly support the $375 million of Internalization Consideration and its allocation to the Property Managers' and Advisor's owners. The financial statements, however, had been generated so as to inflate the Advisor's and Property Managers' purported value. The Advisor's financial statements were materially inflated and misleading because they failed to report any of the Advisor's expenses. The Property Managers' financial statements were materially inflated and misleading by: (1) including excessive fees paid to the Property Managers to which they were not contractually entitled; and (2) understating expenses. Consequently, Defendants were able to attribute grossly inflated "values" to the Advisor and Property Managers. And, Defendants artificially and improperly inflated the amount of Internalization Consideration.

Defendants were assisted in their Proxy solicitation to secure the shareholders' approval of the Internalization by financial advisor William Blair & Company, L.L.C. ("William Blair"), which opined that the Internalization Consideration was "fair" to Inland REIT's shareholders, and by Defendants' auditor, KMPG LLP ("KPMG"), which blessed these entities' financial statements despite the fact that they failed to report, in accordance with generally accepted accounting principles ("GAAP"), related-party transactions and proper accounting of expenses.[2]

Defendants never disclosed in the Proxy the financial reality of the Advisor and Property Managers' businesses. The Proxy failed to disclose that the purported "value" of these entities was made possible only by Defendants having reported inflated financial performances of these entities. And, because of these accounting machinations, the Advisor and Property Managers' financial statements also failed to satisfy accounting requirements for related party disclosure and failed to disclose material transactions among affiliates and related parties.

The Amended Complaint contains detailed allegations of the aspects of the Proxy and financial statements that were materially false and misleading, who was responsible for the misportrayal of the Internalization and financial statements, who stood to gain from this

---

[2] KPMG's Motion to Dismiss the Amended Complaint was filed on August 15, 2008 and Plaintiffs' Opposition to that Motion will be filed on September 19, 2008.

misconduct, and how Inland REIT's shareholders were misled and damaged. Defendants' Motion does not raise a close question; it utterly fails to address, in any credible way, the sufficiency of the pleading to state a claim under federal securities laws or applicable state laws. Defendants' Motion fails to challenge the numerous allegations of materially false and misleading statements in the Proxy, breaches of fiduciary duties and breaches of contract. The challenged transaction involved, at bottom, the value of entities whose acquisition was the subject of shareholder approval, and Defendants attempt to support that value by disseminating financial statements that inflated materially the financial performances of the entities. Defendants can point to no other case involving similar facts where the case has been dismissed at this stage of the proceedings. Their Motion should suffer the same fate.

## II.    PERTINENT FACTUAL BACKGROUND

Inland REIT is a public unlisted[3] real estate investment trust (REIT) primarily engaged in the acquisition and ownership of commercial real estate properties, focusing on multi-tenant shopping centers. Am. Cmplt. ¶ 11. Since commencing an initial public offering on September 17, 2003, and a subsequent offering on December 28, 2004, Inland REIT has raised from shareholders net offering proceeds of over $4.8 billion. *Id.* at ¶ 13. As of December 31, 2007, the Company has approximately 484,921,000 shares outstanding. *Id.* Inland REIT was formed by Inland Real Estate Investment Corporation ("the Sponsor"), which is wholly owned by The Inland Group, an entity controlled by, and substantially owned by Defendants Goodwin, Parks, Baum, Cosenza, and Gujral. *Id.* From its inception until December 2007, all of Inland REIT's business was conducted through its Advisor and three Property Managers. *Id.* Not without coincidence, these entities were affiliates of The Inland Group and Defendants Goodwin, Parks, Baum, Cosenza, and Gujral. *Id.* at ¶¶ 20, 26, 29.

### A.    The Advisor.

The Advisor was formed in 2003 for the sole purpose of serving as the business manager and advisor to Inland REIT. *Id.* at ¶ 21. This relationship was governed by the terms of an Advisory Agreement. *Id.* The Advisor was an affiliate of the founders, officers and certain

---

[3] Inland REIT's common stock is not listed on a national securities exchange ("Listing") and there is not a public market for the stock. *Id.* at ¶¶ 16-17. Inland REIT has stated that by September 15, 2008 its board of directors would determine if and when to apply for a Listing. *Id.* If the Listing was not feasible by that date, the Company could then: sell its assets individually; list shares at a future date; or liquidate within ten years. *Id.* Despite the imminent date, the Company has not, as of this filing, disclosed its plans.

directors of Inland REIT. *Id.* at ¶ 20. The Advisor was a wholly-owned subsidiary of Inland REIT's Sponsor, Inland Real Estate Investment Corporation, which is wholly owned by The Inland Group, and which is controlled by Individual Defendants Goodwin, Parks, Baum, Cosenza and Gujral. *Id.* The multitude of duties and responsibilities of the Advisor were enumerated in the Advisory Agreement, and included:

- Present to the Company a continuing and suitable real estate investment program and opportunities to make investments in Real Properties consistent with the investment policies of the Company ...;
- Manage the Company's day-to-day investment operations. . .;
- Serve as the Company's investment advisor . . .;
- On behalf of the Company, investigate, select and conduct relations with lenders, consultants, accountants, brokers, property managers, attorneys, underwriters . . .;
- Cooperate with the Management Agent in connection with property management services and other activities relating to the Company's assets . . .;
- Upon request of the Company, act, or obtain the services of others to act, as attorney-in-fact or agent of the Company in making, acquiring and disposing of investments. . .;
- Assist in negotiations on behalf of the Company with investment banking firms and other institutions or investors for public or private sales of securities of the Company or for other financing on behalf of the Company. . .;
- Supervise the preparation and filing and distribution of returns and reports to governmental agencies and to investors and act on behalf of the Company in connection with investor relations. . .;
- Advise the Company of the operating results of the Company properties, to cause the Manager to prepare on a timely basis, and to review, for such properties operating budgets, maintenance and improvement schedules, one, three and five year projections of operating results and such other reports as may be appropriate. . .;
- As requested by the Company, make reports to the Company of its performance of the foregoing services and furnish advice and recommendations . . .;
- Prepare on behalf of the Company all reports and returns required by the Securities and Exchange Commission, Internal Revenue Service and other . . .governmental agencies;
- Undertake and perform all services or other activities necessary and proper to carry out the investment objectives of the Company. [4]

*Id.* at ¶ 116. In exchange for providing these services to Inland REIT, the Advisor received fees as set forth in the Advisory Agreement. *Id.* at ¶ 117. The Advisor was responsible for providing these services to Inland REIT's 302 commercial properties which cost in excess of $6 Billion.[5] *Id.* at ¶ 139. To provide these services, the Advisor required experienced, paid employees, whose compensation and benefits would necessarily cost millions. Inland REIT paid the Advisor $39.5

---

[4] *See* Section 2 of the Second Amended and Restated Advisory Agreement, attached as Exhibit A.

[5] *See* excerpt from Inland REIT's Annual Report for year ended Dec. 31, 2006, attached as Exhibit B.

million and $20.9 million in fees in 2006 and 2005 for these services. *Id.* at ¶ 121. But, the Advisor reported no payroll. *Id.* at ¶¶ 168, 170-74.

Instead, the financial statements of the Advisor, which were included in the Proxy materials,[6] reported salary and benefit expenses of $1 million, and simultaneously reported that Inland REIT reimbursed the Advisor for $1 million of salaries and benefits. *Id.* at ¶ 168. Pursuant to the Advisory Agreement, however, the Advisor was only entitled to be reimbursed for limited expenses only related to administrative services. *Id.* at ¶ 118 (*See* Advisory Agreement, Sect. 9(c)(2)). The financial statements, therefore, failed to reflect any amount of expenses beyond those administrative services and failed to reflect expenses which would have been necessary in order for the Advisor to perform its enumerated duties. Similarly, the Advisor's financial statements also fail to report reimbursements from Inland REIT of $3.4 million, $4.5 million and $1.5 million, in 2006, 2005 and 2004, respectively, which do appear in Inland REIT's Financial Statements. *Id.* at ¶¶ 171, 174(d).

### B.    The Property Managers.

From its inception, Inland REIT utilized the services of three Property Managers to furnish it with property management services under the terms of a Property Management Agreement for each designated property. *Id.* at ¶ 29. Prior to the consummation of the Internalization, the Property Managers were owned by Defendants Parks, Goodwin, Baum, Cosenza, Gujral and Grimes. *Id.* For Inland REIT's 300+ properties, the Property Managers furnished property management services (such as rental, leasing, operation and management services), and prepared monthly and annual reports and budgets.[7] *Id.* at ¶¶ 29, 34, 37, 40.

The financial statements of the Property Managers, which were included in the Proxy materials,[8] reported that the Property Managers were paid a 4.5% fee, plus salary reimbursements of $5.3 million and $2.3 million in 2006 and 2005, respectively. *Id.* ¶ 169. Defendants do not dispute this. Paying the Property Managers a 4.5% fee violates governing provisions in the Property Management Agreements, the Company's Articles of Incorporation (the "Charter"), Offering Documents, and the Advisory Agreement, which capped to a "market

---

[6] The Advisor was not publicly held and its financial statements were not publicly available until they were disclosed in the Proxy. KPMG was the auditor of the Advisor's financial statements. *Id.* at ¶ 29.

[7] *See* Master Property Management Agreement, Exhibit 3 to the IW Defendants' Motion.

[8] The Property Managers were not publicly held and their financial statements were not publicly available until they were disclosed in the Proxy. KPMG was also the auditor of the Property Managers' financial statements. Am. Cmplt. ¶ 31.

rate" the amount of fees that could be paid to the Property Managers.[9] *Id.* at ¶¶ 130-40. A 4.5% fee was not a market rate for comparable property management services, especially for 20% of Inland REIT's portfolio of single-tenant properties which typically garner a 1.5% fee. *Id.* at ¶¶ 138-39, 175-78. This systematic overcharge inflated the Property Managers' value.

Moreover, the Property Managers were contractually obligated to perform the numerous property management duties and responsibilities for the bulk of Inland Western's Properties. *Id.* at ¶ 176. Only a fraction of those duties and responsibilities were subcontracted out to third parties. *Id.* The financial statements, however, failed to reflect an amount of salaries and expenses necessary to have performed the Property Managers' numerous duties. As a result, the expenses reflected on the Property Managers' financial statements were materially less than what was required to provide Inland REIT with property management services. *Id.* at ¶ 177.

## C. Purchase Option Formulas.

The Advisory and Property Management Agreements both directed that Inland REIT could acquire the entire business, affairs, operations and assets of the Advisor and Property Managers after September 15, 2008 and May, 2008, respectively, pursuant to a Purchase Option Formula. *Id.* at ¶¶ 122-23, 128-29. The inclusion of the Purchase Option Formula in the Agreements was to act as a protection for Inland REIT's shareholders in that it set out an objective method (not subject to non-arms length negotiations among affiliates) by which the consideration to be paid for the Advisor and Property Managers by the REIT and shareholders would have been determined. *Id.* at ¶¶ 122-23, 128-29. Defendants, however, realizing that the Purchase Option Formula would yield a grossly excessive payment for the Advisor and Property Managers (up to $ 541 million, *id.*¶ 222-23), instead utilized the Advisor's and Property Managers' inflated historical financial statements and purported values to derive the Internalization Consideration. *Id.* ¶ 226. As a result, Defendants were able to create the false illusion in the Proxy that the Internalization was a good deal, and certainly one that was better than the Purchase Option Formula.

## D. Internalization of the Advisor and Property Managers

On September 10, 2007, Defendants filed the Proxy with the SEC, seeking shareholder approval of Inland REIT's Internalization of the Advisor and the Property Managers whereby these entities would become wholly-owned subsidiaries of Inland REIT for a total consideration

---

[9] *See* Second Amended and Restated Articles of Incorporation ("Charter"), attached as Exhibit C.

comprised entirely of 37,500,000 newly issued shares of Inland REIT's common stock with a deemed value of $375 million (the "Internalization Consideration"). *Id.* at ¶¶ 152, 154, 158. The Proxy stated that the key reasons for the proposed Internalization included the "*Goal of Self Administration*," which "may better position us to raise capital or list our shares on a national securities exchange." *Id.* at ¶ 156. And, the Proxy also stated that the Special Committee failed to recommend pursuing alternatives to the Internalization because, among other reasons, "the value that self-administration could add to our company in anticipation of a public listing or liquidity event." *Id.* at ¶ 157. The Proxy, however, omitted material facts that a reasonable shareholder would consider important in deciding how to vote on the Internalization, and contained misstatements of material fact that caused shareholders to not be adequately informed. *See* Section IV, below. Shareholders could not make a rational determination on whether to support or oppose the Internalization. Shareholders approved the Internalization, which was consummated on November 15, 2007. *Id.* at ¶¶ 166-67.

### E.    Defendants

This Action asserts legal claims against individuals who profited from the Internalization, who were required under the Company's Charter to exercise oversight and control over the Advisor and Property Managers, who were intimately involved with the Internalization, who owed fiduciary duties to the REIT and shareholders, and who recommended and solicited shareholder approval of the Internalization pursuant to the false and misleading Proxy. *Id.* at ¶¶ 83-85, 98-99, 101-103.

