# EXHIBIT C

```
<DOCUMENT>
<TYPE>EX-3.1
<SEQUENCE>4
<FILENAME>a2146336zex-3_1.txt
<DESCRIPTION>EXHIBIT 3.1
<TEXT>
<Page>
```

EXHIBIT 3.1

INLAND WESTERN RETAIL REAL ESTATE TRUST, INC.

SECOND AMENDED AND RESTATED
ARTICLES OF INCORPORATION

THE UNDERSIGNED, in order to form a corporation for the purposes
hereinafter stated, under and pursuant to the provisions of the General
Corporation Law of the State of Maryland, does hereby certify as follows:

ARTICLE I

NAME

The name of the corporation is: Inland Western Retail Real Estate Trust,
Inc. (the "Company"). So far as may be practicable, the business of the Company
shall be conducted and transacted under that name.

ARTICLE II

ORGANIZATION

The name and address of the incorporator shall be David J. Kaufman, 227
West Monroe Street, Suite 3400, Chicago, Illinois 60606. Said incorporator, an
individual older than eighteen (18) years, shall form the corporation under the
general laws of Maryland.

ARTICLE III

PURPOSES AND POWERS

The purposes for which the Company is formed are to engage in any lawful
act or activity (including, without limitation or obligation, qualifying as a
real estate investment trust (a "REIT") under Sections 856 through 860, or any
successor sections, of the Internal Revenue Code of 1986, as amended (the
"Code")), for which corporations may be organized under the general laws of the
State of Maryland as now or hereafter in force.

ARTICLE IV

RESIDENT OFFICE/AGENT AND PRINCIPAL OFFICE

The post office address of the principal office of the Company in the State
of Maryland is c/o The Corporation Trust Incorporated, 300 East Lombard Street,
Baltimore, Maryland 21202. The Company may have such other offices and places of
business within or outside the State of Maryland as the Board of Directors may
from time to time determine. The Company shall continuously maintain in the
State of Maryland a registered office and a registered agent whose office is
identical with such registered office. The post office address of the Company's
registered office in the State of Maryland is 300 East Lombard Street,
Baltimore, Maryland 21202. The name of the Company's registered agent at such
address is The Corporation Trust

```
<Page>
```

Incorporated. The Company reserves the power to change its registered agent and registered office at any time.

## ARTICLE V

## DEFINITIONS

For the purposes of these Articles, the following terms shall have the following meanings:

"ACQUISITION EXPENSES" means expenses related to the Company's selection, evaluation and acquisition of, and investment in, Properties, whether or not acquired or made, including but not limited to legal fees and expenses, travel and communications expenses, costs of appraisals and surveys, nonrefundable option payments on Property not acquired, accounting fees and expenses, computer use related expenses, architectural and engineering reports, environmental and asbestos audits, title insurance and escrow fees, and personal and miscellaneous expenses related to the selection and acquisition of Properties.

"ACQUISITION FEE" means the total of all fees and commissions paid by the Company, the Advisor or any Affiliate of the Company or the Advisor to any Person, or paid by any Person to the Advisor or any Affiliate of the Company or the Advisor and remitted to the Company, in connection with making or investing in mortgage loans or the purchase, development or construction of Property by the Company. Included in the computation of such fees or commissions shall be any real estate commission, selection fee, Development Fee, Construction Fee, non-recurring management fee, loan fees or points or any fee of a similar nature, however designated. Excluded shall be Development Fees and Construction Fees paid to Persons not affiliated with the Sponsor in connection with the actual development and construction of a project.

"ADVISOR" means the Person responsible for directing or performing the day-to-day business affairs of the Company, including a Person to which an Advisor subcontracts substantially, all such functions. The Advisor is Inland Western Retail Real Estate Advisory Services, Inc. or any Person which succeeds it in such capacity.

"ADVISOR ASSET MANAGEMENT FEE" means the fee paid to the Advisor for directing or performing the day-to-day business affairs of the Company, which shall not exceed 1% of the Average Assets.

"AFFILIATE" means, with respect to any other Person, (i) any Person directly or indirectly owning, controlling or holding, with the power to vote, 10% or more of the outstanding voting securities of such other Person; (ii) any Person 10% or more of whose outstanding voting securities are directly or indirectly owned, controlled or held, with the power to vote, by such other Person; (iii) any Person directly or indirectly controlling, controlled by or under common control with such other Person; (iv) any executive officer, director, trustee or general partner of such other Person; and (v) any legal entity for which such Person acts as an executive officer, director, trustee or general partner.

2

<Page>

"ASSET COVERAGE" means the ratio which the value of the total assets of the Company, less all liabilities and indebtedness for unsecured borrowings, bears to the aggregate amount of all unsecured borrowings of the Company.

"AVERAGE ASSETS" means, for any period, means the average of the total book value of our real estate assets plus the total value of our loans receivables secured by real estate, before reserves for depreciation or bad debts or other

similar non-cash reserves. We will compute our average assets by taking the
average of these values at the end of each month during the quarter for which we
are calculating the fee.

     "CASH FLOW" means, with respect to any period: (i) all cash receipts
derived from investments made by the Company; plus (ii) cash receipts from
operations (including any interest from temporary investments of the Company)
without deduction for depreciation or amortization, less (iii) cash receipts
used to pay operating expenses (including the Advisor Asset Management Fee).

     "CODE" means the Internal Revenue Code of 1986, as amended, and the
Regulations promulgated thereunder (sometimes referred to as the "Treasury
Regulations") or corresponding provisions of subsequent revenue laws.

     "COMPETITIVE REAL ESTATE COMMISSION" means the real estate or brokerage
commission paid for the purchase or sale of a Property which is reasonable,
customary and competitive in light of the size, type paid location of such
Property.

     "CONTRACT PRICE FOR THE PROPERTY" means the amount actually paid or
allocated to the purchase, development, construction or improvement of a
Property exclusive of Acquisition Fees and Acquisition Expenses.

     "CONSTRUCTION FEE" means a fee or other remuneration for acting as general
contractor and/or construction manager to construct improvements, supervise and
coordinate projects or to provide major repairs or rehabilitation on the
Company's Property.

     "DEVELOPMENT FEE" means a fee for the packaging of the Property of the
Company, including negotiating and approving plans, and undertaking to assist in
obtaining zoning and necessary variances and necessary financing for the
specific Property, either initially or at a later date.

     "DIRECTOR(S)" means the members of the Board of Directors of the Company
(including Independent Directors).

     "EQUITY STOCK" means stock that is either common stock or preferred stock
of the Company.

     "INDEPENDENT DIRECTOR(S)" means the Directors who: (i) are not affiliated
and have not been affiliated within the two years prior to their becoming an
Independent Director, directly or indirectly, with the Company, the Sponsor or
the Advisor whether by ownership of, ownership interest in, employment by, any
material business or professional relationship with, or as an officer or
director of the Company, the Sponsor, the Advisor or any of their Affiliates;
(ii)

3

<Page>

do not serve as a director for more than two other REITs originated by the
Company or the Advisor or advised by the Advisor; and (iii) perform no other
services for the Company, except as Directors. For this purpose, an indirect
relationship shall include circumstances in which a member of the immediate
family of a Director has one of the foregoing relationships with the Company,
the Sponsor or the Advisor or any of their Affiliates. For purposes of
determining whether or not the business or professional relationship is
material, the aggregate gross revenue derived by the prospective Independent
Director from the Company, the Sponsor, the Advisor and their Affiliates shall
be deemed material per se if it exceeds 5% of the prospective Independent
Directors: (i) annual gross revenue, derived from all sources, during either of
the last two years; or (ii) net worth, on a fair market value basis.

"INDEPENDENT EXPERT" means a Person with no material current or prior business or personal relationship with the Advisor or the Directors who is engaged, to a substantial extent, in the business of rendering opinions regarding the value of assets of the type held by the Company.

"INITIAL INVESTMENT" means the purchase of 20,000 shares of Common Stock by the Advisor in connection with the organization of the Company for $200,000. The Advisor shall not sell this initial investment while the Advisor remains the sponsor, but may transfer the shares to other affiliates.

"MARKET PRICE" means on any date the average of the Closing Price (as defined below per Share for the five consecutive Trading Days (as defined below) ending on such date. The "Closing Price" on any date means the last sale price, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the principal national securities exchange on which the Shares are listed or admitted to trading or, if the Shares are not listed or admitted to trading on any national securities exchange, the last quoted price, or if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by The Nasdaq Stock Market, Inc. ("Nasdaq"), or, if Nasdaq is no longer in use, the principal automated quotation system that may, then be in use or, if the Shares are not quoted by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in the Shares selected by the Board, or if there is no professional market maker making a market in the Shares, the average of the last ten (10) sales pursuant to the Offering if the Offering has not concluded, or if the Offering has concluded, the average of the last ten (10) purchases by the Company pursuant to its Share Repurchase Program (the "SRP"), and if there are fewer than ten (10) of such purchases under the SRP, then the average of such lesser number of purchases, or, if the SRP is not then in existence, the price at which the Company is then offering Shares to the public if the Company is then engaged in a public offering of Shares, or if the Company is not then offering Shares to the public, the price at which a Stockholder may purchase Shares pursuant to the Company's Distribution Reinvestment Program (the "DRP") if such DRP is then in existence, or if the DRP is not then in existence, the fair market value of the Shares as determined by the Company, in its sole discretion. "Trading Day" shall mean a day on which the principal national securities exchange or national

4

<Page>

automated quotation system on which the Shares are listed or admitted to trading is open for the transaction of business or, if the Shares are not listed or admitted to trading on any national securities exchange or national automated quotation system, shall mean any day other than a Saturday, a Sunday or a day on which banking institutions in the State of Illinois are authorized or obligated by law or executive order to close. The term "regular way" means a trade that is effected in a recognized securities market for clearance and settlements pursuant to the rules and procedures of the National Securities Clearing Corporation, as opposed to a trade effected "ex-clearing" for same-day or next-day settlement.

"NET ASSETS" or "NET ASSET VALUE" means the total assets of the Company (other than intangibles) at cost before deducting depreciation or other non-cash reserves less total liabilities of the company, calculated at least quarterly on a basis consistently applied.

"NET INCOME" means, for any period, total revenues applicable to such period, less the expenses applicable to such period other than additions to or allowances for reserves for depreciation, amortization or bad debts or other similar non-cash reserves; provided, however, that Net Income shall not include

the gain from the sale of the Company's assets.

    "ORGANIZATION AND OFFERING EXPENSES" means all those expenses incurred by
and to be paid from the assets of the Company in connection with and in
preparing the Company for registration and subsequently offering and
distributing shares of common stock of the Company to the public, including, but
not limited to, total underwriting and brokerage discounts and commissions
(including fees of the underwriters' attorneys paid by the Company), expenses
for printing, engraving, mailing, salaries of the Company's employees while
engaged in sales activity, charges of transfer agents, registrars, trustees,
escrow holders, depositories, experts, expenses of qualification of the sale of
the securities under federal and state laws, including taxes and fees, and
accountants' and attorneys' fees and expenses.

    "PERSON" means an individual, corporation, business trust, estate, trust,
partnership, limited liability company, association, two or more persons having
a joint or common interest, or any other legal or commercial entity.

    "PROPERTY" or "PROPERTIES" means any, or all, respectively, of the real
property and improvements thereon owned or to be owned by the Company, directly
or indirectly through one or more of its Affiliates.

    "PROSPECTUS" means any document, notice, or other communication satisfying
the standards set forth in Section 10 of the Securities Act of 1933, as amended,
and contained in a currently effective registration statement filed by the
Company with, and declared effective by, the Securities and Exchange Commission,
or if no registration statement is currently effective, then the Prospectus
contained in the most recently effective registration statement.

