IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION, THE INLAND GROUP, INC., INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP., INLAND WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL A. GOODWIN, ROBERT A. BAUM, G. JOSEPH COSENZA, KPMG LLP, AND WILLIAM BLAIR & COMPANY, L.L.C., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 07 C 6174 <br><br> Judge Robert W. Gettleman |

**REPLY MEMORANDUM OF THE NON-KPMG/WILLIAM BLAIR
DEFENDANTS IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION........................................................................................................1

ARGUMENT ...............................................................................................................3

   I.      PLAINTIFFS' 1934 ACT CLAIMS SHOULD BE DISMISSED............................3

      A.     Plaintiffs' § 14(a) Claim Fails Because Plaintiffs Offer No Facts
           Establishing That Each Defendant Acted With The Required State Of
           Mind. ...........................................................................................................4

      B.     The § 14(a) Claim Also Fails To Offer Specific Facts Demonstrating
           That The Proxy Contained Material Misstatements or Omissions..................7

      C.     Plaintiffs' § 20(a) Claim Fails. ..................................................................15

   II.     PLAINTIFFS' DERIVATIVE CLAIMS SHOULD BE DISMISSED.................15

      A.     Counts III-VII Should Be Dismissed Because Plaintiffs Have Not
           Established That Demand Was Futile............................................................15

      B.     Because Plaintiffs Cannot Satisfy Maryland's Personal and Distinct
           Injury Requirement for Direct Claims, Counts III and IV Fail to State
           a Claim. ......................................................................................................18

      C.     Counts III-VII Should Be Dismissed Because Plaintiffs Fail to Rebut
           the Presumption of the Business Judgment Rule.........................................21

      D.     Plaintiffs' Breach Of Fiduciary Duty Claims (Counts III-V) Fail To
           Allege Cognizable Duties Or Breaches. .....................................................24

   III.    PLAINTIFFS' COMMON LAW CLAIMS. ......................................................24

      A.     The Amended Complaint Fails To State A Claim For Breach Of
           Contract. .....................................................................................................25

      B.     Plaintiffs' Unilateral Attempt to Amend Their Unjust Enrichment
           Claims Cannot Prevent Dismissal of Count VI. ..........................................29

CONCLUSION ..........................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air Safety, Inc. v. Teachers Realty Corp.*,
706 N.E.2d 882 (Ill. 1999) ................................................................................26

*Beck v. Dobrowski*,
No. 06 C 0411, 2007 WL 3407132 (N.D. Ill. Nov. 14, 2007).........................4, 5, 7

*Bender v. Schwartz*,
917 A.2d 142 (Md. Ct. Spec. App. 2007) ...........................................................22

*Blau v. Harrison*,
No. 04 C 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006) ................................6

*Bond Opportunity Fund v. Unilab Corp.*,
No. 03-7592, 87 Fed. App'x 772 (2d Cir. 2004) .......................................5

*Car Carriers, Inc. v. Ford Motor Co.*,
745 F.2d 1101 (7th Cir. 1984) ..........................................................................29

*Danielewicz v. Arnold*,
769 A.2d 274 (Md. Ct. Spec. App. 2001) ..............................................17, 18, 19

*Donovan v. ABC-NACO Inc.*,
No. 02 C 1951, 2002 WL 1553259 (N.D. Ill. July 15, 2002) ..............................15

*Doppelt v. Perini Corp.*,
No. 01 CIV. 4398, 2002 WL 392289 (S.D.N.Y. Mar. 13, 2002) ........................26

*F.D.I.C. v. Wabick*,
No. 01 C 8674, 2004 WL 2032315 (N.D. Ill. Sept. 9, 2004).............................28

*FASTI USA v. FASTI Farrag & Stipsits GmbH*,
No. 02 C 8191, 2003 WL 1581472 (N.D. Ill. Mar. 26, 2003) .............................28

*Feldman v. Cutaia*,
951 A.2d 727 (Del. 2008) ..................................................................................21

Felker v. Anderson
No. 04-0372-CV-W-ODS, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005 ...............17

*Fisher v. Kanas*,
467 F. Supp. 2d 275 (E.D.N.Y. 2006) ................................................................15

*Forge Indus. Staffing, Inc. v. De La Fuente*,
No. 06 C 3848, 2006 WL 2982139 (N.D. Ill. Oct. 16, 2006)..............................28

*Froelich v. Erickson*,
  96 F. Supp. 2d 507 (D. Md. 2000) ..................................................................24

*FSLIC v. Williams*,
  599 F. Supp. 1184 (D. Md. 1984) ...................................................................22

*Guinn v. Hoskins Chevrolet*,
  836 N.E.2d 681 (Ill. App. Ct. 2003) ...............................................................30

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003).........................................................................18

*Hayes v. Crown Cent. Petroleum Corp.*,
  No. 02-2190, 78 Fed. App'x 857 (4th Cir. 2003) .............................................5

*Hudson v. Prime Retail, Inc.*,
  No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) ...............22, 23

*Hulliung v. Bolen*,
  548 F. Supp. 2d 336 (N.D. Tex. 2008) ..............................................................9

*In re Caremark Int'l, Inc. Deriv. Litig.*,
  698 A.2d 959 (Del. Ch. 1996)..........................................................................18

*In re CNL Hotels & Resorts, Inc. Secs. Litig.*,
  No. 604CV1231ORL31KRS ............................................................................17

*In re InfoSonics Corp. Derivative Litig.*,
  No. 06cv1336, 2007 WL 2572276 (S.D. Cal. Sept. 4, 2007) ..........................17

*In re Moustafi*,
  371 B.R. 434 (Bankr. D. Ariz. 2007).................................................................12

*In re The Walt Disney Company Derivative Litigation*,
  906 A.2d 27 (Del. 2006) ..................................................................................23

*Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*,
  No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005) ............17, 19, 21

*JP Morgan Chase & Co. Sec. Litig.*
  No. 06 C 4674, 2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ............................5, 7

*Kennedy v. Venrock Associates*,
  348 F.3d 584 (7th Cir. 2003) .............................................................................6

*King v. First Capital Fin. Servs. Corp.*,
  828 N.E.2d 1155 (Ill. 2005)..............................................................................28

*Knollenberg v. Harmonic, Inc.*,
  No. 03-16238, 152 Fed. App'x 674 (9th Cir. 2005) ..................................................5

*Lambert v. Calprotrack, Inc.*,
  No. 95 C 4076, 1996 WL 224515 (N.D. Ill. May 1, 1996) ....................................15

*Lewis v. CNL Restaurant Properties, Inc.*,
  223 S.W.3d 784 (Tx. Ct. App. 2007)......................................................................21

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*,
  339 F.3d 1087 (9th Cir. 2003) ................................................................................26

*N.A.A.C.P. v. Golding*,
  679 A.2d 554 (Md. Ct. Spec. App. 1996) ...............................................................23

*NPF WL, Inc. v. Sotka*,
  No. 99 C 7966, 2000 WL 574527 (N.D. Ill. May 10, 2000) ..................................27

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ....................................................................................4

*RehabCare Group East, Inc. v. Certified Health Management, Inc.*,
  No. 07 C 2923, 2007 WL 3334500 (N.D. Ill. Nov. 8, 2007)..................................27

*Resolution Trust Corp. v. Hecht*,
  818 F. Supp. 894 (D. Md. 1992)..............................................................................22

*Rudolph v. UTStarcom*,
  560 F. Supp. 2d 880 (N.D. Cal. 2008) ......................................................................7

*Sekuk Global Enters. Profit Sharing Plan v. Kevinides*,
  Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508 (Md.
  Cir. Ct. May 25, 2004)............................................................................................17

*Starr v. !Hey, Inc.*,
  No. 01 C 6087, 2003 WL 21212596 (N.D. Ill. May 23, 2003) .............................15

*Strategic Reimbursement, Inc. v. HCA, Inc.*,
  No. 06 C 6501, 2007 WL 2274709 (N.D. Ill. Aug. 2, 2007)..................................30

*Strougo v. Scudder, Stevens & Clark, Inc.*,
  964 F. Supp. 793 (S.D.N.Y. 1997)..........................................................................22

*Taylor v. First Union Corp. of S.C.*,
  857 F.2d 240 (4th Cir. 1988) ..................................................................................14

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004)......................................................................................20

*Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, Inc.*,
    No. 02 C 3979, 2004 WL 765368 (N.D. Ill. Apr. 7, 2004).............................................27, 28

*Typographics Plus, Inc. v. I.M. Estrada & Co.*,
    No. 98 C 886, 2000 WL 1006572 (N.D. Ill. July 19, 2000) ....................................................28

*United States v. Rigas*,
    No. 4:05-CR-402, 2008 U.S. Dist. LEXIS 53605 (M.D. Pa. July 11, 2008)..........................12

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)...............................................................................................................14

*Waller v. Waller*,
    49 A.2d 449 (Md. 1946) ..............................................................................18, 19, 20, 21

*Washtenaw County Emp. Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*,
    Civil Action No. 1:07-CV-862, 2008 WL 2302679 (N.D. Ga. Mar. 31, 2008) .........14, 17, 21

*Werbowsky v. Collumb*,
    766 A.2d 123 (Md. 2001) ........................................................................................ *passim*

*Xerion Partners I, LLC v. Resurgence Asset Mgmt., LLC*,
    474 F. Supp. 2d 505 (S.D.N.Y. 2007)......................................................................................12

## STATUTES

15 U.S.C. § 78u-4(b)(1) ...............................................................................................................3

15 U.S.C. § 78u-4(b)(2) .............................................................................................................3, 5

Md. Code A Corps. § 2-408.1(a), (c), (e) .....................................................................................22

## OTHER AUTHORITIES

FED. R. CIV. P. 8(a)......................................................................................................................28

FED. R. CIV. P. 9(b).......................................................................................................................6

FED. R. CIV. P. 23.1 ..............................................................................................................1, 2, 4

## **INTRODUCTION**

In their Motion to Dismiss and Opening Memorandum, Defendants argued that the Amended Complaint is quintessential shotgun pleading -- a verbose, unfocused collection of conclusory and often inconsistent allegations -- that violates controlling standards, relies on unsupportable legal theories, and offers no specific facts sufficient to support any asserted claim. Plaintiffs' Opposition effectively validates the criticisms leveled at the Amended Complaint. Rather than demonstrating compliance with controlling pleading standards, Plaintiffs argue that the rules do not apply to them -- asserting that they need not comply with the PSLRA -- and their Amended Complaint remains unverified, despite Rule 23.1's express verification requirement. Attempting to evade controlling standards, Plaintiffs all but concede that the Amended Complaint's speculative, generalized and conclusory allegations are no substitute for the particularized facts required under the PSLRA, Rule 23.1, and Maryland law.

Plaintiffs' Opposition demonstrates a similar disdain for controlling authority.  Although conceding that Maryland law governs demand futility, the Opposition disregards the controlling Maryland decision, and the nearly 20 decisions following it, in favor of one outlier decision from a federal judge in Missouri.  Later, the Opposition again admits that Maryland law controls the direct/derivative question, but nevertheless urges adherence to Delaware's quite different standard.  When arguing that they need not follow the PSLRA, Plaintiffs ignore the statute and rely on one District opinion (*Blau*), despite the fact that two later District decisions reject *Blau*'s holding, as do all other federal courts.  Plaintiffs will say anything to avoid dismissal.

