# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust Inc., <br><br> Plaintiffs, <br><br> vs. <br><br> INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION, THE INLAND GROUP, INC., INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP., INLAND WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL A. GOODWIN, ROBERT A. BAUM, G. JOSEPH COSENZA, KPMG LLP, AND WILLIAM BLAIR & COMPANY, L.L.C., <br><br> Defendants. | Case No. 07 C 6174 <br><br> Judge Robert W. Gettleman |

**INDEX OF CASES NOT AVAILABLE IN AN OFFICIAL REPORTER BUT AVAILABLE ON WESTLAW CITED IN THE REPLY MEMORANDUM OF THE NON-KPMG/WILLIAM BLAIR DEFENDANTS IN FURTHER SUPPORT OF THIER MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

1.      *Bond Opportunity Fund v. Unilab Corp.*, 87 Fed. App'x. 772 (2d Cir. 2004)

2.      *Doppelt v. Perini Corp.*, No. 01 CIV. 4398, 2002 WL 392289 (S.D.N.Y. Mar. 13, 2002)

3.      *Hayes v. Crown Cent. Petroleum Corp.*, 78 Fed. App'x. 857 (4th Cir. 2003)

4.      *Jolly Roger Fund LP v. Sizeler Prop. Investors, Inc.*, No. Civ. RDB 05-841, 2005 WL 2989343 (D. Md. Nov. 3, 2005)

5.      *Knollenberg v. Harmonic, Inc.*, 152 Fed. App'x. 674 (9th Cir. 2005)

6.      *NPF WL, Inc. v. Sotka*, No. 99 C 7966, 2000 WL 574527 (N.D. Ill. May 10, 2000)

7.      *RehabCare Group East, Inc. v. Certified Health Management, Inc.*, No. 07 C 2923, 2007 WL 3334500 (N.D. Ill. Nov. 8, 2007)

8.      *Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, Inc.*, No. 02 C 3979, 2004 WL 765368 (N.D. Ill. Apr. 7, 2004)

9.      *Typographics Plus, Inc. v. I.M. Estrada & Co.*, No. 98 C 886, 2000 WL 1006572 (N.D. Ill. July 19, 2000)

# 1



87 Fed.Appx. 772                                                                                                      Page 1
87 Fed.Appx. 772, 2004 WL 249583 (C.A.2 (N.Y.)), Fed. Sec. L. Rep. P 92,683
**(Not Selected for publication in the Federal Reporter)**

◄Bond Opportunity Fund v. Unilab Corp.
C.A.2 (N.Y.),2004.
This case was not selected for publication in the
Federal Reporter.
United States Court of Appeals,Second Circuit.
BOND OPPORTUNITY FUND, Steven Gidumal,
suing on his own behalf individually, and on behalf
of all shareholders of Unilab Corporation, Plaintiffs-
Appellants,
v.
UNILAB CORPORATION, David C. Weavil,
Haywood Cochrane, Kirby L. Cramer, William J.
Gedale, Richard A. Michaelson, Gabriel B. Thomas,
B.T. Alex Brown, Defendants-Appellees.
No. 03-7592.

Feb. 10, 2004.

**Background:** Former shareholders brought action
against former directors, investment banker, and
others, alleging that proxy materials containing false
and misleading statements were issued in furtherance
of scheme to induce them to sell their shares at
unfairly low price pursuant to buyout arising from
merger. The United States District Court for the
Southern District of New York, Martin, J., 2003 WL
21058251, dismissed complaint, and shareholders
appealed.

**Holdings:** The Court of Appeals held that:
(1) proxy's suggestion that two institutional
shareholders retained their stock in order to benefit
other shareholders was not misleading, and
(2) proxy's misstatement that outside auditor's
fairness opinion was supported by "publicly available
research analysts' estimates," when there was only
one analyst covering company, was obviously
unimportant.

Affirmed.

West Headnotes

**[1] Securities Regulation 349B ☜49.21**

349B Securities Regulation

349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.19 False or Fraudulent
Proxies; Accuracy and Completeness
349Bk49.21 k. False or Misleading
Statements; Misrepresentation. Most Cited Cases
Proxy's suggestion that two institutional shareholders
retained their stock in order to benefit other
shareholders was not misleading, and thus did not
support claim under § 14(a) and Rule 14a-9, despite
contention that they actually did so to earn additional
profit, absent explanation as to why institutional
investors would have cashed out majority of their
shares at unacceptable price in order to retain rest of
their shares, when they carried enough voting power
to have chance of defeating merger. Securities
Exchange Act of 1934, § 14(a), 15 U.S.C.A. §
78n(a); 17 C.F.R. § 240.14a-9(a).

**[2] Securities Regulation 349B ☜49.26(3)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.19 False or Fraudulent
Proxies; Accuracy and Completeness
349Bk49.26 Grounds of and
Defenses to Liability
349Bk49.26(3) k. Materiality of
Violation; Reliance and Causation. Most Cited Cases
Proxy's misstatement that outside auditor's fairness
opinion was supported by "publicly available
research analysts' estimates," when there was only
one analyst covering company, was obviously
unimportant, and thus failed to meet standard for
materiality necessary to support claim under § 14(a)
and Rule 14a-9. Securities Exchange Act of 1934, §
14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-
9(a).

***772** Appeal from the United States District Court
for the Southern District of New York (Martin, J.).
Thomas S. McNamara, Indik & McNamara,
Philadelphia, PA, for Appellants.
Steven J. Kolleeny, Skadden, Arps, Slate, Meagher &
Flom, New York, NY, for Appellee Unilab.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

87 Fed.Appx. 772                                                                                                      Page 2
87 Fed.Appx. 772, 2004 WL 249583 (C.A.2 (N.Y.)), Fed. Sec. L. Rep. P 92,683
(Not Selected for publication in the Federal Reporter)

*773 Stephen W. Greiner,Wilkie Farr & Gallagher, New York, NY, for Appellees Weavil, et al.
James D. Mathias, Piper Rudnick, Baltimore, MD, for Appellee B.T. Alex Brown.

Present: POOLER, Circuit Judge,FN*UNDERHILL, District Judge.FN**

> FN* The Honorable Amalya L. Kearse of the United States Court of Appeals for the Second Circuit was originally assigned as a member of the panel, but recused herself prior to oral argument and did not participate in the appeal. The appeal is being determined by the remaining members of the panel, who are in agreement. See 2d Cir. R. § 0.14(b); Murray v. National Broad. Co., 35 F.3d 45, 46 (2d Cir.1994).

> FN** The Honorable Stefan R. Underhill, District Judge of the United States District Court for the District of Connecticut, sitting by designation.

## SUMMARY ORDER

**\*\*1 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of said District Court be and it hereby is **AFFIRMED.**

Plaintiffs, Bond Opportunity Fund and Steven Gidumal, appeal from a judgment granting Defendants' 12(b)(6) motion and dismissing their complaint in its entirety. We assume the reader's familiarity with the underlying facts, procedural history, and specification of appellate issues and hold as follows.

Plaintiffs' Corrected Complaint, filed on November 5, 1999, shows that on that date they at least had notice of the facts giving rise to an action against B.T. Alex Brown and thus failed to meet the one year statute of limitations that applies in Section 14(a) actions when they first named B.T. Alex Brown as a defendant on September 26, 2001, in their Second Amended Complaint. SeeCeres Partners v. GEL Associates, 918 F.2d 349, 362-63 (2d Cir.1990). Thus, we affirm the district court's decision to dismiss the claims against B.T. Alex Brown on timeliness grounds.

In order to recover under Section 14(a) and Rule 14a-9, plaintiffs must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs' injury, and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. Furthermore, the PSLRA requires the complaint to specify each allegedly misleading statement, explain the reason (or reasons) that the statement is misleading, and, if an allegation is made upon information and belief, all facts with particularity upon which that belief is formed. 15 U.S.C. § 78u-4(b)(1). None of the misstatements identified by Plaintiffs in the Unilab proxy statement (the "Proxy") is pleaded in such a way as to meet these standards.

[1] Plaintiffs first claim that the Proxy was misleading because it suggested that two institutional shareholders retained their stock in order to benefit the other shareholders, when they actually did so to earn an additional profit. However, Plaintiffs do not provide any support for their vote-buying theory, and mere speculation is insufficient to satisfy the PSLRA pleading standard. Furthermore, Plaintiffs fail to adequately explain why the institutional investors would cash out the majority of their shares at an unacceptable price in order to retain the rest of their shares, when they carried enough voting power to have a chance of defeating the merger.

**\*\*2** Plaintiffs next allege that the Proxy was misleading because it failed to disclose that Unilab's board of directors had provided a financial windfall to another institutional investor in order to buy its vote. However, Plaintiffs rely on nothing more than *774 pure speculation to connect the windfall to the merger, and thus fail to meet the PSLRA pleading standard.

Third, Plaintiffs take issue with the Proxy's explanation of how B.T. Alex Brown reached its fairness opinion, suggesting that the Proxy misleads the reader into thinking that B.T. Alex Brown used the Projections that are included in the Proxy in doing so. However, this is not a misstatement, as the Projections clearly state that "they were prepared solely for the Company's internal purposes ... and such information is being included in this proxy statement *solely* because it was furnished to UC

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

87 Fed.Appx. 772                                                                                                                Page 3
87 Fed.Appx. 772, 2004 WL 249583 (C.A.2 (N.Y.)), Fed. Sec. L. Rep. P 92,683
**(Not Selected for publication in the Federal Reporter)**

Acquisition Sub and Kelso" and that "[t]he inclusion of this information should not be regarded as an indication that the Company, UC Acquisition Sub or anyone else who received this information considered it a reliable predictor of future events...."

[2] Fourth, Plaintiffs claim that the Proxy was misleading because it stated that B.T. Alex Brown's fairness opinion was supported by "publicly available research analysts' estimates" when there was only one analyst covering the company. This alleged misstatement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Thus, it fails to meet the standard for materiality. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Plaintiffs also argue that the Proxy was made misleading by the failure to disclose that this research analyst was urged by the company to reduce her projections. This claim fails to meet the PSLRA pleading standard because there is no suggestion that the analyst's independence was compromised.

Fifth, Plaintiffs argue that the Proxy's claim that the extensive auction process supported the fairness of the merger price was misleading because B.T. Alex Brown's involvement on both sides prevented the bidding process from being fair. However, Unilab's proxy supplement adequately disclosed the multiple roles played by B.T. Alex Brown, precluding this claim from being brought under Section 14(a).

Finally, we do not reach the state of mind issue because Plaintiffs have failed to adequately plead that a material misrepresentation was made.

Thus, we affirm the district court's dismissal of the Section 14(a) claims and the dismissal of the entirety of the complaint with prejudice.

C.A.2 (N.Y.),2004.
Bond Opportunity Fund v. Unilab Corp.
87 Fed.Appx. 772, 2004 WL 249583 (C.A.2 (N.Y.)), Fed. Sec. L. Rep. P 92,683

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**2**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 392289 (S.D.N.Y.)

**H**Doppelt v. Perini Corp.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Frederick DOPPELT, Arthur I. Caplan and Michael
Miller, individually and as representatives of a class
of holders of Depository Convertible Exchangeable
Preferred Shares, Plaintiffs,
v.
PERINI CORPORATION, Ronald N. Tutor, Robert
Band, Christopher H. Lee, Marshall M. Criser,
Arthur J. Fox, Jr., Michael R. Klein, Richard J.
Boushka, Peter Arkley, Robert A. Kennedy, Jane E.
Newman, Douglas J. McCarron, Nancy Hawthorne,
Raymond R. Oneglia, Albert A. Dorman, and John J.
McHale, Defendants.
No. 01 CIV. 4398(LMM).

March 13, 2002.

MEMORANDUM AND ORDER

MCKENNA, D.J.
**\*1** Frederick Doppelt ("Doppelt"), Arthur I. Caplan
("Caplan") and Michael Miller ("Miller")
(collectively, "plaintiffs") commenced this action on
behalf of themselves and other holders of Depository
Convertible Exchangeable Preferred Shares ("Senior
Preferred Stock") of Perini Corporation ("Perini")
alleging breach of contract against defendant Perini
and breach of fiduciary duty against the individually
named directors (collectively, "individual
defendants") of Perini.[FN1]Perini moves to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6)
for failure to state a claim upon which relief can be
granted, while the individual defendants move to
dismiss both pursuant to 12(b)(6) as well as Rule
12(b)(2), for lack of personal jurisdiction. For the
reasons set forth below, the motions are granted and
the case is dismissed.

FN1. By stipulation dated August 1, 2001,
plaintiffs agreed to dismiss defendants Jane
E. Newman, Albert A. Dorman, and John J.
McHale from this action.

Background [FN2]

FN2. For the purposes of resolving the
motions to dismiss, all facts alleged are to be
taken as true. *Mills v. Polar Molecular
Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993).

Perini is a construction corporation organized and
existing under the laws of the Commonwealth of
Massachusetts. (Am.Compl.¶ 7.) Its principal place
of business is in Massachusetts but it maintains an
office in New York and is registered in New York as
a foreign corporation authorized to do business in the
state. (Id.)

In June 1987, Perini filed a prospectus and
registration statement with the Securities and
Exchange Commission ("SEC") in connection with
the initial public offering of the Senior Preferred
Stock. (Id.¶ 32.) Thereafter, Perini sold 1,000,000
shares of the Senior Preferred Stock to the public at
the price of $25.00 per share. (Id.) According to
plaintiffs, each share was entitled to receive annual
cash dividends of $2.125. (Id.)

Under the heading "Description of Preferred Stock,"
the prospectus states, in relevant part, that:

Dividends on the Preferred Stock will be cumulative
from the date of original issue and shall be payable to
the holder of record on the record date fixed for such
payment.

[U]nless full cumulative dividends on the Preferred
Stock have been paid or declared and funds therefor
set apart for such payment, no cash dividends shall be
declared or paid or other distribution made upon the
Common Stock of the Company or any other stock of
the Company ranking junior to or on a parity with the
Preferred Stock as to dividends.

(Doppelt Aff. Ex. D at 18; Am. Compl. ¶ 33.) The
prospectus generally provides that:
[the] summary of terms ... contained in this
Prospectus does not purport to be complete and is
subject to, and qualified in its entirety by, the
provisions of the Company's Restated Articles and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 392289 (S.D.N.Y.)

Page 2

the Certificate of Vote of Directors Establishing a Series of a Class of Stock fixing the relative rights and preferences of the Preferred Stock.

Doppelt Aff. Ex. D at 17.) The Certificate of Vote of Director's Establishing a Series of a Class of Stock ("Certificate of Vote"), which was filed with the SEC along with the prospectus and registration statement provides, in relevant part, that:

in no event (so long as any [Senior Preferred Stock] shall remain outstanding) shall any cash dividends whatsoever be declared or paid upon, nor shall any cash distribution be made upon, the Common Stock, or any other stock of the corporation ranking junior to or on a parity with the [Senior Preferred Stock] as to dividends unless full cumulative dividends on all outstanding shares of [Senior Preferred Stock] for all dividend payment periods terminating on or prior to the date of the payment of such dividends shall have been paid or declared and funds therefor set apart for such payments.

**\*2** (Cohen Aff. Ex. C at 2A-2B.)

According to plaintiffs, Perini paid cash dividends to the holders of Senior Preferred Stock from 1987 through 1995 but ceased making such payments on or about February 22, 1996 when Perini amended its revolving credit agreements with its banks. (Am.Compl.¶ 34-35.) Under the modified credit agreements, Perini could no longer pay any dividends on any of its equity securities until, among other things, the credit line was repaid. (Id.¶ 35.) Thus, at that point, the unpaid dividends began to accrue despite alleged statements by Perini that it intended to continue making dividend payments to the Senior Preferred Stockholders once it satisfied the terms of its credit agreements. (Id.¶ 35-36.) Plaintiffs claim that Perini refused to resume paying dividends to the Senior Preferred Stockholders despite paying the credit line. (Id.¶ 37.) Moreover, according to plaintiffs, Perini's annual report for the year 2000 states that the company does not foresee ever resuming such payments or paying the amounts that have accrued. (Id.)

On or about January 17, 1997, Perini sold an aggregate of 150,150 shares of Series B Cumulative Convertible Preferred Stock (the "Junior Preferred Stock") in a private offering to an investment group, in which Perini received approximately $30,000,000

in total compensation. (Id.¶ 38.) These stockholders were junior in rank to the Senior Preferred Stockholders, both as to priority for the payment of dividends and liquidation preference. (Id.¶ 39.) Because the Junior Preferred Stock was not registered, the stockholders could not freely trade their shares on a stock exchange or national market. (Id.¶ 41.)

Subsequently, on March 29, 2000 Perini engaged in two transactions which form the basis for this lawsuit. First, Perini authorized the holders of the Junior Preferred Stock to exchange their shares for 7,490,417 shares of Perini's liquid Common Stock at $5.50 per share, an approximate 43% discount from the current conversion price of 9.68 per share. (Id.¶ 42.) Perini received over $41,000,000 from this exchange, $11,000,000 more than the original $30,000,000 Perini received when the Junior Preferred Stock was initially sold. (Id.) Plaintiffs allege that the $11,000,000 difference represents the payment of "cash dividends" or "other distribution" to the Junior Preferred Stockholders in violation of the Senior Preferred Stock's prospectus or a "cash distribution" in violation of the Senior Preferred Certificate of Vote. (Id.)

Second, Perini sold 9,411,765 shares of its Common Stock to a different investment group at $4.25 per share, raising an additional $40,000,000 in capital. (Id.¶ 43.) One member of this investment group was the Tutor-Saliba Corporation in which defendant Ronald Tutor, a director of Perini, is the Chairman, President, CEO and sole shareholder. (Id.¶¶ 8, 43.)

The two transactions were jointly approved by the Board of Directors. (Doppelt Aff. ¶ 11.) The transactions were not brought to the Senior Preferred Stockholders for approval. (Id.) As a result of these transactions, Perini announced that it had satisfied its credit agreements with its banks. (Am.Compl.¶ 46.) According to plaintiffs, at this time, the accumulated dividend arrears on the Senior Preferred Stock were approximately $9,562,500. (Id.) Plaintiffs claim that "[n]o payment in whole or in part for the accumulated dividend arrears was made to the holders of the Senior Preferred Stock on March 29, 2000 or at any time thereafter, despite repeated demands for such payment by the holders of the Senior Preferred Stock."(Id.¶ 48.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06174     Document 74-5     Filed 09/10/2008     Page 11 of 69

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2002 WL 392289 (S.D.N.Y.)

*3 Plaintiff Doppelt, a current director of Perini, owns 63,900 shares of the Senior Preferred Stock and has owned shares since August 22, 1991. (Am.Compl.¶ 4.) Plaintiff Caplan, a director of Perini during the relevant period of this lawsuit, owns 2,500 shares of the Senior Preferred Stock and has owned shares since February 20, 1996. (Id.¶ 5.) Plaintiff Miller owns 2000 shares of the Senior Preferred Stock which he has owned since September 19, 1996. (Id.¶ 6.) The individual defendants are either former or current directors of Perini. (Id.¶¶ 8-22.)

Plaintiffs initially commenced this action in state court but defendants removed it to federal court. (Perini's Mem. at 8.) [FN3] Plaintiffs' first cause of action is for breach of contract against Perini. (Am.Compl.¶¶ 49-52.) Plaintiffs' second cause of action is for breach of fiduciary duty against the individual defendants. (Id.¶¶ 53-58.)

> FN3. "Perini's Mem." refers to the Memorandum of Law submitted on behalf of Perini and individual defendants Tutor, Band, Lee, Klein, Boushka, Arkley, Kennedy, McCarron, Hawthorne and Oneglia. Defendants Criser and Fox filed a separate Memorandum of Law.

## Discussion

### A. Legal Standards

Under Federal Rule 12(b)(6), a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."Fed.R.Civ.P. 12(b)(6). The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations.Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993)."A court should only dismiss a suit under Rule 12(b)(6) if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Under Federal Rule 12(b)(2), a party may make a motion to dismiss for lack of personal jurisdiction. Absent an evidentiary hearing on jurisdiction, the plaintiff bears the burden of making out a prima facie case that jurisdiction exists. Fort Knox Music, Inc. v. Baptiste, 139 F.Supp.2d 505, 508 (S.D.N.Y.2001). If a plaintiff has taken discovery on jurisdictional issues, she has the burden of proving by a preponderance of the evidence that jurisdiction exists. Landoil Res. Corp. v. Alexander & Alexander Servs., 918 F.2d 1039, 1043 (2d Cir.1991). In determining whether personal jurisdiction exists over a particular defendant, courts apply a two part test-first, they determine whether there is statutory jurisdiction pursuant to the laws of the state of the forum and, second, they determine if the exercise of jurisdiction is consistent with federal due process requirements. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir.1999).

### B. Personal Jurisdiction

All individual defendants move to dismiss under 12(b)(2) on the grounds that the Court does not have personal jurisdiction over them. As noted above, plaintiff initially bears the burden of making a prima facie showing that personal jurisdiction exists. Fort Knox Music, 139 F.Supp.2d at 508.

Plaintiffs claim that the Court has jurisdiction over the individual defendants pursuant to 28 U.S.C. § 1367, under a theory of supplemental jurisdiction. (Pl.'s Mem. in Opp'n at 27.) Plaintiffs argue that because the Court has jurisdiction over Perini, which is not disputed by the parties, it has jurisdiction over the individual defendants because the claims against both are based on the same common nucleus of operative facts and form part of the same case. (Id. at 29.)

*4 The Court rejects this argument. The supplemental jurisdiction statute invoked by plaintiffs is a subject matter jurisdiction device which enables a plaintiff to join pendent claims in a federal proceeding. Huff v. Chandris SA, No. 93 Civ. 6685, 1994 WL 414467, at *4 (S.D.N.Y. Aug. 8.1994). Even assuming arguendo that the Court has supplemental jurisdiction over the claims brought by plaintiff, the Court still must have personal jurisdiction over each and every defendant in order to adjudicate the claims brought against that defendant. Id. (dismissing defendants where there is no personal jurisdiction over each of them). Because plaintiff has made no allegations as to how the individual defendants are subject to personal jurisdiction in New York under New York law, the breach of fiduciary duty claim against them must be

Not Reported in F.Supp.2d                                                                                                      Page 4
Not Reported in F.Supp.2d, 2002 WL 392289 (S.D.N.Y.)

dismissed.[FN4]

> FN4. The Court does not reach the federal
> due process analysis because there is no
> statutory personal jurisdiction.

C. Breach of Contract

Plaintiffs claim that when Perini engaged in the transactions described above and approved of the exchange of Junior Preferred Stock for Perini Common Stock:

Perini breached the covenant contained in the prospectus which guaranteed to the holders of the Senior Preferred Stock that no cash dividends would be declared or paid, or other distribution of any kind made, upon any other stock of the Company ranking junior to the Senior Preferred Stock, while there were accumulated unpaid dividends due to the Senior Preferred Stockholders.

(Am.Compl.¶ 50.) Defendants move to dismiss this claim on the grounds that the Certificate of Vote, not the prospectus, was the controlling contract between the Senior Preferred Stockholders and Perini, and that none of the transactions violated the terms of the Certificate of Vote. (Perini's Mem. at 10-12.)

The two documents differ in that the prospectus states that no "cash dividends shall be declared or paid or *other distribution* made" (Doppelt Aff. Ex. D at 18, emphasis added), whereas the Certificate of Vote states that no "cash dividends whatsoever [will] be declared or paid upon, nor shall any *cash distribution* be made."(Cohen Aff. Ex. C at 2A, emphasis added.) Thus, the critical issues in evaluating this breach of contract claim are: (1) which document (or documents) is controlling and (2) whether the transactions described above violate the terms of that document.

