## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Themselves and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust, Inc., | |
| Plaintiff, | **CASE NO. 07 C 6174** |
| v. | Judge Robert W. Gettleman |
| INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION; THE INLAND GROUP, INC., INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP., INLAND WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL A. GOODWIN, ROBERT A. BAUM, G. JOSEPH COSENZA, KPMG LLP , AND WILLIAM BLAIR & COMPANY, L.L.C, | **JURY TRIAL REQUESTED** |
| Defendants. | |

## LEAD PLAINTIFFS' MEMORANDUM OPPOSITION TO
## KPMG LLP'S MOTION TO DISMISS

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................................1

II.   PERTINENT FACTUAL BACKGROUND ....................................................................2

III.  ARGUMENT ................................................................................................................5

      A.    The Requirements to State Claim Under Section 14(a) Are Satisfied. ............5

            1.    Plaintiffs Need Not Plead Scienter as to KPMG. .......................................6

            2.    The Amended Complaint Satisfies Applicable Pleading Standards. ........7

      B.    KPMG's Audit Reports Were Materially False and Misleading ......................8

      C.    KPMG's Explanations Do Not Address the Allegations. ................................12

      D.    The Amended Complaint States a Claim against KPMG for Aiding
            and Abetting Breaches of Fiduciary Duty. .....................................................13

IV.   CONCLUSION ............................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422 (6th Cir. 1980) .........................................7

*Alleco Inc. v. Harry and Jeanette Weinberg Found., Inc.*, 665 A.2d 1038 (Md. 1995)................14

*In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192
(S.D.N.Y. 2004)...................................................................................................................8

*Beck v. Dobrowski*, 2007 U.S. Dist. LEXIS 84093 (N.D. Ill. Nov. 14, 2007) ........................... 7-8

*Blau v. Harrison*, 2006 U.S. Dist. LEXIS 19795 (N.D. Ill. Mar. 24, 2006) ................................ 7-8

*Buckley v. Deloitte & Touche USA LLP*, 2007 U.S. Dist. LEXIS 37107
(S.D.N.Y. May 21, 2007) ...................................................................................................15

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997)........................................9

*Cent. Laborers' Pension Fund v. Sirva, Inc.*, 2006 U.S. Dist. LEXIS 73375
(N.D. Ill. Sept. 22, 2006). ...................................................................................................8

*CMNY Capital, L.P. v. Deloitte & Touche*, 821 F. Supp. 152, 157
(S.D.N.Y. 1993)...................................................................................................................9

*Cronau v. Asche*, 2002 U.S. Dist. LEXIS 7785 (N.D. Ill. Apr. 30, 2002) ...................................15

*In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. Cal. 2005)...............................................................8

*Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697 (N.D. Ill. 2005) .............................................................11

*DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. Ill. 1990)............................................................15

*In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924 (N.D. Ill. 1996) ...............................................9

*Ekas v. Burris*, 2007 U.S. Dist. LEXIS 84340 (S.D. Fla. Nov. 13, 2007)........................................9

*Eliasen v. Hamilton*, 1987 U.S. Dist. LEXIS 1826 (N.D. Ill. Mar. 6, 1987)....................................7

*In re Fleming Packaging Corp.*, 370 B.R. 774 (Bankr. C.D. Ill. 2007). ........................................14

*Gans v. Filmways, Inc.*, 453 F. Supp. 1116 (E.D. Pa. 1978)............................................................5

*Goldin Assocs., L.L.C. ex rel. SmarTalk Teleservices, Inc. v. Donaldson, Lufkin & Jenrette Sec.
Corp.*, 2003 U.S. Dist. LEXIS 16798 (S.D.N.Y. Sept. 24, 2003) ....................................14

*Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); ......................................................8

*Grossman v. Waste Management, Inc.*, 589 F. Supp. 395 (N.D. Ill. 1984)....................................6

*Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260
    (S.D. Fla. 1995) ......................................................................................................6

*In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276 (7th Cir. 1996) ..................................15

*In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192 (E.D.N.Y. 1997) .......................................9

*Hefferman v. Bass*, 467 F.3d 596 (7th Cir. 2006)................................................................... 14-15

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001 ......................................................................6

*Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179 (3d Cir. 1988)......................................................7

*Hochfelder v. Ernst & Ernst*, 503 F.2d 1100 (7th Cir. Ill. 1974) ...................................................6

*J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) ...............................................................................5, 9

*Kennedy v. Venrock Assocs.*, 348 F.3d 584 (7th Cir. 2003) ............................................................6

*Lewis v. Straka*, 2007 U.S. Dist. LEXIS 59054 (E.D. Wis. Aug. 13, 2007) ................................12

*Malone v. Microdyne Corp.*, 26 F.3d 471 (4th Cir. 1994)...............................................................8

*McCurdy v. SEC*, 396 F.3d 1258 (D.C. Cir. 2005)..........................................................................8

*In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248 (N.D. Cal. 2000)................................7

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)..........................................................................6

*In re Moustafi*, 371 B.R. 434 (Bankr. D. Ariz. 2007)......................................................................9

*In re Nat'l Century Fin. Enters.*, 541 F. Supp. 2d 986 (S.D. Ohio 2007)....................................15

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. Ohio 2004 ...............................................8

*Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997).....................................................11

*Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000).....................11

*Riggs Ptnrs, LLC v. Hub Group, Inc.*, 2002 U.S. Dist. LEXIS 20649
    (N.D. Ill. Oct. 23, 2002) ......................................................................................11

*Robison v. Caster*, 356 F.2d 924 (7th Cir. 1966)..............................................................................14

*Roth v. Aon Corp.*, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008) ..................................13

*Schleicher v. Wendt*, 529 F. Supp. 2d 959 (S.D. Ind. 2007)............................................................13

