**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CITY OF ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM and MADISON INVESTMENT TRUST, On behalf of Itself and All Others Similarly Situated, and Derivatively On behalf of Inland Western Retail Real Estate Trust, Inc.,<br>Plaintiffs,<br>v.<br>INLAND WESTERN RETAIL REAL ESTATE TRUST, INC., INLAND REAL ESTATE INVESTMENT CORPORATION; THE INLAND GROUP, INC., INLAND WESTERN RETAIL REAL ESTATE ADVISORY SERVICES, INC., INLAND SOUTHWEST MANAGEMENT CORP., INLAND NORTHWEST MANAGEMENT CORP., INLAND WESTERN MANAGEMENT CORP., ROBERT D. PARKS, BRENDA G. GUJRAL, FRANK A. CATALANO, JR., KENNETH H. BEARD, PAUL R. GAUVREAU, GERALD M. GORSKI, BARBARA A. MURPHY, STEVEN P. GRIMES, DANIEL L. GOODWIN, ROBERT H. BAUM, G. JOSEPH COSENZA, KPMG LLP, AND WILLIAM BLAIR & COMPANY, L.L.C.,<br>Defendants. | Case No. 07 C 6174<br>Judge Robert W. Gettleman |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

I. PRELIMINARY STATEMENT ..... 1

II. SUMMARY OF THE FACTS AND THE ACTION. ..... 4

III. SUMMARY OF THE PROCEEDINGS. ..... 7

*A. Co-Lead Counsel's Investigation of the Claims* ..... 7

*B. Prosecution of the Action* ..... 9

*C. Discovery* ..... 11

*D. Mediation* ..... 13

IV. SUMMARY OF THE TERMS OF THE STIPULATION OF SETTLEMENT ..... 15

V. ARGUMENT ..... 17

*A. The Proposed Settlement is Fair and Reasonable and Should be Approved* ..... 17

*B. Certification of the Class Under Rules 23(a) and 23(b)(2) and (b)(3) for Settlement Purposes is Appropriate* ..... 25

1. The Settlement Class Meets the Conditions of Rule 23(a) ..... 25

2. The Settlement Class Meets the Requirements of Rule 23(b)(2) and Rule 23(b)(3) ..... 28

VI. CONCLUSION ..... 31

# TABLE OF AUTHORITIES

## Cases

*In re Anicom Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 5575 (N.D. Ill. Mar. 26, 2002) ........ 27

*Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305 (7th Cir. 1980) ........ 17, 18, 24

*In re Bank One Sec. Litig./Chicago S'holder Claims*, 00 CV 0767, 2002 U.S. Dist. LEXIS 8709 (N.D. Ill. May 9, 2002) ........ 26

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) ........ 18

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ........ 24

*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225 (7th Cir. 1983) ........ 26-27

*Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87 (S.D.N.Y. 1981) ........ 29

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ........ 18, 19, 23

*Eisen v. Carlisle & Jacqueline,* 417 U.S. 156 (1974) ........ 3

*Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 58 (N.D. Ill. 1996) ........ 27

*Gautreaux v. Pierce*, 690 F.2d 616 (7th Cir. 1982) ........ 19

*In re Heritage Bond Litig.*, No. 02-ml-01475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ........ 23

*In re Indep. Energy Holdings, PLC*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ........ 24

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ........ 17, 18, 19, 23

*J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) ........ 22

*Kaufman v. American Express Travel Related Services Co., Inc.*, 264 F.R.D. 438 (N.D. Ill. 2009) ........ 25, 26, 27-28

*Kaufman v. Cooper Companies, Inc.*, 719 F.Supp. 174 (S.D.N.Y. 1989) ........ 22

*Kennedy v. Tallant*, 710 F.2d 711 (11th Cir. 1983) ........ 26

*In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74 (D. Md. 1991) ........ 30

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001) ........ 18, 23, 24

*Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677 (7th Cir. 1987) ........ 24

*McDaniel v. Univ. Fid. Corp.*, No. 04 C 2157, 2004 U.S. Dist. LEXIS 21320 (N.D. Ill. Oct. 20, 2004) ........ 25

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ........ 3

*In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104 (S.D.N.Y. 1997) ........ 23

*Robinson v. Sears, Roebuck & Co.*, 111 F. Supp. 2d 1101 (E.D. Ark 2000) ........ 28

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ........ 26

*Satchell v. Federal Express Corp.*, No. C03-2659 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ........ 24

*Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982 (N.D. Ill. June 12, 2003) ........ 30

*In re VMS Sec. Litig.*, 136 F.R.D. 466 (N.D. Ill. 1991) ........ 30

*Wesley v. Gen. Motors Acceptance Corp.*, 1992 WL 57948 (N.D. Ill. Mar. 20, 1992) ........ 26

**Rules and Other**

Fed. R. Civ. P. 23(a) ........ 25-28, 31

Fed. R. Civ. P. 23(b)(2) ........ 28, 31

Fed. R. Civ. P. 23(b)(3) ........ 29-30, 31

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778, at 528 (2d ed. 1986) ........ 29

This Memorandum of Law is submitted in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Certification of Settlement Class and an Award of Attorneys' Fees and Expenses ("Plaintiffs' Motion"). This Memorandum of Law addresses Final Approval of the Settlement, and is submitted concurrently with a separate Memorandum of Law that addresses Plaintiffs' application for an Award of Attorney Fees and Expenses. The accompanying Declaration of Kimberly M. Donaldson ("KMD Decl."), and exhibits thereto, is filed in support of Final Approval of the Settlement, Certification of Settlement Class and an Award of Attorneys' Fees and Reimbursement of Expenses.

Unless otherwise indicated, all capitalized terms used herein have the same meaning as in the Second Amended Class Action Complaint filed in this Action on May 1, 2009 ("SAC" or "Complaint") and in the Stipulation of Settlement dated July 14, 2010 ("Stipulation"), Exhibit D to KMD Decl.

## I. PRELIMINARY STATEMENT

Co-Lead Plaintiffs City of St. Clair Shores General Employees' Retirement System ("CSCS") and Madison Investment Trust ("Madison") and all named Defendants have entered into an agreement to settle this Action.[1] This Action arises from a transaction in which Inland Western Retail Real Estate Trust, Inc. ("IWEST") obtained shareholder approval to acquire

---

[1] Defendants are: Inland Western Retail Real Estate Trust, Inc. ("IWEST" or "Company"); Inland Western Retail Real Estate Advisory Services, Inc. ("Advisor"); Inland Western Management Corporation ("IWMC"), Inland Northwest Management Corporation ("INMC") and Inland Southwest Management Corporation ("ISMC")("Property Managers"); Inland Real Estate Investment Corporation ("IREIC"); The Inland Group, Inc.; Robert D. Parks; Brenda G. Gujral; Frank A. Catalano, Jr.; Kenneth H. Beard; Paul R. Gauvreau; Gerald M. Gorski; Barbara A. Murphy; Steven P. Grimes; Daniel L. Goodwin; Robert H. Baum; G. Joseph Cosenza; William Blair & Company, LLC; and KPMG LLP. *See* KMD Decl. ¶¶ 12-31.

affiliates of its sponsor, directors, and officers for 37.5 million shares of IWEST's stock. The Stipulation, Exhibit D to KMD Decl., provides for the return to IWEST of 24% - nine million (9,000,000) shares - of the 37.5 million IWEST shares that were paid as Internalization Consideration. At the time of the Internalization, the 37.5 million shares were valued at approximately $375 million; therefore, the return of 9 million shares equates to a $90 million reduction of the Internalization Consideration. On July 22, 2010 [Dkt. 143], the Court issued an Order granting preliminary approval of the Settlement, conditionally certifying the Settlement Class and providing for notice to the Class. Lead Plaintiffs now seek final approval of the Settlement. *See* Exhibits I and J to KMD Decl., Declarations of Lead Plaintiffs in support of the Settlement.