The Directors of Inland REIT solicited shareholders' votes and recommended that they approve the Internalization pursuant to a materially false and misleading Proxy: Defendants Robert D. Parks ("Parks") (director since March, 2003; Chairman of the Board since March 5, 2003; former CEO); Brenda Gujral ("Gujral") (director since March, 2003, CEO until November, 2007); Frank A. Catalano, Jr. ("Catalano"), Kenneth H. Beard ("Beard") and Paul R. Gauvreau ("Gauvreau") (directors since March, 2003); and, Gerald M. Gorski ("Gorski") and Barbara A. Murphy ("Murphy") (both directors since July, 2003) (collectively "Board of Directors" or "Director Defendants"). *Id.* at ¶¶ 61-65, 71-79. Each of the Director Defendants: (i) authorized, filed with the SEC, and disseminated to Inland REIT's shareholders the Proxy (including an accompanying explanatory letter to shareholders signed by Defendant Parks); *id.* at ¶ 299; (ii) was responsible for determining whether fees and reimbursements to the Advisor and

Property Managers were fair and reasonable and not less favorable to the Company than would be available from an unaffiliated source. *id.* at ¶ 120; and (iii) pursuant to Article VII, Section 5(f) of the Charter, were to "determine, from time to time and at least annually, that the total fees and expenses of the Company are reasonable in light of . . . the fees and expenses of other comparable unaffiliated Companies." *Id.* at ¶¶ 262-63 (*quoting* Advisory Agreement, Sect. 5(i), "Payments to the Advisor, its Affiliates . . . may only be made upon a determination that . . . (ii) the compensation is not greater than the charges for comparable services available from others who are competent and not affiliated with any of the parties involved"). Defendants Beard, Gauvreau, Gorski and Catalano were also members of the Special Committee that purportedly investigated and reviewed the Internalization, approved the Internalization, and recommended that shareholders approve the Internalization. *Id.* at ¶ 97.

Individual Defendants Daniel Goodwin ("Goodwin"), Robert H. Baum ("Baum"), G. Joseph Cosenza ("Cosenza"), Steven P. Grimes ("Grimes"), Parks and Gujral are also liable for the wrongdoing alleged in the Action because of their positions as the primary owners, founders, control persons and officers of Inland REIT, the Advisor and the Property Managers. *Id.* at ¶¶ 53-60, 66-68. These Defendants wore multiple hats with conflicting roles. As "Affiliates" of the Advisor, these Individual Defendants owed fiduciary duties to the Company and its shareholders. *Id.* at ¶¶ 256-57. Goodwin is Chairman, President and the controlling shareholder of The Inland Group, the ultimate owner of the Advisor, and, along with Parks, Cosenza, Baum, and Gujral, owned substantially all of the Advisor's stock prior to the Internalization. *Id.* at ¶ 20. Together Goodwin, Parks, Cosenza, Grimes, Gujral, and Baum owned in the aggregate greater than 50% of the stock of each of the Property Managers. *Id.* at ¶ 54.

Individual Defendants Goodwin, Baum, Cosenza, Grimes, Gujral and Parks had a material financial interest in the Internalization due to their ownership interests in the Advisor and the Property Managers. *Id.* at ¶ 165. Following the Internalization, (a) Goodwin owned over 30 million shares of Inland REIT with a deemed valued of over $300 million; (b) Parks received shares of Inland stock valued at $6.8 million; (c) Gujral received shares of Inland REIT stock valued at $1.3 million; (d) Grimes received shares of Inland REIT stock valued at $380,000; and (e) Baum and Cosenza received an undisclosed, material percentage of the Internalization Consideration by virtue of their ownership of The Inland Group and Property Managers. *Id.*

8

## III.    PLEADING STANDARDS UNDER RULE 12(b)(6)

Plaintiffs' well-pled Amended Complaint is more than sufficient to fulfill notice pleading requirements of Rule 12(b)(6).[10]  Defendants, citing *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007), contend that a complaint is subject to dismissal unless it alleges "factual allegations sufficient to raise a right to relief above a 'speculative level.'" Defs. Mem. at 26. The Seventh Circuit has since stated that the Rule 8(a)(2) requires only that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007). This liberal pleading requirement does not require the pleading of specific facts at the motion to dismiss stage. *Gray v. McCormick*, 2008 U.S. App. LEXIS 12620, *3 (7th Cir. Jun. 12, 2008). A complaint need only put defendants on fair notice of what the "claim is and the grounds upon which it rests," *Concentra Health Servs.*, 496 F.3d at 776, and "set forth enough facts to state a claim to relief that is plausible on its face." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 504 (7th Cir. 2008). The Amended Complaint is not just a "formulaic recitation of the elements" but rather satisfies *Twombly* by alleging facts stating a claim to relief that is plausible on its face. In reviewing a motion to dismiss, a court must accept Plaintiffs' allegations as true and construe the complaint liberally in the Plaintiffs' favor. *Feldman v. Bahn*, 12 F.3d 730, 734 (7th Cir. 1993).

## IV.    PLAINTIFFS ASSERT LEGALLY ACTIONABLE CLAIMS UNDER SECTION 14(a) OF THE EXCHANGE ACT.

### A.    Allegations Required To State Claim Under Section 14(a)

The Exchange Act "was designed to prevent management or others from obtaining

---

[10]  Defendants' contention that the Amended Complaint violates federal pleading requirements by failing to provide fair notice of the claims against them is hollow. Defs. Mem. at 22. The Amended Complaint is not "unintelligible" and therefore cannot be dismissed under Fed. R. Civ. P. Rule 8(a). *Jackson v. F.B.I.*, No 02 C 3957, 2007 WL 433143, at *2 (N.D. Ill. Jan. 31, 2007). In fact, "a district court is not [even] authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter. . ." *Id.* (*citation omitted*). Defendants have articulated and responded to the Amended Complaint's allegations, which illustrates that each Defendant was clearly placed on notice of each particular allegation against it. Defs. Mem. at 23. The Amended Complaint includes particularized allegations that form the basis of each claim and asserts the shareholders legal rights and claims, as it must.. Defendants' characterization of the Amended Complaint as a "shotgun pleading" notwithstanding, its complexity was driven by Defendants' affiliated relationships and structure, *e.g.*, The Amended Complaint particularly defines those Defendants who owe fiduciary duties to the Company and its shareholders, and why, and how those duties were breached. *Id.* at ¶¶ 31, 256-272. Defendants also did not move under Rule 12(e) to require the filing of a more definite statement. *Anderson v. Dist. Bd. Of Trs. Of Cent. Fla. Cmt. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). While dismissal of the Amended Complaint on that basis is not warranted, courts do routinely grant leave to replead. *Jackson*, 2007 WL 433143, at *4.

authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). In this regard, Section 14(a) of the Exchange Act[11] governs the solicitation of proxies, with the ultimate aim of assuring that shareholders exercise their right of corporate suffrage on the basis of corporate information fairly and fully disclosed to them by their company and their fiduciaries, 4 A.L.R. Fed. 1021, §4, by "prohibiting the solicitation of proxies by means of materially false or misleading statements." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087 (1991).

To state a claim under Section 14(a), a plaintiff must allege that (1) the proxy statement contained a material misstatement or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 384-85 (1970). Section 14(a) requires only a showing of negligence, as acknowledged by Defendants. Defs. Mem. at 27-28; *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003) (negligent omission of material information from a proxy statement violates Section 14(a)); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 29-30 n. 45 (7th Cir. 1972); *see also Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1266 (S.D. Fla. 1995) (plaintiffs need not plead or prove privity, reliance, causation or scienter to recover under Section 14(a)). Co-Lead Plaintiffs allege that Defendants prepared and disseminated a materially false and misleading Proxy. Am. Cmplt. ¶¶ 167-255, 291-300. "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to show a director's negligence." *Wilson v. Great Am. Indus.*, 855 F.2d 987, 995 (2d Cir. 1988).[12]

The touchstone of a Section 14(a) violation is a material misstatement or omission –

---

[11] Section 14(a) provides: "It shall be unlawful... to solicit or permit the use of [a] name to solicit any proxy." Rule 14a-9 prohibits solicitation of a shareholder's vote by means of a proxy that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a.

[12] *E.g., In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1256 (N.D. Cal. 2000); *In re BankAmerica Corp. Sec. Litig.*, 78 F. Supp. 2d 976, 989 (E.D. Mo. 1999); *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 679, 701 (M.D.N.C. 1992). Plaintiffs' Section 14(a) claims stand alone and are based on negligent misconduct. Am. Cmplt. ¶¶ 292-301. Defendants make a futile and misplaced attempt to cast Plaintiffs' Section 14(a) claims as sounding in fraud. Defs. Mem. at 28-29. *See* 15 U.S.C. § 78u-4(b)(2) (1997), as interpreted by *Tellabs v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509-10 (2007) with respect to the scienter requirement for Section 10(b) claims, and to Rule 9(b)'s requirement that fraud be pled with particularity. *See* Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). *See infra* Section IV.B.

something "that a reasonable shareholder would consider . . . important in deciding how to vote." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Shareholders must be adequately informed so that they can make rational determinations on whether to support or oppose particular transactions. *Gans v. Filmways, Inc.*, 453 F. Supp. 1116 (E.D. Pa. 1978). At the motion to dismiss stage in the proceedings, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001). The Amended Complaint alleges with particularity that the Proxy failed to fulfill the underlying requirement of Section 14(a) – to provide full and fair disclosure from which shareholders may draw their own inferences and make their decisions on how to vote. *J.I. Case Co.*, 377 U.S. at 431; *TSC Indus. Inc.*, 426 U.S. at 448. The alleged misstatements and omissions would have assumed significance in the deliberations of the Inland REIT's shareholders. *PPM Am., Inc. v. Marriott Corp.*, 853 F. Supp. 860, 868 (D. Md. 1994).

**B.    Defendants' Misrepresentations and Omissions of Material Facts Rendered the Proxy False and Misleading**

Information about the value and price to be paid in a merger is among the most material information necessary for a shareholder voting on the Proxy. *SEC v. Lipson*, 46 F. Supp. 2d 758, 765 n.5 (N.D. Ill. 1999) (information contained in financial reports, such as hard revenue and performance numbers, is information that reasonable investors would consider significant in making investment decisions); *see SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938, 103-104 (C.D. Cal. Mar. 16, 2006). The Proxy sought Inland REIT's shareholders approval of a self-dealing transaction, the Internalization. The Proxy informed shareholders that their fiduciaries recommended the Internalization, that a purported independent financial advisor had deemed the $375 million Internalization Consideration to be "fair," and that the Advisor and Property Managers' financial statements were properly audited by KPMG. These statements to shareholders were false and shareholders were not given any meaningful information about the Internalization and Company's strategic alternatives. The Proxy materials misstated or failed to disclose the most important information necessary for shareholders to exercise a fully informed vote on the Internalization. Am. Cmplt. ¶¶ 168-255.

11

### 1. The Advisor's Financial Statements Failed to Report Expenses.

The Advisor's financial statements included in the Proxy failed to report expenses of the Advisor, rendering the Advisor's value and financial statement presentation patently inflated, unrealistic and not reflective of the true operating and financial performance of the Advisor. *Id.* at ¶¶ 170-74. Defendants dismiss these allegations as "baseless." Defs. Mem. at 33. However, Defendants never address Co-Lead Plaintiffs' particularized allegations that financial statements which reflect a high level of profitability by understating expenses are materially false and misleading.[13] *U.S. v. Rigas*, 2008 U.S. Dist. LEXIS 53605 (M.D. Pa. July 11, 2008) (in order to maintain a high EBITDA, defendants moved expenses and income between affiliated entities).

The Amended Complaint alleges that the Advisor failed to report expenses, which inflated the financial performance and value of the Advisor in the Internalization. Am. Cmplt. ¶ 170-74. Defendants point out that since the financial statements of the Advisor reported salary and benefit expenses of approximately $1 million in 2005 and 2006, the allegation is unfounded. Defs. Mem. at 33. Defendants fail, however, to address the fact that the financial statements also report that the Advisor was reimbursed by Inland REIT for those salaries and benefits. Am. Cmplt. ¶ 168; Table I. Those expenses, therefore, necessarily represented salaries and benefits for providing very specific, enumerated ministerial and administrative services and did not reflect the salaries and benefits necessary to perform and carry out the Advisor's day-to-day operations.[14] *Id.* at ¶ 118 (See Advisory Agreement, Sect. 9(c)(2)). Therefore, the financial

---

[13] Defendants' reliance on *Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 519 (S.D.N.Y. 2007) is misplaced. Defs. Mem. at 33-34. In *Xerion*, the court focused on the failure of the plaintiff to allege a single fact to support its claim that defendants' EBITDA was inflated. Additionally, the court addressed plaintiffs' baseless conclusion that certain expense items were manipulated to inflate earnings due to the movement of expenses from one reporting period to another. *Id.* at 518 ("There is nothing inherently improper, however, about reporting a positive EBITDA while simultaneously reporting a net loss"). Here, Plaintiffs assert that the Advisor and the Property Managers reported virtually no expenses, which was clearly impossible in light of the magnitude of services provided by these entities to Inland REIT. Accordingly, Plaintiffs allege that those expenses were either re-directed to affiliates of the Advisor or not reported at all. Such particularized allegations are sufficient to show a material misstatement with respect to EBITDA figures. *Id.* at 519 (allegations that the EBITDA figures were inflated in part because of the improper "inventory moratorium" were sufficiently particularized).

[14] The Advisory Agreement, Section 9(c)(2)(b) provides that the Advisor is only entitled to be reimbursed for certain expenses related to <u>administrative services</u>. *Reimbursement for the cost to the Advisor and its Affiliates for*: (i) the cost to the Advisor or its Affiliates of goods and services used for and by the Company and obtained from unaffiliated parties; and (ii) administrative services related thereto. "Administrative Services" include ministerial services such as typing, record keeping, preparation and dissemination of Company reports. *Id.*

statements failed to reflect any amount of expenses which would have been necessary for the Advisor to perform its numerous services for the Company. That level of operating efficiency – zero expenses - is not only improbable, it is impossible. *In re Moustafi*, 371 B.R. 434, 435 (Bankr. D. Ariz. 2007) ("no one has zero expenses"). The only reasonable inference is that the Advisor re-directed its expenses to affiliates of the Advisor and that the financial statements included in the Proxy and used to calculate the Internalization Consideration were not reflective of the true operating and financial performance of the Advisor. *Id.* at ¶¶ 172, 174, 177-78.