    "REIT" means a real estate investment trust as defined by the Code and the
applicable Regulations.

    "ROLL-UP" means a transaction involving the acquisition, merger, conversion
or consolidation either directly or indirectly of the Company and a Roll-Up
Entity and the issuance of securities of such Roll-Up Entity to the Stockholders
of the Company. Such term does not include:

                                       5

<Page>

        (a)    a transaction involving securities of the Company that have
been for at least 12 months listed on a national securities exchange or traded
through The Nasdaq Stock Market-Nasdaq National Market; or

        (b)    a transaction involving the conversion to corporate, trust or
association form of only the Company, if, as a consequence of the transaction,
there will be no significant adverse change in any of the following:

            (i)    Stockholders' voting rights;

            (ii)   the term and existence of the Company;

            (iii)  Sponsor or Advisor compensation; or

            (iv)   the Company's investment objectives.

    "ROLL-UP ENTITY" means a partnership, REIT, corporation, trust or other
entity that would be created or would survive after the successful completion of
a proposed Roll-Up transaction.

    "SPONSOR" means any Person directly or indirectly instrumental in
organizing, wholly or in part, the Company, or any, Person who will control,
manage or participate in the management of the Company, and any Affiliate of any

such Person. Not included is any Person whose only relationship with the Company is as that of an independent property manager of the Company's assets, and whose only compensation is as such. Sponsor does not include wholly independent third parties such as attorneys, accountants and underwriters whose only compensation is for professional services. A Person may also be deemed a Sponsor of the Company by:

   (a)    taking the initiative, directly or indirectly, in founding or organizing the business or enterprise of the Company; either alone or in conjunction with one or more other Persons;

   (b)    receiving a material participation in the Company in connection with the founding or organizing of the business of the Company, in consideration of services or property, or both services and property;

   (c)    having a substantial number of relationships and contacts with the Company;

   (d)    possessing significant rights to control Company Properties;

   (e)    receiving fees for providing services to the Company which are paid on a basis that is not customary in the industry; or

   (f)    providing goods or services to the Company on a basis which was not negotiated at arm's-length with the Company.

                                   6

<Page>

   Initially the Sponsor shall be Inland Real Estate Investment Corporation or any Person which succeeds it in such capacity.

   "STOCKHOLDERS" means holders of shares of Equity Stock.

   "TOTAL OPERATING EXPENSES" means the aggregate expenses of every character paid or incurred by the Company as determined under Generally Accepted Accounting Principles, including any fees paid to the Advisor, but excluding:

   (g)    the expenses of raising capital such as Organization and Offering Expenses, legal, audit, accounting, underwriting, brokerage, listing, registration and other fees, printing and other such expenses, and taxes incurred in connection with the issuance, distribution, transfer, registration and stock exchange listing of the shares of common stock of the Company);

   (h)    interest payments;

   (i)    taxes;

   (j)    non-cash expenditures such as depreciation, amortization and bad debt reserves;

   (k)    incentive fees payable to the Advisor; and

   (l)    Acquisition Fees, Acquisition Expenses, real estate commissions on resale of Property and other expenses connected with the acquisition, disposition and ownership of real estate interests, mortgage loans or other property (such as the costs of foreclosure, insurance premiums, legal services, maintenance, repair and improvement of property).

                               ARTICLE VI

                                 STOCK

SECTION 1.  AUTHORIZED STOCK. The total number of shares of stock which the Company has authority to issue is 650,000,000 shares, of which 640,000,000 are shares of common stock, $.001 par value per share ("Common Stock"), and 10,000,000 are shares of preferred stock, $.001 par value per share ("Preferred Stock"). The aggregate par value of all authorized shares of stock having par value is $650,000. If shares of one class of stock are classified or reclassified into shares of another class of stock pursuant to this Article VI, the number of authorized shares of the former class shall be automatically decreased and the number of shares of the latter class shall be automatically increased, in each case by the number of shares so classified or reclassified, so that the aggregate number of shares of stock of all classes that the Company has authority to issue shall not be more than the total number of shares of stock set forth in the first sentence of this paragraph. To the extent permitted by Maryland law, the Board of Directors, without any action by the stockholders of the Company, may amend the charter from time to time to increase or decrease the aggregate number of shares of stock or the number of shares of stock of any class or series that the Company has authority to issue.

7

<Page>

SECTION 2.  LIQUIDATION. Subject to any preferential rights in favor of any class of Preferred Stock, upon liquidation or dissolution of the Company, each issued and outstanding share of Common Stock shall be entitled to participate pro rata in the assets of the Company remaining after payment of, or adequate provision for, all known debts and liabilities of the Company.

SECTION 3.  COMMON STOCK.

(a)  Subject to the provisions of Article IX regarding Equity Stock (as such term is defined therein), each issued and outstanding share of Common Stock shall entitle the holder thereof to one vote on all matters presented for a vote of Stockholders. Shares of Common Stock do not have cumulative voting rights.

(b)  A majority of voting shares of Equity Stock present in person or by proxy at an Annual Meeting at which a quorum is present, may, without the necessity for concurrence by the Directors, vote to elect the Directors. A quorum shall be 50% of the then outstanding voting shares of Equity Stock.

(c)  With respect to voting shares of Equity Stock owned by the Advisor, the Sponsor, the Directors or any Affiliate, neither the Advisor, the Sponsor, the Directors, nor any Affiliate may vote or consent on matters submitted to the Stockholders regarding the removal of the Advisor, the Sponsor, the Directors, or any Affiliate or any transaction between the Company and any of them. In determining the requisite percentage interest of voting shares of Equity Stock necessary to approve a matter on which the Advisor, the Sponsor, the Directors or any Affiliate may not vote or consent, any shares of Equity Stock owned by any of them shall not be included.

(d)  The Board of Directors may reclassify any unissued shares of Common Stock from time to time in one or more classes or series of stock.

SECTION 4.  PREFERRED STOCK. The Board of Directors may classify any unissued shares of Preferred Stock and reclassify any previously classified but unissued shares of Preferred Stock of any series from time to time, in one or more classes or series of stock.

SECTION 5.  CLASSIFIED OR RECLASSIFIED SHARES. Prior to issuance of classified or reclassified shares of any class or series, the Board by resolution shall: (i) designate that class or series to distinguish it from all other series and classes of stock of the Company; (ii) specify the number of shares to be included in the class or series; and (iii) subject to the

provisions of Article IX regarding Equity Stock, and subject to the express terms of any class or series of stock of the Company outstanding at the time, set or change the preferences, conversion or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications and terms of redemption for each class or series; and (iv) cause the Company to file articles supplementary with the State Department of Assessments and Taxation of Maryland ("SDAT"). Any of the terms of any class or series of stock set or changed pursuant to clause (iii) of this Section 5 may be made dependent upon facts or events ascertainable outside the charter (including determinations by the Board of Directors or other facts or events within the control of the Company) and may vary among holders thereof, provided that the manner in which such

8

<Page>

facts, events or variations shall operate upon the terms of such class or series of stock is clearly and expressly set forth in the articles supplementary filed with the SDAT.

SECTION 6.  GENERAL NATURE OF EQUITY STOCK. All shares of Equity Stock shall be personal property entitling the Stockholders only to those rights provided in these Articles. The Stockholders shall have no interest in any Properties and shall have no right to compel any partition, division, dividend or distribution of the Company or any Properties.

SECTION 7.  FRACTIONAL SHARES OF EQUITY STOCK. The Company may, without the consent or approval of any Stockholder, issue fractional shares of Equity Stock, eliminate a fraction of a Share by rounding up or down to a full Share, arrange for the disposition of a fraction of a Share by the person entitled to it, or pay cash for the fair value of a fraction of a Share.

SECTION 8.  PREEMPTIVE RIGHTS. Except as may be provided by the Board in setting the terms of classified or reclassified shares of stock pursuant to Section 5 of this Article VI, no Stockholder of the company shall, as such Stockholder, have any preemptive right to purchase or subscribe for any additional shares of Equity Stock or any other security of the Company which it may issue or sell.

SECTION 9.  CHARTER AND BYLAWS. All persons who shall acquire Equity Stock shall acquire the same subject to the provisions of these Articles and the bylaws of the Company (the "Bylaws"), as these Articles and such Bylaws may be amended from time-to-time.

SECTION 10. TERMS AND CONDITIONS OF EQUITY STOCK. The Company shall not issue:

(a)    Common Stock which is non-voting or assessable;

(b)    Warrants, options or similar evidences of a right to buy its Equity Stock, unless (i) issued to all of its holders of Equity Stock ratably, (ii) as part of a financing arrangement, or (iii) as part of a stock option plan to Directors, officers or employees of the Company;

(c)    Common Stock which is redeemable at the option of the holder; (ii) debt securities unless the historical debt service coverage (in the most recently completed fiscal year) as adjusted for known charges is sufficient to properly service the higher level of debt; (iii) options or warrants to purchase Equity Stock to the Sponsor, the Advisor, any Directors, or their Affiliates except on the same terms as sold to the general public, provided that the Company may issue options or warrants to persons not affiliated with the Company at exercise prices not less than the fair market value of such securities on the date of grant and for consideration (which may include services that in the

judgment of the Independent Directors have a market value not less than the value of such option on the date of grant), and provided further that options or warrants issuable to the Sponsor, the Advisor, Directors or Affiliates thereof shall not exceed an amount equal to ten percent (10%) of the outstanding Equity Stock on the date of grant of any options or warrants; or

(d)     Shares of Equity Stock on a deferred payment basis or similar arrangement.

9

<Page>

SECTION 11. RIGHTS OF OBJECTING STOCKHOLDERS.

Holders of Equity Stock are not entitled to exercise any rights of an objecting stockholder provided for under Title 3, Subtitle 2 of the Maryland General Corporation Law.

## ARTICLE VII

## BOARD OF DIRECTORS

SECTION 1.  NUMBER AND CLASSIFICATION. The number of Directors of the Company shall initially be seven, which number may be increased or decreased pursuant to the Bylaws, but shall never be less than three, nor more than eleven, a majority of whom will be Independent Directors. Independent Directors shall nominate replacements for vacancies amongst the Independent Directors' positions. The Directors may establish such committees as they deem appropriate (provided the majority of the members of each committee are Independent Directors). A Director shall have had at least three years of relevant experience demonstrating the knowledge and experience required to successfully acquire and manage the type of assets being acquired by the Company. At least one of the Independent Directors shall have three years of relevant real estate experience.

The names of the Directors who shall serve initially until the first annual meeting of the Stockholders and until their successors are duly elected and qualify are:

        Robert D. Parks
        Brenda G. Gujral
        Frank Catalano         (Independent Director)
        Kevin Beard            (Independent Director)
        Paul R. Grauvreau      (Independent Director)
        Gerald M. Gorski       (Independent Director)
        Barbara A. Murphy      (Independent Director)

SECTION 2.  ELECTION AND TERM. Each Director (other than a Director elected to fill the unexpired term of another Director) is elected by the voting Stockholders and shall serve a one year term and hold office until his or her successor is duly elected and qualify.

SECTION 3.  RESIGNATION, REMOVAL OR DEATH. Any Director may resign by written notice to the Board, effective upon execution and delivery to the Company of such written notice or upon any future date specified in the notice. Subject to the rights of holders of one or more classes or series of Preferred Stock to elect or remove one or more Directors, a Director may be removed at any time, with or without cause, at an annual or special meeting of the Stockholders, by the affirmative vote of the holders of not less than a majority of the shares of Equity Stock then outstanding and entitled to vote generally in the election of Directors. For purposes of this paragraph, "cause" shall mean with respect to any particular director, conviction of a felony or a final judgment of a court of competent jurisdiction holding that such director caused

demonstrable, material harm to the Company through bad faith or active and deliberate dishonesty.