In like fashion, the Opposition uses shifting, inconsistent characterizations of Defendants' alleged conduct and state of mind, depending on the claim trying to be salvaged.  Plaintiffs characterize Defendants' conduct as ordinary negligence when trying to escape the PSLRA's impact on their § 14(a) claim; they describe the same conduct as "gross negligence" when arguing for demand futility; Plaintiffs then label the conduct "bad faith" when trying to avoid the business judgment rule.  Such schizophrenia demonstrates that Plaintiffs make arguments of convenience rather than arguments grounded in particularized factual allegations.  Instead of citing specific facts to establish what each Defendant actually knew and understood about fees, expenses, and financial statements, the Opposition merely highlights Plaintiffs' own suppositions, then asks this Court to presume knowledge by Defendants.  Likewise, Plaintiffs argue that this presumed knowledge enabled 19 separate Defendants to "scheme" to conceal the

truth from the shareholders, with the "end-game" of enriching company insiders by hundreds of millions of dollars. The PSLRA, Rule 23.1, and Maryland's demand rule exist to prevent speculative suits in which shareholder-plaintiffs file first, and later seek to discover facts to support their conjecture. Plaintiffs' wishful speculation does not state a claim or meet the applicable, stringent pleading requirements.

Below, Defendants demonstrate the many shortcomings of Plaintiffs' allegations on all of their legal theories. <u>First</u>, Plaintiffs cannot escape the PSLRA's heightened pleading standards by re-characterizing as mere "negligence" their scandalous allegations that each Defendant knowingly acted to enrich company insiders via the Internalization. Although Plaintiffs cannot, as a matter of convenience, use their Opposition to alter the allegations of intentional conduct made in the Amended Complaint, Plaintiffs' 1934 Act claims also fail because the PSLRA standards apply even to negligence claims, and Plaintiffs do not meet those standards. Moreover, the PSLRA requires particularized facts to support Plaintiffs' view that the Advisor and Property Managers hid material expenses by failing to report them on their audited financial statements, but Plaintiffs offer no such facts.

<u>Second</u>, with respect to the state law derivative claims in Counts III-VII, Plaintiffs have not alleged particularized facts to satisfy the *Werbowsky* standard for excusing pre-suit demand upon the IWEST Board. Indeed, the Opposition lays bare that Plaintiffs cannot challenge the Special Committee for having a financial interest in the Internalization; instead, they rest their demand futility arguments on the singular allegation that the Special Committee participated in and approved the Internalization. As Plaintiffs are well aware, "participation and approval" allegations are in themselves legally insufficient to establish demand futility under *Werbowsky*. Indeed, the district courts in both *CNL* and *Wells* declined the same entreaty from Plaintiffs' counsel (*i.e.*, to disregard *Werbowsky* and recognize their "participation and approval" allegations) and dismissed with prejudice their derivative shareholder claims.

<u>Third</u>, Count III-IV's so-called "direct" claims for breaches of fiduciary duty merely parrot the allegations in the derivative claims in a blatant attempt to circumvent Maryland's demand requirement. But, even here, Plaintiffs have not satisfied the standards for pleading direct, common-law shareholder claims. Maryland law, as set forth in *Waller*, requires Plaintiffs to plead a separate and distinct injury from all other IWEST shareholders. Plaintiffs wholly ignore *Waller* and invite the Court to apply inapposite Delaware authority which has no such

requirement.

Finally, when pressed to explain their contradictory and illogical breach of contract and unjust enrichment allegations, Plaintiffs fashion an entirely new alter ego theory, add and delete Defendants at will, and abandon facts in the Amended Complaint that undermine their theories. This Court should not countenance such gamesmanship, and should dismiss the Amended Complaint in its entirety without further futile efforts to replead.

## ARGUMENT

## I.    PLAINTIFFS' 1934 ACT CLAIMS SHOULD BE DISMISSED.

As set forth in Defendants' Opening Memorandum, Plaintiffs' claim under § 14(a) of the 1934 Act (Count I) fails to satisfy the heightened pleading requirements of the PSLRA.[1]   The PSLRA includes two standards, both applicable to Plaintiffs.  First, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged act or omission.  15 U.S.C. § 78u-4(b)(2).  Second, if the claim alleges misrepresentations, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  Defendants showed that the Amended Complaint offers only speculation to support its allegations that the Proxy contained material misstatements and that each Defendant acted with the alleged state of mind.  (Def. Mem. at 27-28.)

In their Opposition, Plaintiffs erroneously contend that the PSLRA does not apply to their state of mind allegations because the PSLRA applies only to claims alleging fraud, and their claim -- after stripping away their allegations of a "scheme to mislead shareholders" -- sounds in negligence.  (Pl. Opp. at 23-25.)[2]   Plaintiffs are wrong in two ways.  First, any objective reading of the Amended Complaint reveals a claim alleging intentional wrongdoing.  Second, the law is clear that the PSLRA state of mind pleading standard applies to all § 14(a) claims, even ones that allege only negligence.  Plaintiffs further argue that their high-EBITDA-equals-missing-expenses theory is sufficient to meet the PSLRA's particularized pleading requirements.  Because Plaintiffs misconstrue both the law and the sufficiency of their allegations, they fail to state a §

---

[1] "Opening Memorandum" or "Def. Mem." refers to the July 17, 2008 memorandum filed by the Non-KPMG/William Blair Defendants in support of their Motion to Dismiss, Docket No. 57.

[2] "Plaintiffs' Opposition" or "Pl. Opp." refers to the August 21, 2008 memorandum filed by the Lead Plaintiffs in opposition to the Non-KPMG/William Blair Defendants' Motion to Dismiss, Docket No. 71.

14(a) claim and this Court should dismiss Counts I and II with prejudice.

**A.    Plaintiffs' § 14(a) Claim Fails Because Plaintiffs Offer No Facts Establishing That Each Defendant Acted With The Required State Of Mind.**

In their Opening Memorandum, Defendants demonstrated that the PSLRA's heightened pleading standard applies to and undermines Plaintiffs' § 14(a) claim. (Def. Mem. at 28-38.) The PSLRA standard obligates every § 14(a) plaintiff to allege specific facts creating a strong inference of the applicable state of mind with respect to each defendant. *Beck v. Dobrowski*, No. 06 C 0411, 2007 WL 3407132, at *5 (N.D. Ill. Nov. 14, 2007) (Leinenweber, J.); *see also, Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Plaintiffs make three arguments in an effort to escape this standard, but those arguments are unavailing.

First, Plaintiffs attempt to dodge the PSLRA's standards completely. They argue that the PSLRA applies only to claims alleging fraud, and they characterize their claim as one alleging only negligence. (Pl. Opp. at 23-25.) By characterizing Count I as a negligence claim, Plaintiffs essentially concede that they do not allege facts sufficient under the PSLRA to support allegations of intentional wrongdoing, and make no effort to validate the "scheme to conceal" allegations made throughout the Amended Complaint. Moreover, Plaintiffs' description of their §14(a) claim as a negligence claim contradicts other assertions in Plaintiffs' Opposition. The same alleged facts underpin all Plaintiffs' claims -- all involve allegations that Defendants knowingly received excessive fees and used inflated financial statements to accomplish the Internalization. In defending their § 14(a) claim, Plaintiffs describe these allegations as sounding in ordinary negligence. When seeking to escape Maryland's demand requirement, Plaintiffs assert that the Directors engaged in "gross negligence." (*Id.* at 34.) When trying to avoid the fatal impact of the business judgment rule, they proclaim that Defendants engaged in "bad faith" -- a term that connotes intentional dealing. (*Id.* at 43-44.) Because they have chosen to ignore Rule 23.1's requirement that they verify their Amended Complaint, Plaintiffs apparently feel free to retreat from and change their allegations as they deem expedient. Plaintiffs will, quite literally, say anything to save their Amended Complaint from dismissal.

The key to whether the § 14(a) claim alleges "intentional" or "negligent" wrongdoing is not Plaintiffs' characterizations, but the actual allegations in the Amended Complaint. *Beck*, 2007 WL 3407132, at *5 (noting that the language of the complaint betrayed plaintiff's description of his claim as negligence-based). Here, Plaintiffs' own allegations belie their current protestation that they allege only "negligence" -- a word that appears only once in the

entire Amended Complaint, and even then as a reference to "gross negligence" relating to demand futility allegations. (Am. Compl. ¶ 104.) The Amended Complaint actually alleges that 19 separate Defendants all "understood and knew" that the Proxy contained false statements, but permitted their inclusion so as to employ the Internalization as the "end game" of a scheme to enrich corporate insiders. (Am. Compl. ¶¶ 172, 174, 178, 180, 218, 226.) Plaintiffs further allege that Defendants "scheme[d]" to "conceal[]" information from, and "mislead," shareholders as part of their effort to benefit "perfidious fiduciaries." (Am. Compl. ¶¶ 183, 226.) Plaintiffs cannot now abandon their own allegations merely because Defendants have demonstrated that the Amended Complaint lacks the factual support required by the PSLRA.

Second, even if Plaintiffs were permitted to abandon their allegations of intentional misconduct, their claim still would fail because they are wrong in arguing that the PSLRA applies only to claims "sounding in fraud." (Pl. Opp. at 23.) Contrary to Plaintiffs' argument, the language of the statute encompasses *all* types of § 14(a) claims: "In *any private action arising under [the 1934 Act]* in which the plaintiff may recover damages only on proof that the defendant acted with a particular state of mind, the complaint *shall, with respect to each act or omission alleged to violate this chapter, state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind.*" 15 U.S.C. § 78u-4(b)(2) (emphasis added). The majority of Circuits and two recent decisions from this District have held that this standard means precisely what it says -- it applies to any action whether sounding in fraud, intentional misconduct or negligence. *Beck,* 2007 WL 3407132, at *5 (finding PSLRA's state of mind requirement to be "unambiguous" and applicable to any § 14(a) action); *JP Morgan Chase & Co. Sec. Litig.* No. 06 C 4674, 2007 WL 4531794 at *6-7 (N.D. Ill. Dec. 18, 2007) (Coar, J.) (agreeing with majority of federal courts that "the PSLRA standards apply to all claims under the Exchange Act").[3]

Plaintiffs make no effort to explain why this Court should depart from the unambiguous language of the statute, or reject the majority of decisions applying the particularized state of mind pleading requirements to all § 14(a) claims. Instead, they ask this Court to apply one

---

[3] *See, e.g., Knollenberg v. Harmonic, Inc.,* No. 03-16238, 152 Fed. App'x 674, 682-83 (9th Cir. 2005); *Bond Opportunity Fund v. Unilab Corp.,* No. 03-7592, 87 Fed. App'x 772, 773-74 (2d Cir. 2004); *Hayes v. Crown Cent. Petroleum Corp.,* No. 02-2190, 78 Fed. App'x 857, 861 (4th Cir. 2003).

outlier case which has been subject to criticism since its issuance -- *Blau v. Harrison*, No. 04 C 6592, 2006 WL 850959 (N.D. Ill. Mar. 24, 2006) (Hibbler, J.).  (Pl. Opp. at 24.)  That court based its flawed conclusion -- that the PSLRA did not apply to a § 14(a) claim alleging only negligence -- entirely on *Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir. 2003), an inapt decision which merely held that Rule 9(b)'s pleading standards do not apply to a § 14(a) claim unless the claim sounds in fraud.  *Blau* improperly conflated Rule 9(b)'s pleading standard, which only applies to claims of fraud or mistake, with the PSLRA's universal state of mind pleading standard.  *Blau*, 2006 WL 850959, at *6.  These are two separate pleading standards, and Defendants have never argued for application of Rule 9(b) here.  It is thus not surprising that two recent District decisions (*Beck* and *JP Morgan*) have expressly rejected *Blau* as being inconsistent with the PSLRA and in conflict with the holdings in all other federal decisions to have addressed the subject.