Massachusetts law applies in this diversity action because that is the state in which Perini is incorporated. *Guttman v. Illinois Cent. R. Co.,* 91 F.Supp. 285, 292 (E.D.N.Y.1950) (finding Illinois law applicable in diversity action for the determination of plaintiff's dividend rights where defendant was incorporated in Illinois). Under Massachusetts law, contract interpretation is

generally a matter of law and when the language in the contract is unambiguous, the court will interpret the contract according to its plain terms. *Den Norske Bank AS v. First Nat'l Bank of Boston,* 75 F.3d 49, 52 (1st Cir.1996).

The Court finds that the Certificate of Vote is the controlling document in this case. The prospectus clearly states that it is only a summary of terms and that it "does not purport to be complete and is subject to, and qualified in its entirety by, the provisions of" the Certificate of Vote. (Doppelt Aff. Ex. D at 17.) With such explicit qualifying language, the Court must apply the terms of the Certificate of Vote in analyzing whether plaintiff's breach of contract allegations have any merit. *In the Matter of Discon Corp.,* 346 F.Supp. 839, 843 (S.D.Fla.1971) (resolving conflict between documents where prospectus included such qualifying language). While it is true that a party may challenge the terms of the prospectus as containing false or misleading statements under the securities laws, plaintiffs' action in this case is for breach of contract. E.g. *Discon Corp.,* 346 F.Supp. at 844 ("[t]he purpose of the registration statement and prospectus is to prevent fraud by fully and fairly disclosing the nature and finances of the company to investors ...."); *Hassett v. S.F. Iszard Co.,* 61 N.Y.S.2d 451, 455 (N.Y.Sup.Ct.1945) (prospectus might be evidence in action in fraud by a purchaser of stock). Although plaintiffs claim that they reviewed and relied only upon the prospectus when they decided to purchase shares of Senior Preferred Stock, the plain language of the prospectus would have made them aware of the Certificate of Vote.

*5 The terms in the provision of the Certificate of Vote at issue here are unambiguous. Because the terms "dividends" and "distribution" are modified in this provision by the word "cash," Perini would have violated the terms of the Certificate of Vote only if it declared or paid "cash" dividends or made a "cash" distribution before it paid or declared full cumulative dividends on the outstanding shares of Senior Preferred Stock. (Cohen Aff. Ex. C at 2A-2B.)

Thus, the only remaining issue is whether the transactions plaintiffs complain of involved cash dividends or a cash distribution to any shareholder junior to the Senior Preferred Shareholder. Defendants argue that the transactions resulted in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                           Page 5
Not Reported in F.Supp.2d, 2002 WL 392289 (S.D.N.Y.)

issuance of stock to the Junior Preferred Stockholders, not cash, and therefore did not violate the Certificate of Vote. (Defs.' Rely Mem. at 9-10).

In opposition, plaintiffs principally argue that by authorizing the conversion of Junior Preferred Stock into freely tradeable Perini Common Stock, Perini violated the terms of the Certificate of Vote because the common stock was a form of "cash distribution." (Pls.' Mem. in Opp'n at 18.) As a result, according to plaintiffs, "Perini has, in effect, made a cash equivalent distribution to the Junior Preferred Stockholders while unpaid dividend arrearages due to holders of the Senior Preferred Stock were outstanding."(Id.)

Plaintiffs have failed to convince the Court that the transaction in which the Junior Preferred Stockholders exchanged their Junior Preferred Stock for Perini common stock was either a a "cash dividend" or "cash distribution." As a result of the exchange, the Junior Preferred Stockholders did not receive cash. In fact, the Junior Preferred Stockholders actually paid cash to the company. Plaintiffs' argument that the receipt of freely tradeable common stock is a functional equivalent of cash is without merit. Thus, as a matter of law, plaintiffs' breach of contract claim fails and must be dismissed.[FN5]

> FN5. The Court rejects plaintiffs' additional argument that the conversion of the Junior Preferred Stock into common stock was unauthorized. (Pls.' Mem. in Opp'n at 18-20.) Plaintiffs have not pointed to anything in the Junior Preferred Certificate of Vote which indicates that the conversion was not authorized. The "Right of Conversion" provision in the Junior Preferred Certificate of Vote, which authorizes conversion of stock at the option of the Junior Preferred Stockholder, is not applicable to the kind of conversion that took place on March 29, 2000. In addition, plaintiffs' argument that "as a condition of the conversion, Perini had to first fully pay all senior dividend arrearages" (Pls.' Mem. in Opp'n at 20), is also unconvincing because the "Liquidation Preference" clause in the Junior Preferred Certificate of Vote that plaintiffs rely on is also not applicable to the March 29, 2000

transaction. Thus, plaintiffs cannot maintain a breach of contract action against defendants on this ground.

Conclusion

In sum, the individual defendants are dismissed from this action for lack of personal jurisdiction and Perini's 12(b)(6) motion to dismiss is granted.

So ordered.

S.D.N.Y.,2002.
Doppelt v. Perini Corp.
Not Reported in F.Supp.2d, 2002 WL 392289 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**3**



78 Fed.Appx. 857                                                        Page 1
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
**(Not Selected for publication in the Federal Reporter)**

**H**Hayes v. Crown Central Petroleum Corp.
C.A.4 (Va.),2003.
This case was not selected for publication in the
Federal Reporter.UNPUBLISHEDPlease use FIND
to look at the applicable circuit court rule before
citing this opinion. Fourth Circuit Rule 36(c). (FIND
CTA4 Rule 36(c).)
    United States Court of Appeals,Fourth Circuit.
    James J. HAYES; Thomas Boots, on behalf of
    themselves and all others similarly situated,
    Plaintiffs-Appellants,
v.
    CROWN CENTRAL PETROLEUM
CORPORATION; Michael F. Dacey; Stanley A.
Hoffberger; Barry L. Miller; Henry A. Rosenberg,
Jr.; John E. Wheeler, Jr.; Jack Africk; Harold Ridley;
Credit Suisse First Boston Corporation; Rosemore,
Incorporated; Frank B. Rosenberg, Defendants-
Appellees.
**No. 02-2190.**

Argued May 6, 2003.
Decided Oct. 17, 2003.

Former shareholders brought class action suit against
corporation and its directors, financial advisor, and
majority shareholder, alleging violations of federal
securities laws and breach of fiduciary duty in
connection with merger transaction. The United
States District Court for the Eastern District of
Virginia, 249 F.Supp.2d 725,Claude M. Hilton, Chief
District Judge, dismissed, and appeal was taken. The
Court of Appeals held that: (1) most alleged
misrepresentations in proxy statement were not
material; (2) remand was required for initial
consideration of one alleged misrepresentation; and
(3) complaint failed to state claim against defendants
for breach of fiduciary duty.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Securities Regulation 349B ⬅️49.22(6)**

349B Securities Regulation

349BI Federal Regulation
    349BI(C) Trading and Markets
        349BI(C)4 Proxies
            349Bk49.19  False  or  Fraudulent
Proxies; Accuracy and Completeness
                349Bk49.22 Items to Be Disclosed;
Nondisclosure
                    349Bk49.22(6)  k.  Fiscal  or
Accounting Data; Valuation. Most Cited Cases
Figures regarding refinery margins, in proxy
solicitation for proposed merger, were not materially
misleading, within meaning of Securities Exchange
Act section prohibiting solicitation of proxies by
means of materially false or misleading statements,
despite omission of single month's margin or claim
that defendants should have used different
methodology for indicating margins. Securities
Exchange Act of 1934, § 14(a), as amended, 15
U.S.C.A. § 78n(a).

**[2] Securities Regulation 349B ⬅️49.22(4)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)4 Proxies
                349Bk49.19  False  or  Fraudulent
Proxies; Accuracy and Completeness
                    349Bk49.22 Items to Be Disclosed;
Nondisclosure
                        349Bk49.22(4)  k.  Mergers,
Acquisitions or Sales of Assets. Most Cited Cases
Failure to disclose sale of two refineries by third
parties, in proxy solicitation for proposed merger, did
not alter total mix of information made available, as
would support investors' claim for misrepresentation
in solicitation to vote on corporation's proposed
refinery sale, where investors failed to allege that
other refinery sales were comparable. Securities
Exchange Act of 1934, § 14(a), as amended, 15
U.S.C.A. § 78n(a).

**[3] Securities Regulation 349B ⬅️49.22(4)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 Fed.Appx. 857                                                                              Page 2
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
**(Not Selected for publication in the Federal Reporter)**

349BI(C)4 Proxies
349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
349Bk49.22 Items to Be Disclosed; Nondisclosure
349Bk49.22(4) k. Mergers, Acquisitions or Sales of Assets. Most Cited Cases
Proxy solicitation for proposed merger accurately disclosed favorable impact that would result from settlement of a labor dispute, and thus did not violate Securities Exchange Act section prohibiting solicitation of proxies by means of materially false or misleading statements, even though disclosure was not included in statement section titled j'Recent Developments." Securities Exchange Act of 1934, § 14(a), as amended, 15 U.S.C.A. § 78n(a).

**[4] Securities Regulation 349B ☞49.22(4)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
349Bk49.22 Items to Be Disclosed; Nondisclosure
349Bk49.22(4) k. Mergers, Acquisitions or Sales of Assets. Most Cited Cases
Proxy solicitation for proposed merger accurately disclosed favorable financial impact that would result from corporation's termination of contract, and thus did not violate Securities Exchange Act section prohibiting solicitation of proxies by means of materially false or misleading statements, even if it presented information as if it was negative development. Securities Exchange Act of 1934, § 14(a), as amended, 15 U.S.C.A. § 78n(a).

**[5] Securities Regulation 349B ☞49.22(4)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
349Bk49.22 Items to Be Disclosed; Nondisclosure
349Bk49.22(4) k. Mergers, Acquisitions or Sales of Assets. Most Cited Cases

Newspaper article, dated five months after shareholders approved merger, reporting that corporation had been considering sale of its refineries for more than year was insufficient to support claim that merger proxy solicitation, stating that corporation had no plans to sell material amount of its assets, violated Securities Exchange Act section prohibiting solicitation of proxies by means of materially false or misleading statements; subsequent disclosure was not inconsistent with proxy solicitation's disclosure that corporation had been considering all options, including sale of assets, for some time. Securities Exchange Act of 1934, § 14(a), as amended, 15 U.S.C.A. § 78n(a).

**[6] Corporations 101 ☞310(1)**

101 Corporations
101X Officers and Agents
101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
101k310 Management of Corporate Affairs in General
101k310(1) k. In General. Most Cited Cases
Under Maryland law, investors asserting breach of fiduciary duty claim against corporation's directors failed to plead facts sufficient to defeat application of corporate charter provision which limited director liability; complaint explicitly disavowed that directors engaged in fraud, and there was no allegation that directors' received improper benefits. West's Ann.Md.Code, Courts and Judicial Proceedings, § 5-418.

**[7] Corporations 101 ☞182.3**

101 Corporations
101IX Members and Stockholders
101IX(A) Rights and Liabilities as to Corporation
101k182 Corporate Property, Funds, and Securities
101k182.3 k. Majority and Minority Stockholders in General. Most Cited Cases
Under Maryland law, third party's shares would not be attributed to minority shareholder, for purpose of determining whether it was actually majority shareholder owing fiduciary duties to other minority shareholders; third party had not been named as defendant.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 Fed.Appx. 857
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
(Not Selected for publication in the Federal Reporter)

Page 3

*858 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Chief District Judge. (CA-02-122-A).

ARGUED: Edward M. Selfe, Bradley, Arant, Rose & White, L.L.P., Birmingham, Alabama, for Appellants. Anne Marie Whittemore, McGuireWoods, L.L.P., Richmond, Virginia; Jonathan Lee Greenblatt, Shearman & Sterling, Washington, D.C., for Appellees. ON BRIEF: John F. Goodman, Bradley, Arant, Rose & White, L.L.P., Birmingham, Alabama; Michael Straus, Mark J. Schirmer, Straus & Boies, L.L.P., Birmingham, Alabama, for Appellants. Elizabeth F. Edwards, McGuireWoods, L.L.P., Richmond, Virginia; Neil H. Koslowe, Suzanne Miller Trinh, Shearman & Sterling, Washington, D.C.; Lawrence Portnoy, Kimberley D. Harris, *859 Davis, Polk & Wardwell, New York, New York; Robert S. Bennett, Richard L. Brusca, Mary L. Smith, Skadden, Arps, Meagher, Slate & Flom, L.L.P., Washington, D.C.; Amy Berman Jackson, John Thorpe Richards, Jr., Trout & Richards, P.L.L.C., Washington, D.C., for Appellees.

Before LUTTIG, MOTZ, and SHEDD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished PER CURIAM opinion.

## OPINION

PER CURIAM.
**1 Former shareholders of Crown Central Petroleum Corporation ("Crown") brought a class action against Crown; members of Crown's Board of Directors; Rosemore, Inc. ("Rosemore"); and Credit Suisse First Boston Corporation ("CSFB"), alleging violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 ("the Act") and Maryland state law. The district court granted the defendants' motion to dismiss, and the plaintiffs appeal. For the reasons set forth below, we affirm in part, vacate in part, and remand for proceedings consistent with this opinion.

### I.

In February 1999, Crown, a refiner and marketer of petroleum products, retained CSFB as a financial advisor and announced that it was exploring strategic alternatives. At the recommendation of CSFB, Crown elected to pursue the sale or merger of Crown as a whole or the sale of its refining assets. In January 2000, Rosemore, Crown's largest shareholder, expressed interest in purchasing Crown. At that time, Henry Rosenberg, Jr. served as Chairman, President, and Chief Executive Officer of Crown as well as Chairman of the Board of Rosemore. The directors of Crown, other than Rosenberg, subsequently constituted themselves as an independent committee that would consider offers to purchase Crown. The independent committee agreed to pay CSFB a $3.27 million fee, of which $1.5 million was contingent upon the completion of a purchase deal with Rosemore.

In April 2000, Rosemore proposed to enter into a cash-out merger with Crown pursuant to which the public shareholders of Crown would receive $9.50 per share, and CSFB rendered an opinion that this offer was fair to the shareholders. The independent committee, and the Board of Directors thereafter, approved the merger. Before a shareholder vote could be taken on the Rosemore proposal, APEX Oil Company, a privately owned entity of the Novelly Group ("Novelly"), proposed a stock-for-stock merger valued at $10.50 per share. In the wake of the APEX offer, Crown's shareholders defeated the Rosemore proposal.

After the failed merger attempt, Rosemore and Novelly entered into negotiations for the sale of Novelly's stock to Rosemore, and Rosemore again sought a merger with Crown. An agreement was reached in which Novelly would vote its Crown shares in favor of the Crown and Rosemore merger, and, in return, Rosemore would pay $10.50 per share to all shareholders plus an additional $1.75 million to Novelly for the expenses incurred during its pursuit of Crown.

On December 14, 2000, Crown held its annual shareholder meeting and elected a new Board of Directors, all of whom are named defendants. Immediately following the meeting, the Board of Directors met and appointed three of its members as the new independent committee. On December 16, 2000, CSFB presented an oral opinion to the independent committee, subsequently confirmed in

78 Fed.Appx. 857                                                                                  Page 4
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
**(Not Selected for publication in the Federal Reporter)**

writing, that the offer of $10.50 per share was fair to Crown *860 shareholders. CSFB specifically noted that it had not performed, and had not been asked to perform, a liquidation value of Crown. CSFB stated, however, that it did not believe that this liquidation value would produce a greater value for shareholders than the proposed merger with Rosemore. At the conclusion of the meeting, the independent committee voted to recommend the Rosemore proposal to the Crown Board of Directors. The independent committee also recommended that the merger receive a majority of the votes cast, excluding those of Rosemore and its affiliates. The Novelly Group votes, however, already pledged to vote in favor of the merger, were not to be considered as Rosemore votes. Subsequently, the Crown Board of Directors voted unanimously to approve the merger.

**\*\*2** Crown prepared a proxy statement, which relied upon the CSFB report, asserting that the terms of the merger were fair to, and in the best interests of, Crown's public shareholders. The proxy statement, dated January 31, 2001, and mailed to shareholders on or about February 2, 2001, set forth various indicators of Crown's economic health. For example, the proxy statement included information on an industry refining margin known as the Gulf Coast 20-day delayed 3/2/1 crack spread. A positive crack spread indicates that the value of refined products is more than the cost of the crude oil used to produce it. Conversely, a negative crack spread indicates that the value of the refined products is less than the cost of the crude oil, resulting in losses to refiners such as Crown. The proxy statement asserted that the crack spread fell from an average of $4.89 per barrel for the first eleven months of 2000 to a negative $1.68 per barrel in December 2000. The statement noted, however, that the crack spread was expected to be approximately $4.85 per barrel for the first six months of 2001.

The proxy statement also set forth a selected companies analysis performed by CSFB that utilized financial, operating and stock market data of other petroleum refiners and marketers to estimate the value of Crown stock. The equity market value of these companies was calculated as multiples of their estimated earnings before interest, taxes, depreciation, and amortization ("EBITDA") for calendar years 2000 and 2001. According to the proxy statement, CSFB applied these multiples to

Crown's 2000 and 2001 EBITDA and to Crown's 1997-1999 average EBITDA to approximate the share price of Crown stock and calculated a reference range of $4.28 to $7.79 per share.

In addition, the proxy statement included a valuation of Crown's refineries based upon recent industry transactions involving comparable refineries; a statement regarding the settlement of a labor dispute; information regarding the termination of Crown's contract with Statoil Marketing and Trading, Inc. ("Statoil"); and a statement that Crown did not have plans to sell material amounts of its assets.

On March 7, 2001, Crown shareholders approved the merger by the requisite margin. The plaintiffs subsequently brought this class action, alleging (1) that Crown and the individual members of the Board of Directors issued a proxy statement containing false or misleading statements of material facts or omitting material facts, in violation of Section 14(a) of the Act; (2) that Crown, the individual members of the Board of Directors, and CSFB knowingly issued a false statement of opinion in the proxy statement, in violation of Section 14(a) of the Act; (3) that Crown, the individual members of the Board of Directors, and CSFB issued a false statement of opinion that they should have known was false, in violation of Section 14(a) of the Act; and (4) that Rosemore and Henry *861 Rosenberg, Jr. were controlling persons under Section 20(a) of the Act. The plaintiffs also asserted a claim under Maryland law, alleging that Rosemore and the individual members of the Crown Board breached a fiduciary duty owed to Crown shareholders and that CSFB aided and abetted the directors' breach. As to all of the claims, the plaintiffs excluded any allegations of fraudulent conduct. The district court granted the defendants' motion to dismiss all claims, and this appeal followed.

## II.

**\*\*3** We review *de novo* the dismissal of claims pursuant to Fed.R.Civ.P. 12(b)(6). *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir.2002). A motion to dismiss should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support its claim and entitle it to relief, and the complaint should be viewed in the light most favorable to the plaintiff. *Id.* To survive a motion to dismiss a securities fraud complaint, a plaintiff must

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 Fed.Appx. 857                                                                              Page 5
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
(Not Selected for publication in the Federal Reporter)

also comply with the heightened pleading requirements imposed by the Private Securities Litigation Reform Act ("PSLRA"). Specifically, the PSLRA requires that:

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). In any action requiring proof that the defendant acted with a particular state of mind, the facts alleged must give rise "to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint does not meet these pleading requirements, the district court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

Section 14(a) of the Act makes unlawful the solicitation of a proxy regarding any security, by way of interstate commerce, in contravention of the rules and regulations prescribed by the Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78n(a). Of relevance here, SEC Rule 14a-9 prohibits false or misleading statements with respect to material facts as well as the omission of material facts necessary to make the statements therein not false or misleading. 17 C.F.R. § 240.14a-9. To prevail in a private cause of action asserting a violation of Rule 14a-9, a plaintiff must show that (1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction. Gen. Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3rd Cir.1992) (citing Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)). A misrepresentation or omission is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). The Supreme Court has expressly declined to determine what showing of culpability is required to establish liability for a misleading proxy statement. Id. at 444, n. 7, 96 S.Ct.

2126.

The plaintiffs allege that the proxy statement made several material misrepresentations or omissions of fact that painted a bleak picture of Crown's future profitability, thereby inducing Crown's shareholders to approve the merger with Rosemore. We address each of these contentions in turn.

A.

**4 [1] We first address plaintiffs' allegation that the proxy statement misrepresented*862 the refining margin known as the crack spread. The plaintiffs assert that Crown emphasized the negative crack spread for December 2000, yet omitted the actual crack spread for January 2001, which the plaintiffs submit to have been $8.64 per barrel. The plaintiffs also argue that the proxy statement should have disclosed industry refining margins other than the crack spread.

We conclude, however, that the plaintiffs have failed to allege facts that would entitle them to relief based upon the defendants' use of crack spreads in the proxy statement. There is no indication in the record that the defendants made any misstatements regarding the crack spread figures or omitted any material information. While the proxy statement did indicate that crack spreads fell from an average of $4.89 per barrel for the first eleven months of 2000 to a negative $1.68 per barrel in December 2000, it also noted that crack spreads were expected to improve to approximately $4.85 per barrel for the first six months of 2001. The plaintiffs do not challenge the accuracy of these numbers, and the predicted upturn hardly gives the impression that the crack spreads were expected to remain at low or negative levels. As to the plaintiffs' assertion that the omission of the actual crack spread for January 2001 was misleading, the omission was immaterial. Because the shareholders were provided with an estimate of improved crack spreads for the first six months of 2001, we find unpersuasive the plaintiffs' contention that the omission of one month's actual crack spread significantly altered the total mix of information made available to investors. See TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126. We also find no merit in the plaintiffs' argument that the proxy statement was materially misleading because it did not disclose refining margins other than the crack spread. Rule

78 Fed.Appx. 857                                                                                                      Page 6
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
**(Not Selected for publication in the Federal Reporter)**

14a-9 does not require that Crown include every conceivable methodology available for the determination of refining margins. The proxy statement, therefore, was not materially misleading with respect to crack spreads, and the plaintiffs cannot survive a motion to dismiss with respect to this issue.

### B.

[2] The plaintiffs next allege that Crown omitted from the proxy statement two purchases of refineries in 2000, and, if these industry purchases had been considered in determining the value of Crown's assets, the liquidation of Crown would have been more attractive to the shareholders. The plaintiffs argue on appeal that the refineries were comparable, but the complaint clearly fails to draw a direct comparison. While dismissal under Rule 12(b)(6) is generally disfavored for inartfully drafted complaints, *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130 (4th Cir.1993), this is a securities case, and we must apply the pleading requirements of the PSLRA. Because the complaint does not state that the refineries were comparable, it fails to specify the reason why the omission was misleading. *See*15 U.S.C. § 78u-4(b)(1). Accordingly, the plaintiffs cannot prevail on this issue.

### C.

**\*\*5** [3] The plaintiffs also allege that Crown omitted from the proxy statement the favorable impact that would result from the settlement of a labor dispute at Crown's refinery in Pasadena, Texas. Although the settlement of the labor dispute did appear in the proxy statement, Hayes argues that it should have been included in the section titled "Recent Developments." We find the plaintiffs' argument to be without merit. Because information regarding the labor dispute was included in the proxy statement, there was no omission, and the plaintiffs have presented no **\*863** set of facts on this issue that would entitle them to relief.

### D.

[4] The plaintiffs next allege that the proxy statement was misleading because it treated the termination of Crown's contract with Statoil as a detriment to Crown, when in fact the termination of the contract

provided the potential for increased profits. Although a fair reading of the "Recent Developments" section of the proxy statement would perhaps lead one to conclude that the termination of the Statoil contract was a negative development for Crown, the plaintiffs have not alleged that the statements therein-asserting that the conclusion of the contract would increase Crown's credit and working capital requirements at the Pasadena factory-were false. Moreover, the 1999 Form 10-K, filed with the SEC and attached to the proxy statement, plainly revealed the advantages associated with the Statoil contract termination. We therefore conclude that the plaintiffs cannot prevail on this issue.