*Scholes v. Moore*, 1993 U.S. Dist. LEXIS 724 (N.D. Ill. Jan. 22, 1993) ......................................15

*SEC v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1999) ........................................................................6

*SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938 (C.D. Cal. Mar. 16, 2006).........................................6

*Shofstall v. Allied Van Lines, Inc.*, 455 F. Supp. 351 (N.D. Ill. 1978) ............................................6

*In Re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308 (M.D. Fla. 2002).....................................12

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006).........................................8

*TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)...............................................................5, 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007)............................................12

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 U.S. Dist. LEXIS 20733
     (D.N.H. Oct. 14, 2004) ........................................................................................................8. 12

*Van De Velde v. Coopers & Lybrand*, 899 F. Supp. 731 (D. Mass. 1995)......................................8

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) .......................................................6

*Wolf v. Liberis*, 505 N.E.2d 1202 (Ill. App. Ct. 1987) ..................................................................14

## Other

3E Harold S. Bloomenthal & Samuel Wolff,
     Securities and Federal Corporate Law § 24:63, at 24-121 (2000)...........................7
17 C.F.R. § 240.14a.......................................................................................................1, 6
Fed. R. Civ. P. 8.............................................................................................................14
Fed. R. Civ. P. 9(b) .................................................................................................. 14-15

City of St. Clair Shores General Employees Retirement System and Madison Investment Trust ("Plaintiffs"), shareholders of Inland Western Retail Real Estate Trust, Inc. ("Inland REIT" or "REIT"), submit this Memorandum in Opposition to KPMG LLP's ("KPMG") Motion to Dismiss and Memorandum [Docs. 66-67] ("KPMG Memo"). The Amended Class Action Complaint [Doc. 38] ("Cmplt.")[1] charges KPMG with: (i) violation of 15 U.S.C. §78n(a), Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and 17 C.F.R. § 240.14a-9 ("Rule 14a-9") (Count I); and (ii) aiding and abetting breaches of fiduciary duty (Count IV).

## I.    INTRODUCTION

KPMG was the outside auditor for Inland-affiliated entities: the Advisor, the Property Managers, Inland REIT, the Sponsor and The Inland Group. Cmplt. ¶ 45. These entities constantly engaged in related-party transactions, treating as fungible their employees and resources. The relationships were by design: Inland REIT had no employees. So, it paid the Advisor and Property Managers millions of dollars to provide it with the litany of services necessary to run a multi-billion dollar real estate portfolio. Because of their relationships with Inland affiliates, the Advisor and Property Managers were able to render these services by incurring no costs. In 2007, the Advisor and Property Managers' owners determined that it was time for Inland REIT to buy them out for $375 million worth of stock ("Internalization"). What was the "support" for this $375 million "pay-day" that came at the expense of the REIT's shareholders? The Advisor and Property Managers' financial statements, which failed to report expenses. This failure caused the Advisor's and Property Managers' operating results, EBITDAs and, consequently, "value," to be inflated.

KPMG was charged with auditing the Advisor and Property Managers' financial statements and providing Audit Reports for the Proxy which sought shareholder approval of the Internalization. In doing so, KPMG was faced with financial statements that: (i) reported nominal expenses and (ii) reflected EBITDAs of 100% and 60% of Total Revenues - which starkly contrast with the EBITDAs of comparable public companies which range from *3 to 15%.* Cmplt. ¶¶ 139(b), 245. Notwithstanding these absurd results, and despite its institutional knowledge of their businesses, KPMG declared the financial statements to have been prepared in accordance with generally accepted accounting principles ("GAAP"), and blithely explained to Inland REIT's shareholders that the Advisor's and Property Managers' expenses were "not necessarily

---

[1]    Unless indicated, capitalized terms have the same meaning as in the Amended Complaint.

indicative" of the expenses they would have incurred absent the related-party transactions.

KPMG recklessly disregarded that the reported expenses were *not even remotely indicative* of those an independent entity would incur and that the financial statements failed to identify the omitted expenses and their dollar amounts. By doing so, KPMG enabled defendants to issue financial statements in the Proxy which omitted the material impact the related-party transactions and attendant re-allocation of expenses had on inflating the Internalization Consideration. Because the financials did not itemize expenses, and because KPMG did not require defendants to disclose the degree to which the unreported expenses inflated the Advisor's and Property Managers' operating results, the shareholders were deprived of the precise material information needed to evaluate the fairness of the exorbitant price paid in the Internalization.

KPMG's Motion hinges on a view that the Advisor and Property Managers "prospered" because of Inland REIT's "phenomenal growth," and that the Advisor left money "on the table." (KMPG Memo at 2-3, 11-13). Prosperity and allegedly foregone fees simply do not offer an "innocent justification" to the failure to disclose expenses. Rather, they highlight the material impact that the extensive related-party transactions had on inflating the Advisor's and Property Managers' "prosperity" via the financial statements, which were the vehicles for defendants to obtain $375 million worth of Inland REIT's stock at Inland REIT's shareholders' expense.

## II.    PERTINENT FACTUAL BACKGROUND.

On September 10, 2007, Inland REIT (at the direction of its directors, officers, affiliates and advisors) filed a proxy solicitation statement ("Proxy") with the Securities and Exchange Commission ("SEC"). Cmplt. ¶¶ 22, 28, 42, 83-85, 154. The Proxy sought shareholders' approval of Inland REIT's acquisition of affiliated entities (the "Internalization") that performed significant advisory and property management services for Inland REIT (the "Advisor" and the "Property Managers"). *Id.* ¶¶ 152-157. The Advisor's and Property Managers' owners founded Inland REIT or were Inland REIT's executive officers or directors. *Id.* ¶¶ 19-28, 33, 36, 39, 53-67. Inland REIT, the Advisor and Property Managers are not publicly traded on a national stock exchange; their operations were not subjected to market scrutiny. *Id.* ¶¶ 16, 20, 31. The Internalization had Inland REIT acquiring the Advisor and Property Managers for consideration valued at approximately $375 million ("Internalization Consideration"). *Id.* On November 13, 2007 shareholders approved the Internalization; two days later, it was consummated. *Id.* ¶¶ 166-7.