This Settlement resolves all claims against all Defendants and achieves a substantial recovery that is premised on, and addresses fully, the wrongs alleged in the Action. This Settlement is the result of a significant amount of work: hotly contested motion to dismiss practice, discovery, and a lengthy, arms-length mediation conducted by an experienced mediator. Lead Plaintiffs' and Co-Lead Counsel's prosecution required, and the Settlement was reached after, among other things: extensive investigation and research (*id.* ¶¶ 55-74); retention of experienced experts and consultants (*id.*); two rounds of motion to dismiss briefing and amendments to the complaints, resulting in the claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act") being sustained (*id.* ¶¶ 83-88); extensive discovery (*id.* ¶¶ 90-100); extensive factual and legal investigation with multiple financial experts and consultants (*id.* ¶¶ 56-69); and over 5 months of mediation and hard-fought settlement negotiations (*id.* ¶¶ 101-114). The Settlement was reached at a time when Lead Plaintiffs and Co-Lead Counsel were

fully cognizant of the strengths and weaknesses of the case and the risks of continued litigation. *Id.* at ¶¶ 122-133, *see also,* Section V. A., *infra.*

The Settlement of this Action for the return of a significant portion of the Internalization Consideration is an excellent result for IWEST shareholders. The Action alleged that Defendants utilized a false and misleading Proxy to secure shareholders' approval of the Internalization, and the Action questioned whether the Proxy provided sufficient information about the Internalization's value and the magnitude of the Internalization Consideration. The Settlement directly addresses the harm alleged under these circumstances (shareholders approving an overpriced deal) by conferring an immediate and substantial benefit for the Class and IWEST through the return of a substantial portion of the Internalization Consideration.

The Settlement has been very well received by IWEST shareholders and members of the Settlement Class. On or about July 19, 2010, Defendants commenced with the CAFA notification to the applicable state governmental agencies, on or about August 3, 2010, the Class Notice was sent to over 100,000 Class Members, and on August 6, 2010, the Summary Class Notice was published in *Investors Business Daily.*[2] As of this date, only three class members, representing only 7,455 IWEST shares (out of over 450 million issued), have requested exclusion. No objections have been filed.[3]

---

[2] On November 1, 2010, Defendants will file an Affidavit with respect to the mailing of the CAFA Notice, the mailing of the Class Notice, and the publication of the Summary Notice. The Class Notice, which was approved by the Court for dissemination to the Class in the Preliminary Approval Order ¶7, was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and satisfied the requirements of due process. See *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 173 (1974).

[3] The deadline for Class members to request exclusion or object is October 18, 2010. Co-Lead Counsel will file papers concerning any objections and the opt-outs by November 1, 2010.

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs respectfully request final approval of the proposed Settlement with all Defendants and that the Court grant final approval of the proposed class action settlement of this Action on the terms set forth in the Stipulation and certify for Settlement purposes the Settlement Class, by entering the Final Judgment (Exhibit E, KMD Decl.).

## II. SUMMARY OF THE FACTS AND THE ACTION.[4]

Inland Western Retail Real Estate Trust, Inc. ("IWEST"), a real estate investment trust ("REIT"), was formed in 2003. KMD Decl. ¶¶ 12-13. IWEST has sold approximately 450 million shares of its common stock through two best efforts public stock offerings, and has realized total net offering proceeds of $4.8 Billion as of December 31, 2009. *Id.* ¶ 14. IWEST is a non-listed REIT whose common stock is not listed on a national securities exchange or on an over-the-counter market. *Id.* ¶¶ 5- 11, 15.

From its inception until November 15, 2007, IWEST had no employees. IWEST's day-to-day business was conducted by Inland Western Retail Real Estate Advisory Services, Inc., which was called the "Advisor." *Id.* ¶¶ 16-19. IWEST's properties were managed by three "Property Managers," namely Inland Western Management Corporation ("IWMC"), Inland Northwest Management Corporation ("INMC") and Inland Southwest Management Corporation ("ISMC"). *Id.* ¶ 19. IWEST paid the Advisor and Property Managers fees for the services they performed for the Company. *Id.* ¶¶ 32-40.

The Advisor and Property Managers were affiliated with IWEST. The Advisor and Property Managers were owned (directly or indirectly) by Daniel Goodwin ("Goodwin"), Robert

[4] The facts underlying the Action are fully set out in the accompanying KMD Decl. in Section I and in the SAC.

Parks ("Parks"), Robert Baum ("Baum"), G. Joseph Cosenza ("Cosenza"), Brenda Gujral ("Gujral"), and Steven Grimes ("Grimes"). *Id.* ¶¶ 25-30-. Parks and Gujral were also Directors of IWEST, and Parks, Gujral and Grimes were officers of IWEST until November 15, 2007. *Id.*

The Action arose from a transaction in which IWEST obtained shareholder approval for IWEST to acquire the Advisor and Property Managers, for 37.5 million shares of IWEST's stock having a deemed value of $375 million ("Internalization"). *Id.* ¶¶ 41-46. On August 17, 2007, IWEST announced that its Board of Directors (comprised of Parks, Gujral, Frank A. Catalano, Jr. ("Catalano"), Kenneth Beard ("Beard"), Paul Gauvreau ("Gauvreau"), Gerald Gorski ("Gorski") and Barbara Murphy ("Murphy")) had entered into an agreement that would result in the Company being self-advised ("Merger Agreement"), meaning that the Company would be able to perform the services previously performed by the Advisor and Property Managers. ("Internalization") *Id.* ¶ 47. The agreement stated that the Company would pay 37.5 million shares of IWEST stock, with a deemed value of $375 million, to acquire the Advisor and the Property Managers ("Internalization Consideration"). *Id.* The 37.5 million shares would be paid to the Advisor's and Property Managers' owners, who, in large part, were the founders of IWEST and its then-current officers and directors. *Id.*

The Advisor and Property Managers were affiliates of IWEST's sponsor, directors and officers. *Id.* ¶¶ 13, 17, 25-20, 53. The Property Managers had been retained to provide IWEST with property management services and the Advisor was responsible for IWEST's management and supervision of its daily operations. *Id.* ¶ 19. These entities were private companies that were wholly-owned directly or indirectly by officers, directors and/or their affiliates and were formed contemporaneously with IWEST. *Id.* ¶¶ 13, 17, 25-20, 53.