As a result of the Advisor's failure to report expenses, the financial statements reflected an EBITDA for the Advisor that was nearly 100% of its Total Revenues. In addition, the financial statements failed to report, for the years ended December 31, 2006, 2005 and 2004, reimbursements from Inland REIT for $3.4 million, $4.5 million and $1.5 million of general and administrative costs, respectively. *Id.* at ¶ 174. The financial statements of the Advisor provided the basis for the Advisor's valuation in the Internalization. The failure to report the Advisor's expenses resulted in an inflated valuation of the Advisor in the Internalization. *Id.* at ¶ 172. The Proxy was rendered materially false and misleading in that it included and utilized financial statements of the Advisor that failed to report expenses and inflated the Advisor's purported profitability, which statements were represented as supporting the Advisor's valuation in the Internalization. *Id.* at ¶ 173.

In addition, the financial statements of the Advisor were false because they violated aspects of GAAP by failing to disclose details of all related party transactions between or among Inland REIT, the Advisor and the Property Managers, including disclosure of expense allocations and payments of salaries, including the failure to disclose complete information concerning services provided by The Inland Group, the Sponsor and/or any affiliates, which were necessary to make the financial statements not false and misleading. *Id.* at ¶¶ 195-202. Financial statements in "violation of GAAP can constitute a material misrepresentation that gives rise to an action for securities fraud." *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 935 (N.D. Ill. 1996) (quoting *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.*, 927 F. Supp. 1297, 1306 (C.D. Cal. 1996)). Whether financial statements comply with GAAP is a factual question that should not be addressed on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997).

To rebut these allegations, Defendants claim that they properly disclosed that Inland

REIT relied on "a host of service providers" to conduct its affairs (Defs. Mem. at 34-35). Defendants point to several "disclosures" in the Proxy which indicated that affiliates of The Inland Group provided services to Inland REIT, and thus participated in "running" Inland REIT as an attempt to "undercut" Plaintiffs' assumptions about expenses. *Id.* at 34. That is not the import of those disclosures. Those disclosures only state that affiliated entities provided administrative and other services which were *not* provided by the Advisor. (Proxy at 12, 21, 72-73). Defendants' "disclosures", therefore, do not address how the Advisor, which was contractually bound to provide a multitude of services to Inland REIT and was paid millions in fees to do so, performed those services without incurring any expenses. Am. Cmplt. ¶¶ 170-180. The fact that the expenses of the Advisor were understated, which in turn, inflated its profitability, is material information that a shareholder would consider important in deciding how to vote on a proposal to acquire those entities. *TSC Indus. Inc.*, 426 U.S. at 448-49; *see Lipson*, 46 F. Supp. 2d at 765 n.5.

### 2. The Property Managers' Financial Statements Reported Inflated Fees

The Property Managers' financial statements included in the Proxy failed to report the Property Managers' systematic overcharging of fees to Inland REIT, which in turn inflated the Property Managers' purported value in the Internalization. *Id.* at ¶ 171. Defendants assert that the Property Managers' financial statements accurately disclose the actual 4.5% property management fees received by the Property Managers, and thus are not false and misleading. Defs. Mem. at 35-36. Although the Property Managers' financial statements reported the fees actually received from Inland REIT, that does not render them true. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).

The Amended Complaint alleges that receipt of a 4.5% Property Management Fee was in excess of what the Property Managers were contractually entitled to receive. Am. Cmplt. ¶ 130-40, 183. The Property Managers' profitability and EBITDA, therefore, were inflated. *Id.*. Defendants' assertion that the "4.5% rate was precisely the rate set by the Property Management Agreements" (Defs. Mem. at 6, 36) does not rebut Co-Lead Plaintiffs' allegations. Defendants, and Inland REIT's relationship with the Property Managers, were governed by the Charter, which must be read together with the Property Management Agreement, the Offering Documents and the Advisory Agreement. *Id.* ¶¶ 130-40. First, the Property Management Agreement does

14

not provide for a flat 4.5% fee, but states that the fees to the Property Managers would be <u>up to</u> 4.5%. *Id.* Defendants had a fiduciary duty to read the Property Management Agreement in conjunction with the other operative agreements. *Id.* In reading these documents together, as Defendants should have done to properly exercise their fiduciary duties, it becomes clear that:

(a)     The Property Management Agreements set forth a ceiling by which fees could in no event exceed 4.5%;

(b)     The Charter provided for the Directors to oversee compensation to the Property Managers to ensure that "the compensation is not greater than the charges for comparable services available from others who are competent and not affiliated with any of the parties involved." The Directors failed to cap payments to the Property Managers at a Market Rate, in breach of their fiduciary duties;

(c)     The Charter also required Directors to "determine, from time to time, but at least annually, that the total fees and expenses of the Company are reasonable in light of... the fees and expenses of other comparable unaffiliated Companies." Defendants failed to adhere to this oversight provision and determine that the fees were reasonable and in line with the Market Rate, in breach of their fiduciary duties;

(d)     The Offering Documents and the Advisory Agreement provided for a fee of "90% of the Market Rate," which fee was *initially* set at 4.5%. *See Dolphin & Bradbury, Inc. v. SEC*, 379 U.S. App. D.C. 200 (D.C. Cir. 2008) (offering documents should accurately reflect all material facts which a prudent investor should know);[15]

(e)     Defendants never implemented or applied a market rate check (and do not now state that they did) in violation of the Charter, Property Management Agreement, Advisory Agreement, and statements in the Offering Documents.

(f)     The financial statements included in the Proxy reflected a fee of 4.5% plus reimbursements without disclosing the discrepancy that the fees were never capped at Market Rate or 90% of Market Rate. The 4.5% flat fee is in sharp contrast to the 1.5% fee typically paid to manage single-tenant properties, which represent in excess of 20% of Inland REIT's portfolio.

The Charter and Agreements make clear that the Property Management Fees were to be capped at either a Market Rate or 90% of Market Rate. Am. Cmplt. ¶¶ 130-40. As set forth in the Amended Complaint, since 2004, market rates for property management services have been

---

[15] Where there is an inconsistency between statements in the Offering Documents and later SEC filings, Defendants have a duty to correct such inconsistency, and any misrepresentation of such fact is material. "That an investor could hypothetically research publicly available documents and filings to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its obligations under Rule 14a-9." *Shaev v. Saper*, 320 F.3d 373, 381 (3d Cir. 2003).

significantly below 4.5%, and in fact the market rate for retail properties with single tenant triple-net leases, representing over 20% of Inland REIT's portfolio, ranges from 1.0% to 2.0%, far from the 4.5% actually charged. *Id.* at ¶ 138. The Amended Complaint sufficiently alleges that it was misleading, and in violation of the operative Agreements and Charter, for the Property Managers to charge a 4.5% fee, plus reimbursements for salaries.

The financial statements of the Property Managers provided the basis for its valuation in connection with the Internalization. The Property Managers' systematic overcharging of fees to Inland REIT inflated the Property Managers' purported value and increased the amount of Internalization Consideration Defendants received in the Internalization. *Id.* at ¶ 178. Due to Defendants' failure to comply with the terms of the Property Management Agreements, and by disregarding or overlooking the terms set forth in the Charter and the Advisory Agreement, the financial statements of the Property Managers reflected inflated Property Management Fees. The Property Managers' levels of profitability, which were directly related to the value of the consideration being paid for the Property Managers, were material to Inland REIT's shareholders in casting an informed vote on the self-dealing Internalization. *Lipson*, 46 F. Supp. 2d at 765 n.5. Defendants secured a tainted Proxy vote by failing to disclose material facts a reasonable shareholder would consider important in deciding how to vote. *TSC Indus. Inc.*, 426 U.S. at 449.

### 3. The Property Managers' Financial Statements Understated Expenses.

The Property Managers' financial statements included in the Proxy understated expenses incurred by the Property Managers, rendering the Property Managers' financial statements patently inflated, unrealistic and not reflective of the true operating and financial performance of the Property Managers. *Id.* at ¶¶ 175-77. The Property Managers' financial statements reflected minimal expenses in 2005 and 2006. *Id.* at ¶¶ 175-180. The financial statements thereby failed to report the levels of expenses necessary to provide property management services to over 300+ properties.[16] Due to this minimal amount of expenses reported, the Property Managers' financial statements reflect an EBITDA of 60% of Total Revenues. *Id.* at ¶ 175. See Section IV.B.1, *supra*. The reasonable inference is that the Property Managers re-directed their expenses to their affiliates and that the financial statements included in the Proxy and used to calculate the Internalization Consideration were not reflective of the true operating and financial performance

---

[16] Only a fraction of the duties and responsibilities of the Property Managers were subcontracted out to third parties. Am. Cmplt. ¶ 176. The Property Managers themselves retained primary responsibility to handle the property management duties and responsibilities for the bulk of Inland REIT's Properties. *Id.*

16

of the Property Managers. *Id.* at ¶¶ 177-78; *Rigas*, 2008 U.S. Dist. LEXIS 53605 at *8-10 (in order to maintain a high EBITDA, defendants moved expenses and income between affiliated entities). The facts concerning the Property Managers' levels of profitability, which were directly related to the value of the consideration being paid for the Property Managers, were material to Inland REIT's shareholders in casting an informed vote on the self-dealing Internalization. *Lipson*, 46 F. Supp. 2d at 765 n.5.

### 4. The Proxy Contained Materially False and Misleading Statements About the Fairness of Internalization Consideration.

The Proxy made several affirmative statements concerning the value of the Advisor and the Property Managers and the corresponding fairness of the Internalization to the shareholders. *Id.* at ¶¶ 217-20. Defendants assert that the actionability of these statements depends on Plaintiffs' ability to show that the financial statements were materially false and misleading, which Plaintiffs have addressed in Sections 1-3, above. Defs. Mem. at 32. As discussed, the Internalization Consideration materially exceeded the actual and fair values of the Advisor and Property Managers and was derived from materially false and misleading financial statements. Therefore, the statements in the Proxy concerning the range of value for the Advisor and the Property Managers, the fairness of the Internalization Consideration, and the fairness of the Internalization were materially false and misleading because the Internalization Consideration was derived from the inflated EBITDA calculated from the Advisor's and Property Managers' false and misleading historical financial statements of the. *Id.* at ¶ 219. "Although a corporate transaction's 'fairness' is not, as such, a federal concern, a proxy statement's claim of fairness presupposes a factual integrity that federal law is expressly concerned to preserve." *Va. Bankshares*, 501 U.S. at 1094 n.6.

### 5. The Proxy Contained Materially False and Misleading Statements About the Purchase Options.

In an effort to justify the $375 million Internalization Consideration, the Proxy pointed to the Purchase Option Formulas, stating that "Our Board elected not to wait and pursue the options outlined in this proxy statement whereby we could acquire our Business Manager/Advisor and Property Managers under the terms of the existing advisory agreement and property management agreement, beginning in September and May 2008, respectively, which could have resulted in approximately 54.1 million shares issued in connection with such acquisition." *Id.* at ¶ 221. The Amended Complaint alleges that the statements concerning the amount of shares that could have

17

been issued if the Purchase Options were pursued were false created a ruse that shareholders were approving a more financially favorable transaction. The Purchase Option Formulas would not have yielded consideration to Defendants valued at over $540 million. *Id.* at ¶ 225. To the extent that the actionability of these statements depends on Plaintiffs' ability to show that the financial statements were materially false and misleading, Plaintiffs have done so in Sections 1-3, above. Defs. Mem. at 32.

Notwithstanding Plaintiffs' allegations concerning the Advisor's and Property Managers' financial statements, the statements in the Proxy about the amount that would have been paid under the Purchase Options were false and misleading because Defendants (1) utilized inflated historical financial statements, and (2) failed to use the "annualized audited Net Income" of the Advisor and Property Managers, "for the calendar month immediately preceding the month in which the Merger Agreement is executed," as required by the Purchase Option Formula. *Id.* at ¶ 224. If Defendants had calculated the Purchase Option price for the Advisor and Property Managers in accordance with Formula, as required, and did not utilize inflated financials, the Formula would have yielded consideration to Defendants valued at a fraction of the Internalization Consideration. *Id.* at ¶ 225.[17] Defendants secured a tainted Proxy vote and proceeded with an improper Internalization by failing to disclose material facts a reasonable shareholder would consider important in deciding how to vote. *TSC Indus. Inc.*, 426 U.S. at 449.