10

<Page>

SECTION 4.  SERVICE AS NOMINEE. Legal title to any Property shall be vested in the Company, but the Company may cause legal title to any such Property to be held by or in the name of any or all of the Directors or any other person as nominee. Upon the resignation or removal of any Director, or his otherwise ceasing to be a Director, he shall automatically cease to have any right, title or interest in and to any Property and shall execute and deliver such documents as the remaining Directors require for the conveyance of any such Property held in his name, and shall account to the remaining Directors as they require for all such Property which he holds as Director. Any right, title or interest of the Director in and to any Property shall automatically vest in successor and additional Directors upon their qualification and acceptance of election or appointment as Directors, and they shall thereupon have all the rights and obligations of Directors, whether or not any conveyancing documents have been executed and delivered. Written evidence of the qualification and acceptance of election or appointment of successor and additional Directors may be filed with the records of the Company and in any such other offices, agencies or places as the Company or Directors may deem necessary or desirable.

SECTION 5.  DUTIES AND POWERS.

(a)   GENERAL. The business and affairs of the Company shall be managed under the direction of the Board of Directors. All powers of the Company may be exercised by or under authority of the Board of Directors except as conferred on or reserved to the Stockholders by law or by the Articles or the Bylaws. These Articles shall be construed with a presumption in favor of the grant of power and authority to the Board of Directors. Any construction of these Articles or determination made in good faith by the Board of Directors concerning its powers and authority hereunder shall be conclusive. The enumeration and definition of particular powers of the Board of Directors included in these Articles or in the Bylaws shall in no way be construed or deemed by inference or otherwise in any manner to exclude or limit the powers conferred upon the Board of Directors under the Maryland General Corporation Law, the general laws of the State of Maryland or any other applicable laws as now or hereafter in force. At or before the first meeting of the Board of Directors, the Articles shall be reviewed and ratified by a majority both of the Directors and of the Independent Directors.

(b)   REIT QUALIFICATION. The Board shall use its reasonable best efforts to cause the Company to qualify for U.S. federal income tax treatment in accordance with the provisions of the Code applicable to a REIT. In furtherance of the foregoing, the Board shall use its reasonable best efforts to take such actions as are necessary, and may take such actions as in its sole judgment and discretion are desirable, to preserve the status of the Company as a REIT; provided, however, that if a majority of the Board (including a majority of the Independent Directors) determines that it is no longer in the best interest of the Company to continue to have the Company qualify as a REIT, the Board may revoke or otherwise terminate the Company's REIT election pursuant to Section 856(g) of the Code. The Board of Directors also may determine that compliance with any restriction or limitation on stock ownership and transfers set forth in Article IX is no longer required for REIT qualification.

(c)   AUTHORIZATION BY BOARD OF STOCK ISSUANCE. The Board of Directors may authorize the issuance from time to time of shares of stock of the Company of any class or series, whether now or hereafter authorized, or securities or rights convertible into shares of its stock or

11

<Page>

any class or series, whether now or hereafter authorized, for such consideration as the Board of Directors may deem advisable (or without consideration in the case of a stock split or stock dividend), subject to such restrictions or limitations, if any, as may be set forth in these Articles or the Bylaws.

(d)    DISTRIBUTIONS. The Company intends to pay regular quarterly distributions to its Stockholders ("Distributions"). However, the Company reserves the right to pay Distributions on a monthly basis in an amount determined by the Board. Distributions will be at the discretion of the Board. The Company's ability to pay Distributions and the size of these Distributions will depend upon a variety of factors. There can be no assurance that Distributions will be made or that any particular level of Distributions established in the future, if any, will be maintained by the Company.

To the extent possible, the Company seeks to avoid the fluctuations in Distributions which might result if Distributions were based on actual cash received during the Distribution period. To avoid fluctuation, the Company may use Cash Flow received during prior periods, or Cash Flow received subsequent to the Distribution period and prior to the payment date for such Distribution, in order to pay annualized Distributions consistent with the Distribution level established from time to time by the Board. The Company's ability to maintain this policy is dependent upon the Company's Cash Flow and the applicable requirements for qualifying as a REIT as contained in Code Section 856 through 960 and the Regulations promulgated thereunder. There can be no assurance that there will be Cash Flow available to pay Distributions, or that Distribution amounts will not fluctuate. Quarterly Distributions will be calculated with daily record and Distribution declaration dates. However, the Board could, at any time, elect to pay Distributions monthly, and later switch back to quarterly, to reduce administrative costs.

Concurrently with any Distribution, the Company shall provide Stockholders with a statement disclosing the source of the funds distributed. If such information is not available concurrently with the making of a Distribution, a statement setting forth the reasons why such information is not available shall be provided concurrently. In no event shall such information be provided to Stockholders more than 60 days after the close of the fiscal year in which the Distribution was made.

Distributions in-kind shall not be permitted, except for Distributions of: (i) readily marketable securities; (ii) beneficial interests in a liquidating trust established for the dissolution of the Company and the liquidation of its assets; or (iii) Distributions of in-kind property which meet all of the following conditions: (a) the Directors advise each Stockholder of the risks associated with direct ownership of the in-kind Property; (b) the Directors offer each Stockholder the election of receiving in-kind property Distributions; and (c) the Directors distribute in-kind property only to those Stockholders who accept the Directors' offer.

The Directors shall endeavor to declare and pay such Distributions as shall be necessary under the Code; however, Stockholders shall have no right to any Distribution unless and until declared by the Directors. The exercise of the powers and rights of the Directors pursuant to this Section 5 shall be subject to the provisions of any class or series of Equity Stock at the time outstanding. The receipt by any person in whose name any shares of Equity Stock are registered

12

<Page>

on the records of the Company or by his, her or its duly authorized agent shall be a sufficient discharge for all dividends or distributions payable or

deliverable in respect of such shares of Equity Stock and from all liability related to the application thereof.

(e)   DISTRIBUTION REINVESTMENT PROGRAM. The Directors may adopt a distribution reinvestment program on such terms and conditions as shall be set forth in the Prospectus, which program may be amended from time to time by the Directors, provided, however, that such program shall, at a minimum, provide for the following:

(i)   All material information regarding the Distribution to the Stockholder and the effect of reinvesting such Distribution, including the tax consequences thereof, shall be provided to the Stockholder at least annually; and

(ii)   Each Stockholder participating in the distribution reinvestment program shall have a reasonable opportunity, to withdraw from the distribution reinvestment program at least annually after receipt of the information required in subparagraph (i) above.

(f)   DETERMINATION OF REASONABLENESS OF FEES AND EXPENSES. The Independent Directors shall determine, from time to time but at least annually, that the total fees and expenses of the Company are reasonable in the light of the investment performance of the Company, its Net Assets, its Net Income, and the fees and expenses of other comparable unaffiliated Companies. Each such determination shall be reflected in the minutes of the meeting of the Directors.

(g)   REVIEW OF INVESTMENT POLICIES. The Directors shall establish written policies on investments and borrowing and shall monitor the administrative procedures, investment operations and performance of the Company and the Advisor to assure that such policies are carried out. The Independent Directors shall review such policies of the Company, with sufficient frequency and at least annually to determine that the policies being followed by the Company at any time are in the best interests of the Stockholders. Each such determination and the basis therefor shall be set forth in the minutes of the Board of Directors.

(h)   DETERMINATION OF CONSIDERATION. The consideration paid for Properties acquired by the Company shall ordinarily be based upon the fair market value of the Properties and approved by a majority of the Directors (including a majority of the Independent Directors). In cases in which a majority of the Independent Directors so determine, or if assets are acquired from a Sponsor, Advisor, Director or an Affiliate of any of the foregoing, pursuant to Section 6 of Article VIII, such fair market value shall be as determined by a qualified independent real estate appraiser selected by the Independent Directors.

(i)   ADVISORY AGREEMENT; ADVISOR COMPENSATION. Subject to the approval of a majority of the Directors, including a majority of the Independent Directors, an advisory agreement will be entered into by the Company which will be for a one-year term subject to successive one-year renewals upon the mutual consent of the parties. Such advisory agreement shall be terminable by either party or by mutual consent of the parties or by a majority of the Independent Directors of the Company or the Advisor, as the case may be, upon 60 days written notice without cause or penalty. In the event of the termination of the advisory agreement, the

13

<Page>

Advisor will cooperate with the Company and take all reasonable steps requested to assist the Directors in making an orderly transition of the advisory function. The Independent Directors shall determine from time to time and at least annually that the compensation which the Company contracts to pay to the

Advisor is reasonable in relation to the nature and quality of services performed and that such compensation is within the limits prescribed by these Articles and applicable state law. The Independent Directors shall also supervise the performance of the Advisor to determine that the Advisor or a successor Advisor possesses sufficient qualifications to perform the advisory function for the Company and to justify the compensation paid to it by the Company as well as to confirm that the provisions of such contract are being carried out. It shall be the duty of the Directors, including the Independent Directors, to evaluate the performance of the Advisor before entering into or renewing an advisory contract. Such determination shall be based upon the following factors and all other factors such Independent Directors may deem relevant and the findings of such Directors on each of such factors shall be recorded in the minutes of a Directors meeting: (i) the size of the advisory fee in relation to the size, composition and profitability of the investment portfolio of the Company; (ii) the success of the Advisor in generating opportunities that meet the investment objectives of the Company; (iii) the rates charged to other REITs and to investors other than REITs by advisors performing similar services; (iii) additional revenues realized by the Advisor and its Affiliates through their relationship with the Company including loan administration, underwriting or broker commissions, servicing, engineering, inspection and other fees, whether paid by the Company or by others with whom the Company does business; (v) the quality and extent of service and advice furnished by the Advisor; (vi) the performance of the investment portfolio of the Company, including income, conservation or appreciation of capital, frequency of problem investments and competence in dealing with distress situations; and (vii) the quality of the investment portfolio of the Company in relationship to the investments generated by the Advisor for its own account. Payments to the Advisor, its Affiliates and the Directors for services rendered in a capacity other than that as investment advisor or Director may only be made upon a determination that: (i) the compensation is not in excess of their compensation paid for any comparable services; and (ii) the compensation is not greater than the charges for comparable services available from others who are competent and not affiliated with any of the parties involved.

        (j)     RESERVED POWERS OF BOARD. The Board of Directors, without any action by the Stockholders of the Company, shall have and may exercise, on behalf of the Company, without limitation, the exclusive power to adopt, alter and repeal any provision of the Bylaws and to make new Bylaws.

    SECTION 6. PERFORMANCE OF DUTIES. A Director shall perform his or her duties as a Director, including his or her duties as a member of a committee of the Board on which he or she serves in accordance with Maryland law. A Director who performs his or her duties in accordance with Maryland law has no liability by reason of being or having been a Director.

    SECTION 7. FIDUCIARY DUTY. The Directors and Advisor of the Company shall be deemed to be in a fiduciary relationship to the Company and the Stockholders. The Directors shall also have a fiduciary duty to the Stockholders to supervise the relationship of the Company with the Advisor.