Third, almost as an afterthought, Plaintiffs argue that to the extent their Amended Complaint alleges a "scheme to conceal," the Court should "strip away" those allegations and evaluate whether the Amended Complaint then alleges sufficient facts to establish that Defendants "knew or should have known" that the financial statements in the Proxy were misstated.  (Pl. Opp. at 25-27.)  Plaintiffs should not be permitted to use their Opposition to re-characterize the Defendants' alleged conduct whenever deem necessary to salvage a claim.  But even if the Court elects to disregard the pervasive "scheme" allegations and analyzes the remaining allegations to see whether they support a negligence claim, the Court will find that nothing in the Amended Complaint establishes what each Defendant knew or should have known, or how they were negligent in issuing the Proxy in light of such knowledge.  In fact, the Amended Complaint does not contain a single example of any information that was known by or made available to any Defendant.  Instead, Plaintiffs argue generally that all Defendants knew or should have known of the financial statements' falsity because they were generally involved in the preparation of the Advisor's and/or the Property Managers' financials or in IWEST's operations.  (*Id*. at 26-27.)  Such generalized allegations are not even close to constituting particularized facts creating a strong inference that each Defendant acted negligently.

Moreover, Plaintiffs' newly-minted negligence allegations return to an impermissible reliance on group pleading. After Defendants pointed out in their Opening Memorandum that Plaintiffs treat all Defendants collectively, Plaintiffs responded by dividing Defendants into

"sub-groups," generally alleging that all Defendants in each sub-group were somehow involved in preparing financial statements or supervising Advisor or Property Manager activities. (Pl. Opp. at 26.) They thus allege that: the Property Managers, the Advisor, and various other Defendants were involved in the preparation of financial statements; Goodwin, Parks, Cosenza, Grimes, Gujral, and Baum collectively owned 50% of the Property Managers' stock; TIGI, the Sponsor, and Goodwin were the owners of the Advisor; the Director Defendants had responsibility for overseeing IWEST's activities and fee payments; William Blair prepared the fairness opinion; and KPMG audited the financial statements. (*Id.*) Categorizing Defendants into "sub-groups" is no less impermissible group pleading than lumping all of them together in one group.[4]

Plaintiffs' conclusory allegations do not meet the PSLRA standard and do nothing to substantiate Plaintiffs' contention that each Defendant necessarily knew, or should have known, that the financial statements were false and misleading.

**B.    The § 14(a) Claim Also Fails To Offer Specific Facts Demonstrating That The Proxy Contained Material Misstatements or Omissions.**

Plaintiffs' failure to meet the PSLRA's state of mind pleading standard resolves Count I entirely. Because Plaintiffs do not establish each Defendant's mental state, this Court need not even evaluate whether Plaintiffs have offered facts sufficient to establish Proxy misstatements. If, however, the Court tests the Amended Complaint's allegations against the PSLRA standard for alleging misstatements, the Court will find additional grounds for dismissal. In their Opening Memorandum, Defendants focused on the key allegation that the Proxy contained misstated financial statements, and noted that Plaintiffs fail to "specify each statement alleged to have been misleading," and do not allege "the reason or reasons why the statement is misleading," or "state with particularity all facts" supporting an allegation made on information and belief. (Def. Mem. at 26-27 (citing 15 U.S.C. § 78u-4(b)(1).) *See Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 891 (N.D. Cal. 2008) (merely stating that a proxy contained false statements is insufficient under the PSLRA); *Beck*, 2007 WL 3407132, at *6 (simply listing information allegedly omitted from a

---

[4] Plaintiffs' suggestion that the decision in *JP Morgan* somehow supports their reliance on general, group pleading allegations is absurd. (Pl. Opp. at 25.) In marked contrast to the type of conclusory allegations made by the Amended Complaint here, the plaintiffs in *JP Morgan* supported their allegations of "secret meetings" between two CEO's with particularized allegations, from newspapers and confidential information, that buttressed the fact of the meetings and the fact that the two CEO's regularly updated their respective boards of directors as to their negotiations. *JP Morgan*, 2007 WL 4531794, at *8.

proxy is insufficient under the PSLRA).

In their Opposition, Plaintiffs argue that the property management fees set out in the financials are excessive -- even though accurately reported -- because the Property Management Agreement should be construed so as to have required a cap on those fees.  In addition, as "support" for the allegation that Advisor and Property Manager expenses were understated, Plaintiffs offer no facts; instead they attempt to explain further their supposition that high EBITDAs must reflect hidden expenses.  Finally, sensing that their allegations of financial statement manipulation are tenuous at best, Plaintiffs simply repeat their largely skeletal allegations as to a host of other supposed Proxy misstatements.  Below, Defendants demonstrate that none of Plaintiffs' arguments changes the analysis offered in Defendants' Opening Memorandum -- that Plaintiffs cannot support any alleged Proxy misstatement, creating another, independent basis for dismissal of the entire § 14(a) claim.

### 1. Plaintiffs Fail To Allege Sufficiently That The Advisor's And Property Managers' Financial Statements Are False And Misleading.

#### a. The Property Managers' Financial Statements Do Not Report Excessive Property Management Fees.

In the Opening Memorandum, Defendants demonstrated that the Property Managers' financial statements do not reflect excessive fees because they accurately reflect the fees paid by IWEST and received by the Property Managers.  (Def. Mem. at 35-36.)  Plaintiffs concede this point, admitting that "the Property Managers' financial statements reported the fees actually received from [IWEST]."  (Pl. Opp. at 14.)  This concession should conclude the analysis -- the financials are accurate and do not misstate the management fees.

Nevertheless, Plaintiffs persist in arguing that the Property Managers' financial statements were "misleading" because the fees reported, though accurate, exceed "what the Property Managers were contractually entitled to receive."  (*Id*. at 15-16, 36-37.)  Plaintiffs' argument is factually unsupported and legally unsound.  <u>First</u>, as a matter of law, there is no market-based cap on the property management fees.  Although they concede that the Property Management Agreement does not contain any market-based cap on base fees, Plaintiffs nevertheless argue that the Agreement cannot be read in isolation.  (*Id*. at 14-15; Am. Compl. ¶¶ 130-40.)  They contend that (a) other IWEST documents reference some form of market-based cap that must be inserted into the Property Management Agreement; (b) the Property Managers breached the contract as thus amended by charging an above-market rate; and (c) the

breach of contract makes the financial statements misleading. (*Id.*)[5] The Proxy misstatement claim depends upon Plaintiffs' ability to state a breach of contract claim. As the Defendants show in Section III.A, supra, Plaintiffs' contract theory fails for several reasons:

- Plaintiffs base their argument on an incomplete presentation of the Offering Documents which (a) state in at least three places, that fees for base property management services are <u>not</u> subject to a cap; and (b) direct readers to the actual Property Management Agreement, which was included as an exhibit to the Offering Documents and which imposes no cap;[6]

- The Property Management Agreement includes an integration clause that expressly precludes the use of outside materials -- like the documents Plaintiffs cite -- to amend or interpret the Agreement; and

- Settled law establishes that when the terms of a contract differ from statements in other corporate documents, like prospectuses, the contract terms control.

Indeed, Plaintiffs admit that they cannot even tell from the "other" documents whether the supposedly applicable cap imposes "a Market Rate or 90% of Market Rate." (Pl. Opp. at 15, 36.) There is no breach of contract, and thus no Proxy misstatement.[7]

     <u>Second</u>, Plaintiffs offer no facts at all, and certainly no particularized allegations, to support their conclusory assertions that the "Market" rate for comparable services provided by a third party is less than the 4.5% paid by IWEST and that the Defendants knew or should have known this supposed fact. Plaintiffs' allegations regarding the "Market" for Property Managers

---

[5] Plaintiffs also assert, for the first time in their Opposition, that "Defendants" -- apparently all of them -- breached a fiduciary duty to read the Property Management Agreements in conjunction with the other IWEST-created documents. (Pl. Opp. at 15-16.) This unsupported assertion, not based on anything in the Amended Complaint, is irrelevant to whether the property management fees complied with terms of the contract and were fairly presented in the financial statements for purposes of § 14(a).

[6] There is no basis to Plaintiffs' suggestion, in a footnote, that Defendants had a duty in the Proxy to clarify statements in the Offering Documents. (Pl. Opp. at 15 n.15.) Contrary to Plaintiffs' intimation, there is no inconsistency to be clarified, as the Offering Documents include accurate descriptions accompanied by the Property Management Agreement itself. Additionally, Plaintiffs do not even purport to allege that any language in the Offering Documents relating to possible caps on future property management fees, accompanied by accurate descriptions, could have been material to any investor.

[7] Plaintiffs improperly attempt to use the financial statements to make external documents relevant to their Proxy claim. Section 14(a) plaintiffs often argue that a proxy must not be read in isolation, but incorporate statements from prospectuses or other documents. Courts have rejected such arguments, holding that in the absence of express incorporation, statements made outside of a proxy are irrelevant to analysis of whether the proxy is misleading. *See Hulliung v. Bolen*, 548 F. Supp. 2d 336, 339-40 (N.D. Tex. 2008) (dismissing the plaintiffs' Proxy claims to the extent they were based on alleged inaccuracies included in defendant's other documents not incorporated into the Proxy). Here, Plaintiffs wish to hold Defendants to statements made outside the Proxy. Because the Proxy does not incorporate such statements, Plaintiffs use the ploy of arguing that the documents inform the contract which in turn informs the financial statements. This effort to accomplish indirectly what the law prohibits directly is unavailing.

consist of exactly *two* paragraphs in their Amended Complaint. (Am. Compl. at ¶¶ 138-39.) Plaintiffs provide no market study, reports, articles, or any other objective criteria to support their definition of the "Market." They never allege that the "Market" rate they hypothesize is for an identical bundle of services as those supplied by IWEST. Instead, they just allege *ipse dixit* that property managers generally charge less than 4.5%, and further allege, based solely on this supposition, that the 4.5% fee on the Property Managers' financial statements is misleading because it is an "above-market" rate. The PSLRA requires far more particularized allegations than Plaintiffs' bystander view of the market. Otherwise, any shareholder-plaintiff could describe his own view of the market, and then allege that the fees accurately reported by the company in an SEC filing are misleading to the extent they exceeded the plaintiff's market rate. Plaintiffs thus fail to establish either that a market-based cap limited property management fees or that the fees actually paid and reported exceeded market rates (if a fee cap had existed). Because the financial statements correctly state the property management fees paid and received, the Amended Complaint fails to state a § 14(a) claim based on allegedly excessive fees.