### E.

[5] The plaintiffs also argue that the proxy statement misrepresented Crown's plans regarding the future sale of its assets. According to the proxy statement, Crown had no plans to sell a material amount of its assets. The plaintiffs point to a newspaper article, dated five months after the shareholders approved the merger, reporting that Crown had been considering the sale of its refineries for more than a year. The newspaper article, however, fails to demonstrate that the proxy statement was misleading. Crown publicly stated in early 1999, at the time it hired CSFB, that it was considering the sale of its assets, and this information was fully disclosed in the proxy statement. Given Crown's interest in selling its assets during the months prior to the merger, it is not surprising that a newspaper article characterized Crown as having an ongoing interest in the sale of its assets during the past year. In any case, Crown's assertion that it had no plans to sell its assets at the time of the proxy statement did not necessarily mean that Crown was not considering the eventual sale of those assets. The plaintiffs, therefore, cannot prevail on this issue.

### F.

We turn next to the plaintiffs' allegation that Crown misrepresented the CSFB selected companies analysis, and that, as a result, the purported range of share values in the proxy statement was inaccurate. Although the statement described the analysis as utilizing Crown's estimated 2000 and 2001 EBITDA, the plaintiffs contend that CSFB only considered Crown's 1997-1999 EBITDA in its calculations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 Fed.Appx. 857                                                                                    Page 7
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
(Not Selected for publication in the Federal Reporter)

regarding the "Pasadena" segment of Crown's operations. If the 2000 and 2001 EBITDA had been incorporated into these calculations, according to the plaintiffs, the per share reference range would have been $1.51 to $32.26, rather than $4.28 to $7.79. The defendants counter by noting that the calculations regarding the "Wholesale" segment of Crown's operations utilized 2000 and 2001 EBITDA, which they argue indicates that all segments of Crown's operations, including Pasadena, were calculated properly. The defendants further argue that any alleged discrepancy in the selected companies analysis is immaterial.

**6 Our review of the record indicates that the district court did not consider this issue. We believe that under the circumstances presented, the case should be remanded so that the district court may consider in the first instance the manner in which the EBITDA calculations were used in the selected companies analysis. At *864 this point, we cannot say, as a matter of law, that the EBITDA figures are correct or otherwise immaterial. If the price per share of Crown stock should have been valued as high as $32.26 per share, rather than $7.79 per share as presented in the proxy statement, this information clearly would have been material as it would have significantly altered the total mix made available to shareholders, who had to decide whether to accept the offer of $10.50 per share under the terms of the merger.

III.

Although we make no judgment as to whether the proxy statement was misleading with regard to the EBITDA data, our inquiry under Section 14(a) does not end there. The plaintiffs also allege that Crown, the Board of Directors, and CSFB knowingly issued an objectively false statement of opinion in the proxy statement.

The Supreme Court has held that Section 14(a) of the Act and Rule 14a-9 apply to statements of opinion with respect to material facts. _Virginia Bankshares v. Sandberg,_ 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Liability may arise under Section 14(a) for false statements of reasons, opinion, and belief that are knowingly made. _Virginia Bankshares,_ 501 U.S. at 1087, 111 S.Ct. 2749. A statement of opinion has both subjective and

objective components: "as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed." _Id._ at 1092, 111 S.Ct. 2749. Subjective disbelief by those asserting an opinion, absent proof that the statement was false or misleading, is insufficient to establish liability under Section 14(a). _Virginia Bankshares,_ 501 U.S. at 1096, 111 S.Ct. 2749.[FN1]

> FN1. In determining that the complaint did not allege that the statement of opinion was "knowing" under _Virginia Bankshares,_ the district court appears to have considered it significant that the plaintiffs expressly excluded allegations of fraud, presumably because scienter, or an intent to deceive, is a necessary element of securities fraud. We note, however, that the Supreme Court has not determined whether it is necessary to demonstrate scienter to satisfy the "knowing" element of a Section 14(a) claim. _See Virginia Bankshares,_ 501 U.S. at 1091, n. 5, 111 S.Ct. 2749.

The plaintiffs allege that Crown, the Board of Directors, and CSFB issued a statement of opinion that the merger price was fair to Crown shareholders when, in fact, the merger price was not fair (objectively false) and the defendants knew or should have known that it was not fair (subjectively false). The district court dismissed these claims, finding that the plaintiffs had not satisfied the pleading requirements of the PSLRA by failing to allege facts giving rise to a strong inference that the defendants knowingly issued a false statement of opinion in the proxy statement. _See_ 15 U.S.C. § 78u-4(b)(2).

The district court, as it did with the plaintiffs' claim alleging material misstatements of fact, did not consider the manner in which the EBITDA calculations were used in the selected companies analysis. The claims alleging false statements of opinion, therefore, should also be remanded to allow the district court to consider them in light of this issue.

IV.

The district court dismissed the plaintiffs' claim against Rosemore and Henry Rosenberg, Jr. as

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

78 Fed.Appx. 857                                                                                          Page 8
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))
(Not Selected for publication in the Federal Reporter)

controlling persons under Section 20(a) of the Act. The court held that because the plaintiffs failed to state a claim for primary violations of the Act under Section 14(a), the plaintiffs necessarily failed to state a claim under Section 20(a). If, on remand, the district court determines that the plaintiffs have **865 stated a Section 14(a) claim, the Section 20(a) claim, of course, should be reconsidered.

### V.

**7 Last, we turn to the Maryland state law claims. The plaintiffs allege a breach of fiduciary duty against Crown's directors and Rosemore because they knew or should have known that the merger was not in the best interests of the public shareholders of Crown. The plaintiffs also assert a claim against CSFB for aiding and abetting the alleged breach of fiduciary duty by the directors. The plaintiffs specifically excluded, however, allegations of fraudulent conduct.

Under Maryland law, directors owe fiduciary duties to a corporation's shareholders. *Toner v. Baltimore Envelope Co.,* 304 Md. 256, 498 A.2d 642, 648 (1985). A corporation's charter may limit the liability of directors for money damages except to the extent that (1) the directors received an improper benefit or (2) engaged in active and deliberate dishonesty. Md.Code Ann., Cts. & Jud. Proc. § 5-418. Because Crown's charter specifically limits the liability of its directors for money damages as provided by law, the plaintiffs must allege an improper benefit or active and deliberate dishonesty in order to state a claim.

[6] We conclude that the plaintiffs have not alleged facts necessary to survive a motion to dismiss their claim against the directors. The complaint does not allege that the directors received improper benefits. As to active or deliberate dishonesty, the plaintiffs cannot prevail because the pleadings specifically exclude allegations of fraud. Accordingly, the district court properly granted the motion to dismiss the claim against the directors for breach of fiduciary duty.[FN2]

> FN2. Because the plaintiffs have failed to state a claim against the directors, the plaintiffs' claim against CSFB for aiding and abetting the alleged breaches of fiduciary duty must also fail.

[7] The plaintiffs also allege that Rosemore owed a fiduciary duty to the minority shareholders and breached that duty by purchasing Crown at an unfair price. Maryland law provides that in certain circumstances, majority shareholders owe fiduciary duties to minority shareholders. *See Toner,* 498 A.2d at 647-648. The plaintiffs argue that Rosemore, although a minority shareholder, should be considered a majority shareholder because the combined shares of Rosemore and Novelly constituted a majority of votes eligible to be cast. We decline, however, to recharacterize a minority shareholder as a majority shareholder. Furthermore, Novelly was not a named defendant in this action. The plaintiffs, therefore, have failed to state a claim against Rosemore for breach of fiduciary duty.

### VI.

Accordingly, we vacate the judgment of the district court in part and remand the Section 14(a) and Section 20(a) claims for consideration of the defendants' use of EBITDA in the selected companies analysis. We affirm the judgment of the district court as to all other alleged misrepresentations of material fact, and we affirm the dismissal of the state law claims.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*

C.A.4 (Va.),2003.
Hayes v. Crown Central Petroleum Corp.
78 Fed.Appx. 857, 2003 WL 22365985 (C.A.4 (Va.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**4**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

Page 1

**C**Jolly Roger Fund LP v. Sizeler Property Investors, Inc.
D.Md.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Maryland.
JOLLY ROGER FUND LP, et. al, Plaintiffs,
v.
SIZELER PROPERTY INVESTORS, INC., et al.,
Defendants.
**No. Civ. RDB 05-841.**

Nov. 3, 2005.

Glenn Edward Mintzer, H. Russell Smouse, Law Offices of Peter G. Angelos, Baltimore, MD, for Plaintiffs.
Mark D. Gately, Mark Spencer Saudek, Hogan and Hartson LLP, Baltimore, MD, for Defendants.

*MEMORANDUM OPINION*

BENNETT, J.
**\*1** Pending before the Court is the Motion to Dismiss filed by Defendants Sizeler Property Investors ("Sizeler") and its nine directors [FN1] ("Directors") (collectively the "Defendants"). Defendants move to dismiss the Complaint filed, on March 28, 2005, by Plaintiffs Jolly Roger Fund LP and Jolly Roger Offshore Fund, Ltd., on behalf of a proposed class of all Sizeler common stockholders, (collectively the "Plaintiffs") based on Rule 12(b)(6) of the Federal Rules of Civil Procedure.

> FN1. These Directors are: J. Terrell Brown; William G. Byrnes; Harold B. Judell; Sidney W. Lassen; Thomas A. Masilla Jr.; James W. McFarland; Richard L. Pearlstone; James Robert Peltier; and Theodore Strauss. (Com pl.¶¶ 10-18.)

Sizeler is a self-managed real estate investment trust ("REIT") incorporated in Maryland with its principal place of business in Kenner, Louisiana. (Compl.¶ 9.) Sizeler, which is publically traded on the New York Stock Exchange ("NYSE") under the symbol "SIZ", owns and manages income-producing apartment and

shopping center properties in the southeastern United States. (Compl.¶ 9.) Plaintiffs were holders of Sizeler common stock as of the close of trading on March 14, 2005.[FN2](Compl.¶ 8.) It is unclear whether Plaintiffs were Sizeler shareholders at the time this lawsuit was filed.

> FN2. Although Plaintiffs do not specifically allege in which state they reside, they allege that this dispute is between citizens of different states and that the amount in controversy exceeds $75,000. (Compl.¶ 5.)

Plaintiffs allege, in a one count Complaint, a direct suit against Sizeler and its Directors for breach of their fiduciary duties "to Sizeler's outside common shareholders." (Compl.¶ 1.) Specifically, Plaintiffs allege that their stock holdings were diluted when Defendants sold 2.69 million newly issued Sizeler shares to four institutional investors [FN3] at a discounted price. Defendants assert that this claim must be dismissed, as it cannot be a direct action [FN4] by the shareholders against the Directors, but instead must be a derivative action [FN5] brought by the shareholders on Sizeler's behalf. Defendants, however, contend that Plaintiffs have failed to satisfy the legal prerequisites necessary to pursue a derivative action and, therefore, any derivative claim must also be dismissed.

> FN3. The institutional investors included TIAA-CREF Investment Management, LLC, Heitman Real Estate Securities, Inc., RREEF America, L.L.C., and Palisade Capital management LLC.

> FN4. "A 'direct' action is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder." *Paskowitz v. Wohlstadter*, 151 Md.App. 1, 9, 822 A.2d 1272, 1276 (2003) (applying Delaware law).

> FN5. "A 'derivative' action is a claim asserted by a shareholder plaintiff on behalf of the corporation to redress a wrong against

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

the corporation."*See id.*

The issues have been fully briefed and no hearing is necessary on this motion. *See* Local Rule 105.6 (D.Md.2004). For the reasons stated below, the Defendants' Motion to Dismiss is GRANTED.

## BACKGROUND

For the purposes of this Rule 12(b)(6) motion, the Court accepts all well-pleaded allegations contained in Plaintiffs' Complaint as true and construes them in the light most favorable to the Plaintiffs. *See Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir.1997). Plaintiffs allege that Sizeler's Board of Directors implemented a plan to entrench themselves in anticipation of a proxy contest after First Union Real Estate Equity & Mortgage Investments ("First Union") [FN6] began to solicit proxies. (Compl.¶ 3.) First Union is the single largest stockholder of Sizeler, having acquired a substantial amount of its shares starting in the Fall of 2004 as detailed below. (Compl.¶ 26.) On September 8, 2004, First Union filed with the United States Securities and Exchange Commission ("SEC"), on Form 13D, a general statement of acquisition of beneficial ownership as notification that it had become a beneficial owner of 5.07% of Sizeler stock. (Compl.¶ 27.) On November 16, 2004, and December 6, 2004, First Union amended its 13D filing to disclose that it has increased its ownership interest to 7.7% and 8.46%, respectively. (Compl. ¶¶ 28 & 29.) On or about December 21, 2004, First Union notified Sizeler of its intention to nominate Michael L. Ashner and Peter Braveman, both directors and trustees of First Union, as well as Steven Zalkind to Sizeler's Board of Directors. (Compl. ¶ 30.) First Union continued to acquire additional shares of Sizeler and filed a series of amended Form 13D disclosures with the SEC. (Compl. ¶¶ 31 & 32.) In its February 23, 2005 SEC filing, First Union disclosed that it had sent a letter to Sizeler shareholders proposing a slate of directors, and indicating that if its slate was elected, it intended to have Mr. Lassen removed as Chairman and Chief Executive Officer ("CEO") of Sizeler. (Compl.¶ 33.) First Union's last amended Form 13D filing was made on March 9, 2005 and it disclosed that First Union had a 9.9% ownership interest in Sizeler. (Compl. ¶ 34.)

FN6. In a related suit, on March 15, 2005,

Sizeler and its Directors filed a Complaint in this Court against its largest shareholder, First Union. *See Sizeler Property Investors, Inc., et. al v. First Union Real Estate Equity & Mortgage Investments,* RDB 05-718. In its Complaint, Sizeler asked for a declaratory judgment that, pursuant to Maryland law, Sizeler's Directors did not breach their fiduciary duties with respect to the placement of additional Sizeler shares, which was allegedly part of a longstanding corporate plan. This action, which also alleged a violation of the federal securities laws and contained a counter-claim, was resolved by the parties and an Order approving a stipulation of dismissal with prejudice was entered by this Court on September 13, 2005.

*2 As indicated above, *supra* at n. 1, Sizeler has nine directors. All but two of Sizeler's directors are outside directors, meaning that they are not Sizeler executives or employees. In addition to acting as directors, Mr. Lassen is Sizeler's CEO and Mr. Masilla is Sizeler's President and Chief Operating Officer. (Compl. ¶¶ 13 & 14.) On March 14, 2005, after the NYSE closed at 4:00 p.m. and without prior disclosure to the public,[FN7] Defendants entered into a transaction to sell 2.649 million shares of newly issued Sizeler common stock to four large institutional investors at $10.75 per share. (Compl.¶ 36.) Sizeler's stock closed at $12.10 that day, but the sale price used for the transaction with the institutional investors was discounted by $1.35 a share. (Compl.¶ 36.) Plaintiffs' Complaint does not specify which Directors voted in favor of this transaction. On March 15, 2005, Sizeler issued a press release announcing the sale and, on March 17, 2005, it filed an amended 10-K disclosing the transaction. (Compl.¶ 37.) On the day Sizeler announced the stock sale, First Union sent a letter to Sizeler offering to purchase all of the offered shares for $11.25 per share. (Compl.¶ 38.)

FN7. A 10-K filed by Sizeler earlier the same day did not mention a new stock offering. (Compl.¶ 35.)

Plaintiffs allege that the Directors violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann.[FN8] by violating their duty of good faith. (Compl.¶ 49.)

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

Furthermore, Plaintiffs allege that the Directors acted in their own self-interest because the stock sale was an effort to entrench themselves as Directors in response to First Union's proxy battle. (Compl.¶ 50.) Plaintiffs allege that "Defendants' violations of law set forth herein adversely affected Plaintiffs and the Class' ownership interest in Sizeler by diluting the respective proportions of equity."(Compl.¶ 54.) The Complaint does not allege that Plaintiffs had a controlling interest in Sizeler that was negatively impacted by the dilution caused by the stock sale. Nor does the Complaint specifically state whether the alleged injury caused by the "dilution" was to the Class' voting rights or to the value of its Sizeler shares, or an injury for both.

> FN8.Section 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. states:
>
> A director shall perform his duties as a director, including his duties as a member of a committee of the board on which he serves:
>
> (1) In good faith;
>
> (2) In a manner he reasonably believes to be in the best interests of the corporation; and
>
> (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

## STANDARD OF REVIEW

Defendants seek to dismiss Plaintiffs' Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. As the legal sufficiency of the complaint is challenged under a Rule 12(b)(6) motion, the court assumes "the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations."*Eastern Shore Mkts. v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir.2000) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the

plaintiff cannot prove any set of facts in support of his claim entitling him to relief."*Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325 (4th Cir.2001). Furthermore, the "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim."*Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."*Migdal,* 248 F.3d at 325-26;*see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

*3 In reviewing the complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.*Ibarra,* 120 F.3d at 473;*Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). The court must disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969). However, in considering a motion to dismiss, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments" nor "the legal conclusions drawn from the facts."*Eastern Shore Mkts., Inc.,* 213 F.3d at 180;*see also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,* 329 F.Supp.2d 574, 578 (D.Md.2004).

## DISCUSSION

This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. As the source of this Court's jurisdiction over this case is based on diversity, the principles set forth in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) require application of the law of Maryland to questions of substantive law.[FN9]With respect to corporate governance issues, Maryland courts often look to Delaware caselaw.[FN10] Accordingly, this Court's analysis must be guided by Maryland law, but will make reference to Delaware law in the absence of applicable Maryland law.

> FN9. Sizeler is a Maryland corporation and the parties both apply Maryland law in their submissions to this Court.

Case 1:07-cv-06174    Document 74-5    Filed 09/10/2008    Page 27 of 69

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

Page 4

FN10. Delaware courts are frequently recognized for their expertise on corporate law issues. *See generally Werbowsky, 362 Md. at 618, 766 A.2d at 143* (noting respect properly accorded Delaware decisions on corporate law); Lisa M. Fairfax, *Spare the Rod, Spoil the Director? Revitalizing Director's Fiduciary Duty Through Legal Liability,* 42 Hous. L.Rev. 393, 405 n. 63 (2005); E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992-2004, A Retrospective on Some Key Developments,* 153 U. Pa. L.Rev. 1399, 1403 (2005); Patty M. DeGaetano, Comment, *The Shareholder Direct Access Teeter-Totter: Will Increased Shareholder Voice in the Director Nomination Process Protect Investors?,* 41 Cal. W.L.Rev. 361, 376 (2005) ( "Delaware is well known as the most important state for purposes of corporate law because not only are a majority of public companies incorporated there, other states look to Delaware corporate law for guidance.").

"The decision whether a suit is direct or derivative may be outcome-determinative."*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1036 (Del.2004) (noting that the distinction between a direct suit and a derivative one is sometimes difficult, but has many legal consequences). For example, if a suit is derivative the shareholder must make demand on the company's board of directors, absent a showing of demand futility, requesting that the board pursue the suit on behalf of the company, before the shareholder is permitted to pursue the cause of action. *See id.*(discussing Delaware law); *Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123 (Md.2001) (recognizing demand requirement under Maryland law); Fed. R. Civ. Pro. 23.1. Even when a stockholder can properly pursue a derivative action on behalf of a corporation, any damages recovered must go to the corporation and not the stockholder plaintiff. This result is because a derivative action is brought by the shareholder *on behalf of the corporation* to redress a wrong against the corporation. *See Paskowitz v. Wohlstadter,* 151 Md.App. 1, 10, 822 A.2d 1272, 1276 (Md.Ct.Spec.App.2003) (applying Delaware law). "The defendant in a derivative action may be a corporate fiduciary, such as a director, who

committed a wrong against the corporation."*Id.* In contrast, a " 'direct action' is a claim asserted by a shareholder, individually, against a corporate fiduciary, such as a director, to redress an injury personal to the shareholder."*Id.* Damages recovered in a direct action are payable individually to the shareholder, not to the corporation, because the claimed injury is to the shareholder, and therefore the remedy must address this individual injury. *See id.*

A. *Whether Plaintiffs' Complaint is Properly a Direct Suit*

**\*4** The Plaintiffs assert that this action is brought directly by shareholders against Sizeler and its Directors for breach of fiduciary duty. Defendants assert that the allegations in Plaintiffs' Complaint cannot be brought as a direct claim. "Whether a claim is derivative or direct is not a function of the label the plaintiff gives it."*Paskowitz,* 151 Md.App. at 10, 822 A.2d at 1277. A court must generally look to the nature of the action, as it is stated in the complaint, to determine whether a cause of action is derivative or direct. *See id.*(internal citations omitted); *see also Tooley,* 845 A.2d at 1039. Unlike the neighboring Supreme Court of Delaware, which recently established a new test to examine this issue, the Maryland Court of Appeals has not recently had the opportunity to clearly articulate what test should be applied to determine whether a shareholder claim is direct or derivative. *But see Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (Md.1946) (discussed in detail below).

In *Tooley,* the Supreme Court of Delaware held that to determine whether a stockholder's claim is derivative or direct the "issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"*Tooley,* 845 A.2d at 1033. To bring a direct suit, "[t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation."*Id.* at 1039;*see also Tafflin v. Levitt,* 92 Md.App. 375, 381, 608 A.2d 817, 820 (Md.Ct.Spec.App.1992) (finding that individual action by depositor was not permissible where the injury was incidental and not distinct from injury to institution). To show such an injury, "[t]he stockholder must demonstrate that the duty breached

Not Reported in F.Supp.2d                             Page 5
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."*Id.* The framework outlined in *Tooley* is instructive on the issues presented to this Court.

### 1. *Maryland Fiduciary Duty Obligations*

The parties take opposite views on what both characterize as "well-settled" Maryland law outlining the fiduciary duties owed by directors of a corporation and the resulting causes of actions that can stem from a possible breach of these duties. Plaintiffs state that, under Maryland law, a director owes fiduciary duties, not only to the corporation, but also to the corporation's shareholders. As a result, Plaintiffs argue, that breaches of these fiduciary duties may result in a direct action by the corporation's shareholders. Defendants assert that, pursuant to Maryland law, a stockholder may only pursue a derivative cause of action on behalf of the corporation for breach of fiduciary duty.

As noted above, Plaintiffs allege that Defendants violated § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. Recently, the Maryland Court of Appeals conducted a detailed discussion of derivative shareholder actions in *Werbowsky v. Collomb*, 362 Md. 581, 766 A.2d 123 (Md.2001). In doing so, the court explained that § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann., the very provision that Plaintiffs in this case claim was violated, acts as a check to the directors' managerial authority by requiring them to perform their duties in good faith.*Werbowsky*, 362 Md. at 598-99, 766 A.2d at 133. The court specifically stated that the directors' obligations under this provision "run[ ], however, to the corporation and *not, at least directly, to the shareholders."Id.* (emphasis added).

**\*5** In *Waller,* the Maryland Court of Appeals stated: "It is generally stated that directors occupy a fiduciary relation to the corporation and all its stockholders, but they are not trustees for the individual stockholders."*Waller,* 187 Md. at 194, 49 A.2d at 454.[FN11] The Court further noted that "[t]he reason for this distinction is that in law the corporation has a separate existence as a distinct person, in which all the corporate property is vested and to which the directors are responsible for a strict and faithful discharge of their duty, *but there is no legal privity or immediate connection between the*

*directors and the individual stockholders."Id.* (emphasis added). The court went onto hold that "[w]here directors commit a breach of trust, they are liable to the corporation, not to its creditors or stockholders, and any damages recovered are assets of the corporation, and the equities of the creditors and stockholders are sought and obtained through the medium of the corporate entity."*Waller,* 187 Md. at 190, 49 A.2d at 452.

> FN11. The Maryland Court of Appeals made a similar statement in *Toner v. Baltimore Envelope Co.,* 304 Md. 256, 498 A.2d 642 (Md.1985), which dealt with a dispute involving a closely held corporation, not a publicly, exchange-traded one like Sizeler. *Toner,* 304 Md. at 268, 498 A.2d at 648. Furthermore, *Toner* focused on the relationship between majority and minority shareholders, not directors and shareholders.*Toner,* 304 Md. at 273, 498 A.2d at 650.