The Advisor and Property Managers generated all of their income and business from

Inland REIT and its Shareholders. *Id.* ¶ 21. The multitude of duties and responsibilities of the Advisor were enumerated in the Advisory Agreement, and included:

- Present to the Company a continuing and suitable real estate investment program …;
- Manage the Company's day-to-day investment operations. . .;
- Serve as the Company's investment advisor . . .;
- Investigate, select and conduct relations with lenders, consultants, accountants, . . .;
- [Assist in] property management services and other activities relating to the [REIT's assets];
- Assist in negotiations on behalf of the Company with investment banking firms. . .;
- The preparation and filing and distribution of returns and reports to governmental agencies. . .;
- Advise the Company of the operating results of the Company properties. . .;
- Prepare . . . all reports and returns required by the [SEC], Internal Revenue Service. . .;
- Undertake and perform all services or other activities necessary and proper to carry out the investment objectives of the Company.

*Id.* ¶ 116; *See* Section 2 of Advisory Agreement, Exhibit A to Plaintiffs' August 21, 2008 Opposition to the Non-KPMG/William Blair Defendants' Motion to Dismiss [Doc. 71] ("IW Opp"). In exchange for providing these services for the REIT's 302 commercial properties which cost in excess of $6 Billion, Inland REIT paid the Advisor $39.5 million and $20.9 million in fees in 2006 and 2005. Cmplt. ¶¶ 139, 121. Despite having provided a plethora of services for which it was paid millions, the Advisor reported nominal expenses. *Id.* ¶¶ 168, 170-74. The Advisor reported $1 million of salary and benefit expenses and reimbursements from the REIT in that amount. *Id.*[2] Those reimbursements, however, were for only a limited subset of the Advisor's expenses related to administrative services. *Id.* ¶ 118; Ex. A, IW Opp, Section 9(c)(2). They do not represent the Advisor's costs to provide asset management services for 300+ properties.

For each of Inland REIT's 300+ properties, the Property Managers furnished property management services (handling rental, leasing, operation and management services), and prepared monthly and annual reports and budgets. *Id.* ¶¶ 29, 34, 37, 40. The Property Managers' financials failed to reflect the salaries and expenses necessary to perform those services for which the REIT paid $29.8 million and $20.7 million in 2006 and 2005, respectively. *Id.* ¶¶ 127, 169, 177.

Until included in the Proxy, the Advisor's and Property Managers' financial statements were unknown; these entities operated outside the shareholders' and public scrutiny, but not KPMG's. To secure shareholder approval of the Internalization, Defendants utilized the assistance

---

[2]    The Advisor's financial statements are even, on their face, inconsistent with Inland REIT's financials which reported reimbursements to the Advisor of $3.4 million, $4.5 million and $1.5 million, in 2006, 2005 and 2004, respectively. *Id.* ¶¶ 171, 174(d).

of legal and financial advisors, including KPMG.[3] Having performed audit services for the Inland-affiliated entities, KPMG had access to and knowledge of their businesses and operations, including the related-party transactions among the various Inland-affiliated entities. For the Internalization and Proxy, KPMG was asked to provide Audit Reports representing that the Advisor's and the Property Managers' financial statements "presented fairly, in all material respects, [their] financial position[s] . . . and the results of [their] operations . . . in conformity with U.S. generally accepted accounting principles ["GAAP"]." ("Audit Reports"). *Id.* ¶¶ 186-87. Despite auditing financial statements that reported nominal expenses and reflected EBITDAs of nearly 100% and 60% of the Advisors' and Property Managers' Total Revenues, respectively, KPMG issued unqualified Audit Reports. *Id.* ¶ 191. The Proxy and financial statements, however, never disclosed the material impact on the Advisor's and Property Managers' operating results and "value" due to the related-party transactions which resulted in the re-allocation of expenses in the financials. *Id.* ¶¶ 199, 201. The Proxy and financial statements also never itemized the expenses reallocated to the Advisor's and Property Managers' affiliates, including:

- officer salaries;
- employee salaries;
- the rent paid for office space;
- the costs incurred for accounting and legal services.

*Id.* ¶ 200. The dollar amounts of these expenses were never revealed in the Proxy. KPMG's statement to the contrary (Memo at 8) is simply false. And, obviously, the REIT's shareholders were in no position to know the dollar amounts of the omitted expenses (or to itemize them in the Complaint), because they were never disclosed. Instead, the shareholders had to evaluate a $375 million deal based on unqualified Audit Reports and a false, and, under the circumstances, wholly misleading, statement that the Advisor's and Property Managers' expenses were "not necessarily indicative" of expenses they would have incurred absent the related-party transactions.

GAAP comprises the conventions, rules, and procedures necessary to define accepted accounting practices. Cmplt. ¶ 195.[4] SFAS No. 57, which establishes requirements for related-party disclosure, governs here. *Id.* ¶ 196. As related parties, the financial statements of Inland REIT, the Advisor and the Property Managers, were required to comply with SFAS 57 and disclose all material transactions between or among affiliates including: (a) A description of the

---

[3]     The REIT paid KPMG $1,085,850 in 2006 and $1,353,946, in 2005, for auditing its annual financial statements and providing other audit and tax related services. Cmplt. ¶ 45.

[4]     GAAP are accepted by the SEC and consist of authoritative literature including the Financial Accounting Standards Board Statements of Financial Accounting Statements ("SFAS"). Cmplt. ¶¶ 195-6.

transactions, including transactions to which no amounts or nominal amounts were ascribed . . . and such other information deemed *necessary to an understanding of the effects of the transactions of the financial statements*; (b) The dollar amounts of transactions. . .; and (c) Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. Cmplt. ¶ 198. (emphasis added).