In a September 10, 2007 proxy solicitation (as amended or supplemented by the additional proxy solicitation materials filed on October 10, October 12, and November 9, 2007 ("Proxy")), IWEST asked its shareholders to approve the Internalization. *Id.* ¶¶ 48-54. As was alleged in the Action, Defendants utilized the Advisor's and Property Managers' historical, and theretofore undisclosed, financial statements to support the $375 million of Internalization Consideration, which financial statements, however, inflated the Advisor's and Property Managers' purported net income by historically understating and underreporting expenses. *Id.* ¶¶ 79, 84, 87. In addition, it was alleged that the Property Managers' financial statements further inflated net income by including as income excessive fees to which they were not contractually entitled, and that inflated net income was used by Defendants to calculate the "value" of the Advisor and Property Managers. *Id.* ¶¶ 38-40, 87. Accordingly, it was alleged that the Proxy was soliciting shareholders' approval of the Internalization which overvalued the Advisor and Property Managers.

It was alleged that the Proxy contained other misstatements that misled shareholders into approving the Internalization in which IWEST would pay too much for the Advisor and Property Managers. The Proxy included an opinion by financial advisor William Blair which stated that, from a financial point of view, the Internalization was fair to IWEST and its shareholders. *Id.* ¶ 24. The Action alleged that William Blair's opinion, however, utilized methodologies and reached conclusions that were flawed, and misled investors about the purported fairness of the Internalization. *Id.* ¶ 79, 87. Moreover, the Proxy stated that the Internalization, as proposed, would avoid the use of the Purchase Option Formulas (*id.* ¶¶35, 40), which the Proxy stated would have resulted in at least a $500 million purchase price. Plaintiffs alleged that the Proxy was misleading because Defendants were using the allegedly inflated financial data of the

Advisor and Property Managers to calculate an astronomical "Purchase Option" price – 54.1 million shares valued at approximately $541 million – which, if calculated using net income figures that were not derived from the allegedly inflated financial statements, would have yielded only a fraction of the $375 million Internalization Consideration that was approved by shareholders and paid by IWEST. *Id.* ¶ 135.

At the November 13, 2007 shareholder meeting, the Internalization was approved. On November 15, 2007, the Internalization was consummated. *Id.* ¶ 54.

## III. SUMMARY OF THE PROCEEDINGS.

### *A. Co-Lead Counsel's Investigation of the Claims.*

Co-Lead Counsel's investigation of the claims commenced before the filing of the initial complaint and involved, among other things, working with several industry experts and consultants. KMD Decl. ¶¶ 55-74. Beginning in 2007, Co-Lead Counsel engaged Partners Advisory Services Corp. ("PASCORP"), and its founder and President James M. Vodola, CPA, to review the performance of IWEST and any strategic alternatives it was evaluating, to assess the fees it was paying to the Advisor and Property Managers, and to review IWEST's SEC Filings. *Id.* ¶¶ 56-59. In August 2007, Co-Lead Counsel expanded its investigation of IWEST upon IWEST's filing of a preliminary proxy (Schedule 14A) with the SEC concerning the Merger Agreement and Internalization. *Id.* ¶¶ 60, 69-74. Co-Lead Counsel also expanded the scope of PASCORP's engagement to include the analysis and review of the terms of the Merger Agreement and the proffered valuation of the Advisor, (*id.* ¶ 60), and retained additional industry experts to assist in the assessment of the legal claims. (*Id.* ¶¶ 61-68). Co-Lead Counsel retained GlenDevon Group, Inc. ("GDG") to assist in the forensic investigation, the analysis of potential damages and the valuation analysis of the Internalization, the Advisor and the Property

Managers, and Weiser Realty Advisors LLP and its former partner, Peter Korpacz, to assist in assessing IWEST's contracts with the Property Managers and Advisors in the context of arms-length comparable transactions and contracts, and to assess the accounting treatment of various related party transactions. *Id.* ¶¶ 61-74.

Co-Lead Counsel extensively investigated possible claims in this action based on Defendants' conduct in connection with the Internalization and the payment of fees and reimbursement of expenses to the Advisor and Property Managers. *Id.* ¶¶ 69-74. Co-Lead Counsel conducted an extensive inquiry into the relevant accounting principles and pronouncements governing IWEST's, the Advisor's and the Property Managers' financial statements. *Id.* Moreover, Co-Lead Counsel, working with PASCORP, conducted an extensive survey of the non-listed REIT industry, the attendant accounting practices and the process of internalizing affiliated entities through a merger with the REIT. *Id.* Co-Lead Counsel also worked with its consultants to analyze the value of the Internalization, the Advisor and the Property Managers, and to assess fees paid in the real estate industry for property management and advisory services in arms-length arrangements. *Id.*

Co-Lead Counsel and their experts accessed and analyzed thousands of pages of filings made by IWEST with the SEC, as well as other publicly-available information relating to the non-traded REIT industry, Internalization-type transactions and IWEST's business. *Id.* ¶¶ 70-71. This information, among other things, was utilized in: forming the allegations and claims asserted in the initial and amended complaints filed in this Action; opposing Defendants' Motions to Dismiss; preparing document requests and interrogatories directed to Defendants, conducting the Mediation; and assessing and formulating a Settlement that is in the best interests of the Class of IWEST shareholders who were entitled to vote on the Proxy and Internalization.

### *B. Prosecution of the Action.*

On November 1, 2007, prior to the shareholders' meeting, Plaintiff City of St. Clair Shores General Employees Retirement System ("CSCS GERS") filed a class action and derivative complaint against all Defendants (except KPMG LLP) alleging violations of Sections 14 and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and violations of state law for breach of fiduciary duty and breach of contract ("Initial Complaint"). KMD Decl. ¶ 75. The Initial Complaint was filed on behalf of the shareholders of IWEST who were shareholders of record as of the close of business on August 31, 2007 and entitled to vote on the matters that were the subject of the Schedule 14(a) Proxy Statement that was filed with the SEC by IWEST on September 10, 2007, pursuant to Section 14(a) of the Securities Exchange Act of 1934, as amended or supplemented on October 10, October 12, and November 9, 2007. ("Class"). *Id.* The Initial Complaint alleged that the Class approved an overpriced transaction based on a materially false and misleading Proxy.

On January 22, 2008, the Court appointed CSCS GERS and Madison Investment Trust ("Madison") as Co-Lead Plaintiffs under the Private Securities Litigation Reform Act ("PSLRA"), and affirmed their selection of Chimicles & Tikellis LLP, Labaton Sucharow LLP and Wolf Haldenstein Adler Freeman & Herz LLP as Co-Lead Counsel. *Id.* ¶ 77.

On June 12, 2008, Co-Lead Counsel and Co-Lead Plaintiffs filed the Amended Class Action and Derivative Complaint ("Amended Complaint"), and added KPMG as a Defendant. *Id.* ¶¶ 78-82. The Amended Complaint alleged that the Proxy contained materially false and misleading statements in violation of Sections 14(a) and 20(a) of the Exchange Act. ("Proxy Claims"). *Id.* ¶ 79. In addition, the Amended Complaint asserted breach of fiduciary duty claims ("Direct BOFD Claims" and "Derivative BOFD Claims") on behalf of IWEST shareholders and

IWEST. *Id.* ¶¶ -81-82.