### 6.  *The Independent Auditors' Reports Were Materially False and Misleading.*

The Proxy included the KPMG Independent Auditors' Reports which opined that the financial statements of the Advisor and the Property Managers "presented fairly, in all material respects, the financial position of the Advisor [and the Property Managers] as of December 31, 2006 and 2005, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2006 in conformity with U.S. generally accepted accounting principles." *Id.* at ¶ 187. The inclusion of KPMG's independent auditors' reports in the Proxy misleadingly conveyed to the shareholders that the financial statements of the Advisor and the Property Managers were fairly presented in accordance with GAAP when in fact, those financial statements materially varied from aspects of GAAP by: (a) failing to disclose details of

---

[17] Defendants do not specifically address the allegations that the statements in the Proxy concerning the Purchase Option Formula were materially false and misleading because they depend on the assertion that the financial statements were misleading. Defs. Mem. at 32. As set forth in Section IV.B.1-3, the financial statements of the Advisor and the Property Managers were materially false and misleading.

all related party transactions between or among Inland REIT, the Advisor and the Property Managers, including disclosure of expense allocations and payments of salaries (*id.* at ¶¶ 196-200); and (b) failing to disclose complete information concerning services provided by The Inland Group, the Sponsor and/or any affiliates, which were necessary to make the financial statements not false and misleading (*id.* at ¶¶ 201-02).[18]

The Independent Auditors' Reports provided by KPMG and included by Defendants in the Proxy legitimized the materially false and misleading financial statements of the Advisor and the Property Managers, rendering the statements in the Proxy concerning the Fairness Opinion and the Independent Auditors' Reports materially false and misleading.[19] *Id.* at ¶¶ 185-216, 235-255. Defendants asked shareholders to approve an Internalization which would dilute their interest in Inland REIT by $375 million; information about the valuation and fairness of the $375 Internalization Consideration was among the most important information that could be provided to shareholders. *Va. Bankshares*, 501 U.S. at 1093.

### 7. The Fairness Opinion Was Materially False and Misleading.

The Proxy included the William Blair Fairness Opinion that deemed the Internalization Consideration "fair, from a financial point of view, to [Inland REIT] and [its] stockholders." *Id.* at ¶ 235. William Blair opined that the Internalization Consideration was fair despite utilizing financial statements of the Advisor and Property Managers, that, on their face: (a) failed to report expenses; (b) failed to disclose details of all related party transactions between or among Inland REIT, the Advisor and the Property Managers, including disclosure of expense allocations and payments of salaries; (c) failed to disclose complete information concerning services provided by The Inland Group, the Sponsor and/or any affiliates; and (d) flatly contradicted what was revealed by a comparable company analysis-- that the level of operating expenses that the

---

[18] The Complaint also alleges that KPMG violated generally accepted auditing standards ("GAAS") by failing to conduct a reasonable investigation of the financial statements of the Advisor and the Property Managers with respect to related party transactions and to detect material misstatements that violated GAAP, and thus, did not possess reasonable grounds for expressing its opinions that the financial statements were presented and prepared in accordance with GAAP. *Id.* at ¶¶ 191, 194, 203-16. Plaintiffs will address this in their Opposition to KPMG's Motion to Dismiss [Docs. 66-67].

[19] Defendants do not specifically address the allegations that the Proxy was rendered false and misleading by its inclusion of KPMG's Auditors' Reports. Am. Cmplt. ¶¶ 185-216, 235-55; *See* Opposition to KPMG's Motion to Dismiss. The Auditors' Reports were incorporated into, and part of, the "total mix" of information available to shareholders deciding how to vote on the Proxy. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007) (total mix of information included 10-K that accompanied proxy statement and where proxy directed readers to relevant portions of the 10-K).

Advisor and Property Managers reported was significantly inadequate and impossible had they been stand-alone companies that were not subsidized by affiliates. *Id.* at ¶¶ 235-55. The inclusion of this Fairness Opinion in the Proxy only served to misleadingly convey to the shareholders that some purportedly independent entity had conducted an assessment of the Internalization, when, in fact, the Fairness Opinion was seriously flawed, devoid of credibility and reliability, and amounted to a vehicle that masked and aided Defendants' wrongdoing. [20] *Id.* at ¶¶ 248-55.

Defendants do not address the allegations that the Proxy was rendered false and misleading by its inclusion of William Blair's Fairness Opinion and all of the alleged factual inaccuracies and misstatements contained therein. Am. Cmplt. ¶¶ 185-216, 243-55. The Fairness Opinion was incorporated into, and part of, the "total mix" of information available to shareholders deciding how to vote on the Proxy. *In re Marsh & McLennan Cos.*, 536 F. Supp. 2d at 323. The Fairness Opinion provided by William Blair legitimized the materially false and misleading financial statements of the Advisor and the Property Managers, rendering the statements in the Proxy about the fairness of the Internalization Consideration materially false and misleading. *Id.* at ¶¶ 185-216, 235-255. *See* Plaintiffs' Opposition to William Blair's Motion to Dismiss. Defendants asked shareholders to approve an Internalization which would dilute their interest in Inland REIT by $375 million; information about the valuation and fairness of the $375 Internalization Consideration was among the most important information that could be given to shareholders. *Va. Bankshares*, 501 U.S. at 1093; *PPM Am., Inc.*, 853 F. Supp. at 868.

### 8.  *The Proxy Failed to Disclose Strategic Alternatives to the Internalization.*

Defendants make boilerplate arguments about how the Amended Complaint supposedly fails to sufficiently allege misstatements and non-disclosures in the Proxy concerning strategic alternatives. Defs. Mem. at 37-38. On the contrary, the Amended Complaint alleges that the Proxy failed to give shareholders meaningful reasons for the Internalization and how it would be in their best interests if some exit strategy other than a Listing materialized (such as a buyout of the shareholder's interests or a liquidation of the Company). Am. Cmplt. ¶¶ 227-228. In addition, the Proxy failed to state material facts about the cost to the shareholders if the

---

[20] The Proxy was false because it included a fairness opinion that lacked a reasonable basis or was made without a genuine belief in its accuracy. *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 184 (3d Cir. 1988). In challenging the fairness opinion and Proxy, Plaintiffs properly allege facts that "undercut[] the statement that the [proposed transaction] was 'fair from a financial point of view.'" *Minzer v. Keegan*, 218 F.3d 144, 151 (2d Cir. 2000). *See also*, Opposition to William Blair's Motion to Dismiss.

Internalization was approved and consummated but some event other than a Listing subsequently occurred. *Id.* at ¶ 229. Defendants assert that they sufficiently disclose that the Special Committee addressed these issues and that there is no basis to conclude that Inland REIT was required to disclose alternatives to the Internalization in the Proxy. Defs. Mem. at 20-21, 37-38. However, Defendants had an obligation to disclose other approaches to reaching a goal of a public listing or liquidity event. *See N.J. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1132 (D. Kan. 2004). "When a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. N.Y. 1993).

The Proxy stated that the key reasons for the proposed Internalization included the "*Goal of Self Administration*," which "may better position us to raise capital or list our shares on a national securities exchange." Am. Cmplt. at ¶ 156. The Proxy also stated that the Special Committee failed to recommend pursuing alternatives to the Internalization because, among other reasons, "the value that self-administration could add to our company in anticipation of a public listing or liquidity event." *Id.* at ¶ 157. Once making these affirmative statements, Defendants had a duty to make certain they were complete and accurate by disclosing the other approaches to reaching the goal of liquidity for the shareholders. *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) ("When a corporation does make a disclosure--whether it be voluntary or required--there is a duty to make it complete and accurate"). According to the Proxy, the Internalization was "the most significant step[] toward achieving our goal of an effective liquidity event" for shareholders. Am. Cmplt. ¶¶ 227-31. Aside from this generalized statement, the Proxy failed to name the "strategic alternatives" and which, if any, were evaluated by the Special Committee. *Id.* (The Proxy also did not disclose the impact that the Internalization would have on the shareholders if the various liquidity events stated occur or do not occur. *Id.* The shareholders needed information about what was done to maximize shareholder value through the investigation of strategic alternatives and the assessment of liquidity events in the face of this $375 million self-dealing transaction. *Id.* The Proxy was of no use in this regard.

### 9. *The Proxy Failed to Disclose Material Facts About the Advisor and the Property Managers' Past Performances.*

Defendants' argument that the Amended Complaint fails to sufficiently allege how the alleged misstatements and non-disclosures concerning the Property Managers' and Advisor's

21

past performance rendered the Proxy false and misleading must be rejected. Defs. Mem. at 37-38. The Proxy sought shareholder approval for the Internalization without providing the Director Defendants' objective evaluation of, or information concerning, the Advisor and the Property Managers' performances, which information was meaningful to shareholders voting on whether to pay consideration valued at $375 million to acquire the Advisor and Property Managers. *Id.* at ¶¶ 232-34. Moreover, the Amended Complaint alleges that the Proxy failed to disclose material facts about the Advisor's and Property Managers' performances in advising and managing Inland REIT. *Id.* at ¶¶ 232-234. Defendants contend that the Amended Complaint fails to state why this omission rendered the Proxy materially misleading. Defs. Mem. at 37. When shareholders are asked to approve a hefty $375 million payment so the Company can acquire affiliates, the results of the Directors' Charter-mandated evaluations of the Advisor's and the Property Managers' performance would have given shareholders with an objective basis to evaluate the Internalization Consideration. *Shaev*, 320 F.3d at 382 (a proxy's omission of information is material if stockholders had no way of substantiating payment of a bonus to executive).

Without any information about the Advisor's and Property Managers' performances, the shareholders were left with an incomplete and misleading basis on which to vote in favor of the Internalization and were misled as to the valuation of the Advisor and the Property Managers. Moreover, in light of Defendants' relationships to the Advisor, the Property Managers and Inland REIT, Defendants' superior access to the information required to be disclosed, the benefit to be derived by the Defendants, Defendants' awareness of Plaintiffs' reliance on Defendants in making investment decisions, and Defendants' role in the Internalization and Proxy, Defendants had a duty to provide complete and accurate information in the Proxy. *Rudolph v. Arthur Andersen & Co.*, 800 F.2d 1040, 1043 (11th Cir. 1986). Accordingly, Plaintiffs have alleged with particularity that the alleged misstatements and omissions would have assumed significance in the deliberations of the reasonable shareholder. *PPM Am., Inc.*, 853 F. Supp. at 868.

### C.    Heightened Pleading Standards Do Not Apply to Section 14(a) Proxy Claims.

Fed. R. Civ. P. Rule 8 generally requires that a complaint contain a short and plain statement of the claim informing the defendant of the nature of the claim and showing that the pleader is entitled to relief. *See Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) (pleadings are only required to give a "fair notice" of a claim in order to enable the opposing party to answer and prepare for trial). Under Section 14(a), liability exists for negligent material

22

misrepresentations or omissions, and there is no requirement that a plaintiff satisfy Fed. R. Civ. P. Rule 9(b), which relates solely to pleading averments of fraud with particularity. *Rombach v. Chang*, 355 F.3d 164, 171(2d Cir. 2004) (Rule 9(b) only applies to claims premised on fraud.) Under the Section 14(a) negligence standard, Plaintiffs are not required to plead that the defendants knowingly or fraudulently omitted or misrepresented material information with the intent to deceive. *Wilson*, 855 F.2d at 995. Although scienter is not an element of a Section 14(a) claim, under unique circumstances, the heightened pleading requirements of the PSLRA will be triggered if a plaintiff's claims sound in fraud.[21]

Defendants assert that the PSLRA heightened pleading standards apply to any private action arising under the Exchange Act. Defs. Mem. at 26-27. However, the Seventh Circuit has not yet ruled as to whether the PSLRA's heightened pleading requirements for securities claims (requiring plaintiff to plead the "who, what, where, why and how") apply to Plaintiffs' Section 14(a) claim. In *Blau v. Harrison*, 2006 U.S. Dist. LEXIS 19795, *16 (N.D. Ill. Mar. 24, 2006) (J. Hibbler), this Court ruled that the pleading requirements of the PSLRA do not apply to a section 14(a) claim that does not "sound in fraud." *C.f. Beck v. Dobrowski*, 2007 U.S. Dist. LEXIS 84093 (N.D. Ill. Nov. 14, 2007) (J. Leinenweber) (applying the PSLRA's heightened pleading standards, to a Section 14(a) action, but distinguishing *Blau* because plaintiff's 14(a) claims were based in intentional conduct, not negligence); *In re JP Morgan Chase & Co. Secs. Litig.*, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007) (J. Coar) (following *Beck*, held that PSLRA standards apply to all claims under the Exchange Act, including Section 14(a) claims of negligence). Defendants' reliance on *Beck* to have this Court apply the PSLRA heightened pleading standards to all Exchange Act claims is unavailing because Plaintiffs' Section 14(a) claims are based in negligence. The *Beck* court specifically stated that "reliance on [*Blau* was] misplaced because, unlike in *Blau*, Plaintiffs' 14(a) claims here are based in intentional conduct, not negligence." *Beck*, 2007 U.S. Dist. LEXIS 84093, at *13.

### 1.    *The Amended Complaint Does Not Sound in Fraud.*

The Amended Complaint alleges that Defendants were negligent in omitting from the

---

[21] *Blau v. Harrison*, 2006 U.S. Dist. LEXIS 19795 (N.D. Ill. Mar. 24, 2006) (Section 14(a) allegations are not required to meet the PSLRA particularity requirements where claims are based on averments of negligence); *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 378 (D.N.J. 1999)(where plaintiffs alleged negligence in a Section 14(a) claim, they need not plead fraud, let alone with particularity); *In re Trump Hotels Shareholder Deriv.Litig.*, 2000 U.S. Dist. LEXIS 13550, (S.D.N.Y. Sept. 21, 2000).