14

<Page>

    SECTION 8. DETERMINATIONS BY BOARD. The determination as to any of the following matters, made in good faith by or pursuant to the direction of the Board consistent with these Articles and in the absence of actual receipt of an improper benefit in money, property or services or active and deliberate dishonesty established by a court, shall be final and conclusive and shall be binding upon the Company and every holder of shares of its Equity Stock: (i) the amount of the net income of the Company for any period and the amount of assets at any time legally available for the payment of dividends, redemption of its Equity Stock or the payment of other distributions on its Equity Stock; (ii) the amount of paid-in surplus, net assets, other surplus. annual or other net

profit, net assets in excess of capital, undivided profits or excess of profits
over losses on sales of assets; (iii) the amount, purpose, time of creation,
increase or decrease, alteration or cancellation of any reserves or charges and
the propriety thereof (whether or not any obligation or liability for which such
reserves or charges shall have been created shall have been paid or discharged);
(iv) the fair value, or any sale, bid or asked price to be applied in
determining the fair value, of any asset owned or held by the Company; (v) any
matters relating to the acquisition, holding and disposition of any assets by
the Company; or (vi) any other matter relating to the business and affairs of
the Company.

ARTICLE VIII

PROVISIONS FOR DEFINING, LIMITING AND
REGULATING CERTAIN POWERS OF THE COMPANY
AND OF ITS DIRECTORS AND STOCKHOLDERS

Until such time as the Board of Directors shall determine, in its sole and
absolute discretion, that it is no longer in the best interests of the Company
or its Stockholders that the Company continue to operate as a REIT, or until
such time as the Company shall fail to qualify as a REIT:

SECTION 1. LIMITATION ON ORGANIZATION AND OFFERING EXPENSES. The
Organization and Offering Expenses paid in connection with the Company's
formation or the syndication or sale of shares of Common Stock shall be
reasonable and shall in no event exceed fifteen percent (15%) of the proceeds
raised in such syndication or sale.

SECTION 2. LIMITATION ON ACQUISITION FEES AND EXPENSES. The total of all
Acquisition Fees and Acquisition Expenses paid by the Company in connection with
the purchase of a property by the Company shall be reasonable, and shall in no
event exceed an amount equal to 6% of the Contract Price for the Property, or in
the case of a mortgage loan, 6% of the funds advanced; provided, however, that a
majority of the Directors (including the majority of the Independent Directors)
not otherwise interested in the transaction may approve fees and expenses in
excess of these limits if they determine the transaction to be commercially
competitive, fair and reasonable to the Company.

SECTION 3. LIMITATION ON TOTAL OPERATING EXPENSES. The annual Total
Operating Expenses of the Company shall not exceed in any fiscal year the
greater of 2% of the Average Assets of the Company or 25% of the Company's Net
Income. The Independent Directors have a fiduciary responsibility to limit the
Company's annual Total Operating Expenses to amounts that do not exceed the
limitations described above. The Independent Directors may, however,

15

<Page>

determine that a higher level of Total Operating Expenses is justified for such
period because of unusual and non-recurring expenses. Any such finding by the
Independent Directors and the reasons in support thereof shall be recorded in
the minutes of the meeting of Directors. Within 60 days after the end of any
fiscal quarter of the Company for which Total Operating Expenses (for the 12
months then ended) exceed 2% of Average Assets or 25% of Net Income, whichever
is greater, as described above, there shall be sent to the Stockholders a
written disclosure of such fact. If the Independent Directors determine that
such higher Total Operating Expenses are justified, such disclosure will also
contain an explanation of the Independent Directors' conclusion. In the event
the Total Operating Expenses exceed the limitations described above and if the
Directors are unable to conclude that such excess was justified then, within 60
days after the end of the Company's fiscal year, the Advisor shall reimburse the
Company the amount by which the aggregate annual Total Operating Expenses paid
or incurred by the Company exceed the limitation.

SECTION 4.   LIMITATION ON REAL ESTATE COMMISSIONS. If the Company sells property, the Company may pay real estate brokerage fees which are reasonable, customary and competitive, taking into consideration the size, type and location of the Property ("Competitive Real Estate Commission"), which shall not in the aggregate exceed the lesser of the Competitive Real Estate Commission or an amount equal to 6% of the gross sales price of the Property. The amount of such fees payable to the Advisor or an Affiliate thereof shall not exceed the lesser of (i) one-half of the Competitive Real Estate Commission; or (ii) 3% of the gross sales price of a Property and shall be paid only if such person provides a substantial amount of services in connection with the sale of the Property.

SECTION 5.   LIMITATION ON INCENTIVE FEES. The Company shall pay the Advisor a reasonable incentive advisory fee. Such a fee shall be considered presumptively reasonable if it does not exceed 15% of the balance of such net proceeds remaining after payment to the Stockholders, in the aggregate, of an amount equal to 100% of the original issue price of the Shares, plus an amount equal to 6% of the original issue price of the Shares per annum cumulative. For purposes of this Section 5, the original issue price of the Shares may be reduced by prior cash distributions to Stockholders of net proceeds from the sale of Properties. In the case of multiple advisors, advisors and Affiliates shall be allowed incentive fees in accordance with the foregoing limitation, provided such fees are distributed by a proportional method reasonably designed to reflect the value added to the Company's assets by each respective advisor or Affiliate.

SECTION 6.   LIMITATION ON TRANSACTIONS WITH AFFILIATES.

        (a)    SALES AND LEASES TO COMPANY. The Company shall not purchase Property from the Sponsor, Advisor, Directors or any Affiliate thereof, unless a majority of Directors (including a majority of Independent Directors) not otherwise interested in such transaction approve the transaction as being fair and reasonable to the Company and at a price to the Company no greater than the cost of the asset to such Sponsor, Advisor, Director or any Affiliate thereof, or if the price to the Company is in excess of such cost, that substantial justification for such excess exists and such excess is reasonable. In no event shall the cost of such asset to the Company exceed its appraised value at the time of acquisition of the Property by the Company.

                                    16

<Page>

        (b)    SALES AND LEASES TO SPONSOR, ADVISOR, DIRECTOR OR ANY AFFILIATE. A Sponsor, Advisor, Director or any Affiliate thereof shall not acquire assets from the Company unless approved by a majority of Directors (including a majority of Independent Directors), not otherwise interested in such transaction, as being fair and reasonable to the Company. The Company may lease assets to a Sponsor, Advisor, Director or any Affiliate thereof only if approved by a majority of the Directors (including a majority of Independent Directors), not otherwise interested in such transaction, as being fair and reasonable to the Company.

        (c)    LOANS. No loans may be made by the Company to the Sponsor, Advisor, Director or any Affiliate thereof except as provided in Article X hereof, or to wholly owned subsidiaries of the Company. The Company may not borrow money from the Sponsor, Advisor, Director or any Affiliate thereof, unless a majority of Directors (including a majority of Independent Directors) not otherwise interested in such transactions, approve the transaction as being fair, competitive and commercially reasonable and no less favorable to the Company than loans between unaffiliated parties under the same circumstances.

        (d)    INVESTMENTS. The Company shall not invest in joint ventures with the Sponsor, Advisor, Director or any Affiliate thereof, unless a majority

of Directors (including a majority of Independent Directors) not otherwise
interested in such transactions, approve the transaction as being fair and
reasonable to the Company and on substantially the same terms and conditions as
those received by the other joint ventures. The Company shall not invest in
equity securities unless a majority of Directors (including a majority of
Independent Directors) not otherwise interested in such transaction approve the
transaction as being fair, competitive, and commercially reasonable.

        (e)    OTHER TRANSACTIONS. All other transactions between the Company
and the Sponsor, Advisor, Director or any Affiliate thereof, shall require
approval by a majority of the Directors (including a majority of Independent
Directors) not otherwise interested in such transactions as being fair and
reasonable to the Company and on terms and conditions not less favorable to the
Company than those available from unaffiliated third parties.

        SECTION 7. LIMITATION ON BORROWING. The Company may not incur indebtedness
to enable it to make Distributions except as necessary to satisfy the
requirement that the Company distribute at least the percentage of its REIT
taxable income required for annual distribution of dividends by the Internal
Revenue Code of 1986, as amended, or otherwise as necessary or advisable to
assure that the Company maintains its qualification as a REIT for federal income
tax purposes. The aggregate borrowing of the Company, secured and unsecured,
shall be reasonable in relation to the Net Assets of the Company and shall be
reviewed by the Board of Directors at least quarterly. The aggregate amount of
Company borrowings in relation to the Net Assets shall, in the absence of a
satisfactory showing that a higher level of borrowing is appropriate, not exceed
300% of Net Assets. Any excess in borrowing over such 300% of Net Assets level
shall be approved by a majority of the Independent Directors and disclosed to
Stockholders in the Company's next quarterly report to Stockholders, along with
justification for such excess. Any excess in borrowing over such 300% of Net
Assets level shall be subject to the approval by the Stockholders.

        SECTION 8.  SUITABILITY OF STOCKHOLDERS.

                                       17

<Page>

        (a)    INCOME AND NET WORTH STANDARDS. Stockholders shall have (i) a
minimum annual gross income of $45,000 and a minimum net worth of $45,000, or
(ii) a minimum net worth of $150,000 at the time they make their investment in
the Company. Net worth shall be determined exclusive of home, home furnishings
and automobiles. In the case of sales to fiduciary accounts, these minimum
standards shall be met by the beneficiary, the fiduciary account, or by the
donor or grantor who directly or indirectly supplies the funds to purchase the
shares of Equity Stock if the donor or grantor is the fiduciary.

        (b)    DETERMINATION THAT SALE TO STOCKHOLDER IS SUITABLE AND
APPROPRIATE. The Sponsor and each Person selling shares of Equity Stock on
behalf of the Sponsor or Company shall make every reasonable effort to determine
that the purchase of shares of Equity Stock is a suitable and appropriate
investment for each Stockholder. In making this determination, the Sponsor or
each Person selling shares of Equity Stock on behalf of the Sponsor or the
Company shall ascertain that the prospective Stockholder: (i) meets the minimum
income and net worth standards established for the Company; (ii) can reasonably
benefit from the Company based on the prospective Stockholder's overall
investment objectives and portfolio structure; (iii) is able to bear the
economic risk of the investment based on the prospective Stockholder's overall
financial situation; and (iv) has apparent understanding of: (1) the fundamental
risks of investment; (2) the risk that the Stockholder may lose the entire
investment; (3) the lack of liquidity of shares of Equity Stock of a REIT; (4)
the restrictions on transferability of shares of Equity Stock of a REIT; (5) the
background and qualification of the Sponsor or the Advisor; and (6) the tax
consequences of the investment. The Sponsor may require minimum initial and

subsequent cash investment amounts.

ARTICLE IX

RESTRICTION ON TRANSFER AND OWNERSHIP OF SHARES

    SECTION 1.   DEFINITIONS. For the purpose of this Article IX, the following
terms shall have the following meanings:

    AGGREGATE STOCK OWNERSHIP LIMIT. The term "Aggregate Stock Ownership Limit"
shall mean not more than 9.8 percent in value of the aggregate of the
outstanding shares of Equity Stock. The value of the outstanding shares of
Equity Stock shall be determined by the Board of Directors of the Company in
good faith, which determination shall be conclusive for all purposes hereof.

    BENEFICIAL OWNERSHIP. The term "Beneficial Ownership" shall mean ownership
of Equity Stock by a Person, whether the interest in the shares of Equity Stock
is held directly or indirectly (including by a nominee), and shall include
interests that would be treated as owned through the application of Section 544
of the Code, as modified by Section 856(h)(1)(B) of the Code. The terms
"Beneficial Owner," "Beneficially Owns" and "Beneficially Owned" shall have the
correlative meanings.