### b. The Amended Complaint Does Not Properly Plead That The Advisor And Property Managers Understated Their Expenses.

In their Opening Memorandum, Defendants noted that the sole support for the Amended Complaint's assumption that the Advisor and Property Managers' financial statements hid expenses is Plaintiffs' baseless surmise that because the financial statements reflect surprisingly high EBITDAs, there must have been improprieties in the reporting of expenses. (Def. Mem. at 33-35.) In Opposition, Plaintiffs offer nothing more to support their argument as to the Property Managers, and only unsupported conclusions in purported support of their argument as to the Advisor. (Pl. Opp. at 12-13, 16-17.) Plaintiffs' speculation, standing alone, is insufficient to meet the particularized pleading requirements of the PSLRA.

Property Managers' Expenses: Plaintiffs simply conclude, that although the Property Managers incurred approximately $14.6 million in reported 2006 expenses, there must have been additional expenses. (*Id*. at 16-17; Am. Compl. at ¶ 169.) Without supporting facts or explaining why $14.6 million must be understated, Plaintiffs' conclusion is inadequate. Plaintiffs do not allege the types of expenses that were allegedly hidden, the amounts of those expenses, and how the inclusion of those expenses would have materially reduced the merger valuation of the Property Managers.

Advisor's Expenses:   Plaintiffs now assert that because IWEST reimbursed all the Advisor's 2005-2006 expenses for salary and benefits, those expenses must have related only to ministerial tasks, meaning the Advisor must have hidden all salary and benefit expenses for non-ministerial personnel carrying out day-to-day duties.  (*Id.* at 12-13.)  According to Plaintiffs, having no such expenses "is impossible."  (*Id.* at 13.)  As with their allegations as to the Property Managers, Plaintiffs never allege what these purportedly hidden expenses should have been and how these expenses, if included in the financial statements, would have affected the valuation of the Advisor.  Instead, Plaintiffs assert that the Advisor "failed to report [for 2006, 2005, and 2004] reimbursements from [IWEST] for $3.4 million, $4.5 million, and $1.5 million of general and administrative costs."  (*Id.*; Am. Compl. at ¶ 174.)  That allegation is unsupported and disingenuous.  The apparent source for Plaintiffs' allegation is IWEST's Form 10-K for the fiscal year ended December 31, 2006, which states that IWEST reimbursed "[the Advisor] *and* its affiliates" for "general and administrative expenses relating to [IWEST's] administration and acquisition of properties" in the amounts and for the years Plaintiffs allege.  (Excerpts from IWEST Form 10-K filed with the SEC on March 1, 2007 (Ex. A) at 28, 56.)  IWEST's aggregate reimbursement to several entities proves nothing about the Advisor's financial statements.

Plaintiffs' failure to quantify the allegedly hidden expenses also demonstrates Plaintiffs' failure to allege materiality.  Here, the Advisor and Property Managers were ascribed a value of $566 or $609 million.  (Excerpts from IWEST's Proxy filed with the SEC on September 10, 2007 (Ex. B) at 52.)  For Plaintiffs to demonstrate that the purportedly hidden expenses were material, they would need to assert that such expenses, if included in the financial statements, would have produced a value for the Advisor and Property Managers of less than the $375 million Internalization acquisition price.[8]  Plaintiffs leave this guesswork to the Court, which is entirely improper.

Recognizing this fatal problem, Plaintiffs revert to their bald conclusion that there must have been other costs involved in performing the Advisor's day-to-day operations and that those

---

[8] Plaintiffs' contention that the Advisor's financial statements violated GAAP is similarly unavailing.  This contention is premised on Plaintiffs' unsupported assumption that there were undisclosed services provided to the Advisor by TIGI, the Sponsor, and/or "affiliates."  (Pl. Opp. at 13.)  Because Plaintiffs set forth nothing to support their allegation that there were undisclosed services -- and there are multiple, explicit affiliate-provided disclosures of such service -- this cannot form the basis of a Proxy misstatement.  The many shortcomings in this conclusory allegation are described, in detail, in the Motion to Dismiss and supporting Memorandum filed by KPMG.

costs must have been borne by affiliates.  (Pl. Opp. at 13.)  But these conclusory allegations, based solely on Plaintiffs' theory that the financial statements *must* be wrong because the service providers made too much money, are insufficient as a matter of law.  *See Xerion Partners I, LLC v. Resurgence Asset Mgmt., LLC*, 474 F. Supp. 2d 505, 513, 518-19 (S.D.N.Y. 2007) (plaintiff's claim of inflated financials deemed inadequate where supported only by assertion that defendant inflated EBITDA through a "variety of techniques to inflate earnings").  In a feeble effort to distinguish *Xerion*, Plaintiffs assert that the Amended Complaint includes "particularized allegations" showing the EBITDAs were inflated. (Pl. Opp. at 12, n. 13.)  That is empty rhetoric, as Plaintiffs identify nothing in the Amended Complaint to support their contention that the "impossible" expense levels of the Advisor and Property Managers must mean they "failed to report expenses." (*Id*. at 12.)  The Amended Complaint does not allege improperly classified income or expenses; Plaintiffs identify no services that should have been, but were not, provided; and Plaintiffs point to no expenses that were incurred but excluded from the financial statements. Plaintiffs rely on conclusory allegations that are essentially identical to those found lacking in *Xerion*.  *See Xerion*, 474 F. Supp. 2d at 518.  Plaintiffs imagine that expenses must have been shifted to Affiliates, but far from being concealed, the Proxy contains detailed information of the expenses paid to Affiliates for services performed, as Defendants set forth in the Opening Memorandum.  (Def. Mem. at 34-35.)  Plaintiffs do not support their conclusory assertion that the Advisor misstated its financial statements by understating operating expenses.

Failing to distinguish *Xerion* or find supporting facts, Plaintiffs rely on irrelevant authority to support their supposition that reported levels of profits or expenses can establish that expenses were hidden.  Plaintiffs' reliance on *In re Moustafi*, 371 B.R. 434, 435 (Bankr. D. Ariz. 2007), for the proposition that the Advisor's level of operating efficiency was impossible (Pl. Opp. at 13), is disingenuous at best.  In *Moustafi*, a *pro se* Chapter 7 debtor sought court approval of a reaffirmation agreement with her credit union.  *Id*.  In a footnote, the court noted that the *pro se* debtor apparently made a mistake on one of her accompanying income/expense schedules, as it reflected no expenses, and "no one has zero expenses." *Id*. at 435 n.1. (Pl. Opp. at 13.)  This language, quoted by Plaintiffs, in no way suggests that it is impossible for the Advisor to operate at the level of profitability and with the level of expenses reflected on its financial statements.  Their reliance on *United States v. Rigas*, No. 4:05-CR-402, 2008 U.S. Dist. LEXIS 53605 (M.D. Pa. July 11, 2008), is equally unavailing.  The Adelphia insider defendants

allegedly masterminded a massive fraud to inflate earnings, a charge supported by mountains of detailed allegations about their precise method of deception. Far from suggesting that high profits alone are proof of financial statement manipulation, *Rigas* demonstrates that particularized allegations -- present in *Rigas* but conspicuously absent here -- must be offered to establish that a defendant has cooked its books. Because they fail to offer any facts establishing missing expenses, excluded categories of expenses, or anything other than their conclusory allegation that profits were high and expenses were low, Plaintiffs fail to comply with the PSLRA.

> **2.    Plaintiffs' Failure To Substantiate Allegations Of Financial Statement Manipulation Undermines Many Of The Alleged Misrepresentations.**

Plaintiffs' failure to state a Proxy claim based on misstated financial statements undercuts many of their other alleged Proxy misrepresentations. For example, Plaintiffs allege that the Proxy erroneously described the contractual purchase option, but the sole basis for that claim is Plaintiffs' assertion that the contract option would have yielded a lower price, assuming it relied on Advisor and Property Manager financial statements reflecting lower profits. (Am. Compl. ¶¶ 221-26.) The William Blair analysis demonstrated that the purchase option would have yielded a higher price if existing financials were used. Likewise, the § 14(a) claims premised upon the independent auditors' report (*id.* ¶¶ 185-216); fairness opinion (*id.* ¶¶ 235-55); and statements about the fairness of the Internalization (*id.* ¶¶ 217-20) all hinge upon Plaintiffs' contention that profits in the financial statements of the Advisor and Property Managers were inflated. Plaintiffs' failure to offer proper support for their allegations of financial statement manipulation renders these allegations equally infirm.

> **3.    Allegations That The Proxy Failed To Disclose Strategic Alternatives and Information Regarding The Advisor and Property Managers' Past Performance Are Insufficient To Sustain a § 14(a) Claim.**

In the Opening Memorandum, Defendants demonstrated that Plaintiffs' suggestion that the Proxy should have included more details on other topics -- strategic alternatives and the service providers' past performance -- fails to state a § 14(a) claim because Plaintiffs never alleged how the supposed omissions rendered misleading any statement in the Proxy. (Def. Mem. at 37-38.) Plaintiffs' Opposition merely repeats the Amended Complaint's conclusory assertion that the Proxy provided no strategic alternatives to the Internalization evaluated by the Special Committee. (Pl. Opp. at 20-21.) That allegation fails to state a claim. <u>First</u>, it fails to

address Defendants' point that Plaintiffs never establish how the claimed omissions rendered misleading any statement in the prospectus, as the PSLRA requires. <u>Second</u>, there were no omissions.   The Proxy discussed strategic alternatives to the Internalization, including maintaining the status quo and obtaining similar services from a third party.  (Def. Mem. Ex. 1, at 16-17)  As Plaintiffs acknowledge, the Proxy disclosed the goals of the Internalization (Am. Comp. ¶ 156) and included the fairness opinion (Am. Compl. ¶¶ 235-38), reflecting an objective evaluation of strategic issues as well as of the historical performance of the Advisor and Property Managers.   Plaintiffs might have preferred a longer Proxy that included lengthy discussions about every possible alternative to the Internalization or each director's assessment of the Advisor and Property Managers, but the law is clear that a Proxy is not required to include details of speculative prospects or of all possible alternatives.  *See Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244-45 (4th Cir. 1988).  Indeed, Plaintiffs' counsel made precisely this same boilerplate argument in *Wells,* involving comparable Proxy disclosures, only to have the court reject their argument.  *See Washtenaw County Emp. Ret. Sys. v. Wells Real Estate Inv. Trust, Inc.*, Civil Action No. 1:07-CV-862, 2008 WL 2302679, at *6 (N.D. Ga. Mar. 31, 2008) (rejecting plaintiffs' assertion that shareholders should have been informed that the Board could have provided a mechanism to reverse the internalization if the shares were not ultimately listed publicly because that was "merely one of many possible alternatives to the action proposed in the Proxy").  There is no basis to demand even more discussion than was included, especially where Plaintiffs cannot allege that the omissions rendered misleading any Proxy statements.