In *Waller* the plaintiff claimed that several officers and directors were conspiring to obtain control of the company and destroy the value of his stock. In that case, the Court of Appeals held that "an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in *diminishing or destroying the value of the stock."Waller,* 187 Md. at 189, 49 A.2d at 452 (emphasis added). This holding in *Waller* is "applicable even when the wrongful acts were done maliciously with intent to injure a particular stockholder."*Danielewicz v. Arnold,* 137 Md.App. 601, 617, 769 A.2d 274, 283 (2001).[FN12]

> FN12.*Waller* does recognize that certain types of actions may be brought by a shareholder directly. "[U]nquestionably[,] a stockholder may bring suit in his own name to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation."*Waller,* 187 Md. at 192, 49 A.2d at 453. For example, a suit alleging

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

corporate malfeasance that directly results in the impairment of a common stockholder's right to vote is likely a direct suit. *See e.g., Lipton v. News Intl.*, 514 A.2d 1075, 1079 (Del.1986), *overruled on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del.2004) (explaining that the right to vote is a contractual right possessed by a shareholder); *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir.2000).

Plaintiffs cite a decision issued by the United States Court of Appeals for the Second Circuit, *Strougo v. Bassini*, 282 F.3d 162 (2d Cir.2002), which found that Maryland law recognizes fiduciary duties owed by directors, not only to the corporation, but also directly to shareholders. *Id.* at 173 (citing *Toner v. Baltimore Envelope Co.*, 304 Md. 256, 268-69, 498 A.2d 642, 648 (Md.1985); *Waller*, 187 Md. at 194, 49 A.2d at 454). In reaching this conclusion, however, *Strougo* did not discuss the 2001 Maryland Court of Appeal's decision in *Werbowsky*. *See Werbowsky*, 362 Md. at 598-99, 766 A.2d at 133. Instead the Second Circuit relied exclusively on *Waller* and *Toner*. *See Strougo*, 282 F.3d at 173.

### 2. The Claims in Jolly Roger's Complaint

Based on the facts presented by this case, however, this Court need not determine whether Maryland law recognizes a fiduciary duty owed by a corporation's directors directly to shareholders, nor whether shareholders are prohibited from pursuing derivative claims based on breaches of fiduciary duty. Both parties accept that directors owe fiduciary duties to the corporation. *See generally Werbowsky*, 362 Md. at 598-99, 766 A.2d at 133 (noting that under § 2-405.1(a) of Md. Corp. & Ass'ns Code Ann. a director's obligations "run [ ], however, to the corporation and not, at least directly, to the shareholders."). Although it is difficult to discern precisely what injury Jolly Roger claims in its Complaint, what is clear is that there was an alleged injury suffered by Sizeler, the corporation, as a result of the stock issuance on March 14, 2005. The Complaint contends that the Sizeler Directors wrongfully sold the newly issued shares for a discounted price in the private sale to the four institutional investors to entrench themselves as Directors and, in some cases, officers of the company. If true, the resulting injury would clearly

be one to the corporation, as it would have received inadequate consideration for its shares because of the Directors' allegedly disingenuous motive of entrenchment.

**\*6** The Complaint also characterizes the Plaintiffs' injury as one of dilution. The Complaint, however, does not specify whether the dilution claim relates to dilution of voting power or dilution of share value. Assuming for a moment that a reasonable inference from the Plaintiffs' Complaint is that it contains a claim for dilution of voting power and share/asset value, the Maryland Court of Special Appeals rejected the suggestion that a similar contention could support a direct suit in *Danielewicz*. *Danielewicz*, 137 Md.App. at 616, 769 A.2d at 283. In *Danielewicz* the plaintiff argued that she had a cause of action as an individual because the alleged wrongful conduct resulted in "the dilution of her majority interest" in the company. *Id.* The court rejected this position. Under *Waller* any dilution in the price or value of the stockholders' shares is not an actionable direct injury. *See Waller*, 187 Md. at 189, 49 A.2d at 452 (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action).

Pre-*Tooley*, Delaware courts determined that dilution claims were individual in nature only where a significant stockholder's interest was increased at the sole expense of the minority. *See In re Paxson Communication Corp. Shareholders Litigation*, 2001 WL 812028, \*5 (Del.Ch.2001). This holding was recognized post-*Tooley*, in *In re J.P. Morgan Chase & Co.*, 2005 WL 1076069 (Del.Ch. April 29, 2005), which stated "to the extent that any alleged decrease in the asset value and voting power of plaintiffs' shares ... results from the issuance of new equity to a third party ..., plaintiffs' dilution theory as a basis for a direct claim fails and any individual claim for dilution must be dismissed."*Id.* at \*6 (quoting *In re Paxson Communication Corp. Shareholders Litigation*, 2001 WL 812028 at \*5) (rejecting that dilution claim was direct).

Certainly not every issuance of stock by a corporation can constitute a direct claim for dilution by the corporation's stockholders. Here, the Plaintiffs' dilution claim is dependent on the alleged fiduciary duty breach to Sizeler, which claims that the

Not Reported in F.Supp.2d                                                Page 7
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

Directors, to entrench themselves, accepted inadequate consideration for the shares sold to the institutional investors. Therefore, in this case, any dilution claim is incidental to the alleged fiduciary duty breach to the corporation. *See Waller, 187 Md. at 189, 49 A.2d at 452* (explaining that an action that causes harm to a corporation and incidentally injures shareholders by diminishing or destroying the value of their stock is not a direct action); *Tooley, 845 A.2d at 1039* (holding that to bring a direct suit "[t]he stockholder's claimed direct injury must be independent of *any alleged injury to the corporation*" and to show such an injury, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation.*") (emphasis added). As a result, Defendants' Motion to Dismiss is granted to the extent that any purported direct cause of action asserted by the Plaintiffs must be dismissed with prejudice.

B. *Whether Plaintiffs May Assert a Derivative Claim*

*7 Although not addressed by either party, nowhere in Plaintiffs' Complaint does it state that Jolly Roger was a shareholder at the time the instant suit was filed. A plaintiff that ceases to be a shareholder loses standing to continue a derivative suit. *See Lewis v. Anderson, 477 A.2d 1040, 1047 (Del.1984); Lewis v. Ward, 852 A.2d 896 (Del.2004).*[FN13] Even though it would appear from the face of the Complaint that Plaintiff Jolly Roger cannot bring a derivative suit because it failed to state that it was a shareholder at the time the suit was filed, this Court will consider whether Plaintiffs meet the prerequisites necessary to bring a derivative suit.

> FN13.*Snyder v. Pleasant Valley Finishing Co., Inc., 756 F.Supp. 725, 730 (S.D.N.Y.1990)* (citing *Tenney v. Rosenthal, 6 N.Y.2d 204, 189 N.Y.S.2d 158, 163, 160 N.E.2d 463 (1959))* ("A corporation's dissolution or liquidation, without more, will not defeat a shareholder's right to prosecute an action on the corporation's behalf.... Where a plaintiff, however, voluntarily disposes of her shares, her rights as a shareholder cease, and her interest in the derivative action is terminated."); *Schilling v. Belcher, 582 F.2d 995, 996 (5th Cir.1978)* (applying federal and Florida law) ("[A]

shareholder who sells his stock pending appeal of a favorable judgment in a shareholder's derivative suit against the corporation, loses standing to further prosecute or defend the case" unless its judgment is personally in his favor.); *Heckmann v. Ahmanson, 168 Cal.App.3d 119, 130, 214 Cal.Rptr. 177 (1985)* ("Once a derivative plaintiff sells its stock, it no longer has standing to prosecute the derivative claims on behalf of the remaining shareholders.").

Both Maryland law and Rule 23.1 of the Federal Rules of Civil Procedure require that a stockholder make demand on a corporation before bringing suit. Since the cause of action belongs to the corporation in a derivative suit, "a shareholder [must] first make a good faith effort to have the corporation act directly and explain to the court why such an effort either was not made or did not succeed."*Werbowsky, 362 Md. at 600, 766 A.2d at 133.* Rule 23.1 requires that a complaint in a derivative action "shall also allege with *particularity the efforts,* if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and *the reasons for the plaintiff's failure to obtain the action or for not making the effort."*Fed. R. Civ. Pro. 23.1 (emphasis added). Plaintiffs' Complaint does not meet these requirements, likely because Plaintiffs sought to bring a direct action.

In addition to requesting leave to re-plead its cause of action as derivative, Plaintiffs argue that demand on the corporation would have been futile. The Maryland Court of Appeals has specifically addressed the issue of demand futility in its recent opinion *Werbowsky v. Collomb, 362 Md. 581, 766 A.2d 123 (Md.2001).* For demand to be futile, the allegations or evidence must clearly demonstrate, "in a very particular manner, either that (1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation, or (2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule."*See Werbowsky, 362 Md. at 620, 766 A.2d at 144.* This futility exception is very limited. *See id.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

Plaintiffs contend that demand is excused under the second exception because the Directors were personally conflicted, as they want to keep their positions as directors and officers of the corporation. Plaintiffs' Complaint does not even specify which Directors voted for the challenged transaction-the stock issuance to the four institutional investors. In addition, all but two of the Directors are outside directors. The Maryland Court of Appeals specifically noted that demand will not be excused "simply because a majority of the directors approved or participated in some way in the challenged transaction or decision, or on the basis of generalized or speculative allegations that they are conflicted or are controlled by other conflicted persons, or because they are paid well for their services as directors, were chosen as directors at the behest of controlling stockholders, or would be hostile to the action." *Werbowsky, 362 Md. at 618, 766 A.2d at 143-44.* Applying this standard, the allegations in Plaintiffs' Complaint are insufficient to excuse demand. Therefore, Defendants' Motion to Dismiss is granted and any derivative claims alleged by Plaintiffs must be dismissed without prejudice.

## *CONCLUSION*

**\*8** For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. A

D.Md.,2005.
Jolly Roger Fund LP v. Sizeler Property Investors, Inc.
Not Reported in F.Supp.2d, 2005 WL 2989343 (D.Md.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**5**



152 Fed.Appx. 674                                                                                                                           Page 1
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

**H**Knollenberg v. Harmonic, Inc.
C.A.9 (Cal.),2005.
This case was not selected for publication in the
Federal Reporter.Not for Publication in West's
Federal Reporter See Fed. Rule of Appellate
Procedure 32.1 generally governing citation of
judicial decisions issued on or after Jan. 1, 2007. See
also Ninth Circuit Rule 36-3. (Find CTA9 Rule 36-3)
United States Court of Appeals,Ninth Circuit.
Robert G. KNOLLENBERG, et al., Plaintiffs-
Appellants,
v.
HARMONIC, INC., et al., Defendants-Appellees.
**No. 03-16238.**

Argued and Submitted Feb. 17, 2005.
Decided Nov. 8, 2005.

**Background:**    Shareholders filed putative class
action against acquired corporation, acquiring
corporation, and several of their top executives for
violations of securities laws in connection with
decline in stock price of both corporations around the
time merger. The United States District Court for the
Northern District of California, 2002 WL
31974384,Phyllis J. Hamilton, J., granted defendants'
motion to dismiss, and plaintiffs appealed.

**Holdings:**    The Court of Appeals held that:
(1) allegations that corporations and their executives
failed to disclose key customer's demand for
acquiring corporation's products had declined and
would continue to do so were insufficient to state
claim of securities fraud;
(2) allegations that statements favorable to acquired
corporation or merger were misleading were
insufficient to claim of securities fraud;
(3) allegations that acquired corporation's sales
weakness had become "common knowledge" among
acquiring corporation's management and employees
were insufficient to support strong inference of
scienter required for securities fraud claim;
(4) insider trading allegations were insufficient to
raise strong inference of scienter;
(5) shareholders failed to state a proxy solicitation
violation claim;
(6) shareholders stated claim for liability for material

misstatements or omissions in registration statement;
(7) shareholders adequately pleaded liability for sale
of securities by means of misleading prospectus; and
(8) shareholders' allegations were sufficient to state a
secondary claim for "control person" liability claim
against acquiring corporation's president, but not
corporation.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Securities Regulation 349B** ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most
Cited Cases
    (Formerly 349Bk60.51)
Shareholders' allegations, that acquired and acquiring
corporations and their executives failed to disclose
key customer's demand for acquiring corporation's
products had declined and would continue to do so,
were insufficient to state claim of securities fraud,
absent facts establishing corporations or executives
knew statements were false or acted with deliberate
recklessness as to whether statements were false;
shareholders failed to make precise allegations
explaining how alleged statement that acquiring
corporation was experiencing "strong demand" for its
products was misleading or untrue, and failed to
explain how allegedly omitted facts would have been
viewed by reasonable investor as having significantly
altered total mix of information made available.
Securities Exchange Act of 1934, §§ 10(b),
21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17
C.F.R. § 240.10b-5.

**[2] Securities Regulation 349B** ☞60.51(2)

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674                                                                                                   Page 2
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most
Cited Cases
(Formerly 349Bk60.51)
Shareholders' allegations that acquiring corporation knew that key customer's management of its inventory would result in a slowing of its purchases from corporation until inventory was deployed by customer were insufficient to raise a "strong inference" of scienter, so as to satisfy requirements of Private Securities Litigation Reform Act (PSLRA) for securities fraud claim under § 10(b) and Rule 10b-5; shareholders failed to allege basic facts regarding either customer's "weekly forecasts" or corporation's internal reports, and failed to show corporation or its executives were aware that customer had been canceling orders. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B ⌐➞60.28(15)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
349Bk60.28 Nondisclosure; Insider Trading
349Bk60.28(10) Matters to Be Disclosed
349Bk60.28(15) k. Mergers, Acquisitions, Reorganizations or Tender Offers. Most Cited Cases
Shareholders' allegations that statements favorable to acquired corporation or merger were misleading, insofar as such statements failed to disclose that several of acquired corporation's largest customers withdrew their orders shortly after merger announcement, were insufficient to claim of securities fraud. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[4] Securities Regulation 349B ⌐➞60.54**

349B Securities Regulation

349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.54 k. Nondisclosure. Most Cited Cases
Shareholders' allegations that acquired corporation's sales weakness had become "common knowledge" among acquiring corporation's management and employees "well before the merger" and that corporations and executives had obligation to disclose such information to the market were insufficient to support "strong inference" of scienter, so as to satisfy requirements of Private Securities Litigation Reform Act (PSLRA) for securities fraud claim under § 10(b) and Rule 10b-5; allegation of "common knowledge" did not comport with PSLRA's requirement that shareholders allege the required state of mind as to each defendant who made an allegedly misleading statement. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[5] Securities Regulation 349B ⌐➞60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases
(Formerly 349Bk60.51)
Shareholders' allegations that "insider selling" on part of certain executives of acquired corporation demonstrated merged corporations and their executives had motive and opportunity to mislead investors were insufficient to raise a "strong inference" of scienter, so as to satisfy requirements of Private Securities Litigation Reform Act (PSLRA) for securities fraud claim under § 10(b) and Rule 10b-5; under terms of merger agreement, acquired corporation and its executives were required to exercise their stock options. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**[6] Securities Regulation 349B ⌐➞49.28**

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

Page 3

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)4 Proxies
        349Bk49.28 k. Pleading. Most Cited Cases
Shareholders failed to state a proxy solicitation violation claim, under the Securities Exchange Act, where shareholders failed to present facts demonstrating corporate directors did not believe that merger was in the "best interests" at time they made recommendation or facts that would lead investor to conclude corporations or their executives knew either customer would not be buying as much product in the future as it had in the past or that acquired corporation's performance was down from its previous comparable levels. Securities Exchange Act of 1934, § 14, 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[7] Securities Regulation 349B ☞25.18**

349B Securities Regulation
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
        349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.18 k. In General. Most Cited Cases
Shareholders' allegations, that acquiring corporation and its executives omitted from registration statement facts that key customer's orders had declined, that acquired corporation's sales had slowed after announcement of merger, and that acquiring corporation's stock declined 47% that day after press release disclosed that corporation expected its second quarter revenue to be approximately half the amount previously represented, were sufficient to state a claim for liability for material misstatements or omissions in registration statement. Securities Act of 1933, § 11, 15 U.S.C.A. § 77k.

**[8] Securities Regulation 349B ☞25.57**

349B Securities Regulation
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
        349Bk25.55 False Statements or Omissions; Accuracy
        349Bk25.57 k. Particular Prospectuses or Communications. Most Cited Cases
Shareholders' allegations, that acquiring corporations and its executives omitted from prospectus the facts that key customer's orders had declined, that acquired corporation's sales had slowed after announcement of merger, and that corporations and executives were negligent in omitting to state these facts from their prospectus, adequately pleaded liability for sale of securities by means of misleading prospectus. Securities Act of 1933, § 12(a)(2), 15 U.S.C.A. § 77l(a)(2).

**[9] Securities Regulation 349B ☞25.20(1)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)4 Registration Statements
        349Bk25.17 False Statements or Omissions; Accuracy
        349Bk25.20 Persons Liable
         349Bk25.20(1) k. In General. Most Cited Cases

**Securities Regulation 349B ☞25.61(4)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(B) Registration and Distribution
      349BI(B)5 Prospectuses and Communications
        349Bk25.55 False Statements or Omissions; Accuracy
        349Bk25.61 Persons Liable
         349Bk25.61(4) k. Controlling Persons. Most Cited Cases

**Securities Regulation 349B ☞60.40**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.39 Persons Liable
        349Bk60.40 k. In General; Control Persons. Most Cited Cases
Shareholders' allegations were sufficient to state a secondary claim for "control person" liability claim

152 Fed.Appx. 674

152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554

**(Not Selected for publication in the Federal Reporter)**

Page 4

against acquiring corporation's president; shareholders alleged that president signed registration statement for merger, and jointly with acquired and acquiring corporations, actively caused the prospectus to be drafted, revised, and approved. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o; Securities Exchange Act of 1934, § 20, as amended, 15 U.S.C.A. § 78t(a).

**[10] Securities Regulation 349B** ⌐══25.20(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(B) Registration and Distribution
         349BI(B)4 Registration Statements
            349Bk25.17 False Statements or Omissions; Accuracy
               349Bk25.20 Persons Liable
                  349Bk25.20(1) k. In General.
Most Cited Cases

**Securities Regulation 349B** ⌐══25.61(4)

349B Securities Regulation
   349BI Federal Regulation
      349BI(B) Registration and Distribution
         349BI(B)5 Prospectuses and Communications
            349Bk25.55 False Statements or Omissions; Accuracy
               349Bk25.61 Persons Liable
                  349Bk25.61(4) k. Controlling Persons. Most Cited Cases

**Securities Regulation 349B** ⌐══60.40

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.39 Persons Liable
               349Bk60.40 k. In General; Control Persons. Most Cited Cases
Shareholders' allegations that acquiring corporation exerted control over itself failed to state secondary claim for "control person" liability claim against corporation. Securities Act of 1933, § 15, 15 U.S.C.A. § 77o; Securities Exchange Act of 1934, § 20, as amended, 15 U.S.C.A. § 78t(a).

**[11] Securities Regulation 349B** ⌐══60.51(1)

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
         349BI(C)7 Fraud and Manipulation
            349Bk60.50 Pleading
               349Bk60.51 In General
                  349Bk60.51(1) k. In General.
Most Cited Cases
   (Formerly 349Bk60.51)
Shareholders failed properly to allege loss causation, as was required under Private Securities Litigation Reform Act (PSLRA) to state securities fraud claim under § 10(b) and Rule 10b-5; although they alleged that the named representatives for the putative class purchased stock during the class period and that the stock price then fell, shareholders did not allege that any of these same plaintiffs sold stock at a loss caused by alleged fraud or misrepresentation by merged corporations or their executives. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u-4(b)(2); 17 C.F.R. § 240.10b-5.

**\*677** David Kessler, Andrew L. Barroway, Schiffrin & Barroway, Bala Cynwyd, PA, Edward M. Gergosian, Esq., Benjamin Galdston, Barrack, Rodos & Bacine, William S. Lerach, Esq., Christopher Lometti, Jay P. Saltzman, Samuel P. Sporn, Esq., Schoengold & Sporn, P.C., New York, NY, for Plaintiffs-Appellants.
Terry T. Johnson, Esq., Cheryl W. Foung, Jerone F. Birn, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, Melvin R. Goldman, Esq., Morrison & Foerster LLP, San Francisco, CA, for Defendants-Appellees.
Sanford Svetcov, Esq., Reed R. Kathrein, Esq., Patrick J. Coughlin, Esq., Susan K. Alexander, Esq., Shawn A. Williams, Esq., Stan S. Mallison, Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Francisco, CA, William S. Lerach, Esq., Eric A. Isaacson, Esq., Lerach Coughlin Stoia Geller Rudman & Robbins, LLP, San Diego, CA.

Appeal from the United States District Court for the Northern District of California, Phyllis J. Hamilton, District Judge, Presiding. D.C. No. CV-00-2287-PJH.

Before: ALARCÓN, SILVERMAN, and BEA, Circuit Judges.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

MEMORANDUM [FN*]

> [FN*] This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

**\*\*1** In this securities fraud class action, Plaintiffs-Appellants Robert G. Knollenberg ("Knollenberg") *et al.* brought this putative class action against Defendants-Appellees Harmonic Inc. ("Harmonic") and C-Cube Microsystems, Inc. ("Old C-Cube") and several of their top executives for violations of securities laws in connection with the decline in stock price of both companies around the time of the May 3, 2000 merger between Harmonic and Old C-Cube.[FN1]

> [FN1]. Plaintiff Knollenberg seeks to represent a putative class of persons who purchased or otherwise acquired (1) shares of Harmonic between January 19, 2000 and June 26, 2000 (the "Class Period") and (2) shares of Old C-Cube prior to the merger (between January 19, 2000 and May 3, 2000).

Because the parties are familiar with the facts and procedural history of the case, we do not recite them here in detail except as necessary to our decision.

# I. BACKGROUND

On October 27, 1999, Harmonic and C-Cube announced that Harmonic would acquire DiviCom, Inc. ("DiviCom", a division of C-Cube). They filed Form 8-K with the Securities and Exchange Commission ("SEC"), which contained their proposed merger agreement. On April 24, 2000, the shareholders of both companies voted to approve the merger. On May 3, 2000, the merger was completed. Pursuant to the merger, Harmonic acquired DiviCom and Old C-Cube ceased to exist.[FN2]

> [FN2]. C-Cube Microsystems was renamed C-Cube Semiconductor, Inc. (later renamed C-Cube Microsystems, Inc.) ("New C-Cube").

On June 28, 2000, Plaintiffs filed a securities class action complaint in the district court alleging

Defendants and several of their executives made a series of misleading statements for the purpose of obtaining shareholder approval of Harmonic's acquisition of C-Cube's DiviCom division **\*678** while they engaged in insider selling and thereby violated Sections 10b, 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"); Rules 10b-5 and 14a-9 promulgated under the 1934 Act; and Sections 11, 12 and 15 of the Securities Act of 1933 (the "1933 Act").

# II. LEGAL STANDARDS

We review *de novo* the district court's order dismissing Plaintiffs' Second Amended Complaint with prejudice for repeated failure adequately to state a claim for violations of the securities laws under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), and Federal Rule of Civil Procedure 9(b). *See* 28 U.S.C. § 1291; *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir.1999). We review the district court's denial of leave to amend for abuse of discretion. *See Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir.2002).

# III. DISCUSSION

**A. *Claims Under Section 10(b) of the 1934 Act and Rule 10b-5***

To plead securities fraud under Section 10(b) of the 1934 Act or Rule 10b-5, Plaintiffs must allege: "(1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which [plaintiffs] relied (5) which proximately caused [the plaintiffs'] injury." *DSAM Global Value Fund v. Altris Software, Inc.* 288 F.3d 385, 388 (9th Cir.2002).