The Advisor's and Property Managers' financial statements, however, did not accurately and completely reflect the impact the material related-party transactions had on their financial results, or the impact the undisclosed expenses had on their "value." *Id.* ¶¶ 199-200. Even if nominal,[5] financial statement disclosure of the details and amounts of the expense re-allocations was required because these entities were under common ownership and management control. *Id.* ¶ 199. Without such disclosures, the financial statements failed to present "complete" information in violation of GAAP and left the shareholders without any understanding of the effects of the transactions on the financial statements. *Id.* ¶¶ 201-202.[6] Because these omissions and facts rendered the financials not compliant with GAAP, KPMG's Audit Reports both violated generally accepted auditing standards ("GAAS") and enabled the defendants to secure shareholder approval of the Internalization at an unsupported and grossly inflated price. *Id.* ¶¶ 203-16.

## III.   ARGUMENT.

### A.   The Requirements to State Claim Under Section 14(a) Are Satisfied.

Shareholders must be adequately informed so that they can make rational determinations on whether to support or oppose particular transactions. *Gans v. Filmways, Inc.*, 453 F. Supp. 1116 (E.D. Pa. 1978). The Exchange Act "was designed to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). The touchstone of a Section 14(a) violation is a material misstatement or omission – something "that a reasonable shareholder would consider . . . important in deciding how to vote." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A complaint cannot be properly dismissed on the ground that the misstatements or omissions are not material "unless they are so obviously unimportant to a

---

[5]     As confirmed by the EBITDAs of their peers, their expenses were not nominal. Cmplt. ¶¶ 243-47.

[6]     SFAS 57, ¶ 17 ("financial statements may not be complete without additional explanations of and information about related party transactions and thus may not be reliable. Completeness implies that nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions.").

reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001). [7]

KPMG's false and misleading statements in the Proxy about the Advisor's and Property Managers' financial statements comprise the most material information imparted on the shareholders: the consideration to be paid to fiduciaries and insiders in the Internalization. *SEC v. Lipson*, 46 F. Supp. 2d 758, 765 n.5 (N.D. Ill. 1999) (information contained in financial reports, such as hard revenue and performance numbers, is information that reasonable investors would consider significant in making investment decisions); *see SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938, 103-104 (C.D. Cal. Mar. 16, 2006); Cmplt. ¶¶ 168-255.

### 1. *Plaintiffs Need Not Plead Scienter as to KPMG.*

To state a Section 14(a) claim, a plaintiff must allege that (1) the proxy statement contained a material misstatement or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. *Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 384-85 (1970).[8] Plaintiffs need not plead scienter to state a Section 14(a) claim because it requires only a showing of negligence. *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 593 (7th Cir. 2003) (negligent omission of material information from a proxy statement violates Section 14(a)); *see also Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F. Supp. 1260, 1266 (S.D. Fla. 1995) (Pleading privity, reliance, causation or scienter are not necessary under Section 14(a)).

Contrary to KPMG's assertions (KPMG Memo at 5), outside professionals – including accountants - may be liable for negligence to non-privy third parties who "are members of a limited class whose reliance on the financial statements is specifically foreseen." *Shofstall v. Allied Van Lines, Inc.*, 455 F. Supp. 351, 360 (N.D. Ill. 1978) (*quoting Hochfelder v. Ernst & Ernst*, 503 F.2d 1100, 1107 (7th Cir. Ill. 1974), *rev'd on other grounds*, 425 U.S. 185 (1976)).

---

[7]   Section 14(a)'s aim is to ensure that shareholders exercise their voting rights on the basis of information fairly and fully disclosed to them by their company and fiduciaries by "prohibiting the solicitation of proxies by means of materially false or misleading statements." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087 (1991). Rule 14a-9 prohibits solicitation of shareholder votes by means of a proxy that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a.

[8]   KPMG (Memo at 3, 13) states that a shareholder vote was not required. IW Defendants never even argue this because it is wrong: the Internalization was predicated on securing shareholder approval. Cmplt. ¶¶ 154, 166. Once the Proxy was issued it could not be materially false or misleading or violate Section 14(a). *Grossman v. Waste Management, Inc.*, 589 F. Supp. 395, 409 (N.D. Ill. 1984) (when a corporation makes a disclosure, whether voluntary or required, there is a duty to disclose the whole truth).

KPMG asks this Court to deviate from the negligence standard generally applied to Section 14(a) claims and instead apply a dated Sixth Circuit decision, *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422 (6th Cir. 1980) *cert. denied*, 449 U.S. 1067 (1980). Although the Seventh Circuit has not specifically ruled on the state of mind requirement applied to Section 14(a) claims against an outside auditor, *Adams* has been expressly rejected and criticized by courts in *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 190 (3d Cir. 1988) and *In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248, 1264 (N.D. Cal. 2000),[9] and by commentators, *see* 3E Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 24:63, at 24-121 (2000) (criticizing *Adams* for a "cavalier attitude" toward the professional responsibilities of outside auditors and predicting that the decision "is not likely to be followed by discerning courts"). Similarly, KPMG's reliance on *Eliasen v. Hamilton*, 1987 U.S. Dist. LEXIS 1826, *21-22 (N.D. Ill. Mar. 6, 1987), does not support its position about the state of mind requirement since *Eliasen* involved claims against corporate issuers, not auditors or accountants. KPMG cannot skirt liability for negligence to the shareholders in light of the known and intended significant role the financials and Audit Reports served in securing shareholder approval of the Internalization via the Proxy.[10]