In July and August 2008, all Defendants sought to dismiss all of the claims in the Amended Complaint, filing three separate motions on behalf of three groups of Defendants: (1) William Blair; (2) KPMG; and (3) the Non-KPMG/Non-William Blair Defendants ("Motions to Dismiss"). Generally, as to the Proxy Claims, Defendants' motions asserted that those claims should be dismissed because: (a) no harm had been suffered by the Class; (b) the claims were not pleaded with the requisite particularity; (c) certain Defendants could not legally be held liable for the claims asserted; and (d) the material misstatements were not, in fact, material, were not required to be disclosed, and all material information was disclosed to the Class. As to the Fiduciary Duty Claims, Defendants asserted that such claims were insufficiently alleged as derivative and direct claims.

Plaintiffs vigorously opposed Defendants' three motions, including seeking permission, which was granted, to file a sur-reply in further opposition to KPMG's motion to dismiss. Substantively, Plaintiffs: (a) challenged Defendants' characterization of the allegations; (b) asserted that it was not appropriate, when ruling on motions to dismiss, for the Court to resolve disputed facts or rule on the merits of the Action; (c) disputed the application of a heightened pleading standard to the allegations which were based on the negligent and careless conduct of Defendants; (d) asserted that once Defendants undertook to make statements to investors they then had a duty to include material facts necessary in order to make those disclosures not false or misleading; and (e) asserted the sufficiency of their allegations concerning damages. As to the Direct BOFD Claims, Plaintiffs countered that the harms alleged were directly borne by the Class. Further, as to the Derivative BOFD Claims, Plaintiffs asserted that any demand made on IWEST's Board to act on IWEST's behalf would have been futile because of the Board's

conflicted position, therefore rendering the Derivative BOFD Claim by IWEST shareholders proper.

In its March 31, 2009 Order, the Court granted in part and denied in part the Motions to Dismiss, substantially upholding the Proxy Claims against all Defendants. *Id.* ¶¶ 84-85. The Court found that Plaintiffs had properly pled the following elements of their Section 14 and 20 claims, with respect to most of the allegations. *Id.* ¶ 84. The Court, however, dismissed the Direct BOFD Claims and Derivative BOFD Claims in their entirety. *Id.* ¶ 85.

The Second Amended Complaint ("SAC") was filed on May 1, 2009 conforming to the opinion dated April 1, 2009, seeking damages and injunctive relief on behalf of the Class under Sections 14 and 20 of the Securities Exchange Act. *Id.* ¶ 86. The SAC alleged that that Proxy was materially false and misleading because, *inter alia,* the Advisor's and Property Managers' operations and profitability were inflated, their financial statements understated their expenses and overstated revenue, and shareholders were misled about their value. *Id.* ¶ 87. On May 29, 2009 Defendants filed a limited motion to dismiss with respect to one claim in the SAC; however, the Court promptly denied Defendants' motion to dismiss and ordered the Defendants to answer the SAC. *Id.* ¶ 88. Defendants answered the SAC on July 2, 2009, and their answers included several affirmative defenses. *Id.* ¶ 89.

### *C. Discovery.*

The parties began engaging in fact discovery in Summer 2009. KMD Decl. ¶¶ 90-100. Co-Lead Counsel prepared several detailed document requests and interrogatories, directed toward all Defendants and several third-parties, seeking production of documents and information related to all claims asserted in the Action, background materials on IWEST and its properties, the Advisor and Property Management Agreements, the Internalization, the work

performed by the Special Committee and its advisors, work done by KPMG and William Blair, among many other things.

Plaintiffs sought discovery from all Defendants as well as the following third parties: Silver Portal Capital (financial advisors to the Advisor and Property Managers), Hewitt Associates LLC (retained by Special Committee to assist in its review of executive compensation in connection with the proposed internalization transaction), Morrow & Company, Inc. (proxy solicitor, called stockholders who had not yet voted), Wolf & Company LLC (auditor of the financial statements of the Property Managers prior to the Internalization), Duane Morris LLP (counsel for Inland REIT), Sidley Austin LLP (Counsel for Special Committee), Jenner & Block LLP (counsel for the Advisors and Property Managers), and Inland American Holdco (identified in Initial Disclosures as having information relating to the operations, procedures and financial statements of the Property Managers and Inland REIT). *Id.* ¶ 93-94.

Plaintiffs reviewed and analyzed tens of thousands of pages of documents from the Special Committee, Jenner & Block, Morrow, Silver Portal, Wolf & Company, KPMG and William Blair. *Id.* ¶ 93-94. These documents consisted of, among other things, contracts, correspondence, financial analyses and presentations, workpapers and audit files, IWEST formation documents, information about IWEST's properties, Special Committee minutes, documents received and reviewed by the Special Committee and its advisors, analyses and presentations conducted by William Blair and the financial advisor to the Advisor and Property Managers' owners, documents concerning the negotiations of the Internalizations, and documents memorializing the Internalization and merger. *Id.* ¶ 94. Co-Lead Counsel's consultants also participated in the review of these documents, as well as other publicly-available

information relating to the non-traded REIT industry, Internalization-type transactions and IWEST's business.

In May through early June 2010, Co-Lead Counsel conducted in-depth interviews of 5 key witnesses: Defendant Goodwin, Defendant Grimes, Defendant Gauvreau (IWEST Director and chair of the Special Committee), Phil Reitz, Defendant William Blair's representative, and Ray Milnes, Defendant KPMG's representative. *Id.* ¶¶ 98-100. These interviews touched on all key topics with respect to the formulation and negotiation of the Internalization, the work done with respect to the amount to be paid for the Advisor and Property Managers in the Internalization, the work done by financial advisors and accountants pertinent to the Internalization and the Proxy, and the work done by William Blair with respect to advising the Special Committee and issuing the Fairness Opinion. *Id.*

Discovery continued throughout the mediation and settlement negotiations. *Id.* ¶ 97.

### *D. Mediation.*

In November 2009, Defendants suggested to Co-Lead Counsel that the parties engage a Mediator to explore the possibility of whether the Action could be resolved by the parties. *Id.* ¶ 101. The parties determined to proceed with a non-binding mediation with Jonathan Marks of MarksADR, LLC ("Mediator"), who has 29 years experience as a mediator and who has presided over several mediations involving federal securities claims. *Id.* ¶ 102. The parties decided to hold a two-day mediation in early January 2010 in Chicago. *Id.* ¶¶ 107-109.