Proxy certain facts which were material to shareholders' reasonable and independent evaluation of the Internalization to be voted on in the Proxy. Am. Cmplt. ¶¶ 167-255. Nowhere does the Amended Complaint assert that any of the Defendants acted with fraudulent intent or scienter.[22] For a complaint to sound in fraud, a plaintiff must allege that defendants knowingly omitted or misrepresented material information with the intent to deceive. *Joyce v. Morgan Stanley & Co.*, 2007 U.S. Dist. LEXIS 22814, *20-21 (N.D. Ill. Mar. 29, 2007). In this regard, Defendants just point to Plaintiffs' allegations that Defendants "understood and knew" of facts demonstrating the falsity of the Proxy yet issued it anyway. Defs. Mem. at 29.    The fact that Defendants knew certain facts and omitted them from the Proxy does not imply that they did so with the requisite *intent to deceive*, the hallmark of a fraud. *See In re McKesson,* 126 F. Supp. 2d at 1266, n.8 ("As an initial matter, the court notes that the Section 14(a) claim does not 'sound in fraud' as to all defendants, many of whom are not alleged to have acted intentionally:  Indeed, with respect to the director defendants, the allegations of the complaint sound solely in negligence").

The Amended Complaint specifically alleges that Defendants acted negligently, not fraudulently, in omitting information from, and misrepresenting facts in, the Proxy. Plaintiffs' allegations simply support its claims of negligence asserted in Count I of the Amended Complaint. *See BankAmerica*, 78 F. Supp. 2d at 989, *quoting Wilson*, 855 F.2d at 995. ("[a]s a matter of law, the preparation of a proxy statement by corporate insiders containing materially false and misleading statements or omitting a material fact is sufficient to satisfy the ... negligence standard."). To hold otherwise would turn Section 14(a) on its head and wrongly impose on every Section 14(a) claim a fraud element. *See Kennedy*, 348 F.3d at 593 (plaintiff does not have to allege fraud to have a viable proxy claim).

Even if the Court were to determine that Count I of the Amended Complaint sounds in fraud, the proper remedy is not dismissal. The Court should "strip away" the allegations that run afoul of a negligence standard and determine whether plaintiff has nonetheless stated a claim. *See Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)("The proper route is to disregard averments of fraud not meeting 9(b)'s standard and then ask whether a claim has been stated"); *see also In re Nationsmart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th

---

[22] Courts have held that it is the plaintiff's choice whether or not to charge fraud in alleging a Section 14(a) claim. *See Kennedy*, 348 F.3d at 594 ("In their briefs in this court, however, the plaintiffs make clear that they indeed are claiming that all the omissions were fraudulent").

Cir. 1997).[23] Even if the Court accepted Defendants' claim that one or two allegations sound in fraud, the Amended Complaint, taken as a whole, sufficiently states a claim under Sections 14 and 20 by alleging that the Proxy was misleading because it negligently omitted information or contained materially misleading statements. *See Lone Star Ladies,* 238 F.3d at 369. If the PSLRA's heightened pleading requirements were applicable to the Section 14(a) claim, it would not alter the substantive elements of the claim and a plaintiff would only be required to allege with particularity the manner in which defendants acted negligently. Plaintiffs have done so throughout the Amended Complaint. Am. Cmplt. ¶¶ 167-255.

> **2.  *Even if the Heightened Pleading Requirements of the PSLRA Applies to Plaintiffs' Section 14(a) Claims, Plaintiffs Allege a Strong Inference of Negligence***

If the Court agrees with Defendants that the PSLRA standards apply to all claims under the Exchange Act, including Section 14(a) claims of negligence, the question then becomes whether Plaintiffs' pleadings are sufficient to give rise to a strong inference of negligence on the part of the Defendants. *In re JP Morgan,* 2007 U.S. Dist. LEXIS 93877, at * 22-23. Allegations that director defendants were either fully aware of certain details or, as directors, had the opportunity and obligation to monitor and inquire into such details, are sufficient to plead a strong inference of negligence to sustain a Section 14(a) claim. *Id.* (pleadings alleged sufficient facts to support an inference that the Director Defendants "knew or should have known" certain details). "Whether or not [directors] actually inquired, or acted reasonably in their roles as Director, are questions on the merits." *Id.*

Defendants assert that that Plaintiffs fail to establish how each Defendant was associated with the Advisor or the Property Managers and how they would possess knowledge that the financial statements were false and misleading. Defs. Mem. at 30. However, the Amended Complaint alleges in detail that each of the 19 Defendants knew or should have known that the Advisor and Property Managers had understated their expenses on their financial statements, which inflated their profitability, resulting in their overvaluation in the Internalization:[24]

---

[23] If the Court prefers, Plaintiffs will amend the Amended Complaint to comply with the Court's findings. *In re CNL Hotels & Resorts Secs. Litig., Inc.,* 2005 U.S. Dist. LEXIS 38876 (M.D. Fla. Sept. 13, 2005) (granting leave to amend securities claims and directing plaintiffs to delete superfluous allegations which sounded in fraud); *see Bryant v. Dupree,* 252 F.3d 1161 (11th Cir. 2001)(District court's dismissal, without leave to amend, for failure to meet the PSLRA's pleading requirements, was an abuse of discretion.); *Lone Star Ladies,* 238 F.3d. at 368.

[24] Plaintiffs do not rely on the "Group Pleading Doctrine." Defs. Mem. 31. In fact, the Amended

(1) The Advisor and its owners, the Sponsor, The Inland Group, and Daniel Goodwin, as the control person of The Inland Group, were involved in the preparation of the Advisor's financial statements upon which the valuation of the Advisor was fundamentally predicated. Am. Cmplt.¶ 299(a).

(2) The 3 Property Managers, and Defendants Goodwin, Parks, Cosenza, Grimes, Gujral and Baum, who together owned in the aggregate greater than 50% of the stock of each of the Property Managers, were involved in the preparation of the Property Managers' financial statements upon which the valuation of the Advisor was fundamentally predicated. *Id.*

(3) The Director Defendants, Defendants Parks, Gujral, Catalano, Beard, Gauvreau, Gorski and Murphy, were responsible for overseeing the activities and performance of the Advisor, including approving the compensation and reimbursements paid to the Advisor. *Id.* at ¶¶ 261, 268.

(4) The Director Defendants were responsible for supervising the fees paid to the Property Managers, to determine that such fees were not in excess of the fees that would be payable to non-affiliated third parties. *Id.* at ¶ 262. The Director Defendants were responsible for determining whether the fees and expenses of Inland REIT were reasonable. *Id.* at ¶ 263.

(5) William Blair, as the entity performing the Fairness Opinion, was retained by the Special Committee to review the financial statements of the Advisor and the Property Managers and to provide an opinion as to the fairness of the Internalization to the Company and its shareholders. *Id.* at ¶¶ 235-237.

(6) KPMG, as Inland REIT's independent auditor since 2003, and the independent auditor of the financial statements of the Advisor and the Property Managers, which were part of the Proxy, was retained to provide an independent auditor assessment of the financial statements of the Advisor and the Property Managers. *Id.* at ¶¶ 185-186.

*See also*, Section II, *supra.* Each of the Defendants was either involved in the preparation of the financial statements upon which the valuations were fundamentally predicated, or the operations of the REIT which included the retention of both the Advisor and Manager and the periodic evaluation of their performance for the purpose of the renewal of the agreements under which they operated. Am. Cmplt. ¶ 233. The Amended Complaint alleges that each Defendant was fully aware of the details of the operations of the Advisor and Property Managers, specifically relating to expenses and fees. Moreover, even if the Defendants did not specifically know the details of

---

Complaint alleges sufficient facts to create a strong inference that each individual defendant knew or had reason to know that the Proxy contained materially false and misleading statements. *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (plaintiffs must create a strong inference of the applicable state of mind with respect to each individual defendant).

the operations of the Advisor and the Property Managers, by reason of their management, directorial or advisory positions, they had the opportunity and obligation to monitor and inquire into the details of such fees and expenses. *Berman v. Thomson*, 403 F. Supp. 695, 699 (N.D. Ill. 1975) ("As a matter of policy," an outside director should be held liable for his failure to investigate the truthfulness or validity of the proxy statement or failure to "refute any misleading statement in a document as vital as a proxy statement"). These allegations support a strong inference that the Director Defendants "knew or should have known" that the Advisor and the Property Managers understated expenses, and that the fees paid to the Property Managers exceeded fees to which they were entitled, and whether they acted reasonably in their roles as Director, is a question on the merits. *In re JP Morgan*, 2007 U.S. Dist. LEXIS 93877 at \*22-23.

## V.    PLAINTIFFS STATE A CLAIM FOR CONTROL PERSON LIABILITY.

Defendants do not contest the fact that the Advisor, the Property Managers, the Sponsor and The Inland Group meet the definition of control persons under Section 20(a) of the Exchange Act, but instead argue that there is no underlying Section 14 violation, which argument Plaintiffs sufficiently debunked above in Section IV. Defs. Mem. at 38.    Regarding the Individual Defendants' liability as control persons, Defendants contend the Amended Complaint does not allege that the Individual Defendants exercised the type of control necessary for liability under Section 20(a) [25] and that the Plaintiffs merely assert that the Individual Directors were officers and directors of Inland REIT. *Id.* The question of whether particular individuals are control persons under § 20(a) is a question of fact that cannot be determined at the pleading stage. *In re Sears, Roebuck and Co. Sec. Litig.,* 291 F.Supp.2d 722, 727 (N.D.Ill. 2003).

Plaintiffs sufficiently plead control person liability because the Amended Complaint alleges Individual Defendants were high-level officers or directors who controlled the company, as they signed the financial statements, attended high-level meetings, and influenced and controlled the decision-making and dissemination of allegedly false and misleading statements and omissions are sufficient to allege control person liability. *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 983 (N.D. Ill. 2006).    Here, the Amended Complaint alleges that each of the

---

[25] To qualify as control persons, the individual defendants must (1) have exercised actual control over the general operations and (2) have had the ability and power to direct (or prevent) the fraudulent statements at issue. *In re Hollinger Int'l, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 47173 (N.D. Ill. June 28, 2006). Because the Advisor and Property Managers had control of Inland REIT's business (Am. Cmplt. ¶¶ 114-19, 124-27), and Defendants do not dispute these allegations, they are control persons under Section 20.

Director Defendants Parks, Gujral, Catalano, Beard, Gauvreau, Gorski and Murphy: (a) signed the Company's Offering Documents; (b) approved the Internalization; (c) recommended that the shareholders vote for the Internalization, and (d) signed the Proxy, which is alleged to contain materially false and misleading statements. Am. Cmplt. ¶ 99. Defendant Grimes was a high level officer of Inland REIT who signed the Company's Offering Documents. Defendants Goodwin, Baum, Cosenza, Parks, Grimes and Gujral are alleged to control the Advisor and/or the Property Managers, which entities disseminated and provided information contained in the materially false and misleading Proxy. *Id.* at ¶¶ 294-295. The Amended Complaint alleges that each Individual Defendant caused Inland REIT to disseminate to its shareholders information containing false and misleading statements, which is sufficient to show that the Individual Defendants are control persons having "possession, *direct or indirect*, of the power to direct or cause the direction of [the REIT's] management and policies." *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996), *quoting* 17 C.F.R. § 230.405 (1995) (emphasis added).

## VI.    PLAINTIFFS STATE DIRECT BREACH OF FIDUCIARY DUTY CLAIMS

In Counts III and IV, Plaintiffs assert that certain Defendants breached their fiduciary duties and aided and abetted breaches of fiduciary duties to the members of the Class, and as a result of these breaches, the Class members have suffered damages. Defendants seek dismissal of these claims for lack of standing because: (1) all of these claims are essentially "derivative claims"; and (2) Plaintiffs did not make a pre-suit demand. Defs. Mem. at 24-35. For the following reasons, those positions are unavailing and Defendants' Motion must be denied.

### A.    Plaintiffs Have Standing to Assert Direct Breach of Fiduciary Duty and Aiding and Abetting Fiduciary Duty Claims

Defendants ignore the factual and legal context of Plaintiffs' claims in arguing that Counts III and IV cannot be asserted by the Class directly. Defs. Mem. at 15-16. First, Inland REIT's Charter provides that each Director Defendant serves in a fiduciary capacity to the shareholders of the REIT, including a specific fiduciary duty to supervise the relationship of the REIT with the Advisor and its Affiliates. Am. Cmplt. ¶ 257. Plaintiffs have alleged that the Individual Defendants, the Advisor, the Property Managers, Sponsor, and The Inland Group (collectively, the "Fiduciary Duty Defendants"), by virtue of their positions with and responsibilities to Inland REIT and its shareholders, owed fiduciary duties of trust, loyalty, full disclosure and due care at all relevant times. *Id.* at ¶¶ 255-56, 310, 346; *see Indurated Concrete*

*Corp. v. Abbott,* 74 A.2d 17 (Md. 1950). It is these specific, enumerated fiduciary duties that the Fiduciary Defendants are alleged to have violated by approving and consummating the Internalization and by obtaining the shareholders' approval of the Internalization by issuing a false and misleading Proxy. The Fiduciary Defendants utterly disregarded these duties. Am. Cmplt. ¶¶ 316-326.