    BUSINESS DAY. The term "Business Day" shall mean any day, other than a
Saturday or Sunday, that is neither a legal holiday nor a day on which banking
institutions in New York City are authorized or required by law, regulation or
executive order to close.

18

<Page>

    CHARITABLE BENEFICIARY. The term "Charitable Beneficiary" shall mean one or
more beneficiaries of the Trust as determined pursuant to Section 3.6, provided
that each such organization must be described in Section 501(c)(3) of the Code
and contributions to each such organization must be eligible for deduction under
each of Sections 170(b)(1)(A), 2055 and 2522 of the Code.

    CHARTER. The term "Charter" shall mean the charter of the Company, as that
term is defined in the MGCL.

    CODE. The term "Code" shall mean the Internal Revenue Code of 1986, as
amended from time to time.

    COMMON STOCK OWNERSHIP LIMIT. The term "Common Stock Ownership Limit" shall
mean not more than 9.8 percent (in value or in number of shares, whichever is
more restrictive) of the aggregate of the outstanding shares of Common Stock of
the Company. The number and value of outstanding shares of Common Stock of the
Company shall be determined by the Board of Directors of the Company in good
faith, which determination shall be conclusive for all purposes hereof.

    CONSTRUCTIVE OWNERSHIP. The term "Constructive Ownership" shall mean
ownership of Equity Stock by a Person, whether the interest in the shares of
Equity Stock is held directly or indirectly (including by a nominee), and shall
include interests that would be treated as owned through the application of
Section 318(a) of the Code, as modified by Section 856(d)(5) of the Code. The
terms "Constructive Owner," "Constructively Owns" and "Constructively Owned"
shall have the correlative meanings.

    EQUITY STOCK. The term "Equity Stock" shall mean all classes or series of
stock of the Company, including, without limitation, Common Stock and Preferred
Stock.

    EXCEPTED HOLDER. The term "Excepted Holder" shall mean a stockholder of the

Company for whom an Excepted Holder Limit is created by these Articles or by the
Board of Directors pursuant to Section 2.7.

     EXCEPTED HOLDER LIMIT. The term "Excepted Holder Limit" shall mean,
provided that the affected Excepted Holder agrees to comply with the
requirements established by the Board of Directors pursuant to Section 2.7, and
subject to adjustment pursuant to Section 2.8, the percentage limit established
by the Board of Directors pursuant to Section 2.7.

     INITIAL DATE. The term "Initial Date" shall mean the date upon which the
Articles of Amendment containing this Article IX are filed with the SDAT.

     MARKET PRICE. The term "Market Price" on any date shall mean, with respect
to any class or series of outstanding shares of Equity Stock, the Closing Price
for such Equity Stock on such date. The "Closing Price" on any date shall mean
the last sale price for such Equity Stock, regular way, or, in case no such sale
takes place on such day, the average of the closing bid and asked prices,
regular way, for such Equity Stock, in either case as reported in the principal
consolidated transaction reporting system with respect to securities listed or
admitted to trading on the NYSE or, if such Equity Stock is not listed or
admitted to trading on the NYSE, as

                                       19

<Page>

reported on the principal consolidated transaction reporting system with respect
to securities listed on the principal national securities exchange on which such
Equity Stock is listed or admitted to trading or, if such Equity Stock is not
listed or admitted to trading on any national securities exchange, the last
quoted price, or, if not so quoted, the average of the high bid and low asked
prices in the over-the-counter market, as reported by the National Association
of Securities Dealers, Inc. Automated Quotation System or, if such system is no
longer in use, the principal other automated quotation system that may then be
in use or, if such Equity Stock is not quoted by any such organization, the
average of the closing bid and asked prices as furnished by a professional
market maker making a market in such Equity Stock selected by the Board of
Directors of the Company or, in the event that no trading price is available for
such Equity Stock, the fair market value of the Equity Stock, as determined in
good faith by the Board of Directors of the Company.

     MGCL. The term "MGCL" shall mean the Maryland General Corporation Law, as
amended from time to time.

     NYSE. The term "NYSE" shall mean the New York Stock Exchange.

     PERSON. The term "Person" shall mean an individual, corporation,
partnership, estate, trust (including a trust qualified under Sections 401(a) or
501(c)(17) of the Code), a portion of a trust permanently set aside for or to be
used exclusively for the purposes described in Section 642(c) of the Code,
association, private foundation within the meaning of Section 509(a) of the
Code, joint stock company or other entity and also includes a group as that term
is used for purposes of Section 13(d)(3) of the Securities Exchange Act of 1934,
as amended, and a group to which an Excepted Holder Limit applies.

     PROHIBITED OWNER. The term "Prohibited Owner" shall mean, with respect to
any purported Transfer, any Person who, but for the provisions of Section 2.1,
would Beneficially Own or Constructively Own shares of Equity Stock, and if
appropriate in the context, shall also mean any Person who would have been the
record owner of the shares that the Prohibited Owner would have so owned.

     REIT. The term "REIT" shall mean a real estate investment trust within the
meaning of Section 856 of the Code.

RESTRICTION TERMINATION DATE. The term "Restriction Termination Date" shall mean the first day after the Initial Date on which the Company determines pursuant to Section 5.7 of the Charter that it is no longer in the best interests of the Company to attempt to, or continue to, qualify as a REIT or that compliance with the restrictions and limitations on Beneficial Ownership, Constructive Ownership and Transfers of shares of Equity Stock set forth herein is no longer required in order for the Company to qualify as a REIT.

TRANSFER. The term "Transfer" shall mean any issuance, sale, transfer, gift, assignment, devise or other disposition, as well as any other event that causes any Person to acquire Beneficial Ownership or Constructive Ownership, or any agreement to take any such actions or cause any such events, of Equity Stock or the right to vote or receive dividends on Equity Stock, including (a) the granting or exercise of any option (or any disposition of any option), (b) any

<Page>

20

disposition of any securities or rights convertible into or exchangeable for Equity Stock or any interest in Equity Stock or any exercise of any such conversion or exchange right and (c) Transfers of interests in other entities that result in changes in Beneficial or Constructive Ownership of Equity Stock; in each case, whether voluntary or involuntary, whether owned of record, Constructively Owned or Beneficially Owned and whether by operation of law or otherwise. The terms "Transferring" and "Transferred" shall have the correlative meanings.

TRUST.   The term "Trust" shall mean any trust provided for in Section 3.1.

TRUSTEE. The term "Trustee" shall mean the Person unaffiliated with the Company and a Prohibited Owner, that is appointed by the Company to serve as trustee of the Trust.

SECTION 2.  EQUITY STOCK.

SECTION 2.1. OWNERSHIP LIMITATIONS. During the period commencing on the Initial Date and prior to the Restriction Termination Date:

(b)  Basic Restrictions.

(i)    (1) No Person, other than an Excepted Holder, shall Beneficially Own or Constructively Own shares of Equity Stock in excess of the Aggregate Stock Ownership Limit, (2) no Person, other than an Excepted Holder, shall Beneficially Own or Constructively Own shares of Common Stock in excess of the Common Stock Ownership Limit and (3) no Excepted Holder shall Beneficially Own or Constructively Own shares of Equity Stock in excess of the Excepted Holder Limit for such Excepted Holder.

(ii)    No Person shall Beneficially or Constructively Own shares of Equity Stock to the extent that such Beneficial or Constructive Ownership of Equity Stock would result in the Company being "closely held" within the meaning of Section 856(h) of the Code (without regard to whether the ownership interest is held during the last half of a taxable year), or otherwise failing to qualify as a REIT (including, but not limited to, Beneficial or Constructive Ownership that would result in the Company owning (actually or Constructively) an interest in a tenant that is described in Section 856(d)(2)(B) of the Code if the income derived by the Company from such tenant would cause the Company to fail to satisfy any of the gross income requirements of Section 856(c) of the Code).

(iii)    Notwithstanding any other provisions contained herein, any Transfer of shares of Equity Stock (whether or not such Transfer is the result of a transaction entered into through the facilities of the NYSE or any

other national securities exchange or automated inter-dealer quotation system) that, if effective, would result in the Equity Stock being beneficially owned by less than 100 Persons (determined under the principles of Section 856(a)(5) of the Code) shall be void AB INITIO, and the intended transferee shall acquire no rights in such shares of Equity Stock.

        (c)     TRANSFER IN TRUST. If any Transfer of shares of Equity Stock (whether or not such Transfer is the result of a transaction entered into through the facilities of the NYSE or any other national securities exchange or automated inter-dealer quotation system) occurs which,

                                          21

<Page>

if effective, would result in any Person Beneficially Owning or Constructively Owning shares of Equity Stock in violation of Section 2.1(a)(i) or (ii),

        (i)     then that number of shares of the Equity Stock the Beneficial or Constructive Ownership of which otherwise would cause such Person to violate Section 2.1(a)(i) or (ii)(rounded to the nearest whole share) shall be automatically transferred to a Trust for the benefit of a Charitable Beneficiary, as described in Section 3, effective as of the close of business on the Business Day prior to the date of such Transfer, and such Person shall acquire no rights in such shares; or

        (ii)    if the transfer to the Trust described in clause (i) of this sentence would not be effective for any reason to prevent the violation of Section 2.1(a)(i) or (ii), then the Transfer of that number of shares of Equity Stock that otherwise would cause any Person to violate Section 2.1(a)(i) or (ii) shall be void AB INITIO, and the intended transferee shall acquire no rights in such shares of Equity Stock.

        SECTION 2.2. REMEDIES FOR BREACH. If the Board of Directors of the Company or any duly authorized committee thereof shall at any time determine in good faith that a Transfer or other event has taken place that results in a violation of Section 2.1 or that a Person intends to acquire or has attempted to acquire Beneficial or Constructive Ownership of any shares of Equity Stock in violation of Section 2.1 (whether or not such violation is intended), the Board of Directors or a committee thereof shall take such action as it deems advisable to refuse to give effect to or to prevent such Transfer or other event, including, without limitation, causing the Company to redeem shares, refusing to give effect to such Transfer on the books of the Company or instituting proceedings to enjoin such Transfer or other event; PROVIDED, HOWEVER, that any Transfer or attempted Transfer or other event in violation of Section 2.1 shall automatically result in the transfer to the Trust described above, and, where applicable, such Transfer (or other event) shall be void AB INITIO as provided above irrespective of any action (or non-action) by the Board of Directors or a committee thereof.

        SECTION 2.3. NOTICE OF RESTRICTED TRANSFER. Any Person who acquires or attempts or intends to acquire Beneficial Ownership or Constructive Ownership of shares of Equity Stock that will or may violate Section 2.1(a) or any Person who would have owned shares of Equity Stock that resulted in a transfer to the Trust pursuant to the provisions of Section 2.1(b) shall immediately give written notice to the Company of such event, or in the case of such a proposed or attempted transaction, give at least 15 days prior written notice, and shall provide to the Company such other information as the Company may request in order to determine the effect, if any, of such Transfer on the Company's status as a REIT.

        SECTION 2.4. OWNERS REQUIRED TO PROVIDE INFORMATION. From the Initial Date and prior to the Restriction Termination Date:

    (d)    every owner of more than five percent (or such lower percentage
as required by the Code or the Treasury Regulations promulgated thereunder) of
the outstanding shares of Equity Stock, within 30 days after the end of each
taxable year, shall give written notice to the Company stating the name and
address of such owner, the number of shares of Equity Stock and other shares of
the Equity Stock Beneficially Owned and a description of the

22

<Page>

manner in which such shares are held. Each such owner shall provide to the
Company such additional information as the Company may request in order to
determine the effect, if any, of such Beneficial Ownership on the Company's
status as a REIT and to ensure compliance with the Aggregate Stock Ownership
Limit; and

    (e)    each Person who is a Beneficial or Constructive Owner of Equity
Stock and each Person (including the stockholder of record) who is holding
Equity Stock for a Beneficial or Constructive Owner shall provide to the Company
such information as the Company may request, in good faith, in order to
determine the Company's status as a REIT and to comply with requirements of any
taxing authority or governmental authority or to determine such compliance.