4.   **Plaintiffs' Allegations That The Proxy Was False And Misleading Based Upon The Inclusion Of The William Blair Fairness Opinion And The KPMG Audit Report Are Insufficient To Sustain A § 14(a) Claim.**

Plaintiffs assert that the Opening Memorandum fails to address allegations that the Proxy was rendered false and misleading by the inclusion of the William Blair fairness opinion and the KPMG independent audit report that "legitimized" the financial statements.  (Pl. Opp. at 18-20.) That assertion is misleading, at best.  As discussed above, and in the Opening Memorandum (Def. Mem. at 32-35), Plaintiffs' utter failure to properly plead financial statement manipulation requires dismissal of these allegations.  Further, Defendants incorporate by reference William Blair and KPMG's arguments, including Plaintiffs' failure to demonstrate that these third-party opinions were both objectively and subjectively false.  *See Virginia Bankshares, Inc. v.*

*Sandberg*, 501 U.S. 1083, 1095-96 (1991); *Fisher v. Kanas*, 467 F. Supp. 2d 275, 282 (E.D.N.Y. 2006).

      **C.**     **Plaintiffs' § 20(a) Claim Fails.**

      In their Opening Memorandum, Defendants demonstrated that Plaintiffs' § 20(a) claim -- Count II -- must be dismissed because the § 14(a) claim is fatally defective.  (Def. Mem. at 38-39.)  The § 20(a) claim also fails to state a claim on its own.  Plaintiffs argue that the question of whether particular individuals are control persons is a question of fact, incapable of resolution on a motion to dismiss.  (Pl. Opp. at 27.)  This is absurd.  Many cases in this District have been resolved in defendants' favor at the pleading stage.[9]  Likewise, Plaintiffs' allegations that the Special Committee directors "served" on the Special Committee of the IWEST board and that the remaining Individual Defendants held a high level position with IWEST or controlled the Advisor and/or Property Managers are plainly insufficient to state a claim for control person liability because "it is not enough to establish control by merely claiming the person occupies a position of control within an organization."  *Lambert v. Calprotrack, Inc.*, No. 95 C 4076, 1996 WL 224515, at *3 (N.D. Ill. May 1, 1996) (Zagel, J.) (citations omitted).  Plaintiffs must allege more than just general control over the primary violator.  The control person test requires allegations of control over the specific activity comprising the primary violation -- here the issuance of the Proxy.  *Id.* at *1.  Plaintiffs here allege no facts to support their conclusion that all Defendants named in this count, let alone any of them, "controlled" the decision-making and dissemination of the Proxy.  (Am. Compl. ¶¶ 99, 299(f).)  These allegations fall well short of the "control" over the proxy statement issuance required to state a § 20(a) control person claim.

## II.    PLAINTIFFS' DERIVATIVE CLAIMS SHOULD BE DISMISSED.

      **A.**     **Counts III-VII Should Be Dismissed Because Plaintiffs Have Not Established That Demand Was Futile.**

      The parties agree that to establish demand futility under Maryland law, Plaintiffs must meet the high standards set forth in *Werbowsky v. Collumb* by presenting particularized facts demonstrating that a majority of the IWEST Board members was so conflicted or committed to the decisions in dispute that they could not respond to a demand in good faith.  766 A.2d 123,

---

[9] *See Starr v. !Hey, Inc.*, No. 01 C 6087, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) (Hibbler, J.); *Donovan v. ABC-NACO Inc.*, No. 02 C 1951, 2002 WL 1553259, at *5-6 (N.D. Ill. July 15, 2002) (Kocoras, J.); *Lambert v. Calprotrack, Inc.*, No. 95 C 4076, 1996 WL 224515, at *1 (N.D. Ill. May 1, 1996) (Zagel, J.).

144 (Md. 2001).  As set forth in Defendants' Opening Memorandum, at all relevant times the majority of the IWEST Board consisted of disinterested, independent directors, and these same independent directors formed the Special Committee that reviewed, analyzed and recommended the Internalization.  (Def. Mem. at 9-15.)  The Special Committee directors are not employees of IWEST or its affiliates, and did not receive any benefits in connection with the Internalization. (*Id.* at 12.)  Defendants further established that Plaintiffs' generalized allegations regarding their potential personal liability, director fees and stock ownership, social or business relationships, or selection for the Board by the Advisor's owners or affiliates, did not even come close to satisfying *Werbowsky*'s "very limited" demand futility exception.  (*Id.* at 11, 13-15.)

Notwithstanding their concession that generalized or speculative facts are insufficient to satisfy their burden to allege with particularity the reasons why demand is excused, Plaintiffs rely on nothing more than conclusory rhetoric concerning "real conflicts and self-dealing by a majority of the members of the Company's Board," and fail to identify a single specific conflict or self-dealing by any member of the Special Committee.  (Pl. Opp. at 32-33.)  Plaintiffs' only argument is that demand is excused because the Special Committee directors "approved" the corporate actions challenged in the derivative claims.  (*Id.* at 34-35.)  This alleged "conflict" is patently insufficient under *Werbowsky*.  (*Compare* Pl. Opp. at 34-35 *with* Def. Mem. at 13-15.)[10]

Whether and to what extent the directors participated in the challenged conduct is irrelevant under Maryland law in evaluating demand futility.  (Def. Mem. at 12-13.)  *Werbowsky* specifically held that the fact that "a majority of directors approved or participated in some way in the challenged transaction or decision" is irrelevant to the issue.  766 A.2d at 143.  (*See also* Def. Mem. at 11 (citing cases).)  "Demand futility is . . . a preliminary issue that does not go to the merits of the underlying complaint."  *Werbowsky*, 766 A.2d at 145.  This approach "avoids injecting into a preliminary proceeding issues that go more to the merits of the complaint -- whether there was, in fact, self dealing, corporate waste, or a lack of business judgment with

---

[10] Plaintiffs ask the Court to ignore the Maryland cases cited in the Opening Memorandum -- including two cases brought by Plaintiffs' own lead counsel -- because those cases did not contain "particularized allegations" of the directors' active involvement in the alleged wrongdoing or their risk of personal liability.  (Pl. Opp. at 34 n.34.)  The very same allegations were made by Plaintiffs' counsel in *Wells* and *CNL*, and were summarily rejected under *Werbowsky*.  Likewise, Plaintiffs' citation to a pre-*Werbowsky* Virginia case -- in which demand was made and refused -- is taken entirely out of context and is inapposite.  (Pl. Opp. at 33 (citing *Clark Enters., Inc. v. Holywell Corp.*, 559 F. Supp. 1307, 1310 (E.D. Va. 1983) (one of two board members accused of self-dealing and controlling second director).)

respect to the decision under attack." *Id.* at 144.  Plaintiffs simply ignore this holding in arguing that the merits of the derivative lawsuit are relevant to the inquiry and ask the Court to do the same.  (Pl. Opp. at 35 n.35.)[11]

Given *Werbowsky's* high standard, it is not surprising that 17 courts applying Maryland law have consistently enforced the demand requirement.[12]  Plaintiffs request that the Court ignore *all* of these Maryland law cases enforcing the demand requirement in favor of a *single* unpublished order by a federal district court in Missouri, attempting to apply Maryland law and holding, with little analysis, that allegations of wrongdoing are sufficient to show that demand was futile.  (Pl. Opp. at 34-35 (citing *Felker v. Anderson*, No. 04-0372-CV-W-ODS, 2005 WL 602974 (W.D. Mo. Feb. 11, 2005).)  This outlier case has been consistently criticized as inconsistent with *Werbowsky*.  In fact, Plaintiffs' counsel here has asked two other courts to follow *Felker* and both steadfastly refused to follow it.  The *CNL* court did not find *Felker* persuasive because, "it is not clear how to square [*Felker's*] holding with *Werbowsky's* clear admonition that a court should not 'excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision.'" *In re CNL Hotels & Resorts, Inc. Secs. Litig.*, No. 604CV1231ORL31KRS, 604CV1341ORL19JGG, 2005 WL 2219283, at *5 n.18 (internal citations omitted).  Likewise, the *Wells* court also rejected *Felker*, stating:

> Notably, the *Felker* case is the only post-*Werbowsky* case reviewing demand futility under Maryland law to find that demand was futile.  Moreover, *Felker* appears to ignore *Werbowsky's* clear admonition that a court should not "excuse the failure to make demand simply because a majority of the directors approved or participated in some way in the challenged transaction or decision."

*Wells*, 2008 WL 2302679, at *14 (internal citations omitted).  This Court should reach the same

---

[11] For all these reasons, Plaintiffs' effort to "distinguish" *In re InfoSonics Corp. Derivative Litig.*, No. 06cv1336, 2007 WL 2572276, at *7 (S.D. Cal. Sept. 4, 2007), must fail.  (Pl. Opp. at 35 n.35.)  That court correctly followed *Werbowsky* in holding that the "likelihood of liability" is not a proper reason to excuse demand under Maryland law.

[12] *See, e.g., Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*, No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005); *Sekuk Global Enters.  Profit Sharing Plan v. Kevinides*, Nos. 24-C-03-007496, 24-C-03-007876, 24-C-03-008010, 2004 WL 1982508 (Md. Cir. Ct. May 25, 2004); *Danielewicz v. Arnold*, 769 A.2d 274 (Md. Ct. Spec. App. 2001).

conclusion, and dismiss Counts III-VII for failure to make a demand.[13]

**B.      Because Plaintiffs Cannot Satisfy Maryland's Personal and Distinct Injury Requirement for Direct Claims, Counts III and IV Fail to State a Claim.**

For over half a century, Maryland courts have rejected "direct" shareholder actions that only allege injuries common to all shareholders. *Waller v. Waller*, 49 A.2d 449, 454 (Md. 1946); *Danielewicz v. Arnold*, 769 A.2d 274, 284–85 (Md. Ct. Spec. App. 2001).   In their Opening Memorandum, Defendants cited *Waller* and *Danielewicz* in support of dismissing Counts III and IV, which purport to allege direct claims under Maryland law based on injuries common to all IWEST shareholders.   (Def. Mem. at 15.)   In their Opposition, Plaintiffs choose not to acknowledge or address this controlling and longstanding Maryland precedent.   Instead, they proceed in "denial" as if Defendants never cited it:   "Defendants argue, *without citation to any authority*, that Plaintiffs cannot bring direct claims for injuries that are "common to all IWEST shareholders." (Pl. Opp. at 29) (emphasis added).   As set forth below, Plaintiffs choose to ignore these cases for good reason -- they warrant the dismissal of Counts III and IV.

In *Waller*, the seminal Maryland decision addressing direct shareholder actions, a shareholder plaintiff brought a direct action against officers and directors of the corporation.   The plaintiff alleged that, pursuant to an arbitration award, he was entitled to majority ownership of the corporation, but that his brother conspired with management "to obtain control of the corporation and did everything he could to ruin plaintiff financially and destroy the value of his stock."   *Waller*, 49 A.2d at 451.   Affirming the lower court's dismissal of these claims as derivative in nature, the Maryland Court of Appeals remarked that the plaintiff could not maintain a direct action because he only alleged injuries "common" to all the stockholders:

> the [pleading] does not allege the violation of any right personal to plaintiff, but only violation of rights common to all the stockholders.   Hence, any wrongs committed by defendants were

---

[13] Without any conflict that satisfies the *Werbowsky* standard, Plaintiffs argue that the Board was "grossly negligent" and resort to citing inapplicable Delaware law concerning "reasonable doubts" that excuse demand.   (Pl. Opp. at 33 (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).)   Maryland courts have explicitly rejected this Delaware "reasonable doubt" standard.   Moreover, this "failure of oversight" theory is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l, Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).   Plaintiffs must plead facts showing that "the directors were conscious of the fact that they were not doing their jobs." *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003).   Plaintiffs in this case only allege a failure to supervise as a conclusion; Plaintiffs do not come close to pleading facts showing that the directors consciously chose not to do their jobs.   (Am. Compl. ¶¶ 261-268.)