Under the PSLRA, Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act or omission. *See* 15 U.S.C. § 78u-4(b)(2); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.2002). By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation." *Gompper*, 298 F.3d at 897.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674                                                                                          Page 6
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

**\*\*2** As to *forward looking statements* made by the Defendants, Plaintiffs must allege facts demonstrating a strong inference defendants made those statements with *actual knowledge that they were false.* 15 U.S.C. § 78u-5(c)(1)(B)(I); *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1085 (9th Cir.2002). A forward looking statement is any statement regarding "(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 936 (9th Cir.2003). A forecast is actionably false if " 'there is no reasonable basis for the belief' " or " 'the speaker is aware of undisclosed facts tending seriously to undermine the statements' accuracy.' " *Provenz v. Miller,* 102 F.3d 1478, 1487 (9th Cir.1996) (citation omitted).

As to *non-forward looking statements* made by the Defendants, Plaintiffs must allege facts demonstrating a strong inference defendants made those statements with *intentional falsity or with deliberate recklessness as to the statements' falsity. Id.*

Claims that a defendant "could have" or "should have" known that the statements were false are insufficient to satisfy the standard for either forward looking or non-forward looking statements. "Negligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud under the PSLRA." *DSAM,* 288 F.3d at 391.

Plaintiffs allege that Defendants Harmonic and several of its executives (Ley, Dickson, Yost, Flatow, Nazarathy, Kvamme,**\*679** Lane, Lemieux, Vaillaud), and New C-Cube and several of its executives (Balkanski, Lookabaugh, Brown, Foreman, McKinney, Padval, Valentine, Walcykowski, Futa and Reyes) made false or misleading statements in violation of Section 10(b) and Rule 10b-5.

Analysis of the Second Amended Complaint, however, demonstrates that there are no materially misleading statements or omissions, nor are there allegations raising a "strong inference of scienter."

*1. Misstatements or Omissions of Material Fact*

Plaintiffs allege Defendants sought to inflate the value of the stock of both companies to convince shareholders to approve the merger and to allow the C-Cube Defendants to sell their personal shares.

Plaintiffs allege Defendants published several false financial statements [FN3] and press releases during the class period that were materially misleading insofar as the financial documents failed to disclose: (1) AT & T's demand for Harmonic products in the fiscal year for 2000 had declined and would continue to do so; and (2) DiviCom's business had slowed following the October 1999 announcement of the pending merger causing lower revenues in the fourth fiscal quarter of 2000.

> FN3. As discussed below, Plaintiffs allege misleading statements were made in the following documents: (1) eight joint C-Cube and Harmonic press releases; (2) Harmonic's 1999 Form 10-K and first quarter for 2000 Form 10-Q; (3) the March 23, 2000 Form S-4 Registration Statement; and (4) seven analyst reports.

**A.** *AT & T's Demand for Harmonic Products*

**\*\*3** [1] Plaintiffs allege Defendants made several statements that Harmonic was experiencing "strong demand" for its products from traditional operators such as AT & T, and these statements were misleading because Defendants knew AT & T had been cancelling orders for 2000 and the record sales for the fourth quarter of 1999 were the result of the fact that AT & T was obligated to pay for large quantities of previously ordered custom-built product. As a result, Plaintiffs allege, Defendants knew that AT & T would place few new orders in the first quarter of 2000 and failed to disclose this information.

Plaintiffs fail to make precise allegations explaining how the alleged statement that Harmonic was experiencing "strong demand" for its products was misleading or untrue. According to Plaintiffs' allegations, Harmonic did not make a concrete prediction about future sales, only a statement about current sales. Further, Plaintiffs fail to allege exactly who at Harmonic knew about the alleged decline in sales from AT & T, when they knew it, how it was

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
(Not Selected for publication in the Federal Reporter)

communicated to them, or how many sales orders AT & T had cancelled. Nor do Plaintiffs explain how the allegedly omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. *See In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1408-09 (9th Cir.1996).*

Without more, the statements that there was "strong demand" are insufficient to meet the heightened pleading standard under the PSLRA. *See Ronconi v. Larkin, 253 F.3d 423, 431 (9th Cir.2001)* (statement that "sales growth was accelerating" does not adequately allege facts giving rise to claim under 10(b); rather "[p]laintiffs do not specify facts or evidence that show why the statement was false at the time it was made nor that defendants knew or with deliberate recklessness disregarded that it was false").

**\*680** Accordingly, Plaintiffs' allegations are insufficient to state a claim of fraud under Section 10(b) or Rule 10b-5 because Plaintiffs fail adequately to state facts establishing that the defendants knew the statements were false or acted with deliberate recklessness as to whether the statements were false.

B. *Scienter Regarding AT & T Statements*

Not only did Plaintiffs fail to plead material misstatements or omissions with regard to Harmonics' sales to AT & T, Plaintiffs also failed adequately to plead specific facts which give rise to a "strong inference" of scienter that Defendants either knew their statements were false or made the statements with deliberate recklessness as to the statements' veracity. *See, e.g., Karacand v. Edwards, 53 F.Supp.2d 1236, 1252 (D.Utah 1999)* ("Where, as here, plaintiffs have not adequately pleaded falsity, it is unnecessary to determine whether they have adequately pleaded scienter."). Even assuming, *arguendo*, that Plaintiffs here have adequately pleaded violations under 10(b), they nonetheless still fail to plead facts that give rise to a "strong inference" of deliberate recklessness or actual knowledge.

**\*\*4** [2] Plaintiffs allege that the Harmonic Defendants "monitored inventory" through AT & T's weekly order forecasts and prepared internal reports based on information contained in such reports. From the knowledge obtained from monitoring the inventory, the Harmonic defendants "w[ere] aware that AT & T had been canceling and pushing out the scheduling of orders all throughout 1999" and that "AT & T had an excessive inventory and backlog from its late-1999 purchases of Harmonic products." Therefore, Plaintiffs allege, the Harmonic Defendants "knew [in early 2000] that AT & T's management of this inventory would result in a slowing of its purchases from Harmonic until this inventory was deployed by AT & T."

These allegations are insufficient to raise a "strong inference" of scienter. While courts have held that internal reports may support a strong inference of scienter, a complaint relying on the existence of such reports must contain "at least some specifics from those reports as well as such facts as may indicate their reliability." *Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230-31 (9th Cir.2004).* Here, Plaintiffs fail to allege basic facts (such as author, date prepared, contents) regarding either AT & T's "weekly forecasts" or Harmonic's internal reports. *See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 977 (9th Cir.1999)* (dismissing claim where plaintiffs failed to state the source of information regarding the reports, how she learned of them, who drafted them, or which officers received them); *see also Lipton v. Pathogenesis Corp., 284 F.3d 1027, 1231 (9th Cir.2002)* (same).

Nor do Plaintiffs allege facts to show that any particular Harmonic Defendant was aware that AT & T had been cancelling orders. Plaintiffs fail to allege that the same person who read these internal reports was the person who released the alleged misleading statements. Plaintiffs' allegation the Harmonic Defendants therefore knew AT & T would be slowing its purchases of Harmonic inventory is unsupported by factual allegations. Finally, Plaintiffs' allegations with respect to the information allegedly provided by unnamed management sources is insufficient. *See Haft v. Eastland Fin. Corp., 772 F.Supp. 1315 (D.R.I.1991)* (holding that recounting of analysts' opinions did not prove 'underlying factual support' necessary to create a "strong inference of scienter.").

**\*681** C. *DiviCom Sales*

[3] Plaintiffs also allege that shortly after the

152 Fed.Appx. 674                                                                                    Page 8
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

announcement of the Harmonic-C-Cube (DiviCom) merger, several of DiviCom's largest customers withdrew their orders from DiviCom because such customers were concerned that DiviCom's acquisition by a cable company would "draw the company's focus and development efforts" from its satellite products to cable products.

Accordingly, Plaintiffs allege Defendants' statements favorable to DiviCom or the Harmonic-C-Cube (DiviCom) merger were misleading insofar as such statements presented DiviCom in a more positive light than was warranted given that DiviCom's largest customers had withdrawn orders. Thus, Plaintiffs allege that the Harmonic defendants:

> **\*5** failed ... to disclose DiviCom's poor performance to the market, despite the fact that ... DiviCom's sales weakness had become 'common knowledge' among Harmonic management and employees well before the merger.

Plaintiffs' allegations are insufficient for several reasons. First, Plaintiffs fail to specify the *amount* by which DiviCom's sales declined.  *See In re Vantive Sec. Litig.,* 283 F.3d 1079, 1088 (9th Cir.2002) (affirming district court's dismissal of plaintiff's claim under Section 10(b) where plaintiffs alleged misstatements regarding inferior product features that resulted in "slow sales" of such products).

Second, Plaintiffs fail to allege facts establishing Defendants had knowledge the merger announcement would precipitate a decline in orders. Here, Plaintiffs allege the *announcement* of the merger itself caused DiviCom's customer's to "back away." However, Plaintiffs do not allege facts demonstrating Defendants knew such would be the market reaction.

Third, Plaintiffs fail to plead the *source* of the information about DiviCom's future after announcement of merger plans with sufficient particularity. Rather, plaintiffs state that "former employees" are the source of this information that the lagging DiviCom sales were "common knowledge" among "Harmonic management." Significantly, however, Plaintiffs fail to allege facts demonstrating that the "former employees" consulted were in a position to know what management knew. *See In re Splash Tech. Holdings, Inc., Sec. Litig.,* 160 F.Supp.2d 1059, 1080 n. 15 (N.D.Cal.2001) (reliance

on "confidential informants" was not sufficient in the absence of "any information that the Court might use to evaluate the confidential informants' bases for alleging that the defendants had access to adverse information.").

Fourth, the allegation that Defendants misled investors by failing to publish DiviCom's financial results for 1999 and the first quarter of 2000 *before* the scheduled date of the merger is insufficient because Plaintiffs fail to allege facts demonstrating that any Harmonic defendant had a duty to publish these results prior to the merger. Silence, absent a duty to disclose, is not actionable.  *See, e.g., Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002) (10b-5 prohibits misleading statements, not ones that are merely "incomplete.").

D. *Scienter Regarding DiviCom*

[4] Plaintiffs allege "DiviCom's sales weakness had become "common knowledge" among Harmonic management and employees "well before the merger" and defendants had an obligation to disclose such information to the market.

This allegation is insufficient to support a "strong inference" of scienter. The allegation that it was "common knowledge" that sales had declined does not comport **\*682** with the PSLRA's requirement that plaintiffs allege the required state of mind as to each Defendant who made an allegedly misleading statement and is therefore insufficient. *See* 15 U.S.C. § 78u-4(b)(2).

2. *Allegations of Insider Sales do not Raise a "Strong Inference" of Scienter*

**\*6** [5] Plaintiffs next allege that "insider selling" on the part of certain executives of C-Cube [FN4] demonstrates Defendants had "motive and opportunity" to mislead investors and such insider sales give rise to a strong inference of scienter.

> FN4. Plaintiffs alleged insider trading on the part of Harmonic's executives as well. However, Plaintiffs concede on appeal that they are no longer asserting claims against Flatow and Yost. Accordingly, there are no remaining claims as to "insider sales" by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

Page 9

Harmonic's executives.

In general, to determine whether a particular insider sale is "suspicious," courts consider the following factors: "(1) percentage of shares sold by the insiders; (2) timing of the sales; and (3) whether the sales were consistent with the trader's previous history." *See In re Silicon Graphics,* 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)).

Plaintiffs' allegations are insufficient here because, under the terms of the merger agreement, the C-Cube Defendants were *required* to exercise their options. Defendants sold some of their stock to raise the money necessary to exercise their vested options and purchase the underlying shares. Accordingly, Plaintiffs fail to allege facts from which this court can conclude that insider selling gives rise to a "strong inference" of scienter.

B. *Claims Under Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder*

[6] Plaintiffs also bring claims under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder. 17 C.F.R. § 240.14a-9. Plaintiffs allege Defendant Harmonic, and certain of its executives (Ley, Nazarathy, Kvamme, Lane, Lemieux, and Vaillaud) and Defendant New C-Cube and certain of its executives (Balkanski, McKinney, Padval, Valentine, Futa and Reyes) made false or misleading statements in proxy solicitations that were distributed to certain putative class members for the purpose of inducing them to approve the proposed merger between Harmonic and C-Cube (DiviCom) in violation of Section 14(a) and Rule 14a-9.

To state a claim under Section 14(a), a plaintiff must establish that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation, [rather than the particular defect in the solicitation materials], was an 'essential link in the accomplishment of the transaction.' " *Atlantic Coast Airlines Holdings v. Mesa Air Group, Inc.,* 295 F.Supp.2d 75, 81-82 (D.D.C.2003) (quoting *General Elec. Co. v. Cathcart,* 980 F.2d 927, 932 (3d Cir.1992)) (quoting *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)).

Moreover, the PSLRA pleading requirements apply to claims brought under Section 14(a) and Rule 14a-9. *See In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1267 (N.D.Cal.2000). However, unlike Section 10(b), Section 14(a) "lacks any reference to a 'manipulative device or contrivance ... to indicate a requirement of scienter." *Id.* at 1263. Accordingly, negligence is sufficient to support a claim for a violation of Section *683 14(a) for both forward looking and non-forward looking statements. *Id.* at 1267 ("a Section 14(a) plaintiff must plead with particularity facts that give rise to a strong inference of negligence").

**7 None of Plaintiffs' allegations state a claim under Section 14(a). First, statements that the merger was "in the best interests of the shareholders" were expressions of opinion. *See In re McKesson,* 126 F.Supp.2d 1248 at 1265. To state a claim upon which relief can be granted, plaintiff must allege "particularized facts showing that the opinion was both subjectively and objectively false." *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095-96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Here, Plaintiffs do not allege such particularized facts. Nor can they show that the merger was not "in the best interests of the shareholders." Even if they could, Plaintiffs' Second Amended Complaint is bereft of facts alleged which demonstrate the directors did not believe that the merger was in the "best interests" at the time they made the recommendation, let alone a "strong inference" of negligence.

Second, Plaintiffs do not allege any facts that would lead an investor to the conclusion Defendants knew AT & T would not be buying as much Harmonic product in the future as it had in the past or that DiviCom's performance was down from its previous comparable levels.

Accordingly, Plaintiffs fail to state a claim for relief under Section 14(a) and Rule 14a-9.

C. *Claims Under Sections 11 and 12 of the 1933 Act*

Next, Plaintiffs bring claims under Sections 11 and 12 of the Securities Act of 1933. 15 U.S.C. §§ 77k, 77l(a)(2).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Claims brought under Sections 11 and 12 of the 1933 Act are *not* subject to the heightened pleading requirements of the PSLRA. *See In re Stac Electronics Sec. Litig., 89 F.3d at 1404.* Rather, only those allegations of violations of Sections 11 and 12 which "sound in fraud" must be pleaded with particularity under Fed.R.Civ.P. 9(b). *See In re Stac, 89 F.3d at 1404.*

*2. Section 11(a) of the 1933 Act*

[7] Defendants may be liable for violations of Section 11 for innocent or negligent misstatements or omissions. *See Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).* Plaintiffs allege Defendant Harmonic and certain Harmonic executives (Ley, Dickson, Nazarathy, Kvamme, Lane, Lemieux and Vaillard) made material misstatements or omissions of material fact in Harmonic's Registration Statement. To state a claim under Section 11(a), a plaintiff must allege that: (1) the registration statement contained an omission or misrepresentation; and (2) the omission or misrepresentation was material. *See In re Stac Electronic Sec. Litig., 89 F.3d at 1403-04.*

Plaintiffs allege Harmonic omitted the following material facts from its Registration Statement on Form S-4 filed with the SEC on March 23, 2000:(1) AT & T's orders from Harmonic had declined and (2) DiviCom's sales had slowed after the October 1999 announcement of the merger between Harmonic and C-Cube (DiviCom).

Plaintiffs allege that in its June 26, 2000 press release, Harmonic disclosed that it expected second quarter revenue of $74 million to $82 million, approximately *half* the amount previously represented by Defendants and expected by the market. The press release also stated that its reduction in earnings was due, in large part, *684 to the reduction in orders from AT & T. The next day, June 27, 2000, Harmonic's stock declined 47% from over $40 per share to just over $23 per share.

**8 These claims are not "grounded in fraud" because Plaintiffs allege a basis for Section 11 liability other than fraud; i.e., the omission of a material fact from the Registration statement. Notably, plaintiffs do not rely on a unified course of

fraudulent conduct or on the "wholesale adoption" of their securities fraud allegations. *See In re Daou Systems, Inc., 411 F.3d 1006, 1027-28 (9th Cir.2005).* Plaintiffs also disclaim any allegations of fraud. While a disclaimer alone is insufficient to re-characterize a complaint whose gravamen is plainly fraud, here plaintiffs have made an effort to plead a non-fraudulent basis for Section 11 liability. *See In re Stac Electronics Sec. Litig., 89 F.3d at 1405 n. 2.* Accordingly, Plaintiffs' claims under Section 11 are not subject to Fed.R.Civ.P. 9(b)'s particularity requirements. *See In re Exodus Communications, Inc., Sec. Litig., No. C-01-2661-MMC, 2005 WL 2206693, at \*1 (N.D.Cal. Sept.12, 2005).*

In sum, Plaintiffs' allegations are sufficient to state a claim under Section 11. Plaintiffs allege the Registration Statement contained omissions and allege that the omissions were material. Since the complaint is not "grounded in fraud," that is all that Section 11 requires. *See In re Stac Electronic Sec. Litig., 89 F.3d at 1403-04* (citing *Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir.1994)).*

*2. Section 12(a)(2) of the 1933 Act*

[8] Plaintiffs also bring claims under Section 12(a)(2) of the 1933 Securities Act against Defendants Harmonic and Ley.

To state a claim under Section 12(a)(2), Plaintiffs must allege: (1) that the prospectus contained an omission or misrepresentation; and (2) that the omission or misrepresentation was material. *See In re Stratosphere Corp. Sec. Litig., 1 F.Supp.2d 1096, 1120 (D.Nev.1998)* (citing *Pinter v. Dahl, 486 U.S. 622, 646-48, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).*

Here, Plaintiffs reiterate the allegations that the Harmonic Defendants omitted from their prospectus filed with the SEC on March 23, 2000 ("Prospectus") the facts that: (1) AT & T's orders of Harmonic had declined and (2) DiviCom's sales had slowed after the October 1999 announcement of the merger between Harmonic and C-Cube (DiviCom). Plaintiffs also allege Defendants were negligent in omitting to state these facts from their prospectus.

Plaintiffs have adequately pleaded a violation of Section 12(a)(2) by alleging that Defendants

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674                                                                                   Page 11
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

negligently omitted material facts from the prospectus. *See In re Stratosphere Corp. Sec. Litig., 1 F.Supp.2d at 1120.* For the reasons discussed above regarding Plaintiffs' Section 11 claims, Plaintiffs' claims under Section 12(a)(2) are not "grounded in fraud" and, therefore, are not subject to Fed.R.Civ.P. 9(b).

D. *Secondary Claims of Control Person Liability Under § 15 of the 1933 Act and § 20(a) of the 1934 Act*

Finally, Plaintiffs allege secondary claims for "control person" liability against Defendants Harmonic and Ley under Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and against Defendants Harmonic, New C-Cube, Ley and Balkanski under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).

**\*\*9** As to Plaintiffs' claims under Section 20(a) of the 1934 Act, Plaintiffs have not met the threshold requirement of adequately pleading a primary violation of the **\*685** federal securities laws. *See, e.g., Paracor Finance, Inc. v. General Elec. Capital Corp., 96 F.3d 1151, 1161 (9th Cir.1996).*

To state a claim for control person liability under Section 15 of the 1933 Act, this circuit requires the Plaintiff to plead: (1) the defendant had the power to influence or control the primary violator and (2) the defendant actively used this influence or control so as to be a "culpable participant" in the primary violation. *See Durham v. Kelly, 810 F.2d 1500, 1503-04 (9th Cir.1987).*

[9] Here, as to Defendant Ley, Plaintiffs plead the first prong adequately by alleging Ley's position as President, CEO and Chairman of the Board of Harmonic. *See In re Immune Response Sec. Litig., 375 F.Supp.2d 983 (S.D.Cal.2005)* (allegations of control by virtue of board position or stock ownership sufficient to meet first prong). Plaintiffs plead the second prong adequately by alleging that Ley signed the Registration statement, and jointly with his co-defendants, actively caused the prospectus to be drafted, revised and approved. *Cf. In re Calpine Corp. Sec. Litig., 288 F.Supp.2d 1054, 1081 (N.D.Cal.2003)* (Plaintiffs failed to state a Section 15 claim when they did not allege defendants either signed or were involved in the preparation of

the prospectus that contained material misstatements or omissions).

[10] Plaintiffs' theory of control person liability against Defendant Harmonic is unclear, since it rests on allegations that Harmonic exerted control over itself. While Plaintiffs thus fail to state a claim against Harmonic under Section 15, they might be able to cure this defect by amending the complaint to identify a primary violator over whom Harmonic exercised control.

**IV. Loss Causation**

[11] Finally, a private securities fraud action must include allegations of facts establishing economic loss to the plaintiffs caused by the defendants' fraud or misrepresentation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544U.S. 336, ----, 125 S.Ct. 1627, 1629, 161 L.Ed.2d 577 (2005). Here, Plaintiffs failed properly to allege loss causation. Although they allege that the named representatives for the putative class purchased stock during the class period and that the stock price then fell, they do not allege that any of these same Plaintiffs sold stock at a loss caused by the Defendants' fraud or misrepresentation.

Accordingly, Plaintiffs have failed to allege a necessary element to their cause of action for securities fraud under Section 10(b) of the 1934 Act.

**V. CONCLUSION**

For the foregoing reasons, Plaintiffs have failed adequately to plead violations of Sections 10(b) and 14(a) of the 1934 Act under the heightened pleading standards of the PSLRA. After three attempts, Plaintiffs have failed to plead proper causes of action under the PSLRA. Furthermore, the defects in Plaintiffs' Second Amended Complaint cannot be remedied by further amendment. *See Desaigoudar v. Meyercord,* 223 F.3d 1020, 1026 (9th Cir.2000). Plaintiffs' claim under Section 20(a) of the 1934 Act likewise must also fail. Accordingly, we affirm the district court's dismissal with prejudice of Plaintiffs' 1934 Act claims.

**\*\*10** Plaintiffs have, however, pleaded violations of Sections 11 and 12 of the 1933 Act adequately. Accordingly, we reverse the dismissal Plaintiffs'

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554
**(Not Selected for publication in the Federal Reporter)**

claims under Sections 11 and 12 of the 1933 Act.

Further, Plaintiffs' allegations are sufficient to state a claim against Ley under **\*686** Section 15 of the 1933 Act. Thus, we reverse the district court's dismissal of the Section 15 claim against Ley. We affirm dismissal of Plaintiff's Section 15 claim against Harmonic, but grant leave to amend. Each party shall bear its own costs on appeal.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.

C.A.9 (Cal.),2005.
Knollenberg v. Harmonic, Inc.
152 Fed.Appx. 674, 2005 WL 2980628 (C.A.9 (Cal.)), Fed. Sec. L. Rep. P 93,554

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**6**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

Page 1

NPF WL, Inc. v. Sotka
N.D.Ill.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
NPF WL, INC., Plaintiff,
v.
Joseph SOTKA, et al., Defendants.
**No. 99 C 7966.**

May 10, 2000.

*MEMORANDUM OPINION*

KOCORAS, J.
*1 Before the Court are the Defendants' Motions to
Dismiss. For the reasons set forth below, we deny the
motions in part and grant them in part.

BACKGROUND

This lawsuit centers around the alleged failure of
Watertower Surgicenter Corp. ("Watertower"), a
health care provider, to forward over three million
dollars to Plaintiff NPF WL, Inc. ("Plaintiff"), a
purchaser of receivables from health care providers.
Following a favorable verdict in Ohio against
Watertower for breach of contract, Plaintiff filed suit
in federal court seeking damages from Churchill
Sterling & Stewart, Ltd. ("Churchill"), Watertower's
parent corporation, Health and Hospitality, Inc. ("H
& H"), Churchill's parent corporation, and James F.
Graves ("Graves"), Joseph Sotka ("Sotka"), and
Thomas P. Muldoon ("Muldoon"), three officers and
directors of Watertower, Churchill, and H & H.