## 2.　*The Amended Complaint Satisfies Applicable Pleading Standards.*

KPMG Memo at 5 wrongly asserts that the PSLRA heightened pleading standards apply. However, the Seventh Circuit has not ruled whether the PSLRA's pleading requirements for fraud-based securities claims apply to Section 14(a) claims. Rather, in *Blau v. Harrison*, 2006 U.S. Dist. LEXIS 19795, *16 (N.D. Ill. Mar. 24, 2006) (J. Hibbler), the court ruled that the pleading requirements of the PSLRA do not apply to a Section 14(a) claim that does not "sound in fraud." *Cf. Beck v. Dobrowski*, 2007 U.S. Dist. LEXIS 84093 (N.D. Ill. Nov. 14, 2007) (J. Leinenweber) (applying the PSLRA's heightened pleading standards to a Section 14(a) action but

---

[9]　　In *Herskowitz v. Nutri/System, Inc.*, 857 F.2d 179, 190 (3d Cir. 1988), the Third Circuit stated that "since an investment banker rendering a fairness opinion in connection with a leveraged buyout knows full well that it will be used to solicit shareholder approval, and is well paid for the service it performs, we see no convincing reason for not holding it to the same standard of liability as the management it is assisting." Accordingly, "all persons liable under Section 14 should be held to the same standard of culpability: negligence." And, in *In re McKesson HBOC Secs. Litig.*, 126 F. Supp. 2d 1248, 1264 (N.D. Cal. 2000) the Court stated "the *Adams* court's concerns about holding outside auditors liable for minor mistakes seems misplaced, because even under a negligence standard plaintiffs only prevail if they prove that the misstatements were material and that the defendants deviated from an appropriate standard of care."

[10]　　If "scienter" was required, KPMG's conduct, as shown below, was sufficiently reckless or knowing given that it violated SFAS 57 in the face of such obvious "red flags" as: (i) nominal disclosed expenses; (ii) impossible to achieve reported operating results; and (iii) a facially false and misleading statement about expenses and operating results not necessarily being "indicative" of real world results.

distinguishing *Blau* because plaintiff's 14(a) claims were not based on negligence). Plaintiffs' Section 14(a) claims are based in negligence. *Beck*, 2007 U.S. Dist. LEXIS 84093, at *13.

If the Court were to apply the PSLRA's heightened pleading standards, the inquiry is whether the Amended Complaint states facts with particularity that give rise to a strong inference that KPMG acted negligently. *See Blau*, 2006 U.S. Dist. LEXIS at *16. The Advisor and Property Managers' financial statements violated GAAP (Cmplt. ¶¶ 195-202) and the Audit Reports violated GAAS. *Id.* at ¶¶ 203-216. KPMG, by reason of its position as auditor for the pertinent affiliated entities, had the opportunity and obligation to monitor and inquire into the details of the Advisor and Property Managers' expenses in the context of the related-party transactions. *See McCurdy v. SEC*, 396 F.3d 1258, 1261 (D.C. Cir. 2005)("Among transactions calling for close inspection [by auditors] are related-party transactions. . ."). *See* Section II B, below.

Moreover, allegations made here that an auditor ignored "red flags" when coupled with GAAP and GAAS violations are sufficient to demonstrate facts giving rise to a strong inference of KPMG's negligence to withstand a motion to dismiss. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279-280 (3d Cir. 2006); *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004); *see Van De Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 736 (D. Mass. 1995) ("[A] complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of 'red flags' sufficiently attention-grabbing to have alerted a reasonable auditor to the audited company's shenanigans"); *see In re Daou Sys.*, 411 F.3d 1006, 1016 (9th Cir. Cal. 2005; *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994). "Specific factual allegations that a defendant ignored red flags, or warning signs that would have revealed the accounting errors prior to their inclusion in public statements," indicate at a minimum, a defendant was negligent. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686-687 (6th Cir. Ohio 2004). Indeed, allegations that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts" are also sufficient to allege scienter. *Cent. Laborers' Pension Fund v. Sirva, Inc.*, 2006 U.S. Dist. LEXIS 73375 (N.D. Ill. Sept. 22, 2006).

**B.    KPMG's Audit Reports Were Materially False and Misleading.**

KPMG, Inland REIT's and its affiliates' outside auditors for several years, issued false

and unqualified Audit Reports on false financial statements. Cmplt. ¶ 191. The reported level of operating efficiency in the financials was improbable and impossible. *In re Moustafi*, 371 B.R. 434, 435 (Bankr. D. Ariz. 2007) ("no one has zero expenses"). The re-direction of the Advisor's and the Property Managers' operating expenses to affiliates rendered their financials not reflective of their true financial performance in violation of GAAP. Cmplt. ¶¶ 172-78.

Thus, KPMG knew that: (a) the Advisor and Property Managers were engaged in related-party transactions; (b) the Advisor and Property Managers' financial statements reported nominal expenses; (c) the financial statements never itemized the expenses that were re-allocated from the Advisor and Property Managers to their affiliates; (d) the financial statements only revealed that expenses (just for administrative services and rent) "are not indicative" of those in arms-length transactions; and (e) neither the financial statements nor Proxy disclose the material impact the related-party transactions had, by their re-allocation of expenses, of materially inflating the Advisor and Property Managers "value." *Id.* at ¶¶ 168-180, 241-242, 244-246. These facts call into question the veracity of the Advisor's and Property Managers' financial statements, the Audit Reports and the Proxy. Based on this, shareholders were left with no basis on which to assess what a proper "value" of the Advisor and Property Managers was in the Internalization.[11]

It is well-established that GAAP violations or violations of auditing principles can result in materially inaccurate and misleading financial statements. [12] *In re Discovery Zone Sec. Litig.*, 943 F. Supp. 924, 935 (N.D. Ill. 1996) (financial statements in "violation of GAAP can constitute a material misrepresentation that gives rise to an action for securities fraud"); *Ekas v. Burris*, 2007 U.S. Dist. LEXIS 84340, *8 (S.D. Fla. Nov. 13, 2007); *In re Health Mgmt. Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997); *CMNY Capital, L.P. v. Deloitte & Touche*, 821 F. Supp. 152, 157, 165 (S.D.N.Y. 1993) (complaint alleged facts in support of a theory of reckless disregard of auditing procedures by listing actual, specific audit procedures that the defendant auditor failed to follow and explained why its failure to follow them was significant). The Amended Complaint makes particularized allegations that the Proxy failed to fulfill Section 14(a)'s mandate: to provide full and fair disclosure from which shareholders may make their decision on how to vote. *J.I. Case Co.*, 377 U.S. at 431; *TSC Indus. Inc.*, 426 U.S. at 448.