Co-Lead Counsel immediately conferred and conducted an expedited review of all of discovery secured from third-parties and Defendants as of that date, including Defendants' insurance policies, which were key to Co-Lead Counsel's conducting productive and effective negotiations. *Id.* ¶¶ 103-106. Co-Lead Counsel also consulted with its experts, including James

Vodola of PASCORP and Kathleen Chimicles of GDG, to construct and analyze possible settlement models and to determine the potential impact of settlement models on IWEST and the Class. *Id.* Co-Lead Counsel formulated potential settlement frameworks that addressed, among other things, the SAC's allegations that IWEST and the Class paid too much for the Internalization by focusing on the return of a substantial portion of the Internalization Consideration paid by IWEST. *Id.* Co-Lead Counsel also took into consideration the existence of the Purchase Option Formulas, and the amounts that IWEST was contractually required to pay under those provisions of the Property Management and Advisory Agreements *Id.* ¶ 135. Moreover, Co-Lead Counsel took into consideration that because IWEST's shares are not actively traded on a national stock exchange and its share redemption plan, to the extent it was available since the Internalization, is limited, and therefore, most of the shareholders who comprise the Class are presently shareholders of IWEST. *Id.* ¶ 105.

Prior to the mediation, the parties exchanged extensive factual and legal written and oral presentations advocating their respective positions on liability and damages issues. *Id.* ¶ 106. The Parties began intensive in-person negotiations with the Mediator in early January 2010 in Chicago. *Id.* ¶¶ 107-108. Additionally, IWEST's and its directors' and officers' insurance carriers were present during the mediation and negotiations, however, it was possible that coverage for this Action was being disclaimed by those carriers. *Id.* ¶ 107. At the close of the two-day in person mediation session, the parties had not reached a settlement in principal. *Id.* ¶ 109. The parties however, determined to continue their mediation efforts thereafter through frequent teleconferences between and among the parties and the Mediator. *Id.* ¶¶ 109-113. In addition, during this time period, Co-Lead Counsel and the consultants continued to review IWEST's SEC filings, and in particular IWEST's announcement concerning its per share ERISA

valuation, in order to discuss and possibly formulate alternate settlement frameworks to address Defendants' positions, IWEST's business plan, and the best interests of the Class. *Id.* ¶¶ 110-111. In addition, Co-Lead Counsel submitted additional legal memoranda to the Mediator to address questions raised during the mediation process. *Id.* At times, it appeared that the parties would not be able to reach an agreement on all of the terms of an acceptable settlement. *Id.* ¶ 112. However, the negotiations progressed until the basic terms of the Settlement were agreed to on the eve of a scheduled March 24, 2010 status hearing with the Court. *Id.* ¶ 113.

The parties reached agreement as to the primary term of the Settlement – the return of a significant portion of the Internalization Consideration, 9 million shares or 24% to IWEST - which proposed to resolve this Action in its entirety, while enhancing the important goals of positioning IWEST to continue operations, and achieving outstanding and substantial benefits for the Class, and thereafter reached agreement on Co-Lead Counsel's fee. *Id.* ¶ 113.

The parties immediately commenced with negotiating the terms of the stipulation of settlement. The parties had several disagreements about the terms of the Stipulation, and attendant documents. In fact, at certain points during the negotiation and drafting of the Stipulation of Settlement and accompanying documents, the parties encountered significant disagreements about various terms of the Stipulation. The Settlement documents were not finalized until July 14, 2010, the day the Stipulation was signed. *Id.* ¶ 114.

## IV. SUMMARY OF THE TERMS OF THE STIPULATION OF SETTLEMENT.

However, after hundreds of hours expended by Co-Lead Counsel of mediations, negotiation and drafting, the parties finalized the terms of the Stipulation of Settlement (Exhibit D to KMD Decl) which, in consideration of the covenants and mutual promises provided for

therein and in full, complete and irrevocable satisfaction and settlement of the Action, provided that the Settlement Consideration would consist of the following (KMD Decl. ¶ 115):

a. IWEST amended the Escrow Agreement extending the distribution date of the portion of the Internalization Consideration that was being held in an escrow account to the Effective Date (defined in Section 1 ¶ n of the Stipulation). *See* Exhibit T, KMD Decl., IWEST SEC filing concerning Escrow extension.

b. Upon the Effective Date, IWEST shall cause 9,000,000 IWEST shares ("Settlement Shares") to be transferred from the Escrow Fund to IWEST.

c. KPMG LLP pays the reasonable costs and expenses relating to Class Notice and Summary Notice up to $150,000, and IWEST pays any reasonable costs and expenses relating to Class Notice and Summary Notice exceeding $150,000.

d. IWEST shall cause to be paid on behalf of the Settlement Class, fees and expenses to Co-Lead Counsel in the amount awarded by the Court, with such amount not to exceed $10,000,000 inclusive of expenses and costs.[5]

The Stipulation, Section 8, states Defendants' Denial of Liability. KMD Decl. ¶ 121. The Stipulation also provides in Section 4 that the parties agree to seek certification of the following Settlement Class under Fed. R. Civ. P. ("Rule") 23(b)(2) and 23(b)(3) *(id.* ¶ 117):

> Shareholders of IWEST, and their parents, subsidiaries, affiliates, predecessors, successors, heirs, legatees, beneficiaries, trustees, personal representatives, and assigns, who were shareholders of record as of the close of business on August 31, 2007 and entitled to vote on the matters that were the subject of the Schedule 14A proxy statement

---

[5] Section 3.b. of the Stipulation provides that the failure of the Court to approve Co-Lead Counsel's fee application shall not relieve the parties of their respective obligations set out in the Stipulation of Settlement. KMD Decl. ¶ 116.

that was filed with the SEC by IWEST on September 10, 2007, pursuant to Section 14(a) of the Securities Exchange Act of 1934, as amended or supplemented on October 10, October 12, and November 9, 2007.[6]

Co-Lead Plaintiffs and the Settlement Class will release all Settled Equitable Claims and all Settled Legal Claims as against each of the Released Persons. Decl. ¶¶ 119-120. In settling the Settled Equitable Claims pursuant to Rule 23(b)(2), Settlement Class members have no right to be excluded from the Class. *Id.* In settling the Settled Legal Claims pursuant to Rule 23(b)(3), Settlement Class members have been given notice (by means of the Class Notice) and the opportunity to request exclusion from the Settlement Class only with respect to the Settled Legal Claims. *Id.* As of this date, only three have.

## V. <u>ARGUMENT</u>

### *A. The Proposed Settlement is Fair and Reasonable and Should be Approved.*

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *Armstrong v. Board of School Directors of the City of Milwaukee*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."). In determining whether to approve a class action settlement, the district court's inquiry "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*, 75 F.3d at 1196.

While, in this case, the proposed settlement is clearly advantageous to the Class and IWEST, nevertheless, because of the favor with which settlements are viewed, district courts

[6] The Settlement Class does not include (Stipulation Section 1.tt): Defendants, officers and directors of Defendants, members of each individual Defendants' immediate family, any entity in which any Defendant has a controlling interest, and the legal affiliates, representatives, heirs, beneficiaries, trustees, personal representatives, controlling persons, successors or predecessors in interest or assigns of any such excluded person or entity.

have been admonished "to refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." *Id.* at 1196-97 (quoting *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985); *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) (cautioning that in reviewing a proposed class settlement, a court should "not decide the merits of the case or resolve unsettled legal questions."); *Armstrong*, 616 F.2d at 315 (stating that when considering approval of a settlement, "the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to the optimal settlement terms for the judgment of the litigants and their counsel.").