It is well-settled in Maryland that directors owe fiduciary duties to both the corporation *and* its shareholders.[26] *Storetrax.com, Inc, v. Gurland,* 915 A.2d 991, 1000 (Md. 2007); *Strougo v. Bassini,* 282 F.3d 162, 173 (2d Cir. 2002) (applying Maryland law). Under Maryland law, "shareholders may bring a direct suit" when they "suffer an injury that is distinct from that of the corporation." *Bassini,* 282 F.3d at 171. Defendants argue, without citation to any authority, that Plaintiffs cannot bring direct claims for injuries that are "common to all IWEST shareholders." Defs. Mem. at 15. However, Maryland law does not require that a shareholder allege an injury distinct from an injury to other shareholders. *Bassini,* 282 F.3d at 171-72 ("To sue directly, a shareholder must allege an injury distinct from an injury to the corporation, not from that of other shareholders"). To permit shareholders to bring direct claims only when their injuries are distinct from those of other shareholders would improperly leave shareholders without legal recourse. *Id.* at 172. Therefore, "the rule under Maryland law is that where shareholders suffer a distinct injury, *i.e.,* an injury that does not derive from the corporate injury, they may bring a direct suit, even if their injury is undifferentiated among them." *Id.*

Plaintiffs have standing to bring direct claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty because they allege injuries that are personal to Plaintiffs and the putative class and distinct from any injury that may have been suffered by Inland REIT. Misrepresentations or nondisclosures in proxy statements soliciting votes give rise to direct actions for damages by stockholders who suffer economic injury or injury to their voting rights. *Albert v. Alex Brown Mgmt. Servs.*, 2005 Del. Ch. LEXIS 133 (Del. Ch. 2005); *Paskowitz v. Wohlstadter*, 822 A.2d 1272, 1280 (Md. Ct. Spec. App. 2003) (a fiduciary's disclosure violations that negatively impact voting or economic rights' support a direct shareholder claim).

Defendants' impairment of Plaintiffs' voting rights also gives rise to direct claims. *Washtenaw County Emples. Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, 2008 U.S. Dist.

---

[26] *Waller v. Waller*, 49 A.2d 449, 452 (Md. 1946), cited by Defendants (Defs. Mem. at 16), states the general rule that stockholders must sue derivatively to recover for injuries suffered by the *corporation.*

LEXIS 53652 (N.D. Ga. Mar. 31, 2008) (claim asserting a cause of action for the harm to shareholders' voting rights is properly brought as a direct claim). The failure to disclose valuation information underlying a proposed transaction bears directly upon each individual investor's right to cast a fully informed vote in connection with the transaction and gives the injured investor a direct claim. *In re Cencom Cable Income Partners, L.P. Litig.*, 2000 Del. Ch. LEXIS 10, *12 (Del. Ch. 2000) ("[i]nadequate disclosures bearing on individual investors' right to cast a fully informed vote constitute direct claims"); *see, e.g., Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006). Plaintiffs' claim that the shareholders were given materially false and misleading information in the Proxy when being asked to vote on the Internalization, and that those shareholders were then misled by the information, demonstrates a harm suffered by the shareholders distinct from any harm to the Company. Defendants' argument that Plaintiffs' breach of fiduciary duty and aiding and abetting breaches of fiduciary duty claims are actionable *only* as derivative claims is meritless.

### B. Plaintiffs Adequately Allege Direct Breaches of Fiduciary Duties

In order to state a cause of action for breach of fiduciary duty, Plaintiffs must show "a breach of duty owed by the fiduciary to the beneficiary," and "harm resulting from the breach." *Alleco Inc. v. Harry and Jeanette Weinberg Found., Inc.*, 665 A.2d 1038 (Md. 1995).[27]  As discussed in Section VI.A., *infra*, Plaintiffs suffered injury to their voting rights.

Inland REIT's Charter states that each of the Director Defendants serves in a fiduciary capacity to the REIT and owes a fiduciary duty to the shareholders of the REIT, including a specific fiduciary duty to supervise the relationship of the REIT with the Advisor and its Affiliates. Am. Cmplt. ¶ 257.  The Company's Charter and the Advisory and Property Management Agreements specifically require the Director Defendants to oversee the activities and performance of the Advisor (*id.* at ¶ 261); to supervise the fees paid to the Property Managers (*id.* at ¶ 262); and to determine that the fees are reasonable and in line with Market Rates (*id.* at 263). In addition, pursuant to the Advisory Agreement, "The Advisor, on behalf of itself and its Affiliates, acknowledges that the Advisor and its Affiliates have fiduciary duties to

---

[27] A breach of fiduciary duty claim is "governed by the law of the state of incorporation" of the company for which the duty was allegedly breached. *Peregring Emerging CTA Fund, LLC v. Tradersource, Inc.*, 2008 U.S. Dist. LEXIS 11860, *10 (N.D. Ill. Feb. 19, 2008). Because Plaintiffs allege a breach of the Defendants' fiduciary duties to the REIT, the applicable substantive law is the law of the state where the REIT is incorporated, which is Maryland.

the Company and to the Company's Stockholders." In addition the following "affiliates" of the Advisor owe fiduciary duties to the Company and its shareholders: the Property Managers, The Inland Group, the Sponsor and Individual Defendants Goodwin, Parks, Baum, Cosenza, Gujral and Grimes. *Id.* at ¶¶ 255-56. Each of the Fiduciary Duty Defendants breached their fiduciary duties to supervise the fees paid to the Property Managers and to determine that the fees are in line with Market Rates by paying a flat 4.5% fee (which is above Market Rate) to the Property Managers. See Section IV.B.2., infra. The Fiduciary Duty Defendants owed a fiduciary duty to ensure that these provisions of the Property Management Agreements, the Advisory Agreement, the Charter and the Offering Documents were fair to the shareholders and in their best interests, and not in their own self-interests. Additionally, each Fiduciary Duty Defendant aided and abetted the other Fiduciary Duty Defendants in breaching their fiduciary duties.[28] *Bloomington Partners, LLC v. City of Bloomington*, 2005 U.S. Dist. LEXIS 38004, *14-15 (C.D. Ill. Nov. 23, 2005) (defendant's independent duty owed to plaintiff is not required for, but does not preclude, aiding and abetting claim),

Defendants assert that the fiduciary duty claims suffer from "shortcomings" because they depend on the allegations of wrongdoing derived from the Proxy claims. Defs. Mem. at 43-44. As discussed in Section IV, *infra*, the Amended Complaint adequately alleges that the Fiduciary Duty Defendants breached fiduciary duties to the Class in preparing financial statements of the Advisor and the Property Managers that were materially false and misleading because they failed to report the Advisor's expenses, overcharged Inland REIT for Property Management Fees and understated the Property Managers' expenses. The Amended Complaint specifically alleges that the Fiduciary Defendants breached the duties owed to the shareholders by (1) artificially inflating the profitability of the Advisor and the Property Managers which artificially inflated the Internalization Consideration (Am. Cmplt. ¶ 259(b)); (2) disseminating a materially misleading proxy statement which, among other things, encouraged shareholders to support the Internalization (which they proposed, formulated, and recommended) at a price that was based on false and misleading financial statements and exceeded any fair or reasonable value of the

---

[28] A claim of aiding and abetting includes the following elements: (1) The party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be generally aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Wolf v. Liberis*, 505 N.E.2d 1202, 1208 (Ill. App. Ct. 1987).

Advisor and Property Managers that was detrimental to Inland REIT (*id.* at ¶¶ 259(d), (e), (h)); (3) failing to investigate or evaluate strategic alternatives to the Internalization which may have provided shareholders with opportunity for a profitable liquidity event; and (4) abandoning the Purchase Option Formulas and rushing into the Internalization just six months prior to the date that the Purchase Options were to become effective. Plaintiffs have adequately alleged direct breaches of fiduciary duty.

## VII.    PLAINTIFFS STATE DERIVATIVE CLAIMS

Defendants contend that Plaintiffs' derivative claims for breach of fiduciary duty, unjust enrichment and breach of contract (Counts V-VII) should be dismissed for failure to plead demand futility and the failure to plead facts. Despite Defendants' attempts to pigeonhole this action as having raised garden-variety demand futility issues, the Amended Complaint is replete with particularly alleged facts demonstrating real conflicts and self-dealing by a majority of the members of the Company's Board that rendered them incapable of considering a demand by the shareholders. Am. Cmplt. ¶¶ 94-113

### A.    Plaintiffs Have Properly Pled That Demand on The Board Was Futile. [29]

For more than one hundred years, Maryland courts have recognized a demand futility exception rule.[30] In *Parish v. Maryland and Virginia Milk Producers Ass'n*, 242 A.2d 512, 545 (Ct. App. Md. 1968), the court stated that demand was futile when the allegations of the complaint stated causes of action against the defendant directors for acts of fraud, concealment, illegality, gross negligence, waste of corporate assets and conspiracy to conceal losses. The demand futility standard articulated in *Parish* remained undisturbed until 2001 when the court in *Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. Ct. App. 2001) articulated a streamlined demand futility exception, holding that a shareholder plaintiff must establish, with particularized allegations,[31] that either a "(1) demand, or a delay in awaiting a response to a demand, would

---

[29] Fed. R. Civ. P. 23.1 governs the pleading standards of derivative actions by shareholders. Under Rule 23.1, "one or more shareholders or members may bring an action to enforce a right of a corporation, the corporation having failed to enforce a right which may properly be asserted by it." Fed. R. Civ. P. 23.1. A complaint "shall [] allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Id.*

[30] Inland REIT's state of incorporation, Maryland, supplies the law for analyzing whether demand in a shareholders' derivative action is excused. *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991).

[31] In applying these criteria, the well-pled allegations of the Amended Complaint are assumed to be true, and all reasonable references are to be drawn in the Plaintiffs' favor. *Khanna v. McMinn*, 2006 Del. Ch.

cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky*, 766 A.2d at 144. While "generalized or speculative allegations that [directors] are conflicted" or allegations that directors merely "approved or participated in some way in the challenged transaction," *id.* at 143-44, do not suffice to show demand futility—Plaintiffs have not plead those types of generalized or speculative facts. Defs. Mem. at 11.

Plaintiffs satisfy *Werbowsky* by demonstrating, with particularized facts, that a majority of the Director Defendants affirmatively breached their fiduciary duties to their shareholders and the Company in connection with the Merger and to have participated in the dissemination of a false and misleading Proxy.[32] *Kamen*, 500 U.S. at 102 ("demand typically is deemed to be futile when a majority of the directors have participated in or approved the alleged wrongdoing"); *Clark Enters., Inc. v. Holywell Corp.*, 559 F. Supp. 1307, 1310 (E.D. Va. 1983) ("Demand is almost always excused in derivative suits alleging that the directors have engaged in willful or negligent breach of their fiduciary duties"). In addition, a conscious failure by directors to discharge oversight responsibilities is a breach of the duty of good faith and also raises a reasonable doubt excusing demand. *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

When this action was filed, the Board was comprised of Defendants Parks, Gujral, Beard, Catalano, Gauvreau, Gorski and Murphy. Am. Cmplt. ¶ 95. The majority[33] of the Director Defendants were so personally and directly conflicted or committed to the decisions in dispute that they could not reasonably have been expected to respond to a demand in good faith and within the ambit of the business judgment rule. *Id.* at ¶ 96. Defendants concede that three of Inland REIT's seven directors – Defendants Parks, Gujral and Catalano – are "conflicted" for purposes of the demand futility analysis. Defs. Mem. at 11. Thus, Defendants admit that Plaintiffs have standing to assert derivative claims if any *one* of the remaining four

---

LEXIS 86, at *45 (Del. Ch. May 9, 2006). Moreover, substantive allegations, that may be, by themselves, insufficient, can be considered "in toto" and can "push the analysis over the threshold of 'reasonable doubt' and thereby excuse demand." *Id.* at * 54.

[32] Defendants do not gain any support for their arguments by repeated use of "one-liner" references to the *Washtenaw County Employees' Retirement System*, 2008 U.S. Dist. LEXIS 53652 and *In re CNL Hotels & Resorts, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 38876. *See, e.g.,* Defs. Mem. at 2, 12-13. Demand futility must be determined based on the unique factual circumstances. Defendants' citation of *Washtenaw County* and *CNL Hotels* are red herrings in an unavailing attempt to misdirect this Court.

[33] If at least four of the seven directors are disqualified, demand is excused. *Werbowsky,* 766 A.2d at 144.

"independent" directors – Defendants Beard, Gauvreau, Gorski and Murphy (the "Special Committee" Directors) – is conflicted. *Id.* Plaintiffs have met that burden.

Specifically, Plaintiffs have averred that the Special Committee members face a substantial risk of personal liability to Plaintiffs (Am. Cmplt. ¶ 104), because they not only approved the Internalization, but also approved and disseminated the materially false and misleading Proxy to shareholders. *See Felker v. Anderson,* 2005 U.S. Dist. LEXIS 4236 (W.D. Mo. Feb. 11, 2005). Plaintiffs allege particularized facts – which are beyond dispute – that each Director "publicly stated that the internalization 'was fair to [] the [] stockholders of [the] company'" and that each Director "recommended in the Proxy that each shareholder vote for the Internalization." *Id.* at ¶ 98. The Special Committee approved and recommended the self-dealing and grossly overpriced Internalization. *Id.* at ¶ 97. Each of the Director Defendants permitted their names and their backgrounds to appear on the Proxy and recommended that shareholders vote for the Internalization. *Id.* at ¶ 99, 347(c). Each Director likewise "signed the Offering Documents containing statements about the market rate cap on the payment of fees to the Property Managers" but nevertheless "paid the Property Managers fees that exceeded that rate" and permitted them "to be paid consideration in the Internalization based on inflated financial statements." *Id.* at ¶ 103.

Further, each of the Special Committee members also acted with "gross negligence" by violating their fiduciary duties under Inland REIT's Charter to prevent management self-dealing. *Id.* at ¶¶ 101-02, 104. The Director Defendants were responsible for evaluating and monitoring the Advisor relationship, reviewing fees and expenses paid to the Advisor and monitoring the Advisor's performance. These Director Defendants were charged with the oversight of the Advisor relationship, which they completely abandoned in proposing and recommending the Internalization. *Id.* Such disregard for the duties is exemplified by their circumventing the contractual Purchase Options, which served as a potentially objective measure of payment to the Advisor and the Property Managers. *Id.* at ¶¶ 270-271.