    SECTION 2.5. REMEDIES NOT LIMITED. Subject to Section 5.7 of the
Charter, nothing contained in this Section 2 shall limit the authority of the
Board of Directors of the Company to take such other action as it deems
necessary or advisable to protect the Company and the interests of its
stockholders in preserving the Company's status as a REIT.

    SECTION 2.6. AMBIGUITY. In the case of an ambiguity in the application
of any of the provisions of this Section 2, Section 3, or any definition
contained in Section 1, the Board of Directors of the Company shall have the
power to determine the application of the provisions of this Section 2 or
Section 3 or any such definition with respect to any situation based on the
facts known to it. In the event Section 2 or 3 requires an action by the Board
of Directors and the Charter fails to provide specific guidance with respect to
such action, the Board of Directors shall have the power to determine the action
to be taken so long as such action is not contrary to the provisions of Sections
1, 2 or 3.

    SECTION 2.7. EXCEPTIONS.

    (f)    Subject to Section 2.1(a)(ii), the Board of Directors of the
Company, in its sole discretion, may exempt a Person from the Aggregate Stock
Ownership Limit and the Common Stock Ownership Limit, as the case may be, and
may establish or increase an Excepted Holder Limit for such Person if:

    (i)    the Board of Directors obtains such representations and
undertakings from such Person as are reasonably necessary to ascertain that no
individual's Beneficial or Constructive Ownership of such shares of Equity Stock
will violate Section 2.1(a)(ii);

    (ii)   such Person does not and represents that it will not own,
actually or Constructively, an interest in a tenant of the Company (or a tenant
of any entity owned or controlled by the Company) that would cause the Company
to own, actually or Constructively, more than a 9.9% interest (as set forth in
Section 856(d)(2)(B) of the Code) in such tenant and the Board of Directors
obtains such representations and undertakings from such Person as are reasonably
necessary to ascertain this fact (for this purpose, a tenant from whom the
Company (or an entity owned or controlled by the Company) derives (and is
expected to continue to derive) a sufficiently small amount of revenue such
that, in the opinion of the Board of Directors

<Page>

of the Company, rent from such tenant would not adversely affect the Company's ability to qualify as a REIT, shall not be treated as a tenant of the Company); and

(iii) such Person agrees that any violation or attempted violation of such representations or undertakings (or other action which is contrary to the restrictions contained in Sections 2.1 through 2.6) will result in such shares of Equity Stock being automatically transferred to a Trust in accordance with Sections 2.1(b) and 3.

(g)     Prior to granting any exception pursuant to Section 2.7(a), the Board of Directors of the Company may require a ruling from the Internal Revenue Service, or an opinion of counsel, in either case in form and substance satisfactory to the Board of Directors in its sole discretion, as it may deem necessary or advisable in order to determine or ensure the Company's status as a REIT. Notwithstanding the receipt of any ruling or opinion, the Board of Directors may impose such conditions or restrictions as it deems appropriate in connection with granting such exception.

(h)     Subject to Section 2.1(a)(ii), an underwriter which participates in a public offering or a private placement of Equity Stock (or securities convertible into or exchangeable for Equity Stock) may Beneficially Own or Constructively Own shares of Equity Stock (or securities convertible into or exchangeable for Equity Stock) in excess of the Aggregate Stock Ownership Limit, the Common Stock Ownership Limit, or both such limits, but only to the extent necessary to facilitate such public offering or private placement.

(i)     The Board of Directors may only reduce the Excepted Holder Limit for an Excepted Holder: (1) with the written consent of such Excepted Holder at any time, or (2) pursuant to the terms and conditions of the agreements and undertakings entered into with such Excepted Holder in connection with the establishment of the Excepted Holder Limit for that Excepted Holder. No Excepted Holder Limit shall be reduced to a percentage that is less than the Common Stock Ownership Limit.

SECTION 2.8. INCREASE IN AGGREGATE STOCK OWNERSHIP AND COMMON STOCK OWNERSHIP LIMITS. The Board of Directors may from time to time increase the Common Stock Ownership Limit and the Aggregate Stock Ownership Limit.

SECTION 2.9. LEGEND. Each certificate for shares of Equity Stock shall bear substantially the following legend:

The shares represented by this certificate are subject to restrictions on Beneficial and Constructive Ownership and Transfer for the purpose of the Company's maintenance of its status as a Real Estate Investment Trust under the Internal Revenue Code of 1986, as amended (the "Code"). Subject to certain further restrictions and except as expressly provided in the Company's Charter, (i) no Person may Beneficially or Constructively Own shares of the Company's Common Stock in excess of 9.8 percent (in value or number of shares) of the outstanding shares of Common Stock of the Company unless such Person is an Excepted Holder (in which

24

<Page>

case the Excepted Holder Limit shall be applicable); (ii) no Person may Beneficially or Constructively Own shares of Equity Stock of the Company in excess of 9.8 percent of the value of the total outstanding shares of Equity Stock of the Company, unless such Person is an

Excepted Holder (in which case the Excepted Holder Limit shall be applicable); (iii) no Person may Beneficially or Constructively Own Equity Stock that would result in the Company being "closely held" under Section 856(h) of the Code or otherwise cause the Company to fail to qualify as a REIT; and (iv) no Person may Transfer shares of Equity Stock if such Transfer would result in the Equity Stock of the Company being owned by fewer than 100 Persons. Any Person who Beneficially or Constructively Owns or attempts to Beneficially or Constructively Own shares of Equity Stock which causes or will cause a Person to Beneficially or Constructively Own shares of Equity Stock in excess or in violation of the above limitations must immediately notify the Company. If any of the restrictions on transfer or ownership are violated, the shares of Equity Stock represented hereby will be automatically transferred to a Trustee of a Trust for the benefit of one or more Charitable Beneficiaries. In addition, upon the occurrence of certain events, attempted Transfers in violation of the restrictions described above may be void AB INITIO. All capitalized terms in this legend have the meanings defined in the charter of the Company, as the same may be amended from time to time, a copy of which, including the restrictions on transfer and ownership, will be furnished to each holder of Equity Stock of the Company on request and without charge.

Instead of the foregoing legend, the certificate may state that the Company will furnish a full statement about certain restrictions on transferability to a stockholder on request and without charge.

SECTION 3.   TRANSFER OF EQUITY STOCK IN TRUST.

SECTION 3.1. OWNERSHIP IN TRUST. Upon any purported Transfer or other event described in Section 2.1(b) that would result in a transfer of shares of Equity Stock to a Trust, such shares of Equity Stock shall be deemed to have been transferred to the Trustee as trustee of a Trust for the exclusive benefit of one or more Charitable Beneficiaries. Such transfer to the Trustee shall be deemed to be effective as of the close of business on the Business Day prior to the purported Transfer or other event that results in the transfer to the Trust pursuant to Section 2.1(b). The Trustee shall be appointed by the Company and shall be a Person unaffiliated with the Company and any Prohibited Owner. Each Charitable Beneficiary shall be designated by the Company as provided in Section 3.6.

SECTION 3.2. STATUS OF SHARES HELD BY THE TRUSTEE. Shares of Equity Stock held by the Trustee shall be issued and outstanding shares of Equity Stock of the Company. The Prohibited Owner

25

<Page>

shall have no rights in the shares held by the Trustee. The Prohibited Owner shall not benefit economically from ownership of any shares held in trust by the Trustee, shall have no rights to dividends or other distributions and shall not possess any rights to vote or other rights attributable to the shares held in the Trust.

SECTION 3.3. DIVIDEND AND VOTING RIGHTS. The Trustee shall have all voting rights and rights to dividends or other distributions with respect to shares of Equity Stock held in the Trust, which rights shall be exercised for the exclusive benefit of the Charitable Beneficiary. Any dividend or other distribution paid prior to the discovery by the Company that the shares of Equity Stock have been transferred to the Trustee shall be paid by the recipient of such dividend or distribution to the Trustee upon demand and any dividend or other distribution authorized but unpaid shall be paid when due to the Trustee. Any dividend or distribution so paid to the Trustee shall be held in trust for

the Charitable Beneficiary. The Prohibited Owner shall have no voting rights
with respect to shares held in the Trust and, subject to Maryland law, effective
as of the date that the shares of Equity Stock have been transferred to the
Trustee, the Trustee shall have the authority (at the Trustee's sole discretion)
(i) to rescind as void any vote cast by a Prohibited Owner prior to the
discovery by the Company that the shares of Equity Stock have been transferred
to the Trustee and (ii) to recast such vote in accordance with the desires of
the Trustee acting for the benefit of the Charitable Beneficiary; provided,
however, that if the Company has already taken irreversible corporate action,
then the Trustee shall not have the authority to rescind and recast such vote.
Notwithstanding the provisions of this Article IX, until the Company has
received notification that shares of Equity Stock have been transferred into a
Trust, the Company shall be entitled to rely on its share transfer and other
stockholder records for purposes of preparing lists of stockholders entitled to
vote at meetings, determining the validity and authority of proxies and
otherwise conducting votes of stockholders.

          SECTION 3.4. SALE OF SHARES BY TRUSTEE. Within 20 days of receiving
notice from the Company that shares of Equity Stock have been transferred to the
Trust, the Trustee of the Trust shall sell the shares held in the Trust to a
person, designated by the Trustee, whose ownership of the shares will not
violate the ownership limitations set forth in Section 2.1(a). Upon such sale,
the interest of the Charitable Beneficiary in the shares sold shall terminate
and the Trustee shall distribute the net proceeds of the sale to the Prohibited
Owner and to the Charitable Beneficiary as provided in this Section 3.4. The
Prohibited Owner shall receive the lesser of (1) the price paid by the
Prohibited Owner for the shares or, if the Prohibited Owner did not give value
for the shares in connection with the event causing the shares to be held in the
Trust (E.G., in the case of a gift, devise or other such transaction), the
Market Price of the shares on the day of the event causing the shares to be held
in the Trust and (2) the price per share received by the Trustee from the sale
or other disposition of the shares held in the Trust. Any net sales proceeds in
excess of the amount payable to the Prohibited Owner shall be immediately paid
to the Charitable Beneficiary. If, prior to the discovery by the Company that
shares of Equity Stock have been transferred to the Trustee, such shares are
sold by a Prohibited Owner, then (i) such shares shall be deemed to have been
sold on behalf of the Trust and (ii) to the extent that the Prohibited Owner
received an amount for such shares that exceeds the amount that such Prohibited
Owner was entitled to receive pursuant to this Section 3.4, such excess shall be
paid to the Trustee upon demand.

          SECTION 3.5. PURCHASE RIGHT IN STOCK TRANSFERRED TO THE TRUSTEE.
Shares of Equity Stock transferred to the Trustee shall be deemed to have been
offered for sale to the

                                      26

<Page>

Company, or its designee, at a price per share equal to the lesser of (i) the
price per share in the transaction that resulted in such transfer to the Trust
(or, in the case of a devise or gift, the Market Price at the time of such
devise or gift) and (ii) the Market Price on the date the Company, or its
designee, accepts such offer. The Company shall have the right to accept such
offer until the Trustee has sold the shares held in the Trust pursuant to
Section 3.4. Upon such a sale to the Company, the interest of the Charitable
Beneficiary in the shares sold shall terminate and the Trustee shall distribute
the net proceeds of the sale to the Prohibited Owner.