> done to the corporation, affected all the stockholders of the corporation, and could be redressed only by an action brought by the corporation . . .

*Id*. at 454.  *Waller* is still recognized by Maryland courts as being "well-settled law, evidenced by adherence to it by numerous courts since its decree."  *Danielewicz*, 769 A.2d at 285; *see also Werbowsky*, 766 A.2d at 136 (discussing *Waller*).

*Danielewicz* reaffirmed Maryland's "separate and distinct" injury requirement for direct shareholder claims.  There, a shareholder plaintiff sued a company director in a direct action, alleging that the director's decision to exchange company stock for stock of another corporation caused her to lose a controlling interest in the company.  In affirming the lower court's dismissal, the Maryland Court of Appeals, relying extensively on *Waller* as "dispositive," held that the loss of plaintiff's controlling interest, which diluted both her voting rights and economic interests, was even less of a separate and distinct injury than that alleged in *Waller*.  *Danielewicz*, 769 A.2d at 285; *see also Sizeler*, 2005 WL 2989343, at \*5-6 (citing *Waller* and *Danielewicz* in dismissing direct claim by a purported class of shareholders alleging that a board's issuance of shares for inadequate consideration caused the shareholders to suffer both "dilution of voting power" and "dilution of share value").

Plaintiffs' alleged injuries in Counts III and IV similarly fail under Maryland law.  The alleged injuries to their "individual economic interests" (*i.e.*, alleged share dilution) and "voting rights" (*i.e.*, an allegedly misinformed vote) are not personal to Plaintiffs, but common to all IWEST shareholders:  "The Shareholders suffered injury to their individual economic interests and their voting rights as a result of the wrongful conduct of the Advisor, the Property Managers, the Sponsor, the Inland Group and the Individual Defendants, who received unfair benefits, at the expense of the Shareholders."  (Am. Compl. at ¶ 315.)  Thus, because the Amended Complaint merely alleges injuries that were common to all shareholders, any alleged wrongdoing was "done to the corporation, affected all the stockholders of the corporation, and could be redressed only by an action brought by the corporation."  *Waller*, 49 A.2d at 454.

Tellingly, Plaintiffs do not address, much less distinguish the Maryland decisions cited above, other than by offering a skewed mischaracterization of *Waller* buried in a footnote: "*Waller*[], cited by Defendants (Defs. Mem. at 16), states the general rule that stockholders must sue derivatively to recover for injuries suffered by the corporation."  (Pl. Opp. at 29 n.26.)

*Waller* stands for far more than Plaintiffs are willing to acknowledge, including the separate and distinct injury requirement that they admittedly cannot satisfy.

Instead of engaging in a good faith analysis of Maryland law,[14] Plaintiffs' Opposition makes two arguments, both of which are easily addressed.  First, Plaintiffs argue that "[t]o permit shareholders to bring direct claims only when their injuries are distinct from those of other shareholders would improperly leave shareholders without legal recourse."  (Pl. Opp. at 29.) *Waller* puts this argument to rest.  The *Waller* court recognized that where, as here, shareholders seek monetary damages, derivative litigation will make them whole because any damages recovered by the corporation will be made available for distribution to the shareholders:

> The rule [that an action at law to recover damages for an injury to a corporation must be brought derivatively] is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.

*Waller*, 49 A.2d at 452.  Thus, *Waller* correctly recognizes that there is no "redress" Plaintiffs cannot obtain through derivative litigation.[15]  Here, Plaintiffs acknowledge that such redress is possible in filing derivative claims for the same alleged wrongs.

Second, Plaintiffs argue that they should be able to proceed with direct claims because alleged disclosure violations that cause injury to economic interests or voting rights "give rise to direct actions" under Delaware law.  (Pl. Opp. at 29.)  Delaware law, however, differs from Maryland law in that Delaware courts no longer recognize the separate and distinct injury requirement.  *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) (direct action does not require shareholder to allege "separate and distinct injury" from other shareholders).  As the Delaware Supreme Court recently noted, "In [*Tooley*], this Court

---

[14] In fact, Plaintiffs cite one Second Circuit decision as "Maryland law" because it contains language favorable to their position:  "Under Maryland law, 'shareholders may bring a direct suit' when they 'suffer an injury that is distinct from that of the corporation.'"  (Pl. Opp. at 29 (citing *Strougo v. Bassini*, 282 F.3d 162, 173 (2d. Cir. 2002).)  As demonstrated above, *Strougo* incorrectly states the separate and distinct injury test under Maryland law to the extent it rejects the additional requirement that a plaintiff must allege a personal injury distinct from *other shareholders*.

[15] Further, derivative litigation prevents a "multiplicity" of shareholder suits: "[I]f the courts would open their doors to all complaining stockholders without requiring them to show that it was impossible to obtain redress through regular corporate action, litigation of this kind would be endless."  *Waller, 49 A.2d.* at 453.

renounced the special injury test, *i.e.*, whether the plaintiff has suffered an injury different from that suffered by shareholders in general, for determining whether a claim is direct or derivative." *Feldman v. Cutaia*, 951 A.2d 727, 734 n.32 (Del. 2008).  One court recently rejected Delaware law to the extent it conflicted with another state's "separate and distinct injury" requirement:

> Florida employs the separate and distinct injury test to determine whether a stockholder may bring a direct action . . . Under the separate and distinct injury test, the injury … must be separate and distinct from any injury sustained by other stockholders. . . . Appellants urge this Court to follow the test set forth by the Delaware Supreme Court [in *Tooley*].  Florida has not adopted the test set forth in *Tooley* and, therefore, we decline to follow it.

*Lewis v. CNL Restaurant Properties, Inc.*, 223 S.W.3d 784, 786–87 (Tx. Ct. App. 2007).  This Court must similarly reject Delaware law because Maryland has not adopted the *Tooley* test.[16]

Plaintiffs concede that "the applicable substantive law is . . . Maryland" (Pl. Opp. at 30, n.27), and, as such, there is no dispute that Maryland's separate and distinct injury test controls the analysis.  Like its demand futility test, Maryland law is more restrictive than Delaware law with respect to a shareholder's ability to bring direct claims.  Under Maryland law, Plaintiffs lack standing to bring direct claims under Counts III and IV because they do not allege injuries separate and distinct from all IWEST shareholders, and therefore they must be dismissed.[17]

### C.    Counts III-VII Should Be Dismissed Because Plaintiffs Fail to Rebut the Presumption of the Business Judgment Rule.

In their Opening Memorandum, Defendants established that even if Plaintiffs' allegations were sufficient to excuse demand, which they are not, Plaintiffs' breach of fiduciary duty claims nevertheless fail because each of the disputed actions was taken by a Board, the majority of whom was independent and entitled under Maryland's business judgment rule to a judicial presumption of having acted with due care, in good faith and in the best interests of the

---

[16] In *Wells,* the court "look[ed] to Delaware caselaw" in recognizing a direct claim for an alleged injury to "voting rights." *Wells*, 2008 WL 2302679, at 11 n.5.  The parties in *Wells* did not point out that Maryland and Delaware law differ on the separate and distinct injury requirement.  The *Wells* court ultimately dismissed the direct claims with prejudice for failure to rebut the business judgment rule.

[17] Plaintiffs suggest indirectly that they have standing to bring direct claims because Maryland directors owe fiduciary duties to both the corporation and the shareholders.  (Pl. Opp. at 29.)  *Waller* and other Maryland courts have rejected this argument.  As Maryland courts note, the issue is not standing, but whether the claim to be asserted by a shareholder is direct or derivative in nature.  *Waller*, 49 A.2d at 454; *Sizeler*, 2005 WL 2989343, at *4-5 (rejecting argument that duty to shareholders creates individual standing under Maryland law).

corporation. (Def. Mem. at 16-17.)  Md. Code Ann. Corps. § 2-405.1(a), (c), (e).  Plaintiffs concede that this business judgment rule must guide this Court's review of the IWEST Board's actions.  (Pl. Opp. at 41-42.)

Notwithstanding this concession, Plaintiffs argue that the business judgment rule is inapplicable at the motion to dismiss stage because "[w]hether a director breached fiduciary duties of loyalty and good faith are fact-intensive questions that are inappropriate to resolve on a motion to dismiss."  (Pl. Opp. at 42.)  Once again, Plaintiffs ignore the multitude of cases that dismissed claims with prejudice for failure to rebut the business judgment rule's presumption, including *CNL* and *Wells*, which were filed by Plaintiffs' counsel.  Indeed, the purpose of Maryland's business judgment rule statute would be eviscerated if the Court could not dismiss claims for failure to rebut the presumption.  And even the case cited by Plaintiffs, *Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383 (Md. Cir. Ct. Apr. 1, 2004) (Pl. Opp. at 42), demonstrates the falsity of Plaintiffs' argument, as *Hudson* dismissed claims concerning breach of the fiduciary duties of loyalty, good faith and disclosure.  Thus, it is entirely appropriate to apply the presumption of the business judgment rule on a motion to dismiss.[18]

To rebut the business judgment rule presumption of loyalty, Plaintiffs are required to establish that a majority of the Board did not exercise their judgment independently, or had a material interest in the transaction at issue.  *See Hudson*, 2004 WL 1982383, at *11-12.  Plaintiffs must allege "more than mere suspicions and must state a claim in particular, rather than conclusory terms."  *Bender v. Schwartz*, 917 A.2d 142, 152-53 (Md. Ct. Spec. App. 2007).  As set forth in the Opening Memorandum, the Special Committee directors did not have a personal or financial interest in the Internalization, the property management fees, or the Advisor or Property Managers.  (Def. Mem. at 11-12.)  Plaintiffs do not even attempt to argue that the four Special Committee directors were in any way interested in the allegedly improper actions.[19]

---

[18] The other cases cited by Plaintiffs are taken out of context and irrelevant.  Under Maryland law, to survive a motion to dismiss, Plaintiffs "must allege facts showing the failure of the directors to adhere to their duties."  *Hudson*, 2004 WL 1982383, at *11.  In two of the cases, the courts held that the complaints stated facts supporting breach of fiduciary duty claims that took the case out of the business judgment rule.  *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 793, 802 (S.D.N.Y. 1997); *Resolution Trust Corp. v. Hecht,* 818 F. Supp. 894, 902 (D. Md. 1992).  The third case cited by Plaintiffs had nothing to do with a motion to dismiss.  *See FSLIC v. Williams*, 599 F. Supp. 1184, 1213 (D. Md. 1984).

[19] Plaintiffs' Opposition argues that state law disclosure obligations are not subject to the business judgment rule.  (Pl. Opp. at 42.)  Because none of Plaintiffs' fiduciary duty claims (Counts III-V) set forth allegations of state law disclosure violations, they must be dismissed.