Our immediate attention is drawn to the sufficiency
of Plaintiff's complaint, the factual allegations of
which we must accept as true for the purposes of this
motion. See*Bontkowski v. First National Bank of
Cicero,* 998 F.2d 459, 461 (7th Cir.1993). Plaintiff's
business involves contracting with health care
providers to purchase their eligible accounts
receivables at a discounted value based on the
likelihood of receiving payment for the services
rendered. Health care providers use the program to
facilitate cash flow.

Once a health care provider contracts with Plaintiff,
the parties utilize the following process. The provider
must submit all of their accounts receivable
information to Plaintiff on a continuous basis.
Plaintiff then determines which of the individual
receivables it will purchase, and the purchase price.
Plaintiff wires payment to the provider, and the
provider promises to open lockbox accounts to
deposit the monies from every collected account. The
provider then transfers the amounts from the lockbox
account into a corporate trust account of a national
banking association for Plaintiff's benefit.

On July 30, 1992, Watertower entered into an
accounts receivable purchase agreement, called a
Sale and Subserving Agreement ("the Agreement"),
with Plaintiff's predecessor in interest, NPF III, Inc.
("NPF"). The contract provided for terms similar to
those enumerated above, which Muldoon agreed to
on Watertower's behalf in his capacity as its treasurer.
The contract provided that Watertower would
forward its receivables for purchase to Plaintiff
through July 31, 1995, which was extended to
September 9, 1995. As a result, October 27, 1995 was
the last day that NPF provided funds for Watertower
receivables.

On February 29, 1996, NPF assigned its interest in its
agreement with Watertower, allegedly $3,572,015.98,
to Plaintiff, its successor in interest. Plaintiff claims
that Watertower never paid this amount because
Sotka, Graves, and Muldoon (collectively "the
Individual Defendants") tortiously diverted
collected cash for accounts purchased by NPF, resulting in the
Individual Defendants depriving NPF of money owed
it under the Agreement.

*2 Plaintiff filed a complaint containing a potpourri
of claims in the Southern District of Ohio seeking
restitution from the Individual Defendants, Churchill,
H & H and Watertower. The suit was eventually
transferred to this Court and the instant motions to
dismiss have followed.

LEGAL STANDARD

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. *See* *Bontkowski v. First National Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also* *Hartford Fire Insurance Co. v. California,* 509 U.S. 764 (1993); *Sherwin Manor Nursing Center, Inc. v. McAuliffe,* 37 F.3d 1216, 1219 (7th Cir.1994). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *See* *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992).

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. *See* Fed.R .Civ.P. 10(c). In addition, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Associates Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431 (7th Cir.1993). It is with these principles in mind that we turn to the motions before us.

### DISCUSSION

Defendants challenge the sufficiency of Plaintiff's complaint on a host of fronts, which we shall address in turn.

### I. Statute of Limitations

Plaintiff's action seeks recovery of a minimum of $3,572,015.98 they claim Defendants wrongfully converted. Defendants claim that Plaintiff is barred from bringing suit because the time for bringing its action has expired. The applicable Illinois statute of limitations for Plaintiff's various counts is five years. *See* 735 ILCS 5/13-205. Courts do not rigidly construe the five-year period, but recognize that it begins to run when Plaintiff "knows or reasonably should know both that an injury occurred and that it was wrongfully caused." *LeBlang Motors, Ltd. v. Subaru of America, Inc.,* 148 F.3d 680, 690 (7th Cir.1998) (quoting *Nolan v. Johns-Manville Asbestos,* 421 N.E.2d 864, 868 (Ill.1981). When Plaintiff gains such knowledge, it must conduct a further inquiry to ascertain whether it suffered an actionable wrong. *See* *Nolan,* 421 N.E.2d at 868.

**\*3** Plaintiff here seeks recovery for receivables which it claims H & H improperly withheld transferring to it. While Plaintiff was aware at an earlier date that it had not received payment, this only constitutes early knowledge of the alleged injury. Plaintiff claims it did not learn of the specific wrongful cause until it conducted Graves' deposition on December 16, 1998. It then filed suit on February 3, 1999, well within five years of incurring its injury and having learned of Defendants' alleged liability. Accordingly, Plaintiff's claims are not time-barred.

### II. Election of Remedy

Sotka and Graves next argue that Plaintiff has elected its remedy and thus may not pursue Counts I, II, IV, and IX. Election of remedies was a common law doctrine which forbade a party from seeking alternative remedies. *See* *Olympia Hotels Corp. v. Johnson Wax Development Corp.,* 908 F.2d 1363, 1371 (7th Cir.1990) (plaintiff could sue for either breach of contract or fraud, but not both). However, Rule 8(e)(2) of the Federal Rules of Civil Procedure expressly abolished the doctrine of election of remedies as it relates to this procedural aspect. *See* *Olympia Hotels,* 908 F .2d at 1371. Still remaining is the substantive aspect stemming from the law of remedies rather than procedure, which is intended to prevent double recovery, and is akin to res judicata. *See* *id.* Under this doctrine a plaintiff is not entitled to collect the same damages for breach of contract and for fraud. *See* *id.* Thus, the doctrine of election of remedies creates a ceiling above which damages may not rise. Even then, however, courts

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

should not apply the doctrine before the trial and verdict to force plaintiff to choose between its various forms of damages because it could prevent plaintiff from recovering its total damages. *See id.* at 1371-72.

Plaintiff here filed suit in the United States District Court for the Southern District of Ohio seeking damages from Watertower for breach of contract. While the mere filing of this suit does not preclude the case before us, Plaintiff also received a judgment in its favor. Thus, Plaintiff has been made at least partially whole by virtue of the Ohio verdict, at least to the extent of having a judgment in its favor.

In this action, however, Plaintiff seeks recovery of $3,572,015.98, approximately $800,000 more than the judgment in Ohio. The doctrine of election of damages does not operate to dismiss Plaintiff's suit in its entirety, but merely prevents Plaintiff from obtaining a judgment here for damages identical to those already recovered in Ohio. Nonetheless, to the extent the damages awarded in Ohio overlap with those sought in this action, awarding Plaintiff damages here would entail a double recovery. As such, Plaintiff will be required at some point to show that its claimed damages in this case are for different accounts than those involved in the Ohio case. To the extent that Defendants seek dismissal of counts based upon the election of remedies doctrine, that argument fails.

### III. Personal Liability of Corporate Officers for the Acts and Omissions of Corporation-Count I

**\*4** Sotka and Graves next argue that they are not liable for the acts or omissions of the corporation, and thus Count I should be dismissed. Paragraph 25 of Count I, however, alleges that Sotka, Graves, and Muldoon "directed or authorized and conspired to direct and authorize that application of such specifically identified monies to accounts other than [Plaintiff's] lockbox accounts."While limited liability principles protect corporate officers from liability for the wrongs of the corporation, it does not shield them from liability for their own wrongful acts. *See Spartech Corp v. Opper*, 890 F.2d 949, 953 (7th Cir.1989). On its face, Count I seeks damages allegedly caused by the personal actions of Sotka and Graves, not the actions of the Watertower, and their opposing arguments fail.[FN1]

[FN1.] We likewise find that Count I adequately alleges causation.

### IV. Breach of Fiduciary Duty-Count II

Sotka and Graves next argue that Count II for breach of fiduciary duty should be dismissed because officers cannot be held liable for breaches committed by their corporate employer. In response, Plaintiff claims that because Watertower owed it a duty to transfer to it the collected receivables, Sotka, Muldoon, and Graves also owed it a similar duty. Thus, Plaintiff claims that Sotka, Muldoon, and Graves are individually liable to Plaintiff because the breach was caused by their tortious conduct.

Defendant cites *Chicago Title & Trust Co. v. DeLasaux*, 168 N.E. 640 (Ill.1929) in support of dismissal. However, *DeLasaux*, concerned an attorney's liability for her client's actions, and does not even address corporate liability. *DeLasaux* merely brushes up against the liability of a corporate officer for the acts of the corporation only upon the barest of agency principles. We believe *DeLasaux* is distinguishable and cannot support the dismissal of Count II.

Despite the existence of many years of relevant, applicable Illinois case law, Sotka, Muldoon, and Graves do not cite any additional cases. In addition to this failure to meet their burden, our independent research demonstrates the propriety of denying the dismissal of Count II.

A fiduciary duty is "the duty of an agent to treat his principal with the utmost candor, rectitude, care, loyalty, and good faith."*Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir.1992). To adequately plead a breach of fiduciary duty count in Illinois a plaintiff must allege (1) the existence of a fiduciary duty; (2) its breach by defendant; and (3) the breach caused an injury. *See LaSalle Bank Lake View v. Seguban*, 937 F.Supp. 1309, 1324 (N.D.Ill.1996).

Fiduciary relationships may be created by contract or informally developed. While parties to a contract usually do not become each other's fiduciaries, *see Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

Cir.1992), an action for breach of fiduciary duty "is controlled by the substantive laws of agency, contract and equity."See*Capitol Indem. Corp. v. Stewart Smith Intermediaries, Inc.,* 593 N.E.2d 872, 876 (1992) (citing *Kinzer v. City of Chicago,* 539 N.E.2d 1216, 1220 (Ill.1989)). An agency relationship is created when one party authorizes another to use its discretion to transact and manage its business, and to give an accounting of it. See*Petri v. Gatlin,* 997 F.Supp. 956, 979 (N.D.Ill.1997). When an agency relationship exists between parties it creates a fiduciary relationship. See*Peterson v. H & R Block Tax Services, Inc.,* 971 F.Supp. 1204, 1213 (N.D.Ill.1997) (quoting *Letsos v. Century 21-New West Realty,* 675 N.E.2d 217, 224 (1996)).

**\*5** In *Petri,* two owners of multi-unit apartment buildings contracted to purchase natural gas from an independent third-party gas supplier. See*Petri, 997 F.Supp. at 961.* The parties' agreement revealed that the supplier was obligated to: (1) receive and review the plaintiffs' monthly statements and any other pertinent information from the local gas distribution companies; (2) review the statements for plaintiffs to ensure the statements were accurate and plaintiffs were being charged for the proper volume of natural gas; and (3) inform plaintiffs of any invoice incongruities and attempt to resolve the discrepancies. See*id.* at 961-62.The court found that this created an agency relationship, which in turn gave rise to a fiduciary relationship between the plaintiffs, the provider, and the provider's officers and directors. See*id.* at 979-980.

A fiduciary relationship may also informally arise through the course of dealing of the parties. In Illinois, it is difficult for a plaintiff to meet its burden and show that it developed an informal fiduciary relationship with the defendant. See*Midwest Decks, Inc. v. Butler & Baretz Acquisitions, Inc.,* 649 N.E.2d 511, 518 (Ill.App.Ct.1995); *Oil Express Nat'l, Inc. v. Burgstone,* 958 F.Supp. 366, 370 (N.D.Ill.1997). However, a fiduciary relationship arises "where one party reposes special trust and confidence in another who accepts that trust and confidence and thereby gains superiority and influence over the subservient party."*Eldridge v. Eldridge,* 617 N.E.2d 57, 62 (Ill.App.Ct.1993). To determine whether a fiduciary relationship exists courts may consider the amount of trust and confidence endowed upon the dominant party. See*id.*

In this instance, the relationship between the parties was not a typical customer/supplier relationship. The complaint alleges that under the Agreement Watertower was obligated to collect the receivables, which it would then hold in trust before depositing the funds in the lockbox account, before transferring the funds to Plaintiff. Plaintiff claims that this duty was violated by the failure to transfer the funds to it.

The parties do not have a depositor/bank relationship, which ordinarily is insufficient to create a fiduciary relationship between the parties. See*Johnson v. Edwardsville Natl. Bank & Trust Co.,* 594 N.E.2d 342, 345 (Ill.App.Ct.1992) (Courts will not find a fiduciary duty to exist between bank and its depositor unless a showing is made that depositor was subject to domination and influence on part of bank). Rather, it appears to be more similar to that of a trustee/beneficiary because the complaint alleges that Plaintiff authorized Watertower to manage the collection and transfer of the receivables owed it. These allegations are sufficient to plead a fiduciary duty count against Watertower, and the Individual Defendants, its officers and directors, which arose from the Agreement.

**\*6** Moreover, at a minimum we believe the plaintiffs also adequately plead an "informal fiduciary relationship" theory. The pleadings allege that Plaintiff endowed Watertower with a significant amount of trust and confidence that it would collect the funds and transfer them to Plaintiff. Following discovery on the issue, the question will remain as to whether such a relationship existed and whether any of the actions allegedly taken by Defendants could constitute breaches of the fiduciary duty. See*Martin v. Heinold Commodities, Inc.,* 510 N.E.2d 840, 845 (1987). For purposes of the instant motion, however, we find that Plaintiff has adequately plead such a relationship, and that it was breached by Defendants, which damaged Plaintiff. Accordingly, we deny the motion to dismiss for Count II.

V. Piercing the Corporate Veil/Alter Ego Liability

A. The Individual Plaintiffs-Count III

In Count III, Plaintiff alleges on an alter ego theory that the corporate veil should be pierced and Muldoon, Sotka, and Graves should be held

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

Page 5

personally liable for the improper acts committed by Watertower.

As an initial matter, we must address the law to be utilized in our analysis. Since H & H, Churchill and Watertower are all incorporated in the State of Illinois, under Illinois choice of law principles it would seem that Illinois law governs disputes surrounding whether Churchill and Watertower's corporate form will be disregarded-not Ohio law. See e.g, Mark I, Inc. v. Gruber, 38 F.3d 369, 371 (7th Cir.1994) (Utilizing Connecticut law to determine whether to pierce the veil of a Connecticut corporation); Kolson v. Vembu, 869 F.Supp. 1315, 1323 (N.D.Ill.1994) (Utilizing Wisconsin law to adjudicate whether the corporate veil should be pierced where corporation was incorporated in Wisconsin and sole shareholder was a Wisconsin citizen); United Nat'l Records Inc. v. MCA, Inc., 616 F.Supp. 1429, 1431 (N.D.Ill.1985) (Utilizing California law where the parent company was a California corporation to ascertain whether the parent was liable for the acts of its subsidiary.).

H & H, Watertower, and Churchill are Illinois corporations. Thus, we believe that Illinois law should apply. However, with nary a word in support of utilizing Ohio law, Plaintiff continually cites cases from the Buckeye State, in addition to other foreign forums. Absent an argument in support of the application of Ohio law, we assume both parties agree that Illinois law applies to the alter ego issue, and we will not disturb that assumption, nor hold otherwise. See Vukadinovich v. McCarthy, 59 F.3d 58, 62 (7th Cir.1995) (Because choice of law is not jurisdictional, it usually is waivable); Wood v. Mid-Valley, Inc., 942 F.2d 425, 426-27 (7th Cir.1991) (In a diversity case when neither party raises a conflict of law issue the court applies the law of the state in which the federal court sits because courts need not create issues). Thus, under both choice of law principles and by assumption, Illinois law applies.

*7 In the State of Illinois, corporations generally are discernible entities separate and distinct from their officers, directors, and shareholders, who are not liable for the corporation's debts, liabilities, and other obligations. See Spartech Corp. v. Opper, 890 F.2d 949, 953 (7th Cir.1989); Ted Harrison Oil Co. v. Dokka, 617 N.E.2d 898, 901 (Ill.App.1993). In the interest of equity, however, courts have fashioned the

doctrine of "piercing the corporate veil" to prevent perpetrators of injustice and fraud from hiding behind the corporate form and expose them to individual liability. See Alpert v. Bertsch, 601 N.E.2d 1031, 1036 (Ill.App.Ct.1992). While courts should exercise caution when requested to pierce a corporate veil, see National Soffit & Escutcheons, Inc. v. Superior Systems, Inc., 98 F.3d 262, 265 (7th Cir.1996) (piercing a corporate veil is a task reluctantly undertaken by courts); Obras Civiles, S.A. v. ADM Securities, Inc., 32 F. Supp .2d 1018, 1022 (N.D.Ill.1999), courts will permit plaintiffs to impose liability on an individual who unjustly seeks to shield himself from liability under the corporate umbrella. See Lumpkin v. Envirodyne Inds., Inc., 933 F.2d 449, 460 (7th Cir.1991).

To properly plead a count seeking to pierce a corporate veil, plaintiff must allege that:

First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exists; and second, circumstances must be such that adherence to the fiction of a separate corporate existence would sanction fraud or promote injustice."

Hystro Prods, Inc. v. MNP Corp., 18 F.3d 1384, 1388-89 (7th Cir.1994) (quoting Van Dorn Co. v. Future Chemical & Oil Corp., 753 F.2d 565, 569-70 (7th Cir.1985)). To determine whether Plaintiff has plead facts sufficient to justify piercing the corporate veil and hold Muldoon, Sotka, and Graves individually liable, we will consider the allegations of the complaint with regard to the two requirements stated above.

To determine whether sufficient unity of interest exists between the corporation and the individual defendants to justify piercing the corporate veil, Illinois courts focus not upon any one factor, but weigh a number of elements, including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation at the relevant time; (6) non-functioning of other officers or directors; (7) absence of corporate records; or (8) whether the corporation is an insignificant veneer for the operation of dominant shareholders. See e.g. Ted Harrison Oil Co. v. Dokka,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

617 N.E.2d 898, 902 (Ill.App.Ct.1993); _Webb v. Webb_, 536 N.E.2d 206, 208 (Ill.App.Ct.1989).

Plaintiff alleges that Sotka, Muldoon, and Graves exercised such dominion and control over Watertower that it had no mind, will, or individual existence apart from the triumvirate. Plainly these are bare legal conclusions, which do not suffice to establish the requisite degree of unity of interest and ownership necessary to establish the disintegration of the separate personalities of Watertower and the Individual Plaintiffs. Plaintiff has not plead any facts establishing unity of ownership, let alone that Watertower has failed to act like a corporation by not issuing stock, keeping no corporate records, having ghost officers or directors, or not abiding by corporate formalities. Even viewed in the light most favorable to Plaintiff Count III is insufficient.

**\*8** Plaintiff alleges that the Individual Defendants abused their dominant positions to engage in fraudulent and unjust acts, namely diverting and stealing proceeds from accounts receivables held as fiduciaries by Watertower, but owned by Plaintiff. This allegation, however, goes towards establishing the second _Van Dorn_ requirement for unjust enrichment necessary, not the first requirement regarding unity of interest. It does not serve to fulfill both elements, and thus we dismiss Count III.

B. H & H-Count VI

In Count VI, Plaintiff seeks to hold H & H, a shareholder of Churchill (the parent of its wholly owned subsidiary Watertower), liable for Watertower's acts on an alter ego theory.[FN2] If a single business operates under several corporate names and charters but is actually only one entity, courts may find that they are alter egos of each other. See_United States v. Vitek Supply Corp._, 151 F.3d 580, 585 (7th Cir.1998); _Lumpkin v. Envirodyne Inds., Inc._ 933 F.2d 449, 460 (7th Cir.1991). Plaintiffs may demonstrate interconnectedness through (1) misrepresentation; (2) failing to maintain adequate corporate records; (3) failing to comply with corporate formalities; (4) commingling funds or assets; (5) undercapitalization; or (6) treating the assets of another corporation as its own. See_Lumpkin_. 933 F.2d at 463.

> [FN2.] The motion erroneously lists the

allegations of Count VI, as being those of Count V. However, all arguments are geared towards H & H. Because no arguments are directed towards Churchill we will only address the sufficiency of Count VI.

In support of its claim that H & H is an alter ego of Watertower, Plaintiff alleges that H & H, Churchill, and Watertower had: (1) common ownership (Graves was the sole shareholder of H & H, which owned a large portion of Churchill's shares.); (2) interlocking Board of Directors; (3) common officers and directors; (4) fund-sharing and transfers; and (5) mutuality of control over accounts and funds. Plaintiff claims that this resulted in H & H, Churchill, and Watertower having an identity of centralized ownership, operations, management, control, and beneficial interests, resulting in H & H so completely dominating and controlling Watertower that Watertower ceased to have an independent existence. These allegations are specific and sufficient enough to plead that H & H was an alter ego of Watertower and preserve Count VI.

While H & H correctly argues that to pierce its corporate veil it must have been a dominant player in the corporate activities, see_Snyder v. Dunn_, 638 N.E.2d 744, 748 (Ill.App.Ct.1994), it seeks to equate its proprietary role with its ownership stake, by claiming it must have been a dominant _shareholder_ to have liability imposed upon it. The two concepts are not equivalent and the case law firmly contradicts H & H's assertion, finding corporate directors and officers can have such a unity of interest or ownership that they meld with the corporation. See_Froehlich v. J.R. Froehlich Mfg. Co._ 416 N.E.2d 1134, 1137 (Ill.App.Ct.1981). Given that H & H cites no case law in support of its position, we believe its argument is insufficient to warrant dismissal of Count VI.

VI. Trust Fund Liability-Count IV

**\*9** In Count IV, Plaintiff alleges that the Individual Defendants were trustees of the corporate property (i.e. the receivables)for the benefit of the corporation's creditors, with the assets considered to be held in a trust fund. Plaintiff further alleges that the Individual Defendants defrauded Plaintiff as a creditor by participating in the dissipation of Watertower's assets. Thus, Plaintiff seeks damages

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-06174    Document 74-5    Filed 09/10/2008    Page 52 of 69

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

Page 7

for what it terms "Trust Fund Liability."

It is well settled that "so long as a corporation remains solvent, its directors ... owe no duties or obligations to others." *Beach v. Miller*, 22 N.E. 464, 466 (Ill.1889). Thus, creditors customarily may not assert actions for breach of fiduciary duty against corporate officers. *See e.g. In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill.1994); *In re Reusher*, 169 B.R. 398, 402 (S.D.Ill.1994). However, once a corporation becomes insolvent, the corporate assets are treated as being held in a trust fund for the purpose of satisfying the claims of creditors, with the directors acting as trustees and fiduciaries. *See Coleman v. Howe*, 39 N.E. 725, 727 (Ill.1895); *Atwater v. American Exch. Nat'l Bank of Chicago*, 38 N.E. 1017, 1022 (Ill.1893); *O'Connell v. Pharmaco, Inc.*, 493 N.E.2d 1175, 1182 (Ill.App.Ct.1986).

In its complaint, Plaintiff alleges that because Plaintiff was a corporate creditor, the Individual Defendants were trustees of the corporate property, and thus owed Plaintiff a duty to preserve the corporation's assets. Plaintiff further alleges that the Individual Defendants breached their duty to Plaintiff by dissipating Watertower's assets, including an attempt to transfer Watertower's Certificate of Need, its largest asset. While Plaintiff has failed to explicitly plead that Watertower was insolvent and that upon its insolvency, the Individual Defendants engaged in, or permitted to occur, a raid upon the corporation's assets, given the Individual Defendants argument that the attempted sale of the Certificate of Need was part of a bankruptcy proceeding, we believe the complaint provided sufficient notice under federal notice pleading standards. Accordingly, Count IV is adequately plead, and we deny the motion to dismiss as it pertains to it.