---

[11]　　The Amended Complaint does not allege that KPMG violated auditing practices with respect to the fees reported by the Property Managers. *Compare* KPMG Memo at 7.
[12]　　Whether financial statements comply with GAAP is a fact question that should not be addressed on a motion to dismiss. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997).

In response, KPMG asserts that the Amended Complaint fails to provide particulars as to which expenses and related-party transactions were not reported (KPMG Memo at 7-8, 10). The Amended Complaint alleges that the Proxy and financial statements never disclosed the material impact that the reallocation of expenses to affiliates as part of related-party transactions had on inflating the Advisor's and Property Managers' operating results. Cmplt. ¶¶ 174(c), 177. The Amended Complaint also alleges that the Proxy or financial statements never itemized the expenses (such as officer and employee salaries, rent paid for office space, and costs incurred for accounting and legal services) that were reallocated to affiliates. *Id.* at ¶ 200. Plaintiffs, of course, cannot allege the dollar amounts of the omitted expenses, because they were never disclosed.

KPMG also claims (Memo at 10-11) that the financials complied with FAS 57 ¶ 16 by making a statement about the amount of fees the Advisor and Property Managers charged and that costs, for *administrative services and rent*, charged by affiliates to the Advisor were not necessarily indicative of the expense they may have incurred if they received services from unaffiliated suppliers.   Aside from representing an egregious understatement (the reported nominal expenses were not remotely indicative of arm's-length transactions), this statement applies only to "Administrative services and rent" and does not cover any of the millions of dollars of expenses – salaries and cost of services – omitted from the Advisor and Property Managers' financial statements. Cmplt. ¶¶ 118(b); 171, 176-77.

KPMG further asserts that since virtually all of the Advisor's salary and benefit expenses were reimbursed, any increase in expenses would have been offset by a reimbursement. KPMG Memo at 8, fn 3.  KPMG misreads the Advisory Agreement: The Advisor was only entitled to reimbursement for certain expenses related to administrative services, and was not entitled to reimbursement for all of the salaries and benefits necessary to perform and carry out its services as asset manager of a multi-billion dollar real estate portfolio. Cmplt. ¶ 118; Ex. A, IW Opp, Section 9(c)(2)(b). If, *arguendo*, all of the Advisor's expenses were reimbursable, it does not alter the fact that the Advisor's financials were materially false and misleading. Keeping in mind that the REIT was not purchasing the Advisory Agreement but the Advisor, the financial statements were still required to reflect the actual <u>cost</u> of performing the full panoply of advisory services so that the REIT's shareholders could assess the fairness of the Internalization Consideration.

KPMG then counters that the financials stated that affiliates provided "a host of related services for IWEST that were paid for by IWEST directly." (KPMG Memo at 9). Those

disclosures, however, only refer to services provided by affiliates which were **not** provided by the Advisor. (Proxy at 12, 21, 72-73). KPMG's statements do not address how the Advisor and Property Managers were paid millions in fees to provide a plethora of services, but performed those services without reporting any expenses, and then, proposed a $375 million self-dealing transaction based on those financials. Cmplt. ¶¶ 170-180. None of KPMG's cases support dismissal of the Action. *Riggs Ptnrs, LLC v. Hub Group, Inc.*, 2002 U.S. Dist. LEXIS 20649 (N.D. Ill. Oct. 23, 2002), cited by KPMG, does not address the sufficiency of allegations made under Section 14(a), but rather under Section 10(b) which requires a showing of scienter. *Riggs* teaches that even if allegations of GAAP and GAAS violations, standing alone, are insufficient to plead *scienter* under the PSLRA for a Section 10(b) claim, GAAP and GAAS violations remain relevant to plead scienter when the complaint identifies "red flags" or specific, highly suspicious facts and circumstances available to the auditor at the time of the audit, and alleges that these facts were ignored, either deliberately or recklessly. *Riggs*, 2002 U.S. Dist. LEXIS 20649.

Other cases relied on by KPMG (Memo at 9) are similarly distinguishable in that the courts were faced with claims under Section 10(b), the allegations did not rise to the level of egregiousness presented by the Advisor and Property Managers' financial statements and the courts did not face auditors who had a comparable degree of intimate familiarity with affiliated companies' books and records. In *Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 718 (N.D. Ill. 2005), the court dismissed claims of GAAS violations because there was no link between the auditor's conduct and the breach of auditing standards. In *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1009 (S.D. Cal. 2000), the court declined to infer auditor's knowledge of accounting improprieties based upon idiosyncratic details of which that the auditor would not be expected to have knowledge. In contrast, the accounting improprieties alleged are evident from the face of the financials, not requiring investigation in order to be uncovered or discovered by KPMG. Simply, KPMG's knowledge or reckless disregard of the improprieties is readily inferable here because the financial statements on their face failed to report expenses and KPMG had intimate knowledge of the books and records of all of the REIT affiliates. *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the [accounting] error, the less believable are defendants protests that they were completely unaware of Eagle's true financial status and the stronger is the inference that defendants must have known about the discrepancy").