The district courts have wide discretion in determining the appropriateness of a settlement, but should resist substituting their own judgment for that of parties represented by experienced counsel. *Armstrong*, 616 F.2d at 313; *see E.E.O.C. v. Hiram Walker*, 768 F.2d at 890 ("[A] district court should be chary of disapproving a consent decree. . . ."); *see Mangone v. First USA Bank*, 206 F.R.D. 222, 224 (S.D. Ill. 2001) ("Consistent with the policy that courts favor the settlement of class action litigation, the Court has viewed the settlement components in their entirety while evaluating the fairness of the settlement."). To guide the district courts, the Seventh Circuit has identified several factors pertinent to whether a class action settlement should be approved, including:

1. the strength of the plaintiff's case on the merits measured against settlement terms;
2. the complexity, length, and expense of continued litigation;
3. the amount of opposition to the settlement;
4. the opinion of competent counsel;
5. the presence of collusion in gaining a settlement;

6. the stage of the proceedings; and

7. the amount of discovery completed.

*E.E.O.C. v. Hiram Walker*, 768 F.2d at 889 (citing *Gautreaux v. Pierce*, 690 F.2d 616, 631 (7th Cir. 1982)); *Armstrong*, 616 F.2d at 314. The first of these factors is generally considered the most important. *Isby*, 75 F.3d at1199; *E.E.O.C. v. Hiram Walker*, 768 F.2d at 889.

***The Strength of Plaintiffs' Case Measured Against the Settlement***: Plaintiffs believe that they have a strong case on the merits and that the evidence uncovered as a result of discovery and their independent investigation would establish at trial that all Defendants solicited IWEST shareholder votes to ratify the Internalization pursuant to a materially false and misleading Proxy in violation of the Exchange Act. KMD Decl. ¶¶ 122-133. Plaintiffs further believe the evidence would show that, among other things, the Proxy, including the opinions provided by William Blair and KPMG, misrepresented the fairness of implementing the Internalization in exchange for 37.5 million IWEST shares. *Id.* While Plaintiffs believe in the strength of their case, they must realistically acknowledge that the case could be lost, and many other risks and uncertainties relating to liability and damages are present.

The Settlement represents a significant benefit for IWEST and the Class. *Id.* ¶¶ 134-138. The Settlement will have the effect of reducing the Internalization Consideration from 37.5 million shares to 28.5 million shares. The proposed Settlement, therefore, represents a recovery of 24% of the Internalization Consideration. *Id.* ¶ 136. Moreover, the return of the 9 million shares represents a **35% recovery** of the estimated or possible damages as calculated by the Plaintiffs (or, in other words, a return of 35% the amount of Internalization Consideration that Co-Lead Counsel and its consultants estimate was excessive). *Id.* ¶ 135. In addition, IWEST will cause to be paid up to $10 million, subject to Court review and approval, to Co-Lead Counsel for

its time and expenses incurred for achieving this result and securing this significant recovery. *Id.* ¶¶ 115-116. The Settlement Shares – the return of the 9 million shares – can be valued at a range of $61,650,000 (if shares are valued at their current Net Asset Value of $6.85) to $90,000,000 (if shares are valued at the $10.00 Net Asset Value at the time of the Internalization). *Id.* ¶ 137. Under the circumstances of this case, including the impact of the terms of the fully-disclosed contracts IWEST had with the Advisor and Property Managers (*see id.* ¶¶ 35, 40, 135), these amounts and percentages of recovery of estimated damages are significant and justify the settlement of the Action at this time.

Furthermore, the significant reduction in the Internalization Consideration benefits IWEST and reduces the dilutive impact on the Class from the Internalization. *Id.* ¶¶ 136, 138. Importantly, IWEST will continue its operations without any interruption, and will benefit from the return of stock, as it will enhance its bottom line and per share value. *Id.* The Settlement remedies the alleged harm (misleading shareholders to approve an overpriced deal), which, not insignificantly, presents extremely difficult and complex issues for litigation.

It must be noted that a fact unique to this Action, due to IWEST's status as a non-listed REIT, is the direct correlation between the securing and payment of an excessive monetary settlement to the Class and current IWEST's shareholder equity, since most of the current IWEST shareholders are members of the Class. Because of the relative illiquidity of the IWEST common stock, Co-Lead Counsel were confronted with the unusual situation where a large percentage of the Class comprised current IWEST stockholders and, therefore, the continued financial health and condition of IWEST were of keen interest to most of the members of the Class. Thus, Co-Lead Counsel determined that settlement consideration comprised primarily of IWEST stock received by the Advisor's and Property Managers' former owners in the

Internalization and its return to IWEST, was the most appropriate type of settlement consideration under these circumstances.

Certainly, there are many uncertainties of proceeding with the litigation, including whether a better result could be achieved or whether the Court will dismiss certain defendants or all of the Proxy Claims in connection with inevitable Motions for Summary Judgment. *Id.* ¶¶ 122-133. Similarly, if the case were to proceed to jury trial, Co-Lead Counsel cannot predict the jury's verdict on liability and/or the type and amount of relief.

In sum, in reaching agreement on the return of the 9 million shares to IWEST, Co-Lead Counsel weighed and balanced: (i) the maximum recoverable damages; (ii) the risk of establishing and persuading a jury of the validity and measurability of those damages; (iii) the risk to IWEST from continued litigation; and (iv) the risk to IWEST if there were no settlement and Defendants were unsuccessful in pursuit of their rights as insureds under the liability policies. Co-Lead Counsel also fully evaluated the strengths and weaknesses of remaining claims. Co-Lead Counsel recognized the lack of certainty surrounding certain of the accounting treatment claims, and in particular recognized that the Proxy and financial statements included disclosures with respect to the impact of related-party transactions on the Advisor's and Property Managers' financial condition. In addition, Co-Lead Counsel recognized that the damages could be offset or mitigated by claims that the Advisor forwent over $150 million in fees owed to it by IWEST, and that maximum recoverable damages assuming Plaintiffs prevailed on all claims was estimated aggressively to be $250 million. *Id.* ¶¶ 122-133. Under these circumstances, this resolution was a wise course.

Given these considerations, the Settlement of this Action for the recovery of a substantial percentage of the Internalization Consideration – 24% of Internalization Consideration paid or,

alternatively, 35% of Plaintiffs' estimate of the maximum recoverable damages – is fair, reasonable and should be approved, and stands favorably among settlements of Section 14(a) cases that often involve disclosure-only relief. The remedies available under Section 14(a) are broad, *J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) (Section 14 empowers court to order rescission, to secure restitution, and even to "enforce the right of restitution against a third party."),[7] and having the Settlement Shares flow to IWEST as part of the settlement and compromise of this Action is, for this case, appropriate and efficient because substantially all Settlement Class members remain as IWEST shareholders. This factor weighs in favor of approval.