None of the cases on which Defendants rely[34] involved the type of particularized

---

[34] The cases cited by Defendants are factually distinguishable: *Sekuk Global Enters. Profit Sharing Plan v. Kevenides,* 2004 Md. Cir. Ct. LEXIS 20, at **14-19, 26 (Md. Cir. Ct. May 25, 2004) (long history of social and business relationships and speculative threat of personal liability insufficient); *Washtenaw County Employees' Retirement Sys.,* 2008 U.S. Dist. LEXIS 53652, at **40-41 (ownership interests in REIT and service on related boards and family trusts); *In re Infosonics Corp. Deriv. Litig.,* 2007 U.S.

allegations of either directors' active involvement in the challenged wrongdoing or their genuine prospect of consequent personal liability as those asserted here. *See Werbowsky*, 766 A.2d at 145-46 (no conflict found based on directors' receipt of large fees, presumed desire to retain directorships, good relationships with senior management, or routine business conducted between their other companies and nominal defendant company).[35] More akin to the facts here are those in *Felker* in which the court applied *Werbowsky* and held that plaintiffs established that demand on the defendant board members would be futile because a majority of the directors participated in, approved, or permitted the wrongdoing which allegedly occurred, and they allegedly participated in the non-disclosure of those wrongs to shareholders. 2005 U.S. Dist. LEXIS 4236, at * 7-8. The *Felker* court held that the actions of the directors impaired the board's ability to exercise its business judgment, the board was therefore unable to make an independent decision as to whether to accept plaintiff's demands, and if the defendant directors were to cause the company to assert its claims, they would expose their own negligence and misconduct. *Id.* at *8 (demand futile where plaintiff "particularly alleges... that Defendants permitted and/or approved of the dissemination of false or misleading press releases, they violated state law and the fiduciary duties... and they concealed information from the public").

Based on the above, and Am. Cmplt. ¶¶ 94-113, none of the Director Defendants (all 7 of the members of the Board at the time the original complaint was filed) have any reasonable basis to assert that demand would have been anything but futile. They were so personally and directly conflicted or committed to the Internalization that they could not reasonably have been expected to impartially respond to a demand in good faith and within the ambit of the business judgment rule. The Amended Complaint contains precisely the type of "very particular" allegations that have been found to sufficiently plead demand futility under Maryland law. *See Felker*, 2005 U.S. Dist. LEXIS 4236, at **4-8.

---

Dist. LEXIS 66043, at **18-19 (S.D. Ca. Sept. 4, 2007) (mere approval of alleged back-dated option grants).

[35] The *Infosonics* court wrongly refused to consider allegations that the directors faced a "substantial likelihood of liability" because it misinterpreted *Werbowsky* as deeming such facts irrelevant. 2007 U.S. Dist. LEXIS 66043, at **19-20. *Werbowsky* does no such thing. Rather, properly interpreted, *Werbowsky* merely warns that courts should avoid "injecting into" a threshold inquiry assessing the adequacy of demand futility pleadings a full-blown *analysis* of "the merits of the complaint – whether there was, in fact, self-dealing, corporate waste, or a lack of business judgment with respect to the decision or transaction under attack." *Werbowsky*, 766 A.2d at 144.

**B.    Plaintiffs State Derivative Claims for Breaches of Fiduciary Duties**

Each of the Fiduciary Duty Defendants owes a fiduciary duty to Inland REIT as well as to the REIT's shareholders. Am. Cmplt. ¶ 257-63. In addition to breaching the fiduciary duties to the REIT as described in Section VI.B, *infra*, the Fiduciary Duty Defendants have breached the duties owed to the REIT by committing corporate waste in causing and permitting Inland REIT payment of excessive Property Management fees in violation of their enumerated duties. *Id.* at ¶ 259(a). Inland REIT's injuries resulting from the Fiduciary Defendants' breaches were two-fold: (1) Inland REIT historically paid excessive property management fees to the Property Managers, which amounts to corporate waste; and (2) as a result of the breaches related to the Internalization, the Internalization Consideration that Inland REIT paid to acquire the Advisor and Property Managers was overvalued. Accordingly, Plaintiffs state a derivative claim for breaches of fiduciary duties.

**C.    Plaintiffs State a Derivative Claim For Breach of Contract**

**1.    Plaintiffs Adequately Allege Breaches of the Advisory and Property Management Agreements and the Charter.**

The Amended Complaint alleges that the Advisor and the Property Managers, The Inland Group, the Sponsor and Individual Defendants Goodwin, Parks, Baum, Cosenza, Grimes and Gujral violated specific provisions of the Advisory Agreement, Property Management Agreements and the Charter by charging Property Management Fees of 4.5% plus salary reimbursements. The Property Management Agreements provided for a property management fee at an amount "no greater than [4.5%] of the Gross Income for the month for which the payment is made." Am. Cmplt. ¶ 126. This provision does not stand on its own. Defs. Mem. at 40. When read in conjunction with the Advisory Agreement and the Charter, it is clear that the Property Management Fee was intended to be capped at either a Market Rate or 90% of Market Rate. The 4.5% that was charged is well above Market Rate, and in breach of the provisions of the Property Management Agreement, the Advisory Agreement and the Charter. See Section IV.B.2.

The Advisory Agreement and the Property Management Agreement each contained a provision to allow Inland REIT to acquire them and a formula for setting the price. Defendants assert that the Advisor, the Property Managers and the Director Defendants could not have violated the provisions of the Advisory Agreement and the Property Management Agreement

that addressed the consideration to be provided in the event of internalization because Inland REIT waived that provision as stated in the Proxy. Defs. Mem. at 42. In making this argument, the Defendants conveniently ignore the factual context in which this so-called "waiver" occurred. The Amended Complaint alleges that the financial statements of the Advisor and the Property Managers were materially false and misleading by understating expenses, which inflated their profitabilities. These same inflated financial statements were utilized in the Proxy to determine the fees that the Advisor and the Property Managers "would have received" if the Purchase Option Formulas had been followed. Accordingly, Defendants improperly calculated the amount that would have been paid under the Purchase Options because they utilized the false and misleading financial and operating results for the Advisor and Property Managers to derive a purchase price of over $541 million in the aggregate for the Advisor and Property Managers.

Defendants' dispensing with the Purchase Options, contrary to its misleading presentation in the Proxy, was in no way a "favor" to the shareholders and was, in fact, a way to (i) circumvent the protections afforded to shareholders under which Defendants would garner a fraction of the proposed consideration for this self-dealing transaction; and (ii) to mislead the shareholders into voting for a transaction that was not a "better deal." Defendants cannot now be permitted to further this wrongdoing by using the "waiver" to insulate themselves from liability for their breach of the Advisory and Property Management Agreements. Am. Cmplt. ¶ 348. Whether or not the false and misleading Proxy can serve as a waiver of the Purchase Option is an issue of fact that cannot be decided at this stage of the litigation. *See Benda v. Per-Se Tech., Inc.*, 2005 WL 1563214, *4 (N.D. Ill. Jun. 2, 2005) (waiver is an issue of fact for the trier of fact to determine after considering all information and circumstances); *Cont'l Cas. Co. v. Steelcase Inc.*, 2004 WL 1965699, *12 (N.D. Ill. Aug. 23, 2004) (issues of fact exist as to whether the plaintiff waived a contract provision).

### 2. *The Inland Group, the Sponsor, Goodwin, Parks, Baum, Cosenza and Grimes are Alter-Egos of the Advisor and/or the Property Managers*

Defendants assert that they cannot be held liable for breaching the contract because, prior to the Internalization, the Property Management Agreement and the Advisory Agreement were between Inland REIT and the Property Manager and Advisor, not "TIGI, the Sponsor, Goodwin, Parks, Baum, Cosenza, Grimes and Gujral." Defs. Mem. at 41. Defendants' argument ignores the Amended Complaint's allegations that, before Internalization, The Inland Group (referred to as "TIGI" by Defendants), the Sponsor, Goodwin, Parks, Baum, Cosenza, Grimes and Gujral,

controlled the Advisor and the Property Manager, and used their power to cause the Property Manager and the Advisor to overcharge Inland REIT for the advisory and property management services and to breach the Property Management Agreements.

Defendants conveniently ignore the allegations in the Amended Complaint which demonstrate that these Defendants "owned and controlled" both the Advisor (owned by "the Sponsor, The Inland Group, Goodwin, Parks, Cosenza, Baum, and Gujral") and the Property Managers (owned by "Goodwin, Parks, Cosenza, Baum, Gujral and Grimes") during the time that the Advisory Agreement and Property Management Agreements were in effect. Am. Cmplt. ¶¶ 12, 20, 26-27, 344. The Amended Complaint's allegations of control establishes, at this stage of the litigation, a breach of contract claim against the Sponsor, The Inland Group, Goodwin, Parks, Cosenza, Baum, Gujral and Grimes as the Advisor's and the Property Manager's alter-egos. *F.D.I.C. v. Wabick*, 2004 WL 2032315, *6 (N.D. Ill. Sep. 9, 2004) (holding that alleging an alter-ego relationship without providing details satisfies federal pleading requirements); *FASTI USA v. FASTI Farrag & Stipsits GmbH*, 2003 WL 1581472, *3 (N.D. Ill., Mar. 26, 2003); Whether the Advisor and the Property Manager were merely alter-egos of one or all of the Defendants is an issue that cannot be resolved at this stage of the litigation. *See Forge Indus. Staffing, Inc. v. De La Fuente*, 2006 WL 2982139, *10 (N.D. Ill. Oct. 16, 2006) ("the alter ego analysis is fact-intensive and therefore, is inappropriate for resolution on a motion to dismiss").

### D.     Plaintiffs State a Derivative Claim for Unjust Enrichment

To state a claim for unjust enrichment under Illinois law, a plaintiff must establish that the defendant received a benefit to the plaintiffs' detriment, and that the defendants' retention of the benefit would be unjust. *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F. 3d 822, 828 (7th Cir. 1998). The Amended Complaint alleges that Defendants Goodwin, Parks, Baum, Cosenza, Grimes and Gujral "as owners of the Property Managers" and Defendants Goodwin, Parks, Baum, Cosenza and Gujal "indirectly as owners of The Inland Group and the Sponsor, which directly owned the Advisor" were unjustly enriched at the expense of Inland REIT and its shareholders. Am. Cmplt. ¶ 355-356. The Advisor and the Property Managers were unjustly enriched by receiving excessive Internalization Consideration due to the overvaluing of the Advisor and Property Managers in the Internalization. *Id.* at ¶ 355. The Property Managers were unjustly enriched by receiving excessive Property Management Fees. *Id.* at ¶ 356.

The Amended Complaint's short, plain statement is all that is required under the Federal

Rules.[36] *See Zurich Capital Mkts. Inc. v. Coglianese*, 332 F. Supp. 2d 1087, 1119-20 (N.D. Ill. 2004) (declining to dismiss unjust enrichment claim where the plaintiff provided a short and plain statement as required by Rule 8(a)). Despite the fact that the Amended Complaint clearly complies with Fed. R. Civ. P. 8(a), Defendants nevertheless assert that a factual issue – whether or not the property management fees paid by Inland REIT went directly to the Property Managers – requires the Court to dismiss Plaintiffs' unjust enrichment claim. As noted above, the Amended Complaint alleges a web of conflict and control between and among all the Defendants and, more importantly, that the Property Managers and the Advisors were controlled by the Individual Defendants. *See* Am. Cmplt. ¶¶ 12, 20, 26-27, 29. Whether or not the Individual Defendants received a benefit to Plaintiffs' detriment is an issue of fact that cannot be resolved in a motion to dismiss. *See Reis Robotics USA, Inc. v. Concept Indust., Inc.*, 462 F. Supp. 2d 897, 913 (N.D. Ill. 2006) (denying a motion to dismiss an unjust enrichment claim that complied with the Federal Rules pleading standards); *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.*, 155 F. Supp. 2d 1069, 1116-17 (S.D. Ind. 2001) (not dismissing an unjust enrichment claim where "there is at least one set of facts, consistent with the Master Complaint, which, if proven, would support Plaintiffs' unjust enrichment claim"); *see also* Section III, *supra*.

Defendants further assert that the existence of terms in the Merger Agreement which govern the payment of Internalization Consideration precludes the Plaintiffs' unjust enrichment claim. Defs. Mem. at 43. Defendants misinterpret the application of this standard of law. Illinois law permits plaintiffs to state a claim for unjust enrichment if the express contract and the quasi contract (unjust enrichment claim) are of a different subject matter. *Heavey v. Ehret*, 519 N.E.2d 996, 1001 (Ill. App. 1988). Here, the Amended Complaint alleges that Defendants were unjustly enriched by their receipt of excessive and unsupported Internalization Consideration. Am. Cmplt. ¶ 356. Defendants do not assert that Defendants breached the Merger Agreement. *See Strategic Reimbursement, Inc. v. HCA, Inc.*, 2007 WL 2274709, *4 (N.D. Ill., Aug. 2, 2007)

---

[36] *See also Shah v. Inter-Cont'l Hotel Chicago Operating Corp.*, 314 F. 3d 278, 282 (7th Cir. 2002) ("The civil rules, as both the Supreme Court and this court have emphasized repeatedly ... establish a system of notice pleading. The plaintiff is not required to plead facts or legal theories or cases or statutes, but merely to describe his claim briefly and simply.") (Citations omitted). In *Zurich Capital Mkts.*, plaintiffs alleged that each defendant "improperly and unjustly obtained property and assets that properly belong to Plaintiffs and which were misappropriated by the illegal conduct" and that defendants obtained plaintiffs' property and assets "under circumstances in which it is not just, equitable, or conscionable for Defendants to retain the Plaintiffs' property and assets." 332 F. Supp. 2d at 1119. In this case, as in *Zurich*, Plaintiffs' short, plain statement is sufficient to survive a motion to dismiss.