          SECTION 3.6. DESIGNATION OF CHARITABLE BENEFICIARIES. By written
notice to the Trustee, the Company shall designate one or more nonprofit
organizations to be the Charitable Beneficiary of the interest in the Trust such
that (i) the shares of Equity Stock held in the Trust would not violate the
restrictions set forth in Section 2.1(a) in the hands of such Charitable

Beneficiary and (ii) each such organization must be described in Section
501(c)(3) of the Code and contributions to each such organization must be
eligible for deduction under each of Sections 170(b)(1)(A), 2055 and 2522 of the
Code.

SECTION 4. NYSE TRANSACTIONS. Nothing in this Article IX shall preclude
the settlement of any transaction entered into through the facilities of the
NYSE or any other national securities exchange or automated inter-dealer
quotation system. The fact that the settlement of any transaction occurs shall
not negate the effect of any other provision of this Article IX and any
transferee in such a transaction shall be subject to all of the provisions and
limitations set forth in this Article IX.

SECTION 5. ENFORCEMENT. The Company is authorized specifically to seek
equitable relief, including injunctive relief, to enforce the provisions of this
Article IX.

SECTION 6. NON-WAIVER. No delay or failure on the part of the Company or
the Board of Directors in exercising any right hereunder shall operate as a
waiver of any right of the Company or the Board of Directors, as the case may
be, except to the extent specifically waived in writing.

ARTICLE X

INVESTMENT RESTRICTIONS

The investment policies set forth in this Article X shall be approved by a
majority of the Independent Directors. Subject to the restrictions set forth in
this Article X and so long as the Company qualifies as a REIT, a majority of the
Directors (including a majority of the Independent Directors) may set the
investment policies if they determine that such policies are in the best
interests of the Company. The Independent Directors shall review the Company's
investment policies at least annually to determine that the policies being
followed are in the best interests of the Stockholders.

The Company shall not make investments in: (i) any foreign currency or
bullion; (ii) short sales; and (iii) any security in any entity holding
investments or engaging in activities prohibited by these Articles.

27

<Page>

In addition to other investment restrictions imposed by the Directors from
time to time consistent with the Company's objective to qualify as a REIT, the
Company will observe the following restrictions on its investments:

(a)    Not more than 10% of the Company's total assets will be
invested in unimproved real property or mortgage loans on unimproved real
property. For purposes of this paragraph, "unimproved real properties" does not
include properties (i) acquired for the purpose of producing rental or other
operating income, (ii) having development or construction in process, and (iii)
under contract or planned for development or construction within one year from
the Company's purchase thereof;

(b)    The Company may not invest in commodities or commodity future
contracts. Such limitation is not intended to apply to interest rate futures,
when used solely for hedging purposes;

(c)    The Company may not invest in contracts for the sale of real
estate;

(d)    The Company may not invest in or make mortgage loans unless an
appraisal is obtained concerning the underlying property. Mortgage indebtedness

on any property shall not exceed such property's appraised value. In cases in
which the majority of Independent Directors so determine, and in all cases in
which the mortgage loan involves the Advisor, the Sponsor, the Directors or any
Affiliates, such appraisal must be obtained from an Independent Expert
concerning the underlying property. The appraisal shall be maintained in the
Company's records for at least five years, and shall be available for inspection
and duplication by any Stockholder. In addition to the appraisal, a mortgagee's
or owner's title insurance policy or commitment as to the priority of the
mortgage or condition of the title must be obtained. The Company may not invest
in real estate contracts of sale otherwise known as land sale contracts;

        (e)    The Company may not make or invest in mortgage loans, including
construction loans, on any one property, if the aggregate amount of all mortgage
loans outstanding on the property, including the loans of the Company, would
exceed an amount equal to 85% of the appraised value of the property as
determined by appraisal unless substantial justification exists because of the
presence of other underwriting criteria provided that such loans would in no
event exceed the appraised value of the property at the date of the loans;

        (f)    The Company may not make or invest in any mortgage loans that
are subordinate to any mortgage or equity interest of the Advisor, the Sponsor,
any Director or Affiliates thereof;

        (g)    The Company may not acquire securities in any company holding
investments or engaging in activities prohibited by this Article X;

        (h)    The Company shall not invest in equity securities unless a
majority of the Directors (including a majority of the Independent Directors)
not otherwise interested in such transaction approves the transaction as being
fair, competitive and commercially reasonable. Investments in entities
affiliated with the Sponsor, the Advisor, any Directors or Affiliates thereof
are subject to the restrictions on joint venture investments. Notwithstanding
these restrictions, the Company may purchase its own securities, when traded on
a secondary market

                                     28

<Page>

or on a national securities exchange or market, if a majority of the Directors
(including a majority of the Independent Directors) determine such purchase to
be in the best interests of the Company;

        (i)    The Company may not engage in any short sale or borrow, on an
unsecured basis, if such borrowing will result in an Asset Coverage of less than
300%;

        (j)    To the extent the Company invests in Properties, a majority of
the Directors shall approve the consideration paid for such Properties, based on
the fair market value of the Property. If a majority of the Independent
Directors determine, such fair market value shall be determined by a qualified
independent real estate appraiser selected by the Independent Directors. In the
event the Company acquires Property from the Advisor, the Sponsor, any Director,
or Affiliates, the provisions of Section 6 of Article VIII are applicable;

        (k)    The Company may not invest in indebtedness (herein called
"Junior Debt") secured by a mortgage on real property which is subordinate to
the lien of other indebtedness (herein called "Senior Debt"), except where the
amount of such Junior Debt, plus the outstanding amount of the Senior Debt, does
not exceed 90% of the appraised value of such Property, if after giving effect
thereto, the value of all such investments of the Company (as shown on the books
of the Company in accordance with generally accepted accounting principles,
after all reasonable reserves but before provision for depreciation) would not
then exceed 25% of the Company's tangible assets. The value of all investments

in Junior Debt of the Company which does not meet the aforementioned requirements shall be limited to 10% of the Company's tangible assets (which would be included within the 25% limitation);

(l)     The Company may not engage in trading, as compared with investment activities; and

(m)     The Company may not engage in underwriting or the agency distribution of securities issued by others.

## ARTICLE XI

## STOCKHOLDERS

SECTION 1.  ACCESS TO RECORDS. Any Stockholder and any designated representative thereof shall be permitted access to all records of the Company at all reasonable times, and may inspect and copy any of them for the purposes specified below. Inspection of the Company's books and records by a state securities administrator shall be provided upon reasonable notice and during normal business hours. In addition, an alphabetical list of names, addresses and business telephone numbers of the Stockholders of the Company along with the number of shares of Equity Stock held by each of them (the "Stockholder List") shall be maintained and updated quarterly as part of the books and records of the Company and shall be available for inspection by any Stockholder or the Stockholder's designated agent at the business office of the Company upon the request of the Stockholder. A copy of the Stockholder List shall be mailed to any Stockholder requesting the Stockholder List within ten days of the request. The copy of the Stockholder List shall be printed in alphabetical order, on white paper, and in a readily readable

29

<Page>

type size (in no event smaller than 10-point type). The Company may impose a reasonable charge for expenses incurred in reproducing such list. The permitted purposes for which a Stockholder may request a copy of the Stockholder List include, without limitation, matters relating to Stockholders' voting rights under these Articles and the exercise of Stockholders' rights under federal proxy laws. If the Advisor or the Directors of the Company neglect or refuse to exhibit, produce or mail a copy of the Stockholder List as requested in accordance with and as required by applicable law and these Articles, the Advisor and the Directors shall be liable to any Stockholder requesting the Stockholder List, for the costs, including reasonable attorneys' fees, incurred by that Stockholder for compelling the production of the Stockholder List, and for actual damages suffered by any Stockholder by reason of such refusal or neglect. It shall be a defense to such liability that the actual purpose and reason for the requests for inspection or for a copy of the Stockholder List is to secure such list of Stockholders or other information for the purpose of selling such Stockholder List or copies thereof, or of using the same for a commercial purpose or other purpose not in the interest of the applicant as a Stockholder relative to the affairs of the Company). The Company may require the Stockholder requesting the Stockholder List to represent that the Stockholder List is not requested for a commercial purpose unrelated to the Stockholder's interest in the Company. The remedies provided hereunder to Stockholders requesting copies of the Stockholder List are in addition to, and shall not in any way limit, other remedies available to Stockholders under federal law, or the laws of any state.

SECTION 2.  REPORTS AND MEETINGS.

(a)     REPORTS. Each year the Company shall prepare an annual report of its operations. The report shall include a balance sheet, an income statement, and a surplus statement. The financial statements in the annual

report shall be certified by an independent certified public accountant based on
the accountant's examination of the books and records of the Company in
accordance with generally accepted auditing principles. The annual report shall
also include: (i) the ratio of the costs of raising capital during the period to
the capital raised; (ii) the aggregate amount of advisory fees and the aggregate
amount of other fees paid to the Advisor and any Affiliate of the Advisor by the
Company and including fees or charges paid to the Advisor and any Affiliate of
the Advisor by third parties doing business with the Company; (iii) the Total
Operating Expenses of the Company stated as a percentage of Average Assets and
as a percentage of Net Income; (iv) a report from the Independent Directors that
they believe the policies being followed by the Company are in the best
interests of the Stockholders. and the basis for such determination; and (v)
separately stated, full disclosure of all material terms, factors and
circumstances surrounding any and all transactions involving the Company, the
Advisor, the Directors and any Affiliates thereof occurring in the year for
which the annual report is made. Independent Directors shall examine and comment
in the annual report on the fairness of all transactions involving the Company.
The annual report shall be submitted to each Stockholder at or before the annual
meeting of the Stockholders and shall be placed on file at the Company's
principal office within the earlier of 20 days after the annual meeting of
Stockholders or 120 days after the end of the Company's fiscal year.

        (b)    MEETINGS. Meetings of Stockholders shall be held at any place
in the United States as is provided in the Bylaws or as set by the Board of
Directors under provisions in the Bylaws.

                                      30

<Page>

        There shall be an annual meeting of the Stockholders of the Company to
elect Directors and transact any other business within a reasonable period (not
less than 30 days) following delivery of the annual report, but within six
months after the end of each fiscal year. The Directors, including the
Independent Directors, are required to take reasonable steps to insure that the
requirements of this Article XI are met. Special meetings of the Stockholders
may be called by the President, a majority of the Directors or a majority of the
Independent Directors, or any other person specified in the Bylaws, and shall be
called by the Secretary of the Company upon written request (which states the
purpose of the meeting and the matter(s) to be acted upon) of Stockholders
holding in the aggregate not less than 10% of the outstanding shares of Equity
Stock entitled to vote at such meeting. Upon receipt of such a written request,
the Secretary of the Company) shall inform the Stockholders making the request
of the reasonably estimated cost of preparing and mailing a Notice of such
meeting, notify each Stockholder entitled to Notice of the meeting within ten
(10) days after receipt of the written Notice of a meeting and the purpose of
the meeting to be held on a date not less than fifteen (15) nor more than sixty
(60) days after distribution of such Notice. The Company will pay the reasonable
cost of such notice and mailing for such a meeting.

        Except as provided in the fourth sentence of the second paragraph of
Section 2(c) of this Article XI, notice of any annual or special meeting of
Stockholders shall be given not less than 10 nor more than 90 days before such
meeting and shall state the purpose of the meeting and the matters to be acted
upon.