Instead, Plaintiffs rely only on the bald assertion that these directors "lacked independence and acted in bad faith." (Pl. Opp. at 44.)  The various problems associated with Plaintiffs' meritless "independence" arguments are discussed *infra* at II.A. and in the Opening Memorandum at 18-19.  To be clear, to establish an independence issue, Plaintiffs "must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling." *Hudson*, 2004 WL 1982383, at *12 (quoting *Orman v. Cullman*, 794 A.2d 5, 24 (Del. Ch. 2002)).  By failing to allege any facts that the majority of the Board -- *i.e.*, the four Special Committee directors -- were dominated or controlled, Plaintiffs concede that a majority of the Board was independent.

Most interesting is the Plaintiffs' complete silence with respect to their duty of care allegations.  As Defendants pointed out in the Opening Memorandum, the Amended Complaint does not contain one fact regarding the information the Board considered, or the process employed by the Board to reach its decisions. (Def. Mem. at 10-15.)  Plaintiffs' responsive silence on this point is deafening; they simply claim that IWEST paid too much in property management fees and paid too much to acquire the Advisor and Property Managers, without any allegations as to what the Board did or did not consider in allowing these payments.  Under the business judgment rule, it is presumed statutorily that the Board acted with due care and considered all relevant information.  Absent any particularized facts demonstrating otherwise, Plaintiffs cannot legally challenge such decisions based on their dissatisfaction with the outcome.

In the end, Plaintiffs are left only with an argument that the Special Committee directors acted in "bad faith" which requires a showing that the directors acted in "intentional and conscious" disregard for their duties, without "adequate information and without adequate deliberation" and with "subjective bad motive or intent." *In re The Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 62 (Del. 2006).  Like their duty of care claim, to rebut the statutory presumption that each Defendant acted with good faith, Plaintiffs must allege particularized facts "directed solely at the manner, or process, by which a director makes decisions rather than at the results of those decisions."[20]  *Hudson*, 2004 WL 1982383, at *16 (quotation omitted).  As set

---

[20] Plaintiffs' cited cases -- *Yost*, *Daniels*, *Parish*, *Edge Partners*, *Della Ratta*, and *Strougo* (*see* Pl. Opp. at 43) -- are distinguishable because the plaintiffs in each of those cases pled specific particularized facts necessary to show the Board acted in bad faith.  This case is more like two other cases cited by Plaintiffs where allegations of bad faith were insufficient.  *See N.A.A.C.P. v. Golding*, 679 A.2d 554, 563 (Md. Ct. Spec. App. 1996) ("under Maryland corporations law, applying the business judgment rule, we would not

forth above, Plaintiffs improperly direct their allegations to the Board's decisions, not its process, and simply argue that because IWEST paid more than what Plaintiffs believe to be "market," the Board must have made its decisions in bad faith.  Under Maryland law, far more is required.  These failings require the dismissal of Counts III-VII.

> **D.    Plaintiffs' Breach Of Fiduciary Duty Claims (Counts III-V) Fail To Allege Cognizable Duties Or Breaches.**

As demonstrated in the Opening Memorandum and above, the Amended Complaint makes no particularized allegations of wrongdoing against any specific Defendant; instead it improperly lumps Defendants together and pleads dozens of conclusory allegations against the "Defendants" in classic shotgun fashion.  (Def. Mem. at 21-25.)  Plaintiffs' Opposition is devoid of any cogent response.  In fact, Plaintiffs attempt to mask this glaring deficiency by recasting their allegations against the "Fiduciary Duty Defendants."  (Pl. Opp. at 28-30.)  Even if the Court were to permit Plaintiffs to amend their pleading and re-direct their allegations on a "sub-group" of Defendants, which is actually comprised of all but three of the Defendants (Am. Compl. ¶¶ 256-58), the fatal problem continues to exist.  Each Defendant is entitled to fair notice as to what duties he, she or it owes, which duties were breached, how such duties were breached, and the damages resulting from the breach.  Generalized, wholesale allegations that 17 "Fiduciary Duty Defendants" similarly were dominated and controlled, had material financial interests in the transactions, did not act with due care, and intentionally performed their duties in bad faith, without more, are hardly sufficient.

## III.   PLAINTIFFS' COMMON LAW CLAIMS.

As set forth above, Plaintiffs' derivative common law claims (Counts VI-VII) fail because Plaintiffs did not make the required demand on the Board and because these claims are based on decisions that are protected by the business judgment rule.  Should this Court consider the merits, Plaintiffs fail to state claims for breach of contract and unjust enrichment.  (Def. Mem. at 39-44.)

---

interfere with the organization's decision because the NAACP did not engage in any fraud, arbitrariness, or bad faith."); *Froelich v. Erickson*, 96 F. Supp. 2d 507, 527 (D. Md. 2000) ("Because [plaintiff] has not presented evidence establishing that Erickson or the Board acted in bad faith, the decisions of the Board are protected by the business judgment rule.").

**A.      The Amended Complaint Fails To State A Claim For Breach Of Contract.**

**1.      The Property Management Agreements Were Not Breached By The Property Managers' Receipt Of The Fees To Which They Were Contractually Entitled.**

In the Opening Memorandum, Defendants demonstrated that they could not breach the Property Management Agreement by violating a term -- a cap on base fees -- that is not in the Agreement. (Def. Mem. at 39-40.)  The Property Management Agreement outlines the services to be provided by the Property Managers and the fees to be paid.  Under that Agreement, the Property Managers are entitled to receive a property management fee of up to 4.5% of Gross Income for the base services identified in the Agreement.  (Def. Mem., Ex. 3, at 11.)  There is no other cap or limit on the amount of fees that may be paid under this formula.  (Def. Mem. at 6.)

In their Opposition, Plaintiffs argue that the Property Management Agreement may not be read in isolation, and that other, unrelated documents effectively re-write the terms of the Property Management Agreement.  (Pl. Opp. at 14-15; Am. Compl. ¶¶ 130-40.)  Pointing to language in IWEST's Offering Documents, a definitional clause in the Advisory Agreement, and a clause in IWEST's Articles of Incorporation regarding director responsibilities, Plaintiffs argue that these other documents impose a cap on base fees.  Plaintiffs concede that they are not really sure what type of cap is suggested by these non-contractual documents -- it is "either a Market Rate or 90% of Market Rate" -- but Plaintiffs nonetheless conclude that some form of market-based cap on fees for base services must be imported from these documents into the Property Management Agreement.  (Pl. Opp. at 15-16; Am. Comp. ¶ 182.)  This as-amended Agreement allegedly was breached when the Property Managers charged fees at 4.5% of Gross Income.

Plaintiffs' effort to re-write the terms of the Property Management Agreement fails for multiple reasons.  First, as a factual matter, Plaintiffs provide an incomplete and misleading description of the Offering Documents' disclosures.  The Amended Complaint cites three passages in the Prospectus that suggest a 90%-of-market cap applies to base property management fees.  Plaintiffs simply ignore the fact that at least three other sections in the same document indicate that the 90% cap does *not* apply to the base 4.5% fee.  (Def. Mem., Ex. 2, at 42, 239, 303.)  For example, elsewhere the Prospectus states, "We will pay a monthly fee of 4.5% of the gross income from the properties.  We will also pay a monthly fee for any extra services equal to no more than 90% of that which would be payable to an unrelated party providing the services."  (*Id*. at 42, 303.)  Moreover, the Prospectus cautions: "Whenever a

25

reference is made in this prospectus to any contract or other document of ours, the reference may not be complete and you should refer to the exhibits that are a part of the registration statement for a copy of the contract or document." (*Id*. at 309.) The Property Management Agreement, stating that the 90% cap does not apply to the 4.5% fee for base services, was filed with the SEC on May 8, 2003 as Exhibit 10.3 of the Amended Registration Statement. (Def. Mem., Ex. 3.)

Second, Plaintiffs' argument that extraneous documents control the meaning of the Property Management Agreement is undermined by an integration clause in that Agreement, "This Agreement contains the entire Agreement of the parties relating to the subject matter hereof, and there are no understandings, representations or undertakings by either party except as contained herein. This Agreement may be modified solely by a written agreement executed by both parties hereto." (*Id.*, Ex. 3, at 16.) The inclusion of an integration clause manifests the intent of IWEST and the Property Managers "to protect themselves against misinterpretations which might arise from extrinsic evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999). There is no allegation of any written modification to the Agreement executed by both IWEST and the Property Managers, meaning that this clause precludes the use of external materials, like the other documents Plaintiffs cite, in interpreting the Agreement.

Third, courts addressing arguments like Plaintiffs' have held that a prospectus or other offering document that summarizes a contract cannot alter the terms of that contract. *See Doppelt v. Perini Corp*., No. 01 CIV. 4398, 2002 WL 392289, at *4 (S.D.N.Y. Mar. 13, 2002) (holding that the contract, not the summary of the contract in the prospectus, controls) (citing *In re Discon Corp.*, 346 F. Supp. 839, 843 (S.D. Fla. 1971)). *Cf. McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc*., 339 F.3d 1087, 1092 (9th Cir. 2003) (holding that the merger agreement, not the prospectus, governs). In *Doppelt*, for example, a contract between the company and its shareholders allowed the company to exchange certain junior preferred stock for common stock. In a subsequent prospectus, the company described restrictions on its ability to exchange stock that went beyond the restrictions contained in the contract. *Doppelt*, 2002 WL 392289, at *1-2. When the company effected an exchange that was permitted by the pre-existing contract, but inconsistent with the terms of its prospectus, the shareholders filed suit alleging that the company breached its contract with the shareholders. *Id.* Dismissing the plaintiffs' claim, the court noted that the prospectus did not accurately summarize the pre-existing contract and the parties were bound by that contract, not by the prospectus' summary of that contract. *Id.* at *4.

Here, as in *Doppelt*, one contracting party's description of contract terms cannot modify the actual terms of the underlying agreement. The Property Management Agreement must be construed as drafted, and Plaintiffs have no claim for breach of contract.

### 2.    Non-Parties To The Advisory And Property Management Agreements Cannot Be Liable For The Alleged Breach Of Those Agreements.

As demonstrated in the Opening Memorandum, Defendants who were not even parties to the Advisory and Property Management Agreements could not have breached those agreements. (Def. Mem. at 41.)  Plaintiffs do not dispute that Defendants TIGI, the Sponsor, Goodwin, Parks, Baum, Cosenza, Gujral, and Grimes are not parties to the Advisory Agreement or Property Management Agreement.  In their Opposition, Plaintiffs for the first time assert that these Defendants can be held liable for breach of those contracts as the "alter-egos" of the Advisor and Property Managers.  (Pl. Opp. at 37-38.)  To plead a viable claim for alter-ego liability, and pierce the multiple veils in this matter, Plaintiffs must allege:  (1) "such unity of interest and ownership that the separate personalities of the corporation and the individual or other corporation no longer exist;" and (2) that "adherence to the fiction of a separate corporate existence would sanction fraud or injustice."  *NPF WL, Inc. v. Sotka*, No. 99 C 7966, 2000 WL 574527, at *7 (N.D. Ill. May 10, 2000) (Kocoras, J.) (citations omitted); *see RehabCare Group East, Inc. v. Certified Health Management, Inc.*, No. 07 C 2923, 2007 WL 3334500, at *3 (N.D. Ill. Nov. 8, 2007) (Zagel, J.) (citing *Chicago Florsheim Shoe Store Co. v. Cluett, Peabody & Co., Inc.*, 826 F.2d 725 (7th Cir. 1987)).  The Amended Complaint does not plead alter-ego liability and Plaintiffs' attempt to assert it in the Opposition cannot remedy this glaring deficiency.