## VII. Unjust Enrichment-Count VII

Count VII seeks damages from Churchill and H & H, claiming they were unjustly enriched at Plaintiff's expense. In Illinois, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Johnson v. Gudmundsson*, 35 F.3d 1104, 1114 (7th Cir.1994) (citing *HPI Health Care v. Mt. Vernon Hosp.*, 545

N.E.2d 672, 679 (Ill.1989)). Here, Plaintiff alleges that Churchill and H & H were unjustly enriched by the funds improperly retained by Watertower. If plaintiff seeks recovery of a benefit that a third party transferred to defendant, plaintiff must plead either that: (1) the benefit should have been transferred to plaintiff, but a mistake caused the third party to give it to defendant; (2) defendant used wrongful conduct to acquire the benefit from the third party; or (3) for some other reason plaintiff has a more valid claim to the benefit than Defendant. *See HPI Health Care*, 545 N.E.2d at 679. Plaintiff here did not plead that Watertower intended to pay it, but mistakenly paid H & H and Churchill. Accordingly, Plaintiff must plead allegations sufficient under federal notice standards to set forth its theory that its claim to the receivables is superior to that of H & H and Churchill, or that they wrongfully acquired the funds from Watertower. *See id.*

*10 In essence, Plaintiff claims that: (1) Watertower improperly failed to convey receivables to Plaintiff; (2) Watertower, H & H and Churchill were transferring funds to and from each other giving H & H and Churchill control over Watertower's funds; (3) by continuing to retain the proceeds of the receivables, Defendants received a gratuitous monetary benefit and imposed a corresponding monetary loss on Plaintiff since Plaintiff had already advanced the funds; (4) Defendants wrongfully retained $3,572,015.98 and inflicted an equivalent loss upon Plaintiff by failing to convey the funds to Plaintiff; and (5) it would be unjust to allow Defendants to retain the money under these circumstances. We believe these allegations sufficiently sets forth Plaintiff's cause that it has a superior claim to any monies improperly transferred to H & H and Churchill from Watertower, because under the Agreement it was owed the money by Watertower. Count VII also sufficiently alleges that they wrongfully acquired the funds from Watertower by means of improper co-mingling of funds. Accordingly, the motion to dismiss is denied as it pertains to Count VII.

## VIII. Fraud-Count VIII

Count VIII is a fraud claim against all of the Defendants. "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Federal Rule of Civil*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

Procedure 9(b). To state a sufficient claim, plaintiff must merely provide a general outline of the alleged fraud scheme which reasonably notifies defendants of their professed role in the scheme. See *Pelfresne v. Village of Rosemont,* 22 F.Supp.2d 756, 763 (N.D.Ill.1998). Further, plaintiff need not allege the evidentiary details it will employ to support the fraud claim at a later date. See *Banowitz v. State Exchange Bank,* 600 F. Supp 1466, 1469 (N.D.Ill.1985).

Nonetheless, the law requires some degree of specificity. The allegations of fraud must set forth facts including: (1) a false statement of material fact; (2) which is known or believed to be false by the party saying it; (3) and is intended to induce another party to act; (4) relying on the accuracy of the statement the other party acts; and (5) which damages the other party. See *Soules v. General Motors Corp.,* 402 N.E.2d 599, 600 (Ill.1980). In addition, the party must have justifiably relied on the representation. See *id.*

Here, the Defendants are: (1) the directors and officers of Watertower, H & H and Churchill, (2) Watertower, (3) Watertower's parent company (Churchill), and (4) Churchill's parent company (H & H). However, Plaintiff's claims do not equally implicate them and do not apply to each of them in the same way. Accordingly, we will first consider the validity of the claims against the parent companies, and then weigh each attacked fraud allegation as it applies to the directors and officers.

In Count VIII, Plaintiff *interalia* claims that it justifiably relied upon Watertower's false representations that it would deposit all collected receivables into the lockbox account, even though the Individual Defendants knew otherwise. It then claims that certain directors and officers transferred cash and assets of it to Churchill and H & H, damaging Plaintiff. However, Plaintiff only alleges that the Individual Defendants participated in the fraudulent scheme through their knowledge that the statements were false and their activities in diverting assets. Plaintiff does not make any allegations that the Individual Defendants made any false representations to it. Rather, Plaintiff claims that the allegations were made by unknown agents of Watertower. Therefore, we do not believe Plaintiff has adequately plead a fraud count against the Individual Defendants.

*11 Likewise, the fraud claim against Churchill and H & H, Watertower's parent companies fails for the same reasons. Plaintiff has not plead any specific actions taken by them, nor cited any case law in its response brief which supports this count, but lumps them in with the Individual Defendants as "Defendants." Rule 9(b) requires more exacting specificity. Accordingly, we dismiss Count VIII in its entirety.

IX. Punitive Damages-Count IX

Finally, Plaintiff seeks punitive damages and attorneys' fees from the Individual Defendants based on a conspiracy claim. When courts ground their decision in state law, as in this diversity action, state law provides the basis of the decision. See *Browning-Ferris Inds. of Vermont. Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909 (1989). Illinois law permits the recovery of punitive damages in appropriate conspiracy cases. See *Sarno v. Thermen,* 608 N.E.2d 11, 21 (Ill.App.Ct.1992). Thus, Plaintiff may properly seek punitive damages under its conspiracy claim.

CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in part.

N.D.Ill.,2000.
NPF WL, Inc. v. Sotka
Not Reported in F.Supp.2d, 2000 WL 574527 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

7

Slip Copy                                                                 Page 1
Slip Copy, 2007 WL 3334500 (N.D.Ill.)

**C**RehabCare Group East, Inc. v. Certified Health
Management, Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
REHABCARE GROUP EAST, INC. d/b/a
Rehabcare Group Therapy Services, Inc., Plaintiff,
v.
CERTIFIED HEALTH MANAGEMENT, INC., et
al., Defendants.
**No. 07 C 2923.**

Nov. 8, 2007.

Adam K. Hollander, Alan J. Martin, Jaime L. Stilson,
Mayer Brown LLP, Chicago, IL, Phillip A. Martin,
Fultz, Mfaddox, Hovious & Dickens PLC, Louisville,
KY, for Plaintiff.
Matthew Thomas Gensburg, Tanisha Renae Jones,
Greenberg Traurig, LLP, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

JAMES B. ZAGEL, United States District Judge.

**I. INTRODUCTION**

*1 Plaintiff RehabCare Group East, Inc. ("plaintiff"
or "rehabcare") Brings This six-count complaint
against Certified Health Management, Inc.
("Defendant" or "CHM"), an entity that manages
skilled nursing homes. While the motion to dismiss
before me now only involves CHM, Plaintiff also
brings its complaint against seven facilities that CHM
manages ("Facilities"). At bottom, this is a contract
dispute. The nub of Plaintiff's complaint is its
allegation that Defendant and the Facilities failed to
pay RehabCare for the therapy services RehabCare
provided. For the reasons stated below, CHM's
motion is granted in part and denied in part.

**II. DISCUSSION**

*A. Motion to Dismiss Standard*

A motion to dismiss tests the sufficiency of a
complaint, not the merits of a case. *Autry v.
Northwest Premium Servs., Inc.,* 144 F.3d 1037, 1039
(7Th Cir.1998). I must accept all well-pleaded factual
allegations in the complaint as true, drawing all
reasonable inferences from those facts in Plaintiff's
favor. *Cleveland v. Rotman,* 297 F.3d 569, 571 (7th
Cir.2002). I may grant the motion only if "no relief
could be granted under any set of facts that could be
proved consistent with the allegations."*Hishon v.
King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81
L.Ed.2d 59 (1984). That said, "a plaintiff's obligation
to provide the grounds of his entitlement to relief
requires more than labels and conclusions, and a
formulaic recitation of the elements of a cause of
action will not do. Factual allegations must be
enough to raise a right to relief above the speculative
level."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, --
-- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929
(2007) (internal citations and quotations omitted). As
the Seventh Circuit noted, "it is not enough for a
complaint to *avoid foreclosing* possible bases for
relief; it must actually *suggest* that the plaintiff has a
right to relief."*EEOC v. Concentra Health Services,
Inc.,* 496 F.3d 773, 496 F.3d 773, 777 (7th Cir.2007)
(emphasis in original). While the Supreme Court's
recent decision in *Bell Atlantic* may not have changed
the federal pleading standard to a fact-pleading
regime, "at some point the factual detail in a
complaint may be so sketchy that the complaint does
not provide the type of notice of the claim to which
the defendant is entitled."*Airborne Beepers & Video,
Inc. v. AT & T Mobility LLC,* --- F.3d ----, No. 06-
2949, 499 F.3d 663, 2007 WL 2406859, at *4 (7th
Cir.2007).

*B. Counts I, IV, and V-Breach of Contract, Account
Stated, and Attorneys' Fees*

In Count I, RehabCare alleges a breach of contract
claim, Count IV alleges an "account stated" claim,
and Count V seeks attorneys' fees. CHM's motion to
dismiss these claims is premised on the simple fact
that it is not a party to any contract with Plaintiff.
RehabCare concedes this, but argues that its claims
against CHM are valid under the "alter ego" theory.
That is, it seeks to argue that CHM is so intertwined

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

with the Facilities that CHM should be held responsible for the Facilities' obligations. RehabCare seeks to do this despite the "well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors, and officers, and generally, from other corporations with which it may be affiliated."*Innkeepers' Telemanagement & Equip. Corp. v. Hummert Management Group, Inc., 841 F.Supp. 241, 245 (N.D.Ill.1993)* (citation omitted).

**\*2** In order to employ the "alter ego" theory, RehabCare must "pierce the corporate veil." Under Illinois law,[FN1] courts will pierce the corporate veil where: (1) "the corporation was so controlled and manipulated that it had become a mere instrumentality of another" and (2) "recognition of a separate corporate identity would sanction a fraud or promote injustice."*Chicago Florsheim Shoe S. v. Cluett, Peabody & Co., 826 F.2d 725, 728 (7th Cir.1987).* Parties seeking to pierce the corporate veil face a daunting hurdle. *See Pederson v. Paragon Pool Enterprises, 214 Ill.App.3d 815, 158 Ill.Dec. 371, 574 N.E.2d 165, 167 (Ill.Ap.Ct.1991)* ("Piercing [the] corporate veil is a task which courts should undertake reluctantly."); *see also Hornsby v. Hornsby's Stores, Inc., 734 F.Supp. 302, 307-08 (N.D.Ill.1990)* (explaining that exceptions to the rule providing that corporations have separate identities are "not favored and are stringently applied"). The task is even more difficult in a breach of contract case. *See Main Bank of Chicago v. Baker, 86 Ill.2d 188, 56 Ill.Dec. 14, 427 N.E.2d 94, 101 (Ill.1981)* (holding that in a breach of contract case, "additional compelling facts," such as a finding of fraud, may also be required in order to pierce the corporate veil). Nevertheless, the question here is not whether Plaintiff can necessarily pierce the corporate veil, but whether its claim can survive a motion to dismiss, a much lower threshold. *Cf., Ermoian v. LaSalle Capital L.L.C., No. 07 C 1314, 2007 WL 1752206, at \*1 (N.D.Ill. June 15, 2007)* (declining to grant individual defendants' motion to dismiss "with the understanding that their present retention in the case is limited to the potential of their liability on corporate-veil-piercing or alter-ego grounds").

> FN1. Both parties agree that Illinois law applies here.

Despite the lower threshold in this procedural posture, Plaintiff nevertheless fails to sufficiently plead its breach of contract or account stated claims under the alter ego theory. As noted, Plaintiff must establish two facts in order to pierce the corporate veil. Plaintiff fails adequately to plead either one. For the first requirement, Plaintiff must plead that the Facilities were so controlled and manipulated that they had become mere instrumentalities of CHM. Plaintiff's attempt to do so comes in the form of its allegation that "upon information and belief, Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate and legal entities."This is insufficient, even under the liberal pleading requirements of FED.R.CIV.P. 8.

Numerous courts have granted motions to dismiss because the party seeking to pierce the corporate veil failed to adequately plead the alter ego doctrine.In *Classic Fire & Marine Ins. Co. v. Illinois Ins. Exchange., No. 97 C 1256, 1997 WL 767290 (N.D.Ill.Dec.3, 1997)*, the plaintiff asserted that two entities were "affiliate members of the same corporate group, and are subject to common control and ownership."The court deemed the plaintiff's "conclusory" pleading to be insufficient vis-a-vis the first requirement. *Id.* at \*5;*see also Hornsby, 734 F.Supp. at 307-08* (mere allegation that corporations shared office space, office staff and directors is insufficient to suggest fraud or injustice or that one corporation was the alter ego of another); *Club Assistance Program, Inc. v. Zukerman, 594 F.Supp. 341, 351 (N.D.Ill.1984).*

**\*3** The court in *Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, No. 02 C 3979, 2004 WL 765368, at \*3 (N.D.Ill. April 7, 2004)*, also determined that a plaintiff failed to sufficiently plead the alter ego doctrine. There, the plaintiff pled that one entity "controlled the actions of [another entity] and was at all times aware of the wrongful conduct of the company."*F & v. Cement Contractors, 2004 WL 765368, at \*3.* The court held that averment to be "the kind of barebones, conclusory allegation that has been found insufficient to state an alter ego claim even under the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a)."*Id.; see also Strojmaterialintorg v. Russian Am. Commercial Corp., 815 F.Supp. 103, 105 (E.D.N.Y.1993)* (holding that conclusory allegations regarding the exercise of dominion and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

control are insufficient when attempting to plead the alter ego doctrine).

Like in *Classic Fire & Marine Ins. Co.* and *F & v. Cement Contractors,* Plaintiff's attempt to satisfy the first requirement of the alter ego doctrine is insufficient to withstand a motion to dismiss. RehabCare's allegation-that "upon information and belief, Defendants operate without respect for corporate formalities and in a manner that is inconsistent with their being separate and legal entities-is precisely the type of formulaic, skeletal conclusion that were found lacking in *Classic Fire & Marine Ins. Co.* and *F & v. Cement Contractors.*Furthermore, even if I were to deem this sufficient for the first requirement, Plaintiff's complaint does not even allege that the second requirement has been satisfied.

As against CHM, Counts I, IV, and V of Plaintiff's complaint are premised upon the alter ego doctrine. Because Plaintiff fails to satisfactorily plead that theory here, Defendant's motion to dismiss Counts I, IV and V (as against CHM) is granted.

### C. Count II-Promissory Estoppel

In Count II, Plaintiff asserts a claim for promissory estoppel. "To plead a cause of action for promissory estoppel, plaintiff must allege that (1) defendants made an unambiguous promise to plaintiff; (2) plaintiff relied on this promise; (3) plaintiff's reliance was expected and foreseeable by defendants; and (4) plaintiff relied to his detriment."*Robinson v. BDO Seidman, LLP,* 367 Ill.App.3d 366, 305 Ill.Dec. 175, 854 N.E.2d 767, 773 (Ill.App.Ct.2006) (*quoting Jago v. Miller Fluid Power Corp.,* 245 Ill.App.3d 876, 185 Ill.Dec. 785, 615 N.E.2d 80 (Ill.App.Ct.1993)).

Defendant's first line of attack on this Count argues that promissory estoppel is no longer recognized as an offensive cause of action in Illinois. To be sure, some intermediate courts of appeal in Illinois have held that promissory estoppel can no longer be pled as a cause of action, but rather only as an affirmative defense. *See, e.g., Dewitt v. Fleming,* 357 Ill.App.3d 571, 293 Ill.Dec. 446, 828 N.E.2d 756 (Ill.App.Ct.2005); *ESM Dev. Corp. v. Dawson,* 342 Ill.App.3d 688, 277 Ill.Dec. 30, 795 N.E.2d 397, 403 (Ill.App.Ct.2003). However, the Illinois Supreme Court's most recent statement on promissory estoppel

was not definitive on this question. *See Quake Constr., Inc. v. American Airlines, Inc.,* 141 Ill.2d 281, 152 Ill.Dec. 308, 565 N.E.2d 990 (Ill.1990). Moreover, there is disagreement amongst the Illinois courts as to whether *Dewitt* and *ESM* reflect the position of the Illinois Supreme Court. *See, e.g., Chatham Surgicore, Ltd. v. Health Care Serv. Corp.,* M826 N.E.2d 970, 975 (Ill.App.Ct.2005) (citing *Quake* and holding that plaintiff stated an affirmative claim for promissory estoppel). Several courts sitting in diversity in this district have declined to adopt the "novel" theory that promissory estoppel can no longer be pled as an offensive cause of action in Illinois. *See Kamboj v. Eli Lilly & Co.,* No. 05 C 4023, 2007 WL 178434, at *10 (N.D.Ill. January 18, 2007); *TNT Logistics North America, Inc. v. Bailly Ridge TNT, LLC,* No. 05 C 7219, 2006 WL 2726224, at *10 (N.D.Ill. September 21, 2006); *LM Insurance Corp. v. Sourceone Group, Inc.,* 454 F.Supp.2d 727, 741 (N.D.Ill.2006)("*Quake*... still stands as the governing law in Illinois concerning promissory estoppel."). I agree with the other judges on this Court; while exercising diversity jurisdiction, I am unwilling to adopt the position of the Dewitt and ESM courts absent a more definite statement from the Supreme Court of Illinois.

**\*4** Plaintiff sufficiently pleads the elements of a promissory estoppel claim. RehabCare claims that CHM promised to pay for Plaintiff's services. Plaintiff further claims that it relied on this promise and continued providing services. Plaintiff asserts that its reliance was reasonable, and lastly, it states that its reliance resulted in damages.

The fact that Plaintiff has overcome the low hurdle of the lax federal pleading standards obviously does not necessarily mean that it will be able to recover on this theory. CHM cites to both *Dumas v. Infinity Broadcasting Corp.,* 416 F.3d 671 (7th Cir.2005) and *Kamboj,* both of which may ultimately frustrate RehabCare's efforts to prevail. Nevertheless, the *Kamboj* court disposed of the plaintiff's claim on summary judgment. 2007 WL 178434, at *10. Similarly, the Seventh Circuit in *Dumas* was reviewing a district court's grant of summary judgment. 416 F.3d at 672. Because the procedural posture is different here, those authorities fail to counsel in favor of the result CHM seeks. Defendant's motion to dismiss Count II is denied.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 4
Slip Copy, 2007 WL 3334500 (N.D.Ill.)

*D. Count III-Unjust Enrichment*

In Count III, Plaintiff seeks recovery based on the theory of unjust enrichment. To state a cause of action based on a theory of unjust enrichment, RehabCare must allege that CHM "has unjustly retained a benefit to [RehabCare's] detriment, and that [CHM's] retention of the benefit violates the fundamental principles of justice, equity, and good conscience."*HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 545 N.E.2d 672, 679 (Ill.1989). Plaintiff's unjust enrichment claim is non-traditional in the same way as the plaintiff's claim in *HPI* was. Here, as there, Plaintiff "is seeking recovery of a benefit that was transferred to the defendant by a third party" as opposed to a benefit that Plaintiff itself transferred. *Id.* In this case, RehabCare seeks to recover any funds that CHM may have received from the federal government via the Medicare program.

In a situations like this, where an unjust enrichment claim is based on a benefit transferred from a third party to the defendant, Plaintiff must establish one of three propositions in order to recover. Plaintiff must establish either that:

(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*Id.* (internal citations omitted). In this case, Plaintiff relies on the third option and argues that it had a better claim than CHM to the Medicare funds. The parties engage in a minor dust-up concerning materials RehabCare attached to its response brief about the Medicare payments. I need not consider these exhibits at this stage, and in fact, I did not consider them. The allegations in the complaint put CHM on notice of the substance of RehabCare's unjust enrichment claim. Whether RehabCare will ultimately be able to prevail on this claim is a question for another day. Consequently, the motion to dismiss Count III is denied.

*E. Count VI-Tortious Interference with Contract*

*5    In Count VI, RehabCare alleges tortious

interference with contract (also referred to as intentional interference with contract rights. In Illinois, the elements of this tort are:

(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages.

*HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 672 (*citing Prudential Ins. Co. v. Van Matre,* 158 Ill.App.3d 298, 110 Ill.Dec. 563, 511 N.E.2d 740 (Ill.App.Ct.1987).

RehabCare adequately pleads all of these elements. However, this does not end the inquiry. The *HPI* court, in a factually analogous situation, noted that "where the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious."*Id.* at 677.The *HPI* court went on to state hospital management companies enjoy a privilege with regard to the entities they manage. *Id.* ("[T]he duty owed by hospital management companies to their hospitals should take precedence over their duty to the hospitals' contract creditors."). Based on the sound reasoning in *HPI,* I find that CHM-like the defendant in *HPI*-enjoys at least some privilege with regard to the Facilities.

The fact that CHN enjoys the privilege is not, in and of itself, dispositive though. The existence of the privilege means only that in addition to the above-listed elements, RehabCare must *also* allege that CHM acted in a malicious or unjustified manner. *See HPI,* 137 Ill.Dec. 19, 545 N.E.2d at 677 ("[W]here the conduct of a defendant in an interference with contract action was privileged, it is the plaintiff's burden to plead and prove that the defendant's conduct was unjustified or malicious.").

CHM argues, based on *HPI,* that I should dismiss Count VI because RehabCare failed to make these additional allegations that are required as a result of the privilege. However, RehabCare's failure to sufficiently allege that CHM's conduct was unjustified may not be fatal. That is because the *HPI* court also pointed out that "[a] defendant who is

Slip Copy                                                                              Page 5
Slip Copy, 2007 WL 3334500 (N.D.Ill.)

protected by a privilege ... is not justified in engaging in conduct which is totally unrelated or even antagonistic to the interest which gave rise to defendant's privilege."*Id.* at 678.As an example, the court stated that

a hospital management company, whose privilege is based upon the management company's role in exercising business judgment on behalf of the company's hospital, would not be justified in inducing a breach of contract *solely for the management company's gain...* since such conduct would not have been done to further the hospital's interests.

*Id.* So while RehabCare does not sufficiently allege malice, it may nevertheless be able to prevail if it can establish that CHM was acting solely for its own gain, as opposed to on behalf of the Facilities. It is this possibility that rescues Count VI of Plaintiff's complaint.

## V. *CONCLUSION*

**\*6** For the aforementioned reasons, CHM's motion to dismiss is granted as to Counts I, IV and V and denied as to Counts II, III, and VI.

N.D.Ill.,2007.
RehabCare Group East, Inc. v. Certified Health Management, Inc.
Slip Copy, 2007 WL 3334500 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.





Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 765368 (N.D.Ill.), 33 Employee Benefits Cas. 1627

CTrustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, Inc.
N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern Division.
TRUSTEES OF THE CEMENT MASONS FUND, LOCAL 502; Trustees of the Cement Masons Institute of Chicago, Illinois; Trustees of the Cement Masons Savings Fund, Local 502; and Trustees of the Cement Masons Apprentice Education and Training Fund, Local 502, Plaintiffs,
v.
F & V CEMENT CONTRACTORS, INC., an Illinois corporation, and Frank Partipilo, individually; and Bernardina Barbenete, individually; and Maria Partipilo, individually, Defendants.
**No. 02 C 3979.**

April 7, 2004.

Hugh B. Arnold, Donald D. Schwartz, Arnold & Kadjan, Chicago, IL, for Plaintiffs.
Jeffrey S. Fowler, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL; William Robert Quinlan, John H. Scheid, Quinlan & Carroll, Ltd., Steven Craig Rueckert, Law Offices of Steven Rueckert, Jill J. Gladney, Knepper & Gladney, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*[FN1]

> FN1. Pursuant to 28 U.S.C. § 636(c), all parties to this case have voluntarily consented to have a United States Magistrate Judge conduct all proceedings in this case, including the entry of final judgment (see doc. 20, 21, 22, 42. __).SCHENKIER, Magistrate J.

*1 This matter comes before the Court on a motion by individual defendant Maria Partipilo pursuant to Fed.R.Civ.P. 12(b)(6). The plaintiffs (collectively the "Funds") have brought this action under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, 1145, and the Taft Hartley Act, 29 U.S.C. § 185, against corporate

defendant F & V Cement Contractors, Inc. ("F & V") and individual defendants Frank Partipilo, Bernardina Barbenete, and Maria Partipilo. In their three-count amended complaint, the Funds seek an order requiring the corporate and individual defendants to submit an audit of their books and to pay all unpaid contributions (as well as attorneys' fees and costs). Count III of the amended complaint alleges that all three individual defendants engaged in a "fraud to avoid payment of contributions to the funds" (Am. Compl., at 5).

Ms. Partipilo has moved to dismiss Count III of the Funds' amended complaint, which is the only count that pertains to her (doc. # 32). For the reasons set forth below, Ms. Partipilo's motion to dismiss is granted.

I.

The purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to test the sufficiency of the complaint, not to decide its merits. *Gibson v. Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). When ruling on a motion to dismiss, a court assumes that all well-pled allegations are true and draws all reasonable inferences in the light most favorable to the moving party.*Henderson v. Sheahan,* 196 F.3d 839, 845 (7th Cir.1999), *cert. denied,*530 U.S. 1244, 120 S.Ct. 2691, 147 L.Ed.2d 962 (2000).

Although it is often said that a claim may be dismissed only if, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,"*Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)), the Seventh Circuit has observed that this maxim "has never been taken literally." *Kyle v. Morton High School,* 144 F.3d 448, 455 (7th Cir.1998) (quoting *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648, 654 (7th Cir.1984)). Rather, the complaint must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory. *Chawla v. Klapper,* 743 F.Supp. 1284, 1285 (N.D.Ill.1990).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 765368 (N.D.Ill.), 33 Employee Benefits Cas. 1627

## II.

The relevant allegations set forth in the Funds' amended complaint, which we will take as true for purposes of ruling on this motion, are as follows. Since June 30, 1975, F & V has been required to make periodic contributions to the Cement Masons Pension Funds on behalf of its employees pursuant to collective bargaining agreements (Am. Compl., at 3). Beginning on January 1, 1998 and continuing through the filing date of the amended complaint (November 18, 2003), F & V has failed to make some of the contributions required by the collective bargaining agreement (*Id.*). Maria Partipilo, along with the other two individual defendants, allegedly "controlled the actions of F & V and were at all times aware of the wrongful conduct of the company"(*Id.* at 5). These individual defendants allegedly engaged "in a scheme and or conspiracy to deprive the funds of required contributions and or their conscious and knowing involvement in submitting false contribution reports to the funds."(*Id.* at 5).

**\*2** Specifically, the Funds allege that Ms. Partipilo, and the other two individual defendants, made false statements of material facts to the Funds by: (1) concealing the existence of "side jobs"; (2) concealing wage payments to employees; (3) falsely reporting employees as laid off to collect unemployment benefits; and (4) knowingly under-reporting fringe benefit reports (*Id.* at 5-6). Accordingly, the Funds claim that "[b]y reason of the aforesaid the Individually Named Defendants are also alter egos of the Company and liable in their individual capacities for all the actions of the company"(*Id.* at 6).

## III.

Under Count III of the amended complaint, a basis of liability for the individual defendants could only arise under 29 U.S.C. § 1145.[FN2] Under Section 1145, only an "employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under terms of a collectively bargained agreement" faces liability.

> FN2.29 U.S.C. § 185 and 29 U.S.C. § 1132, which the Funds also cite, only provide the Funds the right to sue, and delineate what

damages are recoverable. They do not set forth who properly may be sued as defendants.

Therefore, we must first determine whether Ms. Partipilo is an "employer" under 29 U.S.C. § 1145. "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan."29 U.S.C. § 1002(5). In their amended complaint, the Funds have alleged not that Ms. Partipilo is an employer, but rather that "Maria Partipilo is an employee, officer and owner of F & V" (Am. Compl., at 5)."Congress did not intend through Section 1145 to upset the general rule that individuals are not liable for corporate debt."*Sullivan v. Cox,* 78 F.3d 322, 325 (7th Cir.1996). In fact, "[c]ourts routinely rebuff efforts to collect pension debts from managers unless the officer or investor would be liable under state law-in other words, unless courts would 'pierce the corporate veil .' " *Levit v. Ingersoll Rand Financial Corp.,* 874 F.2d 1186, 1194 (7th Cir.1996).

Consequently, for Ms. Partipilo to face individual liability under Section 1145, she must face some liability under state law.

Under Illinois law, it is a well-established principle that a corporation is separate and distinct as a legal entity from its shareholders, directors, and officers ... Under the Illinois alter ego doctrine, courts will pierce the corporate veil only when plaintiff shows that: (1) "the corporation was so controlled and manipulated that it had become a mere instrumentality of another" and (2) "recognition of a separate corporate identity would sanction a fraud or promote injustice."

*Classic Fire & Marine Insurance Co. v. Illinois Insurance Exchange,* 1997 U.S. Dist. LEXIS 19524, at \*15 (N.D.Ill. December 2, 1997). Factors to be considered in determining the first element include "(1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation at the relevant time; (6) non-functioning of other officers or directors; (7) absence of corporate records; and (8) whether the corporation is an insignificant veneer for the operation of dominate shareholders."*NPF WL, Inc. v. Sotka,* No.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 765368 (N.D.Ill.), 33 Employee Benefits Cas. 1627

99 C 7966, 2000 WL 574527, at *7 (N.D.Ill. May 10, 2000).

**\*3** The Funds' amended complaint fails to plead any allegations which satisfy the two elements required to pierce the corporate veil. The last paragraph of Count III simply states "[b]y reason of the aforesaid the Individually Named Defendants are also alter egos of the Company and liable in their individual capacities for all the actions of the Company (Am. Compl., at 6). The "aforesaid" allegations almost exclusively pertain to alleged conduct by Ms. Partipilo (and others) directed at the Funds (*Id.*, ¶¶ 8, 13-18). While plaintiffs also allege that Ms. Partipilo "controlled the actions of F & V and [was] at all times aware of the wrongful conduct of the company"(*Id.*, 12), that is the kind of barebones, conclusory allegation that has been found insufficient to state an alter ego claim even under the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a).*See NPF WL,* 2000 WL 574527, at *7-8;*see also Northwestern Corp. v. Gabriel Mfr. Co., Inc.,* No. 95 C 2004, 1996 WL 732519, at *10-11 (N.D.Ill.Dec.18, 1996).*A fortiori,* this allegation falls far short of the kind of specificity required by Federal Rule of Civil Procedure 9(b), which at least one court in this district has applied to alter ego claims. *See Typographics Plus, Inc. v. I.M. Estrada & Co., Inc.,* No. 98 C 886, 2000 U.S. Dist. LEXIS 10351, at *13 (N.D. Ill. July 14, 2000 (D.J. Williams).

## CONCLUSION

For the foregoing reasons, defendant Maria Partipilo's motion to dismiss without prejudice Count III of the amended complaint (doc. # 32) against her is granted.

N.D.Ill.,2004.
Trustees of Cement Masons Fund, Local 502 v. F & V Cement Contractors, Inc.
Not Reported in F.Supp.2d, 2004 WL 765368 (N.D.Ill.), 33 Employee Benefits Cas. 1627

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**9**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1006572 (N.D.Ill.)

Page 1

**C**Typographics Plus, Inc. v. I.M. Estrada & Co., Inc.
N.D.Ill.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
TYPOGRAPHICS PLUS, INC., Plaintiff,
v.
I.M. ESTRADA & CO., INC., William Horty and
Unknown Persons Defendants.
**No. 98 C 886.**

July 19, 2000.

MEMORANDUM OPINION AND ORDER

WILLIAMS, J.
**\*1** Plaintiff Typographics Plus ("Typographics")
brought suit against Defendants I.M. Estrada & Co.
("Estrada") and William (Bill) Horty ("Horty") for
breach of contract, common law fraud and violation
of the Illinois Consumer Fraud Act, 815 ILCS
505/2et seq. Now before the court is Individual
Defendant Horty's motion to dismiss for failure to
state a claim pursuant to Federal Rule of Civil
Procedure 12(b)(6) and 9(b). For the reasons set forth
below, the court grants Horty's motion to dismiss
Count II with prejudice and Count III without
prejudice.

*Background*

On a motion to dismiss, the court accepts as true the
factual allegations of the complaint. *Lashbrook v.
Oerkfitz,* 65 F.3d 1339, 1343 (7th Cir.1995) (citations
omitted). Typographics is an Illinois corporation with
its principal place of business in Cook County,
Illinois. Bill Horty is a person who controls and
directs the business and operations of Estrada, a
corporation with it principal place of business in
Connecticut. Horty is also an officer and director of
Estrada. (Am.Compl.¶ 1-3.)

In 1997, Estrada placed advertising in a publication
called *Printers Hot Line* for the sale of various
equipment and services. (*Id.* ¶ 6.) Upon seeing the
advertising, a representative from Typographics,

Michael Izrael ("Izrael") called Horty to speak with
him regarding the products advertised. (*Id.* ¶ 8.)
After having telephone conversations pertaining to
the items for sale and the price and terms of items for
sale, Typographics agreed to purchase a piece of
equipment, the AGFA Select Set 7000 (hereinafter
"the equipment") under the following terms: (1) a
total purchase price of $44,000; (2) payment of
$14,666.67 upon submission of a written
confirmation of the oral agreement to purchase; (3)
payment of the balance on delivery of equipment. (*Id.*
¶ 9.) Soon thereafter, Estrada sent Typographics a
written invoice, which Typographics representatives
signed and returned, along with a check in the
amount of $14,666.67, to Estrada. (*Id.* ¶ 11.)

Between the dates of April 29, 1997 and June 16,
1997, Horty and Izrael had additional phone
conversations, after which, Typographics agreed to
purchase an additional piece of equipment, the
Harlequin Software RIP (hereinafter "the
equipment"). Typographics agreed to (1) a purchase
price of $10,500; (2) to pay $6,000 upon submission
of a written confirmation of the oral understanding;
and (3) to pay the balance upon delivery. (*Id.* ¶
12.)Again, Estrada sent Typographics an invoice
which Typographics then executed and sent back
along with a payment in the amount of $6,000. (*Id.* ¶
14.)

Following the execution of these agreements, Estrada
failed and refused to deliver the equipment
Typographics ordered. At the same time however,
Estrada has not returned the $20,666.67
Typographics paid in down payments for the
equipment. (*Id.* ¶ 15.)At various times, Estrada,
through Horty and others, would represent to
Typographics that either the equipment had been
shipped, even though it had not, or that Estrada
would be shipping each of the items, even though it
never did. (*Id.*) Accordingly, Typographics claims
that Estrada never intended to ship either item or to
otherwise fulfill its obligation to deliver the
equipment as promised. In addition, Typographics
maintains that Horty knew that Estrada would not
and was not in a position to ship and deliver the
equipment Typographics ordered and that Horty
never intended to fulfill any of the obligations

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1006572 (N.D.Ill.)

described in the invoices. (*Id.*)

**\*2** Typographics filed its three-count First Amended Complaint ("Complaint") seeking monetary damages for breach of contract, common law fraud and consumer fraud under the Illinois Consumer Fraud Act. Horty then filed his motion to dismiss.[FN1]

> FN1. On February 2, 1998, this court entered a judgment in plaintiff's favor and against corporate defendant Estrada on Counts I through III.

*Analysis*

A motion to dismiss tests the sufficiency of the complaint, not the merits of the suit. *Demitropoulos v. Bank One Milwaukee, N.A.,* 915 F.Supp. 1399, 1406 (N.D.Ill.1996) (citing *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990)). Therefore, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff.*Zinernon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Colfax Corp. v. Illinois State Toll Highway Auth.,* 79 F.3d 631, 632 (7th Cir.1996) (citations omitted). The court will dismiss a claim only if "it appears beyond doubt that [the plaintiff] can prove no set of facts in support of his claim which would entitle him to relief."*Colfax,* 79 F.3d at 632 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Horty argues that in both Counts II and III, Typographics fails to state facts with sufficient particularity to support his claims for fraud and for a Consumer Fraud Act violation as required by Federal Rule of Civil Procedure 9(b). In response, Typographics maintains that under Federal Rule of Civil Procedure 8(a) and to defeat a motion under Rule 12(b)(6), all it needed to do was set forth a plain statement of the claims involved that put defendants on notice of the allegations being made.

I. Common Law Fraud Claim

A. Rule 9(b)

Horty claims that instead of providing defendants with the information required under Rule 9(b),

Typographics offers nothing but unsupported conclusions. Typographics contends that under Federal Rule 12(b)(6), it has stated sufficient facts to state a claim for fraud. To state a claim for common law fraud in Illinois, Typographics must allege: (1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury. *See Verda Industries, Inc. v. Lightning Deterrent Corp.,* No. 94 C 1693, 1995 WL 548610, \*6 (N.D.Ill. Sept.13, 1995).

Horty correctly argues that Typographics has a higher pleading burden under Federal Rule of Civil Procedure 9(b). The rule states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."Fed.R.Civ.P. 9(b). As such, when stating a claim for fraud, plaintiffs must state (1) the identity of the person who made the misrepresentation; (2) the time, place and content of the misrepresentation; and (3) the method by which the misrepresentation was communicated to the plaintiff. *See Uni\*quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992).

**\*3** In its Complaint, Typographics alleges that Horty "knew" Estrada could not obtain the equipment Typographics ordered and that he "knew" Estrada would not be delivering the equipment ordered. Rule 9(b) requires that plaintiffs plead in detail the "who, what, when, where, and how" of the circumstances constituting the fraud. *See DiLeo v. Ernst and Young,* 901 F.2d 624, 627 (7th Cir.1990). While Typographics does identify the "who" of the fraud, plaintiff does not make the "what" very clear at all. Typographics alleges that Horty accepted orders knowing that Estrada could not fill them, that he accepted deposits without delivering equipment ordered, that he depleted Estrada's funds as part of his fraudulent scheme, that he placed an ad in a trade magazine and that he "made false and deceptive allegations as to having shipped equipment to Typographics" when he knew no equipment had been, or ever would be, shipped.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2000 WL 1006572 (N.D.Ill.)

Plaintiff's repeated use of legal conclusions to describe its allegations casts serious doubt on whether Typographics has met its burden under Rule 9(b). Additionally, Typographics has offered little in the way of times, places and other factual data to support its claim of common law fraud. *See Cumis Insurance Society v. Peters,* 983 F.Supp. 787, 792 (N.D.Ill.1997) (finding that plaintiff made no attempt to specify what fraudulent representations and promises were made other than in accounting statements and checks).[FN2] Still, under notice pleading, Typographics may have offered enough facts concerning the fraud. "Rule 9(b)'s requirement that fraud be alleged with particularity is relaxed where facts that the plaintiff would otherwise be required to plead are in the exclusive possession of the defendants." *Whirlpool Financial Corp. v. GN Holdings, Inc.,* 873 F.Supp. 111, 119 (N.D.Ill.1995)aff'd., 67 F.3d 605 (7th Cir.1995). Ultimately, the court need not reach this question however, because plaintiff has not alleged sufficient facts to hold Horty liable as an individual.

> FN2. The court also notes that Typographics' claim appears, at least in part, to allege "promissory fraud" which under Illinois law "is actionable only if it either is particularly egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance."*Desnick v. American Broadcasting Communications, Inc.,* 44 F.3d 1345, 1354 (7th Cir.1995). Plaintiff has not plead facts describing a scheme that was particularly egregious, nor has it identified, in any detail, a pattern of deceptions or enticements.

**B. Alter Ego Theory**

Alternatively, Horty argues that under the heightened pleading standard set forth in Rule 9(b), Typographics failed to allege facts sufficient to support his claim that Estrada is merely a sham corporation from which Horty, as an individual, unlawfully diverts revenue. Horty maintains that no facts have been submitted to suggest that Estrada was the Horty's alter ego and that the court should pierce the corporate veil and hold him liable as an individual for Estrada's failures under the contract. Typographics, however, contends that the Complaint

contains ample facts to establish Estrada's liability as an individual under an alter ego theory.

Ordinarily, a corporation is a legal entity that exists separate and apart from its shareholders, directors, and officers, who are not generally liable for the corporation's debts and obligations. However, a court may "pierce the corporate veil" where the corporate entity "would otherwise present an obstacle to the protection of private rights, or where the corporation is merely the alter ego or business conduit of the governing or dominant personality."*Hystro Products, Inc. v. MNP Corporation,* 18 F.3d 1384, 1390 (7th Cir.1994) (interpreting Illinois law).

**\*4** Illinois courts apply a two-part test to determine whether to pierce the corporate veil: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *See Hystro,* 18 F.3d at 1388-89. In determining whether there is sufficient unity of interest and ownership between Estrada and Horty to warrant piercing the corporate veil, the court will look to several factors: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation at the time; (6) nonfunctioning of other officers or directors; (7) absence of corporate records; and (8) whether the corporation is a mere facade for the operation of dominant stakeholders. *See Tome Engenharia E Transpoprtes v. Malki,* No. 94 C 7427, 1996 WL 172286, *2 (N.D.Ill. Apr.11, 1996).

A review of the Complaint suggests that no piercing of the corporate veil is warranted. Specifically, Typographics alleges that, on information and belief:

Estrada is a thinly and undercapitalized entity having no assets available to fulfill its obligations or undertakings and Horty, individually ... created Estrada and operates the corporation as a mere shell used to further a scheme to obtain deposits for equipment neither Horty nor Estrada ever intend to actually deliver....

Horty, individually and/or acting with Unknown

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2000 WL 1006572 (N.D.Ill.)

Persons, has accepted orders in the name of Estrada from purchasers in Illinois ... and has regularly and knowingly accepted deposits and failed, as part of a general scheme and practice, to deliver the equipment involved....

All of the proceeds of deposits and other revenue received by Estrada are diverted from the corporation to Horty, individually ... and Horty knowingly depletes the available cash of Estrada as part of a scheme to obtain deposits for equipment Horty and Unknown Persons know will not be delivered and in fact they never intend to deliver.

(Am.Compl.¶ 21.) Typographics then goes on to allege that Horty knew Estrada had no money to purchase the equipment plaintiff ordered, that Horty intended to divert the money Typographics sent under the agreement for his own use and purposes, and that he placed an ad in the *Printers Hot Line* even though he knew neither he nor Estrada had any of the advertised equipment available. (Am.Compl.¶ 22.)

Beyond its allegation that Estrada is thinly and under-capitalized, with no assets to fulfill its obligations, Typographics fails to include any facts to support its claim that Estrada is a sham corporation and Horty's alter ego. The mere assertion that Horty operates Estrada as a mere shell to further his fraudulent schemes is not enough to satisfy the requirements of 9(b), even under the liberal notice pleading requirements of this court.

**\*5** Even were Typographics to satisfy the first prong of the test, plaintiff's claim fails on the second prong. To meet the requirements of the test's second prong, Typographics must allege facts sufficient to establish that adherence to the fiction of separate identities would sanction a fraud or promote injustice. "Although the 'promote injustice' test requires something less than an affirmative showing of fraud, it requires something more than the mere prospect of an unsatisfied judgment." *Tome,* 1996 WL 172286 at *5. "[C]ourts that properly have pierced corporate veils to avoid 'promoting injustice' have found that, unless [they] did so, some 'wrong' beyond the creditor's inability to collect would result ." *Sea-Land Services, Inc. v. Pepper Source,* 941 F.2d 519, 522-24 (7th Cir.1991).

Here, Typographics attempts to satisfy its burden by alleging that Horty was the principal actor, working through Estrada, to perpetrate a fraud against plaintiff. Typographics claims that it was Horty who made the agreement with plaintiff, who represented that the equipment Typographics ordered had either been sent or was being shipped, and who kept Typographics' deposit without ever delivering any merchandise. No facts have been alleged however, to show that unless the court holds Horty individually liable, it will be sanctioning some fraud or injustice. In fact, Typographics obtained judgment on all three counts against Estrada in the amount of $129,000.

Illinois courts have pierced the corporate veil when failure to do so would unfairly enrich one of the parties, *see B. Kriesman & Co. v. First Arlington Nat'l Bank,* 91 Ill.App.3d 847, 47 Ill.Dec. 757, 415 N.E.2d 1070 (Ill.App.1980), or when a corporate owner uses corporations to avoid responsibilities to creditors and is unjustly enriched, *see Sea-Land v. Pepper Source.* 993 F.2d 1309, 1312 (7th Cir.1993). Typographics has not plead any facts to suggest that without piercing the veil, Horty would be unjustly enriched or be able to avoid any financial obligations he might have to plaintiff as an employee or officer of Estrada. As such, the court concludes that Typographics has plead insufficient facts to support its alter ego theory and the court has no reason to pierce the corporate veil. Therefore, the court will grant Horty's motion to dismiss Count II.

**II. Illinois Consumer Fraud Act Claim**

Count III of Typographics' Complaint purports to state a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA"). Horty again argues that Typographics has failed to allege sufficient facts to state a claim, against Horty individually, under the CFA.

As an initial matter, although the CFA was created to protect consumers, a corporation may have standing to bring a CFA action. In 1990, the CFA was amended to dispense with the requirement previously imposed by courts that a plaintiff prove public injury in order to obtain standing. *See* 815 ILCS 505/1-505/12. Therefore, although the CFA is primarily concerned with protecting consumers, a business may have standing if it is a consumer of another business's product. *See Lefebvre Intergraphics v. Sanden Machine Limited,* 946 F.Supp. 1358, 1368

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1006572 (N.D.Ill.)

Page 5

(N.D.Ill.1996). Here, Typographics was a consumer of Estrada's printing equipment and services.

*6 Horty's principal argument is that under Rule 9(b), Typographics' Complaint falls short of stating facts with the requisite particularity. To state a CFA claim, plaintiff must set forth facts alleging that (1) defendants committed a deceptive act, such as misrepresentation or concealment of a material fact; (2) defendant intended to induce plaintiff's reliance on the deception; and (3) the deception occurred in a course of conduct involving trade or commerce. See Petri v. Gatlin, 997 F.Supp. 956, 967 (N.D.Ill.1997). In its Complaint, Typographics alleges that by placing an advertisement for the equipment in furtherance of its scheme to defraud plaintiff, defendants engaged in conduct that "amounted to fraud, false pretenses, false promise and otherwise violated the provisions of" the CFA. (Am.Compl.¶ 24.)

Again, Typographics does not describe specific details of the deceptive act it charges Horty of committing. In fact, in Count III, plaintiff does not even identify Horty by name as it did in Count II. Unlike the plaintiffs involved in cases like Lefebvre and Petri, Typographics does not specify what statements contained in Estrada's advertising or promotional materials contained a misrepresentation or concealed a material fact. The ad itself merely lists the prices of the various equipment Estrada sold. In Lefebvre, the plaintiff alleged that the defendant made false statements concerning the capabilities of its printing press. See Lefebvre, 946 F.Supp. at 1366. In Petri, the plaintiffs charged that defendants falsely stated that its products would enable a customer to save 15% to 35% on annual gas bills. See Petri, 997 F.Supp. at 969. Typographics merely alleges that defendants created and circulated an advertisement to sell merchandise and to "further its scheme to obtain funds without delivering merchandise for same."(Am.Compl.¶ 20.) This is not enough to put Horty on notice of the nature of Typographic's CFA claim.

Furthermore, without more facts illustrating how Horty violated the CFA, Typographics cannot defeat Horty's motion to dismiss on this claim. This is especially true in light of the fact that judgment has already been entered on the CFA claim against Estrada. Horty is the only remaining defendant and

Typographics has not made clear what role he played, as an individual, in placing the allegedly deceptive ad. "In a case involving multiple defendants ... 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'" Vicom v. Harbridge Merchant Services, 20 F.3d 771, 778 (7th Cir.1994) (citation omitted). Yet, as the Petri court noted, when plaintiffs generally allege that individual defendants were responsible for conduct in violation of the CFA, the notice pleading requirements of Federal Rule of Civil Procedure 8(a) are satisfied.Petri, 997 F.Supp. at 969. As such, the court will dismiss Count III without prejudice and permit Typographics to amend its complaint so as to cure these defects.[FN3]

> FN3. Due to an error in the record, the existence of a pending motion in this case was not brought to the court's attention and did not show up on the court's tracking system. Once it was discovered, the court ruled.

### Conclusion

*7 For the reasons set forth above, the court grants Horty's motion to dismiss Count II with prejudice and grants his motion to dismiss Count III without prejudice [13-1]. The court grants Typographics leave to file a Second Amended Complaint consistent with this opinion. Failure to amend Count III of the First Amended Complaint within 30 days of this ruling will result in dismissal of Count III with prejudice.

N.D.Ill.,2000.
Typographics Plus, Inc. v. I.M. Estrada & Co., Inc.
Not Reported in F.Supp.2d, 2000 WL 1006572 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.