Finally, KPMG argues (Memo at 11) that Plaintiffs are at a "loss" to explain the specific

red flags KPMG missed. "Red flags," or audit risks, are the various "risk factors" that auditors must consider under GAAS. *Id*; *see also In Re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002), ("'Red flags' are those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors"). KPMG was confronted with these red-flags: (i) the Advisor and Property Managers' expenses were re-allocated to affiliates; (ii) the financial statements reported impossibly low levels of operating expenses; (iii) the Advisor and Property Managers' EBITDAs were at unattainably high levels; and (iv) the Advisor's and Property Managers' financial statements reflected EBITDAs of nearly 100% and 60% of their Total Revenues, respectively, which starkly contrast with the EBITDAs of comparable public companies which range from *3 to 15%*. *Id.* at ¶¶ 139(b), 168-184, 243-247. In *Lewis v. Straka*, 2007 U.S. Dist. LEXIS 59054, 9-10 (E.D. Wis. Aug. 13, 2007), plaintiffs' failure to point to any violation of specific GAAP or GAAS standards and the alleged red flags warranted dismissal. KPMG Memo at 9, 11. In contrast, the Amended Complaint lists the specific auditing standards and principles violated by KPMG, the reasons why the Advisor's and Property Managers' financial statements violated GAAP, and the "red flags." *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 U.S. Dist. LEXIS 20733, 37-36 (D.N.H. Oct. 14, 2004).[13]

## C.    KPMG's Explanations Do Not Address the Allegations.

KPMG's so-called "competing" inferences do not trump the facts alleged or warrant dismissal under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) (KPMG Memo at 2, 11-13). KPMG claims that the Advisor's and Property Managers' profits were the result of prosperity and phenomenal growth. *Id.* The Advisor's growth was indeed phenomenal: total revenues in 2004 of $1.5 million grew to $22.5 million in 2005 and $40.5 million in 2006. Cmplt. ¶ 168. This growth, which was directly attributable to the growth of the REIT's real estate funded by the REIT's shareholders, does not address the failure to report expenses. What is "phenomenal" is that the non-reimbursed expenses incurred by the Advisor to perform its

---

[13]    In *In re Tyco*, 2004 U.S. Dist. LEXIS at *37-36, the court noted the "types of circumstantial evidence relevant in pleading scienter: (1) GAAP violations; (2) accounting shenanigans;. . . (7) the self-interest of defendants in saving their own salaries or jobs. . ." "[A] combination of several factors may satisfy the [scienter] requirement" *Id.* In *Tyco*, the complaint alleged a number of auditing standards and principles violated the company's accountant. *Id.* The court held that plaintiffs specified each statement alleged to be misleading and the reasons why (violations of GAAP and GAAS) "sufficient to survive a motion to dismiss even under the heightened pleading standards of the PSLRA." *Id.* at *31.

complex and specialized services for the REIT's $6 billion real estate portfolio never exceeded $160,000. *Id.* ¶ 168. KPMG's "explanation" does not create a more plausible opposing inference to overcome Plaintiffs' highly plausible allegations of wrongdoing about the material impact the related-party transactions and concomitant failure to adequately report expenses reallocated to affiliates had on the Advisor's and Property Managers' operating results and "value."

Similarly irrelevant is KPMG's statement (Memo at 13, *citing* Proxy)[14] that the Advisor left $84 million "on the table." The Advisor did not even make this argument because it begs the question, what was behind that forbearance? Was it a concern that the REIT would be left with inadequate funds to make shareholder distributions? Would it have revealed a significant overreaching by insiders under the Advisory Agreement? Moreover, it does not address the failure to report expenses or disclose that impact of such failure on "value." And, the Internalization had a larger goal of obtaining $187.5 million in stock for the Advisor.

Under *Tellabs*, a complaint survives a motion to dismiss if it pleads "facts rendering *an* inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, 127 S. Ct. at 2513 (emphasis added); *Roth v. Aon Corp.*, 2008 U.S. Dist. LEXIS 18471 (N.D. Ill. Mar. 7, 2008). The Advisor and Property Managers' expenses were not reported, which directly inflated their operating results, EBITDAs and "value" without explanatory or adequate disclosure. As a result, the Advisor's and Property Managers' owners enjoyed a $375 million pay-day. KPMG's explanations are not a sufficiently compelling competing inference of an "innocent mental state" dictating dismissal at the pleading stage. *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 979 (S.D. Ind. 2007)(a "choice between competing reasonable inferences is not one that the court can make at the pleading stage...[defendants'] explanations are not sufficiently compelling competing inferences of an innocent mental state so as to require dismissal at the pleading stage.")

## D.    The Amended Complaint States a Claim against KPMG for Aiding and Abetting Breaches of Fiduciary Duty.

A claim of aiding and abetting breach of fiduciary duty includes the following elements: (1) The party whom the defendant aids must perform a wrongful act which causes an injury; (2)

---

[14]    KPMG also disregards the Advisor's obligation to forego fees. The Proxy at p. 73 (Exhibit 1, IW Defs Memo. in support of Motion to Dismiss [Doc. 57]) states that the Advisor reimbursed the REIT for "an amount, which will not exceed the asset advisor management fee for that year, equal to any difference between the total amount of distributions to stockholders for that year and a 6% minimum annual return on the net investment of stockholders." Any excessive fees received by the Advisor relative to the shareholders' return had to be reimbursed. This offers a more cogent explanation of the $84 million.

the defendant must be generally aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Wolf v. Liberis*, 505 N.E.2d 1202, 1208 (Ill. App. Ct. 1987). The Amended Complaint satisfies each of these elements. Plaintiffs alleged direct breaches of fiduciary duty.[15] *See* IW Opp. at 30-32. KPMG, in its role as auditor, assisted with the following breaches of fiduciary duty: (1) inflation of the Advisor's and the Property Managers' profitability which, in turn, improperly inflated the Internalization Consideration; and (2) securing shareholders' approval of the Internalization based on false and inflated financial statements (*id.* ¶¶ 259, 279-290). Accordingly, sufficient facts are alleged, under the applicable federal standard of notice pleading, to satisfy each element of a claim for aiding and abetting a breach of a fiduciary duty. *In re Fleming Packaging Corp.*, 370 B.R. 774, 796 (Bankr. C.D. Ill. 2007).