***The Complexity, Length and Expense of Continued Litigation absent Settlement***: The proposed Settlement makes final decision on several disputed factual and legal issues unnecessary. *See* KMD Decl. ¶¶ 122-133. The case could well have resulted in a battle of the experts on the issues of valuation and accounting issues, with the outcome dependant upon whose experts the jury understood or liked best. Moreover, if the case had not settled, the expenses of continued litigation would also have been enormous. Costs of testifying experts, additional discovery, summary judgment motion practices, as well as pre-trial and trial and likely ensuing appeals, would have been substantial. Further, appeals could take years to resolve. This Settlement provides a favorable and reasonably prompt resolution without these additional major expenditures of time and money. This factor weighs in favor of preliminary approval.

---

[7] "[C]ourts are empowered to `grant all necessary remedial relief to effectuate the purposes behind Section 14(a). . . "*Kaufman v. Cooper Companies, Inc.*, 719 F.Supp. 174, 178 (S.D.N.Y. 1989).

***The Amount of Opposition to the Settlement***: In early August, 2010, Class Notice was mailed to over 100,000 Class Members explaining the Settlement and the Summary Class Notice was published in *Investors Business Daily*. No class members have objected to the Settlement. Only three class members, representing 7,455 IWEST shares out of over 450 million shares issued, have requested exclusion from the Rule 23(b)(3) Class. This factor weighs strongly in favor of approval. *Isby*, 75 F.3d at 1200 (upholding approval of settlement even though thirteen percent of the class submitted written objections); *Mangone*, 206 F.R.D. at 227 (stating that "overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement.").

***The Opinion of Competent Counsel***: In determining the reasonableness of the Settlement, the Court must also take into account the judgment of Co-Lead Counsel in this litigation. *E.E.O.C. v. Hiram Walker*, 768 F.2d at 889; *see also In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."); *In re Heritage Bond Litig.*, No. 02-ml-01475, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.").

The Settlement proposed by Co-Lead Counsel is the result of hard-fought litigation as well as lengthy negotiations conducted under the oversight of an experienced mediator. In prosecuting their case, Co-Lead Counsel prepared extensive factual and legal written and oral presentations advocating Plaintiffs' position on liability and damages issues. The Stipulation of Settlement was the result of several months of negotiations involving the mediator and parties'

counsel and provides substantial relief to the Class while eliminating the risks that Defendants could prevail if the matter was fully litigated.

Co-Lead Counsel in this case are among the nation's leading class action litigation firms. *See* resumes of Co-Lead Counsel, attached as Exhibits G, H, and Q to the Decl. Accordingly, their judgment that this settlement is in the interest of the Class weighs in favor of approval.

***The Presence of Collusion in Gaining a Settlement:*** As a matter of law, a court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion in the absence of evidence to the contrary. *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325. This presumption is applicable here. This Action has been vigorously litigated for over two years. Moreover, the Settlement was reached only after arms-length negotiations which were presided over by a widely respected Mediator with significant experience in mediating complex securities actions. KMD Decl. ¶¶ 101-114; *see Mangone*, 206 F.R.D. at 226; *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."). There has not been any suggestion that the Settlement is the product of collusion in any way.

Moreover, the participation of an experienced mediator in the settlement process as been recognized as additional evidence that the settlement is not collusive. *Satchell v. Federal Express Corp.*, No. C03-2659 SI, 2007 WL 1114010, at *4(N.D. Cal. Apr. 13, 2007); *In re Indep. Energy Holdings, PLC*, No. 00 Civ. 6689 (SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003). This factor weighs in favor of approval.

***The Stage of the Proceedings and the Amount of Discovery Completed When Settlement was Achieved***: Although settlement was achieved prior to the conclusion of

discovery, Co-Lead Counsel thoroughly investigated the claims, utilizing several expert consultants with experience in the relevant disciplines, reviewed thousands of pages of documentary evidence, thoroughly analyzed the financials of IWEST and the acquired companies, and conducted interviews of key witnesses prior to executing the Stipulation of Settlement. KMD Decl. ¶¶ 55-74. In the course of conducting intensive investigations of the facts and the financial statements of IWEST, the Advisor, and the Property Managers, opposing motions to dismiss, drafting and presenting mediation submissions and conducting confirmatory discovery, Co-Lead Counsel thoroughly researched the facts and legal claims. *Id.* ¶¶ 75-89. A substantial factual and legal record was developed upon which experienced counsel could assess that this is a fair settlement. *Id.* ¶¶ 90-100. This factor weighs in favor of approval.

Based on all of the foregoing, the Settlement should be approved as lawful, fair, reasonable and adequate.

### *B. Certification of the Class Under Rules 23(a) and 23(b)(2) and (b)(3) for Settlement Purposes is Appropriate*

Plaintiffs seek certification of the Settlement Class under Rules 23(b)(2) and (b)(3), and the selection of Co-Lead Plaintiffs as Class Representatives, for purposes of the Settlement. A class may be certified if it satisfies the requirements of Rule 23(a) and any one or more of the three subparagraphs of Rule 23(b). *See McDaniel v. Univ. Fid. Corp.*, No. 04 C 2157, 2004 U.S. Dist. LEXIS 21320 (N.D. Ill. Oct. 20, 2004); *Kaufman v. American Express Travel Related Services Co., Inc.*, 264 F.R.D. 438, 442 (N.D. Ill. 2009).

#### 1. **<u>The Settlement Class Meets the Conditions of Rule 23(a)</u>**

Rule 23(a) establishes four prerequisites to certification of any class: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) the claims raise common questions of law or fact ("commonality"); (3) the claims or defenses of the proposed

representatives are typical of those of the class ("typicality"); and (4) the representative parties can fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a).

***Numerosity***: The members of the Settlement Class are sufficiently numerous under Rule 23(a)(1). Joinder of approximately 110,000 IWEST shareholders, who are geographically dispersed, would be impracticable. *See In re Bank One Sec. Litig./Chicago S'holder Claims*, 00 CV 0767, 2002 U.S. Dist. LEXIS 8709, at *9 (N.D. Ill. May 9, 2002).

***Commonality***: The Settlement Class' claims also satisfy Rule 23(a)(2). They raise common questions of law and fact because their claims arise from the acts of defendants and stem from "a common nucleus of operative fact." *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). Defendants' common course of conduct concerns: (a) the Proxy, that was directed to all members of the Settlement Class; and (b) whether the information contained therein was materially false and misleading with respect to, among other things, the Advisor's and Property Managers' profitability, financial statements and the price to be paid for the Internalization. Defendants' misconduct affected all members of the Settlement Class in the same way. *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983) ("a single conspiracy and fraudulent scheme against a large number of individuals is particularly appropriate for class action"); *Kaufman*, 264 F.R.D. at 442 ("The commonality requirement does not necessitate 'every class member's factual or legal situation to be a carbon copy' of those of the named plaintiffs, so the 'low commonality hurdle is easily surmounted.'") (quoting *Wesley v. Gen. Motors Acceptance Corp.*, 1992 WL 57948, at *3 (N.D. Ill. Mar. 20, 1992)).