(holding that a quasi-contractual claim was not precluded by an express contract where the quasi contractual claim was substantially different since the quasi contractual claim dealt with benefits conferred on the Defendant above what the express contract allowed).    Accordingly, the existence of the Merger Agreement has no effect on Plaintiffs' unjust enrichment claim.

### E.    The "Voluntary Payment Doctrine" Is Inapplicable to the Derivative Breach of Contract and Unjust Enrichment Claims

Defendants assert that even if the Advisor and the Property Managers and their owners breached the Advisory Agreement and Property Management Agreement by overcharging the REIT for property management services and causing the REIT to pay excessive Internalization Consideration, because Inland REIT paid the inflated fees voluntarily, the "voluntary payment doctrine" absolves them of liability for under Plaintiffs' breach of contract and unjust enrichment claims. Defs. Mem. at 41. In making this argument, the Director Defendants disingenuously misconstrue the scope of the voluntary payment doctrine.

The voluntary payment doctrine provides that, absent fraud, misrepresentation or mistake of fact, or other circumstances amounting to compulsion, money that is voluntarily paid under a claim of right to the payment and with full knowledge of the facts by the payer cannot be recovered. *See Ramirez v. Smart Corp.*, 863 N.E.2d 800, 811-12 (Ill. App. 2007); *see Alexian Bros. Health Providers Ass'n. Inc. v. Humana Health Plan, Inc.,* 277 F. Supp. 2d 880 (N.D. Ill. 2003) (holding that incomplete knowledge of facts can contribute to the mistake of fact exception to the voluntary payment doctrine).    The voluntary payment doctrine is inapplicable in this case because Inland REIT paid excessive Internalization Consideration to the Advisor and the Property Managers only because shareholders were misled by the materially false and misleading Proxy to approve the Internalization. *Alexian Bros..,* 277 F. Supp. 2d at 892. Accordingly, the shareholders approval of the Internalization was made with false and incomplete knowledge of the facts, and Defendants, who prepared and disseminated the misleading Proxy materials, cannot now be heard to invoke the voluntary payment doctrine to say that the money was "voluntarily paid" to the Advisor and the Property Managers.

Moreover, excess Property Management Fees were paid by Inland REIT as the result of the Property Managers' breaches of fiduciary duties.    The Property Managers cannot shield themselves from liability under the voluntary payment doctrine because they in fact induced Inland REIT to pay excessive fees through their breaches of fiduciary duty. *Avianca, Inc. v.*

*Corriea*, 1992 U.S. Dist. LEXIS 4709 (D.D.C. Apr. 13, 1992). It would be premature, at this stage, to conclude that Inland REIT voluntarily made the property management fee payments with full knowledge of the facts. *Alexian Bros.*, 277 F. Supp. 2d at 892. Whether the voluntary payment doctrine applies is an issue of fact that cannot be decided on a motion to dismiss. *Kerr S.S. Co. v. Chicago Title & Trust Co.*, 458 N.E.2d 1009, 1016 (Ill. App. 1983).

## VIII.  DEFENDANTS CANNOT CLAIM THE BENEFIT OF THE BUSINESS JUDGMENT RULE

Defendants seek to shield themselves from Plaintiffs' direct fiduciary duty claims and all of Plaintiffs' derivative claims by invoking the business judgment rule ("BJR"). Defs. Mem. at 16-21. The BJR cannot protect the Director Defendants from liability. The BJR "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *NCAAP v. Golding*, 679 A.2d 554, 559 (Md. 1996). Under Maryland law, a fiduciary owes a duty to shareholders to "disclose to stockholders all material information reasonably available when seeking stockholder action." *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 137 (Del. 1997); *Hudson*, 2004 WL 1982383, at *13 (fiduciary disclosure under Maryland law). The Amended Complaint alleges that the Director Defendants breached fiduciary duties owed to the Class by causing Inland Western to disseminate a materially false and misleading Proxy. Am. Cmplt. ¶ 259.

Directors of Maryland corporations have "an inherent obligation, implied in the acceptance of such trust, not only that [the directors] will use their best efforts to promote the interest of the shareholders, but they will in no manner use their positions to advance their own individual interest as distinguished from that of the corporation, or acquire an interest that may conflict with the fair and proper discharge of their duty." *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 605-06 (1875). This long-standing standard of conduct of corporate directors is now codified in Maryland by Section 2-405.1(a) of the Corporations and Associations Article of the Annotated Code of Maryland as follows: " A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves: (1) In good faith; (2) In a manner he reasonably believes to be in the best interests of the corporation; and (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances." Md. Code Ann., Corps & Ass'ns § 2-405.1(a).

Under Section 2-405.1(c), only those directors who fulfill each of these duties enjoy

immunity from liability under the judicially-created "business judgment rule." Md. Code Ann., Cts. & Jud. Proc. § 5-417 ("A person who performs the duties of that person in accordance with the standard provided under § 2-405.1 of the Corporations and Associations Article has no liability by reason of being or having been a director of a corporation."). However, an act of a director of a corporation is presumed to satisfy the standards of proper business judgment." Md. Code Ann., Corps & Ass'ns § 2-405.1(e); *see Yost v. Early*, 589 A.2d 1291 (Md. 1991) (stating that "the business judgment rule [is] a presumption that corporate directors acted in accordance with" the standard of care imposed upon them).

To survive a motion to dismiss premised on the BJR, the Amended Complaint simply "must allege facts showing a failure of the directors to adhere to their duties." *Hudson*, 2004 WL 1982383 at * 13. Whether a director breached fiduciary duties of loyalty and good faith are fact-intensive questions that are inappropriate to resolve on a motion to dismiss. *Resolution Trust Corp. v. Hecht*, 818 F. Supp. 894, 902 (D. Md. 1992); *Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 801 (S.D.N.Y. 1997) (applying Maryland law); *FSLIC v. Williams*, 599 F. Supp. 1184, 1213 (D. Md. 1984) (summary judgment was not appropriate because "the facts concerning the defendant's knowledge and conduct, and the circumstances in which they existed, as well as any determinations of how they relate to the legal standard of corporate fiduciary responsibility are best left for resolution by the trier of fact at trial"). Defendants' Motion seeking dismissal of Counts III-VII must be denied on this ground alone.

## A.    Disclosure Obligations Are Not Subject to the Business Judgment Rule.

Decisions that do not concern the management or business affairs of a corporation do not receive the protection of the BJR. *See In re Anderson, Clayton S'holders' Litig.*, 519 A.2d 669, 675 (Del. Ch. 1986). Directors' decisions to provide shareholders with materially misleading materials are not protected by the BJR. *St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, 2006 WL 2849783, *5 (S.D.N.Y. Oct. 4, 2006) ("a director's decision to include materially misleading declarations or omissions in a proxy statement in contravention of federal and state law would presumably be evaluated without the presumption of propriety afforded by the business judgment rule.") (applying federal policy considerations); *Hudson*, 2004 WL 1982383, at *13, n. 15 (The duty of disclosure is grounded in a duty to act in good faith); *Vides v. Amelio*, 265 F. Supp. 2d 273, 275 (S.D.N.Y. 2003) ("Whether a proxy statement properly omitted an item is regarded as a question of materiality, not one protected by the business judgment rule.").

Courts do not apply the BJR in these situations because determining what shareholders are told "is not a decision concerning the management of business and affairs of the enterprise of the kind the business judgment rule is intended to protect; it is rather a matter relating to the directors' duty to shareholders..." *Anderson, Clayton*, 519 A.2d at 675. Here, the Director Defendants filed false and misleading Proxy statements with the SEC and disseminated such materials to the shareholders in seeking their approval of the Internalization.

The Director Defendants' decisions in this regard are not protected by the BJR because these decisions concern the level of disclosure shareholders are entitled to and not a decision of the Board of Directors regarding the management of Inland REIT. A decision reflecting what shareholders are entitled to know *about* the management of the company is well outside the protection of the BJR. *In re Tri-Star Pictures, Inc. Litig.*, 1990 WL 82734, at *8 (Del. Ch. Jun. 14, 1990) (holding that the business judgment rule does not apply to "the question [of] whether shareholders have, under the circumstances, been provided with appropriate information upon which an informed choice on a matter of fundamental corporate importance may be made") (internal quotations omitted). Therefore, the Defendants' reliance on the BJR is misplaced and their motion to dismiss the Plaintiffs' breach of fiduciary duty claims should be denied.

### B.    Allegations of Bad Faith Rebut any Business Judgment Rule.

Allegations that the Directors lacked good faith defeat the presumption of the BJR. *Golding*, 679 A.2d at 559; *Yost*, 589 A.2d at 1298; *Daniels v. New Germany Fund, Inc.*, 2006 U.S. Dist. LEXIS 96145 (D. Md. 2006); *Froelich v. Erickson*, 96 F. Supp. 2d 507, 520 (D. Md. 2000). And, an exception to the BJR applies when a plaintiff shows that a company's directors' acts constitute gross negligence, waste of corporate assets or culpable negligence. *Parish*, 242 A.2d at 540; *see Edge Partners, L.P. v. Dockser*, 944 F. Supp. 438, 442 (D. Md. 1996). The BJR cannot insulate the Director Defendants' decisions from judicial review since the Amended Complaint alleges that the majority of directors acted in bad faith, with gross negligence and wasted corporate assets. *See Della Ratta v. Larkin*, 382 Md. 553, 580 (Md. 2004).

An allegation that a director is interested in the outcome of a transaction creates a prima facie case that that director did not act in good faith. *Strougo*, 964 F. Supp. at 802 (applying Maryland law); Hanks, Maryland Corporation Law, § 6.6(b), at 165. Directors seeking the protection of the BJR "can neither appear on both sides of a transaction, nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which

devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812. Indisputably, Director Defendants Parks and Gujral, stood on both sides of the Internalization as directors of Inland REIT, and as the owners of the Advisor and Property Managers, received tens of millions of dollars worth of Inland REIT's stock, and thus, cannot claim they are protected by the BJR.[37] Am. Cmplt. ¶¶ 61-65. The four so-called independent Directors lacked independence and acted in bad faith and, therefore cannot hide behind the BJR.

As to Inland Western's payment of excessive fees to the Property Managers, it is alleged that the Directors have precise, enumerated duties with respect to oversight of compensation to the Property Managers. *Id.* at ¶ 262 (payments may only be made upon a determination that "the compensation is not greater than the charges for comparable services available from others who are competent and not affiliated with any of the parties involved"). It is alleged that the Directors never fulfilled such duties and, instead, approved fees to the Property Managers which were in excess of the Market Rate. *Id.* at ¶¶ 297-298. These particularized allegations are sufficient to demonstrate that the Directors acted in bad faith, and in violation of their fiduciary duties, in approving the excessive fees to Property Managers.

Bad faith is also evidenced by the fact that Inland REIT and the Advisor and Property Managers were contractually bound by the Purchase Option Formulas in the Advisory Agreement and the Property Managers whereby the Advisor would be objectively valued in an Internalization. *Id.* at ¶¶ 224-231. The Director Defendants, however, agreed to circumvent this objective measurement of value by instead proposing and consummating the Internalization.

## IX.    CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss should be denied in all respects.

Dated: August 21, 2008

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

*/s/ Adam J. Levitt*
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603

---

[37] Defendants do not challenge the interestedness of Defendants Parks, Gujral and Catalano. Defendants only challenge the allegations relating to the four "independent directors who formed the Special Committee." Defs. Mem. at 18-19.

Telephone:  (312) 984-0000
Facsimile:  (312) 984-0001
Email:  levitt@whafh.com

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Lawrence A. Sucharow
Joseph Sternberg
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

Lawrence P. Kolker
Alexander Schmidt
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

*Co-Lead Counsel*

Michael J. VanOverbeke
Thomas C. Michaud
**VaNOVERBEKE MICHAUD &
  TIMMONY, P.C.**
79 Alfred Street
Detroit, Michigan  48201
Telephone:  (313) 578-1200
Facsimile:  (313) 578-1201

*Counsel to City of St. Clair Shores
  General Employees Retirement System*

## CERTIFICATE OF SERVICE

I, Kimberly L. Kimmel, an attorney, hereby certify that on August 21, 2008, I caused **Co-Lead Plaintiffs' Opposition to the Non-KPMG/William Blair Defendants' Motion to Dismiss Plaintiffs' Amended Complaint, and the Exhibits thereto,** to be filed electronically with the United States District Court for the Northern District of Illinois, Eastern Division. Notice of this filing will be sent electronically to the following parties by operation of the Court's electronic filing system. Parties and interested persons may access this filing through the Court's system

Jerold S. Solovy
James L. Thompson
Anthony C. Porcelli
JENNER & BLOCK, LLP
330 N. Wabash Avenue
Chicago, IL 60611
(312) 222-9350
(312) 527-0484

Harold C. Hirshman
SONNENSCHEIN NATH &
ROSENTHAL LLP
7800 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6404
Telephone: (312) 876-8000
Fax: (312) 876-7934

Samuel B. Isaacson
Joseph E. Collins
DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

Richard B. Kapnick
Courtney A. Rosen
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Fax: (312) 853-7036

James C. Schroeder
John Joseph Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606

Jonathan C. Medow
PERKINS COIE LLP
131 South Dearborn Street
Suite 1700
Chicago, IL 60603

/s/ Kimberly L. Kimmel