                                ARTICLE XII

                                 ELECTION

        SECTION 1.  ELECTION. Pursuant to the authority granted by Section
3-603(e)(1)(iii) of the Maryland General Corporation Law, the Company hereby
elects not to be governed by the provisions of Section 3-602 of the Maryland
General Corporation Law, in whole as to business combinations involving the

Company and The Inland Group, Inc., a Delaware corporation, or any of the
Affiliates of The Inland Group, Inc.

## ARTICLE XIII

### ROLL-UPS

SECTION 1.  APPRAISAL. In connection with a proposed Roll-Up, an appraisal
of all of the Company's assets shall be obtained from an Independent Expert. The
appraisal will be included in a prospectus used to offer the securities of a
Roll-Up Entity and shall be filed with the Securities and Exchange Commission
and the state regulatory commissions as an exhibit to the registration statement
for the offering of the Roll-Up Entity's shares. Accordingly, an issuer using
the appraisal shall be subject to liability for violation of Section 11 of the
Securities Act of 1933, as amended, and comparable provisions under state laws
for any material misrepresentations or material omissions in the appraisal.

The Company's assets shall be appraised in a consistent manner. The appraisal
shall:

31

<Page>

        (a)     be based on an evaluation of all relevant information;

        (b)     indicate the value of the Company's assets as of a date
immediately prior to the announcement of the proposed Roll-Up transaction; and

        (c)     assume an orderly liquidation of the Company's assets over a
12-month period.

    The terms of the engagement of the Independent Expert shall clearly state
that the engagement is for the benefit of the Company and its Stockholders. A
summary of the independent appraisal, indicating all material assumptions
underlying the appraisal, shall be included in a report to the Stockholders in
connection with the proposed Roll-Up.

    SECTION 2. STOCKHOLDER OPTIONS. Stockholders who vote "no" on the proposed
Roll-Up shall have the choice of:

        (a)     accepting the securities of the Roll-Up Entity offered in the
proposed Roll-Up; or

        (b)     one of either:

        (i)     remaining as Stockholders of the Company and preserving
their interests therein on the same terms and conditions as previously existed,
or

        (ii)    receiving cash in an amount equal to the Stockholder's
pro rata share of the appraised value of the net assets of the Company.

    SECTION 3.  RESTRICTIONS. The Company may not participate in any proposed
Roll-Up which would:

        (a)     result in the Stockholders having rights to meetings less
frequently or which are more restrictive to Stockholders than those provided in
these Articles;

        (b)     result in the Stockholders having voting rights that are less
than those provided in these Articles;

        (c)     result in the Stockholders having greater liability than as

provided in these Articles;

(d)    result in the Stockholders having rights to receive reports that are less than those provided in these Articles;

(e)    result in the Stockholders having access to records that are more limited than those provided in these Articles;

(f)    include provisions which would operate to materially impede or frustrate the accumulation of shares of Equity Stock by any purchaser of the securities of the Roll-Up Entity (except to the minimum extent necessary to preserve the tax status of the Roll-Up Entity);

32

<Page>

(g)    limit the ability of an investor to exercise the voting rights of its securities in the Roll-Up Entity on the basis of the number of shares of Equity Stock held by that investor;

(h)    result in investors in the Roll-Up Entity having rights of access to the records of the Roll-Up Entity that are less than those provided in these Articles; or

(i)    place any of the costs of the transaction on the Company if the Roll-Up is not approved by a majority of the shares of Equity Stock;

provided, however, that nothing herein shall be construed to prevent participation in any proposed Roll-Up which would result in Stockholders having rights and restrictions comparable to those contained in this Article XIII. Approval of a majority of the voting shares of Equity Stock is required for the Company to engage in any Roll-Up which is in conformity with this Article XIII.

SECTION 4.  GENERAL. The provisions of this Article XIII will cease to apply if the Board of Directors determines that it is no longer in the best interests of the Company to attempt, or continue, to qualify as a REIT.

ARTICLE XIV

AMENDMENTS AND EXTRAORDINARY ACTIONS

SECTION 1.  GENERAL. The Company reserves the right from time to time to make any amendment to these Articles, now or hereafter authorized by law, including any amendment altering the terms or contract rights, as expressly set forth in these Articles, of any unissued shares of Equity Stock. All rights and powers conferred by these Articles on Stockholders, Directors and officers are granted subject to this reservation. All references to these Articles shall include all amendments thereto.

SECTION 2.  STOCKHOLDERS APPROVAL. Subject to (a) the provisions of any class or series of Equity Stock at the time outstanding, (b) the restrictions on Roll-Ups described in Article XIII hereof so long as applicable, (c) the limitations described in Article IX hereof, and (d) Section 3 of this Article XIV, the Directors may not, without the approval of holders of at least a majority of the outstanding voting shares of Equity Stock: (i) amend these Articles or sell all or substantially all of the Company's assets other than in the ordinary course of the Company's business or in connection with liquidation and dissolution; nor (ii) except in each case to the extent the Maryland General Corporation Law permits such transactions to be approved solely by the Board of Directors, cause a merger, consolidation or share exchange of the Company; nor (iii) dissolve or liquidate the Company. The Company shall deem a sale of two-thirds or more of the Company's assets, based on the total number of Properties and mortgages owned by the Company, or the current fair market value

of such Properties and mortgages, as a sale of "substantially all of the Company's assets."

SECTION 3.  BY STOCKHOLDERS. Notwithstanding any provision of law permitting or requiring such action to be taken or approved by the affirmative vote of the holders of shares entitled to cast a greater number of votes, the holders of a majority of the then outstanding voting shares of Equity Stock may, at a duly called meeting of such holders, vote to (i) amend these

33

<Page>

Articles, or (ii) dissolve the Company. Such action may also be taken by written consent of such holders. In the event that the holders of the then outstanding voting shares of Equity Stock direct the amendment of these Articles or the dissolution of the Company, the proper officers of the Company shall promptly file such documents and take all such corporate action as is necessary to accomplish such amendment or dissolution.

ARTICLE XV

LIMITATION OF LIABILITY AND INDEMNIFICATION

SECTION 1.  LIMITATION OF STOCKHOLDER LIABILITY. No Stockholder shall be personally liable for any debt, claim, demand, judgment or obligation of any kind of, against or with respect to the Company by reason of its being a Stockholder, nor shall any Stockholder be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Property or the affairs of the Company.

SECTION 2.  LIMITATION OF DIRECTOR AND OFFICER LIABILITY. Except as otherwise limited in this Section 2, no Director or officer of the Company shall be liable to the Company or to any Stockholder for money damages to the extent that Maryland law, in effect from time to time, permits limitation of the liability of directors and officers of a corporation. No Director or officer of the Company shall be held harmless for any loss or liability suffered by the Company, unless all of the following conditions are met: (a) the Director of officer of the Company has determined, in good faith, that the course of conduct which caused the loss or liability was in the best interests of the Company; (b) the Director of officer of the Company was acting on behalf of or performing services for the Company; (c) such liability or loss was not the result of negligence or misconduct by the Director or officer of the Company, except that in the event such Director is or was an Independent Director, such liability or loss was not the result of gross negligence or willful misconduct; and (d) such agreement to hold harmless is recoverable only out the net assets of the Company and not from the Stockholders. Neither the amendment nor repeal of this Section 2, nor the adoption or amendment of any other provision of these Articles inconsistent with this Section 2, shall apply to or affect in any respect the applicability of this Section 2 with respect to any act or failure to act which occurred prior to such amendment, repeal or adoption.

SECTION 3.  INDEMNIFICATION.

(a)     Subject to paragraphs (b), (c) and (d) of this Section 3, the Company shall, to the fullest extent permitted by Maryland statutory or decisional law, as amended or interpreted and, without limiting the generality of the foregoing, in accordance with Section 2-418 of the Maryland General Corporation Law, indemnify and pay, advance or reimburse reasonable expenses to any Director, officer, employee and agent of the Company and the Advisor and its Affiliates (each an "Indemnified Party").

(b)     As long as the Company qualifies as a REIT, it shall not indemnify nor pay, advance or reimburse expenses to an Indemnified Party unless:

(i) the Directors have determined, in good faith, that the course of conduct
which caused the loss or liability was in the best interest of the Company; (ii)
the Indemnified Party was acting on behalf of or performing services on the part
of the Company; (iii) such liability or loss was not the result of negligence or

34

<Page>

misconduct on the part of the Indemnified Party except that in the event the
Indemnified Party is or was an Independent Director, such liability or loss
shall not have been the result of gross negligence or willful misconduct; and
(iv) such indemnification or agreement to be held harmless is recoverable only
out of the Net Assets of the Company and not from the Stockholders.

        (c)     As long as the Company qualifies as a REIT and notwithstanding
anything to the contrary in Section 3(b) of this Article XV, the Company shall
not indemnify a Director, officer, employee or agent of the Company or the
Advisor or its Affiliates for losses, liabilities or expenses arising from or
out of an alleged violation of federal or state securities laws by such party
unless one or more of the following conditions are met: (i) there has been a
successful adjudication on the merits of each count involving alleged securities
law violations as to the particular Indemnified Party; (ii) such claims have
been dismissed with prejudice on the merits by a court of competent jurisdiction
as to the particular Indemnified Party; or (iii) a court of competent
jurisdiction approves a settlement of the claims and finds that indemnification
of the settlement and related costs should be made and the court considering the
request has been advised of the position of the Securities and Exchange
Commission (the "Commission") and the published opinions of any state securities
regulatory authority in which securities of the Company were offered or sold as
to indemnification for violations of securities laws.

        (d)     The Company, may advance amounts to an Indemnified Party for
legal and other expenses and costs incurred as a result of any legal action for
which indemnification is being sought only in accordance with Section 2-418 of
the Maryland General Corporation Law, and, as long as the Company qualifies as a
REIT, only if all of the following conditions are satisfied: (i) the legal
action relates to acts or omissions with respect to the performance of duties or
services by the Indemnified Party, for or on behalf of the Company; (ii) the
legal action is initiated by a third party who is not a Stockholder or the legal
action is initiated by a Stockholder acting in his or her capacity as such and a
court of competent jurisdiction specifically approves such advancement; and
(iii) the Indemnified Party receiving such advances undertakes in writing to
repay the advanced funds to the Company, together with the applicable legal rate
of interest thereon, in cases in which such party is found not to be entitled to
indemnification.

        (e)     The Company shall have the power to purchase and maintain
insurance or provide similar protection on behalf of an Indemnified Party
against any liability asserted which was incurred in any such capacity with the
Company or arising out of such status; provided, however, that the Company shall
not incur the costs of any liability insurance which insures any person against
liability for which he, she or it could not be indemnified under these Articles.
Nothing contained herein shall constitute a waiver by any Indemnified Party of
any right which he, she or it may have against any party under federal or state
securities laws. The Company shall also have power to enter into any contract
for indemnity and advancement of expenses with a Director, officer, employee or
agent to such further extent consistent with law.

35

<Page>

                              ARTICLE XVI

APPROVAL

    These First Amended and Restated Articles of Incorporation were approved by the Company's Board of Directors and Stockholders on October 15, 2003.

    IN WITNESS WHEREOF, the undersigned has signed these Second Amended and Restated Articles of Incorporation of Inland Western Retail Real Estate Trust, Inc., and acknowledges the same to be his act, this 8th day of November, 2004.

                              /s/ Roberta S. Matlin
                              ----------------------------------
                              Roberta S. Matlin
                              Vice President - Administration

Attested to by:

/s/ Scott W. Wilton
----------------------
Scott W. Wilton
Secretary

                              36

</TEXT>
</DOCUMENT>