First, Plaintiffs do not allege a unity of interest and ownership between the identified Defendants and the service providers.  To the contrary, Plaintiffs' cursory allegation that the relevant Defendants "owned and controlled" the service providers (Pl. Opp. at 38; Am. Compl. ¶¶ 12, 20, 26-27, 344) has routinely been rejected by Courts in this District as falling far short of pleading a unity of interest such that multiple, separate personalities no longer exist.  *See Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, Inc.*, No. 02 C 3979, 2004 WL 765368, at *2-3 (N.D. Ill. Apr. 7, 2004) (Schenkier, Mag. J.) (allegations that one defendant "controlled the actions" of another defendant and was "aware of the wrongful conduct of the [other defendant]" were too bare-bones to state an alter-ego claim); *RehabCare Group*, 2007 WL 3334500, at *3 (rejecting conclusory allegations that "Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate

and legal entities"). In addition, the Amended Complaint completely fails to allege any of the factors courts consider when analyzing whether the requisite unity of interest and ownership exists, such as inadequate capitalization, failure to observe corporate formalities, or failure to pay dividends. *See F & V Cement Contractors*, 2004 WL 765368, at *2. This creates a stark contrast between the Amended Complaint and the complaints in the cases Plaintiffs cite. *See, e.g.*, *FASTI USA v. FASTI Farrag & Stipsits GmbH*, No. 02 C 8191, 2003 WL 1581472, at *3 (N.D. Ill. Mar. 26, 2003) (Conlon, J.) (complaint alleged failure to observe corporate formalities, inadequate capitalization, failure to pay dividends, insolvency, failure to maintain proper corporate records, and improper use of corporate funds).[21]

Second, the Amended Complaint's failure to make any allegations regarding the second element -- that not piercing the corporate veil would "sanction fraud or injustice" -- also dooms the alter-ego claim. *See Typographics Plus, Inc. v. I.M. Estrada & Co.*, No. 98 C 886, 2000 WL 1006572, at *5 (N.D. Ill. July 19, 2000) (Williams, J.) (plaintiff's claim "fail[ed] on the second prong" of the alter-ego test because it did not allege facts "to show that unless the court holds [defendant] individually liable, it will be sanctioning some fraud or injustice"). Plaintiffs' alter-ego claim is an unsupportable afterthought to avoid dismissal of a patently-flawed contract claim.

### 3. The Voluntary Payment Doctrine Bars The Breach Of Contract Claim (Count VII) And The Unjust Enrichment Claim (Count VI).

In the Opening Memorandum, Defendants showed that the voluntary payment doctrine bars Plaintiffs' breach of contract and unjust enrichment claims because money voluntarily paid under a claim of right to the payment, with full knowledge of the facts by the person making the payment, cannot be recovered solely because the claim was illegal, unless the payment was made under circumstances amounting to compulsion. (Def. Mem. at 40-41.) *See King v. First Capital Fin. Servs. Corp.*, 828 N.E.2d 1155, 1170-71 (Ill. 2005) (affirming dismissal of the case based on

---

[21] The other authority purportedly supporting Plaintiffs' newly-minted alter-ego theory is inapposite. In *Forge Indus. Staffing, Inc. v. De La Fuente*, No. 06 C 3848, 2006 WL 2982139, at *10 (N.D. Ill. Oct. 16, 2006) (Manning, J.), the Court did not even address the sufficiency of alter-ego claim allegations, as the case involved a defendant's argument that an allegedly-breached contract was between the defendant and its alter-ego. *Id.* In *F.D.I.C. v. Wabick*, No. 01 C 8674, 2004 WL 2032315, at *6 (N.D. Ill. Sept. 9, 2004) (Darrah, J.), this pre-*Twombly* decision credited, under Rule 8, the complaint's allegation that an individual defendant was the alter-ego of a corporation. The Amended Complaint here never asserts that any Defendants are the service providers' alter-egos. In addition, *Wabick's* analysis is inconsistent with the more probing inquiry required by the more recent decision in *RehabCare*.

the voluntary payment doctrine).  Plaintiffs argue that the doctrine does not apply because IWEST paid the allegedly excessive fees "only because shareholders were misled" in considering whether to approve the Internalization.[22]  (Pl. Opp. at 40.)  Plaintiffs offer no legal support for the proposition that a non-contracting third party's knowledge should be considered in applying the voluntary payment doctrine, nor does any such legal support exist.  Thus, absent any allegation that IWEST was somehow misled or coerced into making the payments, Plaintiffs' unjust enrichment claims and breach of contract claims are barred by the voluntary payment doctrine as a matter of law.

## B. Plaintiffs' Unilateral Attempt to Amend Their Unjust Enrichment Claims Cannot Prevent Dismissal of Count VI.

Defendants' Opening Memorandum demonstrated that Plaintiffs' unjust enrichment theory in Count VI fails to state a claim because it contains contradictory allegations as to which Defendants received property management fees.  (Def. Mem. at 42-43.)  Specifically, the Amended Complaint repeatedly asserts that IWEST paid property management fees to the Property Managers.  (See, e.g., Am. Compl. ¶¶ 3, 103, 104, 127, 176, 322.)  Plaintiffs directly contradict those allegations in Count VI, claiming that IWEST paid the property management fees to eight other Defendants:  "Defendants Goodwin, Parks, Baum, Cosenza, Grimes, Gujral and the Inland Group and the Sponsor were unjustly enriched at the expense of and to the detriment of the REIT and its Shareholders by their receipt of . . . excessive Property Management Fees."  (Am. Compl. at ¶ 356.)

Instead of conceding that Count VI is fatally contradictory, Plaintiffs attempt to cure this deficiency by re-writing Count VI in their Opposition.  Plaintiffs' "new" Count VI, as "pleaded" in their Opposition, drops TIGI and the Sponsor as Defendants, adds the three Property Managers as Defendants, and deletes the assertion that Defendants Goodwin, Parks, Baum, Cosenza, Grimes, and Gujral received excess property management fees.  (Pl. Opp. at 38.)  "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."  Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984).  That is precisely what Plaintiffs attempt to do here.  Furthermore, any effort to amend, as described in the Opposition, would be futile.  The Opposition's revised allegations -- that only the Property

---

[22] It is also undisputed and indisputable that shareholder approval, although solicited, was not required in order to consummate the Internalization.  (Def. Mem., Ex. 1, at 20.)

Managers allegedly received excessive consideration -- are barred by the established rule that the existence of a written contract serves as a legal bar to any "quasi-contractual claim" for unjust enrichment under Illinois law. *Guinn v. Hoskins Chevrolet*, 836 N.E.2d 681, 704 (Ill. App. Ct. 2003) ("[W]here there is a specific contract that governs the relationship of the parties, the doctrine of unjust enrichment has no application."). All fees received by the Property Managers were paid under the Property Management Agreement, barring any claim that Defendants were directly or indirectly enriched unjustly by receipt of such fees.

The same fate awaits Plaintiffs' other unjust enrichment theory -- that numerous Defendants were unjustly enriched by their indirect receipt of allegedly inflated Internalization Consideration. After Defendants pointed out that the Amended Complaint was inconsistent in suggesting that any individual Defendants directly received Internalization Consideration, the Opposition again seeks to amend its allegations, adding an allegation that "the Advisor and Property Managers were unjustly enriched by receiving excessive Internalization Consideration . . .." (Pl. Opp. at 38.) Along with being an improper amendment via motion practice, that change would undercut the entire claim because the Internalization Consideration was paid pursuant to the terms of a Merger Agreement, making quasi-contractual relief unavailable.[23] Plaintiffs thus fail to identify any viable claim for unjust enrichment.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Defendants' Opening Memorandum, the Non-KPMG/William Blair Defendants respectfully request that this Court grant their Motion to Dismiss and dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  September 10, 2008

Respectfully submitted,

| | |
|---|---|
| **Counsel for Inland Real Estate Investment Corporation, The Inland Group, Inc., Robert D. Parks, Brenda** | **Counsel for Inland Western Retail Real Estate Trust, Inc., Inland Western Retail Real Estate Advisory Services,** |

---

[23] Although a narrow exception to the contractual bar exists where the contract and quasi-contract relate to different subject matters (Pl. Opp. at 39), that exception does not help Plaintiffs. That "exception is applicable only when the difference in subject matter between the express and alleged implied contract is substantial." *Strategic Reimbursement, Inc. v. HCA, Inc.*, No. 06 C 6501, 2007 WL 2274709 at *4 (N.D. Ill. Aug. 2, 2007) (Gettleman, J.). Here, the property management fees and Internalization Consideration arise from the same subject matter as the Property Management Agreement and Merger Agreement.

**G. Gujral, Daniel L. Goodwin, Robert H. Baum, and G. Joseph Cosenza**

*/s/ James L. Thompson*
Jerold S. Solovy
James L. Thompson
Anthony C. Porcelli
JENNER & BLOCK, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
Telephone: (312) 222-9350
Facsimile:  (312) 527-0484

**Counsel for Kenneth H. Beard, Paul R. Gauvreau, Gerald M. Gorski, Barbara A. Murphy**

*/s/ Richard B. Kapnick (with consent)*
Richard B. Kapnick
Courtney A. Rosen
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036

**Inc., Inland Northwest Management Corp., Inland Southwest Management Corp., Inland Western Management Corp., Frank A. Catalano, Jr., and Steven P. Grimes**

*/s/ Samuel B. Isaacson (with consent)*
Samuel B. Isaacson
Joseph E. Collins
DLA PIPER US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
Telephone: (312) 368-4000
Facsimile:  (312) 236-7516

## CERTIFICATE OF SERVICE

I, Anthony C. Porcelli, an attorney, hereby certify that on September 10, 2008, I caused **Reply Memorandum Of the Non-KPMG/William Blair Defendants In Further Support Of Their Motion To Dismiss Plaintiffs' Amended Complaint** to be filed electronically with the United States District Court for the Northern District of Illinois, Eastern Division.  Notice of this filing will be sent electronically to the following parties by operation of the Court's electronic filing system.  Parties and interested persons may access this filing through the Court's system.

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041

Alexander H. Schmidt
Lawrence P. Kolker
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
270 Madison Avenue
New York, NY 10016

Harold C. Hirshman
SONNENSCHEIN NATH & ROSENTHAL
7800 Sears Tower
233 South Wacker Drive
Chicago, IL 60606-6404

Adam J. Levitt
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC
55 West Monroe Street
Suite 111
Chicago, IL 60661

Lawrence A. Sucharow
Joseph Sternberg
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005

Jonathan C. Medow
James C. Schroeder
John Joseph Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606

/s/  Anthony C. Porcelli