KPMG wrongly asserts that Count IV sounds in fraud and that Plaintiffs must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b). (KPMG Mem. at 14). To the extent that the question is whether Plaintiffs adequately alleged that KPMG aided and abetted the Fiduciary Defendants' breaches of fiduciary duties, the Court looks to Rule 8. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (reviewing claims that a non-fiduciary aided and abetted an actor in both breach of fiduciary duties and in fraud); *Goldin Assocs., L.L.C. ex rel. SmarTalk Teleservices, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2003 U.S. Dist. LEXIS 16798 (S.D.N.Y. Sept. 24, 2003) (Rule 9(b)'s particularity standards do not apply to the aiding and abetting breach of fiduciary duty claim asserted; general pleading standards of Rule 8(a) apply). The heightened pleading standards of Rule 9(b) only apply to the extent that the claim is that KPMG aided and abetted the Fiduciary Duty Defendants in committing fraud. *Id.*; *Robison v. Caster*, 356 F.2d 924, 925 (7th Cir. 1966) (if breach of fiduciary duty claim asserts a "scheme to defraud," Rule 9(b) must be followed). The Amended Complaint does not assert that the Defendants acted with fraudulent intent or scienter. In support of its position KPMG points to Plaintiffs' allegations that KPMG "rendered substantial and knowing assistance." KPMG Memo at 14. However, whether KPMG knew certain facts and rendered knowing assistance to the Defendants does not equate to alleging that they did so with the requisite *intent to deceive*, the hallmark of a fraud.

---

[15]    Under Maryland law, in order to state a cause of action for breach of fiduciary duty, Plaintiffs must show "a breach of duty owed by the fiduciary to the beneficiary," and "harm resulting from the breach." *Alleco Inc. v. Harry and Jeanette Weinberg Found., Inc.*, 665 A.2d 1038 (Md. 1995).

Even if Count IV sounds in fraud, Rule 9(b) only requires that facts such as "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff be alleged in detail." *Hefferman*, 467 F.3d at 601; *In re Nat'l Century Fin. Enters.*, 541 F. Supp. 2d 986, 1015 (S.D. Ohio 2007) (a plaintiff need not allege that aider and abettor had actual knowledge of all of the details of the primary party's scheme). Further, "[a] plaintiff may use circumstantial evidence to support an inference of actual knowledge." *In re Nat'l Century Fin. Enters.*, 541 F. Supp. 2d at 1015. In *Hefferman*, although nothing in the complaint suggested that an alleged aider and abetter knew (as opposed to should have known) either that another was engaged in a fraud or that the alleged aider and abettor willingly joined in his scheme, Rule 9(b) allows "knowledge" or "condition of mind" to be alleged generally. *Hefferman*, 467 F.3d at 602. The court found that a complaint satisfied Rule 9(b) by alleging that participation in fraud and breach of fiduciary duty was knowing and intentional and specifically identifying the assistance provided. *Id.* Here, it is alleged that KPMG rendered substantial and knowing assistance to the Fiduciary Duty Defendants by preparing and issuing unqualified Audit Reports.[16]

On point is *Scholes v. Moore*, 1993 U.S. Dist. LEXIS 724 (N.D. Ill. Jan. 22, 1993), in which the court held that aiding and abetting breach of fiduciary duty claims against a financial advisor survived a motion to dismiss where plaintiffs alleged that the advisor was not only aware of breaches of fiduciary duties, but he assisted the fiduciary in soliciting investors. *See Buckley v. Deloitte & Touche USA LLP*, 2007 U.S. Dist. LEXIS 37107, **38-39 (S.D.N.Y. May 21, 2007) (sustaining claim against Deloitte & Touche for aiding and abetting DVI officers' alleged violation of their fiduciary duties). Similarly, KPMG 's Motion should be denied.

## IV.    CONCLUSION.

For the foregoing reasons, KPMG's Motion to Dismiss Counts I and IV should be denied in its entirety.

---

[16]    The cases cited by KPMG are inapposite, involving claims that actors aided and abetted securities fraud claims and were held to an inapplicable higher standard of pleading scienter: *DiLeo v. Ernst & Young*, 901 F.2d 624, 628 (7th Cir. 1990) (abettor must act with the same degree of scienter necessary for the primary Section 10(b) violation); *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996) (Rule 9(b) requires that the essential element of scienter be pled with a sufficient level of factual support to state a valid Rule 10b-5 claim); *Cronau v. Asche*, 2002 U.S. Dist. LEXIS 7785 (N.D. Ill. Apr. 30, 2002) (dismissing Section 10(b) claims for failure to satisfy heightened pleading standards).

Dated:  September 19, 2008

Respectfully submitted,

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**

*/s/  Adam J. Levitt*
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Telephone:  (312) 984-0000
Facsimile:  (312) 984-0001
Email:  levitt@whafh.com

Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

Lawrence A. Sucharow
Joseph Sternberg
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

Lawrence P. Kolker
Alexander Schmidt
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

*Co-Lead Counsel*

Michael J. VanOverbeke
Thomas C. Michaud
**VANOVERBEKE MICHAUD &**
  **TIMMONY, P.C.**
79 Alfred Street
Detroit, Michigan  48201
Telephone:  (313) 578-1200
Facsimile:  (313) 578-1201

***Counsel to City of St. Clair Shores***
  ***General Employees Retirement System***