***Typicality***: Co-Lead Plaintiffs' claims are typical of the Settlement Class because the claims arise "from the same event or practice or course of conduct that gives rise to the claims of other class members and his . . . claims are based on the same legal theory." *See De La Fuente v.*

*Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). The Co-Lead Plaintiffs, like all members of the Settlement Class, allege, *inter alia*, that they were entitled to vote on the Proxy (a uniform document filed with the SEC and distributed by IWEST), which contained material misstatements and omitted material information concerning the Internalization. *See* Exhibits I and J to KMD Decl., Declarations of Lead Plaintiffs in support of the Settlement. Key is that the materiality of the misrepresentations and omissions in the Proxy are measured under an objective "reasonable shareholder" standard. The alleged conduct pertinent to proof of liability did not differ among the Settlement Class members.

***Adequacy***: This requirement is met because Co-Lead Plaintiffs have interests in common with, and not antagonistic to, the class' interests, have vigorously prosecuted the action on behalf of the Class, and their attorneys are qualified, experienced, and able to conduct the litigation. *See In re Anicom Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 5575, *8 (N.D. Ill. Mar. 26, 2002) (*citing Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 58 (N.D. Ill. 1996)). Co-Lead Plaintiffs' interests are aligned with all Settlement Class members as they were all allegedly injured by Defendants' solicitation of their votes via a false and misleading Proxy. Co-Lead Plaintiffs have no interests antagonistic to the class' interests. *See* Exhibits I and J to KMD Decl., Declarations of Lead Plaintiffs in support of the Settlement. Moreover, Co-Lead Counsel, who are highly experienced in shareholder class action litigation and in litigating claims on behalf of investors in non-traded REITs, exhibited the desire and expertise to vigorously prosecute this action and to successfully negotiate a compromise. Finally, the ratio of attorney's fees and expenses to the estimated value of the Settlement Shares (11-16%) is well within the acceptable range. *Kaufman*, 264 F.R.D. at 443 (finding "adequacy of representation" requirement was met with a

roughly 29% ratio); *see* Memorandum of Law in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses filed concurrently herewith.

### 2. The Settlement Class Meets the Requirements of Rule 23(b)(2) and Rule 23(b)(3)

In addition to satisfying Rule 23(a), the Settlement Class satisfies the certification requirements of, and therefore should be certified under, Rules 23(b)(2) and (b)(3).

Certification of the Settlement Class under Rule 23(b)(2) is appropriate because "[T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. . . ." Fed. R. Civ. P. 23(b)(2). The requirements of this rule are satisfied where "settling the legality of the [opposing party's] behavior with respect to the class as a whole, is appropriate." Rule 23 advisory committee's note, subdivision (b)(2). Furthermore, "[i]f the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." *Robinson v. Sears, Roebuck & Co.*, 111 F. Supp. 2d 1101, 1114 (E.D. Ark 2000) (citations omitted).

These requirements are satisfied here because Co-Lead Plaintiffs sought the return of a portion of the Internalization Consideration to IWEST, relief that would necessarily affect all IWEST shareholders and requiring injunctive and declaratory relief. Defendants' course of conduct, as well as the harm resulting from that conduct, was uniform as to the prospective members of the Settlement Class. Thus, Defendants have acted and refused to act on grounds generally applicable to the Settlement Class. Accordingly, Plaintiffs' request for injunctive relief was appropriate – and indeed necessary – for the adequate resolution of the claims. Rule 23(b)(2)'s requirements are satisfied.

Furthermore, Co-Lead Plaintiffs satisfy the Rule 23(b)(3) requirements that: "[T]he questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . ." Fed. R. Civ. P. 23(b)(3). Class action status is appropriate where common questions represent a significant aspect of a case and they can be resolved in a single action. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1778, at 528 (2d ed. 1986). Common questions, however, need not be dispositive of the entire action, because the term "predominate" under the rule does not mean "determinative." *Id.* at 528-29. Courts generally focus on the liability issue, and if the liability issue is common to the class, common questions are held to predominate over individual questions. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981). The question of liability under Sections 14 and 20 of the Exchange Act is common to all members of the Settlement Class. Any member of the Settlement Class would have needed to establish the same facts to prove the Proxy contained materially false and misleading statement resulting in Exchange Act violations. Common questions regarding the Proxy and why it was materially false and misleading would have predominated at trial. Therefore, with the exception of individual damages calculations, if any, the respective factual and legal elements of liability in this action would have dominated the litigation with respect to the Class.

As to whether the "superiority" requirement of Rule 23(b)(3) is met, the Court considers:

A. the interest of members of the Class in individually controlling the prosecution of separate actions;

B. the extent and nature of any litigation concerning the controversy already commenced by members of the Class;

C. the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

D. the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). With respect to B and C, no other litigation was commenced by any other member of the Settlement Class concerning the subject matter of the Action. Further, the forum, federal court in Illinois, is particularly desirable since the conduct at issue occurred in Illinois. IWEST, along with most of the Defendants, reside in or have their principal places of business located in Illinois.

With respect to A and D, courts repeatedly recognize the general superiority of class treatment in securities class actions involving a large number of investors. Rule 23(b)(3) Advisory Committee Note ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action"); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 77 (D. Md. 1991) ("It is well-recognized that class actions are particularly appropriate to resolve . . . claims alleging violations of the federal securities laws and that Rule 23 is to be construed liberally to effectuate that end"); *see, e.g., Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982 at *26 (N.D. Ill. June 12, 2003) ("issues . . . flow[ing] from defendants' alleged misstatements . . . predominate."). Moreover, prosecution of this action on a class basis is much more efficient than individual adjudication of thousands of claims.

First, IWEST shareholders (the majority of whom are individual investors) would find individual litigation likely to be cost-prohibitive and inefficient. *See In re VMS Sec. Litig.*, 136 F.R.D. 466, 473 (N.D. Ill. 1991). Second, Co-Lead Counsel, who have substantial experience in class action litigation, have already demonstrated their abilities in the management of this litigation and shown that there are predominate common questions of fact and law. Finally, the action is typical of proxy violation claims handled on a class basis and would not have presented any management difficulties if the case had proceeded. Since the case is being settled, there will

not be any management difficulties. Therefore, the class action device is the superior method for adjudicating the claims of the Settlement Class.

For all the foregoing reasons, this Court should find that the Class meets the requirements of Rules 23(a) and 23(b)(2) and (b)(3) and should certify the Class.

## VI. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant Final Approval of the Stipulation of Settlement and Certification of the Settlement Class, and enter the Final Judgment (in the form proposed as Exhibit E to KMD Decl.).

**Dated:** October 11, 2010

Respectfully submitted,

**CHIMICLES & TIKELLIS LLP**

*/s/ Kimberly M. Donaldson*
Nicholas E. Chimicles
Kimberly M. Donaldson
Kimberly L. Kimmel
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**

*/s/ Adam J. Levitt*
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
Email: levitt@whafh.com

Lawrence A. Sucharow
Joseph Sternberg
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005

Telephone: (212) 907-0700
Facsimile: (212) 818-0477

Lawrence P. Kolker
Alexander Schmidt
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

***Co-Lead Counsel***